IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD R. FEEZLE, | ) | |
| SUSAN E. SCHEUFELE, | ) | CASE NO. 4:23-cv-00242-BYP |
| DAVID J. SCHEUFELE, ROLLERENA | ) | |
| AUTO SALES, LLC, and MARILYN | ) | |
| FIGLEY, on behalf of themselves | ) | |
| and all others similarly situated, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| NORFOLK SOUTHERN RAILWAY CO., | ) | |
| and NORFOLK SOUTHERN CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT; JURY
DEMAND ENORSED HEREON**

Plaintiffs Harold R. Feezle, Susan E. Scheufele, David J. Scheufele, Rollerena Auto

Sales, LLC, and Marilyn Figley, individually and on behalf of a putative class of all others

similarly situated, file this First Amended Class Action Complaint asserting claims

against Defendant Norfolk Southern Railway Company and Defendant Norfolk Southern

Corporation.  Based on personal knowledge, investigation of counsel, review of publicly

available information and documents, upon information and belief allege as follows:

**I.  PARTIES, VENUE, AND JURISDICTION**

1.  The following Representative Plaintiffs are residents of Columbiana

County, Ohio who own real property and businesses and resided in the vicinity of the

train derailment, or were present in or about the vicinity of the derailment site, and seek to be representatives of the Putative Class defined below.

2.  Harold R. Feezle is an individual owning a business known as Rollerena Auto Sales, located at 50263 State Route 14, East Palestine, Ohio 44413.  Mr. Feezle is the sole member of Rollerena Auto Sales, LLC, a limited liability company organized and existing under the laws of the state of Ohio.  Mr. Feezle's business was located within the area required to evacuate as a result of the train derailment.  Mr. Feezle was forced to close his business during the time of the forced evacuation and suffered damages therefrom.  Mr. Feezle hereby brings a claim on behalf of himself and on behalf of Rollerena Auto Sales, LLC, as the sole member of that entity.

3.  Susan E. Scheufele is an individual residing at 298 East Clark Street, East Palestine, Ohio 44413.  As a result of the train derailment that is the subject of this case, Ms. Scheufele was forced to evacuate her residence and suffered damages therefrom.

4.  David J. Scheufele is an individual residing at 298 East Clark Street, East Palestine, Ohio 44413.  As a result of the train derailment that is the subject of this case, Mr. Scheufele was forced to evacuate his residence and suffered damages therefrom.  Mr. Scheufele also suffered injuries as a direct and proximate result of his exposure to the toxic chemicals and fumes emanating from the accident site.

5.  Marilyn Figley is an individual residing at 171 S. Pleasant Drive, East Palestine, Ohio 44413.  She owns and operates with her husband a thirty-acre farm located approximately one-half mile to the south of the derailment site, where she grows a variety of crops and raises livestock, primarily for personal consumption.  As a result of the train

derailment that is the subject of this case, Ms. Figley evacuated from her farm and suffered damages therefrom.

6.     The Representative Plaintiffs and the members of the Putative Class are among the hundreds (perhaps thousands) of persons who were adversely exposed to, among other things, toxic chemicals, fumes, and carcinogens, many of whom were ordered to evacuate from their residences and businesses (or shelter in place) as a result of Defendants' train derailment and resulting chemical spills, explosions, and fires.

7.     Defendant Norfolk Southern Railway Company ("NSR") is a Class I railroad organized and existing under the laws of Virginia with a principal place of business in Atlanta, Georgia.

8.     Defendant Norfolk Southern Corporation ("NS") is a publicly traded company that is organized and existing under the laws of Virginia with a principal place of business in Atlanta, Georgia.   NS owns all of the common stock of and controls NSR.

9.     NSR operates approximately 19,300 route miles in 22 states and the District of Columbia, and serves every major container port in the eastern United States.

10.     This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of Ohio, were engaged in business within the state of Ohio at the time of the derailment, and the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of Ohio at the time of the derailment.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2) in that this is a class action, as defined in 28 U.S.C. §1332(d)(1)(B), in which the matter in

controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs. Additionally, this Court has jurisdiction because there is complete diversity of citizenship between the Representative Plaintiffs and Defendants.

## II.     FACTUAL ALLEGATIONS

12.     This is a Class Action Complaint seeking redress for residents, property owners, and businesses located near the scene of a train derailment that occurred on Friday, February 3, 2023 at approximately 9:00 p.m. near the Village of East Palestine, Ohio.  The train was operated by Defendants and consisted of three locomotives and 150 train cars, approximately 20 of which were listed as carrying hazardous materials.  The train was traveling from Illinois to Pennsylvania, and its route took it right through the middle of East Palestine, Ohio.

