**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION, YOUNGSTOWN**

| | | |
|---|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | : | **CASE NO.: 4:23-cv-00242** |
| | : | |
| | : | **JUDGE BENITA Y. PEARSON** |
| **Steven McKay, Susan Scheufele, Kayla Baker, Neely Jack, Dawn Baughman, David Anderson, James Ross, Jon Luke Affeltranger, Rosemary Mozuch, Charles Mozuch, Gregory Swan, Lance Beck, Clarissa Cohan, Rollerena Auto Sales LLC, Harold Feezle, DalQan Holdings, LLC, Valley View MPH LLC, Competition & Luxury Vehicle Club of Darlington, LLC,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Individually and on behalf of all others similarly situated,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **Norfolk Southern Corporation and Norfolk Southern Railway Company,** | : | |
| | : | |
| **Defendants** | : | |
| | : | |

<u>**MASTER CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**</u>

Plaintiffs, Steven McKay, Susan Scheufele, Kayla Baker, Neely Jack, Dawn Baughman,

David Anderson, James Ross, Jon Luke Affeltranger, Rosemary Mozuch, Charles Mozuch,

Gregory Swan, Lance Beck, Clarissa Cohan, Rollerena Auto Sales LLC, Harold Feezle, DalQan

Holdings, LLC, Valley View MHP LLC, Competition & Luxury Vehicle Club of Darlington, LLC,

1

individually and on behalf of putative classes of all others similarly situated ("Class Members" or "Class(es)"), sue Defendants Norfolk Southern Corporation ("NSC"), Norfolk Southern Railway Company ("NSRC"), (collectively "Defendants"), and based on personal knowledge, investigation of counsel and review of public documents and information, allege as follows:

## INTRODUCTION

1.      This Consolidated Class Action seeks redress for residents, property owners, employees and businesses living, working and/or located in and around the February 3, 2023 Norfolk Southern Freight Train 32N derailment and subsequent "controlled" release in East Palestine, Ohio (the "Derailment Site"[1]), that resulted in contamination of, and exposure to, massive amounts of vinyl chloride, dioxins, and other toxic chemicals—including butyl acrylate, benzene, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, volatile and semi-volatile byproduct compounds and other combustible materials. As a result of this derailment and NSC and NSRC's actions afterwards to conduct a "controlled" release and burn, the Classes have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption and economic damages as alleged more specifically below.[2]

## THE PARTIES

2.      At all relevant times, Plaintiff Steven McKay was an adult citizen of Ohio and the owner-occupier of the real property located at 710 East Martin Street, East Palestine, Ohio 44413.

---

[1] The Derailment Site is in East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W.

[2] These events are herein referred to as the train derailment and resulting toxic chemical explosion.

3.     Further, at all relevant times, Mr. McKay's principal place of employment was located at 242 Chippewa Town Center, Beaver Falls, Pennsylvania 15010, which is located within five miles of the Derailment Site.

4.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. McKay has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

5.     Mr. McKay seeks to represent the Ohio Property Owner Subclass, the Ohio Resident Subclass, and the Pennsylvania Employee Subclass as defined below.

6.     At all relevant times, Plaintiff Susan Scheufele was an adult citizen of Ohio residing at 298 East Clark Street, East Palestine, Ohio 44413.

7.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Scheufele has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

8.     Ms. Scheufele seeks to represent the Ohio Resident Subclass as defined below.

9.     At all relevant times, Plaintiff Kayla Barker was an adult citizen of Ohio and the owner-occupier of the real property located at 737 Moore Lane, East Palestine, Ohio 44413.

10.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Barker has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

11.     Ms. Barker seeks to represent the Ohio Property Owner Subclass and the Ohio Resident Subclass as defined below.

12.     At all relevant times, Plaintiff Neely Jack was an adult citizen of Ohio residing at 116 ½ East North Avenue, East Palestine, Ohio 44413.

13.     Further, at all relevant times, Ms. Jack's principal place of employment was located at 60 South Market Street, East Palestine, Ohio 44413.

14.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Jack has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals and contamination of her residence and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

15.     Ms. Jack seeks to represent the Ohio Employee Subclass and Ohio Resident Subclass as defined below.

16.     At all relevant times, Plaintiff Dawn Baughman was an adult citizen of Ohio and the owner-occupier of the real property located at 456 East Martin Street, East Palestine, Ohio 44413, where she operates an agricultural business.

4

17.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Baughman has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

18.     Ms. Baughman seeks to represent the Ohio Property Owner Subclass, the Ohio Resident Subclass, and the Ohio Agricultural Business Subclass as defined below.

19.     At all relevant times, Plaintiff David Anderson was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 377 Echo Valley Road, New Galilee, Pennsylvania 16141, where he operates an agricultural business known as Echo Valley Farms.

20.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Anderson has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air, soil and water.

21.     Mr. Anderson seeks to represent the Pennsylvania Property Owner Subclass, the Pennsylvania Resident Subclass, and the Pennsylvania Agricultural Business Subclass as defined below.

22.     At all relevant times, Plaintiff James Ross was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 139 Taggert Road, Darlington, Pennsylvania 16115, where he operates an agricultural business.

23.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Ross has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air, soil and water.

24.     Mr. Ross seeks to represent the Pennsylvania Property Owner Subclass, the Pennsylvania Resident Subclass, and the Pennsylvania Agricultural Business Subclass as defined below.

25.     At all relevant times, Plaintiff Jon Luke Affeltranger was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 2029 Circle Drive, Aliquippa, Pennsylvania, 15001

26.     Further, at all relevant times, Mr. Affeltranger's principal place of employment was located at 3944 Constitution Blvd., Darlington, Pennsylvania, 16115.

27.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Affeltranger has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

28.     Mr. Affeltranger seeks to represent the Pennsylvania Property Owner Subclass, the Pennsylvania Resident Subclass, and the Pennsylvania Employee Subclass as defined below.

29.     At all relevant times, Plaintiff Rosemary Mozuch was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 108 Alice Street, Darlington, Pennsylvania, 16115.

30.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Mozuch has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

31.     Ms. Mozuch seeks to represent the Pennsylvania Property Owner Subclass and the Pennsylvania Resident Subclass as defined below.

32.     At all relevant times, Plaintiff Charles Mozuch was an adult citizen of Pennsylvania and the owner-occupier of the real property located at 108 Alice Street, Darlington, Pennsylvania, 16115.

33.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Mozuch has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

34.     Mr. Mozuch seeks to represent the Pennsylvania Property Owner Subclass and the Pennsylvania Resident Subclass as defined below.

35.     At all relevant times, Plaintiff Gregory Swan was an adult citizen of West Virginia and the owner-occupier of the real property located at 558 Titus Street, Weirton, West Virginia 26062.

36.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Swan has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

37.     Mr. Swan seeks to represent the West Virginia Property Owner Subclass and the West Virginia Resident Subclass as defined below.

38.     At all relevant times, Plaintiff Lance Beck was an adult citizen of West Virginia and the owner-occupier of the real property located at 16 Kiefer Way, Weirton, West Virginia 26062, where he also operates a business. Mr. Beck grows plants, including flowers and tomatoes.

39.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Beck has suffered damages, including, but not limited to, loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

40.     Mr. Beck seeks to represent the West Virginia Property Owner Subclass, West Virginia Resident Subclass, West Virginia Employee Subclass, and West Virginia Business Subclass as defined below.

8

41.     At all relevant times, Plaintiff Clarissa Cohan was an adult citizen of West Virginia and the owner-occupier of the real property located at 525 California Avenue, Chester, West Virginia 26034. Ms. Cohan grows plants, including flowers, tomatoes, peppers, basil, cilantro, and parsley.

42.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Cohan has suffered damages, including, but not limited to, an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

43.     Ms. Cohan seeks to represent the West Virginia Property Owner Subclass and the West Virginia Resident Subclass as defined below.

44.     At all relevant times, Rollerena Auto Sales LLC operates an automotive sales business located 50263 State Route 14, East Palestine, Ohio 44413. The sole member of Rollerena Auto Sales LLC is Harold Feezle, a resident and citizen of East Palestine, Ohio.

45.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Rollerena Auto Sales LLC has suffered a loss of business income and goodwill, and its business property and place of employment has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

46.     Rollerena Auto Sales LLC seeks to represent the Ohio Business Subclass as defined below.

47.     At all relevant times, Plaintiff Harold Feezle was an employee of a business known as Rollerena Auto Sales LLC located 50263 State Route 14, East Palestine, Ohio 44413.

48.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Mr. Feezle has suffered a loss of income and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

49.     Mr. Feezle seeks to represent the Ohio Employee Subclass as defined below.

50.     At all relevant times, Plaintiff DalQan Holdings, LLC was an Ohio domestic limited liability company operating a Dairy Queen located at 262 South Market Street, East Palestine, Ohio 44413. The sole member of DalQan Holdings, LLC is Covelli Enterprises, Inc., an Ohio citizen.

