## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

---

**IN RE: EAST PALESTINE TRAIN DERAILMENT**

STEVEN MCKAY, SUSAN SCHEUFELE, KAYLA
BAKER, NEELY JACK, DAWN BAUGHMAN,
DAVID ANDERSON, JAMES ROSS, JON LUKE
AFFELTRANGER, ROSEMARY MOZUCH,
CHARLES MOZUCH, GREGORY SWAN, LANCE
BECK, CLARISSA COHAN, ROLLERENA AUTO
SALES LLC, HAROLD FEEZLE, DALQAN
HOLDINGS, LLC, VALLEY VIEW MPH LLC,
COMPETITION & LUXURY VEHICLE CLUB OF
HARLINGTON, LLC, individually and on behalf of all
others similarly situated,

     *Plaintiffs*,

    v.

NORFOLK SOUTHERN CORPORATION and
NORFOLK SOUTHERN RAILWAY COMPANY,

     *Defendants/Third-Party Plaintiffs*,

    v.

OXY VINYLS LP, GATX CORPORATION,
GENERAL AMERICAN MARKS COMPANY,
TRINITY INDUSTRIES LEASING COMPANY,

     *Third-Party Defendants*.

Case No. 4:23-CV-00242-BYP

JUDGE BENITA Y. PEARSON

**THIRD-PARTY COMPLAINT
JURY TRIAL DEMANDED**

---

## NORFOLK SOUTHERN RAILWAY COMPANY AND
## NORFOLK SOUTHERN CORPORATION'S THIRD-PARTY COMPLAINT

Pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Norfolk Southern"), by their undersigned counsel, for their Third-Party Complaint against Third-Party Defendants Oxy Vinyls LP, GATX Corporation, General American Marks Company, and Trinity Industries Leasing Company, allege as follows:

## INTRODUCTION

On the night of February 3, 2023, a Norfolk Southern train, Train 32N, derailed in East Palestine, Ohio. Norfolk Southern is a common carrier, which means it is required by federal law to accept and transport innumerable materials, including chemicals that are used to make everyday products. Train 32N was transporting several railcars containing chemicals, including five railcars containing vinyl chloride. Vinyl chloride is used to make polyvinyl chloride, or PVC, one of the most widely produced synthetic plastics, typically found in clothing, pipes, doors, windows, and residential construction. Norfolk Southern did not manufacture, load, or own the vinyl chloride and other chemicals that Train 32N was carrying on February 3, 2023, nor did it manufacture, lease, or own the railcars that contained the vinyl chloride and other chemicals.

In the United States, railroads are obligated as common carriers under 49 U.S.C. § 11101 to transport hazardous materials, including chemicals. This common-carrier obligation recognizes the public good of open access to rail transportation, which is the safest and most fuel-efficient means for the transport of hazardous materials. The responsibility for safe transport is shared among several interested parties, including the manufacturers of the railcars and safety devices, the owners and lessees of the railcars, the manufacturers and shippers of the material being transported, and the railroad. Each interested party along the way is regulated by a multitude of federal laws, regulations, and industry practices: railcars, railcar components, and hazardous materials tank cars are federally certified to meet physical

- 1 -

and safety requirements; specialized shipping procedures are required for chemicals; and inspections are conducted of the railcars and their safety features, the shipped materials, the tracks, and devices along the tracks.

Despite this regulatory scheme and the rail industry's focus on safety, incidents can occur. On February 3, 2023, Train 32N included a railcar owned by General American Marks Company. A bearing on that railcar failed and the car derailed. In turn, several railcars on Train 32N derailed. Norfolk Southern did not manufacture or own the bearing; did not manufacture, own, or lease the derailed railcar; and did not manufacture, own, or load the contents of that railcar. Nonetheless, Norfolk Southern responded to the derailment quickly and comprehensively, including by working to clean up the released materials, restore local waterways, and provide millions of dollars in assistance to residents and communities. Norfolk Southern is committed to being there for East Palestine and the surrounding communities for the long haul, and nothing in this Third-Party Complaint changes that.

At the same time, through this Third-Party Complaint, Norfolk Southern seeks to ensure that all necessary parties are involved. In the rail industry, a host of regulations and standards govern the design, materials, construction, conversion, and modification of railcars and their components. Shippers of chemicals are required to comply with handling procedures and, under federal hazard communications standards, must provide each transporter of a chemical with safety information. Compliance with these regulations and standards governing railcar equipment, compatibility with the lading, and safe handling are a centerpiece of safe railroad transportation. As set forth below, Third-Party Defendants failed to comply with their obligations, and in bringing this Third-Party Complaint, Norfolk Southern seeks only what is appropriate under the law.

## OVERVIEW OF CLAIMS

1.      Throughout the legal process following the East Palestine train derailment, Norfolk Southern has committed to making things right in the greater East Palestine area. Norfolk Southern has taken significant steps to assist the people of East Palestine and the surrounding area, including by providing millions of dollars in financial assistance to residents and communities. Norfolk Southern is committed to establishing long-term funds to address concerns about health, water quality, and residential property values as part of a final resolution of claims. Norfolk Southern also continues to remediate the derailment site with oversight by the U.S. Environmental Protection Agency, the Ohio Environmental Protection Agency, and other federal, state, and local regulatory agencies. Norfolk Southern has undertaken these steps without any financial assistance from other entities.

2.      This Third-Party Complaint does not change any of those commitments, but rather seeks to ensure that those responsible pay what is appropriate under the law.

3.      Thus, Norfolk Southern brings this Third-Party Complaint for damages under Ohio law for the negligence of Third-Party Defendants that failed to follow federal regulations, rules, and standards governing the compliance and certification of hazardous materials tank cars, failed to ensure that shipping equipment was compatible with the lading, failed to provide accurate hazardous communication information, and/or failed to properly maintain railcars and equipment.

## THE PARTIES

4.      Third-Party Plaintiff Norfolk Southern Railway Company, a Virginia company, is a subsidiary and principal operating company of Norfolk Southern Corporation. Norfolk Southern Railway Company conducted railroad operations in East Palestine, Ohio, on February 3, 2023.

5.      Third-Party Plaintiff Norfolk Southern Corporation, a Virginia corporation, is the parent of Norfolk Southern Railway Company.

6.      Third-Party Defendant Oxy Vinyls LP ("Oxy Vinyls"), a Delaware limited partnership, was at all relevant times the owner of railcars OCPX80235 ("Car 27"[1]), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53"), that derailed on February 3, 2023. Oxy Vinyls, shipping from its La Porte, Texas, facility, was additionally at all relevant times the shipper of TILX402025 ("Car 26"), Car 27, Car 28, GATX95098 ("Car 29"), and Car 53, all of which derailed on February 3, 2023.

7.      Third-Party Defendant GATX Corporation, a New York corporation, was at all relevant times the owner of Car 29.

8.      Third-Party Defendant Trinity Industries Leasing Company, a Delaware company and subsidiary of Trinity Industries Corporation, was at all relevant times the owner of Car 26.

9.      Third-Party Defendant General American Marks Company, a subsidiary of GATX Corporation, a Delaware Corporation, was at all relevant times the owner of railcar GPLX75465 ("Car 23") that derailed on February 3, 2023.

**JURISDICTION**

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367.

**VENUE**

11.      Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Norfolk Southern's claims occurred in the Northern District of Ohio. Additionally, this Third-Party Complaint is brought in an action already pending before this Court.

---

[1]      The car numbers used in this Third-Party Complaint refer to each railcar's position among the train's 149 railcars, which followed the two head-end locomotives. For example, Car 1 would refer to the train's first railcar, which would have been in the third position in the train overall.

