PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:  EAST PALESTINE TRAIN
DERAILMENT

)
)
)
)
)
)
)
)
)

CASE NO.  4:23CV0242

JUDGE BENITA Y. PEARSON

**MEMORANDUM OF OPINION
AND ORDER**
[Resolving ECF Nos. 188, 190, and 194]

Pending is Third-party Defendant OxyVinyls LP's ("OxyVinyls") Motion to Dismiss the

Third-party Complaint Under Fed. R. Civ. P. 12(b)(6) (ECF No. 188).

Also pending is Third-party Defendant Trinity Industries Leasing Company's ("Trinity")

Motion to Dismiss the Third-party Complaint Under Fed. R. Civ. P. 12(b)(2) and (6) (ECF No.

190).

Finally, pending is Third-party Defendants GATX Corporation ("GATX") and General

American Marks Company's ("General American") Motion to Dismiss the Third-party

Complaint Under Fed. R. Civ. P. 12(b)(6) (ECF No. 194).

The Court has been advised, having reviewed the record, the parties' briefs, and the

applicable law.  For the reasons set forth below, as announced during the Status Conference held

in Chambers on February 9, 2024, the motions are granted in part and denied in part.

## I. Background

The above-entitled action arises from the February 3, 2023 derailment in East Palestine,

Ohio of Norfolk Southern Train 32N, known as "32 Nasty" to rail workers because of their

concerns about its safety risks.  *See* First Amended Master Consolidated Class Action Complaint

(4:23CV0242)

("First Amended Complaint") (ECF No. 138) at PageID #: 1796, ¶ 158.[1]  Train 32N traveled

eastbound on the Fort Wayne Line through northeast Ohio and passed at least three wayside

defect detectors before derailing.  *See* ECF No. 138 at PageID #: 1797, ¶ 165.  Train 32N

(comprised of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive between

the 111th and 112th railcars) derailed 38 railcars.  *See* ECF No. 138 at PageID #: 1795, ¶ 155;

Third-party Complaint (ECF No. 119) at PageID #: 1415, ¶ 28; PageID #: 1418, ¶ 40.

According to Plaintiffs, Train 32N derailed because an improperly maintained bearing on Car 23

(a railcar allegedly owned by General American and/or GATX) failed.  *See* ECF No. 138 at

PageID #: 1793-94, ¶ 146.

Car 23 was a hopper car owned by General American, which was carrying polyethylene

(plastic) pellets.  *See* ECF No. 119 at PageID #: 1416, ¶ 30.  Car 23 was equipped with roller

bearings that allow for the transfer of weight from the car and its lading to the wheels, and allow

the axle to rotate under the load, while minimizing the rotational friction.  Bearings are capable,

however, of overheating and can cause derailments.  *See* ECF No. 119 at PageID #: 1416, ¶ 32.

In addition to conducting visual, on-the-ground inspections of railcars pursuant to 49 C.F.R. Part

215, Norfolk Southern also has equipped its network, including the Fort Wayne Line, with hot

bearing detectors ("HBDs") to assess the temperature conditions of bearings and provide

audible, real-time warnings to train crews and Norfolk Southern's Advance Train Control

Wayside Help Desk when certain bearing temperature thresholds are met.  *See* ECF No. 119 at

PageID #: 1416, ¶ 33.

---

[1]  The Court relies on certain of the allegations made by Plaintiffs in their First Amended Complaint" (ECF No. 138) in this Background section.

(4:23CV0242)

On the evening of February 3, 2023, an HBD in East Palestine recorded a bearing on Car 23 at 253°F above ambient temperature, triggering a critical audible alarm and causing the train engineer to engage the brake application to stop the train, which was already in the process of slowing due to train traffic on the network. Shortly thereafter, during deceleration, at approximately 8:54 p.m., the overheated bearing on Car 23 failed, and the car derailed along with 37 additional railcars, five of which were carrying vinyl chloride (also known as "vinyl chloride monomer" or "VCM"), a flammable gas that is transported in a pressurized liquid state, and that must be stabilized for safe transportation to prevent contact with reactive agents like oxygen. *See* ECF No. 119 at PageID #: 1418-19, ¶¶ 39-46; PageID #: 1420-21, ¶¶ 55-56. Under prolonged exposure to fire or heat, liquefied vinyl chloride turns to vapor and expands, which can cause its container to violently rupture and explode – this reaction is called a boiling liquid evaporating vapor explosion ("BLEVE"). *See* ECF No. 119 at PageID #: 1421, ¶ 58. Under exposure to heat or to catalytic metals, *e.g.*, copper, aluminum, and their alloys, vinyl chloride can also polymerize, a chemical reaction that turns vinyl chloride into a solid-state polymer, which can increase the risk of a BLEVE by blocking the proper operation of the pressure relief devices ("PRDs"). *See* ECF No. 119 at PageID #: 1421-23, ¶¶ 60-66. A PRD is designed to automatically relieve pressure from the tank car when the tank's contents exceed a pressure threshold. *See* ECF No. 119 at PageID #: 1420, ¶ 51.

Car 29, one of the five tank cars carrying vinyl chloride, was owned by GATX. *See* ECF No. 119 at PageID #: 1419, ¶ 47(c). At the time of the derailment, Car 29 was allegedly equipped with an unapproved PRD. *See* ECF No. 119 at PageID #: 1433, ¶ 120(b).

3

(4:23CV0242)

The Bearing Install Manual for the bearing on Car 23 states that "[c]ars, coaches, and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces." (quoting Timken, *Installing and Maintaining Timken AP and AP-2 Bearings, Diesel Locomotive, Passenger and Freight Car Applications*, 25 (2015)). ECF No. 119 at PageID #: 1431, ¶ 107. According to Norfolk Southern, Timken's guidance is consistent with industry practice to prevent railcars from sitting stationary for long periods because grease separation may occur, which reduces the amount of lubrication around the bearings and may impact functionality. *See* ECF No. 119 at PageID #: 1431, ¶ 108.

As the owner of Car 23, General American was responsible for ensuring that Car 23 moved at least one car length every six months. *See* ECF No. 119 at PageID #: 1431, ¶ 106. Norfolk Southern alleges that the movement data for Car 23, which operated out of the Gulf States for long periods, indicates that Car 23 had few shipments and low mileage over the prior decade, and that it had been stationary for longer than six months at least twice: first for 565 days ending in August 2018 and again for 206 days ending in May 2019. *See* ECF No. 119 at PageID #: 1431, ¶¶ 109-111. Norfolk Southern claims that General American's failure to move Car 23 every six months resulted in the internal degradation and ultimate failure of Car 23's bearing. *See* ECF No. 119 at PageID #: 1444, ¶ 184.

The derailed cars included tank cars carrying hazardous materials that subsequently ignited, fueling fires that damaged additional railcars and resulted in the evacuation of residents. *See* ECF No. 138 at PageID #: 1803, ¶¶ 180-81. Seeking to represent a putative class "upwards of 500,000 Class Members" (ECF No. 138 at PageID #: 1806, ¶ 188), Plaintiffs propose classes

4

(4:23CV0242)

and subclasses of residents, property owners, employees, and businesses spanning three (3) States and nearly 3,000 square miles encompassed by a 30-mile radius around the derailment site. Plaintiffs seek recovery of alleged "real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness." ECF No. 138 at PageID #: 1835, ¶ 287.

Plaintiffs assert 17 claims against Norfolk Southern in the First Amended Complaint (ECF No. 138), which include: negligence, negligence per se, and gross negligence/willful and wanton conduct (Counts I(A) and XVII); strict liability (Count II); statutory, private, and public nuisances (Counts III-VI); trespasses (Counts VII and VIII). Plaintiffs also assert state-law statutory claims (Counts IX, X, XI, and XII), claims for medical monitoring (Counts XIII, XIV, and XV), and spoliation (Count XVI). Plaintiffs request compensatory, punitive, and exemplary damages.

Plaintiffs assert that Norfolk Southern's flagrant disregard for safety and the resulting consequences coincides with their adoption of "Precision Scheduled Railroading" ("PSR") in 2019. ECF No. 138 at PageID #: 1789, ¶ 116. They allege that "[w]hile railroads like Norfolk Southern are ultimately responsible for ensuring the safe transport of all rail cars, including any hazardous materials in the railcars they accept for transport along their systems, owners, lessees and shippers are also responsible for any defects they cause, or fail to remedy, or otherwise fail

(4:23CV0242)

to comply with the freight car safety regulations.  *See* 49 CFR 215.7."  ECF No. 138 at PageID #: 1792, ¶ 132.

On July 25, 2023, Norfolk Southern filed a Third-party Complaint (ECF No. 119) naming OxyVinyls, GATX, General American, and Trinity as Third-party Defendants.  Norfolk Southern asserts negligence (Count One - against OxyVinyls, GATX, and Trinity; Count Two - against OxyVinyls; and, Count Three - against GATX and General American) and Ohio joint and several liability and contribution claims (Count Four - against OxyVinyls, GATX, General American, and Trinity) in ECF No. 119.

The First Amended Complaint (ECF No. 138) subsequently named OxyVinyls, GATX, General American, and Trinity as New Party Defendants.  Plaintiffs allege that:  General American was the owner of railcar GPLX75465 ("Car 23"); "Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed;" OxyVinyls was the owner of railcars OCPX80235 ("Car 27"), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53"); GATX was the owner of railcar GATX95098 ("Car 29"); Trinity was the owner of railcar TILX402025 ("Car 26"); OxyVinyls was also the shipper of Cars 26, 27, 28, 29 and 53; and, Cars 26, 27, 28, 29 and 53 were tank cars and each contained vinyl chloride monomer in a pressurized liquid state, which was released during the February 3, 2023 derailment, including the subsequent controlled release on February 6, 2023.  *See* ECF No. 138 at PageID #: 1792, ¶ 133-39.

