PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  EAST PALESTINE TRAIN DERAILMENT | ) | CASE NO.  4:23CV0242 |
| | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| | ) | **MEMORANDUM OF OPINION AND ORDER** |
| | ) | [Resolving ECF Nos. 205, 206, and 207] |
| | ) | |

Pending is New Party Defendants GATX Corporation ("GATX") and General American Marks Company's ("General American") Motion to Dismiss First Amended Master Consolidated Class Action Complaint Under Fed. R. Civ. P. 12(b)(6) (ECF No. 205).

Also pending is New Party Defendant Trinity Industries Leasing Company's ("Trinity") Motion to Dismiss First Amended Master Consolidated Class Action Complaint Under Fed. R. Civ. P. 12(b)(2) and (6) (ECF No. 206).

Finally, pending is New Party Defendant OxyVinyls LP's ("OxyVinyls") Motion to Dismiss First Amended Master Consolidated Class Action Complaint Under Fed. R. Civ. P. 12(b)(6) and/or to Strike Request for Punitive Damages Under Fed. R. Civ. P. 12(f) (ECF No. 207).

The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law.  For the reasons set forth below, as announced during the Status Conference held in Chambers on February 9, 2024, the motions are granted in part and denied in part.

(4:23CV0242)

## I. Background

The above-entitled action arises from the February 3, 2023 derailment in East Palestine, Ohio of Norfolk Southern Train 32N, known as "32 Nasty" to rail workers because of its known safety risks.  *See* First Amended Master Consolidated Class Action Complaint ("First Amended Complaint") ([ECF No. 138](#)) at PageID #: 1796, ¶ 158.  Train 32N traveled eastbound on the Fort Wayne Line through northeast Ohio and passed at least three wayside defect detectors before derailing.  *See* [ECF No. 138 at PageID #: 1797, ¶ 165](#).  Train 32N (comprised of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive between the 111th and 112th railcars) derailed 38 railcars.  *See* [ECF No. 138 at PageID #: 1795, ¶ 155](#); Third-party Complaint ([ECF No. 119](#)) at PageID #: 1415, ¶ 28; PageID #: 1418, ¶ 40.[1]  According to Plaintiffs, Train 32N derailed because an improperly maintained bearing on Car 23 (a railcar allegedly owned by General American and/or GATX) failed.  *See* [ECF No. 138 at PageID #: 1783, ¶ 68; PageID #: 1793-94, ¶ 146](#).

Car 23 was a hopper car owned by General American and/or GATX, which was carrying polyethylene (plastic) pellets.  *See* [ECF No. 119 at PageID #: 1416, ¶ 30](#).  Car 23 was equipped with roller bearings that allow for the transfer of weight from the car and its lading to the wheels, and allow the axle to rotate under the load, while minimizing the rotational friction.  Bearings are capable, however, of overheating and can cause derailments.  *See* [ECF No. 119 at PageID #: 1416, ¶ 32](#).  In addition to conducting visual, on-the-ground inspections of railcars pursuant to

---

[1]  The Court relies on certain of the allegations made by Norfolk Southern in its Third-party Complaint ([ECF No. 119](#)).  The First Amended Complaint ([ECF No. 138](#)) named as additional defendants OxyVinyls, GATX, General American, and Trinity – the four parties that Norfolk Southern named as Third-party Defendants.

(4:23CV0242)

49 C.F.R. Part 215, Norfolk Southern also has equipped its network, including the Fort Wayne Line, with hot bearing detectors ("HBDs") to assess the temperature conditions of bearings and provide audible, real-time warnings to train crews and Norfolk Southern's Advance Train Control Wayside Help Desk when certain bearing temperature thresholds are met. *See* ECF No. 119 at PageID #: 1416, ¶ 33.

On the evening of February 3, 2023, an HBD in East Palestine recorded a bearing on Car 23 at 253°F above ambient temperature, triggering a critical audible alarm and causing the train engineer to engage the brake application to stop the train, which was already in the process of slowing due to train traffic on the network. Shortly thereafter, during deceleration, at approximately 8:54 p.m., the overheated bearing on Car 23 failed, and the car derailed along with 37 additional railcars, five of which were carrying vinyl chloride (also known as "vinyl chloride monomer" or "VCM"), a flammable gas that is transported in a pressurized liquid state, and that must be stabilized for safe transportation to prevent contact with reactive agents like oxygen. *See* ECF No. 119 at PageID #: 1418-19, ¶¶ 39-46; PageID #: 1420-21, ¶¶ 55-56. Under prolonged exposure to fire or heat, liquefied vinyl chloride turns to vapor and expands, which can cause its container to violently rupture and explode – this reaction is called a boiling liquid evaporating vapor explosion ("BLEVE"). *See* ECF No. 119 at PageID #: 1421, ¶ 58. Under exposure to heat or to catalytic metals, *e.g.*, copper, aluminum, and their alloys, vinyl chloride can also polymerize, a chemical reaction that turns vinyl chloride into a solid-state polymer, which can increase the risk of a BLEVE by blocking the proper operation of the pressure relief devices ("PRDs"). *See* ECF No. 119 at PageID #: 1421-23, ¶¶ 60-66. A PRD is designed to

3

(4:23CV0242)

automatically relieve pressure from the tank car when the tank's contents exceed a pressure threshold.  *See* ECF No. 119 at PageID #: 1420, ¶ 51.

Car 29, one of the five tank cars carrying vinyl chloride, was owned by GATX.  *See* ECF No. 119 at PageID #: 1419, ¶ 47(c).  At the time of the derailment, Car 29 was allegedly equipped with an unapproved PRD.  *See* ECF No. 119 at PageID #: 1433, ¶ 120(b).

The Bearing Install Manual for the bearing on Car 23 states that "[c]ars, coaches, and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces." (quoting Timken, *Installing and Maintaining Timken AP and AP-2 Bearings, Diesel Locomotive, Passenger and Freight Car Applications*, 25 (2015)).  ECF No. 119 at PageID #: 1431, ¶ 107.  According to Norfolk Southern, Timken's guidance is consistent with industry practice to prevent railcars from sitting stationary for long periods because grease separation may occur, which reduces the amount of lubrication around the bearings and may impact functionality.  *See* ECF No. 119 at PageID #: 1431, ¶ 108.

The owner of Car 23 was responsible for ensuring that the railcar moved at least one car length every six months to distribute lubricant over the bearing surface.  *See* ECF No. 138 at PageID #: 1793, ¶ 141; ECF No. 119 at PageID #: 1431, ¶ 106.  Such movement is necessary as railcars that sit stationary for extended periods of time in the weather and elements can enable grease separation leading to a reduction in the amount of lubrication around the bearings that negatively impacts functionality.  *See* ECF No. 138 at PageID #: 1793, ¶¶ 142-43.  The movement data for Car 23, which operated out of the Gulf States for long periods, indicates that it had few shipments and low mileage over the prior decade, and that it had been stationary for

4

(4:23CV0242)

longer than six months at least twice:  first for 565 days ending in August 2018 and again for 206 days ending in May 2019.  *See* ECF No. 138 at PageID #: 1793, ¶ 144; ECF No. 119 at PageID #: 1431, ¶¶ 109-111.  Plaintiffs and Norfolk Southern claim that General American and/or GATX's failure to move Car 23 every six months resulted in the internal degradation and ultimate failure of Car 23's bearing.  *See* ECF No. 138 at PageID #: 1793-94, ¶¶ 145-46; ECF No. 119 at PageID #: 1444, ¶ 184.

The derailed cars included tank cars carrying hazardous materials that subsequently ignited, fueling fires that damaged additional railcars and resulted in the evacuation of residents. *See* ECF No. 138 at PageID #: 1803, ¶¶ 180-81.  Seeking to represent a putative class "upwards of 500,000 Class Members" (ECF No. 138 at PageID #: 1806, ¶ 188), Plaintiffs propose classes and subclasses of residents, property owners, employees, and businesses spanning three (3) States and nearly 3,000 square miles encompassed by a 30-mile radius around the derailment site.  Plaintiffs seek recovery of alleged "real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness."  ECF No. 138 at PageID #: 1835, ¶ 287.

Plaintiffs assert 17 claims against Norfolk Southern in the First Amended Complaint (ECF No. 138), which include:  negligence, negligence per se, and gross negligence/willful and wanton conduct (Counts I(A) and XVII); strict liability (Count II); statutory, private, and public nuisances (Counts III-VI); trespasses (Counts VII and VIII).  Plaintiffs also assert state-law

(4:23CV0242)

statutory claims (Counts IX, X, XI, and XII), claims for medical monitoring (Counts XIII, XIV, and XV), and spoliation (Count XVI).  Plaintiffs request compensatory, punitive, and exemplary damages.

Plaintiffs assert that Norfolk Southern's flagrant disregard for safety and the resulting consequences coincides with its adoption of "Precision Scheduled Railroading" ("PSR") in 2019. ECF No. 138 at PageID #: 1789, ¶ 116.  They allege that "[w]hile railroads like Norfolk Southern are ultimately responsible for ensuring the safe transport of all rail cars, including any hazardous materials in the railcars they accept for transport along their systems, owners, lessees and shippers are also responsible for any defects they cause, or fail to remedy, or otherwise fail to comply with the freight car safety regulations.  See 49 CFR 215.7."  ECF No. 138 at PageID #: 1792, ¶ 132.

On July 25, 2023, Norfolk Southern filed a Third-party Complaint (ECF No. 119) naming OxyVinyls, GATX, General American, and Trinity as Third-party Defendants.  Norfolk Southern asserts negligence (Count One - against OxyVinyls, GATX, and Trinity; Count Two - against OxyVinyls; and, Count Three - against GATX and General American) and Ohio joint and several liability and contribution claims (Count Four - against OxyVinyls, GATX, General American, and Trinity) in ECF No. 119.

The First Amended Complaint (ECF No. 138) subsequently named OxyVinyls, GATX, General American, and Trinity as New Party Defendants.  Plaintiffs allege that:  General American was the owner of railcar GPLX75465 ("Car 23"); "Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed;" OxyVinyls was the owner of railcars OCPX80235 ("Car 27"), OCPX80179

(4:23CV0242)

("Car 28"), and OCPX80370 ("Car 53"); GATX was the owner of railcar GATX95098 ("Car 29"); Trinity was the owner of railcar TILX402025 ("Car 26"); OxyVinyls was also the shipper of Cars 26, 27, 28, 29 and 53; and, Cars 26, 27, 28, 29 and 53 were tank cars and each contained vinyl chloride monomer in a pressurized liquid state, which was released during the February 3, 2023 derailment, including the subsequent controlled release on February 6, 2023.  *See* ECF No. 138 at PageID #: 1792, ¶ 133-39.

Plaintiffs assert claims against OxyVinyls, GATX, General American, and Trinity in the First Amended Complaint (ECF No. 138).  Count I(B) asserts a negligence claim against GATX and General American.  Count I(C) alleges a claim for negligence against OxyVinyls, GATX, and Trinity.  Counts XIII, XIV, and XV assert medical monitoring claims against all Defendants on behalf of the Ohio, Pennsylvania, and West Virginia residents and employees subclasses, respectively.  Count XVII asserts a gross negligence/willful and wanton conduct claim on behalf of all classes against all Defendants.

Plaintiffs and Norfolk Southern claim that the PRDs malfunctioned after the derailment and/or were manufactured with components containing materials inconsistent with vinyl chloride, which was the chemical being shipped in its stabilized form.  *See* ECF No. 119 at PageID #: 1439-41, ¶¶ 151-62; PageID #: 1442, ¶¶ 167 and 172; PageID #: 1443, ¶ 173. Immediately after the derailment, the tank cars owned and/or shipped by OxyVinyls were surrounded by pool fires.[2]  Around midnight on February 4, 2023, the PRDs on the vinyl chloride tank cars began activating and releasing pressure in a cycle of thirty seconds on

---

[2]  Pool fires are fires that occur when a pool of volatile liquid evaporates and burns.  *See* ECF No. 119 at PageID #: ¶ 73.

