UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**In re: East Palestine Train Derailment**      :          CASE NO.: 4:23-CV-00242-BYP

**Settlement Objection**

                                    :          JUDGE: BENITA Y. PEARSON

### OBJECTION TO CLASS SETTLEMENT AGREEMENT AND MOTION TO ENLARGE TIME TO OPT OUT OF PROPERTY PORTION OF CLASS SETTLEMENT AGREEMENT

Now comes Rev. Joseph Sheely, class member, and objects to the preliminary settlement on behalf of himself, his household, and the putative class, including, in particular, and without limitation, the deadline for filing objections and for opting out of the property portion of the Preliminary Class Action Settlement ("Settlement"). The Rev. Sheely further moves this honorable Court to enlarge the time for class members to opt out of the property portion of the Settlement and to allow those residents who have opted out of the Settlement a mechanism or opportunity to opt back in upon being fully and properly informed and notified of its terms and benefits. As further basis and support thereof, Rev. Sheely states the following:

#### OBJECTION TO PROPOSED CLASS SETTLEMENT

1.  Objector Rev. Joseph Sheely is a class member in this case.

2.   By Order dated May 21, 2024 (ECF 458), this Court granted preliminary approval of a proposed settlement in this case.

3.   Objector makes the following objections to the *In re: East Palestine Train Derailment Settlement*.

4.   The address at which I lived from February 2, 2023 to the present is 50167 S.R. 14, East Palestine Ohio 44413.

5.  My telephone number is 330-332-0990.

6.  Documentation establishing my status as a Settlement Class Member is attached as **Exhibit 1**.

7.  I will appear and testify at the final approval hearing.

8.  My attorney has objected to zero class action settlements in the past 5 years.

9.  My objections to the settlement are set forth below.

## A.  Objection and Opt-Out Periods are too Short

10.  As has been averred in the operative complaint in this case, the derailment and subsequent "controlled burn" caused toxic chemicals to be released into the surrounding air, land, and water.  This caused not only immediate health effects, but will likely cause medical problems for class members and others far into the future.

11.  There has been inadequate time for class members to decide whether to opt-out of or object to the proposed settlement in this case.

12.  The class notice in this case requires opt-out requests and objections to be made by July 1, 2024.  The notices were required to be mailed and posted on the class action website by May 31, 2024 (Preliminary Approval Order, ECF 458, para. 10(a)). This only provides for a 31-day period in which a party can opt-out or object.

13.  Courts in this Circuit and throughout the country appear divided on what a "reasonable" opt-out/objection period is.  As recognized in the preeminent treatise on class actions:

> courts typically provide for a few months between the issuance of settlement notice and either the deadline for objections or the fairness hearing[6] although gaps of one month or less have been found adequate.[7] **Since important due process rights are at stake, and time is rarely of immense importance, however, there**

**is no compelling reason that class members should not be given at least 60 days' time frame in which to file objections or appear at a fairness hearing**.

3 Newberg and Rubenstein on Class Actions § 8:16 (6th ed.) [Emphasis added].

14.     Further, the Manual for Complex Litigation states:

The opt-out procedure should be simple and should afford class members a reasonable time in which to exercise their option. Courts usually establish a period of thirty to sixty days (or longer if appropriate) following mailing or publication of the notice for class members to opt out. If the case involves a complex settlement or significant individual claims, a class member might need more time to consult with attorneys or financial advisors before making an informed opt-out decision. [Emphasis added.]

Ann. Manual Complex Lit. § 21.321 (4th ed.) [Emphasis added].

15.     The present case involves both a complex settlement where tens of thousands of class members whose injuries vary by type and severity will purportedly be receiving unknown amounts of settlement cash benefits based on an undisclosed formula, and significant individual claims where many class members have had their health, business, and/or residences significantly impacted by the subject train derailment and "controlled burn."

