# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

# EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | **CASE NO. 4:23-CV-00242-BYP** <br> **JUDGE BENITA Y. PEARSON** |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF
### FINAL APPROVAL OF SETTLEMENT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND AND SETTLEMENT SUMMARY ..................................... 2

        A.      Investigation and Consolidation ......................................................... 2

        B.      Extensive Discovery ........................................................................... 4

        C.      Settlement Negotiations ...................................................................... 5

        D.      Summary of the Settlement.................................................................. 7

        E.      Preliminary Approval........................................................................... 8

        F.      Notice and Claims Administration....................................................... 8

III.    THE SETTLEMENT MERITS FINAL APPROVAL .................................. 10

        A.      The Class Has Been Vigorously Represented ................................... 11

        B.      The Parties Negotiated Settlement at Arm's Length Under the Auspices of an Experienced, Neutral Mediator .................................................... 13

        C.      The Settlement Provides Meaningful Relief to the Class .................. 14

                1.      The Settlement relief outweighs the costs, risks, and delay of trial and appeal ....................................................................... 14

                2.      The Distribution Plan ensures settlement funds will be distributed in a simple, expedient manner .................................. 16

                3.      Class Counsel seek reasonable attorneys' fees and expenses and a reasonable service award for Plaintiffs. .................................. 17

                4.      There are no agreements between the parties other than the Settlement ................................................................................. 17

        D.      The Settlement Treats Settlement Class Members Equitably............. 18

        E.      The Sixth Circuit's Additional Factors Support Approval ................. 19

        F.      The Objections Should Be Overruled ................................................ 21

                1.      Class Counsel amassed sufficient evidence to evaluate the Settlement ................................................................................. 21

                2.      No information was withheld or suppressed by Class Counsel.............. 23

                3.      Objections to the Plan of Distribution are unfounded .............. 24

                4.      Settlement Class Members are not required to participate in the Voluntary Exposure Supplement, an entirely optional, additional benefit for the Settlement Class ............................................. 26

# TABLE OF CONTENTS
## (CONTINUED)

**Page**

5. The Settlement fairly considers and provides damages for mental and emotional injuries and provides medical monitoring ....................... 27

6. The Settlement appropriately and fairly releases claims against Norfolk Southern and other entities ......................................................... 29

7. Remaining objections similarly lack merit ................................. 29

IV. CLASS CERTIFICATION IS APPROPRIATE FOR SETTLEMENT PURPOSES ............................................................................................. 31

A. Rule 23(a) is Satisfied ....................................................................... 31

B. The Requirements of Rule 23(b)(3) are satisfied ............................. 33

V. CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arledge v. Domino's Pizza, Inc.*,
    2018 WL 5023950 (S.D. Ohio Oct. 17, 2018)..........................................................................13

*Baker v. SeaWorld Entertainment, Inc.*,
    2020 WL 4260712 (S.D. Cal. July 24, 2020) ........................................................................16

*Cates v. Cooper Tire & Rubber Co.*,
    253 F.R.D. 422 (N.D. Ohio 2008) ........................................................................................32

*City of Fairborn, Ohio v. United States Env't Prot. Agency*,
    No. 3:22-CV-102, 2023 WL 2478572 (S.D. Ohio Mar. 13, 2023)........................................29

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006) ..........................................................................................31, 34

*Daoust v. Maru Rest., LLC*,
    2019 WL 1055231 (E.D. Mich. Feb. 2, 2019) ......................................................................31

*Does 1-2 v. Deja Vu Servs., Inc.*,
    925 F.3d 886 (6th Cir. 2019) ..........................................................................................17, 20

*Ford Motor Co. v. Tomlinson*,
    229 F.2d 873 (6th Cir. 1956) ................................................................................................29

*Gardner v. Lafarge Corp.*,
    2007 WL 1695609 (E.D. Mich. June 12, 2007), *aff'd sub nom. Olden v.*
    *Gardner*, 294 F. App'x 210 (6th Cir. 2008) ........................................................................30

*Garner Props. & Mgmt., LLC v. City of Inkster*,
    2020 WL 4726938 (E.D. Mich. Aug. 14, 2020)....................................................................21

*Garner Props. & Mgmt., LLC v. City of Inkster*,
    333 F.R.D. 614 (E.D. Mich. 2020) .......................................................................................13

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982)..............................................................................................................32

*Hillson v. Kelly Servs. Inc.*,
    2017 WL 279814 (E.D. Mich. Jan. 2023, 2017)...................................................................13

*Hilsley v. Ocean Spray Cranberries, Inc.*,
    2020 WL 520616 (S.D. Cal. Jan. 31, 2020)....................................................................16, 17

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ................................................................................................32

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*In re Automotive Parts Antitrust Litig.*,
  2017 WL 3499291 (E.D. Mich. July 10, 2017) ....................................................31

*In re Flint Water Cases*,
  583 F. Supp. 3d 911 (E.D. Mich. 2022)...............................................................17

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
  910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ..........................................................................20, 25

*In re Polyurethane Foam Antitrust Litig.*,
  168 F.Supp.3d 985 (N.D. Ohio 2016)..................................................................21

*IUE-CWA v. Gen. Motors Corp.*,
  238 F.R.D. 583 (E.D. Mich. 2006) ......................................................................15

*Jackson v. Nationwide Ret. Sols., Inc.*,
  No. 2:22-CV-3499, 2024 WL 958726 (S.D. Ohio Mar. 5, 2024).........................27

*Midland Funding, LLC v. Brent*,
  No. 3:08 CV 1434, 2011 WL 3557020 (N.D. Ohio Aug. 12, 2011) .....................15

*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*,
  315 F.R.D. 226 (E.D. Mich. 2016) .................................................................12, 14

*Olden v. Gardner*,
  294 F. App'x 210 (6th Cir. 2008) ........................................................................15

*Philips v. Philip Morris Cos. Inc.*,
  298 F.R.D. 355 (N.D. Ohio 2014) .......................................................................32

*Rikos v. P&G*,
  799 F.3d 497 (6th Cir. 2015) ...............................................................................32

*Robles v. Comtrak Logistics, Inc.*,
  No. 15-CV-2228, 2022 WL 17672639 (W.D. Tenn. Dec. 14, 2022) ....................18

*Ross v. Abercrombie & Fitch Co.*,
  257 F.R.D. 435 (S.D. Ohio 2009) ........................................................................34

*Todd S. Elwert, Inc., DC v. All. Healthcare Servs., Inc.*,
  No. 3:15-CV-2673, 2018 WL 4539287 (N.D. Ohio Sept. 21, 2018).....................21

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)..........................................................................................34

**TABLE OF AUTHORITIES**
**(CONTINUED)**

Page(s)

*UAW v. Ford Motor Co.*,
    2006 WL 1984363 (E.D. Mich. July 13, 2006) ...................................................15

*UAW v. Ford Motor Co.*,
    2008 WL 4104329 (E.D. Mich. Aug. 29, 2008)................................................19

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ........................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................................32

*Wood v. FCA US LLC*,
    No. 520CV11054JELAPP, 2022 WL 17361963 (E.D. Mich. Dec. 1, 2022) ...........9

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) .....................................................................33

**Statutes**

49 U.S.C. § 1154(b) ............................................................................................23

Class Action Fairness Act, 28 U.S.C. § 1715(b) .............................................9

**Court Rules**

Fed. R. Civ. P. 23 ............................................................................... *passim*

**Other Authorities**

2 McLaughlin On Class Actions (16th ed.) ......................................................24

Manual for Complex Litigation (4th ed.)...........................................................18, 24

4 William B. Rubenstein, *Newberg on Class Actions* § 13:44 (6th ed. 2022)..............................10

## I.     INTRODUCTION

After over a year of hard-fought litigation, Plaintiffs and Co-Lead Class Counsel secured a Settlement[1] on behalf of individuals and businesses impacted by the February 3, 2023, derailment of Norfolk Southern Train 32N. The Settlement is an excellent outcome. Settlement Class Members overwhelmingly support it—with unprecedented participation rates, especially within East Palestine. It provides a non-reversionary fund of $600 million to compensate Settlement Class Members, inclusive of attorneys' fees and costs. If approved, it provides that payments to the Settlement Class may commence almost immediately. Pursuant to the Court's May 21, 2024, Order preliminarily approving the Settlement, Plaintiffs now file three motions to complete the approval process.[2]

Through this motion, Plaintiffs seek final approval of the Settlement and certification of the Settlement Class. *First*, the Settlement readily satisfies Rule 23's fair, adequate, and reasonable approval standard for the same reasons this Court found in granting Preliminary Approval. The Settlement was the product of hard-fought and arm's-length negotiation, informed by extensive discovery, and was facilitated with the aid of an experienced mediator, the Hon. Layn R. Phillips, who fully endorses the Settlement in all respects. The Settlement heads off the unpredictable risks of continued litigation, including class certification, summary judgment, trial, and multiple appeals — risks that are heightened in this case given its complexity and scope — and treats all Settlement Class Members equitably. *Second*, the proposed Settlement Class should

---

[1] The Settlement Agreement is at ECF No. 452-1.

