**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN RE:
EAST PALESTINE TRAIN DERAILMENT          CASE NO. 4:23-CV-00242-BYP

                                                                 **JUDGE BENITA Y. PEARSON**

**RESPONSE TO MOTION FOR FINAL APPROVEMENT OF SETTLEMENT AND OBJECTORS' BRIEF IN SUPPORT OF OBJECTIONS**

**A.**      **INTRODUCTION**

On July 1, 2024, the undersigned entered an appearance and submitted objections to the Class Action Settlement Agreement on behalf of thirty-five Objectors.[1] The Court should withhold approval of the final settlement until the agreement is amended to address Objectors' concerns. To facilitate the process, Objectors respectfully request that the Court order that the stakeholders meet and confer with counsel for the objecting parties to revise the agreement to address the issues raised by the objections before the agreement is submitted to the Court for final approval.

The crux of the objections raised on behalf of these Objectors is that they were not provided with sufficient information to evaluate the settlement and felt pressured to agree to the settlement without any understanding of the merits of the case and the evidence that supports it or how they

---

[1] The undersigned represents the following Class Members who have raised objections to the Settlement: Jade Caudill, Daniel Clements, Andrew Clendennen, Craig Compton, Timothy Cope, Rebecca Davis, Joseph Dinello, Cynthia Ford, Tyler Foster, Luann Gregory, Robert Haglan, Joseph Helpy, Donald Hetrick, Michael Hetrick, Glenn Knopp, Jr., Glenn Knopp, Sr., Tammy Lyda, Paul Mahovlich, Michael Moore, Ralph Moore, Timothy Moore, Louis Pagani, Christopher Raley, Angela Rayl, Michael Routh, Harper Sanner, James Scullion, Ronald Simmons, Zoey Spellman, Kevin Steves, Steven Tigelman, Karen Toothman, Penny Wilson, Melinda Woods, and Thomas Young. These individuals will hereafter be referred to as "Objectors" for purposes of this brief.

1

will be compensated under the terms of the settlement. These Objectors oppose Class Counsel's efforts to push the settlement through without regard to the due process rights of the Class Members, including Objectors.

On July 1, 2024, Objectors timely submitted their Objections to the proposed Class Settlement including written notice that their counsel would appear on their behalf at the hearing. [Objections, Doc. #487] This brief is being submitted by Objectors to explain their positions with respect to the approval of the settlement prior to the Final Approval Hearing on September 25, 2024.

It should be noted that the undersigned was involved in this case from the day of the derailment with multiple clients contacting me to assist them with this case. Within days, the undersigned had boots on the ground. Significant time, effort and costs were expended to hire experts, engage environmental lawyers, visit the community on multiple occasions, collect water, soil and other samples of materials. A class action case was filed along with a CERCLA Complaint.

The undersigned has been litigating cases against railroads for many years. Many of the cases have involved whistleblower claims where a railroad has engaged in unsafe practices. Cases have been litigated in both federal and state courts.

This is an unprecedented case. The evidence clearly establishes that multiple chemicals and other products were burned, sending a constellation of toxins into the community by way of air, water and soil. The real harms that will befall this community have yet to reveal themselves.

Below is a list of objections that had to be made before Class Counsel was required to file their most recent pleadings. While the same objections remain today, the information that has now been revealed by Class Counsel will impact some of the specifics of these objections. The undersigned has sent multiple emails to Class Counsel requesting clarification and has had

telephone discussions with them which still has not resulted in obtaining answers to critical questions.

**B.     ARGUMENT**

    **1.     Objectors were forced to make their decisions regarding the settlement before having enough of the facts and information.**

The Settlement Agreement was submitted to the Court for approval on April 26, 2024. [Exhibit A, Doc. #452-2] At that point, the NTSB had not issued its final report regarding the investigation of the East Palestine Train Derailment. The NTSB report was not available until June 25, 2024. While Lead Class Counsel states in their Memorandum in Support of Final Approval of Settlement ("Memo in Support of Settlement") that the NTSB report just made public the knowledge that they already had, this knowledge was not known to the Settlement Class Members and impacted their decision on whether to opt-out.

