PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  EAST PALESTINE TRAIN DERAILMENT | ) ) | CASE NO.  4:23CV0242 |
| | ) ) | JUDGE BENITA Y. PEARSON |
| | ) ) | **ORDER** |
| | ) | [Resolving ECF No. 520] |

Pending is Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Service

Awards (ECF No. 520) related to the Class Action Settlement Agreement reached between

Plaintiffs and Defendants Norfolk Southern Corporation and Norfolk Southern Railway

Company ("Norfolk Southern").  The approval of the Settlement and plan of distribution of

settlement funds are the subject of separate contemporaneous Orders of the Court.  The Court has

been advised, having reviewed the record, including, but not limited to, the parties' briefs,

objections made with and without declarations, and the applicable law.  The Court has also

considered the oral arguments of counsel offered during the fairness hearing conducted on

September 25, 2024.  For the reasons stated on the record and the following reasons, the Court

grants the Motion.

## I.  BACKGROUND AND PROCEDURAL HISTORY

This consolidated case arises from the derailment of Norfolk Southern Train 32N in East

Palestine, Ohio, on February 3, 2023.  Approximately 38 railcars derailed; twenty were damaged,

several of which carried dangerous and hazardous industrial materials.  ECF No. 138 at ¶ 160.

Three days later, Norfolk Southern and others conducted a "vent and burn" of five railcars

(4:23CV0242)

containing vinyl chloride.  Plaintiffs allege that this operation caused a massive explosion that released various dangerous chemicals that polluted the surrounding air, soil, and water, and exposed  neighboring properties, businesses, and persons to those chemicals.  *Id.* at ¶¶ 183-85, 279.

In the aftermath of the derailment, and as early as February 7, 2023, certain plaintiffs filed the first of many class action complaints against Norfolk Southern, seeking redress for residents, property owners, employees and businesses surrounding the Derailment Site.  The Court consolidated the many cases into this action and invited attorneys to apply for leadership positions on behalf of plaintiffs.  After briefing and oral presentations, the Court appointed Seth A. Katz of Burg Simpson Eldredge Hersh & Jardine, P.C., M. Elizabeth Graham of Grant & Eisenhofer P.A., and Jayne Conroy of Simmons Hanly Conroy LLC as Interim Class Counsel and Co-Lead Counsel ("Co-Lead Class Counsel"), as well as T. Michael Morgan of Morgan & Morgan, P.A. as Co-Lead Counsel.  The Court additionally appointed a leadership structure comprised of experienced attorneys from experienced and well-respected firms to serve on Plaintiffs' Executive and Steering Committees, as Community Liaison Counsel, and to perform subcommittee work as assigned by Co-Lead Counsel (collectively with Co-Lead Class Counsel, "Class Counsel").  ECF No. 28.

Pursuant to that same Order, Co-Lead Class Counsel filed a 92-page consolidated class action complaint on May 4, 2023.  ECF No. 31.  Plaintiffs subsequently amended their Complaint to expand and refine their allegations and claims.  Plaintiffs' operative pleading in this lead case is now the 105-page First Amended Master Consolidated Class Action Complaint ("Master Complaint"), filed on August 14, 2023.  ECF No. 138.  The Master Complaint sought

2

(4:23CV0242)

to recover damages against Norfolk Southern for the loss of use and enjoyment of property, property damage, exposure to toxic material, economic damages, and the need for medical monitoring.  *Id.* ¶¶ 274-473.

On June 2, 2023, Norfolk Southern sought dismissal of the Master Complaint for a variety of reasons, including that Plaintiffs' claims were preempted by federal law.  ECF No. 76.[1] The Court denied Defendant's Motions to Dismiss nearly in its entirety, dismissing only the Ohio-based medical monitoring claim, finding that under Ohio law it is not a stand-alone cause of action.  The Court observed, however, that medical monitoring as an element of damages remained viable for Ohio residents, as do all other claims and remedies of Plaintiffs against all Defendants.  ECF Nos. 428, 430.  ECF Nos. 428, 430.

Hoping to afford an opportunity for adequate, fair, and expeditious relief, the Court established an aggressive schedule for the parties to move the case toward resolution.  ECF No. 98 (Case Management Order).  Over the ten months following the issuance of the  Court's Case Management Order, Class Counsel engaged in comprehensive and voluminous discovery.  Class Counsel obtained and reviewed over 720,000 documents produced by Norfolk Southern (and over 1,345,000 documents produced by all non-plaintiffs collectively), many of them containing highly technical information about various pertinent topics, including but not limited to railroad industry standards, mechanical requirements of railcars, chemical transportation, chemical reactions, environmental contamination, emergency response, and environmental cleanup.  Class

---

[1]  Though the First Amended Master Consolidated Class Action Complaint was not yet filed, the Court ruled that Norfolk Southern's Motion to Dismiss and to Strike did not need to be amended or refiled because of the limited scope of the new allegations in the First Amended Complaint.  ECF No. 137.

(4:23CV0242)

Counsel expended substantial time and resources in order to organize, review, and comprehend the documents and overall subject matter.  Plaintiffs, in turn, produced over 6,880 documents, all of which Class Counsel organized, reviewed, and analyzed.  Graham Decl. ¶¶ 27, 28; Katz Decl. ¶¶ 27, 28.

Class Counsel defended the depositions of all the 16 proposed Class Representatives, including some in their capacities as corporate designees.  Graham Decl. ¶ 30; Katz Decl. ¶ 30. Class Counsel took or participated in approximately 70 additional depositions over the course of discovery, including Rule 30(b)(6) depositions of all Defendants, and individual depositions of their employees, agents, or representatives involved in the derailment and its aftermath.  Graham Decl. ¶ 31; Katz Decl. ¶ 31.

Class Counsel also collected extensive environmental data and facilitated a comprehensive environmental sampling and testing program, in addition to air modeling, to determine the geographic range of exposure.  Katz Decl. ¶ 49.  The environmental testing included approximately 160 sampling sites in and around East Palestine, covering sites as far as 45 miles from the derailment site.  Plaintiffs engaged some of the nation's leading scientific and technical experts, including experts in air modeling, source term calculating, chemistry, chemical properties, meteorology, toxicology, epidemiology, environmental remediation, geology, hydrology, medical monitoring, industrial hygiene, pulmonology, oncology, real property diminution in value, forensic accounting for commercial loss modeling, and population modeling and research.  Katz Decl. ¶ 49.

This discovery effort also entailed substantial motion practice and further litigation.  This included participating in litigating issues related to discovery against the National Transportation

4

(4:23CV0242)

Safety Board ("NTSB") to ensure that critical evidence from the derailment site was obtained and prerserved. Graham Decl. ¶ 35; Katz Decl. ¶ 37. Class Counsel also participated in numerous lengthy meet and confers, several culminating in hearings before Magistrate Judge Henderson. Graham Decl. ¶ 36. Class Counsel also negotiated and litigated the entry of a protective order (ECF Nos. 116, 117, 124), discoverability of privileged or protected information (ECF No. 162), application of the work product doctrine (ECF Nos. 160, 162, 167), deposition logistics (9/27/2023 Minutes of proceedings), and the physical inspection of evidence (ECF No. 433).

