Confidential - Pursuant to Protective Order

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3
     IN RE: EAST PALESTINE    ) CASE NO.
4    TRAIN DERAILMENT         ) 4:23-CV-00242-BYP
                              ) JUDGE BENITA Y. PEARSON
5

6              TUESDAY, JANUARY 16, 2024

7      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

8                      - - -

9              Videotaped deposition of Charles

10   Day, held at the offices of Wilmer Cutler

11   Pickering Hale and Dorr LLP, 2100 Pennsylvania

12   Avenue NW, Washington, DC, commencing at

13   9:03 a.m. Eastern, on the above date, before

14   Carrie A. Campbell, Registered Diplomate

15   Reporter, Certified Realtime Reporter,

16   Illinois, California & Texas Certified

17   Shorthand Reporter, Missouri, Kansas,

18   Louisiana & New Jersey Certified Court

19   Reporter.

20                      - - -

21
                GOLKOW LITIGATION SERVICES
22                    877.370.DEPS
                     deps@golkow.com
23

24

25

Confidential - Pursuant to Protective Order

```
 1          A P P E A R A N C E S :

 2

 3    GRANT & EISENHOFER P.A.
      BY:  ADAM J. GOMEZ
 4         agomez@gelaw.com
           ADAM STOLTZ
 5         astoltz@gelaw.com
      123 South Justison Street, 6th Floor
 6    Wilmington, Delaware  19801
      (303) 622-7000
 7

 8    and

 9

      BURG SIMPSON ELDREDGE HERSH &
10    JARDINE, P.C.
      BY:  SETH A. KATZ
11         skatz@burgsimpson.com
      40 Inverness Drive East
12    Englewood, Colorado  80112
      (303) 792-5595
13    Counsel for Plaintiffs

14

15    WILMER CUTLER PICKERING HALE AND DORR LLP
      BY:  NOAH LEVINE
16         noah.levine@wilmerhale.com
      7 World Trade Center
17    250 Greenwich Street
      New York, New York  10007
18    (212) 230-8800

19

      and
20

21    WILMER CUTLER PICKERING HALE AND DORR LLP
      BY:  WILLIAM CHORBA
22         william.chorba@wilmerhale.com
      2100 Pennsylvania Avenue NW
23    Washington, DC  20037
      (202) 663-6000
24    Counsel for Norfolk Southern
      Corporation and Norfolk Southern
25    Railway Company
```

Confidential - Pursuant to Protective Order

```
 1    BRACEWELL
      BY:   STEPHEN L. BRAGA
 2          stephen.braga@bracewell.com
            JASON B. HUTT
 3          jason.hutt@bracewell.com
            STEPHEN WALD
 4          stephen.wald@bracewell.com
      2001 M Street NW, Suite 900
 5    Washington, DC  20036-3310
      (202) 828-5800
 6    Counsel for the Specialized Response
      Solutions
 7


 8
      BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
 9    BY:   JOHN D. BYARS
            john.byars@bartlit-beck.com
10    54 West Hubbard, Suite 300
      Chicago, Illinois 60654
11    (312) 494-4400
      Counsel for Trinity Industries
12    Leasing Company


13


14    VORYS, SATER, SEYMOUR AND PEASE LLP
      BY:   ALYCIA N. BROZ
15          anbroz@vorys.com
            SARA INGRAM
16          saingram@vorys.com
      52 East Gay Street
17    Columbus, Ohio  43215
      (614) 464-6400
18    Counsel for Oxy Vinyls


19


20    KIRKLAND & ELLIS LLP
      BY:   ROBERT B. ELLIS
21          robert.ellis@kirkland.com
            SYDNE K. COLLIER
22          sydne.collier@kirkland.com
      300 North LaSalle
23    Chicago, Illinois  60654
      (312) 862-2000
24    Counsel for GATX and General
      American Marks Company
25
```

Confidential - Pursuant to Protective Order

```
 1   ALSO PRESENT:
          GINA VELDMAN, trial technician,
 2        Precision Trial Solutions (VIA ZOOM)

 3

 4   V I D E O G R A P H E R :
          DANIEL HOLMSTOCK,
 5        Golkow Litigation Services

 6                        – – –

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2                                          PAGE

 3    APPEARANCES...................................   2

 4    EXAMINATIONS

 5      BY MR. GOMEZ...............................   9

 6      BY MR. BYARS.............................. 267

 7      BY MS. BROZ............................... 309

 8      BY MR. ELLIS............................. 363

 9

10                      EXHIBITS

11    No.   Description                           Page

12    1     Group D, Exhibit 26, Vinyl            57
13          Chloride Monomer Safety Data
             Sheet,
14          NO BATES

      2     Group C, Exhibit 3, Emergency         75
15          Response Guide (ERG) 2020 Guide
             116 Vinyl Chloride,
16          NO BATES

17    3     September 27, 2016 Fall Meeting,      84
             Orlando, FL, Transportation Issue
18          Team, The Chlorine Institute,
             NO BATES
19

20    4     Pamphlet 171 Vinyl Chloride           87
             Monomer (VCM) Tank Car & Cargo
             Tank Handling Manual Edition 1,
21          NO BATES

22    5     Group H, Exhibit 56, NJ Department    105
             of Health and Senior Services
23          Hazardous Substance Fact Sheet
             Vinyl Chloride (June 2001),
24          NO BATES

25
```

Confidential - Pursuant to Protective Order

| 1 | 6 | Group H, Exhibit 57, New Jersey Department of Health - Right to Know Hazardous Substance Fact Sheet (October 2015), NO BATES | 110 |
| 2 | | | |
| 3 | | | |
| 4 | 7 | Text message(s) between Bob Gold and Chip Day, February 5, 2023, NO BATES | 117 |
| 5 | | | |
| 6 | 8 | Text message(s) between Drew McCarty and Chip Day, SPSI TEXTS 000512 - SPSI TEXTS 000513 | 190 |
| 7 | | | |
| 8 | | | |
| | 9 | E-mail(s), NS-CA-000017188 - NS-CA-000017189 | 224 |
| 9 | | | |
| 10 | 10 | Group D, Exhibit 54, Figure 62, Hazardous Materials Group Chair's Factual Report. Screenshot from NS contractor video taken from E. Taggart Street near N. Pleasant Drive looking north. Vent-and burn of 5 vinyl chloride tank cars showing two material plumes visible about 2-seconds following detonation of explosive charges, February 6, 2022, 4:37 p.m., NO BATES | 243 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| | 11 | E-mail(s), SRS-0000213 | 249 |
| 17 | | | |
| 18 | 12 | Text message(s) between Drew McCarty and Chip Day, SPSI TEXTS 000285 - SPSI TEXTS 000292 | 254 |
| 19 | | | |
| 20 | | | |
| | 13 | Composite exhibit from pictures in the Hazardous Materials Group Chair's Factual Report, Exhibit B 10 to the NTSB hearing | 268 |
| 21 | | | |
| 22 | | | |
| 23 | 14 | Printout from the website "Feels Like Home Realty," Agent Details | 336 |
| 24 | | | |
| 25 | | | |

Confidential - Pursuant to Protective Order

1    15    Group G, Exhibit 3, Interview             355
           Transcript - Charles Day, Senior
2          Project Manager, Specialized
           Response Solutions, March 1, 2023,
3          NS-CA-000004153 - NS-CA-000004195

4    16    Group B, Exhibit 10, Hazardous            377
           Materials Group Chair's Factual
5          Report,
           NS-CA-000002467 - NS-CA-000002625
6
     17    Indemnity and Hold Harmless              411
7          Agreement,
           NS-CA-003807064 - NS-CA-003807065
8
     18    Table 12. Vinyl chloride tank car        435
9          temperature trends as measured by
           SPSI, February 5, 2023, 16:00 to
10         February 6, 2023, 14:30

11   19    Video of vent and burn                   447

12   20    Photos of vent and burn,                 451
           SRS-0000589 - SRS-0000590
13
     21    Video of vent and burn                   460
14

15      (Exhibits attached to the deposition.)

16

17   CERTIFICATE.................................472

18   ACKNOWLEDGMENT OF DEPONENT..................474

19   ERRATA......................................475

20   LAWYER'S NOTES..............................476

21

22

23

24

25

Confidential - Pursuant to Protective Order

```
 1              VIDEOGRAPHER:  We are now on
 2       the record.  My name is Daniel
 3       Holmstock.  I am the videographer for
 4       Golkow Litigation Services.
 5              Today's date is January 16,
 6       2024.  The time on the video screen is
 7       9:03 a.m.
 8              This deposition is being held
 9       at the address of 2100 Pennsylvania
10       Avenue Northwest in Washington, DC, in
11       the matter of In Re: East Palestine
12       Train Derailment, pending before the
13       United States District Court for the
14       Northern District of Ohio, Eastern
15       Division.
16              Our deponent today is
17       Mr. Charles Day.
18              Counsel, your appearances will
19       be noted on the stenographic record.
20              Our court reporter is Carrie
21       Campbell, who will now administer the
22       oath to the witness.
23
24              CHARLES DAY,
25    of lawful age, having been first duly sworn
```

Confidential - Pursuant to Protective Order

 1    to tell the truth, the whole truth and

 2    nothing but the truth, deposes and says on

 3    behalf of the Plaintiffs, as follows:

 4

 5                 DIRECT EXAMINATION

 6    QUESTIONS BY MR. GOMEZ:

 7         Q.     Good morning, sir.

 8         A.     Good morning.

 9         Q.     Can you please state and spell

10    your name for the record?

11         A.     Charles Day, D-a-y.

12         Q.     And, Mr. Day, you're currently

13    employed by Specialized Response Solutions.

14                Correct?

15         A.     Yes, sir.

16         Q.     And you are a senior project

17    manager?

18         A.     Yes, sir.

19         Q.     Were you a senior project

20    manager in February of 2023 at Specialized

21    Response Solutions?

22         A.     Yes, sir.

23         Q.     Shorthand for Specialized

24    Response Solutions is SRS.

25                Right?

Confidential - Pursuant to Protective Order

```
 1          A.      Yes.  Yes.

 2          Q.      So I'm going to use SRS

 3    throughout the remainder of the day.

 4                  Okay?

 5          A.      I want you to use the whole

 6    thing.

 7          Q.      That'll be too much for me.

 8    I'm sorry.

 9                  But we can agree SRS means

10    Specialized Response Solutions.

11                  Right?

12          A.      Yes, sir.

13          Q.      Okay.  Am I correct that you

14    have a bachelor's of science in occupational

15    health and safety?

16          A.      Yes, sir.

17          Q.      And from what institution did

18    you receive that degree?

19          A.      Columbia Southern University.

20          Q.      In what year?

21          A.      2015?  '16?  One of those two.

22          Q.      And as part of obtaining that

23    degree in occupational health and safety,

24    what, if any, courses in chemistry did you

25    take?
```

Confidential - Pursuant to Protective Order

1      A.      I didn't take any chemistry

2  classes in that class.

3      Q.      Okay.  So no chemistry classes

4  while at -- was it Columbia?

5      A.      Southern.

6      Q.      Columbia Southern.

7              Correct?

8      A.      Yes, sir.

9      Q.      You also attended at some point

10  in your career firefighter academy.

11              Correct?

12      A.      Several, yes, sir.

13      Q.      Okay.  What was the first

14  firefighter academy that you attended?

15      A.      Tarrant County Junior College,

16  right after I graduated in 1981.

17      Q.      Okay.  And thereafter, what's

18  the next firefighter academy you had?

19      A.      City of Arlington fire

20  department recruit class of 1983.

21      Q.      Okay.  Other than those two

22  academies, were there additional firefighting

23  academies?

24      A.      There's a lot of firefighting

25  classes, yes, sir.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  I'm just talking about

2   like academies or schools specifically.

3         Any others?

4    A.    Texas A&M.  Illinois State fire

5   college.  There's a lot of them over

6   41 years.

7    Q.    Understood.

8         Just focusing on the first two

9   institutions that you mentioned --

10   A.    Yes, sir.

11   Q.    -- did you receive HAZMAT

12   training?

13   A.    Yes, sir.

14   Q.    And as part of that HAZMAT

15   training, did you receive education in

16   chemistry?

17   A.    It was discussed.  It was --

18   there were classes about chemistry, yes.

19   Q.    Those chemistry classes, did

20   they include specific instruction on vinyl

21   chloride monomer?

22   A.    In the fire classes, no.

23   Q.    I'm going to be using the

24   phrase, as I'm sure you can guess, "vinyl

25   chloride monomer" a lot today.

1      A.      Yes.

2      Q.      Can we agree that that's

3  abbreviated to VCM?

4      A.      VCM, yes, sir.

5      Q.      Okay.  Other than the bachelor

6  of science that we discussed, do you have any

7  other formal, post-high school education?

8      A.      No, sir.

9      Q.      Other than what we've

10  discussed, do you have any other formal

11  education in chemistry?

12      A.      No, sir.

13      Q.      Other than what we've

14  discussed, do you have any formal instruction

15  in chemistry?

16      A.      No, sir.

17      Q.      You do not consider yourself to

18  be a chemist.

19              Correct?

20      A.      That is correct.

21      Q.      You do not consider yourself to

22  be a chemical engineer.

23              Correct?

24      A.      That is correct.

25      Q.      And you don't consider yourself

Confidential - Pursuant to Protective Order

```
 1    to be a material scientist.
 2             Right?
 3    A.        That is correct.
 4    Q.        So you would agree with me that
 5    you are not an expert in VCM.
 6             Correct?
 7             MR. LEVINE:  Objection.
 8             THE WITNESS:  I have a lot of
 9        experience dealing with vinyl chloride
10        in containers and in plants and in
11        transportation.
12    QUESTIONS BY MR. GOMEZ:
13    Q.        Let me ask the question a
14    little differently.
15             You'd agree with me that you're
16    not an expert in the chemical properties of
17    VCM.
18             Correct?
19    A.        Correct.
20    Q.        You'd agree with me that you're
21    not an expert in the reactivity of VCM?
22    A.        That's correct.
23    Q.        You'd agree with me that you're
24    not an expert in the polymerization of VCM?
25    A.        That's correct.
```

Confidential - Pursuant to Protective Order

1    Q.    You mentioned a number of

2  schools beyond the two -- and forgive me,

3  I've forgotten them already -- that you've

4  attended for firefighting and HAZMAT

5  training.

6            Right?

7    A.    Yes, sir.

8    Q.    And I believe you actually

9  produced in response to a subpoena a large

10  number of certificates and other

11  documentation reflecting that you've done

12  training at these establishments.

13            Do you recall producing those?

14    A.    Yes, sir.

15    Q.    I think there were over 200

16  different certificates.  I'm just going to

17  call them certificates.

18            Does that sound about right?

19    A.    Yes, sir.

20    Q.    And those spanned, if I recall

21  correctly, from 1997 up through pretty much

22  the present.

23    A.    I don't remember when they

24  started.  I had a lot of certificates.

25    Q.    Fair enough.

Confidential - Pursuant to Protective Order

1           But I think 1997 sounds about

2    when you started firefighter academy.

3           Is that right?

4    A.     No, sir.

5    Q.     When was that again?

6    A.     1981.

7           MR. LEVINE:  Can we take one

8        break?  I realized I'm not mic'ed up

9        to be able to make my objections.

10          VIDEOGRAPHER:  Stand by.  The

11       time is 9:09 a.m.  we're going off the

12       record.

13        (Off the record at 9:09 a.m.)

14          VIDEOGRAPHER:  The time is

15       9:11 a.m., and we're back on the

16       record.

17   QUESTIONS BY MR. GOMEZ:

18   Q.     Mr. Day, before we took a quick

19   break, you corrected me that your firefighter

20   training began in 1981.

21   A.     My firefighter training began

22   in actually -- probably in the '70s.

23   Q.     Okay.

24   A.     But I graduated in '81 and went

25   to recruit class at TCJC.

Confidential - Pursuant to Protective Order

1     Q.     Okay.  Understood.

2            From 1981 to the present,

3     you've attended a number of continuing

4     education and refresher courses in

5     firefighting.

6            Right?

7     A.     Yes, sir.

8     Q.     And some of those classes also

9     entailed HAZMAT.

10           Right?

11    A.     Most classes did, yes, sir.

12    Q.     Some of the institutions that

13    provided those refreshers and training

14    include OSHA.

15           Right?

16    A.     Yes, sir.

17    Q.     Another one is CHLOREP.

18           Is that correct?

19    A.     Yes, sir.

20    Q.     What does CHLOREP stand for?

21    A.     It's the -- it's a division of

22    The Chlorine Institute.  It's the -- a trade

23    organization for chlorine manufacturers, and

24    they cover all things that -- mission

25    chemicals of chlorine production.

Confidential - Pursuant to Protective Order

1    Q.    Is SRS a member of CHLOREP?

2    A.    We're an associate member.

3    Q.    And just briefly, what's an

4    associate member?

5    A.    We're not a voting member, but

6    we attend training.  We attend conferences

7    and such.

8    Q.    So you participate in CHLOREP

9    trainings and meetings, things of that

10    nature?

11    A.    Yes, sir.

12    Q.    You also attended refreshers

13    and education that was put on by a group with

14    the abbreviation is SERTC.

15          Is that correct?

16    A.    Yes, sir.

17    Q.    And what does SERTC stand for?

18    A.    SERTC is the -- basically it's

19    the old Transportation Technology Center at

20    Pueblo, Colorado, that teaches emergency

21    response for rail and highway accidents and

22    incidents.

23    Q.    Is that sometimes in shorthand

24    referred to as "going out to Pueblo" or

25    "training in Pueblo"?

1        A.      Pueblo, yes, sir.

2        Q.      Okay.  I also saw in some of

3    those certificates and other documents

4    references to tank car specialist.

5                Are you familiar with that

6    phrase?

7        A.      Yes, sir.

8        Q.      Can you just describe for me

9    what that means?

10       A.      Basically it's somebody that

11   knows containers, that knows the construction

12   of them and how to handle them when they're

13   involved in incidents and accidents and have

14   leaks.

15       Q.      And you've since -- certainly

16   since 1981 have attended a number of

17   refreshers and continuing education specific

18   to tank cars.

19                Correct?

20       A.      Yes, sir.

21       Q.      Throughout that period, let's

22   say from 1981 to the present, which of these

23   various trainings and refreshers do you

24   recall providing specific instruction on

25   vinyl chloride monomer polymerization?

Confidential - Pursuant to Protective Order

1      A.      The classes that we put on are

2  not -- don't focus solely on polymerization

3  of VCM.  It's more of how to deal with

4  compressed flammable gases in emergency

5  response situations.

6      Q.      Do you recall from any of the

7  trainings and refreshers during that period,

8  1981 to the present, any of them providing

9  specific instruction on the polymerization of

10 VCM?

11     A.      Yes, sir.

12             MR. BRAGA:  Object to the form

13     of the question.

14 QUESTIONS BY MR. GOMEZ:

15     Q.      Which trainings are those or

16 were those?

17     A.      A lot of the classes briefly

18 touch on polymerization of VCM and other

19 polymer material.

20     Q.      And you said that they briefly

21 touch upon it.

22             What kind of areas do they

23 cover with respect to VCM polymerization?

24     A.      What happens to inhibitors when

25 exposed to elevated heat, high pressure and

Confidential - Pursuant to Protective Order

1   such.

2       Q.      Okay.  And when you're

3   referencing inhibitors, that's in connection

4   with the transportation of stabilized VCM in

5   a railcar, for example.

6               Right?

7       A.      All materials, yes, sir.

8       Q.      And again, you mentioned

9   inhibitors.  That's a method for stabilizing

10  VCM for transportation.

11              Right?

12      A.      That is correct.

13      Q.      Oxygen purging is another way

14  of stabilizing VCM for transportation.

15              Correct?

16      A.      That is correct.

17      Q.      Those are distinct methods for

18  stabilizing VCM for transportation.

19              Correct?

20      A.      That's correct.

21      Q.      Would you agree with me, based

22  off of your training, that both of those

23  methods neutralize the initiators needed to

24  start the polymerization reaction in VCM?

25              MR. BRAGA:  Objection to the

Confidential - Pursuant to Protective Order

```
 1         form of the question.
 2              MR. LEVINE:  And same
 3         objection.
 4              THE WITNESS:  Yes, sir.
 5    QUESTIONS BY MR. GOMEZ:
 6         Q.    An inhibitor is actually added
 7    to the VCM to stop the reaction from
 8    occurring.
 9              Right?
10         A.    Stabilizes the materials, yes,
11    sir.
12         Q.    And an inhibitor can include a
13    variety of chemicals.  One of them, I think,
14    is phenol?
15         A.    Yes, sir.
16         Q.    Whereas oxygen purging removes
17    oxygen from the vessel so that there is not a
18    catalyst or initiator for the VCM to start
19    polymerizing.
20              Right?
21              MR. LEVINE:  Objection.
22              MR. BRAGA:  Same objection.
23              THE WITNESS:  Yes, sir.
24              MR. GOMEZ:  Just before we go
25         any further, in past depositions we've
```

Confidential - Pursuant to Protective Order

```
 1          agreed that one objection is an

 2          objection for all.

 3                  MR. BRAGA:  Okay.

 4                  MR. GOMEZ:  I'm happy to agree

 5          to that as well.

 6                  MR. LEVINE:  Let's do that.

 7  QUESTIONS BY MR. GOMEZ:

 8          Q.     You mentioned in connection

 9  with inhibitors that you received training, I

10  think, specifically about how heat interacts

11  with those inhibitors?

12          A.     Yes, sir.

13          Q.     Do I remember that correctly?

14          A.     Yes, sir.

15          Q.     When VCM is -- when stabilized

16  VCM is shipped with an inhibitor, is it your

17  understanding that heating can lead to the

18  loss of the inhibitor?

19          A.     Yes, sir.

20          Q.     And correct me if I'm wrong,

21  it's not well-understood exactly how those

22  inhibitors get lost, but experience shows

23  that when there's heating and VCM, the

24  inhibitors tend to go away over time.

25                  Right?
```

Confidential - Pursuant to Protective Order

1          MR. BRAGA:  Object.

2          THE WITNESS:  Yes, sir.

3   QUESTIONS BY MR. GOMEZ:

4       Q.     That's not the case when there

5   is stabilization of VCM via oxygen purging.

6          Right?

7          MR. LEVINE:  Objection.

8          THE WITNESS:  It can be, yes,

9       sir.

10  QUESTIONS BY MR. GOMEZ:

11      Q.     How can it be?

12         MR. LEVINE:  Same objection.

13         THE WITNESS:  Anytime that you

14      stabilize something, inhibit

15      something, elevated heat and extreme

16      pressure can change things at a

17      molecular level.

18  QUESTIONS BY MR. GOMEZ:

19      Q.     So is it your understanding

20  that when we're talking about oxygen purged,

21  stabilization for VCM, the application of

22  heat changes something within the vessel that

23  detracts from the ability to stop the

24  polymerization reaction?

25      A.     It has the ability, it's my

1    understanding, yes, sir.

2        Q.    And which of your trainings or

3    educations or refreshers from 1981

4    specifically gave you that information with

5    respect to oxygen stabilized VCM?

6            MR. BRAGA:  Object to the form

7        of the question.

8            THE WITNESS:  There's -- there

9        was a lot of training between 1981 and

10       the present, and I can't specifically

11       tell you which class said that.  But

12       basically in emergency response,

13       stabilized mat -- we have a book of

14       experience that tells us we need to --

15       that we need to deal with certain

16       materials certain ways.

17           And VCM is a stabilized

18       product, and you have the ability to

19       generate polymer during that -- during

20       heating, elevated heating.

21   QUESTIONS BY MR. GOMEZ:

22       Q.    So I appreciate that, but my

23   question is specific to trainings that you

24   recall about the polymerization of

25   oxygen-stabilized VCM and the loss of

1    inhibiting properties.

2              Do you recall any specific

3    trainings from 1981 to the present that

4    discussed that topic?

5         A.    No, sir.

6         Q.    From 1981 to the present, do

7    you remember any instructors who provided

8    information or education or training about

9    the loss of inhibitors in oxygen-stabilized

10   VCM?

11        A.    No, sir.

12             MR. BRAGA:  Object to the form

13        of the question.

14             But go ahead, you can answer.

15             THE WITNESS:  No, sir.

16   QUESTIONS BY MR. GOMEZ:

17        Q.    You mentioned a book of

18   experience.  I take it that's not a literal

19   book of experiences.

20             Right?

21        A.    That's correct.

22        Q.    It's the collective memory and

23   experience of those in the HAZMAT industry.

24             Fair?

25        A.    That's correct.

Confidential - Pursuant to Protective Order

1    Q.    And based off of that

2    collective experience, various instructors

3    provide information and insight at, among

4    other things, these trainings that we're

5    talking about.

6         Right?

7    A.    Yes, sir.

8    Q.    Do you recall any discussion

9    from any trainings from 1981 to the present

10   about specific experiences involving the

11   polymerization of oxygen-stabilized VCM?

12   A.    Can you restate the question?

13   Q.    Sure.

14        From 1981 to the present, do

15   you recall any of the trainings or refresher

16   courses discussing real-life experiences

17   where oxygen-stabilized VCM polymerized?

18        MR. LEVINE:  Objection.

19        THE WITNESS:  The training

20        classes, we don't break down VCM into

21        oxygen-stabilized or inhibited VCM.

22   We deal with it as all stabilized VCM.

23   QUESTIONS BY MR. GOMEZ:

24   Q.    But you agree with me that

25   those are chemically different ways of

1    stopping the reaction.

2              Correct?

3              MR. LEVINE:  Objection.

4              THE WITNESS:  Yes, sir.

5    QUESTIONS BY MR. GOMEZ:

6       Q.    And you'd agree with me that

7    it's important to understand which way VCM is

8    being stabilized when dealing with a HAZMAT

9    situation involving that chemical.

10             Correct?

11             MR. BRAGA:  Object to the form

12        of the question.

13             THE WITNESS:  Yes, sir.

14   QUESTIONS BY MR. GOMEZ:

15      Q.    In your experience in the field

16   responding to HAZMAT situations, can you

17   describe for me the instances where you

18   personally have dealt with a derailed railcar

19   containing VCM?

20      A.    I have dozens of incidents

21   involving vinyl chloride.

22      Q.    Okay.

23      A.    So you have to be specific on

24   what -- which one you want.

25      Q.    Fair enough.

Confidential - Pursuant to Protective Order

1          Let's start with the number.
2    You said dozens.
3          Would you say more or less than
4    50?
5      A.     Less than 50.
6      Q.     More or less than 25?
7      A.     Probably more.
8      Q.     So somewhere between 25 and 50.
9          Fair?
10     A.     Sure.
11     Q.     Of those 25 to 50 situations
12   involving derailed VCM cars, how many of
13   those presented a concern for polymerization
14   of VCM?
15     A.     It's always a concern because
16   it is a stabilizer-inhibited product, so
17   there's always a heightened level of concern
18   when we're dealing with vinyl chloride.
19     Q.     Let me ask the question
20   differently.
21          Of those 25 to 50 incidents
22   involving VCM, how many of those -- in how
23   many of those was the polymerization and
24   potential explosion of the VCM-containing
25   vessel the primary concern?

Confidential - Pursuant to Protective Order

1          MR. BRAGA:  Object to the form

2     of the question.

3          THE WITNESS:  There was one in

4     1982.

5  QUESTIONS BY MR. GOMEZ:

6     Q.     1982.  That would be the

7  Livingston, Louisiana, incident.

8          Right?

9     A.     Correct.

10    Q.     In the Livingston, Louisiana,

11 incident in 1982, was the VCM in the railcars

12 stabilized?

13    A.     I was a technician in 1982, so

14 I do not know.

15    Q.     You didn't come to learn at any

16 point after that whether it was stabilized or

17 not?

18    A.     I don't recall.

19    Q.     When you say you were a

20 technician in 1982, just can you describe for

21 me what that means, what those duties were?

22    A.     I was a laborer.

23    Q.     Okay.  Doing what specifically

24 in connection with the -- that derailment, if

25 anything?

Confidential - Pursuant to Protective Order

1    A.    Working as directed.

2    Q.    And who were you working for?

3    A.    Western Emergency Service.

4    Q.    And as far as the Livingston

5    derailment, what services -- what specific

6    emergency services was Western Emergency

7    Services providing in connection with that

8    incident?

9    A.    We were a response team that

10   assisted in cleanup operations.

11   Q.    Transitioning from our

12   discussion of inhibitors to a little bit more

13   detail on oxygen-stabilized VCM, are you

14   familiar with the process that shippers

15   employ to achieve oxygen stabilization of

16   VCM?

17        MR. LEVINE:  Objection.

18        THE WITNESS:  Yes, sir.

19   QUESTIONS BY MR. GOMEZ:

20   Q.    And in that process, one of the

21   first things that they do is they take in the

22   railcar and they take an oxygen reading.

23        Right?

24   A.    Yes, sir.

25   Q.    And specifically they're

1    looking to see if the level of oxygen within

2    the railcar is less than 200 parts per

3    billion.

4              Right?

5              MR. BRAGA:  Object.

6              THE WITNESS:  Okay.

7    QUESTIONS BY MR. GOMEZ:

8        Q.    And depending on that reading,

9    they either begin loading the VCM or pump

10   nitrogen into the railcar to purge the oxygen

11   from the railcar.

12             Right?

13       A.    Yes, sir.

14             MR. LEVINE:  Objection.

15   QUESTIONS BY MR. GOMEZ:

16       Q.    And once they've achieved the

17   desired threshold of oxygen, they then go

18   ahead and they load the VCM into the railcar.

19             Right?

20             MR. BRAGA:  Objection.

21             THE WITNESS:  Okay.

22   QUESTIONS BY MR. GOMEZ:

23       Q.    I'm asking.

24             Do you know?

25       A.    I'm guessing they do.

Confidential - Pursuant to Protective Order

1      Q.     And they then check it again

2   for oxygen concentration.

3             Right?

4             MR. LEVINE:  Objection.

5             THE WITNESS:  Okay.

6   QUESTIONS BY MR. GOMEZ:

7      Q.     Have you ever seen a VCM

8   railcar loaded?

9      A.     Yes, sir.

10     Q.     It's a closed system.

11            Correct?

12     A.     That's correct.

13     Q.     So if oxygen is purged from the

14  railcar, VCM is then loaded, there's no way

15  for anything to get into the railcar

16  unintentionally, assuming the system stays

17  closed.

18            Right?

19            MR. BRAGA:  Object.

20            THE WITNESS:  That is correct.

21  QUESTIONS BY MR. GOMEZ:

22     Q.     So if they've done it

23  correctly, the end result of this whole

24  closed loading system is that you have

25  99.9 percent pure VCM.

1          Right?

2     A.     As long as --

3          MR. LEVINE:  Objection.

4          THE WITNESS:  As long as the

5     system is purged, yes.

6  QUESTIONS BY MR. GOMEZ:

7     Q.     As long as the system is purged

8  and as long as there's no breaches in the

9  closed system.

10          Right?

11     A.     That is correct.

12     Q.     We talked a little bit about

13  training, and you mentioned, I think, at one

14  point that some of the discussions involve

15  monomers and the polymerization of monomers,

16  at least generally or as a class of

17  chemicals.

18          Is that right?

19     A.     Yes, sir.

20     Q.     Another chemical that is

21  discussed in these trainings and refreshers

22  is styrene.

23          Right?

24     A.     Yes, sir.

25     Q.     Do you have personal experience

Confidential - Pursuant to Protective Order

```
 1   responding to derailments where styrene is a

 2   chemical of concern?

 3        A.     Yes, sir.

 4        Q.     Styrene is a polymerizable

 5   monomer.

 6               Right?

 7        A.     That is correct.

 8        Q.     Styrene is capable of

 9   polymerizing just by the application of heat.

10               Right?

11               MR. BRAGA:  Objection.

12               THE WITNESS:  It can.

13   QUESTIONS BY MR. GOMEZ:

14        Q.     And that's something that you

15   were taught or instructed on in the trainings

16   we discussed earlier?

17        A.     Yes, sir.

18               MR. BRAGA:  Objection.

19   QUESTIONS BY MR. GOMEZ:

20        Q.     Another chemical that I think

21   I've seen mentioned in some of the documents

22   is butadiene?

23        A.     Excuse me?

24        Q.     Butadiene?

25        A.     Butadiene, yes, sir.
```

Confidential - Pursuant to Protective Order

```
1          Q.      And do you have any personal
2    experience responding to derailments where
3    butadiene was the chemical of concern?
4          A.      Butadiene, yes, sir.
5          Q.      I neglected to ask.
6                  In connection with styrene, can
7    you estimate again for me how many incidents
8    you've been involved in personally where
9    styrene was the chemical of concern?
10                 MR. LEVINE:  Objection.
11                 THE WITNESS:  I can't recall.
12         A lot.
13   QUESTIONS BY MR. GOMEZ:
14         Q.      Roughly the same amount as VCM?
15   More or less?
16         A.      Over 42 years, a lot.
17         Q.      Fair enough.
18                 Same answer for butadiene?
19         A.      Butadiene, yes, sir.
20         Q.      Okay.  Butadiene is also a
21   polymerizable chemical.
22                 Right?
23         A.      That is correct.
24         Q.      And butadiene also can
25   polymerize on the application of heat alone.
```

Confidential - Pursuant to Protective Order

1                    Right?

2        A.       That is correct.

3        Q.       In fact, butadiene has a

4    relatively low temperature threshold for

5    polymerization.

6                    Right?

7                    MR. BRAGA:  Objection.

8                    THE WITNESS:  You'll have to

9        clarify what fairly low is.

10   QUESTIONS BY MR. GOMEZ:

11       Q.       Sure.

12                    Specifically, it can start to

13   polymerize at about 175 degrees Fahrenheit?

14       A.       That sounds about right, yes,

15   sir.

16       Q.       Now, when we talk about

17   polymerization through your training and the

18   refreshers, you understand that that's a

19   process whereby the bonds of these various

20   chemicals are broken and then form solids.

21                    It's a crude way of kind of

22   explaining the process.

23                    Right?

24       A.       Fairly well done, yes, sir.

25       Q.       Okay.  And it's these

Confidential - Pursuant to Protective Order

1   initiators or these catalysts that actually

2   break the bonds and start that process.

3              Right?

4       A.     Yes, sir.

5       Q.     So in the case of VCM, these

6   initiators or catalysts, they break one of

7   the chlorine bonds, leading to a reaction

8   that ultimately forms PVC.

9              Right?

10             MR. BRAGA:  Objection.

11             THE WITNESS:  Yes, sir.

12  QUESTIONS BY MR. GOMEZ:

13      Q.     Through your educations, your

14  trainings, your refreshers, have you come to

15  understand that unlike styrene and butadiene,

16  VCM does not polymerize on the application of

17  heat alone?

18             MR. BRAGA:  Object.

19             THE WITNESS:  Rephrase the

20      question.

21  QUESTIONS BY MR. GOMEZ:

22      Q.     Sure.

23             Through these -- through

24  education, your refreshers, your training

25  from, let's say, 1981 to the present, have

1    you come to understand that unlike styrene

2    and butadiene, VCM does not polymerize on the

3    application of heat alone?

4            MR. BRAGA:  Same objection.

5            THE WITNESS:  Heat alone can

6        initiate -- my understanding, heat

7        alone can initiate polymerization in

8        VCM.

9    QUESTIONS BY MR. GOMEZ:

10       Q.    And which training, refresher

11   or education from 1981 to the present do you

12   specifically recall discussing that concept?

13           MR. BRAGA:  Object.

14           THE WITNESS:  The VCM is a

15       polymerizable material.

16           And although oxygen is -- it's

17       oxygen purge -- the tank is oxygen

18       purged, that's when the car is running

19       down the tracks in normal operation,

20       going to and from a plant.

21           In a derailment situation,

22       things happen to cars.  Fires start

23       and heat is applied, and oxygen can

24       get into the tanks.

25           We deal with vinyl chloride as

1    a polymerizable material because based

2    on the SDS, it shows that a

3    polymerization can occur, is

4    potential.

5    QUESTIONS BY MR. GOMEZ:

6        Q.    So if I understood what you

7    said just now correctly, the training, the

8    refreshers, the education, they focus on the

9    polymerization of VCM in connection with heat

10   because in a derailment situation, there can

11   be a loss of containment that allows oxygen

12   to get in.

13           Is that right?

14       A.    That's correct.

15           MR. LEVINE:  Objection.

16   QUESTIONS BY MR. GOMEZ:

17       Q.    But if there's not a loss of

18   containment, and assuming that the tank was

19   purged properly before loading, oxygen

20   doesn't get in.

21           Right?

22           MR. LEVINE:  Objection.

23           THE WITNESS:  Possibly, yes,

24       sir.

25

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. GOMEZ:

 2        Q.     And assuming that oxygen does

 3   not infiltrate a derailed VCM tank car, heat

 4   alone will not polymerize that VCM.

 5               Correct?

 6   A.        Correct.

 7               MR. LEVINE:  Objection.

 8   QUESTIONS BY MR. GOMEZ:

 9        Q.     In fact, in terms of the

10   application of heat alone, you've been

11   educated or trained from 1981 to the present

12   that VCM is stable up to at least 500 degrees

13   Fahrenheit.

14               Right?

15               MR. LEVINE:  Objection.

16               MR. BRAGA:  Objection.

17               MR. LEVINE:  Sorry.

18               THE WITNESS:  We don't go to

19          the highest temperature.  We don't

20          discuss what the maximum temperature

21          would be.

22               We discuss heat in general

23          terms.  You apply heat to the product

24          itself, and bad things can happen.

25
```

1    QUESTIONS BY MR. GOMEZ:

2         Q.     So there's a discussion of heat

3    generally, but not in terms of any one

4    particular chemical at this particular

5    temperature will lead to polymerization?

6         A.     Correct.

7         Q.     So fair to say that from 1981

8    to the present, you've never received any

9    education or training specific to the

10   temperatures that may trigger VCM

11   polymerization?

12        A.     It's basically discussed in

13   low, medium and high temperatures.

14        Q.     What's a temperature range for

15   low?

16        A.     Ambient.

17        Q.     And what's a temperature range

18   when you say medium heat?

19        A.     A couple hundred, 300 degrees.

20   Upwards, it would be high.

21        Q.     So anything above 300 would be

22   high heat?

23        A.     Low, medium and high.

24        Q.     Understood.

25               I'm trying to get a sense of --

1    A.    I understand what you want.

2  I'm just telling you we don't talk about

3  specific temperature ranges.  It's low heat,

4  ambient, medium heat-ish, small fires, and

5  then large fires, lots of heat.

6    Q.    So there's no assignment of

7  specific temperatures to these three kind of

8  ranges?

9    A.    Correct.

10    Q.    In your training and education

11  from 1981 to the present, what heat category

12  does VCM fall into in connection with

13  polymerization?

14        MR. BRAGA:  Object.

15        THE WITNESS:  Medium to high.

16  QUESTIONS BY MR. GOMEZ:

17    Q.    From 1981 to the present,

18  throughout these trainings and education

19  courses and the like, what training have you

20  received about the signals that show VCM

21  polymerization in a railcar?

22        MR. BRAGA:  Object.

23        THE WITNESS:  Ask that question

24      again.

25

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    Sure.

3            Throughout these trainings,

4    from 1981 to the present, what instruction,

5    if at all, have you received about the types

6    of observations or the data that you can

7    gather to assess whether polymerization is

8    occurring in a derailed VCM car?

9            MR. BRAGA:  Same objection.

10            THE WITNESS:  When you have --

11        when you have heat, lots of heat,

12        applied, when your cars are involved

13        in pool fires and such, pressure

14        release devices begin to operate

15        around 247 and a half PSI,

16        approximately.

17            When PRDs, or pressure relief

18        devices, are going off, that means

19        it's absorbing heat from the outside,

20        reducing liquid volume, increasing

21        vapor space in the cars.

22    QUESTIONS BY MR. GOMEZ:

23        Q.    So in order to determine

24    whether VCM is polymerizing in a derailed

25    railcar, you're looking for, among other

1    things, PRD activation?

2        A.      PRD activation.

3               One of the keys that we use and

4    teach first responders is if PRDs are going

5    off, and they stop going off and there's no

6    major change in operations, you haven't

7    applied large volumes of water, extinguished

8    fires around the cars and the PRDs go off,

9    that's a sign, that's a signal, that

10   something potentially could be going wrong

11   inside that car.

12       Q.     So I want to focus just on the

13   activation rather than the activation and

14   then the sudden stopping.

15              Are you trained that the

16   activation of the PRDs alone is a sign or a

17   signal that polymerization is occurring in a

18   derailed VCM car?

19       A.      No, sir.

20       Q.      There are other explanations

21   for why the PRD in a derailed VCM car could

22   be activating.

23              Right?

24       A.      Yes, sir.

25       Q.      One of those explanations could

1    be heating resulting in an increase in

2    pressure without polymerization occurring.

3              Right?

4        A.    Yes, sir.

5        Q.    And to put a fine point on it,

6    there could be exposure to fires, for

7    example, that are increasing the heat and

8    therefore increasing the pressure in a

9    derailed VCM car without polymerization

10   occurring.

11             Right?

12       A.    Yes, sir.

13       Q.    In the trainings that you've

14   undergone since 1981 where -- what

15   instruction, if any, have you received about

16   the connection between PRD activation and

17   oxygen infiltration in a derailed railcar?

18             MR. BRAGA:  Object.

19             THE WITNESS:  We get a lot of

20       training about PRD activation and

21       things that can happen, that have been

22       seen to happen.

23   QUESTIONS BY MR. GOMEZ:

24       Q.    And what training do you recall

25   specific to the concept of oxygen

1    infiltration as a result of PRD activation?

2         A.    It's the discussion a lot, in a

3    lot of the classes.

4         Q.    Can you give me some examples

5    of what's discussed in that respect?

6         A.    When pressure is relieved from

7    a -- through a PRD, there is a time when

8    oxygen, depending on the atmosphere,

9    atmospheric conditions, locations, that

10   oxygen can be drawn back into the car.

11        Q.    Okay.  What are those

12   atmospheric conditions?

13        A.    High elevation, low elevation,

14   different conditions, high atmospheric

15   pressure, oxygen can migrate its way back

16   into the cars even during the PRD activation.

17        Q.    And who is it that has provided

18   the information or the data that leads to

19   that specific training about atmospheric

20   conditions allowing oxygen to infiltrate the

21   cars?

22             MR. LEVINE:  Objection.

23             MR. BRAGA:  Objection.

24             THE WITNESS:  Are you looking

25        for an instructor's name?

```
 1    QUESTIONS BY MR. GOMEZ:

 2         Q.      Sure, let's start there.

 3         A.      There's -- we go to a lot of

 4    training classes.  The Chlorine Institute

 5    has -- VCM is a mission chemical in

 6    transportation, so every other year, every

 7    third year, we have VCM-specific training.

 8                 We talk to manufacturers.  We

 9    deal with manufacturers across the country,

10    across North America, that handle VCM.  And

11    their emergency response teams and us train

12    together.  We talk together.

13                 When we have an incident, we

14    discuss specifics of what they've seen, what

15    we've seen, to get better in the industry.

16         Q.      But you don't recall anyone

17    specifically who you can testify to now

18    giving training or instruction about

19    atmospheric conditions allowing oxygen

20    infiltration via the PRD on the derailed VCM

21    car?

22                 MR. LEVINE:  Objection.

23                 THE WITNESS:  Correct.

24    QUESTIONS BY MR. GOMEZ:

25         Q.      You're aware that the VCM in
```

Confidential - Pursuant to Protective Order

1    the derailed railcars in the East Palestine

2    incident were -- contained stabilized VCM.

3                    Right?

4         A.       Correct.

5         Q.       Did you know that at the time

6    you first arrived on-scene?

7         A.       When I first arrived on-scene,

8    no, sir.

9         Q.       Did you learn that at any point

10   between when you first arrived on-scene and

11   the vent and burn on February 6 --

12        A.       Yes.

13        Q.       -- 2023?

14                 Can you estimate for me when

15   you first learned?

16        A.       Sunday -- Sunday morning,

17   probably.

18        Q.       So not too long after you first

19   arrived on-scene.

20                 Right?

21        A.       Correct.

22        Q.       And when you learned that the

23   VCM in the derailed railcars was stabilized,

24   did you learn specifically how it had been

25   stabilized?

1    A.    No, sir.

2    Q.    And am I correct that at least

3  as far as your training and experience goes,

4  it didn't really matter how it was stabilized

5  for purposes of your work at the site?

6         MR. BRAGA:  Object.

7         THE WITNESS:  That's correct.

8  QUESTIONS BY MR. GOMEZ:

9    Q.    So is it fair to say that when

10  you're responding to a derailment involving

11  VCM, you treat all the VCM cars the same?

12         MR. BRAGA:  Object.

13         MR. LEVINE:  Objection.

14         THE WITNESS:  Pretty much, yes,

15    sir.

16  QUESTIONS BY MR. GOMEZ:

17    Q.    And certainly for purposes of

18  determining whether polymerization is a

19  concern?

20    A.    Correct.

21    Q.    And that treatment really boils

22  down to whether there's a significant amount

23  of heat being introduced to the cars.

24         Right?

25         MR. LEVINE:  Objection.

Confidential - Pursuant to Protective Order

```
 1                 MR. BRAGA:  Objection.

 2                 THE WITNESS:  That's correct.

 3     QUESTIONS BY MR. GOMEZ:

 4         Q.      And while you treat all

 5     derailed VCM cars the same for purposes of

 6     responding to concerns of polymerization, you

 7     agree with me that you can't treat cars

 8     containing VCM the same as cars containing

 9     other monomers.

10                 Right?

11         A.      That's correct.

12         Q.      Because not all monomers are

13     the same.

14                 Right?

15         A.      Correct.

16         Q.      They have different properties.

17                 Right?

18         A.      They do.

19         Q.      Different reactivity?

20         A.      Yes, sir.

21         Q.      Different polymerization

22     characteristics.

23                 Right?

24         A.      Yes, sir.

25         Q.      Different pressure curves.
```

Confidential - Pursuant to Protective Order

```
1              Right?
2      A.      Yes, sir.
3      Q.      Pressure curves are certainly
4  something that you're aware of in a
5  derailment situation.
6              Right?
7      A.      Yes, sir.
8      Q.      And if all monomers are not the
9  same, it's important to understand the
10 specific chemical properties of the monomer
11 you're dealing with in any given derailment
12 situation.
13             Right?
14             MR. LEVINE:  Objection.
15             THE WITNESS:  Correct.
16 QUESTIONS BY MR. GOMEZ:
17     Q.      So in the case of East
18 Palestine, it was important to understand the
19 specific properties of the VCM contained in
20 the cars that derailed.
21             Right?
22             MR. LEVINE:  Objection.
23             THE WITNESS:  VCM in East
24     Palestine was dealt with as it was
25     potentially polymerizing due to the
```

Confidential - Pursuant to Protective Order

1    heat.

2    QUESTIONS BY MR. GOMEZ:

3        Q.    My question is just a little

4    bit different.

5             It's important to understand in

6    connection with the East Palestine derailment

7    the specific properties of the VCM contained

8    in those cars.

9             Correct?

10            MR. LEVINE:  Objection.

11            THE WITNESS:  Based on the SDS,

12       we dealt with it as designed, yes,

13       sir.

14   QUESTIONS BY MR. GOMEZ:

15       Q.    You mentioned just now,

16   actually, the SDS.

17            Fair to say that that was a

18   reliance document for the HAZMAT response in

19   East Palestine derailment?

20       A.    Yes, sir.

21       Q.    Was it the primary reliance

22   document?

23            MR. BRAGA:  Object.

24            THE WITNESS:  It was one of the

25       documents used.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    Okay.  Can you name the other

3    ones for me that you recall?

4        A.    Condensed Chemical Dictionary.

5    OxyChem.  Oxy Vinyls' SDS.  DOT guidebook.

6    WISER.  It's a program.

7              There were probably some other

8    ones, but those are the ones that come to

9    mind.

10       Q.    Okay.  In your line of work,

11   you deal with SDS's frequently.

12             Fair statement?

13       A.    Yes.

14       Q.    SDS, by the way, stands for

15   safety data sheet?

16       A.    Yes, sir.

17       Q.    And the safety data sheet is

18   actually a standardized document.

19             Right?

20       A.    That it is.

21       Q.    It's an OSHA requirement, I

22   believe?

23       A.    Yes, sir.

24       Q.    And it's designed to provide

25   the same type of information in a uniform

Confidential - Pursuant to Protective Order

1    manner for any type of hazardous chemical.

2            Right?

3            MR. LEVINE:  Objection.

4            MR. BRAGA:  Objection.

5            THE WITNESS:  Yes, sir.

6    QUESTIONS BY MR. GOMEZ:

7        Q.    The SDS is also a document that

8    applies to a wide variety of scenarios.

9            Right?

10           MR. LEVINE:  Objection.

11           THE WITNESS:  I don't

12       understand your question.

13   QUESTIONS BY MR. GOMEZ:

14       Q.    Sure.

15           An SDS isn't specific to a

16   derailment.

17           Right?

18       A.    That's correct.

19       Q.    An SDS isn't created

20   specifically for rail transportation?

21       A.    An SDS is created for

22   information.

23       Q.    There's one SDS created for one

24   type of chemical.

25           Right?

```
 1        A.      Correct.
 2        Q.      And that's used across a
 3   variety of industries.
 4                Right?
 5                MR. LEVINE:  Objection.
 6                THE WITNESS:  Yes, sir.
 7   QUESTIONS BY MR. GOMEZ:
 8        Q.      Across a variety of HAZMAT
 9   incidents.
10                Right?
11        A.      Yes, sir.
12        Q.      It's always the same document?
13                MR. LEVINE:  Objection.
14                THE WITNESS:  It's -- yes, it's
15        a 16-section document.
16   QUESTIONS BY MR. GOMEZ:
17        Q.      And you mentioned that it's
18   a -- one of the reliance documents.
19                In the East Palestine
20   derailment, were there particular sections
21   that were relied on in the East Palestine
22   derailment?
23                MR. LEVINE:  Objection.
24                THE WITNESS:  Yes, sir.
25
```

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. GOMEZ:

 2        Q.     Which sections were those?

 3        A.     1 through 16.

 4        Q.     So the whole document?

 5        A.     Yes, sir.

 6        Q.     Right?

 7               So if you were relying on the

 8   whole document, you agree with me it's

 9   important to read the whole document.

10               Right?

11        A.     Yes, sir.

12        Q.     And to understand the document

13   as a whole.

14               Right?

15        A.     Yes, sir.

16               (Day Exhibit 1 marked for

17          identification.)

18   QUESTIONS BY MR. GOMEZ:

19        Q.     Let's pull up Document

20   Number 30, which we'll mark as Exhibit 1 to

21   Mr. Day's deposition.

22               Mr. Day, our court reporter is

23   going to put a sticker on it, and then you'll

24   have a copy.

25               Mr. Day, when I -- just as a
```

Confidential - Pursuant to Protective Order

1  general instruction, when I show you

2  documents today, feel free to take a look at

3  them before I ask you questions.  I'm not

4  going to repeat that over and over again.

5           Let me know when you're ready

6  for me to ask some questions about that

7  document in front of you.

8           MR. BRAGA:  While he's doing

9       that, can somebody tell me again what

10      the exhibit number was?

11          MR. GOMEZ:  This is 1.

12          MR. BRAGA:  It's a good place

13      to start.

14          MR. GOMEZ:  Got to start

15      somewhere.

16  QUESTIONS BY MR. GOMEZ:

17      Q.    Mr. Day, if you want to spend

18  some time with the document, just let me

19  know.  We'll go off the record while you do

20  that.

21      A.    No, that's okay.

22      Q.    Are you ready for me to ask

23  questions?

24      A.    No, not yet.

25          Okay.

1    Q.    The document that we've marked

2  as Exhibit 1 to your deposition, on the cover

3  page, it's actually the Group D, Exhibit 26

4  to the NTSB investigative hearings.

5         Do you see that?

6    A.    Yes, sir.

7    Q.    And the title provided, at

8  least by the NTSB, is "Vinyl Chloride Monomer

9  Safety Data Sheet."

10        Right?

11   A.    Yes, sir.

12   Q.    As we get into the substance of

13 the document itself, the document is the Oxy

14 Vinyls safety data sheet for vinyl chloride

15 monomer.

16        Right?

17   A.    Yes, sir.

18   Q.    Looking just at the title, it

19 says, "Vinyl Chloride, parentheses, Monomer."

20        Right?

21   A.    Yes, sir.

22   Q.    This SDS is not specific to VCM

23 in a stabilized form.

24        Right?

25   A.    This is an SDS for vinyl

Confidential - Pursuant to Protective Order

```
 1    chloride monomer.

 2         Q.     And vinyl chloride monomer can

 3    exist in an unstable form and a stable form.

 4                Right?

 5         A.     Sure.

 6         Q.     And this SDS applies equally to

 7    both.

 8                Right?

 9         A.     Correct.

10         Q.     If we look --

11         A.     Let me rephrase that.  I

12    believe so.

13         Q.     You believe so?  Okay.

14         A.     I believe so.

15         Q.     Let's take a look at some of

16    the statements made in the -- in the

17    document.

18                On page 2 -- it's at the

19    bottom.  That's what I'll be referring to, 2

20    of 18.

21         A.     Yes, sir.

22         Q.     There's a -- there's a

23    statement towards the middle of the page.  It

24    says, "Physical hazards."

25                Do you see that?
```

Confidential - Pursuant to Protective Order

```
 1         A.     Yes, sir.
 2         Q.     And it reads, "May mass explode
 3  in fire.  Extremely flammable gas.  Contains
 4  gas under pressure.  May explode if heated.
 5  Polymerization can occur."
 6                Did I read that correctly?
 7         A.     Yes, sir.
 8         Q.     When you testified that this
 9  document, the Oxy Vinyls SDS, is one that you
10  relied on in responding to the derailment, is
11  that statement one of the statements in the
12  SDS you relied on?
13         A.     Yes, sir.
14         Q.     Let's go to the, let's see, the
15  fourth page.  And I'll direct you -- just a
16  little bit below the top, there's a section
17  that says, "Physical Hazards Not Otherwise
18  Classified."
19                Do you see that?
20         A.     Yes, sir.
21         Q.     And it says, "Polymerization
22  can occur."
23                Right?
24         A.     Yes, sir.
25         Q.     Is that also a statement from
```

 1    the SDS that you relied on in responding to

 2    the East Palestine derailment?

 3         A.    That is a statement in the SDS,

 4    yes, sir.

 5         Q.    Okay.  But is it a statement

 6    that you relied on in responding to the East

 7    Palestine derailment?

 8         A.    It's a statement that's in the

 9    SDS.

10         Q.    So because you relied on the

11    SDS, you relied on that statement.

12               Is that fair?

13         A.    Fair enough.

14         Q.    And a similar statement appears

15    on page 6, right above the section header for

16    Section 6.

17               Let me know if you see that.

18         A.    Page 6, yes, sir.

19         Q.    Page 6, right above where it

20    says, "Section 6, Accidental Release

21    Measures," there's a section that says,

22    "Physical Hazards Not Otherwise Classified."

23               Right?

24         A.    Yes, sir.

25         Q.    And that's the same one that we

Confidential - Pursuant to Protective Order

1    just read, polymerization can occur.

2              Right?

3        A.    It's a different page, but it's

4    the same statement.

5        Q.    Sure.

6              And we see that statement again

7    on page 8, right towards the top.  Let me

8    know if you see that.

9        A.    Yes, sir.

10       Q.    And lastly, on page 10 there's

11   a section titled "Hazardous Polymerization."

12             Can you see -- tell me if you

13   see that.

14       A.    Yes, sir.

15       Q.    And that section is actually

16   under a larger section called Section 10,

17   Stability and Reactivity.

18             Right?

19       A.    Yes, sir.

20       Q.    And if we read it, it says,

21   "Polymerization can occur.  Exposure to the

22   following conditions or mixtures with the

23   following elements and materials can cause

24   explosive or violent polymerization of VCM:

25   air, sunlight, excessive heat, oxidizers,

Confidential - Pursuant to Protective Order

1  catalytic metals such as copper, aluminum and

2  their alloys and certain catalytic

3  impurities.  Avoid elevated temperatures,

4  oxidizing agents, oxides of nitrogen, oxygen,

5  peroxides, other polymerization

6  catalysts/initiators, air and sunlight."

7           Did I read that correctly?

8      A.    Yes, sir, you did.

9      Q.    That section that we just read,

10 Hazardous Polymerization within Section 10 of

11 the Oxy Vinyls SDS, is that specifically a

12 part of the SDS that you relied on in

13 responding to the derailment?

14     A.    Yes, sir.

15     Q.    Okay.  If we go back to the

16 beginning of the document, you testified a

17 moment ago that you relied on the whole SDS.

18           Right?

19     A.    Yes, sir.

20     Q.    Sections 1 through 16.

21     A.    Yes, sir.

22     Q.    Right?

23           And that in order to rely on

24 that whole document, you have to read the

25 document as a whole.

1          Right?

2     A.     That's correct.

3     Q.     So let's look at some other

4  statements about polymerization.

5     A.     No problem.

6     Q.     There is a section there,

7  precautionary statement, on page 2.

8          Do you see that?

9     A.     Yes, sir.

10    Q.     It says -- second sentence

11 says, "Requires stabilizer to prevent

12 potential dangerous polymerization."

13         Do you see that?

14    A.     Yes, sir.

15    Q.     Is that a statement that you

16 relied on in connection with the response to

17 the East Palestine derailment?

18    A.     The stable -- yes, sir.  Stick

19 with that.

20    Q.     Page 3.  There's a section

21 entitled "GHS - Precautionary Statement(s) -

22 Prevention."

23         Do you see that, toward the

24 middle of the page?

25    A.     Yes, sir.

1    Q.    And the second bullet point

2  reads, "Stabilize with a polymerization

3  inhibitor," parentheses, chemical name which

4  I will omit, "or purging to remove oxygen."

5         With the exception of the

6  omission, did I read that correctly?

7    A.    Yes, sir.

8    Q.    Is that a statement that you

9  also relied on in this SDS in the course of

10  responding to the East Palestine derailment?

11    A.    I couldn't say that I was -- it

12  was used.

13    Q.    But it's in one of the 16

14  sections of the SDS.

15         Right?

16    A.    That is correct.

17    Q.    And you relied on the whole

18  SDS.

19         Right?

20    A.    Yes, sir.

21    Q.    Let's skip down to page 10,

22  that section we were just discussing,

23  Section 10, Stability and Reactivity.

24    A.    Yes, sir.

25    Q.    Very top section reads,

```
1    "Chemical Stability:  Generally stable at

2    normal temperatures and pressures; however,

3    may violently polymerize or generate other

4    hazardous conditions when not stabilized

5    and/or stored correctly."

6            Did I read that correctly?

7       A.     Yes, sir.

8       Q.     Is this a section that you

9    relied on in the course of responding to the

10   East Palestine derailment?

11      A.     It's in the document, yes, sir.

12      Q.     So the answer is, yes, you did

13   rely on it?

14      A.     The document, yes, sir.

15      Q.     And this is a statement in the

16   document.

17            Right?

18      A.     Okay.  This is going to be a

19   long, long day if we're going to keep going

20   back to this exact same discussion.

21            We used the entire document.

22   We had different people reading this

23   document.  We used different sections of it,

24   yes, sir.

25      Q.     Okay.  I agree it'll be a long,
```

Confidential - Pursuant to Protective Order

1    long day, so my question is simply:  If this

2    statement is in the document and you relied

3    on the whole document, can you confirm, yes

4    or no, that you relied on the statement under

5    the Chemical Stability heading on page 10?

6              MR. LEVINE:  Objection.

7              MR. BRAGA:  Objection.

8              THE WITNESS:  I don't know that

9         we used that specific document -- or

10        documentation, the statements, the

11        wording.  I don't know that we read

12        that specific spot.  Yes, we used the

13        document.

14   QUESTIONS BY MR. GOMEZ:

15        Q.    Okay.  Would that be the same

16   answer for the next section, Reactivity?

17        A.    Yes, sir.

18        Q.    And that reads, "Explosive or

19   violent polymerization can occur when exposed

20   to air, sunlight or excessive heat if not

21   properly stabilized."

22              Right?

23        A.    Yes, sir.

24        Q.    And you'll agree with me that

25   that's a statement in the SDS.

Confidential - Pursuant to Protective Order

```
 1              Right?
 2     A.       Yes, sir.
 3     Q.       Now, at any point in time when
 4  you were responding to the East Palestine
 5  derailment, do you recall any HAZMAT
 6  responders expressing confusion about the
 7  SDS?
 8              MR. BRAGA:  I'm sorry, can you
 9        read that back or restate it?
10              MR. GOMEZ:  Sure.
11              Why don't I just ask it again.
12              MR. BRAGA:  Whatever.
13  QUESTIONS BY MR. GOMEZ:
14     Q.       At any point in time while you
15  were responding to the derailment, do you
16  recall discussion amongst the HAZMAT
17  responders about confusion generated by this
18  SDS?
19     A.       There was a lot of discussion.
20  You have to define what responding to.  Are
21  we responding mobilizing to the site?  Are we
22  working on the site?  What part are you
23  talking about?
24     Q.       Sure.
25              At any point in time between
```

Confidential - Pursuant to Protective Order

1    when you first arrived on-site the morning of

2    February 5th to the time of the vent and

3    burn, that's what I'm referring to.

4         A.     Yes, there was a lot of

5    confusion.

6         Q.     Okay.  Specifically confusion

7    about the document.

8              Right?

9         A.     And statements from folks about

10   the stabilization of the material, yes, sir.

11        Q.     And this document, as you

12   understand it, was written by Oxy Vinyls.

13            Right?

14        A.     That's correct.

15        Q.     And this document actually

16   provides contact information so that you can

17   discuss the SDS with Oxy Vinyls.

18            Right?

19        A.     That is correct.

20            MR. LEVINE:  Objection.

21   QUESTIONS BY MR. GOMEZ:

22        Q.     And you, in fact, were in

23   communication with Oxy Vinyls between when

24   you arrived on-site and the vent and burn.

25            Right?

Confidential - Pursuant to Protective Order

```
 1        A.      That is correct.

 2        Q.      In fact, there were

 3   representatives of Oxy Vinyls on the site

 4   physically.

 5                Right?

 6        A.      There were.

 7        Q.      Did you ever express to the

 8   folks at Oxy Vinyls, whether physically in

 9   East Palestine or otherwise, that you were

10   confused about the statements made in the

11   SDS?

12        A.      Yes, sir.

13        Q.      When?

14        A.      The first day.  Sunday.

15        Q.      Sunday morning?  Sunday

16   afternoon?

17        A.      Sunday morning.

18        Q.      Who did you express that to?

19        A.      The three folks that were there

20   from Oxy.

21        Q.      Do you recall roughly what

22   time?

23        A.      I don't remember what time they

24   showed up.  I know we had a conversation in a

25   conference call early that morning with the
```

1   folks from Dallas, and later on during the

2   day, the time I don't know, some people

3   were -- a specific person said that

4   polymerization cannot occur.  Made us scratch

5   our heads.

6             And reverting back to previous

7   training, polymerization could occur.  And

8   when the Oxy folks showed up on-site, they

9   were confused with the discuss -- with that

10  statement as well.

11      Q.     When you refer to the Oxy

12  folks, you're referring to the three

13  gentlemen who were on-site?

14      A.     Yes, sir.

15      Q.     And I want to make sure I

16  understand what you testified to.

17             They also expressed confusion

18  about the SDS?

19      A.     They expressed confusion about

20  the statement about the material would not

21  polymerize.

22      Q.     But regardless of who had that

23  confusion, whether it was the three

24  representatives in the field or the first

25  responders, you were in communication with

Confidential - Pursuant to Protective Order

```
 1    experts at Oxy about this document.

 2                    Right?

 3                    MR. LEVINE:  Objection.

 4                    MR. BRAGA:  Object to the form.

 5                    THE WITNESS:  That's correct.

 6    QUESTIONS BY MR. GOMEZ:

 7         Q.    And do you recall anyone asking

 8    those folks pointedly how to reconcile any

 9    confusion or inconsistencies about

10    polymerization in this document?

11                    MR. LEVINE:  Objection.

12                    MR. BRAGA:  Objection.

13                    THE WITNESS:  I don't recall.

14    QUESTIONS BY MR. GOMEZ:

15         Q.    But you do recall that on

16    several occasions, the experts in VCM and

17    this document stated polymerization was not

18    occurring.

19                    Right?

20                    MR. LEVINE:  Objection.

21                    THE WITNESS:  I heard several

22         people say that, yes, sir.

23    QUESTIONS BY MR. GOMEZ:

24         Q.    And that would be the folks in

25    Dallas, Texas.
```

Confidential - Pursuant to Protective Order

```
 1                    Right?
 2       A.      That's correct.
 3       Q.      Who are experts in VCM?
 4               MR. BRAGA:  Objection.
 5               MR. LEVINE:  Objection.
 6               THE WITNESS:  I don't know if
 7       they're experts in VCM or not.
 8   QUESTIONS BY MR. GOMEZ:
 9       Q.      Fair enough.
10               They're certainly the
11   manufacturers of the product in the railcars.
12               Right?
13       A.      That, they are.
14               MR. LEVINE:  Objection.
15   QUESTIONS BY MR. GOMEZ:
16       Q.      And the authors of this SDS?
17               MR. LEVINE:  Objection.
18               THE WITNESS:  Someone within
19       Oxy is the author, yes, sir.
20   QUESTIONS BY MR. GOMEZ:
21       Q.      Let's put that one aside.  And
22   I think you mentioned also relying on, I
23   think you called it, the DOT guide.
24               Is that right?
25       A.      Yes, sir.
```

 1      Q.      Is that also known as the

 2  Emergency Response Guide?

 3      A.      Yes, sir.

 4              (Day Exhibit 2 marked for

 5      identification.)

 6  QUESTIONS BY MR. GOMEZ:

 7      Q.      Let's pull up Document

 8  Number 119, and we'll mark that as Exhibit 2.

 9              MR. GOMEZ:  Why don't we

10      actually go off record and we'll take

11      a ten-minute break.

12              VIDEOGRAPHER:  The time is

13      10:02 a.m., and we're going off the

14      record.

15       (Off the record at 10:02 a.m.)

16              VIDEOGRAPHER:  The time is

17      10:13 a.m., and we're back on the

18      record.

19  QUESTIONS BY MR. GOMEZ:

20      Q.      Mr. Day, we marked Exhibit 2 to

21  your deposition before we took a break, but I

22  do to want to revisit one topic very briefly

23  before we discuss this exhibit.

24              We talked about your training

25  regarding oxygen infiltration before the

Confidential - Pursuant to Protective Order

1   break.

2              Am I correct that none of your

3   training from 1981 to the present has

4   indicated that if oxygen infiltrates a

5   derailed VCM car, it's the oxygen that can

6   cause the polymerization reaction to occur?

7              MR. LEVINE:  Objection.

8              THE WITNESS:  You need to ask

9        that question again.  I'm --

10  QUESTIONS BY MR. GOMEZ:

11       Q.     Sure.

12       A.     -- lost.

13       Q.     We talked about oxygen

14  infiltration.

15              Remember that?  Right?

16       A.     Yes, sir.

17       Q.     In any of your training, HAZMAT

18  training, from 1981 to the present, have you

19  been told or learned that the oxygen is

20  itself what initiates the polymerization

21  reaction with VCM?

22       A.     I've learned that oxygen can

23  enter the car, yes, sir.

24       Q.     Okay.  Enter the car.

25              I'm just specific to whether

Confidential - Pursuant to Protective Order

1    it's the oxygen that starts the

2    polymerization reaction in a VCM car.

3         A.    I don't know.

4         Q.    You were a panelist on the NTSB

5    hearings in East Palestine in June of 2023.

6              Right?

7         A.    Yes, sir.

8         Q.    One of your fellow panelists

9    was Dr. William Carol.

10             Do you remember that?

11        A.    Yes, sir.

12        Q.    Dr. Carol is a chemist?

13        A.    I believe so, yes, sir.

14        Q.    And he made several statements

15   about the chemistry and -- chemistry and the

16   properties of VCM.

17             My question to you is, do you

18   recall disagreeing with any of the statements

19   he made about the chemistry of VCM?

20             MR. LEVINE:  Objection.

21             MR. BRAGA:  Objection.

22             THE WITNESS:  Formally

23        disagreeing, no, sir.

24   QUESTIONS BY MR. GOMEZ:

25        Q.    How about informally

Confidential - Pursuant to Protective Order

1    disagreeing?

2         A.     Yes, because several times he

3    stated that he didn't know why the statement

4    of polymerization potential was on the SDS.

5         Q.     Okay.  So if you took issue, it

6    was with his statements about some of the

7    comments that are in the SDS?

8         A.     Correct.

9                MR. LEVINE:  Objection.

10   QUESTIONS BY MR. GOMEZ:

11        Q.     Was there anything else that

12   you recall taking exception to or disagreeing

13   with in what Dr. Carol said about the

14   chemistry of VCM?

15               MR. LEVINE:  Objection.

16               THE WITNESS:  I'd have to refer

17        back to read his document -- or his

18        testimony.

19   QUESTIONS BY MR. GOMEZ:

20        Q.     But fair to say nothing stands

21   out right now?

22        A.     Right now --

23               MR. LEVINE:  Objection.

24               THE WITNESS:  -- no, sir.

25

```
 1   QUESTIONS BY MR. GOMEZ:

 2       Q.    Let's look at document -- well,

 3   Exhibit Number 2.

 4             Mr. Day, this is the Group C,

 5   Exhibit 3 to the NTSB hearings.

 6             Right?

 7       A.    Yes, sir.

 8       Q.    And the title is "Emergency

 9   Response Guide, parentheses, ERG, 2020, Guide

10   116, Vinyl Chloride."

11             Right?

12       A.    Flammable gas unstable.

13       Q.    This document, specifically

14   Guide 116 from the 2020 ERG, is this another

15   reliance document in the course of responding

16   to the derailment?

17       A.    This is a couple pages from

18   that, yes, sir.

19       Q.    And these are the pages that

20   are specific to VCM.

21             Right?

22             MR. BRAGA:  Objection.

23             THE WITNESS:  I need to see the

24       book.

25
```

1    QUESTIONS BY MR. GOMEZ:

2         Q.    Okay.  You don't know that 116P

3    is the designation for VCM?

4         A.    Correct.

5         Q.    I'll represent to you that 116P

6    is the -- is the designation for VCM.

7              So if you can assume that for

8    purposes of my questions, I've just got a

9    couple for you on this document.

10             MR. LEVINE:  Objection.

11   QUESTIONS BY MR. GOMEZ:

12        Q.    Looking at this ERG --

13        A.    Hang on just one second.  I

14   need to see the book.  I don't know that 116

15   is -- this -- you got to understand, DOT

16   guidebook is -- it's a book that first

17   responders use for information.  You get a --

18   you look at the chemical, whether the name of

19   the chemical or the UM number, and it takes

20   you to a guide.

21             The guides are -- these guides

22   are set up lumping several chemicals as one,

23   into one guide.  Like this one is for

24   acetylene as well.

25        Q.    Okay.  That's actually my

1    question.  Right?

2              These guides, including looking

3    this one we're looking at, 116, they just

4    don't apply to just one particular chemical.

5              Right?

6              MR. BRAGA:  Objection.

7              THE WITNESS:  That is correct.

8    QUESTIONS BY MR. GOMEZ:

9         Q.    Right.

10             They apply to several that fall

11   within a particular categorization or

12   classification.

13             Right?

14             MR. BRAGA:  Object.

15             THE WITNESS:  Yes, sir.

16   QUESTIONS BY MR. GOMEZ:

17        Q.    In this case, the guide we're

18   looking at, Guide 116, applies to Gases -

19   Flammable (Unstable).

20             Right?

21        A.    I'm going to have to take your

22   word for it, yes, sir.

23        Q.    Well, I'm just reading the top

24   of the guide.

25             Do you agree with me that

1  that's what it says?

2          MR. LEVINE:  Objection.

3          THE WITNESS:  I agree that

4      that's what it says.

5  QUESTIONS BY MR. GOMEZ:

6      Q.    Okay.  That's my only question.

7          And it also says, if we look

8  underneath fire or explosion, there's a

9  bullet point that reads, "Those substances

10  designated with a P may polymerize

11  explosively when heated or involved in a

12  fire."

13          Did I read that correctly?

14      A.    Yes, sir.

15      Q.    My question is, is there

16  anything in these two pages of the ERG that

17  we're looking at that specifically identifies

18  vinyl chloride monomer?

19      A.    No, sir.

20      Q.    And is there anything in these

21  two pages that we're looking at of the 2020

22  ERG that specifically discusses stabilized

23  vinyl chloride monomer?

24      A.    Not that I know of, no, sir.

25      Q.    Okay.  And in these two pages

1  of Guide 116 to the 2020 ERG, do you see any

2  statements that talk about how stabilization

3  affects the ability of flammable gases to

4  polymerize?

5            MR. BRAGA:  Object.

6            THE WITNESS:  I'll refer back

7        to the very beginning.  I don't know

8        that 116 is the guidebook guide for

9        vinyl chloride in the DOT guidebook.

10  QUESTIONS BY MR. GOMEZ:

11       Q.    My question is not about vinyl

12  chloride.  I'm going to ask it generally.

13            Do you see any statements in

14  the two pages of Guide 116 to the 2020 ERG

15  that talk about how stabilization interacts

16  with the potential for polymerization?

17       A.    I'll need to read this.

18            No, sir.

19       Q.    We can put that one aside.

20            We discussed CHLOREP earlier.

21            Do you remember that?

22       A.    Yes, sir.

23       Q.    And that's part of The Chlorine

24  Institute?

25       A.    It's a division within The

Confidential - Pursuant to Protective Order

1    Chlorine Institute.  Or a group within The

2    Chlorine Institute.

3          Q.     And SRS is an associate member

4    of The Chlorine Institute.

5                 Right?

6          A.     Yes, sir.

7          Q.     As an associate member of The

8    Chlorine Institute, or SRS as an associate

9    member of The Chlorine Institute, are you

10   familiar with the Pamphlet 171 on vinyl

11   chloride monomer?

12         A.     There is a pamphlet about VCM,

13   yes, sir.

14                (Day Exhibit 3 marked for

15         identification.)

16   QUESTIONS BY MR. GOMEZ:

17         Q.     Okay.  Let's bring up

18   Document 112.  We'll mark that as Exhibit 3.

19                And, Mr. Day, I will tell you

20   that I'm going to direct your attention to

21   just a handful of pages that start roughly

22   halfway through the packet.

23                The first slide is titled "VCM

24   Workshop."

25                MR. LEVINE:  There's no page

Confidential - Pursuant to Protective Order

```
1        numbers?

2               MR. GOMEZ:  Unfortunately, no.

3        It's 58 of the PDF, but that's not

4        going to help you much.

5               Yep, you found it.

6    QUESTIONS BY MR. GOMEZ:

7        Q.     My question to you, Mr. Day,

8    is, the page that you're looking at

9    references the Transportation & Emergency

10   Workshop held July 13, 2016, in Calvert City,

11   Kentucky, Westlake host.

12              Do you see that?

13       A.     I do.

14       Q.     Is this a workshop that you

15   attended?

16       A.     Obviously, yes, sir.

17       Q.     Right?

18              Your name is listed there, and

19   next to it is USES.

20              Right?

21       A.     Yes, sir.

22       Q.     What's USES?

23       A.     United States Environmental

24   Services.

25       Q.     Is that at the time your
```

1    employer?

2         A.    That is.

3         Q.    And there's also a reference to

4    a Drew McCarty.

5              Do you see that?

6         A.    Yes, sir.

7         Q.    And next to his name is SPSI.

8              Right?

9         A.    That's correct.

10        Q.    SPSI is one of the contractors

11   that responded to the derailment in East

12   Palestine.

13             Right?

14        A.    Yes, sir.

15        Q.    And specifically Mr. McCarty

16   responded to the derailment.

17             Right?

18        A.    That's correct.

19        Q.    The next page of this

20   presentation references the VCM workshop at

21   the top and notes a "Detailed discussion of:

22   Physical & Chemical Properties."

23             Do you see that?

24        A.    Yes, sir.

25        Q.    Do you recall participating in

Confidential - Pursuant to Protective Order

1    a Chlorine Institute workshop in or around

2    2016 where you discussed VCM physical and

3    chemical properties?

4        A.    I remember the class,

5    basically, yes.

6        Q.    The last bullet point of that

7    page notes, "Discussion will be used as a

8    baseline for pamphlet development."

9              Do you see that?

10       A.    Yes, sir.

11       Q.    Did you participate in The

12   Chlorine Institute's preparation of any

13   pamphlets regarding vinyl chloride monomer?

14       A.    I don't recall.

15       Q.    Okay.  We can put that one

16   aside.

17             MR. BRAGA:  The whole exhibit?

18             MR. GOMEZ:  Yes.

19             MR. BRAGA:  Okay.

20             (Day Exhibit 4 marked for

21        identification.)

22   QUESTIONS BY MR. GOMEZ:

23       Q.    Let's bring up Document

24   Number 32, which we'll mark as Exhibit 4.

25             Let's actually scratch that,

1    Gina.

2              Can you bring up Document

3    Number 137, which we'll mark as Exhibit 4?

4              Mr. Day, this Exhibit 4 that

5    we've just handed to you is Pamphlet 171 from

6    The Chlorine Institute titled "Vinyl Chloride

7    Monomer VCM Tank Car & Cargo Tank Handling

8    Manual."

9              Do you see that?

10   A.      I do.

11   Q.      It appears to be roughly a

12   63-page document.

13             My question to you is, is this

14   document that we've marked as Exhibit 4 one

15   of the documents that you relied on in the

16   East Palestine -- in responding to the East

17   Palestine derailment?

18   A.      Information in it, yes, sir.

19   Q.      I want to go through some of

20   that information to understand what it was

21   exactly that you relied on.

22             On page -- the page numbers are

23   marked on the top right corner, just for your

24   information.

25             On page 3, there's a section

1    that says -- that's 1.5, Disclaimer.

2              Do you see that?

3        A.    Yes, sir.

4        Q.    And there's a sentence that

5    begins with the word "moreover" and reads,

6    "Moreover, it should not be assumed that

7    every acceptable procedure is included or

8    that special circumstances may not warrant

9    modified or additional procedure.  The user

10   should be aware that changing technology or

11   regulations may require a change in the

12   recommendations herein."

13             Did I read that correctly?

14       A.    Yes, sir.

15       Q.    When you were relying on

16   certain information in this document,

17   Pamphlet 171, were you aware of this

18   disclaimer?

19       A.    I don't pay that much attention

20   to the disclaimers, no, sir.

21       Q.    Okay.  Let's look at page 4.

22             There's Section 2.2, VCM and

23   Transportation.

24             Do you see that?

25       A.    Yes, sir.

Confidential - Pursuant to Protective Order

1    Q.    And the last sentence of that

2  section reads, "VCM is shipped as a

3  compressed liquified gas and must be

4  stabilized by appropriate means, such as the

5  addition of a chemical inhibitor or purging

6  to remove oxygen, to prevent dangerous

7  polymerization," parentheses, several

8  regulations.

9          Did I read that right?

10   A.    Yes, sir.

11   Q.    Is this statement in

12 Section 2.2 a statement that you relied on in

13 the course of responding to the East

14 Palestine derailment?

15   A.    It's a statement in this

16 document, yes, sir.  I don't know that we

17 used that specific statement or concerned

18 about it.

19   Q.    Section 2.3, right below that,

20 Polymerization and Other Reaction

21 Considerations.

22          Do you see that section?

23   A.    Yes, sir.

24   Q.    It reads, "VCM is shipped in a

25 stabilized state and is generally stable at

1    normal temperatures and pressures."

2              Right?

3        A.    Yes, sir.

4        Q.    It goes on to say, "However,

5    certain conditions or mixtures with certain

6    materials can cause VCM to violently

7    polymerize or other hazardous conditions."

8              Right?

9        A.    It does.

10       Q.    The next sentence, "Exposure to

11   the following conditions or mixtures with the

12   following elements and materials can cause

13   explosive or violent polymerization of VCM."

14             Right?

15       A.    That's correct.

16       Q.    And one of the bullet points is

17   excessive heat.

18             Do you see that?

19       A.    That's correct.

20       Q.    Are these statements statements

21   that you relied on in the course of

22   responding to the East Palestine derailment?

23       A.    We -- yes, sir.

24       Q.    The document doesn't define

25   what excessive heat is.

Confidential - Pursuant to Protective Order

```
1                    Do you agree with me on that?
2          A.       Yes, sir.
3          Q.       What did you take excessive
4    heat to mean in this context?
5          A.       Excessive heat.
6          Q.       How do you define "excessive
7    heat"?
8          A.       Excessive heat.
9          Q.       What makes heat more or less
10   excessive?
11         A.       Can you stand it or not.
12         Q.       Can you stand it, like standing
13   next to it?
14         A.       Yes, sir.
15         Q.       So if you can stand next to it,
16   it's not excessive heat.
17                  Right?
18         A.       Correct.
19         Q.       If you can't stand next to it,
20   it's excessive heat?
21         A.       If you're exposed to it and you
22   get burned, it's probably excessive heat.
23         Q.       Okay.  There's no more granular
24   kind of definition of what excessive heat is
25   to you?
```

1       A.      No, sir.

2       Q.      If we go on to the next page of

3   the document, this Pamphlet 171 provides some

4   specific comments about heat ranges and vinyl

5   chloride monomer.

6               Do you see that in the section

7   that starts with "In addition to violent

8   polymerization"?

9       A.      I do.

10      Q.      Okay.  And I'll read that into

11  the record.  It says, "In addition to violent

12  polymerization, VCM may also react with

13  organic peroxides, strong bases and oxidizing

14  agents, resulting in potential heat

15  generation, fire and/or explosion."

16              Did I read that right?

17      A.      Yes, sir.

18      Q.      The next sentence says, "In

19  particular, at 59 degrees to 406.4 degrees

20  Fahrenheit, 15 degrees Celsius to 208 degrees

21  Celsius, ultraviolet, UV, can initiate a

22  reaction between VCM with excessive oxygen to

23  produce peroxides; it's also commonly

24  referred to as polyperoxides, polyvinyl

25  peroxides."

Confidential - Pursuant to Protective Order

1              Did I read that right?

2      A.     Yes, sir.

3      Q.     "These reactants can

4  automatically ignite on their own to create

5  an explosive condition under extreme heat or

6  impact."

7              Right?

8      A.     Yes, sir.

9      Q.     So just focusing on this

10 statement about what can happen to VCM

11 between heat ranges of 59 degrees and

12 406.4 degrees Fahrenheit, is this a statement

13 that you relied on in the course of

14 responding to the East Palestine derailment?

15     A.     Yes, sir.

16     Q.     The next sentence talks about

17 what happens at a different heat range.

18             It says, "Further heating to

19 676.4 degrees Fahrenheit, 358 degrees

20 Celsius, causes peroxides to decompose to

21 formaldehyde, carbon monoxide and hydrogen

22 chloride.  Peroxides may also cause

23 uncontrollable polymerization reactions at

24 high concentrations or temperatures."

25             Do you see that?

1      A.      Yes, sir, I do.

2      Q.      Is this statement one that you

3   relied on in the course of responding to the

4   East Palestine derailment?

5      A.      The operative words that were

6   used is "high" -- "excessive heat," "high

7   concentrations and temperatures."

8              Excessive heat is one of the

9   main statements that's used to call that

10  polymerization could be occurring.

11     Q.      So the reference to heating to

12  676.4 degrees Farenheit, 358 degrees Celsius,

13  was not something that was considered?

14             MR. LEVINE:  Objection.

15             THE WITNESS:  Excessive heat.

16  QUESTIONS BY MR. GOMEZ:

17     Q.      Understood.  My question is

18  specific.

19             Did you consider that the

20  document talks about heating specifically to

21  676.4 degrees Fahrenheit, 358 degrees

22  Celsius?

23             MR. LEVINE:  Objection.

24             THE WITNESS:  All I can say is

25      excessive heat was applied to these

Confidential - Pursuant to Protective Order

1        cars.

2    QUESTIONS BY MR. GOMEZ:

3        Q.      Were you aware of the

4    temperature ranges that Pamphlet 171 talks

5    about in connection with polymerization on

6    page 5 of this exhibit during the derailment?

7        A.      I did not.

8        Q.      The next page, page 6, there's

9    a Section 2.6, Temperatures Considerations.

10            Do you see that?

11       A.      Yes, sir, I do.

12       Q.      And it says, "In typical VCM

13   plant operations, VCM process temperatures

14   range between ambient temperature 68 degrees

15   Fahrenheit, 20 degrees Celsius, and

16   300 degrees Fahrenheit, 148.9 degrees

17   Celsius, while contained under pressure."

18            Do you see that?

19       A.      I do.

20       Q.      Is that a statement that was

21   relied on in the course of responding to the

22   East Palestine derailment from this

23   Pamphlet 171?

24            MR. LEVINE:  Objection.

25            THE WITNESS:  I can't say that

Confidential - Pursuant to Protective Order

1          we actually used that statement in our

2          response considerations.

3     QUESTIONS BY MR. GOMEZ:

4          Q.     Did you use any information

5     about the temperatures at which VCM is

6     processed while contained under pressure when

7     determining your response activities in East

8     Palestine derailment?

9               MR. LEVINE:  Objection.

10              THE WITNESS:  There were a lot

11         of -- there was a lot of information

12         being fed into the technical group

13         about what was going on in the cars.

14              The one thing about this

15         document is, this is in normal

16         conditions.  This is in a plant

17         operation.  It's not on the side of a

18         derailed -- or in a city where a

19         derailment has occurred and excessive

20         heat has been applied to tank cars.

21    QUESTIONS BY MR. GOMEZ:

22         Q.     Well, actually, if we look at

23    the cover page for this document, it says

24    that it applies specifically to tank car and

25    cargo tank handling.

Confidential - Pursuant to Protective Order

1              Right?

2       A.     That's correct.

3       Q.     Okay.  And the VCM involved in

4   the East Palestine derailment was in a tank

5   car.

6              Right?

7       A.     It was, but it was also exposed

8   to excessive heat in a derailment.

9       Q.     Okay.  So your testimony is

10  that this Pamphlet 171 doesn't apply to the

11  conditions that a VCM-containing railcar are

12  exposed to in a derailment?

13      A.     Things change from normal

14  conditions in a derailment.

15      Q.     So does this document apply to

16  a derailment or not?

17      A.     It could.

18             MR. BRAGA:  Objection.

19             THE WITNESS:  But -- excuse me.

20      It could.

21  QUESTIONS BY MR. GOMEZ:

22      Q.     And it could not, I guess?

23      A.     It could not.

24      Q.     So how do you determine what

25  parts apply and don't apply in a derailment

Confidential - Pursuant to Protective Order

```
 1   situation?
 2               MR. LEVINE:  Objection.
 3               MR. BRAGA:  Objection.
 4               THE WITNESS:  We base it on
 5        visual observations, gathering as much
 6        data as we can about the cars,
 7        speaking to the manufacturers, coming
 8        up with conclusions, developing a
 9        response plan and implementing such
10        response plan.
11   QUESTIONS BY MR. GOMEZ:
12        Q.    You mentioned observations and
13   data.
14               Does that include temperature
15   data?
16        A.    At times, yes, sir, when you
17   can get it correctly.
18        Q.    And then you take those data
19   and observations and discussions with the
20   product manufacturers to understand what
21   parts of this document might apply to a
22   derailment scenario.
23               Is that fair?
24               MR. LEVINE:  Objection.
25               THE WITNESS:  That is fair.
```

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. GOMEZ:
 2         Q.     Let's skip down to page 49.
 3                This page 49 of Pamphlet 171,
 4    which we've marked as an exhibit to your
 5    deposition, is titled "Appendix C.  Vapor
 6    Pressure for Vinyl Chloride."
 7                Right?
 8         A.     Yes, sir.
 9         Q.     The vapor pressure of a
10    chemical contained in a derailed tank car is
11    a data point that you're paying attention to
12    in responding to a derailment.
13                Right?
14         A.     Yes, sir.
15         Q.     And in this case with respect
16    to VCM in East Palestine, you were paying
17    attention to the vapor pressure curve for VCM
18    in those derailed railcars.
19                Right?
20         A.     We wanted to, yes, sir.
21         Q.     Looking at what this chart
22    represents, would you agree with me that it
23    shows that for VCM generally, as temperature
24    increases, so does pressure?
25                MR. BRAGA:  Object.
```

Confidential - Pursuant to Protective Order

```
1              THE WITNESS:  That is correct.
2    QUESTIONS BY MR. GOMEZ:
3         Q.    And would you agree with me
4    that it also shows that as temperature
5    decreases, pressure decreases?
6         A.    That is correct.
7         Q.    Would you also agree with me
8    that in connection with vinyl chloride
9    monomer, pressure cannot increase without a
10   corresponding increase in temperature?
11        A.    Ask the question again.
12        Q.    Sure.
13              Would you agree with me that
14   with respect to vinyl chloride monomer, VCM,
15   its temperature in a contained vessel cannot
16   increase without a corresponding increase in
17   pressure?
18        A.    Correct.
19        Q.    Okay.  And the opposite is
20   true; there cannot be a corresponding
21   increase in pressure without also an increase
22   in temperature.
23              Right?
24        A.    Correct.
25        Q.    You see that there's a
```

1    reference in this chart to a PRD start to

2    discharge setting 247.5 PSI?

3         A.    Yes, sir.

4         Q.    I think you discussed that

5    earlier.  That's the start to discharge

6    pressure for a pressure relief device.

7         A.    Correct.

8         Q.    Right?

9         A.    In normal conditions.

10        Q.    And here, according to the

11   vapor pressure curve for vinyl chloride

12   monomer, that pressure of 247.5 corresponds

13   with a temperature of roughly 180 and

14   190 degrees.

15             Is that fair?

16        A.    Fair.

17        Q.    Okay.  247.5 PSI, that was the

18   start to discharge pressure for the PRDs that

19   were equipped on the railcars that derailed

20   in East Palestine.

21             Right?

22             MR. LEVINE:  Objection.

23             THE WITNESS:  For the class of

24        car that the vinyl chloride is

25        transported in, they have

Confidential - Pursuant to Protective Order

1          begin-to-operate pressures of 247.5.

2          I can't say that every one of those

3          PRDs, without looking at the

4          documentation, were set for 247.5.

5     QUESTIONS BY MR. GOMEZ:

6          Q.     Okay.  That's fair.

7          But we can agree that when

8     there's pressure equal to the start to

9     discharge for the PRDs that are equipped on

10    vinyl chloride monomer cars, the temperature

11    is at least 180 to 190 degrees?

12         A.     That's what the graph says,

13    yes, sir.

14         Q.     There's also, if we look at

15    this chart, a temperature reference 200.

16         Do you see that on the bottom

17    right?

18         A.     Yes, sir.

19         Q.     And again, just using the

20    chart, that corresponds to roughly 300 PSI in

21    pressure.

22         Right?

23         A.     Yes, sir.

24         Q.     The design pressure of a DOT

25    105 is 300 PSIG.

Confidential - Pursuant to Protective Order

```
 1                    Right?

 2                    MR. BRAGA:  Object.

 3                    THE WITNESS:  On a 105J, what

 4        car?

 5   QUESTIONS BY MR. GOMEZ:

 6        Q.      On the 105 cars that were

 7   involved in the derailment.

 8        A.      What's the whole classification

 9   of the car?

10        Q.      I think you got me there.

11        A.      I believe --

12        Q.      Let me ask you this.  Let me

13   ask you this.

14                    What did you understand the

15   design pressure of the five derailed VCM cars

16   in East Palestine to be?

17        A.      105J300W cars.

18        Q.      And the design pressure for

19   that specific car is?

20        A.      The tank test pressure is 300.

21   The burst pressure is about three times that.

22        Q.      Three times that, so roughly

23   900 PSIG?

24        A.      Correct.

25        Q.      The data that's provided by
```

Confidential - Pursuant to Protective Order

```
1    this Appendix C, page 49 to the -- to

2    Pamphlet 171, is this data that was relied on

3    in the course of responding to the East

4    Palestine derailment?

5         A.     This was reviewed, yes.

6         Q.     This was data and information

7    that would have been available to first

8    responders on-site at the East Palestine

9    derailment.

10              Right?

11              MR. LEVINE:  Objection.

12              THE WITNESS:  This document --

13         this -- the pressure curve was

14         considered and looked at, yes, sir.

15   QUESTIONS BY MR. GOMEZ:

16         Q.     We can put that one aside, sir.

17              You also -- you mentioned a

18   couple of other reliance documents.

19              Do you recall whether there

20   were any reliance documents authored by the

21   New Jersey Department of Health and Human

22   Services that were used in the derailment?

23         A.     Yes, sir.

24              (Day Exhibit 5 marked for

25         identification.)
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2         Q.      Let me show you my Document

3    Number 42, which we will mark as Exhibit 5.

4              Mr. Day, this Exhibit 5 to your

5    deposition.  On the cover page it notes it's

6    the Group H, Exhibit 56 to the NTSB hearing.

7              Is that right?

8         A.      Yes, sir.

9         Q.      And the title, at least given

10   by the NTSB, is "NJ Department of Health and

11   Senior Services, Hazardous Substance Fact

12   Sheet, Vinyl Chloride, June 2001."

13             Do you see that?

14        A.      Yes, sir.

15        Q.      Taking a look at the document,

16   is this one of the documents that first

17   responders and HAZMAT responders relied on in

18   the course of responding to the derailment?

19             MR. LEVINE:  Objection.

20             THE WITNESS:  It was reviewed,

21        yes, sir.

22   QUESTIONS BY MR. GOMEZ:

23        Q.      Okay.  Do you recall how this

24   document came to be involved in the

25   discussion amongst HAZMAT responders?

```
 1              MR. BRAGA:  Objection.

 2              THE WITNESS:  There was -- due

 3         to the confusion of will it

 4         polymerize, will it not polymerize,

 5         there were additional requests made,

 6         searches done, to find other documents

 7         to review during the mounting of the

 8         response and preparing for operations

 9         at the site.

10    QUESTIONS BY MR. GOMEZ:

11         Q.    And do you recall whether this

12    specific document, Exhibit 5, was one of

13    those that was requested or found via a

14    search to supplement the discussions?

15         A.    It was.

16         Q.    Who was it that found it or

17    provided it, if you know?

18         A.    I do not know.

19         Q.    But nevertheless, you can

20    confirm that it was one that was reviewed?

21         A.    It was.

22         Q.    Again, this is -- if we look at

23    the first substantive page of the document,

24    it's a hazardous substance fact sheet

25    provided by the New Jersey Department of
```

Confidential - Pursuant to Protective Order

```
 1    Health and Senior Services.
 2                Right?
 3         A.     Yes.
 4         Q.     And it's the fact sheet for
 5    vinyl chloride, according to the document.
 6                Right?
 7         A.     That is correct.
 8         Q.     And the date of the document is
 9    December 1994.
10                Do you see that top right
11    corner?
12         A.     Yes, sir.
13         Q.     And then with a revision in
14    June of 2001.
15                Right?
16         A.     Yes, sir.
17         Q.     You agree with me that this
18    document is not specific to stabilized vinyl
19    chloride monomer.
20                Correct?
21         A.     This document is for vinyl
22    chloride.
23         Q.     Which can be stable or
24    unstable.
25                Correct?
```

Confidential - Pursuant to Protective Order

```
 1        A.      That is correct.
 2        Q.      And if we look at page 3 of 6
 3   noted in the top right-hand corner, there's a
 4   section that says, "Handling and Storage."
 5               Do you see that?
 6        A.      Yes, sir.
 7        Q.      And the fourth bullet point
 8   reads, "Store in tightly closed containers in
 9   a cool, well-ventilated area away from heat,
10   air and sunlight, as hazardous polymerization
11   may occur."
12               Do you see that?
13        A.      Yes, sir.
14        Q.      The statement that I just read,
15   is that one that you relied on from this
16   document in the course of responding to the
17   East Palestine derailment?
18        A.      This is a document that was
19   used, reviewed and discussed, and
20   polymerization potential was pointed out.
21        Q.      Pointed out specifically from
22   this document?
23        A.      Yes.
24        Q.      Okay.  As we look at this
25   document, do you see any reference to the
```

1    stabilization of vinyl chloride monomer?

2          A.     No, sir.

3          Q.     At the time of your response to

4    the derailment, between February 5th and

5    February 6, 2023, were you aware of the fact

6    that this document conflicts with other vinyl

7    chloride guidance given by the State of New

8    Jersey?

9                 MR. LEVINE:  Objection.

10                MR. BRAGA:  Objection.

11                THE WITNESS:  No, I was not.

12                (Day Exhibit 6 marked for

13         identification.)

14   QUESTIONS BY MR. GOMEZ:

15         Q.     Let's look at Document 126,

16   which we'll mark as Exhibit 6 to your

17   deposition.

18                Mr. Day, this document that

19   we've marked as Exhibit 6 is also the

20   Group H, Exhibit 57 to the NTSB hearings.

21                Right?

22         A.     Yes, sir.

23         Q.     And the title provided by the

24   NTSB is "New Jersey Department of Health -

25   Right to Know Hazardous Substance Fact Sheet,

Confidential - Pursuant to Protective Order

1  October 2015."

2          Right?

3      A.     That it is.

4      Q.     And according to the first

5  page, it's another New Jersey hazardous

6  substance fact sheet for vinyl chloride.

7          Right?

8      A.     That it is.

9      Q.     The date of the original

10 document is November 2010, with a revision in

11 October 2015.

12         Right?

13     A.     That is correct.

14     Q.     Looking at this document, can

15 you tell me whether this is one that was

16 relied on by first responders and HAZMAT

17 responders in connection with the East

18 Palestine derailment?

19     A.     I do not know.

20     Q.     Okay.  Fair to say you don't

21 recall any specific discussions about this

22 document at the time of the derailment?

23     A.     I know that a document from the

24 New Jersey -- from New Jersey was referenced

25 and discussed, and which of these documents,

Confidential - Pursuant to Protective Order

```
1    I can't tell you which one was used.
2         Q.     Okay.
3         A.     I do not recall.
4         Q.     But focusing just on this
5    document, there's --
6         A.     Excuse me.
7         Q.     -- statements regarding
8    polymerization that I want to direct your
9    attention to.
10              The first is on that first
11   page, right above the section that's entitled
12   "Workplace Exposure Limits."
13        A.     Yes, sir.
14        Q.     There's a bullet point that
15   reads, "Explosive polymerization may occur at
16   elevated temperatures if vinyl chloride is
17   not inhibited."
18        A.     Correct.
19        Q.     Right?
20        A.     Yes, sir.
21        Q.     Do I understand correctly from
22   your prior testimony that you can't confirm
23   whether this was a statement that was relied
24   on by first responders in connection with the
25   East Palestine derailment?
```

Confidential - Pursuant to Protective Order

```
 1                MR. BRAGA:  Objection.
 2                THE WITNESS:  There -- you
 3        showed me two documents, and I
 4        remember we used a document from New
 5        Jersey Health.
 6   QUESTIONS BY MR. GOMEZ:
 7        Q.    Okay.
 8        A.    Which one, I can't tell you.
 9        Q.    But you can't confirm whether
10   it was Exhibit 5 or now Exhibit 6.
11                Right?
12        A.    You are correct.
13        Q.    Okay.  Let's look at some of
14   the other statements in this document.
15                On page 3 of 6, there is a
16   section entitled "Fire Hazards."
17                Do you see that?
18        A.    3 of 6.
19                Yes, sir.
20        Q.    The first bullet point reads,
21   "Vinyl chloride is a flammable and reactive
22   gas that can explosively polymerize if not
23   inhibited."
24                Did I read that right?
25        A.    That, you did.
```

Confidential - Pursuant to Protective Order

1    Q.    And at least according to this

2  document, that's guidance given by the State

3  of New Jersey.

4              Right?

5              MR. BRAGA:  Object.

6              THE WITNESS:  That is correct.

7  QUESTIONS BY MR. GOMEZ:

8    Q.    We can put that document aside,

9  sir.  Thank you.

10             You mentioned in connection

11 with whichever one of the New Jersey

12 documents was used that it was either found

13 or provided in an effort to get more

14 information about VCM.

15             Fair?

16   A.    Correct.

17   Q.    As part of your efforts -- and

18 when I say "your," I mean HAZMAT responders

19 on the scene in East Palestine -- were there

20 any consultations with outside VCM experts

21 other than the manufacturer of the product?

22   A.    Yes, sir.

23   Q.    Who were those experts?

24   A.    One retired VCM emergency

25 response and production manager from Westlake

Confidential - Pursuant to Protective Order

1    Polymers, and one degreed chemist, retired

2    HAZMAT director, for another Class I

3    railroad.

4         Q.    Okay.  Let's go with the first

5    one that you mentioned.

6               Was that Bob Gold?

7         A.    That was.

8         Q.    And Bob Gold was previously

9    employed by Westlake.

10              Right?

11        A.    That's correct.

12        Q.    Westlake manufactures VCM?

13        A.    Yes, sir.

14        Q.    Westlake is a competitor of Oxy

15   Vinyls?

16        A.    Yes, sir.

17        Q.    What role, if you know, did Bob

18   Gold have at -- when he was last employed by

19   Westlake?

20        A.    He was an emergency response

21   person, and he worked in the plant.

22        Q.    Do you know if at any point

23   during Bob Gold's tenure at Westlake he was

24   responsible for the production of VCM?

25        A.    He worked in a VCM plant.

Confidential - Pursuant to Protective Order

```
 1          Q.      Did he work as like a process
 2   engineer?
 3          A.      I do not know.
 4          Q.      Do you understand his roles to
 5   be limited to emergency response?
 6          A.      We knew him through the
 7   emergency response, but he knew VCM very
 8   well.
 9          Q.      Do you know if he was a chemist
10   at Westlake?
11          A.      I don't know.  He was an
12   emergency response person.
13          Q.      Do you know if he was a
14   chemical engineer at Westlake?
15          A.      I don't -- he was an emergency
16   response person.  That's how we knew him.
17          Q.      What do you know about Bob
18   Gold's educational background, if anything?
19          A.      I do not.
20          Q.      So you don't know if he has any
21   chemical training?
22          A.      I do not.
23          Q.      When did you first reach out to
24   Bob Gold in connection with the East
25   Palestine derailment?
```

Confidential - Pursuant to Protective Order

1       A.      I'd have to look back at my

2   records.

3               (Day Exhibit 7 marked for

4       identification.)

5   QUESTIONS BY MR. GOMEZ:

6       Q.      Okay.  Let's bring up

7   Document 143, which we'll mark as Exhibit 7

8   to the deposition.

9               And I will represent for the

10  record that this was produced as SRS 338, but

11  for technical reasons, we can't get it to

12  print out with the Bates number.

13              MR. BRAGA:  I'll confirm that

14      we produced it, and I'm sorry about

15      that.

16              MR. GOMEZ:  I think it's on our

17      end, actually, but thank you.

18  QUESTIONS BY MR. GOMEZ:

19      Q.      Mr. Day, what we're looking at

20  is Exhibit 7 to your deposition.

21              Do you recognize this document?

22      A.      I don't recognize the document,

23  no, sir.

24      Q.      No?

25      A.      I know what it is.

Confidential - Pursuant to Protective Order

```
 1         Q.     And it appears to be a text
 2   message that you sent to Bob Gold.
 3                Fair?
 4         A.     That's correct.
 5         Q.     And this printout of the text
 6   message was generated from your mobile
 7   device.
 8                Is that also fair?
 9         A.     Yes, sir.
10         Q.     If we look specifically at the
11   text message, it appears that the time was
12   9:04:18 when you texted Bob Gold.
13                Right?
14         A.     That is correct.
15         Q.     Do you know if that's Eastern
16   Time or Central Time?
17         A.     It's 9:04:18.  That's all I can
18   tell you.
19         Q.     Fair enough.
20                At the time that you sent this
21   text message to Bob Gold on Sunday,
22   February 5, 2023, you were already on the
23   ground in East Palestine.
24                Right?
25         A.     Yes, sir.
```

Confidential - Pursuant to Protective Order

```
1      Q.     Whether it was 9:04 or 8:04 --
2      A.     Yeah, that doesn't matter.  I'm
3  looking at the date.
4      Q.     Okay.  And the text message you
5  sent to Bob Gold is -- says, "Bob, this is
6  Chip Day.  I really need to talk about VCM
7  involved in fire in Ohio."
8             Did I read that correctly?
9      A.     That, you did.
10     Q.     Did you send this message to
11  Bob Gold before or after you directly
12  consulted with anyone from Oxy?
13     A.     After.
14     Q.     And what, if anything, about
15  the conversation you had with Oxy prompted
16  you to send this message?
17     A.     So you have to understand a lot
18  about the emergency response business,
19  especially when you have hazardous chemicals
20  involved in pretty major incidents.
21             We -- it's almost phone a
22  friend.  We are a very tight-knit community.
23  We communicate a lot, bouncing ideas off each
24  other, confirming or denying information that
25  we've received.
```

Confidential - Pursuant to Protective Order

1          After the conference call in

2     the Suburban, we got conflicting information

3     and wanted to bounce it off somebody else.

4     Bob is somebody that I regard highly as a

5     professional, and he has been exposed to

6     incidents involving vinyl chloride incidents,

7     spills, fires, and wanted to get his take on

8     some of the information we were receiving.

9          Q.     Did you specifically want to

10    get his take on the conclusion that Oxy

11    shared with you that morning, February 5th,

12    that polymerization was not occurring in the

13    cars?

14          A.     Correct.

15          Q.     We don't see a response, at

16    least in text, from Bob Gold here.

17                 Right?

18          A.     That's correct.

19          Q.     Did Bob Gold respond in any way

20    to this text message?

21          A.     Later on in the day he called.

22          Q.     Later on Sunday, February 5th?

23          A.     Correct.

24          Q.     Can you estimate for me roughly

25    what time that would have been?

Confidential - Pursuant to Protective Order

1    A.    No.  I could look back at my

2  phone and try to figure it out, but not here

3  right now.

4    Q.    Can you tell me whether it was

5  early afternoon, mid-afternoon, late

6  afternoon?

7    A.    It was -- I can tell you it was

8  on Sunday, but I can't tell you early -- the

9  time when an incident like this is going on,

10  time goes by that quick.

11    Q.    Can you describe for me the

12  conversation that you had with Bob Gold when

13  you called you back on February 5, 2023?

14    A.    The basics of it were, VCM is

15  normally shipped unstabilized in pipelines.

16  Normally it's shipped in a stabilized or

17  inhibited form in transportation.

18              The material that was involved

19  in the fire, he'd seen it on the video -- on

20  TV.

21              I asked him point-blank, do you

22  think polymerization could be occurring, and

23  he confirmed, yes, in his opinion, yes,

24  polymerization could be occurring.

25    Q.    What temperature data did you

Confidential - Pursuant to Protective Order

1    give Bob Gold to allow him to reach that

2    conclusion?

3        A.    Zero.

4        Q.    What pressure data did you give

5    Bob Gold to allow him to reach that

6    conclusion?

7        A.    Zero.

8        Q.    What specific data or

9    observations did you give Bob Gold that

10   allowed him to reach that conclusion?

11              MR. BRAGA:  Object.

12              THE WITNESS:  The incident

13          occurred on Friday evening.  There was

14          massive fire.  Cars were in pool fires

15          for extended periods of time.  PRDs

16          were operating.  PRDs settled out for

17          a period of time.  I don't remember

18          what -- exactly how long that was.

19          And then one PRD went off for

20          70 minutes.

21   QUESTIONS BY MR. GOMEZ:

22       Q.    Were there any other

23   observations or data you specifically recall

24   giving Bob Gold during that conversation?

25       A.    Just what we were seeing, the

Confidential - Pursuant to Protective Order

1   damage we were seeing on the cars.

2       Q.      And Bob Gold told you

3   polymerization could be occurring.

4               Right?

5       A.      He felt like it could be

6   occurring, yes, sir.

7       Q.      He did not say it is occurring.

8               Right?

9       A.      Correct.

10      Q.      He did not say that it

11  definitely had already occurred.

12              Right?

13      A.      Polymerization could be

14  occurring.

15      Q.      As in it was a possibility.

16              Right?

17      A.      Correct.

18      Q.      Not a certainty?

19      A.      Yes, sir.

20      Q.      Between this telephone

21  conversation that we just discussed and the

22  vent and burn on February 6th, did you have

23  any other conversations with Bob Gold

24  regarding the VCM in the derailed tank cars?

25      A.      No, sir.

Confidential Pursuant to Protective Order

1     Q.     And that includes conversations

2  over the phone, e-mail, text.  None -- no

3  others?

4     A.     No, sir.

5     Q.     Do you recall whether, when you

6  had the conversation with Bob Gold, you had

7  access to temperature and pressure data from

8  any of the cars?

9     A.     We only had pressure on one

10  car.  We couldn't get up to get accurate

11  temperature and pressure on four of the five

12  cars.

13     Q.     And this is at the time of the

14  Bob Gold conversation.

15         Right?

16     A.     Pretty much throughout the

17  entire incident, yes, sir.

18     Q.     And to confirm, you didn't

19  share that one pressure data that you had

20  with him.

21         Right?

22     A.     I don't remember.

23     Q.     When Bob Gold worked at

24  Westlake, do you know how Westlake would

25  stabilize VCM for shipment?

Confidential - Pursuant to Protective Order

1     A.     Bob was an emergency responder

2   for Westlake, and that's pretty much all I

3   know about Bob's time with Westlake.

4     Q.     But fair to say it didn't come

5   up in the course of this conversation we've

6   been referring to, how Westlake would

7   stabilize its VCM for transportation?

8     A.     No, sir.

9            MR. LEVINE:  Objection.

10  QUESTIONS BY MR. GOMEZ:

11    Q.     And there was also no

12  conversation with Bob Gold during this

13  telephone call about the different methods

14  for stabilization.

15           Right?

16    A.     That's correct.

17    Q.     And there was no conversation

18  about the significance, if any, of the

19  different methods for stabilization in terms

20  of the potential for polymerization.

21           Right?

22    A.     Correct.

23    Q.     You also mentioned another

24  conversation with, I think it was, a chemist

25  from a Class I railroad.

1           Is that correct?

2     A.    Retired, yes, sir.

3     Q.    And what was the name of that

4  person?

5     A.    Pat Student.

6     Q.    Can you spell that last name,

7  please?

8     A.    S-t-u-d-e-n-t.

9     Q.    Pat Student.

10          And just briefly, how do you

11 know Pat Student?

12    A.    He's a mentor of mine.  He

13 worked for the Missouri Pacific Railroad, and

14 he was a customer of mine since 1981.

15    Q.    Is Pat Student currently

16 employed by any railroad?

17    A.    He's retired.

18    Q.    How long has he been retired?

19    A.    I don't remember.  A long time.

20    Q.    And what was this -- you said

21 he was a chemist, but do you know what his

22 job role was at Missouri Pacific Railroad?

23    A.    He was a HAZMAT responder when

24 I first got to know him.

25    Q.    When you say that he is -- "he"

Confidential - Pursuant to Protective Order

```
 1    being Mr. Student, was a chemist, was he a

 2    formally educated chemist?

 3         A.     I do not know.

 4         Q.     So what leads you to believe he

 5    was a chemist?

 6         A.     He told me.

 7         Q.     He --

 8         A.     Told me.

 9         Q.     He told you that he was a

10    chemist?

11         A.     (Witness nods head.)

12         Q.     And when did this conversation

13    with Mr. Student occur?

14         A.     I met him in 1981.  I got to

15    know him.  He was a mentor of mine in the

16    emergency response business.  I can't tell

17    you what day, what time, anything about --

18    other than he is a resource of mine that I

19    bounce ideas off of if I have a problem.

20         Q.     That was a bad question.  I

21    meant in terms of the East Palestine

22    derailment.

23              When was the conversation that

24    you had with Mr. Student about the East

25    Palestine --
```

Confidential Pursuant to Protective Order

```
 1        A.      Sunday night --

 2        Q.      -- derailment?

 3        A.      Late --

 4                MR. BRAGA:  Let him finish his

 5        question first.

 6                THE WITNESS:  Sorry.

 7                Ask the question again.

 8   QUESTIONS BY MR. GOMEZ:

 9        Q.      Sure.

10                The conversation that you

11   referenced with Mr. Student, when did it

12   occur in the course of your response to the

13   East Palestine derailment?

14        A.      Late Sunday night.

15        Q.      And can you describe for me

16   what you remember of that conversation?

17        A.       It was a discussion about the

18   decision made to vent and burn these cars.

19        Q.      And what did you tell

20   Mr. Student about that decision?

21        A.      We talked about the damage

22   assessment.  We talked about the events that

23   led up to the decision to be made -- that was

24   made to vent and burn the cars, what we were

25   seeing, and needed his opinion on were we
```

1    making the right decision.

2         Q.    And what was the opinion that

3    he ultimately expressed to you?

4         A.    That he agreed.

5         Q.    You said this conversation was

6    late in the evening on Sunday.

7               Are you able to estimate a

8    time?

9         A.    You can go back to my phone.

10   It was somewhere around ten o'clock.

11        Q.    By that point in time, ten

12   o'clock on Sunday, February 5th, responders

13   were monitoring the temperature on the

14   derailed railcars.

15              Right?

16        A.    Yes, sir.

17        Q.    Did you provide Mr. Student

18   with those temperature readings?

19        A.    There's a lot of discussion

20   about temperature and temperature readings

21   that were being taken.  My concern was the

22   temperatures, because we were not getting

23   accurate readings of the core temperature of

24   the product.  I was suspect that they were

25   getting -- they weren't accurate.

Confidential — Pursuant to Protective Order

1    Q.    Whether you believe them to be
2  accurate or not, did you share the readings
3  that you had with Mr. Student during this
4  conversation on Sunday, February 5th?
5    A.    In general terms, yes.
6    Q.    Did you give him the specific
7  numbers?
8    A.    I gave him general numbers.
9    Q.    When you say "general numbers,"
10  what does that mean?
11    A.    150s to 160s to 180s.
12    Q.    So you did not give him the
13  specific temperature readings at each hour
14  that they were taken.
15          Right?
16    A.    That is correct.
17    Q.    You did not give him the trend
18  of the temperatures?
19    A.    That is correct.
20    Q.    Did you give Mr. Student any
21  pressure readings that you might have had?
22    A.    Yes.
23    Q.    And what pressure readings were
24  those?
25    A.    60.  Pressure reading.  Single.

1    Individual.

2         Q.     Single reading.

3              You didn't give Mr. Student any

4    corresponding pressure reading based off of

5    the vapor pressure curve that we discussed

6    earlier.

7              Right?

8         A.     I had a pretty good indication

9    that Mr. Student knew exactly where the

10   pressures would be.  Should be.

11        Q.     You understood that if you gave

12   Mr. Student general temperatures, he would

13   understand what the corresponding pressure

14   for VCM would be?

15        A.     He's a pretty smart guy, yes,

16   sir.

17        Q.     Did you tell Mr. Student that

18   at the time of that conversation, the evening

19   of Sunday, February 5th, the product

20   manufacturer, Oxy Vinyls, had concluded

21   polymerization was not occurring?

22              MR. LEVINE:  Objection.

23              THE WITNESS:  We had a

24         discussion about the conflicting

25         information we were receiving from Oxy

Confidential - Pursuant to Protective Order

1          personnel in Dallas.

2     QUESTIONS BY MR. GOMEZ:

3          Q.     And did that information

4     include the conclusion that polymerization

5     was not occurring?

6          A.     That was some of the

7     information that we were conflicted with.

8          Q.     Okay.  And what was

9     Mr. Student's response to that specific piece

10    of information?

11         A.     He didn't understand why

12    somebody in Dallas would say that

13    polymerization was not occurring.

14         Q.     Did he explain that any

15    further?

16         A.     No, sir.

17         Q.     Did you ask him to explain that

18    any further?

19         A.     No, sir.

20         Q.     So he told you that he was

21    surprised by that statement?

22                Is that fair?

23         A.     That's correct.

24         Q.     And you didn't inquire any

25    further as to why that might be the case?

Confidential - Pursuant to Protective Order

1    A.    He was inquisitive as I was.

2  We didn't know why somebody would say based

3  on the conditions that we were seeing that

4  polymerization was not occurring.

5    Q.    If Mr. Student was a chemist,

6  could you have asked him for the chemical

7  explanation of what was likely going on in

8  those railcars?

9         MR. BRAGA:  Objection.

10        THE WITNESS:  You're asking me

11     to speculate, and I can't.  I don't

12     know Pat was thinking.  We were having

13     a conversation about the decision that

14     was made to vent and burn these cars.

15  QUESTIONS BY MR. GOMEZ:

16    Q.    And I don't want you to

17  speculate about what Mr. Student was

18  thinking.  But if he is a chemist, you could

19  have asked him for a chemical explanation of

20  what's happening in the cars.

21         Right?

22        MR. LEVINE:  Objection.

23        THE WITNESS:  I could.

24  QUESTIONS BY MR. GOMEZ:

25    Q.    And you didn't do that?

Confidential - Pursuant to Protective Order

```
 1          A.      I did not.

 2          Q.      These two conversations that

 3   we've been discussing, the first with Bob

 4   Gold and the second with Pat Student, at any

 5   time did you share that -- share the -- those

 6   discussions with NS personnel?

 7          A.      It most likely came up in

 8   discussions, yes.

 9          Q.      These two conversations, the

10   one with Bob Gold and the one with Pat

11   Student, did you discuss the contents of

12   those discussions with anyone at incident

13   command?

14          A.      You have to understand the

15   hierarchy of control command, how an incident

16   command structure works.

17                  We were a support structure to

18   the NS.  The NS communicated directly with

19   incident command.

20          Q.      Okay.  So you yourself did not

21   communicate directly with the folks in

22   incident command?

23          A.      Only during the vent and burn

24   operation.

25          Q.      During the vent and burn
```

Confidential - Pursuant to Protective Order

1    operation, did you happen to mention anything

2    about the conversation with Bob Gold or Pat

3    Student?

4         A.    During the vent -- the

5    communications with incident command during

6    the vent and burn operation, it was strictly

7    to request permission to initiate and feed

8    information once the vent and burn was done.

9         Q.    So other than that conversation

10   to get permission to initiate the vent and

11   burn, you did not have direct communication

12   with incident command?

13        A.    That is correct.

14        Q.    So to the extent that incident

15   command was aware of the discussions you had

16   with Bob Gold and Pat Student, that would

17   have had to come from someone at NS?

18        A.    It would have had --

19             MR. LEVINE:  Objection.  Sorry.

20             THE WITNESS:  That

21        communication would have had to come

22        through NS, yes, sir.

23   QUESTIONS BY MR. GOMEZ:

24        Q.    NS having learned it from you

25   at some point, obviously?

Confidential - Pursuant to Protective Order

```
 1        A.      Correct.

 2                MR. LEVINE:  Objection.

 3   QUESTIONS BY MR. GOMEZ:

 4        Q.      How about Oxy?  At any point in

 5   time did you discuss the information that you

 6   received from Bob Gold or Pat Student with

 7   any employee of Oxy?

 8        A.      It was brought up in

 9   conversations, trying to determine if

10   polymerization was occurring.  We have to --

11   we have -- in this business, we have to rely

12   on a lot of information from a lot of

13   different people when you start getting

14   conflicting information.

15        Q.      What do you recall specifically

16   about sharing the statements made by Bob Gold

17   or Pat Student with employees of Oxy?

18        A.      We've spoken to other former

19   manufacturers of VCM, and they don't feel

20   that -- or they feel that polymerization

21   could be occurring in these cars.

22        Q.      And what was the response from

23   Oxy?

24        A.      I don't remember.

25        Q.      But Oxy never changed its
```

Confidential - Pursuant to Protective Order

```
 1    opinion about polymerization not occurring.
 2              Right?
 3              MR. LEVINE:  Objection.
 4              THE WITNESS:  They -- there was
 5         three folks on-site, and at least two
 6         of those folks, Oxy folks, on-site
 7         felt that there was a possibility of
 8         polymerization occurring.
 9    QUESTIONS BY MR. GOMEZ:
10         Q.    And they expressed that to you?
11         A.    Yes.
12         Q.    Do you remember their names?
13         A.    Justin and, I believe, Steve.
14         Q.    Justin Cox.
15              Right?
16         A.    Correct.
17         Q.    Steve Smith.
18              Right?
19         A.    Correct.
20         Q.    And if you recall, let's say,
21    Steve Smith expressing to you that
22    polymerization could be occurring, do you
23    also recall him saying that he's not an
24    expert in polymerization?
25         A.    That's correct.
```

Confidential Pursuant to Protective Order

1    Q.    And you recall him saying that

2 he would have to check with the experts on

3 polymerization back in Dallas?

4    A.    He said things along those

5 lines, yes, sir.

6    Q.    And he in fact did check with

7 the experts back in Dallas about

8 polymerization.

9         Right?

10        MR. LEVINE:  Objection.

11        MR. BRAGA:  Objection.

12        THE WITNESS:  I guess.

13 QUESTIONS BY MR. GOMEZ:

14    Q.    He told you that he did.

15        Right?

16        MR. LEVINE:  Objection.

17        THE WITNESS:  We had several

18    discussions, multiple times during

19    those days, that there was conflicting

20    information.

21 QUESTIONS BY MR. GOMEZ:

22    Q.    And each time that you brought

23 that up to him, he reiterated the conclusion

24 from the product manufacturers that

25 polymerization was not occurring.

1          Right?

2          MR. BRAGA:  Objection.

3          MR. LEVINE:  Objection.

4          THE WITNESS:  That's correct.

5    QUESTIONS BY MR. GOMEZ:

6      Q.     Mr. Day, we can take down this

7    document.

8          We've taken for granted a

9    little bit of the timeline of your

10   involvement in the derailment, so I kind of

11   want to go back to the beginning there.

12         Am I correct that you were not

13   contacted by Norfolk Southern to respond to

14   the derailment; rather, you first reached out

15   to Norfolk Southern?

16     A.     Correct.

17     Q.     And that would have been the

18   night of February 4th.

19         Right?

20     A.     Saturday the 4th, yes.

21     Q.     And I think you read -- you

22   reached out specifically to David

23   Schoendorfer?

24     A.     Dave Schoendorfer, yes, sir.

25     Q.     Did you have a preexisting

1    relationship with Mr. Schoendorfer?

2         A.     Yes, sir.

3         Q.     Can you describe that for me?

4         A.     We were friends.

5         Q.     Personal friends?

6         A.     I believe so.

7         Q.     Did you have any professional

8    relationship with Mr. Schoendorfer?

9         A.     We worked for the Norfolk

10   Southern.

11        Q.     And on those jobs, was Dave

12   Schoendorfer one of your points of contact?

13        A.     Yes, sir.

14        Q.     Did any of the jobs you worked

15   for NS including Dave Schoendorfer involve

16   VCM?

17        A.     I don't remember specifically

18   VCM.  We've done quite a bit of work for the

19   Norfolk Southern.

20        Q.     And what prompted you to

21   proactively reach out to Mr. Schoendorfer?

22        A.     As I said before, this

23   community is very, very small.  When one

24   person has an issue, a big problem, as East

25   Palestine was, it kind of affects us all.  We

Confidential - Pursuant to Protective Order

1    all watch, listen and try to gather

2    additional information.

3              I was mowing my pasture and

4    heard a news report that the fire was still

5    going on Saturday afternoon, and that's why I

6    sent the text to Dave asking what -- besides

7    plastic pellets and vinyl liquid, what else

8    was on fire.

9        Q.    At the time you reached out to

10   Mr. Schoendorfer via text, did you know that

11   SPSI was on-site?

12       A.    Yes, sir.

13       Q.    Did you know that Mr. McCarty

14   was on-site?

15       A.    If SPSI was on-site and -- yes.

16       Q.    If SPSI is there, Mr. McCarty

17   is there?

18       A.    Most likely.

19       Q.    And in the past, has

20   Mr. McCarty reached out to you for

21   assistance?

22       A.    Yes, sir.

23       Q.    But he didn't reach out to you

24   for assistance on this derailment.

25              Right?

Confidential - Pursuant to Protective Order

```
 1        A.      Hadn't yet, no, sir.

 2        Q.      Instead, it was you that

 3   reached out not to Mr. McCarty but to NS?

 4        A.      Correct.

 5        Q.      And that text message that you

 6   sent to Mr. Schoendorfer, I think you just

 7   said, was with respect to what was -- what

 8   was on fire.

 9                Right?

10        A.      That's correct.

11        Q.      In East Palestine?

12                And he responded that vinyl

13   chloride was on fire.

14                Right?

15        A.      VCM, yes, sir.

16        Q.      And take me through kind of

17   what happened that ultimately transitioned

18   that conversation from talking about what was

19   on fire to you getting asked to come up

20   on-scene.

21        A.      I sent the text.  He replied

22   back and within -- I replied back, I believe,

23   one more time with something.  And within a

24   few minutes, he called and said, just getting

25   ready to call you.  We got VCM cars on fire,
```

Confidential - Pursuant to Protective Order

1    and we need additional assistance -- we need

2    more eyes on it.  I need Terry, Bobby and

3    Chip to fly up here and put equipment on the

4    road.

5         Q.    Terry is Terry Rockwell?

6         A.    Correct.

7         Q.    Right?

8               Chip is Charles Day, you.

9         A.    Correct.

10        Q.    Right.

11              And you mentioned Bobby?

12        A.    Bobby Breed.

13        Q.    Bobby Breed.  Okay.

14              Also employed by SRS?

15        A.    Yes, sir.

16        Q.    In the course of that

17   conversation with Mr. Schoendorfer, was there

18   any discussion about you or SRS's experience

19   with polymerizing VCM?

20        A.    Specifically he wanted

21   additional help with compressed gas cars on

22   fire, with VCM cars on fire.  We didn't

23   really discuss polymerization potential that

24   I remember.  But in a subsequent

25   conversation, there was.

Confidential - Pursuant to Protective Order

1    Q.    There was discussion about

2  polymerization?

3    A.    There was discussion about

4  polymerization.

5    Q.    Did Mr. Schoendorfer mention

6  during that phone call the evening of

7  February 4th the potential for a vent and

8  burn?

9    A.    The discussion that -- there

10 was discussion some -- something around the

11 line of potential for a vent and burn.

12   Q.    Okay.  And that would have been

13 the evening of Sunday -- or I'm sorry,

14 Saturday, February 4th.

15         Right?

16   A.    Correct.

17   Q.    Before there was any

18 temperature readings of the car.

19         Right?

20   A.    Correct.

21   Q.    And before there were pressure

22 readings of the car as well?

23   A.    I don't know.

24   Q.    And I shouldn't say "readings."

25         Reading, right?  Single

Confidential - Pursuant to Protective Order

1    reading.

2        A.    Correct.

3        Q.    So you and SRS eventually

4    mobilized and got to East Palestine.

5              Right?

6        A.    That's correct.

7        Q.    I think you got to -- you got

8    to the Pittsburgh area around midnight?

9        A.    Correct.

10       Q.    But didn't actually arrive

11   on-scene until early the following morning.

12             Right?

13       A.    That's correct.

14       Q.    So roughly 6 a.m.,

15   February 5th?

16       A.    Correct.

17       Q.    Can you tell me a little bit

18   about the preparations that you undertook to

19   get ready to get on-scene?

20             MR. LEVINE:  Objection.

21             THE WITNESS:  We gathered up

22        the personnel, the equipment, got the

23        equipment on the road.  Got on a

24        plane.  Flew up there.

25

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    What equipment did you bring

3    with you?

4        A.    We have a 48-foot response

5    truck that -- filled with pumps and hoses and

6    compressors and protective clothing,

7    monitoring equipment.  And that's pretty much

8    it.  Just a lot of stuff.

9        Q.    So it's like the standard

10   load-out that you have?

11       A.    Yes, sir.

12       Q.    Okay.  Did you bring any

13   equipment based specifically on what you

14   understood to be occurring at the scene?

15            MR. LEVINE:  Objection.

16            THE WITNESS:  I don't

17       understand the question.

18   QUESTIONS BY MR. GOMEZ:

19       Q.    Sure.

20            Did you bring, for example, any

21   tools or equipment specific to flammable gas

22   tank cars that are derailed for either

23   monitoring or testing or anything along those

24   lines?

25            MR. LEVINE:  Objection.

Confidential - Pursuant to Protective Order

1          THE WITNESS:  We brought

2     response equipment.

3 QUESTIONS BY MR. GOMEZ:

4     Q.     Did you speak to anybody other

5 than Mr. Schoendorfer to get information

6 about what happened at the derailment site

7 before you arrived on-scene that following

8 morning?

9     A.     Robert Wood.

10     Q.     When did the conversation with

11 Mr. Wood occur?

12     A.     Around the time with

13 Mr. Schoendorfer.

14     Q.     And can you describe for me the

15 nature of that conversation?

16          MR. LEVINE:  Objection.

17          THE WITNESS:  From what I can

18     remember, it was, we need some WS-27,

19     which is an Acronel -- acrylate

20     killer, odor control material that's

21     manufactured by a company in south

22     Texas.

23          What he was seeing, fires that

24     were going on and that the PRD on one

25     of the three VCM cars had been going

1          off for the last -- a period of time.

2    QUESTIONS BY MR. GOMEZ:

3          Q.    Was there any discussion at

4    that point in time with Mr. Wood about vent

5    and burn?

6          A.    No, sir, not that I remember.

7          Q.    When you eventually arrived

8    on-site, SRS was working as a subcontractor

9    for SPSI.

10               Is that correct?

11         A.    That's correct.

12         Q.    And if I recall correctly, that

13   was because of some contract issues with the

14   acquisition of SRS?

15         A.    That's -- that -- very good,

16   yes, sir.

17         Q.    Right?

18               SRS had been acquired by

19   US Ecology?

20         A.    So SRS was acquired by NRC.

21   NRC was acquired by US Ecology.  US Ecology

22   was acquired by Republic Services.

23         Q.    And maybe I'm oversimplifying

24   it, but the issue was that there wasn't a

25   contract between NS and Republic Services in

Confidential - Pursuant to Protective Order

1    place at the time.

2              Right?

3       A.    It may have expired.  There was

4    some kind of contractual issue.

5       Q.    But regardless, you agreed to

6    be on-site as a sub for SPSI.

7              Correct?

8       A.    Yes.

9              MR. BRAGA:  When you get to a

10         good breaking point.

11             MR. GOMEZ:  Yeah.  Maybe five

12         minutes?

13             MR. BRAGA:  Sure.

14   QUESTIONS BY MR. GOMEZ:

15      Q.    As a subcontractor for SPSI,

16   can you describe for me kind of the hierarchy

17   of decision-making between the two entities,

18   SRS and SPSI?

19      A.    So SRS and SPSI are fierce

20   competitors.  We -- the customer base is

21   fairly limited, but -- we're fierce

22   competitors when we're trying to get work,

23   but once one lands work and needs assistance,

24   we work -- you never know where one stops and

25   the other one starts.  We work very much

Confidential - Pursuant to Protective Order

1    hand-in-glove.

2         Q.    So would you characterize it as

3    once you arrived on-site, joint

4    decision-making between SPSI and SRS?

5              MR. LEVINE:  Objection.

6              THE WITNESS:  SPSI took care of

7         their folks; we took care of our

8         folks.  And when decisions needed to

9         be made, obviously we were both

10        supporting the Norfolk Southern.

11   QUESTIONS BY MR. GOMEZ:

12        Q.    So you were both -- "you" being

13   SPSI and SRS -- were both supporting

14   decisions ultimately made by Norfolk

15   Southern.

16             Right?

17        A.    Correct.

18             MR. LEVINE:  Objection.

19   QUESTIONS BY MR. GOMEZ:

20        Q.    So the two entities are working

21   together, but as far as decision-making in

22   East Palestine responding to the derailment,

23   it is your understanding that Norfolk

24   Southern was making those decisions?

25        A.    Anything -- any decisions that

Confidential - Pursuant to Protective Order

1 needed to be made or work that needed to be

2 done, it would come down, and it would be

3 split out whoever had folks available.

4      Q.     And would that include the

5 decision to conduct the vent and burn?

6      A.     The decision to make -- to do

7 the -- perform the vent and burn was from the

8 technical group to the Norfolk Southern to

9 the incident commander.

10      Q.     When you say -- you've used

11 "technical group" a couple of times.

12      Is that just SPSI and SRS?

13      A.     So the -- in these kinds of

14 incidents when Mr. Schoendorfer and I spoke,

15 they wanted SRS and SPSI to focus on the VCM

16 cars and the isobutylene car, compressed gas

17 cars, and the other contractors to focus on

18 the general service cars and the spill

19 cleanup.

20      Within that -- when SPSI and

21 SRS came together, we formed somewhat of a

22 technical group that were focused strictly on

23 the VCM.

24      Drew had a lot of other

25 operations going on.  He had folks handling

Confidential - Pursuant to Protective Order

1    other parts.

2              So the technical group was

3    SPSI, SRS, the Norfolk Southern, OxyChem --

4    Oxy Vinyls, excuse me, to discuss a path

5    forward for the VCM cars.

6         Q.    So with respect specifically to

7    the vent and burn, the technical group that

8    you just described made the recommendation to

9    Norfolk Southern to conduct the vent and

10   burn.

11             Right?

12        A.    That's correct.

13        Q.    And then Norfolk Southern

14   decided to take that recommendation to the

15   incident command for approval?

16             MR. LEVINE:  Objection.

17             THE WITNESS:  That's correct.

18        That's correct.

19             MR. GOMEZ:  We can stop here.

20        Take a break.

21             MR. BRAGA:  Okay.

22             VIDEOGRAPHER:  All right.  The

23        time is 11:23 a.m., and we're going

24        off the record.

25        (Off the record at 11:23 a.m.)

Confidential - Pursuant to Protective Order

```
1              VIDEOGRAPHER:  The time is
2         11:37 a.m., and we're back on the
3         record.
4    QUESTIONS BY MR. GOMEZ:
5         Q.    Mr. Day, we were talking before
6    the break about when you first arrived
7    on-scene.  That was the morning of
8    February 5th.
9              Right?
10        A.    Yes, sir.
11        Q.    At approximately 6 a.m.
12             Does that sound fair?
13        A.    Somewhere around there, yes,
14   sir.
15        Q.    At the time you arrived
16   on-scene, am I correct that there were no
17   more active pool fires?
18        A.    No, sir.
19        Q.    Okay.  How many pool fires were
20   there?  Or where were the pool fires, I
21   should say?
22        A.    The pool fires were to the west
23   of four VCM cars, coming up on the fifth
24   toward the Leake Oil side of the incident.
25        Q.    Okay.  Were any of the five VCM
```

Confidential - Pursuant to Protective Order

1    railcars, at the time you arrived on-scene,

2    impinged by the pool fires?

3            MR. BRAGA:  Object to the form.

4            THE WITNESS:  The pile of four

5        VCM cars, the three that were -- had

6        active -- two of the three that had

7        active fires from the protective

8        housings were up against cars that

9        were blocking them -- some portion of

10       them were getting blocked by another

11       car.

12   QUESTIONS BY MR. GOMEZ:

13       Q.    Okay.  When you say "blocked by

14   another car," what -- blocked from the fire?

15       A.    I think it was a plastic pellet

16   car that was between the majority of the pool

17   fire and the VCM cars.

18       Q.    Okay.  At the time you arrived

19   on-scene at -- the early morning of

20   February 5th, was there no longer concern for

21   a BLEVE in the five vinyl chloride-containing

22   cars?

23            MR. BRAGA:  Objection.

24            THE WITNESS:  There's always

25       still a concern for BLEVE.

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. GOMEZ:

 2        Q.     Okay.  Why is there always

 3   still a concern for BLEVE?

 4        A.     Because the nature of the

 5   product and the heat that's already been

 6   applied to the cars.

 7        Q.     So between when you arrived the

 8   morning of February 5th to the time of the

 9   vent and burn, there was always a concern for

10   a BLEVE?

11        A.     Correct.

12        Q.     Did you communicate that

13   concern to anyone at Oxy Vinyls?

14        A.     It's one of those assumed

15   things.  When you have cars in pool fires, in

16   close proximity to pool fires, exposed to

17   elevated heat, that a potential for a BLEVE

18   is there.

19        Q.     So you may not have

20   specifically discussed it with them, but

21   given the conditions, you felt they would

22   know it was an issue --

23        A.     Yes.

24        Q.     -- to be aware of?

25        A.     Yes, sir.
```

Confidential Pursuant to Protective Order

1      Q.    A BLEVE is different from a

2  failure because of polymerization of VCM.

3            Right?

4            MR. LEVINE:  Objection.

5            THE WITNESS:  A BLEVE is a

6      Boiling Liquid Expanding Vapor

7      Explosion.

8            Basically the car comes apart

9      in three pieces.  You have a rocket,

10     you have a dance floor, and you have

11     the end of the car.

12           A polymerization can create

13     a -- an explosion due to

14     overpressuring building up and

15     basically the car coming apart with

16     lots of shrapnel.

17  QUESTIONS BY MR. GOMEZ:

18     Q.    They're both explosions, but

19  they happen for different reasons.

20           Is that fair?

21           MR. LEVINE:  Objection.

22           THE WITNESS:  Potato, potato.

23  QUESTIONS BY MR. GOMEZ:

24     Q.    I'll take that.

25           MR. BRAGA:  Hakuna Matata, too.

1    QUESTIONS BY MR. GOMEZ:

2         Q.     When you arrived on-scene, were

3    any of the PRDs on the vinyl chloride cars

4    still activating?

5         A.     We had active fires in the

6    protective housing of three cars.

7         Q.     Okay.  And does that mean that

8    the PRDs were activating?  Cycling?

9         A.     We had three cars with active

10   fires inside the protective housings.

11        Q.     Okay.  I'm not trying to be

12   obtuse.  I want to make sure I understand

13   this.

14              Your testimony is that there

15   were fires in the protective housings.

16              My question is, were the PRDs,

17   the pressure relief devices, were they

18   cycling?  Were they actually letting out

19   product?

20        A.     I'll say it one more time this

21   way.  We had active fires in the protective

22   housings of three of the VCM cars.  I

23   can't -- couldn't tell you where those fires

24   were coming from, but I couldn't {sic} tell

25   you that we had fire in three protective

Confidential - Pursuant to Protective Order

1    housings.

2         Q.     Okay.  So you couldn't tell if

3    the PRDs were activating because of fire?

4         A.       There were three cars with

5    protective housings on fire, yes, sir.

6         Q.       What did you learn about, when

7    you arrived on-scene, the -- what I'll call

8    the extended activation of the PRD on one of

9    the vinyl chloride cars the evening before?

10              Let me ask you this way.  When

11   you arrived on-scene, were you told that the

12   night before there was an extended activation

13   of one of the PRDs on the vinyl chloride

14   cars?

15        A.     Yes, sir.

16        Q.     And was that the third vinyl

17   chloride car?

18        A.     I believe that was the third --

19   yes, the third VCM car.

20        Q.     And that -- well, the PRDs had

21   been cycling from the late evening, early

22   morning of February 4th, through the morning

23   of February 4th {sic} before eventually

24   stopping.

25              Right?

Confidential - Pursuant to Protective Order

```
1              MR. LEVINE:  Objection.

2              THE WITNESS:  I'm trying to get

3       my days correct.

4              So the fires started on the

5       night of the 4th, and the PRDs

6       operated as designed through that

7       night, the 5th, and into the morning

8       of the 5th, yes.

9  QUESTIONS BY MR. GOMEZ:

10      Q.     Into the morning of the 5th?

11      A.     Correct.

12      Q.     Okay.  The derailment occurred

13 on the 3rd.

14      A.     So the derailment occurred on

15 the 3rd.

16      Q.     Yeah.

17      A.     The fires were burning all day

18 the 4th.  When we got on-site on the 5th, we

19 had protective housings on fire on three of

20 the five VCM cars.

21      Q.     Okay.  Tell me what was

22 described to you about the extended

23 activation of the PRD on that third vinyl

24 chloride car February 4th before you arrived

25 on-site.
```

Confidential - Pursuant to Protective Order

1    A.    There was a -- they were

2  planning on doing some offensive operations,

3  and the PRD on one of the VCM cars operated

4  for 70 minutes.

5    Q.    And it was the activation of

6  that PRD, followed by it stopping working,

7  that led SPSI to believe that the

8  polymerization was occurring.

9         Is that correct?

10        MR. BRAGA:  Object to the form.

11        THE WITNESS:  That PRD -- the

12        PRD -- all the PRDs were operating as

13        designed throughout the 4th -- for

14        several hours on the 4th, and

15        everything settled down.  And then

16        this one -- this one car went off for

17        70 minutes, which is uncharacteristic

18        of what everybody's been observing

19        before that time.

20  QUESTIONS BY MR. GOMEZ:

21    Q.    So I want to make sure I

22  understand this correctly.

23        Was it the extended activation

24  of the PRD on this one car compared to the

25  other PRDs calming down or slowing down that

Confidential - Pursuant to Protective Order

1   you understood led SPSI to believe

2   polymerization was occurring?

3           MR. BRAGA:  Objection.

4           MR. LEVINE:  Objection.

5           THE WITNESS:  The belief that

6       polymerization was occurring takes us

7       back to the training that we get in

8       polymerizable materials that if your

9       PRD operates and there is no

10      aggressive changes made, large volumes

11      of water pumped onto cars, the cooling

12      effect of the cars, and a PRD were to

13      go off and then stop suddenly, that is

14      a telltale indicator that you have --

15      you could have polymerization

16      occurring.

17  QUESTIONS BY MR. GOMEZ:

18      Q.    Did you ultimately concur, when

19  you arrived on-scene, with SPSI in their

20  determination that polymerization could be

21  occurring in the cars based off the behavior

22  of the PRDs?

23      A.    Absolutely.

24      Q.    And at that point in time, when

25  you arrived on-scene the morning of

1    February 5th, had SPSI already concluded that

2    there was a need for a vent and burn based on

3    the cars' condition?

4                    MR. BRAGA:  Objection.

5                    THE WITNESS:  There's a

6            hierarchy.  There's a decision-making

7            process that leads us to all different

8            things before you ever get to vent and

9            burn.

10   QUESTIONS BY MR. GOMEZ:

11        Q.      Okay.  And I appreciate that.

12                My question is, by the time you

13   arrived on-scene that morning, Sunday,

14   February 5th, had SPSI already gone through

15   that decision-making tree and reached the

16   conclusion that there was a need for a vent

17   and burn?

18                    MR. BRAGA:  Objection.

19                    THE WITNESS:  I can't answer

20           that question because I wasn't there.

21   QUESTIONS BY MR. GOMEZ:

22        Q.      When was it that anyone from

23   SPSI first communicated to you their belief

24   that there was a need for a vent and burn?

25        A.      There was concurrence during

Confidential - Pursuant to Protective Order

1    several of the technical group committee

2    meetings, group meetings, in their trailer

3    after we were already on-scene.

4         Q.    And the technical group, again,

5    was members of SRS.

6              Right?  Yes?

7         A.    Yes.

8         Q.    Members of SPSI.

9              Right?

10        A.    Yes.

11        Q.    And who were the other members?

12   I'm sorry.

13        A.    Norfolk Southern.

14        Q.    Norfolk Southern?

15        A.    And once OxyChem -- Oxy Vinyls

16   showed up, Oxy.

17        Q.    So it's your testimony that

18   Oxy, through its representatives, were

19   members of that technical group?

20        A.    That is correct.

21        Q.    Was that ever communicated to

22   them?

23        A.    "To them."  Define --

24        Q.    Were the three individuals from

25   Oxy who were on-scene told that they were

Confidential Pursuant to Protective Order

1    members of this technical group?

2         A.    They attended some of the

3    meetings.

4         Q.    Okay.  But were they told that

5    they were part of the technical group?

6         A.    They attended some of the

7    meetings.

8         Q.    Were they told that they had

9    input into the decision to vent and burn?

10        A.    They were part of the technical

11   group.  They were -- they attended the

12   meetings.

13        Q.    So --

14        A.    Some of the meetings.

15        Q.    So if I understand your answer

16   correctly, by virtue of being in those

17   meetings, they had a voice in the decision to

18   vent and burn.

19              Is that your testimony?

20        A.    They were members of that

21   group, yes, sir.

22        Q.    Is there a reason why you can't

23   say whether they were a member of the

24   technical group?

25              MR. BRAGA:  Objection.

Confidential - Pursuant to Protective Order

1           THE WITNESS:  They were in the

2       meetings.  Why would you -- if you

3       weren't a member of the group, why

4       would you be attending the meetings.

5   QUESTIONS BY MR. GOMEZ:

6       Q.    So they had as much say in what

7   happened once they arrived on-site as SPSI,

8   SRS and Norfolk Southern.

9           Is that your testimony?

10          MR. BRAGA:  Objection.

11          THE WITNESS:  You're absolutely

12      correct.

13  QUESTIONS BY MR. GOMEZ:

14      Q.    And who communicated that to

15  these folks from Oxy who were on-site?

16          MR. FUKUMURA:  Objection.

17          THE WITNESS:  Several people

18      invited them every time -- hey, we're

19      having a meeting, or, hey, we're

20      having a meeting.

21  QUESTIONS BY MR. GOMEZ:

22      Q.    If the folks from Oxy were

23  members of this technical group and had as

24  much say as SPSI, SRS and Norfolk Southern,

25  then why weren't they invited to all the

Confidential - Pursuant to Protective Order

1    meetings that you had?

2              MR. BRAGA:  Objection.

3              THE WITNESS:  They were invited

4        to all the meetings.

5    QUESTIONS BY MR. GOMEZ:

6        Q.    They were invited to every

7    meeting?

8        A.    You are absolutely correct.

9        Q.    They were invited to the

10   meeting that was had with the governor of

11   Ohio?

12       A.    There were only two members --

13   three members of the technical group that

14   were told to be at the meeting with the

15   governor.

16       Q.    Okay.  So they weren't at that

17   meeting.

18             Right?

19       A.    I don't know where they were.

20       Q.    Were you at that meeting?

21       A.    I was.

22       Q.    Do you remember them being at

23   that meeting?

24       A.    There were 70-some people in

25   this IT room or library or something.

Confidential - Pursuant to Protective Order

```
 1      Q.     What meetings do you recall the
 2 folks from Oxy being invited to that they
 3 didn't attend?
 4             MR. LEVINE:  Objection.
 5             MR. BRAGA:  Objection.
 6             THE WITNESS:  We had meetings.
 7      We would -- NS would be there.  Drew,
 8      myself, Terry, the SRS, SPSI folks
 9      were there.  Where is OxyChem.
10      Somebody call OxyChem.
11             And they would finally show up.
12      They were doing other things.
13 QUESTIONS BY MR. GOMEZ:
14      Q.     And who would be tasked with
15 getting in contact with them?
16      A.     Whoever was closest to the
17 door, because we couldn't get telephone
18 communications inside the trailer.
19      Q.     Okay.  Just generally speaking,
20 between February 5th and February 6th, how
21 did any of the other members of the technical
22 group, SPSI, SRS and Norfolk Southern, let
23 the folks from Oxy know that they were about
24 to have a meeting?
25      A.     Phone calls.
```

Confidential - Pursuant to Protective Order

1        Q.      So --

2        A.      Or we were in close proximity.

3    Hey, we're going to meet.

4        Q.      Going back to the PRDs and the

5    behavior of the PRDs, it's the training that

6    tells you and others in the industry that if

7    they're activating and suddenly stop, despite

8    circumstances remaining largely the same,

9    that's an indicator that polymerization could

10   be occurring.

11              Right?

12       A.      I lost track what you were

13   saying.  Say that one more time.

14       Q.      No problem.

15              The training that you receive

16   and others in your industry receive tells you

17   that if a PRD is activating and then suddenly

18   stops, but otherwise the conditions of the

19   railcars remain the same, there's not an

20   addition of large amounts of water, pool

21   fires haven't stopped, it's that -- it's that

22   sudden stopping that indicates polymerization

23   might be occurring?

24              MR. BRAGA:  Objection.

25              THE WITNESS:  There is a --

1          there is a possibility, yes, sir.

2     QUESTIONS BY MR. GOMEZ:

3          Q.     There are other explanations

4     for a PRD ceasing activation.

5               Right?

6          A.     There are several reasons, yes,

7     sir.

8          Q.     Right.

9               It can be that the product has

10    auto-refrigerated.

11              Right?

12         A.     Correct.

13         Q.     It could be that the pressure

14    has decreased within the vessel.

15              Right?

16         A.     That's correct.

17         Q.     It could be that the

18    pressure -- or that the product has been

19    exhausted.

20              Right?

21         A.     Correct.

22         Q.     It could be a mechanical

23    failure of the pressure relief device.

24              Right?

25         A.     Correct.

Confidential - Pursuant to Protective Order

1    Q.    So what is it about the

2  behavior of the PRD in the five vinyl

3  chloride cars derailed in East Palestine that

4  led you and SPSI to rule out these other

5  explanations for their behavior in favor of a

6  conclusion that it may be polymerizing?

7    A.    The PRDs, everything settled

8  down.  They operated during the fire, the

9  biggest majority of the fire.  They calmed

10  down.  They calmed down for an extended

11  period of time.

12          Then one of them went off for

13  70 minutes, uncharacteristic of all the rest

14  of the data -- all the information that was

15  being gathered at the site visually.  The PRD

16  went off for 70 minutes and then stopped.

17          Un -- it had not done it

18  before; therefore, there's a high probability

19  that polymerization was occurring.

20    Q.    Okay.  For that specific car,

21  when it -- when the PRD cycled for 70 minutes

22  and then suddenly stopped, what data points

23  allowed you to rule out that it wasn't

24  because of product exhaustion or a decrease

25  in pressure within the -- within the tank car

Confidential - Pursuant to Protective Order

```
 1    as opposed to polymerization?

 2              MR. BRAGA:  Objection.

 3              THE WITNESS:  So now we're

 4         getting into the part of the job that

 5         we've got to base a lot of our

 6         decisions on how we're feeling based

 7         on training and communications with a

 8         lot of folks on site and off site.

 9              When a PRD goes off for

10         70 minutes, nothing has changed, we

11         didn't apply a lot of water to the

12         car, and it stops going off, with a

13         material that has the potential for

14         polymerization, we could be sitting

15         here and talking about an explosion

16         that took out half of East Palestine.

17              We can Monday morning

18         quarterback all we want, but we don't

19         know.  At that point, we do not know.

20         So we've got to err on the side of

21         safety of personnel, life safety,

22         figure out how to stabilize that

23         incident and get this incident, this

24         part of the incident, over with.

25
```

Confidential – Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    And that's what your training

3    tells you?

4        A.    That's what our training tells

5    us.

6        Q.    And what part of your training

7    tells you that a PRD can activate and

8    suddenly stop as a result of polymerization?

9        A.    Because it can get plugged with

10   polymer.

11       Q.    What training specifically

12   imparted that information on you?

13           MR. LEVINE:  Objection.

14           THE WITNESS:  When you're

15       dealing with polymerizable materials,

16       if polymer is formed, it can bring

17       up -- it can plug the PRD.  There's

18       documented evidence where a material

19       has polymerized, the polymer material

20       has plugged the PRD, and the car has

21       blown apart.

22   QUESTIONS BY MR. GOMEZ:

23       Q.    Where can I find that

24   documented evidence?

25       A.    Rohm and Haas, Houston, Texas,

Confidential - Pursuant to Protective Order

1    early '90s.  BASF Corporation, Freeport,

2    Texas, late '90s, early 2000s, on a

3    caprolactam car.

4         Q.     You said Freeport was in the

5    late '90s, early 2000s?

6         A.     Late '90s, early 2000s.

7         Q.     In the Rohm and Haas incident,

8    what was the chemical involved there?

9         A.     Crude wash glacial acrylic

10   acid.

11        Q.     And that specific form of

12   acrylic acid, is that a polymerizable

13   chemical?

14        A.     Yes, sir.

15        Q.     Do you know if it shares

16   chemical properties with vinyl chloride

17   monomer?

18        A.     I do not know.

19        Q.     Okay.  So you don't know if it

20   polymerizes in the same way as vinyl chloride

21   monomer.

22               Right?

23        A.     Not a chemist, no, sir.

24        Q.     If you're comparing past

25   incidents to what happened in East Palestine,

Confidential - Pursuant to Protective Order

```
 1   isn't it important to compare the chemical

 2   properties of the different chemicals at

 3   issue?

 4            MR. LEVINE:  Objection.

 5            MR. BRAGA:  Objection.

 6            THE WITNESS:  The PRDs on those

 7        cars plugged.  For some reason, the

 8        PRDs operated very well on four of the

 9        five cars, or at least three of the

10        five cars, and then settled down,

11        which is a good indicator that, hey,

12        things are kind of getting under

13        control.  And then it goes off for

14        70 minutes straight, wide open.

15            The PRD relief pressure -- or

16        relief volume is around 37,000

17        standard cubic feet per minute, and it

18        went off for 70 minutes, which is

19        unlike anything that had occurred

20        previous.  They were going off for --

21        every two minutes for approximately

22        30 seconds --

23   QUESTIONS BY MR. GOMEZ:

24        Q.    Okay.

25        A.    -- relieving pressure.
```

Confidential - Pursuant to Protective Order

1    Q.    If you're using your experience

2  from past situations involving PRDs getting

3  plugged up or gummed up from polymerizable

4  material --

5    A.    Yes, sir.

6    Q.    -- can you agree with me that

7  it is important to understand the chemical

8  differences between the chemicals in East

9  Palestine and the chemicals involved in those

10 past incidents?

11           MR. BRAGA:  Objection.

12           MR. LEVINE:  Objection.

13           THE WITNESS:  The fact that

14      polymer is -- was formed, was being

15      formed, is a potential for the vinyl

16      chloride, because it is a

17      polymerizable material, and the other

18      materials that I've spoke of.  So the

19      conditions are very right for polymer

20      to be plugging the PRD.

21 QUESTIONS BY MR. GOMEZ:

22    Q.    The conditions are very right

23 for VCM to polymerize and plug the PRD.

24           Is that what you're saying?

25    A.    That's exactly what I'm saying.

Confidential - Pursuant to Protective Order

1      Q.      Okay.  So you'll agree with me

2   that then it's important to understand the

3   conditions that VCM requires to polymerize.

4              Right?

5              MR. LEVINE:  Objection.

6              THE WITNESS:  If polymer is

7        being formed inside the car, that

8        material can plug the PRD.

9   QUESTIONS BY MR. GOMEZ:

10     Q.      Yeah.  I understand that.

11             My question is, if you're

12  thinking that the VCM is polymerizing and

13  leading the PRDs to gum up, isn't it

14  important to understand exactly what has to

15  happen for VCM to polymerize?

16     A.      Yes, sir.  It's a bit of a

17  fact, yes, sir.

18     Q.      And you're not a chemist.

19             Right?

20     A.      I am not.

21     Q.      Drew McCarty is not a chemist.

22     A.      That is correct.

23     Q.      Right?

24             The chemists were in Dallas.

25             Right?

Confidential - Pursuant to Protective Order

1                MR. LEVINE:  Objection.

2                THE WITNESS:  I don't know.

3    QUESTIONS BY MR. GOMEZ:

4        Q.     You don't know that the team in

5    Dallas for Oxy Vinyls had chemists on it?

6        A.     I did not.

7        Q.     Where did you think that they

8    were coming up with all this information for

9    the chemical that they manufactured?

10               MR. BRAGA:  Objection.

11               THE WITNESS:  I have no idea.

12   QUESTIONS BY MR. GOMEZ:

13       Q.     Aren't they your customer?

14       A.     They -- certain parts of them

15   are, yes.

16       Q.     Yeah.

17               You know that Oxy Vinyls

18   employs chemists.

19               Right?

20       A.     Yes, sir.

21       Q.     Isn't it a fair assumption that

22   if they're providing you chemical -- or

23   advice and technical information about a

24   chemical, that they have chemists involved in

25   that?

Confidential - Pursuant to Protective Order

```
 1                    MR. BRAGA:  Objection.

 2                    MR. LEVINE:  Objection.

 3                    THE WITNESS:  They have

 4          chemists within the organization.  I

 5          don't know that they were in the

 6          conference room or the emergency

 7          operations center in Dallas.

 8    QUESTIONS BY MR. GOMEZ:

 9          Q.    If there was no chemist

10    involved in any of these conversations, did

11    it occur to you to ask whether anyone in

12    Dallas was a chemist?

13                    MR. BRAGA:  Objection.

14                    THE WITNESS:  No, because I --

15          I was trusting what they were saying,

16          but I was conflicted with the

17          information I was receiving.

18    QUESTIONS BY MR. GOMEZ:

19          Q.    Receiving from who?

20          A.    From the folks in Dallas.

21          Q.    So you were trusting what they

22    were saying, but conflicted with the

23    information from Dallas.

24                    Aren't they the same people?

25          A.    So Dallas has -- I don't know
```

Confidential - Pursuant to Protective Order

1    who was on the telephone.  There were a lot

2    of people on the conference call.

3              When the three folks from Oxy

4    showed up, they were wondering why we were

5    getting conflicting information.

6       Q.    And they told you they're not

7    experts.

8              Right?

9              MR. BRAGA:  Objection.

10             THE WITNESS:  Exactly.

11   QUESTIONS BY MR. GOMEZ:

12      Q.    That the people in Dallas were

13   the experts.

14             Right?

15      A.    They said -- no.  No.  They

16   were not -- they did not indicate that they

17   were the experts, that Dallas was the

18   experts.

19      Q.    So you had no idea between

20   February 5th and February 6th that the people

21   from Oxy Vinyls in Dallas providing you all

22   this information about polymerization were

23   experts in the product?

24             MR. BRAGA:  Objection.

25             THE WITNESS:  They were saying,

Confidential - Pursuant to Protective Order

```
 1          we don't believe polymerization is

 2          occurring.  No.

 3    QUESTIONS BY MR. GOMEZ:

 4          Q.     My question was different.

 5                 My question was, between

 6    February 5th and February 6th, all these

 7    conversations that you were having with the

 8    folks in Dallas, you didn't understand any of

 9    those folks to be experts in the chemical

10    that you were discussing?

11                 MR. BRAGA:  Objection.

12                 MR. LEVINE:  Objection.

13                 THE WITNESS:  They have

14          experience with the product.  I don't

15          know that they're considered experts

16          in the product or polymerization.

17    QUESTIONS BY MR. GOMEZ:

18          Q.     They make the product.

19                 Right?

20          A.     Okay.

21          Q.     They've been making it for

22    decades.

23          A.     Okay.  Is there a question?

24          Q.     If not them -- if not them, who

25    else is an expert in VCM manufactured and
```

1   shipped by Oxy Vinyls?

2                   MR. LEVINE:  Objection.

3                   MR. BRAGA:  Objection.

4                   THE WITNESS:  I don't know how

5        you want me to answer the question,

6        sir.

7   QUESTIONS BY MR. GOMEZ:

8        Q.    Do you believe, sitting here

9   today, that the folks in Dallas from Oxy

10  Vinyls, providing technical assistance and

11  information over the course of 48 to

12  72 hours, were experts in their own product?

13                  MR. LEVINE:  Objection.

14                  THE WITNESS:  I was receiving

15       conflicting information, so it put a

16       question in my mind.

17  QUESTIONS BY MR. GOMEZ:

18       Q.    Okay.  I'll ask it one more

19  time.

20                  As you sit here today, do you

21  believe that the people from Oxy Vinyls who

22  were providing technical information and

23  advice from Dallas were experts in their own

24  product?

25                  MR. BRAGA:  Objection.

1          THE WITNESS:  They know the

2     product.

3  QUESTIONS BY MR. GOMEZ:

4     Q.     Okay.  You're not willing to

5  say that they're experts in the product?

6     A.     I don't know who was on the

7  phone, no, sir.

8     Q.     Okay.  So if you didn't consult

9  with experts at Oxy Vinyls about the vinyl

10  chloride monomer in the railcars, what

11  experts did you consult with?

12     A.     I spoke to a lot of people

13  about vinyl chloride.

14     Q.     Okay.  Which of those people do

15  you consider experts in vinyl chloride?

16     A.     The manufacturer is -- they

17  make the product.  They understand the

18  product.  They know the product.

19          The gentlemen that sat beside

20  me at the NTSB hearing, he was a degreed

21  chemist.  Is he an expert in polymerization?

22  I don't know.  He's a chemist.

23          He doesn't -- did not -- he

24  specifically said he didn't know why the

25  statements were in the SDS, so that's

Confidential - Pursuant to Protective Order

1   conflicting information.

2              We read all these different

3   documents, and you get conflicting

4   information.  So you have to reach out to a

5   lot of people and form decisions.

6        Q.    And those people that you

7   reached out to, which of them do you consider

8   to be experts in vinyl chloride monomer?

9              MR. LEVINE:  Objection.

10             THE WITNESS:  I don't.  None of

11        them.  None of them were experts in

12        vinyl chloride monomer.

13   QUESTIONS BY MR. GOMEZ:

14        Q.    So as far as you're concerned,

15   no one consulted with any experts about vinyl

16   chloride monomer before conducting the vent

17   and burn on February 6th?

18        A.    There were a lot of discussions

19   about vinyl chloride, the potential for

20   polymerization of material.

21        Q.    My question is specific to

22   experts, so I'll ask it again.

23             As far as you're concerned,

24   between February 5th and February 6th, there

25   was never a consultation with any expert in

1   vinyl chloride monomer.

2           Yes or no?

3           MR. LEVINE:  Objection.

4           THE WITNESS:  OxyChem makes

5       VCM.  They understand VCM.  They sent

6       folks to the scene that understand VCM

7       in emergency conditions.

8           So hanging a tag of expert on

9       any one person, I'm not going to do it

10      because we were getting so much

11      conflicting information.

12          It is -- could it potentially

13      polymerize; yes or no?

14          Well, we're not experts in

15      polymerization.  We really don't know.

16      I guess we're going to have to go to

17      Dallas to explain why there's a P in

18      the DOT guidebook behind vinyl

19      chloride.  The potential was there.

20  QUESTIONS BY MR. GOMEZ:

21      Q.    Did it occur to you at any

22  point in time while you were on-scene before

23  the vent and burn occurred on February 6th

24  that it would make sense to talk to the most

25  knowledgeable experts in vinyl chloride

Confidential - Pursuant to Protective Order

1    monomer before conducting that operation?

2                    MR. LEVINE:  Objection.

3                    THE WITNESS:  We spoke to a lot

4         of people.  None of them, I'm going to

5         say, are experts in vinyl chloride

6         monomer.

7                    We talked to professionals in

8         tank car manage -- or tank car

9         derailment assessment after the

10        recommendation to vent and burn the

11        cars were made.

12   QUESTIONS BY MR. GOMEZ:

13        Q.    So no one decided that they

14   should reach out to the most knowledgeable

15   person available on VCM polymerization before

16   conducting a vent and burn?

17                   MR. LEVINE:  Objection.

18                   MR. BRAGA:  Objection.

19                   THE WITNESS:  There's a lot of

20        people in the technical group that had

21        the ability.  You're asking me the

22        question.  I was one of several

23        people.

24   QUESTIONS BY MR. GOMEZ:

25        Q.    But none of them were experts.

Confidential - Pursuant to Protective Order

1                    Right?  We've established that?

2                    MR. LEVINE:  Objection.

3      QUESTIONS BY MR. GOMEZ:

4          Q.     Is that yes?

5          A.     Correct.

6          Q.     Okay.  None of them were

7      chemists.

8                    Right?

9          A.     Correct.

10         Q.     Wouldn't it make sense to at

11     least get a chemist involved before

12     conducting the vent and burn if you believe

13     that there was polymerization occurring?

14         A.     I had folks that I spoke to.

15     Drew had folks that he spoke to.  The Oxy

16     Vinyls folks had folks that they spoke to.

17     Everybody in the group was able to speak to

18     different people to gather additional

19     information.

20         Q.     But you can't say whether any

21     of those people across all of those different

22     conversations were experts in vinyl chloride

23     monomer polymerization?

24         A.     I cannot.

25         Q.     Between the activation of that

Confidential - Pursuant to Protective Order

1  PRD on the third car for 70 minutes and the

2  vent and burn on February 6, 2023, it was

3  roughly 48 hours.

4           Right?

5      A.    Give me that time one more

6  time?

7      Q.    Sure.

8           The PRD activated for

9  70 minutes.  I'm going to refer to that as

10 extended PRD activation.

11          Okay?

12     A.    Okay.

13     Q.    Just for shorthand.

14          Between the time that the PRD

15 activated for an extended period of time on

16 that vinyl chloride monomer car and the time

17 of the vent and burn on February 6, 2023, was

18 roughly 48 hours.

19          Wasn't it?

20     A.    Yes, sir.

21     Q.    And the reason ultimately to

22 decide to do the vent and burn was because of

23 the possibility that polymerization was

24 occurring.

25          Right?

Confidential - Pursuant to Protective Order

1          A.      Correct.

2          Q.      And that that polymerization

3     could lead to an increase in pressure in the

4     cars.

5                  Right?

6          A.      Correct.

7          Q.      And there was an imminent

8     danger that those cars would then break apart

9     and explode, sending shrapnel throughout East

10    Palestine.

11                 Right?

12         A.      Correct.

13         Q.      So if that decision was made,

14    or if that conclusion was made, 48 hours

15    before the vent and burn occurred, why did it

16    take so long to conduct the operation?

17                 MR. LEVINE:  Objection.

18                 THE WITNESS:  There was a lot

19         of setup.  There was a lot of

20         communications that needed to take

21         place.  There was a lot of planning,

22         and we had to bring a lot of stuff to

23         the site.

24    QUESTIONS BY MR. GOMEZ:

25         Q.      And in addition to all those

Confidential - Pursuant to Protective Order

1    preparations and planning and staging that

2    you needed to do, you wanted to get as much

3    information as possible about whether

4    polymerization was actually occurring in

5    those cars before deciding to blow them up.

6              Right?

7              MR. LEVINE:  Objection.

8              THE WITNESS:  We did not blow

9         the cars up.

10   QUESTIONS BY MR. GOMEZ:

11        Q.    Okay.  Let me rephrase it.

12              Putting aside all the staging

13   and getting equipment to the site and the

14   like, you also wanted to use that 48-hour

15   period to generate as much information about

16   whether or not polymerization was actually

17   occurring in the vinyl chloride cars before

18   you conducted the vent and burn.

19              Right?

20        A.    There was a concern that

21   polymerization was occurring, yes.  So, yes.

22        Q.    Okay.  Let me -- let me just

23   make it a simpler question.

24              During the 48 hours that you

25   were staging the vent and burn, did you also

1    try and get more information to con -- to

2    confirm whether or not polymerization was

3    actually occurring?

4              MR. LEVINE:  Objection.

5              MR. BRAGA:  Objection.

6              THE WITNESS:  There was --

7         there were a lot of temperatures taken

8         on the cars.  The unfortunate part is

9         with polymerization, you -- it forms

10        on the inside of the car.  And we were

11        using contact thermometers and

12        infrared thermometers to take the

13        temperature readings.  We were not

14        able to get up on top of the cars and

15        take a core temperature of the

16        product.

17             (Day Exhibit 8 marked for

18        identification.)

19   QUESTIONS BY MR. GOMEZ:

20        Q.    Can we pull up Document 107

21   which we will mark as Exhibit 8, please?

22             Mr. Day, this document that

23   we've marked as Exhibit 8 is a text message

24   exchange between you and Drew McCarty.

25             Is that correct?

Confidential - Pursuant to Protective Order

```
 1        A.      This appears to be it, yes,
 2   sir.
 3        Q.      Okay.  And if we look at the
 4   dates of the conversations, it looks like
 5   this particular thread begins March 26, 2023.
 6                Right?
 7        A.      Yes, sir.
 8        Q.      And the time is actually in
 9   GMT, so it's five hours ahead of the actual
10   time.  So 2:20 a.m. would have been roughly
11   9:20 p.m. the night before.
12                Is that fair?
13        A.      Sure.
14        Q.      I just kind of want to orient
15   us because the time doesn't quite line up
16   with the time zone that we're currently in.
17                And if we look through this
18   thread, it looks like there's two
19   conversations going on.
20                The second begins with Drew
21   McCarty texting on March 26, 2023, at
22   10:08 p.m., or what says 10:08 p.m.
23                "Do you recall roughly when NS
24   called you guys on February 4thh and when you
25   got to EP?"
```

Confidential - Pursuant to Protective Order

1              Do you see that?

2      A.      Yes, sir.

3      Q.      And then you respond, laying

4  out the timeline of your involvement.

5              Right?

6      A.      Yes, sir.

7      Q.      Drew thanks you for that

8  information.

9              And you respond, "What's up

10  now?"

11             Right?

12     A.      Uh-huh.  Yes, sir.

13     Q.      Mr. McCarty then says, "I have

14  to do a presentation tomorrow," and continues

15  by saying, quote, "Basically I want to get

16  ahead of a question that could pop up.  If

17  you were already at V&B Saturday afternoon

18  after the sudden and violent PRD 70-minute

19  release, why wait till Sunday afternoon to

20  present to fire chief?  My response would be

21  such a significant decision, NS wanted to get

22  more folks like you and Terry here for your

23  opinions as well before deciding that.  I

24  just wanted to make sure I recalled the

25  timeline correctly, and I believe I have it.

1    All good."

2              Did I read that correctly?

3    A.    Yes, sir.

4    Q.    The reference to V&B in this

5    text message from Drew McCarty, did you take

6    that to mean vent and burn?

7    A.    Yes, sir.

8    Q.    And according to his text

9    message, he's saying that his explanation of

10   why there was a delay between when the

11   decision was made to conduct a vent and burn

12   to the presentation to incident command was

13   to get more eyes on the cars and more

14   opinions about whether polymerization was

15   occurring.

16             Right?

17             MR. LEVINE:  Objection.

18             MR. BRAGA:  Objection.

19             THE WITNESS:  That's basically

20        what it looks like it's saying, yes,

21        sir.

22   QUESTIONS BY MR. GOMEZ:

23   Q.    And he mentions specific people

24   whose opinions he wanted.

25             Right?

Confidential Pursuant to Protective Order

```
 1      A.      Yes, sir.

 2      Q.      There's a reference to you.

 3              Right?

 4      A.      Yes, sir.

 5      Q.      There's a reference to Terry.

 6              Right?

 7      A.      Yes, sir.

 8      Q.      That's Terry Rockwell.

 9              Right?

10      A.      Yes, sir.

11      Q.      And they wanted your opinions

12   about whether polymerization was occurring

13   before actually making the recommendation and

14   carrying out the operation.

15              Right?

16              MR. LEVINE:  Objection.

17              THE WITNESS:  That appears what

18       it says.

19   QUESTIONS BY MR. GOMEZ:

20      Q.      Nothing in this text message

21   suggests that Mr. McCarty wanted information

22   from the product manufacturer before making

23   that presentation to incident command.

24              Right?

25              MR. BRAGA:  Objection.
```

Confidential - Pursuant to Protective Order

1    THE WITNESS:  I'm not sure what

2    the -- the presentation he's talking

3    about.  I don't know if this is to

4    incident command.  I don't know

5    anything.

6    And the 26th, it's after the

7    incident is over.

8    QUESTIONS BY MR. GOMEZ:

9    Q.    Understood.

10   I'm focusing just on his

11   explanation that he wants to get ahead of a

12   question about being at vent and burn on

13   Saturday afternoon and waiting until Sunday

14   to present to the fire chief.

15   You agree with me that his

16   explanation, at least according to this text

17   message, was he wanted more eyes on the

18   railcars, yours included.

19   Right?

20   MR. LEVINE:  Objection.

21   THE WITNESS:  The Norfolk

22   Southern.

23   QUESTIONS BY MR. GOMEZ:

24   Q.    That Norfolk Southern wanted

25   more eyes --

Confidential - Pursuant to Protective Order

1      A.      Correct.

2              MR. LEVINE:  Objection.

3    QUESTIONS BY MR. GOMEZ:

4      Q.      -- on the cars.

5              Right?

6      A.      That's what it says.  Norfolk

7    Southern wants more eyes -- more folks like

8    you and Terry here for your opinion as well

9    before deciding that.

10     Q.      And at least according to this

11   text message, Mr. McCarty doesn't identify

12   that Norfolk Southern wanted the product

13   manufacturer's eyes on the cars before

14   deciding on the vent and burn.

15             Right?

16     A.      That's -- it doesn't say

17   anything about the product manufacturer.

18     Q.      They're nowhere to be found.

19             Right?

20             MR. LEVINE:  Objection.

21             THE WITNESS:  I have no idea

22      where they're at.

23   QUESTIONS BY MR. GOMEZ:

24     Q.      And --

25     A.      This is on March 26th, well

Confidential - Pursuant to Protective Order

1    after the incident.

2         Q.    Yeah.

3              Mr. McCarty's, after the fact,

4    trying to come up with an explanation for why

5    he waited to make a presentation on vent and

6    burn after the PRD activated for 70 straight

7    minutes on Saturday, February 4th.

8              Right?

9              MR. BRAGA:  Objection.

10             MR. LEVINE:  Objection.

11             THE WITNESS:  I'm not sure

12        what you're asking me.

13   QUESTIONS BY MR. GOMEZ:

14        Q.    Well, I'm asking you if what

15   you took this text message to mean, the one

16   that he sent you on March 26, 2023, was

17   Mr. McCarty trying to come up with an

18   explanation for if polymerization was an

19   imminent danger, why it took so long for him

20   to make that presentation to incident

21   command?

22             MR. BRAGA:  Objection.

23             MR. LEVINE:  Objection.

24             THE WITNESS:  I don't know what

25        presentation he's making this --

Confidential - Pursuant to Protective Order

1          making.  This is on the 26th, so this

2          is after the incident.

3     QUESTIONS BY MR. GOMEZ:

4          Q.     He says, "Present to fire chief

5     staff."

6                 He's referring to Sunday

7     afternoon.  He's talking about making the

8     presentation of the vent and burn option.

9                 Right?

10                MR. LEVINE:  Objection.

11                THE WITNESS:  He has a

12          presentation to do -- to make

13          tomorrow, and this is on 3/26.

14                I'm confused what your question

15          is.

16    QUESTIONS BY MR. GOMEZ:

17         Q.     Yeah.  I'm not asking about the

18    presentation he made in March of 2023.

19         A.     Okay.

20         Q.     What I'm asking is about his

21    explanation to you in the subsequent text

22    that he wants to come up with an explanation

23    for why so much time elapsed between when the

24    PRD went off for 70 minutes and he first

25    decided to bring up vent and burn to the

Confidential - Pursuant to Protective Order

1    incident command structure.

2                    MR. BRAGA:  Objection.

3                    MR. LEVINE:  Objection.

4    QUESTIONS BY MR. GOMEZ:

5        Q.    Did you take that statement --

6    did you take that text message to be

7    providing an explanation for why he waited so

8    long?

9                    MR. LEVINE:  Objection.

10                    THE WITNESS:  Generally you

11        could come to that, yes.

12    QUESTIONS BY MR. GOMEZ:

13        Q.    And the reason was, NS wanted

14    other folks' input on the condition of the

15    railcars.

16                    Right?

17        A.    Yes, sir.

18        Q.    You were one of those people?

19        A.    I was.

20        Q.    Terry Rockwell was one of those

21    people?

22        A.    He was.

23        Q.    According to this text message,

24    the product manufacturer was not one of those

25    people.

1          MR. LEVINE:  Objection.

2          THE WITNESS:  That's correct.

3   QUESTIONS BY MR. GOMEZ:

4      Q.    According to this text message,

5   outside experts were not some of those

6   people.

7          MR. LEVINE:  Objection.

8          THE WITNESS:  It identifies

9      myself and Terry.

10  QUESTIONS BY MR. GOMEZ:

11     Q.    And you're --

12     A.    Wants "more folks like."

13          And it says, "NS wanted to get

14  more folks like you and Terry," not, NS

15  wanted you and Terry.  More folks.

16     Q.    So you took that to mean that

17  there were other people that they wanted as

18  well --

19     A.    Correct.

20     Q.    -- right?

21          He just neglected to identify

22  them here.

23     A.    He didn't identify them, yes,

24  sir.

25     Q.    Right?

Confidential - Pursuant to Protective Order

1               And you agree with this

2     explanation.

3               Right?

4               MR. LEVINE:  Objection.

5               THE WITNESS:  I agree that the

6          NS wanted to get more folks like

7          myself and Terry to get their opinions

8          on the car.

9     QUESTIONS BY MR. GOMEZ:

10          Q.    Okay.  That's why you said that

11    you're on the same sheet of music on the

12    next -- in the next text message.

13               Right?

14          A.    That's correct.

15          Q.    But as you sit here today, you

16    can't say whether those more folks included

17    Oxy Vinyls as the product manufacturer.

18               Right?

19               MR. LEVINE:  Objection.

20               THE WITNESS:  You're asking me

21          about the definition of "NS wanted to

22          get more folks like you and Terry for

23          your opinions as well as -- as well

24          before deciding that."

25               And I understand.  I'm on the

Confidential - Pursuant to Protective Order

```
 1           same sheet of music.  We want to get
 2           more people involved.
 3    QUESTIONS BY MR. GOMEZ:
 4           Q.     Okay.  And I'm asking you, do
 5    those more people, those more folks who you
 6    agreed with by saying "same sheet of music,"
 7    include the product manufacturer?
 8                  MR. LEVINE:  Objection.
 9                  MR. BRAGA:  Objection.
10                  THE WITNESS:  That would be --
11           theoretically, that would be the
12           product manufacturer as well --
13    QUESTIONS BY MR. GOMEZ:
14           Q.     No, not theoretically.  You
15    were in the East Palestine.
16           A.     With OxyChem.
17           Q.     Did you want insight from
18    OxyChem before recommending the vent and
19    burn?
20           A.     Yes.
21           Q.     And they told you no
22    polymerization was happening.
23                  Right?
24                  MR. LEVINE:  Objection.
25                  THE WITNESS:  But were not
```

Confidential - Pursuant to Protective Order

```
 1          polymerization experts.
 2   QUESTIONS BY MR. GOMEZ:
 3          Q.     That's the guys in the field.
 4          Right?
 5          A.     Correct.
 6          Q.     Who told you, we're not
 7   experts, but we can get you the answers from
 8   the experts.
 9          A.     So we're getting conflicting
10   information from the people -- from the
11   manufacturer.  Polymerization can occur.  It
12   could occur, but we're not experts in it.
13                 It's an emergency response.
14   We've got to make decisions pretty rapidly to
15   get the things moving because the clock is
16   ticking.  We've got to get things done to
17   protect life safety and the City of East
18   Palestine.
19          Q.     But you were told in no
20   uncertain terms from the experts in Dallas,
21   at least 48 hours before the vent and burn
22   occurred, that no polymerization was
23   occurring.
24                 MR. LEVINE:  Objection.
25                 MR. BRAGA:  Objection.
```

Confidential - Pursuant to Protective Order

```
 1                    THE WITNESS:  And the reference
 2          manuals that we were using indicated
 3          that polymerization was a potential.
 4   QUESTIONS BY MR. GOMEZ:
 5          Q.    So between your reading of the
 6   reference manuals and the conclusions of the
 7   experts that wrote it, you choose your
 8   reading of the materials?
 9                    MR. LEVINE:  Objection.
10                    MR. BRAGA:  Objection.
11                    THE WITNESS:  An SDS is
12          provided to emergency responders in
13          case of an incident involving that
14          product.  They say seven different
15          times, or six different times, that
16          polymerization is a potential.
17                    Now we're getting conflicting
18          information.  Well, it could occur,
19          won't occur, won't occur.  What is it?
20                    The SDS says it could occur.
21   QUESTIONS BY MR. GOMEZ:
22          Q.    If that information in the SDS
23   is conflicting, and you're speaking to the
24   people that wrote it, and they are clarifying
25   it for you, it's no longer conflicting?
```

Confidential - Pursuant to Protective Order

```
 1        A.     Even --

 2               MR. LEVINE:  Objection.

 3               MR. BRAGA:  Objection.

 4               THE WITNESS:  Even the chemist

 5        sitting next to me at the NTSB hearing

 6        said he's not sure why it's in there.

 7        Okay?

 8               But it's a document.  It's

 9        seven different times.  It's hard to

10        say -- if it was once, I can

11        understand it.  Twice, eh.  Seven --

12        six or seven times, polymerization is

13        potential?  You got to believe

14        something -- somebody, and we believed

15        the SDS.

16   QUESTIONS BY MR. GOMEZ:

17        Q.     Over the people that wrote it?

18               MR. LEVINE:  Objection.

19               THE WITNESS:  I don't know who

20        wrote the SDS.

21   QUESTIONS BY MR. GOMEZ:

22        Q.     Oxy wrote it.

23               Right?

24        A.     Oxy wrote it.

25        Q.     Yeah.
```

Confidential - Pursuant to Protective Order

```
 1                  MR. LEVINE:  Objection.
 2   QUESTIONS BY MR. GOMEZ:
 3        Q.     And you were talking to Oxy?
 4        A.     Oxy is great group of people.
 5   A great group of people.  They have a lot of
 6   people that are really, really good at what
 7   they do.
 8                  All I can say tell you is we
 9   were getting conflicting information.  We
10   needed to come up with a solution and a
11   recommendation.
12                  What they didn't provide was
13   other options.
14        Q.     Other options for what?
15        A.     What to do with that product.
16   Could we tran -- there's a list of options
17   they have to emergency responders.  I can go
18   through each one of them.  None of those
19   could be done.
20                  They were getting ready to
21   hot-tap the car when that PRD went off.  But
22   there's so many hazards, there's so much risk
23   involved in that.
24                  The outcome is exactly the
25   same.  It's just over a much, much longer
```

Confidential - Pursuant to Protective Order

```
1    period of time.
2         Q.    And all of those other options
3    that you just referenced, they were ruled out
4    because of polymerization.
5              Right?
6              MR. BRAGA:  Objection.
7              THE WITNESS:  The other
8         options.  We have to go individually.
9         You want to go to individually?  I can
10        start right now.  I'll tell you
11        individually each one and the problems
12        with that option.
13   QUESTIONS BY MR. GOMEZ:
14        Q.    Actually, let's just go to
15   hot-tap.
16              Hot-tap was ruled out because
17   of polymerization.
18              Right?
19        A.    Polymerization potential, yes,
20   sir.
21        Q.    Okay.  If polymerization wasn't
22   occurring, you would have hot-tapped the
23   cars?
24        A.    We were -- they were preparing
25   to hot-tap the cars when that PRD went off.
```

Confidential - Pursuant to Protective Order

```
1          Q.      Okay.  And you thought
2   polymerization was occurring because of
3   statements in the SDS.
4                  Right?
5          A.      And the way the cars were --
6   the cars were acting, yes.
7          Q.      And when the experts who wrote
8   the SDS told you polymerization is not
9   occurring, you believed your interpretation
10  of the SDS over what they told you?
11                 MR. LEVINE:  Objection.
12                 MR. BRAGA:  Objection.
13                 THE WITNESS:  And other
14         industry folks.
15  QUESTIONS BY MR. GOMEZ:
16         Q.      None of whom are chemists.
17                 Right?
18         A.      Correct.
19         Q.      None of whom are experts in VCM
20  polymerization.
21                 Right?
22         A.      Correct.
23                 MR. LEVINE:  Lunch?
24                 MR. GOMEZ:  Yeah.  It's a good
25         time.
```

Confidential - Pursuant to Protective Order

```
 1                    VIDEOGRAPHER:  Okay.  Stand by.
 2                    The time is 12:24 p.m., and
 3             we're going off the record.
 4              (Off the record at 12:24 p.m.)
 5                    VIDEOGRAPHER:  The time is
 6             1:02 p.m., and we're back on the
 7             record.
 8      QUESTIONS BY MR. GOMEZ:
 9             Q.     Mr. Day, are you familiar with
10      the concept of super-cooling derailed tank
11      cars?
12             A.     I've never heard that term, no.
13             Q.     Did you discuss at any point in
14      time with Bob Gold in connection with the
15      East Palestine derailment the need to keep
16      VCM cars cool?
17             A.     Are you talking about
18      auto-refrigeration?
19             Q.     No, I'm talking about actual
20      activities that responders can take to
21      actively cool VCM tank cars that are
22      derailed.
23             A.     That are on fire?
24             Q.     Yes.
25             A.     Yes.
```

1    Q.    Okay.

2    A.    "Super-cooling," I've never

3  heard that term, but cooling of cars, yes.

4    Q.    And the idea there is to keep

5  the temperature down so that you don't have a

6  BLEVE.

7          Right?

8    A.    Correct.

9    Q.    And if there's a concern about

10  heat causing polymerization of a

11  polymerizable chemical like VCM, the cooling

12  helps with that as well.

13          Right?

14    A.    If you're getting it to the

15  product, yes, sir.

16    Q.    From the time that you arrived

17  on-scene the morning of February 5th to the

18  time of the vent and burn, there were no

19  operations to cool the derailed VCM cars.

20          Correct?

21    A.    There was no operation for

22  cooling the VCM cars when we were there, yes.

23          However, very important part to

24  know is, these are jacketed tank cars.  They

25  have an inner shell, is where the product is.

Confidential - Pursuant to Protective Order

1    There's four inches of insulation.  There's a

2    half-inch thermal protection, and there's an

3    eight-inch outer jacket.

4            In order to get cooling water

5    to the shell of the car, you have to take all

6    that jacket off.

7        Q.    So is it your testimony that

8    but for the jackets being on the cars, there

9    would have been efforts to cool the VCM

10   railcars?

11           MR. BRAGA:  Objection.

12           THE WITNESS:  I -- at the time

13       I was there, had I been there and we

14       had jacket removed, the jackets were

15       not there, we probably would have put

16       cooling water on the cars.

17   QUESTIONS BY MR. GOMEZ:

18       Q.    During your time on the scene

19   between February 5th and February 6th, did

20   you ever become aware of discussions about

21   using foam to cool the VCM cars?

22       A.    Foam does nothing for cooling.

23   And again, you still have to get it on the

24   shell of the car, not the jacket.

25       Q.    Okay.  So putting that aside,

Confidential - Pursuant to Protective Order

1    my question is, were there any conversations

2    about using foam to cool the cars that you

3    are aware of between February 5th and

4    February 6th?

5          A.    There are no -- no use of foam

6    for cooling because you're not getting the

7    foam to the shell of the car.

8          Q.    So if there were conversations

9    about using foam that were ruled out because

10   foam is fluorinated, you weren't aware of

11   those.

12              Right?

13         A.    Correct.

14         Q.    Are you familiar with a product

15   called F-500?

16         A.    I am.

17         Q.    F-500 is a thermal

18   encapsulator.

19              Right?

20              MR. BRAGA:  Object to the form

21         of the question.

22              THE WITNESS:  F-500 is a

23         material that is available to the fire

24         service.

25

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. GOMEZ:

2         Q.    It's a super-cooling material.

3               Isn't it?

4         A.    F-500 is a material that is

5    available to the fire service.  That's as far

6    as I know about F-500.

7         Q.    Okay.  You've been a

8    firefighter since 19 --

9         A.    In the '70s.

10        Q.    -- '81?

11        A.    In the '70s.

12        Q.    So over 40 years.

13              Fair?

14        A.    Fair.

15        Q.    And all you know about F-500 is

16   that it's a material that's available to the

17   firefighting industry?

18        A.    You are absolutely correct.

19        Q.    Were there any conversations

20   that you can recall from February 5th to

21   February 6th in East Palestine about whether

22   F-500 was an option to cool the VCM cars?

23        A.    No, sir.

24        Q.    Is it fair to say that you

25   don't recall any conversations between
```

1  February 5th and February 6th about the

2  availability of F-500 product in the area to

3  support the East Palestine derailment

4  response?

5            MR. LEVINE:  Objection.

6            THE WITNESS:  F-500 is a

7       material that's available to fire

8       service across the nation.

9  QUESTIONS BY MR. GOMEZ:

10       Q.     It's a product that's been

11  around for over a decade.

12            Right?

13       A.     It's available to the fire

14  service.

15       Q.     Fair to say you don't know

16  anything about the application of F-500 or

17  potential application of F-500 to the VCM

18  cars in the East Palestine derailment?

19            MR. BRAGA:  Objection.

20            MR. LEVINE:  Objection.

21            THE WITNESS:  In order to cool

22       the cars, whether you're using F-500,

23       AR-AFFF, the new Green foam or water,

24       the jackets must be removed.  You must

25       apply cooling water to the shell of

Confidential - Pursuant to Protective Order

1          the car, not the jacket.

2     QUESTIONS BY MR. GOMEZ:

3          Q.     And you can say that even

4     though you don't know anything about F-500

5     except that it's available to the

6     firefighting service?

7               MR. BRAGA:  Objection.

8               THE WITNESS:  I'll say it one

9          more time.  F-500 is a material

10         available to the fire service, just

11         like AR-AFFF, just like the new Green

12         foam, just like water.

13              The material, in order to --

14         for it to cool, must be applied to the

15         shell of the car, not to the jacket.

16         Otherwise, you're wasting it.

17    QUESTIONS BY MR. GOMEZ:

18         Q.     And you know that for a fact in

19    the case of F-500?

20         A.     I know that for a fact for

21    water, foam, Green foam -- AR-AFFF, Green

22    foam or F-500.

23         Q.     Okay.  Can you tell me how

24    F-500 works?

25         A.     It's a material that's

Confidential - Pursuant to Protective Order

1    available.  I am not an expert in F-500.  I

2    have an opinion of F-500 that I'd rather not

3    divulge.

4         Q.    I'm just trying to understand

5    how you know nothing about F-500 except that

6    it's available, but at the same time can say

7    that it wouldn't work to cool the VCM cars.

8         A.    The construction of a tank car,

9    a 105J300W tank car, there is a shell where

10   the product is.  There is four inches of

11   insulation.  There is a half-inch thermal

12   protection.  There is an eighth-inch outer

13   jacket.  On the heads, there's an additional

14   half-inch of head shield.  May be full, may

15   be half.

16             In order to cool the car, you

17   must apply a cooling solution.  Whether it's

18   F-500, AR-AFFF, Green foam or water, it's got

19   to be on the shell, not on the jacket.

20        Q.    Have you received any training

21   specific to the application of F-500 in

22   railcars?

23        A.    No, sir.

24        Q.    I want to fast-forward to the

25   vent and burn preparations and the actual

Confidential - Pursuant to Protective Order

1    procedure itself.

2              As far as implementing the vent

3    and burn, there was outsourcing of work to

4    Explosive Services International.

5              Is that fair?

6         A.    Correct.

7         Q.    And the head of Explosive

8    Services International in February of 2023

9    was Jason Poe?

10        A.    Yes, sir.

11        Q.    Okay.  I believe his father,

12   Billy Poe, founded the company.

13             Right?

14        A.    That's correct.

15        Q.    And Billy Poe was the

16   contractor who placed the explosives for the

17   vent and burn in Livingston, Louisiana.

18             Right?

19        A.    I don't think he was the

20   contractor.  I think he was still with the

21   state police.

22        Q.    Okay.  "Contractor" is a bad

23   word.

24             He was the person?

25        A.    That's offensive.

Confidential - Pursuant to Protective Order

```
1        Q.      I don't mean it like that, sir.
2               Rather, it was not the proper
3    word to use in that question.
4               Is it fair to say that Billy
5    Poe -- or do you recall Billy Poe being the
6    person who placed and implemented the
7    explosives for the Livingston vent and burn?
8        A.      Billy Poe was the explosives
9    person for Livingston, yes, sir.
10       Q.      Is it understood within your
11   industry that Billy Poe developed or invented
12   the vent and burn procedure?
13              MR. BRAGA:  Objection.
14              THE WITNESS:  Refined it, I'll
15   say, yes.
16   QUESTIONS BY MR. GOMEZ:
17       Q.      Okay.  So it had been around
18   before Billy Poe, but Billy Poe fine-tuned it
19   to what we understand it to be today.
20              Is that fair?
21       A.      That's a good surmise, yes,
22   sir.
23       Q.      And his son, Jason Poe, the now
24   current head of ESI, has a background in law
25   enforcement, if I'm not mistaken.
```

Confidential - Pursuant to Protective Order

```
 1                    Right?
 2        A.      That's correct.
 3        Q.      Specifically with explosive
 4   ordnance.
 5                    Right?
 6        A.      He's on the state police.  He
 7   was on the SWAT team, several other groups.
 8        Q.      Okay.  In your opinion, is ESI
 9   the best contractor for using explosives in a
10   vent and burn procedure?
11                    MR. LEVINE:  Objection.
12                    THE WITNESS:  Yes.
13   QUESTIONS BY MR. GOMEZ:
14        Q.      And would that include Jason
15   Poe specifically?
16        A.      Yes, sir.
17        Q.      And as the best folks available
18   to implement and carry out a vent and burn,
19   they know the best conditions under which to
20   do it.
21                    Right?
22                    MR. BRAGA:  Objection.
23                    THE WITNESS:  I'm not -- I'm
24        not following your question.
25
```

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. GOMEZ:

 2        Q.    Sure.

 3              If they are the best in

 4   carrying out a vent and burn, would you agree

 5   with me that they also know when the right

 6   conditions are to actually implement the

 7   procedure?

 8        A.    Yes, sir.

 9              MR. LEVINE:  Objection.

10   QUESTIONS BY MR. GOMEZ:

11        Q.    When Jason Poe and his company,

12   ESI, are brought in to, let's say, a

13   derailment, for example, they're not

14   performing their own assessment of the

15   railcars.

16              Right?

17              MR. BRAGA:  Objection.

18              THE WITNESS:  That's correct.

19        They are not performing the

20        assessment.

21   QUESTIONS BY MR. GOMEZ:

22        Q.    They're taking in information

23   about the railcars that's provided to them by

24   the railroad.

25              Right?
```

Confidential - Pursuant to Protective Order

1     A.     By multiple sources.

2     Q.     The railroad included?

3     A.     Included.

4     Q.     Emergency -- other emergency

5  contractors.

6            Right?

7     A.     Yes, sir.

8     Q.     Okay.  And that information can

9  include the condition of the railcars.

10           Right?

11    A.     Yes, sir.

12    Q.     The volume of the lading

13 remaining in the railcars.

14           Right?

15    A.     The volume remaining, we don't

16 have access to thermometer -- or not

17 thermometers, but gauging rods, to determine

18 how much liquid is left in those cars because

19 of the fires.

20    Q.     How about the effects, the air

21 effects, of any vent and burn procedure?  Are

22 they relying on the railroad and contractors

23 to provide them information about that?

24           MR. BRAGA:  Objection.

25           MR. LEVINE:  Objection.

Confidential - Pursuant to Protective Order

```
 1                    THE WITNESS:  To understand how
 2          an incident like this occurs,
 3          everybody is brought in for mostly
 4          specific functions.  There are air
 5          folks, and there are ground folks, and
 6          there are contractors that transfer
 7          products.  So the environmental
 8          conditions, that is handled by other
 9          folks.
10   QUESTIONS BY MR. GOMEZ:
11          Q.     Okay.  So if, let's say, air
12   conditions are important to someone like
13   Jason Poe, he's relying on the air folks to
14   give him that information.
15                 Right?
16          A.     Correct.
17          Q.     He's not capable of doing it
18   himself.
19                 Right?
20                 MR. BRAGA:  Objection.
21                 THE WITNESS:  That's correct.
22   QUESTIONS BY MR. GOMEZ:
23          Q.     So the outcome of what Jason
24   Poe does in a vent and burn is only as good
25   as the information he's getting.
```

Confidential - Pursuant to Protective Order

1          Right?

2          MR. LEVINE:  Objection.

3          THE WITNESS:  Yes.

4    QUESTIONS BY MR. GOMEZ:

5      Q.    Part of getting Jason Poe to

6    the site and eventually conducting the vent

7    and burn was having Norfolk Southern complete

8    some paperwork with him.

9          Correct?

10     A.    That's correct.

11     Q.    Specifically an indemnity

12   agreement.

13         Right?

14     A.    There was some documentation

15   that needed to be signed.

16     Q.    And that information, or

17   documentation, flowed to Norfolk Southern

18   from Jason Poe through you.

19         Right?

20     A.    That's correct.

21     Q.    And do you recall that one of

22   those -- two of those documents were

23   indemnity or hold harmless agreements?

24     A.    They were documents.  Jason

25   told me, I need these signed, and the conduit

Confidential - Pursuant to Protective Order

1    was very easy while he was setting up --

2    working with his explosives guys for me to do

3    it.

4         Q.    And he told you he needed it

5    signed so that he was protected from

6    intentionally releasing product into the

7    environment.

8              Right?

9              MR. LEVINE:  Objection.

10             THE WITNESS:  I need this

11        paperwork signed.

12             (Day Exhibit 9 marked for

13        identification.)

14   QUESTIONS BY MR. GOMEZ:

15        Q.    Can we pull up Document

16   Number 92, which is Exhibit Number 9?

17             Mr. Day, this Exhibit 9 that

18   we've marked to your deposition.  It's an

19   e-mail exchange that starts on the second

20   page from February 5, 2023.

21             Is that right?

22        A.    It is February 5, 2023.

23        Q.    And you'll agree with me these

24   are e-mails.

25             Right?

1    A.    These are copies of e-mails,

2  yes, sir.

3    Q.    Okay.  That e-mail that's on

4  the -- that starts on the second page, the

5  bottom of the second page of the exhibit,

6  that's an e-mail from Jason Poe to you.

7        Correct?

8    A.    That is from him to me, yes,

9  sir.

10    Q.    And the e-mail says, "Chip,

11  here's my hold harmless.  I will need NF to

12  sign before I make any shots."

13        Did I read that correctly?

14    A.    That, you did.

15    Q.    NF, do you understand that to

16  actually be a typo?  It should be NS?

17    A.    Sure.  I can agree to that.

18    Q.    The e-mail then goes on to say,

19  "Please give this to whomever will make that

20  decision."

21        Right?

22    A.    That's what it says.

23    Q.    And the e-mail concludes, "This

24  covers cover me for intentionally,

25  parentheses, as directed by them, from

1   putting the product in the air and on the

2   ground when I make the shots."

3          Did I read that correctly?

4   A.     You did.

5   Q.     Okay.  So this is -- this

6   e-mail is Mr. Poe sending you a hold harmless

7   agreement for NS to sign so that he is

8   protected in the event that he implements the

9   explosives and product is released into the

10  environment.

11         Right?

12  A.     That is correct.

13  Q.     And there is a reference to --

14  where it says, "Please give this to whomever

15  will make that decision."

16         My question is, Mr. Poe's

17  reference to a decision there, did you

18  understand that to mean the vent and burn

19  decision?

20  A.     Since it's coming from Jason,

21  I'm going to say it probably has to do with

22  that.

23  Q.     So because Norfolk Southern was

24  the ones making the decision about the vent

25  and burn, you gave this agreement to folks at

Confidential - Pursuant to Protective Order

1    Norfolk Southern.

2              Right?

3              MR. LEVINE:  Objection.

4              MR. BRAGA:  Objection.

5              THE WITNESS:  So the document,

6         the e-mail, is a hold harmless

7         agreement he asked me to send to the

8         Norfolk Southern.

9              The signature must -- since

10        he's working for the Norfolk Southern,

11        the signature for the decision to sign

12        the -- sign the document would be

13        coming from the Norfolk Southern.

14   QUESTIONS BY MR. GOMEZ:

15        Q.    Okay.  And you in fact did send

16   it to Norfolk Southern.

17              Right?

18        A.    According to this e-mail,

19   February 5th at 5:09 p.m. is when I sent it

20   to Mr. Schoendorfer and Mr. Wood.

21        Q.    And when Mr. Poe says in his

22   original e-mail, "This covers me for

23   intentionally, as directed by them, from

24   putting the product in the air and on the

25   ground when I make the shots," by forwarding

Confidential - Pursuant to Protective Order

1    this e-mail to Norfolk Southern, you

2    understood that it was Norfolk Southern who

3    he was referring to there.

4                 Right?

5                 MR. BRAGA:  Objection.

6                 MR. LEVINE:  Objection.

7                 THE WITNESS:  I sent this

8         document to the Norfolk Southern.

9    QUESTIONS BY MR. GOMEZ:

10           Q.    Because they're the ones that

11   were hiring him to do the vent and burn.

12                Right?

13           A.    That's correct.

14           Q.    Before the East -- we can put

15   that aside, sir.

16           A.    Oh.

17           Q.    Before the East Palestine

18   derailment, when was the last opportunity

19   that you had to work directly with Jason Poe

20   or ESI?

21           A.    On an offshore project a few

22   months before that.

23           Q.    In your past experience with

24   either Jason Poe or ESI, have any of those

25   involved vinyl chloride monomer?

1    A.    No.

2    Q.    Have you -- before being

3  involved in the East Palestine derailment,

4  did you ever have the occasion to discuss

5  Mr. Poe or ESI's background with venting and

6  burning materials undergoing polymerization?

7         MR. LEVINE:  Objection.

8         THE WITNESS:  I don't

9    understand your question.

10  QUESTIONS BY MR. GOMEZ:

11    Q.    Sure.

12         Before the East Palestine

13  derailment, had you ever discussed with

14  Mr. Poe or anyone else at ESI the company's

15  experience with carrying out a vent and burn

16  on materials that were considered to be

17  polymerizing?

18    A.    We've talked about materials

19  that have the potential for polymerization,

20  yes.

21    Q.    Did you ever, before the East

22  Palestine derailment, discuss with Jason Poe

23  or anyone else at ESI what kind of training

24  they had specifically to conducting a vent

25  and burn on material that was undergoing

1    polymerization?

2              MR. BRAGA:  Objection.

3              THE WITNESS:  ESI provides a

4         unique service.  They basically have

5         supported all Class I railroads in

6         incidents involving cars that needed

7         to be vent and burned.

8    QUESTIONS BY MR. GOMEZ:

9         Q.    Whose idea was it in connection

10   with East Palestine derailment to select

11   Jason Poe and ESI for the vent and burn

12   operation?

13        A.    There were several people.  ESI

14   is the Coca-Cola of folks that do this.

15        Q.    Can you name the people who

16   were involved in that decision?

17        A.    In the decision --

18        Q.    Yeah.

19        A.    -- to bring ESI in?

20        Q.    Yeah, to bring Jason Poe in.

21        A.    There were conversations with

22   Mr. Schoendorfer, myself, Drew, Terry

23   Rockwell, Robert Wood, Scott Deutsch, Scott

24   Gould.  A plethora of folks.

25        Q.    And to your knowledge, did any

Confidential - Pursuant to Protective Order

1  of those folks understand that neither

2  Mr. Poe nor ESI had experience with

3  venting and burning materials that were

4  actively undergoing polymerization?

5           MR. BRAGA:  Objection.

6           MR. LEVINE:  Objection.

7           THE WITNESS:  ESI is the

8      company that the Class Is go to when

9      vent and burn operations have to be --

10     take place on a car.  It's not just

11     specific to polymerizable material.

12 QUESTIONS BY MR. GOMEZ:

13     Q.    But my question is, did any of

14 those folks know that Mr. Poe and ESI had no

15 experience before East Palestine with venting

16 and burning materials that were undergoing

17 active polymerization?

18          MR. LEVINE:  Same objection.

19          THE WITNESS:  That would --

20     that would be a question for all those

21     folks that I named.

22 QUESTIONS BY MR. GOMEZ:

23     Q.    How about yourself?

24          MR. LEVINE:  Same objection.

25          THE WITNESS:  ESI is the go-to

Confidential - Pursuant to Protective Order

```
 1            company for vent and burn operations.
 2            Their expertise is in vent and burn
 3            operations, not polymerizable
 4            materials.
 5   QUESTIONS BY MR. GOMEZ:
 6            Q.     Same question for yourself, at
 7   least.
 8                 Did you know at the time that
 9   you were discussing the East Palestine vent
10   and burn operation with Mr. Poe that neither
11   he nor ESI had any training with venting and
12   burning materials undergoing polymerization?
13                 MR. LEVINE:  Objection.
14                 THE WITNESS:  As I said before,
15            that part doesn't matter.  They're
16            bringing a specific skill set to the
17            site.
18   QUESTIONS BY MR. GOMEZ:
19            Q.     If Mr. Poe said that it
20   mattered, would you disagree with him?
21                 MR. LEVINE:  Objection.
22                 THE WITNESS:  We would talk to
23            him and understand what his concern
24            is, yes.
25
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    Are you aware that Mr. Poe gave

3    an interview to the NTSB in connection with

4    the East Palestine derailment?

5        A.    We all talked to the NTSB, yes,

6    sir.

7        Q.    As you sit here today, are

8    you -- are you aware of the fact that Mr. Poe

9    said that ESI and he have no training on how

10   to conduct a vent and burn when materials are

11   undergoing active polymerization?

12           MR. BRAGA:  Objection.

13           THE WITNESS:  I don't -- didn't

14       hear that Mr. Poe said that.

15           We're not bringing Mr. Poe in

16       for his chemical expertise.  We're

17       bringing Mr. Poe in for the specific

18       operation of applying explosives to

19       tank cars.

20   QUESTIONS BY MR. GOMEZ:

21       Q.    But you are bringing him in to

22   conduct the explosive operation.

23           Right?

24       A.    We bring him in to perform that

25   function of setting up and performing the

Confidential - Pursuant to Protective Order

1   vent and burn operation.

2        Q.     And Mr. Poe has a right to

3   accept or decline the assignment.

4               Right?

5               MR. LEVINE:  Objection.

6               MR. BRAGA:  Objection.

7               THE WITNESS:  You're absolutely

8        right.

9   QUESTIONS BY MR. GOMEZ:

10       Q.     Right.

11              So if Mr. Poe said that he

12  would not conduct a vent and burn on

13  materials that he knew were actively

14  polymerizing, you wouldn't take any issue

15  with that.

16              Right?

17              MR. LEVINE:  Objection.

18              MR. BRAGA:  Objection.

19              THE WITNESS:  I would not ask

20       him -- if he was uncomfortable doing

21       it, yes, we would not ask him to do

22       the job.

23  QUESTIONS BY MR. GOMEZ:

24       Q.     Do you know that that's what he

25  told the NTSB?

Confidential - Pursuant to Protective Order

```
 1              MR. LEVINE:  Objection.

 2              MR. BRAGA:  Objection.

 3              THE WITNESS:  How would I know

 4       that?  I didn't know it.  How was I

 5       supposed to know that?  You're telling

 6       me now.

 7  QUESTIONS BY MR. GOMEZ:

 8       Q.    Well, you were a panelist on

 9  the investigative hearings.

10              Right?

11       A.    I was, but Mr. Poe was not.

12       Q.    Okay.  Did you read any of the

13  materials that were posted by the NTSB in

14  preparation for your panel testimony?

15       A.    I listened to -- I read mine,

16  and that was pretty much it for the NTSB.

17  I read -- reread and studied my testimony.

18       Q.    So let me just ask it this way.

19              If Mr. Poe gave a statement to

20  the NTSB where he said that he and his

21  company had no training on venting and

22  burning materials that were actively

23  undergoing polymerization, and he would not

24  have vented and burned materials actively

25  undergoing polymerization, would you disagree
```

Confidential - Pursuant to Protective Order

1   with him on that?

2                  MR. LEVINE:  Objection.

3                  MR. BRAGA:  Objection.

4                  THE WITNESS:  You're asking me

5        to make an opinion of something that

6        Mr. Poe said.  I would have to read

7        his document in order to form an

8        opinion.

9   QUESTIONS BY MR. GOMEZ:

10       Q.    And if that is his opinion,

11  he's entitled to it.

12                 Right?

13       A.    That's correct.

14       Q.    Okay.  And you wouldn't

15  disagree with him as the expert actually

16  doing the explosive parts of the project.

17                 Right?

18                 MR. LEVINE:  Objection.

19                 THE WITNESS:  One more time.

20       Mr. Poe and ESI are brought in to

21       perform a certain function.  If

22       they're uncomfortable, they don't have

23       to do the job.

24  QUESTIONS BY MR. GOMEZ:

25       Q.    That assumes they're given all

Confidential - Pursuant to Protective Order

1    the facts.

2              Right?

3              MR. BRAGA:  Objection.

4    QUESTIONS BY MR. GOMEZ:

5         Q.    Let me withdraw the question.

6    I'll ask a different question.

7              How could Mr. Poe have

8    determined whether he was comfortable or not

9    with venting and burning in East Palestine if

10   he didn't know polymerization was actively

11   underway in the cars?

12             MR. LEVINE:  Objection.

13             THE WITNESS:  You're asking --

14        I don't know.  How should I know?  I

15        don't know what he's thinking.

16   QUESTIONS BY MR. GOMEZ:

17        Q.    And because you didn't tell him

18   that the cars were polymerizing.

19             Right?

20             MR. BRAGA:  Objection.

21             THE WITNESS:  The reason the

22        cars were vent and burned was because

23        we believed the cars were undergoing

24        polymerization.

25

Confidential - Pursuant to Protective Order

1 QUESTIONS BY MR. GOMEZ:

2   Q.  But you didn't tell that to

3 Mr. Poe?

4   A.  Mr. Poe knew that the cars were

5 in dire straits and that we needed to vent --

6 we just don't vent and burn cars just for the

7 heck of it.

8   Q.  So if Mr. Poe testified or

9 stated to the NTSB that he didn't know the

10 cars were polymerizing and wouldn't have

11 vented and burned them if they weren't -- if

12 they were polymerizing, he would be lying?

13     MR. BRAGA:  Objection.

14     MR. LEVINE:  Objection.

15     THE WITNESS:  I would have to

16  read Mr. Poe's testimony.

17 QUESTIONS BY MR. GOMEZ:

18   Q.  Okay.  You didn't tell him that

19 the cars were polymerizing.  You told him

20 that the pressure was building in the cars.

21     Right?

22   A.  I don't remember the

23 conversation that Jason and I have had over

24 the course of the events leading up to him

25 arriving on-site.

Confidential - Pursuant to Protective Order

1      Q.     So you don't remember whether

2  you told him specifically the cars are

3  polymerizing or there's pressure building in

4  the cars?

5      A.     That's correct, I do not

6  remember.

7      Q.     We just touched upon the

8  investigative hearings a little bit.

9             You were on a panel with, among

10  others, Drew McCarty.

11             Right?

12      A.     That's correct.

13      Q.     And do you recall that there

14  were questions that were asked of you by the

15  NTSB and others regarding visual observations

16  of the vent and burn that you and Mr. McCarty

17  had made?

18      A.     It's been a while since I read

19  it, but, vaguely, yes.

20      Q.     Where were you located at the

21  time that the vent and burn was initiated?

22      A.     On the Brave Industry side,

23  towards the tank farm -- or what became the

24  tank farm, protected by the Brave Industries

25  building where I could walk backwards from

Confidential - Pursuant to Protective Order

1    the building and see the cars to the left.

2         Q.    When you say "the cars," do you

3    mean the VCM cars?

4         A.    The derailment, yes, sir.

5         Q.    And you used a term, phrase,

6    there I'm not familiar with.

7               Was it tank farm?

8         A.    It wound up being a tank farm

9    where frac tanks were parked toward the

10   parking lot of the Brave Industries.

11        Q.    Is that like a staging point or

12   something like that?

13        A.    It's the other end of the Brave

14   Industries building.

15        Q.    Yeah, I just don't know what a

16   tank farm is, if you would explain --

17        A.    It's where a lot of tanks are.

18        Q.    Okay.

19        A.    Storage tanks.

20        Q.    And who was with you in that

21   location when the vent and burn was

22   initiated?

23        A.    The ESI folks, some CTH {sic}

24   folks, the commissioner with a drone, and

25   some of the SRS folks.

Confidential - Pursuant to Protective Order

1    Q.    You mentioned ESI folks.

2         Was Jason Poe there?

3    A.    Yes, sir.

4    Q.    And you said that you could see

5    the derailment, but can you estimate for me

6    just generally what your distance was?

7    A.    Sir, I had a problem on-site.

8    I didn't know which direction was east and

9    which direction was west.  I was turned

10   around because we flew in.

11        The building -- let's just say

12   200 yards from the front of the structure --

13   100 yards from the front of the structure to

14   the back of the structure.  A quarter mile

15   away.  Probably 2,000, 2,500 feet.

16   Q.    And from that distance when the

17   vent and burn was initiated, you believe that

18   you saw polymers ejected from the railcars.

19        Is that correct?

20   A.    When we got permission to

21   initiate the vent and burn, we had the first

22   shot, which lit up the fuses.  The next shot,

23   I backed up, and I saw what I thought were

24   sparklers coming out of the top of the

25   western-most car.

Confidential - Pursuant to Protective Order

```
1        Q.      Can you describe for me what
2   you mean by sparklers?
3        A.      When the explosive charge, the
4   high shot, the one that relieves the vapor,
5   goes through and we precisionally drill a
6   hole, gas pressure is released.  Material
7   comes up, and typically it just -- the fire
8   goes up.  Within a few seconds, the bottom
9   shot is hit, and the liquid flows out and
10  everything is consumed in fire.  Just like it
11  was in East Palestine.
12              When it hit the top shot, I
13  wanted to make sure we had ignition.  I
14  backed away from the Brave Industries
15  building, and I saw materials coming out and
16  going toward the ground.
17       Q.      Okay.  Those -- I'm sorry.  I
18  didn't mean to interrupt you.
19       A.      I theorized that as -- I called
20  them sparklers.  I theorized that was
21  polymer.
22       Q.      The materials that you've
23  called sparklers and that you theorized were
24  polymers, was it solid material?
25       A.      It seemed to be, yes, sir.
```

Confidential - Pursuant to Protective Order

1           (Day Exhibit 10 marked for

2       identification.)

3   QUESTIONS BY MR. GOMEZ:

4       Q.      Let's pull up Document

5   Number 44, which we'll mark as Exhibit 10 to

6   Mr. Day's deposition.

7               And, Mr. Day, this Exhibit 10

8   is also the exhibit -- or the Group D,

9   Exhibit 54 to the NTSB hearings.

10              Right?

11      A.      That's what it says, yes, sir.

12      Q.      And according to the cover page

13  prepared by the NTSB, it's "Figure 62,

14  Hazardous Materials Group Chair's Factual

15  Report, screenshot from NS contractor video

16  taken from East Taggart Street near North

17  Pleasant Drive looking north.  Vent and burn

18  of five vinyl chloride tank cars showing two

19  material plumes visible about two seconds

20  following detonation of explosive charges,

21  February 6, 2022, 4:37 p.m."

22              Did I read that correctly?

23      A.      Yes, sir.

24      Q.      The date that's noted there,

25  February 6, 2022, could we agree that

Confidential - Pursuant to Protective Order

1    that's -- should be February 6, 2023?

2         A.    Yes, you can.

3         Q.    Okay.  The photo that appears

4    on the next page, that's a photo that the

5    NTSB questioned you about at your panel

6    hearing.

7               Right?

8         A.    No, sir.

9         Q.    Was there -- I don't know what

10   that was.  Sorry.

11              Was there a photo similar to

12   this photo that you were questioned about by

13   the NTSB?

14        A.    No, sir.

15        Q.    So it's your testimony that the

16   NTSB never asked you any questions about

17   these photos?

18        A.    This photo, no, sir.

19              MR. BRAGA:  Objection.

20   QUESTIONS BY MR. GOMEZ:

21        Q.    Okay.  Does this photo that

22   we're looking at here show what you observed

23   to be the sparklers or solid material being

24   ejected from the first shot of the vent and

25   burn?

Confidential - Pursuant to Protective Order

```
 1          A.      Sir, all I see is a couple
 2   buildings, a truck, some black smoke and some
 3   white smoke.
 4          Q.      So you don't know what's
 5   depicted in this photo at all?
 6          A.      You are absolutely correct.
 7          Q.      Again, Jason Poe was with you
 8   at the time of the operation.
 9                  Right?
10          A.      Yes, sir.
11          Q.      We can put that aside, sir.
12                  And Jason Poe's the best there
13   is at doing this operation.
14                  Right?
15          A.      That's correct.
16          Q.      And do you have a sense of how
17   many vent and burns he personally has
18   conducted before?
19          A.      A lot.  That's all I can say.
20          Q.      Okay.  Press you a little bit
21   on that.
22                  Dozens?
23          A.      Let's just say I've been on 30,
24   and he's been on all those, plus.
25          Q.      Plus the ones that you're not
```

1    on?

2         A.    Correct.

3         Q.    Okay.  So in excess of 30.

4               Right?

5         A.    Sure.

6         Q.    You don't have any reason to

7    disagree with his observations of the vent

8    and burn.

9               Right?

10              MR. LEVINE:  Objection.

11              THE WITNESS:  As I said before,

12         ESI is -- they are really, really good

13         at what they do.  Their task is vent

14         and burn cars.

15              They're not chemists.  They're

16         not emergency responders when it comes

17         to derailments.  That's why we team

18         folks together with them.  They set

19         the explosives.  Our guys suggest

20         locations because of -- for the

21         setting of explosives.

22    QUESTIONS BY MR. GOMEZ:

23         Q.    But if they're the best at

24    conducting vent and burns, they know what to

25    expect once they hit those shots off.

Confidential - Pursuant to Protective Order

1          Right?

2              MR. LEVINE:  Objection.

3              MR. BRAGA:  Objection.

4              THE WITNESS:  They're the best

5          at what they do, setting off explosive

6          charges and venting and burning cars,

7          yes.

8    QUESTIONS BY MR. GOMEZ:

9          Q.     Okay.  Do you ever speak to

10   Mr. Poe about what he observed when he set

11   off the first shot of the vent and burn?

12         A.     I was sitting right beside --

13   or standing right beside him.

14         Q.     And what did Mr. Poe tell you,

15   if anything?

16         A.     We have ignition.

17         Q.     Did he say anything about

18   solids or polymers being ejected?

19         A.     He did not.

20         Q.     Okay.  Are you aware that in

21   the wake of the East Palestine derailment, he

22   gave statements to the NTSB about what he

23   observed being expelled or ejected from the

24   tank cars once they were vented and burned?

25         A.     As I said before, I haven't

Confidential - Pursuant to Protective Order

1    read his testimony, no.

2         Q.    So you don't know that he said

3    there was no solid material ejected from the

4    vinyl chloride cars upon initial ignition.

5              Right?

6              MR. LEVINE:  Objection.

7              MR. BRAGA:  Objection.

8              THE WITNESS:  I would have to

9         read it, and I have not spoke to him.

10   QUESTIONS BY MR. GOMEZ:

11        Q.    If that's -- if that is what

12   Mr. Poe experienced, that there was no solids

13   or polymers ejected upon the initial shot of

14   the vent and burn, would you have any reason

15   to disagree with that?

16             MR. LEVINE:  Objection.

17             MR. BRAGA:  Objection.

18             THE WITNESS:  I saw what I saw.

19        He saw what he saw.

20   QUESTIONS BY MR. GOMEZ:

21        Q.    And do you think it's within

22   his expertise conducting explosive operations

23   for vent and burns to understand whether

24   solid materials were or were not coming out

25   of that first shot?

Confidential - Pursuant to Protective Order

```
 1              MR. BRAGA:  Objection.

 2              MR. LEVINE:  Objection.

 3              THE WITNESS:  ESI is the best

 4         at what they do, setting explosives,

 5         operating explosives.

 6              After that, no.

 7    QUESTIONS BY MR. GOMEZ:

 8         Q.    So once he hits the -- once he

 9    hits the detonator on that shot, that's the

10    end of his expertise?

11         A.    When we have ex -- ignition,

12    correct.

13         Q.    After the vent and burn had

14    been conducted, it's my understanding that

15    SRS provided a number of services, including

16    forensic documentation of the site.

17              Is that correct?

18         A.    No, sir.

19              (Day Exhibit 11 marked for

20         identification.)

21    QUESTIONS BY MR. GOMEZ:

22         Q.    Let's pull up Document 11 C,

23    which we'll mark as Exhibit 11 to the

24    deposition.

25              Sorry, Gina, 111 C.
```

Confidential - Pursuant to Protective Order

1          Mr. Day, this Exhibit 11 is a
2    document produced by SRS.  It's document SRS
3    213.
4          Do you see that in the bottom
5    right-hand corner?
6    A.    Yes, sir.
7    Q.    And it appears to be an e-mail
8    exchange.
9          Right?
10   A.    That's correct.
11   Q.    Okay.  The first e-mail appears
12   at the bottom of the page.  It's dated
13   February 15, 2023, from Andy Shipe?
14   A.    Shipe.
15   Q.    Is that correct?
16   A.    That's correct.
17   Q.    Who is Andy Shipe?
18   A.    That is my boss's boss.
19   Q.    And who is your boss?
20   A.    Bobby Breed.
21   Q.    Bobby Breed.  Okay.
22         Mr. Shipe writes in this
23   e-mail, "Can you give me an update on the
24   train derailment?  Who do we have there, and
25   what are we doing?"

Confidential - Pursuant to Protective Order

1              Is that correct?

2      A.      That's what it says.

3      Q.      And that e-mail, by looks of

4   the response, was to Bobby Breed.

5              Right?

6      A.      That is correct.

7      Q.      And Bobby Breed responds also

8   on February 15, 2023.

9              Right?

10     A.      Yes, sir.

11     Q.      And he says, "We are still

12  on-site.  Chip Day is running the operations

13  and has three other special ops guys with him

14  managing product transfers and railcar

15  de-inventory."

16             Did I read that correctly?

17     A.      There's a time with -- Andy

18  Shipe's e-mail says February 15, 2023, at

19  4:08, Shipe, Andy.  And Bobby's response was

20  Wednesday, 2/15/2023, at 4:03:55 UTC.

21             So Bobby's response is, what,

22  five minutes before the -- Andy's e-mail.

23     Q.      Well, that assumes that Andy

24  Shipe's e-mail was also in UTC time.

25             Right?

Confidential - Pursuant to Protective Order

```
1        A.      I have no idea.  I'm just

2   saying it's 4:08 versus 4:03, so I do not

3   know.

4        Q.      Yeah.  You don't know if what

5   was produced by SRS is in UTC time or not.

6               Right?

7        A.      I'm just telling you that it

8   says 4:03 on Bobby's response to a 4:08 Andy

9   Shipe question.

10       Q.      And I'm just telling you that

11  this is what was produced by your company.

12              So do you have any reason to

13  believe or think that this e-mail that we see

14  at the top of the page from Bobby Breed to

15  Andy Shipe providing the exact information

16  that Andy Shipe requests at the bottom of the

17  page is not a response?

18       A.      I don't know.

19       Q.      Okay.

20       A.      There's a time difference.

21       Q.      Let's talk about what the

22  e-mail says, putting aside the time.

23              Bobby Breed writes in this

24  e-mail to Andy Shipe, "I'm addition."

25              Can we agree that should be "in
```

1    addition"?

2             It's the last -- second to last

3    e-mail of the e-mail.

4        A.    Yes.

5        Q.    "In addition, our crews are

6    assisting with forensic documentation on the

7    VCM cars and the damage done during the

8    derailment."

9             Did I read that correctly?

10       A.    That's what it says.

11       Q.    Having read this e-mail from

12   Bobby Breed, your boss, does that refresh

13   your recollection as to whether you were

14   doing -- or SRS was doing forensic

15   documentation on the VCM cars after the vent

16   and burn?

17       A.    Wordsmithing?  It could

18   probably be done if you used a different

19   word.  Forensic documentation.

20            We wound up doing some air

21   monitoring.  We did some -- took parts off

22   the car for the NTSB.

23       Q.    You also documented the cars

24   with pictures.

25            Right?

Confidential - Pursuant to Protective Order

```
 1         A.      We took some pictures, yes.

 2                 We didn't document them.

 3                 I have pictures of the cars,

 4   but -- and they were produced to you guys.

 5   But for -- a report or anything like that was

 6   not produced.

 7                 (Day Exhibit 12 marked for

 8         identification.)

 9   QUESTIONS BY MR. GOMEZ:

10         Q.      We can put this one aside, sir,

11   and we'll pull up Document 142, which we'll

12   mark as Exhibit 12 to the deposition.

13                 Mr. Day, the exhibit that we

14   just marked, it's a text message exchange

15   between you and Drew McCarty containing

16   certain photographs.

17                 Is that a fair

18   characterization?

19         A.      Fair characterization.

20         Q.      And the dates on these messages

21   are all February 9, 2023.

22                 Right?

23         A.      Uh-huh.  Yes, sir.

24         Q.      Now, the photos themselves are

25   tough to see within the e-mail exchange, but
```

1   we've included them at the end, and they are

2   SPSI TEXTS 289 through 292.

3           Do you see those, what looks

4   like four enlarged images?

5       A.      Yes, sir.

6       Q.      And my question to you is, do

7   you know who took these images?

8       A.      Yes, sir, I should do.

9       Q.      Who was it?

10      A.      Me.

11      Q.      And can you describe for me

12  where you were when you took these photos?

13      A.      These were taken while we were

14  doing the air monitoring of the inside space

15  of the car to allow us to escort NTSB

16  into or -- and around the cars.  Up to and

17  around the cars.

18      Q.      And were you physically within

19  the tank?

20      A.      No, I was taking high air

21  monitoring from the top shot hole, holding

22  the air monitor in, looking inside.

23      Q.      Okay.  So in terms of

24  positioning the camera and actually taking

25  the photographs, can you explain to me how

Confidential - Pursuant to Protective Order

1   you -- how you did that?

2          A.     Climbed up on top of the car.

3          Q.     Uh-huh.

4          A.     Went to the hole.  Dropped the

5   air monitor in.  Got the readings that we

6   needed.  Provided them to CTH {sic}.  Looked

7   in, saw what I thought was polymer, and took

8   pictures.

9          Q.     And these images, were they

10  taken from a personal camera or device or an

11  SRS camera or device?

12         A.     On my phone.

13         Q.     Okay.  And once you took those

14  photos, you sent them off to Drew McCarty.

15                Right?

16         A.     Correct.

17         Q.     About how long after you took

18  them do you recall sending them?

19         A.     We'd have to pull it up from my

20  phone.

21         Q.     Fair enough.

22                But the reason you sent those

23  pictures to Drew McCarty is because you

24  thought that it showed polymer.

25                Right?

Confidential - Pursuant to Protective Order

```
1       A.      Correct.

2       Q.      And that's, in fact, why you

3  say on the page that's marked 286 on the

4  bottom right-hand corner, "Justice" --

5       A.      Correct.

6       Q.      -- with three exclamation

7  points.

8               Correct?

9       A.      Correct.

10      Q.      And the conversation continues

11 with a message from Mr. McCarty following the

12 images, saying, "Inside of VC cars, question

13 mark?"

14              Right?

15      A.      That's what it says.

16      Q.      Mr. McCarty is asking you, did

17 you take these photos from inside the VCM

18 cars.

19              Right?

20      A.      Correct.

21      Q.      And your response is, all

22 capitals, "Inside," with two exclamations.

23              Right?

24      A.      Yes, sir.

25      Q.      He then follows up, "Hard to
```

Confidential - Pursuant to Protective Order

1   tell from photos.  Polymers, question mark?"

2        A.     Correct.

3        Q.     And you confirm, "Yes, sir."

4               Right?

5        A.     That's correct, sir.

6        Q.     Other than documenting what you

7   believe to be polymer inside of the VCM cars

8   with these photographs, did you do anything

9   else to document what you found?

10       A.     No, sir.

11       Q.     You did not collect any of the

12  polymer.

13              Right?

14       A.     OxyChem -- Oxy Vinyls did.

15       Q.     It's your understanding that

16  OxyChem took samples what of we see in these

17  photos?

18       A.     No, sir.  They took samples.

19       Q.     Okay.  So putting aside the

20  separate samples that OxyChem took, I want to

21  focus just on what we're looking at in these

22  photos.

23       A.     Okay.

24       Q.     Did you do anything to take

25  samples from the areas that are photographed

Confidential - Pursuant to Protective Order

1    in this Exhibit 12?

2         A.    No, sir.

3         Q.    Did you do anything to preserve

4    the condition of what you've documented in

5    these photographs supposedly showing polymer?

6         A.    No, sir.

7         Q.    Instead of collecting -- let me

8    withdraw that.

9              Did you alert anyone at NTSB

10   about what you had observed and documented in

11   these photos?

12        A.    I believe I did, yes, sir.

13        Q.    And who do you recall telling?

14        A.    Some of the NTSB investigators

15   when they were on the scene.

16        Q.    Do you recall having any

17   conversations with anyone at OxyChem about

18   what you had seen and documented in these

19   photos?

20        A.    The three folks that were

21   on-scene.

22        Q.    So it's your understanding that

23   they were still there on February 9, 2023?

24        A.    There were folks there, or at

25   least they were either there or they came

Confidential - Pursuant to Protective Order

1    back when they pulled the samples.  I think

2    they came back.

3         Q.     After these photos were taken,

4    the VCM cars were decontaminated.

5               Right?

6         A.     No, sir.

7         Q.     The VCM cars were not pressure

8    washed?

9         A.     No, sir.

10        Q.     If the NTSB has stated that

11   they were pressure washed, do you disagree

12   with that?

13        A.     I do.

14        Q.     Okay.

15        A.     From when these pictures were

16   taken, yes.

17        Q.     What do you mean by that?

18        A.     So the cars were clean.  They

19   were clear.  We have air monitoring data

20   through CTH {sic} that showed what the air

21   monitoring data inside was, and there was no

22   need to add additional water to an already

23   muddy situation.

24        Q.     Understood.

25               Okay.  These cars that you

Confidential - Pursuant to Protective Order

1    documented with these photographs were

2    eventually wrecked.

3              Right?

4    A.    Oh, they were wrecked, yes,

5    sir.

6    Q.    And --

7    A.    In the derailment they were

8    wrecked.

9    Q.    They were wrecked in the

10   derailment, and they were also broken apart

11   to move them off-site.

12             Right?

13   A.    I don't know.  When I left,

14   they were still whole.

15   Q.    So you don't know what the fate

16   was of what was left of the cars after you

17   left the site.

18             Right?

19   A.    I know the fate of the

20   protective housings, and that's all -- that's

21   all I know about the cars.

22   Q.    Who would be the best person to

23   ask about when, if at all, these cars were

24   broken up and moved off of site?

25   A.    Somebody that knows about the

1    decontamination or demolition of those cars,

2    scrapping of those cars.

3         Q.    Other than you personally, did

4    anyone else from SRS collect samples of

5    what's supposedly polymer in these

6    photographs?

7              MR. BRAGA:  Object to the form

8         of the question.

9              THE WITNESS:  There was no

10        samples for SRS because we don't pull

11        samples.  There's no reason for it.

12   QUESTIONS BY MR. GOMEZ:

13        Q.    Well, you did know that one of

14   the central questions about the East

15   Palestine derailment was whether or not these

16   cars were polymerizing.

17              Right?

18              MR. BRAGA:  Objection.

19              MR. LEVINE:  Objection.

20              THE WITNESS:  I knew one of the

21        issues was if it was polymerizing, but

22        at this point, the VCM is gone, the

23        cars are clear, and we're continuing

24        on with the operations.

25

Confidential - Pursuant to Protective Order

1   QUESTIONS BY MR. GOMEZ:

2       Q.      Do you think it's important for

3   future rail incidents to understand whether

4   or not the VCM in the cars in East Palestine

5   were actually undergoing polymerization?

6               MR. BRAGA:  Objection.

7               THE WITNESS:  It would be nice

8       to know, yes, sir.

9   QUESTIONS BY MR. GOMEZ:

10      Q.      And one of the ways we could

11  know that is if we had samples from inside

12  the car.

13              Right?

14      A.      Yes, sir.

15              MR. LEVINE:  Objection.

16  QUESTIONS BY MR. GOMEZ:

17      Q.      And we could certainly know

18  that if we had samples of what you believe

19  was polymer and decided to photograph but not

20  collect.

21              Right?

22              MR. LEVINE:  Objection to the

23      form.

24              THE WITNESS:  It's really

25      simple for us all to sit here and

Confidential - Pursuant to Protective Order

```
1          Monday morning quarterback what we
2          should -- would have, should have,
3          could have done.  But you're
4          absolutely right, we could have pulled
5          samples.  We could have had them
6          analyzed.  We had a whole a lot other
7          operations that needed to take place.
8     QUESTIONS BY MR. GOMEZ:
9          Q.     So is it your testimony that
10    you just didn't have the time?
11              MR. LEVINE:  Objection.
12              THE WITNESS:  We had other
13         things on our mind than taking samples
14         of these cars.  We believed it was
15         polymer.  The OxyChem representative
16         that came back, that pulled the
17         samples of where they wanted to take
18         samples, pulled samples.  Never heard
19         what the analysis was.
20              The only joking thing they said
21         was, don't drop any PVC resin in the
22         car to make it look like polymer.
23    QUESTIONS BY MR. GOMEZ:
24         Q.     You took these photos because
25    you thought that what we were looking at is
```

Confidential - Pursuant to Protective Order

1    polymer.

2              Right?

3    A.       That's correct.

4    Q.       Didn't Terry Rockwell want to

5    send polymer to one of the executives at Oxy

6    Vinyls to prove that polymerization was

7    occurring in those cars?

8    A.       I don't know.  You'll have to

9    talk to Terry about that.

10   Q.       He never said that in front of

11   you?

12   A.       I don't recall.

13   Q.       You don't recall him telling

14   the folks from Oxy Vinyls who were there

15   on-site that once they confirmed

16   polymerization was occurring, they were going

17   to collect all the PVC and send a care

18   package to him?

19   A.       That does not sound like Terry

20   Rockwell.

21   Q.       So if we have text messages

22   where Terry Rockwell is asking you to collect

23   PVC resin, it would be for some other

24   purpose?

25              MR. BRAGA:  Objection.

1          THE WITNESS:  I'd have to see a

2      text message from Terry asking to

3      collect.

4   QUESTIONS BY MR. GOMEZ:

5      Q.     Did you tell anyone from

6   Norfolk Southern, by the way, that you had

7   found what you believed to be polymer inside

8   the cars?

9      A.     I believe so.

10      Q.     Who'd you tell?

11      A.     I believe I told the Norfolk

12   Southern, some of the folks, either Scott

13   Gould -- or the people that we reported to, I

14   believe we found some polymer.  That's why I

15   photo-documented it.

16      Q.     And what was their response to

17   that?

18      A.     I don't remember.

19      Q.     They didn't tell you to collect

20   anything.

21          Right?

22      A.     No, sir.

23      Q.     They didn't tell you to take

24   samples.

25          Right?

Confidential - Pursuant to Protective Order

1    A.    I've already established that,
2  yes, sir.
3    Q.    Right.  You established that
4  you didn't take samples.
5          My question is, they didn't
6  instruct you to take samples.
7          Right?
8    A.    You are absolutely correct.
9          MR. GOMEZ:  Okay.  Sir, I'm
10       going to reserve what little time I
11       have left and invite some of the other
12       attorneys to ask you their questions.
13          VIDEOGRAPHER:  Off the record?
14          MR. GOMEZ:  Yes.
15          VIDEOGRAPHER:  The time is
16       1:53 p.m., and we are going off the
17       record.
18       (Off the record at 1:53 p.m.)
19          VIDEOGRAPHER:  The time is
20       2:03 p.m., and we're back on the
21       record.
22          DIRECT EXAMINATION
23  QUESTIONS BY MR. BYARS:
24    Q.    Good afternoon, Mr. Day.  My
25  name is John Byars.  I'm with the law firm

Confidential - Pursuant to Protective Order

1    Bartlit Beck, and I represent Trinity

2    Industries in this lawsuit.

3              You've heard of Trinity

4    Industries before.

5              Right?

6         A.    Yes, sir.

7              (Day Exhibit 13 marked for

8         identification.)

9    QUESTIONS BY MR. BYARS:

10        Q.    Okay.  I'm going to introduce

11   another exhibit.  This will be Exhibit 13.

12   And this is to help orient us on what this

13   derailment looked like.

14              And I'll just represent to you,

15   Mr. Day, that this is a composite that's put

16   together from pictures that were in the

17   Hazardous Materials Group Chair's Factual

18   Report, which was Exhibit B 10 to the NTSB

19   hearing that you attended.

20              Have you seen these pictures

21   before?

22        A.    I've seen some -- a lot of

23   overflight pictures of East Palestine.

24        Q.    Does this look like a fair

25   representation of the derailment site between

Confidential - Pursuant to Protective Order

1    February 3rd and the time of the vent and

2    burn?

3         A.    Yes, sir.

4         Q.    Okay.  Now, I want to draw your

5    attention to the box at the left-hand corner

6    of the picture -- at the left-hand side of

7    this document.  And you'll see that it has

8    car numbers, car types, and then line

9    numbers.

10        A.    Yes, sir.

11        Q.    Do you see that?

12        A.    Yes, sir.

13        Q.    And the lines numbers that are

14   in red in that box are the VCM cars.

15              Do you understand that?

16        A.    Yes, sir.

17        Q.    I want to draw your attention

18   now to line number 28, which is TILX402025.

19              Do you see that in that box?

20        A.    Line -- yeah, TILX402025, yes,

21   sir.

22        Q.    Right.

23              And if you look at it on the

24   picture, it's the car -- you'll see Car 28

25   almost at the end of the right side of this

Confidential - Pursuant to Protective Order

1    picture.

2              Do you see it?

3        A.    Yes, sir.

4        Q.    Okay.  And do you understand

5    that to be the VCM car that was owned by

6    Trinity?

7        A.    Yes, because of the reporting

8    marks.

9        Q.    Okay.  And if I refer to that

10   as the "Trinity VCM car," will you understand

11   that means TILX402025, which is line

12   number 28?

13       A.    Yes, sir.

14       Q.    Thank you.

15             So are you aware that Norfolk

16   Southern has sued Trinity in this lawsuit?

17       A.    I found out yesterday.

18       Q.    Have you ever seen the

19   complaint that Norfolk Southern filed against

20   Trinity?

21       A.    No, sir.

22       Q.    One of the things that Norfolk

23   Southern says in the complaint is that

24   discrepancies between the Trinity VCM car's

25   AAR 42 Certificate of Construction and the

Confidential - Pursuant to Protective Order

```
 1    Trinity VCM car's actual characteristics

 2    existed.

 3              Okay?

 4              So they're saying that there

 5    were discrepancies between the Certificate of

 6    Construction of the Trinity's VCM car and the

 7    tank car's actual characteristics.

 8              Do you know anything about that

 9    allegation?

10    A.    No, sir.

11    Q.    To your knowledge, did any

12    supposed discrepancies between the Trinity

13    VCM car's Certificate of Construction and its

14    actual physical characteristics have anything

15    to do with the vent and burn decision?

16              MR. LEVINE:  Objection.

17              THE WITNESS:  No, sir.

18    QUESTIONS BY MR. BYARS:

19    Q.    To your knowledge, did any

20    supposed discrepancies between any of the

21    other VCM cars' Certificates of Construction

22    have anything to do with a vent and burn

23    decision?

24    A.    No, sir.

25              MR. LEVINE:  Objection.
```

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  Sorry.
 2  QUESTIONS BY MR. BYARS:
 3       Q.    To your knowledge, did the
 4  supposed presence of aluminum in any of the
 5  VCM cars, including the Trinity VCM car, have
 6  anything to do with the vent and burn
 7  decision?
 8       A.    No, sir.
 9       Q.    Now, Trinity had nothing to do
10  with the derailment.
11              Can we agree on that?
12       A.    Sure.
13       Q.    And Trinity had nothing to do
14  with the vent and burn decision.
15              Correct?
16       A.    That's correct.
17       Q.    Would you say that the cars --
18  the VCM cars operated as designed?
19              MR. LEVINE:  Objection.
20              MR. BRAGA:  Objection.
21              THE WITNESS:  They were
22       involved in a derailment, and they did
23       not blow up.
24  QUESTIONS BY MR. BYARS:
25       Q.    So is it fair to say that they
```

Confidential - Pursuant to Protective Order

1    operated as designed?

2              MR. LEVINE:  Objection.

3              THE WITNESS:  Loosely, yes.

4    QUESTIONS BY MR. BYARS:

5         Q.    In fact, that's something that

6    you said not long after the derailment.

7              Right?

8         A.    Yes, sir.

9         Q.    Okay.  And you believed that

10   the Trinity VCM car was stable prior to the

11   vent and burn.

12             Correct?

13        A.    The Trinity VCM car was the

14   first VCM car in line, and it's the one that

15   we were able to put a pressure gauge on and

16   wanted to possibly get it slid out of the

17   way, into the clear, before the vent and burn

18   operation took place.

19        Q.    And you were willing to try and

20   do that because you believed it was stable.

21             Is that right?

22        A.    Yes, sir.

23        Q.    And you knew that because of

24   the pressure gauge.

25             Right?

Confidential - Pursuant to Protective Order

1    A.    The pressure gauge and the lack

2  of extremely deep burn, heat, scorching on

3  that car, yes, sir.

4    Q.    Okay.  And when you arrived at

5  the derailment site on the morning of

6  February 5th, were there any pool fires that

7  the Trinity VCM car was in?

8    A.    There were some fires burning

9  backwards and flashing back and forth in the

10  ballast rock underneath the Trinity car, but

11  nothing sustained.

12    Q.    Okay.  Anything that would keep

13  you from entering the area in order to

14  inspect the Trinity rail -- the Trinity VCM

15  car?

16    A.    We performed --

17        MR. BRAGA:  On the same day?

18        MR. BYARS:  Yeah, talking

19    about -- sorry.  Let me ask the

20    question so it's clear.

21  QUESTIONS BY MR. BYARS:

22    Q.    The morning of February 5th

23  when you get there, any pool fires under the

24  Trinity VCM car that would have kept you from

25  inspecting the Trinity VCM car?

Confidential - Pursuant to Protective Order

1      A.      There were some fires flashing

2  back and forth in the ballast rock, like I

3  said.  And we walked up to the car on that

4  day, I can't tell you exactly when, to

5  perform a damage assessment on that car.

6      Q.      Okay.  So the fires that were

7  flashing back and forth on the ballast rock

8  didn't keep you from performing your

9  inspection?

10     A.      That's correct.

11     Q.      And when you say "on the

12 ballast rock," can you identify on Exhibit 13

13 what you -- what you're referring to?

14     A.      So to understand railroad

15 tracks, there's the rail, there's the ties,

16 and then there's ballast rock.

17             There was a lot of water flowed

18 on the derailment site trying to extinguish

19 fires, so there was a layer of water.  There

20 was a layer of flammable liquids, very thin

21 layer of flammable liquids, moving around on

22 the site.  And just the nature of flammable

23 liquids, ground heated begins to off-gas

24 flammable vapors, finds an ignition source

25 and flashes.

Confidential - Pursuant to Protective Order

1             And we have -- it's a common

2    phenomenon in derailments.  We have ballast

3    rock flash fires moving up and down the

4    ballast rock.

5        Q.    And will you just identify on

6    the picture the ballast rock so that I'm

7    clear?

8        A.    It's the rock that the railroad

9    track was sitting on.

10       Q.    So if I'm looking at Car 28 in

11   the label 28 --

12       A.    It's laying on the track, on

13   the ties, on the rock.  The ballast rock is

14   what the ties, the train track, sits on.

15       Q.    Okay.  Thank you.

16             So after the morning -- well,

17   strike that.

18             We established -- or you

19   testified earlier today that there was about

20   48 hours between the extended PRD release on

21   February 4th and the vent and burn on

22   February 6th.

23             Do you recall that?

24       A.    There's a discussion on time.

25   I've not sat down and looked at a clock and

Confidential - Pursuant to Protective Order

1  figured out exactly how far it was.  But to

2  make this thing move along, somewhere around

3  24 to 48 hours, yes.

4       Q.    So during -- and within that

5  time period is when you arrived on Sunday --

6  on Sunday morning, February 5th.

7             Correct?

8       A.    Correct.

9       Q.    All right.  Was there ever any

10  time between the time that you arrived at the

11  derailment site on the morning of

12  February 5th and the vent and burn where

13  conditions ever deteriorated so that you had

14  to withdraw everyone from the derailment

15  site?

16      A.    I -- when I was there, I don't

17  remember any.

18      Q.    Now, we touched briefly on the

19  fact that there was an attempt to move the

20  Trinity VCM car.

21            Correct?

22      A.    There was discussion, yes, sir.

23      Q.    There was discussion.

24            And can you tell me why it was

25  ultimately decided not to move the Trinity

Confidential - Pursuant to Protective Order

1    VCM car?

2        A.      So on the night of

3    February 5th, Cranemasters and Hulcher were

4    sitting up equipment in front of Leake Oil in

5    preparation for train wrecking operations.

6              We needed to move several cars

7    to the east of the derailment in order to

8    build a containment for the pending vent and

9    burn operation.

10             Due to the limited damage to

11   the TILX car, which we call it the white car,

12   the train wreckers came in, they looked at

13   all the cars, they knew they could move

14   the covered hopper cars.  They came up and

15   performed a wrecking operation/damage

16   assessment on the Trinity car.

17             And I'm not sure how long that

18   took, but they -- late that night, they

19   surmised that they could not move that car

20   due to bolster damage and -- just bolster

21   damage.  They couldn't get it rolled up and

22   picked up without impacting the other cars,

23   the other VCM cars.

24       Q.     Can you explain that a little

25   bit more, how this bolster damage would have

Confidential - Pursuant to Protective Order

1  possibly impacted the other VCM cars?

2      A.     The couplers were -- I believe

3  the couplers were still attached between the

4  28 car and the 29 car.  That's the way the

5  train was set up.  In a derailment, cars pass

6  each other.

7            The wrecking contractors were

8  not comfortable hooking on to that car and

9  sliding it out of the way.

10           I personally was not on-site.

11  I was just advised that they could not move

12  that car.

13     Q.     And when you say "wrecking

14  contractors," will you tell me who again that

15  was?

16     A.     That was Crane -- on that end

17  of the derailment, Cranemasters and Hulcher,

18  H-u-l-c-h-e-r, and the opposite end was

19  Corman.  Opposite end of the derailment was

20  Corman.

21     Q.     And can you tell me who gave

22  you this information regarding TILX402025?

23     A.     I do not remember who called

24  me.

25     Q.     All right.  So you don't recall

1   who called from you Hulcher or Cranemasters?

2       A.      I don't know if it was them.

3   It may have been the nighttime SPSI manager.

4   Somebody told me that they were not

5   comfortable moving that car.

6       Q.      So probably best for me to talk

7   to somebody from Hulcher or Cranemasters

8   about that.

9               Fair to say?

10      A.      Most likely.

11      Q.      Okay.  And you don't have any

12  pictures showing that bolster damage, by any

13  chance?

14      A.      I presented everything -- all

15  the pictures that I have.

16      Q.      Okay.  Thank you.

17              The next thing I wanted to ask

18  you about real quick.  You had mentioned that

19  you didn't -- that water was not applied to

20  the VCM cars on February 5th and 6th because

21  they still had their jackets on.

22              Is that correct?

23      A.      That's correct.

24      Q.      And the idea there is that

25  because they had their jackets on, the water

Confidential - Pursuant to Protective Order

1    wouldn't cool the cars.

2              Is that correct?

3         A.    It wouldn't be able to get to

4    the shell.

5         Q.    Okay.  And is there a basis for

6    you believing or testifying that you have to

7    have water on the shell in order for the car

8    to be cooled?

9              MR. LEVINE:  Objection.

10             THE WITNESS:  That basically

11        just goes back to firefighting 101.

12        If you're trying to cool a product

13        that's inside, under four inches of

14        insulation, under an eighth-inch

15        jacket, under a half-inch of thermal

16        protection, you must get the cooling

17        material to the shell, not on the

18        jacket.

19   QUESTIONS BY MR. BYARS:

20        Q.    And is that something that

21   you're taught in firefighting school?

22        A.    Firefighting school and the

23   Pueblo classes.

24        Q.    The Pueblo classes.

25             Okay.  And what's the most

Confidential - Pursuant to Protective Order

1    recent Pueblo class that you had where that

2    particular concept was taught?

3         A.      Any of the fire training

4    classes at Pueblo, any fire training classes

5    involving tank cars, crude by rail, ethanol

6    by rail.  It's a -- it's a common theme.

7         Q.      The only thing, Mr. Day, I'll

8    tell you that I'm struggling with a little

9    bit is that there seems to be a consensus

10   that heat can be transferred from a pool

11   fire, through a jacket, into the material

12   inside the car.  So I'm having trouble

13   understanding why a car can't be cooled by

14   applying water to the jacket and trying to

15   move heat off of it that way.

16        A.      I'm not a thermal dynamics

17   expert, but basically in a pool fire, heat is

18   absorbed in the steel, deteriorates

19   insulation.  The jacket and the insulation

20   protect the shell, the product, from the

21   outside environment.

22               Once the insulation is

23   compressed, once the insulation is destroyed,

24   damaged, due to fire, then you start getting

25   heat transfer through.

Confidential - Pursuant to Protective Order

1              Heat transfer is a lot easier

2     than water transfer.

3          Q.     Okay.

4          A.     We can rip the jackets off but

5     also take -- it's also a very risky business

6     to put folks up on cars with active fires.

7          Q.     So is it possible that the

8     jackets were deteriorated to the point where

9     if there had been water applied to the cars,

10    there could have been some cooling effect?

11         A.     You're asking me to speculate,

12    and I try not to.  I've been advised not to

13    speculate.  It is what it is or it isn't.

14         Q.     Sitting here today, though, you

15    can't tell me with certainty that there

16    couldn't have been some cooling effect to

17    applying water to the cars?

18         A.     That's your opinion.  I have my

19    own opinion.

20         Q.     Now, you also said that there

21    were some fires that were burning in the

22    protective housings of two of the VCM cars?

23         A.     Three of the VCM cars.

24         Q.     Three of the VCM cars.

25                Now, they weren't burning in

Confidential - Pursuant to Protective Order

1    the TILX402025 car.

2              Right?

3         A.    You are absolutely correct.

4         Q.    Did you -- was there ever any

5    consideration given to putting out those

6    fires?

7         A.    Consideration, yes.  However,

8    if you go back to the SDS and firefighting

9    101, if you extinguish fires, you must be

10   able to control the release.

11        Q.    Okay.  I don't understand that.

12             What do you mean -- what does

13   extinguishing fires and protective housings

14   have to do with controlling the release?

15        A.    Didn't you just say, if you --

16   can you -- could you have gone in and put out

17   the fire?

18        Q.    Yeah.  Yes.  I was asking could

19   you put out the fire on the protective

20   housings of the three cars.

21        A.    Most definitely, yes, sir.

22        Q.    Okay.  How would you have done

23   that?

24        A.    Fire extinguisher.

25        Q.    And why didn't you do that?

Confidential - Pursuant to Protective Order

1     A.     Because you have -- if you go

2    to the SDS and you go to the New Jersey

3    document that we spoke of earlier, you must

4    be able to control the release.

5              For some reason, those

6    protective housings are on fire.  That means

7    it's releasing material.  Something from

8    inside the car is leaking through, and you

9    have fire.

10              Now, if you go up there and

11    extinguish it, you must be able to control

12    those vapors that are coming out that used to

13    be on fire.  Now you have an uncontrolled

14    flammable gas release.

15              Flammable gas -- VCM is heavier

16    than air.  It flows off the side of the car,

17    gets to the ground, reaches out in fingers

18    and finds pockets.  Once those pockets get

19    accumulated enough, it finds an ignition

20    source and flashes back.

21     Q.     So your concern was -- I think

22    I understand what you're saying now.

23              My understanding is that your

24    concern was that if you put out those fires

25    that were in those protective housings, then

Confidential - Pursuant to Protective Order

1    you would just have gas that would pour over

2    the top, go down the side of the -- of the

3    cars.

4              Is that right?

5         A.    And find an ignition source.

6         Q.    Find an ignition source.  Okay.

7              Which of the three cars had

8    protective housings -- well, sorry, had fires

9    still burning in the protective housings, if

10   you refer to Exhibit 13?

11        A.    55, 31 and 30.

12        Q.    Okay.

13        A.    I believe those are the ones.

14        Q.    Thank you.

15              Now, you also said that there

16   were these fires that were in the -- what did

17   you call it, the ballast rocks?

18        A.    Yes, sir.

19        Q.    Was there any attempt made to

20   put those fires out?

21        A.    Those fires flashed, and it

22   went away.  They flash.  They went away.  It

23   wasn't a constant fire.  It was fed by the

24   fire underneath the biggest pile of cars.

25        Q.    Okay.  And when you say "the

Confidential - Pursuant to Protective Order

```
 1    fire underneath the biggest pile of cars,"

 2    can you identify that for me on Exhibit 13?

 3         A.     From 31 going toward 44, 45.

 4         Q.     Okay.  Was there ever any

 5    attempt made to put the fire out underneath

 6    those cars?

 7         A.     Multiple times.

 8         Q.     And can you describe those

 9    attempts to me?

10         A.     This might sound like a smart

11    ass.  Laid a fire hose out, hooked up -- put

12    a nozzle on it, pressurized it with water,

13    opened the nozzle, sprayed foam, put out

14    fire.  Fire flashed back.

15              The problem we have is, these

16    kind of fires, with all this equipment on

17    top, all these cars, all this material,

18    there's spot fires everywhere.  As those spot

19    fires continue to burn, it's heating other

20    things, some of the stuff that you wouldn't

21    expect to burn, some of the lube oils and

22    stuff like that.

23              So you go in, you put the fire

24    out, then it would flash back.

25         Q.     When were those attempts made
```

Confidential - Pursuant to Protective Order

1  to put the fire out that was under the pile

2  with water?

3       A.    Several times during the entire

4  operation, leading up to and after the vent

5  and burn.

6       Q.    Okay.  So while you were there

7  from the time that you arrived at the

8  derailment site on the morning of

9  February 5th until the vent and burn on

10  February 6th, did you personally witness the

11  attempts to put out that fire?

12       A.    I don't recall.

13       Q.    What about the use of foam to

14  put out that fire?  Was that ever tried?  Do

15  you know?

16       A.    That would be for the fire

17  service and for SPSI.  I know foam was used

18  at times.

19       Q.    Do you know when it was used?

20       A.    During the wrecking operation.

21       Q.    Did you ever personally observe

22  it being used?

23       A.    I saw -- I flowed a lot of

24  water, but not a lot of foam.

25       Q.    Was there any time where you

1   ever saw unmanned hoses, water hoses, set up

2   to train water on the derailment?

3          A.     There's a lot of pictures from

4   the night -- the night of the incident, and

5   there were times during the vent and burn

6   operation where unmanned monitors were set

7   up, and then during the wrecking operations

8   after the vent and burn.

9          Q.     And that's actually the term I

10  was looking for, "unmanned monitors."  I

11  couldn't remember that.

12                Those are the unmanned water

13  hoses.

14                Right?

15         A.     Correct.

16         Q.     Were there any unmanned water

17  hoses set up between the time that you

18  arrived on the morning of February 5th and

19  the vent and burn?

20         A.     There were.

21         Q.     And where were those set up?

22         A.     To protect Leake Oil and I

23  believe Brave Industries and the blue

24  building.

25         Q.     Were there any that were set up

Confidential - Pursuant to Protective Order

1    so that the water was being aimed at the

2    derailment site?

3        A.    The water was used to protect

4    the structures.

5        Q.    So there was no water that was

6    being put onto the derailed cars from these

7    unmanned monitors.

8              Is that correct?

9        A.    Correct.

10       Q.    And do you know why there was

11   no water being aimed at the derailed cars

12   from these unmanned monitors during that

13   time?

14       A.    Some of it may have been trying

15   to reduce the flow of water downstream.  It

16   was washing contamination away from the site.

17       Q.    Did anybody ever tell you that?

18       A.    It was obvious.

19       Q.    Did you ever discuss that with

20   anybody?

21       A.    I wasn't there for an

22   environment -- for environmental issues.  I

23   was there for compressed gas cars.

24       Q.    Did you ever hear anyone

25   discussing that?

Confidential - Pursuant to Protective Order

1    A.    There's -- the cleanup is still

2  going on, so obviously there's been a lot of

3  discussion about it.

4    Q.    Okay.  When you were there from

5  the morning of February 5th until the vent

6  and burn, did you ever hear anyone discussing

7  not putting water on the derailment site

8  because of the flow of water downstream that

9  would result?

10    A.    Is that a question?

11    Q.    Yes.

12    A.    Could you restate it?

13    Q.    I sure can.

14          When you were at the derailment

15  site from the morning of February 5th until

16  the vent and burn, did you ever hear anyone

17  discussing not putting water on the

18  derailment site because of the flow of water

19  downstream that would result?

20    A.    No.

21    Q.    Do you think that if there had

22  been water -- strike that.

23          Do you think if there had

24  been -- if the unmanned monitors had been

25  used to put water on the derailment site from

Confidential - Pursuant to Protective Order

1    the morning of February 5th until the vent

2    and burn, that that could have had a cooling

3    effect on the VCM cars?

4                    MR. BRAGA:  Objection.

5                    THE WITNESS:  As I previously

6        stated, applying water to jackets does

7        nothing to cool product.

8    QUESTIONS BY MR. BYARS:

9        Q.    What if you're -- what if the

10   water is being applied to the -- to the

11   ballast rock or to the fire that was

12   underneath cars from, I think you said, 31 --

13   Car 31 to Car 45?  Would there have been a

14   cooling effect on the VCM cars then?

15                   MR. LEVINE:  Objection.

16                   THE WITNESS:  You can't apply

17       water to a jacketed car and expect

18       cooling to take place.

19   QUESTIONS BY MR. BYARS:

20       Q.    I guess I'm asking, what if you

21   weren't applying the water to the jacketed

22   car but instead were applying it to what the

23   car was sitting on?

24       A.    You're asking me for

25   speculation.  I'm not going to speculate.

Confidential - Pursuant to Protective Order

```
 1        Q.    So -- all right.  If you had to
 2   guess, and I know you don't like to do this,
 3   but what would be your guess as to whether
 4   that would have had any cooling effect on the
 5   VCM cars?
 6              MR. BRAGA:  Objection.
 7              You can go ahead and guess.
 8              THE WITNESS:  I hate to guess.
 9         It possibly could.  It possibly could
10         not.
11   QUESTIONS BY MR. BYARS:
12        Q.    Sitting here today, you can't
13   tell me that there would not have been a
14   cooling effect had water been applied to the
15   areas underneath the VCM cars?
16              MR. LEVINE:  Objection.
17              THE WITNESS:  Pumping water on
18         a jacketed car does virtually no help
19         to cool -- the cooling.  It's been
20         proven dozens of times in incidents
21         across the country involving jacketed
22         cars.
23   QUESTIONS BY MR. BYARS:
24        Q.    What about pumping water to the
25   area that the cars are sitting on?
```

Confidential - Pursuant to Protective Order

```
 1                    MR. LEVINE:  Same objection.

 2   QUESTIONS BY MR. BYARS:

 3        Q.      Would that have a cooling

 4   effect?

 5        A.      It would possibly put out fire,

 6   possibly wash contamination downstream.

 7        Q.      Were there any -- let's look at

 8   Car 55 real quick.

 9                You see Car 55 on Exhibit 13?

10        A.      Yes, sir.

11        Q.      And do you see Car 54, which is

12   right up against Car 55?

13        A.      I do see that.

14        Q.      Do you recall if Car 54 was on

15   fire?

16        A.      It was a smoldering fire, yes,

17   sir.

18        Q.      Was any water ever applied to

19   Car 54?

20        A.      No, there was not.  Not until

21   the end.

22        Q.      When you say "until the end,"

23   when was that?

24        A.      When the wrecking operation got

25   up to that car.
```

1      Q.     So that was after the vent and

2   burn?

3      A.     That was after the vent and

4   burn.

5      Q.     So before -- or from the

6   morning of February 5th when you arrived at

7   the derailment scene until the vent and burn,

8   there was no water that was put on Car 54.

9             Is that right?

10     A.     That is correct.

11     Q.     And why is that?

12     A.     We were -- I mean,

13  environmentally, any water you flow on that

14  car is going to go to the ground, and it's

15  going to wash more contamination downstream.

16  And the environmental folks had a heck of

17  problem going on with contamination getting

18  off-site.

19     Q.     So were you instructed not to

20  put water on that car because of the possible

21  runoff?

22     A.     I was not.

23            MR. LEVINE:  Objection.

24  QUESTIONS BY MR. BYARS:

25     Q.     Did you make the decision not

Confidential - Pursuant to Protective Order

1    to put water on that car because of possible

2    runoff?

3        A.    I -- sir, I was there for the

4    compressed gas cars, the five VCM cars and

5    the one isobutylene car.

6        Q.    If water had been put on

7    Car 54, would it have cooled Car 54 down?

8            MR. LEVINE:  Objection.

9            THE WITNESS:  It's possible.

10   QUESTIONS BY MR. BYARS:

11       Q.    And if water had put -- if

12   Car 54 had been cooled down, is it possible

13   that Car 55 would have cooled down as well?

14           MR. LEVINE:  Objection.

15           THE WITNESS:  It's very

16       possible.

17   QUESTIONS BY MR. BYARS:

18       Q.    What about foam?  Was foam ever

19   considered to be put on Car 54?

20       A.    I don't remember what was in

21   Car 54 that was burning.

22       Q.    So do you not recall whether it

23   was ever considered to put foam on Car 54?

24       A.    I don't know what was in

25   Car 54, so I wouldn't ever know what was

Confidential - Pursuant to Protective Order

1   going to be -- could be used to extinguish

2   the fire.

3         Q.      Do you know what the condition

4   of the valves were on the Car 28?  That's the

5   Trinity VCM car.

6         A.      They must have been in really

7   good shape, because they were able to hook up

8   to the -- either the vapor valve or the

9   sample port and get a gauge pressure on it.

10        Q.      Would it have been possible to

11  transfer the VCM inside of Car 28 through one

12  of those valves?

13              MR. BRAGA:  Objection.

14              THE WITNESS:  Anything is

15        possible.

16  QUESTIONS BY MR. BYARS:

17        Q.      Did you con -- did you consider

18  doing that?

19        A.      We had to have a place to go

20  with the material, which means we either had

21  to have tank cars or tank trucks, and then we

22  had to have a place to go with that material

23  that was going to accept it.

24              And there's still the potential

25  for it to be a reactive material, which means

Confidential - Pursuant to Protective Order

1  we would have to put it on a road or put it

2  on railroad tracks and taken it -- let's just

3  say OxyChem -- Oxy Vinyls accepted that

4  material back to Houston.  We would have had

5  to road that stuff all the way back.

6      Q.     Do you know if anyone tried to

7  obtain a tank car that the VCM from Car 28

8  could have been transferred to?

9      A.     I have no idea.

10     Q.     Do you know if anyone tried

11 to -- or tried to find someone who would

12 transport a tank car filled with VCM that had

13 been transferred from Car 28?

14     A.     The transfer to a receiving car

15 or truck is one part of the puzzle, but

16 there's several other steps that's got --

17 that have to be made in order to get that

18 done, yes, sir.

19         I don't -- I don't know of

20 anyone that looked for transportation

21 services.

22     Q.     Okay.  And did you ever talk to

23 OxyChem about the possibility of transferring

24 VCM from Car 28 into a tank car?

25     A.     The plan was to -- the initial

Confidential - Pursuant to Protective Order

1    plan when wrecking operations started

2    Saturday night were to move that car out and

3    get it into the clear and perform the vent

4    and burn operation on the other four cars.

5         Q.    Do you recall how far you were

6    planning to move Car 28 into the clear,

7    assuming you had been able to do so?

8         A.    Down yonder.  We were -- we

9    were moving it across the tracks toward the

10   Leake Oil side and down the way to get it

11   away from the fire from the vent and burn.

12        Q.    Can you give me an estimate

13   just in terms of yards?

14        A.    Several hundred.

15        Q.    I like the down yonder, by the

16   way.  That sounds like a technical term from

17   Texas.

18             All right.  So several -- you

19   were looking to move it several hundred yards

20   down towards Leake Oil.  All right.

21        A.    No, it was across from Leake

22   Oil --

23        Q.    Sorry.

24        A.    -- so away from Leake Oil, on

25   the Leake Oil side.

```
1        Q.      Aside from Car 54, were there

2    any other non-VCM cars that were on fire

3    between February 5th when you arrived at the

4    derailment and the time of the vent and burn?

5        A.      You see the smoke in the pile?

6        Q.      I do see that.

7        A.      There you go.

8        Q.      Do you know which cars those

9    were, by any chance?

10       A.      Jokingly, all of them.

11       Q.      Okay.

12       A.      There's stuff on fire, and

13   basically all of those cars are --

14       Q.      Were those jacketed cars?

15       A.      The general service cars, I

16   don't believe were.  I'd have to go each

17   individual car and look at it.  There's not

18   jackets on every car.

19       Q.      So we can actually look at

20   Exhibit 13 here and look at the table on the

21   left side, and that may help us.

22               So as we've talked about

23   already, the VCM cars are denoted in red on

24   their line numbers.

25               And then I think that you had
```

1  mentioned Cars 32 to 45 having fire around

2  them.  That's the general area of that smoke.

3            So from Cars 32 to 45, can you

4  look at Exhibit 13 and tell me if any of

5  those cars are jacketed cars?

6       A.    Okay.  So Car 49 is a DOT

7  105J300W car.  That's an isobutylene car.

8       Q.    Okay.

9       A.    That's a jacketed car.  Because

10  that J means it's jacketed.

11            The unfortunate part when it

12  gets to general service cars, 111A100W1 cars,

13  could or could not have jackets.  There's

14  no differentiation.  It doesn't put a J in

15  there to tell us, so you have to look at each

16  individual car.

17       Q.    The hop --

18       A.    The 117J100W is a jacketed car

19  because it's got a J in that.  However, the J

20  does not always mean it's got a jacketed --

21  or excuse me.  J means it has a jacket.  The

22  A does not always dictate that it has a

23  jacket.

24       Q.    And then what about Car 42,

25  which was AAR 211?  I'll omit the rest of the

Confidential - Pursuant to Protective Order

1    numbers and letters.  Was that a jacketed

2    car?

3         A.    A 111A is the same as a DOT

4    211A.  It could have a jacket.  It could not

5    have a jacket.

6         Q.    Okay.  And the hopper cars

7    weren't jacketed.

8               Is that right?

9         A.    The hopper cars are hopper

10   cars.

11        Q.    Okay.  So if any of the hopper

12   cars were the sources of those fires, could

13   have applied water to those, and those fires

14   might have gone out.

15              Is that right?

16        A.    And the risk of another PRD

17   going off, now you have firefighters, first

18   responders, in, setting up unmanned monitors

19   and streams, pumping water to it, washing

20   contamination down the stream.  And the setup

21   is -- it's a risk-based determination that

22   we're not going to apply water.

23        Q.    Well, how long does it take to

24   set up an unmanned monitor?

25        A.    Depends on how far we have to

Confidential - Pursuant to Protective Order

```
 1   lay and the wind effect on the monitors we

 2   can set up.

 3              In one side, we could be

 4   flowing 10,000 gallons a minute on the car

 5   from a long distance away.  But the City of

 6   East Palestine doesn't have the water supply

 7   for a 10,000 GPM operation.

 8        Q.    How long would it have taken to

 9   set up unmanned monitors on this pile of cars

10   from Car 32 to Car 45?

11        A.    Most likely several hours.

12        Q.    Was there any point in time

13   from the time that you arrived on the morning

14   of February 5th until the vent and burn when

15   personnel were absent from the derailment

16   site for several hours?

17        A.    There were a lot of times.

18        Q.    So there were times when nobody

19   was at the derailment site?

20        A.    That's correct.

21        Q.    Okay.  Were there times when

22   people were present at the derailment site

23   for several hours?

24        A.    There were a lot of operations

25   going on, so people were in and out.
```

Confidential - Pursuant to Protective Order

```
 1          Q.     And were there -- was there
 2    ever anyone who was there for a period of,
 3    say, 30 minutes?
 4          A.     Possibly.
 5          Q.     How about an hour?
 6          A.     Possibly.
 7          Q.     Two hours?
 8          A.     Oh, my God.  Okay.  We can --
 9    we can go down this road as far as you want
10    to go.  An hour, two hours, three hours.
11    We -- there was a lot of work going in, being
12    done and coming back out, gathering data,
13    gathering information, making plans.
14          Q.     So just -- I understand,
15    Mr. Day, that this can be frustrating, and
16    for that I apologize.  I'm not trying to
17    frustrate you.
18                 But is it possible that there
19    were people who were there for a span of two
20    hours at the derailment site?
21                 MR. LEVINE:  Objection.
22                 THE WITNESS:  There was --
23           there was a very delicate balance
24           between risk management and getting
25           information and us planning what we
```

Confidential - Pursuant to Protective Order

1          can do next, what is safe for the

2          folks to do.

3                  So crews would go in, they

4          would take some air monitoring

5          readings.  There were crews that would

6          go in, take temperatures.  There were

7          crews that would go in to try to do an

8          assessment from a different angle.

9                  There's a lot of operations

10         going on simultaneously.  Crews are

11         going in and out.

12   QUESTIONS BY MR. BYARS:

13         Q.     So can you tell me, sitting

14   here today, that from the time that you

15   arrived at the derailment site on the morning

16   of February 5th until the vent and burn, that

17   there was never anyone who was at the

18   derailment site for two hours?

19                 MR. LEVINE:  Objection.

20                 THE WITNESS:  The longest time

21         that I personally know folks were on

22         scene is when we were setting up the

23         explosives.

24   QUESTIONS BY MR. BYARS:

25         Q.     Okay.  And how long did that

1   take?

2        A.      About three and a half hours.

3        Q.      So you were setting up the

4   explosives for about three and a half hours.

5               Were there also pits being dug

6   at that point?

7        A.      The previous night, yes, sir.

8        Q.      The previous night.

9               Can you identify for me on

10  Exhibit 13 where pits were being dug?

11       A.      Car 27 was moved to the east,

12  and there was a pit -- or a containment built

13  that would hold around 158 to 160,000 gallons

14  of fluid, using natural ground curvature to

15  build a containment area around the pile of

16  four VCM cars and a channel to the Brave

17  Industries side of the tracks to funnel the

18  liquid from Car 55 away and prevent it from

19  getting toward the isobutylene car to the

20  east.

21       Q.      And so the pit, if I'm

22  understanding correctly, that was around

23  where Car 27 appears on Exhibit 13?

24       A.      It incorporated -- 27 was out

25  of the way.  It incorporated 28, 29, 30 and

Confidential - Pursuant to Protective Order

1    31.

2         Q.    Do you know about how long it

3    took to construct that pit and the

4    containment area around the pile of the four

5    VCM cars?

6         A.    I was in bed.  No, sir.

7         Q.    Probably something I should

8    ask.  Was it Hulcher and -- well, strike

9    that.

10         Well, do you know who was

11    responsible for doing that work?

12         A.    I do not.

13         Q.    Would it have been Hulcher's?

14         A.    It could have been Hulcher.  It

15    could have been Cranemasters.  It could have

16    been SPSI.

17         Q.    What would it have taken -- so

18    strike that.

19         Prior to the vent and burn

20    being executed, what would it have taken to

21    convince you that there was no polymerization

22    occurring in the VCM cars?

23         MR. BRAGA:  Objection.

24         THE WITNESS:  I don't know that

25    you could have convinced me.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. BYARS:

2        Q.     And let's say for a moment that

3    it had been determined that there was no

4    polymerization occurring in the VCM cars.

5               What would you have done with

6    the VCM cars?

7               MR. LEVINE:  Objection.

8               THE WITNESS:  Had there not

9        been any polymerization going on, had

10       the cars just been derailed, we would

11       have transferred them.

12   QUESTIONS BY MR. BYARS:

13       Q.     And by "transferred them," can

14   you just explain for the jury what that

15   means?

16       A.     We would take the product out

17   of one tank and put it in the other.

18              MR. BYARS:  So, Mr. Day, I'm

19       going to reserve the balance of my

20       time.  I don't have any further

21       questions for you right now.

22              Thank you for your patience.  I

23       do appreciate it.

24              THE WITNESS:  Yes, sir.

25              VIDEOGRAPHER:  All right.  The

Confidential - Pursuant to Protective Order

```
 1          time is 2:47 p.m.  We're going off the

 2          record.

 3           (Off the record at 2:47 p.m.)

 4                 VIDEOGRAPHER:  The time is

 5          2:56 p.m., and we're back on the

 6          record.

 7                 DIRECT EXAMINATION

 8   QUESTIONS BY MS. BROZ:

 9          Q.    Good afternoon, Mr. Day.  My

10   name is Alycia Broz, and I'm from the law

11   firm of Vorys, Sater, Seymour and Pease, and

12   I represent Oxy Vinyls in this litigation.

13                 I believe we met earlier today.

14          A.    I think so.

15          Q.    Okay.  Thank you for coming to

16   talk to us today and to answer some questions

17   for us.

18                 Could you let us know what you

19   did to prepare for today's deposition?

20          A.    I flew from Boston to

21   Washington, DC.

22          Q.    Do you currently reside in

23   Boston?

24          A.    No, sir -- ma'am.  Sorry.

25          Q.    It's okay.  All right.
```

Confidential - Pursuant to Protective Order

```
 1        A.     No, ma'am.  I live in Fort
 2   Worth, Texas.
 3        Q.     Okay.  And did you meet with
 4   anyone prior to your deposition?
 5        A.     With my attorneys and the
 6   Norfolk Southern attorney.
 7        Q.     So you met with Mr. Braga.
 8               Is that correct?
 9        A.     That's correct.
10        Q.     And you also met with Norfolk
11   Southern's attorneys?
12        A.     Correct.
13        Q.     Okay.  And which Norfolk
14   Southern attorneys did you meet with?
15        A.     Noah, who is the lead guy.
16   Pretty much everybody on this side.
17        Q.     Everybody on the side of your
18   table you met with.
19               Did you meet with anybody else
20   other than your counsel, which I assume
21   Mr. Braga to be, and Norfolk Southern counsel
22   in preparation for today's deposition?
23        A.     Mr. Braga is mine, along with
24   Mr. Hutt and Mr. Wald.
25        Q.     And did you meet with anyone
```

Confidential - Pursuant to Protective Order

```
 1    else?

 2         A.      My boss was with us.

 3         Q.      Okay.  And who is your boss?

 4         A.      Bobby Breed.

 5         Q.      And he participated in all the

 6    meetings you had in preparation for your

 7    deposition today?

 8         A.      Yes, ma'am.

 9         Q.      Did you discuss your testimony

10    with Mr. Breed?

11         A.      He was in the room when we were

12    talking about all things that we're talking

13    about now.

14         Q.      Okay.  Did you meet with anyone

15    else?

16         A.      No, ma'am.

17         Q.      And how long did you meet with,

18    you know, counsel for Norfolk Southern, your

19    own counsel and Mr. Breed in preparation for

20    your deposition?

21         A.      Several hours on Sunday and

22    several hours yesterday.

23         Q.      Yesterday being Monday?

24         A.      Monday the 15th.

25         Q.      Okay.  Did you do anything else
```

Confidential - Pursuant to Protective Order

1    to prepare for your deposition today?

2         A.    I read the dep -- the

3    transcript from the NTSB hearing and the

4    interview -- the NTSB interview.

5         Q.    Your NTSB interview?

6         A.    Excuse me?

7         Q.    Your NTSB interview?

8         A.    Yes, ma'am.

9         Q.    And did you read the entire

10   transcript from June 22, 2023, NTSB hearing?

11        A.    My portion.

12        Q.    So just the afternoon?

13        A.    Just my portion, yes, ma'am.

14        Q.    Are you paying for Mr. Braga to

15   be your attorney?

16        A.    Somebody is paying him.

17        Q.    But it's not you?

18        A.    Personally?

19        Q.    Yes.

20        A.    Not out of my checking account,

21   no.

22        Q.    Is SRS paying for Mr. Braga to

23   be your attorney?

24        A.    I think our parent company is.

25        Q.    Your parent company is.

1          And who is your parent company?

2     A.     SRS was acquired by NRC, that

3     was acquired US Ecology, that was acquired by

4     Republic Services.

5     Q.     And you believe Republic

6     Services is paying for Mr. Braga to be your

7     counsel here today?

8     A.     Yes, ma'am.

9     Q.     Did you talk to anyone in

10    preparation for your deposition today, other

11    than the folks we've already mentioned?

12    A.     No, ma'am.

13          I guess I must clarify.  One

14    moment.

15          I said I was going to say to DC

16    for a deposition.

17    Q.     And who did you say that to?

18    A.     The folks I was working with up

19    in Boston.

20    Q.     Are those fellow coworkers?

21    A.     They were coworkers and my

22    customer.

23    Q.     Did you talk to anyone else

24    about your deposition or the fact that you

25    would have to testify here today?

1          A.      No, ma'am.

2          Q.      And you also testified in East

3    Palestine at a hearing before the NTSB on

4    June 22, 2023.

5                  Is that correct?

6          A.      Yes, ma'am.

7          Q.      And what did you do to prepare

8    for that testimony?

9          A.      I met with Mr. Braga, Mr. Hutt,

10   and some folks with WilmerHale.  I don't

11   remember they were.

12         Q.      So counsel for Norfolk Southern

13   you also met with prior to your testimony in

14   the NTSB hearing on June 22, 2023?

15         A.      Yes, ma'am.

16         Q.      Did you meet with anyone else

17   prior to that hearing?

18         A.      No, ma'am.

19         Q.      Did you talk to anyone else

20   prior to that hearing about your testimony?

21         A.      Just the crew that I was

22   working with in St. Croix.

23         Q.      Who was the crew in St. Croix?

24         A.      My crew that I was working with

25   in St. Croix, I said I had to leave to go to

Confidential - Pursuant to Protective Order

1    Miami for a meeting.

2         Q.    Did you talk to anyone else?

3         A.    The folks that I was working

4    for, my customer.

5         Q.    In preparation for your

6    testimony at the East Palestine NTSB hearing

7    on June 22, 2023, did you review any

8    documents?

9         A.    I don't remember.

10        Q.    How about in preparation for

11   your testimony here today?  Did you review

12   any documents?

13        A.    I think I said it was my -- the

14   NTSB interview, the NTSB hearing, my portion

15   of it, and some other documents about the

16   incident.

17        Q.    Okay.  Did you review the text

18   messages that were produced?

19        A.    Oh, yes, ma'am.

20        Q.    Okay.  Did you review any

21   e-mails that were produced?

22        A.    I don't remember seeing

23   e-mails.  I don't remember.

24        Q.    Okay.  Anything else that you

25   recall reviewing in preparation for your

Confidential - Pursuant to Protective Order

1   deposition here today?

2          A.      Pictures.

3          Q.      Which pictures?

4          A.      The pictures that I had on my

5   phone that were exhibit -- provided.

6          Q.      And you're confident that all

7   those pictures were provided to your counsel

8   to produce today in this litigation?

9          A.      Yes, ma'am.  They had my phone.

10         Q.      Anything else that you

11  reviewed?

12         A.      Not that I know of.

13         Q.      Am I correct that you report to

14  Bobby Breed?

15         A.      That is correct.

16         Q.      And who does Terry Rockwell

17  report to?

18         A.      I believe he reports to Bobby

19  Breed as well.

20         Q.      Are you, like, coworkers or

21  does Terry Rockwell report to you?

22         A.      No.  It's a unique situation.

23  I report to Bobby and Terry reports to Bobby,

24  but we don't -- neither Terry nor I report to

25  each other.

Confidential - Pursuant to Protective Order

1      Q.      Understood.

2              Was Mr. Breed on-scene at East

3   Palestine --

4      A.      No, ma'am.

5      Q.      -- after the derailment?

6      A.      No, ma'am.

7      Q.      But Mr. Rockwell was on-scene

8   after the derailment?

9      A.      Yes, ma'am.

10     Q.      Did he arrive at the same time

11  in East Palestine as you did?

12     A.      We were in the same vehicle,

13  yes, ma'am.

14     Q.      So that would have been the

15  morning of Sunday, February 5, 2023?

16     A.      Yes, ma'am.

17     Q.      Around 6 a.m.?

18     A.      Yes, ma'am.

19     Q.      Okay.  Who else was in that

20  vehicle with you?

21     A.      Kent Farquhar.

22     Q.      Anyone else?

23     A.      No, ma'am.

24     Q.      Does Kent Farquhar report to

25  you?

Confidential - Pursuant to Protective Order

```
 1        A.      No, ma'am.

 2        Q.      Who does he report to?

 3        A.      Terry Rockwell.

 4        Q.      What is Mr. Rockwell's title?

 5        A.      I really do not know.  We

 6   changed positions a lot.

 7        Q.      Okay.  But he's also an

 8   employee of SRS?

 9        A.      Yes, ma'am.

10        Q.      All right.  Prior to the

11   derailment on February 3, 2023, were you

12   familiar with Oxy Vinyls or Occidental

13   Chemical or OxyChem?

14        A.      Very much.

15        Q.      Okay.  And can you explain to

16   me how you're familiar with -- well, can we

17   just call them Oxy Vinyls for short?

18        A.      Or Oxy, yeah.

19        Q.      Sure.

20        A.      I worked with Oxy since the --

21   I would say since the very early '90s, maybe

22   late '80s.

23        Q.      And what do you mean by "worked

24   with"?

25        A.      We were an emergency response
```

Confidential - Pursuant to Protective Order

```
 1    contractor, and Oxy hired -- would hire us to
 2    perform emergency response operations.
 3         Q.     Does SRS have a contract with
 4    Oxy?
 5         A.     That's a contract department
 6    question.
 7         Q.     But you did respond -- you were
 8    an emergency response contractor for them?
 9         A.     Yes, ma'am.
10         Q.     Were there any particular
11    people at Oxy that you knew?
12         A.     Oh, there's a lot of people I
13    know.
14         Q.     Okay.  Who would you -- who do
15    you know at Oxy?
16         A.     Diane Larson.  Butch Polasek.
17    Last name is Wood -- I don't remember Woods.
18    John Makazlik {phonetic}.  I'm terrible with
19    names.
20                There's a lot of people from
21    the corporate office and from the Houston
22    chemical complexes in general.
23         Q.     And do you have any of those
24    individuals' telephone numbers saved to your
25    contact list on your cell phone?
```

Confidential - Pursuant to Protective Order

```
 1          A.      Yes, ma'am.
 2          Q.      And how did you become familiar
 3  with people like Diane or, let's see --
 4          A.      Butch Polasek?
 5          Q.      -- Butch or John?
 6          A.      John was the head of the
 7  emergency response group in the early '90s,
 8  early, mid-'90s.
 9                  Butch Polasek and Diane Larson,
10  they work together at the corporate office,
11  or the tower in Dallas, and they were the
12  lead of emergency services, something along
13  those lines.
14          Q.      Before they arrived on the
15  scene on February 5th, were you familiar with
16  Alex Torres, Steve Smith or Justin Cox?
17          A.      I know Justin Cox from the
18  emergency response group and a CHLOREP
19  response team member.
20                  Steve Smith, we've met at
21  something having to do with CHLOREP or at
22  incidents.
23          Q.      And do you have Justin Cox's
24  contact information saved on your cell phone?
25          A.      It's possible.
```

Confidential - Pursuant to Protective Order

1    Q.    How about Mr. Smith's?

2    A.    It's possible.

3    Q.    At any time after -- and I

4  assume you didn't know who Alex Torres was?

5    A.    No, ma'am.

6    Q.    Okay.  Have you met -- and you

7  had not met him before February 3, 2023?

8    A.    Not that I can recall.

9    Q.    At any time between February 3,

10  2023, and the date of the vent and burn,

11  February 6, 2023, did you attempt to call or

12  text either Mr. Smith or Mr. Cox while they

13  were on the scene?

14    A.    You've got my text logs.  I

15  don't remember.

16    Q.    So if they're not on any

17  texts -- if there are no texts on those logs

18  to either Mr. Smith or Mr. Cox, they didn't

19  happen?

20    A.    That would be my assumption.

21    Q.    So we don't have your call

22  logs.  We have your text logs, but we don't

23  have your calls logs.

24         Did you try to call Mr. Cox or

25  Mr. Smith between February 3rd and

Confidential - Pursuant to Protective Order

1    February 6, 2023?

2         A.      I don't remember.

3         Q.      And did you try to call any of

4    the other Oxy employees that you're familiar

5    with between February 3rd and February 6,

6    2023, including Diane, Butch or John?

7         A.      All those people have retired.

8    No.

9         Q.      You didn't try to text them

10   either?

11        A.      No, ma'am.

12        Q.      And I understand Mr. Gold was

13   also retired, who you reached out via text?

14        A.      Correct.

15        Q.      And it was okay to text him

16   even though he had retired?

17        A.      Correct.

18        Q.      Is there a reason why you

19   didn't reach out to Diane or John or Butch or

20   John after the derailment on February 3,

21   2023?

22        A.      I can't think of a reason why I

23   did -- I would have and wouldn't have.

24        Q.      What does that mean?

25        A.      They worked for Oxy.  They've

Confidential - Pursuant to Protective Order

1   retired, or at least two of them retired.

2   They weren't chemical handlers or emergency

3   response.  They managed the groups.  They

4   were corporate office folks.

5        Q.    But if had you known an

6   emergency response person from Oxy, you would

7   have called them?

8        A.    It's possible.

9           MR. LEVINE:  Objection.

10  QUESTIONS BY MS. BROZ:

11        Q.    But you're not willing to call

12  somebody who would be from a corporate office

13  form Oxy to get their opinion about the

14  derailment on February 3, 2023.

15           Correct?

16           MR. LEVINE:  Objection.

17           MR. BRAGA:  Objection.

18           THE WITNESS:  We already had

19      several people.  The EOC was stood up,

20      and there were several people in the

21      corporate office on -- in

22      communication with the site.  I was

23      listening to conference calls.

24  QUESTIONS BY MS. BROZ:

25        Q.    Let me make sure I understand

1   what you're saying.

2              They were already people that

3   you were talking to from corporate office of

4   Oxy while on the derailment site in East

5   Palestine?

6       A.     Because they stood up the

7   emergency operations center, and everybody

8   was in that room.

9       Q.     Okay.  What do you mean by

10  "stood up the emergency operations center"?

11      A.     They opened it up.  They

12  basically had people come in and manned,

13  stationed, the emergency operations center at

14  the corporate office.

15      Q.     In Dallas?

16      A.     Yes, ma'am.

17      Q.     And that's who you're having

18  conversations with?

19      A.     That was where the conference

20  call -- that's -- I understood that's where

21  the conference call was initiated from.

22      Q.     So let's talk about when you

23  first arrived at East Palestine on

24  February 5, 2023, around 6 a.m.

25             Where did you go first?

Confidential - Pursuant to Protective Order

```
1         A.      We drove by the Leake Oil

2    site -- side of the site and went to the

3    command center.

4         Q.      Did you say legal, l-e-g-a-l?

5         A.      Leake, L-e-a-k-e.  Leake Oil

6    site.

7         Q.      Okay.  That's a lawyer talking

8    to somebody who doesn't do emergency

9    response.

10                And who did you meet up with?

11        A.      Where?

12        Q.      On the Leake Oil side of this

13   derailment.

14        A.      We drove past the Leake Oil

15   side of the response.

16        Q.      Okay.  And where did you go?

17        A.      To the command center.

18        Q.      And where was the command

19   center at that time?

20        A.      In town.

21        Q.      Was it at the fire station, the

22   school, a trailer?  Where was it?

23        A.      There -- I didn't know how it

24   was all set up.

25        Q.      Uh-huh.
```

1    A.    There's a fire station, there's

2 another fire station across the parking lot,

3 so I'm not sure what they called it.  It's a

4 building that everybody was at.

5    Q.    Okay.  But you didn't go to the

6 trailer?

7    A.    To a trailer?

8    Q.    Yes.

9    A.    No.

10    Q.    The command center, was that

11 also where incident command was or was that

12 someplace different?

13    A.    That is where the incident

14 commander, I believe, was.

15    Q.    And you believe it was in a

16 fire station.

17         Is that right?  You believe it

18 was in a fire station?

19    A.    It was at a building.  I can't

20 tell you.  They had two buildings.  One

21 looked like a fire station.  The other looked

22 like another building that looked kind of

23 like maybe an old fire station.  Who knows.

24    Q.    Okay.  Somewhere in town in a

25 building that might have been the fire

Confidential - Pursuant to Protective Order

1    station?

2         A.     That's absolutely correct.

3         Q.     Okay.  Great.

4                And what did you do when you

5    arrived?

6         A.     Walked inside.  Saw that there

7    was a lot of commotion going on.  Seeked out

8    some NS folks.  I met Mr. Williams, may have

9    been Mr. Schoendorfer and Mr. -- Scott

10   Deutsch.

11               There were several NS folks in

12   the -- in that room that they are --

13        Q.     I'm sorry.  I didn't mean to

14   cut you off.

15        A.     Bay.  In the bay.

16        Q.     In the fire station bay?

17        A.     Yes, ma'am.

18        Q.     Okay.  And how soon after you

19   arrived did you participate in the conference

20   call with the Oxy folks in Dallas?

21        A.     It would have been sometime

22   after that.  Before we did the drone

23   overflight.

24        Q.     Where did the conference call

25   on your end happen with the Oxy corporate

Confidential - Pursuant to Protective Order

1    folks in Dallas?

2         A.      In a Suburban outside of the

3    SPSI trailer east of the Leake Oil side of

4    the derailment.

5         Q.      And when you're saying

6    "Suburban," you mean a car?

7         A.      Suburban.  Truck.  SUV.

8         Q.      An SUV.  Okay.  Just want to

9    make sure we're talking about the same thing.

10             How many people were in the

11   Suburban with you?

12        A.      I believe there were a total of

13   four.

14        Q.      Who was there?

15        A.      I'm going to guess it was

16   myself, Mr. Rockwell, Mr. McCarty and

17   possibly Mr. Farquhar, but I don't know that

18   for a fact.

19        Q.      So nobody from NS?

20        A.      No.  Yeah.  That may have been

21   the fourth person.  I don't know who the

22   fourth person was.

23        Q.      Was anybody else on that call

24   who was at the derailment site other than the

25   four of you?

Confidential - Pursuant to Protective Order

```
 1        A.      Not that I know of.

 2        Q.      Do you know who was on the call

 3   from Oxy in Dallas?

 4        A.      Oxy people.

 5        Q.      Do you have any names?

 6        A.      No.

 7        Q.      Did anyone identify themselves

 8   during the call?

 9        A.      Several people identified

10   themselves, but I don't remember who they

11   were.

12        Q.      You don't remember any of the

13   names?

14        A.      No, ma'am.

15        Q.      Do you remember how many people

16   spoke on the call?

17        A.      I didn't pay that much

18   attention to that part of it, no.

19        Q.      Did more than one person speak

20   on the call for Oxy?

21        A.      I'm going to guess yes.

22        Q.      And who spoke as between -- or

23   among you, Mr. Rockwell, Mr. McCarty and

24   Mr. Farquhar?

25        A.      We basically listened, if my
```

1   memory serves me correct.

2       Q.    Did you guys say anything at

3   all on the call?

4       A.    Not on the call, no.

5       Q.    Did Mr. McCarty or Mr. Rockwell

6   say anything on the call?

7       A.    That would be a question for

8   them.  I don't recall.

9       Q.    You don't remember them saying

10  anything?

11      A.    I don't recall, no, ma'am.

12      Q.    And what did Oxy Dallas say to

13  you on that call?

14      A.    We talked about the incident.

15  Obviously we were on a call, so somebody in

16  that Suburban probably said something.  I

17  don't remember what or who.

18          The only takeaway from that was

19  a -- someone that I don't know, that Terry

20  knows -- Terry Rockwell knows very well, said

21  he didn't believe polymerization could occur.

22  Or -- yes, could occur.

23          And at the end of that

24  conversation, at the end of it completely,

25  nobody challenged this person.  When he was

Confidential - Pursuant to Protective Order

1    either put on mute or hung up, the four of us

2    that were in the truck looked at each other,

3    like, I can't believe he actually said that.

4    Because based on our training, that's

5    potentially what was going on.

6         Q.    Okay.  When the Oxy

7    representative said that he didn't believe

8    polymerization could occur or was occurring,

9    did you ask him why he believed that or said

10   that?

11        A.    No, ma'am.

12        Q.    Did you ask him any questions

13   about how he drew those conclusions?

14        A.    Ma'am, I just said that I did

15   not make any -- I was not talking in that

16   truck.  I was listening.

17        Q.    Okay.  Did anybody else in that

18   truck ask the Oxy representative any

19   questions about the statement he made about

20   the possibility of the poly -- of the VCM

21   polymerizing?

22        A.    Not until after the call had

23   ended.

24        Q.    So let me make sure I have this

25   absolutely clear.

Confidential - Pursuant to Protective Order

```
 1              You didn't ask anyone from Oxy
 2    to explain the basis for their conclusion?
 3         A.    I did not.
 4         Q.    And no one else in the truck
 5    asked anybody from Oxy to explain the basis
 6    for their conclusion?
 7         A.    Yes, ma'am.
 8         Q.    Okay.  And after you hung up,
 9    the four of you were talking then?
10         A.    Yes, ma'am.
11         Q.    Okay.  And what did you -- the
12    four of you say?
13         A.    Did they really just say that?
14              And we were trying to wrap our
15    heads around our training and what he just
16    said.
17         Q.    Did you think it might be a
18    good idea at that point in time to call them
19    back to ask any questions that you had since
20    you all drew the same conclusion that you
21    were surprised with what they said on the
22    call?
23         A.    The unfortunate --
24              MR. BRAGA:  Objection.
25              THE WITNESS:  The unfortunate
```

1    part is, we're contractors.  When

2    somebody says something like that, if

3    he was wrong, we're going to call them

4    out in front of superiors and

5    underlings.  Not really good for a

6    contractor to do.

7         So there's a lot of

8    communications that probably took

9    place, that did take place afterwards,

10   going, you got to show some respect.

11        The incident was, at the point,

12   pretty -- getting pretty critical.

13   QUESTIONS BY MS. BROZ:

14   Q.    Uh-huh.

15   A.    We could not, at the time, take

16   all his information at face value.  We needed

17   to check other sources, which is the exact

18   reason I called Bob Gold, the exact reason we

19   talked amongst ourselves.

20        When the OxyChem folks showed

21   up, one of the first things Mr. Cox said was,

22   I guess I'm going to have to go to Dallas and

23   explain what the P on the DOT guidebook

24   means.

25   Q.    Okay.  We'll get to that.  I

Confidential - Pursuant to Protective Order

1    want to know about the conversation you had

2    in the car after you hung up with Oxy.

3          A.    We've got to find -- we've got

4    to get additional information.

5          Q.    Did you tell Norfolk Southern

6    or any representatives of Norfolk Southern

7    what Oxy said on that telephone call that you

8    had in the Suburban?

9          A.    I believe we did.

10         Q.    Who did you tell?

11         A.    Either Scott Deutsch, Scott

12   Gould, Robert Wood, and possibly -- or

13   David -- Dave Schoendorfer.  I know we said

14   it.

15         Q.    Are you certain you said it to

16   one of them?

17         A.    I'm positive.

18         Q.    And it was you personally who

19   said it to one of them?

20         A.    Multiple people said it to

21   them.

22         Q.    But I'm asking about you, Chip

23   Day.

24               Did you say that to any of

25   them?

Confidential - Pursuant to Protective Order

1          A.      I believe I did.

2          Q.      Do you know for certain whether

3    you did?

4          A.      No, ma'am.

5          Q.      Do you recall Norfolk Southern

6    reacting to the conversation that you had

7    with Oxy Vinyls on the morning of

8    February 5th?

9          A.      No, ma'am.

10         Q.      Do you recall them saying

11   anything about Oxy Vinyls' conclusion that

12   polymerization was not happening?

13         A.      No, ma'am.

14         Q.      So your next step was to take

15   it upon yourself to do some independent

16   research to figure out if Oxy Vinyls'

17   statements were true?

18              MR. BRAGA:  Objection.

19              THE WITNESS:  Yes, ma'am.

20   QUESTIONS BY MS. BROZ:

21         Q.      And I believe earlier today we

22   talked about who you reached out to to have

23   those conversations with, so I don't want to

24   retread that ground, but I do want to mark a

25   document as an exhibit.

1    MS. BROZ:  Did you say we're on

2        14?

3        VIDEOGRAPHER:  14.

4        (Day Exhibit 14 marked for

5        identification.)

6    QUESTIONS BY MS. BROZ:

7        Q.    Mr. Day, I'm handing you what

8    we've marked as Deposition Exhibit 14, and I

9    will represent to you that I printed this off

10   on January 4, 2024.  And the HTTP website is

11   on the bottom left-hand corner of the

12   document.

13       Let me know when you have time

14   to look through that.

15       A.    Okay.

16       Q.    If you would turn -- the

17   Internet labeled these for me, so if you

18   would turn to page 4 of 9 and 5 of 9.

19       A.    Yes, ma'am.

20       Q.    And it says this is Bob Gold,

21   sales associate with Feels Like Home Realty.

22       Is that correct?

23       A.    Yes, ma'am.

24       Q.    Okay.  Is that the Mr. Gold

25   that you reached out to after the derailment

Confidential - Pursuant to Protective Order

1  to ask his opinion about the possibility that

2  the vinyl chloride was polymerizing?

3       A.     That's the guy.

4       Q.     Set that aside.

5              MR. BRAGA:  All done with that?

6              MS. BROZ:  Yep.  Just wanted to

7       make sure we had the right person.

8  QUESTIONS BY MS. BROZ:

9       Q.     And what was the next

10 conversation you had with anyone from Oxy

11 Vinyls after that morning call in the

12 Suburban?

13      A.     I don't remember when they --

14 when Oxy showed up.

15      Q.     Okay.  So was it that same day?

16      A.     I believe so.

17      Q.     So on February 5th, somebody

18 from Oxy showed up, and you had an in-person

19 conversation with those individuals?

20      A.     Three somebodies.

21      Q.     Three somebodies.

22             And I think we've already

23 established that one of those somebodies was

24 Justin Cox.  The other one was Steve Smith?

25      A.     Yes, ma'am, and one other guy.

Confidential - Pursuant to Protective Order

1       Q.      And then one other guy.

2               I'll just -- for the record,

3       we'll say it's Alex Torres.

4       A.      There you go.

5       Q.      Okay.  And where did you meet

6       with Mr. Torres, Smith and Cox?

7       A.      At the SPSI trailer.  I believe

8       that's where it was.  Either there or at the

9       command center.

10      Q.      And do you know if it was in

11      the morning or the afternoon of the 5th?

12      A.      I don't remember.  The time was

13      going by very, very fast, so I don't know.

14      Q.      So, soon after they arrived?

15      A.      On-site, I'm going to guess,

16      yes, ma'am.

17      Q.      Who else was in the trailer

18      with you?

19      A.      Folks from SPSI, SRS, maybe the

20      NS.

21      Q.      Do you remember any names of

22      individuals who were there?

23      A.      No, ma'am.

24      Q.      You just know it was somebody

25      from SPSI, somebody from SRS and somebody

Confidential - Pursuant to Protective Order

1    from NS?

2        A.      Most likely NS, yes, ma'am.

3        Q.      Mr. McCarty there?

4        A.      Possibly.

5        Q.      Who else from SRS was there?

6        A.      Could have been Terry Rockwell

7    or Kent Farquhar or both of them.

8        Q.      But you have no specific

9    recollection as to who was in the trailer at

10   the time?

11       A.      No, ma'am.

12       Q.      And who from NS was there?

13       A.      Either Mr. Gould, Mr. Deutsch.

14   Most likely one of those two guys.

15       Q.      But you don't have any specific

16   recollection of either of them being there?

17       A.      No, ma'am.

18       Q.      Okay.  Can you tell me how the

19   conversation started between you and the

20   individuals on the ground from Oxy Vinyls?

21       A.      Well, most likely we probably

22   hugged each other because we are friends.

23       Q.      Uh-huh.

24       A.      Hey, what's going on.  What's

25   happening here, and we described what we've

Confidential - Pursuant to Protective Order

1   seen on the site.

2       Q.      And who did most of the talking

3   for Oxy Vinyls?

4       A.      I don't know.

5       Q.      You don't know.

6               Do you remember any comments or

7   statements that Oxy Vinyls made in the

8   trailer on February 5, 2023?

9       A.      There were comments made --

10  there were discussions made in the trailer,

11  outside of the trailer, in driving from

12  point A to point B, walking around the site,

13  going back to the trailer.  There's -- there

14  was a lot of discussion with a lot of

15  different people.

16      Q.      Do you have any notes of any of

17  those conversations?

18      A.      No, ma'am.

19      Q.      Did you take any notes at all

20  between February 3rd and February 6, 2023?

21      A.      I did.

22      Q.      Okay.  Where are your notes?

23      A.      Produced.

24      Q.      Produced.

25              How many notes did you take?

Confidential - Pursuant to Protective Order

```
 1          A.      Very few.

 2          Q.      And what did you take them on?

 3          A.      A notepad.

 4          Q.      A regular old 8-and-a-half-by-

 5   11-inch notepad?

 6          A.      No, ma'am.

 7          Q.      What was it?  What did it look

 8   like?

 9          A.      A notebook like you slide in

10   your back pocket.  It's got a picture -- you

11   guys have a copy of it, of all the pages and

12   the front and the back.

13          Q.      You handed those over to your

14   counsel?

15          A.      I did.

16                  MR. BRAGA:  They've been

17          produced.

18   QUESTIONS BY MS. BROZ:

19          Q.      Okay.  So you had a

20   conversation.

21                  What I want to focus on is the

22   conversation that you had with Steve Smith

23   and Justin Cox -- we'll put Alex to the

24   side -- in the trailer when they first

25   arrived on February 5, 2023.
```

Confidential - Pursuant to Protective Order

1                Do you remember statements that
2    they made during that conversation?
3        A.    I can make this real easy.  No.
4        Q.    Do you remember any statements
5    that you made during that conversation?
6        A.    We talked about what we were
7    seeing and what had occurred, the reason that
8    we got pulled into the incident.
9        Q.    During that conversation, do
10   you remember anything that anyone else said
11   from SPSI or SRS or Norfolk Southern during
12   that conversation?
13       A.    We were basically discussing
14   what we have been seeing since the beginning.
15             Obviously the NS and SPSI were
16   able to provide, very soon after the
17   derailment, information up to the point that
18   SRS got on-scene and what the conditions --
19   the current conditions were.
20       Q.    Did you discuss polymerization
21   during that conversation?
22       A.    I don't remember.
23       Q.    Were there any -- was there any
24   information that the individuals from Oxy
25   Vinyls were supposed to gather and return to

Confidential - Pursuant to Protective Order

1   you?

2         A.      That would be a question for

3   the Oxy Vinyls folks.

4         Q.      No, I'm asking you if you asked

5   them for any information that they were

6   supposed to gather and return back to you.

7               It's a bad question.  Let me

8   restate it.

9               Did you ask Oxy Vinyls for any

10  information, or did you ask them any

11  questions that they couldn't answer and they

12  said they would get back to you?

13              MR. BRAGA:  Objection.

14              THE WITNESS:  There was

15         obviously a discussion, and we've

16         already touched on it, about the

17         polymerization potential and the

18         comment that the gentleman made on the

19         conference call.  And I believe --

20  QUESTIONS BY MS. BROZ:

21        Q.      You talked --

22        A.      -- that's sometime in the

23  trailer, outside of the trailer, in the

24  Suburban, outside of the Suburban, when

25  Mr. Cox said, I guess I need to go to Dallas,

Confidential - Pursuant to Protective Order

1    that we've already discussed.

2         Q.     And that was the only comment

3    you remember from that conversation?

4         A.     That's a pretty pointed

5    conversation.

6         Q.     I understand that.

7              But is that the only comment

8    you remember from that conversation from

9    somebody from Oxy Vinyls?

10        A.     From that one, yes.

11        Q.     Okay.  How long did that

12   meeting in the trailer or outside the trailer

13   last?

14        A.     I'd say probably maybe

15   30 minutes, 45 minutes-ish.

16        Q.     And then where did the

17   individuals from Oxy Vinyls go?

18        A.     I do not know.

19        Q.     Okay.  When was the next time

20   that you met with either Mr. Smith or

21   Mr. Cox?

22        A.     I'm thinking it may have been

23   when we did the drone -- or not the drone

24   flight, but the next time -- it would have

25   been on the Leake Oil side.  They were

Confidential - Pursuant to Protective Order

1    getting -- trying to get the lay of the land

2    and getting as close as they can.  They've

3    got, you know, particular requirements.

4    They're not allowed to go different places.

5              So I think they were with us in

6    the exclusion -- or at the edge of the

7    exclusion zone looking at the derailment.

8         Q.    Do you remember any

9    conversations that you had during that

10   meeting?

11        A.    We talked about the -- I

12   remember we talked outside about -- so I'm

13   thinking it's possibly at Leake Oil -- about

14   potential for polymerization, what we were

15   thinking.  And that's when Mr. Smith said

16   emphatically, several times, that he's not a

17   polymerization expert, and he doesn't know.

18        Q.    Did Mr. Smith, during that

19   conversation, also tell you that he would go

20   and ask Dallas about it and let you know what

21   the folks at Dallas said about the

22   possibility of polymerization?

23        A.    I don't remember.

24        Q.    Did he -- Mr. Smith ever come

25   back to you between February 3rd and

1  February 6, 2023, and tell you, I've spoken

2  to our folks in Dallas, and they don't

3  believe that polymerization is happening?

4       A.    Yes, ma'am.

5       Q.    Okay.  And when did he tell you

6  that?

7       A.    Sometime after that.

8       Q.    Okay.  And then after Mr. Smith

9  told you that, how did you respond?

10       A.    In -- I was -- I was -- I was

11  surprised.  I know that Oxy has a lot of

12  really, really, really good people, both at

13  the EOC and at their beck and call, to give

14  input on incidents involving vinyl chloride.

15            As the -- one of the other

16  lawyers pointed out, experts.  Don't like the

17  word "expert."  They're experts in the

18  operation of a chemical plant.  They're

19  experts in the product.  They're

20  professionals in all of these rights.

21            But when they -- when we ask

22  questions -- when we provide data -- or

23  information.  Forget the data.  When we

24  provide information of what we're seeing at

25  the site, we're kind of the experts of

Confidential - Pursuant to Protective Order

1    derailments and cars on fire and incidents

2    that are potentially occurring.

3            So it's really difficult for a

4    chemist, sitting in a pristine condition,

5    dealing with moles and grams and liters of

6    materials, to look at a derailment where we

7    have thousands of gallons of this material

8    and different things being -- affecting the

9    product.

10           I know I'm going off, but you

11   got -- the OxyChem were providing

12   information.  I don't believe they were

13   accepting the information we were feeding

14   back to them on why we believed that

15   polymerization was occurring.

16       Q.    Okay.  And what information do

17   you believe that they weren't accepting?

18       A.    They were saying that

19   polymerization could not occur --

20       Q.    Okay.  And what --

21       A.    -- when other folks --

22       Q.    I apologize, go ahead.

23       A.    -- when other folks, other

24   industry professionals, retired or current,

25   were saying it's possible.

Confidential - Pursuant to Protective Order

1      Q.      And what information do you

2  think that they weren't hearing that you were

3  providing to them about what you were seeing

4  on the scene, resulting in your conclusion

5  that polymerization was occurring?

6      A.      That the PRDs were operating as

7  designed for extended periods of time.  They

8  stop.  Several hours later, one goes off for

9  70 minutes.

10     Q.      And if they had heard that, you

11  believe they would have drawn the same

12  conclusion that you did?

13     A.      It's possible.

14     Q.      But they didn't?

15     A.      No, ma'am, because they keep

16  saying that polymerization is not occurring.

17     Q.      Okay.  Okay.  We are at the

18  Leake Oil side, and you're talking to Steve

19  Smith and Alex Torres.

20          When was the next conversation

21  you had with --

22     A.      I don't know that Alex was

23  there.

24     Q.      Okay.  I'm sorry, I misspoke.

25  Let me try that again.

Confidential - Pursuant to Protective Order

1                You're on Leake Oil side, and

2      you're talking to Steve Smith and Justin Cox.

3      I misspoke.

4                When was the next conversation

5      you had with either of them?

6           A.     There were conversations kind

7      of all -- all the -- a lot, moving around the

8      site.   I can't give you exact times.   I can't

9      give you exact locations.

10               There were conversations when

11     we would gather up, we would be walking by,

12     excuse me, bumping into each other at the

13     high school, at the command center.

14          Q.     And were Mr. Smith and Mr. Cox

15     always together when you were speaking with

16     them?

17          A.     If I remember right, they only

18     had one vehicle, so they either left somebody

19     or they were all together.

20          Q.     Do you remember any specifics

21     of any of those additional conversations you

22     had with Mr. Smith or Mr. Cox?

23          A.     No, ma'am.

24          Q.     And you mentioned being at the

25     high school.

Confidential - Pursuant to Protective Order

1              At some point in time did --
2    not incident command, but did all the
3    individuals who were on the scene gather at
4    the high school?
5        A.     After the Ohio IMT team was
6    stood up, the incident management team, I
7    think command actually moved to the high
8    school.
9        Q.     And did you have a room in the
10   high school?
11       A.     Everybody had a room in the
12   high school.
13       Q.     All right.  Which room was
14   yours?
15       A.     The lunchroom.
16       Q.     Smart.
17              Do you remember where Oxy was
18   set up in the high school?
19       A.     No, ma'am.
20       Q.     Do you remember meeting with
21   anyone from Oxy inside the high school after
22   command was moved over there?
23       A.     I do not recall.
24       Q.     Do you remember having any
25   further conversations, other than the ones

Confidential - Pursuant to Protective Order

1  we've discussed, with anyone from Oxy about

2  the possibility of the vinyl chloride cars

3  polymerizing?

4      A.    Like I said a little while ago,

5  there were a lot of conversations.  I can't

6  tell you it was on Thursday at two o'clock in

7  the afternoon at the intersection of X and Y.

8           There were conversations going

9  on.  I was having them.  Terry Rockwell was

10  having them.  Drew McCarty may have been

11  having them.  The incident commander may have

12  had them.  NS may have had them.

13      Q.    Sure.  I was talking about

14  conversations that you personally had.  I'm

15  not asking you to testify for anyone else.

16           So are there other

17  conversations that you recall, other than the

18  ones we've discussed, between February 3rd

19  and February 6th between you and anyone from

20  Oxy?

21      A.    I thought we established that.

22      Q.    What have we established?

23      A.    That there were conversations

24  taking place.  I can't tell you it was at the

25  intersection of X and Y on Tuesday afternoon.

Confidential - Pursuant to Protective Order

1    Q.    I don't want the intersection

2  of X and Y on Tuesday afternoon.  I just

3  remem -- and I don't want you to tell me the

4  date or the time, but I just want you to

5  testify -- tell me if there are any other

6  conversations that you recall having.

7    A.    There were conversations.  I

8  can't tell you where or what was -- what was

9  the subject of the discussion.

10    Q.    Okay.  There you go.  That's

11  what I was getting at.  I apologize for my

12  poor question.

13        Do you remember ever speaking

14  to anyone from Oxy Dallas, other than the

15  conversation we've discussed?

16    A.    No, ma'am.

17    Q.    So you had one call with

18  individuals from Oxy Dallas between

19  February 3rd and February 6, 2023?

20    A.    The conference call, yes,

21  ma'am.

22    Q.    Did you listen in on any other

23  calls between anyone else and individuals

24  from Oxy Vinyls Dallas between February 3rd

25  and February 6, 2023?

Confidential - Pursuant to Protective Order

1     A.     I do not recall.

2     Q.     Okay.

3     A.     Let's take a break.

4            MS. BROZ:  Want a break?  Okay.

5            VIDEOGRAPHER:  The time is

6     3:37 p.m., and we're going off the

7     record.

8      (Off the record at 3:37 p.m.)

9            VIDEOGRAPHER:  The time is

10    3:46 p.m.  We're back on the record.

11    QUESTIONS BY MS. BROZ:

12    Q.     Mr. Day, before we took a

13    break, we were talking about your

14    conversations that you had with Oxy Vinyls'

15    representatives while at East Palestine.  And

16    I believe we talked about all the

17    conversations you had with anybody from Oxy

18    Vinyls who was on the ground at East

19    Palestine.

20            Is that correct?

21    A.     I believe so.

22    Q.     And we talked about all the

23    conversations that you had with anyone from

24    Oxy in Dallas between February 3rd and

25    February 6, 2023.

1           Is that correct?

2      A.      Yes, ma'am.

3      Q.      Okay.  Just a quick -- when you

4  get to go second or third, you get to do a

5  little cleanup and jump around a little bit,

6  so I apologize for that.

7           Who paid SRS's invoices for the

8  work they did at East Palestine?

9           MR. BRAGA:  You can answer that

10      question if you know.

11          THE WITNESS:  SPSI -- SPSI.

12  QUESTIONS BY MS. BROZ:

13     Q.      SPSI paid your invoices?

14          And that was because you were

15  subcontracting for them?

16     A.      I believe so, yes, ma'am.

17     Q.      And since the derailment in

18  East Palestine, do you have a new contract

19  between Norfolk Southern and Republic?

20     A.      I do not know.

21     Q.      Do not know as Chip Day, or do

22  you also not know as the 30(b)(6)

23  representative for SRS?

24          And if you --

25          MR. BRAGA:  Wait till tomorrow

Confidential - Pursuant to Protective Order

1        for that one.

2    QUESTIONS BY MS. BROZ:

3        Q.    Well, I just want to know,

4    because I want to know if I should ask it for

5    you tomorrow.

6        A.    I don't know.

7        Q.    You don't know.  Okay.

8              MR. BRAGA:  I don't know

9        either.

10              THE WITNESS:  I may know

11        tomorrow.

12              (Day Exhibit 15 marked for

13        identification.)

14    QUESTIONS BY MS. BROZ:

15        Q.    Okay.  Mr. Day, I've handed you

16    what we've marked as Deposition Exhibit 15.

17              Do you recognize this document?

18        A.    It says, "Interview Transcript,

19    Charles Day, Senior Project Manager,

20    Specialized Response Solutions, March 1,

21    2023."

22              Yes, ma'am, I recognize it.

23        Q.    And that is what this document

24    is?

25        A.    You handed it to me.  I'm

1    guessing it is.

2         Q.    Okay.  If you want to look

3    through it to confirm that that's what it is,

4    you're more than welcome to do that.

5         A.    Okay.  Yes, ma'am.

6         Q.    This occurred March 1, 2023, so

7    less than a month after the derailment?

8         A.    Yes, ma'am.

9         Q.    And you answered questions that

10   were put to you by NTSB and its

11   representatives.

12               Is that correct?

13        A.    Yes, ma'am.

14        Q.    And you attempted to answer

15   these questions truthfully?

16        A.    Yes, ma'am.

17        Q.    And after the question -- and

18   you were able to answer the questions fully

19   and completely.  You weren't cut off or

20   anybody stopped you from testifying?

21        A.    Correct.

22        Q.    And did anybody prepare you for

23   this interview that happened on March 1,

24   2023?

25        A.    No, ma'am.

Confidential - Pursuant to Protective Order

1    Q.    And after the interview was

2  completed, you had an opportunity to review

3  the transcript.

4              Is that right?

5    A.    Yes, ma'am.

6    Q.    And if you turn to the very

7  last page, which is marked NS-CA-4195, do you

8  see that?

9    A.    Yes, ma'am.

10    Q.    And that's your signature on

11  the transcript?

12    A.    That is.

13    Q.    And it's dated April 20, 2023?

14    A.    It's March 20, 2023.  April,

15  yes.  March.  Or April.  I'm sorry.

16    Q.    That's okay.

17              And you were able to make any

18  corrections that you wanted to on the

19  transcript on that same piece of paper?

20    A.    It was my understanding if I

21  found things spelled wrong, that was what I

22  was allowed to correct.

23    Q.    And just things that were

24  spelled wrong?

25    A.    Correct.

Confidential - Pursuant to Protective Order

```
1        Q.    Okay.  And is everything -- you
2   testified to me earlier today that you
3   reviewed this in preparation for your
4   deposition.
5             Is that right?
6        A.    Yes, ma'am.
7        Q.    Is there anything upon your
8   review that you believe is inaccurate or
9   incorrect that is contained in this
10  transcript?
11       A.    I don't believe so.
12       Q.    Okay.
13       A.    But I'll bet you'll show me
14  something.
15       Q.    You've been around lawyers too
16  long.  You have no trust in us.
17             Turn your page.  Could you turn
18  to page 13 of the transcript?
19       A.    Yes, ma'am.
20       Q.    Okay.  And you see the last
21  paragraph that starts on line 21?
22       A.    Yes, ma'am.
23       Q.    And it says, "I guess if you
24  want to call us a technical group, myself,
25  Drew McCarty, Robert Wood and several others
```

Confidential - Pursuant to Protective Order

1    agreed to then burn what was going to be the

2    chosen method for taking care of these VCM

3    cars."

4              I don't want to ask you about

5    the chosen method for taking care of the VCM

6    cars, but I do want to ask you about the

7    technical group.

8              Who else were the others in the

9    technical group, the other folks mentioned in

10   there?

11        A.    So the technical group was

12   basically made up of myself, Mr. Rockwell,

13   Mr. McCarty, a few other folks from SPSI,

14   representatives of the NS.

15             OxyChem -- Oxy Vinyls was --

16   was part of our group.  They would come to

17   these meetings when we discussed things.  I

18   don't know exactly what this exact time was,

19   whether they were there or somewhere else.

20             So it was pretty much everybody

21   that was on-scene and assigned to the

22   compressed gas cars.

23        Q.    Okay.  Did Oxy Vinyls just come

24   to the meetings of the technical group, or is

25   it your testimony that they were members of

Confidential - Pursuant to Protective Order

```
 1    the technical group?

 2         A.     They attended the meetings.

 3         Q.     Did Oxy Vinyls attend any

 4    meetings in which the technical group decided

 5    to vent and burn the five vinyl chloride

 6    railcars?

 7         A.     I believe they did.

 8                MR. BRAGA:  Object to the form

 9         of the question.

10                THE WITNESS:  I believe they

11         did.

12    QUESTIONS BY MS. BROZ:

13         Q.     Okay.  Which meeting was that?

14         A.     I -- the one that we decided

15    that we needed to recommend vent and burn of

16    the -- to the incident commander.

17         Q.     And you believe Oxy Vinyls was

18    at that meeting?

19         A.     I believe they were.

20         Q.     And did they say, yes, our only

21    option is to vent and burn the five railcars?

22                MR. BRAGA:  Object.

23                THE WITNESS:  I do not recall.

24    QUESTIONS BY MS. BROZ:

25         Q.     Do you recall what they said at
```

1   that meeting?

2       A.      They towed the Oxy Vinyls line

3   that polymerization -- multiple times in

4   meetings, they said that Dallas doesn't

5   believe that the cars were polymerizing.

6       Q.      Did they offer an opinion as to

7   whether it was appropriate to vent and burn

8   the five vinyl chloride railcars?

9       A.      I'm not going to throw at least

10  two of those three guys under the bus and

11  say, yeah, they said they weren't really

12  sure.

13      Q.      Let me make sure.

14              What is your testimony about

15  what they said at those meetings where the

16  decision was made to vent and burn the five

17  vinyl chloride railcars?

18      A.      There was --

19              MR. BRAGA:  Object to the form

20      of the question.

21              Go ahead.

22              THE WITNESS:  There was

23      discussion multiple times, it wasn't

24      just one meeting, where vent and burn

25      was discussed by the technical group.

Confidential – Pursuant to Protective Order

```
 1            Sometimes Oxy was there.  Sometimes
 2            Oxy wasn't there.  They had another
 3            agenda.
 4                   But I'm not going to throw two
 5            of the three people under the bus that
 6            said -- might have said, we don't know
 7            if it's polymerizing.  Dallas says
 8            it's not.
 9    QUESTIONS BY MS. BROZ:
10            Q.    Okay.  My question is a little
11    bit different.
12                   Did anyone from Oxy Vinyls make
13    the decision to vent and burn the five vinyl
14    chloride railcars?
15            A.    That's a totally different
16    question, ma'am.
17            Q.    It is not.  You're just
18    answering the question you want to answer
19    that I have not been asking you.
20                   So could you please answer my
21    question?
22                   Did anyone from Oxy Vinyls make
23    the decision to vent and burn the five vinyl
24    chloride railcars?
25            A.    No, ma'am.
```

Confidential - Pursuant to Protective Order

```
 1                  MR. BRAGA:  Are we all done
 2        with the interview transcript?
 3                  MS. BROZ:  For now I am.
 4                  I think I only have six minutes
 5        left, so I'm going to reserve my time.
 6                  Okay.
 7                  VIDEOGRAPHER:  Off the record
 8        again?
 9                  MS. BROZ:  Yes, thank you.
10                  VIDEOGRAPHER:  The time is
11        3:55 p.m., and we're going off the
12        record.
13         (Off the record at 3:55 p.m.)
14                  VIDEOGRAPHER:  The time is
15        3:58 p.m., and we're back on the
16        record.
17                  DIRECT EXAMINATION
18   QUESTIONS BY MR. ELLIS:
19        Q.    Mr. Day, my name is Rob Ellis.
20   I represent GATX.
21                  I have some questions for you
22   about Exhibit Number 13, which we're also
23   showing to the jury.
24                  Before I get to those, when you
25   first arrived in East Palestine on Saturday,
```

Confidential - Pursuant to Protective Order

1    February 5th, did you go right to the

2    derailment site?

3        A.      We drove by the derailment

4    site.

5        Q.      Okay.  How long did you spend

6    at -- and what time did you get to the

7    derailment site the morning of February 5th?

8        A.      Somewhere around six o'clock.

9        Q.      Okay.  How long did you spend

10   there?

11       A.      Almost a month.

12       Q.      How long did you spend at the

13   derailment site that morning before you left

14   to go to the incident command center?

15       A.      We passed by the derailment

16   site.

17       Q.      Did you stop?

18       A.      No, sir.

19       Q.      Okay.  And then you went to the

20   incident command center.

21               How long were you there?

22       A.      Some period of time.

23       Q.      Do you have any more specific

24   answer other than "some period of time"?  An

25   hour?  Two hours?  Five hours?  All morning?

Confidential - Pursuant to Protective Order

```
1        A.      We were there for a period of

2   time.  We met some people.  We were provided

3   an assignment, and we left the command

4   center.

5        Q.      Okay.  Did you do the call with

6   Oxy before you left the command center?

7        A.      The call with Oxy was after the

8   command center.

9        Q.      Okay.  And where were you when

10  you did the call with Oxy?

11       A.      The SPSI trailer on the Leake

12  Oil side east of the derailment site.

13       Q.      Other than driving past, when

14  you drove past at 6 a.m., it was dark.

15              Correct?

16       A.      It was -- there were light

17  towers up, and you could see the derailment.

18       Q.      Oh.

19              Did you make any observations

20  about the site when you drove by on your way

21  to the incident command center on

22  February 5th?

23       A.      Wow, that's the derailment.

24       Q.      Other than, wow, it's a

25  derailment, did you make any other specific
```

1    observations about the site when you drove by

2    on your way to the command center on the

3    morning of February 5th?

4         A.    Things were still on fire.

5         Q.    Okay.  And what specifically,

6    when you were driving by, did you see on fire

7    on your way to the incident command center

8    that morning?

9         A.    Some tank cars, hopper cars and

10   black smoke.

11        Q.    Did you identify any specific

12   tank cars that were on fire that morning when

13   you drove by?

14        A.    No, sir.

15        Q.    What time did you arrive on the

16   scene after you left -- on the derailment

17   scene when you left the incident command

18   center?

19        A.    We went -- we left the command

20   center.  We went back to the SPSI trailer.

21   We had a meeting, meetings, and then went to

22   the Leake Oil side of the derailment to

23   start -- to meet the commissioner to do the

24   drone overflight.

25        Q.    Okay.  When you were at the

Confidential - Pursuant to Protective Order

1    SPSI sailor -- trailer, could you see the

2    derailment site?

3        A.    No, sir.

4        Q.    In the morning when you drove

5    by, did you witness housing fires on any of

6    the VCM cars?

7        A.    Sir, when I drove to the site,

8    I had not been given a map.  I knew there --

9    the cars were involved.  I didn't know what

10   direction the train was going.  We saw cars

11   on fire.  We went to the command center.

12       Q.    Okay.  And my question simply

13   was, when you drove by, did you specifically

14   witness any housing fires on any of the VCM

15   cars?

16           MR. LEVINE:  Objection.

17           THE WITNESS:  There were cars

18       on fire.

19   QUESTIONS BY MR. ELLIS:

20       Q.    My question was, did you

21   witness any VCM car housings on fire when you

22   drove by that morning?

23           MR. LEVINE:  Objection.

24           THE WITNESS:  We can go down

25       this road a long time --

1    QUESTIONS BY MR. ELLIS:

2         Q.    Yes.

3         A.    -- and I'll say the exact same

4    thing.  I was not provided the drawing,

5    knowing which direction the train was going

6    and what the order of the cars were.

7                There were cars on fire.

8         Q.    Okay.  And so is it fair to say

9    then that you didn't identify any specific

10   housing fires when you drove by that morning?

11               MR. LEVINE:  Objection.

12               THE WITNESS:  One more time.

13               There were cars on fire.

14   QUESTIONS BY MR. ELLIS:

15        Q.    Yes, I understand that.  My

16   question is a little different.

17               My question is, did you see

18   specifically housings on fire when you drove

19   by?

20               MR. LEVINE:  Objection.

21               THE WITNESS:  I'm going to say

22        it one more time.

23               When we drove by, going to the

24        command center, I did not know which

25        direction the train was going.  There

Confidential - Pursuant to Protective Order

```
 1          were cars on fire.
 2     QUESTIONS BY MR. ELLIS:
 3          Q.     Yes.
 4          A.     Fire high.  Fire low.  Fire to
 5     the left.  Fire to the right.
 6          Q.     Did you --
 7          A.     I did not know what cars were
 8     on fire.
 9          Q.     Okay.  Did you know what cars
10     had housings when you drove by?
11          A.     No, I did not.
12          Q.     Okay.  And you therefore didn't
13     identify specifically, when you drove by in
14     the morning, any specific housings on fire.
15               Correct?
16               MR. LEVINE:  Objection.
17               THE WITNESS:  There were cars
18          on fire.
19     QUESTIONS BY MR. ELLIS:
20          Q.     Yes, I understand that.
21               My question is, did you
22     specifically, when you drove by in the
23     morning, identify tank car, VCM tank car,
24     housings on fire?
25               MR. LEVINE:  Objection.
```

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  I'm going to stop

 2       answering the question, Counsel.

 3              MR. BRAGA:  Listen to the

 4       question.  Do your best to answer it,

 5       and we'll move on.

 6              Can you ask the question again?

 7              MR. ELLIS:  Would you read him

 8       the question back, please?

 9              (Court Reporter read back

10       question.)

11              THE WITNESS:  There were tank

12       cars on fire.  There are multiple cars

13       that have protective housings, some

14       general service, some pressure cars.

15              I didn't know where in the

16       train the VCM cars were; that simply

17       there were cars on fire.

18  QUESTIONS BY MR. ELLIS:

19       Q.    Okay.  And because you didn't

20  know where the VCM cars were -- and I'm just

21  asking when you drove by.  We'll get to other

22  times of the day.

23              When you drove by, you didn't

24  know whether you were looking at a VCM car or

25  a different car when you saw cars on fire.
```

Confidential - Pursuant to Protective Order

```
 1              Right?
 2      A.      That's correct.
 3      Q.      Okay.  Now, later you did
 4  identify the VCM cars.
 5              Correct?
 6      A.      Yes, sir.
 7      Q.      Okay.  And you did later that
 8  morning identify the VCM cars.
 9              Correct?
10      A.      As soon as I got to the command
11  center and got to see the overflight pictures
12  that we had, knowing the direction the train
13  was going -- granted, I was spun around on
14  direction, we knew -- I found out where the
15  VCM car pile was and where the other
16  compressed gas car was.
17      Q.      Okay.  So when you were at the
18  command center, someone showed you
19  photographs of the cars that allowed you to
20  identify the VCM cars and the one isobutylene
21  car.
22              Correct?
23      A.      Correct.
24      Q.      Okay.  And was it this photo
25  that you were shown?  Exhibit 13?
```

Confidential - Pursuant to Protective Order

1      A.      I don't remember if it was this

2  one or some other still photos.

3      Q.      Do you know -- once you left

4  the SPSI trailer and got to the derailment

5  site later that morning, do you know what

6  time you arrived at the site?

7      A.      No, sir.

8      Q.      Was it before noon?

9      A.      May have been.

10      Q.      Was it before 9 a.m.?

11      A.      I do not remember.

12      Q.      Okay.  Using Exhibit 13, would

13  you indicate when you first arrived on the

14  scene the morning of February 5th which VCM

15  car housings were on fire?

16      A.      Car 31, Car 30 and Car 55.

17      Q.      Okay.  During the time that you

18  were on-scene, were any housings extinguished

19  and then reignited?

20      A.      No, sir.

21      Q.      So during the entire time you

22  were on-scene, exhibit -- VCM Cars 30, 31 and

23  55, were they always -- those housings always

24  burning?

25      A.      What day are we talking about?

Confidential Pursuant to Protective Order

```
 1      Q.    February 5th.

 2      A.    February 5th, 31 and 30 were

 3 burning.  Sometime on the 5th, 55 went out.

 4      Q.    30 and 31 were burning sometime

 5 on the 5th.

 6            Is that correct?

 7      A.    Burning the whole time.  55 is

 8 the one that went out later in the day.

 9      Q.    Okay.  So 55, do you know what

10 time the housing on 55 went out?

11      A.    No, sir.

12      Q.    Was it after noon?

13      A.    It could be.

14      Q.    Was it before dark?

15      A.    It was probably -- it was

16 confirmed that it was out probably around

17 dark.

18      Q.    Around dark, it was confirmed

19 that the housing on the VCM car labeled 55 on

20 Exhibit 13 was extinguished.

21            Is that correct?

22      A.    That's correct.

23      Q.    Okay.  Did that --

24      A.    Time out.  Extinguished.

25 Identify what you're saying -- what you
```

Confidential - Pursuant to Protective Order

1   define as extinguished.

2           Was it put out, or did it burn

3   out?

4       Q.    Well, I was about to ask you

5   that question.

6       A.    Well, ask it.

7       Q.    So do you know whether the

8   car -- the housing on Car 55 was put out or

9   whether it went out on its own?

10      A.    Car 55 went out on its own.

11      Q.    Did you witness that?

12      A.    No, sir.

13      Q.    How did you come to learn that

14  Car 55 went out on its own?

15      A.    Because the crew went up to

16  perform some damage assessment on Car 55 and

17  were able to climb up on Car 54, walk down

18  and get within a few feet of the protective

19  housing before they started getting elevated

20  readings of VOCs.

21      Q.    Okay.  My question was, how did

22  you learn that Car 55's housing went out on

23  its own?

24      A.    Because the crew went up and

25  were able to get in close proximity to the

Confidential - Pursuant to Protective Order

1   car and confirm the fire was not burning in

2   Car 55.

3       Q.      Did somebody tell you that that

4   car went out on its own?

5       A.      I don't remember.

6       Q.      That the housing fire on that

7   car went out on its own?  Did somebody tell

8   you that on the crew?

9       A.      We would not have -- nobody on

10  that crew, whether it's SPSI or SRS, would

11  have put that fire out, so it would have had

12  to have burned out.

13      Q.      My question was different.  My

14  question was, did somebody on the crew tell

15  you that they saw the fire go out on its own?

16      A.      They saw the fire -- they --

17  they saw that there was no more fire in

18  Car 55.

19      Q.      My question was, did somebody

20  on that crew tell you that they saw the fire

21  go out on its own?

22      A.      No.

23      Q.      Okay.  Did anybody tell you

24  that they witnessed the housing fire on

25  Car 55 go out on its own?

Confidential - Pursuant to Protective Order

1      A.      Didn't I just answer that?

2      Q.      No.   I asked you if anybody on

3   the crew asked -- told you that.

4              Now I'm asking you if anyone

5   told you that they saw the housing fire on

6   Car 55 go out on its own.

7      A.      No, sir.

8      Q.      Car 30, you said it was burning

9   the entire day of February 5th.

10             Is that right?

11     A.      That's correct.

12     Q.      Was there anytime where you

13  witnessed Car 30 having been out and then

14  restart the housing fire?

15     A.      I don't recall.

16     Q.      Did anybody report to you that

17  the fire in the housing of Car 30 was out and

18  then restarted on February 5th?

19     A.      I don't recall.

20     Q.      The car -- the housing fire on

21  Car 29, that was not -- the housing was not

22  burning on Car 29 when you got to the scene.

23             Correct?

24     A.      The housing on Car 29 was not

25  burning, no, sir.

Confidential - Pursuant to Protective Order

1    Q.    And you never witnessed the

2  housing on Car 29 burn.

3         Correct?

4    A.    That's correct.

5    Q.    And the same is true for Car 28

6  on Exhibit 13; you never witnessed that

7  housing burn.

8         Correct?

9    A.    The protective housing did not

10  burn on Car 28.

11    Q.    Did the protective housing on

12  Car 29 burn at some time?

13    A.    I do not recall.

14         (Day Exhibit 16 marked for

15    identification.)

16  QUESTIONS BY MR. ELLIS:

17    Q.    Would you do Tab 25?

18  Exhibit 16.

19         Mr. Day, you've been handed

20  what's been marked as Day Exhibit Number 16.

21         Is this a document you've seen

22  before?

23    A.    I've seen portions of it.

24    Q.    When is the last time you saw

25  portions of it?

1      A.     I don't remember.  It's been a

2  while.

3      Q.     Okay.  Directing your attention

4  to the page on the bottom right that's

5  numbered 2513, and let me know when you're

6  there, please.

7      A.     Okay.

8      Q.     Figure 15 in this document,

9  which is entitled "Hazardous Material Group

10 Chair's Factual Report," and it's Group B,

11 Exhibit 10 to the NTSB investigative hearing.

12              Figure 15 is entitled, "Lead

13 four vinyl chloride tank cars in situ,

14 February 5, 2023, 8:44."

15              Do you see that?

16     A.     Yes, sir.  Oh --

17     Q.     Now, in this photograph -- have

18 you ever seen this photograph before?

19     A.     No, sir.

20     Q.     Now, in this photograph, do

21 you -- can you identify the VCM cars or car

22 with a housing fire?

23     A.     That would be Car 31.

24     Q.     And that's the GATX95098 car.

25              Right?

Confidential - Pursuant to Protective Order

```
 1          A.     That's correct.

 2          Q.     Do you see any other housing

 3   fires in this photograph at 8:44 in the

 4   morning?

 5          A.     Not that I can see, no.  No,

 6   sir.

 7          Q.     You mentioned before that --

 8   but it was your understanding, was it not,

 9   that OCPX80179 and OCPX80235, at some point

10   those housings burned.

11                 Was that your understanding?

12          A.     Yes, sir.

13          Q.     And how did you get that

14   understanding?  Who told you that?

15          A.     You could see it.

16          Q.     When could you see it?

17          A.     When we were on-scene.  And

18   there's pictures of it.

19          Q.     Do you think -- have you seen

20   pictures of the 80179 car with the housing

21   fire on February 5th?

22          A.     I don't know what day.  I've

23   seen pictures where both protective housings

24   are going, and I believe that 30 is the one

25   that went off on the 4th.
```

Confidential Pursuant to Protective Order

```
 1          Q.     30 is the one that went --
 2   80179, Car 30, is the VCM car that had the
 3   PRD venting for what was claimed to be
 4   70 minutes on February 4th.
 5               That was your understanding,
 6   correct?
 7          A.     Yes, sir.
 8          Q.     You were not there then, and
 9   you did not witness that.
10               Correct?
11          A.     That is correct.
12          Q.     Someone sent you a video of
13   that, and you circulated it among your team
14   members on the 4th, though.
15               Correct?
16          A.     Correct.
17          Q.     You still have that video.
18               Right?
19          A.     I believe so.
20          Q.     And then at some point that
21   housing fire extinguished, as did the one on
22   80235.
23               Correct?
24          A.     The fire -- there's no fires
25   right here, right now, no, sir.
```

1    Q.    And at some point, even you

2    witnessed their -- those two housings not to

3    have a housing fire.

4             Correct?

5    A.    Correct.

6    Q.    Okay.  And the same with the

7    housing --

8    A.    Time out.

9             I've never seen the fire not in

10   the number 30 car, OCPX80179.  I've always

11   seen that protective housing on fire.

12   Q.    Oh.

13   A.    I don't remember seeing it not

14   on fire.

15   Q.    Okay.  So you don't remember

16   seeing it in its condition that's depicted

17   here in Figure 15?

18   A.    That's correct.

19   Q.    All right.  And what about on

20   the 6th?  It was burning on the 6th as well?

21   A.    I'd have to go back to other

22   photographs to see if it was burning.

23   Q.    As you sit here right now, do

24   you know whether or not that housing fire was

25   burning on the 6th?

Confidential - Pursuant to Protective Order

```
 1        A.      I do not.

 2        Q.      Now, I think you testified

 3   earlier that you made the affirmative

 4   decision not to extinguish any housing fires

 5   because it would result in an uncontrolled

 6   flammable gas release.

 7              Correct?

 8        A.      That's correct.

 9        Q.      Okay.  And did you make that

10   decision on your own, or were there other

11   people, first responders, on-scene who also

12   made the affirmative decision not to

13   extinguish housing fires because it would

14   result in an uncontrolled flammable gas

15   release?

16        A.      That is basic HAZMAT 101.  You

17   don't extinguish fires on -- that are

18   preventing uncontrolled releases of flammable

19   gases unless you can block them in.

20        Q.      Okay.  My question was, I

21   know -- I heard you say you made the

22   decision.

23              Did anybody else on-scene make

24   the same decision you did to affirmatively

25   not put housing fires out because it would
```

1    result in an uncontrolled flammable gas

2    release?

3        A.    You're going to have to speak

4    to the other people that were on the scene.

5        Q.    Okay.  So as far as you know,

6    nobody told you that they made a decision

7    like you did.

8              Is that right?

9        A.    That's correct.

10       Q.    In this photograph, is the

11   80179 car experiencing an uncontrolled

12   flammable gas release?

13       A.    I do not know.

14       Q.    Did you do anything to

15   determine that?

16       A.    The only way to do it is put

17   people in harm's way to go up with air

18   monitors to identify if there was leaks.

19       Q.    Did you do that?

20       A.    We did not.

21       Q.    What about 80235?  Is that

22   housing undergoing an uncontrolled flammable

23   gas release in this photograph?

24       A.    Without air monitoring, I can't

25   tell you.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  And you never did that,

2  did you?

3    A.    No, sir.

4    Q.    Okay.  What about for your crew

5  that saw the housing on Car 55 extinguished?

6  Did they witness an uncontrolled flammable

7  gas release?

8    A.    They got --

9        MR. LEVINE:  Objection.

10       Go ahead.

11       THE WITNESS:  The crew

12       received -- was -- were picking up the

13       uncontrolled VOCs coming from the

14       protective housing.

15  QUESTIONS BY MR. ELLIS:

16    Q.    And we'll talk about that in a

17  minute.

18       Was that -- what that crew

19  reported, was that in your view an

20  uncontrolled flammable gas release?

21    A.    There was a flammable gas

22  release, yes.

23    Q.    My question was, was that in

24  your view an uncontrolled flammable gas

25  release?

1    A.    Yes, sir.

2    Q.    What did you do to stop that

3    uncontrolled flammable gas release?

4    A.    Pulled the crews back.

5    Q.    Did you do anything else other

6    than pulling the crews back?

7    A.    No, sir.

8    Q.    And did you ever do anything

9    about any uncontrolled flammable gas release

10   on any other -- on any of the other VCM cars?

11   A.    No, sir.

12   Q.    On Exhibit 13, you describe the

13   biggest fire, pool fire, being between

14   Cars 31 and 45.

15         Did I understand that

16   correctly?

17   A.    There was a lot of fire in that

18   area, yes, sir.

19   Q.    Okay.  Was there fire in any

20   other areas on February 5th that you

21   witnessed?

22   A.    Over the course of the

23   derailment, there was fire in a lot of

24   different areas across the derailment site.

25   Q.    Okay.  Right now I'm just on

Confidential - Pursuant to Protective Order

1  Feb 5.

2           On February 5th, did you

3  witness any fires other than the area you

4  indicated between 31 -- Car 31 and 45?

5       A.     31 and 45, that area was --

6  they had fire, and the 54 was on fire.  There

7  was smoldering in boxcars.  So there was

8  fire -- specific -- sporadic fire throughout

9  the site.

10      Q.     Okay.  So between 31 and 45,

11  you witnessed fire on February 5th, and you

12  also witnessed fire on Car 54.

13           Was there any fire between

14  Car 45 and Car 54?

15      A.     Not that I saw.

16      Q.     And is that the same -- is the

17  same the case on February 6th?

18      A.     There was more fire in the

19  piles around 45, 44, 43, the plastic pellets,

20  where a lot of smoke is coming from right

21  now.  There was more active fires on the 6th.

22      Q.     Okay.  Were there active fires

23  still on the 6th between 31 and 45?

24      A.     There was -- where that black

25  smoke is, there was fire.

Confidential - Pursuant to Protective Order

```
1        Q.      In between 31 and 45?

2        A.      Yes, sir.

3        Q.      Okay.  And that happened on the

4   5th and the 6th.

5                Is that correct?

6        A.      It occurred -- is still going.

7        Q.      Okay.  And the Car 54, that car

8   was burning on the 5th and the 6th.

9                Is that correct?

10       A.      That's correct.

11       Q.      What about the areas of 44, 45,

12  47, was that burning on just the 6th?

13       A.      There was fires throughout the

14  site pretty much the entire time until after

15  we wrecked the train -- after the vent and

16  burn.

17       Q.      Okay.  And would that include

18  the area of Cars 44, 45 and 47?

19       A.      Most of the fire was on the

20  Leake Oil side.  It was more on the 41, 40,

21  37, 39, 35 area.

22       Q.      Okay.  Was there any fire in

23  the 44, 45, 47 area?

24       A.      I don't remember.

25       Q.      What about Car 50, was that --
```

Confidential - Pursuant to Protective Order

```
 1        A.     I don't remember.
 2        Q.     Let me finish my question, and
 3   then you can answer it.
 4               What about Car 50?  Was that
 5   ever on fire?
 6        A.     I don't remember.
 7        Q.     What about Car 52?  Was that
 8   car ever on fire?
 9        A.     Obviously it was at one time.
10        Q.     Did you witness Car 52 on fire
11   on February 5th or February 6th?
12        A.     No.
13        Q.     You were asked some questions
14   about placing monitors, unmanned water
15   streams.
16               Did you ever make the
17   affirmative decision not to place monitors at
18   the scene?
19        A.     I did not.
20        Q.     To your knowledge, did anybody
21   ever make the affirmative decision not to use
22   fire monitors at the scene?
23        A.     Fire monitors were used at the
24   scene.
25        Q.     On the wreck, on the
```

Confidential - Pursuant to Protective Order

```
1    derailment, were fire monitors used?
2         A.    All the fire departments
3    responded and pumped lots of water on the
4    site.
5         Q.    Okay.
6         A.    Yes, sir.
7         Q.    On February 5th?
8         A.    Not on February -- they pulled
9    back.
10        Q.    On February 5th, did you make
11   the affirmative decision not to use monitors
12   to spray water on the derailment site?
13        A.    No, sir.
14        Q.    What about on February 6th, did
15   you make the affirmative decision not to use
16   fire monitors to spray water on the
17   derailment site?
18        A.    Fire monitors were used to
19   protect the structures around the vent and
20   burn site.
21        Q.    I'm asking about the
22   derailment, the actual cars.
23              Did you make a decision on
24   February 6th not to use monitors to spray the
25   cars?
```

Confidential - Pursuant to Protective Order

1       A.      No, sir.

2       Q.      At any time did you make the

3  affirmative decision not to spray waters

4  using fire monitors on the cars?

5       A.      No, sir.

6       Q.      To your knowledge, did anybody

7  make the decision to affirmatively not use

8  monitors to spray the cars?

9       A.      You'd have to talk to anybody.

10      Q.      My question is what you know.

11              To your knowledge, did anybody

12 make that decision?

13      A.      I do not know.

14      Q.      Did you ever consider using

15 monitors to spray water on the cars?

16      A.      Consider, yes.

17      Q.      When did you first consider

18 using water to spray the cars?

19      A.      Obviously in firefighting 101,

20 you want to put cooling streams on the car.

21              The unfortunate part is these

22 are jacketed cars, and the majority of that

23 water would have washed more contaminants

24 downstream, and we'd be having a totally

25 different conversation.

Confidential Pursuant to Protective Order

```
1       Q.      My question was, when did you
2  first make -- consider spraying water using
3  monitors on the cars at the derailment site?
4               MR. LEVINE:  Objection.
5               THE WITNESS:  Sometime -- I
6          would have thought about it sometime
7          while I was on-scene.
8  QUESTIONS BY MR. ELLIS:
9       Q.      Okay.  Was that on February 5th
10 that you thought about it?
11      A.      Most likely.
12      Q.      Do you remember thinking about
13 it?
14      A.      No, sir.
15      Q.      Okay.  So you think you might
16 have thought about it?
17              MR. BRAGA:  Object to the form.
18              THE WITNESS:  That's -- it's
19         based on firefighting experience.  Put
20         the wet stuff on the red stuff.  It's
21         how we're taught.
22 QUESTIONS BY MR. ELLIS:
23      Q.      Okay.  And did I hear you
24 correct that because the cars were jacketed
25 and because you didn't want to wash more
```

1    contaminants downstream and have a different

2    conversation, you decided not to do that?

3         A.     That's correct.

4         Q.     Did you discuss that decision

5    with anybody else on-scene?

6              MR. LEVINE:  Objection.

7              THE WITNESS:  The discussion

8         about using unmanned fire monitors

9         on derailments, it's always a very

10        ticklish situation.  It is considered.

11        It is discussed.  If it's needed,

12        we're going to -- we're going to apply

13        water.

14   QUESTIONS BY MR. ELLIS:

15        Q.     My question was different.

16             Did you discuss it with anyone

17   else on the scene?

18        A.     Break.

19             MR. LEVINE:  Objection.

20             MR. ELLIS:  We're not off the

21        record, so...

22             THE WITNESS:  I need a break.

23             MR. BRAGA:  Okay.  We'll be

24        back.

25             MR. ELLIS:  Okay.

Confidential - Pursuant to Protective Order

```
1              VIDEOGRAPHER:  All right.  The
2         time is 4:27 p.m.  We're going off the
3         record.
4          (Off the record at 4:27 p.m.)
5              VIDEOGRAPHER:  The time is
6         4:32 p.m., and we're back on the
7         record.
8    QUESTIONS BY MR. ELLIS:
9         Q.    Okay.  Before you called the
10   break, Mr. Day, we were discussing your
11   discussion about using unmanned fire monitors
12   on the derailment scene.
13              And my question was, did you
14   discuss that with anybody else on-scene on
15   February 5th?
16        A.    No, sir.
17              MR. LEVINE:  Objection.
18   QUESTIONS BY MR. ELLIS:
19        Q.    Did you discuss that with
20   anyone on-scene on February 6th?
21        A.    No, sir.
22        Q.    Did anybody discuss that
23   subject on February 5th or 6th with you?
24              MR. BRAGA:  Objection.
25              THE WITNESS:  No, sir.
```

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. ELLIS:

2         Q.      Now, before you said that

3    Car 55, you had a crew that climbed up on

4    Car 54, the hopper car, to get a look at the

5    housing, and that housing was not burning.

6              Correct?

7         A.      Yes, sir.

8         Q.      You said, I believe, that your

9    crew -- who was on that crew?

10        A.      I believe that was Drew McCarty

11   and a technician.

12        Q.      Do you know the name of the

13   technician?

14        A.      No, sir.

15        Q.      Was that a technician that

16   worked for SRS or SPSI?

17        A.      Could have been either.

18        Q.      And you, I think, testified

19   that that crew got a reading from a device

20   that indicated to you that there was an

21   uncontrolled flammable gas release occurring

22   from Car 55.

23              Is that correct?

24        A.      There was elevated VOC reading

25   in close proximity -- in somewhat close
```

1    proximity to the protective housing.

2         Q.      Was there an uncontrolled

3    flammable gas release?

4         A.      There was a VOC reading.

5         Q.      My question was, was there an

6    uncontrolled flammable gas release occurring

7    from Car 55 when the crew was taking the

8    reading?

9         A.      There was an elevated VOC

10   reading from the protective housing.

11        Q.      Okay.  Do you know whether

12   there was an uncontrolled flammable gas

13   release occurring from that car when the crew

14   was taking the measurement?

15        A.      There was an elevated VOC

16   reading coming from the protective housing.

17        Q.      Does an elevated VOC reading

18   indicate to you that there is an uncontrolled

19   flammable gas release occurring from that

20   car?

21        A.      It is possible.

22        Q.      My question was, does that

23   indicate to you that it is occurring?

24        A.      We had an elevated reading of

25   VOCs coming from the protective housing.

1    Q.    Okay.  Did that indicate to you

2  that there was an uncontrolled flammable gas

3  release occurring from that housing?

4    A.    It told me that there was an

5  elevated reading of VOCs in that -- from that

6  protective housing.

7    Q.    Did it tell you anything other

8  than that there was an elevated VOC reading

9  coming from that area?

10    A.    That's exactly what it told me,

11  yes, sir.

12    Q.    And anything else?

13    A.    That there was an uncontrolled

14  release of VOCs at an elevated level.

15    Q.    Okay.  So you determined that

16  there was an uncontrolled release at an

17  elevated level from Car 55.

18          Right?

19    A.    Yes, sir.

20    Q.    And as a result, you ordered

21  the crew to withdraw.

22          Is that correct?

23    A.    The crew withdrew, yes, sir.

24    Q.    But did you order the crew to

25  withdraw, or did the crew withdraw on its

1    own?

2         A.      Restate the question.

3         Q.      Did you order the crew to

4    withdraw, or did the crew withdraw on its

5    own?

6                 MR. LEVINE:  Objection.

7                 THE WITNESS:  The crew came

8         out.

9    QUESTIONS BY MR. ELLIS:

10        Q.      Did it come out because of the

11   elevated VOC reading?

12        A.      You'd have to take it up with

13   the crew.

14        Q.      Okay.  Do you know why the crew

15   withdrew that morning after it took the

16   reading?

17        A.      I do not.

18        Q.      Did you ever do anything with

19   respect to Car 55 and the VOCs that you

20   believed were being released from the car?

21                MR. LEVINE:  Objection.

22                MR. BRAGA:  Objection.

23                THE WITNESS:  We monitored the

24        area sporadically, and that's about

25        it.

```
 1    QUESTIONS BY MR. ELLIS:

 2         Q.    Okay.  And what did you do --

 3    when you say "monitored sporadically," what

 4    do you mean?

 5         A.    We would go in and take

 6    temperatures and run air monitoring readings.

 7         Q.    What equipment did you use to

 8    run the air monitoring readings?

 9         A.    PID.

10         Q.    How many times did you take PID

11    readings from Car 55?

12         A.    Every time we went in and got

13    temperatures.

14         Q.    Did you do the PID readings

15    yourself?

16         A.    No, sir.

17         Q.    Did you do any of the

18    temperature readings yourself?

19         A.    Some.

20         Q.    Okay.  Which temperature

21    readings did you do?

22         A.    Ones that were relayed back to

23    the SPSI folks.

24         Q.    Okay.  Were they on Car 55?

25         A.    No, sir.  I was down on the big
```

Confidential - Pursuant to Protective Order

```
1   pile.

2        Q.     So you never did PID readings

3   of Car 55, and you never did temperature

4   readings of Car 55.

5               Is that correct?

6        A.     That's correct.

7        Q.     Looking at Exhibit 13, can you

8   identify, please, the VCM cars for which you

9   did do, yourself, temperature readings.

10       A.     30 and 31.

11       Q.     30 and 31.

12              31 is GATX95098.

13              Correct?

14       A.     30 is OCPX80179.

15       Q.     Yeah, I think I mentioned 31.

16              31 is 95098, and 30 is the Oxy

17  car you just identified.

18              Correct?

19       A.     31 is GATX95098.

20       Q.     And you knew at some point when

21  you arrived on the scene that there was one

22  VCM car owned by GATX.

23              Right?

24       A.     I -- when I arrived on-scene,

25  no, sir, I did not.
```

Confidential - Pursuant to Protective Order

1    Q.    When is the first time that you

2  learned that one of the cars was a GATX-owned

3  car?

4    A.    When I saw the consist.

5    Q.    When did you see the consist?

6    A.    I don't remember.  It would

7  have been on the first day when we were

8  getting our assignments.

9    Q.    Okay.  So sometime on

10  February 5th, you learned that GATX had one

11  of the VCM cars, owned one of the VCM cars.

12         Correct?

13    A.    Yes, sir.

14    Q.    Did you review any information

15  regarding specifically the GATX95098 car?

16         MR. BRAGA:  Object to the form.

17         MR. LEVINE:  Objection.

18         THE WITNESS:  So GATX95098 is

19    basically a 105J300W tank car, which

20    is identical to the TILX and the OCPX

21    cars.

22  QUESTIONS BY MR. ELLIS:

23    Q.    Okay.

24    A.    So once you realize that you

25  have five VCM cars, you pretty much know what

1    the classification of the cars are.

2        Q.    Did you review any information

3    specifically about GATX95098 on February 5th?

4        A.    No, sir.

5        Q.    Did you review any information

6    specifically about GATX95098 on February 6th?

7        A.    No, sir.

8        Q.    Did you receive any drawings

9    for 95098 at any time while you were on-scene

10   February 5th or February 6th?

11           MR. BRAGA:  Object to the form.

12           THE WITNESS:  There was some

13       discussions sometime.  I don't know --

14       I can't put my finger on the exact

15       time, but there was some discussion

16       about getting the engineer drawings of

17       the cars.  But since they were all

18       105J300W tank cars, you have one, you

19       have them all.

20   QUESTIONS BY MR. ELLIS:

21       Q.    Okay.  And because they were

22   all the same, you never looked at anything

23   specific to 95098.

24           Right?

25       A.    That is correct.

Confidential – Pursuant to Protective Order

1      Q.     Okay.  And between February 3rd

2  and February 6th, you had no communications

3  with GATX, anyone at GATX.

4             Correct?

5      A.     No, sir.

6      Q.     That was little ships passing

7  in the night.

8             Am I correct that you had no

9  communications with anyone from GATX between

10  February 3rd and February 6th?

11             MR. BRAGA:  Object to the form.

12             THE WITNESS:  Are you asking a

13      question?

14  QUESTIONS BY MR. ELLIS:

15      Q.     Yes.  I'm asking you, isn't it

16  true you had no communications with GATX

17  between February 3rd and February 6th?

18      A.     Correct.

19      Q.     You didn't ask any information

20  from GATX between the 3rd and the 5th -- or

21  the 6th of February.

22             Correct?

23             MR. BRAGA:  Object to the form.

24             THE WITNESS:  There was no

25      communications between myself and GATX

Confidential - Pursuant to Protective Order

1      on any of those days.

2  QUESTIONS BY MR. ELLIS:

3      Q.    I take it then that you never

4  advised GATX that you were going to vent and

5  burn its 95098 tank car.

6            Correct?

7            MR. LEVINE:  Objection.

8            MR. BRAGA:  Object to the form.

9            THE WITNESS:  That would have

10     had to come from the Norfolk Southern.

11  QUESTIONS BY MR. ELLIS:

12     Q.    My question simply was, you

13  never made the call.

14            Correct?

15     A.    That's not in my -- that's not

16  what I was brought to the scene to do.

17     Q.    And because it wasn't what you

18  brought to the scene to do, you never talked

19  to anyone about venting and burning 95098 at

20  GATX.

21            Right?

22     A.    Never spoke to them.

23            MR. LEVINE:  Objection.

24            THE WITNESS:  I never spoke to

25     anybody from GATX about this car.

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. ELLIS:

2         Q.    Did you ever speak with anybody

3    at GATX about the derailment?

4         A.    Over the course of the next

5    several months after the incident, I talked

6    to a lot people about the incident.

7         Q.    At GATX?

8         A.    I spoke to a lot of people.  I

9    don't remember all the people I spoke to.

10        Q.    Okay.  Can you identify

11   specifically as you sit here today anybody at

12   GATX with whom you had a conversation about

13   the East Palestine derailment?

14        A.    Not about East Palestine.

15        Q.    Have you ever -- since you

16   qualified it "not about East Palestine," as

17   you sit here today, do you recall

18   conversations with GATX, anybody at GATX,

19   about a vent and burn?

20        A.    No, sir.

21        Q.    What about VCM railcars?  Have

22   you had conversations with anybody at GATX

23   about VCM railcars since the derailment?

24        A.    No, sir.

25        Q.    You agree that the decision to
```

Confidential Pursuant to Protective Order

1    vent and burn a railcar is a very serious

2    decision.

3                    Right?

4                    MR. BRAGA:  Object to the form.

5                    THE WITNESS:  That's a very

6        serious decision, yes, sir.

7    QUESTIONS BY MR. ELLIS:

8        Q.    You knew that you'd be

9    releasing hazardous substances into the

10   environment when you vent and burned those

11   five VCM cars.

12                   Right?

13       A.    When the vent and burn

14   operation occurred, yes, sir.

15       Q.    And you knew that that was

16   going to occur.

17                   Right?

18       A.    Yes, sir.

19       Q.    You also knew that people could

20   get hurt either from the explosion or from

21   the release of hazardous substances when you

22   did the vent and burn.

23                   Right?

24       A.    Yes, sir.

25       Q.    And given that it was five cars

Confidential - Pursuant to Protective Order

1   and not just one VCM car, it made it all the

2   more important.

3                   Correct?

4                   MR. BRAGA:  Object to the form.

5                   THE WITNESS:  You're not quite

6           understanding the gravity of what it

7           takes to decide to do this and how

8           it's done.

9                   It's not like we can go in and

10          grab, for example, TILX and say, we're

11          going to vent and burn that one.

12          Because of the size of the fire, you

13          have to either move cars out of the

14          way or take them all out at the same

15          time.

16   QUESTIONS BY MR. ELLIS:

17          Q.    Okay.  My question was simply

18   because it was five, it's all the more

19   significant.

20                   Correct?

21                   MR. LEVINE:  Objection.

22                   THE WITNESS:  It was a

23          significant incident, yes, sir.

24   QUESTIONS BY MR. ELLIS:

25          Q.    And because it can have such

Confidential - Pursuant to Protective Order

1    catastrophic consequences, that's something

2    you want to carefully weigh before you make

3    the decision to vent and burn.

4              Correct?

5              MR. BRAGA:  Object to the form.

6              MR. LEVINE:  Objection.

7              THE WITNESS:  The

8         recommendation to the NS to perform

9         the vent and burn operation was very

10        heavy on everybody that was making the

11        recommendation to them to take it to

12        the incident commander.

13   QUESTIONS BY MR. ELLIS:

14        Q.    The decision to vent and burn

15   was a decision of last resort.

16             Right?

17        A.    It's the final option.

18        Q.    A decision of last resort.

19             Right?

20        A.    It's the final option.

21        Q.    Okay.  And because it's the

22   final option, you want to exhaust all other

23   alternatives before you make that very

24   important decision.

25             True?

1          MR. BRAGA:  Object to the form.

2          THE WITNESS:  Which is exactly

3     what we did.

4  QUESTIONS BY MR. ELLIS:

5     Q.    And you want to have good,

6  accurate information, including scientific

7  information, before you make a decision as

8  significant as a vent and burn decision.

9          Correct?

10         MR. BRAGA:  Objection.

11         THE WITNESS:  Yes, sir.

12  QUESTIONS BY MR. ELLIS:

13     Q.    You want to bring the best

14  scientific minds available and as much

15  scientific expertise as you can before you

16  make that decision.

17         Correct?

18         MR. BRAGA:  Objection.

19         MR. LEVINE:  Objection.

20         THE WITNESS:  The gravity of

21     making the decision to vent and burn

22     these cars was not taken lightly

23     whatsoever.  We had people helping us

24     make this recommendation.

25         Reviewing what we were seeing,

Confidential Pursuant to Protective Order

```
 1          talking about what we were seeing,

 2          coming up with are there other

 3          solutions, going through our checklist

 4          of transfer, clear, hot-tap, cold-tap,

 5          before we got to vent and burn.  Each

 6          one of those was weighed very, very

 7          heavily, multiple times, before the

 8          decision was made, the recommendation

 9          was made, for the incident commander

10          to decide vent and burn or not.

11   QUESTIONS BY MR. ELLIS:

12          Q.    Okay.  And it was a group of

13   you making that decision that you all knew

14   was a very, very serious decision.

15          Correct?

16          MR. LEVINE:  Objection.

17          THE WITNESS:  Yes, sir.

18   QUESTIONS BY MR. ELLIS:

19          Q.    Okay.  And --

20          A.    Excuse me.

21          Q.    -- you knew that people might

22   have questions after the fact about why you

23   made that decision.

24          Right?

25          MR. BRAGA:  Object to the form.
```

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  Every decision
 2        that's made is usually Monday morning
 3        quarterbacked, yes.
 4   QUESTIONS BY MR. ELLIS:
 5        Q.    Okay.  So when you made the
 6   decision to do the vent and burn, you knew
 7   that people later might have questions about
 8   why you did it or what decision-making you
 9   went through.
10              Right?
11              MR. BRAGA:  Objection.
12              THE WITNESS:  Yes, sir.
13   QUESTIONS BY MR. ELLIS:
14        Q.    And in fact, I think you said
15   that this vent and burn decision was the
16   toughest decision you've ever made.
17              Right?
18        A.    One of the toughest decisions,
19   yes, sir.
20        Q.    It was the toughest decision
21   you ever made.  You told someone that.
22              Didn't you?
23        A.    It's one of the toughest
24   decisions I've ever made.
25        Q.    And in fact your company
```

Confidential - Pursuant to Protective Order

```
1   wouldn't make that decision until it had a

2   complete indemnity from Norfolk Southern.

3           Correct?

4   A.      Negative.

5           MR. BRAGA:  Object to the form.

6   QUESTIONS BY MR. ELLIS:

7   Q.      Well, your company does have an

8   indemnity from Norfolk Southern.

9           Doesn't it?

10  A.      That's nice to know.  No, I did

11  not know that.

12          MS. COLLIER:  Tab 11.

13          VIDEOGRAPHER:  Exhibit 17.

14          (Day Exhibit 17 marked for

15      identification.)

16  QUESTIONS BY MR. ELLIS:

17  Q.      17.

18          Mr. Day, you've been handed

19  what's been marked as Exhibit 17.  Have you

20  ever seen this before?

21  A.      No, sir.

22  Q.      Were you ever involved in

23  discussions with Bobby Breed about SRS

24  needing an indemnity?

25  A.      The only indemnity that I
```

1   was -- the paperwork that I was involved in

2   was for ESI.

3        Q.     Because you knew that the vent

4   and burn decision was so significant, and

5   because you knew that people would be looking

6   afterwards and wanting to know why you made

7   the decision you wanted to make, you

8   ultimately made, you wanted to keep good and

9   accurate records of your decision-making.

10              Didn't you?

11              MR. LEVINE:  Objection.

12              THE WITNESS:  I'm not sure how

13       to answer that question.

14   QUESTIONS BY MR. ELLIS:

15       Q.     Well, don't you think it would

16   have been a good idea to make a clear,

17   written record of such a significant decision

18   as making -- as venting and burning five VCM

19   cars?

20              MR. LEVINE:  Objection.

21              MR. BRAGA:  Objection.

22              THE WITNESS:  Had I taken

23       copious amounts of notes, they would

24       have all been discovered, and we'd be

25       going line item for line item through

Confidential - Pursuant to Protective Order

```
 1        this entire thing.
 2   QUESTIONS BY MR. ELLIS:
 3        Q.    And that's why you didn't keep
 4   the notes?
 5        A.    Pretty much.
 6              MR. BRAGA:  Object to the form.
 7   QUESTIONS BY MR. ELLIS:
 8        Q.    At the time the vent and burn
 9   was executed, are you aware of anybody making
10   a written record of the reasons for the vent
11   and burn?
12        A.    No, sir.
13        Q.    Do you know why nobody made a
14   written record of the reasons for the vent
15   and burn?
16              MR. LEVINE:  Objection.
17              MR. BRAGA:  Object to the form.
18              THE WITNESS:  You'd have to ask
19        anybody.
20   QUESTIONS BY MR. ELLIS:
21        Q.    At the time the vent and burn
22   was executed, the temperatures in all the VCM
23   cars were stable or decreasing.
24              Right?
25        A.    Okay.
```

Confidential - Pursuant to Protective Order

1      Q.      Are you aware of that?

2      A.      No, sir.

3      Q.      Are you -- let's talk about the

4    temperatures you took then.

5      A.      Okay.

6      Q.      We were looking at Exhibit 13.

7              Which cars on Exhibit 13 did

8    you personally take temperature measurements

9    for?

10     A.      30 and 31.

11     Q.      When did you take temperature

12   measurements for 30 and 31?

13     A.      The evening of the 5th.

14     Q.      How many temperature readings

15   did you take for 30 and 31?

16     A.      I don't remember.

17     Q.      Did you do it hourly?

18     A.      No, sir.  Just one time.

19     Q.      Just once.

20             So you took one temperature

21   reading for Car 30 and one temperature

22   reading for Car 31.

23             Is that correct?

24     A.      I didn't say that.

25     Q.      Okay.  What did you say?

```
 1              How many readings did you take

 2  for Car 30?

 3       A.     Several.

 4       Q.     When did you do those?

 5       A.     The evening of February 5th.

 6       Q.     Do you know the time?

 7       A.     No, sir.  Dark.

 8       Q.     Did you make a written record?

 9       A.     Radio communications back to

10  SPSI, who was taking records -- keeping

11  records.

12       Q.     Did you do it hourly?

13       A.     I only did it one time.

14       Q.     And you took multiple readings

15  on Car 30 that one time.

16              Is that correct?

17       A.     That's correct.

18       Q.     What equipment were you using?

19       A.     A laser pointer IR gun.

20       Q.     Where were you pointing the

21  laser?

22       A.     Through holes in the jacket at

23  the shell and around the bolsters.

24       Q.     So you took some through the

25  jacket at the actual shell and some at the
```

1    bolster.

2                Is that correct?

3        A.      That's correct.

4        Q.      Were all the readings the same?

5        A.      No, sir.

6        Q.      And did you radio back each of

7    those readings and identify where the

8    specific reading came from?

9        A.      I radioed back that Car 30,

10   which we would give the car number itself, A

11   end, B end, right side, left side, top,

12   bottom, bolster.

13       Q.      Okay.  So you identified for

14   the person at SPSI on the other end of the

15   radio where specifically you were pointing

16   the laser and what the reading was.

17               Is that correct?

18       A.      Correct.

19       Q.      Have you ever seen a written

20   recording of that?

21       A.      I've seen several bits of

22   information.

23       Q.      My question is, have you ever

24   seen a written recording of what you radioed

25   back, the multiple readings at different

Confidential - Pursuant to Protective Order

1    parts of the tank at the same time?

2         A.    No, sir.

3         Q.    Did you ever ask to see that?

4         A.    No, sir.

5         Q.    You were mentioning that you

6    didn't want to cool the tanks with water

7    because they were jacketed, and it makes --

8    it doesn't help to cool jacketed tanks with

9    water.

10              Is that -- is that your

11   testimony?

12        A.    Yes, sir.

13        Q.    Going back to Exhibit 4.  Would

14   you get Exhibit 4?

15              MR. BRAGA:  He has it.

16   QUESTIONS BY MR. ELLIS:

17        Q.    Exhibit 4 is The Chlorine

18   Institute Pamphlet 171 that specifically

19   addresses VCM tank cars, including those

20   engulfed by fire.

21              Correct?

22        A.    Vinyl Chloride Monomer Tank Car

23   & Cargo Tank Handling Manual, yes, sir.

24        Q.    And there's a specific section,

25   is there not -- are you familiar with this?

Confidential - Pursuant to Protective Order

```
 1        A.     I have seen it, and I've been
 2   involved in it, yes, sir.
 3        Q.     And when you say "involved in
 4   it," you mean you wrote some of it?
 5        A.     I was involved in some of the
 6   meetings leading up to it.
 7        Q.     Okay.  So this is a document
 8   you're very familiar with?
 9             MR. LEVINE:  Objection.
10             THE WITNESS:  Define "very."
11   QUESTIONS BY MR. ELLIS:
12        Q.     Well, I want to know.  I'm
13   asking you.  Is this a document that you're
14   very familiar with?
15             MR. LEVINE:  Objection.
16             MR. BRAGA:  Objection.
17             THE WITNESS:  This is a
18        document that I use, I reference,
19        to -- for VCM incidents.
20   QUESTIONS BY MR. ELLIS:
21        Q.     Did you reference it for this
22   specific VCM incident in East Palestine?
23        A.     I do not recall.
24        Q.     Was it available -- did you
25   have it in writing with you when you were in
```

Confidential - Pursuant to Protective Order

```
 1    East Palestine?

 2         A.      When I was there, no, sir.

 3         Q.      You didn't bring it with you?

 4         A.      I did not.

 5         Q.      Why not?

 6         A.      I don't know.

 7         Q.      Directing your attention to

 8    page 40 --

 9         A.      40.

10         Q.      -- there's a Section 10.4.8

11    entitled "Tank in a Fire."

12              Do you see that?

13         A.      Not yet.

14         Q.      And incidentally, how many

15    times have you dealt with a derailment where

16    a VCM car was involved?

17         A.      A lot.

18         Q.      Were those incidents all

19    involving the same type of tank?  105J?

20         A.      I believe many years ago, VCM

21    was carried in a 112J.

22         Q.      Okay.  But all the current,

23    more recent situations you've been involved

24    with where a tank car involving VCM was

25    involved, it was a 105J.
```

1          Right?

2     A.     There were -- they still -- I

3   believe they -- I believe they still have

4   112s in service.

5     Q.     Okay.

6     A.     In VCM service.

7     Q.     Would you say the majority of

8   the tank incidents you've been involved with

9   involving VCM have been 105J cars?

10    A.     No, sir.

11    Q.     They've been the other kind?

12    A.     They've been both kinds.

13    Q.     Okay.  Are the older kinds

14  jacketed?

15    A.     They're -- pretty much

16  everything that's in flammable gas service

17  now is required to be jacketed.

18    Q.     Okay.  And this particular

19  pamphlet is from 2018.

20           Correct?

21    A.     That's correct.

22    Q.     So it would apply to tanks in

23  use in 2018 and through the present.

24           Right?

25    A.     Yes, sir.

1    Q.    Including those that carry VCM.

2          Correct?

3    A.    Correct.

4    Q.    Okay.  And in Section 10.4.8,

5    Tank in a Fire, it says, "If a tank is

6    engulfed by fire," third bullet point.

7          Would you read into the record

8    what that says?

9    A.    No, go ahead.

10   Q.    Would you read into the record

11   what that says?

12   A.    "A water spray on the tank in

13   the fire may help reduce temperature and

14   pressure rise."

15   Q.    And that doesn't say anything

16   about needing to take the jacket off.

17         Does it?

18   A.    Nope.

19   Q.    And then the next bullet point,

20   would you read that one into the record?

21   A.    "VCM tanks not directly in

22   fire, but in line of sight of fire, will

23   typically heat up due to radiant heat.  These

24   tanks should be sprayed with water fog, as it

25   will help reduce rate of pressure increase

Confidential - Pursuant to Protective Order

1    within the tank."

2        Q.    And that doesn't say anything

3    about taking the jacket off either.

4            Does it?

5        A.    No, sir.

6        Q.    Would you get Exhibit 2 out,

7    please?

8        A.    Okay.

9        Q.    Exhibit 2 is the Emergency

10   Response Guide that you talked about earlier

11   today that you use in responding to incidents

12   like the one in East Palestine.

13           Correct?

14       A.    Yes, sir.

15       Q.    Okay.  And on page 169 of this

16   exhibit -- it's the third page in if you

17   count the cover page -- there's a section in

18   here that discusses fire involving tanks.

19           Correct?

20       A.    Yes, sir.

21       Q.    The second bullet point, would

22   you read that into the record, please?

23       A.    "Water fog or spray."

24       Q.    I'm sorry, "Fire Involving

25   Tanks."

Confidential Pursuant to Protective Order

1                    Do you see that section?

2          A.      Oh, yes.

3          Q.      Okay.  And now that we're on

4    the same area, in Fire Involving Tanks,

5    there's a second bullet point.

6                    Would you read that into the

7    record?

8          A.      "Fight fire from a maximum

9    distance or use unmanned master stream

10   devices or monitor nozzles."

11         Q.      Okay.  That's the first bullet.

12                   And then right underneath, what

13   does it say?

14         A.      This is not a reading

15   comprehension deal, sir.  If you want to read

16   it, knock yourself out.

17         Q.      Answer my question, please.

18                   What does the second bullet

19   point in Exhibit 2 say?

20                   MR. BRAGA:  Just read it into

21        the record.

22                   THE WITNESS:  "Cool containers

23        with flooding quantities of water

24        until well after fire is out."

25

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. ELLIS:

 2         Q.     Okay.  And that doesn't say

 3    anything about taking the jacket off.

 4               Does it?

 5         A.     No, sir.

 6         Q.     And the fifth bullet point?

 7         A.     "Do not direct water at source

 8    or leak or safety devices; icing may occur."

 9         Q.     I'm sorry.  The one, two,

10    three, four, five, sixth bullet point.

11               MR. BRAGA:  The one that begins

12         with --

13               THE WITNESS:  "For massive

14         fire, use unmanned master stream

15         devices or monitor nozzles.  If this

16         is impossible, withdraw and let the

17         area -- from area and let fire burn."

18    QUESTIONS BY MR. ELLIS:

19         Q.     Okay.  And that doesn't say

20    anything about taking jackets off.

21               Does it?

22         A.     No, sir.

23         Q.     Now going back to your

24    temperature reading taking -- your

25    temperature readings that you took on the
```

1  various VCM cars.  And if we get Exhibit 13

2  back up so the jury can have an

3  understanding.

4                  We talked about the one

5  instance where you took temperature

6  measurements on Car 30, and you got several

7  measurements in one instance, and you radioed

8  those back to someone at SPSI.

9                  Correct?

10     A.      Correct.

11     Q.      And then did you do the same at

12  the same time with respect to Car 31?

13     A.      After it, yes, sir.

14     Q.      Okay.  So you did Car 30 first,

15  and then you did Car 31.

16                  Is that correct?

17     A.      I don't remember which

18  direction -- which one I did first.

19     Q.      Okay.  And you do those two,

20  and if -- I think I remember those are the

21  only two you did.

22                  Correct?

23     A.      That's correct.

24     Q.      And where, when you were taking

25  the measurements on Car 31, did you point the

1    laser?

2         A.    A end, B end, any cracks in

3    the -- or holes in the jacket, and up against

4    the bolsters.

5         Q.    The A end?

6         A.    And B end.

7         Q.    The B end, where there were

8    cracks in the jacket where you could see the

9    actual tank.

10              Is that correct?

11        A.    The shell.

12        Q.    The shell?

13        A.    Yes, sir.

14        Q.    Okay.  And on the bolster.  So

15   those four locations.

16              Is that correct?

17        A.    Correct.

18        Q.    And I take it that you yourself

19   did not record any of the temperatures that

20   you were measuring.

21              Correct?

22        A.    You're absolutely correct.

23        Q.    You radioed those back to

24   someone.  You don't remember who.

25              Correct?

Confidential - Pursuant to Protective Order

1       A.      Correct.

2       Q.      Where specifically on the A end

3  were you pointing the laser?

4       A.      Where there was a hole in the

5  jacket.

6       Q.      So there was a hole in the

7  jacket in the A end of Car 31, and you were

8  pointing the laser through the jacket onto

9  the shell?

10      A.      Correct.

11      Q.      Where were you pointing the

12 B -- the laser when you were measuring the

13 temperature on the B end?

14      A.      If we found holes in the

15 jacket.

16      Q.      Okay.  So you, on the evening

17 of the 5th, found holes in the jacket on

18 Car 31, and you pointed your laser through

19 those holes onto the shell.

20              Is that correct?

21      A.      Yes, sir.

22      Q.      And then you took the bolster.

23              Where on the bolster did you

24 point the laser?

25      A.      On the bolster, as close to the

1    shell as possible.  The oil pads.

2         Q.    And I take it you didn't make

3    any recording of specifically where -- either

4    by photograph or written description of

5    specifically where you were pointing the

6    laser.

7              Correct?

8         A.    Correct.

9         Q.    And then the last place you

10   said you were doing it is where?  A end, B

11   end, bolster as close to the shell as

12   possible.

13             And where was the fourth?

14        A.    On the right and on the left.

15        Q.    On the right and the left?

16        A.    On the right and the left.

17        Q.    Okay.  So six places on Car 31.

18             Correct?

19        A.    Where there were holes in the

20   jacket.

21        Q.    Okay.  So there was a hole in

22   the jacket on the right side and a hole in

23   the jacket on the left side, and you pointed

24   your laser through those holes and got a

25   reading on the shell.

Confidential - Pursuant to Protective Order

```
 1                   Correct?
 2                   MR. LEVINE:  Objection.
 3                   THE WITNESS:  Anywhere that we
 4         could get a -- get readings against
 5         the shell of the car is where we
 6         pointed the lasers.
 7   QUESTIONS BY MR. ELLIS:
 8         Q.    Okay.  But what I want to know
 9   is, on the evening of the 5th when you were
10   doing Car 31, was there a hole on the left
11   side of the shell of the tank where you were
12   able to get the shell temperature?
13         A.    Must have been.
14         Q.    Do you remember that?
15         A.    There had to have been if I
16   said it.
17         Q.    Okay.  And same on the right
18   side, there must have been a hole on the
19   right side that you could get the laser
20   through and get the shell?
21         A.    Yes, sir.
22         Q.    Okay.  So six readings overall.
23               Were they all the same?
24         A.    No, sir.
25         Q.    What were -- what was the
```

Confidential - Pursuant to Protective Order

1    difference?

2              MR. BRAGA:  Object to the form.

3              THE WITNESS:  They were

4        different.

5    QUESTIONS BY MR. ELLIS:

6        Q.    How different?

7        A.    I don't remember.

8        Q.    Do you remember any of the

9    readings at all?

10       A.    No, sir.

11       Q.    Going back to Car 30, do you

12   remember any of the readings at all?

13       A.    No, sir.

14       Q.    Do you remember at all the

15   range of differences that you got?

16       A.    No, sir.

17       Q.    Other than those two times, did

18   you take any other temperature measurements

19   on any of the VCM cars on February 5th or

20   February 6th?

21       A.    No.

22       Q.    Did you take any measurements

23   of any kind on any of the VCM cars other than

24   the two we've just discussed?

25       A.    Me personally, no.

Confidential Pursuant to Protective Order

1           MR. ELLIS:  Can we just take a

2      five-minute break here?

3           MR. BRAGA:  Sure.

4           VIDEOGRAPHER:  The time is

5      5:04 p.m., and we're going off the

6      record.

7       (Off the record at 5:04 p.m.)

8           VIDEOGRAPHER:  The time is

9      5:15 p.m., and we're back on the

10      record.

11  QUESTIONS BY MR. ELLIS:

12      Q.    Mr. Day, you were talking

13  about -- or we were discussing your

14  temperature measurements that you took on

15  February 5th on two of the VCM cars.

16           And you, I think, said you were

17  using an IR laser-pointed gun.

18           Right?

19      A.    Correct.

20      Q.    Okay.  Do you know what model?

21      A.    No, sir.

22      Q.    Where did you get it?

23      A.    Out of my wreck bag.

24      Q.    Out of your wreck bag?

25      A.    Yes.

Confidential - Pursuant to Protective Order

```
 1        Q.     What is a wreck bag?
 2        A.     A bag that has wreck -- wreck
 3   equipment, clothes, monitor.
 4        Q.     Do you have a bag that you keep
 5   packed or you have available for when you
 6   need to go to a train derailment or a wreck?
 7        A.     In an emergency, yes, sir.
 8        Q.     Okay.  And that's what you
 9   called your wreck bag?
10        A.     Yes.
11        Q.     And your IR gun is in there?
12        A.     Yes, sir.
13        Q.     Is it in there now?
14        A.     Yes, sir.  No, it's not.  It's
15   in Boston.
16        Q.     Okay.  Your IR gun is in
17   Boston?
18        A.     On a job.
19        Q.     Okay.  Does it store readings?
20        A.     No, sir.
21        Q.     When's the last time -- let me
22   ask you this.
23               Does it require calibration?
24        A.     No, sir.
25        Q.     How far away were you when you
```

Confidential - Pursuant to Protective Order

1   were taking your temperature readings?  How

2   far away from the VCM cars were you?

3               MR. BRAGA:  Object to the form.

4               Go ahead.

5               THE WITNESS:  My distance was

6         somewhere between six and zero inches.

7   QUESTIONS BY MR. ELLIS:

8         Q.    Did you ever make contact with

9   the tanks with your gun?

10        A.    It was not a contact

11  thermometer.

12        Q.    Okay.  My question was, did you

13  ever make contact?

14        A.    It's not a contact thermometer.

15  It's an IR gun.

16        Q.    I understand that.  I

17  understand.  But you said somewhere between

18  zero and six, and zero to me is contact.

19              So was it zero?  Did you make

20  contact with your gun?

21        A.    I do not remember.

22        Q.    Okay.  You don't recall one way

23  or the other.

24              Is that right?

25        A.    Zero to six inches with a gun,

Confidential Pursuant to Protective Order

1    that's where I was reading from.

2         Q.    Okay.  And you don't recall one

3    way or another whether you made contact with

4    the tank.

5              Right?

6         A.    That's correct.

7         Q.    Were you using the same

8    distance for every reading?

9              MR. BRAGA:  Object to the form.

10             THE WITNESS:  So the -- a tank

11        car -- the way the tank cars are

12        built, you have the inner shell, you

13        have four inches of insulation, you

14        have a half-inch of thermal

15        protection, and you have an

16        eighth-inch outer jacket.  Sometimes

17        it was compressed right up against the

18        shell; other times it was ripped away.

19             So it was anywhere from zero to

20        six inches.

21   QUESTIONS BY MR. ELLIS:

22        Q.    Okay.  Not the same distance

23   every time.  It depended on the circumstances

24   of the particular measurement you were

25   taking.

Confidential - Pursuant to Protective Order

1              Is that correct?

2       A.      It depended on what access

3    point I had to get to the shell of the car.

4       Q.      Okay.  Could we get Tab 31 up,

5    please?

6              And this is Exhibit 16 {sic}.

7    This is the page ending 2559 of Exhibit 6 --

8              VIDEOGRAPHER:  18.

9              MR. ELLIS:  This was 18?

10             VIDEOGRAPHER:  No.  If you're

11       marking one now --

12             MR. ELLIS:  No.  No, this is an

13       exhibit -- this is a previously marked

14       exhibit.  It is Exhibit 16.

15             VIDEOGRAPHER:  Okay.

16             MR. ELLIS:  And it is the

17       HAZMAT Group Chair's Factual Report,

18       and specifically this is page 2559.

19             (Day Exhibit 18 marked for

20       identification.)

21    QUESTIONS BY MR. ELLIS:

22       Q.      Oh, this is Exhibit 19.  18.

23    Thank you.  18.

24             You've been handed what's been

25    marked as Exhibit 18, which I'll represent to

Confidential - Pursuant to Protective Order

1    you is just on the second page an enlarged

2    version so folks can see the chart a little

3    easier.

4                Do you have Exhibit 18 in front

5    of you and the second page with the chart

6    that is 2559 from Exhibit 16?

7         A.    Say it one more time.

8         Q.    Do you have Exhibit 18 in front

9    of you?  It's the same as page 2559 on

10   Exhibit 16.

11               Right?

12        A.    Yes, sir.

13        Q.    Okay.  Do you see on the box on

14   the left is a series of temperatures that

15   were taken on the five VCM cars on

16   February 5th and 6th.

17               Right?

18        A.    Okay.

19        Q.    Have you ever seen this before?

20        A.    No, sir.

21        Q.    Okay.  Do --

22        A.    Or let me rephrase that.

23   Excuse me.  I saw it yesterday.

24        Q.    Okay.  Yesterday was the first

25   time you saw it?

Confidential - Pursuant to Protective Order

1       A.      That I remember seeing this.

2               MR. BRAGA:  Object to the form.

3    QUESTIONS BY MR. ELLIS:

4       Q.      Okay.  Do any of these

5    temperature readings look familiar to you?

6               MR. BRAGA:  Object to the form.

7               THE WITNESS:  They're

8       temperatures.

9    QUESTIONS BY MR. ELLIS:

10      Q.      Do any of them look like the

11   ones you took on February 5th of Cars 31 and

12   30?

13      A.      I do not remember.

14      Q.      Did you ever see, either on

15   February 5th or February 6th, temperature

16   measurements other than the ones that you

17   took?

18      A.      Temperatures were discussed a

19   few times in passing conversations.

20              I didn't put a lot of credence

21   into these temperature readings because they

22   were taken with IR guns, unknown accuracy.

23   They might give you a positive.  They might

24   give you a negative.  It might -- I don't --

25   I don't trust the readings we were getting.

Confidential - Pursuant to Protective Order

1          The way to get a temperature is

2     to go through the protective housing and get

3     a core temperature of the product using the

4     thermometer well.

5          Q.     Okay.  My question was, either

6     on February 5th or February 6th, did you see

7     temperature readings for any or all of the

8     five VCM cars?

9          A.     We discussed them.

10         Q.     Did you see any readings?

11               MR. LEVINE:  Objection.

12               THE WITNESS:  We discussed

13        them.

14   QUESTIONS BY MR. ELLIS:

15         Q.     Okay.  My question was, did you

16    see in writing any readings, either on

17    February 5th or February 6th?

18         A.     You didn't say that.  In

19    writing, no.

20         Q.     And who did you discuss the

21    temperature readings with?

22         A.     Drew, Terry, the NS folks.

23               Drew was concerned, I was

24    concerned, with the accuracy of the

25    temperature readings and the inability to get

Confidential - Pursuant to Protective Order

1    core temperatures.

2        Q.    Okay.  Why were you taking

3    readings of Cars 30 and 31?

4             MR. BRAGA:  Object to the form.

5             THE WITNESS:  It's part of my

6        job.

7    QUESTIONS BY MR. ELLIS:

8        Q.    And specifically what part of

9    your job is taking temperature readings?

10            MR. LEVINE:  Objection.

11            THE WITNESS:  We, as in SRS,

12       only had three folks on-scene at the

13       time.  We had people responding, but

14       they weren't on-scene yet, so we were

15       filling in.  We were doing all kinds

16       of things, things that a senior

17       project manager would do, things that

18       a senior project manager doesn't

19       usually do.

20            I'm a hazmatician -- I'm a

21       HAZMAT technician, HAZMAT operations,

22       HAZMAT sector chief.  I can be all of

23       these different things.  This is what

24       I do for a living.

25

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. ELLIS:

2         Q.     Okay.  And one of the things

3    that you do when you're doing an emergency

4    response is take temperatures of tanks that

5    are involved in a fire.

6               Is that right?

7         A.     Perform damage assessment.

8         Q.     Okay.  Part of performing

9    damage assessment is taking temperature

10   readings of a tank car?

11        A.     Yes, sir.

12        Q.     Okay.  And you have the IR gun

13   in your wreck bag because that's the tool you

14   use to take temperature readings.

15              Right?

16        A.     One of them.

17        Q.     Okay.  It's definitely a tool

18   that you've used in other wrecks.

19              Right?

20        A.     That's correct.

21        Q.     And you used it in this wreck.

22              Right?

23        A.     Yes, sir.

24        Q.     Okay.  Did you ever express to

25   anybody that you thought the temperature
```

Confidential - Pursuant to Protective Order

1    readings were unreliable?

2          A.      Many times.

3          Q.      To who?

4          A.      Drew, Terry, the NS folks.

5          Q.      Who at NS did you tell

6    temperature readings were unreliable?

7          A.      Scott Gould, Scott Deutsch,

8    possibly Chris Burch, and possibly Robert

9    Wood and Dave Schoendorfer.

10         Q.      Did you tell Mr. Schoendorfer

11   that you thought the temperature readings

12   that they were getting on the five VCM cars

13   were unreliable?

14         A.      I did.

15         Q.      When did you tell him that?

16         A.      I do not remember.

17         Q.      Did you tell him that on the

18   5th?

19         A.      I do not remember.

20         Q.      Do you remember -- did you tell

21   him that before the vent and burn?

22         A.      Yes.

23         Q.      Tell me everything you recall

24   about your conversation with Mr. Schoendorfer

25   about temperatures being unreliable,

Confidential - Pursuant to Protective Order

1    temperature readings being unreliable.

2              MR. LEVINE:  Objection.

3              THE WITNESS:  I'm not -- I'm

4       not sure the temperatures are

5       reliable.

6    QUESTIONS BY MR. ELLIS:

7       Q.    You said you weren't sure the

8    temperatures were reliable.

9              What else did you say?

10      A.    I'm not sure that the

11   temperatures are reliable.

12      Q.    What else did you say?

13      A.    I'm not sure the temperatures

14   are reliable.

15      Q.    Did you say anything else?

16      A.    I do not recall.

17      Q.    Okay.  What did

18   Mr. Schoendorfer say to you?

19      A.    Please take more temperature

20   readings.

21      Q.    Did you?

22      A.    I personally did not.

23      Q.    Other than please take more

24   temperature readings, did he say anything

25   else about -- after you told him that

 1    temperature readings were unreliable?

 2        A.      No.

 3        Q.      What about Mr. Wood?  Did you

 4    tell Mr. Wood that you thought the

 5    temperature readings you were getting were

 6    unreliable?

 7        A.      I do not remember.

 8        Q.      What about Mr. Gould?  Did you

 9    tell him that the temperature readings you

10    were getting were unreliable?

11        A.      I believe so.

12        Q.      When did you tell him that?

13        A.      I do not remember.

14        Q.      Do you remember if it was on

15    February 5th or February 6th?

16        A.      It would have been on

17    February 5th.

18        Q.      Do you remember where you were

19    when you were having that conversation with

20    Mr. Gould?

21        A.      Either in the fire station,

22    walking across the parking lot going towards

23    city hall or on-site.

24        Q.      And tell me everything that you

25    said to him and he said to you.

1          MR. LEVINE:  Objection.

2          THE WITNESS:  I can't do that.

3     QUESTIONS BY MR. ELLIS:

4          Q.     What do you remember about that

5     conversation?

6          A.     That specifically they were --

7     they, as in NS, wanted more data, more

8     temperature readings.  And I said I -- I'm

9     unsure that the temperatures are reliable.

10         Q.     Okay.  And what did he say in

11    response?

12         A.     I do not remember.

13         Q.     Did you ever send any written

14    communication to anybody stating your view

15    that the temperature readings that were being

16    taken of the five VCM cars on February 5th

17    and February 6th were unreliable?

18         MR. BRAGA:  Object to the form.

19         THE WITNESS:  I did not

20         generate any data, no, sir.

21    QUESTIONS BY MR. ELLIS:

22         Q.     And you didn't text anybody

23    that?

24         A.     No, sir.

25         Q.     You didn't e-mail anybody that?

1          A.      No, sir.

2          Q.      Did you ever try to get more

3     reliable temperature readings?

4          A.      The problem you have with a

5     material that is potentially polymerizing is

6     you get a buildup of polymer on the inside of

7     the car.  So you could be taking an erroneous

8     reading because it could almost insulate that

9     spot or those spots that you're hitting.  You

10    don't know where the polymer is.  The polymer

11    could be all over the inside of the tank.

12         Q.      So was the reason you thought

13    the temperature readings were unreliable

14    because you thought polymer was inside the

15    tank and blocking the readings?

16         A.      It was possible.

17         Q.      Was there any other reason you

18    thought the readings were unreliable?

19         A.      I was concerned that the

20    reliability of the instruments, contact

21    thermometers, polymer buildup on the inside

22    of the car and such.

23         Q.      You said contact thermometers.

24    You weren't using a contact thermometer, were

25    you?

Confidential - Pursuant to Protective Order

```
1        A.      There were contact thermometers
2   used, and I was concerned with the accuracy
3   of those, along with the IR guns.
4        Q.      Okay.  The IR gun, were you
5   concerned about the inaccuracy of those
6   readings, other than the fact that you
7   thought polymer might be blocking the
8   reading?
9        A.      That's the reason.
10       Q.      That's the sole reason for the
11   IR gun.
12               Is that right?
13       A.      That is a reason, yes.
14       Q.      Were there any other reasons
15   you were worried about the IR readings?
16       A.      If they were -- if they were --
17   weren't giving us a true reading.
18       Q.      What about the IR gun made you
19   concerned about a true reading other than
20   polymer?
21       A.      Age is part of it.  The
22   accuracy is not spot-on.  We needed really
23   good data and couldn't get it.
24       Q.      The --
25       A.      The only way to get good data
```

1    is to put a thermometer into the thermometer

2    well to get a temperature of the core of the

3    product.

4         Q.    Did you ever try to get a

5    temperature in the well?

6         A.    I could not get into the

7    thermometer well.

8         Q.    Did you try?

9         A.    No.

10        Q.    Could we move on to the next --

11   I have a video that we're going to show you.

12   It's tab -- what tab is it?

13             MS. COLLIER:  51.

14             (Day Exhibit 19 marked for

15        identification.)

16   QUESTIONS BY MR. ELLIS:

17        Q.    51.  And we'll mark this video

18   Exhibit 19.

19             Before we show the video, you

20   gave some testimony about seeing what you

21   thought were sparklers after the vent and

22   burn was initiated that you believed to be

23   polymer.

24             Correct?

25        A.    Yes, sir.

Confidential - Pursuant to Protective Order

```
 1        Q.      Did you tell other people --

 2   let me ask you this.

 3                Did you tell anybody at Norfolk

 4   Southern that you saw material that you

 5   believed to be polymer?

 6        A.      Yes, sir.

 7        Q.      Who did you tell?

 8        A.      Pretty much everybody that we

 9   met with after the vent and burn was done.

10        Q.      And when you say "pretty much

11   everyone," who do you mean?

12        A.      Mr. Wood, Mr. Deutsch,

13   Mr. Gould, my crew.

14        Q.      Did they ask you whether you

15   saw polymer, or did you volunteer it?

16        A.      I volunteered it.

17        Q.      Other than people at Norfolk

18   Southern, who else did you tell?

19        A.      We had discussions with the Oxy

20   Vinyl folks.

21        Q.      On February 6th?

22        A.      I don't remember when we talked

23   to them.

24        Q.      On February 6th, did you have

25   any discussions with anybody other than
```

Confidential - Pursuant to Protective Order

1    Norfolk Southern about your views that you

2    saw polymer when the vent and burn was

3    initiated?

4         A.    There was a lot going on after

5    the vent and burn operation, so I talked to a

6    lot of people in the heat of the moment, so I

7    don't remember.

8         Q.    You don't remember one way or

9    the other.

10             Is that right?

11        A.    I don't remember.

12        Q.    Could we play the video?

13             (Video played.)

14        Q.    When you -- when you see, if

15   you see -- can we just stop for a second?

16             Sorry, this is not super...

17             My question for you is, if you

18   see in this video what you believed was

19   polymer ejecting from the tanks, let us know

20   and we'll stop.

21             Okay?

22        A.    Sure.

23        Q.    Okay?

24        A.    Okay.

25        Q.    Okay.  Go ahead and play the

Confidential - Pursuant to Protective Order

```
1   video.
2              (Video played.)
3        Q.    So far in the video, do you see
4   anything that you thought was polymer?
5        A.    No, sir.
6        Q.    You do not?
7        A.    No, sir.
8        Q.    Okay.  You can stop the video
9   now.
10             MR. BRAGA:  Can we put on the
11        record what timestamp we stopped it
12        at?
13             MR. ELLIS:  Well, let's let it
14        play all the way through.  Apologies.
15             MR. BRAGA:  Thank you.
16             (Video played.)
17   QUESTIONS BY MR. ELLIS:
18        Q.    While you're looking, when you
19   saw the polymer, was it at the beginning of
20   the initiation or at the end?
21        A.    The beginning.
22        Q.    It was at the beginning.
23             So we would have already passed
24   it if you had seen it in this video.
25             Is that right?
```

Confidential - Pursuant to Protective Order

1       A.      This is on the opposite side
2  from where I was.
3       Q.      This is on the opposite side
4  from where you were?
5       A.      Yes, sir.
6       Q.      Okay.  But you didn't see it in
7  this video.
8               Is that correct?
9       A.      That's correct.
10      Q.      And Tab 49.
11              VIDEOGRAPHER:  It's going to be
12      Exhibit 20.
13              MR. ELLIS:  Okay.  Let's -- we
14      need to organize exhibits.  Can we go
15      off the record for a minute?
16              VIDEOGRAPHER:  All right.  The
17      time is 5:34 p.m.  We're going off the
18      record.
19       (Off the record at 5:34 p.m.)
20              VIDEOGRAPHER:  The time is
21      5:42 p.m., and we're back on the
22      record.
23              (Day Exhibit 20 marked for
24      identification.)
25

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. ELLIS:

2         Q.     Mr. Day, you've been handed

3    what's been marked as Day Exhibit Number 20.

4    It's two photographs.  One is SRS 000589, and

5    the other one is 590.  These came from

6    production from your company.

7              Do you recognize those two

8    photos?

9         A.     I do.

10        Q.     Were these taken from your

11   point of view, from where you were standing

12   when the vent and burn was executed?

13        A.     No, sir.

14        Q.     Is this -- do you know what

15   point of view this is?

16        A.     Pretty poor pictures.

17             MR. BRAGA:  Object to the form.

18   QUESTIONS BY MR. ELLIS:

19        Q.     Are these stills from the

20   drone?

21        A.     I can't tell you.  I do not

22   know.

23        Q.     Okay.  Do you know where these

24   two --

25        A.     These are going to --
```

Confidential - Pursuant to Protective Order

1      Q.      -- photographs came from?

2      A.      These are going to have to be

3  screenshots from a video.

4      Q.      Okay.  Do you -- my question

5  was simply -- they came out of an SRS

6  production, so my question is, do you know

7  where they came from?

8      A.      No, sir.

9      Q.      Okay.  Do either of these

10  pictures depict what you believed were the

11  sparklers evidencing polymerization at the

12  time the vent and burn was executed?

13      A.      No, sir.

14      Q.      Since that day, have you ever

15  seen any photo or video of the sparklers that

16  you believed you saw showing polymerization

17  when the vent and burn was executed?

18      A.      No, sir.

19      Q.      After the vent and burn, did

20  you go to the scene to see if there was any

21  physical evidence of polymerization?

22      A.      The fires burned for several --

23  several hours afterwards, and once it -- I

24  didn't go back until the next day.

25      Q.      Okay.  And the next day, did

Confidential Pursuant to Protective Order

```
1    you look for pieces of polymer or any

2    physical evidence of polymerization?

3         A.     Everything was burned up.

4         Q.     My question simply was, did you

5    look for physical evidence of polymerization,

6    including any of the sparklers that you saw?

7         A.     There was no need because

8    everything was burned up.

9         Q.     Okay.  Did anybody tell you

10   that they saw any physical evidence of

11   polymerization from any of the VCM cars?

12        A.     No, sir.

13        Q.     And to this day, other than the

14   time you thought you saw it at the time of

15   the vent and burn, have you ever seen

16   evidence of polymerization?

17        A.     Just what's in the bottom of

18   the cars.

19        Q.     I'm sorry?

20        A.     Just what is in the bottom of

21   the cars that was photo-documented.

22        Q.     Okay.  You saw it in your

23   photographs.

24               Have you seen any other

25   evidence that you believed is evidence of
```

Confidential - Pursuant to Protective Order

```
 1    polymerization?

 2         A.     No, sir.

 3                MR. BRAGA:  Object to the form.

 4    QUESTIONS BY MR. ELLIS:

 5         Q.     You kind of stepped on your

 6    lawyer.

 7                Is the answer no?

 8         A.     No, sir.

 9                MR. BRAGA:  He's been stepping

10         on me all day.

11    QUESTIONS BY MR. ELLIS:

12         Q.     We have one more video.  We'll

13    mark this as Exhibit 21.

14                And again, same for this one.

15    If you see while we're playing this video

16    what you believe to be the evidence of

17    polymerization or indication of sparklers

18    that you've said you saw, let us know and

19    we'll stop.

20                Okay?

21                Oh, we need to tell Gina?

22                Let's -- let's scrub this.

23    We'll do this one later.  We will not mark

24    Exhibit 21.

25                We were discussing the
```

Confidential - Pursuant to Protective Order

1    temperature measurements that you and others

2    were taking.  Other than it being something

3    that you do when you respond to an emergency,

4    i.e., take tank temperatures, did you have an

5    understanding as to any other reason why you

6    were doing it?

7              MR. BRAGA:  Object to the form.

8              THE WITNESS:  During the damage

9         assessment phase of -- during the

10        damage assessment of the response to

11        tank cars, there's multiple things

12        that we do.  One is take temperatures.

13        One is take pressures.  One is to

14        inspect as much of the visible shell

15        of the car.

16   QUESTIONS BY MR. ELLIS:

17        Q.    Okay.  So part of the standard

18   response is to take VCM tank car temperatures

19   or any flammable gas, pressurized flammable

20   gas, tank car.

21              Right?

22              MR. BRAGA:  Objection.

23              THE WITNESS:  Any car that's

24        involved in fire, we'll take

25        temperatures.

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. ELLIS:

 2        Q.     Okay.  And when you take

 3   temperatures -- well, let me ask you this.

 4               Did you also have an

 5   understanding that Oxy Vinyls wanted

 6   temperatures taken?

 7               MR. BRAGA:  Object to the form.

 8               THE WITNESS:  Ask the question

 9        again.

10   QUESTIONS BY MR. ELLIS:

11        Q.     Did you have an understanding

12   either on February 5th or February 6th that

13   Oxy Vinyls suggested taking temperatures of

14   the tank cars?

15        A.     I believe that is why a

16   concerted effort was made to take

17   temperatures.

18        Q.     Okay.  And did that include

19   your concerted effort?

20        A.     I was one of them that took

21   temperatures, yes, sir.

22        Q.     So one of the reasons you were

23   taking your temperatures on Cars 30 and 31

24   was because Oxy Vinyls had said that that was

25   a way you could determine whether
```

Confidential - Pursuant to Protective Order

1    polymerization was occurring.

2              Right?

3              MR. BRAGA:  Object to the form.

4              THE WITNESS:  The NS asked us

5         to take temperatures at as many places

6         as we could on all of the cars.

7    QUESTIONS BY MR. ELLIS:

8         Q.    And the NS asked you to take

9    those temperatures, in part, because Oxy

10   Vinyls wanted them.

11             Right?

12             MR. LEVINE:  Objection.

13             MR. BRAGA:  Object to the form.

14             THE WITNESS:  That would be a

15        question for NS folks.

16   QUESTIONS BY MR. ELLIS:

17        Q.    My question is, did you have an

18   understanding as to why you were doing it?

19        A.    My understanding --

20             MR. LEVINE:  Objection.

21             THE WITNESS:  -- was my

22        customer asked for temperatures to be

23        taken, and that was done.

24   QUESTIONS BY MR. ELLIS:

25        Q.    Did you have any understanding

1    that that was at Oxy Vinyls' request?

2                   MR. LEVINE:  Objection.

3                   THE WITNESS:  We were working

4         for the Norfolk Southern, and they

5         asked us to take temperatures.

6    QUESTIONS BY MR. ELLIS:

7         Q.     My question was different.

8                   My question was, excuse me, did

9    you have an understanding that Norfolk

10   Southern wanted it because Oxy Vinyls had

11   asked?

12        A.     That would be --

13                  MR. LEVINE:  Objection.

14                  MR. BRAGA:  Objection.

15                  THE WITNESS:  That would be a

16        question for the Norfolk Southern.

17   QUESTIONS BY MR. ELLIS:

18        Q.     I understand.

19                  My question was your

20   understanding.  Did you have that

21   understanding?

22                  MR. LEVINE:  Objection.

23                  THE WITNESS:  My customer asked

24        me to perform -- or asked us as a

25        group to perform air monitoring -- or,

Confidential - Pursuant to Protective Order

1          excuse me, temperature of the cars.

2                (Day Exhibit 21 marked for

3          identification.)

4    QUESTIONS BY MR. ELLIS:

5          Q.    We now have that video, so we

6    will mark that as Exhibit 21.  Excuse me.

7    Same instructions.  If you see what you

8    believed are the sparklers or evidence of

9    polymerization, let us know.

10               (Video played.)

11         Q.    And I think as we discussed

12   before, what you saw was at the beginning, so

13   if you would have seen it, you would have

14   seen it by now.

15               Right?

16         A.    So these two pictures are a

17   screenshot of that video, and I was on the

18   opposite side of the derailment.

19         Q.    Okay.  This video, this was a

20   video you sent around to colleagues and other

21   folks you knew right after the vent and burn.

22               Right?

23         A.    If this is the Channel 8 News

24   video, yes.

25         Q.    Okay.  Did you take any video

1    yourself of the vent and burn?

2        A.      I did not.

3        Q.      Okay.  And I think you answered

4    this, but nobody told you that they saw

5    physical evidence of polymerization at the

6    time of the vent and burn.

7                Right?

8                MR. BRAGA:  Object.

9                THE WITNESS:  Ask that question

10       again.

11   QUESTIONS BY MR. ELLIS:

12       Q.      Nobody told you that they saw

13   physical evidence of polymerization at the

14   time of the vent and burn?

15       A.      No, sir.

16       Q.      The temperatures that were

17   being taken, did you -- the temperature

18   readings on the VCM cars that were being

19   taken, did you ever learn the results of

20   those on the 5th or 6th of February?

21       A.      Excuse me?  I don't -- I don't

22   understand your question.

23       Q.      Well, you took two temperature

24   measurements, and then other folks at either

25   SRS or SPSI took temperature measurements on

1    the five VCM cars.

2            Right?

3        A.      Correct.

4        Q.      Okay.  And did you, on the 5th

5    or 6th of February, learn the results of

6    those measurements?

7        A.      It's -- all the measurements

8    are in these documents.

9        Q.      I get that.

10           Some of the documents you only

11   saw for the first time yesterday.

12           Right?

13       A.      Correct.

14       Q.      Okay.  My question was, on the

15   5th or the 6th, did you personally learn the

16   results of those temperature readings?

17       A.      I heard temperatures --

18           MR. BRAGA:  What's that noise?

19           THE WITNESS:  Somebody is

20       outside yelling.

21           MR. LEVINE:  It's outside.

22           MR. BRAGA:  Oh, okay.  Future

23       client.

24           Sorry, go ahead.

25           MR. ELLIS:  They're protesting

Confidential - Pursuant to Protective Order

1          you, is what I was going to say.

2               MR. BRAGA:  Yeah.

3     QUESTIONS BY MR. ELLIS:

4          Q.     Did you learn the results of

5     those temperature readings?

6          A.     I heard some numbers, yes.

7          Q.     What numbers did you hear?

8          A.     130s.

9          Q.     You heard 130s.

10              Was it with respect to a

11    specific VCM car?

12         A.     No, sir.

13         Q.     Did you have an understanding

14    as to which VCM car was getting 130

15    temperature readings?

16         A.     There was discussion, and I'd

17    learned afterwards during the NTSB hearing

18    that they were the Car 55.  I'd have to refer

19    back to one of these exhibits where the cars

20    are.  54, 55.

21              MR. BRAGA:  You want to look

22         back at 13?

23              THE WITNESS:  55.

24    QUESTIONS BY MR. ELLIS:

25         Q.     Okay.  But that's something you

Confidential - Pursuant to Protective Order

```
1    learned after the fact.
2              Is that right?
3    A.      Correct.  Correct.
4    Q.      You yourself never learned
5    which specific VCM car was getting a 130
6    reading.
7              Is that correct?
8    A.      I believe so, yes.
9    Q.      And you never learned when that
10   reading occurred or whether it was higher or
11   lower.
12             Is that correct?
13   A.      Correct.
14   Q.      What about -- did you learn
15   whether it was all five VCM cars that had 130
16   or whether it was just one at the time,
17   either on the 5th or the 6th of February?
18   A.      I didn't put a lot of emphasis
19   on the temperatures that they were -- that
20   people were getting, receiving.  I heard on
21   the radio 60s, 70s.  I heard that
22   information.
23             I didn't put a lot of credence
24   in it because of the concern that we had
25   polymerization going on, and it -- the
```

Confidential - Pursuant to Protective Order

1    readings could be wrong.

2        Q.    Okay.  So am I right then that

3    your decision to execute a vent and burn on

4    all five VCM cars didn't involve the

5    temperature readings at all?

6              MR. LEVINE:  Objection.

7              MR. BRAGA:  Objection to the

8         form.

9              THE WITNESS:  A, I didn't make

10        the decision to vent and burn.  I was

11        part of a group that recommended to

12        the NS to take to the incident

13        commander to vent and burn those five

14        cars.

15   QUESTIONS BY MR. ELLIS:

16        Q.    You told folks it was the

17   toughest decision you ever made.

18             Didn't you?

19        A.    I did.

20        Q.    Okay.  And when you were making

21   a decision, did you consider temperatures or

22   not?

23        A.    I considered a lot of things.

24        Q.    Did you consider temperatures?

25        A.    I didn't put a lot of credence

Confidential - Pursuant to Protective Order

1    in the temperatures, no.

2        Q.    Did you consider the

3    temperatures at all?

4        A.    I don't remember.

5        Q.    You don't remember whether you

6    considered temperatures at all.

7              Is that your testimony?

8        A.    That is my testimony.

9        Q.    In your training, in the

10   seminars that you've been in, when you're

11   measuring a VCM tank car temperature as part

12   of your damage assessment, is there a

13   recommendation as to where on the car you

14   should shoot the temperature?

15             MR. BRAGA:  Objection.

16             THE WITNESS:  The shell.

17   QUESTIONS BY MR. ELLIS:

18       Q.    On the shell.

19             Any particular place of the

20   shell?

21       A.    The shell.

22       Q.    My question was, in your

23   trainings, in the manuals you rely on, is

24   there any recommendation as to where on the

25   shell you should shoot the temperature?

Confidential - Pursuant to Protective Order

```
 1              MR. BRAGA:  Objection.
 2              THE WITNESS:  On the shell, in
 3         the liquid phase.
 4    QUESTIONS BY MR. ELLIS:
 5         Q.    On the shell, in the liquid
 6    phase.
 7              How do you make that
 8    determination?
 9         A.    Hope and prayer.
10         Q.    Okay.  Other than on the shell,
11    in the liquid phase, in your trainings, in
12    the literature that you rely on as part of
13    your damage assessment in a VCM tank car
14    emergency response, is there any more
15    specific place that you're instructed to take
16    the temp -- shoot the temperature?
17              MR. BRAGA:  Objection.
18              THE WITNESS:  Shoot the
19         temperature, no.
20              The easy -- the best way to get
21         a core temperature is to put
22         thermometer -- the thermometer into
23         the thermometer well.
24    QUESTIONS BY MR. ELLIS:
25         Q.    Okay.  And if you're using an
```

Confidential - Pursuant to Protective Order

1    IR camera or an IR gun, is there any specific

2    recommended place to shoot that temperature?

3         A.    On the shell.

4         Q.    Just anywhere on the shell?

5         A.    On the shell.

6         Q.    Anywhere on the shell?

7         A.    On the shell.

8         Q.    My question was, is it

9    anywhere?  Is anywhere on the shell an

10   acceptable place in your view?

11        A.    As long as it's on the shell.

12        Q.    Okay.  Is there any specific

13   manner of IR temperature measurement device,

14   either a camera or a gun, that is the

15   preferred way if you can't measure in the

16   well?

17             MR. BRAGA:  Objection.

18             THE WITNESS:  The more

19        sophisticated the equipment, obviously

20        the better the readings are.  There

21        are some -- there are some equipment

22        out there that can read through

23        jacket, but they're few and far

24        between.  They're not readily

25        available.

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. ELLIS:

2         Q.     And --

3         A.     It takes --

4         Q.     -- does SRS have any of those?

5         A.     -- to be able to operate that

6    gun.  And a lot of times the folks that come

7    in to operate those guns are not qualified to

8    be on a hazardous waste site, even under

9    emergency conditions.

10        Q.     Does SRS have access to that

11   sophisticated equipment?

12        A.     We have access through

13   subcontractors.

14        Q.     Okay.  Did you use it here?

15        A.     No, sir.

16        Q.     Why not?

17        A.     Didn't -- it was not available.

18        Q.     Did you try and check to see if

19   it was available?

20        A.     I personally did not.

21        Q.     Who did?

22        A.     I can't tell you that.

23        Q.     Do you know of anybody checking

24   to see if the sophisticated measuring

25   equipment that's available to SRS was
```

Confidential - Pursuant to Protective Order

1    available for this particular incident?

2          A.     I did not ask.

3                 MR. BRAGA:  Objection.

4    QUESTIONS BY MR. ELLIS:

5          Q.     Did you personally witness all

6    five tank car PRDs actuate?

7          A.     I -- no, I saw video of one.

8          Q.     Okay.  Did you personally

9    witness any of the PRDs actuate on any of the

10   VCM cars?

11         A.     No, sir.

12         Q.     And you saw video of one.  That

13   was the video that you were sent when you

14   were first called in after you reached out to

15   Mr. Schoendorfer.

16                Right?

17         A.     That's correct.

18         Q.     And you sent that to your

19   colleagues, and that was the PRD that

20   actuated for what folks on-scene estimated to

21   be 70 minutes.

22                Correct?

23         A.     That's correct.

24         Q.     While you were on-scene, none

25   of the PRDs activated.

Confidential - Pursuant to Protective Order

1          Right?  Actuated?
2     A.     That is correct.
3          MR. BRAGA:  Object to the form.
4          MR. ELLIS:  I think we're at a
5     good stopping point.  I think we've
6     used almost all of our time, so that's
7     all I have for you right now.
8          VIDEOGRAPHER:  Any other
9     statements for the record?
10          Okay.  The time is 5:58 p.m. on
11     January 16, 2024.  We're going off the
12     record, completing today's
13     video-recorded session.
14     (Deposition concluded at 5:58 p.m.)
15          - - - - - - -
16
17
18
19
20
21
22
23
24
25

Confidential - Pursuant to Protective Order

1                         CERTIFICATE

2             I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
4  of the examination, Charles Day, was duly
   sworn by me to testify to the truth, the
5  whole truth and nothing but the truth.

6             I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
7  testimony as taken stenographically by and
   before me at the time, place and on the date
8  hereinbefore set forth, to the best of my
   ability.
9
              I DO FURTHER CERTIFY that I am
10 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
11 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
12 that I am not financially interested in the
   action.
13

14

15

16 _____
   CARRIE A. CAMPBELL,
   NCRA Registered Diplomate Reporter
17 Certified Realtime Reporter
   California Certified Shorthand
18 Reporter #13921
   Missouri Certified Court Reporter #859
19 Illinois Certified Shorthand Reporter
   #084-004229
20 Texas Certified Shorthand Reporter #9328
   Kansas Certified Court Reporter #1715
21 New Jersey Certified Court Reporter
   #30XI00242600
22 Louisiana Certified Court Reporter
   #2021012
23 Notary Public
   Dated:  January 18, 2024
24

25

Confidential - Pursuant to Protective Order

1           INSTRUCTIONS TO WITNESS

2    DATE:  January 18, 2024

3           Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8           After doing so, please sign the

9    errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13          It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4          I,_____, do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8

9

10

11

12  _____
   Charles Day                    DATE
13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

```
1                    - - - - - - -
                          ERRATA
2                    - - - - - - -

3       PAGE    LINE    CHANGE

4       _____   _____   _____

5       _____   _____   _____

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21

22      _____
                      CHARLES DAY

23

24      _____ day of _____, 2024.

25      _____
                      Notary Public
```

Confidential - Pursuant to Protective Order

```
 1                      - - - - - - -
                       LAWYER'S NOTES
 2                      - - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```