13.     Approximately 50 train cars were affected by the derailment, which resulted in a massive fire that burned for several days:









14.      On February 4, "[r]esponding crews discovered contaminated runoff on two surface water streams:  Sulphur Run and Leslie Run."[1]  It was also noted that the runoff "impacted aquatic life" and officials with the Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

15.      The fire continued to burn until Sunday, February 5, when first responders and others learned of "a drastic temperature change in a rail car, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile."  Area residents were advised to shelter in place, and local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5 for anyone living within a mile of the derailment site:

---

[1] https://response.epa.gov/site/site_profile.aspx?site_id=15933.



16.     On the morning of February 6, the evacuation area was expanded based on "new modeling information" in advance of a planned, so-called "controlled release" of hazardous materials in some of the train cars.

17.     On February 6, responding crews engaged in what was called a "controlled release" of five rail cars containing vinyl chloride that were in danger of exploding.  The vinyl chloride was then ignited, causing another massive fire and plume of hazardous and toxic gases and particulates, including hydrogen chloride and phosgene gas:





18.     Hydrogen chloride is one of the main sources of danger from a vinyl chloride fire.  Hydrogen chloride is irritating and corrosive to any tissue with which it comes in contact.  Further, when hydrogen chloride comes into contact with water (including water vapor in the atmosphere), it forms hydrochloric acid.  Hydrochloric acid causes irritation to the eyes, skin, and mucous membranes of humans and animals.  Acute inhalation may cause coughing, hoarseness, inflammation, and ulceration of the respiratory tract; chest pain; and pulmonary edema.  Contact with skin may produce burns, ulceration, and scarring.

19.     Phosgene was used as a chemical warfare agent during World War I and is banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare.

20.     Upon information and belief, approximately 1 million pounds of vinyl chloride were in the train cars that derailed, and was spilled or dumped onto the ground near the derailment site and set on fire.

21.     On February 8, Governor DeWine and local officials in both Ohio and Pennsylvania lifted the evacuation, and many residents, property owners, and business owners began to return to their homes and businesses in the vicinity of the derailment site.

22.     Nevertheless, area residents continue to experience symptoms consistent with exposure to toxic and hazardous symptoms.  Local officials have advised residents only to drink bottled water and those who have water wells to have those wells tested.

23.     According to documents provided by Norfolk Southern to the United States Environmental Protection Agency, the derailed train contained the following hazardous substances:  vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, butyl acrylate, and benzene.  The train also contained numerous other chemical substances that were in the cars involved in the derailment, causing those chemicals to be spilled and in some instances burned in the ensuing fire.

24.     The material safety data sheet for vinyl chloride describes it as an extremely flammable gas that may form an explosive mixture with air, and is carcenogenic – meaning it is known or presumed to cause cancer in humans.  A 5-minute exposure to airborne concentrations of vinyl chloride at 8,000 ppm can cause dizziness.  As airborne levels increase to 20,000 ppm, effects can include drowsiness, loss of coordination, visual and auditory abnormalities, disorientation, nausea, headache, and burning or tingling of the extremities.  Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.  Vinyl chloride exposure is also associated with an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

25.     The material safety data sheet for ethylene glycol monobutyl ether describes it as a combustible liquid that causes skin irritation and serious eye irritation, and is harmful if swallowed or inhaled.

26.     The material safety data sheet for ethylhexyl acrylate describes it as a combustible liquid and vapor that causes respiratory tract, digestive tract, skin, and eye

irritation, causes serious eye damage, and may cause allergic skin reactions.  It is also harmful to aquatic life.

27.    The material safety data sheet for butyl acrylate describes it as a flammable liquid and vapor that causes skin irritation and serious eye irritation, that is harmful if inhaled and may cause an allergic skin reaction.

28.    The material safety data sheet for benzene describes it as a highly flammable liquid and vapor that causes skin irritation and serious eye irritation, and may cause cancer and genetic defects.

29.    Upon information and belief, the derailment and subsequent chemical spills, explosions, and fires were caused by the negligence of Defendants in the failure to provide adequate staffing, failure to conduct appropriate inspections of Defendants' track and rail cars, failure to adequately service and maintain its equipment, failure to provide adequate warnings, failure to provide appropriate instructions, negligence in the operation of the train, defects in NSR's track system, and/or defects in one or more of the cars.  The National Transportation Safety Board has reported that "[s]urveillance video from a residence showed what appears to be a wheel bearing in the final stage of overheat failure moments before the derailment."[2]

30.    All residents and businesses within a one- to two-mile radius of the derailment site were forced to evacuate as a result of the derailment.