51.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, DalQan Holdings, LLC has suffered a loss of business income and goodwill, and its business property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

52.     DalQan Holdings, LLC seeks to represent the Ohio Business Subclass as defined below.

53.     At all relevant times, Plaintiff Valley View MHP LLC was a Pennsylvania domestic limited liability company with a principal place of business located at 377 Echo Valley Road, New Galilee, Pennsylvania 16141.

54.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Valley View MHP LLC has suffered a loss of business income and goodwill, and its business property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

55.     Valley View MHP LLC seeks to represent the Pennsylvania Business Subclass as defined below.

56.     At all relevant times, Plaintiff Competition & Luxury Vehicle Club of Darlington LLC was a Pennsylvania domestic limited liability company with a principal place of business located at 3944 Constitution Blvd., Darlington, Pennsylvania 16115.  Plaintiff Competition & Luxury Vehicle Club of Darlington LLC has one member, who is a resident and citizen of Pennsylvania.

57.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023, train derailment and resulting toxic chemical explosion, Competition & Luxury Vehicle Club of Darlington LLC has suffered a loss of business income and goodwill, and its business property has been contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water.

58.     Competition & Luxury Vehicle Club of Darlington LLC seeks to represent the Pennsylvania Business Subclass as defined below.

59.     Defendant NSC is a publicly traded corporation that is organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

60.     Defendant NSC plays a controlling role in decisions regarding the operations of NSRC, which operates a freight railroad over 35,000 miles of track in 22 states, transporting all manner of materials and goods, including coal, intermodal containers, agricultural products, chemicals, metals, and automotive products.

61.     Defendant NSRC is a wholly owned subsidiary of NSC.  NSRC is a Class I railroad corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

62.     Defendant NSRC is a common carrier that accepts hazardous substances for transport.

63.     Defendants NSC and NSRC operated Norfolk Southern Train 32N and its railcars in their Keystone Division in Pennsylvania, at all relevant times.

64.     Defendants NSC and NSRC owned the locomotive and certain of the railcars on Norfolk Southern Train 32N at all relevant times.

65.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.


**JURISDICTION AND VENUE**

66.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

67.     This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of Ohio, were engaged in business within the state of Ohio prior to and at the time of the derailment, and because the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of Ohio prior to and at the time of the derailment.

68.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Ohio, Plaintiffs and all Class Members were injured because of tortious activity in this District.

## **FACTUAL ALLEGATIONS**

*The Relationship Between NSC and NSRC*

69.     Both NSC and NSRC operate out of the same corporate headquarters, and the President, Vice President, Chief Financial Officer, and Treasurer for NSRC hold the same or very similar positions in NSC.

70.     NSC and NSRC are jointly and severally liable for conduct alleged herein because they acted in concert and under alter ego and piercing the corporate veil theories, including based on the domination and /or control by NSC and the interlocking and overlapping officers and directors.

71.     The United States Surface Transportation Board requires railroad companies operating within the United States to submit an annual report ("Annual Report").

72.     NSC's 2021 Annual Report states that all of NSC's subsidiaries were under the common control of NSC, and that rail operations are coordinated at the holding company level by NSC's Chief Operating Officer.

73.     The 2021 Annual Report identifies NSRC as the principal subsidiary of NSC.

13

74.     Clairborne L. Moore, the Vice President and Controller for NSC, signed the 2021 Annual Report.

75.     In affidavits filed in federal ligation[3], Jason Zampi, a Vice President and Controller for NSC, stated that the annual reports submitted to the Surface Transportation Board are prepared by personnel of NSC with knowledge of and a business duty to prepare the information contained in the annual reports.

76.     In affidavits filed in that same federal litigation, Roger Petersen, NSC's General Counsel for Litigation, stated that NSC "directs, controls, oversees, and handles litigation involving it and its wholly-owned subsidiaries, including [NSRC]."

77.     Approximately eighty percent (80%) of the compensation for NSC's executives are based on performance metrics.

78.     These metrics focus on performance measures such as operating ratio and operating income for NSC subsidiaries, including NSRC. Operating ratio looks at operating expenses as a percentage of revenue. Operating income looks at operating revenue less operating expenses.

79.     These financial metrics were selected to motivate and reward NSC's executives for increasing revenue, improving operating efficiency, and reducing expenses of its railroad subsidiaries.

80.     NSC's executives achieve these metrics by controlling subsidiaries' operations, which includes the operations of NSRC.

81.     Over the past four years, NSC's Annual Reports show a stark contrast between the increases in operating income and the drop in railroad operating costs.

---

[3] *See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

82. The drop in operating costs includes reductions in NSC and/or NSRC spending to repair, service, and maintain locomotives and freight cars, perform train inspections, and pay engine crews and train crews.

83. In 2019, Mike Wheeler, then the Executive Vice President and Chief Operating Officer for NSC, issued Operating Rules governing the operations of all of NSC's railroad subsidiaries, including NSRC.

84. Upon information and belief, these same or similar Operating Rules were in place at the time of the train derailment and subsequent explosion.

85. These Operating Rules cover almost every aspect of NSRC's operations, including train inspections, use of defective equipment detectors, train movement, braking, and positive train control.

86. NSC has also issued Railroad Special Hazmat Instructions that govern the transportation and handling of hazardous materials by NSRC employees.

87. NSC requires each NSRC employee who inspects or transports hazardous materials by rail to have a copy of and comply with the Railroad Special Hazmat Instructions.

88. Upon information and belief, NSC's Railroad Special Hazmat Instructions were in place at the time of the train derailment and subsequent explosion.

89. Further, NSC trains each NSRC employee who transports hazardous materials.

*NSC and NSRC's Prolific History of Train Derailments*

90. Between 1990 and 2022, there were a total of 55,755 train derailments throughout the United States, for an average of 1,742 train derailments a year.[4]

---

[4] *See* Federal Railroad Safety Administration. Office of Safety Analysis, Table 3.16 data, available at 3.16 - Summary of Train Accidents With Reportable Damage, Casualties, and Major Causes (dot.gov).

91.     According to the Federal Railroad Administration ("FRA"), NSC and NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 69 accidents total—22 in 2019, 18 in 2020, 15 in 2021 and 14 in 2022.

92.     According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 76 total accidents from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 16 in 2022.

93.     According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in West Virginia. This includes 13 total accidents from 2019 to 2022—4 in 2019, 6 in 2020, 2 in 2021, and 1 in 2022.

94.     According to data from the FRA, there were a total of 103 derailments in January 2023, and 11 were NSC and NRSC derailments.  Although the FRA only has publicly available data through January 2023, additional NSC and NRSC derailments have occurred this year: February 16 in Van Buren Township, Michigan; February 16 in Mingo County, West Virginia; February 25 in Lexington, North Carolina; March 4 in Springfield, Ohio; March 9 in Iron City, Alabama; Aril 8 in Pittsburgh, Pennsylvania; and April 9 in Jasper, Alabama.

95.     NSC and NSRC's record of train derailments and accidents, especially in recent years, is caused, in part, by its adoption of operating procedures referred to as "Precision Scheduled Railroading" ("PSR").

96.     More specifically, in 2019, NSC and NSRC launched an "ambitious three-year strategic plan," which relied heavily on PSR to achieve "goals that include creating longer trains, continuing productivity initiatives and finding growth opportunities."[5]

_____

[5] *See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

97.     In plain speak, PSR was NSC's and NSRC's plan to cut jobs, cut costs, cut safety and increase risks – all so they could increase their profits.

98.     PSR eliminates necessary inspections, maintenance, repairs and safety devices so that trains stay in depots for shorter amounts of time.  The elimination of these tasks also allowed NSC and NSRC to eliminate a number of jobs for inspectors, maintenance workers and repair workers.

99.     PSR is a widely criticized practice in the railroad industry because it eliminates jobs while increasing the overall size and weight of trains leading to increased safety risks.

100.    Increasing the overall size and weight of trains makes trains more difficult to control, renders safety devices less effective, and increases the risks of train wrecks.

101.    PSR also deprioritizes rail and railcar inspections, maintenance, repairs, and safety devices in favor of increasing the speed and efficiency with which loads are transported.

102.    For example, NSC and NSRC were aware that there are different, safer braking mechanisms available for their trains, including Electronically Controlled Pneumatic (ECP) brakes, which have the potential to reduce train stopping distances by up to sixty percent. However, under its PSR program, NSC and NSRC prioritized profits over safety by utilizing outdated airbrakes instead of ECP brakes in its trains.