## FACTUAL ALLEGATIONS

**A.     Railroad Transportation and Common Carrier Obligations**

12.     Railroads are one of multiple links in the chain of production, transportation, distribution, and consumption that connects American businesses and industries to the global economy.

13.     As common carriers, railroads have a statutory duty to provide "transportation or service on reasonable request" to all shippers. 49 U.S.C. § 11101(a). Railroads may not refuse to provide service because doing so would be inconvenient, unprofitable, or potentially risky.

14.     This common-carrier obligation also imposes a duty on railroads to transport hazardous materials, even when a railroad might prefer not to do so. Under this obligation, railroads have been charged with the safe transportation of materials such as crude oil, spent nuclear fuel, and a range of chemicals, among other hazardous materials.

15.     Railroads take the common-carrier obligation seriously and are the nation's most trusted transporter of hazardous materials. Incident rates stemming from the transport of hazardous materials by rail are at an all-time low, and more than 99.9% of hazardous materials reach their destination without incident. The railroad industry's accident rate is far lower than the accident rate for trucking—according to studies, trucks carrying hazardous materials are involved in nearly ten times the rate of fatal accidents. In addition, transport by rail has a lower environmental impact than trucking. Trains are four times more efficient than trucks and are able to move one ton of freight more than 470 miles on one gallon of diesel fuel.

16.     While railroads are the primary face of hazardous materials transportation, they are only one of many regulated steps in the transportation process. Generally, railroads

are responsible for train movement and track maintenance, but rely considerably on other entities for the safe transportation and delivery of hazardous goods.

17.     For example, railroads—like Norfolk Southern here—typically do not own tank cars that carry hazardous materials. Rather, they rely on tank car manufacturers and owners to ensure tank cars are compliant with federal laws and regulations, national and industry standards, and are capable of safely moving hazardous materials. *See generally* 49 C.F.R. part 180.

18.     Additionally, railroads rely on shippers for the safe loading, packaging, and inspection of hazardous goods. Shippers ensure, and certify to railroads pursuant to federal regulations, that hazardous materials are properly classified as hazardous, loaded into tank cars following specific steps, securely closed, labeled with a placard for outward hazardous identification, and shipped with proper identification and safety materials for the railroad and potential first responders to rely on. *See generally* 49 C.F.R. part 173.

19.     When a tank car carrying hazardous materials is presented to a railroad for shipment, the railroad is responsible for collecting shippers' certifications and other shipping papers, conducting a limited visual inspection of the tank car from the ground, and transporting the hazardous materials in a safe and expeditious manner. *See generally* 49 C.F.R. part 174.

20.     However, railroads are limited in their ability to conduct a detailed inspection or take other action. They cannot, for example, test or certify a tank car's safety-related mechanical functions—as car owners must do under 49 C.F.R. § 180.509 and other provisions—or load the hazardous materials to ensure proper stability and pressure for shipment—as chemical shippers must do under 49 C.F.R. § 173.22. It is the shipper that has the primary obligation to ensure that the railcar and equipment used are compatible with the lading.

21. Ultimately, the safe transportation of hazardous materials depends on the care of each and every company involved in shipment. When accidents occur, as they did on February 3, 2023, each interested party is responsible for doing its part to address the impact.

**B.      The Fort Wayne Rail Line**

22. Norfolk Southern operates a Class I freight railroad that connects twenty-two states and the District of Columbia across the eastern United States.

23. From its headquarters in Atlanta, Georgia, Norfolk Southern manages operations for more than 19,000 route miles. It is the largest intermodal network in the eastern United States.

24. The Fort Wayne rail line traces back to the 1850s, when it was built to connect Chicago, Illinois to Pittsburgh, Pennsylvania. The line runs from southwest to northeast across Indiana, then east and southeast across Ohio to Pittsburgh.

25. Before crossing the border into Pennsylvania, the line runs through East Palestine, Ohio, at approximately milepost fifty.

26. East Palestine is a village in Columbiana County near the Pennsylvania border, approximately twenty miles north of the Ohio River border separating Ohio from West Virginia. East Palestine was founded in 1828. Today, it is home to roughly 4,700 residents.

**C.      The February 3, 2023, Derailment**

27. On February 3, 2023, Train 32N, a Norfolk Southern Railway general merchandise freight train, was traveling eastbound on the Fort Wayne Line of the Keystone Division through northeast Ohio.

28. Train 32N was comprised of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive that was positioned between the 111th and 112th railcars.

29.    The train was assembled in Madison, Illinois, and was destined for Conway, Pennsylvania. On February 1, 2023, in Madison, a qualified mechanical inspector conducted a mechanical inspection and air brake test.

30.    One of Train 32N's cars was Car 23, a hopper car owned by General American Marks Corporation that was carrying polyethylene (plastic) pellets.

31.    Car 23 was received by Norfolk Southern at the interchange in the Terminal Railroad Association ("TRRA") of St. Louis yard in Madison and transferred by Alston & Southern Railway, a subsidiary of Union Pacific Railroad Company. At the TRRA yard, TRRA employees performed and certified a brake test on Car 23.

32.    Modern railcars, like Car 23, have roller bearings that transfer the weight of the car and its lading to the wheels. The bearings allow the axle to rotate under the load, while minimizing the rotational friction. Bearings are capable of overheating and, though uncommon, can cause derailments.

33.    Therefore, Norfolk Southern has equipped its network, including the Fort Wayne Line, with a hot bearing detector ("HBD") system. HBDs are devices that assess the temperature conditions of bearings and provide audible, real-time warnings to train crews and Norfolk Southern's Advance Train Control Wayside Help Desk—a twenty-four-hour alert desk in Atlanta—when bearing temperatures indicate potential overheating.

34.    HBDs provide alerts and alarms to train crews and the Wayside Help Desk when bearings report high temperatures above ambient temperature. Per Norfolk Southern's protocol in effect on February 3, 2023, if a bearing temperature reading exceeded 200°F above ambient temperature, a critical alarm would be triggered that required the train crew to stop the train. Another type of non-critical alarm would be triggered at 170°F above ambient temperature. And an alert created by Norfolk Southern—called a "953 alert"—would be

triggered based on a trending algorithm of train data to alert the Wayside Help Desk that a bearing may be overheating.

35.     Although the Federal Railroad Administration does not require the use of HBDs, at the time of the derailment, Norfolk Southern had HBDs spaced at a maximum of every forty miles. The average spacing of HBDs across Norfolk Southern's network is 13.9 miles.

36.     On the night of February 3, 2023, Norfolk Southern's HBD system on the Fort Wayne Line was in operation. Train 32N passed three HBDs in northeast Ohio in the thirty miles west of East Palestine. Approximately thirty miles before the derailment, near Sebring, Ohio, at milepost 79.8, the first of these three HBDs recorded a bearing on Car 23 at 38°F above ambient temperature. This temperature was within normal range and did not send any alert.

37.     When the train passed the next HBD about ten miles later outside Salem, Ohio, at milepost 69.01, the bearing's recorded temperature was 103°F above ambient temperature, still below the temperature threshold for any alarm. The Salem temperature did cause a 953 alert (not an alarm) to be sent to the Wayside Help Desk, but the temperature reading did not require any action by the Wayside Help Desk, as it was well below the threshold for any alarm.

38.     At the third HBD in East Palestine at milepost 49.81, the detector recorded a temperature of 253°F above ambient temperature, triggering a critical, audible alarm to the train crew. At this time, the Norfolk Southern train crew was traveling forty-seven miles per hour and already slowing the train because of train traffic ahead on the line. Upon receiving the critical alarm, the train engineer increased the brake application to further slow the train to a stop.