Norfolk Southern claims that the PRDs malfunctioned after the derailment and/or were manufactured with components containing materials inconsistent with vinyl chloride, which was

(4:23CV0242)

the chemical being shipped in its stabilized form. *See* ECF No. 119 at PageID #: 1439-41, ¶¶ 151-62; PageID #: 1442, ¶¶ 167 and 172; PageID #: 1443, ¶ 173. Immediately after the derailment, the tank cars owned and/or shipped by OxyVinyls were surrounded by pool fires.[2] Around midnight on February 4, 2023, the PRDs on the vinyl chloride tank cars began activating and releasing pressure in a cycle of thirty seconds on (releasing) and two minutes off. *See* ECF No. 119 at PageID #: 1425, ¶ 76. "Because of the surrounding pool fires, the flammable gas venting from the PRDs ignited, which upon information and belief began to melt part or all of the [vinyl chloride] tank car[s'] liquid transfer valves and fittings." ECF No. 119 at PageID #: 1425, ¶ 77. The PRDs continued to vent through the early morning hours of February 4, 2023. *See* ECF No. 119 at PageID #: 1425, ¶ 79.

After the PRDs stopped venting in the early afternoon of February 4, 2023, responders sent in two teams to monitor the pressure conditions of the vinyl chloride tank cars. *See* ECF No. 119 at PageID #: 1426, ¶¶ 82-83. During this time, the PRD on Car 28 (owned by OxyVinyls) activated again and began to continuously vent gas for approximately 70 minutes, frightening responders and causing concern that pressure and heat were building inside the tank of Car 28. *See* ECF No. 119 at PageID #: 1426-27, ¶ 84. Responders also detected elevated temperatures on Car 53 (owned by OxyVinyls), raising the concern that the tank temperature and pressure were rising without external stimulus. *See* ECF No. 119 at PageID #: 1427, ¶ 86. The PRDs on the other cars carrying vinyl chloride, including Car 29 (owned by GATX), did not resume venting. *See* ECF No. 119 at PageID #: 1426, ¶ 82. The allegedly unapproved PRD on

---

[2] Pool fires are fires that occur when a pool of volatile liquid evaporates and burns. *See* ECF No. 119 at PageID #: ¶ 73.

(4:23CV0242)

Car 29 stopped working, raising fears that the car could explode.  *See* ECF No. 138 at PageID #: 1839, ¶ 303(e).

The elevated temperature on Car 53 and sudden extended venting from Car 28 caused responders to become concerned about the potential for catastrophic explosions.  *See* ECF No. 119 at PageID #: 1427, ¶ 88.  These factors also indicated to Unified Command (*i.e.*, Norfolk Southern, in coordination with government officials) that polymerization may have blocked the PRDs on Car 28 and the other vinyl chloride cars, including Car 29.  *See* ECF No. 119 at PageID #: 1428, ¶ 90.  As a result, on the morning of February 6, 2023, Unified Command met to discuss strategies to relieve the pressure in the five vinyl chloride tanks and avoid a catastrophic uncontrolled explosion, and ultimately decided to vent and burn the contents of all five vinyl chloride railcars.  *See* ECF No. 119 at PageID #: 1429, ¶ 96.

Unified Command decided to detonate explosives on all five derailed cars containing hazardous materials and to vent and burn the released vinyl chloride dumped in a trench, causing a massive explosion that sent toxic chemicals over East Palestine and the surrounding area.  *See* ECF No. 138 at PageID #: 1804, ¶¶ 183-185; *see also* ECF No. 138 at PageID #: 1832-33, ¶ 279 (z-ee, gg-ll) (alleging violations of duties following the derailment); ECF No. 119 at PageID #: 81-96 (detailing the options available to Norfolk Southern and explaining why the vent and burn was the only option in light of the evidence of polymerization occurring in the five tank cars).

## II.  Standards of Review

### A.    Motion to Dismiss Under Rule 12(b)(2)

When a defendant affirmatively raises a personal jurisdiction challenge under Fed. R. Civ. P. 12(b)(2), the court may decide the motion based on written submissions only, permit

(4:23CV0242)

discovery in aid of the motion, or conduct an evidentiary hearing on the merits of the motion. *See Serras v. First Tenn. Bank Nat'l. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). "A district court has discretion in how it resolves a 12(b)(2) motion." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (citing *Serras*, 875 F.2d at 1214). If the district court relies solely on written submissions to resolve a motion to dismiss for lack of personal jurisdiction, "the burden on the plaintiff is 'relatively slight.' " *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988)). The plaintiff bears the burden of establishing that jurisdiction exists and "must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The plaintiff need only make a "prima facie showing that personal jurisdiction exists" in order to defeat a properly supported motion for dismissal. *Am. Metal Stamping Co., LLC v. Pittsburgh Pipe & Supply Corp.*, No. 1:21CV2334, 2022 WL 19349904, at *3 (N.D. Ohio June 6, 2022). The court must construe all "the pleadings and the affidavits in a light most favorable to the plaintiff" and disregard any "contrary factual contentions of the defendant." *Vlach v. Yaple*, 670 F. Supp.2d 644, 647 (N.D. Ohio 2009); *see also Serras*, 875 F.2d at 1215 (when plaintiff's written submissions state facts sufficient to establish personal jurisdiction, the court is "obligat[ed] to ignore contrary assertions" by defendant).

**B.    Motion to Dismiss Under Rule 12(b)(6)**

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). A

(4:23CV0242)

cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in th[e] complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007); *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 895 n.3 (6th Cir. 2019) (when determining the plausibility of claims at the motion to dismiss stage, the complaint must be viewed as a whole).  A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.  A pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557.  It must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570; *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The plausibility standard is not akin to a "probability requirement," but it suggests more than a sheer possibility that a defendant has acted unlawfully.  *Twombly*, 550 U.S. at 556.  When a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557 (brackets omitted).  "[When] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)).  The Court "need not accept as true a legal

(4:23CV0242)

conclusion couched as a factual allegation or an unwarranted factual inference." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012) (citations and internal quotation marks omitted).

## III.  Law and Analysis

### A.    Trinity's Motion to Dismiss Under Rule 12(b)(2)

Trinity attempts to escape liability by arguing the Court lacks personal jurisdiction over it.  In April 2021, the Ohio Legislature amended Ohio's long-arm statute to make it co-terminous with the limits of due process under the United States Constitution.  *See, e.g.*, Ohio Rev. Code § 2307.382(C) ("[A] court may exercise personal jurisdiction over a person on any basis consistent with . . . the United States Constitution."); *Zahara Ariel LLC v. Lionsgate Entm't Corp.*, No. 2:23-cv-1916, 2023 WL 4706188, *2-3 (S.D. Ohio June 14, 2023) (holding that Ohio's long-arm statute is now "co-extensive with the limits of the federal Due Process Clause"); *Smith v. Swaffer*, 566 F. Supp.3d 791, 806 (N.D. Ohio 2021) ("In April 2021, the Ohio General Assembly extended the State's long-arm statute to the limits of the Constitution."). Accordingly, the Court has personal jurisdiction over Trinity if such jurisdiction comports with Due Process.

Having reviewed the parties' written submissions and attachments, the Court concludes that the matter of specific personal jurisdiction over Trinity (a Texas-based company) may be resolved by the parties' submissions (ECF Nos. 190, 228, and 236), without additional discovery or an evidentiary hearing.  Norfolk Southern can defeat the motion of Trinity under Fed. R. Civ. P. 12(b)(2) by "establishing with reasonable particularity sufficient contacts between [Trinity]

11

(4:23CV0242)

and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted).  The Court views the pleadings and affidavits in the light most favorable to Norfolk Southern, and importantly, it does not weigh Trinity's "controverting assertions."  *Theunissen*, 935 F.2d at 1459 (citing *Serras* 875 F.2d at 1214).

Specific personal jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation marks and bracket omitted); *see also Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011) (specific jurisdiction is proper "in a suit arising out of or related to the defendant's contacts with the forum.") (citation omitted).  Specific personal jurisdiction comports with due process under the Constitution when "the defendant has sufficient minimal contacts such that traditional notions of fair play and substantial justice are not offended."  *Intera Corp. v. Henderson*, 428 F.3d 605, 615-616 (6th Cir. 2005) (quotation marks and citation omitted).  The Sixth Circuit utilizes a three-pronged test for evaluating whether the proposed exercise of personal jurisdiction comports with due process, considering (1) whether the defendant purposefully availed himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) whether the plaintiff's cause of action arises from or relates to the defendant's activities in the forum state; and (3) whether acts of the defendant or the consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.  *See Beydoun v. Wataniya Restaurants Holdings Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014).  Norfolk Southern has satisfied all three of these elements.

12

(4:23CV0242)

## 1.

Norfolk Southern has made a *prima facie* showing that Trinity purposefully availed itself of the privilege of conducting activities in Ohio or causing consequences in Ohio. The Sixth Circuit has adopted the "stream of commerce plus" approach to determining whether the purposeful availment prong has been met. *See Fortis Corp. Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 220 (6th Cir. 2006). That test is satisfied if the non-resident defendant places a product into the stream of commerce and then takes affirmative steps to distribute the product at issue (in this case, railcar TILX402025 ("Car 26")) within the forum state. *Id.*

Trinity's parent company (Trinity Industries, Inc.) has been registered to do business in Ohio for decades. *See* https://businesssearch.ohiosos.gov/ (last visited March 13, 2024). Trinity concedes that as of January 31, 2023 it had "nine (9) leasing customers with billing addresses in Ohio—approximately 1% of its leasing customer base" and "derived approximately 2% of its total revenue from railcars routed through Ohio" in the 2022 calendar year. Affidavit of J. Travis Galt (ECF No. 190-2) at PageID #: 2214, ¶¶ 10-11. Since December 2014, Norfolk Southern has also submitted approximately 23,776 invoices to Trinity for repairs performed on its railcars in Ohio, totaling about $3,676,800 in repair costs. *See* Declaration of Christopher A. Rheinheimer (ECF No. 228-1) at PageID #: 2596, ¶ 5; *see also CSX Transp., Inc. v. Union Tank Car Co.*, 247 F. Supp.2d 833, 842 (E.D. Mich. 2002) (defendant had sufficient contacts with Michigan where it generated revenue from its railcars traveling through the state and paid for a significant number of repairs to its railcars within the state).