7

(4:23CV0242)

(releasing) and two minutes off. *See* ECF No. 119 at PageID #: 1425, ¶ 76. "Because of the surrounding pool fires, the flammable gas venting from the PRDs ignited, which upon information and belief began to melt part or all of the [vinyl chloride] tank car[s'] liquid transfer valves and fittings." ECF No. 119 at PageID #: 1425, ¶ 77. The PRDs continued to vent through the early morning hours of February 4, 2023. *See* ECF No. 119 at PageID #: 1425, ¶ 79.

After the PRDs stopped venting in the early afternoon of February 4, 2023, responders sent in two teams to monitor the pressure conditions of the vinyl chloride tank cars. *See* ECF No. 119 at PageID #: 1426, ¶¶ 82-83. During this time, the PRD on Car 28 (owned by OxyVinyls) activated again and began to continuously vent gas for approximately 70 minutes, frightening responders and causing concern that pressure and heat were building inside the tank of Car 28. *See* ECF No. 119 at PageID #: 1426-27, ¶ 84. Responders also detected elevated temperatures on Car 53 (owned by OxyVinyls), raising the concern that the tank temperature and pressure were rising without external stimulus. *See* ECF No. 119 at PageID #: 1427, ¶ 86. The PRDs on the other cars carrying vinyl chloride, including Car 29 (owned by GATX), did not resume venting. *See* ECF No. 119 at PageID #: 1426, ¶ 82. The allegedly unapproved PRD on Car 29 stopped working, raising fears that the car could explode. *See* ECF No. 138 at PageID #: 1839, ¶ 303(e).

The elevated temperature on Car 53 and sudden extended venting from Car 28 caused responders to become concerned about the potential for catastrophic explosions. *See* ECF No. 119 at PageID #: 1427, ¶ 88. These factors also indicated to Unified Command (*i.e.*, Norfolk Southern, in coordination with government officials) that polymerization may have blocked the

8

(4:23CV0242)

PRDs on Car 28 and the other vinyl chloride cars, including Car 29. *See* ECF No. 119 at PageID #: 1428, ¶ 90. As a result, on the morning of February 6, 2023, Unified Command met to discuss strategies to relieve the pressure in the five vinyl chloride tanks and avoid a catastrophic uncontrolled explosion, and ultimately decided to vent and burn the contents of all five vinyl chloride railcars. *See* ECF No. 119 at PageID #: 1429, ¶ 96.

Unified Command decided to detonate explosives on all five derailed cars containing hazardous materials and to vent and burn the released vinyl chloride dumped in a trench, causing a massive explosion that sent toxic chemicals over East Palestine and the surrounding area. *See* ECF No. 138 at PageID #: 1804, ¶¶ 183-185; *see also* ECF No. 138 at PageID #: 1832-33, ¶ 279 (z-ee, gg-ll) (alleging violations of duties following the derailment); ECF No. 119 at PageID #: 81-96 (detailing the options available to Norfolk Southern and explaining why the vent and burn was the only option in light of the evidence of polymerization occurring in the five tank cars).

## II.  Standards of Review

### A.    Motion to Dismiss Under Rule 12(b)(2)

When a defendant affirmatively raises a personal jurisdiction challenge under Fed. R. Civ. P. 12(b)(2), the court may decide the motion based on written submissions only, permit discovery in aid of the motion, or conduct an evidentiary hearing on the merits of the motion. *See Serras v. First Tenn. Bank Nat'l. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). "A district court has discretion in how it resolves a 12(b)(2) motion." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (citing *Serras*, 875 F.2d at 1214). If the district court relies solely on written submissions to resolve a motion to dismiss for lack of personal jurisdiction,

(4:23CV0242)

"the burden on the plaintiff is 'relatively slight.' " *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988)).  The plaintiff bears the burden of establishing that jurisdiction exists and "must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  The plaintiff need only make a "prima facie showing that personal jurisdiction exists" in order to defeat a properly supported motion for dismissal.  *Am. Metal Stamping Co., LLC v. Pittsburgh Pipe & Supply Corp.*, No. 1:21CV2334, 2022 WL 19349904, at *3 (N.D. Ohio June 6, 2022).  The court must construe all "the pleadings and the affidavits in a light most favorable to the plaintiff" and disregard any "contrary factual contentions of the defendant." *Vlach v. Yaple*, 670 F. Supp.2d 644, 647 (N.D. Ohio 2009); *see also Serras*, 875 F.2d at 1215 (when plaintiff's written submissions state facts sufficient to establish personal jurisdiction, the court is "obligat[ed] to ignore contrary assertions" by defendant).

> **B.     Motion to Dismiss Under Rule 12(b)(6)**

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted).  A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in th[e] complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007); *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 895 n.3 (6th Cir. 2019) (when determining the plausibility of claims at the motion to dismiss stage, the complaint must be viewed as a whole).  A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to

(4:23CV0242)

relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

Plaintiff is not required to include detailed factual allegations, but must provide more than "an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.  A pleading that

merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of

action will not do." *Twombly*, 550 U.S. at 555.  Nor does a complaint suffice if it tenders "naked

assertion[s]" devoid of "further factual enhancement." *Id.* at 557.  It must contain sufficient

factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570;

*Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The plausibility

standard is not akin to a "probability requirement," but it suggests more than a sheer possibility

that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 556.  When a complaint pleads

facts that are "merely consistent with" a defendant's liability, it "stops short of the line between

possibility and plausibility of 'entitlement to relief.'" *Id.* at 557 (brackets omitted).  "[When] the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"

*Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)).  The Court "need not accept as true a legal

conclusion couched as a factual allegation or an unwarranted factual inference." *Handy-Clay v.*

*City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012) (citations and internal quotation

marks omitted).

11

(4:23CV0242)

### III.  Law and Analysis

**A.**  **Trinity's Motion to Dismiss Under Rule 12(b)(2)**

Trinity attempts to escape liability by arguing the Court lacks personal jurisdiction over it.  In April 2021, the Ohio Legislature amended Ohio's long-arm statute to make it co-terminous with the limits of due process under the United States Constitution.  *See, e.g.*, Ohio Rev. Code § 2307.382(C) ("[A] court may exercise personal jurisdiction over a person on any basis consistent with . . . the United States Constitution."); *Zahara Ariel LLC v. Lionsgate Entm't Corp.*, No. 2:23-cv-1916, 2023 WL 4706188, *2-3 (S.D. Ohio June 14, 2023) (holding that Ohio's long-arm statute is now "co-extensive with the limits of the federal Due Process Clause"); *Smith v. Swaffer*, 566 F. Supp.3d 791, 806 (N.D. Ohio 2021) ("In April 2021, the Ohio General Assembly extended the State's long-arm statute to the limits of the Constitution.").  Accordingly, the Court has personal jurisdiction over Trinity if such jurisdiction comports with Due Process.

Having reviewed the parties' written submissions and attachments, the Court concludes that the matter of specific personal jurisdiction over Trinity (a Texas-based company) may be resolved by the parties' submissions (ECF Nos. 206, 234, and 254), without additional discovery or an evidentiary hearing.  Plaintiffs can defeat the motion of Trinity under Fed. R. Civ. P. 12(b)(2) by "establishing with reasonable particularity sufficient contacts between [Trinity] and the forum state to support jurisdiction."  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted).  The Court views the pleadings and affidavits in the light most favorable to Plaintiffs, and importantly, it does not weigh Trinity's "controverting assertions."  *Theunissen*, 935 F.2d at 1459 (citing *Serras* 875 F.2d at 1214).

12

(4:23CV0242)

Specific personal jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation marks and bracket omitted); *see also Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011) (specific jurisdiction is proper "in a suit arising out of or related to the defendant's contacts with the forum.") (citation omitted). Specific personal jurisdiction comports with due process under the Constitution when "the defendant has sufficient minimal contacts such that traditional notions of fair play and substantial justice are not offended." *Intera Corp. v. Henderson*, 428 F.3d 605, 615-616 (6th Cir. 2005) (quotation marks and citation omitted). The Sixth Circuit utilizes a three-pronged test for evaluating whether the proposed exercise of personal jurisdiction comports with due process, considering (1) whether the defendant purposefully availed himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) whether the plaintiff's cause of action arises from or relates to the defendant's activities in the forum state; and (3) whether acts of the defendant or the consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *See Beydoun v. Wataniya Restaurants Holdings Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014). Plaintiffs have satisfied all three of these elements.

### 1.

Plaintiffs have made a *prima facie* showing that Trinity purposefully availed itself of the privilege of conducting activities in Ohio or causing consequences in Ohio. The Sixth Circuit has adopted the "stream of commerce plus" approach to determining whether the purposeful

13

(4:23CV0242)

availment prong has been met.  *See Fortis Corp. Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 220 (6th Cir. 2006).  That test is satisfied if the non-resident defendant places a product into the stream of commerce and then takes affirmative steps to distribute the product at issue (in this case, railcar TILX402025 ("Car 26")) within the forum state.  *Id.*  When Trinity leased Car 26 to OxyVinyls, Trinity allegedly knew that it would travel to and through Ohio.  *See* ECF No. 138 at PageID #: 1785, ¶ 85.

Trinity's parent company (Trinity Industries, Inc.) has been registered to do business in Ohio for decades.  *See* https://businesssearch.ohiosos.gov/ (last visited March 13, 2024).  Trinity concedes that as of January 31, 2023 it had "nine (9) leasing customers with billing addresses in Ohio—approximately 1% of its leasing customer base" and "derived approximately 2% of its total revenue from railcars routed through Ohio" in the 2022 calendar year.  Affidavit of J. Travis Galt (ECF No. 190-2) at PageID #: 2214, ¶¶ 10-11; *see also* ECF No. 138 at PageID #: 1785, ¶ 87.  Since December 2014, Norfolk Southern has also submitted approximately 23,776 invoices to Trinity for repairs performed on its railcars in Ohio, totaling about $3,676,800 in repair costs.  *See* Declaration of Christopher A. Rheinheimer (ECF No. 228-1) at PageID #: 2596, ¶ 5; *see also CSX Transp., Inc. v. Union Tank Car Co.*, 247 F. Supp.2d 833, 842 (E.D. Mich. 2002) (defendant had sufficient contacts with Michigan where it generated revenue from its railcars traveling through the state and paid for a significant number of repairs to its railcars within the state).

Trinity leased Car 26 to OxyVinyls, an entity that regularly does business in and ships railcars through Ohio.  *See* ECF No. 119 at PageID #: 1415, ¶¶ 27-28; PageID #: 1418, ¶ 39. Norfolk Southern alleges that Car 26 previously traveled on the Fort Wayne Line through

(4:23CV0242)

northeast Ohio before it derailed in East Palestine, Ohio.  *See* ECF No. 119 at PageID # 1412, ¶ 6; PageID # 1418, ¶ 40.  By leasing its railcars to shippers, like OxyVinyls, that distribute them throughout the country, Trinity "undoubtedly kn[ows] that its [railcars] could end up in [Ohio] through the stream of commerce." *Fortis Corp. Ins.*, 450 F.3d at 221 (citing *Mott v. Schelling & Co.*, No. 91-1540, 1992 WL 116014, at *6 (6th Cir. May 29, 1992) (a party "cannot avoid liability for the injuries caused by its product [in the forum state] by creating a paper transfer through a middleman"); *see also Step2 Co., LLC v. Parallax Grp. Int'l, LLC*, No. 5:08CV2580, 2010 WL 3783151, at *6 (N.D. Ohio Sept. 17, 2010) ("It is reasonable to infer that [products] placed into the stream of commerce through . . . established national distribution channels may make their way to Ohio."); *CSX Transp., Inc.*, 247 F. Supp.2d at 842 (defendant "purposefully availed itself of causing a consequence within [Michigan]" when it "leas[ed] a rail tank car which it knew or should have known would travel on [third party's] rail system, which includes Michigan"); *Fullington v. Union Pac. Fruit Exp. Co.*, No. CIV.A. 88-2453-S, 1989 WL 21039, at *2 (D. Kan. Feb. 1, 1989) (holding defendant subject to specific personal jurisdiction in out-of-state forum based on inspection of railcar Defendant knew would travel through national rail system).