16.     Accordingly, the opt-out and objection periods should be at least sixty days.

**B.  Evidence of Liability and Damages, Having Been Suppressed or Withheld, And Recent New Evidence And Forthcoming Evidence Renders the Settlement and Its Related Procedural Deadlines, Negligent, Premature, and Unconstitutional.**

17.     Generally, substantial information and evidence has been suppressed, `withheld and otherwise not made public, both by Norfolk Southern Railway ("NSCorp") and/or its contractors, the EPA[1] and other government agencies and officials, and even

---

[1] EPA whistleblower, Robert Kroutil, exposed shocking efforts by the EPA to avoid learning the truth immediately after the East Palestine train derailment – facts that would have prevented a

by Class Counsel for the Plaintiffs, including, without limitation, the expert testing and reports by the Plaintiffs' expert, Stephen Petit. Given that the Settlement releases the EPA and other governmental agencies, this information is further critical to allow more time for a better drafted objection to inform this Court and to weigh against releasing parties/entities other than NSCorp. Furthermore, new and substantial evidence has and continues to be released about the derailment, including, without limitation, whistleblowers from within the EPA and Norfolk Southern Railway and/or its contractors, as well as reports by the NTSB, that bear directly on the issues of liability and damages, and constitute strong evidentiary support for both.

18.     Of notable concern is the June 25, 2024 hearing by the NTSB, wherein the NTSB board, via its Chair, Jennifer Homendy, outed NSCorp's efforts to exert undue influence over the independence of the NTSB and its investigations, and to subvert the proper functioning of a government agency, as part of NSCorp's ongoing campaign to cover-up its actionable conduct arising out of the derailment and resulting environmental disaster. In summary, under the guise of a "party submission,"[2] NSCorp tried, four times, to submit its own investigation of facts and evidence upon which it insisted the NTSB to

---

year-long public health nightmare for residents based on data from its ASPECT (Airborne Spectral Photometric Environmental Collection Technology) airplane. If utilized properly, ASPECT could have prevented the vent and burn of the vinyl chloride tank cars and informed decision makers about when to order and lift evacuations. Unfortunately, EPA chose not to fly the plane until four days after the accident, turned off the sensors so they couldn't gather data over the creeks, and then falsified associate records to cover up the mission breakdown.

[2] Under NTSB regulations, parties may submit to the NTSB written proposed findings to be drawn from the evidence produced during the course of the investigation. "Parties are afforded the privilege not the right, to develop proposed findings from the evidence of [NTSB's] investigation. Parties are not permitted to manufacture their own evidence and develop their own set of facts outside of the NTSB investigative process, which is exactly what Norfolk Southern did." See, https://www.youtube.com/live/vWzqGXCEkuo?si=gdnjcUWu7C8BdgkM.

adopt and rely in rendering its findings.[3] After having its "manufactured evidence,"
derived not from the situs of the accident, "but from commercially purchased products,"
rejected four times by the NTSB investigator in charge, NSCorp went around the
Investigator in hopes of compromising NTSB's general counsel. Id. NTSB's general
counsel affirmed that the Investigator-in-charge has the final say. Id. In an unprecedented
and outrageous act in defiance of NTSB's rules and regulations, NSCorp, accustomed to
acting and being treated as above the law, then circumvented both the NTSB's general
counsel and Investigator, and sent its phony evidence directly to NTSB board members
urging them to disregard regulations by directing the Investigator and their staff to include
NSCorp's phony evidence in their public docket. Id. In later, private meetings with NTSB
board members and staff, NSCorp *threatened* board members of the NTSB, name-
dropped agencies such as the Dept. of Justice and the current Administration, in an effort
to get the NTSB to lie to the American people with pretextual excuses, other than keeping
the $12M per day, money-making rail cars operational, about why NSCorp decided to
vent and burn the toxic railcar chemicals that spread across the community of East
Palestine. Id.[4] Finally, NSCorp tried to malign the reputation of [NTSB's] investigative

---

[3] https://www.youtube.com/live/vWzgGXCEkuo?si=gdnjcUWu7C8BdgkM

[4] Notes quoting relevant portions of the hearing referenced herein:
"Recall the evidence was derived not from the accident scene, but from commercially purchased products. Our
investigator in charge rejected the party submission containing Norfolk Southern's extraneous testing, not once, but
twice. NS then went to our general counsel and appealed, who promptly and appropriately informed them the
investigator in charge has the final say. NS then went around the Investigator in charge and our general counsel, and
sent the material directly to the board members—five presidentially appointed, senate-confirmed government
officials—via email on May 1st, urging us to overrule our investigator in charge, which has the statutory authority to
conduct the investigation and supervise it, and direct him; direct the staff, to include in our public docket, their party
submission, which they'd been told repeatedly, violated our regulations. This demonstrated complete disregard for
the conduct of our independent investigation. In speaking with the investigative and legal teams, NS's abuse of the
party process was unprecedented and reprehensible."