[2] In addition to this motion for final approval, Plaintiffs have concurrently filed a motion to approve the Plan of Distribution, and a motion to award fees, costs, and Class Representative service awards.

be certified because it satisfies the requirements for class certification under Fed. R. Civ. P. 23(a)

and 23(b)(3) for the same reasons this Court found in granting Preliminary Approval.

For all these reasons, Plaintiffs and their counsel submit that the Settlement is not just

fair, reasonable, and adequate — it is an outstanding result for the Settlement Class. Plaintiffs

respectfully request that the Court grant final approval and certify the Settlement Class.

## II.    BACKGROUND AND SETTLEMENT SUMMARY

This case arises out of the February 3, 2023 derailment of Norfolk Southern Train 32N in

East Palestine, Ohio. Plaintiffs allege the derailment resulted in multiple releases of toxic and

hazardous materials into the air, ground, and water, invading surrounding properties and

impacting the local community. First, as a result of the derailment, train cars carrying hazardous

materials spilled and caught fire. ECF No. 138 at ¶¶ 172–178. Then, on February 6, 2023,

Norfolk Southern and its contractors conducted a "vent and burn" of five vinyl chloride cars,

causing an explosion that Plaintiffs allege sent toxic chemicals over East Palestine and the

surrounding area. ECF No. 138 at ¶¶ 183–85, 279.

### A.    Investigation and Consolidation

In the aftermath of the derailment, and as early as February 7, 2023, certain plaintiffs

filed the first of many class action complaints against Norfolk Southern, seeking redress for

residents, property owners, employees and businesses surrounding the Derailment Site.

Declaration of M. Elizabeth Graham ("Graham Decl.") ¶¶ 13–14; Declaration of Seth A. Katz

("Katz Decl.") ¶¶ 14–15. This Court took early charge of the cases, consolidating them into this

single action and inviting attorneys to apply for leadership positions on behalf of plaintiffs. After

briefing and oral presentations, the Court appointed Seth A. Katz of Burg Simpson Eldredge

Hersh & Jardine, P.C., M. Elizabeth Graham of Grant & Eisenhofer P.A., and Jayne Conroy of

Simmons Hanly Conroy LLC as Interim Class Counsel and Co-Lead Counsel ("Co-Lead Class

Counsel"), as well as T. Michael Morgan of Morgan & Morgan, P.A. as Co-Lead Counsel. ECF No. 28 at 13–14. The Court additionally appointed a leadership structure made up of experienced attorneys from well-respected firms (collectively with Co-Lead Class Counsel, "Class Counsel") to serve on Executive and Steering Committees, as Liaison Counsel, and to perform tasks and assignments as delegated by Co-Lead Class Counsel. *Id.* at 14–17.

Pursuant to that same order, Co-Lead Class Counsel filed a consolidated class action complaint on May 4, 2023. ECF No. 31. The 92-page complaint contained detailed factual allegations against Norfolk Southern, and was the result of Plaintiffs' and Class Counsel's highly intensive investigation of the derailment. Plaintiffs subsequently amended their Complaint to expand and refine their allegations and claims in this fast-paced and highly complex litigation. Plaintiffs' operative pleading in this lead case is now the 105-page First Amended Master Consolidated Class Action Complaint ("Master Complaint"), filed on August 14, 2023. ECF No. 138.

In response to Plaintiffs' allegations, Norfolk Southern filed a motion to dismiss addressing numerous and complex issues, including preemption of Plaintiffs' claims by Federal Law.[3] ECF No. 76. Plaintiffs researched, drafted, and filed a comprehensive opposition brief challenging Norfolk Southern's arguments. ECF No. 103. Moreover, considering the substantial risk posed by a negative ruling on preemption, Plaintiffs hired David Frederick, one of the foremost appellate attorneys in the United States, to consult on drafting Plaintiffs' response to Norfolk Southern's preemption arguments. Graham Decl. ¶ 40; Katz Decl. ¶ 41.

---

[3] Specifically, Norfolk Southern argued Plaintiffs' claims are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), the Federal Railroad Safety Act ("FRSA"), and the Hazardous Materials Transportation Act ("HMTA"). ECF No. 76-1 at 7–22.

Plaintiffs' efforts were generally successful; the Court denied the motion to dismiss in large part, but granted it, in part, with respect to Plaintiffs' medical monitoring claim. ECF No. 428 at 38. In its Order, the Court held that Ohio law does not recognize a stand-alone cause of action for medical monitoring, but further held that medical monitoring as an element of damages remained viable for Ohio residents, as well all other claims and remedies of Plaintiffs. ECF No. 428 at 33, 38.

### B.     Extensive Discovery

From the outset of this litigation, it was clear to Plaintiffs that relief to the community should come as swiftly as possible. Thus, from the very first hearing before the Court, Plaintiffs moved with all dispatch to discover the relevant facts and compile the appropriate expert analyses to bring this case to resolution. The Court appeared to be aligned in this goal, and created an aggressive timeframe for the parties to move forward. ECF No. 98 (Case Management Order).

Plaintiffs conducted extensive discovery, including approximately 70 depositions and analysis of approximately 1,345,000 pages of documents. Graham Decl. ¶¶ 27–31; Katz Decl. ¶¶ 27–31. Plaintiffs themselves produced nearly 7,000 documents. Graham Decl. ¶ 28; Katz Decl. ¶ 28. Plaintiffs also collected extensive environmental data and facilitated a comprehensive environmental sampling and testing program, in addition to air modeling, to determine the geographic range hazardous material from the derailment traveled. Graham Decl. ¶¶ 32–33; Katz Decl. ¶ 34–35; *see generally* Decl. of Richard J. Schuhmann, Ph.D. ("Schuhmann Decl."). The environmental testing included approximately 160 sampling sites in and around East Palestine, covering sites as far as 45 miles from the Derailment Site. Graham Decl. ¶ 33; Katz

Decl. ¶ 35. Plaintiffs also worked with experts to determine the damages in their trespass and nuisance claims.[4] Graham Decl. ¶¶ 45, 47.

As evident from the minutes of proceedings recorded on the docket, Class Counsel regularly appeared before Judge Pearson for conferences related to case management and discovery disputes and Magistrate Judge Henderson. Graham Decl. ¶¶ 36–39. Class Counsel negotiated and litigated include the entry of a protective order (ECF Nos. 116, 117, 124), discoverability of privileged or protected information (ECF No. 162), application of the work product doctrine (ECF Nos. 160, 162, 167), deposition logistics (9/27/2023 Minutes of proceedings), and the physical inspection evidence (ECF No. 433).

Defendants deposed all 16 Class Representatives, including some both in their individual capacities and in their capacities as corporate designees. Graham Decl. ¶ 30; Katz Decl. ¶ 30. Plaintiffs took or participated in approximately 70 additional depositions over the course of discovery, including Rule 30(b)(6) depositions of all Defendants, individual depositions of their employees, agents, or representatives involved in the derailment and its aftermath, and Norfolk Southern's CEO, Alan Shaw. Graham Decl. ¶ 31; Katz Decl. ¶ 31. Depositions were concluded by March 1, 2024.