There were even several attempts by multiple Settlement Class Members and/or their attorneys to obtain additional information about what Plaintiff's experts and discovery results lead to. This information was withheld from the Settlement Class Members and/or their attorneys and Lead Class Counsel plainly said that they could not and will not provide the information even after this case is dismissed due to the Protective Order that was issued on August 2, 2023. [Doc. # 127]

It was ultimately up to each Settlement Class Member if they wanted to opt-out or proceed with the proposed Class Settlement Agreement that the Lead Class Counsel had obtained. Lead Class Counsel even refers to this fact in their Memo in Support of Settlement that if a Settlement Class Member did not agree with the terms, they need only to opt-out and pursue their own claims. However, how can one expect a Settlement Class Member to have simply opted-out and pursue their own claims if Lead Class Counsel is holding the whole deck of cards of information, data, and records and not dealing out the information that was obtained through their discovery and

research? Lead Class Counsel has stated several times that they are not able to provide any information. Unfortunately, Settlement Class Members were forced into this Class Action lawsuit and were forced to accept the Class Settlement Agreement as they do not have any data or evidence to support trying to proceed with their own claim against Norfolk Southern and the other defendants. This objection applies to both the property claims and the personal injury claim. It was therefore natural for clients to inquire of their attorneys whether they should participate in each of these claims, and lawyers like the undersigned who were not privy to the information obtained by Class Counsel were left with insufficient information.

> **2. Objectors are being forced to release their claims before sufficient time has passed for symptoms and injuries to occur.**

The East Palestine Train Derailment occurred on February 3, 2023. The physical injuries resulting from chemical exposure have not had enough time to manifest. Thus, even if Objectors would be inclined to settle their personal injury claims as part of settlement of the Class Action, it is too soon to evaluate the extent of any injuries they may have sustained.

Class Counsel maintains that Class Members' participation in the Voluntary Exposure Supplement is completely and wholly voluntary and Class Members are not being forced to sign the associated release. However, Class Counsel has publicly announced that they were not successful in developing necessary scientific evidence to support causation in this case. In fact, apparently Class Counsel enlisted the service of Arch Carson, M.D. to speak at a virtual town hall meeting convincing the audience that in consideration of the EPA data, there is no reason for concern, no reason to believe that the communities' exposure to this unprecedented release of toxins will come to bear any harm upon them. This further encouraged Class Members, regarding claims that were not class claims, to participate in the personal injury payout and release. This did

not give the Class Members sufficient time or information to truly understand what they were exposed to, how they were exposed to it, and what are the known risks of exposure.

### 3. The class claims and settlements proposed are per household and not per person.

The description of "Released Claims" found in paragraph MM of the definitions section is very broadly written to encompass not only the property damage claims that are being addressed in the settlement, but damages that are more commonly associated with personal injury claims – mental or emotional injury or harm and pain and suffering. The claims are released on a per household basis notwithstanding the fact that these damages are personal to the individual residents of each household.

Since the only Class claim is the property damage claim, and it is being paid for damages to the property, it is inconsistent to include in the definition of "Released Claims" a reference to individual personal injury damages. Furthermore, the recent grid that was disclosed by Class Counsel makes reference to the number of children in the household, points awarded based upon that number, which again, flies in the face of a property damage claim. Where is the individual consideration for the Release of these claims?

### 4. Emotional distress has not been properly evaluated.

The Class Members, including Objectors, have experienced a catastrophic event that will forever impact their lives. They were driven from their homes and forced to find shelter outside of their community. Even when they were told they could return home, they no longer felt safe. The settlement purports to include compensation for "alleged aggravation and upset." [Doc. #452-2, PageID #6004] However, the extent of Objectors' aggravation and upset has not been evaluated in any meaningful way.

5

It was first made know by Class Counsel that it was estimated that payment for personal injury would be $10,000.00. It appears that not enough individuals were making these claims (unknown what the agreement was between Class Counsel and NFS on required level of participation), and it appears that without any additional information being discovered, there was an announcement that the number was underestimated, and now people were being told to expect $25,000.00. PTSD is a real and current injury for many of these people who participated in this personal injury bucket of money. However, there appears to be no real medical evidence proffered by Class Counsel to address this issue, or advocate that these claims are worth more than $25,000.00. If the definition of "Released Claims" is to be interpreted as written, people who settle their property damage claims are releasing their PTSD claims.