Plaintiffs and Norfolk Southern were in the midst of discovery when they began to negotiate a potential settlement. Their self-initiated ongoing negotiations led to Norfolk Southern and Plaintiffs engaging in a two-day mediation with the assistance of retired United States District Judge Layn R. Phillips in October 2023. In advance of the mediation, Co-Lead Class Counsel prepared two extensive confidential mediation statements, which were heavily informed by expert consultation and legal analysis. Graham Decl. ¶ 50; Katz Decl. ¶ 52.

Plaintiffs' Class and Co-Lead Counsel were present at the mediation, including senior attorneys from Grant & Eisenhofer P.A., Burg Simpson Eldredge Hersh & Jardine, P.C., Simmons Hanly Conroy LLP, and Morgan and Morgan, P.A. Decl. of Hon. Layn R. Phillips ("Phillips Decl.") ¶ 8. Norfolk Southern was represented at mediation by senior attorneys from Wilmer Cutler Pickering Hale and Dorr LLP and Dickie, McCamey & Chilcote, as well as multiple in-house counsel representatives of Norfolk Southern. *Id.*

The mediation did not result in a settlement at that time, but yielded productive negotiations between Norfolk Southern and Plaintiffs that continued with the assistance of Judge Phillips over the next four months. Graham Decl. ¶¶ 54–56. As fact discovery closed, Norfolk

(4:23CV0242)

Southern and Plaintiffs continued intense negotiations.  *Id.* at ¶ 55.  Ultimately, Plaintiffs and

Norfolk Southern decided to return to a second mediation with Judge Phillips, on February 19,

2024.  *Id.* at ¶ 56.  Again, Co-Lead Class Counsel submitted extensive briefing to Judge Phillips,

which was based on continued consultation with experts and continued negotiations with Norfolk

Southern.  Graham Decl. ¶ 50.

Plaintiffs and Norfolk Southern rigorously negotiated toward a resolution during the

course of a day-long mediation.  Although Plaintiffs and Norfolk Southern did not finalize an

agreement on the day of the mediation, negotiations continued, with counsel for the parties in

near constant contact with the mediator.  Graham Decl. ¶¶ 54–58.  As Judge Phillips recognized,

substantial work went into mediation preparation, and the mediation itself involved complex

issues that required significant analysis.  Phillips Decl. ¶ 11.  Additionally, Judge Phillips

realized that, "absent a settlement, the factual and legal arguments were complex and unlikely to

be resolved before trial."  Phillips Decl. ¶ 14.

As a result of "substantial thought and consideration,"  Judge Phillips presented a

Mediator's Recommendation to Norfolk Southern and Plaintiffs on March 6, 2024.  Over one

month later, both parties accepted the Mediator's Recommendation, reaching an agreement in

principle based on that recommendation on April 6, 2024.  Norfolk Southern and Plaintiffs then

reduced that agreement to writing and executed the Settlement Agreement on April 26, 2024.

*See* Settlement Agreement (ECF No. 452-2).

As set forth in the Settlement Agreement, Norfolk Southern has agreed to a total non-

reversionary payment of $600 million to the Settlement Class in exchange for a release for claims

that were or could have been asserted in the Master Complaint as to Norfolk Southern arising out

(4:23CV0242)

of the Incident, *see* Settlement Agreement ¶ XII, with the exception of personal injury damages, which are the subject of an additional voluntary exposure payment available to Class members at their election.  Class Counsel and Norfolk Southern's counsel did not discuss attorneys' fees or reimbursement of costs prior to agreement on the material terms of the Settlement Agreement. *Id.* ¶ XIV.  Once the parties agreed on the material terms, however, they also agreed that Class Counsel may petition the Court for an award of attorneys' fees and costs and that any such award allowed by the Court would be paid from the Settlement Fund.  *Id.*  Norfolk Southern also agreed that it would not oppose a request by Class Counsel for service awards to the Class Representatives that do not exceed $15,000 per Class Representative.  *Id.* ¶ XV.

The Court granted preliminary approval of the Settlement on May 21, 2024, approved the parties' Notice Plan, and appointed Interim Class Counsel Seth A. Katz, Jayne Conroy, and M. Elizabeth Graham and their respective law firms, as Lead Class Counsel.  ECF No. 458.  As stated in Plaintiffs' memorandum in support of preliminary approval of the settlement, Class Counsel committed to seeking no more than 27% of the total monetary recovery achieved by the Settlement Agreement, expenses of not more than 3% of the recovery, and a $15,000 service award to each Class Representative.  ECF No. 452-1.  These commitments were described in both the Long-Form and Short-Form notices approved by the Court.  ECF Nos. 452-5, 452-6. The cutoff date for class members to opt out or object to the settlement was July 1, 2024.  The final approval hearing was scheduled for September 25, 2024.  ECF No. 458.

Following preliminary approval, the Parties worked with a respected notice provider and settlement administrator, Kroll Settlement Administration LLC ("Kroll"), to successfully disseminate the Court-approved Notice Program.  *See Wood v. FCA US LLC*, No. 5:20-cv-

7

(4:23CV0242)

11054-JEL-APP, 2022 WL 17361963, at *4 (E.D. Mich. Dec. 1, 2022) (approving final

settlement that used Kroll).  In compliance with the Court's Order Granting Preliminary

Approval, Kroll sent thousands of individual notices by mail and thousands more by email to

Settlement Class Members.  *See generally* Decl. of Jeanne C. Finegan, APR of Kroll Notice

Media Solutions ("Finegan Decl.").  Additionally, Kroll supplemented this direct effort with

supplemental forms of notice, including a substantial digital notice effort, which included a

targeted state-of-the-art social media outreach campaign in which the digital ads link directly to

the dedicated Settlement Website (www.EastPalestineTrainSettlement.com) where Settlement

Class Members can review the notices, read FAQs, apprise themselves of key dates, and contact

the Settlement Administrator directly with any additional questions.  Finegan Decl. ¶¶ 11–14;

Decl. of Scott M. Fenwick of Kroll ("Kroll Decl.") ¶ 6.