---

[2] https://www.ntsb.gov/investigations/Pages/RRD23MR005.aspx

31.     Representative Plaintiffs were adversely affected by the derailment in that they were exposed to the toxic substances, toxic fumes, and carcinogens from the resulting chemical spill, suffered mental and physical injuries, were forced to evacuate from their residences and businesses, were prevented from returning to their residences and businesses after the time of the chemical spill, and even after they were able to return to their residences and businesses, the continuing hazardous conditions and contamination of their property caused by the derailment will prevent them from fully and completely using and enjoying their property, and will cause damage to property and property values, and may require remediation efforts to address contamination. Business owners in the affected area were unable to operate during the time of the evacuation, are unable or hindered in operating their businesses while remediation efforts are ongoing, and will continue to be precluded from or hindered in operating their businesses because of the hazardous conditions and contamination caused by the derailment, and may require remediation efforts to address contamination.  Property and business values (including goodwill) will also likely be impacted due to contamination and hazardous conditions resulting from the derailment, or concerns about contamination and hazardous conditions resulting from the derailment.

III.    **CLASS ACTION ALLEGATIONS**

32.     Pursuant to Federal Rule of Civil Procedure 23, the Representative Plaintiffs bring this action on behalf of themselves, and all other members of the Putative Classes for all direct, proximate, and foreseeable losses caused by the derailment.  The Putative Classes are defined as follows:

(a)     **<u>REAL PROPERTY OWNER SUBCLASS</u>**: All individuals and legal entities who owned real property within a thirty-mile radius of the derailment site on February 3, 2023, including all occupants therein.

(b)     **<u>REAL PROPERTY LESSEE SUBCLASS</u>**: All individuals and legal entities who leased real property within a thirty-mile radius of the derailment site on February 3, 2023, including all occupants therein.

(c)     **<u>BUSINESS OWNER SUBCLASS</u>**: All individuals and legal entities who owned or operated a business within a thirty-mile radius of the derailment site on February 3, 2023.

(d)     **<u>TANGIBLE PERSONAL PROPERTY SUBCLASS</u>**: All individuals and legal entities who owned tangible personal property[3] that was located within a thirty-mile radius of the derailment site on February 3, 2023.

(e)     **<u>PHYSICAL INJURIES SUBCLASS (ISSUES CLASS ONLY)</u>**: All persons who suffered physical injuries as a result of the chemical spill, a subclass for which Plaintiffs move for certification under Rule 23(c)(4) only regarding Defendants' conduct.

33.     Excluded from the Class are (1) Defendants and any of their affiliates, parents, or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class; governmental entities; judge(s) assigned to this case, their immediate families, and court staff; and (2) insurance and insurance syndicates whose claims for damages regarding the regarding the derailment arise out of a right of subrogation, whether equitable, contractual, or otherwise.

34.     The thirty-mile radius used in the definition of the subclasses described above is a preliminary designation. As Plaintiffs and their counsel conduct further investigation and discovery, it may be determined that the affected area extends farther than thirty miles in some directions from the derailment site, and perhaps less than that

---

[3] "Tangible personal property" includes, but is not limited to, vehicles; equipment such as tractors, ATVs/UTVs; and livestock.

distance in other directions.  Prevailing winds at the time of the derailment and in the days after during the fire and "controlled release" will affect the boundaries of the geographic area affected, and it remains to be determined how hazardous materials spilled onto the ground migrated in the soil, streams, and groundwater.

35.     Plaintiffs reserve the right to amend or modify the definition of the Putative Class and any subclasses after having had an opportunity to conduct further investigation into the nature of the Putative Class members' claims and damages and conduct discovery regarding Defendants' conduct and the events that occurred prior to and after the derailment.

36.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements for class certification set forth in Rule 23 of the Federal Rules of Civil Procedure.

37.     The Putative Classes are so numerous that the individual joinder of all its members is impracticable.  While the exact number and identification of the Putative Class members are unknown to the Representative Plaintiffs at this time and can only be ascertained through appropriate discovery and notice, the Representative Plaintiffs are informed and believe that the Putative Class includes at least hundreds of individuals, businesses, and legal entities.