103.    NSC and NSRC's decision to adopt PSR also led to the FRA determining that between January 2022 and May 2022, both companies suffered from significant safety violations including undercounting, inadequately observing rules failures, and failing to verify the performance of operational tests.[6]  FRA noted that "NS did not take immediate actions to remediate

---

[6] U.S. Dept. of Transportation, FRA Audit Report of Norfolk Southern Railway Company, FRA Audit Number: 2022-NS Special Audit-01-1, at 7, 9-10, available at https://railroads.dot.gov/sites/fra.dot.gov/files/2022-

defective conditions" and that "these conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service". Additionally, FRA identified a number of rail component defects, and warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential."

104.    NSC and NSRC's decision to adopt PSR likewise contributed to both companies cutting the use of signalmen to install, repair, and maintain signal systems, which railroads use to direct trains from one location to the next safely and on time.

105.    These same signalmen are responsible for inspecting, maintaining, and repairing wayside detectors like "hot-box" detectors, which alert operators to equipment failures while the train is in operation.

106.    Under their PSR program, NSC and NSRC have no such signalmen employed in or around the area of East Palestine, Ohio.

107.    Furthermore, the wayside detectors are not monitored locally, but by NSC and NSRC's train dispatcher located in Atlanta, Georgia.

*The February 3, 2023 Derailment*

108.    On Friday February 3, 2023, NSC and NSRC Train 32N, consisting of 149 cars, was carrying abnormally dangerous and ultrahazardous chemicals including, but not limited to, vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate and isobutylene while traveling a downhill route eastbound from Illinois to Pennsylvania on main track 1 of the NSC/NSRC Fort Wayne line of the Keystone Division.

---

11/Final%20Norfolk%20Southern%20Audit%20Report%202022%20%28003%29.pdf (July 8, 2022) (last visited April 13, 2023).

109.    According to a VICE article entitled *'32 Nasty': Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, "two workers … said 32N in particular was a known safety risk."[7]

110.    These two workers told *VICE* that "multiple red flags, including two mechanical problems, about 32N went undetected or were ignored in the hours leading up to the crash."[8]

111.    According to the article, 32N has a nickname among some rail workers "for a reason."[9] They call this one "**32 Nasty**."[10]

112.    At approximately 9:00 p.m., in the area of East Palestine, Ohio, approximately 38 of the train cars derailed and an additional twenty railcars were damaged, several of which were carrying dangerous and hazardous industrial materials.  The derailment occurred in the State of Ohio, approximately one mile from the Ohio-Pennsylvania border.

113.    The train was already ablaze when at 8:13 p.m., it passed through Salem, Ohio, which is located 20 miles west of the eventual site of the fiery derailment in East Palestine.

114.    Indeed, surveillance video from cameras located along the rails in Salem, Ohio, showed what appears to be a wheel bearing in the final stage of overheating approximately 45 minutes before the derailment.

---

[7] Vice, *'32 Nasty:' Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, available at https://www.vice.com/en/article/88qze4/32-nasty-rail-workers-say-they-knew-the-train-that-derailed-in-east- palestine-was-dangerous (Feb. 15, 2023) (last visited April 13, 2023).

[8] *Id.*

[9] *Id.*

[10] *Id.*



Still frame from surveillance video taken in Salem, Ohio - 20 miles away from the train derailment site.

115.    On the Fort Wayne Line, NSC and NSRC had equipped their rail network with hotbox detectors to assess the temperature conditions of railcar wheel bearings while en route.

116.    The hotbox detectors are used to detect overheated axels and/or wheel bearings on railcars and provide real-time warnings to train crew members.

117.    NSC and NSRC sets its own standards, policies, and procedures for the placement of hotbox detectors, as well as the alarm thresholds for above ambient temperature readings.

118.    NSC/NSRC Train 32N passed three hotbox detectors before the derailment.

119.    At milepost 79.9, Train 32N passed over a NSC/NSRC hotbox detector and the suspect wheel bearing from railcar no. 23 had a recorded temperature of 38° F above ambient.

120.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 69.01, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 103° F above ambient and was visibly already on fire.

121.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 49.81, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 253°F above ambient.

122. This hotbox reading of 253° F above ambient resulted in an alarm message instructing the crew to slow and stop the train to inspect the hot axle. The engineer applied the train's dynamic brake, but it was already too late. This malfunctioning railcar axle is consistent with an overheated wheel bearing, which ultimately caused the train to derail and trigger the application of the emergency brakes as the train passed through East Palestine.

123. Eleven of the derailed cars carried hazardous materials, and five of them contained vinyl chloride:

| Rail Car # | Hazardous Materials | Amount |
|---|---|---|
| TILX 402025 | Vinyl Chloride | 178,300 pounds |
| OCPX 80235 | Vinyl Chloride | 177,250 pounds |
| OCPX 80179 | Vinyl Chloride | 177,600 pounds |
| GATX 95098 | Vinyl Chloride | 178,150 pounds |
| OCPX 80370 | Vinyl Chloride | 176,100 pounds |
| SHPX 211226 | Ethylene Glycol Monobutyl Ether | 185,750 pounds |
| DOWX 73168 | Ethylhexyl Acrylate | 205,900 pounds |
| UTLX 205907 | Butyl Acrylate | 180,000 pounds |
| NATX 35844 | Isobutylene | 155,642 pounds |
| DPRX 259013 | Benzene | Residue |
| DPRX 258671 | Benzene | Residue |

124.    All told, the derailed cars of Train 32N were carrying over 1,600,000 pounds of toxic and hazardous chemicals.

125.    During and after the derailment, the hazardous chemicals, including, but not limited to vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate, and isobutylene ignited, and the resulting fire continued to burn with increasing intensity from February 3-6, 2023.



126.    On Friday, February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled south of Beaver Falls, Pennsylvania.

127.    The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow, and is consistent with the smoke plume being blown to the south and east, traveling at least as far as Bridgewater, Pennsylvania at that time.





23

128.    Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.



129.    As part of the initial response and subsequent investigation, NSC and NSRC produced the below photograph showing the derailed rail cars and describing their contents:



130.    Given the ongoing release of toxic and hazardous chemicals from the derailment, at approximately 11:00 p.m. on February 3, 2023, officials issued a shelter-in-place order for the entire town of East Palestine.

131.    On February 4, "[r]esponding crews discovered contaminated runoff on two surface water streams:  Sulphur Run and Leslie Run."[11]  It was also noted that the runoff "impacted aquatic life" and officials with the Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

132.    As first responders battled the blaze from February 3 to 5, 2023, one railcar carrying vinyl chloride became a focus of concern when its emergency safety valves malfunctioned, and pressure started building to unsafe levels within the railcar's steel shell.

---

[11] https://response.epa.gov/site/site_profile.aspx?site_id=15933.

133. On Sunday, February 5, first responders and others learned of "a drastic temperature change in a rail car, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile." Local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5 for anyone living within a mile of the derailment site:

Governor Mike DeWine
@GovMikeDeWine

East Palestine: Residents living within a mile of the train derailment site who have not yet left their homes are asked to immediately evacuate due to the potential of a major explosion.

EAST PALESTINE URGENT EVACUATION NOTICE

(COLUMBUS, Ohio)—Following an evening briefing regarding the train derailment in East Palestine, Governor DeWine and Columbiana County officials are issuing an urgent warning to those living within a mile of the derailment. Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile.

Although teams are working to prevent an explosion from happening, residents living within a mile of the site are advised to immediately leave the area. While most individuals in the one-mile radius have already evacuated, local officials say that more than 500 people have declined to leave their homes.

Those who have the means to leave are advised to immediately evacuate. Those who need help evacuating the area should call 330-426-4341. According to the Columbiana County Sheriff, those with children in their homes who decline to evacuate may be subject to arrest.

At approximately 8 p.m., Governor DeWine activated the Ohio National Guard to deploy to the scene to assist local authorities. The Ohio State Highway Patrol, Ohio Emergency Management Agency, and Ohio EPA are also assisting.

7:40 PM · Feb 5, 2023 · 668.2K Views

134. These concerns were amplified when, on Monday, February 6, 2023, a drastic temperature change took place within the railcar with the malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion, and causing local officials to expand the evacuation area based on "new modeling information."

135.    Upon information and belief, NSC and NSRC reported to federal, state, and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

136.    This "controlled release" called for NSC, NSRC and/or its contractors to detonate explosive charges on the compromised vinyl chloride tanker, so as to dump the vinyl chloride out of the tanker and into a trench where it would be lit on fire.

137.    Although the concern related to only one of the vinyl chloride cars, at 4:30 p.m. on Monday, February 6, 2023, NSC, NSRC and/or its contractors intentionally blew holes in, not just the one tanker car of concern, but all five derailed rail cars containing vinyl chloride.