39.     During deceleration of the train, at approximately 8:54 p.m., the overheated bearing on Car 23 failed, and the car derailed near milepost 49.5.

40.     Thirty-eight railcars then also derailed from the main track, including the following eight tank cars:

      a.     Car 26, TILX402025, carrying vinyl chloride.

      b.     Car 27, OCPX80235, carrying vinyl chloride.

      c.     Car 28, OCPX80179, carrying vinyl chloride.

      d.     Car 29, GATX95098, carrying vinyl chloride.

      e.     Car 34, SHPX211226, carrying ethylene glycol monobutyl ether.

      f.     Car 36, DOWX73168, carrying 2-ethyl hexyl acrylate.

      g.     Car 48, UTLX205907, carrying butyl acrylates.

      h.     Car 53, OCPX80370, carrying vinyl chloride.

41.     Cars 26, 27, 28, 29, and 53, among others, were subsequently involved in pool fires that lasted until on or about February 6, 2023.

**D.     The Derailed Tank Cars**

42.     Three tank cars carrying chemicals—Cars 34, 36, and 48 (the non-vinyl chloride cars)—were breached in the derailment:

      a.     Car 34 was breached, with damage to the B-end top head of the tank, and its bottom outlet valve fully opened. Car 34 released its load of roughly 25,000 gallons of ethylene glycol monobutyl ether.

      b.     Car 36 had cracks to the B-end top head and B-end bottom head of the tank, and the A-end bottom head was punctured. Car 36 released part of the roughly 29,000 gallons of 2-ethyl hexyl acrylate in its load.

> c.  Car 48's A-end bottom head was punctured, and its manway gaskets burned away. Car 48 released its load of roughly 30,000 gallons of butyl acrylates.

43.  Cars 34, 36, and 48 were all DOT-111 tank cars.

44.  The DOT-111 is an unpressurized general-service tank car with a gross load weight of approximately 286,000 pounds and a capacity of 30,000 or less gallons.

45.  Though one of the most common general-service tank cars, the DOT-111 tank car is a legacy car and subject to a federal phase-out for use transporting flammable liquids. The potential replacement, the DOT-117J, features a thicker tank shell, thermal protection system, and additional features.

46.  Five derailed tank cars were DOT-105J300W specification tank cars carrying vinyl chloride (also referred to as "vinyl chloride monomer" or "VCM"), a chemical that is transported as a compressed liquified gas.

47.  These five tank cars were Cars 26, 27, 28, 29, and 53.

> a.  Car 26 was owned by Trinity Industries Leasing Company and shipped by Oxy Vinyls.

> b.  Cars 27, 28, and 53 were owned and shipped by Oxy Vinyls.

> c.  Car 29 was owned by GATX Corporation and shipped by Oxy Vinyls.

48.  The DOT-105J300W is a standardized tank car with a gross rail load of 263,000 pounds and full water capacity of between 23,570 and 25,742 gallons. By federal regulation, DOT-105 pressure tank cars must have a minimum plate thickness, plate materials that comply with minimum tensile strength, approved venting, loading, and unloading valves, and must be tested in compliance with federal testing procedures. *See* 49 C.F.R. Subpart C, § 179.100 *et seq.*

49.     The five DOT-105J300W tank cars carrying vinyl chloride were manufactured by Trinity Tank Car, Incorporated.

50.     All five tank cars were "fully loaded," carrying approximately 178,000 pounds of vinyl chloride each.

51.     Tank cars carrying pressurized gases are typically outfitted with a reclosing pressure relief device ("PRD"), which is designed to activate automatically to relieve pressure from a tank car when the tank's contents exceed a pressure threshold.

52.     Each of the five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53—were equipped with a PRD designed and manufactured by Midland Manufacturing Corporation.

53.     Tank cars also have a thermal protection system, which consists of a layer of insulated fiber between the tank and outer jacket meant to limit the amount of external heat transferred to the internal tank contents. Federal performance standards for the thermal protection systems aim to protect the internal tank contents from an external pool fire for approximately 100 minutes. After this time, heat will reach the internal tank and the PRD will activate.

54.     Each vinyl chloride tank car was also outfitted with protective housing covers. Cars 27, 28, and 29 were fitted with protective housing covers made of aluminum, and Cars 26 and 53 were fitted with protective housing covers made of steel.

**E.     Vinyl Chloride and Polymerization**

55.     Vinyl chloride is a flammable gas, transported in a pressurized liquid state, that is used to make PVC, a common synthetic plastic polymer.

56.     Vinyl chloride must be stabilized for safe transportation to prevent contact with reactive agents like oxygen. Chemical shippers typically utilize two methods of stabilization: mixing the liquified vinyl chloride with a chemical stabilizer such as phenol;

and/or purging the tank car with nitrogen prior to filling the car so the oxygen concentration is below 200 parts per million.

57.     Oxy Vinyls, which shipped the vinyl chloride in Cars 26, 27, 28, 29, and 53, utilized oxygen purging to stabilize its vinyl chloride.

58.     Vinyl chloride is reactive with various external conditions and materials. Under prolonged exposure to fire or intense heat, liquefied vinyl chloride turns to vapor and expands, which can cause its container to violently rupture and explode. An uncontrolled vinyl chloride explosion can result in the release of hydrogen chloride, phosgene, and carbon monoxide gases, and the resulting rupture can launch tank shrapnel hundreds of feet or more into the surrounding area. This reaction is called a boiling liquid evaporating vapor explosion ("BLEVE").

59.     In the history of chemical shipping, BLEVE incidents have resulted in multiple deaths, mass evacuations, and significant damage to property caused by the violent rupture of the tank car.

60.     Another effect of heating vinyl chloride is polymerization, a chemical reaction that turns vinyl chloride into a solid-state polymer. The industry literature on vinyl chloride for railroad transportation is nearly uniform in stating that vinyl chloride is capable of polymerizing at heightened temperatures caused by fire or radiant heat. *See, e.g.*, The Chlorine Institute & The Vinyl Institute, *Pamphlet 171, Vinyl Chloride Monomer (VCM) Tank Car & Cargo Tank Handling Manual*, 4-5 (1st ed. July 2018) ("Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM: air, sunlight, excessive heat, oxidizers, catalytic metals such as copper and aluminum and their alloys, and certain catalytic impurities."); Richard P. Pohanish, *Sittig's Handbook of Toxic and Hazardous Chemical and Carcinogens*, 2700 (6th ed. 2012) ("Polymerizes in air, sunlight, heat, and on contact with a catalyst, strong

oxidizers, and metals, such as aluminum and copper, unless stabilized by inhibitors, such as phenol.").

61.     Additionally, polymerization can accelerate the risks of a BLEVE by blocking pressure release devices that are intended to allow the release of gas pressure when it is higher than the tank car is designed to contain.

62.     Though Oxy Vinyls is now discounting the risk that stabilized vinyl chloride can polymerize due to heating alone, the chemical data sheet that Oxy Vinyls provided to Norfolk Southern warns of the polymerization and explosion risks of vinyl chloride due to excessive heating.

63.     Chemical manufacturers are required by federal regulation to provide these chemical data sheets, called a Safety Data Sheet ("SDS"), for each chemical they make. *See* 29 C.F.R. § 1920.1200(g). The SDS must "accurately reflect[] the scientific evidence used in making the hazard classification," and must be continually updated. *Id.* § 1920.1200(g)(5), (6). The SDS must include, among other things, information covering handling and storage, accidental release measures, and the chemical's stability and reactivity, including whether the chemical will react or polymerize in various conditions. *Id.* § 1920.1200(g)(2).