Trinity leased Car 26 to OxyVinyls, an entity that regularly does business in and ships railcars through Ohio. *See* ECF No. 119 at PageID #: 1415, ¶¶ 27-28; PageID #: 1418, ¶ 39.

13

(4:23CV0242)

Norfolk Southern alleges that Car 26 previously traveled on the Fort Wayne Line through

northeast Ohio before it derailed in East Palestine, Ohio.  *See* ECF No. 119 at PageID # 1412,

¶ 6; PageID # 1418, ¶ 40.  By leasing its railcars to shippers, like OxyVinyls, that distribute them

throughout the country, Trinity "undoubtedly kn[ows] that its [railcars] could end up in [Ohio]

through the stream of commerce."  *Fortis Corp. Ins.*, 450 F.3d at 221 (citing *Mott v. Schelling &*

*Co.*, No. 91-1540, 1992 WL 116014, at *6 (6th Cir. May 29, 1992) (a party "cannot avoid

liability for the injuries caused by its product [in the forum state] by creating a paper transfer

through a middleman"); *see also Step2 Co., LLC v. Parallax Grp. Int'l, LLC*, No. 5:08CV2580,

2010 WL 3783151, at *6 (N.D. Ohio Sept. 17, 2010) ("It is reasonable to infer that [products]

placed into the stream of commerce through . . . established national distribution channels may

make their way to Ohio."); *CSX Transp., Inc.*, 247 F. Supp.2d at 842 (defendant "purposefully

availed itself of causing a consequence within [Michigan]" when it "leas[ed] a rail tank car

which it knew or should have known would travel on [third party's] rail system, which includes

Michigan"); *Fullington v. Union Pac. Fruit Exp. Co.*, No. CIV.A. 88-2453-S, 1989 WL 21039,

at *2 (D. Kan. Feb. 1, 1989) (holding defendant subject to specific personal jurisdiction in

out-of-state forum based on inspection of railcar Defendant knew would travel through national

rail system).

**2.**

Norfolk Southern's claims arise out of or relates to Trinity's contacts in Ohio.  "The

Sixth Circuit establishes a 'lenient' threshold for meeting this requirement."  *Fortis Corp. Ins.*,

*450 F.3d at 222* (citing *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)).  Trinity leased Car

26 to OxyVinyls and the railcar traveled on the Fort Wayne Line through northeast Ohio before

14

(4:23CV0242)

it derailed in East Palestine, Ohio.  *See* ECF No. 190-2 at PageID #: 2014-15, ¶ 12; ECF No. 119 at PageID #: 1415, ¶ 27; PageID #: 1418, ¶ 40.  Norfolk Southern's claims are based on Trinity's alleged failure to follow federal regulations designed to ensure that Car 26 was safe to transport vinyl chloride in Ohio and elsewhere.  *See* ECF No. 119 at PageID #: 1439, ¶ 152.  Thus, "there is a strong relationship among the defendant [Trinity], the forum [Ohio], and th[is] litigation"—the 'essential foundation' of specific jurisdiction." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (citation omitted).  Moreover, when the "brunt of the harm" (the alleged release of hazardous materials from the railcar) is felt in the forum state, "based on the effects" of the out-of-state conduct (the lease and unapproved modifications of Car 26), jurisdiction is also appropriate.  *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (internal quotation marks omitted).

### 3.

Lastly, the exercise of personal jurisdiction over Trinity is reasonable and fair.  This third factor in the Sixth Circuit's test is whether there is a substantial enough connection between the acts of the defendant or consequences caused by the defendant and the forum state to make the exercise of jurisdiction over the defendant reasonable.  *Air Prods. & Controls, Inc.*, 503 F.3d at 549.  Notably, when "the first two criterion are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.' " *Id.* at 554 (citation omitted).  For this factor, courts typically consider "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.*, 428 F.3d at 618.

(4:23CV0242)

The Court finds that these factors all weigh in favor of exercising personal jurisdiction. First, there is little to no burden placed upon Trinity by litigating this matter in Ohio given the matter's direct connection with Ohio residents; and, in any event, Trinity has not argued that it would be inconvenient or otherwise unfairly burdensome to litigate in this forum. "[M]odern transportation and communication sufficiently ease this burden." *Ardent Techs. Inc. v. Advent Servs. LLC*, No. 3:23-CV-137, 2023 WL 5588547, at *8 (S.D. Ohio Aug. 29, 2023) (quotation marks and citation omitted); *see also AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016) (holding the exercise of personal jurisdiction over Texas resident reasonable when he "deliberately affiliated himself with [the forum] and its residents, and the fact that [defendant] lives in Texas does not overcome the inference of reasonableness"); *Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, No. 13 CV 00439, 2016 WL 11702227 (N.D. Ill. Oct. 7, 2016) (Trinity began an action in Indiana and continued litigating it after it was transferred to Illinois). Second, "Ohio has a strong interest in ensuring the enforcement of its laws," especially because the violation of its tort laws is alleged to have resulted in harm affecting the putative Ohio class members. *CrossCountry Mortgage, Inc. v. Messina*, No. 1:19CV1021, 2019 WL 5653288, at *14 (N.D. Ohio Oct. 31, 2019); *see also Black v. Usher Transp.*, No. 2:10-cv-0003, 2010 WL 2465379, at *5 (S.D. Ohio June 11, 2010) ("The state of Ohio has an interest in protecting its citizens from tortious conduct by non-residents."). Third, Norfolk Southern has a strong interest in obtaining relief in a single proceeding from all those who are or may be liable, and the most reasonable place for that proceeding – both for Norfolk Southern and for the efficient use of judicial resources – is this one already before the Court in which Norfolk Southern (and now, through the First Amended Complaint (ECF No. 138), Trinity) has been sued by Plaintiffs.

16

(4:23CV0242)

*Huey Jiuan Liang v. AWG Remarketing*, No. 2:14-cv-99, 2015 WL 65258, at *8 (S.D. Ohio Jan. 5, 2015) (finding exercise of jurisdiction over third-party defendant reasonable to avoid "piecemeal litigation" and crediting third-party plaintiffs' assertions "that they have a vested interest in resolving the lawsuit in this forum, in turn preventing them from engaging in a separate lawsuit in a different forum that would require the presentation of the evidence given in this case").  Finally, while the state of Texas has an interest in enforcing its own laws against its own citizens, the Court does not find that this interest outweighs Ohio's interest in protecting its own citizens.

As set forth above, Plaintiffs' have made a *prima facie* showing that the Court's exercise of personal jurisdiction over Trinity is consistent with Due Process and Ohio law following the April 2021 amendments to Ohio Rev. Code § 2307.382(C).

**4.**

Assuming *arguendo* that Ohio's long-arm statute, Ohio Rev. Code § 2307.382(A), is not co-extensive with due process, Trinity's forum contacts satisfy Ohio's long-arm statute.  First, by leasing railcars to Ohio customers, Trinity "transact[s]. . . business in [Ohio]."  Ohio Rev. Code § 2307.382 (A)(1).[3]  Second, Trinity "[c]ontract[s] to supply services or goods" in Ohio, including by leasing its railcars to companies that route its cars through Ohio.  Ohio Rev. Code § 2307.382 (A)(2).  Third, Norfolk Southern's claims seek damages for injuries proximately

---

[3]  As recognized by the Supreme Court of Ohio, this provision is "very broadly worded[,]" with the word "[t]ransact" meaning more than "contract" and instead to prosecute negotiations, carry on business, or "have dealings."  *Ky. Oaks Mall Co. v. Mitchell's Formal Wear*, 53 Ohio St.3d 73, 75, 559 N.E.2d 477 (1990).

17

(4:23CV0242)

caused by Trinity's negligence in Ohio.  Ohio Rev. Code § 2307.382 (A)(3) ("[c]ausing tortious injury by an act or omission in [Ohio]").

Therefore, the Court concludes that Trinity has the requisite contacts with Ohio to support this Court's exercise of personal jurisdiction.

**B.**

OxyVinyls argues Norfolk Southern's state laws claims for negligence (Counts One and Two) must be dismissed because they are preempted by the Hazardous Materials Transportation Act ("HMTA") to the extent that the claims impose different requirements than what is required under federal law.  *See* OxyVinyls' Memorandum in Support (ECF No. 188-1) at PageID #: 2155-57.  Trinity, GATX, and General American argue that Norfolk Southern's state laws claims for negligence and contribution must be dismissed because they are preempted by the Federal Railroad Safety Act ("FRSA")[4] and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

**1.**

Norfolk Southern's negligence claims against OxyVinyls are not preempted under federal law because Norfolk Southern alleges that OxyVinyls failed to comply with the requirements of the HMTA,[5] and Norfolk Southern does not seek to impose duties on OxyVinyls exceeding those requirements.  *See Merritt v. BASF Corp.*, No. 1:21-cv-67, 2023 WL 3230983, at *5 (S.D. Ohio May 3, 2023) (holding plaintiff to its disavowal of any intention to find defendant liable based

---

[4]  The FRSA governs matters "related to railroad safety."  49 U.S.C. § 20106.  It authorizes the Federal Railroad Administration ("FRA") to prescribe regulations related to railroad safety.

[5]  Norfolk Southern alleges that OxyVinyls' failure to abide by the regulations is evidence of its negligence to be considered by the trier of fact.