## 2.

Plaintiffs' claims arise out of or relates to Trinity's contacts in Ohio.  "The Sixth Circuit establishes a 'lenient' threshold for meeting this requirement." *Fortis Corp. Ins.*, 450 F.3d at 222 (citing *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)).  Trinity leased Car 26 to OxyVinyls and the railcar traveled on the Fort Wayne Line through northeast Ohio before it

(4:23CV0242)

derailed in East Palestine, Ohio.  *See* ECF No. 190-2 at PageID #: 2014-15, ¶ 12; ECF No. 119 at PageID #: 1415, ¶ 27; PageID #: 1418, ¶ 40.  Plaintiffs' claims are based on Trinity's alleged failure to follow federal regulations designed to ensure that Car 26 was safe to transport vinyl chloride in Ohio and elsewhere.  *See* ECF No. 138 at PageID #: 1794, ¶¶ 147-48; PageID #: 1794-95, ¶¶ 151-52; *see also* ECF No. 119 at PageID #: 1439, ¶ 152.  Thus, "there is a strong relationship among the defendant [Trinity], the forum [Ohio], and th[is] litigation"—the 'essential foundation' of specific jurisdiction."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (citation omitted).  Moreover, when the "brunt of the harm" (the alleged release of hazardous materials from the railcar) is felt in the forum state, "based on the effects" of the out-of-state conduct (the lease and unapproved modifications of Car 26), jurisdiction is also appropriate.  *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (internal quotation marks omitted).

**3.**

Lastly, the exercise of personal jurisdiction over Trinity is reasonable and fair.  This third factor in the Sixth Circuit's test is whether there is a substantial enough connection between the acts of the defendant or consequences caused by the defendant and the forum state to make the exercise of jurisdiction over the defendant reasonable.  *Air Prods. & Controls, Inc.*, 503 F.3d at 549.  Notably, when "the first two criterion are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.' "  *Id.* at 554 (citation omitted).  For this factor, courts typically consider "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy."  *Intera Corp.*, 428 F.3d at 618.

(4:23CV0242)

The Court finds that these factors all weigh in favor of exercising personal jurisdiction. First, there is little to no burden placed upon Trinity by litigating this matter in Ohio given the matter's direct connection with Ohio residents; and, in any event, Trinity has not argued that it would be inconvenient or otherwise burdensome to litigate in this forum. "[M]odern transportation and communication sufficiently ease this burden." *Ardent Techs. Inc. v. Advent Servs. LLC*, No. 3:23-CV-137, 2023 WL 5588547, at *8 (S.D. Ohio Aug. 29, 2023) (quotation marks and citation omitted); *see also AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016) (holding the exercise of personal jurisdiction over Texas resident reasonable when he "deliberately affiliated himself with [the forum] and its residents, and the fact that [defendant] lives in Texas does not overcome the inference of reasonableness"); *Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, No. 13 CV 00439, 2016 WL 11702227 (N.D. Ill. Oct. 7, 2016) (Trinity began an action in Indiana and continued litigating it after it was transferred to Illinois). Second, "Ohio has a strong interest in ensuring the enforcement of its laws," especially because the violation of its tort laws is alleged to have resulted in harm affecting the putative Ohio class members. *CrossCountry Mortgage, Inc. v. Messina*, No. 1:19CV1021, 2019 WL 5653288, at *14 (N.D. Ohio Oct. 31, 2019); *see also Black v. Usher Transp.*, No. 2:10-cv-0003, 2010 WL 2465379, at *5 (S.D. Ohio June 11, 2010) ("The state of Ohio has an interest in protecting its citizens from tortious conduct by non-residents."). Third, Plaintiffs have a strong interest in obtaining relief in a single proceeding from all those who are or may be liable, and the most reasonable place for that proceeding – both for Plaintiffs and for the efficient use of judicial resources – is this one already before the Court wherein Norfolk Southern (and now, through the

(4:23CV0242)

First Amended Complaint (ECF No. 138), Trinity) has been sued by Plaintiffs.  *Huey Jiuan Liang v. AWG Remarketing*, No. 2:14-cv-99, 2015 WL 65258, at *8 (S.D. Ohio Jan. 5, 2015) (finding exercise of jurisdiction over third-party defendant reasonable to avoid "piecemeal litigation" and crediting third-party plaintiffs' assertions "that they have a vested interest in resolving the lawsuit in this forum, in turn preventing them from engaging in a separate lawsuit in a different forum that would require the presentation of the evidence given in this case"). Finally, while the state of Texas has an interest in enforcing its own laws against its own citizens, the Court does not find that this interest outweighs Ohio's interest in protecting its own citizens.

As set forth above, Plaintiffs' have made a *prima facie* showing that the Court's exercise of personal jurisdiction over Trinity is consistent with Due Process and Ohio law following the April 2021 amendments to Ohio Rev. Code § 2307.382(C).

**4.**

Assuming *arguendo* that Ohio's long-arm statute, Ohio Rev. Code § 2307.382(A), is not co-extensive with due process, Trinity's forum contacts satisfy Ohio's long-arm statute.  First, by leasing railcars to Ohio customers, Trinity "transact[s]. . . business in [Ohio]."  Ohio Rev. Code § 2307.382 (A)(1).[3]  Second, Trinity "[c]ontract[s] to supply services or goods" in Ohio, including by leasing its railcars to companies that route its cars through Ohio.  Ohio Rev. Code § 2307.382 (A)(2).  Third, Plaintiffs' claims seek damages for injuries proximately caused by

---

[3]  As recognized by the Supreme Court of Ohio, this provision is "very broadly worded[,]" with the word "[t]ransact" meaning more than "contract" and instead to prosecute negotiations, carry on business, or "have dealings."  *Ky. Oaks Mall Co. v. Mitchell's Formal Wear*, 53 Ohio St.3d 73, 75, 559 N.E.2d 477 (1990).

18

(4:23CV0242)

Trinity's negligence in Ohio.  Ohio Rev. Code § 2307.382 (A)(3) ("[c]ausing tortious injury by

an act or omission in [Ohio]").  Finally, Plaintiffs' claims are premised on the actions of Trinity

outside of and within Ohio related to its improper construction, certification, and placement of an

unsafe railcar carrying hazardous materials onto railways it knew would and did pass through

Ohio, resulting in considerable harm along the way.  Ohio Rev. Code § 2307.382 (A)(4) (causing

tortious injury in Ohio by an act or omission occurring outside of Ohio while regularly doing

business and deriving substantial revenue from services rendered in Ohio).

Therefore, the Court concludes that Trinity has the requisite contacts with Ohio to

support this Court's exercise of personal jurisdiction.

**B.**

The responsibility of safe transport of hazardous materials via rail belongs not only to

railroads like Norfolk Southern, but also to the owners and lessees of the railcars and the

manufacturers and shippers of the materials being transported.  *See* ECF No. 138 at PageID #:

1791, ¶ 128.  Plaintiffs allege that Trinity negligently failed to ensure Car 26 was safe and

approved to transport hazardous materials like vinyl chloride.  According to Plaintiffs, Cars 26

and 29 were not properly constructed, approved, and/or certified for transport at the time of the

derailment.  *See* ECF No. 138 at PageID #: 1794, ¶ 150.  Specifically, critical safety features of

Car 26 were constructed of or coated with aluminum, which is incompatible with shipping

hazardous chemicals due to its low melting point, ability to be damaged by fires, and reactivity

with vinyl chloride.  Car 26 allegedly had aluminum-coated springs in its PRD.  *See* ECF No.

138 at PageID #: 1795, ¶ 152(a).

(4:23CV0242)

As alleged in the First Amended Complaint (ECF No. 138) and Third-party Complaint (ECF No. 119), the Federal Railroad Administration ("FRA") found that Trinity's Association of American Railroads ("AAR") 4-2 Certificate of Construction for Car 26,[4] a DOT-105J300W specification tank car carrying vinyl chloride, *see* ECF No. 119 at PageID #: 1419, ¶¶ 46-48, contained discrepancies and did not match the car's actual characteristics. *See* ECF No. 119 at PageID #: 1432, ¶ 120; PageID #: 1439, ¶ 152; PageID #: 1441, ¶ 161; *see also* ECF No. 138 at PageID #: 1794, ¶ 149.

Next, Plaintiffs allege GATX and General American, owners of Car 23,[5] failed to maintain and inspect the railcar ensuring it was fit and safe for transport. As a result, the wheel bearing on Car 23 failed and caught fire resulting in the derailment of Train 32N. Car 29 (owned by GATX), which was carrying vinyl chloride, also derailed. According to Plaintiffs, GATX failed to ensure that Car 29 was safe and approved to transport a hazardous material. Car 29 allegedly had an incompatible PRD replaced and never received the special regulatory approval needed to ship vinyl chloride. *See* ECF No. 138 at PageID #: 1794, ¶ 149. Car 29 was also constructed with aluminum protective housings and handwheels. *See* ECF No. 138 at PageID #: 1795, ¶ 152. Plaintiffs claim such aluminum features are incompatible with shipping vinyl chloride because the aluminum can melt or be damaged by fires, and there is a potential for an

---

[4] An AAR 4-2 Certificate of Construction certifies that the tank, equipment, and car fully conform to all the requirements of the specification and must be obtained prior to the tank car being placed in service. 49 C.F.R. § 179.5.

[5] At this juncture, the Court declines the invitation of General American and GATX and to resolve a factual dispute as to the owner of Car 23. *See* ECF No. 194 at PageID #: 2257; *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) ("A judge may not grant a Fed. R. Civ. P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's factual allegations.") (citation omitted).

(4:23CV0242)

adverse chemical reaction if the vinyl chloride is exposed to aluminum.  *See* ECF No. 138 at PageID #: 1794-95, ¶ 151.  GATX's Car 29 was constructed of materials that allegedly were inappropriate for, or inconsistent with, the shipment of vinyl chloride at the time of the derailment.  *See* ECF No. 138 at PageID #: 1795, ¶ 153.  Post-derailment, the melting of and damage to the aluminum parts of Car 29 compromised the tank car's ability to properly vent and depressurize, leading to a decision to detonate explosives on all five derailed cars containing hazardous materials, including Car 29.

## C.

Trinity contends Plaintiffs' negligence and gross negligence claims are preempted by the Federal Railroad Safety Act ("FRSA")[6] and Hazardous Materials Transportation Act ("HMTA").[7]  GATX and General American argue both of these claims are preempted by the FRSA.  OxyVinyls maintains Plaintiffs' negligence and gross negligence claims are preempted by the HMTA.  According to Trinity, "Plaintiffs make no plausible allegation that any purported inconsistency between the Form AAR 4-2 and Car 26's 'physical state' violated [ ] any of the cited regulations," and "Plaintiffs cite no rule under the HMTA that prohibits the use of aluminum in any railcar carrying vinyl chloride."  Trinity's Memorandum in Support (ECF No. 206-1) at PageID #: 2370; PageID #: 2372.  Plaintiffs, however, have alleged sufficient facts to

---

[6]  The FRSA governs matters "related to railroad safety."  49 U.S.C. § 20106.  It authorizes the FRA to prescribe regulations related to railroad safety.

[7]  HMTA preemption is limited in relevant part to laws relating to "the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing" of a package or container used in transporting hazardous materials, such as by rail.  49 U.S.C. § 5125(b)(1)(E). The HMTA directed the Secretary of Transportation to issue regulations "for the safe and secure transportation of hazardous materials."  49 C.F.R. § 171.1.  The regulations that the Secretary prescribes under the HMTA are called Hazardous Materials Regulations ("HMRs").

(4:23CV0242)

withstand Trinity's argument that those claims are preempted.  "Federal preemption is an affirmative defense that requires the defendant . . . to prove that . . . federal preemption applies."  *Byrne v. CSX Transp., Inc.*, 541 Fed.Appx. 672, 674-75 (6th Cir. 2013).  Trinity, GATX, General American, and OxyVinyls fail to meet their affirmative defense of federal preemption at the pleading stage.