In a private meeting with board members, in front of several high-ranking witnesses including the NTBS Chair, "one
of NS's senior executives stated, that it was their hope that in this board meeting and in the community meetings the

DocuSign Envelope ID: 658148C8-43A8-4A35-8853-52D59931099D

staff in retaliation for NTSB adhering to its regulations and ethical principles of independence. Id.

19.     Therefore, for a settlement to *precede* evidence of high probative value is illogical, unreliable, and negligent.

20.     Generally, the procedural timelines for objections and affirmatively opting out of the Settlement violate state and federal constitutional notions of fairness and due process because it was contemplated that this Court may yet alter or amend the terms of the Settlement on the basis of objections. In sum, many residents were compelled to opt out of the Settlement due to the uncertainty of its unsettled terms. This Court cannot require class members to commit to be in or out of a Settlement whose terms remained subject to change by this Court.

21.     Therefore, Rev. Sheely as movant/objector, cannot fully present and apprise this Court of greater and detailed grounds for objection to the Settlement, and cannot make a fully informed decision about whether to opt out of the Settlement, given the time deadline for objecting and for opting out.

### C. Medical Monitoring and Mental or Emotional Injury or Harm Should not be Separate from Personal Injury Claims

---

NTSB would put to rest the "rumor" that NS made the decision to vent and burn to move trains. That is not only unethical and inappropriate, but defending an entity's decision-making is not our role. NS's senior executive went on to say that there's a real interests on the part of the Dept. of Justice and the Administration to move on. Something I've never heard once from the Dept. of Justice or the Administration. NF then stated that this is an opportunity to close a chapter and allow the community—allow the community and the railroad to move on. The entire exchange ended with what everyone from the NTSB knew and heard in the room was a threat, and it was delivered that way."

"NF's actions were unconscionable."

"NF tried to malign the reputation of [NTSB's] investigative staff, our topnotch investigative staff. Which is exactly what the aim was, which is clearly evidenced in their 2-pages that they just released to the press."

DocuSign Envelope ID: 658148C8-43A8-4A35-8853-52D59031099D

22.     The Settlement Agreement definition of "Released Claims" includes "medical monitoring, mental or emotional injury or harm" but excludes "Personal Injury Claims". Settlement Agreement (ECF 452-2), section II, para. MM.

23.     The Settlement Agreement defines "Personal Injury Claim" as

> a personal and/or bodily injury claim as defined in Paragraph 5 of Exhibit E (Personal Injury Release). For avoidance of doubt, claims for medical monitoring, or mental or emotional injury or harm, are not Personal Injury Claims and instead are included in the definition of Released Claims, below.
> section II, para. HH.

24.     Under the Settlement Agreement, Personal Injury Claims are released only if a class member elects to receive a personal injury payment and executes a separate personal injury release. Settlement Agreement. Settlement Agreement, section II, para. MM(2).

25.     Accordingly, if a class member elects to participate in the settlement but not to make a personal injury claim under the settlement, any claim they have for mental or emotional injuries, or for medical monitoring to detect any future disease resulting from the settlement is essentially grouped with property damage and similar injuries and released under the settlement, which is inequitable.

26.     Merriam-Webster's online dictionary defines "personal injury" as "an injury to one's body, mind, or emotions; broadly: an injury that is not to one's property[5]" [Emphasis added].

27.     This settlement prevents a class member who receives a direct payment (i.e., a payment based on factors other than personal injuries) under this settlement from

---

[5] https://www.merriam-webster.com/legal/personal%20injury

DocuSign Envelope ID: 658148C8-43A8-4A35-8853-53D59931099D

bringing a separate personal injury lawsuit to make claims for physical injuries and also for related mental and emotional injuries and medical monitoring.