### C.    Settlement Negotiations

 Plaintiffs and Norfolk Southern were in the midst of discovery when they began to negotiate a potential settlement. As a result of ongoing negotiations, Norfolk Southern and Plaintiffs engaged in a two-day mediation with the assistance of retired United States District

---

[4] Plaintiffs have worked extensively with their experts, though no expert reports from Plaintiffs have been exchanged in this litigation. Plaintiffs' original expert disclosure deadline was April 1, 2024 (ECF No. 98), but was extended to April 15, 2024, (ECF No. 432) before the Court granted the motion from Plaintiffs and Norfolk Southern to stay deadlines in Plaintiffs' consolidated case pending the filing of preliminary and final approval papers. (ECF No. 446).

Judge Layn R. Phillips in October 2023. In advance of the mediation, Co-Lead Class Counsel prepared two extensive confidential mediation statements, which were heavily informed by expert consultation and legal analysis. Graham Decl. ¶ 50; Katz Decl. ¶ 52. The mediation did not result in a settlement at that time, but productive negotiations between Norfolk Southern and Plaintiffs continued with the assistance of Judge Phillips over the next four months. Graham Decl. ¶¶ 54–56. As fact discovery came to a close, Norfolk Southern and Plaintiffs were engaged in intense negotiations. *Id.* at ¶ 55. Ultimately, Plaintiffs and Norfolk Southern decided to return to a formal mediation, again with Judge Phillips, on February 19, 2024. *Id.* at ¶ 56 Co-Lead Class Counsel again submitted extensive briefing to the Judge Phillips, which was based on continued consultation with experts and continued negotiations with Norfolk Southern. Graham Decl. ¶ 50.

Plaintiffs' Class and Co-Lead Counsel were present at the mediation, including senior attorneys from Grant & Eisenhofer P.A., Burg Simpson Eldredge Hersh & Jardine, P.C., Simmons Hanly Conroy LLP, and Morgan and Morgan, P.A. Decl. of Hon. Layn R. Phillips ("Phillips Decl.") ¶ 8. Norfolk Southern was represented at mediation by senior attorneys from Wilmer Cutler Pickering Hale and Dorr LLP and Dickie, McCamey & Chilcote, as well as multiple in-house counsel representatives of Norfolk Southern. *Id.* Plaintiffs and Norfolk Southern rigorously negotiated toward a resolution during the course of the day-long mediation. Though Plaintiffs and Norfolk Southern did not finalize an agreement on the day of the mediation, negotiations continued, with counsel for the parties in near constant contact with the mediator. Graham Decl. ¶¶ 54–58. As the Judge Phillips recognized, substantial work went into mediation preparation, and the mediation itself involved complex issues that required significant analysis. Phillips Decl. ¶ 11.

Judge Phillips presented a mediator's recommendation to Norfolk Southern and Plaintiffs on March 6, 2024. Graham Decl. ¶ 58. Both parties accepted the mediator's recommendation, announcing an agreement in principle based on that recommendation on April 9, 2024. *Id.* at ¶ 60. Norfolk Southern and Plaintiffs then reduced that agreement to writing and executed the Settlement Agreement on April 26, 2024. *See* ECF No. 452-2 (Settlement Agreement).

**D.      Summary of the Settlement**

The Settlement calls for Norfolk Southern to create settlement fund of $600 million to compensate the following Settlement Class:

> All Persons and Businesses residing, owning or otherwise having a legal interest in property, working, or owning or operating a Business within a 20-mile radius of the Derailment Site,[5] from February 3, 2023 to April 26, 2024.

No portion of the $600 million will revert to Norfolk Southern. After deduction of notice-related costs and any Court-approved award of attorneys' fees, reimbursement of litigation expenses, and service awards to Class Representatives, all of the remaining monies will be distributed to Settlement Class Members in accordance with Plaintiffs' proposed Plan of Distribution. Alongside this motion, Plaintiffs have filed a motion for approval of the Plan of Distribution.

The proposed Plan of Distribution provides three categories of payments available to Settlement Class Members: Direct Payments to individuals on a per-Household basis ("Direct Payments"); payments to businesses for Business Loss claims ("Business Loss Payments"); and optional payments[6] to Eligible Settlement Class Members who voluntarily agree to release any

---

[5] The coordinates of the Derailment Site are in East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude: -80.5222838°W.

[6] Referred to as "Personal Injury Payments" in the Settlement Agreement (ECF No. 452-1).

personal injury claims they might have in connection with the derailment by executing, if they choose to do so, a separate release[7] ("Voluntary Exposure Supplement"). All payments require the submission of the appropriate Individual Claim Form or Business Loss Claim Form.

In addition to the three categories of payments described above, Settlement Class Members may submit a Claim for Extraordinary Loss, Damage, or Injury in connection with their household's Claim for Direct Payment, their individual Claim for a Voluntary Exposure Supplement, or their Claim for Business Loss. These Claims for Extraordinary Loss, Damage, or Injury are evaluated by the Settlement Administrator and are intended to provide compensation for any claim that is so different in degree from that which the majority of other class members experienced that the Plan of Distribution would not otherwise provide fair, reasonable, and adequate compensation.

### E.    Preliminary Approval

On April 26, 2024, Plaintiffs moved for preliminary approval of the Settlement. ECF No. 452. The Court granted that motion on May 21, 2024, finding that the Settlement from extensive arm's-length negotiations between experienced counsel overseen by an experienced mediator; eliminates the risks to the settling Parties of continued litigation; and will likely merit final approval as fair, reasonable, and adequate, resulted. ECF No. 458 at 2–3. The Court thus directed notice to the Settlement Class, scheduled a Final Approval hearing for September 25, 2024, and set a July 1, 2024, deadline to object or opt out. *Id.* at 9.

### F.    Notice and Claims Administration

Following preliminary approval, the Parties worked with the respected notice provider and settlement administrator, Kroll Settlement Administration, to successfully roll out the Court-

---

[7] Referred to as "Personal Injury Release" in the Settlment Agreement (ECF No. 452-1).

approved Notice Program. *See Wood v. FCA US LLC*, No. 520CV11054JELAPP, 2022 WL 17361963, at *4 (E.D. Mich. Dec. 1, 2022) (approving final settlement that used Kroll Settlement Administration). In compliance with this Court's order granting Preliminary Approval, Kroll sent thousands of individual notices by mail and thousands more by email to Settlement Class Members. *See generally* Decl. of Jeanne C. Finegan, APR of Kroll Settlement Administration ("Finegan Decl."). Additionally, Kroll supplemented this direct effort with supplemental forms of notice, including a substantial digital notice effort, which included a targeted state-of-the-art social media outreach campaign in which the digital ads link directly to the dedicated Settlement Website (www.EastPalestineTrainSettlement.com) where Settlement Class Members can review the notices, read FAQs, apprise themselves of key dates, and contact the Settlement Administrator directly with any additional questions. Finegan Decl. ¶¶ 11–14; Decl. of Scott M. Fenwick of Kroll Settlement Administration ("Kroll Decl.") ¶ 6.

Kroll additionally completed notice of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. §1715(b) ("CAFA Notice"). Kroll Decl. ¶ 4. Kroll distributed CAFA Notice via first-class certified mail to the Attorney General of the United States, the state Attorneys General of Pennsylvania, Ohio, and West Virginia, the United States Federal Railroad Administration, the Public Utilities Commission of Ohio, the Pennsylvania Public Utilities Commission, and the Public Services Commission of West Virginia, as identified in the service list for the CAFA. *Id.* The CAFA Notice directed the recipients to www.CAFANotice.com, a site that contains all necessary and relevant Settlement documents. *Id.*

Unlike the majority of settlements where claims administration is done from afar, here the Parties acknowledged the importance of presence in the community. The brick-and-mortar claims center was opened in East Palestine the week of June 3, 2024. Kroll Decl. ¶ 9. The claims

center was originally open five days a week — and then extended to six days a week with expanded hours in light of the extraordinary interest and participation in the settlement — and was staffed with Class Counsel and Kroll employees, who were available to answer questions and assist Settlement Class Members with their claim forms. *Id.* ¶¶ 9–10; Graham Decl. ¶ 62. In total, the claims center was visited by more than 11,000 people (this number is based on the sign-in sheet at the claims center and does not account for multiple household members visiting together, and does not include the first week the claims center was open). Kroll Decl. ¶ 9; Graham Decl. ¶ 62. Given the community's positive reception and heavy use of the Claims Center, Class Counsel leased and opened a second Claims Center location in East Palestine on July 31, 2024, which was staffed by Class Counsel six days a week from its opening until the claim filing deadline. Kroll Decl. ¶ 10; Graham Decl. ¶ 62. In addition to in-person assistance at the claims centers, Kroll has provided a phone number for persons with questions to call. The call center took at least 48,031 calls. Kroll Decl. ¶ 7.