**5. The funds available for Class Members will be significantly reduced by the amounts allocated to attorneys' fees.**

The attorneys' fees that Class Counsel is requesting from the total settlement proceeds will significantly reduce the funds available for Class Members and will result in inadequate payments to Class Members for their damages. While awarding attorneys' fees in any class action case is something for the reviewing Court to struggle with, it is axiomatic that any reduction in the $600 million dollar settlement by attorneys' fees will reduce the payout to both class settlement claims and non-class settlement claims.

**6. Norfolk Southern is not being sufficiently penalized for the harm caused.**

The NTSB investigation revealed not only deficiencies in the safety measures being employed by Norfolk Southern, but also revealed the lengths that Norfolk Southern went to hide these deficiencies. Derailment of train cars is clearly a preventable event. It is the responsibility of the rail carriers to make sure communities like East Palestine are safe as they blow through their small community constantly blowing their horn reminding residents of their presence. When a

6

derailment does occur, it is the responsibility of the rail carrier to be ready to remedy, address, contain, and remediate the harms. It is public knowledge regarding the financial profits of Norfolk Southern. This settlement is not commensurate with their financial strength nor the damage that has been caused.

### 7. The amount of the settlement is not sufficient to compensate each individual injured and affected by the derailment.

The proposed settlement will result in a $600 million settlement fund available for distribution to Class Members. While this sounds like a vast amount of money, the amount pales when distributed amongst the many Class Members. In addition, the available funds will be further reduced by the amounts allocated to attorneys' fees, the administrative expenses, the service award, and the personal injury settlement fund, prior to any distribution to Class Members.

Although the proposed settlement is intended to resolve property damage claims of Class Members, it will also preclude personal injury claims for those Class Members who elect to sign the Personal Injury Release. Class Counsel has led Class Members to believe that there is a minimal risk that the exposure will result in future personal injuries by having an expert speak at the town hall assuring the attendees that the exposure is not going to cause future injuries. Class Counsel has poisoned the well by these representations as well as representations that Class Members would be unable to establish the necessary causal connection.

The proposed settlement may be sufficient if it is limited to property damage claims based on the estimated value of the property in East Palestine. However, the money allocated for the voluntary personal injury settlements does not adequately compensate the Class Members for personal injuries and losses.

### 8. The negotiation of a personal injury settlement was beyond the scope of Interim Class Counsel's representation.

From day one, Objectors and others have retained the undersigned to represent their interests not only in this Class Action, but also to pursue personal injury claims on their behalf. Initially, no one knew the fate of these cases. Would a class be certified? What, if any, claims would be litigated on their own? Would all or part of this case better be served with an MDL? Clients needed lawyers well versed in these areas to direct them through the process of this initially proposed class action case. If this case had not settled and the class was not certified, each person would be left with only a few months to begin finding lawyers competent to file and prosecute such a complicated environmental case.

According to the settlement documents, the class action settlement is only related to the property damage claims. The "voluntary" personal injury claims are not part of the class claims. To the extent an attorney-client relationship exists between Class Members and Class Counsel, it only exists to the extent of the class claims. Since there is no class claim for personal injury (such a claim would not meet the commonality requirement), no requirement for opt out, then there is no attorney-client relationship regarding the personal injury claims. If there is no relationship, how can Class Counsel negotiate a settlement, why weren't the Class Members' individual lawyers consulted, and how can they receive a fee for services from which no attorney-client relationship exists.

There is much said in the declarations of the experts for Class Counsel addressing what motivates Plaintiff's lawyers to take on such cases. But fundamental is the requirement of a clear attorney fee contract.

Ultimately, the clients look to their individual lawyers for advice, and once again, insufficient information was provided to assist individuals in the decision-making process

8

regarding personal injury claims. Clients were left to conclude that this was the best they were going to do, and it was either take the small amount, or get nothing.