Unlike the majority of settlements in which claims administration is done from afar, here

the Parties acknowledged the importance of presence in the community.  A brick-and-mortar

claims center was opened in East Palestine the week of June 3, 2024.  Kroll Decl. ¶ 9.  The

claims center was originally open five days a week — and then extended to six days a week with

expanded hours in light of the extraordinary interest and participation in the settlement — and

was staffed with Class Counsel and Kroll employees, whom were available to answer questions

and assist Settlement Class Members with their claim forms.  *Id.* ¶¶ 9–10; Graham Decl. ¶ 62.  In

total, the Claims Center was visited by more than 11,000 people (this number is based on the

sign-in sheet at the Claims Center and does not account for multiple household members visiting

together, and does not include the first week the claims center was open).  Kroll Decl. ¶ 9;

Graham Decl. ¶ 62.  Given the community's positive reception and heavy use of the Claims

8

(4:23CV0242)

Center, Class Counsel leased and opened a second Claims Center location in East Palestine on July 31, 2024, which was staffed by Class Counsel six days a week from its opening until the claim filing cutoff date. Kroll Decl. ¶ 10; Graham Decl. ¶ 62. In addition to in-person assistance at the claims centers, Kroll has provided a phone number for persons with questions to call. The call center took at least 48,031 calls. Kroll Decl. ¶ 7.

As of September 3, 2024, Kroll has billed $2,361,940.74 for administrative expenses incurred in the administration, which includes Notice and media costs. Kroll Decl. ¶ 24. This is in addition to the $5,302,128.18 in litigation expenses advanced by Class Counsel. Kroll estimates that it will bill an additional $14.6 million to complete the administration of this Settlement. *Id.*

Plaintiffs now move for an order approving (1) $162 million in attorneys' fees, representing 27% of the Settlement Funds, (2) reimbursement of $18 million in litigation costs incurred by Class Counsel, representing 3% of the Settlement Funds, and (3) service awards of $15,000 to each Class Representative. *See* Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards ("Fees Mot.") at 1.

## II. LEGAL STANDARDS

### A. Attorneys' Fees

Awards of attorneys' fees in class action cases are governed by Federal Rule of Civil Procedure 23(h), which provides that, after a class been certified, the court may award reasonable attorneys' fees and nontaxable costs. When "awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279

(4:23CV0242)

(6th Cir. 2016) (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)).

When litigation leads to the creation of a common fund, district courts apply a two-part analysis to assess the reasonableness of an attorneys' fee request.  *Harsh v. Kalida Mfg., Inc.*, No. 3:18CV2239, 2021 WL 4145720, at *8 (N.D. Ohio Sept. 13, 2021).  First, the Court must determine the appropriate method to calculate the fees, using either the percentage-of-the-fund approach or the lodestar approach.  *Id.*  Courts have discretion to select the "appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them."  *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011).

Second, whichever method is employed, the Court must consider six factors, known as the *Ramey* factors, to assess the reasonableness of the fee.  *Id.* (citing *Moulton v. U.S. SteelCorp.*, 581 F.3d 344, 352 (6th Cir. 2009)).  The *Ramey* factors are:  (a) the value of the benefits rendered to the class; (b) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (c) whether the services were undertaken on a contingent fee basis; (d) the value of the services on an hourly basis; (e) the complexity of the litigation; and (f) the professional skill and standing of all counsel.  *See Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194–97 (6th Cir. 1974).  Courts often consider other factors, including, perhaps most frequently, how the requested fee lines up with awards in other cases.  *See, e.g.*, *In re Cardinal Health Inc. Securities Litig.*, 528 F. Supp. 2d 752, 754 & n.2 (S.D. Ohio 2007); *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *3 (E.D. Tenn., May 17, 2013).  None of these factors are dispositive, and the Court "enjoys wide discretion in assessing the[ir] weight

10

(4:23CV0242)

and applicability[.]"  *Granada Invests., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992).

### B.    Expenses

The Court may also award reasonable non-taxable costs that are authorized by law or by the parties' agreement.  Fed. R. Civ. P. 23(h).  "Expense awards are customary when litigants have created a common settlement fund for the benefit of a class."  *In re Delphi*, 248 F.R.D. at 504.  In determining whether requested expenses are compensable in this common fund, the Court should consider "whether the particular costs are the type routinely billed by attorneys to paying clients in similar cases."  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003).

### C.    Service Awards

"[S]ervice awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *Daoust v. Maru Rest., LLC*, No. 17-cv-13879, 2019 WL 2866490, at *6 (E.D. Mich. July 3, 2019); *see also Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) (explaining that "[i]ncentive awards are typically awards to class representatives for their often extensive involvement with a lawsuit," and noting that "[n]umerous courts have authorized incentive awards").  Among the factors commonly considered by courts include the class representative's actions to protect the class, the degree to which the class has benefitted, the risk (financial and otherwise) assumed, the notoriety and personal difficulties encountered, the duration of the litigation, the personal benefit (or lack thereof) enjoyed by the class representative from litigation, the ultimate recovery to the

11

(4:23CV0242)

class, and the sums awarded in similar cases.  *See* 5 William B. Rubinstein et al., *Newberg on Class Actions* § 17:13 (5th ed. 2019).

## III.  DISCUSSION

**A.      35 Objecting Settlement Class Members Represented by Attorney Daniel N. Abraham**

Before the Court discusses Plaintiffs' request for attorneys' fees, expenses, and service awards, it addresses the Objections of the objections of 35 Settlement Class Members who are represented by Attorney Daniel Abraham.  *See* ECF Nos. 487-2, 516, 529, and 551.

Rule 1.7 of the Ohio Rules of Professional Conduct provides, in relevant part:

*   *   *

(b)      A lawyer shall not accept or continue the representation of a client if a conflict of interest would be created pursuant to division (a) of this rule, unless all of the following apply:

*   *   *

(2)      each affected client gives *informed consent, confirmed in writing*;

(emphasis in original).  Comment 31 to Rule 1.7 states:

Division (b)(2) requires the lawyer to obtain the informed consent of the client, confirmed in writing.  Such a writing may consist of a document signed by the client or one that the lawyer promptly records and transmits to the client following an oral consent.  See Rule 1.0(b) and (p) (writing includes electronic transmission).  If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.  See Rule 1.0(b).  Written confirmation of consent does not supplant the need, in most cases, for the lawyer to talk with the client: (1) to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives; and (2) to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns.  The writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of written consent. [Model Rule Comment 20]

12

(4:23CV0242)

On July 1, 2024, Attorney Abraham listed 15 vague and conclusory objections to the settlement.  *See* ECF No. 487-2.[2]  According to Lead Class Counsel, "Attorney Abraham failed to provide specific grounds for his 15 objections and did not offer any compelling argument as to why the settlement is unreasonable."  ECF No. 530 at PageID #: 11608.  After filing the initial objections, Attorney Abraham submitted a Response to Motion for Final [Approval] of Settlement and Brief in Support of Objections (ECF No. 529) on September 18, 2024.  ECF No. 529 discusses only 13 of the objections.  Thereafter, Attorney Abraham filed the Declaration of Stephen Petty with exhibits, the Declaration of Scott Smith with exhibits, the Supplemental Declaration of Scott Smith, and the Affidavit of Dr. George Thompson with his Curriculum Vitae.  *See* ECF No. 551.[3]

It came to the attention of Lead Class Counsel that Attorney Abraham simultaneously represents Settlement Class Members with directly opposing interests.  On one hand, he represents 35 Settlement Class Members who objected to the settlement and sought to disrupt and block it;[4] while at the same time, he also represents Settlement Class Members who are

---

[2]  Hard copies of the Objections were also served on the Settlement Administrator, Kroll Settlement Administration LLC.  *See* ECF No. 516.  Attorney Abraham subsequently informed the Court that "he no longer represents and withdraws his appearance on behalf of the household of Jeremy Rains and withdraws the objections that were filed on their behalf."  ECF No. 523 at PageID #: 11554.