38.     Common questions of fact and law exist as to all members of the Putative Class and predominate over any questions affecting only individual Class Members.  The common legal and factual questions do not vary from member to member and may be

determined without reference to the individual circumstances of any Class Member, including, but not limited to, the following:

(a)    Whether Defendants were negligent or otherwise culpable with respect to causing the derailment by acts of omission or commission.

(b)    Whether Defendants were negligent or otherwise culpable with how they responded to the derailment by acts of omission or commission.

(c)    Whether Defendants' transport of highly toxic chemicals was an abnormally dangerous activity for which they are strictly liable.

(d)    Whether Defendants' conduct caused toxic and hazardous substances to be disbursed over and onto the geographic area identified in the class definitions.

(e)    Whether Defendants' conduct caused evacuation-related short term economic harm sustained by members of the Putative Class.

(f)    Whether Defendants' conduct caused other short term and immediate losses in the form of damage to or destruction of tangible personal property.

(g)    Whether Defendants' conduct caused long term economic harm sustained by members of the Putative Class, including but not limited to reduced property values, business goodwill, and community viability.

(h)    Whether Defendants' conduct caused a nuisance and the extent of such nuisance.

(i)    Whether Defendants' conduct caused environmental harm to real property owned or leased by members of the Putative Class.

(j)    Whether Defendants' conduct caused members of the Putative Class to be exposed to toxic and hazardous substances with the potential for immediate physical injuries.

(k)    Whether Defendants' conduct caused members of the Putative Class to be exposed to toxic and hazardous substances with the potential for long term physical injuries.

(l)    Whether medical monitoring is an appropriate remedy that should be imposed in order to provide early detection of future injuries to members of the Putative Class.

(m)     Whether Defendants trespassed on real property owned or leased by members of the Putative Class.

(n)     Whether Defendants acted with conscious disregard for the rights and safety of other persons causing substantial harm, rendering it liable for punitive or exemplary damages.

39.     The above common questions predominate over any questions affecting only individual members of the Putative Class.

40.     The Representative Plaintiffs' claims are typical of the claims of the other members of the Putative Class.  The Representative Plaintiffs, like all other Putative Class members, resided, rented, or owned real and personal property within the Class Area and many of them were required to evacuate their homes, shelter in place, or were otherwise deprived of the full use and enjoyment of their property as a result of the derailment and subsequent fires, chemical spills, and atmospheric release of hazardous and toxic substances.  Their claims arise from the same event or course of conduct giving rise to the claims of all members of the Putative Class, and the Representatives Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

41.     The Representative Plaintiffs will fairly and adequately protect the interests of the Putative Class.  The Representative Plaintiffs' interests are not antagonistic, but rather identical, to the interests of all members of the Putative Class.  The Representative Plaintiffs' counsel have broad experience in handling litigation of this type and are fully qualified to prosecute the claims of the class.  The Representative Plaintiffs' counsel has successfully litigated multiple class actions on behalf of claimants, resulting in awards to those claimants of substantial sums.  The Representative Plaintiffs' counsel are competent

and experienced in personal injury, property damage litigation, litigation relating to the loss of use of property, nuisance, and are experts in railroad law matters that will be crucial to prosecuting claims against the instant Defendants.

42.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Adjudication of class members' claims would otherwise require hundreds of individual suits with concomitant duplications of costs, attorney fees, and demand upon court resources.  If individual Class members were required to pursue their claims through separate, individual suits, the potential for recovery would be outweighed by the high cost of investigation, discovery, and expert testimony on the sophisticated scientific and technical issues relating to the liability of Defendants and the appropriate relief.

## IV.     SUPPLEMENTAL MEDICAL MONITORING CLASS ALLEGATIONS

43.     As discussed above, in addition to seeking certification of an "issues" class with respect to the Representative Plaintiffs and other members of the Putative Classes with respect to physical injuries, the Representative Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during the course of that program.

44.     The train derailment caused the Representative Plaintiffs and other members of the Putative Class to be exposed to hazardous and toxic substances, the future consequences of which are unknown.  As noted above, the most significant

amount of hazardous substances spilled or released during the derailment and in the days following was vinyl chloride, a known human carcinogen.

45.     Early detection and treatment of cancer is associated with more favorable outcomes.  Medical monitoring will provide access to appropriate medical testing and examinations for the Representative Plaintiffs and other members of the Putative Classes and permit them to seek early medical intervention that will eliminate or reduce the risk of death or more serious illnesses.

46.     The Court's equitable powers should be invoked to establish and oversee a medical monitoring program.  Details regarding the form, extent, and duration of the program are a matter for the Court to decide, after receipt of fact and expert testimony and in consultation with other experts, and a determination that class adjudication that this remedy is appropriate.