138.    This "controlled release" was anything but controlled.  Once the charges were detonated on the five vinyl chloride cars, there was a large, fiery explosion that released a large plume of thick black smoke forming a mushroom cloud over the entire area.



139.    This toxic mushroom cloud was caused by a temperature and weather inversion over the Derailment Site, which allowed the explosion to disperse dozens of toxic chemicals and combustion by-products, including hydrogen chloride and phosgene gas, for miles.

140.    More specifically, the smoke and particulate plume from the "controlled release" was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud cover.





141.    Upon information and belief, the smoke and particulate plume from the "controlled

release" eventually traveled a total of 30 miles in each direction from the Derailment Site,

contaminating the air, surfaces, soil, and water of upwards of 500,000 Class Members.

142.    On March 22, 2023, the Chair of the National Transportation Safety Board ("NTSB") characterized the derailment as "100% preventable" in her testimony before the U.S. Senate Environment and Public Works Committee.

*Hazardous Chemicals Released*

143.    The following are the hazardous chemicals and combustion products detected in air, water, soil, and sediment samples taken within a 30-mile radius of the Derailment Site following the "controlled release," along with the health and environmental effects associated with each. These chemicals are harmful to humans, as well as livestock, plants and crops. These chemicals may cause a direct effect on livestock, plants and crops, as well as an indirect effect on the food supply.

**Vinyl Chloride**

144.    Vinyl chloride monomer ("vinyl chloride") is classified by the Environmental Protection Agency ("EPA") as a Group A human carcinogen—the most dangerous to human health.

145.    Vinyl chloride exposure can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation, and loss of consciousness.

146.    Vinyl chloride is a toxic chemical that is unstable and prone to explode if not maintained and handled with proper methods and conditions.

147.    Vinyl chloride is specified under the Hazardous Materials Transportation Act ("HMTA") as a hazard class 2.1, flammable gas.

148.    Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as

dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

149.    Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.

150.    Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

151.    According to the NTSB:

Vinyl chloride [CAS # 75-01-4] is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride (PVC). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration (OSHA) regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph (c) of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. **Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence**. **The odor threshold is too high to provide adequate warning for hazardous concentrations**.

152.    Just one pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

153.    Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately **1,000,000 pounds** of vinyl chloride throughout the area surrounding the Derailment Site.

**Dioxins**

154.    Dioxin is a term used to identify several chemical compounds.

155.    These compounds can be placed into three closely related families: polychlorinated dibenzo-*p*-dioxins ("CDD"), polychlorinated debenzofurans ("CDF") and polychlorinated biphenyls ("PCB"). Compounds within all three of these families are highly toxic and have varying toxicity levels.

156.    Each different form of Dioxin is called a "congener."

157.    There are many dioxins and "dioxin-like" congeners: 75 different CDDs, 135 different CDFs and 209 different PCBs.

158.    Dioxins are called persistent organic pollutants ("POP"), meaning they take a long time to break down once they are in the environment.

159.    Dioxins are dangerous and deadly. The EPA and other entities, such as the World Health Organization, began assessing the potential human health risks associated with dioxins as early as the 1970s after animal studies showed one dioxin, TCDD, to be the most potent cancer-causing chemical studied to date.

160.    Exposure to dioxins are known in the scientific and medical communities to cause cancer, liver damage, hormone changes, reproductive damage, miscarriages, birth defects, and decrease the ability to fight infection. Birth defects from dioxins have included skeleton and kidney defects, lowered immune responses, and effects on the development of the brain and the nervous system.

161.    Dioxins are one of the strongest carcinogens known, causing many kinds of cancers.

162.     Dioxin exposure, even in single doses and at very low concentrations, seriously disrupts normal reproduction in humans and other animals. It lowers fertility, increases prenatal mortality, causes birth defects, and increases the risk of endometriosis.

163.     Dioxins interfere with the production and function of many different hormones, growth factors, and enzymes. Their effects can be long term, and their toxicity is much more severe and consistent in children than it is in adults.

164.     Dioxins are particularly toxic to children. Dioxins adversely affect the developing immune, reproductive, nervous, and lymph systems. They cause cleft palate, hemorrhage and edema, impair hearing, and retard growth.

165.     The adverse effects of Dioxin exposure to human health are varied and include:

a.     **Cancer:** lung, stomach, soft tissue, and liver;

b.     **Male Reproductive Toxicity:** reduced sperm count, testicular atrophy, abnormal testis structure, reduced testis size, lower male hormone levels, and feminization of hormonal and behavioral responses;

c.     **Female Reproductive Toxicity:** hormonal changes, decreased fertility, inability to maintain pregnancy, ovarian dysfunction, and endometriosis;

d.     **Developmental Toxicity:**  birth defects, alterations in reproductive system, decreased sperm count, altered mating behavior, structural abnormalities in female genitalia, reduced fertility, delayed puberty, and neurological problems;

e.     **Immune Suppression:** increased susceptibility to infectious disease;

f.     **Hormonal Changes:** altered sex hormones, altered thyroid hormones, and altered digestive hormones;

g.     **Metabolic Changes:** altered glucose response, decreased insulin levels, altered fat metabolism, weight loss, wasting syndrome, fetal death, and diabetes;

h.     **Damage to the central and peripheral nervous systems:** impaired neurological development and subsequent cognitive deficits;

i.     **Organ Damage:** liver, thymus, spleen, bone marrow, lungs, and heart - leading to arrhythmias; and

j.     **Skin Disorders:** chloracne, hyperpigmentation, and hirsutism.

**Ethylene Glycol Monobutyl Ether**

166.    Harmful exposure to ethylene glycol monobutyl ether occurs through ingestion or dermal contact.

167.    Inhaling ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain.

168.    Exposure can cause headaches, dizziness, lightheadedness, and passing out, and it may damage the liver and kidneys.

**Isobutylene**

169.    Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat, frostbite (from dermal contact), headaches, dizziness, lightheadedness, and fatigue.

170.    Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer, reproductive harm, and other long term health effects.

**Benzene**

171.    Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research on Cancer (IARC), and the EPA.

172.    Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness.

173.    Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death.

174.    The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects to bone marrow and can cause a decrease in red blood cells leading to anemia. Benzene exposure can also cause leukemia and lymphoma in humans.

175.    Benzene can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. Benzene may affect menstruation and decrease the size of ovaries in women following many months of exposure to high levels.

### Butyl Acrylate

176.    Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy.

177.    Exposure to butyl acrylate can cause headaches, dizziness, nausea, and vomiting. Repeated exposure can lead to permanent lung damage.

### Ethylhexyl acrylate

178.    Ethylhexyl acrylate is a flammable, clear, colorless liquid used in the production of paints and plastics.

179.    Exposure can cause drowsiness, convulsions, and irritation of the eyes and skin.

### Diethylene glycol

180.    Diethylene glycol is a clear, colorless, and near odorless liquid used to make various industrial products.

181.    Exposure can cause gastrointestinal symptoms, renal failure, and neurological issues.

### Hydrogen sulfide

182.    Hydrogen sulfide is a colorless gas with a strong odor of rotten eggs used in industrial settings including textile factories.

183.    Exposure can cause irritation to the eyes and respiratory system, apnea, coma, convulsions, dizziness, headache, weakness, irritability, insomnia, and upset stomach.

### Hydrogen cyanide

184.     Hydrogen cyanide is a colorless or pale-blue liquid or gas with a bitter, almond-like odor used in fumigation, electroplating, mining, and chemical synthesis.

185.     Hydrogen cyanide interferes with the human body's use of oxygen and can negatively impact the brain, heart, blood vessels, and lungs.

### Phosgene

186.     Phosgene was used as a chemical warfare agent during World War I and is banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare.

187.     Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion.

188.     Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

### Hydrogen Chloride

189.     Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation.

190.     Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation.

191.     Following exposure, people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances.

192.     Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin.

193.     Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.


## CLASS ALLEGATIONS

194.     Plaintiffs bring this consolidated action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and, as warranted, 23(c)(4) on behalf of themselves and the following class of persons and organizations similarly situated for all direct, proximate, and foreseeable losses caused by the February 3, 2023, train derailment, fire and resulting toxic chemical explosion and contamination.  The proposed Classes, inclusive of subclasses, are hereby defined as follows:

1.     **The Residents Class:**

   **All individuals who resided within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:**

   a.   **The Ohio Resident Subclass**:

   **All individuals residing in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;**

b. **The Pennsylvania Resident Subclass**:

> **All individuals residing in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and**

c. **The West Virginia Resident Subclass**:

> **All individuals residing in West Virginia within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present.**

2. **The Property Owners Class**:

> **All individuals or legal entities who owned or otherwise had a legal interest in real property located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:**

a. **The Ohio Property Owner Subclass**:

> **All individuals or legal entities who owned or otherwise had a legal interest in real property in Ohio located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;**

b. **The Pennsylvania Property Owner Subclass**:

> **All individuals or legal entities who owned or otherwise had a legal interest in real property in Pennsylvania located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and**

c. **The West Virginia Property Owner Subclass**:

> **All individuals or legal entities who owned or otherwise had a legal interest in real property in West Virginia located within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N;**

Longitude 80.5222838°W from February 3, 2023, to the present.