64.     The vinyl chloride SDS that Oxy Vinyls provided to Norfolk Southern described the above risks, noting that vinyl chloride "MAY MASS EXPLODE IN FIRE. EXTREMELY FLAMMABLE GAS. CONTAINS GAS UNDER PRESSURE, MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR." *See* Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, 2 (Nov. 30, 2020).

65.     Further, Oxy Vinyls' SDS warned that vinyl chloride "[r]equires stabilizer to prevent potential dangerous polymerization." *Id.* The SDS warns about hazardous polymerization and notes: "*Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM*: Air,

Sunlight, Excessive heat, Oxidizers, Catalytic metals, such as *copper*, *aluminum* and their alloys and certain catalytic impurities. Avoid *elevated temperatures*, oxidizing agents, oxides of nitrogen, oxygen, peroxides, other polymerization catalysts/initiators, air and sunlight." *Id.* at 10 (emphasis added).

66. The SDS also warns of incompatible substances, listing "aluminum" and "aluminum alloys," and noting: "Explosive or violent polymerization can occur when exposed to air, sunlight, or excessive heat if not properly stabilized. Polymerizes exothermically in the presence of light, air, oxygen, or catalyst. Reacts with the following incompatible materials and create a strong exothermic reaction: oxygen, moisture, polymerization additives, copper, aluminum…." *Id.*

67. In the case of a railcar fire, the SDS warns to "[l]et burn unless leak can be stopped immediately." *Id.* at 6.

68. Oxy Vinyls has acknowledged that its SDS for vinyl chloride contained this information.

69. The information on vinyl chloride in Oxy Vinyls' SDS also matches Norfolk Southern's own emergency safety guidance for vinyl chloride, which notes that the chemical "[p]olymerizes in air, sunlight, or heat unless stabilized by inhibitors such as phenol"; "[r]eacts with copper, aluminum…." Norfolk Southern Corp., *Emergency Safety Guide, Vinyl Chloride Division 2.1* (Flammable Gas), 1 (Sept. 2006). The guidance also warns that exposure of vinyl chloride containers "to fire or heat may result in violent polymerization" and that "[e]xcessive heat, light, or air may cause spontaneous violent polymerization resulting in container rupture." *Id.* at 2.

70. Additionally, the U.S. Department of Transportation's Emergency Response Guidebook ("ERG 2020 Guidebook"), which is intended for use by first responders during hazardous materials incidents, designates vinyl chloride as a chemical capable of explosively

polymerizing when heated or involved in fire. This guidance defines substances as capable

for polymerization when it "may polymerize violently under high temperature conditions or

contamination with other products during a transportation incident," as well as where there is

a "strong potential for polymerization in the absence of an inhibitor due to depletion of this

inhibitor caused by accident conditions." *See* U.S. Dep't of Transp., Pipeline and Hazardous

Materials Safety Admin., *2020 Emergency Response Guidebook*, 381 (2020).

71.     In line with this definition, the bills of lading provided by Oxy Vinyls for each

of the vinyl chloride shipments state that "substances designated with a (P) may polymerize

explosively when heated or involved in a fire." This language is taken directly from and

references the ERG 2020 Guidebook, which designates "vinyl chloride, stabilized" with a

"P." *Id.* at 31, 168.

**F.      The Derailment Response**

72.     On February 3, 2023, at 8:56 p.m. local time, minutes after the critical alarm

sounded in the engineer cabin, the train crew on Train 32N contacted local dispatchers and

the Norfolk Southern Wayside Help Desk regarding an emergency and possible derailment.

73.     Local first responders arrived on scene by 9:00 p.m. local time and began

responding to small spreading pool fires. Within the hour, East Palestine dispatch requested

hazardous material ("hazmat") support, additional responders, and emergency responders

from Columbiana County, Ohio, and Beaver County, Pennsylvania.

74.     By midnight, a Unified Command team was formed comprised of local first

responders and personnel from the Ohio Environmental Protection Agency, Pennsylvania

Department of Environmental Protection, Norfolk Southern Hazmat Team, Pennsylvania

State Police, Beaver County Hazmat Response Team, U.S. Environmental Protection

Agency, Ohio Emergency Management Agency, and Ohio and Pennsylvania state officials.

75.     In the initial hours after the derailment, local firefighters responded to small spreading fires and the Unified Command team monitored the derailed tank cars. Over time, the fires grew into hot, active fires that surrounded the derailed railcars.

76.     Shortly after midnight, on February 4, 2023, the PRDs on the vinyl chloride tank cars began activating and releasing pressure in a cycle of thirty seconds on (releasing) and two minutes off.

77.     Because of the surrounding pool fires, the flammable gas venting from the PRDs ignited, which upon information and belief began to melt part or all of the tank car liquid transfer valves and fittings.

78.     Midland Manufacturing Corporation, which manufactured the PRDs, only tests PRDs with air. They are not tested to ensure their ability to withstand flame, heat, or corrosion from materials that can be expelled when the PRD activates.

79.     The PRDs continued to vent through the early morning hours of February 4, 2023, cycling between venting and pausing for approximately twelve hours.

80.     As the PRDs continued to vent, on-site responders, which included hazmat and tank derailment specialists, began assessing the damage to the tank cars to plan for next steps.

81.     Following a tank car derailment and fire, responders typically have four options: First, responders can re-rail the tank car and move it to the next destination if they determine there is no tank damage. Second, if the tank car is damaged and cannot be safely re-railed and moved, responders can transfer the product from the tank car using the transfer valves. This method requires working valves and access to the cars for a prolonged period of time. Third, responders can transfer the product via "hot tapping," a procedure that involves welding a transfer valve onto the tank, drilling a hole in the tank, and transferring the remaining liquid product through the hole. This third option carries significant risks, because

the welder might accidentally weld and drill into a gaseous space, rather than into the liquid; this can ignite the tank car and cause a BLEVE. Further, if the tank car's structural integrity is compromised, welding can cause cracking in the still-pressurized tank car, which can also cause a BLEVE. Hot tapping also requires prolonged exposure to a tank car that may be experiencing increased pressurization and BLEVE conditions. The fourth option, and the last resort, is to conduct a controlled "vent and burn." During a vent and burn, responders place a series of explosive charges on the tank cars, which detonate and puncture holes at the top and bottom of the car to burn off pressurized gas (from the top) and expel liquid (from the bottom) in a controlled manner. Although a last resort option, a vent and burn is the safest option when the other strategies are infeasible or carry too high a risk of loss of life.

82.     After venting vinyl chloride for approximately twelve hours, the PRDs stopped venting in the early afternoon of Saturday, February 4, 2023. By that same afternoon, the pool fires at the derailment site began to die down.

83.     At that point, responders sent in two "assess and entry" teams to the east and west ends of the derailment site to monitor the potential pressure conditions of the vinyl chloride tank cars. Because of the damage to the tank cars, responders concluded they were not able to re-rail the tank cars. They further determined that product transfer was not viable because the seals and gaskets within the transfer valves were damaged by heat. Therefore, responders began assessing the cars to implement a hot-tap option.

84.     As responders were monitoring that afternoon, the PRD on Car 28 activated again and began to continuously vent gas for approximately 70 minutes. The pressure relief was described by a hazmat specialist as akin to a violent and sudden roar of fury following two hours of calm. It scared responders with decades of experience handling hazmat derailment responses. Specifically, responders were concerned that pressure and heat were building inside the Car 28 tank, even though the pool fire under Car 28 and surrounding pool

fires had extinguished hours ago, indicating that the rising heat was from an internal process and not the external fires.