18

(4:23CV0242)

on any duties different than the hazardous materials regulations).  The duties Norfolk Southern

alleges OxyVinyls violated are included in 49 C.F.R. §§ 171.1 (explaining that the HMTA

authorizes the Secretary of Transportation to "establish regulations for the safe and secure

transportation of hazardous materials in commerce") (*see* ECF No. 119 at PageID #: 1438, ¶

149); 179.5 (*see* ECF No. 119 at PageID #: 1439, ¶ 152); 179.100-13, 179.15 (*see* ECF No. 119

at PageID #: 1435-36, ¶ 135); 173.22, 173.31(a) (*see* ECF No. 119 at PageID #: 1441, ¶¶ 160-61;

PageID #: 1445, ¶ 188; PageID #: 1436-37, ¶ 137; PageID #: 1440, ¶ 159); and, 173.24 (*see* ECF

No. 119 at PageID #: 1445, ¶ 188).  Count One alleges that OxyVinyls failed to ensure the

certified design, building, conversion, testing, modification, and requalification of its tank cars to

ensure they could safely transport hazardous materials, as OxyVinyls was required to do under

the federal regulations.  Count Two alleges that OxyVinyls failed to ensure that its cars were

compatible with the lading (*i.e.*, vinyl chloride) and could safely transport vinyl chloride through

the certification and approval processes required by federal regulations.  *See Chambers v. St.

Mary's Sch.*, 82 Ohio St.3d 563, 568, 697 N.E.2d 198 (1998) (holding that "a violation of an

administrative rule may be admissible as evidence of negligence"); *see also Tipton v. CSX

Transp., Inc.*, No. 3:15-CV-311-TAV-CCS, No. 3:15-CV-337-TAV-CCS, No.

3:15-CV-497-TAV-CCS, No. 3:15-CV-346-TAV-CCS, 2016 WL 11501426, *15 (E.D. Tenn.

July 7, 2016) ("As the Sixth Circuit has held that the FRSA preemption analysis applies to the

HMTA, and the FRSA preemption section contains a savings clause that expressly states that

state law claims for personal injury or property damage for failure to comply with a federal

regulation or standard are not preempted, the Court finds that it would be consistent with the

(4:23CV0242)

Sixth Circuit's holding to find that a common law negligence action is not preempted under the HMTA either.").

The HMTA only preempts state law claims in certain circumstances. As relevant here, the HMTA preempts state laws that are "about" certain enumerated claims and subjects that are not based on a violation of the HMTA, or "a regulation prescribed under [the HMTA]." 49 U.S.C. § 5125(a) and (b). In other words, state law claims that are based on violations of the HMTA or HMTA regulations are not preempted. It should be noted that states may enforce state common laws, like the negligence claims in the case at bar, "that are the same as their Federal counterparts." Roth v. Norfalco LLC, 651 F.3d 367, 377 (3d Cir. 2011) (quoting H.R. Rep. No. 101-444, at 24 (1990)).

### 2.

As a general rule, "[t]he FRSA preempts any state or local law, regulation, or order that is 'an additional or more stringent law, regulation, or order related to railroad safety or security.' " Smith v. CSX Transp., Inc., No. 3:13CV2649, 2014 WL 3732622, at *2 (N.D. Ohio July 25, 2014) (quoting 49 U.S.C. § 20106(a)(2)). But states may nonetheless "adopt or continue in force a law, regulation, or order related to railroad safety or security until . . . [the FRA] prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). In addition, even when the FRA prescribes safety standards, a state may still enforce an "additional or more stringent law" related to the same subject matter if: (1) it is necessary to prevent a local safety or security hazard; (2) it is not incompatible with a federal regulation on the safety issue in question; and (3) it does not "unreasonably burden" interstate commerce. 49 U.S.C. § 20106(a)(2). Finally, the Supreme Court has held that "[t]o

20

(4:23CV0242)

prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter, for 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations *substantially subsume* the subject matter of the relevant state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (citation omitted; emphasis added).

The FRSA, however, makes clear that it does not preempt claims premised on a party's failure to comply with federal regulations.  It is also to be noted that Trinity concedes that when a state law action alleges that a party has failed to comply with a federal regulation, it is not preempted.  *See* Trinity's Memorandum in Support (ECF No. 190-1) at PageID #: 2198.  Norfolk Southern's negligence claims against Trinity (Count One), as well as GATX and General American (Count Three[6]) are not preempted because the Third-party Complaint (ECF No. 119) alleges multiple violations by Trinity, GATX, and General American of federal regulations and these allegations must be taken as true for purposes of Trinity's Motion to Dismiss (ECF No. 190) and GATX and General American's Motion to Dismiss (ECF No. 194).  *See Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 178 (3d Cir. 2013) ("We first ask whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to

---

[6]  Norfolk Southern claims that GATX and General American failed to exercise ordinary care in maintaining their railcars before and between service periods thereby creating an internal latent issue within the bearing at issue.  Count Three is premised in part on General American's failure, on two separate occasions, to move Car 23 every six months when it was not in service, resulting in the internal degradation and ultimate failure of Car 23's bearings.  *See* ECF No. 119 at PageID #: 1444, ¶ 182 (alleging that GATX and General American "failed to exercise ordinary care by, among other things, failing to properly maintain Car 23's bearings by leaving the car stationary for periods in excess of sixth months").  Norfolk Southern alleges that, if the car is not moved, then the lubricant around the bearings will separate and degrade.  *See* ECF No. 119 at PageID #: 1444, ¶ 183.

(4:23CV0242)

a federal regulation.  If so, the plaintiff's claim avoids preemption.  *See* 49 U.S.C. Section 20106(b)(1)(A)-(B).  Otherwise, we move to the second step and ask whether any federal regulation covers the plaintiff's claim.").  Because Norfolk Southern seeks to hold Trinity, GATX, and General American liable for violating a federal standard of care created pursuant to federal regulations and does not rely on any state law that imposes a more stringent standard of care than the regulations require, Counts One and Three are not preempted.

In 2007, Congress amended the FRSA to clarify and limit the scope of its preemptive effect.  The "Clarification Amendment" provides, in relevant part, that "[n]othing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party-- (A) has *failed to comply* with the Federal standard of care *established by a regulation or order* issued by the Secretary of Transportation (with respect to railroad safety matters) . . ., covering the subject matter as provided in subsection (a) of this section; (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries."  49 U.S.C. § 20106(b) (emphasis added); *see also Smith*, 2014 WL 3732622, at *3 (court denied motion to dismiss based on FRSA preemption arguments because "the FRA has prescribed regulations regarding the inspection of rails, [and] Plaintiffs allege [the defendant] failed to comply with those regulations.").

As railcar owners, Trinity and General American and/or GATX are subject to regulations promulgated by the Secretary of Transportation that outline railcar owners' obligations to promote safety in railroad operations and reduce railroad-related accidents and incidents. Norfolk Southern seeks only to hold Trinity and General American and/or GATX liable for their

22

(4:23CV0242)

alleged breaches of the federal standard of care created by these federal regulations.  Notably, 49 C.F.R. Part 179 governs specifications for tank cars like Cars 26 and 23.  It authorizes the Association of American Railroads ("AAR") to approve the design, materials, construction, conversion, and modification of tank cars in accordance with the AAR MSRP Specification for Tank Cars and the federal regulatory specifications.  49 C.F.R. § 179.3; *see also* 49 C.F.R. § 179.5(a) (requiring builders to furnish a Certificate of Construction to tank car owners certifying that the tank, equipment, and car fully conform to regulations).  Car owners must receive approval for the railcar construction and any design or component changes that are made later.  49 C.F.R. §§ 179.3 and 179.6.  Car owners must continually certify that they have complied with these requirements and have obtained the proper approvals.  49 C.F.R. §§ 180.507 and 180.517.

In addition, 49 C.F.R. § 180 states that tank cars marked as a "DOT" specification "must retain the certificate of construction (AAR Form 4-2) and related papers certifying that the manufacture of the specification tank car identified in the documents is in accordance with the applicable specification."  49 C.F.R. §§ 180.507 and 180.517(a).  DOT specifies that tank car owners, such as Trinity and General American, are responsible for the inspection, testing, and requalification of the tank car's structural integrity, thickness, internal coating or lining, leakage under pressure, and service equipment like PRDs, at set temporal intervals.  *See* 49 C.F.R. § 180.509 *et seq.*

Norfolk Southern's negligence claims against Trinity (Count One) and GATX and General American (Count Three) are not preempted because they are based on an alleged failure to comply with these federal regulations, which create the federal standard of care.  *See* *Smith,* WL 3732622, at *2-3 (negligence claim not preempted by FRSA because plaintiffs alleged a

23

(4:23CV0242)

failure to comply with regulations prescribed by FRSA). As alleged in the Third-party Complaint, the FRA found that Trinity's AAR 4-2 Certificate of Construction for Car 26, a DOT-105J300W specification tank car carrying vinyl chloride, *see* ECF No. 119 at PageID #: 1419, ¶¶ 46-48, contained discrepancies and did not match the car's actual characteristics. *See* ECF No. 119 at PageID #: 1432, ¶ 120; PageID #: 1439, ¶ 152; PageID #: 1441, ¶ 161. According to Norfolk Southern, discrepancies regarding the five vinyl chloride tank cars on Train 32N included "non-approved changes to the PRDs, valves, and component parts," meaning Car 26 was not approved for vinyl chloride transportation. *See* ECF No. 119 at PageID #: 1441, ¶ 161. Norfolk Southern claims Car 26 was constructed of materials incompatible with vinyl chloride, as evidenced by the aluminum found in samples of the interior surface of the manway nozzle and the aluminum coating on the PRD springs. *See* ECF No. 119 at PageID #: 1435-36, ¶ 135(a). Therefore, Norfolk Southern alleges Trinity violated 49 C.F.R. § 180 by failing to retain accurate certifications that its tank car complied with the applicable specifications under 49 C.F.R. § 179.