Trinity merely disputes the facts alleged by Plaintiffs in the First Amended Complaint (ECF No. 138), which must be taken as true at this stage of the litigation.  *See Est. of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013) ("[c]ourts generally cannot grant motions to dismiss on the basis of an affirmative defense unless the plaintiff has anticipated the defense and explicitly addressed it in the pleadings" and the "undisputed facts conclusively establish an affirmative defense as a matter of law").  Plaintiffs' negligence and gross negligence claims are not preempted under federal law because the First Amended Complaint  (ECF No. 138) alleges that Trinity, GATX, General American, and OxyVinyls failed to comply with the federal standard of care established by the federal regulations applicable to them as the owners of Cars 23, 26, 27, 28, 29 and 53, and Plaintiffs do not seek to impose duties on them exceeding those requirements.  *See Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 178 (3d Cir. 2013) ("We first ask whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation.  If so, the plaintiff's claim avoids preemption.  *See* 49 U.S.C. Section 20106(b)(1)(A)-(B).").  OxyVinyls agrees, arguing that Plaintiffs' claims should be preempted "to the extent that the claims impose different requirements than what is set forth in the HMTA."  OxyVinyls Memorandum in Support (ECF No. 207-1) at PageID #: 2406.

(4:23CV0242)

## 1.

Parts 179 and 180 specify that "[a]ny person who performs a function prescribed in this part" – here, Trinity – "shall perform that function in accordance with this part."  49 C.F.R. §§ 179.1(d); 180.501(c).  Plaintiffs allege that Trinity failed to furnish or maintain accurate certifications.  This allegation must be taken as true at this time, and that failure violated those regulatory provisions.  Plaintiffs have also identified various HMTA regulations that Trinity violated through its use of aluminum in certain components in Car 26, which put Trinity on notice that its alleged negligent conduct violated those duties under federal law.

In *CSX Transp., Inc. v. Public Utils. Comm'n of Ohio*, 901 F.2d 497, 501 (6th Cir. 1990), *cert. denied*, 498 U.S. 1066 (1991), the Sixth Circuit held that the FRSA's preemption provisions, and not those of the HMTA, govern matters of railroad safety.  *See also, e.g.*, *Tipton v. CSX Transp., Inc.*, No. 3:15-CV-311-TAV-CCS, No. 3:15-CV-337-TAV-CCS, No. 3:15-CV-497-TAV-CCS, No. 3:15-CV-346-TAV-CCS, 2016 WL 11501426, *15 (E.D. Tenn. July 7, 2016) ("As the Sixth Circuit has held that the FRSA preemption analysis applies to the HMTA, and the FRSA preemption section contains a savings clause that expressly states that state law claims for personal injury or property damage for failure to comply with a federal regulation or standard are not preempted, the Court finds that it would be consistent with the Sixth Circuit's holding to find that a common law negligence action is not preempted under the HMTA either.").[8]

---

[8]  The Court incorporates by reference its discussion of preemption under the FRSA and HMTA in its Memorandum of Opinion and Order resolving Norfolk Southern's Motion to Dismiss.

(4:23CV0242)

Throughout the First Amended Complaint, Plaintiffs allege that Trinity failed to abide by its duties as set forth under pertinent federal regulations.  *See, e.g.*, ECF No. 138 at PageID #: 1785, ¶ 83; PageID #: 1792, ¶¶ 132 and 139; PageID #: 1794-95, ¶¶ 147-54; PageID #: 1838-39, ¶¶ 299-304; PageID #: 1874, ¶ 472(ff) (citing federal regulations, including but not limited to, 49 C.F.R. §§ 180.501 (which itself cites regulations under Parts 107, 171, 172, 173, 174, and 179), 180.507, and 180.509).[9]  These allegations include that the use of aluminum in Car 26, which was used to transport vinyl chloride, was inconsistent with Trinity's obligations under "federal regulations."  *See, e.g.*, ECF No. 138 at PageID #: 1795, ¶¶ 152-53.  According to Plaintiffs, "[t]he use of aluminum in railcars transporting vinyl chloride can be problematic because aluminum components can melt or otherwise be damaged in the event of a fire, as appears to have happened here."  ECF No. 138 at PageID #: 1794, ¶ 151.  Specifically, Plaintiffs allege that Car 26 had "aluminum-coated springs in its PRD device," ECF No. 138 at PageID #: 1795, ¶ 152(a), which violated Trinity's duty to ensure that Car 26 was "compatible with the lading or goods to be transported within" the car.  *See, e.g.*, ECF No. 138 at PageID #: 1795, ¶¶ 153-154; PageID #: 1839, ¶ 302.  In particular, Trinity's use of aluminum-coated springs violated at least 49 C.F.R. § 179.15, which states that "tanks must have a pressure relief device, made of material compatible with the lading."  Indeed, the National Transportation Safety Board ("NTSB") has already reported that the "PRD's internal springs . . . coated with aluminum" were "not compatible with the [vinyl chloride] lading."  NTSB, *Norfolk Southern Railway Train Derailment with Subsequent Hazardous Material Release and Fires*,

---

[9]  There are typographical errors in the First Amended Complaint (ECF No. 138) – 49 C.F.R. § 180.590 should be 49 C.F.R. § 180.509.  *See* Plaintiffs' Memorandum in Opposition (ECF No. 234) at PageID #: 2997 n. 14.

(4:23CV0242)

https://www.ntsb.gov/investigations/Pages/RRD23MR005.aspx (Investigative Update March 21, 2023) (last visited March 13, 2024).[10]

In addition, Plaintiffs allege that Trinity failed to provide or maintain a certificate of construction that accurately reflected its physical condition.  *See, e.g.*, ECF No. 138 at PageID #: 1839, ¶ 303(a) ("Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction.").  As a result of these failures, the railcar was allegedly "unapproved, uncertified or incompatible for use with vinyl chloride," ECF No. 138 at PageID #:1839, ¶ 303, which breached Trinity's duty under 49 C.F.R. § 179.5(a) to accurately "furnish a . . . Form AAR 4-2 . . . certifying that the tank, equipment, and car fully conforms to all requirements of the specification."  To the extent these inconsistencies were the result of modifications, Trinity also allegedly breached its duties under 49 C.F.R. §§ 179.3 and 179.6, which require railcar owners to receive approval for the car construction and any design or component changes that are made later.  Trinity's failure to continually certify approval in an accurate fashion also is alleged to have violated its duties under 49 C.F.R. §§ 180.517, 180.507, 180.509, and 180.501.  *See* ECF No. 138 at PageID #: 1838-39, ¶¶ 300-303 (alleging violations of duties under these provisions).

Plaintiffs, along with Norfolk Southern, have identified many specific regulations that Trinity, GATX,, General American, and OxyVinyls have allegedly violated.  In *Tipton*, the district court considered whether to dismiss claims on preemption grounds when Plaintiffs failed to identify any specific regulation that had purportedly been violated.  "Construing the complaint

---

[10]  The NTSB has noted that it is continuing to assess the extent to which the aluminum had on the "venting and discharge operation."  *Id.*

(4:23CV0242)

in the light most favorable to plaintiffs," the court found that "plaintiffs have given [defendant] fair notice that they allege it has violated certain HMR provisions in its maintenance, inspection, manufacturing, and repair of its tank car used in transporting the toxic material, despite not explicitly citing to those provisions. Thus, the Court finds that the duties plaintiffs allege [defendant] negligently violated are substantively the same as those in the HMR, and should not be preempted." 2016 WL 11501426, at *15 (citations omitted). Similarly, in *Smith v. CSX Transp., Inc.*, No. 3:13CV2649, 2014 WL 3732622, at *3 (N.D. Ohio July 25, 2014), the court denied a motion to dismiss on preemption grounds when plaintiffs alleged defendant failed to comply with FRSA regulations, without identifying any specific regulations. *See also Diehl v. CSX Transp., Inc.*, 349 F. Supp.3d 487, 503 (W.D. Pa. 2018) (denying a motion to dismiss based on FRSA preemption arguments because it would be incorrect to do so "[a]t this [motion to dismiss] stage" because "Plaintiff alleges that Defendant failed to comply with the[ ] regulations").

**2.**

Plaintiffs' claims related to Car 23 are not preempted. Plaintiffs allege General American and/or GATX failed to exercise reasonable care by allowing Car 23 to be "stationary for long periods of time, in excess of six months," without doing anything to maintain the wheel bearing. ECF No. 138 at PageID #: 1836, ¶ 293(d); *see also* ECF No. 138 at PageID #: 1873, ¶ 472(ee); ECF No. 138 at PageID #: 1793, ¶ 144; ECF No. 119 at PageID #: 1431, ¶¶ 109-111.

(4:23CV0242)

GATX and General American cite three FRA regulations under Part 215[11] and argue that they "cover this subject matter and impose no [ ] duty on them "under state law to inspect Railcar 23's bearings more frequently."  GATX and General American's Memorandum in Support (ECF No. 205) at PageID #: 2324.  Plaintiffs' claims related to Car 23, however, are not preempted because the regulations GATX and General American cite do not "substantially subsume" the duty of care owed by railcar owners during extended periods of time when their cars are not in service.  *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("pre-emption will lie only if the federal regulations *substantially subsume* the subject matter of the relevant state law") (emphasis added).  "Normal State negligence standards apply when there is no Federal action covering the subject matter."  49 C.F.R. § 217.2; *see Norfolk S. Ry. Co. v. Box*, 556 F.3d 571, 572 (7th Cir. 2009) (in the absence of any regulations covering such conduct, Congress made clear that states can fill that gap).  Rather, Plaintiffs' claims relate to General American and/or GATX's negligence in maintaining the railcar in the years before Car 23 was placed in service leading up to the derailment.  Subject to exceptions not relevant here, Part 215 "applies to each railroad freight car *in service* on [various track types]."  49 C.F.R. § 215.3(a) (emphasis added).

GATX contends that Plaintiffs' negligence and gross negligence claims related to Car 29 "seek to impose a more stringent standard than the regulations require."  ECF No. 205 at PageID #: 2326.  These claims, however, are not preempted because they allege GATX failed to comply with the federal standard of care established by federal regulations, and do not seek to impose

---

[11] 49 C.F.R. § 215.11 – Designated inspectors, § 215.13 – Pre-departure inspection, and § 215.15 – Periodic inspection).

27

(4:23CV0242)

duties exceeding those requirements.  The FRSA's Clarification Amendment, 49 U.S.C. § 20106(b), leaves no doubt that such claims are not preempted.

Throughout the First Amended Complaint, Plaintiffs allege that GATX failed to abide by its duties as set forth under relevant federal regulations.  *See, e.g.*, ECF No. 138 at PageID #: 1792, ¶¶ 132 and 139; PageID #: 1794-95, ¶¶ 147-54; PageID #: 1838-39, ¶¶ 299-304; PageID #: 1874, ¶ 472(ff) (citing federal regulations, including but not limited to, 49 C.F.R. §§ 180.501 (which itself cites regulations under Parts 107, 171, 172, 173, 174, and 179), 180.507, 180.509, 180.517, and 215.7).  These allegations include that GATX failed to maintain accurate certifications and approvals for Car 29, without which it could not lawfully ship the hazardous materials at issue.  According to Plaintiffs, GATX replaced Car 29's original tank car valve with an incompatible PRD, and did so without ever receiving approval to make the modification. GATX also never received the special regulatory approval needed to ship vinyl chloride.  *See* ECF No. 138 at PageID #: 1794, ¶ 149(b).  These allegations, taken as true, establish that GATX violated its duty under 49 C.F.R. § 179.5(a) to accurately "furnish . . . Form AAR 4-2 . . . certifying that the tank, equipment, and car fully conforms to all requirements of the specification."  GATX's modifications also breached its duties under 49 C.F.R. §§ 179.3 and 179.6, which require railcar owners to receive approval for car construction and any design or component changes that are made later.  Plaintiffs claim GATX's failure to continually certify such approval in an accurate fashion also violated its duties pursuant to 49 C.F.R. §§ 180.517, 180.507, 180.509, and 180.501.  *See* ECF No. 138 at PageID #: 1838-39, ¶¶ 300-303.