28.    This settlement is inequitable because mental and emotional injuries and harm and medical monitoring are released even if a class member does not make a claim for personal injuries under the settlement.

D. **The Settlement is Not Fair, Reasonable, or Adequate to Class Members, the Release is Overly Broad and the Class Notice is Deficient.**

29.    Specifically, objection to the Settlement of In re East Palestine Train Derailment Settlement comes per Fed. CivR. 23 (E). As a member of the current class in the case, that resided at 50167 State Route 14 in East Palestine, OH within 20 miles of the derailment situs, at the time of the derailment, Rev. Sheely requests the Court to take the objection into serious consideration before approving the final class action settlement.

30.    The preliminary settlement, as presented, must be changed or modified as it is not fair, reasonable, or adequate to class members.  Fed. CivR. 23 (e) (2) reads:

   (2) Approval of the Proposal. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

   (A) the class representatives and class counsel have adequately represented the class;

   (B) the proposal was negotiated at arm's length;

   (C) the relief provided for the class is adequate, taking into account:

   (i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

31. Rev. Sheely objects to the settlement proposal as a class member according to the following facts:

32. The class representatives and class counsel have not adequately represented the class.

33. Class representatives and class counsel cannot adequately represent the class because false, contradictory, and insufficient information has been provided to class members to enable them to make informed decisions about remaining in the class settlement (i.e., not opting out). Rev. Sheely is personally aware of several members who have opted out of the settlement, out of an abundance of caution, only because they were not adequately informed about the terms and effects of the settlement on them and/or their households. Rev. Sheely is concerned that the class settlement will either fail due to excessive opt outs, or not adequately benefit the full pool of members who would have otherwise remained in the settlement had they been given time to be adequately informed.

34. While more time is needed to fully account for every known circumstance and example of these failures and inadequacies, to gather affidavits and exhibits, some sample examples include:

35. On May 6, 2024, an email was sent to Krissy Hylton by Anjali Mehta, Esq. of Bevan & Assoc. LPA, asserting that toxicologists found her home to be perfectly safe and free of contaminants from the NSCorp train derailment. This email is troubling given that independent testing has shown Ms. Hylton's property to be one of the most heavily contaminated and affected areas in East Palestine.

36. In community presentations by Class Counsels, residents were being told false statements about the terms of the Settlement and same were being reported to the media, including the Associated Press, such as who the released parties encompassed and the rights of individual class members under the terms of the Settlement.

37. The information I received from various sources, including EPA, NSCorp, Plaintiff's Counsels, and NTSB has been contradictory such that all testing and evidence to date is suspect and requires further review to adequately assess and negotiate an appropriate settlement.

38. The proposal was not negotiated at arm's length. As previously discussed, evidence of liability and damages remains to be revealed, continues to come out, and recent new evidence did not inform the present Settlement. There is reasonable concern that not all Plaintiff counsels are representing the best interests of their clients, as they are required to do, and that information

coming from the multitude of plaintiffs counsels are not uniform in that some members are receiving different.

39.    The relief provided for the class is not adequate, thus class members are not receiving enough relief for the injury they've suffered. There is a high risk associated with pushing the settlement too fast. There remains mass confusion over the terms, functioning, and rights of parties in various individual situations. For example, rights under the Settlement must be exercised based on households rather than individuals, where households are no longer of the same character and no longer comprise the same individuals, and where individuals have different and competing interests. Evidence has not been allowed to be adequately gathered and presented to enhance the amount and terms of the Settlement for the public good and residents of EP.

40.    The method of distributing relief to the class, including the method of processing class-member claims, was not effective as the claims process is confusing or unreasonable. The proposed terms of the attorney's fees are too high.

41.    The proposal does not treat class members equitably relative to each other. In addition to combining conflicting interests of individuals into groupings as households, discussed supra., residents hurt the most and residing closest to the derailment site may receive no money from the Settlement because previously expended money for relocation and other expenses, is being credited against the Settlement. Worse yet, NSCorp has inflated the amount of money advanced to certain residents beyond what it actually spent.

42.     There is no clearly written formula for minimum amounts parties in specific circumstances would receive from the Settlement.