## III.  THE SETTLEMENT MERITS FINAL APPROVAL

Federal courts favor and encourage settlements as a matter of public policy, particularly in class actions, where the costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to claim. *See UAW v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (noting "the federal policy favoring settlement of class actions"); *see also* 4 William B. Rubenstein, *Newberg on Class Actions* § 13:44 (6th ed. 2022) (noting that the law favors settlement "particularly in class actions" and collecting cases).

After preliminary approval, Federal Rule of Civil Procedure 23 requires final evaluation of a proposed class action settlement. Fed. R. Civ. P. 23(e)(2). At this stage, the Court must determine whether to approve the settlement as fair, reasonable, and adequate. *Id.* In determining

whether a class action settlement is fair, reasonable, and adequate, courts consider whether

(1) the proposed Class Representatives and Class Counsel have adequately represented the class;

(2) the Settlement was negotiated at arm's length; (3) the relief provided is adequate; and (4) the

Settlement treats class members equitably relative to each other. *Id.*

      In recently amending Rule 23, the Advisory Committee recognized that the various

Circuits had independently generated their own lists of factors to consider in determining

whether a settlement is fair, reasonable, and adequate.[8] Fed. R. Civ. P. 23(e)(2) advisory

committee's note to the 2018 amendment. Because the Sixth Circuit factors are similar, case law

in this Circuit applying those factors remains instructive here. That said, following the

instructions of the Advisory Committee, Plaintiffs will "present the settlement to the court in

terms of a shorter list of core concerns, by focusing on the primary procedural considerations and

substantive qualities that should always matter to the decision whether to approve the proposal."

*Id.* As detailed below, the Settlement merits final approval.

     **A.**    **The Class Has Been Vigorously Represented**

      Rule 23(e)(2) first asks whether "the class representatives and class counsel have

adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Relevant considerations include

the information available to counsel negotiating the settlement, the stage of the litigation, and the

amount of discovery taken. Fed. R. Civ. P. 23(e)(2) advisory committee's note to the 2018

---

[8] In the Sixth Circuit, those factors are: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *UAW*, 497 F.3d at 631.

amendment.[9] The parties need not unearth every last fact of a case before they can settle it; rather, they must learn as much as necessary to ensure that claims are not settled prematurely. *See N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 237 (E.D. Mich. 2016) (class settlement appropriate where the parties "had sufficient information to evaluate the strengths and weaknesses of the case and the merits of the Settlement").

As detailed above, Class Counsel undertook significant efforts to investigate the facts and allegations here, reviewed volumes of discovery, and retained field-leading experts with whom Class Counsel worked closely on the myriad complex issues presented by the litigation. *See supra* § II.A–B. Armed with that knowledge, Class Counsel drafted a detailed Master Complaint, successfully defeated motions to dismiss, and negotiated terms of relief.

As a result, the parties reached an informed decision based on the seriousness and scope of the claims and issues, and the diligent work of the Court, the parties, their counsel, experts, and the mediator. Class Counsel were therefore well-positioned to evaluate the case and to negotiate a fair and reasonable Settlement. *See N.Y. State Teachers' Ret. Sys.*, 315 F.R.D. at 237 (class settlement appropriate where counsel drafted a detailed complaint, prepared extensive briefing in response to a motion to dismiss, reviewed large volumes of documents, and consulted with relevant experts). They have done so.

Plaintiffs, in their capacity as Class Representatives, also undertook significant effort and have remained actively engaged. Each was consulted on the terms of the Settlement and has expressed their support and continued willingness to protect the Class until the Settlement is approved and its administration completed. *See* Graham Decl. ¶¶ 93–95; Exs. A–P (Class

---

[9] Similarly, under the Sixth Circuit factors courts look to the amount of discovery engaged in by the parties. *See UAW*, 497 F.3d at 631.

Representative Declarations). The Settlement Class remains well represented by experienced Counsel and engaged Class Representatives. This factor weighs in favor of final approval.

### B. The Parties Negotiated Settlement at Arm's Length Under the Auspices of an Experienced, Neutral Mediator

Rule 23(e)(2) next asks whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). To ensure negotiations were conducted at arm's length, courts look to the "conduct of the negotiations," recognizing that "the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e)(2) advisory committee's note to the 2018 amendment. Indeed, courts recognize that negotiations facilitated by a neutral are persuasive evidence of fair settlements. *See Garner Props. & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 627 (E.D. Mich. 2020) (noting "[t]he negotiations of the Settlement Agreement were conducted at arms-length by adversarial parties and experienced counsel, with facilitative assistance from Judge Roberts."); *see also Arledge v. Domino's Pizza, Inc.*, 2018 WL 5023950, at *2 (S.D. Ohio Oct. 17, 2018) (the "participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion").

As described above, and as the Court previously found, the Settlement resulted from extensive arm's-length negotiations between experienced counsel. ECF No. 458 at 2; *see also*, *supra* § II.C. The mediation efforts spanned months and were overseen by Hon. Layn Phillips (Ret.), a "neutral, experienced mediator[.]" *Hillson v. Kelly Servs. Inc.*, 2017 WL 279814, at *6 (E.D. Mich. Jan. 2023, 2017). Settlement was reached only after the parties engaged in a hard-fought, good-faith negotiation process, with the determined involvement of the parties, the mediator, experts, and the Court. Phillips Decl. ¶ 17; *see also*, *supra* § II.C. The Hon. Layn R.

Phillips "strongly support[s] the Court's approval of the Settlement in all respects." Phillips Decl. ¶ 2.

Separately, the Settlement bears none of the traditional signs of collusion. *See N.Y. State Teachers' Ret. Sys.*, 315 F.R.D. at 236 ("[C]ourts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary." (quoting *Sheick v. Auto. Component Carrier LLC*, 2010 WL 4136958, at *19 (E.D. Mich. Oct. 18, 2010))).

In summary, this Settlement is the result of strenuous and informed arm's length settlement negotiations. This factor likewise supports approval.

### C.    The Settlement Provides Meaningful Relief to the Class

The next factor under Rule 23(e)(2) asks whether "the relief provided for the class is adequate," taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed distribution plan, including the claims process; (iii) the terms of any proposed award of attorney's fees; and (iv) any agreement made in connection with the proposal. Fed. R. Civ. P. 23(e)(2)(C).[10] These factors overwhelmingly support final approval. Avoiding years of additional, risky litigation in exchange for immediate and significant cash payments is a principled compromise that works to the clear benefit of the Classes in this case. *See* Fed. R. Civ. P. 23(e)(2)(C).

### 1.    The Settlement relief outweighs the costs, risks, and delay of trial and appeal

The Settlement provides $600 million in non-reversionary cash, a substantial result for the people and businesses of East Palestine and the surrounding community. The Settlement is positioned to put financial relief in the hands of the Settlement Class Members prior to the two-

---

[10] Sixth Circuit factors likewise include the complexity, expense, and likely duration of the litigation and the likelihood of success on the merits. *See UAW*, 497 F.3d at 631.

year anniversary of the derailment, providing households, families, and local businesses with much-needed relief for the losses and inconveniences they sustained.

This result is all the more impressive when weighed against the serious risks of ongoing litigation. Litigating this case further would have carried significant costs, risks, and delay with little to no additional payoff. Despite Class Counsel's confidence in the facts and legal theory that underpin the Class's claims, they recognize that the claims present complex and novel issues, increasing the risks faced by the Settlement Class. Graham Decl. ¶ 80; Katz Decl. ¶ 82; *see also IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 596 (E.D. Mich. 2006) ("there is no such thing as risk-free, expense-free litigation"); *Midland Funding, LLC v. Brent,* No. 3:08 CV 1434, 2011 WL 3557020, at *12 (N.D. Ohio Aug. 12, 2011) (Katz, D.) (courts favor settling "complex cases" because it conserves "substantial judicial resources").