While it is true that Class Counsel will rely on the fact that the personal injury component is voluntary, and people do not have to take it, they can pursue on their own, is unfortunately not true. Again, the declarations by the Class Counsels' experts, one of which was paid $50,000.00, advocate the power of a Class action. The ability to muster multiple lawyers and firms, get contribution to litigation funds of $100,000, be able to spend 59,000 hours of work, take 70 depositions, is the real power to bring large corporations to be held responsible. Class Counsel had the vehicle to get up the hill but abandoned it when it came to the personal injury claims in this case. While their efforts were appreciated, and frankly, if this was a $600 million settlement of class claims only (property damage), these objections would evaporate. However, first, you have no standing to step into the personal injury arena, but if you are, then you need to muster a settlement that would stand alone as being adequate for the release of the personal injury claims. Finally, if Class Counsel does not represent non-class claims, then why are they advocating the strength or weaknesses of such claims? Why are they hiring a medical expert to tell people they have nothing to worry about regarding their health? One also has to question how the subject of the voluntary personal injury component was a necessity to the settlement of the property damage claims.

These claims are not part of this litigation, and Objectors object to any attempt to obtain their release of these claims in conjunction with the settlement. There should be a reservation of rights to bring future claims should evidence develop that individuals sustain an injury from their exposure, both past, present and future.

The Recitals in the Settlement Agreement identify the claims and damages that are the subject of the First Amended Master Consolidated Class Action Complaint. Specifically,

> Plaintiffs assert claims for negligence, negligence per se, gross negligence/willful and wanton conduct, strict liability, nuisance, trespasses, spoliation, injury to property, and medical monitoring. Plaintiffs seek compensatory, punitive, and exemplary damages. Alleged property damages (real and personal) include contamination/damage to real property, loss of use and enjoyment of property, diminution in property value, and loss of inventory. Alleged economic losses include lost wages, lost business income, out of pocket expenses, and permanent relocation expenses. Additionally, Plaintiffs seek medical monitoring for alleged exposure to released chemicals; relief for alleged contamination of workplace; and relief for alleged aggravation and upset.

[Settlement Agreement, Doc. #452-2, PageID #6003-6004] Although there is no mention of personal injury claims, the Settlement Agreement includes a negotiated term to address personal injury claims. Class Counsel had no authority to represent Objectors with respect to their personal injury claims. Thus, the negotiation of a settlement that would in some way include personal injury claims is outside the scope of their representation.

### 9. Objectors' own attorney's fees should be paid from the fund allocated to attorneys' fees.

Soon after the catastrophic event that resulted in this litigation, Objectors retained the undersigned counsel to represent their interests and pursue claims on their behalf. Objectors were forced to join the class action and to acquiesce to having Class Counsel, who were not selected by Objectors, represent them when they had already hired their own counsel to do so. As a result, while Class Counsel will be compensated from the attorneys' fees allocated for this purpose in the Settlement Agreement, Objectors will still be responsible for attorney's fees they agreed to pay their own counsel before Class Counsel was approved by the Court. All attorneys' fees, including those fees due to Objectors' counsel, should be paid from the pool of money allocated to attorneys' fees under the terms of the Settlement Agreement.

In negotiating any settlement, of paramount importance is the net recovery to the client. How will they be compensated for their losses? Are there liens, what are the costs, how much are the attorneys' fees, all fundamental questions that need answers before a Plaintiff can make an informed decision regarding settlement. In the grid for payment, there should have been a provision for payment of attorney's fees to be taken from the 27% requested by Class Counsel. In the undersigned's case, I have been actively engaged in monitoring this litigation, hiring experts, consulting other attorneys on environmental issues, going to town meetings, meeting with clients in East Palestine, attending NTSB presentations, being in clients' homes, advising on what courses of action to take or not to take, advising on all aspects incumbent of any personal injury attorney. Clients rely upon the advice and counsel of their attorneys. The attorneys have an obligation to be well-versed in the law and facts so as to adequately advise their clients. My firm has spent endless hours documenting facts and investigating with experts the negligence, causation, and damages. Therefore, our advice is as important to clients in their decision making, and therefore we are entitled to be paid from the requested 27% attorneys' fees.

Finally, it is well known that counsel who are sharing in the large payout of attorneys' fees through the Class have advised they will not be seeking the enforcement now of their contingent fee contract. While this is appropriate since they are already recovering for their efforts through the requested 27% fee, they would not take this position if they were not awarded a fee through the Court. Attorneys like the undersigned have no ability to be compensated based upon Class Counsel's current position from the fees awarded by this Court. This then puts clients in the position to question why they should be paying attorneys' fees twice. This causes interference with the attorney-client relationship, jeopardizing that relationship, and encourages claimants not to hire an attorney.