[3]  The Declaration of Stephen Petty with exhibits had already been filed.  *See* ECF Nos. 534, 540, and 540-1.  The Declaration of Scott Smith with exhibits had also already been filed.  *See* ECF Nos. 536 and 536-1.  In addition, the Supplemental Declaration of Scott Smith had previously been filed.  *See* ECF No. 542.  Finally, the Affidavit of Dr. George Thompson with his Curriculum Vitae had also previously been filed.  *See* ECF Nos. 537 and 537-1.

[4]  Jade Caudill, Daniel Clements, Andrew Clendennen, Craig Compton, Timothy
(continued...)

13

(4:23CV0242)

participating in the settlement, have filed claims, and have raised no objections.[5]  *See* August 20,

2024, letter from Attorney Abraham (ECF No. 530-1) enclosing a list of his clients.

On September 20, 2024, the Court instructed Attorney Abraham on the record "to get a

waiver from all of your clients. . . .  If you do intend to walk in [to the Final Approval Hearing]

representing those with concurrent adverse positions, you have a waiver from each one."

Attorney Abraham acknowledged that he understood the Court's instructions.  At the Final

Approval Hearing, however, Attorney Abraham initially only produced nine (9) "Waiver of

Conflict" forms.  Those are from the following:  Lexsey Bieber, Marie Bowser, Anthony G.

Foster, Brandi Foster, Tyler Kennedy, Lillian E. Moore, Eric Rayl, Kaylea Ward, and Chelsea J.

Wilson.  He represented that "they are signed by the nine clients that we represent, who were

heads of household, but did not object to the settlement."  ECF No. 553 at PageID #: 14443.[6]

They provide, in relevant part:

---

[4](...continued)
Cope, Rebecca Davis, Joseph Dinello, Cynthia Ford, Tyler Foster, Luann Gregory, Robert
Haglan, Joseph Helpy, Donald Hetrick, Michael Hetrick, Glenn Knopp, Jr., Glenn Knopp,
Sr., Tammy Lyda, Paul Mahovlich, Michael Moore, Ralph Moore, Timothy Moore, Louis
Pagani, Christopher Raley, Angela Rayl, Michael Routh, Harper Sanner, James Scullion,
Ronald Simmons, Zoey Spellman, Kevin Steves, Steven Tigelman, Karen Toothman,
Penny Wilson, Melinda Woods, and Thomas Young.  *See* ECF No. 529 at PageID #:
11590 n. 1; ECF No. 551 at PageID #: 13540 n. 1.

[5]  According to Lead Class Counsel, Attorney Abraham's August 2024 letter lists
"at least eight households and one business that filed claims and did not file objections."
ECF No. 530 at PageID #: 11609.  At the Final Approval Hearing, Attorney Abraham
stated that Rebecca Anderson is no longer his client.  *See* Transcript (ECF No. 553) at
PageID #: 14468.  He also declared that he currently represents nine non-objectors.  *See*
ECF No. 553 at PageID #: 14442.

[6]  Attorney Abraham subsequently produced "Waiver of Conflict" forms from
Zoey Spellman and Michael Loyd during the Final Approval Hearing.  *See* ECF No. 553
at PageID #: 14469-70.

(4:23CV0242)

> 4.      Attorney Abraham has consistently kept me informed of the process of the proposed class action case, and has identified potential issues including conflicts that may occur as the case has proceeded.
>
> *   *   *
>
> 6.      Attorney Abraham has been transparent with me in describing potential conflicts given the multiple clients pursuing claims agains[t] Norfolk Southern.
>
> 7.      I have spoken directly with Attorney Abraham and he has thoroughly informed me of the potential conflict that may exist since the filing of objections on behalf of some of his clients.
>
> *   *   *
>
> 12.      Attorney Abraham has explained the potential conflict concerning representation of those who instructed him to file objections on their behalf and those who did not instruct him to do so.
>
> *   *   *

The Waiver of Conflict forms signed by Lexsey Bieber, Michael Loyd,[7] Lillian E. Moore, and Eric Rayl[8] all provide:

> 9.      I am one of the individuals who requested Attorney Abraham to submit objections to the proposed settlement.  I understand that he also represents individuals who were affected by the derailment but who do not object.  I support his efforts on behalf of both objectors and non-objectors and agree that he may represent myself as well as others who did or did not object.

Lexsey Bieber, Michael Loyd, and Lillian E. Moore, however, are not among the 35 Objecting Settlement Class Members represented by Attorney Abraham.  These eleven (11) waivers were signed on either September 22, 2024 or September 23, 2024, which is at least 2 months, 21 days after Attorney Abraham filed Objections on behalf of the 35 Objecting Settlement Class Members.  This ethical issue was one of the several  reasons the Court overrules any and all objections made to the settlement, to the fees and expenses (to the extent there were any), and/or the distribution of those fees.  At this juncture, the Court remains primarily focused on doing

---

[7] Michael Loyd and Zoey Spellman apparently reside at the same address.  *See* ECF No. 530-1 at PageID #: 11615.

[8] Eric Rayl and Angela Rayl apparently reside at the same address.  *See* ECF No. 530-1 at PageID #: 11616.

(4:23CV0242)

what is lawful and best for the entire group of Settlement Class Members.  The matter of

Attorney Abrahams' concurrent adverse conflict of interest and any waivers of that conflict must

await another day for any due judicial attention.

> **B.**     **Attorneys' Fees**
>
> **1.**     **The Percentage-of-the-Fund Approach is the Appropriate Method to Determining Attorneys' Fees in the Case at Bar.**

The Court finds that the percentage-of-the-fund approach is the appropriate method to

evaluate Plaintiffs' fee request.  In the Sixth Circuit, the percentage-of-the fund method is the

"preferred method" for determining attorneys' fees in common fund cases like the present case,

"where there is a single pool of money and each class member is entitled to a share (*i.e.*, a

'common fund')."  *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010)

(citing *Rawlings*, 9 F.3d at 516); *see also, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at

532 ("This Court's decision to apply the percentage-of-the-fund method is consistent with the

majority trend …."); *In re F & M Distributors, Inc. Sec. Litig.*, Case No. 95–CV–71778–DT,

1999 U.S. Dist. LEXIS 11090 (E.D. Mich. June 29, 1999) (choosing percentage-of-the-fund as

the better method for determining attorneys' fees in a class action); *In re Rio Hair Naturalizer*

*Prods. Liab. Litig.*, MDL No. 1055, 1996 WL 780512, at *16 (E.D. Mich. Dec.20, 1996)

(observing that "more commonly, fee awards in common fund cases are calculated as a

percentage of the fund created, typically ranging from 20 to 50 percent of the fund").