**V.     FIRST CLAIM FOR RELIEF – NEGLIGENCE**

47.     The Representative Plaintiffs incorporate the allegations contained above as if fully rewritten herein.

48.     Defendants knew or should have known that its activities would present an unreasonable risk of harm to residents and property owners in the vicinity of the derailment unless reasonable care was exercised to prevent such harm.

49.     Defendants had a duty to exercise reasonable care to protect all members of the Putative Class and their properties and businesses.

50.     Defendants failed to exercise reasonable care to protect all members of the Putative Class and their properties.  Defendants' negligence includes, but is not limited to, the following:

(a)     failing to exercise reasonable care in the operation of the train that derailed;

(b)     failing to exercise reasonable care to prevent over-loading the train with too many rail cars or too much cargo;

(c)     failing to maintain and inspect its tracks;

(d)     failing to maintain and inspect its rail cars;

(e)     failing to provide appropriate instruction and training to its employees;

(f)     failing to comply with federal regulations and industry best practices;

(g)     failing to upgrade its trains to utilize the most safe equipment;

(h)     engaging in conduct referred to as "precision scheduled railroading" in an effort to maximize profits at the expense of safety;

(i)     failing to provide sufficient employees to safely and reasonably operate its trains;

(j)     failing to give employees sufficient time to inspect rail cars;

(k)     failing to appropriately and carefully engage in post-derailment containment and cleanup efforts;

(l)     and failing to reasonably warn the general public.

51.     As a direct and proximate result of Defendants' negligence, all members of the Putative Class sustained injury and damage.

52.     In carrying out such conduct, Defendants acted in violation of law and in conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.  Therefore, Defendants are liable for exemplary and punitive damages.

## VI.    SECOND CLAIM FOR RELIEF – NEGLIGENCE *PER SE*

53.    The Representative Plaintiffs incorporate the allegations contained above as if fully rewritten herein.

54.    The Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.*, and its accompanying regulations are implemented to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents. 49 U.S.C. § 20101.

55.    The derailment that forms the basis of this lawsuit is currently under investigation by the National Transportation Safety Board ("NTSB").  The Representative Plaintiffs are currently unadvised of the federal or state safety laws and regulations that Defendants or their agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery.

56.    Defendants' violation of such safety laws and regulations constitutes negligence *per se*.

57.    As a direct and proximate result of Defendants' violation of the above-described laws and/or regulations, all members of the Putative Class sustained injury and damage.

## VII.    THIRD CLAIM FOR RELIEF – NUISANCE

58.    The Representative Plaintiffs incorporate the allegations contained above as if fully rewritten herein.

59.    The conduct of Defendants alleged herein created a substantial and unreasonable interference with Representative Plaintiffs' and all members of the Putative Class' use and enjoyment of their homes, property, and businesses, as well as a

substantial and unreasonable threat to all members of the Putative Class' health and safety.  Such conduct by Defendants constitutes a private nuisance.

60.     Defendants contaminated real property located within the geographic area defined in the class definitions above as a result of the derailment and subsequent fire and chemical release, burn, and disbursement of toxic and hazardous substances.

61.     As a direct and proximate result of Defendants' creation of a nuisance, all members of the Putative Class sustained injury and damage.

62.     In carrying out such negligent conduct, Defendants acted in violation of law and in conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.  Therefore, Defendants are liable for exemplary and punitive damages.

## VIII.   FOURTH CLAIM FOR RELIEF – STRICT LIABILITY FOR ABNORMALLY DANGEROUS OR ULTRAHAZARDOUS ACTIVITY

63.     The Representative Plaintiffs incorporate the allegations contained above as if fully rewritten herein.

64.     In carrying out the conduct alleged herein, Defendants engaged in abnormally dangerous and ultrahazardous activity, as described in the RESTATEMENT (SECOND) OF TORTS §§ 519 and 520, and in violation of federal, state, and local laws and regulations, rendering it strictly liable for any resulting damages.

65.     As a direct and proximate result of Defendants' abnormally dangerous and ultrahazardous activity, all members of the Putative Class sustained injury and damage.

66.     In carrying out such conduct, Defendants acted in violation of law and in conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.  Therefore, Defendants are liable for exemplary and punitive damages.

## IX.     FIFTH CLAIM FOR RELIEF – TRESPASS

67.     The Representative Plaintiffs incorporate the allegations contained above as if fully rewritten herein.

68.     Defendants caused or permitted noxious fumes, chemicals, carcinogens, odors, and hazardous substances to invade the real property of each and every member of the Putative Class.  Such invasions constituted trespass.