3. **The Employees Class:**

All individuals who worked within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:

   a. **The Ohio Employee Class Subclass**:

   All individuals who worked in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;

   b. **The Pennsylvania Employee Class Subclass**:

   All individuals who worked in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and

   c. **The West Virginia Employee Class Subclass**:

   All individuals who worked in West Virginia within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present.

4. **The Businesses Class:**

All individuals or legal entities who owned or operated a business within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present, including the following specific subclasses:

   a. **The Ohio Business Class Subclass**:

   All individuals or legal entities who owned or operated a business in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;

39

b. **The Ohio Agricultural Business Subclass**:

All individuals or legal entities who owned or operated an agricultural[12] business in Ohio within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;

c. **The Pennsylvania Business Class Subclass**:

All individuals or legal entities who owned or operated a business in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present;

d. **The Pennsylvania Agricultural Business Subclass**:

All individuals or legal entities who owned or operated an agricultural business in Pennsylvania within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present; and

---

[12] "Agricultural" as used in these Class definitions is intended to encompass any business engaged in farming in all its branches, including but not limited to the cultivation and tillage of the soil, cultivation, growing and harvesting of any agricultural or horticultural commodities, including but not limited to field crops, tobacco, fruits, vegetables, nursery stock, ornamental plants or shrubs, ornamental trees, flowers, sod, or mushrooms; forestry (timber) or silvicultural; pasturage; any combination of the foregoing; the processing, drying, storage, and marketing of agricultural or horticultural commodities; breeding (husbandry), raising, maintaining or utilization of animals, including but not limited to livestock, equine, fur-bearing animals, or poultry; the production of poultry and poultry products, dairy production, or other production or products associated with any of the foregoing animals; activities conducted in conjunction with, but secondary to, such husbandry or production; any practices (including any forestry or lumbering operations) performed with any farming operations, including storage, preparation for market, delivery to storage or to market or to carriers for transportation to market; ranching; aquaculture; algaculture meaning the farming of algae; apiculture or apiaries and related activities, including the maintenance of bees and hives, crop pollination services, sale of bees, production of honey, beeswax, honeycomb, and other related products; viticulture and/or winemaking, enology and brewing along with any related activities; sugarhouse; or agritourism.

e. **The West Virginia Business Class Subclass**:

**All individuals or legal entities who owned or operated a business in West Virginia within a 30-mile radius of East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W from February 3, 2023, to the present.**



*Fig. 1: The Class Zone is represented by a radius of 30 miles emanating from the train derailment, (fire and explosion) site.*

195.    Excluded from the Class(es) are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class(es); and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 train derailment and resulting toxic chemical explosion, arise out of a right of subrogation, whether equitable, contractual or otherwise.

196.    Also excluded from the Class(es) are any claims of physical manifestation of personal or bodily injury.

197.    Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

198.    The multiple Classes and subclasses all involve identical factual issues and common, if not identical, legal issues.

199.    The proposed Class(es) meet(s) the criteria for certification under 23(a), 23(b)(2), and/or 23(b)(3).

*Numerosity and Ascertainability*

200.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.

201.    While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable; the proposed Class includes thousands of residents and businesses who were unlawfully exposed to vinyl chloride and other toxic chemicals or who had property contaminated by unlawful exposure to vinyl chloride and other toxic chemicals and suffered damages. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

*Predominance of Common Issues*

202.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law or fact that predominate over questions affecting only individual Class Members.

203.    The common questions include, without limitation, the following:

a.    Whether Defendants' acts or omissions as set forth herein caused or contributed to the derailment, fire, subsequent release of toxic chemicals, resulting explosion, contamination and evacuation and/or "shelter in place" orders;

b.    Whether Defendants breached their duty of reasonable care in the transportation of hazardous materials through East Palestine, Ohio;

c.    Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity by transporting hazardous substances;

d.    Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity when they dumped the vinyl chloride they were transporting and lit it on fire in a residential community;

e.    Whether Defendants' violated Ohio statutory nuisance law by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property;

f.    Whether Defendants violated Pennsylvania statutory nuisance law by emitting air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act, thereby creating a public nuisance making them liable for the cost of abatement;

g.    Whether Defendants created a private nuisance through their acts and omissions, including by the release of toxic contaminants;

h.    Whether Defendants created a public nuisance through their acts and omissions, including by the release of toxic contaminants;

i.    Whether Defendants committed trespass on the property of Plaintiffs and the Classes by their acts and omissions, including by causing hazardous materials to enter and contaminate said property;

j.    Whether Defendants committed trespass to the chattels of Plaintiffs and the Classes through their acts and omissions, including by impairing the property as to its

43

condition, quality, or value; depriving Plaintiffs and the Classes of the possession or use of their chattels for a substantial time; or causing harm to the property;

k.      Whether Defendants destroyed the vines, bushes, trees, and/or crops of Plaintiffs and the Classes by the entry or intrusion of hazardous materials without privilege or permission in violation of Ohio law;

l.      Whether Defendants destroyed agricultural crops through their acts and omissions, including by exposing the agricultural crops to hazardous substances in violation of Pennsylvania law;

m.      Whether Defendants destroyed the timber, trees, logs, posts, fruits, nuts, growing plants, or products of said plants through their acts and omissions in violation of West Virginia law;

n.      Whether Defendants maliciously or willfully without the consent of the owners killed or injured animals in violation of Ohio law;

o.      Whether Defendants affirmatively destroyed physical evidence, documents, or other materials and/or failed to act timely or reasonably to suspend any automatic processes that would result in such destruction;

p.      Whether Defendants' acts and omissions after the derailment caused or contributed to losses and damages sustained by Plaintiffs and the Classes;

q.      Whether the Plaintiffs and the Classes have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

r.      Whether Plaintiffs' and the Classes' businesses have suffered a loss of income and/or diminution in value due to either (i) the release of vinyl chloride and other toxic and hazardous substances or (ii) the stigma associated with being within the evacuation and/or "shelter in place" zones;

s.      Whether Plaintiffs and the Classes have suffered damages to their businesses due to the derailment and subsequent events, including forced closings and/or the evacuation;

t.      Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the derailment and subsequent release of vinyl chloride and other toxic and hazardous substances;

u.      Whether medical monitoring is an appropriate remedy that should be imposed to provide early detection of future injuries and other benefits to Plaintiffs and the Classes;

44

       v.      Whether monitoring of the diminution in value of Plaintiffs, including the stigma, on the value of the property of Plaintiffs and the Classes is an appropriate remedy; and

       w.     Whether Plaintiffs and the Classes are entitled to relief for the damages caused by Defendants.

*Typicality*

204.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

205.    Plaintiffs own property, reside in, work and/or operate a business within the Class Zone surrounding the train derailment and toxic chemical explosion, and owned property, resided in, worked and/or operated a business in the Class Zone for at all relevant times.

206.    Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

207.    Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

208.    Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

*Adequacy*

209.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation, including successful class actions involving mass displacements caused by the release of dangerous substances that are similar to that at issue here.

210.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

211.    Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

*Superiority and Predominance*

212.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct predominate over any questions affecting only individual Class Members.

213.    Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions.  Moreover, the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

214.     The prosecution of this case as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially

outweighed by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

215.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## MEDICAL MONITORING CLASS INJUNCTIVE RELIEF PURSUANT TO RULE 23(b)(2)

216.     In addition, Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Classes and that require court imposition of uniform relief, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Rules 23(b)(2).

217.     As set forth above, Plaintiffs are not asserting damages claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

218.     Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

219.    As a direct and proximate result of Defendants' wrongful conduct as set forth above, Plaintiffs and the Class Members have actually been exposed, and will continue to be exposed, to toxic substances, toxic fumes and carcinogens and thereby suffer, and will continue to suffer a significantly increased risk of serious injury and diseases as alleged herein, including liver disease such as liver cancer and angiosarcoma of the liver, cancers such as brain cancer and leukemia, lung damage, Raynaud's disease, acro-osteolysis, and reproductive damage. This increased risk is such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic medical testing and necessary examinations.

220.    As the Department of Justice and the Environmental Protection Agency recognized in connection with their own lawsuit, the health risk to Plaintiffs and the Classes is significant and ongoing: "When a Norfolk Southern train derailed last month in East Palestine, Ohio, it released toxins into the air, soil, and water, endangering the health and safety of people in surrounding communities," said Attorney General Merrick B. Garland. "With this complaint, the Justice Department and the EPA are acting to pursue justice for the residents of East Palestine and ensure that Norfolk Southern carries the financial burden for the harm it has caused and continues to inflict on the community."