85.     The next day, on February 5, 2023, responders went into the derailment zone to assess the vinyl chloride tank cars, where they found that the tank shell on Car 53 was exposed due to jacket damage. They were able to get alongside the tank car, but did not hear any audible hiss from the protective housing, liquid lines, vapor lines, or PRD, and reported a negative reading on their meter testing for volatile organic compounds. This indicated to responders that the tank car was not leaking or releasing any gas.

86.     Responders also touched the tank shell inside the jacket of Car 53 and found that the tank was hot, even though surrounding pool fires had died down hours before. Using a thermal imaging camera, responders recorded a temperature of 135°F through a small opening in the jacket, followed by a temperature of 138°F one hour later. Again, responders became concerned that the tank temperature and pressure were rising without external stimulus.

87.     Responders attempted to record the temperatures on the other vinyl chloride tank cars. Where possible, assess and entry teams were able to record temperatures of around 65°F. However, because responders were only able to obtain temperature readings with the thermal imaging cameras through small holes in the jacket without verifying the readings were measuring the temperature of the tank itself—as opposed to the outer jacket— responders discounted the accuracy of these temperature readings.

88.     The elevated temperature on Car 53 and sudden extended venting from Car 28 without a pool fire underneath it caused responders to become concerned about the potential for a catastrophic explosion.

89.     According to chemical industry groups, the temperature of a tank of vinyl chloride measuring "above ambient temperature may imply that the [vinyl chloride] is

polymerizing inside the tank car." The Chlorine Institute & The Vinyl Institute, *Pamphlet 171, Vinyl Chloride Monomer (VCM) Tank Car & Cargo Tank Handling Manual*, at 36. Furthermore, vinyl chloride polymerization is a form of living polymerization and is an exothermic (heat-releasing) process. The rate of polymerization can accelerate thereby generating more heat in a closed-loop system that cycles and can become uncontrollable. Indeed, a key component of controlled vinyl chloride polymerization in the production of PVC is the *removal* of heat through effective thermal management of the process.

90.     The pause in the PRD venting and the inspection of Car 53 indicated to Unified Command that polymerization may have blocked the PRDs on Car 28 and the other vinyl chloride tank cars. Based on guidance from Oxy Vinyls, responders understood that a tank car temperature of 185°F could lead to runaway polymerization and explosion.

91.     Due to the re-activation of the PRD on Car 28 and the unknown liquid levels in the remaining tank cars, hot tapping the cars was considered too high a risk to the welders, who could inadvertently ignite the tank car if they struck gas, would be unable to transfer the product if the tank contained polymer, and could risk reigniting the pool fires throughout the derailment site.

92.     Responders spoke to the on-site representative of Oxy Vinyls—the vinyl chloride manufacturer—who commented that the rising temperature could indicate that polymerization was occurring. Responders also spoke with a support team operating out of the Oxy Vinyls corporate office in Dallas, Texas, which explained its belief that there was a low probability of polymerization and that the PRD was likely responding to other conditions or had a mechanical malfunction.

93.     On a subsequent call, an Oxy Vinyls senior vice president of manufacturing who was not on the scene stated that polymerization was not occurring. The Dallas team also concluded that at least three of the vinyl chloride tank cars were nearly empty. This

determination was made based in part on temperature readings that responders considered inaccurate.

94.     Responders attempted to collect further tank car measurements. While they continued collecting potential readings through the small holes in the jackets, responders were unable to collect internal tank pressure measurements due to the compromised valve assemblies and risk of placing personnel alongside dangerously unstable tank cars.

95.     On the evening of February 5, 2023, responders reported to Unified Command that the temperature trends and dangerous conditions for hot tapping led hazmat specialists to believe that a vent and burn would be the safest option. Responders were also concerned about polymerization, although polymerization was not the only reason that a vent and burn was considered the safest option.

96.     On the morning of February 6, 2023, Unified Command met to discuss strategies to relieve the pressure in the five vinyl chloride tanks and avoid a catastrophic uncontrolled explosion. By approximately noon, Unified Command agreed that a vent and burn of all five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53—should occur. As noted, Unified Command included the U.S. Environmental Protection Agency, National Guard, Ohio state agencies, Pennsylvania state agencies, and local first responders.

97.     At approximately 4:37 p.m. local time on February 6, 2023, Unified Command provided by radio the official green light to execute the vent and burn, and the response team detonated controlled explosives on the five vinyl chloride tank cars—Cars 26, 27, 28, 29, and 53.

98.     The released vinyl chloride burned through the night of February 6, 2023.

99.     During the vent and burn, video footage reportedly identified pure polymer, indicating a polymerization reaction, releasing from two of the vinyl chloride tank cars.

100.    Additionally, the PRDs on Car 28—on which the PRD re-activated—and Car 53—which had a recorded temperature of 138°F—were found to be corroded. According to the PRD manufacturer, Midland Manufacturing Corporation, these PRDs are not tested for fire conditions.

101.    The vent and burn was executed effectively and resulted in no casualties.

**G.    Railroad Regulation and Industry Standards**

102.    The railroad industry is regulated through a combination of federal laws, regulations, and industry standards set by the Association of American Railroads ("AAR"). Norfolk Southern, as a Class I freight railroad, is a member of the AAR.

103.    Rail transportation of hazardous materials is regulated under Title 49, subtitle B, chapter 1, subpart C. These regulations divide obligations for hazardous materials transportation among shippers, railroads, and car owners. *See, e.g.*, 49 C.F.R. §§ 173 (detailing shipper responsibilities), 174 (detailing railroad responsibilities), 180 (detailing car owner responsibilities).

104.    Alongside federal regulations, the AAR publishes rules and standards for the design, operation, maintenance, inspection, and repair of railcars and their components. Among these are the Manual of Standards and Recommended Practices ("MSRP") and the Interchange Rules. These rules set the standards for the movement of railcars and the safety and interoperability of railcar equipment. All freight railroads, interchange freight car owners, and repair agents must subscribe to the Interchange Rules.

105.    The Interchange Rules also divide and assign responsibilities for maintenance and inspection in rail transportation between car owners, railroads, and other entities. For example, the Interchange Rules establish that car owners are responsible for and chargeable for repairs to their railcars necessitated by wear and tear.

### H. Car 23 Was Improperly Maintained

106. Car 23, which derailed first, was a hopper car owned by General American Marks Company.

107. The bearing on Car 23 was manufactured by the Timken Company. Timken's Bearing Install Manual states that "[c]ars, coaches, and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces." Timken, *Installing and Maintaining Timken AP and AP-2 Bearings, Diesel Locomotive, Passenger and Freight Car Applications*, 25 (2015).

108. Industry practice is to prevent railcars from sitting stationary for long periods because grease separation may occur, which reduces the amount of lubrication around the bearings and may impact functionality.

109. Car 23 operated out of the Gulf States, with shipments from New Orleans and other locations along the Gulf Coast.

110. According to car movement data, Car 23 had few shipments and low mileage over the prior decade.

111. Upon information and belief, Car 23 was twice stationary for longer than six months: first for 565 days ending in August 2018 and again for 206 days ending in May 2019.

112. When a bearing sits for extended periods of time, especially in heat, rain, or extreme weather, the grease in the bearing can separate and degrade the bearing. Water damage—such as that caused by sitting in heavy rain, hurricanes, or flooding—can cause friction and quickly degrade the bearing.

113. Under the AAR Interchange Rules, car owners must inspect and, if necessary, repair or replace railcars or components at any time after the car is partially or fully submerged in water.

114.    Due to the construction of the bearings and where they are installed inside the wheelset, the full condition of the bearings cannot be inspected by the railroad without disassembling the bearings from the wheelset.

## I.    Third-Party Defendant Railcar Owners Are Responsible for the Compliance and Maintenance of Railcars Carrying Chemicals

115.    Railcar owners direct the workings of, manage, and conduct the affairs of rolling stock, including tank cars carrying hazardous materials.