Trinity argues, however, that Norfolk Southern's allegations regarding discrepancies between the AAR 4-2 and Car 26's actual characteristics are vague and do not amount to a claim that Trinity violated any federal regulation. *See* ECF No. 190-1 at PageID #: 2207-2208. Assuming *arguendo* that Norfolk Southern's allegations regarding the discrepancies are sufficiently pled, *see* ECF No. 119 at PageID #: 1432, ¶ 120; PageID #: 1439, ¶ 152; PageID #: 1441, ¶ 161, Trinity does not deny that Norfolk Southern has alleged the existence of discrepancies in Car 26's Form AAR 4-2 and the car's actual characteristics on the day of the

24

(4:23CV0242)

derailment.  Norfolk Southern contends that necessarily means Trinity violated federal

regulations regardless of the actual discrepancies.

## C.

Second, CERCLA does not preempt Norfolk Southern's state law claims against Trinity

because (1) the state law claims against Trinity seek damages separate from those recoverable

under CERCLA and (2) there is no conflict between the state law claims and CERCLA.

### 1.

Norfolk Southern's claims against Trinity are not preempted by CERCLA because

Norfolk Southern does not seek damages in the case at bar that would be covered by CERCLA.

Trinity argues that "Norfolk Southern's negligence claim effectively seeks the CERCLA costs it

has incurred related to environmental clean-up."  ECF No. 190-1 at PageID #: 2201.  That

characterization of Norfolk Southern's third-party claims is mistaken.  Norfolk Southern does

not seek its CERCLA environmental response costs in this action; rather, it seeks contribution

for Trinity's share of Norfolk Southern's potential responsibility to the putative class.

### 2.

There is no conflict between Norfolk Southern's state law claims and CERCLA because

they do not defeat the purpose of CERCLA.  "The question, for preemption purposes, is whether

compliance with the state law defeats the purposes and objectives of the federal law, not whether

the two laws impose different standards by different means."  *Merrick v. Diageo Americas*

*Supply, Inc.*, 805 F.3d 685, 695 (6th Cir. 2015).[7]  Trinity asserts that Section 113(f) of CERCLA,

---

[7]  In *Atl. Richfield Co. v. Christian*, 590 U.S. ----, 140 S. Ct. 1335 (2020), the
United States Supreme Court held that the landowners' claim for restoration damages

(continued...)

(4:23CV0242)

42 U.S.C. § 9613(f) – the mechanism for seeking contribution from other parties for CERCLA costs – preempts Norfolk Southern's negligence and contribution claims in the present case because, according to Trinity, "assigning liability under Ohio state law would interfere with CERCLA's contribution scheme."  ECF No. 190-1 at PageID #: 2200 (quoting 42 U.S.C. § 9613(f)(1)).  But Trinity does not articulate how Norfolk Southern's state law claims interfere with the CERCLA scheme.  Trinity cannot identify how Norfolk Southern's state law claims conflict with CERCLA under Section 113 because, at this point in time, no parties have resolved their CERCLA liability.  *See* *State of Ohio v. Norfolk Southern Corp.*, No. 4:23CV0517 (N.D. Ohio filed March 14, 2023) (Adams, J.) (enforcement actions brought by government plaintiffs under CERCLA and Ohio laws to recover, *inter alia*, natural resources damages and CERCLA cleanup oversight costs).  Thus, there is no conflict between CERCLA and the negligence and contribution state law claims, and they are not preempted.  *See* *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, No. 1:05-cv-00437, 2008 WL 11351545, at *16 (S.D. Ohio Aug. 1, 2008) (holding that common law contribution "do[es] not undermine CERCLA's settlement scheme because [the party from whom contribution is sought] has not resolved its liability to the United States and is therefore not entitled to contribution immunity").

GATX and General American contend they should not be responsible for Norfolk Southern's "response costs" because "[t]hose costs reflect the alleged economic loss suffered by the Government and Norfolk Southern in responding to the incident—they do not reflect any economic loss incurred by the First-Party Plaintiffs."  GATX and General American's

---

[7](...continued)
under state law beyond what are recoverable under CERCLA may proceed in parallel with an ongoing CERCLA cleanup.  *Id.* at 1345-48, 1355.

(4:23CV0242)

Memorandum in Support (ECF No. 194) at PageID #: 2253.  Norfolk Southern, however, does

not seek its CERCLA environmental response costs in the case at bar; rather, it seeks damages

from Third-party Defendants for the significant costs it has incurred (from the Family Assistance

Center and the numerous business loss claims), and will continue to incur, and may be required

by the undersigned or a jury to incur in the future, to address the alleged impacts of this incident

on the putative class members.  *See* ECF No. 119 at PageID #: 1411, ¶ 1 ("Norfolk Southern has

taken significant steps to assist the people of East Palestine and the surrounding area, including

by providing millions of dollars in financial assistance to residents and communities.  Norfolk

Southern is committed to establishing long-term funds to address concerns about health, water

quality, and residential property values as part of a final resolution of claims.").

### D.      Negligence Claims

### 1.

Norfolk Southern has sufficiently pled negligence claims against OxyVinyls and Trinity.

To plead a negligence claim under Ohio law, Plaintiff "must show the existence of a duty, a

breach of that duty, and an injury that was proximately caused by the breach."  *Pierre Invs., Inc.*

*v. Fifth Third Bancorp*, No. 1:22-cv-155, 2022 WL 6764494, at *5 (S.D. Ohio Oct. 11, 2022)

(quoting *Rieger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 516, 138 N.E.3d 1121 (2019)).

The Third-party Complaint sets forth in sufficient detail that Trinity had a duty to

exercise reasonable and ordinary care to ensure the "safety of individuals and entities whose

persons or property were within reasonable proximity to the rail line, Norfolk Southern's

employees and its property, and the environment," ECF No. 119 at PageID #: 1438, ¶ 149,

including by complying with all federal regulatory requirements set by the FRA and AAR for the

27

(4:23CV0242)

certification of Car 26's design and components. *See* ECF No. 119 at PageID #: 1430, ¶¶ 103-105; PageID #: 1432-34, ¶¶ 115-25; PageID #: 1438-39, ¶¶ 149-51; 49 C.F.R. §§ 179.3 and 179.6. Trinity's argues that Norfolk Southern "does not distinguish between the potential duties owed to Norfolk Southern by Trinity as the owner/lessor of Car 26 and [OxyVinyl] as the shipper/operator." ECF No. 190-1 at PageID #: 2204. The Third-Party Complaint, however, specifies that certification is the sole domain of car owners, not shippers. *See* ECF No. 119 at PageID #: 1434, ¶ 124. It further alleges that railroads, such as Norfolk Southern, rely on railcar owners' compliance with federal regulations and the accuracy of certification information provided by owners to ensure the cars can safely transport materials. *See* ECF No. 119 at PageID #: 1414, ¶ 17; PageID #: 1432-34, ¶¶ 115-125.

Trinity attempts to disclaim all responsibility, alleging that Norfolk Southern bears sole responsibility for the condition of cars on its line under AAR Interchange Rules. *See* ECF No. 190-1 at PageID #: 2204. But Trinity ignores that both federal regulations and the Interchange Rules divide and assign responsibilities for maintenance and inspection in rail transportation between car owners, railroads, and other entities. *See* ECF No. 119 at PageID #: 1430, ¶¶ 103, 105. "[T]he Interchange Rules establish that car owners are responsible for and chargeable for repairs to their railcars necessitated by wear and tear." ECF No. 119 at PageID #: 1430, ¶ 105. That responsibility continues even after a car owner leases its railcar to a shipper or the car is being transported by a railroad. *See Boston & M. R. R. v. United States*, 297 F. Supp. 615, 618 (D. Mass. March 18, 1969) ("Under the rules of the AAR car owners are responsible for repairs attributable to ordinary wear and tear, and car users are responsible for car repairs made necessary by damage 'due to unfair usage or improper protection by the using line.' ").

28

(4:23CV0242)

Although railroads have their own discrete inspection duties, they rely on railcar owners meeting their responsibilities to ensure that the cars comply with federal standards and are safe for transport.  *See* ECF No. 119 at PageID #: 1434, ¶ 125.

Norfolk Southern has also plausibly alleged that Trinity breached its duty to exercise reasonable and ordinary care when it failed to comply with federal regulations requiring it to certify continuously that Car 26's design and components were approved by the AAR, as evidenced by discrepancies between the AAR 4-2 and Car 26's actual characteristics on the day of derailment.  Norfolk Southern claims "the Federal Railroad Administration found that all five tank cars used to ship vinyl chloride had discrepancies between the AAR 4-2 certificate of construction and the cars' actual characteristics, including non-approved changes to the PRDs, valves, and component parts, and raised questions over whether a tank car was even approved for vinyl chloride transportation."  ECF No. 119 at PageID #: 1441, ¶ 160; *see also* ECF No. 119 at PageID #: 1432-33, ¶ 120; PageID #: 1435-36, ¶ 135; PageID #: 1439, ¶ 152.  According to Norfolk Southern, Trinity's failure to abide by the regulations is evidence of Trinity's negligence, to be considered by the trier of fact.  The fact that the FRA found these discrepancies existed further supports Norfolk Southern's claim that Trinity failed to comply with federal regulations and, therefore, breached its duty.  *See e.g.*, ECF No. 119 at PageID #: 1430, ¶¶ 103 and 105; PageID #: 1432-33, ¶ 120; PageID #: 1434, ¶ 125; PageID #: 1439, ¶ 152; PageID #: 1441, ¶ 161.  And despite the risk of polymerization, when vinyl chloride is exposed to aluminum, it was found in samples of the interior surface of Car 26's manway nozzle and in the coating on the PRD springs of the railcar, which Norfolk Southern argues is a clear breach of the

29

(4:23CV0242)

duty to ensure the safety of individuals near the railcar.  *See* ECF No. 119 at PageID #: 1435-36, ¶¶ 134-135.