In addition, Plaintiffs allege the use of aluminum in Car 29, a railcar used to transport vinyl chloride, was inconsistent with GATX's obligations under "federal regulations."  *See, e.g.*,

28

(4:23CV0242)

ECF No. 138 at PageID #: 1795, ¶¶ 152-53.  According to Plaintiffs, "[t]he use of aluminum in railcars transporting vinyl chloride can be problematic because aluminum components can melt or otherwise be damaged in the event of a fire, as appears to have happened here."  ECF No. 138 at PageID #: 1794, ¶ 151.  Yet Car 29, had an "aluminum protective housing, as well as aluminum handwheels," ECF No. 138 at PageID #: 1795, ¶ 152(b), which allegedly violated GATX's duty to ensure that railcars are "compatible with the lading or goods to be transported within them," ECF No. 138 at PageID #: 1839, ¶ 302; *see also* ECF No. 138 at PageID #: 1795, ¶¶ 153-54.  GATX's use of aluminum in these component parts violated at least 49 C.F.R. § 179.100-13(a), which states that "[v]enting, loading and unloading valves must be of approved design, made of metal not subject to rapid deterioration by the lading."  In light of these asserted failures, GATX similarly violated the Part 180 regulations, which require accurate certification of conformity with tank car specifications.

**3.**

OxyVinyls argues that Plaintiffs' "claims seek to impose duties and obligations that do not 'conform[ ] in every significant respect' to the federal requirements."  ECF No. 207-1 at PageID #: 2406.  Plaintiffs allege multiple discrepancies existed between the required approval, certification, and qualifications of Cars 26, 27, 28, 29, and 53 and the railcars' actual, physical characteristics.  In addition, the railcars OxyVinyls used to ship vinyl chloride contained aluminum-coated springs in the PRD (Car 26), aluminum protective housings and handwheels (Cars 27, 28 and 29), and aluminum angle valve handwheels (Car 53).  *See* ECF No. 138 at PageID #: 1795, ¶ 152.  According to Plaintiffs, OxyVinyls knew or should have known that such aluminum features are incompatible with shipping vinyl chloride, as the aluminum can melt

29

(4:23CV0242)

or be damaged by fires.  Post-derailment, melting and damage caused to the aluminum parts of

the railcars compromised the cars' ability to properly vent and depressurize, leading to a decision

to detonate explosives on all five derailed cars containing vinyl chloride.

Throughout the First Amended Complaint, Plaintiffs allege that OxyVinyls failed to

abide by its duties as an owner and shipper as set forth under specific federal regulations.  *See,*

*e.g.*, ECF No. 138 at PageID #: 1792, ¶ 132 and ¶¶ 138-39; PageID #: 1794-95, ¶¶ 147-54;

PageID #: 1838-39, ¶¶ 299-304; PageID #: 1874, ¶ 472(ff) (citing federal regulations, including

but not limited to, 49 C.F.R. §§ 180.501 (which itself cites regulations under Parts 107, 171, 172,

173, 174, and 179), 180.507, 180.509, 180.517, and 215.7).  These allegations include that as the

owner of Cars 27, 28, and 53, OxyVinyls failed to provide correct and/or complete Form AAR

4-2 Certificates of Construction.  *See, e.g.*, ECF No. 138 at PageID #: 1839, ¶ 303(c).  For

example, Plaintiffs allege that all three cars "had required information missing from their

Certificates of Approval, and Car 27 had modifications that were neither documented nor

approved."  ECF No. 138 at PageID #: 1794, ¶ 149(c).  According to Plaintiffs, these failures

breached OxyVinyls' duties:  (1) under 49 C.F.R. § 179.5 to accurately "furnish a . . . Form AAR

4-2 . . . certifying that the tank, equipment, and car fully conforms to all requirements of the

specification;" and (2) under 49 C.F.R. §§ 179.3 and 179.6, which require railcar owners to

receive approval for the car's construction and any design or component modifications that are

made later.  OxyVinyls' failure to continually certify approval in an accurate fashion also

allegedly violated its duties under 49 C.F.R. §§ 180.517, 180.507, 180.509, and 180.501.  *See*

ECF No. 138 at PageID #: 1838-39, ¶¶ 300-303 (alleging violations of duties under such

provisions).

30

(4:23CV0242)

Next, Plaintiffs allege that OxyVinyls shipped cars carrying vinyl chloride that were constructed with, or had features containing aluminum.  *See, e.g.*, ECF No. 138 at PageID #: 1794-95, ¶¶ 151-154.  According to Plaintiffs, OxyVinyls' shipment of vinyl chloride in railcars containing aluminum was "incompatible" with its obligation under "federal regulations," ECF No. 138 at PageID #: 1795, ¶ 154, including but not limited to its obligation to "only [use] those railcars that are compatible with the lading or goods to be transported within them under applicable federal regulations," ECF No. 138 at PageID #: 1838-39, ¶ 302.  By shipping vinyl chloride in cars containing the alleged aluminum components, Plaintiffs assert OxyVinyls violated its obligation to ensure that "packagings are compatible with their lading," 49 C.F.R. § 173.24(e)(1); its duty to ensure that hazardous material not be offered for transportation in a tank car unless "the tank car meets the applicable specification and packaging requirements," 49 C.F.R. § 173.31(a)(1); and, its duties under 49 C.F.R. § 173.22(a)(2), which set forth the shipper's requirements to ensure that a railcar has been "manufactured, assembled, and marked," in accordance with these regulations.

Finally, Plaintiffs allege that OxyVinyls owned Cars 27, 28, and 53, which  "were each constructed with aluminum in their pressure relief devices ('PRD'), PRD protective housings, handwheels and angle [valve] handwheels."  ECF No. 138 at PageID #: 1839, ¶ 303(d); PageID #: 1874, ¶ 472(ff).  According to Plaintiffs, OxyVinyls' use of aluminum in these components violated its duties under applicable federal regulations.  *See, e.g.*, ECF No. 138 at PageID #: 1839, ¶¶ 303-304; PageID #: 1874, ¶ 472(ff).  Plaintiffs contend that conduct violated, *inter alia*, 49 C.F.R. § 179.100-13(a), which states that "[v]enting, loading and unloading valves must be of

31

(4:23CV0242)

approved design, made of metal not subject to rapid deterioration by the lading," and 49 C.F.R. § 179.15, which states that "tanks must have a pressure relief device, made of material compatible with the lading."[12]  In light of these alleged failures, Plaintiffs assert OxyVinyls similarly violated the Part 180 regulations identified above, which require accurate certification of conformity with tank car specifications.

### D.

### 1.

The First Amended Complaint alleges claims of negligence, gross negligence, and medical monitoring against Trinity, GATX, and General American.  *See, e.g.,* ECF No. 138 at PageID #: 1838-40, ¶¶ 299-308; PageID #: 1863-68, ¶¶ 426-55; PageID #: 1870-74, ¶¶ 466-73. Trinity, GATX, General American, and OxyVinyls argue that Plaintiffs insufficiently pled their state law causes of action.  Plaintiffs, however, have pleaded extensive facts that support their negligence and gross negligence claims.  Plaintiffs' allegations support their claims that Trinity, GATX, General American, and OxyVinyls owed duties to Plaintiffs with respect to Car 23, 26, 27, 28, 29, and 53.  Trinity allegedly breached such duties by failing to maintain, inspect, construct, and certify Car 26 for the transport of vinyl chloride, proximately causing Plaintiffs' damages.  Plaintiffs' allegations further demonstrate that Trinity's actions were willful, wanton, and reckless, thereby adequately supporting Plaintiffs' claim of gross negligence.

---

[12]  *See also* 49 C.F.R. §§ 173.31(a)(3), (d)(1)(ii), and (vi), 173.301(a)(3), 180.205(d)(1), 180.509(b)(1) and (d)(1-4), 180.511(d); 49 C.F.R. § 180.503; 49 C.F.R. §§ 173.24(b)(1-2), 174.61(a); 49 C.F.R. § 173.301(f)(1); 49 C.F.R. §§ 179.18, 173.31(b)(4), 172.101; 49 C.F.R. §§ 172.102(c)(7)(iii), 173.313, 178.276(b)(3), (e)(1), (e)(2), (e)(3), and (f), 173.24(f), 173.304a(a)(2) and Note 5.

(4:23CV0242)

GATX and General American argue Plaintiffs failed to adequately allege that they owed

or breached any duty to Plaintiffs regarding Car 23 (the hopper car).  Second, GATX argues

Plaintiffs have failed to allege their injuries were caused by GATX's breach of duty related to

Car 29 (the vinyl chloride car).  Plaintiffs have pleaded considerable facts that support their

negligence and gross negligence claims against GATX and General American.  Plaintiffs allege

that the owner of Car 23 owed duties to them with respect to the railcar and that the owner

breached such duties by failing to maintain and inspect Car 23.  In addition, Plaintiffs have

sufficiently pleaded how GATX's negligence, in failing to ensure that Car 29 was safe and

approved to transport vinyl chloride, proximately caused Plaintiffs' damages.  Finally, Plaintiffs'

allegations support their claim that GATX and General American's previously described failures

were willful, wanton, and reckless; thereby supporting their claim for gross negligence.

**2.**

Plaintiffs have pleaded facts sufficient to support their negligence claim.  To plead a

negligence claim under Ohio law, Plaintiff "must show the existence of a duty, a breach of that

duty, and an injury that was proximately caused by the breach."  *Pierre Invs., Inc. v. Fifth Third*

*Bancorp*, No. 1:22-cv-155, 2022 WL 6764494, at *5 (S.D. Ohio Oct. 11, 2022) (quoting *Rieger*

*v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 516, 138 N.E.3d 1121 (2019)).

Plaintiffs have adequately alleged Trinity owed duties to Plaintiffs, and set forth facts that

support the "reasonable inference" that Trinity breached duties owed to Plaintiffs.  *See Iqbal*,

556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.").  Plaintiffs set forth in sufficient detail that Trinity had a duty to exercise reasonable

(4:23CV0242)

and ordinary care to ensure Car 26 was fit and safe to transport hazardous materials, including by

complying with all federal regulatory requirements for the certification of Car 26's design and

components.  *See, e.g.*, ECF No. 138 at PageID #: 1794, ¶¶ 147-48.  Trinity's duty includes, but

is not limited to, ensuring Car 26 was fit to carry its contents, ensuring its safety features were

properly constructed, inspected, and maintained, as well as ensuring that the elements from

which Car 26 was constructed were compatible with the contents.  *See* ECF No. 138 at PageID #:

1838-39, ¶¶ 299-302.  According to Plaintiffs, this duty arises from the fact that it is highly

foreseeable that a railcar carrying hazardous materials, which is not fit and safe for service, is

likely to result in substantial harm to others.

In addition, Plaintiffs claim Cars 26, 27, 28, 29 and 53 were unfit, unsafe, and

incompatible with transporting vinyl chloride.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶

149-53.  Plaintiffs also allege that the use of aluminum in Car 26 was inconsistent with Trinity's

obligations under federal regulations.  *See* ECF No. 138 at PageID #: 1795, ¶¶ 152-53; PageID #:

1874, ¶ 472(ff).  Car 26 had "aluminum-coated" springs in its PRD device, which violated

Trinity's duty to ensure that Car 26 was compatible with the lading or goods to be transported.

*See* ECF No. 138 at PageID #: 1795, ¶¶ 153-54; PageID #: 1838-39, ¶ 302; PageID #: 1874, ¶

472(ff).  As alleged, aluminum in railcars transporting vinyl chloride can be problematic because

such aluminum parts can melt or otherwise be damaged in the event of a fire, as happened here.