43.     As a final matter, the objector/movant requires additional time to gather affidavits and exhibits to better inform this Court as to the deficiencies of the current Settlement and ways in which its terms could and should be improved.

44.     The Release is Overly Broad. The Settlement Agreement defines "Released Parties" to include not only the Defendants, but also any other manufacturers, owners, lessors, lessees, shippers, and consignees of the rail cars and products involved in the Incident; the manufacturers, installers, and designers of the rail track or other railroad equipment associated with the Incident, including without limitation Progress Rail; the Association of American Railroads; the Terminal Railroad Association of St. Louis; any persons, business entities, and agencies that assisted in or supported the emergency response, remediation, air monitoring, soil monitoring, water monitoring, and clean-up activities associated with the Incident—including for avoidance of doubt and without limitation, Arcadis U.S., Inc.; Braskem America Inc.; Center for Toxicology and Environmental Health (CTEH); EnviroScience, Inc.; Explosive Service International; Specialized Professional Services Inc. (SPSI); Midland Manufacturing; Specialized Response Solutions (SRS); Hazardous Products Abatement Company (HEPACO); EnviroServe; Engineering Systems Inc. (Esi); Cranemasters; Hulcher Services, Inc.; R.J. Corman Railroad Group; and Timken Company—including the activities of private, public, and governmental agencies, entities, and authorities, whether federal, state, county, or local, their employees,

officers, agents, members, and volunteers; and any owners, lessors, and lessees of any other real property located at the site of the Incident. Settlement Agreement, Section II, Para. NN.

45.     This release is overly broad.  It includes both private entities and governmental entities who are not parties to this lawsuit. These entities may have liability for damages related to the derailment and subsequent "controlled burn", and should not be released from liability.  As an example, Specialized Professional Services Inc. and Specialized Response Solutions recommended that a controlled burn take place, but the NTSB Safety Board Chairwoman said the controlled burn was not necessary.

46.     The Class Notice is Deficient. The class notice sent to class members states that Direct Payments to class members will be based on a "Court-approved formula that takes into account a number of factors, including …".  The class notice does not state what the formula is, and (due to the word "including") does not appear to list all of the factors taken into account.  Similarly, the class notice states that for personal injury payments, "the Settlement Administrator will use objective, Court-approved criteria like the nature of any physical injury and resulting medical treatment, if any, to allocate funds to each [eligible class member]."  The class notice does not provide a complete list of the "Court-approved criteria" and does not explain the formula or other manner in which the settlement administrator will determine the amount of personal injury payments. Class members are not able to make an informed decision on whether to opt out

or object based on this incomplete information, as they will not know how their payments will be calculated.

WHEREFORE, Plaintiff prays that the court considers any statement of objection and provides the following relief:

i.      Enlarge the time for parties to object to the Settlement until October 31, 2024;

ii.     Allow additional time or supplementation, as deemed necessary by this Court, to gather further evidence, affidavits, and exhibits in support of this Objection/Motion;

iii.    Enlarge the time for parties to affirmatively Opt Out of the Settlement to 150 days after this Court has made a final determination as to the terms of the Settlement and same has become final, to permit further additional time for residents to be made fully, properly, and uniformly informed about the terms of the Settlement.

iv.     Order that an explanation about the Settlement be set forth in layman's terms, in writing, that every plaintiff's attorney is required to provide to their clients;

v.      Order the parties to engage in further discovery and fact-finding and to make same available to the public (with exceptions approved by this Court), specifically, ordering the disclosure of plaintiff's counsel's expert witness testing and reports;

vi.      Enter an Order allowing those residents who have opted out of the Settlement a mechanism or opportunity to opt back in upon being fully and properly informed and notified of its finalized terms;

vii.    Enter such further orders as justice may require.

Respectfully submitted,

_____          July 1, 2024
Signature of Objector

Respectfully submitted,

*David Graham*                    July 1, 2024

Attorney for Objector

David Graham, Esquire

Florida Bar No. 95588

David Graham Insurance Lawyers, P.A.

210 E. Forsyth Street

Jacksonville, Florida 32202

Phone: (904) 567-6529

Primary: dgraham@dginslaw.com

Secondary: EastPalestine@dginslaw.com