The parties would soon face substantial additional expenses including dispositive motion practice, *Daubert* briefing, and pre-trial preparations. *UAW v. Ford Motor Co.*, 2006 WL 1984363, at *24 (E.D. Mich. July 13, 2006) ("The costs and uncertainty of lengthy and complex litigation weigh in favor of settlement."). Were this case to proceed to trial, it would be a lengthy proceeding and would require substantial investment in experts to address the many complicated scientific issues. *See Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (weighing in favor of settlement the necessity of complex scientific proof, and cost of the experts necessary to present it, which would have been very expensive for both sides).

Norfolk Southern disputes Plaintiffs' claims and maintains that it has defenses to class certification. Even if Norfolk Southern failed in its efforts to defeat the case outright (through inevitable summary judgment motions or a defense verdict on liability), it was prepared to aggressively challenge Plaintiffs' damages claims. Had Plaintiffs secured a complete victory at

-15-

trial (both on liability and damages), Norfolk Southern undoubtedly would have engaged in "vigorous post-trial motion practice[s]…and likely appeals to the [Sixth] Circuit—delaying any recovery for years." *Baker v. SeaWorld Entertainment, Inc.*, 2020 WL 4260712, at *7 (S.D. Cal. July 24, 2020). Of course, Class Counsel were prepared to defend the Class's case against each of these challenges. Nonetheless, risks remained, and significant and painful delays to recovery would have been inevitable.

The proposed Settlement eliminates all of this risk and expense, cuts through the delay, and provides quick and significant compensation to the Class. This factor strongly favors final approval.

### 2. The Distribution Plan ensures settlement funds will be distributed in a simple, expedient manner

"[T]he effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," is also a relevant factor in determining the adequacy of relief. Fed. R. Civ. P. 23(e)(2)(C)(ii). As explained in Plaintiffs' concurrently filed motion to approve their Plan of Distribution, the Plan readily satisfy Rule 23(e)(2)(c)(ii)'s requirement that settlement funds be distributed "in as simple and expedient a manner as possible." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616, at *7 (S.D. Cal. Jan. 31, 2020) (quoting 4 William B. Rubenstein, *Newberg on Class Actions* § 13:53 (5th ed. 2014)).

This settlement employs the gold standard in class member relief: non-reversionary cash payments. Settlement Class Members were able to make claims by filling out basic information on a user-friendly claim form. *See* Settlement Agreement at Exs. A (Individual Claim Form) and B (Business Loss Claim Form). No Settlement funds will revert to Norfolk Southern; after payment of any attorneys' fees, expenses, service awards, and notice administration, all money

-16-

will be distributed to Settlement Class Members. This is a "[s]ignificant[]" fact that further

demonstrates the Settlement's fairness and effectiveness. *Hilsley*, 2020 WL 520616, at *7.

### 3. Class Counsel seek reasonable attorneys' fees and expenses and a reasonable service award for Plaintiffs.

The Court should also evaluate Class Counsel's "proposed award of attorney's fees,

including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). Plaintiffs have separately filed a

motion in support of their requested fees and costs award. As explained in that motion, the

requested fee of 27 percent is well within the range of reasonable fees approved in this Circuit.

*See, e.g.*, *Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886, 898 (6th Cir. 2019) ("It is not abnormal

for negotiated attorneys' fee awards to comprise 20% to 30% of the total award.") *See also In re*

*Flint Water Cases*, 583 F. Supp. 3d 911, 946 (E.D. Mich. 2022) (awarding fees of just under

31.33% of $626.25 million). The fee request is independent of this final approval motion.

### 4. There are no agreements between the parties other than the Settlement

No side agreements required to be identified under Rule 23(e)(2)(c)(iii) exist. This

provision is aimed at "related undertakings that, although seemingly separate, may have

influenced the terms of the settlement by trading away possible advantages for the class in return

for advantages for others."  Fed. R. Civ. P. 23(e), advisory committee notes 2003 amendments.

Plaintiffs have not entered into any such agreements. As previously explained in Plaintiffs'

Motion for Preliminary Approval (at 24), however, Plaintiffs and Norfolk Southern have entered

into a confidential supplemental agreement, referenced in the Settlement Agreement (§ XI.C), to

provide Norfolk Southern with the option to terminate the proposed Settlement if participation

rates trigger certain numerical thresholds. It is typical for agreements of this nature to remain

confidential because "[k]nowledge of the specific number of opt outs that will vitiate a

settlement might encourage third parties to solicit class members to opt out." Manual for Complex Litigation (4th ed.) § 21.631.

### D. The Settlement Treats Settlement Class Members Equitably

The Settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Relevant considerations include "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2) advisory committee's note to the 2018 amendment.

As noted above, the Plan of Distribution apportions relief among each proposed Class equitably, considering the relative impact and harms to each Settlement Class Member. Allocation of funds among class members is also equitable, reflecting both relative amounts of damages as estimated by expert analysis, and likelihood of recovery given relative strength of claims. *See Robles v. Comtrak Logistics, Inc.*, No. 15-CV-2228, 2022 WL 17672639, at *10 (W.D. Tenn. Dec. 14, 2022) (approving class settlement that allocated amounts to class members based on the number of weeks the employee was misclassified; "[t]his distribution scheme aligns payments with the claim size of each individual driver.").

Depositions and discovery confirm that the Settlement Class Area's 20-mile radius includes the likely universe of meritorious claims. Graham Decl. ¶¶ 72–74. As reflected in this Settlement, using a geographic radius of 20 miles for all claims (excepting only Voluntary Exposure Supplement claims, limited to a 10-mile radius) fairly and adequately compensates those in East Palestine and the surrounding affected communities. *Id.*

Moreover, as just discussed, the Plan of Distribution, which heavily considers proximity to the derailment and expert opinions as to the ensuing spread of toxins, both prioritizes those households most impacted and protects the outlying households from the risk of an adverse

ruling or verdict.[11] *Id.* Eligible Settlement Class Members' ability to voluntarily elect to participate in and receive a Voluntary Exposure Supplement if present within a 10-mile radius of the derailment is designed to compensate those individuals for past, present, and future personal injuries from the derailment. The Settlement avoids risks of a complete non-recovery for any person within the 10-mile radius and provides compensation for personal injuries now and in the years to come. *Id.*

  **E.**  **The Sixth Circuit's Additional Factors Support Approval**

  In addition to the factors articulated in Rule 23(e)(2), Sixth Circuit courts have historically considered the opinions of class counsel, class representatives, and the reaction of absent class members, and asked whether the settlement supports public interest. *UAW*, 497 F.3d at 631.

  Class Counsel have extensive experience handling class actions, including toxic tort and environmental cases. *See, e.g.*, Graham Decl. ¶¶ 7–8; Katz Decl. ¶¶ 5–9. Class Counsel thoroughly investigated and analyzed the claims, made informed judgments regarding the proposed Settlement, and believe it is fair, reasonable, and adequate. *UAW v. Ford Motor Co.*, 2008 WL 4104329, at *26 (E.D. Mich. Aug. 29, 2008) ("The endorsement of the parties' counsel is entitled to significant weight, and supports the fairness of the class settlement."). Likewise, based on his experience and extensive involvement throughout negotiations, Judge Philips agrees that the proposed Settlement provides fair, reasonable, and appropriate relief to the Settlement Class. Phillips Decl. ¶ 2. In addition, Class Representatives actively consulted with Class Counsel throughout the settlement process and strongly support the Settlement because it

---

[11] Norfolk Southern disputes impacts and harm, including as set forth in the Declaration of Richard Schuhmann, but consents to Plaintiffs' Plan of Distribution. *See* Settlement Agreement § XIII.C.

provides much needed relief to their communities. Graham Decl. Exs. A–P.

The quality of the result is reflected by the reaction of the Class: Settlement Class Members overwhelmingly support the proposed Settlement. As of September 3, 2024, the Settlment Administrator has received nearly 55,000 claims, more than three times the typical claims rate in class settlements. Fenwick Decl. ¶ 17. Of the estimated 6,065 households within two miles of the derailment, 195,383 households in the Settlement Class Area, and 15,000 businesses in the Settlement Class, only a tiny percentage have objected or opted out. There have been 82 total household opt-outs from within two miles of the derailment, 370 total household opt-outs from the entire Settlement Class, and 47 total business opt-outs. *Id.* at ¶ 23. These represent 1.35%, .18% and .31%, respectively. In total, less than .018% of Settlement Class Members (86 of 463,271) submitted objections to the Settlement.[12] *Id*. Many of the Objectors are represented by a single firm, Colley Shroyer & Abraham Co. LPA ("Abraham Objectors").