**10. There is no medical monitoring program to protect the interests of class and non-class members.**

The East Palestine Derailment exposed the Class Members, including Objectors, to significant amounts of vinyl chloride, butyl acrylate, benzene residue, and other contaminants, as well as their byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans. [Doc. #138, PageID #1863] Medical monitoring would allow early detection and diagnosis of harmful and debilitating injuries potentially resulting from the exposure to toxic fumes, toxic substances, and carcinogens. [Doc. #138, PageID # 1865]

The relief sought on behalf of the Class Members included medical monitoring. Separate claims for medical monitoring were also brought under Ohio, West Virginia, and Pennsylvania law, although in Ohio, medical monitoring might not be recognized as a separate cause of action. [Doc. # 138, PageID #1863-1868] Medical monitoring is an essential remedy when there has been exposure to toxic substances that creates an increased risk of a serious injury, disease, or illness and where early detection could alter the course of treatment and increase the likelihood of recovery. Notwithstanding the importance of a medical monitoring program to the Class Members, the settlement negotiated with Norfolk Southern does not mention any program to facilitate medical monitoring. Objectors object to the Settlement Agreement to the extent that it fails to provide a medical monitoring program.

In the Memorandum in Support of Final Approval of Settlement, Class Counsel suggest that in a separate proposed settlement agreement with the EPA and United States Department of Justice, Norfolk Southern has agreed to pay "$25 million for a 20-year community health program

that includes medical monitoring for qualified individuals and mental health services for individuals residing in affected counties . . . and a community facilitation plan to assist community members in using the benefits of the program." [Doc. #518-1, PageID #10932] If approved, the medical monitoring provided under the EPA/United States Department of Justice settlement would address Objectors' concerns. However, if not approved, Class Members would be forced to pay for the testing out of the funds allocated to resolve their property damage claims.

**11.     Class Counsel has failed to disclose the "confidential" terms of the settlement to Class Members.**

Before Objectors are required to agree to the terms of a settlement, it is only fair that they be apprised of all of the terms of the settlement. This includes not only the terms memorialized in the Settlement Agreement, but also the "confidential" terms which are not. Until all of the terms are made available for consideration, approval of the settlement would be premature.

**12.     Class Counsel failed to timely provide a grid or formula to be used to calculate the settlement amount.**

Class Counsel claims that the "Long-Form Notice describes *in detail* the factors taken into account." (Emphasis added). The Long-Form Notice does not list any formula or how any of the factors listed would be weighed to determine what payment each household would receive. [Doc. #452-5, PageID #6132] Instead, the Long-Form Notice advises that:

> Individual Settlement Class Member households can receive a lump sum Direct Payment from the Settlement Fund based on a Court-approved formula that takes into account a number of factors, including geographic location, household size, acreage, length of displacement, and the nature of property damage, if any.

The only information provided to the Class Members was an approximation of what the Direct Household Payment would be based on distance from the incident and several other factors. It was not made clear to the Class Members exactly what factors would be involved nor how they were to be evaluated until Class Counsel filed their Plan of Distribution on September 6, 2024.

13

[Doc. #519-2] The Class Members were not able to make a well-informed decision to opt-out or complete the claim form as they did not have all of the information that was going to be utilized and calculated for the award payment until after the deadline to complete the claim form. Class Members should have been given the opportunity to opt-out once they have been advised as to their award amount since they did not have adequate information before the deadline to complete and submit the claim form(s).

Furthermore, the Plan of Distribution fails to state how the payment would be calculated for households that have zero (0) children. Would the category list "Null" or "0x"? This single factor greatly impacts the award amount for the Direct Household Payment. If all the other factors were the same and listed "1x" except for the child count and a "Null" is listed, a household with two adults would receive one hundred (100) points while the other household with two adults and one or two children would only receive ninety (90) points. Meaning, the household with a greater number of people residing would receive a *lower* payment. The Plan of Distribution needs to be revised to include the factor of zero children or instead factor how many individuals were residing in the household to calculate an award that is fair, reasonable, and adequate for all Class Settlement Members.

### 13. The release associated with the Settlement Agreement should be limited to the parties to the Settlement Agreement.