As the Sixth Circuit observed in *Rawlings*, the advantages to the percentage-of-the-fund

method are that it is "easy to calculate; it establishes reasonable expectations on the part of

plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which

avoids protracted litigation."  *Rawlings*, 9 F.3d at 516.  Other courts have noted that the

(4:23CV0242)

percentage approach "encourages efficiency, judicial economy, and aligns the interests of the

lawyers with the class. . . .  While the lodestar approach incentivizes attorneys to work more

hours, without regard to the quality of the output or the class's needs, the percentage approach

instead 'rewards counsel for success and penalizes it for failure.' " *In re Cardinal Health*, 528 F.

Supp. 2d at 762 (quoting *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001);

*see also id.* (Under the percentage approach, "[n]ot only is the Court spared from the costly task

of scrutinizing counsel's billable hours, but attorneys are discouraged from padding hours and

encouraged to work more efficiently.").

Moreover, courts often prefer the percentage-of-the-fund approach because it "mimics the

market."  As Judge Richard Posner explained, "it is not the function of judges in fee litigation to

determine the equivalent of the medieval just price.  It is to determine what the lawyer would

receive if he were selling his services in the market rather than being paid by court order."  *In re*

*Continental Illinois Securities Litig.*, 962 F.2d 566, 568 (7th Cir. 1992); *see also Goldberger v.*

*Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000) (agreeing "that lawyers who

successfully prosecute [class actions] deserve reasonable compensation, and that market rates,

where available, are the ideal proxy for their compensation"); *see generally* Decl. of Prof.

Charles Silver ("Silver Decl."); Decl. of Brian T. Fitzpatrick ("Fitzpatrick Decl.").  Abundant

empirical evidence demonstrates that the market sets compensation for class action attorneys as

percentages of the claimants' recoveries, not as hourly rates.  In one empirical study of hundreds

of securities fraud class actions, every agreement between lawyers and investors provided for

contingent percentage fees.  Silver Decl. ¶ 34 (citing Lynn A. Baker, Michael Perino, and Charles

Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115

(4:23CV0242)

Colum. L. Rev. 1371, 1448 (2015)); *see also id.* ¶¶ 43-46 (finding the same in antitrust class

actions).  Because percentage-based compensation arrangements dominate the market, courts

should use them when awarding fees from common funds.  *Id.* ¶ 25.

The Sixth Circuit endorsed this reasoning when it held that the fee awarded in *Deja Vu

Servs.* was reasonable because, among other things, it was comparable to prevailing market rates.

*Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886, 898 (6th Cir. 2019) ("It is not abnormal for

negotiated attorneys' fee awards to comprise 20% to 30% of the total award.").  The court in the

*Flint Water Cases* also looked to privately negotiated market rates when it approved attorneys'

fees in that case.  *In re Flint Water Cases*, 583 F. Supp. 3d 911, 939 (E.D. Mich. 2022)

("[O]ne-third is the benchmark for privately negotiated contingent fees.").

In contrast to the percentage-of-the-fund approach, the lodestar method "should arguably

be avoided in situations where such a common fund exists" because:

> . . . it does not adequately acknowledge (1) the result achieved or (2) the special
> skill of the attorney(s) in obtaining that result.  Courts and commentators have
> been skeptical of applying the formula in common fund cases. . . .  [M]any courts
> have strayed from using lodestar in common fund cases and moved towards the
> percentage of the fund method which allows for a more accurate approximation of
> a reasonable award for fees.

*Fournier v. PFS Invs., Inc.*, 997 F. Supp. 828, 831–32 (E.D. Mich.1998) (internal citations

omitted); *see also In re Cardinal Health*, 528 F. Supp. 2d at 762 (the lodestar approach

"incentivizes attorneys to work more hours, without regard to the quality of the output or the

class's needs. . . ."); Fitzpatrick Decl. ¶ 10 ("Over time, however, the lodestar approach fell out

of favor in common fund cases because it was difficult to calculate the lodestar (courts had to

review voluminous time records and the like) and the method did not align the interests of

counsel with the interests of the plaintiffs (because counsel's recovery did not depend on how

(4:23CV0242)

much the plaintiffs recovered).").  Courts now only use the lodestar method in a small percentage

of cases, usually when the settlement calls for substantial non-monetary relief or involves a fee-

shifting statute.  *Id.* (citing Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158

U. Pa. L. Rev. 2043 (2010)).  As discussed below, the lodestar method may still be relied on as a

cross-check for the percentage of fund method.

### 2.      The Requested Attorneys' Fees Are Reasonable.

This is a reasonable award.  The percentage is squarely within the range of attorneys' fee

awards that the Sixth Circuit has found to be reasonable.  *See, e.g.*, *Deja Vu Servs.*, 925 F.3d at

898 ("It is not abnormal for negotiated attorneys' fee awards to comprise 20% to 30% of the total

award.").  Moreover, each of the *Ramey* factors overwhelmingly weigh in favor of finding that

the requested fees are reasonable.

### a.      Value of the Benefits Rendered to the Class

The first *Ramey* factor—the value of the benefit rendered to the settlement class—is

"widely regard[ed]" as the "most important" factor.  *In re Cardinal Health*, 528 F. Supp. 2d at

764.  The *Ramey* court evaluated this factor in terms of the number of individuals affected by the

underlying allegations and the total settlement reached.  *Ramey*, 508 F.2d at 1196–98.  This

factor weighs in favor of awarding Class Counsel the fees requested in this consolidated case.

The Settlement provides $600 million in non-reversionary cash, a substantial result for the people

and businesses of East Palestine and the surrounding community.  The Settlement is positioned

to put financial relief in the hands of the Settlement Class Members prior to the two-year

anniversary of the derailment, providing households, families, and local businesses with

much-needed relief for the losses and inconveniences they sustained.

19

(4:23CV0242)

This, alone, is an outstanding result for Settlement Class Members, but it is even more impressive when the settlement amount is compared to the total underlying value of the residential property in the affected area.  The total value of all the residential property within one mile of the derailment was only roughly $100 million.  Fitzpatrick Decl. ¶ 26.  This means that the settlement recovers six times of the entire residential value in the most affected area.  Even if extended to a five-mile radius, the total residential value increases to only roughly $650 million; the settlement therefore recovers nearly 100% of that as well.  *Id.*  Even in a 10-mile radius, the settlement recovers roughly one-fourth of the entire residential value.  *Id.*  This is an excellent result for Settlement Class Members.