69.     Members of the Putative Class did not authorize or consent to such invasions of their properties.

70.     As a direct and proximate result of Defendants' trespass, members of the Putative Class sustained injury and damage.

71.     In carrying out such conduct, Defendants acted in violation of law and in conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.  Therefore, Defendants are liable for exemplary and punitive damages.

## X.     SIXTH CLAIM FOR RELIEF – PUNITIVE OR EXEMPLARY DAMAGES

72.     The Representative Plaintiffs incorporate the allegations contained above as if fully rewritten herein.

73.     Defendants' train followed a route that took it through many communities, big and small.  The tracks owned, operated, and maintained by Norfolk Southern run through the middle of East Palestine, close to creeks and streams, and very close to homes and businesses – practically in people's backyards.  Defendants knew that the train was carrying massive amounts of hazardous materials that would be devastating to people and property in the event of a derailment.

74.     Defendants' failures as alleged herein demonstrate that they acted illegally, maliciously, with aggravated or egregious fraud, and with a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm, and did cause substantial harm.

75.     Consequently, in addition to compensatory damages, the Representative Plaintiffs also bring these claims to recover exemplary or punitive damages.

## JURY DEMAND

76.     Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Representative Plaintiffs on behalf of themselves and all members of the Putative Class and enumerated subclasses pray for judgment against Defendants as follows:

1.     For an Order certifying this action and common issues raised herein as a Class Action under the appropriate provisions of the Federal Rules of Civil Procedure

23(a), 23(b), and 23(c), designating Class Representatives, and appointing the undersigned to serve as Class counsel.

2.      For notice of class certification and of any relief to be disseminated to all Class Members and for such other further notices as this Court deems appropriate under Federal Rule of Civil Procedure 23(d)(2).

3.      For injunctive relief in the form of a Court-supervised medical monitoring program funded by the Defendants.

4.      For an order requiring complete and immediate disclosure of all studies, reports, analyses, data, compilations, and other similar information within the possession, custody, or control of Defendant concerning, relating to, or involving the release of vinyl chloride and other hazardous or dangerous materials in the Class Area on February 3, 2023 and thereafter.

5.      For an order barring Defendants from destroying or removing any computer or similar records which recorded events regarding the train that derailed for the seventy-two (72) hour period immediately preceding the February 3, 2023, incident.

6.      For an order barring Defendants from attempting, on its own or through its agents, to induce any Putative Class member to sign any document which in any way releases any of the claims of any Putative Class member.

7.      For an order directing Defendants to abate the nuisance and the risks from the releases of toxic substances, toxic fumes, and carcinogens, and such other orders as may be necessary or appropriate directing Defendants to take all reasonable and sufficient steps to correct the potentially hazardous conditions now existing.

8.    For an award of compensatory damages in the amount to be determined for all injuries and damages described herein.

9.    For an award of exemplary or punitive damages to the extent allowable by law, in an amount to be proven at trial.

10.    For pre- and post-judgment interest as allowed by law;

11.    For an award of attorneys' fees and costs as allowed by law; and

12.    For such other and further relief, legal, equitable, or injunctive, as is warranted in the interest of justice.

Dated: February 20, 2023                    Respectfully submitted,

    */s/ Andrew J. Thompson*
Neal E. Shapero (0009426)
Andrew J. Thompson (0071530)
SHAPERO | ROLOFF CO., LPA
1111 Superior Ave. East, Suite 1310
Cleveland, Ohio 44114
(216) 781-1700
nshapero@shaperoroloff.com
athompson@shaperoroloff.com

Nicholas T. Amato (0041277)
AMATO LAW OFFICE, LPA
420 Broadway Ave.
Wellsville, Ohio 43968
(330) 532-9500
amato.lawyer@gmail.com

Jayne Conroy (*pro hac vice*)
Gary DiMuzio (*pro hac vice*)
Jo Anna Pollock (*pro hac vice* motion pending)
Justin Presnal (*pro hac vice*)

SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com
gdimuzio@simmonsfirm.com
jpollock@simmonsfirm.com
jpresnal@simmonsfirm.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 20, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Andrew J. Thompson*
Andrew J. Thompson (0071530)

## JURY DEMAND

Plaintiff hereby requests a trial by jury in the manner specified by law.

*/s/ Andrew J. Thompson*
Andrew J. Thompson (0071530)