221.    Moreover, Norfolk Southern Chief Executive Office Alan Shaw acknowledged on multiple occasions both the existence of long-term health risks and the need to monitor them on-going, including testifying to Congress on March 21, 2023, "We are committed to a solution that addresses long-term health risks through the creation of a long-term medical compensation fund."

222.    Early detection and treatment of cancer and many other diseases is associated with more favorable outcomes. Timely-instituted medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to vinyl

chloride and other toxic substances released by the derailment, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and well-being of Plaintiffs and the Classes they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist that make the early detection of exposure to those toxic substances, toxic fumes and carcinogens that were released into the class area as a result of the derailment, as well as early detection of disease, both feasible and beneficial.

223. The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and the Class Members resulting from their exposure to vinyl chloride and other toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendants, that: (a) notifies individuals who have been exposed to vinyl chloride and other toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of disease and injuries caused by exposure to vinyl chloride and other toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to vinyl chloride and other toxic substances.

224. Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

225.     The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

226.     The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees; (b) involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regiment; and (c) involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

## COUNT I
## NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of All Classes Against All Defendants)

227.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

228.     The derailment, fire, uncontrolled release of toxic chemicals, and explosion of toxic chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

229.     Upon information and belief, Plaintiffs aver that the derailment, fire, release, and explosion of toxic chemicals was caused by the joint negligence, carelessness and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

230.     In addition, and in the alternative, the derailment, fire, release, and explosion of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants.  Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

50

231. Defendants owed Plaintiffs and the Class a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio. Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

a. Properly inspect their trains and railcars;

b. Not place in service or continue in service a car with an overheated roller bearing;

c. Not accept or transport any shipment of hazardous material that has pressure relief devices made of materials that are incompatible with the lading;

d. To maintain vigilant lookout during the operation of its trains and railcars;

e. To remedy defects in equipment and remove all cars that are unsafe to run;

f. To immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires have spread beyond the roller bearing;

g. To properly calibrate, maintain, test, and operate train braking systems;

h. To properly develop and implement risk reduction programs;

i. To properly develop and implement risk-based hazard management programs;

j. To properly develop and implement safety performance evaluation processes;

k. Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l. Utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; appropriately place such detectors to ensure timely alerting of any potential problems; implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such detectors are timely and properly inspected and maintained;

m. Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n. Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.    Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.    Prevent over-loading the train with too many railcars or materials;

q.    Load the railcars consistent with accepted practice;

r.    Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.    Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.    Hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.    Train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.    Properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.    Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.    Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.    Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.    Adequately warn those in danger of imminent exposure to hazardous chemicals;

aa.   Institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.   Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.   Institute proper procedures to avoid exposing hazardous materials to the environment;

dd.     Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.     Timely implement such an emergency response plan;

ff.     Transport and handle hazardous materials in a manner which would not cause Plaintiffs and Class Members harm, as Plaintiffs and Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct;

gg.     Properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including avoiding the use of techniques that would further expose Plaintiffs, Class Members, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.     Evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii.     Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.     Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.     Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

ll.     Contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons.

232.     However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly and/or recklessly breached their duties to Plaintiffs and the Class by, among other things:

a.     Failing to properly inspect their trains and railcars;

b.     Placing in service or continuing in service a car with an overheated roller bearing;

c.     Accepting and transporting shipments of hazardous material that had pressure relief devices made of materials that were incompatible with the lading;

d.  Failing to maintain vigilant lookout during the operation of its trains and railcars;

e.  Failing to remedy defects in equipment and remove all cars that were unsafe to run;

f.  Failing to immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires had spread beyond the roller bearing;

g.  Failing to properly calibrate, maintain, test, and operate train brake systems;

h.  Failing to properly develop and implement risk reduction programs;

i.  Failing to properly develop and implement risk-based hazard management programs;

j.  Failing to properly develop and implement safety performance evaluation processes;

k.  Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.  Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

m.  Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.  Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.  Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.  Failing to prevent over-loading the train with too many railcars or materials;

q.  Failing to load the railcars consistent with accepted practice;

r.  Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.  Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.  Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.  Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.  Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.  Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.  Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.  Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.  Failing to adequately warn those in danger of exposure to hazardous chemicals;

aa.  Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.  Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.  Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

dd.  Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.  Failing to timely implement such an emergency response plan;

ff.  Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs and the Class Members injury or harm, as Plaintiffs and the Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct.

gg.    Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiffs, the Class Members, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.    Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii.    Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.    Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

ll.    Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property;

mm.    Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and other combustible liquids; and

nn.    Otherwise unreasonably causing injury to Plaintiffs and the Class Members in ways further investigation and discovery will reveal.

233.    Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and combustible or hazardous liquids by railcar.

234.    Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene and hydrogen chloride.

235.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the controlled release and burn

of hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, were contaminating property at levels that would materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

236.     The damages to Plaintiffs and Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions following the derailment to mitigate the danger and harm associated with their operations.

237.     Additionally, the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., and its accompanying regulations are implemented to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents. 49 U.S.C. § 20101.  The derailment that forms the basis of this lawsuit is currently under investigation by the National Transportation Safety Board ("NTSB").  Plaintiffs are currently unadvised of the full extent of the federal or state safety laws and regulations that Defendants or their agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery.  However, upon information and belief, Defendants' conduct violated one or more regulations, including but not limited to the following:

a.     49 CFR Part 215, including but not limited to 49 CFR § 215.9, 49 CFR § 215.13, 49 CFR § 215.15, 49 CFR § 215.115, Appendix B of CFR Part 215, and Appendix D of 49 CFR Part 215.

b.     49 CFR Part 229, including but not limited to 49 CFR § 229.7, and 49 CFR § 229.29.

c.     49 CFR Part 232, including but not limited to 49 CFR § 232.103 and 49 CFR § 232.109.

d.     49 CFR Part 271, including but not limited to 49 CFR § 271.101, 49 CFR § 271.103, 49 CFR § 271.211, and 49 CFR § 271.213.

e.     49 CFR Part 174, including but not limited to 49 CFR § 174.3.

f.      49 CFR Part 179, including but not limited to 49 CFR § 179.15.

238.    Defendants' violation of such safety laws and regulations constitutes negligence *per se*.

239.    Additionally, the FRSA authorizes railroads such as Defendants to adopt and enforce "additional or more stringent requirements not inconsistent with" the regulations.  Upon information and belief, Defendants did in fact adopt a comprehensive set of operating rules which apply to their operations, and Defendants violated their own Operating Rule 140 regarding train inspections.

240.    As a direct and proximate result of Defendants' negligent use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

241.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

242.    Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate,

benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

243. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT II
## STRICT LIABILITY
### (On Behalf of All Classes Against All Defendants)

244. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

245. Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

246. The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

247. The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by transporting hazardous substances, including but not limited to vinyl chloride, through a residential community, making them strictly liable for any resulting damages.

248. The Defendants also engaged in an abnormally dangerous and/or ultrahazardous activity when they dumped the vinyl chloride they were transporting and lit it on fire in a residential community, making them strictly liable for any resulting damages.

249. As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and Class Members presently suffer, and will continue to suffer,

real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

250.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

251.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

252.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

253.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT III
## STATUTORY NUISANCE (OHIO)
### (On Behalf of the Ohio Residents, Property Owners, Employees,
### Businesses and Agricultural Businesses Subclasses Against All Defendants)

254.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

255.    Ohio R.C. § 3704.05 states "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

256.    Ohio Admin. Code 3745-15-07(A) states "[t]he emission or escape into the open air for any source or sources whatsoever of … fumes, gases, vapors, or any other substance or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance. It shall be unlawful for any person to cause, permit or maintain any such public nuisance."

257.    As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

258.    Ohio R.C. § 3746.06 requires that, when contaminated property is voluntarily cleaned up, the remedial activities undertaken must ensure the groundwater complies with standards for residential use.

259.    As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and Class Members have been exposed to hazardous air pollutants in violation of Ohio law.

260.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs and Class Members, thereby exposing their properties and bodies to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

261.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs and Class Members presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and have the present need for medical monitoring to ensure early detection of any such disease or illness.

262.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

263.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or

illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

264.    Plaintiffs and the Classes suffered injuries that are distinct from the injuries suffered by the public at large.

265.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

<div align="center">

**COUNT IV**
**STATUTORY NUISANCE (PENNSYLVANIA)**
**(On Behalf of The Pennsylvania Residents, Property Owners, Employees,**
**Businesses and Agricultural Businesses Subclasses Against All Defendants)**

</div>

266.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

267.    Under the Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act.

268.    Section 112 of the Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and sets a national emission standard. 41 Fed. Reg. 46560 (1976).