116.    Railcar owners are responsible for a variety of compliance and maintenance measures for tank cars that carry hazardous materials. For example, railcar owners are responsible for the certification, qualification, compliance, and maintenance of railcars and components, such as the thermal protection system, PRDs, and valves. *See, e.g.*, 49 C.F.R. §§ 180.501 (general applicability), 180.507 (qualification requirements), 180.509 (inspection requirements), 180.517 (reporting requirements).

117.    Under the AAR Interchange Rules, railcar manufacturers must have the construction and design of railcars used for hazardous materials transportation approved. The valves, fittings, PRDs, and other car components must also receive standalone approval.

118.    This industry rule is incorporated by 49 C.F.R. § 179.3, pursuant to which the United States Department of Transportation assigns to AAR the authority to approve design, materials, construction, conversion, and modification of tank cars in accordance with the AAR MSRP Specification for Tank Cars and the federal regulatory specifications.

119.    Any changes to the tank car design or components must also be approved. *See* 49 C.F.R. § 179.6. This additional certification is required to ensure that changes to tank cars do not render them unsafe for transportation of hazardous materials.

120.    Here, there were multiple discrepancies, identified by the Federal Railroad Administration, between the approved documents and the actual physical characteristics of the vinyl chloride tank cars on Train 32N.

    a.     Trinity Industries Leasing Company's Car 26 has discrepancies between its AAR 4-2 certificate of construction and the tank car's actual characteristics.

    b.     For GATX Corporation's Car 29, the tank car valve was replaced with a Midland 720 valve without approval. Additionally, this Car's PRD, which had a 225 psi start, was replaced without approval with a PRD with a 247.5 psi start. Finally, according to the Federal Railroad Administration, Car 29 was never approved for vinyl chloride service, which has a special regulatory provision.

    c.     All three vinyl chloride tank cars owned by Oxy Vinyls—Cars 27, 28, and 53—have missing or incorrect information on their AAR Form 4-2. For example, Car 27 has modifications that were not properly documented or approved, including changes to two component parts that modified the material from carbon steel to stainless steel.

121.    Following the approved construction of a tank car, the builder must furnish a Certificate of Construction to the tank car owner certifying that the tank, equipment, and car fully conform to the regulations. *See* 49 C.F.R. § 179.5(a).

122.    The owners of tank cars carrying hazardous materials are required to continue this certification process. Tank cars marketed as a "DOT" specification—like the DOT-111 or DOT-105—must meet all regulatory requirements for tank car specifications, and each owner "must retain the certificate of construction (AAR Form 4-2) and related papers certifying that the manufacture of the specification tank car identified in the documents is in accordance with the applicable specification." 49 C.F.R. §§ 180.507, 180.517.

123.    Additionally, DOT specification tank car owners are responsible for the inspection, testing, and requalification of the tank car's structural integrity, thickness, internal

coating or lining, leakage under pressure, and service equipment like PRDs, at set temporal intervals. *See* 49 C.F.R. § 180.509 *et seq.*

124.    These areas of responsibility—the certification, qualification, compliance, and maintenance—all dictate tank car operations related to the transport of hazardous materials and are the sole domain of car owners.

125.    Railroads have discrete inspection duties and rely on the work of tank car owners to ensure that compliant tank cars are used for safe transport. For example, the railroads are required by federal regulation to inspect each railcar "visually" and "at ground level," but do not climb up on tank cars to inspect PRDs. 49 C.F.R. §§ 174.9(a), 174.9(b). While railroads are required to receive shippers' certifications and shipping papers for hazardous materials shipment, railroads are not responsible for the certified design, building, conversion, testing, modification, and requalification of tank cars.

126.    It is this certified design, building, conversion, testing, modification, and requalification of hazardous materials tank cars that ensures that tank cars containing flammable chemicals can be safely transported.

**J.    Third-Party Defendant Shipper is Responsible for the Compliance and Maintenance of Railcars**

127.    Chemical shippers also direct the workings of, manage, and conduct the affairs of rolling stock, including tank cars carrying chemicals.

128.    Chemical shippers control tank cars carrying chemicals by exercising control over the cars' environmental compliance in a manner that directly prevents—or permits—a release of hazardous substances.

129.    Shippers are responsible for a variety of compliance and maintenance measures for hazardous tank cars. *See generally* 49 C.F.R. § 173.1 *et seq.*

130.    For example, shippers are responsible for the proper loading and labeling of the tank car, which includes federal certification of the proper packaging of the commodity and placement of tank car placards. *See* 49 C.F.R. §§ 173.31, 172.508.

131.    For vinyl chloride, shippers must ensure it is properly mixed with inhibitors or otherwise stabilized to prevent negative effects like violent polymerization. Shippers use a chemical inhibitor to prevent polymerization and/or purge the tank of oxygen with nitrogen prior to filling the tank so oxygen levels are below 200 parts per million.

132.    Oxy Vinyls has stated that it used oxygen purging to stabilize the vinyl chloride for shipment.

133.    As discussed, by federal regulation, chemical manufacturers and importers must also develop an SDS for each hazardous chemical they produce or import that identifies, among other items, accidental release measures, stability and reactivity, and fire-fighting measures. *See* 29 C.F.R. § 1910.1200(g).

134.    The vinyl chloride SDS prepared by Oxy Vinyls and provided to Norfolk Southern warned of the risks of polymerization, noting in twelve instances some variation of the warning that vinyl chloride "MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR" if the vinyl chloride is exposed to "air, sunlight, excessive heat" and/or "Catalytic metals, such as copper, aluminum, and their alloys." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet* at 2, 10.

135.    Upon information and belief, in the aftermath of the derailment and vent and burn, aluminum and copper were found in the vinyl chloride tank cars:

    a.    Car 26 had aluminum found in samples of the interior surface of the manway nozzle and aluminum coating on the PRD springs.

    b.    Car 27, which had been fitted with a protective housing cover made of aluminum that was missing or destroyed, had aluminum in the exterior

surface of the PRD spring in the top guide discharge port of the PRD. Additionally, Car 27 had an aluminum angle valve handwheel, and melted aluminum was found around the base of one of the liquid discharge valves.

    c.    Car 28 had aluminum angle valve handwheels and had been fitted with a protective housing cover made of aluminum that was missing or destroyed. Further, aluminum was found in a sample taken from the interior surface of the manway nozzle, top fitting of the protective housing, and around the base of both liquid valves.

    d.    Car 29, which had been fitted with a protective housing cover made of aluminum that was missing or destroyed, had aluminum found in exterior debris of the protective housing and housing cover on the tank car, as well as a residue sample containing copper inside the tank next to a vent and burn breaching hole. Further, Car 29's angle valves were covered in solidified melted aluminum after the derailment, and its angle valve handwheels were missing.

    e.    Car 53 had angle valve handwheels constructed from aluminum.

136.    By federal regulation, chemical shippers like Oxy Vinyls are also responsible for their chemicals' shipping certification. Shippers may not offer a hazardous material for transportation without a determination "that the tank car is in proper condition and safe for transportation," which requires at minimum a visual inspection of the tank, thermal protection system, valves, and PRDs. 49 C.F.R. § 173.31(d).

137.    Shippers cannot offer a hazardous material for transportation in a tank car unless that tank car meets the applicable specification and packaging requirements, including the approved certificate of construction. 49 C.F.R. § 173.31(a). Shippers must ensure that

hazardous materials are in containers that have been manufactured, assembled, and marked in accordance with various regulations, including AAR tank construction requirements under 49 C.F.R. part 179, 49 C.F.R. § 173.22.