Finally, Norfolk Southern has adequately pled an injury, *i.e.,* by contributing to the release of hazardous materials, that was proximately caused by Trinity's breach of duty.  *See* ECF No. 119 at PageID #: 1440, ¶ 153.  Trinity cites *Sizemore v. Deemer*, 174 N.E.3d 5, 11 ¶ 26 (Ohio App. 3d Dist. June 7, 2021) (holding that alleged violation of a city parking ordinance was not a proximate cause of plaintiff's harm) in support of its argument that its breach was a "single . . . paperwork 'discrepancy.' "  ECF No. 190-1 at PageID #: 2207.  A party's negligence is a proximate cause of an injury if "the injury is a natural and foreseeable result of the act or failure to act."  *Brott Mardis & Co. v. Camp*, 147 Ohio App.3d 71, 76, 768 N.E.2d 1191 (2001).  Proximate cause is "an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred."  *Hardwick v. 3M Co.*, No. 2:18-cv-1185, 2019 WL 4757134, at *16 (S.D. Ohio Sept. 30, 2019) (citation omitted).  Moreover, under Ohio law, "there can be more than one proximate cause of a particular injury."  *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp.3d 773, 795 (N.D. Ohio 2020) (citing *Taylor v. Webster*, 12 Ohio St.2d 53, 57, 231 N.E.2d 870 (1967)).  Furthermore, "[i]t is not necessary that a defendant anticipate a plaintiff's particular injury.  Instead, it is sufficient that the defendant's act is likely to result in injury to someone."  *Id.* (citations omitted).  In the case at bar, Norfolk Southern alleges that Trinity failed to follow federal regulations designed to ensure that Car 26 was safe to transport vinyl chloride, and it was reasonably foreseeable that such a failure would create a risk of polymerization and explosion in the event of an emergency.  *See* ECF No. 119 at PageID #: 1439, ¶ 152.  At the time of the derailment, Cars 26 (owned by

(4:23CV0242)

Trinity) and 29 (owned by GATX) were two of five railcars transporting vinyl chloride, a volatile and hazardous chemical that can, under certain circumstances, rapidly vaporize and expand resulting in a BLEVE or can polymerize, increasing the risk of a BLEVE.  *See* ECF No. 119 at PageID #: 1419, ¶¶ 46-47.  According to Norfolk Southern, Trinity provided a railcar that was not suitable for vinyl chloride service, as evidenced by Car 26's AAR 4-2 and the FRA's findings.  Preventing the release of hazardous materials is precisely why federal regulations require railcar owners to ensure their cars are safe for the transportation of the material.  *See* 49 C.F.R. § 171.1.  After the derailment, the PRD on Car 26 began venting, indicating that the temperature inside the railcar was increasing.  *See* ECF No. 119 at PageID #: 1425, ¶ 76.  Even after the pool fires died, the temperature inside Car 26 was above ambient temperature – a sign that polymerization could be occurring.  *See* ECF No. 119 at PageID #: 1427-28, ¶¶ 86-89.  This risk contributed to Unified Command's determination that a vent and burn was necessary.  *See* ECF No. 119 at PageID #: 1429, ¶¶ 96-97.

**2.**

Norfolk Southern has adequately pled in detail the ways in which OxyVinyls' alleged negligent failure to ensure the five tank cars were properly certified and safe to transport vinyl chloride, as well as its inconsistent guidance on the scene on the threat of polymerization, were a substantial factor in causing the release of hazardous materials.  According to Norfolk Southern, the vent and burn was neither new nor independent of OxyVinyls' negligence, but rather a direct result of its negligent actions.  "The vent and burn and release of hazardous vinyl chloride was the direct result of the improper shipping containers and OxyVinyls' failure to follow federal regulations and its own [Safety Data Sheet ("SDS")]."  ECF No. 119 at PageID #: 1442, ¶ 172.

31

(4:23CV0242)

OxyVinyls' Cars 27 and 28 were allegedly improperly outfitted with protective housing covers made of aluminum.  *See* ECF No. 119 at PageID #: 1420, ¶ 54.  Although the pool fires surrounding the railcars began to die down, the pressure in Car 28 continued to increase, with the PRD continuously venting gas for 70 minutes, and first responders were concerned that heat was building inside the car from internal processes.  *See* ECF No. 119 at PageID #: 1426-27, ¶ 84. First responders also recorded that the internal temperature of OxyVinyls' Car 53 was 135°F, and then 138°F an hour later – indicating the tank temperature was rising due to internal processes.  *See* ECF No. 119 at PageID #: 1427, ¶ 86.  The increasing temperature and pressure inside Cars 28 and 53 allegedly caused responders to conclude that polymerization was occurring, increasing the risk of catastrophic explosions.  *See* ECF No. 119 at PageID #: 1427-28, ¶¶ 88-90.  According to Norfolk Southern,  OxyVinyls' guidance to responders was inconsistent and inconclusive:  the on-site representative of OxyVinyls "commented that the rising temperature could indicate that polymerization was occurring," while other off-scene OxyVinyls officials stated that "there was a low probability of polymerization," despite the polymerization warnings in the SDS[8] required by federal regulation.  *See* ECF No. 119 at PageID #: 1428, ¶ 92; PageID #: 1422, ¶ 63.  Given the risk of catastrophic explosions if polymerization was occurring, on-site industry experts and responders reasonably believed that a vent and burn of the vinyl chloride was the safest option and Unified Command decided to proceed with the vent and burn.  *See* ECF No. 119 at PageID #: 1429, Id. ¶¶ 95-96.  The vent and burn was

---

[8]  The vinyl chloride SDS that OxyVinyls provided to Norfolk Southern stated that vinyl chloride "MAY MASS EXPLODE IN FIRE.  EXTREMELY FLAMMABLE GAS.  CONTAINS GAS UNDER PRESSURE, MAY EXPLODE IF HEATED. POLYMERIZATION CAN OCCUR."  ECF No. 119 at PageID #: 1422, ¶ 64.

(4:23CV0242)

executed effectively, and without casualties or uncontrolled explosions, on February 6, 2023.
*See* ECF No. 119 at PageID #: 1429-30, ¶¶ 97-101.

OxyVinyls contends that Norfolk Southern failed to adequately plead a cause of action for negligence because the failure of OxyVinyls to update an administrative form and its inconsistent guidance regarding the risk of vinyl chloride polymerization were not but-for causes of the derailment and release of hazardous materials.  Norfolk Southern argues to the contrary that these failures were both the but-for and proximate causes of the releases.  According to Norfolk Southern, while OxyVinyls did not make the decision to conduct the vent and burn, that is irrelevant because OxyVinyls' negligence was a proximate cause of the vent and burn decision.  Proximate cause, however, is generally a question of fact for the jury to answer.  *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 564 (6th Cir. 2006) (discussing Ohio law).  Norfolk Southern claims it is reasonably foreseeable that a railcar owner or shipper who fails to comply with regulations designed to ensure safe transportation of hazardous materials—in the case of the owner, by failing to keep its compliance and approvals up-to-date,[9] and in the case of the shipper, by improperly certifying the suitability of the non-compliant cars, thus preventing the railroad and others from knowing of the potential dangers—will substantially contribute to the release of those materials in the event of an emergency.

---

[9]  Norfolk Southern alleges that GATX exercises substantial direct control over the operations of its subsidiary General American, including with respect to railcar maintenance.  *See* ECF No. 119 at PageID #: 1444, ¶ 185.  At this juncture, the Court declines the invitation of General American and GATX to resolve a factual dispute as to the owner of Car 23.  *See* ECF No. 194 at PageID: 2257.  Norfolk Southern's allegations must be accepted as true and construed liberally in their favor in deciding the motions to dismiss.  *See Interstate Safety & Serv. Co. v. City of Cleveland*, No. 1:11CV1181, 2011 WL 5873108, at *1 (N.D. Ohio Nov. 18, 2011) (it is well-settled that "factual disputes . . . cannot be resolved at the motion to dismiss stage").

(4:23CV0242)

**a.**

Norfolk Southern, as a common carrier, has a statutory duty to transport hazardous materials tendered for shipment by companies such as OxyVinyls. *See* ECF No. 119 at PageID #: 1413, ¶¶ 13-14. Norfolk Southern necessarily relies on railcar owners and shippers to ensure and certify that tank cars comply with federal safety regulations and that hazardous materials are safely loaded. *See* ECF No. 119 at PageID #: 1413-14, ¶¶ 16-18. This includes ensuring that tank cars transporting hazardous materials are certified with proper and reliable safety information in case of an emergency. *See* ECF No. 119 at PageID #: 1414, ¶ 18. Norfolk Southern necessarily relies on railcar owners and shippers to abide by the federal regulations to certify a car's safety and to load hazardous materials correctly, ensuring proper stability and pressure for transport. *See* ECF No. 119 at PageID #: 1414, ¶ 20.

OxyVinyls (the owner of Cars 27, 28, and 53) and GATX (the owner of Car 29) are responsible for complying with a variety of compliance and maintenance measures for tank cars that carry hazardous materials. *See* ECF No. 119 at PageID #: 1432, ¶ 116 (citing 49 C.F.R. §§ 180.501 (general applicability), 180.507 (qualification requirements) ("Tank cars prescribed in the following table are no longer authorized for construction[.]"), 180.509 (inspection requirements), and 180.517 (reporting requirements) ("Each owner of a specification tank car must retain the certificate of construction (AAR Form 4-2) and related papers[.]")). Pursuant to 49 C.F.R. § 179.3, the AAR is charged with approving the design, materials, construction, conversion, and modification of tank cars in accordance with the *AAR Manual of Standards and Recommended Practices Specification for Tank Cars* and the federal regulatory specifications.

(4:23CV0242)

*See* ECF No. 119 at PageID #: 1432, ¶ 118.  Similarly, any changes to the tank car design or

components must also be approved by the AAR.  *See* 49 C.F.R. § 179.6.

In the aftermath of the derailment and vent and burn, the FRA found discrepancies

between the approved documents for Cars 27, 28, and 53 (the tank cars owned by OxyVinyls)

and the actual physical characteristics of the cars, including:  (i) missing or incorrect

information; (ii) unapproved and undocumented modifications; and, (iii) unapproved and

undocumented modification of component parts.  *See* ECF No. 119 at PageID #: 1433, ¶ 120(c).