*See* ECF No. 138 at PageID #: 1794-95, ¶ 151.  Plaintiffs claim the use of aluminum on Car 26's

PRD is therefore a clear breach of Trinity's duty.  Plaintiffs additionally allege Trinity breached

its duty by failing to provide or maintain a certificate of construction that accurately reflected its

physical condition.  *See* ECF No. 138 at PageID #: 1839, ¶ 303; PageID #: 1874, ¶ 472(ff).  As a

34

(4:23CV0242)

result of these asserted failures, Car 26 was "unapproved, uncertified or incompatible for use with vinyl chloride," which breached Trinity's duty under the federal regulations to furnish a Form AAR 4-2 certifying that the tank, equipment, and the car fully conforms to all requirements of the specification.  *See* ECF No. 138 at PageID #: 1794, ¶¶ 149-50; PageID #: 1839, ¶ 303; PageID #: 1874, ¶ 472(ff).  Finally, Plaintiffs claim Trinity's breach of duty directly led to the risk that Car 26 could explode when exposed to heat, and ultimately contributed to the venting and burning of the vinyl chloride in the railcar.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-54; PageID #: 1802-1804, ¶¶ 179-84;  PageID #: 1838-40, ¶¶ 299-308.

Trinity argues Plaintiffs' allegations are too vague to sufficiently plead causation.  *See* ECF No. 206-1 at PageID #: 2376-78.  Trinity maintains that its alleged breach was a "paperwork 'discrepancy.' "  ECF No. 206-1 at PageID #: 2376 n. 13.  GATX also attempts to downplay its alleged failure to comply with federal regulations as mere "documentation issues" that played no role in causing Plaintiffs' injuries.  ECF No. 205 at PageID #: 2331.  Finally, OxyVinyls contends its only purported breach of duties owed to Plaintiffs were "administrative deficiencies" that did not cause Plaintiffs' harms.  ECF No. 207-1 at PageID #: 2407.  A party's negligence is a proximate cause of an injury if "the injury is a natural and foreseeable result of the act or failure to act." *Brott Mardis & Co. v. Camp*, 147 Ohio App.3d 71, 76, 768 N.E.2d 1191 (Ohio App. 9th Dist. 2001).  Proximate cause is "an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred." *Hardwick v. 3M Co.*, No. 2:18-cv-1185, 2019 WL 4757134, at *16 (S.D. Ohio Sept. 30, 2019) (citation omitted).  Moreover, under Ohio law, "there can be more than one proximate

35

(4:23CV0242)

cause of a particular injury." *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp.3d 773, 795 (N.D. Ohio 2020) (citing *Taylor v. Webster*, 12 Ohio St.2d 53, 57, 231 N.E.2d 870 (1967)). Furthermore, "[i]t is not necessary that a defendant anticipate a plaintiff's particular injury. Instead, it is sufficient that the defendant's act is likely to result in injury to someone." *Id.* (citations omitted).

Plaintiffs allege detailed facts showing Trinity's failure to ensure Car 26 was safe and properly certified to transport vinyl chloride was a "substantial factor in bringing about" the release of dangerous chemicals and Plaintiffs' injuries.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-54; PageID #: 1838-40, ¶¶ 299-308.  Car 26 was allegedly not properly constructed, approved, or certified for transporting vinyl chloride at the time of the derailment, including because its physical characteristics were incompatible with its AAR 4-2 certificate and because it had safety features constructed of or coated in aluminum, which is prone to damage, melting, and adversely reacting with vinyl chloride.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 150-53. Plaintiffs claim those failures directly led to the risk that Car 26 could explode when exposed to high heat, and ultimately contributed to the venting and burning of the vinyl chloride in Car 26. *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-154; PageID #: 1802, ¶ 179.  Moreover, proximate cause questions are inherently fact bound.  *See In re Nat'l Prescription Opiate Litig.*, 440 F. Supp.3d at 795 (proximate cause is ordinarily a question of fact to be determined by the trier of fact); *Cincinnati Ins. Co. v. Watkins Motor Lines, Inc.*, No. L-07-1333, 2009 WL 50131, at *3 ¶ 16 (Ohio App. 6th Dist. Jan. 9, 2009) ("whe[n] reasonable minds could differ as to which acts, omissions, or violations of a statute constitute the proximate cause of an accident, the determination is a matter for the jury.") (citation omitted).

36

(4:23CV0242)

**3.**

Plaintiffs sufficiently allege GATX and/or General American owed and breached duties to Plaintiffs as to Car 23.  Furthermore, Plaintiffs assert how GATX and/or General American's failure to inspect and maintain Car 23 contributed to the derailment.

"There is 'no set formula' for a court to use in determining whether a duty exists." *Winkler v. Win Win Aviation, Inc.*, 339 F. Supp.3d 772, 778 (S.D. Ohio 2018) (citation omitted), *aff'd*, 769 Fed.Appx. 337 (6th Cir. 2019).  "The Ohio Supreme Court has described duty as 'the [court's] expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " *Id.* (quoting *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).  Duty may be established "by the particular facts and circumstances of a case." *Id.* at 779 (citing *Leizerman v. Kanous*, 181 Ohio App.3d 579, 583 ¶ 13, 910 N.E.2d 26 (Ohio App. 6th Dist. 2009)).  The "existence of a duty depends on the foreseeability of the injury." *Id.* (quoting *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984)).  "The test for foreseeability is 'whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act.' " *Id.* (quoting *Menifee*, 15 Ohio St.3d at 77).  "If the defendant 'knew or should have known that its act was likely to result in harm to someone' then the injury was foreseeable." *Id.* (quoting *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645, 597 N.E.2d 504 (1992)).  "Foreseeability of harm is "not affected by the magnitude, severity or exact probability of a particular harm, but instead by the question of whether some risk of harm would be foreseeable to the reasonably prudent person.' " *Id.* (quoting *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 263 ¶ 24, 29 N.E.3d 921 (2015)).

37

(4:23CV0242)

Plaintiffs allege that, as Car 23's owner, General American and/or GATX owed a duty to ensure Car 23 was fit and safe for service, including by making sure it was inspected, maintained, and delivered in a safe condition.  *See* ECF No. 138 at PageID #: 1793-94, ¶¶ 140-46.  According to Plaintiffs, this duty includes, but is not limited to, ensuring the car did not sit stationary for long periods of time as instructed in the Bearing Install Manual,[13] taking steps to avoid degradation of the structure and lubrication of the wheel bearing, and insuring regular inspection and maintenance of the railcar prior to it going in service.  *See* ECF No. 138 at PageID #: 1793, ¶¶ 141-45.  Plaintiffs argue this duty arises from the fact that it is reasonably foreseeable that a railcar that is poorly maintained, uninspected, and unfit for service, poses serious risk of failure, derailment, and resulting harm.  Plaintiffs allege that railcars sitting stationary for extended periods of time leads to grease separation and a reduction in the amount of lubrication around the bearings, negatively impacting functionality of the car.  *See* ECF No. 138 at PageID #: 1793, ¶ 142.  Plaintiffs maintain that General American and/or GATX, as the owner of Car 23, knew or should have known that allowing Car 23 to sit stationary in the elements for extended periods of time and failing to maintain and inspect the railcar prior to the railcar going in service could likely result in harm to others.  Plaintiffs allege the owner of Car 23 was expressly warned of this risk in the manual.  *See* ECF No. 138 at PageID #: 1793, ¶¶ 141-42.  Accepting all of Plaintiffs allegations as true, it was reasonably foreseeable that such actions would affect the functionality and safety of Car 23, creating a significant risk of train derailment and injury to others.

---

[13]  *See Boyko v. Eagles Nest Outfitters, Inc.*, No. 1:22CV1322, 2022 WL 6234923, at *2 (N.D. Ohio Sept. 26, 2022) (finding that defendant owed a duty of care to plaintiff when he deviated from the instruction manual).

(4:23CV0242)

Next, GATX argues that Plaintiffs did not allege a sufficient causal link between its negligence as to Car 29 and the release of hazardous materials and resulting damages.  *See* ECF No. 205 at PageID #: 2329-31.  The Court disagrees.  Plaintiffs have adequately alleged causation as to GATX's Car 29.  Plaintiffs allege detailed facts showing GATX's failure to ensure Car 29 was safe and approved to transport vinyl chloride proximately caused Plaintiffs' injuries.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-54.  That is all that is required at the pleading stage.  Moreover, as stated above, proximate cause questions are inherently fact bound and ordinarily will be determined by the trier of fact.  *See In re Nat'l Prescription Opiate Litig.*, 440 F. Supp.3d at 795.

Plaintiffs have sufficiently alleged that GATX's failure to ensure Car 29 was safe and properly certified to transport hazardous materials was a "substantial factor in bringing about" the release of dangerous chemicals and Plaintiffs' resulting injuries.  *Hardwick*, 2019 WL 4757134, at *16.  Car 29 allegedly had an incompatible PRD replaced and never received the regulatory approval needed to ship vinyl chloride.  *See* ECF No. 138 at PageID #: 1794, ¶ 149(b); PageID #: 1839, ¶ 303(e).  Plaintiffs claim Car 29 was not properly constructed, approved, or certified for transport at the time of the derailment, including because it had aluminum protective housings and handwheels, despite the fact that aluminum components can become easily damaged and melt when exposed to fire and can dangerously react with vinyl chloride.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 150-152(b) and 153; PageID #: 1839, ¶ 303.[14]  According to Plaintiffs, these failures directly led to the risks that Car 29 could explode

---

[14]  *See* NTSB, *Norfolk Southern Railway Train Derailment with Subsequent Hazardous Material Release and Fires*, https://www.ntsb.gov/investigations/Pages/RRD23MR005.aspx (Investigative Update

(continued...)

(4:23CV0242)

when exposed to high heat, and substantially contributed to the venting and burning of the vinyl chloride in Car 29.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-54; PageID #: 1802-1804, ¶¶ 179-84; PageID #: 1838-40, ¶¶ 299-308.

**4.**

**a.**

OxyVinyls does not dispute that Plaintiffs have adequately alleged OxyVinyls had a duty to Plaintiffs and that it breached that duty.  Rather, OxyVinyls limits its argument to challenging causation and harm.  Plaintiffs, however, have sufficiently pleaded that OxyVinyls' conduct was a substantial factor in producing the harms alleged, and sufficiently set forth their injuries in the First Amended Complaint (ECF No. 138).  Plaintiffs allege detailed facts showing OxyVinyls' failure to ensure Cars 26, 27, 28, 29, and 53 were safe and approved to transport vinyl chloride directly led to Plaintiffs' injuries.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-54.  Plaintiffs have also sufficiently alleged that OxyVinyls' failure to ensure its railcars were safe and properly certified to transport hazardous materials was a "substantial factor in bringing about" the release of dangerous chemicals and Plaintiffs' resulting injuries.  *Hardwick*, 2019 WL 4757134, at *16. The five cars contained allegedly unsafe aluminum parts and components, such as PRDs, protective housings, handwheels, and angle valve handwheels, despite the fact that aluminum components melt when exposed to fire and can cause dangerous adverse chemical reactions with vinyl chloride.  *See* ECF No. 138 at PageID #: 1794-95, ¶ 151; PageID #: 1839, ¶ 303(d); PageID #: 1874, ¶ 472(ff).  According to Plaintiffs, these failures thereby directly led to the risk that one or more of the railcars would explode, and ultimately contributed to the venting and

---

[14](...continued)
March 21, 2023) (last visited March 13, 2024).

40

(4:23CV0242)

burning of the vinyl chloride.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-54; PageID #: 1802-1804, ¶¶ 179-84; PageID #: 1838-40, ¶¶ 299-308.  It is reasonably foreseeable to any railcar owner or shipper that the failure to comply with regulations designed to ensure safe transportation of hazardous materials will substantially contribute to the release of those materials in the event of an emergency.