Finally, the Settlement is in the public interest. "[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources.'" *Deja Vu Services, Inc.*, 925 F.3d at 899 (quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003)). Class Counsel submits there is no basis for not adhering to that policy here. The Settlement provides a tremendous benefit to the public interest by providing robust relief to the community impacted by the train derailment. Moreover, the public interest is best served in this

---

[12] One non-Settlement Class Member, Jami Wallace, filed an objection after opting out from the Settlement. ECF No. 486. Because Ms. Wallace opted out, she has no standing to object to the Settlement and the Court need not consider her objection. *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 941 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ("If you opt out . . . , you legally have no standing to object to the settlements because . . . the settlements do not affect your rights in any way, one way or the other.").

-20-

case by providing such relief to the Settlement Class as expeditiously as possible. *See Garner Props. & Mgmt., LLC v. City of Inkster*, 2020 WL 4726938, at *10 (E.D. Mich. Aug. 14, 2020) (settlement in the public interest where it "promote[d] fair and expeditious resolution of the matter").

### F.       The Objections Should Be Overruled

Once the court has preliminarily approved a settlement, the settlement is presumptively reasonable and "an objecting class member must overcome a heavy burden to prove that the settlement is unreasonable." *Todd S. Elwert, Inc., DC v. All. Healthcare Servs., Inc.*, No. 3:15-CV-2673, 2018 WL 4539287, at *2 (N.D. Ohio Sept. 21, 2018) (quoting *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 550 (S.D. Ohio 2000) (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983))). Here, no Objector came close to carrying their burden.

For the most part, Objectors merely recite Rule 23 factors and offer conclusory statements without any basis as to their purported grounds for objecting. *See, e.g.*, ECF Nos. 490 and 491 (simply reciting Rule 23 factors with no explanation); *see also* ECF No. 487-2 (list of boilerplate, conclusory assertions). These objections fail to "state with specificity the grounds for the objection," Fed. R. Civ. P. 23(e)(5)(A), and as such, should be overruled. *See In re Polyurethane Foam Antitrust Litig.*, 168 F.Supp.3d 985, 994, 998 (N.D. Ohio 2016) (rejecting outright "many unfounded, conclusory, and frivolous objections").

Some Objectors do provide some explanation for certain objections. Those objections, however, are without merit.

### 1.       Class Counsel amassed sufficient evidence to evaluate the Settlement

Some Objectors argue Class Counsel did not gather sufficient evidence before reaching this Settlement. Objectors claims the Settlement should have awaited remediation in East Palestine (ECF No. 493 at 2) and the Settlement should have awaited supposedly "new and

-21-

substantial evidence" in the NTSB's final report issued on June 25, 2024. ECF No. 485 at 4; ECF No. 493 at 3.

These objections either misunderstand or overlook the extensive discovery process undertaken by Class Counsel before reaching this Settlement. As explained above, Class Counsel obtained substantial discovery (*supra*, § II.B), environmental data, and expert opinions, and facilitated a comprehensive environmental sampling and testing program, including air modeling, to assess exposure levels. *See* Schuhmann Decl. ¶¶ 9–17. Class Counsel collaborated with experts to estimate the costs of a medical monitoring program and to assess damages for trespass and nuisance claims. Graham Decl. ¶ 47. As a result of Class Counsel's diligent work during an intensive discovery period, they were able to fully develop and assess the strengths and weaknesses of the case before reaching this Settlement.

None of the information disclosed at the NTSB hearing or in its final report was new to Class Counsel. Class Counsel was already aware of and had developed the same factual evidence, and more, months before the NTSB hearing and the settlement's finalization. Katz Decl. ¶ 32. Class Counsel deposed many of the same witnesses the NTSB interviewed during its investigation, including the President & CEO of Norfolk Southern, the conductors and engineers operating Train 32N on the night of the derailment, hazardous materials managers, wayside detector operators, among others. Class Counsel were also familiar with the documents used by the NTSB, having utilized many of them in discovery. *Id.* In fact, Class Counsel questioned witnesses about these same documents. *Id.*

The NTSB hearing and final report did not present new information; they merely made public what Class Counsel already knew when negotiating the Settlement. Moreover, the NTSB's determination of the derailment's probable cause has minimal, if any effect on this case,

because the report is inadmissible. 49 U.S.C. § 1154(b) ("No part of a report of the [NTSB],

related to an accident or an investigation of an accident, may be admitted into evidence or used

in a civil action for damages resulting from a matter mentioned in the report.")

### 2. No information was withheld or suppressed by Class Counsel

One Objector baselessly accuses Class Counsel of suppressing and/or withholding

evidence. ECF No. 485 at 3–4. He offers two alleged examples, neither of which holds up. First,

he cites news reports about a discredited "whistleblower," Robert Kroutil, who claims the EPA

(not Class Counsel) failed to adequately use an advanced aircraft (ASPECT) for data

collection.[13] The EPA has refuted these claims, explaining that unfavorable weather conditions

prevented flying on the date in question.[14] Any assertion that the EPA withheld or suppressed

data is mere speculation, not fact. Second, Objector Sheely alleges that Class Counsel withheld

testing by expert Stephen Petty.[15] However, Stephen Petty's work was in part based on protected

materials under the Protective Order (ECF No. 127), preventing Class Counsel from disclosing it

without violating the order. In any event, Class Counsel considered all reliable scientific data,

which is consistent with Class Counsel's assessment both of the geographic scope of the

Settlement Class Area and the adequacy of the Settlement. *See* Schuhmann Decl. ¶¶ 16–17. This

objection lacks any factual basis and should be overruled.

---

[13] Joseph Funk, Whistleblower questions EPA delays in use of sensor plane after Norfolk
Southern derailment | AP News, The Associated Press, May 14, 2024.

[14] Stephanie Elverd, EPA calls whistleblower reports false | News, Sports, Jobs - Morning
Journal (morningjournalnews.com), Morning Journal, August 1, 2024.

[15] The Objector identifies Plaintiffs' expert as "Stephen Petit." Plaintiffs assume they are
referring to Stephen Petty.

### 3. Objections to the Plan of Distribution are unfounded

Certain objections target aspects of the Plan of Distribution. *See* ECF No. 485 at 11 (opposing distributing Direct Payment awards to households instead of individuals). As an initial matter, under Rule 23, and the terms of the Settlement itself, approval of the Settlement does not hinge on approval of the Plans of Distribution. 2 McLaughlin On Class Actions (16th ed.) § 6:23 ("[C]ourt approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation . . . [and] courts frequently approve them separately."); Manual for Complex Litigation (4th ed.) § 21.312 ("Often . . . the details of allocation and distribution are not established until after the settlement is approved."); ECF No. 452-2, § XI.B. These objections, therefore, have no bearing on whether the Court should grant Final Approval. Even if they did, the objections still lack merit.

The objection to distributing Direct Payment awards per household rather than per individual overlooks the fact that these awards are designed to compensate for damages primarily experienced by entire households. As explained in the motion to approve the Plan of Distribution, Direct Payment awards compensate for damages caused by interference with and contamination of real property across the Settlement Class Area, including for trespass, nuisance, property damage, loss of property value, loss of use and enjoyment, and the resulting inconvenience and disruption. The Direct Payment also accounts for individuals residing in each household and awards are calculated in part based on the number of household members. The Settlement thus assumes Settlement Class Members are best positioned to decide how to allocate funds within their households. Moreover, calculating awards by household reduces processing time and allows each unit to allocate funds equitably. The Court should overrule the Objections.

Objectors also express concern that Settlement awards are subject to deductions for prior payments made by Norfolk Southern. *E.g.*, ECF No. 485 at 11. The Settlement is non-

reversionary; Norfolk Southern does not get any credit against the Settlement for amounts it previously paid to Class Members. Rather, as explained in the motion to approve the Plan of Distribution, without such reductions, some Settlement Class Members would receive a windfall at the expense of others. Offset provisions are widely recognized as "a fair and reasonable method to avoid double compensation." *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 950 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). The Plan of Distribution appropriately accounts for previous payments from Norfolk Southern, and objections on this basis should be overruled.