The Settlement Agreement reflects the terms of a settlement negotiated by Class Counsel with Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively "Norfolk Southern"). [Doc. #452-2, PageID #6003] Pursuant to its terms, Norfolk Southern is to fund the $600 million settlement. [Doc. #452-2, PageID #6021] However, notwithstanding their failure to contribute to the settlement fund, the release purports to extend not only to Norfolk Southern, but also to the "Non-Settling Railcar Defendants," specifically, OxyVinyls LP, GATX

14

Corporation, General American Marks Company, and Trinity Industries Leasing Company, in addition to numerous other entities that may have played some role in the events that are the subject of this litigation. [Doc. #452-2, PageID #6012-6013]

Class Counsel argues that its inclusion of these other parties is intended to limit Norfolk Southern's future liability for contribution claims and cites *Ford Motor Co. v. Tomlinson*, 229 F.2d 873 (6th Cir. 1956) to argue this is consistent with Ohio law. However, *Ford Motor Co. v. Tomlinson* does not stand for this proposition. Although the release of a tortfeasor that is primarily liable operates to release a secondarily liable tortfeasor, the claims against the Non-Settling Railcar Defendants are independent claims. Those claims do not depend on whether Norfolk Southern is liable to Class Members, and a release of Norfolk Southern does not automatically release the Non-Settling Railcar Defendants.

Objectors are not willing to agree to release the Non-Settling Railcar Defendants without some monetary contribution to the settlement fund from the Non-Settling Railcar Defendants. While there is no question that Norfolk Southern is culpable for the extraordinary losses burdening Objectors and other Class Members, the Non-Settling Railcar Defendants are not without blame. Class Counsel should not be allowed to walk away from this litigation with a substantial fee by compromising the Class Members' rights against the Non-Settling Railcar Defendants.

C.   **CONCLUSION**

The Final Approval Hearing is scheduled to be held on September 25, 2024. [ECF #458, PageID #6176] Despite the extensive briefing provided by Class Counsel, there remain questions as to whether the proposed settlement is fair and reasonable. Until these issues are resolved, approval of the settlement would be premature.

Based upon the above objections, it is respectfully requested that the parties revisit the terms of the settlement consistent with these objections. The Objectors intend to present live witnesses at the fairness hearing to address various aspects of these objections, including potentially testimony from one or more of the Objectors.

Respectfully submitted,

/s/ Daniel N. Abraham
Daniel N. Abraham (0023457)
**Colley Shroyer & Abraham Co., LPA**
536 South High Street, 2nd Floor
Columbus, Ohio 43215
(614) 228-6453 – Telephone
(614) 228-7122 – Fax
dabraham@csajustice.com
*Counsel for Objectors, Jade Caudill, Daniel Clements, Andrew Clendennen, Craig Compton, Timothy Cope, Rebecca Davis, Joseph Dinello, Cynthia Ford, Tyler Foster, Luann Gregory, Robert Haglan, Joseph Helpy, Donald Hetrick, Michael Hetrick, Glenn Knopp, Jr., Glenn Knopp, Sr., Tammy Lyda, Paul Mahovlich, Michael Moore, Ralph Moore, Timothy Moore, Louis Pagani, Christopher Raley, Angela Rayl, Michael Routh, Harper Sanner, James Scullion, Ronald Simmons, Zoey Spellman, Kevin Steves, Steven Tigelman, Karen Toothman, Penny Wilson, Melinda Woods, and Thomas Young*

**Certificate of Service**

      I hereby certify that on September 18, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the following parties:

Seth A. Katz
Burg Simpson Eldredge Hersh & Jardine, P.C.
40 Inverness Drive
East Englewood, CO 80112
*Lead Class Counsel*

M. Elizabeth Graham
Grant & Eisenhofer P.A.
123 S. Justison Street
6th Floor
Wilmington, DE 19801
*Lead Class Counsel*

Jayne Conroy
Simmons Hanly Conroy
112 Madison Avenue
7th Floor
New York, NY 10016
*Lead Class Counsel*

Alan Schoenfeld
Wilmer Cutler Pickering Hale and Dorr, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
*Attorney for Defendant, Norfolk Southern*

Albinas Prizginatas
Wilmer Cutler Pickering Hale and Dorr, LLP
2100 Pennsylvania Avenue
NW, Washington, DC 20037
*Attorney for Defendant, Norfolk Southern*

                                                */s/ Daniel N. Abraham*
                                                Daniel N. Abraham, Esq.