Moreover, the robust, Court-approved Notice Plan ensured that a vast majority of Settlement Class Members were notified of the Settlement, and the Plan of Distribution employs a quick, straightforward claims process that secures claims verification without creating an undue burden on Class Members.  The claims process requires Settlement Class Members to complete one of two claim forms, depending on whether they are individuals or businesses.  *See* Exhibits A and B to the Settlement Agreement (ECF No. 452-2).  Both claim forms were provided to Class Members directly as part of the Court-approved direct notice program, and they were also made available to Class Members online via the settlement website and in person at two Claims Centers located in East Palestine, Ohio.  With the assistance of Kroll, the Court-appointed Settlement Administrator, Class Counsel provided Class Members with online, telephonic and in-person resources to assist Class Members with completing these claims forms throughout the entirety of the 91-day Claims Period.

(4:23CV0242)

The success of the Notice Plan and claims process are reflected in the Settlement's historic participation, which has to date seen over 54,000 filed claims.  Fenwick Decl. ¶ 17.  This represents approximately 28.1% of the estimated 195,3835 Class Member households, a rate that is almost three times what is typical in class action administrations.  *Id.*  These unprecedented claims rates are perhaps the greatest evidence that the process ensured that a vast majority of Class Members would receive relief.

The Settlement also ensures relief for Settlement Class Members that was anything but guaranteed in a time frame that allows for this community to begin to move forward.  Litigating this case further would have carried significant costs, and litigative risks and delay with little to no additional payoff for Settlement Class Members.  *See* Fitzpatrick Decl. ¶ 27.  The Settlement eliminates this risk and expense and cuts through the delay.

> **b.** **Society's Stake in Rewarding the Attorneys Who Achieved These Benefits**

The next *Ramey* factor requires that the Court evaluate the policy considerations of encouraging counsel to accept cases such as this one.  *Ramey*, 508 F.2d at 1196.  This factor also weighs in favor of awarding Class Counsel the requested fees.  Courts recognize that society's interest "in encouraging lawyers to bring complicated cases, which likely will involve a multi-year commitment, particularly when an entire community of people allege they suffered harm to their health, their property, and their businesses, is significant."  *In re Flint Water Cases*, 583 F. Supp. 3d at 938; *see also Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1282 (S.D. Ohio 1996) ("Clearly the global settlement negotiated by Counsel in this case is providing benefits to a class of people who are very much in need of help.").  This is especially true when, as here, the Settlement provides tangible community-wide benefits in the face of risky and challenging

21

(4:23CV0242)

litigation.  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 534 (E.D. Mich. 2003)

("Encouraging qualified counsel to bring inherently difficult and risky but beneficial class

actions like this case benefits society.").

Public policy strongly supports Class Counsel's fee request.  Most individual Class

Members "would lack the resources to litigate a case of this magnitude, and individual recoveries

are often too small to justify the burden and expense of litigation."  *In re Cardinal Health*, 528 F.

Supp. 2d at 765; *see also* Fitzpatrick Decl. ¶ 15 ("[S]ometimes individual claims are too small to

be viable on their own. . . .").  Attorneys who agree to champion large and complex class actions

like this one "serve a benefit to society and the judicial process by enabling . . . claimants to pool

their claims and resources" to "achieve a result they could not obtain alone."  *In re Telectronics*

*Pacing Systems, Inc.*, 137 F. Supp. 2d 1029, 1043 (S.D. Ohio 2001).  Lawyers "need adequate

incentives to take meritorious cases when no one else has, and then to prosecute them to the

fullest.  The way we do that is to give them a proper percentage of what they recover."

Fitzpatrick Decl. ¶ 17.  Here, without the prospect of eventual compensation for Class Counsel,

this case may never have been brought and the significant benefits to Class Members never

realized.  Nevertheless, as Judge Phillips, the mediator, remarked "counsel made readily

apparent, they were fully prepared to proceed with the litigation rather than accept a settlement

that was not in their clients' best interests—as underscored by the fact that the first mediation did

not result in settlement."  Phillips Decl. ¶ 17.  In sum, approving Class Counsel's fee request will

help ensure that plaintiffs' attorneys continue to take up important cases like this in the future.

*See* Fitzpatrick Decl. ¶ 17 ("[T]he percentage requested here will help further the social goal of

(4:23CV0242)

appropriately incentivizing lawyers to invest the right amount of time and money in meritorious

cases like this one in the future.").

### c. Whether Class Counsels' Services Were Rendered on a Contingency Fee Basis

The third *Ramey* factor—whether the lawyers' services were undertaken on a contingent

fee basis—is also met. *Ramey*, 508 F.2d at 1196. Attorneys who take on such a massive task

with a significant risk of nonpayment should be compensated "both for services rendered and for

the risk of loss or nonpayment assumed by accepting and prosecuting the case." *In re Packaged*

*Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011);

*see also In re Cardinal Health*, 528 F. Supp. 2d at 766 (This factor "stands as a proxy for the risk

that attorneys will not recover compensation for the work they put into a case."). The presence of

a contingent fee arrangement is "an important factor in determining the fee award." *Stanley v.*

*U.S. Steel Co.*, No. 04-74654, 2009 WL 4646647, at *3 (E.D. Mich. 2009). Indeed, several

courts consider the risk of non-recovery the most important factor in the fee determination. *See*

*In re Cardinal Health*, 528 F. Supp. 2d at 766 (S.D. Ohio 2007) (collecting cases).

From the outset of the case at bar, Class Counsel prosecuted this action on a contingent-

fee basis and dedicated significant time and resources to doing so, despite the very real risk they

might never be compensated. *Stanley v. U.S. Steel Co.*, No. 04–74654, 2009 WL 4646647, at *3

(E.D. Mich. Dec. 8, 2009) ("A contingency fee arrangement often justifies an increase in the

award of attorneys' fees."). Class Counsel also forewent opportunities to work on other cases in

order to devote the appropriate time and resources necessary to handle this matter. *See Lonardo*,

706 F. Supp. 2d at 796 (significant hours spent on a contingency basis "illustrates the magnitude

(4:23CV0242)

of the risk Class Counsel assumed in terms of lost time that could have been devoted to other matters"). This factor weighs strongly in favor of awarding the fees requested.

### d. The Value of Class Counsels' Services on an Hourly Basis

The fourth *Ramey* factor considers the value of the attorneys' services on an hourly basis. *See Ramey*, 508 F.2d at 1196. Given the preference in the Sixth Circuit for using the percentage-of-the-fund method to evaluate attorneys' fees rather than the lodestar method in common fund cases, consideration of this fourth factor—which courts sometimes refer to as a "lodestar crosscheck"— is not required. *See, e.g.*, *Est. of Benjamin v. DJGN LLC*, No. 1:22-CV-166, 2023 WL 7536973, at *7 (S.D. Ohio Nov. 13, 2023) ("Conducting a lodestar cross-check is optional. . . ."); *Arp v. Hohla & Wyss Enterprises, LLC*, No. 3:18-CV-119, 2020 WL 6498956, at *6-7 (S.D. Ohio Nov. 5, 2020) (noting that a lodestar cross-check is "not required").