269.    35 P.S. § 4013 declares that any violation of the Air Pollution Control Act "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement."

270.  As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

271.  As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Class Members have been exposed to hazardous air pollutants in violation of Pennsylvania law.

272.  As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs and Class Members, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

273.  As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs and Class Members presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an

increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

274.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

275.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

276.    Plaintiffs and the Classes suffered injuries that are distinct from the injuries suffered by the public at large.

277.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT V
## PRIVATE NUISANCE
### (On Behalf of All Classes Against All Defendants)

278.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

279. At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposal of these materials would cause injury to Plaintiffs and the Class Members and their property.

280. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

281. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene onto Plaintiffs' and the Class Members' land and have contaminated Plaintiffs' and the Class Members' real property, water and persons.

282. The Defendants' contamination of Plaintiffs' and the Class Members' property with vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene has unreasonably interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens,

or water pets and livestock. This has, in turn, caused significant loss of income, out of pocket expenses, loss of use and enjoyment and inconvenience.

283.    Defendants' conduct has also substantially interfered with Plaintiffs' and the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

284.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs and the Class Members.

285.    Plaintiffs and the Class Members, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious, illegal, and wrongful conduct, including the pollution of their land and water.

286.    Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene and the contamination of Plaintiffs' and the Class Members' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs and the Class Members to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

287.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be

periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

288. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

289. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT VI
## PUBLIC NUISANCE
### (On Behalf of All Classes Against All Defendants)

290. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

291. At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposing of these materials was hazardous and harmful to people living in nearby areas.

292. Plaintiffs and the Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running and

groundwater without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

293.    Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

294.    As a proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs,' the Class Members,' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

295.    As a proximate result of Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals and carcinogens.

296.    Each of the Plaintiffs and Class Members suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

297.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated

disease or illness, and the present need for medical monitoring to ensure early detection of any

such disease or illness.

298.    Plaintiffs' and the Class Members' damages include the need for remediation and

continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be

periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for

watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and

pets to occupy, and safe for grazing livestock and growing crops.

299.    Plaintiffs' and the Class Members' damages include the need for remediation and

continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or

illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate,

benzene residue, other contaminants as alleged, and byproducts including but not limited to

volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants'

activities alleged herein.

300.    Defendants' conduct as alleged herein shows that Defendants acted with gross

neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or

intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition

of punitive damages.

### COUNT VII
### TRESPASS
### (On Behalf of The Residents, Property Owners, Businesses
### and Agricultural Businesses Classes Against All Defendants)

301.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted

above as if fully set forth herein.

302.    At all times relevant hereto, Defendants knew or should have known vinyl chloride,

butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to

real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and Class Members and their property.

303.     Defendants, through their activities alleged herein, caused hazardous materials to enter and contaminate Plaintiffs' and the Class Members' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs and the Class Members.

304.     Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' and the Class Members' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' and the Class Members' land and water.

305.     At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible liquids was contrary to Plaintiffs' and the Class Members' rights in their property.

306.     At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' and the Class Members' rights to their property.

307.     Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

308.    The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' real and personal property with hazardous materials has interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' and the Class Members' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

309.    Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

310.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

311.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

312.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or

intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT VIII
## TRESPASS TO CHATTELS
### (On Behalf of The Residents, Property Owners, Businesses and Agricultural Businesses Classes Against All Defendants)

313.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

314.    At all relevant times, Plaintiffs and the Class Members had a possessory interest in all their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, food, professional equipment, recreational equipment, livestock, and pets.

315.    Defendants, through their activities alleged herein, caused the impairment of Plaintiffs' and the Class Members' property as to its condition, quality, or value and harmed Plaintiffs' materially valuable interest in the same.

316.    Defendants, through their activities alleged herein, deprived Plaintiffs and the Class Members of the possession or use of their chattel for a substantial time.

317.    Defendants, through their activities alleged herein, caused harm to property in which Plaintiffs and the Class Members had or have a legally protected interest.

318.    At all relevant times Defendants were aware that their conduct in transporting, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene was contrary to Plaintiffs' and the Class Members' legally protected interest in their personal property.

319.    The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' personal property substantially

impaired Plaintiffs' and the Class Members' legally protected interest in their property as well as economic and property damages as alleged herein.

320.  Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' and the Class Members' ability to enjoy their personal property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs and the Class Members so choose.

321.  Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members personal property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience. These damages include, but are not limited to, the contamination and/or death of livestock and pets, and the contamination of personal vehicles, commercial vehicles, household goods, food, professional equipment, and recreational equipment.

322.  Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

323.  Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

324.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT IX**
**DESTRUCTION OF VINES, BUSHES, TREES, AND CROPS**
**OHIO R.C. § 901.51**
**(On Behalf of the Ohio Residents, Property Owners, Businesses**
**and Agricultural Businesses Classes Against All Defendants)**

325.    Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

326.    At all relevant times, Plaintiffs and the Class Members engaged in growing or standing vines, bushes, shrubs, saplings, trees, or crops on real property, owned, leased or otherwise occupied by Plaintiffs and the Class Members.

327.    Defendants, through their activities alleged herein, damaged Plaintiffs' and the Class Members' vines, bushes, and/or trees by the entry and intrusion of hazardous materials to Plaintiffs' and the Class Members' property and were without any applicable privilege or permission for such entry.

328.    At all relevant times, Defendants' conduct displayed indifference to and disregard for the Plaintiffs' and the Class Members' rights to their land.

329.    At all relevant times, Defendants' conduct as alleged herein was done with a conscious disregard or indifference to the substantial and unjustifiable risk of harm to Plaintiffs' and the Class Members' property by the entry and/or exposure to the hazardous materials.

330.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and the Class Members presently suffer, and will continue to

suffer in the future, damage to vines, bushes, shrubs, saplings, trees, and/or crops standing or growing on the land, owned, leased or otherwise occupied by Plaintiffs and the Class Members.

331. Plaintiffs' and the Class Members' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

332. In addition, Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

333. Pursuant to O.R.C. § 901.51, Plaintiffs and the Class Members are entitled to treble damages for the injuries caused and alleged herein, as well as any other damages, including punitive damages.

334. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT X
### AGRICULTURAL CROP DESTRUCTION
### 42 Pa.C.S.A. § 8313
### (On Behalf of the Pennsylvania Residents, Property Owners, Businesses
### and Agricultural Businesses Classes Against All Defendants)

335. Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

76

336.     At all relevant times, Plaintiffs and the Class Members engaged in raising field crops, vegetables or fruit plants, or trees for scientific or commercial purposes, or for testing or research purposes in connection to a public or private research facility or university or governmental agency.

337.     Defendants, through their activities alleged herein, damaged Plaintiffs' and the Class Members' field crops, vegetables or fruit plants, and/or trees and such damage was not the result of research or normal commercial activities.

338.     Plaintiffs' and the Class Members' field crops, vegetables or fruit plants and/or trees were damaged when exposed to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' negligent, reckless, ultrahazardous, and willful and wanton conduct as alleged herein.

339.     Plaintiffs' and the Class Members' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

340.     Pursuant to 42 Pa. C.S.A. §8313, Plaintiffs and the Class Members are entitled to all appropriate relief, including compensatory and punitive damages, reasonable investigative expenses, reasonable attorney fees, and other costs associated with the litigation.

341.     Plaintiffs and the Class Members shall be entitled to damages treble the market value of the field crops, vegetable or fruit plants or trees prior to damage, in addition to actual damages related to the production, research, testing, replacement and crop development costs

directly related to the crop that has been damaged as part of the value of the crop, as well as damage to any records, data and data-gathering equipment or devices.

342.    In addition, Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

343.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

<div align="center">

**COUNT XI**
**DESTRUCTION OF TIMBER, TREES, LOGS, POSTS, FRUITS,**
**NUTS, GROWING PLANTS OR PRODUCTS OF SAID PLANTS**
**W.Va. Code § 61-3-48a**
**(On Behalf of the West Virginia Residents, Property Owners, and Businesses**
**Classes Against All Defendants)**

</div>

344.    Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

345.    At all relevant times, Plaintiffs and the Class Members engaged in growing timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

346.    Defendants, through their activities alleged herein, damaged or caused damage to occur to Plaintiffs' and the Class Members' timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

347.    At all relevant times, the Defendants did not have written permission for the forced entry onto land owned, leased, or otherwise occupied, by Plaintiffs and the Class Members where the damage occurred.

348.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the train derailment and release of hazardous substances and ensuing clean-up activities, resulting in the harm to Plaintiffs and the Class Members.