138.   As described above, Oxy Vinyls offered the five vinyl chloride tank cars for shipment without complete approvals and certifications.

139.   Ultimately, it is the shipper that is responsible for ensuring that the equipment used is compatible with the lading and can safely contain the commodity.

140.   While railroads like Norfolk Southern must also inspect the tank cars from the ground, ensure proper shipping papers, and perform other duties related to rail movement, railroads rely on the accurate federal approvals and certifications of shippers that the equipment and lading are compatible.

141.   When an incident occurs, as it did on February 3, 2023, railroads like Norfolk Southern rely on the accurate representations of shippers during the response.

**K.  Norfolk Southern Has Incurred Response Costs Before and Pursuant to an EPA Unilateral Administrative Order**

142.   Following the derailment, the U.S. Environmental Protection Agency ("EPA") mobilized to the derailment site in East Palestine, Ohio, along with various federal, state, and local agencies.

143.   On February 21, 2023, EPA determined that the derailment site posed an imminent and substantial threat to human health and the environment and issued a Unilateral Administrative Order to Norfolk Southern under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

144.   EPA's Unilateral Administrative Order required Norfolk Southern to implement specific response activities, and incur all associated costs, related to air monitoring and sampling, the identification and delineation of contamination, the containment and remediation of contaminated areas, the removal and disposal of hazardous substances, and

additional actions needed to prevent imminent and substantial endangerment to public health or the environment.

145.    Norfolk Southern has incurred and will incur substantial response costs related to the release of substances resulting from the derailment, pool fires, vent and burn, and firefighting efforts.

146.    In addition, by separate actions in the Northern District of Ohio (Nos. 23-CV-517, 23-CV-675) (Adams, J.), the United States and State of Ohio have brought claims under federal and state law seeking reimbursement of their response costs.

147.    Norfolk Southern has paid millions of dollars and will continue to pay for the comprehensive environmental response in East Palestine. Norfolk Southern is committed to making it right in East Palestine and the surrounding communities. It brings this action to ensure that all necessary parties are involved.

## CLAIMS FOR RELIEF

### COUNT ONE

**Negligence**
**(Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company)**

148.    The allegations in paragraphs 1 through 147 above are incorporated by reference.

149.    In owning and maintaining rolling stock transported by Norfolk Southern, Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company were obligated to exercise care for the safety of individuals and entities whose persons or property were within reasonable proximity to the rail line, Norfolk Southern's employees and its property, and the environment.

150.    In ensuring the certified design, building, conversion, testing, modification, and requalification of hazardous materials tank cars that ensures that tank cars containing chemicals can be safely transported, Oxy Vinyls, GATX Corporation, and Trinity Industries

Leasing Company were obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly situated railcar owner would use under the same or similar circumstances.

151.     Oxy Vinyls, GATX Corporation, and Trinity Industries Leasing Company failed to exercise ordinary care by failing to properly certify the design, building, conversion, testing, modification, and requalification of hazardous materials tank cars and their components. By federal regulation, car owners must receive approval for the car construction and any design or component change. 49 C.F.R. §§ 179.3, 179.6. Car owners must continually certify this approval. 49 C.F.R. §§ 180.507, 180.517.

152.     Each car carrying vinyl chloride had discrepancies between its federal certified and approved certificate of construction and the tank car's actual characteristics:

a.     Trinity Industries Leasing Company's Car 26 has discrepancies between its AAR 4-2 certificate of construction and the tank car's actual characteristics.

b.     For GATX Corporation's Car 29, the tank car valve was replaced with a Midland 720 valve without approval. Additionally, this Car's PRD was replaced from a PRD with a 125 psi start to a PRD with a 247.5 psi start without approval. Finally, Car 29 was never approved for vinyl chloride service, which has a special regulatory provision.

c.     All three vinyl chloride tank cars owned by Oxy Vinyls—Cars 27, 28, and 53—have missing or incorrect information on their AAR form 4-2. For example, Car 27 has modifications that were not properly documented or approved, including changes to two component parts that modified the material from stainless steel to carbon steel.

153. The damage and release of hazardous materials from Cars 26, 27, 28, 29, and 53 were, in part, the result of Third-Party Defendants' failure to follow federal regulations and industry rules on the design, build, testing, modification, and qualification of hazardous materials tank cars and their components.

154. As a direct and proximate result of Third-Party Defendants' negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

**COUNT TWO**

**Negligence**
**(Oxy Vinyls)**

155. The allegations in paragraphs 1 through 147 above are incorporated by reference.

156. In undertaking to ship vinyl chloride by rail, Oxy Vinyls was obligated to exercise care for the safety of Norfolk Southern's employees, its property, those individuals and entities whose persons or property were within reasonable proximity to the rail lines, and the environment.

157. By shipping vinyl chloride, Oxy Vinyls was obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly chemical shipper would use under the same or similar circumstances.

158. As a shipper, Oxy Vinyls was required to ensure that the equipment used in shipping was compatible with the lading and could contain vinyl chloride.

159. By regulation, Oxy Vinyls was required to certify that the tank cars met the applicable specification and packaging requirements, including the approved certificate of construction, and certify that the tank cars were manufactured, assembled, and marked in accordance with AAR tank construction requirements. 49 C.F.R. §§ 173.22, 173.31(a).

160.    Consistent with these requirements, Oxy Vinyls certified that its tank cars and components were suitable for vinyl chloride transportation.

161.    However, the Federal Railroad Administration found that all five tank cars used to ship vinyl chloride had discrepancies between the AAR 4-2 certificate of construction and the cars' actual characteristics, including non-approved changes to the PRDs, valves, and component parts, and raised questions over whether a tank car was even approved for vinyl chloride transportation.

162.    As described above, Oxy Vinyls failed to exercise ordinary care by failing to properly certify the design, build, testing, modification, and qualification of hazardous materials tank cars and their components used for vinyl chloride transportation.

163.    Oxy Vinyls was also required to prepare and submit an SDS for vinyl chloride. 29 C.F.R. § 1920.1200(g).

164.    The SDS was required to "accurately reflect[] the scientific evidence used in making the hazard classification," with continual, ongoing updates. *Id.* §§ 1920.1200(g)(5), 1920.1200(g)(6).

165.    Oxy Vinyls submitted an SDS to Norfolk Southern explicitly stating that "Exposure to the following conditions or mixtures with the following elements and materials can cause explosive or violent polymerization of VCM: Air, Sunlight, Excessive heat, Oxidizers, Catalytic metals, such as *copper*, *aluminum* and their alloys and certain catalytic impurities." Oxy Vinyls, *Vinyl Chloride (Monomer) Safety Data Sheet*, at 10 (emphasis added).

166.    The SDS Oxy Vinyls submitted to Norfolk Southern also warned repeatedly— twelve times in various combinations—that vinyl chloride "MAY EXPLODE IF HEATED" and that POLYMERIZATION CAN OCCUR." *Id.* at 2.

167.    Oxy Vinyls shipped vinyl chloride in tank cars with aluminum components in the pressure release devices and in other components on each of the vinyl chloride tank cars. For example, Cars 26, 27, 28, and 29 contained aluminum in the PRD springs, PRD surface, or had aluminum used in various valves on the tank car. When the PRDs activated—releasing flammable vinyl chloride that ignited—the vinyl chloride mixed with "air, sunlight" and "aluminum."

168.    At the scene of the derailment, Oxy Vinyls representatives made conflicting statements regarding the ability of vinyl chloride to polymerize, asking first responders to ignore the all-caps text in its own SDS. At various times during the derailment response, Oxy Vinyls representatives provided inconsistent warnings that polymerization was possible, was not occurring, and could not occur, each with varying degrees of certainty.