The FRA also identified at least three (3) discrepancies between the approved documents for Car

29 (the tank cars owned by GATX) and its actual physical characteristics, including:  (i) the car

had never been approved for vinyl chloride transport; (ii) the original tank car valve had been

replaced with a Midland 720 valve without approval; and, (iii) the car's original PRD, which had

a 225 psi start, had been replaced with a PRD with a 247.5 psi start without approval.  *See* ECF

No. 119 at PageID #: 1433, ¶ 120(b).  According to Norfolk Southern, each of these

discrepancies violates federal regulations.

As a shipper of Cars 26, 27, 28, 29, and 53 containing vinyl chloride, OxyVinyls was

responsible for the proper loading and labeling of the tank cars, which included federal

certification of the proper packaging of the commodity and placement of tank car placards.  *See*

49 C.F.R. §§ 173.31, 172.508.  Shippers must also provide an SDS for each hazardous chemical

they produce or import that identifies, among other items, accidental release measures, stability

and reactivity, and fire-fighting measures.  *See* ECF No. 119 at PageID #: 1435, ¶ 133; *see also*

49 C.F.R. § 172.602.  The Vinyl Chloride (Monomer) SDS prepared by OxyVinyls and provided

to Norfolk Southern also warned of the risks of polymerization, noting in 12 instances some

35

(4:23CV0242)

variation of the warning that vinyl chloride may explode or polymerize if the vinyl chloride is exposed to "air, sunlight, excessive heat" and/or "Catalytic metals, such as copper, aluminum, and their alloys." *See* ECF No. 119 at PageID #: 1422-23, ¶¶ 64-65; PageID #: 1435, ¶ 134. Despite this risk of polymerization and explosion upon an interaction between vinyl chloride and those elements, Norfolk Southern alleges the railcars had been fitted with protective housing covers made of aluminum (Cars 27, 28, and 29), had aluminum in the interior surface of the manway nozzles (Cars 26 and 28), had aluminum coating on the PRD springs (Cars 26 and 27), had aluminum found in the exterior debris of the protective housing and housing cover (Car 29), had angle valve handwheels made of aluminum (Cars 28 and 53), and had angle valves covered in solidified melted aluminum after the derailment (Car 29). *See* ECF No. 119 at PageID #: 1435-36, ¶ 135; PageID #: 1420, ¶ 54.

**3.**

In addition, OxyVinyls contends that intervening causes relieve it of liability. Even if it were negligent, OxyVinyls argues that the actions of Norfolk Southern and General American (the owner of Car 23) constituted intervening and superseding causes. Norfolk Southern responds that no intervening or superseding cause, independent of OxyVinyls' negligence, absolves OxyVinyls of liability.

"The causal connection of the first act of negligence is broken and superseded by the second, *only if the intervening negligent act is both new and independent*." *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993) (citation omitted; emphasis in original). Norfolk Southern argues the vent and burn was not a negligent act. Rather, it was a reasonable decision based on the best available information at the time. They also maintain the

36

(4:23CV0242)

vent and burn decision was not a new and independent act—it was just the opposite, *i.e.*, a direct

consequence of the foregoing events, including OxyVinyls' negligent conduct.  "The term

'independent' means the absence of any connection or relationship of cause and effect between

the original and subsequent act of negligence.  The term 'new' means that the second act of

negligence could not reasonably have been foreseen.' "  *Id.* (citation and emphasis omitted).

Norfolk Southern claims the release of hazardous materials through the vent and burn had a clear

"connection or relationship of cause and effect" with OxyVinyls' negligence.  "Thus, the key

determination whether an intervening act breaks the causal connection between negligence and

injury depends upon whether that intervening cause was reasonably foreseeable by the one who

was guilty of the negligence."  *Id.* at 270 (internal quotation marks, brackets, and citations

omitted).  Finally, Norfolk Southern argues that as an owner of Cars 27, 28, and 53 and the

shipper of Cars 26, 27, 28, 29, and 53, it was reasonably foreseeable (and thus not new) to

OxyVinyls that if the railcars were unsafe to transport hazardous materials, and if an emergency

involving those materials were to occur, timely and accurate information about those materials to

prevent a catastrophic explosion would be needed.  Indeed, the FRA considers the vent and burn

method to be a foreseeable consequence in the event of an emergency.  *See Handbook for Vent*

*and Burn Method of Field Product Removal*, U.S. Dep't of Transp. (May 1994),

https://railroads.dot.gov/elibrary/handbook-vent-and-burn-method-field-product-removal, (last

visited March 13, 2024).  At the very least, the issue of whether intervening or superseding

causes relieve OxyVinyls of its liability is inherently factual and not something that should be

decided at the motion to dismiss stage.  *Leibreich*, 67 Ohio St.3d at 269 ("We have also

repeatedly recognized that the issue of intervening causation generally presents factual issues to

(4:23CV0242)

be decided by the trier of fact. The determination of intervening causation 'involves a weighing of the evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of the facts.' ") (citations omitted).

**4.**

GATX is alleged to have violated federal regulations, which was a "substantial factor" in the decision to vent and burn the tank cars containing vinyl chloride, resulting in the release of hazardous materials. Specifically, GATX (the owner of Car 29) was required to receive approval for car construction and any design or component changes to the car. *See* ECF No. 119 at PageID #: 1439, ¶ 151 (citing 49 C.F.R. §§ 179.3 and 179.6). Railcar owners must continually certify that they have complied with these requirements. 49 C.F.R. §§ 180.507 and 180.517. Specifically, the Third-Party Complaint alleges that GATX failed to obtain the required approvals in three important respects: (i) the original tank car valve had been replaced with a Midland 720 valve, without approval; (ii) the original PRD, which had a 125 psi start, had been replaced with a PRD with a 247.5 psi start, without approval; and (iii) the car had never been approved for vinyl chloride service. *See* ECF No. 119 at PageID #: 1439, ¶ 152(b).

The approval and recertification process is not merely an exercise in administrative rubber-stamping, but rather critically ensures that railcar owners construct and maintain their railcars in a manner compatible with the lading—the failure of which, as alleged in the Third-Party Complaint (ECF No. 119), can have potentially catastrophic consequences. At the time of the derailment, Car 29 was transporting vinyl chloride. Yet, despite the substantial risks inherent in the transportation of vinyl chloride, even in cars properly equipped and approved for transport of vinyl chloride, GATX allegedly never obtained the necessary approvals for Car 29

38

(4:23CV0242)

to carry vinyl chloride.  *See* ECF No. 119 at PageID #: 1433, ¶ 120(b).  Moreover, Norfolk

Southern specifically alleged that Car 29 contained components made of materials that

substantially increased the risk of polymerization if placed in contact with vinyl chloride and

thus increased the risk of a BLEVE.  *See* ECF No. 119 at PageID #: 1420, ¶ 54; PageID #: 1436,

¶ 135(d); PageID #: 1442, ¶ 167.  In addition, Norfolk Southern claims GATX modified Car 29

to include a non-approved tank car valve and PRD, which may have caused the vinyl chloride

inside the tank car to interact with potentially reactive agents, such as aluminum.  *See* ECF No.

119 at PageID #: 1433, ¶ 120(b); PageID #: 1435-36, ¶ 135.

"Because of the surrounding pool fires, the flammable gas venting from the PRDs

ignited, which upon information and belief began to melt part or all of the [vinyl chloride] tank

car[s'] liquid transfer valves and fittings."  ECF No. 119 at PageID #: 1425, ¶ 77.  This was

particularly troubling with respect to Car 29, "which had been fitted with a protective housing

cover made of aluminum," "had aluminum found in exterior debris of the protective housing and

housing cover on the tank car," and whose "angle valves were covered in solidified melted

aluminum after the derailment."  ECF No. 119 at PageID #: 1436, ¶ 135(d).  According to

Norfolk Southern, the presence of aluminum in Car 29 significantly heightened the risk of

polymerization and a violent BLEVE.  "The elevated temperature on Car 53 and sudden

extended venting from Car 28 without a pool fire underneath it caused responders to become

concerned . . .," ECF No. 119 at PageID #: 1427, ¶ 88, "that polymerization may have blocked

the PRDs on Car 28 and the other vinyl chloride tank cars," including Car 29.  ECF No. 119 at

PageID #: 1428, ¶ 90.  In light of the facts on the ground, Unified Command determined that a

(4:23CV0242)

vent and burn of all five vinyl chloride tank cars—including Car 29—was the safest option. *See*

ECF No. 119 at PageID #: 1429, ¶¶ 96-97.

Therefore, Norfolk Southern has adequately pled that GATX's alleged failure to obtain

regulatory approvals for Car 29's transportation of vinyl chloride and failure to obtain approvals

for certain modifications to Car 29 that made it unsafe for vinyl chloride service were substantial

factors in the decision to vent and burn the vinyl chloride inside Car 29. As alleged in the

Third-Party Complaint (ECF No. 119), had GATX properly complied with federal regulations

and industry rules, Car 29 would not have carried vinyl chloride in the first place, would not

have faced an imminent risk of explosion, and the vent and burn would not have been required.

Norfolk Southern cites *Tipton* in support of its argument that negligence claims against

GATX have been sufficiently pled to permit the claims to move forward. In *Tipton*, the

plaintiffs brought private nuisance and negligence claims against a railroad, CSX Transportation,

Inc., and a railcar owner, Union Tank Car Company ("UTLX"), following a train derailment and

subsequent release of toxic chemicals and fire in Maryville, Tennessee. 2016 WL 11501426, at

*1-2. In that case, the plaintiffs alleged that UTLX had breached its duty of care "by failing to

properly manufacture the roller bearings that overheated and failed, by failing to properly inspect

the roller bearings on the subject tank car to prevent their failure, . . . and by failing to repair or

replace the roller bearings that failed prior to continuing to place the tank car in service." Master

Consolidated Class Action Complaint (Doc. 114 in 3:15-cv-00311-TAV-CCS at PageID #: 957-

58, ¶ 73). As to causation, the plaintiffs alleged that the breaches "were a cause in fact and a

proximate cause of damages to Plaintiffs." Doc. 114 in 3:15-cv-00311-TAV-CCS at PageID #:

958, ¶ 73. The district court held that it "[wa]s able to 'draw the reasonable inference' that each

(4:23CV0242)

defendant's negligence was a proximate cause of the train derailment and subsequent chemical spill and fire, which caused plaintiffs property and personal injury damage." *Tipton*, 2016 WL 11501426, at *18.