**b.**

OxyVinyls cannot escape liability at this time by seeking to blame Norfolk Southern for causing the derailment and for venting and burning vinyl chloride.  Any determination of intervening or superseding cause should be decided at the summary judgment stage or trial, not on a motion to dismiss.  Whether something is an intervening cause goes to the "provability" of the claims.  "But [a 12(b)(6) motion], by rule, only permits a review of the [complaint] to determine whether it plausibly states a claim for relief."  *Buon Vino Mfg., Inc. v. Ostrowski*, No. 1:21CV2268, 2023 WL 3074496, at *3 (N.D. Ohio April 25, 2023).  At the very least, the issue of whether intervening or superseding causes relieve OxyVinyls of its liability is inherently factual and not something that should be decided at the pleading stage.  *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993) ("We have also repeatedly recognized that the issue of intervening causation generally presents factual issues to be decided by the trier of fact.  The determination of intervening causation 'involves a weighing of the evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of the facts.' ") (citations omitted).  Moreover, under Ohio law, "there can

(4:23CV0242)

be more than one proximate cause of a particular injury." *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp.3d at 795 (citing *Taylor v. Webster*, 12 Ohio St.2d 53, 57, 231 N.E.2d 870 (1967)); *see also Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 588, 575 N.E.2d 828 (1991) (" 'In Ohio, when two factors combine to produce damage or illness, *each* is a proximate cause.' ") (citation omitted; emphasis added).

When, like here, more than one act of negligence combines to cause injuries,"[t]he causal connection of the first act of negligence is broken and superseded by the second, *only if the intervening negligent act is both new and independent*." *Leibreich v. A.J. Refrigeration, Inc.*, 61 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993) (citation omitted; emphasis in original). Norfolk Southern argues the vent and burn was not a negligent act. Rather, it was a reasonable decision based on the best available information at the time. Plaintiffs and Norfolk Southern also maintain the vent and burn decision was not a new and independent act—it was just the opposite, *i.e.*, a direct consequence of the foregoing events, including OxyVinyls' negligent conduct in equipping its railcars with unsuitable safety components made of aluminum which failed, ultimately leading to a decision to vent and burn each of the railcars containing vinyl chloride. *See, e.g.*, ECF No. 138 at PageID #: 1804, ¶¶ 182-84. "The term 'independent' means the absence of any connection or relationship of cause and effect between the original and subsequent act of negligence. The term 'new' means that the second act of negligence could not reasonably have been foreseen.' " *Id.* (citation and emphasis omitted). Norfolk Southern claims the release of hazardous materials through the vent and burn had a clear "connection or relationship of cause and effect" with OxyVinyls' negligence. "Thus, the key determination whether an intervening act breaks the causal connection between negligence and injury depends

42

(4:23CV0242)

upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence." *Id.* at 270 (internal quotation marks, brackets, and citations omitted).  Finally, Norfolk Southern argues that as an owner of Cars 27, 28, and 53 and the shipper of Cars 26, 27, 28, 29, and 53, it was reasonably foreseeable (and thus not new) to OxyVinyls that if the railcars were unsafe to transport hazardous materials, and if an emergency involving those materials were to occur, timely and accurate information about those materials to prevent a catastrophic explosion would be needed.  Indeed, the FRA considers the vent and burn method to be a foreseeable consequence in the event of an emergency.  *See Handbook for Vent and Burn Method of Field Product Removal*, U.S. Dep't of Transp. (May 1994), https://railroads.dot.gov/elibrary/handbook-vent-and-burn-method-field-product-removal, (last visited March 13, 2024).  At the very least, the issue of whether intervening or superseding causes relieve OxyVinyls of its liability is inherently factual and not something that should be decided at the motion to dismiss stage.  *Leibreich*, 67 Ohio St.3d at 269 ("We have also repeatedly recognized that the issue of intervening causation generally presents factual issues to be decided by the trier of fact.  The determination of intervening causation 'involves a weighing of the evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of the facts.' ") (citations omitted).

### c.

Plaintiffs allege they have suffered real harms because of OxyVinyls' negligence. Plaintiffs' allegations describe and catalogue the numerous harms they have suffered from the train derailment, including lost income, property damage, contamination at residences and workplaces, and increased risks of serious and potentially fatal illnesses including cancer and

(4:23CV0242)

organ damage necessitating ongoing medical monitoring. *See, e.g.*, ECF No. 138 at PageID #: 1773-81, ¶¶ 4-57; PageID #: 1835, ¶ 287.

In *Hirsch v. CSX Transportation, Inc.*, No. 1:07CV3512, 2008 U.S. Dist. LEXIS 124211, at *5 (N.D. Ohio Oct. 22, 2008), the plaintiffs brought a putative class action in the Northern District of Ohio after a train carrying hazardous materials derailed. Like Plaintiffs in the case at bar, the *Hirsch* plaintiffs asserted negligence claims and alleged "the derailment was accompanied by a chemical spill, fire, and rail car explosion, allegedly causing toxic substances, toxic fumes, and/or carcinogens . . . to be released into the atmosphere, ground and water." *Id.* at *2-3. The district court denied the defendant's motion to dismiss the negligence claims, stating:

> Plaintiffs have sufficiently alleged that toxic substances were on the train and were released because of the derailment, they were exposed to these substances because of the derailment, the toxic substances are associated with increased risk of disease, and because Defendant's conduct caused them to be exposed to these toxic substances they face an increased risk of disease requiring medical monitoring.

*Id.* at *22. The same result is appropriate in the case at bar given the substantially similar negligence allegations in both cases. *See also Tipton*, 2016 WL 11501426, at *18 (summary denial of defendants' motion to dismiss the negligence claim finding that plaintiffs sufficiently detailed "how such breaches were both a proximate cause and cause in fact of plaintiffs' damages").

**5.**

Plaintiffs have also sufficiently pleaded facts to support their gross negligence/willful and wanton conduct claim (Count XVII). Gross negligence is defined as a " 'failure to exercise any or very slight care.' " *Thompson Elec., Inc. v. Bank One, Akron, N.A.*, 37 Ohio St.3d 259, 265, 525 N.E.2d 761 (1988) (citation omitted). Gross negligence is evidenced by willful, wanton, or

44

(4:23CV0242)

reckless conduct. *See Wiley v. City of Columbus*, 36 F.4th 661, 671 (6th Cir. 2022); *Ripepi v. USA Taekwondo, Inc.*, No.: 5:20CV1896, 2021 WL 4459465, *11-12 (N.D. Ohio Sept. 29, 2021). Courts applying Ohio law deny motions to dismiss gross negligence claims when the complaint plausibly alleges the defendant's actions were willful, wanton or reckless. *See, e.g.*, *Ripepi*, 2021 WL 4459465, at *11-13; *Mohat v. Horvath*, No. 2013-L-009, 2013 WL 5450296, at *4 ¶ 23 (Ohio App. 11th Dist. Sept. 30, 2013) (affirming denial of motion to dismiss and holding "a plaintiff is only required to allege a set of facts, which, if proven, would plausibly allow him to recover"); *McGlone v. Centrus Energy Corp.*, No. 2:19-cv-02196, 2020 WL 4431482, at *15 (S.D. Ohio July 31, 2020) (allegation that defendant released toxic substances into community without warning was sufficient to state a plausible claim for gross negligence).

The Supreme Court of Ohio defines "willful misconduct" as "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 388 ¶ 32, 983 N.E.2d 266 (2012). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at ¶ 33. Finally, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligence conduct." *Id.* at ¶ 34.

The allegations in the First Amended Complaint plausibly allege that the actions of Trinity, GATX, General American, and OxyVinyls were willful, wanton, and reckless, and that such acts caused and/or contributed to the decision to explode the five derailed cars containing

45

(4:23CV0242)

hazardous materials, thereby directly harming Plaintiffs. In addition, the allegations plausibly allege that the actions of GATX and General American related to Cars 23 and 29 caused and/or contributed to the derailment. According to Plaintiffs, Trinity's choice to improperly approve, certify, and construct Car 26 with aluminum on the PRD was a willful, wanton, and reckless act. As the owner and lessor of a fleet of railcars – including Car 26 – Trinity was obligated to ensure that its railcars were capable of moving hazardous materials, like vinyl chloride, and that its railcars were compliant with federal laws and regulations. *See* ECF No. 138 at PageID #: 1785, ¶¶ 82-83; PageID #: 1791, ¶ 129. Indeed, Trinity, GATX, and General American allegedly knew full well the types of hazardous and volatile chemicals that could be shipped in their cars, as well as the dangers that would be posed to the communities through which the railcars traveled, should the railcars fail. *See* ECF No. 138 at PageID #: 1871, ¶¶ 469-70. Trinity, GATX, and General American knew that their failure to take appropriate safety measures in the construction, maintenance, and inspection of their railcars "could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities." ECF No. 138 at PageID #: 1871, ¶ 470; *see also* ECF No. 138 at PageID #: 1838-39, ¶¶ 300-302. According to Plaintiffs, Trinity, GATX, and General American cut corners on the construction, maintenance, certification, and upkeep of critical safety features on Cars 26 and 29. *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 150-53; PageID #: 1871-74, ¶ 472.

Specifically, Trinity's Car 26 allegedly had aluminum components and/or coatings in, around, and/or on the PRD. *See* ECF No. 138 at PageID #: 1795, ¶ 152(a); PageID #: 1839, ¶ 303. GATX's Car 29 had a replacement PRD that was unapproved and incompatible with the shipment of vinyl chloride. *See* ECF No. 138 at PageID #: 1794, ¶ 149(b). Car 29 also had

46

(4:23CV0242)

aluminum components and/or coatings in, around, and/or on protective housings and handwheels.  *See* ECF No. 138 at PageID #: 1795, ¶ 152(b).  Aluminum, however, is a soft and malleable metal that has an extremely low melting point and is susceptible to melting and damage from fire.  *See* ECF No. 138 at PageID #: 1794-95, ¶ 151.  According to Plaintiffs, the risk of using unapproved, incompatible, and substandard parts and materials in, around or on critical safety devices (such as a PRD) is readily apparent, as such devices become necessary in the event of derailments and fires.  Plaintiffs argue it is therefore unsurprising that in the case at bar there is evidence that damage to or the melting of aluminum parts compromised the tank cars' ability to properly vent and depressurize the cars, ultimately leading to the decision to detonate explosives on all five derailed cars containing hazardous materials, including Cars 26 and 29.  *See* ECF No. 138 at PageID #: 1795, ¶¶ 153-54; PageID #: 1804, ¶¶ 182-84.

Both GATX and General American own, maintain, and lease fleets of railcars and were therefore obligated to ensure their railcars were compliant with federal laws and regulations and capable of safely moving hazardous materials such as vinyl chloride.  *See* ECF No. 138 at PageID #: 1783, ¶ 67; PageID #: 1784, ¶ 78; PageID #: 1791, ¶ 129.  According to Plaintiffs, GATX and General American failed to meet these obligations.  Indeed, General American and/or GATX knew that the wheel bearings on Car 23 were critical to the safety of their railcars and had a manual informing them of the need to move their railcars regularly to ensure proper wheel bearing operation.  *See* ECF No. 138 at PageID #: 1793, ¶ 141; PageID #: 1836, ¶ 291.  Despite this, the owner of Car 23 let it sit idle in the elements for more than two years.  *See* ECF No. 138 at PageID #: 1793, ¶¶ 141-44.  Furthermore, Plaintiffs claim that General American and/or GATX never conducted a full inspection of Car 23's wheelset or bearings, which would have

47

(4:23CV0242)

revealed the defect that caused Car 23's wheel bearing to fail on February 3, 2023.  *See* ECF No. 138 at PageID #: 1793, ¶ 145.  Plaintiffs argue that these allegations are more than enough to plead gross negligence.

OxyVinyls is alleged to be a leading North American manufacturer of vinyl resins, chlorine, and caustic soda.  *See* ECF No. 138 at PageID #: 1783, ¶ 73.  According to Plaintiffs, OxyVinyls is no stranger to the volatile and toxic properties of vinyl chloride that make it "carcinogenic, mutagenic and/or otherwise harmful to humans," ECF No. 138 at PageID #: 1870, ¶ 468, and OxyVinyls knows the "considerable health risks associated with the release of vinyl chloride . . . into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population," ECF No. 138 at PageID #: 1871, ¶ 469.