Finally, some Objectors complain that the award formula and amounts are unknown to Settlement Class Members. ECF Nos. 485 at 13; 487-2 at 1; 493 at 2. This is incorrect. The Long-Form Notice describes in detail the factors taken into account and provides best estimates of base award amounts and detailed information on how Settlement awards will be calculated. ECF No. 452-2 at 23, 41–51. As is the nature of class actions, final amounts for each household cannot be determined until the claims process has been completed, all claims have been reviewed, participation is decided, and funds have been earmarked for distribution based on points allocated to each claim. At least one Objector fundamentally misunderstands this, as demonstrated by his request to allow residents to "opt back in upon being fully and properly informed and notified" of settlement awards. ECF No. 485 at 15. The proposed Plan of Distribution filed contemporaneously herewith provides further detail, which class members will have an opportunity to comment on before the hearing on final approval.

**4. Settlement Class Members are not required to participate in the Voluntary Exposure Supplement, an entirely optional, additional benefit for the Settlement Class**

Some Objectors incorrectly assert that, through the settlement, they are "being forced to accept and release [their] interest and claims before enough time has passed for the symptoms and injuries to occur." ECF No. 487-2 at 1. This assertion is wholly inaccurate under the terms of the Settlement. As explained in the Motion to Approve the Plan of Distribution, Settlement Class Members within a ten-mile radius of the derailment have the option to participate in a voluntary, supplemental payment program — the Voluntary Exposure Supplement — based on their exposure, in exchange for releasing any potential claim to sue for personal injury related to that exposure. Importantly, participation for this additional benefit is not mandatory; Settlement Class Members are not compelled in any way to release claims for future symptoms or injuries in order to receive a Direct Payment. Those who qualify for the payment have the option to accept the additional funds, which they can set aside in case future injuries or symptoms develop.

Nor was the Voluntary Exposure Supplement negotiated "outside the scope" of Class Counsel's representation. ECF No. 487-2 at 1. It is squarely within the scope of Class Counsel's representation to negotiate this benefit for the Settlement Class: namely, the benefit of the opportunity to obtain this additional form of relief, for Settlement Class Members who are eligible and interested—and only those Settlement Class Members. The opportunity to obtain this payment is an additional form of relief made available to those Eligible Settlement Class Members (those physically present within 10 miles of the Derailment Site) who choose to make an additional claim, separately and independently, and with the opportunity to consult with counsel, without needing to file a separate lawsuit or meet the burdens associated with litigation. Many Settlement Class Members have chosen to do so — including over 97% of the residents in

East Palestine — recognizing the value of this additional benefit, but many others have decided not to do so. The Settlement was intentionally structured to provide an accessible way for Settlement Class Members concerned about future symptoms and injuries to obtain funds without the risk and costs of litigation. The Settlement explicitly ensures that no Settlement Class Member is forced to release their right to sue for future symptoms and personal injury. Although every Eligible Settlement Class Member is entitled to submit a claim for this additional relief, as a benefit of the class settlement, only those Settlement Class Members who elect to do so will release their personal injury claims. Accordingly, objections to the Voluntary Exposure Supplement should be overruled.

> 5.    **The Settlement fairly considers and provides damages for mental and emotional injuries and provides medical monitoring**

Some Objectors challenge the Settlement's release of mental and emotional distress claims. ECF No. 487-2 at 1; ECF No. 485 at 7-8. However, as explained in the Plan of Distribution, the Direct Payment fairly accounts for mental and emotional harm and considers factors such as proximity to the Derailment, family size, and time of displacement, in determining Direct Payment awards. These mental and emotional injuries are closely associated with Plaintiffs' nuisance claims and can be resolved on a class-wide basis. *Jackson v. Nationwide Ret. Sols., Inc.,* No. 2:22-CV-3499, 2024 WL 958726, at *2 (S.D. Ohio Mar. 5, 2024) (granting final approval of class action settlement that resolved, *inter alia*, claims for emotional distress).

Some Objectors argue that it is inequitable for the Settlement to resolve medical monitoring claims rather than allowing them to be brought forth in a separate lawsuit. ECF No. 487-2 at 1. Class Counsel considered the merits of medical monitoring claims and in light of the Court's dismissal of Plaintiffs' standalone medical monitoring claim under Ohio law, while also preserving medical monitoring as a remedy under Ohio law (and preserving of all other

Plaintiffs' claims and remedies), determined that releasing these claims in exchange for the agreed compensation was fair, reasonable, and adequate. In negotiating the settlement, the availability of compensation to allow Settlement Class Members access to funds to pay for medical testing, if desired, was considered and achieved. Settlement Class Members can use their Direct Payment and exposure supplement as they see fit, including to cover the cost of medical monitoring.

In addition, in a separate proposed settlement agreement with the EPA and United States Department of Justice, pending before Judge Adams, Norfolk Southern has agreed to pay "$25 million for a 20-year community health program that includes medical monitoring for qualified individuals and mental health services for individuals residing in affected counties . . . and a community facilitation plan to assist community members in using the benefits of the program."[16] As set forth in the proposed Consent Decree,[17] if approved the community health program will provide 10 medical exams in the first 15 years of the program for residents living within two miles of the derailment site and first responders deployed to the derailment site in February 2023. *See* Consent Decree ¶ 50. In addition, individuals residing outside of the two miles radius may seek inclusion in the Community Health Program on a case-by-case basis. *Id.* The EPA website provides more information about the program, including a map of the medical monitoring program area.

---

[16] United States Reaches over $310 Million Settlement with Norfolk Southern to Address Harms Caused by East Palestine Train Derailment, EPA (May 23, 2024), https://www.epa.gov/newsreleases/united-states-reaches-over-310-million-settlement-norfolk-southern-address-harms.

[17] Available at https://www.justice.gov/enrd/media/1353111/dl?inline.

The Settlement fairly addresses compensation for emotional and mental injuries, as well as medical monitoring, and the objections on these points should be overruled.

### 6.     The Settlement appropriately and fairly releases claims against Norfolk Southern and other entities

Certain objections challenge the Settlement's release as overbroad because it includes entities other than Norfolk Southern (*e.g.*, ECF No. 487-2 at 1). However, there is nothing atypical about the release. Norfolk Southern seeks to ensure that other parties cannot seek contribution from Norfolk Southern, and the release fairly limits Norfolk Southern's future liability on that front, which is consistent with Ohio law. *See Ford Motor Co. v. Tomlinson*, 229 F.2d 873, 877 (6th Cir. 1956) ("In Ohio the release of a tortfeasor primarily liable ordinarily operates to release one secondarily liable, regardless of an attempt to reserve rights against the latter."); *see also City of Fairborn, Ohio v. United States Env't Prot. Agency*, No. 3:22-CV-102, 2023 WL 2478572, at *9 (S.D. Ohio Mar. 13, 2023) ("As countless cases identify, U.S. EPA can be sued under the CAA for violations of non-discretionary duties [only], i.e., those with a legislative command and which impose a clear-cut, date-certain deadline within which to act.").

Class Counsel agreed to these terms in order to obtain a significant sum that would fairly, reasonably, and adequately compensate Settlement Class Members. If Objectors were concerned about releasing their ability to pursue a lawsuit against entities other than Norfolk Southern as a result of the Derailment, they need only have opted out. The release of additional entities does not make this Settlement unfair, unreasonable, or inadequate and these objections should be overruled.

### 7.     Remaining objections similarly lack merit

One Objector complains that the "Court may yet alter or amend the terms of the Settlement on the basis of objections." ECF Nos. 485 at 6. This misunderstands the Court's role

in the Settlement process. Courts may approve or disapprove a proposed settlement under Rule 23, and may consider objections raised by class members in doing so, but courts may not modify or revise proposed settlements. *See Gardner v. Lafarge Corp.*, 2007 WL 1695609, at *5 (E.D. Mich. June 12, 2007), *aff'd sub nom. Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008) ("[I]n ruling on the legitimacy of a preliminarily-approved settlement agreement, the Court may only approve or disapprove the settlement proposal; it may not revise it." (internal quotation marks omitted)). Thus, the objection is baseless and should be overruled.