Even when courts do consider this factor, courts do not employ an exhaustive or precise lodestar cross-check, lest they sacrifice the advantages of the percentage-of-the-fund method. *See In re Flint Water Cases*, 583 F. Supp. 3d at 941 (For the purposes of the lodestar cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court.") (internal citation omitted)); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005), *as amended* (Feb. 25, 2005) (A lodestar cross-check "need entail neither mathematical precision nor bean-counting."); *In re IPO Sec. Litig.*, 671 F. Supp. 2d 467, 506 (S.D.N.Y. 2009) ("it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable") (citing *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)). Thus,

24

(4:23CV0242)

the Court may rely on summaries of Class Counsel's hourly billing records and its own familiarity with the case to determine the reasonableness of the percentage award.

To date, Class Counsel have expended more than 59,000 hours litigating this consolidated case.  Decl. of Michelle L. Kranz ("Kranz Decl.") ¶ 15.  This number of hours is reasonable in light of the novelty and complexity of the case; the extent of discovery, depositions, and motion practice; and, the vigorous settlement negotiations.  Furthermore, Class Counsel expended time and expenses efficiently and assigned work to those attorneys with the lowest hourly rate who could competently perform the task assigned.  Based on prevailing national market rates for attorneys' fees in complex class action litigation, the fees requested by Class Counsel are reasonable.

### e.    The Complexity of the Litigation

This case was extremely factually and legally complex, involving multiple parties in multiple states, numerous witnesses and experts, several novel legal issues, including federal preemption, and over a million documents, many containing highly technical information about various pertinent topics, including but not limited to railroad industry standards, mechanical requirements of railcars, chemical transportation, chemical reactions, environmental contamination, emergency response, and environmental cleanup.  And, as evidenced by the cost and lodestar amounts submitted for approval, the matter required significant investment of time and expenses.  *See Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-CV-436, 2014 WL 1350509, at *21 (S.D. Ohio Apr. 4, 2014), *report and recommendation adopted*, No. 2:11-CV-00436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *aff'd*, 822 F.3d 269 (6th Cir. 2016) (approving fees when action was vigorously contested for two and one-half years prior to

(4:23CV0242)

settlement and involved extensive motion practice and discovery).  This factor strongly favors Class Counsel's fee request.

### f.  The Professional Skill and Standing of All Counsel

The final *Ramey* factor—the professional skill and standing of all counsel—also supports the requested fee award.  Class Counsel are highly experienced and successful practitioners in complex class actions.  Katz Decl. ¶¶ 6-9; Graham Decl. ¶ 6-9.  The quality of their representation here is demonstrated by the substantial benefit achieved through this Settlement and the effective resolution of the action.  Class Counsel defeated a volley of motions to dismiss and to strike, conducted extensive fact and expert discovery, and negotiated the Settlement Agreement in about one year.  That is remarkable, especially given the professional skill and standing of opposing counsel in this case, in particular.

The caliber of opposing counsel is also important when a court evaluates the services rendered by Class Counsel.  *In re Delphi Corp. Sec., Derivative & ERISA Litig.*, 248 F.R.D. 483, 504.  The high quality of Defense Counsel's oppositions to Class Counsels' efforts further proves the caliber of representation that was necessary to achieve the Settlement.  Norfolk Southern is represented by highly skilled, experienced, and attentive attorneys from Wilmer Cutler Pickering Hale and Dorr LLP and Dickie, McCamey & Chilcote, which have well-deserved reputations for vigorous advocacy in the defense of complex class action cases such as the present case.  Class Counsel's ability to obtain a favorable negotiated result in the face of such equally matched opposition is further evidence of Class Counsel's professional skill and competence. Furthermore, even in the midst of this hard-fought litigation, all attorneys handled even the most hotly contested matters with extreme professionalism, expediency, and competency.  Judge

(4:23CV0242)

Phillips, who was present when the Court was not, declared "[a]ll counsel displayed the highest levels of professionalism in zealously and capably representing their clients' interests."  Phillips Decl. ¶ 17.

       g.      **The Requested Fee Award is Comparable to Fees Awarded in Other Common Fund Cases.**

Finally, though not required by *Ramey*, courts often also consider how the requested attorneys' fees compare with fee awards in other common fund cases.  *See, e.g.*, *In re Cardinal Health*, 528 F. Supp. 2d at 754 & n.2 (S.D. Ohio 2007); *In re Southeastern Milk Antitrust Litig.*, No. 2:08–MD–1000, 2013 WL 2155387, at *3 (E.D. Tenn., May 17, 2013).  Courts in this Circuit regularly award fees of similar or even higher percentages of a common fund than the 27 percent requested here.  *See, e.g.*, *In re Flint Water Cases*, 583 F. Supp. 3d at 946 (awarding fees of just under 31.33% of a $626.25 million fund); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (30% of a $147.8 million fund); *Lonardo*, 706 F. Supp. 2d at 803, *on reconsideration in part* (July 21, 2010) (26.4% of a $17,398,633 fund); *In re: Sonic Corp. Customer Data Security Breach Litig.*, MDL No. 2807, No. 1:17-md-2807 (N.D. Ohio Aug. 12, 2019) (30% of a $4,325,000 fund); *Worthington v. CDW Corp.*, No. C-1- 03-649, 2006 WL 8411650, at *5–6 (S.D. Ohio May 22, 2006) (38 1/3% of a $1.45 million fund); *see also* Fitzpatrick Decl. ¶ 20 (the average mean and median fees awarded in the Sixth Circuit between 2009 and 2013 were 26% and 30%, respectively; citing Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017)).

The requested fees in the case at bar are also comparable to fees awarded in federal district courts nationwide.  According to Prof. Brian Fitzpatrick's comprehensive empirical study

(4:23CV0242)

of federal class action settlements and attorneys' fees, the most common percentages awarded by federal district courts nationwide using the percentage method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%.  Fitzpatrick Decl. ¶ 18 (citing Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010)).  A more recent study of attorneys' fees awarded in class actions found that percentages have been even higher in more recent years, with a mean award of 27% and a median award of 29% between 2009 and 2013.  *Id.* ¶ 18 (citing Eisenberg et al., *Attorneys' Fees in Class Actions*, at 945).  Thus, as with fees awarded in this Circuit, the percentage requested in the present case are comparable to or even slightly below the typical fee award nationwide.

The percentage of the fund requested here is comparable to percentages commonly negotiated in private fee agreements—that is, the requested fee "mimics the market."  Empirical studies have established that contingent fees range from 30% to 40% of the recovery in most types of plaintiff representations.  Silver Decl. ¶¶ 38-42.

Finally, Co-Lead Class Counsel, "who are most familiar with the work done by each firm and each firm's overall contribution to the litigation," are best suited to apportion these fees among the firms involved.  *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL NO 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008); *see Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 (6th Cir. 1996) (upholding the district court's decision to "not become involved" in class counsel's division of its fee); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) (noting "the accepted practice of allowing counsel to apportion fees amongst themselves").