349.    Plaintiffs' and the Class Members' injuries include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

350.    In addition, Plaintiffs' and the Class Members' damages also include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

351.    Pursuant to W.Va. Code §61-3-48a, Plaintiffs and the Class Members are entitled to treble damages; an amount three times the value of the timber, trees, growing plants or products thereof, in addition to and distinct from any other penalties provide by law, including punitive damages.

352.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or

intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT XII
## INJURING ANIMALS
## Ohio R.C. § 959.02
## (On Behalf of the Ohio Residents, Property Owners, Businesses
## and Agricultural Businesses Classes Against All Defendants)

353.     Plaintiffs and the Class Members repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

354.     Ohio Rev. Code § 959.02 prohibits anyone from "maliciously, or willfully, and without the consent of the owner" killing or injuring "a horse, mare, foal, filly, jack, mule, sheep, goat, cow, steer, bull, heifer, ass, ox, swine, dog, cat, or other domestic animal that is the property of another."

355.     Per Ohio Rev. Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action and attorneys fees [if authorized] and may recover punitive or exemplary damages [if authorized]."

356.     As a direct and proximate result of Defendants' conduct and activities as alleged herein, Plaintiffs' and the Class Members' animals have been injured and will continue to suffer injury in the future.

357.     Accordingly, Plaintiffs and the Class Members presently suffer, and will continue suffering in the future, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, and inconvenience.

358.     Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for

watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

359. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

360. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive or exemplary damages.

<div align="center">

**COUNT XIII**
**MEDICAL MONITORING**
**(On Behalf of the Ohio Residents and**
**Employees Subclasses Against All Defendants)[13]**

</div>

361. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

362. Plaintiffs and the Class Members have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like

---

[13] Plaintiffs acknowledge that under Ohio law, medical monitoring might not be recognized as a stand-alone cause of action. Accordingly, Plaintiffs allege it here as both a cause of action and an element of damages available under other applicable causes of action. Moreover, Plaintiffs plead herein a request for injunctive relief including medical monitoring on a class basis under Fed. R. Civ. P. 23(b)(2).

hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

363.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

364.    Plaintiffs and the Classes were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

365.    As a proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Classes have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

366.    This increased risk would warrant a reasonable physician to order monitoring.

367.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

368.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposures to the toxic substances, including

vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

369.     As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

370.     As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

<div align="center">

**COUNT XIV**
**MEDICAL MONITORING**
**(On Behalf of the Pennsylvania Residents and**
**Employees Subclasses Against All Defendants)**

</div>

371.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

372.     Plaintiffs and the Class Members have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

373.     The hazardous materials carried by the train and released by Defendants are highly toxic substances.

374.     Plaintiffs and the Class Members were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

375.     As a direct and proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Class Members have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

376.     This increased risk would warrant a reasonable physician to order monitoring.

377.     Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

378.     Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

84

379.     As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

380.     As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

**COUNT XV**
**MEDICAL MONITORING**
**(On Behalf of the West Virginia Residents and**
**Employees Subclasses Against All Defendants)**

381.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

382.     Plaintiffs and the Class Members have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

383.     The hazardous materials carried by the train and released by Defendants are highly toxic substances.

384.     Plaintiffs and the Class Members were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and

proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

385.     As a direct and proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs and the Class Members have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

386.     This increased risk would warrant a reasonable physician to order monitoring.

387.     Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

388.     Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

389.     As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection

and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

390.    As a result, Plaintiffs and the Classes should be awarded the quantifiable costs of such a monitoring regime.

<div align="center">

**COUNT XVI**
**SPOLIATION**
**(On Behalf of All Classes Against All Defendants)**

</div>

391.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

392.    Under the common law of Ohio as well as the Federal Rules of Civil Procedure, the Defendants were required to preserve any and all evidence relating to the train derailment and subsequent toxic explosion once they reasonably anticipated that litigation would ensue.

393.    Under the common law of Ohio, as well as the Federal Rules of Civil Procedure, this duty to preserve evidence not only required the Defendants to refrain from affirmatively destroying physical evidence, documents, and other materials, but also required the Defendants to suspend any automatic processes that would result in the same.

394.    The Defendants reasonably anticipated, or should have reasonably anticipated, litigation concerning the train derailment and subsequent toxic explosion as of February 3, 2023, immediately after Train 32N derailed.

395.    However, despite reasonably anticipating litigation, the Defendants did not act timely or reasonably to suspend automatic processes that would result in the destruction of case-critical evidence.

396.    Specifically, according to the NTSB, the Defendants failed to suspend the processes whereby the full surveillance video from the cab of Train 32N would be preserved, instead placing

Train 32N back into service such that automatic processes in the video recording system deleted and recorded over this case-critical evidence.[14]

397.    According to the NTSB, the full surveillance video from the cab of Train 32N is "just as important" as those limited portions the Defendants selected to preserve before allowing the rest of the surveillance footage to be automatically deleted and overwritten.[15]

398.    Indeed, the NTSB explained that because the Defendants allowed the full surveillance video from the cab of Train 32N to be deleted, "we don't even have what was occurring around the first and second wayside (defect) detectors, much less before that, **all of which is key to investigations**."[16]

399.    As a result of the destruction of this video surveillance footage from the cab of Train 32N – and other acts or omissions which may be revealed throughout the course of investigation and discovery – Defendants have willfully destroyed or interfered with evidence that disrupts Plaintiffs' and the Class Members' ability to prosecute their claims.

400.    Accordingly, Plaintiffs and the Class Members should be awarded damages commensurate with Defendants' spoliation of evidence in an amount to be determined at trial, together with any other appropriate remedies.

## COUNT XVII
## GROSS NEGLIGENCE/WILLFUL AND WANTON CONDUCT
### (On Behalf of All Classes Against All Defendants)

401.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

---

[14] Rowland, Darrel, "Most of Norfolk Southern video leading up to East Palestine derailment is gone" March 26, 2023 (last accessed March 27, 2023).
[15] *Id*.
[16] *Id*. (emphasis added).

402. At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members.

403. Upon information and belief, Defendants were, at all times relevant, aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

404. Upon information and belief, Defendants were, at all times relevant, aware of the considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population.

405. Upon information and belief, Defendants were, at all times relevant, aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

406. Upon information and belief, Defendants were, at all times relevant, aware that at least one railcar was malfunctioning for at least 20 miles before the derailment occurred.

407. Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

    a.    Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

    b.    Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to,

setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

c.     Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

d.     Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

e.     Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

f.     Failing to prevent over-loading the train with too many railcars or materials;

g.     Failing to load the railcars consistent with accepted practice;

h.     Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

i.     Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

j.     Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

k.     Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

l.     Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

m.     Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

n.     Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

o.     Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

p.    Failing to adequately warn those in danger of exposure to hazardous chemicals;

q.    Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

r.    Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

s.    Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

t.    Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

u.    Failing to timely implement such an emergency response plan;

v.    Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs and Class Members injury or harm, as Plaintiffs and Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct;

w.    Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

x.    Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.    Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

z.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

aa.   Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

bb.   Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons in order to avoid injury to;

91

cc.    Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene; and

dd.    Otherwise unreasonably causing injury to Plaintiffs and Class Members in ways further investigation and discovery will reveal.

408.    Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute gross negligence, willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members so as to warrant the imposition of punitive or exemplary damages.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class Members proposed in this Master Consolidated Class Action Complaint, respectfully request that the Court enter judgment in their favor and against each Defendant as follows:

a.    For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Classes;

b.    For damages, including compensatory, punitive, and exemplary damages, in an amount determined just and reasonable;

c.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d.    For prejudgment and post-judgment interest on all amounts awarded;

e.    For injunctive and declaratory relief, as allowed by law, including medical monitoring; and

f.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: May 4, 2023

Respectfully submitted,


 /s/ Seth A. Katz_____
Seth A. Katz (pro hac vice)
BURG SIMPSON ELDREDGE HERSH
& JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
303-792-5595
303-708-0527 (fax)
skatz@burgsimpson.com

M. Elizabeth Graham (pro hac vice)
GRANT & EISENHOFER, P.A.
123 S. Justison Street, 6th Floor
Wilmington, DE 19801
303-622-7000
303-622-7100 (fax)
egraham@gelaw.com

Jayne Conroy (pro hac vice)
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
212-784-6400
212-213-5949 (fax)
jconroy@simmonsfirm.com

Michael Morgan*
MORGAN & MORGAN
20 North Orange Ave., Suite 1600
Orlando, FL 32801
407-420-1414
407-245-3389 (fax)
mmorgan@forthepeople.com


*Plaintiffs Interim Class Counsel and Co-Lead Counsel*

*pro hac vice pending or forthcoming*

**<u>Certificate of Service</u>**

I hereby certify that on May 4, 2023 a copy of foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/ s/ *Seth A. Katz*
Seth A. Katz