169.    Finally, Oxy Vinyls representatives have stated that polymerization was not possible under the derailment conditions and that "stabilized" vinyl chloride—the same vinyl chloride that had been exposed to extreme conditions for nearly two full days—is incapable of polymerizing under "normal" conditions.

170.    Oxy Vinyls ignored its own federally required SDS on the safe handling of vinyl chloride and improperly certified the shipping of its vinyl chloride in conditions contrasting with its own guidance.

171.    Further, Oxy Vinyls then ignored its own federally required warnings on the safe handling of vinyl chloride and provided ineffectual and negligent warnings to Norfolk Southern and first responders.

172.    The vent and burn and release of hazardous vinyl chloride was the direct result of the improper shipping containers and Oxy Vinyls' failure to follow federal regulations and its own SDS.

173. In the alternative, if aluminum components can be safely used with vinyl chloride, then Oxy Vinyls' SDS did not "accurately reflect the scientific evidence," and Oxy Vinyls failed to furnish a correct document for hazard communications.

174. Similarly, if vinyl chloride is not capable of polymerization in circumstances like those present in East Palestine, then Oxy Vinyls' SDS did not "accurately reflect the scientific evidence," and Oxy Vinyls furnished a negligently prepared SDS.

175. Oxy Vinyls violated federal regulations and its duties by failing to ensure that its shipping equipment was compatible with its lading.

176. In addition, and/or in the alternative, as Oxy Vinyls now claims, it violated federal regulations by providing a negligently prepared SDS.

177. As a direct and proximate result of Oxy Vinyls' negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

### COUNT THREE

**Negligence**
**(General American Marks Company and GATX Corporation)**

178. The allegations in paragraphs 1 through 147 above are incorporated by reference.

179. As the railcar owner responsible for the maintenance of Car 23, General American Marks Company, a subsidiary of GATX Corporation, was responsible for ensuring that Car 23 moved at least one car length every six months, yet, upon information and belief, Car 23 was twice stationary for longer than six months.

180. In owning and maintaining rolling stock ultimately transported by Norfolk Southern, General American Marks Company was obligated to exercise care for the safety of Norfolk Southern's employees, its property, those individuals and entities whose persons or property were within reasonable proximity to the rail lines, and the environment.

181.    In ensuring the certification, qualification, compliance, and maintenance of railcars and their components, General American Marks Company was obligated to exercise reasonable and ordinary care, and/or that degree of care that a similarly situated railcar owner would use under the same or similar circumstances.

182.    Upon information and belief, General American Marks Company failed to exercise ordinary care by, among other things, failing to properly maintain Car 23's bearings by leaving the car stationary for periods in excess of six months; failing to inspect the car's bearings after the car remained stationary for periods in excess of six months; failing to advise carriers including Norfolk Southern that the car was not inspected after remaining stationary for periods in excess of six months; and allowing and placing Car 23 into rail service without inspecting its bearings after remaining stationary for periods in excess of six months.

183.    Upon information and belief, leaving Car 23 stationary in excess of six months damaged the lubrication of the bearing, leading to the degradation of the bearing and the ultimate failure of the bearing. Car 23 and several other railcars in Train 32N subsequently derailed.

184.    Upon information and belief, the bearing failure on Car 23 was caused by the negative impacts on the bearing and/or its functionality stemming from General American Marks Company's failure to properly maintain its railcar.

185.    Upon information and belief, GATX Corporation exercises substantial direct control over the operations of its subsidiary General American Marks Company, including with respect to railcar maintenance.

186.    As a direct and proximate result of General American Marks Company and GATX Corporation's negligence, Norfolk Southern has been damaged by incurring costs, expenses, and damages identified herein and to be proved at trial.

**COUNT FOUR**

**Ohio Joint & Several Liability and Contribution**
**(All Third-Party Defendants)**

187.    The allegations in paragraphs 1 through 147 above are incorporated by

reference.

188.    If Plaintiffs establish that Norfolk Southern is responsible for damages, then

such damages were contributed to by Third-Party Defendant Oxy Vinyls because of Oxy

Vinyls' failure to exercise ordinary care by failing to properly certify the design, building,

conversion, testing, modification, and requalification of hazardous materials tank cars and

their components; failing to properly certify that the railcar used was compatible with the

lading; failing to submit a scientifically accurate SDS; and/or failing to properly warn

Norfolk Southern of the dangers of an uncontrolled vinyl chloride fire.

189.    If Plaintiffs establish that Norfolk Southern is responsible for damages, then

such damages were contributed to by Third-Party Defendants General American Marks

Company and GATX Corporation because of General American Marks Company's failure to

properly maintain Car 23's bearings by leaving the car stationary for periods in excess of six

months.

190.    If Plaintiffs establish that Norfolk Southern is responsible for damages, then

such damages were contributed to by Third-Party Defendant Trinity Industries Leasing

Company because of Trinity Industries Leasing Company's failure to property certify the

design, building, conversion, testing, modification, and requalification of hazardous material

tank cars and their components.

191.    Under Ohio statute O.R.C. § 2307.22, Third-Party Defendants Oxy Vinyls,

General American Marks Company, GATX Corporation, and Trinity Industries Leasing

Company are liable for their share of all compensatory damages that represent economic loss.

192.    Under Ohio statute O.R.C. § 2307.25, Third-Party Defendants Oxy Vinyls, General American Marks Company, GATX Corporation, and Trinity Industries Leasing Company are liable to Norfolk Southern for contribution as to any costs that Norfolk Southern has paid and will pay in excess of its proportionate share of costs.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants and Third-Party Plaintiffs Norfolk Southern Railway Company and Norfolk Southern Corporation respectfully seek the following relief:

A.    Grant Norfolk Southern damages and interest as allowed by law; and

B.    Provide such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Norfolk Southern demands a trial by jury of all issues so triable.

Dated: July 25, 2023

Respectfully submitted.

WILMER CUTLER PICKERING
HALE AND DORR LLP

DICKIE, MCCAMEY &
CHILCOTE, P.C.

/s/ Alan Schoenfeld
ALAN SCHOENFELD*
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com

J. LAWSON JOHNSTON
SCOTT D. CLEMENTS, Ohio Bar No.
0096529
AARON PONZO*
PAUL ROMAN*
Two PPG Place, Suite 400
Pittsburgh, PA  15222
Tel.: (412) 281-7272
Fax: (412) 888-811-7144
ljohnston@dmclaw.com
sclemenets@dmclaw.com
aponzo@dmclaw.com
proman@dmclaw.com

*Pro hac vice

DAVINA PUJARI*
CHRISTOPHER A. RHEINHEIMER*
One Front Street, Suite 3500
San Francisco, CA  94111
Tel.: (628) 235-1000
Fax: (628) 235-1011
davina.pujari@wilmerhale.com
chris.rheinheimer@wilmerhale.com

ALBINAS PRIZGINTAS*
2100 Pennsylvania Avenue NW
Washington, DC  20036
Tel.: (202) 663-6000
Fax: (202) 663-6363
albinas.prizgintas@wilmerhale.com

MICHELLE LISZT SANDALS*
60 State Street
Boston, MA  02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
michelle.sandals@wilmerhale.com

*Pro hac vice

*Counsel for Defendants/Third-Party Plaintiffs
Norfolk Southern Corporation and Norfolk Southern Railway Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2023, I caused a copy of the foregoing to be filed with the Clerk of the Court using the Court's CM/ECF electronic filing system, which will provide electronic notice to all counsel of record.

*/s/ Alan Schoenfeld*
ALAN SCHOENFELD