**E.**

Next, Trinity argues the economic loss doctrine bars Norfolk Southern's claim for negligence. ECF No. 190-1 at PageID #: 2208-2209. Norfolk Southern responds that its negligence claim arises outside of contract. "The economic loss doctrine prevents a party from recovering economic losses in tort that result from 'a breach of duties assumed only by agreement.' " *Onyx Envtl. Servs., LLC v. Maison*, 407 F. Supp.2d 874, 879 (N.D. Ohio 2005) (quoting *Corporex Dev. & Constr. Mgmt., Inc.*, 106 Ohio St.3d 412, 414, 835 N.E.2d 701 (2005)). The economic loss doctrine does not apply "whe[n] a tort claim alleges a duty was breached *independent* of the contract." *Jones v. Ohio Nat'l Life Ins. Co.*, No. 1:20-cv-654, 2022 WL 1128596, at *9 (S.D. Ohio April 15, 2022) (emphasis in original) (quoting *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 171 N.E.3d 851, 861 ¶ 27 (Ohio App. 5th Dist. 2021)). A duty is independent of a contract if the defendant would owe that duty "even if no contract existed." *425 Beecher, LLC v. Unizan Bank, Nat'l Ass'n*, 186 Ohio App.3d 214, 230 ¶ 51, 927 N.E.2d 46 (2010) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co*, 115 Ohio App.3d 137, 151, 684 N.E.2d 1261 (1996)).

Norfolk Southern's negligence claim against Trinity is not based on the negligent performance of any contractual duties. Rather, it targets Trinity's duty to exercise reasonable and ordinary care to ensure the "safety of individuals and entities whose persons or property were within reasonable proximity to the rail line, Norfolk Southern's employees and its property,

(4:23CV0242)

and the environment," ECF No. 119 at PageID #: 1438, ¶ 149; *see also* ECF No. 119 at PageID #: 1438-39, ¶¶ 149-51, by complying with all federal regulatory requirements for the certification of Car 26, is alleged to arise *outside* of any contractual obligation. *See* ECF No. 119 at PageID #: 1430, ¶¶ 103-105; PageID #: 1432-34, ¶¶ 115-25; 49 C.F.R. §§ 179.3 and 179.6. There are no contract claims at issue in the case at bar. *See 425 Beecher, LLC*, 186 Ohio App.3d at 230, ¶ 51 ("[A] tort claim based upon the same actions as those upon which a breach-of-contract claim is based will exist independently of the contract action 'only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.' ") (citation omitted).

Moreover, Trinity's argument that the economic loss doctrine should bar Norfolk Southern's negligence claim because it seeks to recover for purely economic losses rather than personal injury or property damage, *see* ECF No. 190-1 at PageID #: 2208, is contrary to the purpose of the doctrine. The doctrine bars tort recovery for purely economic harm only if the duty arose by contract, when the remedy is in contract law. *See E-Tank Ltd. V. Deist Indus., Inc.*, No. 5:11CV2358, 2012 WL 1109986, at *3 (N.D. Ohio March 31, 2012). "[T]he economic-loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise solely from a contract." *Campbell v. Krupp*, 195 Ohio App.3d 573, 580 ¶ 16, 961 N.E.2d 205 (2011); *see also In re National Prescription Opiate Litigation*, 440 F. Supp.3d 773, 813-14 (N.D. Ohio 2020) (holding that the economic loss doctrine did not preclude plaintiffs' negligence claim for purely economic losses because the claim arose from a duty independent of any contract).

(4:23CV0242)

A final reason the economic loss doctrine does not apply in these circumstances is that Norfolk Southern's claims are dependent on the outcome of Plaintiffs' original action from which Norfolk Southern's third-party claims are derived.  *See Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008).  After all, impleader is available only when the third-party defendant's liability is secondary to, or a derivative of, the original defendant's liability on the original plaintiff's claim.  Fed. R. Civ. P. 14(a) allows a defendant to implead a third-party defendant "who is or *may be liable* to it for all or part of the [plaintiff's] claim against it." (emphasis added).  *See CSX Transp., Inc. v. Columbus Downtown Dev. Corp.*, 307 F. Supp.3d 719, 734 (S.D. Ohio. 2018) ("In light of the 'may be liable' language of Rule[ ] . . . 14(a), courts have long held that parties may plead a 'claim of a contingent nature, the ultimate outcome of which depends upon the determination of other features or issues in the case.' " (citations omitted)).  Therefore, in this contribution action, it is irrelevant whether Norfolk Southern itself suffered physical injury, because any physical injury that Norfolk Southern suffered is not contingent on its liability to Plaintiffs.

**F.**

Norfolk Southern impleaded Trinity, OxyVinyls, GATX, and General American in Count Four of the Third-party Complaint (ECF No. 119), seeking contribution under Ohio law in the event it has to pay damages to Plaintiffs, on the ground that Third-party Defendants had been negligent.  *See, e.g.*, *Davis v. Consol. Rail Corp.*, 788 F.2d 1260, 1262 (7th Cir. 1986).  Norfolk Southern's contribution claim is contingent on the success of Plaintiffs' claims – it alleges, for example, that "*[i]f* Plaintiffs establish that Norfolk Southern is responsible for damages, *then* such damages were contributed to by [Trinity]" because of Trinity's failure to comply with

43

(4:23CV0242)

federal regulations. ECF No. 119 at PageID #: 1445, ¶ 190 (emphasis added). Contrary to the

argument of GATX and General American, Norfolk Southern does not seek contribution greater

than its potential liability to Plaintiffs or seek double recovery for damages.

Ohio Rev. Code § 2307.25(A) (eff. April 9, 2003) provides a statutory right of

contribution only for a tortfeasor *who has paid* more than that tortfeasor's proportionate share of

the common liability. *See Berg Corp. v. C. Norris Mfg., LLC*, No. 5:20CV0100, 2020 WL

6064110, at *5, (N.D. Ohio Oct. 14, 2020) (citing *Wagner-Meinert, Inc. v. EDA Controls Corp.*,

444 F. Supp.2d 800, 803 (N.D. Ohio 2006), *aff'd*, No. 06-3777, 2007 WL 579668 (6th Cir. Feb.

23, 2007); *McPherson v. Cleveland Punch & Shear Co.*, 816 F.2d 249, 250-51 (6th Cir. 1987)).

When, as here, the third-party plaintiff has not alleged that it has paid any amount, much less

more than its proportionate share, its contribution claim, if any, is not ripe. *Hoffman v. Fraser*,

No. 2010-G-2975, 2011 WL 1782099, at *8-9 ¶¶ 64-67 (Ohio App. 11th Dist. May 6, 2011);

*Frank v. D'Ambrosi*, 4 F.3d 1378, 1387 (6th Cir. 1993). Therefore, Norfolk Southern has not

sufficiently pled a contribution claim (Count Four) against Trinity, OxyVinyls, GATX, and

General American under Ohio law, and this cause of action is premature.

### G.

OxyVinyls asks that Norfolk Southern's negligence claims be dismissed under the

first-filed rule. The first-filed rule is a prudential doctrine rooted in the need to manage

overlapping litigation across multiple courts. *See Baatz v. Columbia Gas Transmission,*

*LLC*, 814 F.3d 785, 789 (6th Cir. 2016) (it provides that, "when actions involving nearly

identical parties and issues have been filed in two different district courts, 'the court in which the

first suit was filed should generally proceed to judgment.' ") (citation omitted); *Zide Sport Shop*

(4:23CV0242)

*of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 Fed.Appx. 433, 437 (6th Cir. 2001).  According to OxyVinyls, GATX, and General American, these claims seek recovery for Norfolk Southern's own purported damages and are identical to the negligence claims raised in the earlier-filed third-party complaint in *State of Ohio v. Norfolk Southern Corp.*, No. 4:23CV0517 (N.D. Ohio June 30, 2023) (Adams, J.), which was filed 25 days before the Third-party Complaint (ECF No. 119) in the case at bar.  The first-filed rule is inapplicable because the earlier filed affirmative pleading involves parties and issues separate and distinct from the present case in which Norfolk Southern seeks to ensure that OxyVinyls, GATX, General American, and Trinity pay their proportionate share of the common liability for any recoverable personal and property damages alleged by the various classes of private plaintiffs who initiated the present case.

### IV.  Conclusion

As earlier announced,

Third-party Defendant OxyVinyls LP's Motion to Dismiss the Third-party Complaint Under Fed. R. Civ. P. 12(b)(6) (ECF No. 188) is granted in part and denied in part.

Third-party Defendant Trinity Industries Leasing Company's Motion to Dismiss the Third-party Complaint Under Fed. R. Civ. P. 12(b)(2) and (6) (ECF No. 190) is granted in part and denied in part.

Third-party Defendants GATX Corporation and General American Marks Company's Motion to Dismiss the Third-party Complaint Under Fed. R. Civ. P. 12(b)(6) (ECF No. 194) is granted in part and denied in part.

(4:23CV0242)

  The Court grants the motions to dismiss Count Four without prejudice.  All other claims and remedies of Norfolk Southern remain pending against Trinity, OxyVinyls, GATX, and General American.

  At this juncture, Norfolk Southern's claim for contribution (Count Four) against Trinity, OxyVinyls, GATX, and General American under Ohio law is premature.  Should Norfolk Southern become liable, that claim will ripen.


  IT IS SO ORDERED.


  March 13, 2024          */s/ Benita Y. Pearson*
Date             Benita Y. Pearson
              United States District Judge