Despite this knowledge, Plaintiffs argue OxyVinyls chose to cut corners on the construction, maintenance, certification, and upkeep of critical safety features on the railcars it owned and leased.  Specifically, Car 29 was fitted with an unapproved PRD.  *See* ECF No. 138 at PageID #: 1839, ¶ 303(e).  In addition, Cars 26, 27, 28, 29, and 53 had aluminum components and/or coatings in, around, and/or on the PRD, protective housings, and/or handwheel valves. *See* ECF No. 138 at PageID #: 1795, ¶ 152; Page ID #: 1839, ¶ 303.  Aluminum, however, is a soft and malleable metal that has an extremely low melting point and is susceptible to melting and damage from common fires.  *See* ECF No. 138 at PageID #: 1794-95, ¶ 151.  Plaintiffs maintain the risk of using such a weak metal in, around, or on critical valves, housings, and PRDs is readily apparent, as such devices become necessary in the event of derailments and fires.  There is evidence that damage to or the melting of aluminum parts compromised the PRDs' ability to properly vent and depressurize the railcars, ultimately leading to the decision to

48

(4:23CV0242)

detonate explosives on all five derailed cars containing vinyl chloride.  *See* ECF No. 138 at PageID #: 1804, ¶¶ 182-84.  Plaintiffs argue their allegations are more than sufficient to allege that OxyVinyls' actions were willful, wanton, and reckless, which caused and/or contributed to the decision to explode all five vinyl chloride cars and directly harm Plaintiffs.

For the reasons set forth below in Section F, Plaintiffs' allegations also support their requested remedy of punitive damages, as the pleadings demonstrate that OxyVinyls' failure to ensure its railcars were safe and fit for the transport of vinyl chloride was willful, wanton, and reckless.

**E.**

The First Amended Complaint (ECF No. 138) is not a threadbare pleading.  Rather, Plaintiffs have sufficiently pleaded claims for ongoing medical monitoring arising from their exposure to the highly toxic chemicals, including phosgene, released into their homes and workplaces as a result of the derailment and subsequent intentionally set explosions and fire.  *See* ECF No. 138 at PageID #: 1773, ¶¶ 4 and 7; PageID #: 1774, ¶¶ 10 and 14;[15] PageID #: 1775, ¶¶ 17 and 20; PageID #: 1776, ¶ 23; PageID #: 1776-77, ¶ 27; PageID #: 1777, ¶ 30; PageID #: 1777-78, ¶ 33; PageID #: 1778, ¶ 36; PageID #: 1778-79, ¶ 39; PageID #: 1779, ¶ 42; PageID #: 1780, ¶ 48; PageID #: 1863, ¶ 427; PageID #: 1865, ¶ 437; PageID #: 1867, ¶ 447.  Consistent with a prevailing current view of Ohio law, Plaintiffs alleged medical monitoring as a remedy under Ohio law (Count XIII), as well as pleading it as a stand-alone cause of action under Pennsylvania (Count XIV) and West Virginia (Count XV) law.

---

[15] ECF No. 138 was subsequently amended by interlineation to substitute Ms. Brenda Williams for Ms. Neely Jack and modify plaintiff-specific ¶¶ 12-15.  *See* ECF No. 212-1.

(4:23CV0242)

## 1.

Plaintiffs now agree that medical monitoring is not an independent cause of action in Ohio.  *See, e.g.*, Plaintiffs' Memorandum in Opposition to Trinity's Motion (ECF No. 234) at PageID #: 3010.  To the extent that Plaintiffs have pleaded "medical monitoring" as a separate cause of action on behalf of the Ohio residents, the Court grants the motions to dismiss Count XIII.

The presently prevailing view is that medical monitoring in Ohio is an element of damages when liability is otherwise established for an underlying tort claim.  *Wilson v. Brush Wellman, Inc.*, 103 Ohio St.3d 538, 542, 817 N.E.2d 59 (2004); *see also Hirsch*, 2008 U.S. Dist. LEXIS 124211, at *5; ECF No. 138 at PageID #: 1863 n. 13.  Plaintiffs have pleaded exposure to hazardous materials which caused such an increased risk of disease that a reasonable physician would order medical monitoring.  *Elmer*, 127 F. Supp.3d at 825 ("[I]f the Plaintiffs can establish liability and an increased risk of disease, they may be entitled to medical monitoring as a remedy." (alterations and citation omitted)).[16]  To provide that monitoring, Plaintiffs have requested quantifiable costs of a monitoring program, and/or injunctive relief in the form of a court-established medical monitoring program.  *See* ECF No. 138 at PageID #: 1824, ¶¶ 263 and 265; PageID #: 1826, ¶ 271; PageID #: 1827, ¶ 273.

---

[16]  In *Elmer*, the court also noted that expert medical testimony is required to demonstrate increased risk of disease.  127 F. Supp.3d at 825 (citing *Day v. NLO*, 851 F. Supp. 869, 881 (S.D. Ohio 1994).  Expert proof, however, is better reserved for summary judgment and trial and not the pleading stage of litigation.  Neither must Plaintiffs prove anything or present sufficient evidence.  *See Baker v. Deutschland GmbH*, 240 F.Supp.3d 341, 347 (M.D. Penn. 2016) (denying motion to dismiss medical monitoring claims finding Defendants' claim is, "in actuality, a thinly disguised demand for proof rather than plausibility at the pleading stage"); *see also Seaman Corp. v. Siplast, Inc.*, No. 5:20CV2040, 2021 WL 4775631, at *2 (N.D. Ohio March 15, 2021) (Pearson, J.) (denying motion to dismiss because Rule 12(b)(6) cannot be used to challenge a remedy).

50

(4:23CV0242)

## 2.

Trinity argues that "a tenable medical monitoring claim requires non-conclusory allegations that a plaintiff experienced 'significant' or 'greater than normal' vinyl chloride exposure, or that a reasonable physician would order medical monitoring." ECF No. 206-1 at PageID #: 2380. As an initial matter, Norfolk Southern's CEO conceded the necessity for medical monitoring in his testimony before Congress on March 21, 2023 when he stated that "[w]e are committed to a solution that addresses long-term health risks through the creation of a long-term medical compensation fund." ECF No. 138 at PageID #: 1825, ¶ 268. In addition, under any potentially applicable law, *see, e.g.*, *Redland Soccer Club v. Dep't of the Army & Dep't of Def. of the U.S.*, 548 Pa. 178, 195-96, 696 A.2d 137 (1997); *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 141-42, 522 S.E.2d 424 (1999), Plaintiffs have sufficiently alleged exposure to hazardous chemicals known to heighten the risk of disease. *See* ECF No. 138 at PageID #: 1807-1808, ¶¶ 192 and 195-97; PageID #: 1809, ¶ 207; PageID #: 1810, ¶ 209; PageID #: 1811, ¶¶ 215, 217, 219-21; PageID #: 1812, ¶ 224; PageID #: 1813, ¶¶ 234-35 and 237. Plaintiffs have also plausibly alleged they were exposed to such hazardous chemicals, including vinyl chloride and its by-products, above background levels and therefore are at increased risk of cancer and organ damage. *See, e.g.*, ECF No. 138 at PageID: 1773, ¶¶ 4 and 7; PageID: 1774, ¶¶ 10 and 14; PageID: 1775, ¶ 17; PageID: 1780, ¶ 48; PageID: 1863, ¶ 427; PageID: 1865, ¶ 437; PageID #: 1867, ¶ 447. In addition, Plaintiffs have alleged that as a result of that exposure, they are at an increased risk of developing specifically identified conditions, including liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and

51

(4:23CV0242)

acro-osteolysis. *See* ECF No. 138 at PageID #: 1807 ,¶ 192; PageID #: 1907-1808, ¶¶ 195-97; PageID #: 1809-10, ¶¶ 207-12; PageID #: 1811, ¶¶ 215, 217, and 220-21; PageID #: 1812, ¶ 224; PageID #: 1813, ¶¶ 234-35 and 237; PageID #: 1864, ¶ 430; PageID #: 1865-66, ¶ 440; PageID #: 1867-68, ¶ 450. Plaintiffs allege that early detection of these identified diseases is achievable through existing monitoring procedures and periodic diagnostic medical exams (different from typical doctors' visits for those that have not been exposed). *See* ECF No. 138 at PageID #: 1864-65, ¶¶ 430-34; PageID #: 1865-66, ¶¶ 440-44; PageID #: 1867-68, ¶¶ 450-54. Finally, Plaintiffs allege that "[t]his increased risk would warrant a reasonable physician to order monitoring." *See, e.g.*, ECF No. 138 at PageID #: 1864, ¶ 431; PageID #: 1866, ¶ 441; PageID #: 1868, ¶ 451.

**F.**

Finally, OxyVinyls moves the Court to strike Plaintiffs' request for punitive damages pursuant to Fed. R. Civ. P. 12(f). Plaintiffs argue that the motion is procedurally improper and substantively without merit at the pleading stage. Plaintiffs' pleading is more than sufficient and there are no grounds to strike Plaintiffs' request for punitive damages at this time.

**1.**

OxyVinyls bases its motion to strike on the erroneous assertion that Fed. R. Civ. P. 12(f) authorizes the Court to strike an " 'insufficient' claim" and that Plaintiffs' request for punitive damages is insufficiently pled. *See* ECF No. 207-1 at PageID #: 2403. As stated above, punitive damages are not a claim; rather, they are a remedy. *Seaman Corp.*, 2021 WL 4775631, at *2. Because of this distinction, the Court has held Rule 12(b)(6) – which unlike Rule 12(f) does

(4:23CV0242)

focus on the sufficiency of claims – to be inapplicable to requests for punitive damages.  *Id.*

## 2.

Rule 12(f) motions "are viewed with disfavor and are not frequently granted."  *Operating Eng'r's Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citations omitted).  Rule 12(f) authorizes courts to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" from a pleading.  A motion to strike, however, "should be granted only when the pleading to be stricken has no possible relation to the controversy."  *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).

Plaintiffs have alleged that OxyVinyls acted with actual malice.  The actual malice necessary for punitive damages is "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987).  "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross."  *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 37, 543 N.E.2d 464 (1989).  As set forth above in Section D.5. regarding Plaintiffs' gross negligence allegations, Plaintiffs have adequately pleaded that OxyVinyls' actions were willful, wanton, and reckless.  Such allegations not only support that OxyVinyls' actions were grossly negligent, but also that it acted with actual malice.  OxyVinyls, with full knowledge of the dangerous chemicals it was transporting and the extreme hazards that would result if such chemicals were released into the community, allegedly

(4:23CV0242)

chose to cut corners critical to safety on each of the five derailed cars containing vinyl chloride directly resulting in the detonation of Cars 26, 27, 28, 29, and 53.  *See* ECF No. 138 at PageID #: 1794-95, ¶¶ 149-53; PageID #: 1804, ¶¶ 182-84; PageID #: 1838-39, ¶¶ 300-304; PageID #: 1871, ¶470; PageID #: 1871-74, ¶ 472.

### IV.  Conclusion

As earlier announced,

New Party Defendants GATX Corporation and General American Marks Company's Motion to Dismiss First Amended Master Consolidated Class Action Complaint Under Fed. R. Civ. P. 12(b)(6) (ECF No. 205) is granted in part and denied in part.

New Party Defendant Trinity Industries Leasing Company's Motion to Dismiss First Amended Master Consolidated Class Action Complaint Under Fed. R. Civ. P. 12(b)(2) and (6) (ECF No. 206) is granted in part and denied in part.

New Party Defendant OxyVinyls LP's Motion to Dismiss First Amended Master Consolidated Class Action Complaint Under Fed. R. Civ. P. 12(b)(6) and/or to Strike Request for Punitive Damages Under Fed. R. Civ. P. 12(f) (ECF No. 207) is granted in part and denied in part.

To the extent that Plaintiffs have pleaded "medical monitoring" as a separate cause of action on behalf of the Ohio residents, the Court grants the motion to dismiss Count XIII. Nevertheless, because, in Ohio, medical monitoring is an element of damages, should GATX, General American, Trinity, and/or OxyVinyls become liable for an underlying tort claim,

54

(4:23CV0242)

medical monitoring can be imposed against that tortfeasor(s).  All other claims and remedies of

Plaintiffs remain pending against GATX, General American, Trinity, and OxyVinyls.


        IT IS SO ORDERED.


  __March 13, 2024__                        __/s/ Benita Y. Pearson_____
Date                                       Benita Y. Pearson
                                           United States District Judge

55