The Abraham Objectors complain that Class Counsel did not disclose some "confidential terms" to Settlement Class Members. ECF No. 487-2 at 1. This presumably refers to the Supplemental Termination Agreement, which is confidential pursuant to the Settlement Agreement, and provides the conditions for Norfolk Southern to unilaterally terminate the Settlement. ECF No. 452-2 at 21. As such, it has no bearing on Settlement Class Members' rights under the Settlement, and, as noted above, it is typical for agreements of this nature to remain confidential because "[k]nowledge of the specific number of opt outs that will vitiate a settlement might encourage third parties to solicit class members to opt out." Fed. Judicial Ctr., Manual for Complex Litigation (4th ed.) § 21.631.

Some Objectors argue that expected attorney's fees are too high. ECF Nos. 485 at 11; 487-2 at 1. Class Counsel's Fee Application addresses these concerns and Settlement Class Members have the opportunity to comment on the Fee Application.

For these reasons, all objections should be denied.

## IV.    CLASS CERTIFICATION IS APPROPRIATE FOR SETTLEMENT PURPOSES

As the Court concluded in granting preliminary approval and directing notice to the Settlement Class, "meets the requirements for class certification" under Rules 23(a) and 23(b)(3) for the purpose of settlement. ECF No. 458 at 1. This remains true, and the Settlement Class should be certified.[18]

It is well established that a class may be certified for purposes of settlement. *See*, *e.g.*, *In re Automotive Parts Antitrust Litig.*, 2017 WL 3499291, at *12 (E.D. Mich. July 10, 2017) (certifying class settlement classes). Indeed, the fact that the parties have reached a settlement weighs in favor of class certification. *Daoust v. Maru Rest., LLC*, 2019 WL 1055231, at *1 (E.D. Mich. Feb. 2, 2019). To be entitled to class certification, a plaintiff must satisfy each of Rule 23(a)'s four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). In addition, the proposed class must meet the requirements of one of the three subsections of Rule 23(b). *See id*.

### A.    Rule 23(a) is Satisfied

**Numerosity**. Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Settlement Class is sufficiently numerous, as it consists of thousands of residents and businesses within a 20-mile radius of the derailment sight, making joinder impracticable. *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (recognizing that "while there is no strict numerical test, 'substantial' numbers

---

[18] As set forth in the Settlement Agreement, Norfolk Southern stipulates for settlement purposes only to the certification of the Settlement Class, but does not waive, and instead expressly reserves, its right to challenge the propriety of conditional or class certification for any other purposes. *See* Settlement Agreement § IV.C.

usually satisfy the numerosity requirement"). Accordingly, Rule 23's numerosity requirement is satisfied.

**Commonality**. Rule 23(a)(2) requires that there be one or more questions common to the class. This said, "there need only be one question common to the class, so long as the resolution of that question will advance the litigation." *Philips v. Philip Morris Cos. Inc.*, 298 F.R.D. 355, 363 (N.D. Ohio 2014); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("Even a single [common] question will do.") (quotation marks omitted). This case raises multiple common questions, including whether Norfolk Southern acted negligently in operating and maintaining its railcar, and whether it utilized adequate safety measures and systems. The answer to these questions are the same no matter who in the Settlement Class asks them, and the answer to these common questions are central to this litigation. *See Rikos v. P&G*, 799 F.3d 497, 505 (6th Cir. 2015) (commonality is satisfied where "a common question [] will yield a common answer for the class"). Accordingly, Rule 23's commonality requirement is satisfied here.

**Typicality**. The typicality test under Rule 23(a)(3), is "not onerous." *Cates v. Cooper Tire & Rubber Co.*, 253 F.R.D. 422, 429 (N.D. Ohio 2008). A plaintiff's claims are "typical" if they are reasonably coextensive with those of absent class members. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156–57 (1982). Plaintiffs' claims and those of the Settlement Class each represents are based on the same course of conduct and the same legal theories. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (typicality met where a plaintiff's claim (arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory") (citation omitted). Moreover, the Plaintiffs representing the Settlement Class suffered the same types of alleged harm as the Settlement Class Members they seek to represent. Therefore, typicality is satisfied.

**Adequacy of Representation.** As the proposed Class Representatives, Plaintiffs have "fairly and adequately protect[d] the interests of the class," and will continue to do so. Fed. R. Civ. P. 23(a)(4). Courts ask two questions to determine whether proposed class representatives will adequately represent the class: (1) do the named plaintiffs share common interests with unnamed class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012). Class Counsel have extensive experience litigating and resolving class actions, and are well qualified to represent the Settlement Class. *See* Graham Decl. ¶¶ 7–8; Katz Decl. ¶¶ 5–9. Class Counsel have vigorously litigated this action on behalf of the Settlement Class, including engaging in substantial motions practice and extensive investigation and discovery, working with experts, participating in hard-fought mediation, and negotiating the proposed Settlement. *See supra* § II.A–C.

Likewise, Plaintiffs have demonstrated their commitment to the Settlement Class, including by sitting for depositions, providing pertinent information about their losses, searching for and providing documents and information in response to discovery requests, regularly communicating with their counsel about the case, and reviewing and approving the Settlement. Graham Decl. Exs. A–P.

Finally, Plaintiffs' and Class Counsel's interests are aligned with and not antagonistic to the interests of the Settlement Class, with whom they share an interest in obtaining relief from Norfolk Southern for alleged harms caused by the derailment.

### B. The Requirements of Rule 23(b)(3) are satisfied

In addition to the requirements of Rule 23(a), at least one of the prongs of Rule 23(b) must be satisfied. Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3)

**Predominance.** "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). Courts within the Sixth Circuit favor class treatment of claims stemming from a "common course of conduct," like those alleged from the train derailment in this case. *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 452 (S.D. Ohio 2009); *see also Daffin*, 458 F.3d at 554 (finding predominance where class members alleged the same product defect). Common questions predominate here. The Settlement Class Members' claims all arise under the same laws and the same alleged conduct. The questions that predominate include whether Norfolk Southern acted negligently in maintaining and operating its train, and whether Norfolk Southern utilized adequate and appropriate safety measures and systems before and after the derailment. Moreover, under the proposed Settlement, there will not need to be a class trial, meaning there are no potential concerns about any individual issues, if any, creating trial inefficiencies. *See Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial.")

**Superiority.** Rule 23(b)(3)'s superiority inquiry calls for a comparative analysis of whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* at 615. Class treatment is superior to other methods for the resolution of this case, particularly given the robust relief offered to Settlement Class Members under the Settlement. Moreover, as always, Settlement Class Members were free to exclude

-34-

themselves if they wished to do so.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests the Court (1) approve the Settlement as fair, reasonable, and adequate; (2) certify the Settlement Class; (3) appoint her as Class Representative for the Settlement Class; and (4) appoint Class Counsel as counsel for the Settlement Class.

DATED: September 6, 2024                    Respectfully submitted,

/s/ *Michelle L. Kranz*_____
Michelle L. Kranz (OH 0062749)
ZOLL & KRANZ, LLC
6620 West Central Ave., Suite 100
Toledo, Ohio 43617
419-841-9623
419-841-9719 (fax)
michelle@toledolaw.com

*Plaintiffs' Liaison Counsel*

Seth A. Katz (pro hac vice)
BURG SIMPSON ELDREDGE HERSH &
JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
303-792-5595
skatz@burgsimpson.com

M. Elizabeth Graham (pro hac vice)
GRANT & EISENHOFFER, P.A.
123 S. Justison Street, 6th Floor
Wilmington, DE 19801
303-622-7000
egraham@gelaw.com

Jayne Conroy (pro hac vice)
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
212-784-6400
jconroy@simmonsfirm.com

T. Michael Morgan (pro hac vice)
MORGAN & MORGAN
20 North Orange Ave., Suite 1600
Orlando, FL 32801
407-420-1414
407-245-3389 (fax)
mmorgan@forthepeople.com

*Plaintiffs' Co-Lead and Class Counsel*

Mark P. Chalos
Patrick I. Andrews
Christopher Coleman
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN  37201
Telephone:  615.313.9000
Facsimile:  615.313.9965
mchalos@lchb.com
pandrews@lchb.com
ccoleman@lchb.com

*Plaintiffs' Executive Committee Member and
Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this sixth day of September 2024, a copy of the foregoing Plaintiff's Memorandum in Support of Final Approval of Settlement was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Michelle L. Kranz*
Michelle L. Kranz