For the above reasons, the Court finds that Plaintiffs' requested attorneys' fees are

(4:23CV0242)

reasonable and grants the motion for fees in the amount of $162,000,000.

### C.    Litigation Expenses

Class Counsel also request reimbursement for $18 million in out-of-pocket expenses advanced for the benefit of Class Members, as provided for in the Settlement.  Class counsel may recover the taxable costs recoverable by any prevailing party, *see* Fed. R. Civ. P. 54(d)(1), and also "nontaxable costs that are authorized by law or by the parties' agreement," *id.*; Fed. R. Civ. P. 23(h).  "Expense awards are customary when litigants have created a common settlement fund for the benefit of a class."  *In re Delphi*, 248 F.R.D. at 504.  Expense awards are generally awarded from the common fund.  *Todd S. Elwert, Inc., DC v. All. Healthcare Servs., Inc.*, No. 3:15CV2673, 2018 WL 4539287, at *5 (N.D. Ohio Sept. 21, 2018) ("[C]ounsel is entitled to reimbursement from the common fund for these expenses."); *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, No. 2:09-2009 SMH V, 2013 WL 12329512, at *6 (W.D. Tenn. Sept. 5, 2013) (finding that class counsels' requested expenses "are reasonable and should be paid from the common fund.").  In determining whether requested expenses are compensable, the Court should consider "whether the particular costs are the type routinely billed by attorneys to paying clients in similar cases."  *In re Cardizem*, 218 F.R.D. at 535.

Class Counsel advanced all expenses in the present case to date without reimbursement, nor any guarantee of reimbursement.  As part of prosecuting this case, Class and Co-Lead Counsel created a bank account to use for expenses that benefit the Class as a whole and are too large to expect any one firm to advance for the life of a litigation.  Examples of "held" costs are the costs associated with a lawyer from that firm traveling to take a deposition out-of-state.

(4:23CV0242)

Whereas the costs of the court reporter and the deposition transcript are considered "common"

costs and are paid directly out of the fund created by the various law firms.  Katz Decl. ¶ 87.

In this case, Burg Simpson managed that common cost fund or class cost fund.  Class

Counsel instituted a process whereby all Co-Lead and Class Counsel had to approve costs before

they were paid out of that account.  The account was funded by all of the law firms appointed as

Class or Co-Lead Counsel (each firm contributed $250,000), to the Executive Committee (each

firm contributed $175,000), and each firm appointed to the Plaintiffs' Steering Committee

("PSC") (each firm contributed $100,000).[9]  Katz Decl. ¶¶ 88-89.

In total, through September 5, 2024, Plaintiffs' leadership group incurred costs of

$5,302,128.18 prosecuting this case on behalf of the Class.  Kranz Decl. ¶ 19.  By far, the

greatest costs incurred were payments to experts that were hired on behalf of the Class followed

by costs associated with conducting depositions (*e.g.*, court reporters, videographers, and trial

technicians).  Katz Decl. ¶ 90.  Additionally, Kroll, the Settlement Administrator, has billed

$2,361,940.74 for administrative expenses as of September 3, 2024, which includes notice and

media costs.  Fenwick Decl. ¶ 24.  Kroll estimates that it will bill an additional $14.6 million to

complete administration of the Settlement.  *Id.*  Thus, total expenses could exceed $20 million.

Should the final total expenses amount to less than the requested $18 million, the surplus will

revert to the common fund.

---

[9]  There were 5 PSC firms that failed to make their final payment in response to a
call for a capital contribution.  In addition to these firms, there was one firm that failed to
make its full contribution for any of the capital calls made by Class and Co-Lead Counsel.

(4:23CV0242)

For the above reasons, the Court finds that these expenses were reasonable and necessary to achieve the Settlement, and therefore grants Plaintiffs' motion for expenses in the amount of $5,302,128.18 through September 5, 2024.

### D. Class Representative Service Awards

Finally, Plaintiffs request a service award of $15,000 for each Class Representative.  As stated above, "service awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *Daoust*, 2019 WL 2866490, at *6; *see also Hadix*, 322 F.3d at 897 (explaining that "[i]ncentive awards are typically awards to class representatives for their often extensive involvement with a lawsuit," and noting that "[n]umerous courts have authorized incentive awards").

Here, the Class Representatives' extensive involvement in the case supports granting the requested service awards.  The Class Representatives have demonstrated their commitment to the Settlement Class from the very beginning.  Plaintiffs' initial decision to pursue this case as a class action, and not simply seek individual damages, directly benefitted the Class.

Class Representatives further demonstrated their commitment to the Class by sitting for depositions, allowing their home and property to be inspected, providing pertinent information about their losses, searching for and providing documents and information in response to discovery requests, regularly communicating with their counsel about the case, and reviewing and approving the proposed Settlement.  *See* Graham Decl. ¶ 70; Katz Decl. ¶ 72; *see also generally* Declarations of Class Representatives.  Their work was a critical part of securing the benefits to the Class.

(4:23CV0242)

Moreover, the amount of the requested service award is comparable to, or less than, service awards approved in similar cases.  *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, No. 97-CV-750, 2016 WL 5122565, at *7 (S.D. Ohio Sept. 21, 2016) (approving two service awards of $25,000 each from a $3 million settlement); *Davidson v. Henkel Corp.*, No. 12-cv-14103, 2015 WL 13034891, at *3 (E.D. Mich. Dec. 8, 2015) (approving $15,000 service award for the Class Representative from a $3,350,000 settlement fund); *In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679 (N.D. Ohio 2015) (approving incentive awards of $35,000 to each of six Class Representatives from a settlement fund of $433.1 million).

For the above reasons, the Court finds that a $15,000 service award is reasonable to compensate the Class Representatives for the time and effort they expended in assisting the prosecution of the litigation and grants the motion for service awards.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Service Awards (ECF No. 520) is granted.  Accordingly, it is hereby ORDERED as follows:

1.  Class Counsel is awarded 27 percent (27%) of the total settlement amount or One Hundred Sixty-two Million Dollars ($162,000,000) in attorneys' fees, and three percent (3%) or $18,000,000 in costs, which are to be distributed to Class Counsel pursuant to paragraph XIV (D) of the Settlement Agreement.  The Court grants Co- Lead Class Counsel authority to distribute the fees in a manner that, in the judgment of Co-Lead Class Counsel, fairly compensates each attorney and/or firm for their contribution to the prosecution of Plaintiffs' class claims.

(4:23CV0242)

    2.  Each of the Class Representatives is awarded $15,000 in service awards.

    3.  The Court finds that these amounts are warranted and reasonable for the reasons set forth in the moving papers before the Court, at the Final Approval Hearing, and the reasons stated in this Order.


    IT IS SO ORDERED.


    __September 27, 2024__                 _/s/ Benita Y. Pearson_
Date                                       Benita Y. Pearson
                                       United States District Judge