Confidential - Pursuant to Protective Order

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF OHIO
2               EASTERN DIVISION

3
   IN RE: EAST PALESTINE    ) CASE NO.
4  TRAIN DERAILMENT         ) 4:23-CV-00242-BYP
                            ) JUDGE BENITA Y. PEARSON
5

6          WEDNESDAY, JANUARY 24, 2024

7     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

8                    - - -

9              Videotaped deposition of John

10   Andrew McCarty, in his personal capacity and

11   as 30(b)(6) designee for Specialized

12   Professional Services, Inc., held at the

13   offices of Dentons Cohen and Grigsby, 625

14   Liberty Avenue, Fifth Floor, Pittsburgh,

15   Pennsylvania, commencing at 9:12 a.m.

16   Eastern, on the above date, before Carrie A.

17   Campbell, Registered Diplomate Reporter,

18   Certified Realtime Reporter, Illinois,

19   California & Texas Certified Shorthand

20   Reporter, Missouri, Kansas, Louisiana & New

21   Jersey Certified Court Reporter.

22                    - - -

23

              GOLKOW LITIGATION SERVICES
24                 877.370.DEPS
                 deps@golkow.com
25

```
 1          A P P E A R A N C E S :

 2

 3    GRANT & EISENHOFER P.A.
      BY:  ADAM J. GOMEZ
 4         agomez@gelaw.com
           M. ELIZABETH GRAHAM
 5         egraham@gelaw.com
      123 South Justison Street, 6th Floor
 6    Wilmington, Delaware  19801
      (303) 622-7000
 7

 8    and

 9

      BURG SIMPSON ELDREDGE HERSH &
10    JARDINE, P.C.
      BY:  SETH A. KATZ
11         skatz@burgsimpson.com
      40 Inverness Drive East
12    Englewood, Colorado  80112
      (303) 792-5595
13    Counsel for Plaintiffs

14

15    WILMER CUTLER PICKERING HALE AND DORR LLP
      BY:  NOAH A. LEVINE
16         noah.levine@wilmerhale.com
      7 World Trade Center
17    250 Greenwich Street
      New York, New York  10007
18    (212) 230-8800

19

      and
20

21    WILMER CUTLER PICKERING HALE AND DORR LLP
      BY:  BENJAMIN T. MORRIS
22         benjamin.morris@wilmerhale.com
      60 State Street
23    Boston, Massachusetts  02109
      (617) 526-6000
24    Counsel for Norfolk Southern
      Corporation and Norfolk Southern
25    Railway Company
```

Confidential - Pursuant to Protective Order

```
 1    BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
      BY:  BRIAN SWANSON
 2         brian.swanson@bartlit-beck.com
      54 West Hubbard, Suite 300
 3    Chicago, Illinois 60654
      (312) 494-4400
 4    Counsel for Trinity Industries
      Leasing Company
 5


 6

      VORYS, SATER, SEYMOUR AND PEASE LLP
 7    BY:  KIMBERLY WEBER HERLIHY
           kwherlihy@vorys.com
 8         SARA INGRAM
           saingram@vorys.com
 9    52 East Gay Street
      Columbus, Ohio  43215
10    (614) 464-6400
      Counsel for Oxy Vinyls
11


12

      KIRKLAND & ELLIS LLP
13    BY:  HARIKLIA KARIS
           hariklia.karis@kirkland.com
14         SYDNE K. COLLIER
           sydne.collier@kirkland.com
15    300 North LaSalle
      Chicago, Illinois  60654
16    (312) 862-2000
      Counsel for GATX and General
17    American Marks Company


18

19    DENTONS
      BY:  MORGAN J. HANSON
20         morgan.hanson@dentons.com
           ALEXIS B. THURSTON
21         lexie.thurston@dentons.com
      625 Liberty Avenue, Fifth Floor
22    Pittsburgh, Pennsylvania  15222
      (412) 297-4900
23    Counsel for Specialized Professional
      Services, Inc., and Drew McCarty
24


25
```

Confidential - Pursuant to Protective Order

```
1   ALSO PRESENT:
        MICHAEL FRONZAGLIA, trial
2       technician, Precision Trial Solutions

3

4   V I D E O G R A P H E R :
        CHARLES STOCKHAUSEN,
5       Golkow Litigation Services

6                       -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential — Pursuant to Protective Order

```
1                          INDEX

2                                        PAGE

3   APPEARANCES.................................  2

4   EXAMINATIONS

5     BY MR. GOMEZ..............................  10

6     BY MR. SWANSON........................... 275

7     BY MS. HERLIHY........................... 404

8

9                        EXHIBITS

10      No.   Description                      Page

11      1     Group B, Exhibit 10, Hazardous     56
              Materials Group Chair's Factual
12            Report

13      2     Group D, Exhibit 26, Vinyl         72
              Chloride Monomer Safety Data Sheet
14
        3     Group C, Exhibit 3, Emergency      97
15            Response Guide (ERG)2020 Guide 116
              Vinyl Chloride
16
        4     September 27, 2016 Fall Meeting,  109
17            Orlando, FL, Transportation Issue
              Team, The Chlorine Institute,
18            NO BATES

19      5     Pamphlet 171 Vinyl Chloride       114
              Monomer (VCM) Tank Car & Cargo
20            Tank Handling Manual Edition 1,
              NO BATES
21
        6     Aerial photograph of train       171
22            derailment

23      7     Video,                           176
              SPSI TEXTS 000043
24
        8     Video,                           185
25            SPSI TEXTS 000380
```

Confidential - Pursuant to Protective Order

| | | | |
|---|---|---|---|
| 9 | Text messages between Drew McCarty and Chip Day, SPSI TEXTS 000512 - SPSI TEXTS 000513 | 202 | |
| 10 | Text messages between Drew McCarty and Greg Palmer, SPSI TEXTS 000340 - SPSI TEXTS 000341 | 227 | |
| 11 | 2/5/23 Afternoon Entry Findings, SPSI TEXTS 001747 - SPSI TEXTS 001748 | 230 | |
| 12 | E-mail(s), SPSI 008099 | 249 | |
| 13 | Group G, Exhibit 31, Interview Transcript, Drew McCarty, President Specialized Professional Services, Inc., February 23, 2023 | 254 | |
| 14 | Derailment Response Presentation for Senate Commerce Committee 03/27/2023, SPSI 114155 - SPSI 114215 | 261 | |
| 15 | Group D, Exhibit 34, Figure 1, Hazardous Materials Group Chair's Factual Report. Labeled derailment photographs, west trailing cars (top), east leading cars (bottom), February 5, 2023. | 283 | |
| 16 | Group D, Exhibit 61, UAS Aerial Photograph, TILX402025 Proximity to Pool Fire, February 3 - 4, 2023, Time Unknown | 306 | |
| 17 | Text messages between Drew McCarty and Chip Day, SPSI TEXTS 000285 - SPSI TEXTS 000292 | 399 | |
| 18 | E-mail(s), SPSI 001746 - SPSI 001751 | 443 | |

Confidential - Pursuant to Protective Order

```
 1    19      Norfolk Southern Railway and          450
              Specialized Professional Services,
 2            Inc. Environmental Emergency
              Response Agreement_8.15.2016,
 3            NS-CA-000006999 - NS-CA-000007031

 4    20      E-mail(s),                            456
              NS-CA-000017127 - NS-CA-000017129
 5


 6      (Exhibits attached to the deposition.)


 7
```

```
 8   CERTIFICATE.................................481

 9   ACKNOWLEDGMENT OF DEPONENT...................483

10   ERRATA......................................484

11   LAWYER'S NOTES..............................485
```

```
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

```
 1            VIDEOGRAPHER:  We are now on
 2       the record.  My name is Charles
 3       Stockhausen, and I am the videographer
 4       with Golkow Litigation Services.
 5            Today's date is Wednesday,
 6       January 24, 2024, and the time is
 7       9:12 a.m.
 8            This video deposition is being
 9       held at 625 Liberty Avenue, Fifth
10       Floor, Pittsburgh, Pennsylvania 15222,
11       In Re of East Palestine Train
12       Derailment, for the United States
13       District Court, Northern District of
14       Ohio, Eastern Division.
15            The deponent is Drew McCarty.
16            Counsel will be noted on the
17       stenographic record.
18            The court reporter is Carrie
19       Campbell, and she will now swear in
20       the witness.
21            JOHN ANDREW MCCARTY,
22  of lawful age, having been first duly sworn
23  to tell the truth, the whole truth and
24  nothing but the truth, deposes and says on
25  behalf of the Plaintiffs, as follows:
```

Confidential - Pursuant to Protective Order

```
 1          MR. HANSON:  Here on behalf of

 2    SPSI and Drew McCarty, Morgan Hanson

 3    from Dentons.

 4          MS. THURSTON:  Alexis Thurston

 5    for Drew McCarty and SPSI, also from

 6    Dentons.

 7          MR. HANSON:  Oh, I'm sorry.

 8    Okay.  I didn't realize.  Sorry.

 9          All right.  So as we just

10    discussed among counsel, Mr. McCarty

11    is today being deposed pursuant to a

12    subpoena in his personal capacity.  He

13    would be the 30(b)(6) witness for

14    tomorrow's deposition as well, given

15    his status as president and owner of

16    SPSI.

17          We have collectively agreed

18    that any question and answer provided

19    by Mr. McCarty today will also be

20    binding upon SPSI, in an attempt to

21    streamline this and make sure that

22    there's no confusion as to the need to

23    reask questions that have been

24    previously asked to Mr. McCarty

25    individually for SPSI.
```

```
 1                  We are not in any way

 2          attempting to limit any party's rights

 3          to ask questions or utilize the time

 4          allotted to them under either

 5          subpoena.

 6                  And with that, unless there are

 7          any objections, I turn it over to you,

 8          Mr. Gomez.

 9                  MR. GOMEZ:  Thank you, Counsel.

10                  And one more point of order.

11          It's my understanding that the parties

12          have agreed that an objection by one

13          party is an objection preserved for

14          all.  If that's incorrect, please

15          speak up.  But that's my understanding

16          that's our agreement before we went

17          on the record.

18                  Thank you again.

19

20                  DIRECT EXAMINATION

21    QUESTIONS BY MR. GOMEZ:

22          Q.    Good morning, sir.

23          A.    Good morning.

24          Q.    Can you state and spell your

25    name for the record?
```

Confidential - Pursuant to Protective Order

```
 1        A.      John Andrew McCarty.  Everyone
 2   calls me Drew.  J-o-h-n, A-n-d-r-e-w,
 3   M-c-C-a-r-t-y.
 4        Q.      Mr. McCarty, you're currently
 5   employed by Specialized Professional
 6   Services, Inc.
 7                Is that correct?
 8        A.      That's correct.
 9        Q.      And for shorthand, that's SPSI?
10        A.      Yes.
11        Q.      Your position is the owner and
12   president.
13                Is that accurate?
14        A.      That's correct.
15        Q.      I appreciate the comments that
16   your counsel made at the beginning of the
17   deposition about how we're going to proceed,
18   but I just want to confirm through you that
19   the testimony you're going to give today is
20   both the testimony in your personal capacity
21   and as the representative for SPSI.
22                Correct?
23        A.      Yes, that's correct.
24        Q.      So if you answer the questions
25   that are presented to you today and tomorrow,
```

1    we can take that as both you speaking

2    individually and the company -- and speaking

3    for the company.

4            Correct?

5    A.     Yes, correct.

6    Q.     Thank you.

7            Mr. McCarty, you hold a BS in

8    business administration.

9            Is that correct?

10   A.     Yes.

11   Q.     And where did you earn that

12   degree from?

13   A.     Kent State University.

14   Q.     In what year?

15   A.     1988.

16   Q.     And was your focus or major

17   transportation and logistics?

18           Is that correct?

19   A.     Yes, that's correct.

20   Q.     In the course of your studies

21   at Kent State, what, if any, courses did you

22   take in the field of chemistry?

23   A.     I actually did have a college

24   chemistry course in my undergrad work.

25   Q.     Was that a general chemistry

1    course?  Organic chemistry?  Biochemistry?

2    What --

3         A.    Yeah, general chemistry.

4         Q.    In that general chemistry

5    course, was there any discussion or

6    instruction specific to a chemical called

7    vinyl chloride monomer?

8         A.    Oh, I can't remember.  That

9    would have been 1985, I think.

10        Q.    Other than that general

11   chemistry course, have you had any other

12   formal education in the area of chemistry?

13        A.    Throughout my career, yes.

14   Even back into high school I had two

15   chemistry classes in high school.  That's why

16   I took it as an elective in college.

17             But through my career, a lot of

18   customers, specific classes I've been able to

19   take on their product-specific stuff.

20   Attended some Street Smart Chemistry-type

21   programs, one at Pueblo, Colorado, one

22   internally through some old DuPont guys that

23   taught it.

24             So, yeah, there's been industry

25   education along my 35-year career.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  Setting aside the

2  industry education, is there any formal

3  chemistry education beyond what we've already

4  discussed at an institution of higher

5  learning, like a university or a college

6  or --

7    A.    No.

8    Q.    -- a trade school?

9    A.    No.

10    Q.    Am I correct that at some point

11  in your career you attended firefighter

12  academy or firefighter school?

13    A.    Yeah, I've been a firefighter

14  since I was 14 years old.

15    Q.    And forgive me for asking, but

16  approximately how long ago was that?

17    A.    Oh, dating myself.

18        1980-ish.

19    Q.    And understanding that it's

20  roughly 1980 that you would have attended

21  that school, what, if anything, do you recall

22  about specific HAZMAT training that you

23  received?

24    A.    Well, it's been ongoing since

25  1980.  I mean, it's not just one school.

1    Q.    Sure.

2    A.    I've literally had hundreds and

3  hundreds and hundreds of hours of various

4  schools along my career.

5    Q.    Okay.  I'm referring to just

6  the firefighter academy or school.

7          Was there anything specific to

8  HAZMAT training that you had in 1980-ish?

9    A.    Well, the way most firefighter

10 academies are set up, there's firefighting,

11 there's rescue, there's HAZMAT, so they're

12 all compartmentalized training.

13   Q.    You mentioned that it's been an

14 ongoing process of HAZMAT training since

15 roughly 1980.

16         Can you identify for me from

17 that period of time or during that period of

18 time any training or education you've

19 received specific to the chemical vinyl

20 chloride monomer?

21   A.    Yes.

22   Q.    Okay.  Can you identify those

23 trainings?

24   A.    Sure.

25         Predominantly with The Chlorine

1  Institute programming.

2       Q.     And just as we're going through

3  today's deposition, instead of saying vinyl

4  chloride monomer over and over again, can I

5  abbreviate that to VCM?

6       A.     VCM, sure, yeah.

7       Q.     We'll understand each other?

8       A.     Yes.

9       Q.     Approximately how many

10 trainings or instructional meeting sessions

11 did you attend over the course of your career

12 with The Chlorine Institute that were

13 specific to VCM?

14      A.     So The Chlorine Institute does

15 an annual program in Jackson, Mississippi,

16 every spring.  Sometimes it's April.

17 Sometimes it's May.  It's one of the segments

18 of that program every year.

19      Q.     So within this annual program

20 put on by The Chlorine Institute, there's a

21 segment that's devoted to VCM.

22            Is that a fair

23 characterization?

24      A.     Yes.

25      Q.     And what are some of the topics

1  that have been covered in this VCM-specific

2  portion of The Chlorine Institute training?

3      A.    It's primary chemical hazards

4  and -- including polymerization, polymer --

5  you know, primary hazards, chemical

6  characteristics, boiling points, expansion

7  ratios, toxicity, considerations for

8  emergency response.

9      Q.    And when did you first begin

10 attending The Chlorine Institute's yearly

11 training where VCM is part of the education?

12     A.    Probably in the -- I'm just

13 generalizing here -- early to mid-'90s.

14 And -- yeah, that would be about right, early

15 to mid-'90s.

16     Q.    Okay.  And if that's yearly,

17 fair to say roughly 25 to 30 of those

18 sessions you've attended?

19     A.    That would probably be a good

20 guess on the timeline, yes.

21     Q.    Of those 25 to 30 Chlorine

22 Institute trainings where VCM is a portion of

23 the instruction, how many of those would you

24 say have touched upon the subject of VCM

25 polymerization chemistry?

Confidential - Pursuant to Protective Order

1      A.      Every one of them.

2      Q.      And can you identify for me as

3 best you can who it was that gave specific

4 training or education during these 25 or 30

5 sessions on polymerization chemistry of VCM?

6      A.      So in the early years, a lot of

7 the producers would take turns presenting.  I

8 can't remember people's names at this point

9 in time.  But in the last couple of years,

10 since the Paulsboro, New Jersey, derailment,

11 I've been delivering that presentation.

12      Q.      Paulsboro was 2012, I believe.

13              Right?

14      A.      That sounds right.

15      Q.      So for the last 11, 12 years,

16 you've been providing training at these

17 Chlorine Institute sessions regarding VCM

18 polymerization chemistry?

19      A.      Yes.

20      Q.      Do you have, or have you used,

21 during the last 11 or 12 years any written

22 materials in the course of providing

23 education for polymerization -- for VCM

24 polymerization chemistry?

25      A.      The Chlorine Institute as a

1    group prepares those, and I just present.

2    It's pretty much their material; I deliver

3    it.

4         Q.    Do you participate in preparing

5    the material?

6         A.    Yes.

7         Q.    And can you describe for me

8    what those materials are?  For example, are

9    they PowerPoints --

10        A.    It's a PowerPoint presentation,

11   yes.

12             MR. HANSON:  Let's let

13        Mr. Gomez finish his question so the

14        record -- and let's not talk over each

15        other.

16             THE WITNESS:  Oh, okay.

17             MR. GOMEZ:  I'm as guilty of it

18        as you are, so my apologies.

19   QUESTIONS BY MR. GOMEZ:

20        Q.    And these PowerPoints that we

21   were discussing, are they updated annually?

22        A.    Yes.

23        Q.    Do you maintain copies of these

24   PowerPoints?

25        A.    No.  Usually I don't.  I might

Confidential - Pursuant to Protective Order

1    have an old one, I might have a recent one,

2    but Chlorine Institute shepherds all of those

3    documents.

4         Q.    Can you describe for me what

5    you know of the process whereby The Chlorine

6    Institute drafts these PowerPoints and other

7    materials for the presentations you make on

8    VCM polymerization chemistry?

9         A.    I'm not sure -- can you

10   rephrase your question?  I'm not sure if I

11   understood the question.

12        Q.    Sure.

13             If you know, can you walk me

14   through the process The Chlorine Institute

15   uses to put together these PowerPoints?

16             Just, for example, do they have

17   on-staff chemists that prepare the materials

18   and then they're sent out for edits?

19             I want to get a flavor for what

20   that process looks like.

21             MR. LEVINE:  Objection.

22             THE WITNESS:  Yeah, so I'm not

23        sure I know how they draft them, but

24        it is, you know, reviewable by a small

25        committee.

Confidential - Pursuant to Protective Order

1  QUESTIONS BY MR. GOMEZ:

2      Q.    Reviewable by a small committee

3  before it's ultimately presented?

4      A.    Correct.

5      Q.    Are you a member of that

6  committee?

7      A.    Yes.  If I'm the presenter, I'm

8  on that -- I'm on that, you know, section.

9      Q.    And what disciplines are

10  represented in that small committee?

11      A.    Generally producers, other

12  responders, Chlorine Institute members on

13  what they call the EPIT, the emergency

14  response preparedness issue team.

15      Q.    Over the last, just say, 10 to

16  12 years of doing these presentations on VCM

17  polymerization chemistry, what have you

18  personally done to ensure that the

19  information that you are providing in that

20  training is accurate?

21      A.    It's been accurate.  I mean,

22  the information core is there from the

23  industry producers; I just deliver it.

24      Q.    Okay.  So do you do anything

25  independently to make sure that what you're

1  being provided to present in terms of VCM

2  polymerization chemistry is, in fact,

3  accurate?

4       A.    Yes.  That's what we do by

5  committee, by group.  We all have our --

6  that's kind of the checks and balances part

7  of the accuracy of that information, yes.

8       Q.    So you're relying on the small

9  group and the input from the small group to

10 confirm that the information in those

11 PowerPoints and in the presentation is true

12 and correct and accurate.

13            Right?

14      A.    It's a team effort, yes.

15      Q.    With the understanding that

16 you've received training over the course of

17 your career in chemicals and HAZMAT,

18 including VCM, would you consider yourself a

19 chemist?

20      A.    No.

21      Q.    Would you consider yourself a

22 chemical engineer?

23      A.    No.

24      Q.    Would you consider yourself a

25 materials scientist?

1      A.      No.

2      Q.      In the course of responding to

3 incidents involving hazardous materials over

4 the course of your career, would you say it

5 is your practice to consult with chemists?

6      A.      In certain cases, absolutely.

7      Q.      And would that also apply for

8 consulting in certain cases with chemical

9 engineers?

10      A.      Yes.

11      Q.      And also for material

12 scientists?

13      A.      I'm not sure if I understand

14 the definition of a material scientist versus

15 a chemical engineer.  I'm not sure if I

16 understand the distinction there.

17      Q.      Sure.

18              You deal with responding to, in

19 your industry and in your course of work,

20 incidents involving derailed tank cars, for

21 example.

22              Right?

23      A.      Correct.

24      Q.      And in the course of responding

25 to those -- to those incidents, is it your

Confidential - Pursuant to Protective Order

1  practice to, where necessary, consult with

2  experts in the materials that make up those

3  tank cars?

4       A.    If it's a material that we

5  don't already have a lot of experience with,

6  sure, yes.

7       Q.    Understanding that each

8  derailment -- actually, understanding that

9  each hazardous materials incident is

10 different, what are some of the conditions

11 that would prompt you in responding to such

12 an incident to consult with a chemist?

13      A.    I'm sorry, can you ask that one

14 more time?

15      Q.    No problem.

16            Understanding that each

17 incident is different, what are some of the

18 factors that you consider in responding to an

19 incident before reaching out to a chemist for

20 advice, technical information or assistance?

21      A.    One obvious one comes to mind

22 is if there's some strange chemical that is

23 a kind of a one-off chemical that's very a

24 unique name and title I've never heard of

25 before, that absolutely is a trigger to get

Confidential - Pursuant to Protective Order

1  somebody from the producer on the phone and

2  say, tell me about your product.  That would

3  be probably the main example of something

4  like that.

5          I think that answers your

6  question.

7      Q.     It does.  Thank you.

8          So if I understand you

9  correctly, to the extent that the chemical

10  you're dealing with is one that you have

11  familiarity with, you may not reach out to a

12  chemist because you have enough understanding

13  of the product in order to respond.

14          Is that fair?

15      A.     Correct.

16      Q.     I want to talk a little bit

17  more about training.  You mentioned The

18  Chlorine Institute.

19          Is that training as part of an

20  organization or a group called CHLOREP?

21      A.     That's correct.

22      Q.     And what does CHLOREP stand

23  for?  If you can remember.

24      A.     Well, it is a big acronym, and

25  I'm -- I don't want to mess it up because

1    it's an oldie but a goody.  CHLOR --

2    emergency preparedness.  The EP is emergency

3    preparedness, I believe.  So you'll have to

4    ask Chlorine Institute to clarify that.

5          Q.    But it's part of The Chlorine

6    Institute.

7                Is that correct?

8          A.    Yes, absolutely.

9          Q.    There's also a group called

10   SERTC.

11               Are you familiar with that?

12         A.    Yes.

13         Q.    Do you know what that stands

14   for?

15         A.    That's the acronym for the --

16   it was formerly TTCI in Pueblo, Colorado.  I

17   believe it stands for Security and Emergency

18   Response Training Center, if I'm not

19   mistaken.

20         Q.    And you mentioned Pueblo,

21   Colorado.  Is that where the SERTC training

22   takes place?

23         A.    Yes.

24         Q.    Specific to SERTC, over the

25   course of your career, have you attended

Confidential - Pursuant to Protective Order

1    training put on by that group particular --

2    specific to polymerization of monomers?

3         A.    Specific to polymerization of

4    monomers, it would have been part of -- it

5    was a program delivered when it was called

6    TTCI before it was called SERTC.

7              A gentleman named Hank Cox

8    delivered the training.  It was a very good

9    chemistry class, and polymerization was

10   covered in that class in some detail, yes.

11        Q.    And do you recall roughly how

12   long ago that class would have been put on?

13        A.    I don't.

14        Q.    More or less than five years

15   ago?

16        A.    It would have been before five

17   years ago.

18        Q.    More or less ten years ago?

19        A.    I don't remember.  It was -- I

20   don't remember.

21        Q.    Okay.  And Mr. Cox, do you know

22   his credentials, by chance?

23        A.    He's a chemist.

24        Q.    Is he a, if you know, a chemist

25   that's employed by a manufacturer?  Is he an

1    independent chemist?

2         A.    He retired from -- he worked

3    for a couple of Class I railroads.  He

4    retired from CSX.  And he worked as an

5    instructor at TTCI back in that era.

6         Q.    And in the course of Mr. Cox's

7    class that we've just been discussing, was

8    there education provided specifically to the

9    polymerization chemistry of VCM?

10        A.    The polymerization section of

11   that class would have been polymerization as

12   a broad, not specific to VCM, but would have

13   covered VCM, butadiene, styrene, TDI and a

14   bunch of other monomers.

15        Q.    So nothing that was specific to

16   VCM in Mr. Cox's class as best you can

17   recall?

18        A.    As best I can recall, correct.

19        Q.    Over the course of your career,

20   can you estimate for me the number of HAZMAT

21   incidents that you've responded to where the

22   polymerization of a monomer has been a

23   concern that you've had to deal with?

24        A.    One noteworthy one jumps out in

25   my memory.  Three butadiene cars in Brooks,

Confidential - Pursuant to Protective Order

```
 1   Kentucky, were actively polymerizing and were
 2   subject to an emergency de-inventorying with
 3   a liquid flare.
 4        Q.    Other than that butadiene
 5   incident, are there any other incidents you
 6   can recall where the polymerization of a
 7   monomer was a chief concern in the HAZMAT
 8   response?
 9        A.    Not that I've personally
10   responded to as I did in Brooks, Kentucky.  I
11   just know of some other case studies that
12   have happened.
13        Q.    Those case studies that you
14   just mentioned, can you walk me through which
15   ones you're referring to?
16        A.    Well, another piece of training
17   I received was from the former Rohm and Haas.
18   David Ghormley was the monomers response
19   expert for Rohm and Haas.
20             They had a situation -- and I'm
21   trying to remember when that would have been.
22   Late '80s, maybe, but don't quote me on
23   that -- where they had a monomer react and
24   plug up and fouled up the pressure relief
25   device.  Ultimately resulted in a
```

1  catastrophic failure of the car.

2            There was a response somewhere

3  near Cincinnati on a styrene car.  Behaved

4  the same way.  Plugged up the pressure relief

5  device.

6            And I know there was a couple

7  others that I'm just -- I don't -- I wasn't

8  part of them so I can't remember or cite the

9  cases, but...

10      Q.      You mentioned the Cincinnati

11  incident.  The chemical at issue there was

12  styrene there.

13            Correct?

14      A.      Yes.

15      Q.      And then the Rohm and Haas

16  incident, was the chemical involved there

17  glacial acrylic acid?

18      A.      I don't recall.  It was a long

19  time ago.

20      Q.      In terms of the butadiene

21  incident in Brooks, Kentucky, can you

22  generally describe to me what occurred in

23  that incident that led to a concern about the

24  polymerization of that monomer?

25      A.      Three butadiene cars were in a

1   pool fire for a sustained amount of time, and

2   they were showing signs of polymerization.

3   And command said, get them empty right now,

4   get them empty before they do their own

5   thing, and constructed a burn pit, hard-piped

6   it out and were able to de-inventory them

7   through a liquid flare operation.

8        Q.    And in connection with that

9   incident, what were the signs being exhibited

10  that indicated to you that butadiene was

11  undergoing polymerization?

12       A.    Well, in that case, their

13  valves and fittings were in good condition.

14  We were able to get -- after the fires had

15  subsided, we were able to get people in there

16  with pressure gauges and temperature

17  thermometers into the thermal wells.

18            And pressure had increased, and

19  thermometers had in -- the temperatures had

20  increased, and we actually had access to

21  those cars that we could actually work on

22  them.

23       Q.    Do you happen to recall what

24  the temperatures were that were reported?

25       A.    No.  That was a long time ago.

1    Q.    Switching gears just a little

2  bit, what, if any, past experience have you

3  had over the course of your career with

4  HAZMAT incidents involving a concern for VCM

5  polymerization, other than the East Palestine

6  derailment?

7    A.    Well, every time we've ever

8  handled VCM, there was a high level of

9  concern for polymerization.

10    Q.    Why is that?

11    A.    Well, according to the producer

12  we worked for, even the slightest amount of

13  moisture could trigger it.  Any kind of

14  impurities, any kind of dirty gasket in a

15  transfer hose, they've told us that it can

16  trigger polymerization.

17         What was the question again?

18  I'm sorry.  What was the question?  I'm

19  just --

20    Q.    No problem.

21    A.    -- trying to stay on point.

22    Q.    I can read it -- I can read it

23  back to you.

24         What, if any, past experience

25  have you had over the course of your career

1    with HAZMAT incidents involving a concern for

2    VCM polymerization, other than the East

3    Palestine derailment?

4        A.     I'll just say as an absolute,

5    everything I've been taught by the producers

6    of VCM that we work for, anytime we touch

7    VCM, it's high-level, pristine, clean, dry,

8    transfer equipment, high level of quality

9    control, zero tolerance for off-specifying --

10   or off-speccing this product for anything

11   that we do to touch it, with the risk of if

12   we do anything to off-spec it, it could have

13   a problem in transportation.

14            That's what I've been taught.

15   That's what producers, people, have, you

16   know, over -- overseen us in the field, and

17   so we have a very high level of respect for

18   VCM.

19       Q.     So let me ask the question a

20   little differently.

21            Over the course of your career

22   in responding to HAZMAT incidents, which do

23   you specifically recall where polymerization

24   of VCM was suspected, the idea it was

25   actually happening?

1      A.      East Palestine, Ohio.

2      Q.      Okay.  Other than East

3  Palestine, Ohio.  I'm sorry.

4      A.      East Palestine, Ohio.

5      Q.      So other than East Palestine,

6  Ohio, the VCM-related HAZMAT incidents you

7  responded to, polymerization was always a

8  concern, but there were none where you

9  suspected it was actively occurring.

10             Is that fair?

11     A.      That's fair.

12     Q.      Over the course of your

13  training in your career responding to HAZMAT

14  incidents, have you become familiar with the

15  process whereby VCM is stabilized for

16  transport?

17     A.      Yes.

18     Q.      And there are, correct me if

19  I'm wrong, two distinct methods for

20  stabilizing VCM.

21             Is that correct?

22     A.      That's my understanding.

23     Q.      The first is the introduction

24  of an inhibitor.

25             Is that right?

Confidential - Pursuant to Protective Order

1     A.     Correct.

2     Q.     And inhibitors can involve

3  several chemicals, one of which includes

4  phenol.

5          Right?

6     A.     As you mentioned, there's

7  different chemicals that can inhibit VCM, and

8  that's an example where I would consult a

9  chemist to inquire what they might be using

10 to inhibit.

11    Q.     Over the course of your career,

12 have you come to know that phenol is an

13 inhibitor for VCM polymerization?

14    A.     I don't -- I'd have to refer to

15 my data on that.  I'm going to take your word

16 for it.  If you have facts that say that, I

17 will acknowledge that that could be correct.

18    Q.     Putting aside what chemicals

19 are the inhibitors that may be introduced, is

20 it your understanding that the inhibitor

21 effectively prevents the polymerization

22 reaction from occurring as long as it's

23 present within the vessel?

24    A.     In normal handling, that is why

25 they put it in there.

Confidential - Pursuant to Protective Order

```
 1          Q.      The second method for
 2   stabilizing VCM for transport includes
 3   purging of oxygen.
 4                  Is that right?
 5          A.      Can you ask your question one
 6   more time?
 7          Q.      Sure.
 8                  The second method for
 9   stabilizing VCM for transport includes oxygen
10   purging.
11                  Is that correct?
12          A.      Yes, that's what Oxy had shared
13   with us that weekend in East Palestine, yes.
14          Q.      Before the East Palestine
15   derailment, had you had any personal
16   experience responding to HAZMAT incidents
17   involving oxygen-purged, stabilized VCM?
18          A.      Yes.
19          Q.      Which incidents were those, if
20   you can recall?
21          A.      Paulsboro, New Jersey.
22          Q.      And if I'm not mistaken,
23   Paulsboro, New Jersey, was also Oxy-produced
24   VCM.
25                  Is that correct?
```

1      A.      That's correct.

2      Q.      But in the Paulsboro incident,

3  polymerization was not suspected.

4              Is that fair?

5      A.      Much different conditions.  No

6  fires.  No flame impingements.  A huge,

7  gaping hole in the side of tank car with a

8  lot of refrigerated product remaining in it.

9  So night and day difference.  It's apples and

10  oranges, but...

11      Q.      Sure.  And really that's what

12  I'm asking.

13              Polymerization was not a focal

14  point of concern in the Paulsboro derailment.

15              Right?

16      A.      It was a point of discussion in

17  the handling of it as we were trying to get

18  it out of the auto-refrigeration stuff into

19  receiving tank cars.  It was a concern, do we

20  need to inhibit it or not.  That was part of

21  the discussion in the handling of what was

22  auto-refrigerated, so it came up in

23  discussion.

24      Q.      Before the Paulsboro incident,

25  had you received any training specific to the

1    stabilization of VCM for transport using

2    oxygen purging?

3         A.    Not specifically.

4         Q.    Since Paulsboro, have you come

5    to understand that the way oxygen purging

6    stabilizes VCM is by removing organic

7    material that's needed to initiate the

8    polymerization reaction?

9         A.    No.  My understanding is they

10   purge with nitrogen at the rack after they

11   load the car.

12              And I don't know if there's a

13   splitting hairs difference in the molecular

14   chemistry, is why I'm clarifying my

15   understanding.

16        Q.    Sure.

17              The nitrogen is introduced in

18   order to expel oxygen from the vessel.

19              Right?

20        A.    Correct.  They load the VCM

21   into the cars, liquid-phased compressed gas,

22   and then they would put a nitrogen sweep and

23   a nitrogen pad on it to ship it.

24        Q.    So that there is oxygen at less

25   than 200 parts per billion inside of the

Confidential - Pursuant to Protective Order

1    vessel.

2              Right?

3        A.      That sounds accurate.

4        Q.      So it's an introduction of

5    nitrogen in order to remove oxygen.

6              Right?

7        A.      Yes.

8        Q.      And it's because without oxygen

9    inside the vessel, initiators that would

10   typically cause a polymerization reaction

11   can't occur.

12             Is that fair?

13             MR. LEVINE:  Objection.

14             THE WITNESS:  I'd say that's my

15        understanding, but -- that's why they

16        put the nitrogen in there.

17   QUESTIONS BY MR. GOMEZ:

18       Q.      And that's an understanding

19   that you had gained from Oxy going back to

20   Paulsboro?

21       A.      It -- no, not necessarily

22   Paulsboro in the sense of nitrogen purging on

23   a breached car that had a gaping hole in it.

24             We discussed adding inhibitor

25   to the receiving cars, and we were told,

Confidential - Pursuant to Protective Order

1  like, we're not adding inhibitors because we

2  have to work really hard to get them back out

3  again, quote/unquote.

4      Q.     Oh, okay.  So if I understand

5  you correctly, the concept we just discussed

6  came up in the context of transloading the

7  product from the damaged cars in Paulsboro to

8  the receiving cars?

9      A.     Correct.  I had inquired with

10  the producer's folks who were on site and the

11  local plant manager that was receiving those

12  cars, do we need to add inhibitor?  And they

13  said, no, we don't use inhibitors.  We

14  stabilize them with nitrogen because we have

15  to work really hard to get the inhibitors

16  back out of them again.

17      Q.     With respect to VCM that's

18  stabilize via the introduction of an

19  inhibitor, is it your understanding that when

20  heat is applied to a pressurized vessel

21  that's stabilized in that manner, that can

22  lead to the loss of those inhibitors?

23      A.     I'm sorry, ask your question

24  again.

25      Q.     Sure.

1              Talking about VCM stabilized

2    with an inhibitor.

3              Right?

4        A.    With an inhibitor, okay.

5        Q.    Is it your understanding that

6    if heat is introduced to that scenario, it

7    could lead to the loss of that inhibitor and,

8    therefore, the destabilization of VCM?

9        A.    That is the general training

10   that I've received in polymerizable materials

11   training over my years.  That is a good

12   statement, yes.

13       Q.    And has your training indicated

14   that that phenomenon does not occur with VCM

15   that is stabilized for transport via oxygen

16   purging?

17       A.    Can you rephrase -- say your

18   question again?

19       Q.    Sure.

20              Has your training indicated to

21   you that that phenomenon, which occurs when

22   VCM is stabilized with an inhibitor and heat

23   is applied, does not occur when heat is

24   introduced to VCM stabilized via oxygen

25   purging?

Confidential - Pursuant to Protective Order

```
 1              MR. LEVINE:  Objection.
 2              THE WITNESS:  I'd say it's
 3        apples and oranges.  You're asking a
 4        question -- if it's not stabilized
 5        with inhibitor, your question doesn't
 6        make sense.
 7   QUESTIONS BY MR. GOMEZ:
 8        Q.    Okay.  It doesn't make sense
 9   because they're two different methods for
10   stabilizing the VCM.
11              Right?
12        A.    Correct.
13        Q.    And when you introduce heat to
14   VCM that's inhibited by the introduction of
15   an inhibitor, that's when you see that
16   potentially go away.
17              Right?
18              MR. HANSON:  Objection.
19              THE WITNESS:  It's -- yeah,
20        it's just -- it's part of our
21        training.
22   QUESTIONS BY MR. GOMEZ:
23        Q.    Okay.  I understand it's part
24   of your training, and I want to make sure
25   that I understand the differences between
```

1    these two methods.

2         A.     Okay.

3         Q.     Specifically as it relates to

4    the introduction and the application of heat.

5         A.     Okay.

6         Q.     Right?

7                The problem potentially with an

8    inhibited VCM is that when you introduce

9    heat, the inhibitor can go away.

10               Right?

11        A.     That's what I've been taught,

12   yes.

13        Q.     That's what you've been

14   trained.

15               Right?

16        A.     Yes.

17        Q.     But because oxygen

18   stabilization is a completely different

19   method, your training has taught you that

20   when heat is applied, you don't lose

21   inhibition.

22               Right?

23        A.     No, that's not correct.

24        Q.     Okay.  What have you learned

25   about, in terms of oxygen-stabilized VCM,

Confidential - Pursuant to Protective Order

1    what heat does to the stabilization of that

2    product?

3         A.    In the case of East Palestine,

4    Ohio, the heat generated pressure in the car.

5    Pressure relief devices activated early and

6    often.  Would have driven that nitrogen right

7    out of the car into the atmosphere.

8              That nitrogen didn't stay in

9    that car, and that heat sustained for several

10   hours.

11        Q.    Okay.

12        A.    So that was our concern.

13        Q.    So I want to get into East

14   Palestine, obviously, but let's focus first

15   on your training, right, before East

16   Palestine.

17             What training did you receive,

18   and what -- and what does it tell us, or what

19   did it tell you, about what happens to

20   stabilized VCM -- sorry, oxygen-stabilized

21   VCM when heat is introduced?

22             MR. LEVINE:  Objection.

23             THE WITNESS:  Yeah, I need you

24        to ask the question again --

25

1  QUESTIONS BY MR. GOMEZ:

2      Q.      Sure.

3      A.      -- because -- go ahead.

4      Q.      Before East Palestine, what

5  does -- what did your training tell you or

6  instruct you regarding what occurs to

7  oxygen-stabilized VCM when heat is applied?

8              MR. LEVINE:  Objection.

9              THE WITNESS:  Stabilized with

10        nitrogen or not, when you apply heat

11        to VCM, it's a risk.

12  QUESTIONS BY MR. GOMEZ:

13      Q.      What is a risk?

14      A.      It's a risk of polymerization.

15  That's how they started off in the plants.

16  They get it to polymerize by putting in

17  reactors and adding heat to it.  That's how

18  they start their process.

19      Q.      Heat plus an initiator, right?

20              MR. LEVINE:  Objection.

21              THE WITNESS:  People produce it

22        differently, from producer to

23        producer.  I'm not -- I'm not a

24        producing expert.  I'm just an

25        emergency response guy.

1    QUESTIONS BY MR. GOMEZ:

2         Q.    Are you aware of any producer

3    that polymerizes VCM in their facilities

4    simply by adding heat?

5              MR. LEVINE:  Objection.

6              THE WITNESS:  I've been told by

7         one, yes.

8    QUESTIONS BY MR. GOMEZ:

9         Q.    Which one is that?

10        A.    I mean, do I bring in another

11   customer's name here?  I mean, what's the --

12             MR. HANSON:  Answer -- answer

13        your question to the best of your

14        ability.  Answer the question.

15             THE WITNESS:  I'll say the

16        customer's name.

17             Westlake Chemical.

18   QUESTIONS BY MR. GOMEZ:

19        Q.    And is that something that you

20   learned in the course of responding to the

21   East Palestine derailment or at some point

22   previously?

23        A.    They were one of the presenters

24   in my years of The Chlorine Institute

25   programming.  They shared case studies, you

Confidential - Pursuant to Protective Order

1  know.  So, no, I learned that through The

2  Chlorine Institute training.

3       Q.     I want to talk a little bit

4  about something you mentioned earlier as far

5  as heat being applied to, say, a tank car,

6  for example, PRDs activating as a result and

7  the loss of the nitrogen blanket.

8              That's something we were

9  discussing earlier.

10             Right?

11      A.     Yeah, and that's not unique to

12  vinyl chloride.

13      Q.     Is it your understanding that

14  once that nitrogen blanket is expelled under

15  that scenario, that in the case of VCM, the

16  VCM would then become unstable?

17      A.     It would -- in my mind, it

18  would become less stable, yes.

19      Q.     Less stable because there's no

20  longer that nitrogen blanket.

21             Fair?

22      A.     Fair.

23      Q.     But not less stable because the

24  activation of the PRDs would introduce

25  impurities to the vessel.

Confidential - Pursuant to Protective Order

1           Right?

2      A.      No, there is actually a remote

3  chance of that.

4      Q.      Remote chance.

5           Have you seen that in your --

6  in the course of your personal responses to

7  HAZMAT incidents?

8      A.      My personal response is no.

9  But again, various customers that I've been,

10 you know, privy to and blessed to have known

11 in my career have shared stories.

12     Q.      And those stories, were they

13 specific to VCM?

14     A.      Not necessarily.

15     Q.      Can you give -- without

16 identifying who those customers or producers

17 were, can you identify examples that were

18 shared with you about where this phenomenon

19 occurred?

20     A.      No, not specifically.  No, not

21 specifically.

22     Q.      Mr. McCarty, we can agree that

23 not all monomers are the same.

24           Right?

25     A.      Correct.

Confidential - Pursuant to Protective Order

```
 1        Q.      In fact, chemical properties
 2   can vary wildly from one monomer to the next.
 3            Correct?
 4            MR. LEVINE:  Objection.
 5            THE WITNESS:  I was going to
 6        say, I can't comment on the word
 7        "wildly," but I can agree not all
 8        chemistry is the same.  I'll agree to
 9        that.
10   QUESTIONS BY MR. GOMEZ:
11        Q.      Let me be more specific.
12            From one monomer to the next,
13   there can be a variation in their chemical
14   reactivity.
15            Right?
16        A.      Sure.
17        Q.      And from one monomer to the
18   next, there can be variation in boiling
19   points.
20            Right?
21        A.      Yes.
22        Q.      And from one monomer to the
23   next, there can be differences in
24   flammability limits.
25            Right?
```

Confidential - Pursuant to Protective Order

1     A.    Yes.

2     Q.    Same goes for pressure curves.

3 From one monomer to the next, there can be

4 different pressure curves.

5          Right?

6     A.    Correct.

7     Q.    And the same applies to

8 polymerization conditions.  The

9 polymerization conditions that are necessary

10 for one monomer may not apply to another

11 monomer.

12          Right?

13     A.    Correct.

14     Q.    With respect to the

15 polymerization of VCM, can you describe for

16 me specifically by reference to the training

17 you've been providing over the last 10 or

18 12 years what your understanding is of the --

19 of the polymerization chemistry of that

20 chemical?

21     A.    That it has a risk to

22 polymerize if you off-spec it in getting it

23 moist, getting it dirty, getting it hot in a

24 pool fire.  All those three elements are at

25 risk of polymerization.

1    Q.    Okay.  Putting aside the

2  conditions that may trigger polymerization of

3  VCM, can you describe for me the chemistry of

4  how VCM polymerizes?

5    A.    No, I can't.  I'm not a

6  chemist.

7    Q.    So, and I want to make sure

8  that I understand what it is you're training

9  on at the Chlorine Institute.

10        So you're -- is it fair to say

11  you're training on conditions that can cause

12  polymerization, not how polymerization

13  actually occurs, how the reaction actually

14  occurs within the chemical?

15        MR. HANSON:  Objection.

16        MR. LEVINE:  Objection.

17        MR. HANSON:  Sorry.

18        THE WITNESS:  Well, that's

19      accurate.  I mean, that's an accurate

20      characterization of training.  This is

21      emergency response training, not

22      chemistry training.

23  QUESTIONS BY MR. GOMEZ:

24    Q.    Okay.  So you're not given

25  chemistry training in the Chlorine Institute

1  classes; your focus is on identifying

2  conditions from a HAZMAT perspective that

3  could lead to polymerization?

4        A.    And to prevent it, correct.

5        Q.    Okay.  Understanding that

6  you're not a chemist and you're not providing

7  that kind of education at these Chlorine

8  Institute meetings, do you have an

9  understanding of what the chemical reaction

10 looks like when VCM polymerizes into

11 polyvinyl chloride, or PVC?

12       A.    I've never seen it happen other

13 than, like I say, this whole event here.

14 But, so, no, I've never been in a lab that

15 show-and-tell'd me how this works.  I've

16 never seen that.

17       Q.    Fair enough.  "Seen" is a bad

18 word.

19             Has it ever been described to

20 you the chemical changes that VCM undergoes

21 when it polymerizes into PVC?

22       A.    There may be a slide in that

23 slide deck, and I can tell you that slide

24 gets hit for just seconds because

25 99.99 percent of the people in the room,

Confidential - Pursuant to Protective Order

1    including myself, are not chemists.

2        Q.    Okay.

3        A.    So it's...

4        Q.    Well, do you know that when VCM

5    undergoes polymerization to PVC, the way that

6    that happens is by breaking certain bonds in

7    the chemical?

8             Is that something you've been

9    trained on?

10       A.    I can say, the response

11   training that we've gotten is characteristics

12   of VCM, boiling points, pressure curves,

13   expansion ratios, flammable ranges, risk of

14   polymerization, here's how to avoid

15   polymerization, here's what to do in certain

16   cases.

17            Those are the kinds of things

18   we train about.  We don't train to the micro

19   detail of chemistry, no.

20       Q.    Okay.  And those micro details

21   would include the fact that VCM's chemical

22   bonds don't break on the application of heat

23   alone upwards of like 500 degrees Fahrenheit.

24            Right?

25            MR. LEVINE:  Objection.

1          THE WITNESS:  We don't get that

2     specific.

3  QUESTIONS BY MR. GOMEZ:

4     Q.     Have you received training

5  about what type of heat signature is produced

6  by VCM that's actively undergoing

7  polymerization?

8     A.     No.

9     Q.     So you've never received

10  training about the amount of heat that's

11  generated by the VCM reaction if it's

12  undergoing polymerization?

13     A.     Not specifically, no.

14     Q.     So that would include not

15  knowing about the amount of BTUs that are

16  produced per pound of VCM undergoing

17  polymerization.

18          Fair?

19          MR. LEVINE:  Objection.

20          THE WITNESS:  Yeah, not

21     specifically, no.

22  QUESTIONS BY MR. GOMEZ:

23     Q.     And is it fair to say that if

24  you haven't received training or education

25  about the micro details of that chemistry,

Confidential - Pursuant to Protective Order

1    that that would include not having received

2    training on the different temperature

3    thresholds for different parts of the

4    chemical reaction where VCM polymerizes into

5    PVC?

6         A.    Say --

7         Q.    That was a terrible question.

8         A.    I was going to say, can you

9    rephrase that one?

10        Q.    Let me rephrase it.  Terrible

11   question.

12              If you haven't received

13   training or education about the micro details

14   of the chemistry, would that include training

15   on the various temperature thresholds where

16   different things or different steps occur in

17   the VCM polymerization reaction?

18              MR. LEVINE:  Objection.

19              THE WITNESS:  Yeah, that's the

20        kind of stuff we get from reference

21        data in like The Chlorine Institute

22        manual-type stuff.  And so, no, we

23        don't -- again, we're not specifically

24        training as chemists on any given

25        product that we respond to.

1    QUESTIONS BY MR. GOMEZ:

2        Q.    But would you agree with me

3    it's important to know how chemicals involved

4    in a hazardous material incident react in

5    order to gauge or determine the best plan for

6    dealing with that scenario?

7                MR. HANSON:  Objection.

8                MR. LEVINE:  Objection.

9                THE WITNESS:  Yes, we did.

10               (McCarty Exhibit 1 marked for

11          identification.)

12   QUESTIONS BY MR. GOMEZ:

13       Q.    Can we pull up Document

14   Number 43, which we'll mark as Exhibit 1 to

15   Mr. McCarty's deposition?

16               Mr. McCarty, the document that

17   we've marked as Exhibit 1 to your deposition

18   you of course have the opportunity to look

19   through before I ask you any questions, but

20   I'll just direct your -- I'll tell you that

21   I'm only going to ask you about pages 94 and

22   95, if you want to take a look at that.

23               MR. HANSON:  Why don't you look

24          at the whole thing just for a second

25          to make sure you understand what it

Confidential - Pursuant to Protective Order

```
 1           is, and then look at the specific

 2           pages Mr. Gomez would like to you see.

 3                  MR. GOMEZ:  Why don't we -- why

 4           don't we go off the record so that we

 5           can make sure that counsel in the room

 6           have access to the exhibits as well.

 7                  VIDEOGRAPHER:  Off the record

 8           at 9:58.

 9            (Off the record at 9:58 a.m.)

10                  VIDEOGRAPHER:  We are now back

11           on the record at 10:01.

12    QUESTIONS BY MR. GOMEZ:

13           Q.    Mr. McCarty, the document that

14    we marked as Exhibit 1 before we took our

15    quick break, you can see from the cover page

16    it's also Group B Exhibit 10 to the NTSB

17    investigative hearing.

18                  Is that right?

19           A.    Yes.

20           Q.    And according to the title

21    given by the NTSB, the document is the

22    Hazardous Material Group Chair's Factual

23    Report.

24                  Right?

25           A.    Yes.
```

1    Q.    The NTSB investigative hearings

2  that are referenced on this cover page, do

3  you understand those to be the investigative

4  hearings that took place in East Palestine in

5  June of 2023?

6    A.    Yes.

7    Q.    And you were a panelist for one

8  of the sessions of those investigative

9  hearings.

10        Correct?

11    A.    Yes.

12    Q.    Have you seen this document

13  before today?

14    A.    I think perhaps once before

15  those hearings.

16    Q.    As I said, we're going to be

17  focusing on page 94 and 95, if you can turn

18  to -- turn to that section of the report.

19        And specifically I want to

20  direct your attention to the bottom of 94,

21  continuing on to 95, which reads, "The IC

22  said the declining tank car temperatures did

23  not impact SPSI's and SRS's urgency to

24  conduct a vent and burn, but more so the need

25  to get it done during daylight hours.  The

 1   SPSI president and SRS project manager told

 2   the IC that if at any point the tank car

 3   temperature rose to 150 degrees Fahrenheit,

 4   for safety reasons they would withdraw

 5   personnel from the area and stop any -- stop

 6   any attempts to mitigate the tank cars.  They

 7   also told the IC that should the temperature

 8   in the tank car reach 153 to 158 degrees

 9   Fahrenheit, the result would be rapidly

10   increasing temperature and uncontrolled

11   polymerization reaction."

12             Do you see that section, sir?

13        A.    I do see that.

14        Q.    And did I read that section

15   accurately?

16        A.    You read it as it's printed.

17        Q.    There's references to IC in

18   this section of Exhibit 1.

19             Do you understand that to be

20   incident command?

21        A.    Yes.

22        Q.    And the last sentence that I

23   just read aloud, which again is, "They also

24   told the IC that should the temperature in

25   the tank car reach 153 to 158 degrees

1    Fahrenheit, the result would be rapidly

2    increasing temperature and uncontrolled

3    polymerization reaction," is that something

4    that you shared with the incident command?

5         A.    No.

6         Q.    So the reference here to SPSI

7    and SRS providing that information to the IC

8    is inaccurate?

9         A.    It's inaccurate.

10        Q.    These temperature ranges that

11   are discussed here, 153 to 158 degrees

12   Fahrenheit, and the connection to a

13   polymerization reaction, is that your

14   understanding of the polymerization chemistry

15   of VCM?

16        A.    No.  This conversation was -- I

17   read this in early June, prior to the

18   hearings, and I took exception when I read

19   that.  I said, I never said that.

20             So somehow, if this is their

21   final document, that never got clarified.

22             But the memory I have of any

23   conversation with the fire chief, and if he

24   asked the question, you know, when would you

25   be concerned to -- you know, and we said, you

Confidential - Pursuant to Protective Order

1  know, 150.  And it had to do with damage

2  assessment, unknown damages, the risk of any

3  kind of hidden damages.  And most of the car

4  we couldn't see for scorch, gouges, wheel

5  burns, pressure buildups.

6          The fact that this car was no

7  longer venting and burning, it was no longer

8  relieving itself, it was plugged up,

9  everything -- all its service equipment was

10  plugged up at that point.  And if it had

11  showed increases in temperature rise, we were

12  concerned of its internal stability and

13  unknown damages.  That was the context of

14  this answer.

15          What is -- you know, how they

16  got this out the fire chief, I mean, he may

17  have had a preconceived notion of the

18  conversation and assumed we meant

19  polymerization, but I can't assume what the

20  fire chief assumed at that point in time.

21      Q.    Just focusing on that last

22  sentence and the numbers that are provided

23  there, the relationship between this

24  temperature range of 153 degrees Fahrenheit

25  to 158 degrees Fahrenheit and the

1    polymerization of VCM, is that something

2    you've ever learned in your training over the

3    course of your career in HAZMAT?

4          A.    Chip had referenced a New

5    Jersey Health Department document that

6    suggested something in a similar range, and I

7    can't remember what it said.  So that was --

8    again, in my mind, it was about damage

9    assessment, unknown conditions.

10               We never told them

11   polymerization.  I can tell you -- at least I

12   didn't.  I never said the words

13   "polymerization."

14               We were concerned about

15   polymerization, but I never gave them some

16   magic recipe of 150.  And this -- I took

17   exception when I read this in June; I take

18   exception to reading it today.

19         Q.    Do you have any sense of where

20   the NTSB may have gotten this temperature

21   range of 153 to 158 in connection with

22   polymerization and the fact that they claimed

23   you told the IC about this?

24         A.    It was --

25               MR. LEVINE:  Objection.

Confidential - Pursuant to Protective Order

```
 1              THE WITNESS:  -- their
 2      interview with the IC.
 3              Sorry.
 4              But I do know that the NTSB was
 5      their -- their interview from the IC.
 6  QUESTIONS BY MR. GOMEZ:
 7      Q.      And again, just focusing on
 8  what's on the page, the temperature range
 9  specifically.  Polymerization occurring at a
10  temperature range of 153 to 158 degrees is
11  not something that you've been trained on.
12              Right?
13      A.      The data resources, the use of
14  the data resources and the conditions
15  presented in East Palestine, it was a complex
16  chemical -- not a complex chemical.  A
17  complex damage assessment formula.  It was
18  one element in a big-picture recipe.
19      Q.      Okay.  I appreciate that.
20              I just want to know, this
21  temperature range that you're saying you
22  didn't tell the IC, and I appreciate that --
23      A.      This morning, I'd have to go
24  look it up.
25      Q.      My question to you is, this
```

1  temperature range that we're looking at on

2  the page, 153 to 158 causing a runaway

3  polymerization reaction, as you sit here

4  today, is that something that you've ever

5  heard in a training you received in your

6  HAZMAT -- in your HAZMAT career?

7        A.     Not specifically, because we

8  don't go into those details.

9        Q.     This same temperature range,

10 153 to 158, causing a runaway VCM

11 polymerization reaction, is that consistent

12 with any technical advice that you recall

13 receiving on the ground in East Palestine

14 between February 3rd and February 6, 2023?

15       A.     No.

16       Q.     We can put that document aside,

17 sir.  Thank you.

18              In the -- in the course of

19 responding to the derailment in East

20 Palestine, and considering the potential for

21 VCM polymerization, am I correct that there

22 were several guidance documents that you

23 relied on in responding to the conditions of

24 the car?  Cars?

25       A.     Yes.

1    Q.    And is one of those documents

2  the VCM safety data sheet provided by Oxy

3  Vinyls?

4    A.    Yes.

5    Q.    In your field and in your

6  experience, is it commonplace for you to use

7  or reference an SDS in responding to a HAZMAT

8  incident?

9    A.    Yes.

10    Q.    And I should have clarified.

11          Safety data sheet can be

12  abbreviated to SDS.

13          Right?

14    A.    Yes.

15    Q.    An SDS is an OSHA requirement.

16          Right?

17    A.    Yes.

18    Q.    And it's in fact a standardized

19  document.

20          Right?

21    A.    When you say "standardized

22  document," I'm not sure what you mean.

23    Q.    It's a document that has

24  certain sections that are required by federal

25  regulations.

1                    Right?

2          A.      Yes.

3          Q.      To provide information for

4    various chemicals in a standardized form.

5                  Fair?

6          A.      Yes.

7          Q.      Would you agree with me that an

8    SDS is a document that's intended to apply to

9    a wide variety of scenarios?

10         A.      No.

11         Q.      What do you disagree with in

12   that statement?

13         A.      Safety data sheets are to

14   communicate general hazards for people using

15   chemicals under the Right-to-Know Laws.  They

16   want to know, you know, what kind of hazards

17   this chemical presents, maybe some proper

18   shipping names to refer to for bills of

19   lading, stuff like that.

20                 And as you said, it covers a

21   lot of sections, right?  A lot of sections

22   for different applications.

23         Q.      And the general hazards that

24   you referenced, those can present themselves

25   in a variety of different industries or

```
 1    scenarios.

 2              Right?

 3    A.      Yes, but not necessarily always

 4    on the SDS.

 5    Q.      So an SDS for any product can

 6    apply to a HAZMAT incident.

 7              Right?

 8    A.      It's one piece of data, sure.

 9    Q.      It can apply to a HAZMAT

10    incident that occurs in the course of

11    transportation.

12              Right?

13    A.      Yes.

14    Q.      It can occur in a HAZMAT

15    incident involving transportation via rail.

16              Right?

17    A.      Sure.

18    Q.      It can also apply to a HAZMAT

19    incident involving transportation via truck.

20              Right?

21    A.      Yes.

22    Q.      It can apply to a HAZMAT

23    incident involving transportation via ship.

24              Right?

25    A.      Yes.
```

Confidential - Pursuant to Protective Order

```
1        Q.    It can apply to a HAZMAT
2   incident in the course of processing the
3   chemical.
4             Right?
5        A.    Yes.
6        Q.    It can apply to a HAZMAT
7   incident in the course of the chemical being
8   stored.
9             Right?
10       A.    Yes.
11       Q.    It can apply to people in
12  completely different lines of work being
13  exposed to a chemical as it moves through a
14  supply chain.
15            Right?
16       A.    Yes.  That's why they put it
17  out there in the Right-to-Know Laws.
18       Q.    So it's not specific to any one
19  particular type of HAZMAT incident.
20            Right?
21            MR. LEVINE:  Objection.
22            THE WITNESS:  Correct.  Fair.
23  QUESTIONS BY MR. GOMEZ:
24       Q.    And we talked about the
25  standardized sections of the document.
```

Confidential - Pursuant to Protective Order

1          In the course of using SDSs to

2     respond to HAZMAT incidents, has it been your

3     practice to read the entire document when

4     referencing it?

5          A.     Not necessarily.  I don't worry

6     about proper shipping names if I'm not

7     packaging the chemical.  As an example, I

8     wouldn't hone in on, you know, air transport.

9     I audit shipping regulations for samples if

10    I'm dealing with a bulk tank car, so I would

11    ignore those kinds of sections.

12         Q.     So in the course of responding

13    to a HAZMAT incident, how do you decide which

14    sections of the SDS to reference?

15         A.     You look for things like, you

16    know, toxicity, any recommendations on

17    personal protective equipment, reactivity,

18    fire explosion hazards, those types of

19    things.

20         Q.     And is it your practice to read

21    all of those sections together to have a full

22    understanding of the information the SDS is

23    providing you?

24         A.     We read SDSs kind of like a

25    résumé, top to bottom, left to right, and you

Confidential - Pursuant to Protective Order

1    hone in on the things that grab your

2    attention.

3         Q.    But you'd agree that there may

4    be information in certain sections that sheds

5    greater light on sections that you're

6    specifically relying on in responding to a

7    HAZMAT incident.

8              Fair?

9              MR. HANSON:  Objection.

10             THE WITNESS:  Yeah, can you

11        rephrase that?  I'm not sure --

12   QUESTIONS BY MR. GOMEZ:

13        Q.    Sure.

14             Let's say you're concerned

15   about reactivity of a chemical, for example.

16             Right?

17             Would you agree with me that

18   there might be information in other sections

19   of the SDS not specific to reactivity that

20   provide context or additional information

21   about that issue?

22             MR. LEVINE:  Objection.

23             THE WITNESS:  Yeah,

24        potentially, but not necessarily.  I

25        mean, if it's a reactivity issue, it

1          should be in a reactivity section.

2     QUESTIONS BY MR. GOMEZ:

3          Q.     So if information is not within

4     the section that you expect it to be in the

5     SDS, are you not considering it when relying

6     on an SDS in responding to a HAZMAT incident?

7               MR. HANSON:  Objection.

8               MR. LEVINE:  Objection.

9               THE WITNESS:  Like I said, we

10          read them top to bottom, left to

11          right, and all information is

12          considered.

13    QUESTIONS BY MR. GOMEZ:

14         Q.     So you're taking the whole

15    document in, and you're using all the

16    information that you glean from the document.

17               Fair?

18         A.     Fair.

19         Q.     I think you mentioned this

20    before, but correct me if I'm wrong.

21               An SDS is one tool in the

22    course --

23         A.     It's only one.

24         Q.     And there are several in the

25    toolbox, so to speak.

Confidential - Pursuant to Protective Order

1                    Right?

2          A.      Yes.

3          Q.      What are some of the other

4   tools in terms of guidance materials or

5   documents that provide technical information

6   in responding to a HAZMAT incident?

7          A.      So we have the Handbook of

8   Compressed Gases.  The Vinyl Institute

9   manual.  Chlorine Institute has a manual.

10  Railroad emergency action guides.  There's a

11  number of them.

12         Q.      Would you agree with me that

13  expert consultation is also one of those

14  tools in the toolbox?

15         A.      Yes.

16         Q.      And one of those experts might

17  be the product manufacturer who published the

18  SDS.

19                  Right?

20         A.      Yes.

21                  (McCarty Exhibit 2 marked for

22         identification.)

23  QUESTIONS BY MR. GOMEZ:

24         Q.      Can we pull up Document

25  Number 30, which we'll mark as Exhibit

Confidential - Pursuant to Protective Order

1    Number 2 to Mr. McCarty's deposition?

2              Mr. McCarty, this document that

3    we've -- that we've just marked as Exhibit 2

4    to your deposition, it's also the Group D,

5    Exhibit 26 to the NTSB investigative hearing.

6              Is that correct?

7    A.    Yes.

8    Q.    And the title of the document

9    according to the NTSB is "Vinyl Chloride

10   Monomer Safety Data Sheet."

11             Right?

12   A.    Yes.

13   Q.    If we look at the actual

14   document itself, it appears to be 18 pages

15   provided by Oxy Vinyls.  That is the safety

16   data sheet for VCM.

17             Right?

18   A.    Yes.

19   Q.    The title of the document is --

20   well, safety data sheet, vinyl chloride

21   monomer.  It's not specific to stabilized

22   vinyl chloride monomer.

23             Correct?

24   A.    If there's a separate data

25   sheet for stabilized vinyl chloride monomer,

Confidential - Pursuant to Protective Order

1    it was not available to us.

2         Q.    Okay.  I understand that.

3               My question was, is this

4    document, to your knowledge, specific to

5    stabilized VCM?

6         A.    I never thought about it till

7    your question.

8         Q.    And VCM can be stabilized or

9    unstabilized.

10              Right?

11        A.    Sure.

12        Q.    Fair to say that some

13   information in the SDS might apply to vinyl

14   chloride in stabilized form, whereas other

15   information applies to vinyl chloride in

16   unstabilized form?

17              MR. LEVINE:  Objection.

18              THE WITNESS:  Yeah.

19   QUESTIONS BY MR. GOMEZ:

20        Q.    Is that not something you

21   considered at the time you were reviewing

22   this document in the course of responding to

23   the East Palestine derailment?

24        A.    Yes.

25        Q.    Let's take a look at page 2 of

1    18.  It's on the bottom towards the

2    right-hand corner.

3              Under Section 2, Hazards

4    Identification, let me know when you see that

5    section.

6         A.    Page 2, you said?

7         Q.    2 of 18.

8         A.    Okay.  I'm there.

9         Q.    There is a section under that

10   section heading 2 that says, "Precautionary

11   Statements."

12             Do you see that?

13        A.    Yes.

14        Q.    And the second sentence says,

15   "Requires stabilizer to prevent potential

16   dangerous polymerization."

17             Did I read that correctly?

18        A.    Yes.

19        Q.    Is that a statement that you

20   relied on when referencing this document in

21   the course of responding to the East

22   Palestine derailment?

23        A.    I read that statement, and we

24   know that Oxy doesn't ship unstabilized vinyl

25   chloride.  They either inhibit it or they

1   stabilize it.  They do one or the other.

2        Q.    Okay.  So you did rely on this

3   statement that we just read from page 2 of

4   the SDS in the course of responding to the

5   East Palestine derailment?

6             MR. HANSON:  Objection.

7             THE WITNESS:  We take it with

8        all the other information, which would

9        include the one right above that that

10       says, "may mass explode in fire,

11       extremely flammable gas, contains gas

12       under pressure, may explode if heated,

13       polymerization can occur."

14            Yes, we took that into

15       consideration.

16   QUESTIONS BY MR. GOMEZ:

17       Q.    You relied on both of those

18   statements.

19            Right?

20       A.    Yes, we did.

21       Q.    And did both of those

22   statements cause any confusion in the course

23   of responding to the East Palestine

24   derailment?

25       A.    Specifically when Oxy folks

Confidential - Pursuant to Protective Order

1　told us there was no inhibitor in them and

2　they put nitrogen in the vapor space to

3　stabilize, that did absolutely correlate with

4　us, yes.

5　　　　Q.　　And Oxy would be a resource in

6　order to explain any confusion that you had

7　as between those two statements.

8　　　　　　　Right?

9　　　　　　　MR. LEVINE:  Objection.

10　　　　　　THE WITNESS:  They were a

11　　　resource, and they explained how they

12　　　stabilized their shipments.

13　QUESTIONS BY MR. GOMEZ:

14　　　　Q.　　Okay.  They're not just a

15　resource; they're the experts on the product.

16　　　　　　　Right?

17　　　　　　MR. HANSON:  Objection.

18　　　　　　MR. LEVINE:  Objection.

19　　　　　　THE WITNESS:  They are product

20　　　experts on vinyl chloride, yes.

21　QUESTIONS BY MR. GOMEZ:

22　　　　Q.　　And in fact, they're product

23　experts on their own vinyl chloride.

24　　　　　　　Right?

25　　　　A.　　Yes.

Confidential - Pursuant to Protective Order

```
1          Q.      Which is the subject of this
2    SDS.
3                  Right?
4          A.      Yes.
5          Q.      And which is what was in the
6    derailed railcars in East Palestine.
7                  Right?
8          A.      Yes.
9          Q.      So if there was any confusion
10   generated by the statements drafted by Oxy
11   Vinyls, they'd be in the best position to
12   explain any of those confusions.
13                 Right?
14                 MR. LEVINE:  Objection.
15                 THE WITNESS:  Yeah, can you
16        state your question?
17   QUESTIONS BY MR. GOMEZ:
18         Q.      Sure.
19                 If there was any confusion
20   about how to read these two statements that
21   we see on page 2 of 18 of the SDS, Oxy, as
22   the manufacturer of the product at issue,
23   would be in the best position to clarify that
24   confusion.
25                 Right?
```

Confidential - Pursuant to Protective Order

1           MR. HANSON:  Objection.

2           MR. LEVINE:  Objection.

3           THE WITNESS:  I just don't know

4      where the question is going.  I

5      just -- I mean, they stabilize their

6      shipments so they don't polymerize in

7      transportation in normal handling.

8      What you're missing is in normal

9      handling, in normal conditions.

10 QUESTIONS BY MR. GOMEZ:

11      Q.    I'm not asking about handling

12 conditions.

13           What I'm asking about is, if

14 there's confusion about this document drafted

15 by Oxy Vinyls, do you agree with me, yes or

16 no, that Oxy Vinyls is in the best position

17 to clarify that confusion?

18           MR. LEVINE:  Objection.

19           THE WITNESS:  Yes.

20 QUESTIONS BY MR. GOMEZ:

21      Q.    Let's look at page 3 of 18.

22           Towards the middle of the page,

23 there's a section that says "GHS -

24 Precautionary Statements - Prevention."

25           Do you see that?

Confidential - Pursuant to Protective Order

```
 1        A.      Precautionary statements,

 2   prevention, yes.

 3        Q.      Second bullet point reads,

 4   "Stabilize with polymerization inhibitor,

 5   e.g." -- I'm omitting the chemical name --

 6        A.      Yeah.

 7        Q.      -- "or purging to remove

 8   oxygen."

 9                Did I read that correctly?

10        A.      Yes.

11        Q.      Is that a statement that you

12   relied on in referencing this document in the

13   course of responding to the East Palestine

14   derailment?

15        A.      Every shipment of vinyl

16   chloride from all of our customers is

17   generally stabilized with either an inhibitor

18   or, in this case, nitrogen.

19        Q.      Okay.  Respectfully,

20   Mr. McCarty, I didn't ask about whether VCM

21   is shipped stabilized.

22                My question is, the statement I

23   just read, the second bullet point, is that

24   one that you relied on from the SDS in the

25   course of responding to the East Palestine
```

Confidential - Pursuant to Protective Order

1    derailment?

2         A.     Now, when you say I relied on

3    it, that's where I'm kind of confused with

4    the question.  When you say I relied on it,

5    what are you -- what are you asking if I

6    relied on it?

7         Q.     Did you use this information,

8    the information that we're discussing in the

9    SDS, to reach certain conclusions about the

10   conditions of the cars, about the potential

11   for polymerization in the cars and about

12   mitigation activities, if any, that you could

13   take in connection with the cars?

14              MR. LEVINE:  Objection.

15              THE WITNESS:  Yeah, I didn't

16        need to read this on the SDS to know

17        that Oxy stabilizes their shipments.

18        I didn't need to read that.

19   QUESTIONS BY MR GOMEZ:

20        Q.     Okay.

21        A.     But the...

22        Q.     But this statement talks about

23   stabilization vis-à-vis polymerization.

24              Right?

25        A.     In normal handling, yes.

1    Q.    Okay.  I'm just asking what

2  this says.

3              Can we agree that it says

4  "stabilize with a polymerization inhibitor"?

5    A.    Yes.

6    Q.    Right?

7              Okay.  Did you take this

8  statement into account when reading all of

9  the other statements made in the SDS in the

10 course of responding to the East Palestine

11 derailment?

12   A.    Yes.

13   Q.    And did this statement, as

14 compared to other statements in the SDS,

15 cause any confusion to you in the course of

16 responding to the East Palestine derailment?

17   A.    No.

18   Q.    Let's skip down to Section 10,

19 Stability and Reactivity.  That's page 10 of

20 18.

21              Do you see that section, sir?

22   A.    10 of 18, Section 10, yes.

23   Q.    Okay.  And that section is

24 entitled "Stability and Reactivity."

25              Right?

Confidential - Pursuant to Protective Order

1    A.    Yes.

2    Q.    The first subheading is,

3  "Chemical Stability:  Generally stable at

4  normal temperatures and pressures; however,

5  may violently polymerize or generate other

6  hazardous conditions when not stabilized

7  and/or stored correctly."

8          Did I read that right?

9    A.    Yes.

10   Q.    And the section below that is

11 entitled "Reactivity" and reads, "Explosive

12 or violent polymerization can occur when

13 exposed to air, sunlight or excessive heat if

14 not properly stabilized."

15         Did I read that section

16 correctly?

17   A.    Yes.

18   Q.    These two statements under

19 Chemical Stability and Reactivity, are those

20 statements that you relied on in the course

21 of responding to the East Palestine

22 derailment?

23         MR. LEVINE:  Objection.

24         THE WITNESS:  Well, I would

25     say, I'm going to just kind of, again,

1          go back to your phrasing of your

2          question, "relied on."

3               It's certainly part of the

4          information.  And, you know, the key

5          is they stabilize it with nitrogen.

6          And when those PRDs were going off,

7          nitrogen left the cars.  So that

8          limits the amount of stabilization.

9     QUESTIONS BY MR. GOMEZ:

10         Q.     Understood.

11              So is it fair to say that

12    between what you were seeing in the field

13    with the activation of the PRDs and the

14    statements that are here that we're reading

15    in the SDS, there was some inconsistency?

16         A.     There's no inconsistency on the

17    general guidelines for general safe handling

18    of vinyl chloride monomer.

19              Oxy's done a nice job of

20    presenting all the risks.  They're presenting

21    people how to handle it safely in normal

22    handling to make sure you're -- if they have

23    a customer, they have their own employees,

24    they have contractors like us that are

25    transferring it, packaging and handling it,

Confidential - Pursuant to Protective Order

1   this is all good guidance.  It's a good

2   document for their guidance.

3              But safety data sheets are

4   never the one and only document for emergency

5   response because they're lacking a lot of

6   other stuff.  And that's this whole

7   nonscientific, all -- all broad recipe of

8   risk assessment at the derailment site.

9        Q.     So the statements that we're

10  reading in the SDS, those were not the only

11  reason why, for example, you believed that

12  polymerization might be occurring in the --

13  in the VCM cars that derailed in East

14  Palestine.

15             Right?

16       A.     Correct.

17       Q.     Instead, it was the information

18  contained in the SDS plus your observations.

19             Right?

20       A.     Correct.

21       Q.     And if there were any questions

22  about how the statements in the SDS relate to

23  what you're seeing in the field in East

24  Palestine, you had the opportunity to discuss

25  those with Oxy as the product manufacturer.

Confidential - Pursuant to Protective Order

1                     Right?

2          A.     Yes.

3          Q.     And because they both wrote the

4    SDS and are the experts in their product,

5    they could provide valuable insight --

6                     MR. LEVINE:  Objection.

7    QUESTIONS BY MR. GOMEZ:

8          Q.     -- on what was causing in the

9    VCM cars.

10                    Right?

11                    MR. LEVINE:  Objection.

12                    MR. HANSON:  Objection.

13                    THE WITNESS:  I can answer?

14                    MR. HANSON:  Yeah, of course.

15         Go ahead.

16                    THE WITNESS:  So, yes, we

17         respect all the input from our

18         customers, and it's not specific to

19         Oxy.  We respect that input from our

20         customers, yes.

21   QUESTIONS BY MR. GOMEZ:

22         Q.     Okay.  So if I understand you

23   correctly, there are -- there's no single

24   statement in this SDS that ultimately led you

25   to conclude -- to conclude that

1  polymerization could be under -- or could be

2  actively undergoing in the cars.

3          Fair?

4      A.    Other than its repeated

5  references to "could violently polymerize and

6  violently explode" multiple times throughout

7  the SDS.

8      Q.    Okay.  So then that's what I'm

9  trying to understand is, if there's

10 statements in the SDS that say that, and

11 you're seeing -- you're having certain

12 observations in the field, Oxy is the best

13 one to reconcile what you're seeing in the

14 field and the statements in the SDS.

15          Right?

16          MR. HANSON:  Objection.

17          THE WITNESS:  Not necessarily.

18 QUESTIONS BY MR. GOMEZ:

19     Q.    Why not?

20     A.    Because they're 2,000 miles

21 away.

22     Q.    Okay.  They had video of the

23 scene.

24          Right?

25     A.    Some.

Confidential - Pursuant to Protective Order

```
 1         Q.      They had videos of the PRDs.

 2                 Right?

 3         A.      Some.

 4         Q.      They had your reports about

 5   what was happening with the PRDs activating.

 6                 Right?

 7         A.      Yes.

 8         Q.      You gave them all the

 9   information that they would need in order to

10   assess whether or not their product that

11   they're the expert in was undergoing

12   polymerization.

13                 Right?

14                 MR. LEVINE:  Objection.

15                 THE WITNESS:  My communications

16         with them, yes.

17                 What I'm not privy to is, did

18         they get information from anybody else

19         that may have been erroneous.  I don't

20         know.  I have no idea.

21   QUESTIONS BY MR. GOMEZ:

22         Q.      Do you know whether they got

23   information from anyone other than you?

24         A.      I have no idea.

25         Q.      If there was any confusion or
```

Confidential - Pursuant to Protective Order

 1    inconsistencies or contradictions that you

 2    believed existed between the document we're

 3    looking at as Exhibit 2 and your observations

 4    in the field, would you agree with me that

 5    the best set of folks to reconcile those

 6    inconsistencies would have been Oxy?

 7              MR. HANSON:  Objection.

 8              MR. LEVINE:  Objection.

 9              THE WITNESS:  Oxy was engaged

10         in the response.

11    QUESTIONS BY MR. GOMEZ:

12         Q.    Okay.  They were.

13              The question is, would they

14    have been the best people to reconcile any

15    inconsistencies in this document and what you

16    were seeing in the field?

17              MR. LEVINE:  Objection.

18              THE WITNESS:  Inconsistencies

19         in chemistry?  Certain employees at

20         Oxy that are really the chemists

21         certainly were there.  I mean, they

22         were -- they were in the mix of

23         communications.

24    QUESTIONS BY MR. GOMEZ:

25         Q.    And they told you that taking

Confidential - Pursuant to Protective Order

1  into account the statements of the SDS and

2  all the observations that were being reported

3  to them from you in the field, polymerization

4  was not happening in the cars.

5           Right?

6      A.     There was at least one person

7  at Oxy in -- wherever they were from, Dallas

8  or wherever, whoever -- I don't know where

9  they dialed in from -- that believed that.

10          But the people on the ground,

11  the leader of their strike team on the ground

12  and the body language of the other two

13  fellows they had on the ground with us, they

14  didn't concur with that.  We had conflicting

15  information from Oxy.  Clearly, they did not

16  concur with that.

17     Q.     Let's talk about those three

18  gentlemen that were on the ground.

19          One individual was Steve Smith.

20          Right?

21     A.     Yes.

22     Q.     Another individual was Justin

23  Cox.

24          Right?

25     A.     Yes.

Confidential - Pursuant to Protective Order

1    Q.    And the third individual was

2   Alexander, or Alejandro, Torres.

3              Right?

4    A.    That's the one I couldn't

5   remember.  I'll take your word for it.

6    Q.    Do you know all three of their

7   specialties within Oxy?

8    A.    I know Justin is the leader of

9   their strike team because we've trained with

10   him at the CHLOREP programs.  That's how I

11   know Justin.

12              Steve and the other fellow I

13   just met at East Palestine.

14    Q.    And did you come to learn when

15   you met them in East Palestine what their

16   specialties were at Oxy, putting aside Justin

17   Cox?

18    A.    Alejandro, I believe, was a

19   tank car shipping manager kind of guy, I

20   believe.  And Steve, I believe, was a

21   chemist.

22    Q.    Okay.  So Alejandro Torres is a

23   tank car loading specialist.  He knows about

24   how the tank cars are loaded.

25              Right?

Confidential - Pursuant to Protective Order

1     A.    I'll take your word for that.

2     Q.    Justin Cox is an emergency

3  responder.

4           Right?

5     A.    Yes.

6     Q.    So he knows about emergency

7  response.

8           Fair?

9     A.    Yes.  And Oxy's products.

10     Q.    And Steve Smith is a chemist.

11           So did you understand that

12  Steve Smith was an expert in the

13  polymerization of VCM?

14     A.    That was presumed, yes.  That's

15  why they sent him there.  And we presumed if

16  they're sending a chemist, he knows his

17  products.

18     Q.    He told you that he wasn't an

19  expert in VCM polymerization.

20           Right?

21     A.    I don't remember that.

22     Q.    You don't remember him saying

23  on multiple occasions that he was not a

24  polymerization expert?

25     A.    I don't remember specific

Confidential - Pursuant to Protective Order

1   conversations.  What was clear to me, that

2   the people on the ground in East Palestine

3   weren't really able to talk without getting

4   Dallas's permission to talk.

5          Q.     Without their permission or

6   without their insight?

7                 MR. HANSON:  Objection.

8                 THE WITNESS:  I'll say he

9          had -- however you interpret that,

10         that was my -- that was my perception.

11  QUESTIONS BY MR. GOMEZ:

12         Q.     If Mr. Smith, for example, is

13  not an expert in VCM polymerization, would

14  you have expected him to give you information

15  without checking with the experts back in

16  Dallas?

17                MR. LEVINE:  Objection.

18                THE WITNESS:  Say your question

19         again, please.

20  QUESTIONS BY MR. GOMEZ:

21         Q.     Sure.

22                If Mr. Smith was not an expert

23  in VCM polymerization, would you have

24  expected him to give you technical advice and

25  information without first getting it from the

1    actual experts back in Dallas?

2                    MR. LEVINE:  Objection.

3                    THE WITNESS:  In our position

4           as emergency responders -- let's take

5           the East Palestine and Oxy Vinyls off

6           the table for a minute -- we go to any

7           given emergency, and the customer

8           has -- the product owner or the

9           shipper sends their technical reps,

10          their technical -- the reason the

11          shippers send technical reps to the

12          site is for technical expertise.

13                   If they bring a chemist to the

14          site that can't answer chemistry

15          questions, they wasted their money on

16          airfare.

17                   So when they send people, we

18          believe in good faith that they're

19          there for the value that they bring.

20          When they introduce as a chemist, we

21          believe that he clearly understands

22          the chemistry of his product or why

23          else would they send him.

24                   So if he mentioned something to

25          me that he wasn't a VCM expert, I --

1       you know, that was -- okay, I'll -- if

2       there's records that he said that,

3       I'll take your word for it that it's

4       on the record.

5              Yeah, that's --

6    QUESTIONS BY MR. GOMEZ:

7       Q.     Do you understand that there's

8    a difference between being an expert in VCM

9    and being an expert in the polymerization of

10   VCM that causes polyvinyl chloride?

11             MR. LEVINE:  Objection.

12             THE WITNESS:  In a world of

13      emergency response that I've worked in

14      for 35 years, no.

15             When I -- when a product

16      shipper sends a chemist to an

17      emergency scene, they're offering a

18      chemist to help with the emergency

19      scene for that problem.

20   QUESTIONS BY MR. GOMEZ:

21      Q.     And they're also offering

22   chemists back in Dallas.

23             Right?

24      A.     Sure.

25      Q.     Chemists who are special -- who

Confidential - Pursuant to Protective Order

1    are specializing in the polymerization of VCM

2    to PVC?

3            A.      Sure.

4            Q.      All right.  And Mr. Smith,

5    while on site, is not the expert in the

6    process where VCM polymerizes into PVC?

7                    MR. HANSON:  Objection.

8                    THE WITNESS:  Well, you just

9            told me that this morning, so I'll

10           take your word for it.

11   QUESTIONS BY MR. GOMEZ:

12           Q.      So throughout all the response,

13   the NTSB investigation, the panel hearings,

14   today's the first time that you've heard

15   anyone say that Mr. Smith was clear, he was

16   not an expert in VCM polymerization?

17           A.      I don't recall any vivid,

18   detailed conversation like that on-site.  No,

19   I don't.

20                   MR. GOMEZ:  We've been going

21           for a while.  Why don't we take a

22           break.

23                   MR. HANSON:  Sure.

24                   VIDEOGRAPHER:  Off the record

25           at 10:33.

Confidential - Pursuant to Protective Order

1          (Off the record at 10:33 a.m.)

2          VIDEOGRAPHER:  We are now back

3     on the record at 10:49.

4          (McCarty Exhibit 3 marked for

5     identification.)

6  QUESTIONS BY MR. GOMEZ:

7     Q.    Mr. McCarty, we marked before

8  you walked back into the room a new exhibit

9  which is in front of you, Exhibit 3.  It's my

10 Document Number 119.

11          Please take a look at that.  I

12 only have a handful of questions for you, the

13 first being if you're familiar with it.

14    A.    Yes, I am.

15    Q.    And at least according to the

16 cover sheet for this document, it's the

17 Group C, Exhibit 3 to the NTSB hearings.

18          Correct?

19    A.    Exhibit 3, yes, uh-huh.

20    Q.    Titled "Emergency Response

21 Guide (ERG) 2020 Guide 116 Vinyl Chloride."

22          Did I read that correctly?

23    A.    Yes.

24    Q.    And what appears there is in

25 fact the excerpt from the ERG 2020 for

1    Guide 116.

2              Right?

3       A.    Correct.  Guide 116.

4       Q.    Guide 116 is the guide that's

5    applicable to VCM.

6              Right?

7       A.    Correct.

8              Well, I don't see VCM on here,

9    and I don't have the book in front of me, so

10   I'm going to say the NTSB verified that

11   before they published it.

12      Q.    In all the time that you've

13   been working in HAZMAT, have you come to

14   understand that Guide 116 is the one that's

15   applicable to VCM?

16      A.    I don't memorize those things.

17   That's why I just kind of qualified.  I'm

18   going to take this as NTSB vetted this and

19   they put it in their report.

20              So for the purposes of -- I'm

21   going to say yes to this, but I don't

22   memorize the entire DOT guidebook.

23      Q.    Okay.  Thinking back to the

24   East Palestine derailment, do you recall

25   referencing this Guide 116 in connection with

1    VCM?

2         A.    We encourage -- Norfolk

3    Southern encouraged -- "we" as being the team

4    with Norfolk Southern encouraged the fire

5    chief command staff to seriously consider

6    this DOT guidebook for what they were

7    experiencing there, yes.

8         Q.    And that would have been in

9    connection with establishing an evacuation

10   zone.

11            Is that right?

12        A.    Correct.

13        Q.    Correct me if I'm wrong.  The

14   way that the DOT ERG guidebook works, there's

15   multiple chemicals that may be subject to a

16   particular guide.

17            Fair characterization?

18        A.    Correct, yes.

19        Q.    So in the case of this

20   Guide 116, I appreciate you said the NTSB

21   probably did their homework and that it

22   applies to VCM, but there may well be other

23   chemicals that also apply to Guide 16 -- or

24   to which Guide 116 applies?

25        A.    That is possible.

Confidential - Pursuant to Protective Order

1      Q.      I want to just direct your

2   attention to the title of the guide.  It

3   says, "Gases - Flammable (Unstable)."

4              Is that right?

5      A.      That is what's presented as

6   Guide 116, yes.

7      Q.      In connection with the East

8   Palestine derailment, is there any

9   significance to the application of this guide

10  which applies to Gases - Flammable

11  (Unstable), when the VCM in the railcars was

12  stabilized for transportation?

13             MR. LEVINE:  Objection.

14             THE WITNESS:  Say -- rephrase

15        your question.  Or reask your

16        question.

17  QUESTIONS BY MR. GOMEZ:

18     Q.      Sure.

19             The VCM in the railcars was

20  stabilized.

21             Right?

22     A.      At the time of shipping, yes.

23     Q.      And this Guide 116 applies to

24  unstable, flammable gases.

25             So my question is, to your

Confidential - Pursuant to Protective Order

1  mind, is there any issue with applying the

2  advice given in Guide 116 to the derailed

3  railcars in East Palestine because of that

4  distinction?

5          MR. LEVINE:  Objection.

6          THE WITNESS:  There may or may

7      not have been a different guide for

8      stabilized vinyl chloride that the

9      firemen may or may not have looked at.

10         In my mind, both guides would

11     be applicable.

12  QUESTIONS BY MR. GOMEZ:

13     Q.    Okay.  If, in fact, there is

14  not a guide for stabilized flammable gases,

15  do you see any issue with first responders or

16  emergency contractors relying on this

17  Guide 116 in connection with the East

18  Palestine derailment?

19         MR. LEVINE:  Objection.

20         THE WITNESS:  Do I see an issue

21     with responders -- well, say that

22     question again, please.  I'm sorry.

23  QUESTIONS BY MR. GOMEZ:

24     Q.    Sure.

25         If we assume -- for purposes of

Confidential - Pursuant to Protective Order

1   my question, assume that there is no guide

2   for stabilized flammable gases.

3                You with me --

4        A.      Okay.

5        Q.      -- so far?

6                If that's the case, do you see

7   any issue with using the information in this

8   Guide 116 to respond to the derailment when

9   the VCM in the derailed railcars was

10  stabilized for transportation by Oxy?

11               MR. LEVINE:  Objection.

12               THE WITNESS:  Yeah, that's a

13       pretty vague question of speculation

14       on a lot of things.  So I will share

15       with the group, I was assistant fire

16       chief in my community for over ten

17       years and, you know -- but again, take

18       career HAZMAT out of it.

19               If I happen to be the incident

20       commander, you know, every

21       firefighter's training in the -- even

22       in fundamental awareness HAZMAT

23       classes get placard numbers, UN

24       numbers and pull out this orange DOT

25       guidebook.

Confidential - Pursuant to Protective Order

```
 1                 So in the case of fire chief X
 2        or assistant chief Y at East
 3        Palestine, had they put a shipping
 4        paper and a placard number to this
 5        orange DOT guidebook, if the DOT
 6        guidebook referred them to 116, this
 7        is the guide that they're going to
 8        use.
 9   QUESTIONS BY MR. GOMEZ:
10        Q.     Okay.
11        A.     That's how the process works.
12        Q.     I get that completely.  I guess
13   let me try rephrasing the question one more
14   time.
15                 If the DOT -- if the placard
16   corresponds -- if the placard says "VCM" and
17   VCM corresponds to this Guide 116, right?
18                 And the VCM in the railcars is
19   stabilized for transport, is there any
20   problem you see with applying a section that
21   is specific to unstable, flammable gases?
22                 MR. LEVINE:  Objection.
23                 THE WITNESS:  Is there a
24        problem with applying any one -- are
25        you asking me to pick out a specific
```

Confidential - Pursuant to Protective Order

```
1        section from this guide?  I guess I'm

2        not following your question.

3   QUESTIONS BY MR. GOMEZ:

4        Q.      No, I guess -- let me just ask

5   it one more time and see if we can -- we can

6   get on the same page.

7            We've got VCM in the railcars

8   in East Palestine that's stabilized.

9            Right?

10   A.      Okay.

11   Q.      The section of the DOT

12  guidebook for VCM is what we're looking at

13  here in Exhibit 3, Guide 116.

14           Okay?

15           That section is titled "Gases -

16  Flammable (Unstable)."

17           Do you believe that the

18  information in Guide 116 applying to Gases -

19  Flammable (Unstable) still applies to VCM

20  that's stabilized for transportation in

21  railcars?

22           MR. LEVINE:  Objection.

23           THE WITNESS:  The answer is,

24       yes, I do, for the purposes of

25       emergency response consideration early
```

Confidential - Pursuant to Protective Order

1    in a derailment.

2            And again, take VCM off the

3    table.  If it was another compressed

4    gas, a flammable, compressed gas,

5    that's why there -- as you opened up

6    with the line of questioning, this

7    guide may apply to other flammable,

8    compressed gases, not just

9    unstabilized ones.

10   QUESTIONS BY MR. GOMEZ:

11       Q.     Got it.

12           I want to look at the very

13   first section of Guide 116 where the heading

14   is "Potential Hazards, Fire or Explosion."

15           Do you see that?

16       A.     Yes.

17       Q.     The fifth bullet point down

18   reads, "Those substances designated with a P

19   may polymerize explosively when heated or

20   involved in a fire."

21           Did I read that correctly?

22       A.     Yes.

23       Q.     Is this statement that I just

24   read in Guide 116 of the 2020 ERG a statement

25   that you considered in the course of

Confidential - Pursuant to Protective Order

1    responding to the East Palestine derailment?

2        A.    We know vinyl chloride to be a

3    polymerizable material.  I didn't need to

4    read it here in the DOT guidebook.

5        Q.    So it wasn't any information

6    specific to this DOT guidebook that you

7    considered in the course of evaluating

8    whether polymerization was occurring in the

9    VCM cars?

10           MR. LEVINE:  Objection.

11           THE WITNESS:  If you're -- are

12        you asking me did I look at the DOT

13        guidebook myself in this -- what are

14        you asking me?

15   QUESTIONS BY MR. GOMEZ:

16       Q.    I want to know whether or not

17   when you looked at the DOT guidebook and you

18   read the bullet point that we just discussed,

19   whether that was something you kept in mind,

20   specifically from the DOT guidebook, when

21   considering whether polymerization was

22   occurring in the VCM cars.

23           MR. LEVINE:  Objection.

24           THE WITNESS:  I personally did

25        not look at the DOT guidebook.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    Okay.

3        A.    This is -- we recommended that

4    the fire chief and the command staff look at

5    the DOT guidebook.

6        Q.    Okay.  So to your knowledge,

7    did anyone from SPSI consider the guidebook

8    in the course of responding to the

9    derailment?

10        A.    I don't know if any of my

11    employees looked at it or not.  I don't know.

12        Q.    Okay.  Did you ask any of them

13    in preparation for today?

14        A.    No.

15        Q.    Do you know whether anyone from

16    SRS considered or relied on the guidebook?

17        A.    No.  I can't speak to SRS.

18        Q.    We can put that one aside, sir.

19              Let's see.  Are you familiar,

20    Mr. McCarty, with Pamphlet 171 to the -- from

21    The Chlorine Institute?

22        A.    Yes.

23        Q.    And was Pamphlet 171 another

24    resource that was used by SPSI in the course

25    of responding to the East Palestine

Confidential - Pursuant to Protective Order

```
1    derailment?

2         A.     Yes.

3         Q.     Is SPSI a member of The

4    Chlorine Institute?

5         A.     Yes, we are.

6         Q.     And I've had a little bit of

7    explanation about this, but there's different

8    types of membership.

9               Is SPSI an associate member?

10        A.     I don't remember how they

11   categorize us in their categories, so I don't

12   want to guess at that.

13        Q.     But you have some participation

14   in workshops.

15              Right?

16        A.     Yes.

17        Q.     And you have some participation

18   in the compilation of the pamphlets that are

19   published by The Chlorine Institute.

20              Right?

21        A.     On occasion.  We get invited to

22   participate on certain subcommittees that may

23   work on a pamphlet or two on occasion.

24        Q.     And if I'm not mistaken, you

25   had personal involvement with the creation of
```

Confidential - Pursuant to Protective Order

1    Pamphlet 171 from The Chlorine Institute.

2             Right?

3             MR. LEVINE:  Objection.

4             THE WITNESS:  Not its initial

5        creation, no.

6             (McCarty Exhibit 4 marked for

7        identification.)

8    QUESTIONS BY MR. GOMEZ:

9        Q.    Okay.  Let's pull up

10   Document 112, which we'll mark as Exhibit 4

11   to the deposition.

12             And, Mr. McCarty, just for your

13   convenience, we're going to look at the 58th

14   page of that long document, which

15   unfortunately in this version doesn't have

16   page numbers, but we're going to able to pull

17   it up on the screen in front of you to kind

18   of orient you in the document.

19       A.    Okay.

20       Q.    That's it.  Excellent.

21             Mr. McCarty, the document that

22   we've marked as Exhibit 4, it appears to be a

23   presentation put together by The Chlorine

24   Institute.

25             Right?

Confidential - Pursuant to Protective Order

1    A.      Yes.

2    Q.      And specifically that 58th page

3  that I've directed your attention to, that's

4  the start of the -- of the presentation

5  entitled "VCM Workshop"?

6    A.      Yes.

7    Q.      The next page, 59, of the

8  document references a workshop that occurred

9  July 13, 2016, in Calvert City, Kentucky,

10  with Westlake as the host.

11          Do you see that?

12    A.      Yes.

13    Q.      And under HAZMAT ER

14  Contractors, you're listed as an attendee.

15          Right?

16    A.      Yes.

17    Q.      The next page references more

18  information about the VCM workshop, and

19  specifically the last bullet point notes that

20  the discussion will be used as a baseline for

21  pamphlet development.

22          Do you see that?

23    A.      Okay.

24    Q.      Having looked at this document,

25  does that refresh your recollection at all to

Confidential - Pursuant to Protective Order

1    your participation in the -- in the creation

2    of Pamphlet 171 from The Chlorine Institute?

3         A.    I had forgotten about that

4    session in Calvert City in whatever year that

5    that was.  I had forgotten all about it.

6         Q.    Fair enough.

7         A.    2016.

8         Q.    So having looked at that

9    document now, you recall that you

10   participated in the creation of Pamphlet 171.

11             Is that fair?

12        A.    No.

13        Q.    You don't?

14        A.    I participated in that session

15   as an attendee, but I was not on the

16   committee that produced the document.

17        Q.    Okay.  Do you understand from

18   this document that your discussions were used

19   as a baseline for the pamphlet development?

20             MR. HANSON:  Objection.

21             MR. LEVINE:  Objection.

22             THE WITNESS:  No, I wouldn't

23        characterize that.

24   QUESTIONS BY MR. GOMEZ:

25        Q.    So The Chlorine Institute just

Confidential - Pursuant to Protective Order

1    put that in there?

2        A.    Well, you said me personally.

3    You kind of -- you said that my

4    discussions --

5        Q.    Uh-huh.

6        A.    -- is how you phrased your

7    question.

8        Q.    Well, let me ask you this.  Did

9    you participate in discussions during this

10   workshop?

11       A.    In some capacity, perhaps.  It

12   was a long time ago.

13       Q.    Discussions about VCM?

14            MR. LEVINE:  Objection.

15            THE WITNESS:  That's what the

16       workshop was for.

17   QUESTIONS BY MR. GOMEZ:

18       Q.    And that's generally how The

19   Chlorine Institute works, right?

20            There are small groups that

21   have discussions, and then they put together

22   literature based on that, right?

23       A.    Yes.

24       Q.    No reason to believe that there

25   was any different process for the creation of

1    Pamphlet 171.

2              Right?

3              MR. LEVINE:  Objection.

4              THE WITNESS:  You'd have to ask

5         Chlorine Institute on -- I mean,

6         because this isn't the only pamphlet

7         that they produced.

8              You asked earlier, how did they

9         do it.  If this was part of it, I'll

10        take, you know, this PowerPoint as,

11        you know, some memory of that, but

12        you'd have to ask The Chlorine

13        Institute on how they prepare their

14        pamphlets.

15   QUESTIONS BY MR. GOMEZ:

16        Q.    How long have you been a member

17   of The Chlorine Institute?

18        A.    It's been a long time.  I first

19   joined them in my former employer before

20   starting SPSI.  So it's been, you know, a

21   minimum of 25 years or so or more.

22        Q.    And do you know how they go

23   about creating their pamphlets?

24        A.    As I say, I just knew it's a

25   group think.  I know it's by committee.  And

Confidential - Pursuant to Protective Order

1    how they actually put them together, you

2    know, I'm not the guy that does the typing.

3         Q.    Did you have any input into

4    reviewing the information that ultimately

5    went into Pamphlet 171 before it was

6    published?

7         A.    I didn't even remember being

8    there until this morning, so your memory here

9    just brought me rough memory to the event.

10             So I don't recall.

11             (McCarty Exhibit 5 marked for

12        identification.)

13   QUESTIONS BY MR. GOMEZ:

14        Q.    You can put that one aside,

15   sir.  We'll bring up Document Number 32,

16   which we'll mark as Exhibit 5.

17             Actually, strike that.  We're

18   not going to mark Document 32 as Exhibit 5.

19   Instead, we're going to mark Document 137 as

20   Exhibit 5.  137 as Exhibit 5.

21             Okay.  We've got it published.

22             Mr. McCarty, Exhibit 5 to your

23   deposition, that is Pamphlet 171 from The

24   Chlorine Institute.

25             Right?

Confidential - Pursuant to Protective Order

1    A.    Yes.

2    Q.    And the title of it is "Vinyl

3  Chloride Monomer (VCM) Tank Car & Cargo Tank

4  Handling Manual, Edition 1."

5        Right?

6    A.    Yes.

7    Q.    From July 2018?

8    A.    Yes.

9    Q.    Is this --

10    A.    I'm sorry, my microphone.

11        Go ahead.

12    Q.    Is this document, Exhibit 5,

13  Pamphlet 171 from The Chlorine Institute, a

14  document that SPSI considered in the course

15  of responding to the East Palestine

16  derailment?

17    A.    Yes.

18    Q.    I want to direct your attention

19  to Section 2.3, which appears on page 4.

20  It's marked in the top left-hand corner.

21        Do you see that?

22    A.    Yes.

23    Q.    Section 2.3 reads,

24  "Polymerization and Other Reaction

25  Considerations."

Confidential - Pursuant to Protective Order

1              Right?

2       A.     Yes.

3       Q.     And the second paragraph says,

4  "Exposure to the following conditions or

5  mixtures with the following elements and

6  materials can cause explosive or violent

7  polymerization of VCM."

8              Did I read that right?

9       A.     Yes.

10      Q.     And one of the conditions noted

11 is excessive heat.

12             Right?

13      A.     Yes.

14      Q.     These statements that I just

15 read in Section 2.3 of Pamphlet 171, were

16 they considered by SPSI in the course of

17 responding to the East Palestine derailment?

18      A.     Yes.

19      Q.     Pamphlet 171 does not explain

20 or define what excessive heat is.

21             Right?

22      A.     I'd have to review the whole

23 pamphlet, but I don't believe it does.

24      Q.     What did you, in the course of

25 the East Palestine derailment, take excessive

Confidential - Pursuant to Protective Order

1    heat to mean in this document?

2         A.    You know, I'm going to -- I'm

3    going to go back to your previous question.

4              I can't remember if it was this

5    document or another document that talked

6    about if any temperatures are above ambient,

7    it was an indicator.  I read that somewhere

8    in one of the documents.  I can't remember if

9    it was this one or not.

10             But there was clearly some

11   guidance document that I read that weekend

12   that said anything above ambient could be a

13   sign of polymerization.

14        Q.    Okay.

15        A.    I don't remember if it was this

16   document or another document.

17        Q.    So whether it's this document

18   or another, you have a recollection of a

19   document talking about if the temperature is

20   above ambient, that that could be a sign of

21   polymerization.

22             Is that fair?

23        A.    Yes, fair.

24        Q.    But in terms of this

25   Section 2.3, there's no clear definition of

Confidential - Pursuant to Protective Order

1    excessive heat.

2              We can agree on that, right?

3              MR. LEVINE:  Objection.

4              THE WITNESS:  I'm going to have

5        to read the section here.

6    QUESTIONS BY MR. GOMEZ:

7        Q.    And I'm just referring to 2.3.

8    Feel free to read through it.

9        A.    No, that section does, you

10   know, in a couple of paragraphs on page 5,

11   reference some potential scenarios from

12   59 degrees Fahrenheit to 406.4 degrees

13   Fahrenheit.

14             And then further heating above

15   676.4 Fahrenheit can start causing peroxides

16   to decompose, which we were seeing in the

17   fires.  There was a lot of fire and a lot of

18   free radical -- fire itself is a free radical

19   production, right?  It's -- there's a lot of

20   stuff going on there.

21       Q.    So in connection with the

22   reference to excessive heat in 2.3, this

23   Pamphlet 171, on page 5, does talk about

24   certain heat ranges.

25             Right?

Confidential - Pursuant to Protective Order

```
 1          A.      In 2.3, if you read on to the

 2   page 5, it does reference, "In particular, at

 3   59 degrees Fahrenheit to 406 degrees

 4   Fahrenheit, UV can initiate a reaction

 5   between VCM and excessive oxygen and produce

 6   peroxides.  It's also commonly referred to as

 7   polyperoxides, polyvinyl peroxides," yada

 8   yada yada.

 9                  So then further heating, which

10   in this case in East Palestine there was

11   tremendous heat, tremendous fire, we would

12   have had temperatures well above 676 for

13   several hours in those fires.

14          Q.      So let me take just a quick

15   step back.

16                  These two heat ranges that you

17   just referenced, were those -- was that

18   information from this Pamphlet 171 that SPSI

19   considered in the course of the -- responding

20   to the derailment?

21          A.      Not very specifically to

22   reference these paragraphs in specific, no.

23   It's back to the general training we had all

24   these years about the fire.

25          Q.      Got it.
```

1          Looking at that second

2   reference to a specific heat range, "Further

3   heating to 676.4 degrees Fahrenheit,

4   358 degrees Celsius, causes peroxides to

5   decompose to formaldehyde, carbon monoxide

6   and hydrogen chloride.  Peroxides may also

7   cause uncontrollable polymerization reactions

8   at high concentration or temperatures."

9          Did you understand that section

10  to refer to the temperature of the fires or

11  the temperature of the VCM product?

12      A.     Temperatures of the fires at

13  the pressure relief devices and the service

14  equipment that were inherently at the

15  interface of the vapor phase of that product

16  in the car.  Peroxides can be generated in

17  those interface areas.

18          And the answer to your question

19  is, all the above.

20      Q.     "All the above" meaning what?

21      A.     Fires are generating that heat.

22      Q.     Uh-huh.

23      A.     The process of the fires had a

24  potential to generate these chemical

25  reactions.  With the presence of these

Confidential - Pursuant to Protective Order

1    peroxides, even in small amounts around the

2    service equipment, can be a factor in

3    triggering polymerization.

4              Everything that the producers

5    have taught us about safe handling of vinyl

6    chloride?  I've had a producer representative

7    on-site concerned about 3 ounces of water

8    that came out of a pristine stainless steel

9    hose that had just been hydro-tested and was

10   concerned that three drops of water that

11   wouldn't even have wet the bottom of a shot

12   glass be enough to trigger polymerization.

13             So any and all of that stuff

14   just further adds to our emergency response

15   experiences.  It's just risk that we have of

16   potential for polymerization formation at

17   that interface.

18        Q.   So I just want to go back to

19   the heat ranges specifically that are

20   referenced here.

21             If I understood your testimony

22   just now correctly, the guidance provided in

23   this Section 2.3 of Pamphlet 171 is if

24   that -- is if the fires are themselves

25   heating to 676.4 degrees Fahrenheit, that

Confidential - Pursuant to Protective Order

1    alone is a cause for concern of

2    polymerization.

3                    Right?

4         A.      In the event when the fire is

5    burning the vinyl chloride from its service

6    equipment and vinyl chloride is involved in

7    fire, yes.

8         Q.      Okay.  Can you explain to me

9    what you mean by that?

10        A.      I just did in the previous

11   answer --

12        Q.      Okay.

13        A.      -- so it's on the record.

14        Q.      Okay.  Help me understand.

15   What is the difference in your mind between

16   the fires being -- or the fires burning at

17   776.4 {sic} degrees Fahrenheit and the

18   temperature of the VCM in the railcars as it

19   relates to this Section 2.3?

20                    MR. HANSON:  Objection.

21                    THE WITNESS:  We had no good,

22         accurate way to gauge temperatures of

23         the product in the cars because we

24         never had a safe access to most of

25         those cars.

Confidential - Pursuant to Protective Order

1              The formation of peroxides that

2         this is referring to, and of these --

3         these other reactions could trigger

4         polymerization throughout the car?  We

5         had a firm belief and a risk

6         assessment that it was possible and

7         probable that everywhere where the gas

8         gets in things with the service

9         equipment, seals on the pressure

10        relief devices, when they got

11        compromised and were burning in the

12        process of fire, pulling oxygen out of

13        the atmosphere to make fire in the

14        fire triangle, at those interface

15        areas, this could be happening.

16   QUESTIONS BY MR. GOMEZ:

17        Q.    This could be happening.  That

18   the product could be heating to 776 {sic}

19   degrees or the heat at that range was enough

20   to lead to these conditions?

21             MR. LEVINE:  Objection.

22             THE WITNESS:  I want to listen

23        to your question again.  I'm sorry.

24        The -- your question was?

25

1    QUESTIONS BY MR. GOMEZ:

2        Q.     Let me read it back.

3              So is it your understanding,

4    using the temperature range here referenced

5    in Pamphlet 171, that if the fires were

6    reaching the temperatures referenced here,

7    676.4 degrees Fahrenheit specifically, all of

8    these other interactions could occur, leading

9    to polymerization within the VCM railcar?

10       A.     All it would take would be one

11   of these, not necessarily all.

12             And your question about the

13   temperatures as related to and speculation on

14   what's in the car, I can't speculate what the

15   temperatures were in the car after a

16   tremendous pool fire for a sustained amount

17   of time.

18             What I know of tank cars, and I

19   know them pretty well, the flame impingement

20   thermal protection offered to tank car safety

21   is to protect emergency responders in that

22   first 100 or so minutes of a response.

23       Q.     Okay.

24       A.     All bets are off for how long

25   thermal protection holds out heat after that.

1          Hot-temperature fires, a lot

2     hotter than 676 degrees Fahrenheit, a lot

3     hotter than that, burned for a very long

4     period of time underneath those cars.

5          How that radiant heat

6     penetrated the cars?  There was no good way

7     to measure that.

8          Q.     So you take this sentence we've

9     been referring to on page 5 of Pamphlet 171

10    to be, and I want to be absolutely clear, a

11    reference to the temperature of the fire the

12    VCM cars were exposed to, not the temperature

13    of the VCM product itself?

14          MR. LEVINE:  Objection.

15          THE WITNESS:  I'm not saying

16      that, no.  That's not what I'm saying.

17    QUESTIONS BY MR. GOMEZ:

18          Q.     Well, you keep referencing

19    fires that are burning hotter than this.  So

20    how do I -- let me --

21          A.     I'm simply trying to answer

22    your question.

23          Q.     Let me ask the question this

24    way.

25          Reading that paragraph that

Confidential - Pursuant to Protective Order

1    we've just been discussing, right, further

2    heating to 676.4 degrees Fahrenheit, 358

3    Celsius, do you interpret that as referring

4    to the temperature of the fire or the

5    temperature of the VCM product?

6         A.      In emergency response, the risk

7    assessment in pool fires and compressed gas

8    tank cars, the temperature of the fire, flame

9    impinging on -- just like I say, neutral to

10   VCM for a minute.  Any compressed gas tank

11   car.  That is a tremendously hot fire burning

12   for a long period of time, heating up the

13   contents in that package.  There was no good

14   way to measure that.

15              This reference document

16   suggests that if we have heat greater than

17   that, it can decompose and have these other

18   risks.

19        Q.      Heat greater to that in what?

20   The fire or the product itself?

21        A.      The product itself had the

22   potential to heat up more than that in a

23   sustained pool fire.

24        Q.      Okay.  So this is referring to

25   the temperature of the product, not the

Confidential - Pursuant to Protective Order

1    temperature of the fires?

2          A.      That's what the document is

3    referring to, the temperature of the product.

4                 My point is, there was no way

5    to measure that.

6          Q.      So you don't take exception to

7    the heat range that's referenced here.  The

8    issue instead was whether or not you were

9    able to get accurate readings of the

10   temperature of the product in the derailed

11   VCM cars?

12                MR. LEVINE:  Objection.

13                THE WITNESS:  Yeah, rephrase

14        your question.

15   QUESTIONS BY MR. GOMEZ:

16         Q.      Yeah.

17         A.      I'm not sure I followed your

18   question.

19         Q.      So it's not that the section

20   we're reading here on page 5 of Pamphlet 171

21   isn't accurate or good information.  The

22   issue is that in East Palestine, you couldn't

23   get reliable readings of what the temperature

24   of the product -- the VCM product was?

25                MR. LEVINE:  Objection.

1          MR. HANSON:  Objection.

2          Answer, if you can.

3          THE WITNESS:  I mean, that's --

4     we could never get correct readings.

5          In emergency response, you have

6     containers like this of flammable,

7     compressed gases in a pool fire?  It's

8     an inherent risk.  It's truly that

9     simple.  It's an inherent risk.

10   QUESTIONS BY MR. GOMEZ:

11        Q.    Let's go to the next page, 2.6,

12   Temperature Considerations.

13        Do you see that?

14        A.    I'm sorry, which section?

15        Q.    Sure.  Page 6, 2.6, Temperature

16   Considerations, right at the top.

17        A.    Okay.

18        Q.    You with me on that section?

19        A.    2.6, yes, sir.

20        Q.    Yep.

21        First sentence says, "In

22   typical VCM plant operations, VCM process

23   temperatures range between ambient

24   temperature 68 degrees Fahrenheit and

25   300 degrees Fahrenheit while contained under

Confidential - Pursuant to Protective Order

1    pressure."

2            Did I read that correctly?

3        A.    Yes.

4        Q.    Is the temperature at which VCM

5    is processed while under pressure, referenced

6    here on page 6 of Pamphlet 171, a piece of

7    information that you considered in the course

8    of responding to the East Palestine

9    derailment?

10       A.    Well, the entire pamphlet was

11   reviewed, so I'll say yes.

12       Q.    So you can say, yes, 2.6, the

13   information we just read is data that you

14   considered when responding to the East

15   Palestine derailment?

16       A.    Yes.

17       Q.    Okay.  Let's keep going in the

18   document, if you will, to -- let's see.  It's

19   page 49.

20            MR. HANSON:  The page numbers

21       are on the top left.

22            MR. GOMEZ:  They alternate

23       between the left and the right side of

24       the page.

25            MR. HANSON:  Oh, sorry.

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. GOMEZ:

2         Q.    Do you see that?

3         A.    Yes.

4         Q.    Page 49, it's Appendix C -

5    Vapor Pressure for Vinyl Chloride.

6               Right?

7         A.    Yes.

8         Q.    And this Appendix C, as part of

9    Pamphlet 171, if it was considered in its

10   entirety, would have been -- would have been

11   included in the information that SPSI used in

12   responding to the East Palestine derailment.

13              Right?

14        A.    Yes.

15        Q.    Looking at this vapor pressure

16   curve for vinyl chloride, you'd agree with me

17   that generally as temperature increases, so

18   too does pressure.

19              Right?

20        A.    Yes.

21        Q.    And the converse is accurate,

22   right?

23              As temperature decreases,

24   pressure decreases, right?

25        A.    In most compressed gases,
```

Confidential - Pursuant to Protective Order

1   that's an accurate statement.

2        Q.     In most compressed gases.

3               Which compressed gases is that

4   not an accurate statement?

5        A.     Things that are polymerizable

6   and could be polymerizing in the package

7   after you reduce -- after you reduce

8   temperature and you still have an increase in

9   pressure, that's another classic sign we've

10  been trained in, and polymerization can be

11  occurring.

12       Q.     Where specifically did you

13  receive that training?

14       A.     From producers.  Through The

15  Chlorine Institute.  That's a -- all the

16  above, for 35 years of running.

17       Q.     So it's your testimony that

18  training you've received from producers over

19  the course of your career indicates that if a

20  material is undergoing polymerization, there

21  can be a temperature decrease without a

22  corresponding pressure decrease?

23       A.     In the sense of a lot of

24  materials can polymerize from the outside in,

25  that's correct.

Confidential - Pursuant to Protective Order

1          And in the perspective of back

2  to not being able to get intrusive

3  thermometers in through thermometer wells, we

4  could not get a good reading of internal

5  liquid temperatures.

6          The only car that we could get

7  a point-and-shoot-thermometer on was that

8  western car.

9      Q.    Western car would have been --

10     A.    I don't remember the car

11  number.

12     Q.    Well, we'll talk about those

13  shortly.

14          But I just want to make sure

15  that I understand exactly where you're

16  getting this pressure and temperature

17  relationship from in connection with

18  polymerization.

19          So this would have come

20  directly from training provided to you by

21  producers.

22          Fair?

23     A.    Yes.

24     Q.    Do you recall which producers?

25     A.    It's a long -- from Dow

Confidential - Pursuant to Protective Order

1  Chemical to Rohm and Haas to The Chlorine

2  Institute member companies.  It's a -- it's a

3  wide variety.

4        Q.     Do you -- do you recall the

5  names of anyone specifically that gave you

6  training on this concept or this principle?

7        A.     David Ghormley, Rohm and Haas.

8  Barry Lindley, DuPont.

9               Those two come to mind.

10       Q.     And that training that you

11 received from these individuals -- I won't

12 read their names again -- was that specific

13 to polymerizing VCM?

14       A.     No, just monomers in general.

15       Q.     Just referring back to the

16 vapor pressure curve for vinyl chloride that

17 we see here in Appendix C, there's a

18 reference to PRDs start to discharge setting

19 to 47.5 PSI.

20               Do you see that?

21       A.     Yes.

22       Q.     And according to this chart,

23 that would correspond with a temperature of

24 roughly 180 to 190 degrees.

25               Is that fair?

Confidential - Pursuant to Protective Order

1    A.    Yeah, just above 180, it looks

2    like, yes.

3        Q.    So according to this chart,

4    when a PRD set to 247.5 PSI start to

5    discharge, is activating, the minimum

6    temperature within the vessel is 180 to

7    190 degrees.

8            Right?

9        A.    That can generally track within

10   a margin of error, yes, that's correct.

11       Q.    How big is that margin of

12   error, in your experience?

13       A.    It's different for a lot of

14   different conditions.  I can't -- it's -- you

15   can't have an absolute on that.

16       Q.    What are some of the conditions

17   that dictate how that changes?

18       A.    Fire.

19       Q.    Fire causes heat.

20            Right?

21       A.    Yes.

22       Q.    Heat increases temperature.

23            Right?

24       A.    Yes.

25       Q.    And there's a relationship

1    between temperature and pressure.

2         A.    Yes.

3         Q.    Right?

4               In fact, there's a law of

5    chemistry that speaks to this.  It's called

6    Boyle's law.

7               Are you familiar with that?

8         A.    Yes.

9         Q.    Okay.  So what are the

10   conditions that would alter Boyle's law that

11   there's a relationship between temperature

12   and pressure increase?

13              MR. LEVINE:  Objection.

14              THE WITNESS:  It's

15        chemistry-specific.  And to further

16        help you under -- I mean, we put

17        pressure gauges on cars on an

18        80-degree Fahrenheit day.  If you look

19        at a chart like this, at 80 degrees

20        Fahrenheit, the pressure gauge should

21        say this, and it might be 10 PSI off.

22   QUESTIONS BY MR. GOMEZ:

23        Q.    Okay.  So that's the margin of

24   error that we're talking about?

25        A.    In one particular random

Confidential - Pursuant to Protective Order

1    example.

2         Q.     Okay.  Tell me the other

3    conditions that can affect --

4         A.     The chemistry of every product

5    is slightly different.

6         Q.     That's why you have different

7    pressure curves for different products.

8         A.     That's correct.

9         Q.     Right?

10              So what conditions, other than

11   different chemicals and fire, can alter what

12   Boyle's law predicts here for VCM?

13              MR. HANSON:  Objection.

14              THE WITNESS:  Like I said, I'm

15        not a chemist.  I'm not going to

16        speculate on my guesses.  I'm not

17        going to guess.

18   QUESTIONS BY MR. GOMEZ:

19        Q.     But you're using the existence

20   of those conditions to judge whether or

21   not -- or how the product is behaving within

22   the vessel.

23              Aren't you?

24        A.     It's one element in a complex

25   recipe.

Confidential - Pursuant to Protective Order

1        Q.    Okay.  And for that element, if

2    you don't understand the chemistry, you don't

3    understand how the element's actually

4    reacting or causing a reaction within the

5    vessel?

6              MR. HANSON:  Objection.

7              THE WITNESS:  Yeah, as I say,

8         I'm not going to agree with that

9         question because it's leading.

10             But what -- can you restate the

11        question?

12    QUESTIONS BY MR. GOMEZ:

13        Q.    Yeah.

14             If you don't understand the

15    chemistry about how certain conditions affect

16    the reactivity or the behavior of a chemical,

17    then how can you use those conditions to

18    dictate your conclusions about how the

19    chemical is behaving within the vessel?

20             MR. HANSON:  Objection.

21             MR. LEVINE:  Objection.

22             THE WITNESS:  You're pretty

23        much accusing me of not knowing the

24        behaviors of vinyl chloride in a flame

25        impingement condition vessel.

Confidential - Pursuant to Protective Order

```
 1    QUESTIONS BY MR. GOMEZ:
 2         Q.    Well, you told me that you
 3    don't know the chemistry of VCM.
 4         A.    No, I told you I understand the
 5    chemical characteristics of VCM from a risk
 6    management perspective and emergency
 7    response.
 8         Q.    Okay.  Explain to me the
 9    polymerization chemistry of VCM.
10         A.    I'm not a chemist.
11         Q.    Explain to me the
12    polymerization chemistry of VCM.
13              MR. HANSON:  Objection.
14              THE WITNESS:  I am not a
15         chemist.
16    QUESTIONS BY MR. GOMEZ:
17         Q.    So you're not able to describe
18    to me the polymerization chemistry of VCM.
19              Right?
20         A.    I'm not a chemist.
21         Q.    Is the answer yes or no, can
22    you explain to me the chemistry behind the
23    polymerization of VCM?
24         A.    Not in detail.
25         Q.    Okay.  So you can't tell me how
```

1   different conditions affect the chemistry

2   behind the polymerization of VCM.

3                Right?

4                MR. LEVINE:  Objection.

5                MR. HANSON:  Objection.

6                THE WITNESS:  Wrong.

7   QUESTIONS BY MR. GOMEZ:

8        Q.    All right.  On what training?

9        A.    35 years of emergency response

10  experience, a host of training from a host of

11  a lot of good people in the chemical

12  industry.

13       Q.    Okay.  That has nothing to do

14  with the polymerization chemistry of VCM.

15               Right?

16               MR. LEVINE:  Objection.

17               THE WITNESS:  It has a lot to

18       do with the emergency response

19       conditions in a flame-impinged tank

20       car with polymerizable, flammable,

21       compressed gas.

22  QUESTIONS BY MR. GOMEZ:

23       Q.    So you're an expert in

24  emergency response with respect to

25  flame-impinged tank cars and VCM, but you're

Confidential – Pursuant to Protective Order

```
 1   not a chemical expert on what the reactivity

 2   of VCM is.

 3             Right?

 4             MR. LEVINE:  Objection.

 5             THE WITNESS:  I'm not a

 6        chemist.

 7   QUESTIONS BY MR. GOMEZ:

 8        Q.    Okay.  And a chemist is

 9   required to understand how different

10   conditions impact the reactivity and

11   polymerization of VCM.

12             Do you agree with that?

13             MR. LEVINE:  Objection.

14             THE WITNESS:  A chemist should

15        understand the polymerization process

16        if that chemist is producing polymers

17        with that chemical.

18   QUESTIONS BY MR. GOMEZ:

19        Q.    And do you, as an emergency

20   response professional, understand the

21   polymerization chemistry of VCM?

22        A.    I'm not a chemist.

23             MR. LEVINE:  Objection.

24   QUESTIONS BY MR. GOMEZ:

25        Q.    So the answer is no?
```

Confidential - Pursuant to Protective Order

```
 1        A.     No, that answer is not no.

 2        Q.     Okay.  Why can't you answer

 3   that question yes or no?  What is it about

 4   the question that prevents you from answering

 5   it yes or no?

 6             MR. LEVINE:  Objection.

 7             THE WITNESS:  Because I'm not a

 8        chemist.

 9   QUESTIONS BY MR. GOMEZ:

10        Q.     And you would have to be a

11   chemist to understand the polymerization

12   chemistry of VCM.

13             Do you agree with that?

14             MR. LEVINE:  Objection.

15             THE WITNESS:  In detail -- this

16        is what you're fishing for.  In

17        detail, I'm not a chemist.

18   QUESTIONS BY MR. GOMEZ:

19        Q.     And because you're not a

20   chemist, you don't understand how different

21   conditions impact the polymerization

22   chemistry of VCM.

23             Right?

24             MR. LEVINE:  Objection.

25             MR. HANSON:  Objection.
```

Confidential - Pursuant to Protective Order

```
 1                    THE WITNESS:  I understand

 2          heat, possible formations of

 3          peroxides, contaminants.  Everything

 4          that all these data are telling us

 5          that were risks to us is what we went

 6          on.

 7   QUESTIONS BY MR. GOMEZ:

 8          Q.    So you understand that these

 9   factors could contribute to polymerization,

10   but you don't know how they contribute to

11   polymerization?

12                    MR. LEVINE:  Objection.

13                    THE WITNESS:  We understand

14          from an emergency response experience

15          basis that any number of these factors

16          present a risk to us and the community

17          of East Palestine.

18   QUESTIONS BY MR. GOMEZ:

19          Q.    But you don't know how they

20   present a risk?

21                    MR. LEVINE:  Objection.

22                    MR. HANSON:  Objection.

23                    THE WITNESS:  They can trigger

24          polymerization.

25
```

Confidential - Pursuant to Protective Order

```
1    QUESTIONS BY MR. GOMEZ:
2         Q.    Because that's a conclusion
3    that has been shared with you.
4              But you don't understand how
5    they can trigger polymerization?
6         A.    I am not a chemist.
7         Q.    And that's why you don't know
8    how they cause polymerization.
9              Right?
10             MR. HANSON:  Objection.
11             MR. LEVINE:  Objection.
12             THE WITNESS:  You're asking me
13        to say right and yes and agree with
14        you, and I'm just telling you, I'm not
15        a chemist.  And I don't need to
16        understand every little molecular
17        nuance of a reaction.
18   QUESTIONS BY MR. GOMEZ:
19        Q.    So it's your testimony that you
20   don't need to know how chemicals react in
21   order to deal with them in a hazardous
22   situation?
23             MR. HANSON:  Objection.
24             THE WITNESS:  I did not say
25        that.  No, that's not my statement.
```

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2        Q.    Is it your statement that you

3    have enough chemical training to understand

4    the reactivity of different chemicals in

5    hazardous material situations?

6        A.    Rephrase your question, please.

7        Q.    Is it your testimony that you

8    have enough chemical training to understand

9    the reactivity of chemicals in various

10   hazardous situations?

11       A.    That's a broad-brush question

12   covering a whole lot of chemicals.  I'm not

13   an expert in all chemicals all across the

14   world, no.  Not in all chemicals across the

15   world, as you phrased the question.

16       Q.    Okay.  How about VCM?

17       A.    I'm pretty well-versed in VCM.

18   I have a pretty good amount of VCM

19   experience.

20       Q.    Yeah.

21             You've never responded to a

22   situation where VCM was actually polymerizing

23   before East Palestine, though.

24             Right?

25       A.    No, I didn't.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  So it's all based off of

2    your training.

3            Right?

4    A.    Training and other responses.

5    Q.    Training which doesn't include

6    reactivity chemistry.

7            Right?

8            MR. LEVINE:  Objection.

9            THE WITNESS:  No, training that

10            does include reactivity training.

11    QUESTIONS BY MR. GOMEZ:

12    Q.    Okay.  Who gave you chemistry

13    reactivity training?

14    A.    As I say, various producers.  I

15    mentioned one.  You asked about SERTC.

16    Previous to that was TTCI.

17            Reactivity is covered in those

18    kind of programs.

19    Q.    Okay.  And they explained to

20    you the chemistry behind it.

21            Right?

22    A.    Fundamental basic side of it.

23    Q.    They explained to you how

24    various conditions alter or affect

25    polymerization of VCM?

Confidential - Pursuant to Protective Order

1    A.    Those trainings produced

2 conditions in which polymerization is

3 possible, not in the details in which it

4 happens.

5    Q.    Those trainings produced

6 conditions in which polymerization is

7 possible?  I don't understand that.

8              MR. LEVINE:  Objection.

9              THE WITNESS:  The trainings

10       presented conditions in which

11       polymerization was possible.

12 QUESTIONS BY MR. GOMEZ:

13    Q.    And not explanations about how

14 it actually makes polymerization possible.

15              Fair?

16    A.    Those are emergency response

17 training sessions, and they're geared towards

18 the non-chemist emergency responders, so --

19    Q.    They're not geared towards

20 explaining to you how the reactions occur --

21    A.    Molecular chemistry, correct.

22    Q.    -- right?

23              If you needed to understand how

24 different conditions affect how

25 polymerization occurs, you'd need to consult

Confidential - Pursuant to Protective Order

1    with a chemist.

2                    Right?

3                    MR. LEVINE:  Objection.

4                    MR. HANSON:  Objection.

5                    THE WITNESS:  If those micro

6          details were necessary, yes.

7    QUESTIONS BY MR. GOMEZ:

8          Q.    But you don't have enough

9    training to know whether those micro details

10   actually matter.

11                   MR. HANSON:  Objection.

12                   MR. LEVINE:  Objection.

13                   THE WITNESS:  In emergency

14         response, it's a complex recipe of a

15         lot of factors, including the most --

16         just -- sometimes you get into the

17         weeds with those micro details, and

18         sometimes it's not necessary.

19   QUESTIONS BY MR. GOMEZ:

20         Q.    You ever hear of the phrase

21   "the devil's in the details"?

22                   MR. LEVINE:  Objection.

23                   MR. HANSON:  Objection.

24                   THE WITNESS:  I have heard that

25         phrase.

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2         Q.     Yeah.  What does it mean?

3         A.     I honestly don't know.

4         Q.     You don't know what the devil's

5    in the details means?

6         A.     I've heard it, but I can't

7    explain how it would be interpreted.  I don't

8    know.

9         Q.     You don't take it to mean that

10   the smallest detail can mean the biggest

11   difference?

12              MR. HANSON:  Objection.

13              THE WITNESS:  I never thought

14        about it.

15   QUESTIONS BY MR GOMEZ:

16        Q.     So you don't think that what

17   happened in East Palestine required a mastery

18   of the details in order to respond to the

19   incident?

20              MR. HANSON:  Objection.

21              THE WITNESS:  Yeah, that's a

22        pretty, pretty loaded question.

23              There was a team effort from a

24        lot of people at East Palestine.

25              There was plenty of opportunity for a

1       lot of people to have insight.

2  QUESTIONS BY MR. GOMEZ:

3       Q.     Including insight from the

4  people who were experts on the polymerization

5  chemistry of VCM.

6              Right?

7       A.     That's correct.

8       Q.     And who told you it wasn't

9  polymerizing.

10             Right?

11      A.     There was one person in Dallas

12  that just didn't think it was polymerizing.

13  Didn't think it was polymerizing.

14      Q.     It wasn't one person, right?

15  It was a whole team in Dallas?

16      A.     Well, it was one particular

17  person that the team was leaning on on that

18  phone call.

19      Q.     Okay.  So because one person

20  spoke and said it, you took it to mean that

21  it was only one person's opinion?

22      A.     I don't -- I can't speak to

23  Occidental's group think.  I just can speak

24  to the people that was in East Palestine with

25  us that were surprised to hear that position

1    from Dallas.

2         Q.     So you can't speak to the

3    people who were on the phone in Dallas?

4         A.     I don't -- I can't.  I can't

5    speak to, you know -- they believe their

6    stabilized vinyl chloride wasn't going to

7    polymerize because they put nitrogen in it.

8         Q.     That was the reason they told

9    you, was because it was stabilized with

10   nitrogen; therefore, polymerization could not

11   happen?

12        A.     That's exactly my understanding

13   from that phone call, yes.

14        Q.     They didn't tell you that it

15   couldn't polymerize because heat alone

16   doesn't polymerize VCM?

17        A.     No.  I don't remember those

18   details from that conversation, no.

19        Q.     Those are important details to

20   understanding whether their advice was valid.

21             Right?

22             MR. HANSON:  Objection.

23             MR. LEVINE:  Objection.

24             THE WITNESS:  I would say I

25        didn't -- they didn't emphasize it

Confidential - Pursuant to Protective Order

```
 1        enough for me to have a takeaway on

 2        it.

 3   QUESTIONS BY MR. GOMEZ:

 4        Q.      Okay.  Did you consult with any

 5   product experts, experts in VCM, in the

 6   course of responding to the East Palestine

 7   derailment besides anyone from Oxy in the

 8   field or in Dallas?

 9        A.      Just Oxy.

10        Q.      So there was no other product

11   manufacturer that you consulted with?

12        A.      No.

13        Q.      Do you know if anyone within

14   SPSI, other than yourself, consulted with

15   another product manufacturer?

16        A.      No.

17        Q.      Do you know whether anybody

18   working with you on the SRS team consulted

19   with product manufacturers other than Oxy?

20        A.      I understand Chip Day reached

21   out to a contact he had at Westlake.

22        Q.      And what is your understanding

23   of what information, if any, was provided to

24   Chip Day from that contact?

25        A.      The general, just confirming
```

1    our risk.

2        Q.     What risk is that?

3        A.     That these cars could likely be

4    polymerizing.

5        Q.     And did you at any point relay

6    the information you received from that

7    contact to the folks in Dallas that were

8    representing Oxy?

9        A.     I did not.  I didn't have that

10   conversation.  That would be a question for

11   Chip Day.

12       Q.     Do you think it's important or

13   would have been important for Oxy in Dallas

14   to hear that other product manufacturers were

15   reaching different conclusions about

16   polymerization?

17             MR. LEVINE:  Objection.

18             THE WITNESS:  We had Occidental

19        on the ground with us at East

20        Palestine that had conflicting

21        thoughts from the people in Dallas

22        that were 2,000 miles away.

23             With conflicting information,

24        unlike any other -- you look at a

25        NIOSH guidebook for a recommendation

1    on respiratory protection on any given

2    chemical.  OSHA says one thing, NIOSH

3    says another, we go with the more

4    conservative.

5         So when we have conflicting

6    information and a ton of risk

7    presenting to us, it's all one big

8    factored-in equation.  That's the real

9    answer.

10  QUESTIONS BY MR. GOMEZ:

11       Q.    So did you understand the Oxy

12  folks that were on the ground to be separate

13  from the folks in Dallas as far as providing

14  advice?

15            MR. LEVINE:  Objection.

16            THE WITNESS:  They're

17    representing Occidental.

18  QUESTIONS BY MR. GOMEZ:

19       Q.    Yeah.  I guess let me ask it --

20  let me ask the question a little bit

21  differently.

22            What made you choose to put

23  more stock in what you were hearing from the

24  folks that were on the ground from Oxy as

25  opposed to people you were talking to in

1    Dallas from Oxy?

2              MR. LEVINE:  Objection.

3              THE WITNESS:  I'd say when we

4         have a conflict -- when there's a

5         conflict, and I've got someone that

6         I've trained with for years and

7         they're a strike team leader -- this

8         is a gentleman that they've empowered

9         as a corporation to run their Oxy

10        strike team.  With their products.

11        He's, in my mind, a subject matter

12        expert on emergency response to his

13        products.  He clearly communicated the

14        same concern we all had.

15             That's a conflict.  And when

16        you have conflict of information, I'm

17        not willing to put the City of East

18        Palestine in jeopardy of conflicting

19        information.

20   QUESTIONS BY MR. GOMEZ:

21        Q.    You're referring specifically

22   to Justin Cox.

23        A.    Yes.

24        Q.    Right?

25              So Justin Cox had a -- if I'm

Confidential - Pursuant to Protective Order

1    understanding you correctly, had a

2    conflicting opinion with the folks in Dallas.

3              Is that correct?

4         A.    Yes.

5         Q.    And was that about --

6    specifically about whether polymerization was

7    occurring in the cars?

8         A.    Yes.

9         Q.    Did he ever tell you that you

10   shouldn't rely on the opinions from the folks

11   in Dallas and instead take his opinion?

12             MR. HANSON:  Objection.

13             THE WITNESS:  No, he never used

14        those words, no.

15   QUESTIONS BY MR. GOMEZ:

16        Q.    Okay.  Did you ask him, Justin,

17   what do I do?  You're telling me one thing;

18   the guys in Dallas are telling me another?

19        A.    No.

20        Q.    Why not?

21        A.    The conversation we had was

22   brief.  We were in a rental car, SRS rental

23   car, with that call.  And transitioned from

24   that call, went to our ops trailer, and there

25   was the three Oxy guys in our response

```
 1   trailer, and they asked us how that phone
 2   call went.
 3                We told them that, well,
 4   there's somebody in Dallas that doesn't
 5   believe you're polymerizing because you
 6   stabilize it with nitrogen, which we've seen
 7   leaving the car since Friday night in the PRD
 8   releases.
 9                And his reaction was just in
10   disbelief that somebody actually said that.
11        Q.     So his reaction, you're
12   referring to Justin Cox.
13                Right?
14        A.     Yes.
15        Q.     So Justin Cox wasn't even on
16   the phone call --
17        A.     No.
18        Q.     -- with the folks in Dallas --
19        A.     No.
20        Q.     -- who he supposedly disagreed
21   with?
22        A.     Correct.  None of those guys
23   were on that call.
24        Q.     Did you ask Justin to confer
25   with his colleagues back in Dallas to see
```

Confidential - Pursuant to Protective Order

1   whether they could get on the same page about

2   whether polymerization was occurring?

3        A.    No, we did not ask him that.

4        Q.    Why not?

5        A.    That call was done.  This

6   communication happened.  It's two separate

7   communications.  It causes conflict.

8        Q.    If the product manufacturer has

9   got two teams that are giving you conflicting

10  advice about the most critical issue facing

11  these VCM tank cars, wouldn't it occur to you

12  to try and get some clarity on what the

13  company's official position is?

14            MR. HANSON:  Objection.

15            MR. LEVINE:  Objection.

16            THE WITNESS:  No.  In emergency

17        response, you know, you take all of

18        the information, all of the combined

19        information.

20  QUESTIONS BY MR. GOMEZ:

21       Q.    Oxy is a customer of SPSI.

22             Isn't it?

23       A.    Yes, it is.

24       Q.    You have a direct line to Oxy.

25             Right?

```
 1        A.       Yes, I do.

 2        Q.       Did you ever pick up the phone

 3   and call those folks?

 4        A.       I was texted by their corporate

 5   guy, who must have got a ChemCheck

 6   notification, and I think that conversation

 7   started -- I can't even remember now --

 8   Saturday at some point, I believe.

 9        Q.       Okay.  And using that direct

10   line, did you ever pick up the phone and say,

11   I'm getting two different sets of information

12   from your teams; tell me which one is

13   accurate?

14        A.       When Oxy presented that

15   information, it would have been, I believe,

16   Sunday morning.  And we asked Oxy on that

17   phone call, okay, if you don't believe it's

18   polymerizing, what should we do.  We asked

19   them, okay, in lieu -- let's assume you're

20   right.  We asked Oxy, let's assume you're

21   right and it's not polymerizing, what can we

22   do?

23              And this is the sound you heard

24   for minutes.  Not a word.  There was no

25   ideas.  That's on the record.
```

Confidential - Pursuant to Protective Order

1    Q.     No ideas about what to do --

2    A.     No recommendations.  None.

3    Q.     So because thermometers give

4  you alternative options, you discounted their

5  conclusion that polymerization wasn't

6  happening?

7           MR. HANSON:  Objection.

8           THE WITNESS:  We did not.  We

9       respected their input.  We did not --

10      we never discarded anybody's input.

11      We factored in everyone's input into

12      the massive equation of Norfolk

13      Southern's, you know, thought process

14      and the incident commander's process.

15      It was one factor in a complex --

16 QUESTIONS BY MR. GOMEZ:

17   Q.     Who else had input on the

18 question of whether polymerization was

19 occurring?

20           MR. LEVINE:  Objection.

21 QUESTIONS BY MR. GOMEZ:

22   Q.     Well, let me rephrase that.

23           Oxy had input.

24           Right?

25   A.     Yes.

Confidential - Pursuant to Protective Order

1      Q.     You had input.

2             Right?

3      A.     Yes.

4      Q.     Chip Day had input.

5             Right?

6      A.     Yes.

7      Q.     Who else had input on whether

8    polymerization was occurring in the railcars?

9             MR. LEVINE:  Objection.

10            THE WITNESS:  I mean --

11            MR. GOMEZ:  What's the basis

12       for the objection?

13            MR. LEVINE:  You're asking

14       about who has input on what?  For who?

15            MR. GOMEZ:  On whether

16       polymerization was occurring in the

17       VCM cars.

18            MR. LEVINE:  I have input.  Who

19       else has input.

20            MR. GOMEZ:  Sure.  Okay.

21       That's a fair point.  I can rephrase

22       that.

23   QUESTIONS BY MR. GOMEZ:

24       Q.     Between February 3rd and

25   February 6th, right, in your position with

Confidential - Pursuant to Protective Order

1    SPSI, beyond Oxy, yourself and Chip Day, who

2    else gave specific input on polymerization of

3    the VCM cars?

4         A.    I mean, the Norfolk Southern

5    HAZMAT staff.  There were Ohio EPA response

6    guys.  There were Pennsylvania DEP response

7    guys.  There were local emergency management

8    agency officials.  US EPA responders showed

9    up.  There was a whole host of people.

10        Q.    Okay.  Let's go one by one.

11             Who from Norfolk Southern

12   HAZMAT gave specific insight on whether

13   polymerization was occurring in the VCM cars?

14        A.    I communicated a lot with Scott

15   Deutsch and Scott Gould on their HAZMAT

16   squad.

17        Q.    Okay.  What did Scott Deutsch

18   and Scott Gould tell you about whether

19   polymerization was occurring in the VCM cars?

20        A.    We talked through it together,

21   specifically after the -- whatever 5 or

22   6 p.m. event where the one car behind Leake

23   Oil kind of took off in a radical behavior

24   late Saturday afternoon.  That's when we had

25   some varied thought process, okay, here's

Confidential - Pursuant to Protective Order

1    this, here's this, what if this, what if

2    that.

3              So Scott Deutsch and Scott

4    Gould were the first two from Norfolk

5    Southern's HAZMAT.

6              Now, beyond them leaving my

7    trailer and talked among their staffs, I

8    don't know who all they discussed it amongst

9    their staffs.  I don't know.

10    Q.    Okay.  Fair to say those are

11    the two that you recall from Norfolk Southern

12    that gave input on polymerization?  As you

13    sit here today, at least.

14    A.    Yes.

15    Q.    Okay.  Scott Deutsch, Scott

16    Deutsch a chemist?

17    A.    I don't know.

18    Q.    You ever work with Scott

19    Deutsch before?

20    A.    Yes.

21    Q.    You don't know Scott Deutsch's

22    background?

23    A.    Predominantly fire service, but

24    like -- I mean, there's been people in my

25    career that have surprised me.  People like

Confidential - Pursuant to Protective Order

```
1    Tim Mannas, now retired; Hank Cox, now
2    retired.  I come to find out late in my
3    career after working with them for 10 or 15
4    years that they were chemists.  I never knew
5    it.
6         Q.    Scott Deutsch never told you,
7    you know, here's my insight on VCM
8    polymerization; by the way, I'm a chemist?
9         A.    I've never remembered Scott
10   Deutsch telling me he was a chemist.  I know
11   he came out of the chemical plant industry.
12   He was the fire chief at a chemical plant for
13   a while in his career.
14        Q.    Okay.  Not everyone that works
15   in the chemical plant is a specialist in the
16   reactivity of chemicals.
17              Right?
18        A.    That's accurate.
19        Q.    Scott Gould, Scott Gould a
20   chemist?
21        A.    I don't believe so.
22        Q.    Did you ever talk to any
23   chemist employed by Norfolk Southern
24   regarding polymerization between February 3rd
25   and February 6th?
```

Confidential - Pursuant to Protective Order

1     A.    I'm not familiar with any

2  chemists that Norfolk Southern has on staff.

3     Q.    Let's see.  You also mentioned

4  Ohio EPA response guys.

5           Who were the Ohio EPA response

6  guys that had input on whether polymerization

7  was occurring in the railcars?

8     A.    I'm trying to remember who was

9  there.

10          Kurt Koehler would have been

11 there from Ohio.  I believe Don Bialosky from

12 Pennsylvania DEP.

13          And they would have known --

14 like I say, they had the consist Friday night

15 because we were working it together.

16    Q.    Let's start with Kurt Koehler.

17          What's Kurt Koehler's

18 background?

19    A.    He is, as I understand it, the

20 head of the Ohio EPA response group.

21    Q.    If you know, what does the Ohio

22 EPA response group do?

23    A.    They handle emergency responses

24 for anything spilled in the state of Ohio.

25    Q.    Kurt Koehler a scientist?

Confidential - Pursuant to Protective Order

```
 1        A.      I don't know his background.

 2        Q.      Did he ever volunteer that he

 3   was a scientist?

 4        A.      Not that I can recall.

 5        Q.      Did he ever volunteer that he

 6   was a chemist specifically?

 7        A.      No, I don't recall.

 8        Q.      What was the insight Kurt

 9   Koehler provided about whether polymerization

10   was occurring in the cars?

11        A.      That wasn't your question.  You

12   asked who else would have had insight.  And

13   everybody at the unified command post would

14   have had their own research, their own

15   insights, their own ideas.

16        Q.      That's my question now, though.

17   My question now is, what were the insights

18   Kurt Koehler provided about whether

19   polymerization was occurring in the cars?

20        A.      I don't know.  You'd have to

21   ask Kurt Koehler.

22        Q.      But you did talk to Kurt

23   Koehler about polymerization in the cars?

24        A.      Not specifically.

25        Q.      Okay.  There was a gentleman
```

Confidential - Pursuant to Protective Order

1    from the PA DEP whose name I can't find at

2    the moment.

3                Can you -- can you reiterate

4    his name?

5        A.    Well, Don Bialosky is their

6    kind of head of response, and I know he was

7    there at least early on.

8        Q.    Did Don Bialosky give any

9    insight or input on whether polymerization

10   was occurring in the cars?

11       A.    Not that I can recall.

12       Q.    Local emergency officials also

13   gave specific input on polymerization of the

14   VCM cars.

15               Who were they?

16       A.    I don't know who you're

17   referring to.  I don't know.

18       Q.    I'm reading back your

19   testimony.

20               My question was, between

21   February 3rd and February 6th, in your

22   position with SPSI, beyond Oxy, yourself and

23   Chip Day, who else gave specific input on

24   polymerization of the VCM cars?

25               And you responded, in part,

Confidential - Pursuant to Protective Order

1    there was emergency -- there was local

2    emergency officials.

3         A.      Those are the kind of people --

4    the Don Bialoskys, the -- those are the kind

5    of guys I'm referencing.

6         Q.      Okay.  You also mentioned US

7    EPA responders specifically.

8                 Who from US EPA gave specific

9    input on polymerization of the VCM cars?

10        A.      Yeah, I don't -- I don't

11   remember.  If I said US EPA, I just meant

12   that they were there.

13        Q.      So let me put a fine point on

14   it and ask it this way.

15                Beyond Oxy, yourself, Chip Day,

16   who gave an opinion, yes, polymerization is

17   occurring in those cars, no, polymerization

18   is not occurring in those cars, between

19   February 3rd and February 6th?

20        A.      The Norfolk Southern HAZMAT

21   staff comes to mind.

22        Q.      The ones we just discussed?

23        A.      Yeah.

24                MR. GOMEZ:  Can we go off the

25        record for a second?

Confidential - Pursuant to Protective Order

```
1                VIDEOGRAPHER:  We are off the
2        record at 11:48.
3         (Off the record at 11:48 a.m.)
4                VIDEOGRAPHER:  We are now back
5        on the record at 12:29.
6    QUESTIONS BY MR. GOMEZ:
7        Q.     Mr. McCarty, we're back from
8    our lunch break, and I want to shift gears to
9    some of your observations from between the
10   evening of the 3rd through the -- through the
11   6th in East Palestine.
12               Am I correct that you first
13   arrived on-scene in the evening of
14   February 3rd?
15       A.     Yes.
16       Q.     Is that around nine or ten
17   o'clock at night?
18               Is that right?
19       A.     No.  I can't remember what time
20   I got on-site.
21       Q.     When you got on-scene, there
22   were still first responders that were set up
23   with offensive operations in connection with
24   the pool fires and the like?
25       A.     Yes, that's correct.
```

Confidential - Pursuant to Protective Order

```
1      Q.      About how long after you first
2  arrived on-scene do you recall the first
3  pressure relief devices activating on the
4  vinyl chloride cars?
5      A.      It's hard to estimate.  I can't
6  remember how long it took us to do a quick
7  assessment and find -- and actually find the
8  commander to encourage them to back out and
9  then get them back out.
10             It was about 30 minutes or so
11 after they had gotten everybody in the clear,
12 and I don't remember the exact timeline on
13 that.
14      Q.      Okay.  Do you -- understanding
15 that it's hard to pinpoint a specific time,
16 do you know if it was still the evening of
17 February 3rd or maybe the early morning hours
18 of February 4th when the PRDs started to
19 activate?
20      A.      It's possible it was between 11
21 and midnight or between midnight and 1.  It
22 could be in that era.  It would have been in
23 that era.
24      Q.      Fair enough.
25             I want to kind of walk through
```

Confidential - Pursuant to Protective Order

1   each of the vinyl chloride cars, east to

2   west, in their position in the derailment

3   pile so that we can talk about the PRDs.  I

4   just want to orient you to that kind of

5   structure.

6              My understanding, again, east

7   to west, is that the first vinyl chloride car

8   in the derailment pile was the TILX402025.

9              Does that -- does that sound

10  right?

11      A.     That sounds right.  The TILX

12  car was the eastern-most car by itself.

13      Q.     Is that the car that was

14  referred to from time to time as the "white

15  car"?

16      A.     I don't remember referring to

17  them as white and black, but somebody could

18  have.

19      Q.     Okay.  That TILX402025, I'm

20  going to call that, just for these purposes,

21  the first car.

22             Okay?

23      A.     Okay.

24      Q.     That first vinyl chloride car,

25  do you have a specific recollection of when

Confidential - Pursuant to Protective Order

1  the PRD began to cycle on that particular

2  car?

3        A.      That one we don't think ever

4  did.

5        Q.      Fair enough.

6              Moving to the next car, again,

7  east to west.  It's my understanding that the

8  second car would be OCPX80235.

9              Is that correct?

10        A.      I don't have the map of the car

11  layouts in front of us, but, you know, again,

12  if you're looking at it --

13        Q.      I do have a composite of an

14  aerial image.  We can mark it.  I only have

15  one copy, but we'll just use it to refresh

16  your recollection --

17        A.      Sure.

18        Q.      -- and orient you to the -- to

19  the circumstances.

20              (McCarty Exhibit 6 marked for

21        identification.)

22  QUESTIONS BY MR. GOMEZ:

23        Q.      And again, Mr. McCarty, I'm not

24  going to ask you questions about that

25  document, but if helps with kind of orienting

Confidential - Pursuant to Protective Order

1    the position of the cars when we're referring

2    to them, I'm happy to have it in front of

3    you.

4              Okay?

5         A.   Okay.

6         Q.   By reference to that document

7    which we've marked Exhibit 6, does it look

8    like OCPX80235 was the next car in the

9    derailment pile left -- east to west?

10        A.   It looks like it's the 29th car

11   as this -- OCPX80235.  That would have been

12   the second car in from the east.

13        Q.   Okay.  Do you have a specific

14   recollection of when the PRD for that second

15   car began activating?

16        A.   Yeah, that one we didn't think

17   ever did.  That was a little unnerving to us

18   because it was in that big pool fire and

19   wasn't activating for any -- any drone

20   footage that we had that I recall looking at

21   in the drone assessments or from driving by

22   on Taggart Road.  We think that one was just

23   heat-impinged and didn't vent, is what our

24   concern was.

25        Q.   Okay.  So I want to try and

Confidential - Pursuant to Protective Order

1  keep this kind of organized as we're going

2  through this exercise.

3         So far we've got TILX402025,

4  which to your understanding or to your

5  knowledge didn't activate.

6         Correct?

7  A.     That's my recollection.

8  Q.     And the same holds true for

9  OCPX80235, the second car east to west.

10         Right?

11  A.     That second car in, correct,

12  yeah.

13  Q.     The next car -- the next VCM

14  car in the derailment pile east to west would

15  have been OCPX80179.

16         Is that correct?

17  A.     Yes.  Looking at this map,

18  that's correct.

19  Q.     And do you have a specific

20  recollection of when that third car, the PRD

21  began to activate?

22  A.     Between the three other ones --

23  I don't remember which of the two.  They're

24  the 30th and the 31st car.  I don't remember

25  which one went first.  But those two started

Confidential - Pursuant to Protective Order

1  venting, like I say, not long after the

2  firemen cleared up from the area.

3      Q.    So that would be that --

4  roughly that estimate of between 11 and

5  midnight on the 3rd or midnight and 1 on the

6  4th.

7          Right?

8      A.    Correct.  It was most likely

9  closer to 11 to midnight, as I recall.

10     Q.    And can you describe for me as

11  best you recall -- well, let me -- let me

12  withdraw that and ask -- and ask this.

13         Once the PRD on that third car

14  began activating, again, between 11 and

15  midnight on February the 3rd, as best you can

16  estimate, did it continue to activate or

17  cycle continuously into the next day?

18     A.    It cycled through the night,

19  all night Friday into Saturday, yes.

20     Q.    And at what point on Saturday,

21  February 4th, do you recall the PRD on that

22  particular car stopping in activation

23  recycling?

24     A.    It was sometime midday, kind of

25  between noon and 3-ish, something like that.

1    It was like midday.  Call it like 11 to

2    3-ish.  Again, we weren't exactly taking

3    timestamp kind of notes.

4         Q.    Yeah.  And all I'm asking you

5    for is your best estimates as to these kind

6    of time frames.

7         A.    Yes.

8         Q.    Okay?

9              Now between, again, best

10   estimate, 11 to 12 on February 3rd and midday

11   February 4th, can you describe for me what

12   kind of interval the PRD was activating on

13   this third VCM car?

14        A.    It was just minutes.  I mean,

15   it was cycling.  Just -- it was just minutes.

16   It would open, vent, reclose.  It would just

17   keep doing that.

18        Q.    Was it doing it on a consistent

19   kind of interval or cycle?

20        A.    We didn't have anybody close

21   enough to observe.  We were worried about the

22   cars and putting people too close, so we

23   never did stopwatch calculations or anything

24   like that.  It was just no way to observe it

25   from a safe place.

Confidential - Pursuant to Protective Order

```
 1              (McCarty Exhibit 7 marked for
 2        identification.)
 3   QUESTIONS BY MR. GOMEZ:
 4        Q.     I want to introduce
 5   Document 147, which we will mark as
 6   Exhibit 7.
 7              It's a video, so we'll mark the
 8   slip sheet.  But, Mr. McCarty, the video is
 9   going to actually play on the -- on the
10   screen in front of you.
11        A.     Okay.
12        Q.     While we're pulling up the
13   video itself, I'll just read into the record
14   that the Bates number for the video is SPSI
15   TEXTS 000043.
16              We can just play that start to
17   finish.
18              (Video played.)
19        Q.     Mr. McCarty, just take a look
20   at this video, and we'll watch it in its
21   entirety, and then I'll have a few questions
22   for you.
23              Mr. McCarty, do you have --
24   well, the video that we just watched,
25   Exhibit 7, that's the pressure relief device
```

Confidential - Pursuant to Protective Order

1  on one of the derailed railcars in the East

2  Palestine pileup activating.

3            Fair?

4      A.    Yes.

5      Q.    Do you have any idea which

6  specific car that video shows the PRD

7  activating or cycling on?

8      A.    Not from that video.  I

9  couldn't tell you.

10      Q.    And also probably fair to say

11  that you can't tell from that video at what

12  point during what day that particular PRD was

13  cycling.

14            Right?

15      A.    Correct.

16      Q.    So with the understanding that

17  you might not know which specific car and

18  when exactly that video took place, can you

19  say whether that video is a fair depiction of

20  how the PRDs were activating for the VCM cars

21  between February 3rd and February 4th?

22      A.    Overnight Friday night into

23  Saturday, that's correct.  It was relieving

24  and cycling, relieving and cycling.

25      Q.    So over this period, the video,

Confidential - Pursuant to Protective Order

1  Exhibit 7, is a general depiction of how they

2  were behaving.

3              Fair?

4      A.     Yes.

5      Q.     We were discussing the third

6  car in the derailment pileup.  I want to move

7  to the next one.

8              The fourth car east to west

9  would have been GATX95098.

10             Is that correct?

11     A.     Excuse me, yes.

12     Q.     And for that fourth car, do you

13 have a specific recollection as to when it

14 started activating?  When the PRD started

15 activating?

16     A.     In close proximity to the other

17 ones.

18             And the west car was in the

19 same arena as well.  They all -- they all

20 started activating in a similar time frame

21 that evening.

22     Q.     Understood.

23             So when you referenced the west

24 car just now, that would be the fifth car in

25 the -- the fifth VCM in the pileup,

Confidential - Pursuant to Protective Order

1    OCPX80370?

2         A.    Correct.

3         Q.    Okay.  So we can lump those two

4    together for purposes of these questions.

5               They both would have -- the

6    PRDs on both would have started activating

7    around the same time as the car we just

8    discussed, OCPX80179, the third in the

9    derailment pile?

10        A.    In that general 11 p.m. to

11   1 a.m. range, yes.

12        Q.    How about when they stopped

13   discharging for the fourth and the fifth car?

14   Would they have also stopped discharging

15   roughly midday, 11 to 3, on February 4th?

16        A.    I can't recall if any one

17   stopped sooner than the other ones.  I don't

18   recall.

19        Q.    Going back to the video for a

20   second -- and we can replay it if you need me

21   to replay it.

22               The behavior of the PRD that we

23   see in that video, Exhibit 7, did that

24   behavior indicate to you that polymerization

25   was occurring in the VCM railcars?

Confidential - Pursuant to Protective Order

1     A.     At that time, not necessarily.

2     Q.     So if Exhibit 7, the video that

3  we just looked at, shows the PRD activation

4  up until midday February 4, 2023, there was

5  not a concern, based off of how the PRDs were

6  activating in that manner, that

7  polymerization was occurring in the cars.

8          Is that fair?

9     A.     At that timeline in the

10 accident, the direct correlation in our minds

11 was the flame impingement that had that --

12 there was a tremendous amount of combustible

13 flammable liquids that had been spilled by a

14 number of general service tank cars that had

15 been pretty much, you know, heating those

16 cars, building internal pressure, causing

17 those pressure relief devices to activate.

18     Q.     Where polymerization really

19 started to become a concern, correct me if

20 I'm wrong, was with the sudden activation of

21 the PRD on the third VCM railcar after it had

22 ceased operating midday February 4th.

23          Right?

24     A.     As I understand your question,

25 when were we concerned about polymerization?

Confidential - Pursuant to Protective Order

1    Q.    Yeah.  So let me -- let me

2    break it down and make it a little bit easier

3    for all of us to understand.

4           There -- at the time that the

5    PRDs on the three western-most VCM cars had

6    roughly stopped cycling, midday February 4,

7    2023, the thought was the PRDs are activating

8    because of heat impingement, not because of

9    polymerization.

10          Right?

11   A.    That was the primary, initial

12   assessments, but I'm going to get back to

13   your question and the reason I asked you to

14   clarify it.

15          I believe you asked -- and

16   please correct me if I'm wrong.  I believe

17   you asked, when were we concerned about

18   polymerization?

19   Q.    That's where I'm ultimately

20   going, yes.

21          MR. HANSON:  Drew, just let him

22       ask his questions.  I think he's

23       trying to make it easier on you.  Just

24       let him ask his questions and try to

25       answer them.  So let's just --

Confidential - Pursuant to Protective Order

```
1                THE WITNESS:  Okay.

2                MR. HANSON:  -- listen to

3        Mr. Gomez's question.

4                THE WITNESS:  I'm just making

5        sure I'm getting your question right.

6    QUESTIONS BY MR. GOMEZ:

7        Q.    And there's a ton of moving

8    parts to this, so if you don't understand

9    what I'm referencing in terms of the timeline

10   or the cars, just let me know.  I'm happy to

11   break it up so that we're all on the same

12   page.

13               So I'll just go back and kind

14   of start the line again.

15               Midday February 4th, Saturday,

16   the three western-most VCM cars' PRDs stopped

17   activating.

18               Best you recall, right?

19       A.    Yes.

20       Q.    And at that point in time, the

21   understanding was they had been activating

22   because they were heat-impinged, not because

23   they were actively polymerizing.

24               Is that fair?

25       A.    In that era of the derailment,
```

Confidential - Pursuant to Protective Order

1    we concurred and we absolutely acknowledged

2    that they were activating because they were

3    building internal pressure.  They were in

4    pool fires.  That made perfect sense.

5         Q.     Okay.  Where, after they had

6    stopped cycling, midday February 4, 2023,

7    polymerization then became a concern was that

8    third car in the pileup had a sudden and I

9    think you characterized it as a violent

10   activation.

11              Is that correct?

12        A.     That car did have a sudden and

13   violent activation.

14              And back to your root question.

15   Once we realized Friday night with drone

16   flyover that the vinyl chloride cars were

17   involved in pool fires, that's when we first

18   became concerned of the possibility of

19   polymerization.

20              So that's the -- what I wanted

21   to get on the record with your question, and

22   why I asked you to repeat and make sure I

23   understood your question is, when were we

24   concerned about polymerization?

25              We were on the radar with the

Confidential - Pursuant to Protective Order

1    possibility, based on all the training, all

2    the data sheets, everything we know about

3    vinyl chloride being possible, that once we

4    recognized and had drone flight confirmation

5    that we have these cars in pretty serious

6    fires, that's when it was first on our radar

7    for concern.

8              And then to finish answering

9    your question, the event that happened with

10   that particular car that we're talking about,

11   that third one in, that's what really had us,

12   you know, now really concerned.

13       Q.    You described that better than

14   I could ask questions, so thank you very

15   much.

16       A.    You're welcome.

17       Q.    It clarifies it.

18              So now I just want to focus

19   just on that third car, OCPX80179, and the

20   sudden and, again, as you've characterized

21   it, violent activation in the afternoon of

22   February 4th.

23              Okay?  We're oriented on the

24   same page?

25       A.    Yeah.

Confidential - Pursuant to Protective Order

1          (McCarty Exhibit 8 marked for

2       identification.)

3    QUESTIONS BY MR. GOMEZ:

4       Q.    Okay.  Let me -- let's bring up

5    Document Number 163, which we'll mark as

6    Exhibit 8.  And this is another video.

7          And I'll note for the record

8    while we're pulling it up and getting it

9    marked that the Bates number is SPSI TEXTS

10   000380.

11         Mr. McCarty, the video is going

12   to play on your screen in a second.  We'll

13   watch it through its entirety, and then I'll

14   ask you my questions.

15         Okay?

16      A.    Okay.

17          (Video played.)

18      Q.    Mr. McCarty, the video we just

19   watched in Exhibit 8, are you able to tell

20   from what's depicted there whether this is

21   the PRD activating on OCPX80179 suddenly and

22   violently in the afternoon of February 4,

23   2023?

24      A.    Not without watching it through

25   its conclusion.

Confidential - Pursuant to Protective Order

1    Q.    Well, I'll represent --

2    A.    The video concluded, but I

3    don't know how long that burned.

4    Q.    Understood.

5          I'll represent to you that we

6    played the entirety of the video, so I just

7    want to make sure that we're all clear.

8          Based off of what we've got

9    here in Exhibit 8, you can't tell whether

10   this is the third car in the derailment pile

11   activating -- the PRD activating in the

12   afternoon of February 4, 2023?

13   A.    Well, it appeared to be the

14   third car, but I don't know when that was

15   taken.

16   Q.    Okay.  So timing aside, as best

17   you can tell, Exhibit 8 does depict the PRD

18   on the third car activating.

19         Fair?

20   A.    It is the third car activating.

21   Q.    We can play it again just to

22   make sure.  And I'm not trying to trick you

23   here.

24         I want to understand if there's

25   anything from this video, which is what we've

Confidential - Pursuant to Protective Order

1    got, that can lead you to confirm or not

2    confirm if this was the sudden and ac -- the

3    sudden and violent PRD activation in that

4    third VCM car.

5         A.    This video wouldn't be able to

6    do that.

7         Q.    Fair enough.

8               So we can pull that down.

9    Thank you.

10        A.    Okay.

11        Q.    So it was the -- it was the

12   activation and extended activation of the PRD

13   on this third VCM car that made -- I don't

14   want to misquote you -- that made

15   polymerization a serious concern in the

16   afternoon of February 4th.

17              Right?

18        A.    Yeah.  It took it from a

19   possibility the night before to something on

20   the radar to be a situation where of to a

21   probability based on how these cars were

22   behaving at that time.

23        Q.    And the reason for that is your

24   training tells you that if a PRD is

25   activating as intended, or behaving as it

Confidential - Pursuant to Protective Order

1  should, suddenly stops and then activates for

2  an extended period without any change in

3  circumstances, there could be an indication

4  of a chemical reaction occurring in the tank

5  car.

6          Is that fair?

7      A.     Most of what you said is

8  accurate, yes.

9      Q.     What part is not accurate so we

10  can have a clear record?

11      A.     It's just incomplete of all the

12  variables.

13      Q.     Okay.  What are the other

14  variables?

15      A.     So you mentioned, you know,

16  PRDs activating and then reclosing.  And then

17  they don't.

18          The variables in this case

19  were, you know, pool fires underneath the

20  car, i.e., in the lab environment would turn

21  off the Bunsen burner, take heat away.  That

22  would explain why they're not going off

23  anymore.

24          Okay?

25          That made us comfortable in

1    that afternoon era to put people in there in

2    the hot zone, start putting pressure gauges

3    on cars, start looking and seeing what we

4    could do with hot-tapping and where to put

5    burn pits.  That was that objective of that

6    entry in the middle of the afternoon.

7              The phenomenon of what happened

8    there was in the absence of a pool fire,

9    there was still continuous pressure building

10   up in the car.  And what was more unnerving

11   was that car had been relieving itself

12   regularly for several hours.

13             The audible sound in the

14   relief, just as a -- as we referred to this

15   morning, the Matheson Gas charts and the

16   pressure and temperature curves, so do

17   audible sounds from the same orifice.  We had

18   incredibly higher audible sound in that

19   release at whatever time it was, 5 or 6 p.m.,

20   whatever times they have it, and it sustained

21   for over an hour.

22             Those were inherently different

23   conditions than what we had experienced in

24   that previous operating period.

25             So, fundamentally, you know,

1    potential causes of that are, something

2    caused that PRD to get gummed up and get

3    stuck while that pressure was building up,

4    and it relieved at a higher pressure.

5              Any fire impingement from

6    others -- the other fires.  A number of

7    variables, but I'm getting a little winded

8    here.

9         Q.    Sure.

10             And to kind of unpack that a

11   little bit, ultimately what you concluded was

12   most like -- the most likely explanation for

13   that extended PRD activation was that the

14   device itself was getting gummed up from the

15   formation of polymers.

16             Is that correct?

17        A.    Is one possibility.

18        Q.    There were other possibilities

19   that describe -- or that explained the

20   behavior of that PRD.

21             Right?

22        A.    Could be.

23        Q.    One of them could be radiant

24   heat being absorbed by that third tank car.

25             Correct?

1    A.    Well, this one was one that was

2  burning and cycling for several hours.  So

3  this had basically been a blowtorch device

4  for several hours.

5    Q.    So I want to make sure that

6  we're clear.

7         Is it your understanding that

8  under the conditions as they existed at the

9  time of that extended relief from the third

10  car, radiant heat could not be an explanation

11  for why it discharged the way it did?

12    A.    The fires had subsided.  There

13  was no more Bunsen burner pool fire going on

14  that would have created to build pressure in

15  that car the way it did.

16         And the point to be made here

17  is -- let's say it was flame fire.  Let's

18  just hypothetically say it was radiant heat

19  that caused it to build pressure again.  It

20  should have relieved to the same pressure and

21  cycled like it did for the previous 12 hours.

22  But instead, it accumulated and accumulated,

23  accumulated, accumulated, accumulated,

24  accumulated, and decided to find a magic

25  point where it gave and then had a violent

Confidential - Pursuant to Protective Order

1    release.

2         Q.    Are you aware that Chip Day

3    gave a statement to the NTSB in connection

4    with its investigation of the derailment?

5         A.    Yes.

6         Q.    Are you aware that Chip Day

7    cited radiant heat from the ground as a

8    potential alternative explanation for why the

9    PRD activated the way it did on this third

10   car?

11        A.    I -- I'm not privy to what Chip

12   told the NTSB.

13        Q.    Fair enough.

14             What about mechanical failure

15   in the PRD device?  Isn't that another

16   explan -- possible explanation for why the

17   device acted the way that it did?

18        A.    It is one possibility.

19        Q.    Because at least on this car,

20   the PRD had been cycling actively for several

21   hours.

22             Right?

23        A.    Correct.

24        Q.    And any mechanical device has a

25   limit to how often it can cycle, right, how

Confidential - Pursuant to Protective Order

1  often it can function?

2       A.      I mean, any mechanical or --

3  our automobile we drive every day can break,

4  right?  So any mechanical components, it's

5  possible, yes.

6       Q.      And especially when it's

7  exposed to fire conditions, right?

8               Gaskets can get burned out,

9  right?

10      A.      Yes.

11      Q.      All of which can affect the

12  performance of the PRD for mechanical

13  reasons, not polymerization reasons?

14      A.      Well, gaskets being burned out,

15  if anything, would allow pressure to escape

16  the car, which is what was fueling the

17  three-dimensional fuel-fed fires.

18      Q.      Can you describe that for me a

19  little bit more?  Can you explain that for me

20  a little bit more?

21      A.      So the pressure relief devices

22  are mounted to the pressure plates on these

23  tank cars.  There's tongue-and-groove mating

24  surfaces, and they're sealed with gaskets,

25  elastomers.

Confidential - Pursuant to Protective Order

1          In those fires, once those PRDs

2     started, you know, relieving pressure, they

3     instantly ignited with the ground fire.  So

4     they found ignition source and became

5     blowtorches.

6          As the PRDs became blowtorches,

7     liquid lines, vapor lines, service equipment

8     within that protective housing, they also got

9     super-heated from that fire, and those

10     elastomers failed.

11          When those elastomers failed,

12     more three-dimensional fuel-fed fires

13     occurred within the protective housings.

14     Q.     There's other components that

15     could fail in the PRD to explain the behavior

16     beyond just the gaskets.

17          Right?

18     A.     The PRD has a lot of

19     components.

20     Q.     Springs are components of the

21     PRDs.

22          Right?

23     A.     Yes.

24     Q.     What was it specifically that

25     allowed you to rule out other possible

1    explanations for the PRD behavior on this

2    third VCM railcar in favor of polymerization

3    being the more likely explanation?

4              MR. HANSON:  Objection, but

5         please answer.

6              THE WITNESS:  Yeah, we didn't

7         rule out all those possibilities.

8    QUESTIONS BY MR. GOMEZ:

9         Q.    Oh, okay.

10             But you did conclude that the

11   most likely of all the explanations was

12   polymerization.

13             Right?

14        A.    Not necessarily.  They're all

15   options.  They're all possibilities.

16        Q.    Did --

17        A.    Including polymerization was a

18   strong possibility.

19        Q.    Okay.  At this point in time,

20   the 70-minute PRD activation, did you have

21   a -- did you have an opinion of which was the

22   most likely explanation for why the PRD was

23   acting the way it was?

24        A.    You know, the fact that we had

25   roaring, con -- sustained pool fires

Confidential - Pursuant to Protective Order

1  underneath those cars all night long, and

2  they were cycling, they would relieve and

3  reclose, relieve, reclose, under tremendous

4  heat, if Mr. Day testified to some smudge of

5  a residual, charcoalish residual campfire

6  heat kind of thing underneath the car, I

7  guess I can't deny that is a probable

8  possibility.

9            But the correlation is --

10 doesn't jive.  It doesn't match correlation

11 to sustained, tremendous BTU fires all the

12 through the night.  And this PRD responded

13 nicely to relieve and reclose, relieve and

14 reclose, relieve and reclose.

15           And again, the correlation

16 of -- fires burn themselves out, and all of a

17 sudden this has such tremendous pressure

18 buildup, it's essentially stuck.  And for

19 whatever reason, mechanical, polymerization

20 or otherwise, polymerization is absolutely a

21 consideration.

22      Q.    So correct me if I'm wrong, it

23 was at this point in time -- this point in

24 time being the extended activation of the PRD

25 on this third VCM car -- that hot-tapping

Confidential – Pursuant to Protective Order

1    ceased being a viable option for addressing

2    or mitigating the VCM cars.

3                 Is that correct?

4         A.    That is correct.  That was our

5    point of which we like, eh.

6         Q.    And is it also fair to say that

7    when hot-tapping ceased being a viable option

8    because of the PRD activation on this

9    particular car, vent and burn became an

10   option for consideration?

11        A.    Yes.

12        Q.    Do you have a sense of maybe an

13   hour range on February 4th when this extended

14   PRD release might have occurred?

15        A.    I've been told 5 p.m.-ish, and

16   I know people have a video somewhere, and I

17   know -- I probably have it from somebody

18   giving it to me, but I don't remember -- I

19   just don't remember the timestamp on it.

20        Q.    Is it fair to say that

21   you're -- as you sit here right now, your

22   best estimate might be around 5 p.m.,

23   February 4th?

24        A.    That's my rough estimate.

25        Q.    And that would have been on

Confidential - Pursuant to Protective Order

1   February 4, 2023.

2            Right?

3        A.      That would have been the

4   Saturday, yes.

5        Q.      And the vent and burn occurred

6   February 6, 2023, at approximately 4:30 in

7   the afternoon?

8        A.      Yes.

9        Q.      So between when hot-tap stopped

10  being an option for mitigating the VCM cars

11  and when the VCM cars were vented and burned,

12  roughly 48 hours?

13       A.      Yes.

14       Q.      A vent and burn is the option

15  of last resort.

16           You agree with that?

17       A.      Yeah, generic -- generally

18  speaking, yes, it's the last resort.  Nobody

19  wants to go around doing emergency

20  de-inventory on tank cars.  Just by -- let's

21  do this.  You know, it's a last resort

22  option.

23       Q.      And it's the last resort in the

24  case of VCM polymerization because if the VCM

25  is actually polymerizing in the cars, there's

Confidential - Pursuant to Protective Order

1    a corresponding increase with the pressure of

2    the -- of the -- of the VCM in the vessel.

3                    Right?

4         A.       That's correct.

5         Q.       And if that pressure continues

6    to grow and grow and grow without any

7    mitigation, the tank can blow apart.

8                    Right?

9         A.       Correct.

10        Q.       And in addition to releasing

11   the contents of the car, that blowing apart

12   of the car as a result of increased pressure

13   would send shrapnel flying through the area.

14                   Fair?

15        A.       Quite possible, yes.

16        Q.       And because it's a chemical

17   reaction, it has the ability to happen very

18   quickly.

19                   Is that fair?

20        A.       Yes.

21        Q.       So polymerization and the

22   threat posed by polymerization, that's an

23   imminent danger to the community if it causes

24   the vessel to explode and send shrapnel

25   everywhere.

Confidential - Pursuant to Protective Order

1        Fair?

2    A.    Yes.

3    Q.    If the threat of polymerization

4  occurring within the railcars was an imminent

5  threat of that nature, why did it take

6  48 hours to conduct the vent and burn?

7    A.    A lot of moving parts and

8  pieces.  A lot of variables to that question.

9    Q.    You did not present -- let me

10  withdraw that.

11        Correct me if I'm wrong, the

12  vent and burn as an option was not presented

13  to incident command until the afternoon of

14  February 5, 2023.

15        Is that correct?

16    A.    That's my understanding.

17    Q.    And that would be roughly

18  24 hours after the extended PRD release of

19  the third VCM car.

20        Correct?

21    A.    I don't remember what time that

22  meeting was.  I -- whether it was 24 hours or

23  18 hours or anywhere between, I don't

24  remember that, but it would have been

25  sometime Sunday afternoon.

Confidential - Pursuant to Protective Order

1    Q.    Understood.

2          What was the explanation, or

3    what is the explanation, for why there was a

4    delay of 24 hours in expressing vent and burn

5    as the option for mitigating the VCM cars?

6              MR. LEVINE:  Objection.

7              THE WITNESS:  Yeah, so that was

8         beyond my purview.  I mean, I was

9         working for the Norfolk Southern

10        HAZMAT staff.  We spoke about it, kind

11        of thought through that option

12        Saturday right after that PRD

13        excursion that we're talking about.

14             And, you know, they as a staff

15        called in SRS for some extra help,

16        extra set of eyes.

17             And, you know, I can't speak to

18        Norfolk Southern.  I can't speak to

19        their staff discussions.  I can't

20        speak to that.

21   QUESTIONS BY MR. GOMEZ:

22        Q.    Okay.  I don't want -- I don't

23   want you to speculate as to the thought

24   process from Norfolk Southern.

25        A.    Okay.

Confidential - Pursuant to Protective Order

1    Q.    Only what you -- only what you

2    know.

3          And would you say that you know

4    that one of the reasons for waiting to

5    present vent and burn as an option to the

6    incident command was to get additional

7    opinions on the condition of the site and the

8    condition of the cars, including opinions

9    from SRS?

10   A.    That was my feeling, yeah.  I

11   mean, and I didn't blame Norfolk Southern if

12   they were looking for a second opinion.

13         And that's my assumption.  I

14   can't say exactly what Norfolk Southern's

15   thought process was, other than bringing in

16   more experienced people.  I mean, additional

17   experienced people and extra set of eyes and

18   extra qualified manpower.

19         (McCarty Exhibit 9 marked for

20         identification.)

21   QUESTIONS BY MR. GOMEZ:

22   Q.    Okay.  Let's bring up Document

23   Number 107, which we will mark as Exhibit 9

24   to Mr. McCarty's deposition.

25         Mr. McCarty, this Exhibit 9

Confidential - Pursuant to Protective Order

1  that we've marked to your deposition, it's

2  Bates numbers SPSI TEXTS 000512 through 513.

3          It appears to be a March 26,

4  2023 text message exchange between yourself

5  and Chip Day.

6          Is that correct?

7      A.    Yes, appears to be.

8      Q.    I want to direct your attention

9  to the text message that's -- with a

10  timestamp March 26, 2023, 10:08 p.m.

11          Do you see that?  Right-hand

12  side?

13      A.    I was just reading along.  I

14  mean, I'm reading this page.  I'm looking.

15      Q.    Okay.  Well, I'm going to ask

16  you specifically with -- about the text

17  messages starting at 10:08 p.m. so I can

18  orient you to where I am on the document.

19      A.    Okay.  10:08.  Got it.

20      Q.    Yeah.  That text message that

21  you sent to Chip Day reads, "Do you recall

22  roughly when NS called you guys on

23  February 4th and when you got to EP?"

24          Right?

25      A.    Okay.  Yes.

Confidential - Pursuant to Protective Order

```
 1        Q.      And then Mr. Day responds
 2   laying out the timeline of when he arrived.
 3               Right?
 4        A.      He arrived -- yeah, okay.
 5   Yeah.
 6        Q.      You respond, "Thank you," and
 7   Mr. Day responds back to that saying, "What's
 8   up now?"
 9               Do you see that message?
10        A.      Yeah, he probably was wondering
11   why I was asking.
12        Q.      That's what I was going to ask
13   you.  He wanted to know why you needed that
14   information.
15               Right?
16        A.      Yeah.
17        Q.      And your response was that you
18   have to do a presentation tomorrow.
19               Do you see that?
20        A.      Yes.
21        Q.      March 26, 2023, that would be
22   the day before you did a presentation to the
23   United States Senate on what happened in East
24   Palestine.
25               Correct?
```

1      A.    Not the entire Senate.  There

2  was Senate Commerce -- I think they call them

3  subcommittees, whatever their -- staffers for

4  Senator Ted Cruz and the other senator out of

5  State of Washington.  I'm sorry, I don't

6  remember her name.  But, yeah, that's what it

7  was for.

8      Q.    Yeah, that was inartful.

9            Not the entire US Senate,

10  but --

11      A.    Right.

12      Q.    -- certain senators and the

13  subcommittee.

14            Fair?

15      A.    Correct.

16      Q.    Okay.  And you then explain

17  beyond the presentation that you, quote,

18  "Basically want to get ahead of a question

19  that could pop up...if you were already at

20  V&B Saturday afternoon after the sudden and

21  violent PRD 70-minute release, why wait till

22  Sunday afternoon to present to fire chief

23  staff?  My response would be, such a

24  significant decision, NS wanted to get more

25  folks like you and Terry here for your

Confidential - Pursuant to Protective Order

```
1    opinions as well before deciding that.  I
2    just wanted to make sure I had recalled the
3    timeline correctly, and I believe I have it.
4    All good."
5              Did I read that correctly?
6         A.    Yes.
7         Q.    So this is what you just
8    described your understanding to be.  There
9    was a delay because NS wanted additional eyes
10   on the cars or eyes on the site to determine
11   whether polymerization was occurring and then
12   there was a need for a vent and burn.
13             Fair?
14        A.    Other -- additional experienced
15   people on-site, second opinions, more fire
16   power, more -- more, you know -- more
17   experienced folks on-site.  All of the above.
18        Q.    And the people that you
19   mentioned getting additional eyes on-site, at
20   least in this text message, specifically
21   include folks like Chip Day and Terry?
22        A.    Yes.
23        Q.    That's what we see there?
24        A.    Yes.
25        Q.    That would be Terry Rockwell.
```

Confidential - Pursuant to Protective Order

```
1                    Right?
2         A.      Correct.
3         Q.      There's no reference here to NS
4    wanting to get more opinions from folks like
5    the product manufacturers about the need for
6    a vent and burn.
7                    Right?
8         A.      Not in my communication with
9    Chip and I in this text messaging, no.
10        Q.      And in this text messaging,
11   there's no indication that NS wanted to get
12   opinions from the railcar owners, for
13   example, about whether there was a need for a
14   vent and burn.
15                   Right?
16        A.      Well, that wasn't the nature of
17   this texting communication.  Had nothing to
18   do with Norfolk Southern at that time.  It
19   was -- this was between Chip and I.
20                   And I just simply asked Chip,
21   this is my recollection.  I wasn't privy to
22   the conversations between Norfolk Southern
23   and Chip Day.  I wasn't -- that was between
24   them.
25                   I'm just pretty much asking
```

Confidential – Pursuant to Protective Order

```
 1   Chip, you know, I'm assuming they brought you
 2   in for a second set of eyes and extra help,
 3   and he confirmed it.
 4       Q.    Yep.
 5             And all I'm asking you about is
 6   what you're saying in this particular text
 7   message.
 8             Right?
 9       A.    Right.
10       Q.    So according to this text
11   message, what NS wanted was insight from
12   folks like Terry Rockwell and Chip Day.
13             Right?
14       A.    Uh-huh.
15       Q.    And according to this text
16   message, there's nothing in this message
17   about NS wanting input from the product
18   manufacturer.
19             Right?
20       A.    Well, it wasn't the purpose of
21   this message.  But, no, there's no reference
22   to that --
23       Q.    Just asking you about what the
24   message says.
25             There's no reference to NS
```

Confidential - Pursuant to Protective Order

1    wanting to get input from the railcar owners.

2              Right?

3         A.      In this conversation between

4    Chip Day and Drew McCarty, this was not an NS

5    communication.

6         Q.      There's no reference to wanting

7    to get input from any independent experts.

8              Right?

9         A.      This is a communication between

10   Chip Day and Drew McCarty.

11        Q.      That's been well-established.

12   I will give it to you.

13              Right?

14        A.      Okay.  I'm just not following

15   your question, I guess.

16        Q.      This is a conversation that

17   you're having with Chip -- with Chip Day, and

18   I want to know what's in here and what's not

19   in here.

20              Okay?

21              There's no reference to NS

22   wanting to get insight from independent

23   experts about polymerization in this text

24   message.

25              Right?

Confidential Pursuant to Protective Order

```
1         A.      In this text message, there is
2   no reference to any Norfolk Southern
3   communications at all.
4         Q.      And this is your text message
5   to Chip Day for purposes of trying to
6   understand and prepare a response to a
7   question that might be posed by the US Senate
8   subcommittee that you were making a
9   presentation to.
10                Right?
11        A.      Yes.
12        Q.      We can put that aside.  Thank
13  you.
14                Now, during the -- or between
15  the time of the extended PRD activation on
16  February 4th in that third VCM railcar and
17  the vent and burn, there were efforts
18  undertaken to take temperature measurements
19  from the VCM railcars.
20                Correct?
21        A.      Correct.
22        Q.      And those efforts were
23  undertaken because Oxy had indicated that the
24  way to rule out definitively whether or not
25  polymerization was occurring in those cars
```

Confidential - Pursuant to Protective Order

1   was if there was an exothermic heat signature

2   in those readings.

3              Correct?

4              MR. HANSON:  Objection.

5              THE WITNESS:  I don't know

6        where the request came from, other

7        than I was requested by the Norfolk

8        Southern HAZMAT staff.

9   QUESTIONS BY MR. GOMEZ:

10       Q.    Okay.  Do you remember any

11  conversations about the heat signature

12  generated by VCM polymerization in the

13  railcars with Oxy as a way of ruling in or

14  ruling out whether polymerization was

15  actually occurring?

16       A.    Not specifically.

17       Q.    You don't remember

18  conversations where Oxy's technical advisors

19  in Dallas indicated that polymerization could

20  be ruled in -- or would be ruled in if there

21  was a continuing increase in the temperature

22  of the railcars?

23       A.    I don't recall any specific

24  conversation like that.

25       Q.    And you don't recall any

Confidential – Pursuant to Protective Order

1    specific conversation with the Oxy team in

2    Dallas about how, if there were fluctuations

3    in the temperature of the VCM cars, that is,

4    temperature increases followed by decreases,

5    followed by increases, that would rule out

6    polymerization occurring in the cars?

7         A.    I do not recall any

8    conversations like that.

9         Q.    You don't recall any

10   conversations with the Oxy team in Dallas

11   that if temperatures remained stable within

12   the VCM cars, that would rule out

13   polymerization occurring within the VCM cars?

14        A.    They may or may not have

15   mentioned that in one of the calls, but we

16   already knew that from all years of training.

17   Thermometers have to tell us that.

18        Q.    If you don't recall specific

19   conversations about how temperature data

20   could rule in or rule out the occurrence of

21   polymerization in the VCM cars, what was your

22   understanding of why you were taking these

23   temperature readings between February 4th and

24   February 6th?

25        A.    My understanding is because the

Confidential - Pursuant to Protective Order

1   command post wanted Norfolk Southern to get

2   temperature readings.  That was my

3   understanding.

4        Q.     Command post being incident

5   command?

6        A.     Yes.

7        Q.     And did you learn at any point

8   in time what interest incident command had in

9   these temperature readings?

10            I don't want you to speculate.

11       A.     I was going to say, I'm not

12   going to speculate.  I mean, if I was the

13   fire chief, I know what I would be thinking,

14   just to try -- can anybody trend the

15   temperatures, is a general request, right?

16   But I can't speak to the fire chief.

17       Q.     So as far as you know,

18   temperatures were not being taken between

19   February 4th and February 6th for purposes of

20   monitoring or determining whether

21   polymerization was actually occurring within

22   the cars?

23       A.     Prior to our entries into the

24   hot zone on the afternoon of the 4th, on

25   Saturday afternoon, our first entries, we had

Confidential - Pursuant to Protective Order

1  digital thermometers with us during that

2  entry.  Unfortunately, we never really had a

3  chance to use them before that PRD off {sic}

4  and drove our people out of the hot zone.

5          Once that PRD activated at what

6  we -- whatever, four or five o'clock,

7  whatever time it was on Saturday afternoon,

8  four o'clock, five o'clock, six o'clock,

9  whatever time it was, we avoided that hot

10  zone.  We didn't want anybody near those

11  cars.

12      Q.    But you did go back into the

13  hot zone to take these temperatures during

14  that period.

15          Right?

16      A.    We did.

17      Q.    I want to talk a little bit

18  about the equipment that you had for purposes

19  of taking these readings.

20          It's my understanding that

21  there were point-and-shoot thermometers

22  available.

23          Is that correct?

24      A.    Yes.

25      Q.    You know what models they were?

```
 1        A.     It would be a variety, from
 2   Fluke to others, but...
 3        Q.     There were thermal imaging
 4   thermometers.
 5               Is that correct?
 6        A.     Yes.
 7        Q.     Do you happen to know the
 8   manufacturers on the models that we used?
 9        A.     I do know those ones.  They're
10   Draeger 9000s, I believe.  I can get that
11   data, but it's a Draeger unit.
12        Q.     And there were -- well, I'll
13   represent to you that Mr. Day told us that
14   there is some better technology available
15   that can actually take measurements through
16   jacketed installation on a tank car.
17               Are you familiar with that kind
18   of technology?
19        A.     I am not.
20        Q.     So we would have to talk to
21   Mr. Day about specifically what that is.
22               Right?
23        A.     Right.
24        Q.     Fair to say SPSI did not have
25   access to any technology beyond the
```

Confidential - Pursuant to Protective Order

1  point-and-shoot thermometer and the thermal

2  imaging thermometer to gauge the temperature

3  of the VCM in these insulated railcars?

4      A.    In all my travels and all my

5  years of experience, I'm not familiar with

6  any technology that'll put a temperature

7  through an eighth-inch outer steel jacket,

8  through two inches of thermal protection,

9  through two inches of insulation, to get

10 through another tank wall thickness of the

11 tank to get a product temperature.  I'm not

12 familiar with any such technology.

13     Q.    Am I also correct that there

14 was a combination of personnel from SPSI and

15 SRS that were actually the ones during this

16 roughly 48-hour period that were taking the

17 temperatures in the hot zone?

18     A.    It was our people.  I don't

19 believe SRS was doing the temperature

20 readings.

21     Q.    Okay.  Would Ryan Tokarski have

22 been one of those people?

23     A.    Yes, he was in the first entry

24 team that attempted.

25     Q.    You know that Mr. Tokarski gave

Confidential - Pursuant to Protective Order

1    a statement to the NTSB.

2              Right?

3        A.    Yes.

4        Q.    Have you familiarized yourself

5    with that statement?

6        A.    No, I actually have not read

7    his testimony.

8        Q.    Okay.  Based off of what you

9    know from being at the site, from speaking to

10   Mr. Tokarski and others on the team, is it --

11   am I correct that the reason why you were

12   using these external measurers of the

13   temperature in the tank cars is because there

14   was damage to the thermal wells?

15       A.    There was burned-out damage to

16   these cars that we were afraid could lift

17   their PRDs at a moment's notice, just like

18   the car misbehaved.  There was no way we were

19   going to put a human being on top of those

20   tank cars.

21       Q.    Okay.  It wasn't that -- it

22   wasn't that they were physically -- well, I

23   don't want to downplay that.

24              It wasn't that there was damage

25   where you physically couldn't get in.  It was

1    more the risk of being right next to the PRDs

2    and there being --

3           A.    It's a combination of both and

4    other factors.

5           Q.    Okay.  Understood.

6                 Exterior measurements with the

7    devices we just discussed, they're considered

8    acceptable ways of getting temperature

9    readings for the contents of a tank car.

10                Aren't they?

11                MR. LEVINE:  Objection.

12                THE WITNESS:  Only on

13        non-jacketed cars.

14   QUESTIONS BY MR. GOMEZ:

15          Q.    And that's because if you're

16   taking an exterior measurement of a jacketed

17   car, you're pointing and shooting or using a

18   thermal imagery on some significant layers of

19   insulation that prevent you from getting to

20   the shell of the car.

21                Right?

22          A.    Yes, that outer jacket metal,

23   the thermal blanket, any insulation are

24   all -- and the tank wall itself are all

25   insulators that prevent getting accuracy of

Confidential - Pursuant to Protective Order

1    the product in the car.

2        Q.      But if you could point and

3    shoot or take a thermal image of the shell of

4    the car itself, that would be an accurate

5    measurement of the product temperature

6    inside.

7                Would it not?

8        A.      It would be reasonably close,

9    but not -- no, I'd still say no.  And

10   actually, it might be reasonably close, but

11   again, that's a non-jacketed tank in a tank

12   shell, not an outer jacket.

13       Q.      What is -- when you say

14   "reasonably close," is there a margin of

15   error that you can ascribe to that?

16       A.      Well, again, the phenomenon of

17   polymerizables, if there is a polymerizable

18   reaction going on, my training, the people

19   have taught me, is that oftentimes they can

20   react from the outside in.

21                So you can have -- and we've

22   cleaned storage tanks in chemical plants.

23   And some of our challenges is, it can be

24   liquid, gooey, partially reacted material in

25   the middle, and it's already solidified,

Confidential - Pursuant to Protective Order

1    reacted material around the outer perimeter,

2    around the edges.

3              So reactions can happen from

4    the outside in, and then as they react,

5    that's building another insulation layer

6    against external thermometer capabilities.

7        Q.    So in essence, because you're

8    concerned that polymerization is occurring

9    within the car, that, in and of itself, casts

10   doubt on whether the readings that you're

11   getting are accurate.

12             Right?

13       A.    That's one of the variables,

14   yes.

15       Q.    Is that a reason for taking

16   measurements from multiple spots on the tank

17   car shell, if it's accessible?

18       A.    If it's accessible, we would

19   absolutely want to do multiple spots around

20   the car.

21       Q.    And that's, in fact, what

22   Mr. Tokarski and your team did.

23             Right?

24       A.    We attempted it, yes.

25       Q.    They took multiple measurements

Confidential - Pursuant to Protective Order

1   where there were holes or damage in the

2   jackets so that they could get readings from

3   the shell of the car itself.

4            Correct?

5       A.      They tried.

6       Q.      And that's, in fact, what they

7   did.

8            Right?

9       A.      No, they tried.

10      Q.      So if Mr. Tokarski told the

11  NTSB that in the course of taking these

12  measurements he's sure he got the shell,

13  would you have any reason to disagree with

14  that?

15      A.      I would, because he told me

16  something different.

17      Q.      Okay.  How did he tell you

18  that?

19      A.      He said, Drew, I don't think we

20  got to the tank shell.  He said, the best

21  hole I had was about a golf-ball-sized hole,

22  and I can't guarantee I got to the tank

23  shell, and I don't think I did,

24  quote/unquote.

25      Q.      When would he have -- when was

1    it that he told you that?

2        A.    That was after the very first

3    entry, the very first entry on those cars to

4    the east.  Because I'm the one that did the

5    car on the west.  The one -- the western car

6    that started triggering this, well, okay, we

7    got readings here, let's see if we can get

8    readings on the other ones.  So that's kind

9    of how that unfolded.

10       Q.    Sorry, I thought you had

11   more --

12       A.    No, it's --

13       Q.    -- to your -- to your answer.

14             Okay.  So that's what

15   Mr. Tokarski told you.

16             So if Mr. Tokarski told the

17   NTSB in his statement that he definitely got

18   the shell, that's inconsistent with your

19   recollection of your discussions with

20   Mr. Tokarski.

21             Fair?

22       A.    It is.  It's inconsistent.

23       Q.    Again, focusing on the readings

24   that were done by Mr. Tokarski and your

25   other -- and your other personnel, at any

Confidential - Pursuant to Protective Order

1   point in time, did you communicate to Oxy

2   that the temperature readings you -- you,

3   SPSI, were getting were unreliable?

4        A.     I don't recall.

5        Q.     With respect to the temperature

6   readings that you, SPSI, and personnel were

7   getting, did you ever communicate to Norfolk

8   Southern that you were concerned they were

9   unreliable?

10       A.     Yes.

11       Q.     Who specifically did you, SPSI,

12  communicate that to?

13       A.     Norfolk Southern HAZMAT staff.

14  The first communication was with Jon Simpson.

15  I don't -- I'm -- okay.  I don't want to get

16  my sequence wrong.

17             One was Robert Wood, and one

18  was Jon Simpson.  I don't remember the

19  sequence of which I told first.  But after

20  the first entry crew, I explained to Norfolk

21  Southern's HAZMAT staff that there was no

22  good places to get to these cars, there was

23  no reliability of any of these data, and this

24  is kind of a fruitless effort, putting our

25  people at risk for data that's not going to

1    mean anything.

2              And they took that, they ran

3    with it, and I thought that was going to be

4    the end of it.

5              And then an hour or so later,

6    they asked us to keep doing it.  Whether it

7    was 30 minutes or 60 minutes, whatever it is,

8    said, hey we need another round of readings.

9              And I challenged it.  I did a

10   good faith challenge.  I said, why are we

11   doing this.  These data are not accurate.

12   They're meaningless.

13             And I was told the day -- and

14   that's -- this is my assumption, that it was

15   the command staff.  They want some data;

16   we're going to get them some data,

17   quote/unquote.

18             So I don't know if "they"

19   was -- I thought it was the command staff.

20   That's my best thought, is the command staff

21   is pushing for data.

22      Q.     These exchanges that you're

23   referencing where you made the good faith

24   challenge and indicated that you thought the

25   temperatures were unreliable, were they all

1    done verbally?

2         A.    Yes.

3         Q.    Were there -- between -- let's

4    say between February 3rd and February 6th,

5    are there any written e-mails, text messages,

6    other communications that you can recall

7    seeing where you said or anyone else from

8    SPSI said, these measurements we're getting

9    from the tank cars are unreliable?

10        A.    No.  That was two verbal

11   conversations with their management.

12        Q.    It's my understanding, correct

13   me if I'm wrong, that generally the way

14   communication worked within the incident

15   command structure was SPSI and SRS would

16   communicate with Norfolk Southern.  Norfolk

17   Southern would then communicate with incident

18   command.

19              Right?

20        A.    That's correct.

21        Q.    And information would flow the

22   other way, from incident command to Norfolk

23   Southern to SPSI, SRS.

24              Fair?

25        A.    Not always.  I mean, Norfolk

Confidential - Pursuant to Protective Order

1    Southern wouldn't tell us everything.  I

2    mean, if they didn't feel it was within our

3    purview, they may or may not have told us

4    everything.

5         Q.    Yeah.  Bad question.

6               To the extent information

7    needed to flow or the desire was it would

8    flow from incident command to ultimately you

9    and your team --

10        A.    Yeah.

11        Q.    -- it would go through Norfolk

12   Southern.

13              Fair?

14        A.    That's correct.

15        Q.    Do you know if at any point in

16   time between February 4th and February 6th

17   anybody from Norfolk Southern communicated to

18   incident command that you believed the

19   temperature readings you were getting from

20   the VCM cars were inaccurate or unreliable?

21        A.    I do not know.

22        Q.    From the date of the vent and

23   burn to today, have you ever discussed with

24   anyone at Norfolk Southern, lawyers aside,

25   whether or not they communicated your

Confidential - Pursuant to Protective Order

1  concerns about the reliability of the

2  temperature readings to incident command?

3      A.    No, I have not.

4      Q.    Why not?

5      A.    I was particularly told, as

6  soon as I was subpoenaed by the NTSB, that

7  I'm not allowed to talk to anybody, so I

8  didn't.

9           (McCarty Exhibit 10 marked for

10      identification.)

11  QUESTIONS BY MR. GOMEZ:

12      Q.    Let's bring up Document 161,

13  which we will mark as Exhibit 10.

14           Mr. McCarty, Exhibit 10 is a

15  text message exchange that was produced at

16  Bates numbers SPSI TEXTS 000340 to 000341,

17  and appears to be from February 6, 2023,

18  between yourself and Greg Palmer.

19           Do you see that?

20      A.    Yes.

21      Q.    Who is Greg Palmer?

22      A.    He's a retired CN -- retired

23  Canadian National HAZMAT manager, and I had

24  worked with Greg years ago.  He worked for me

25  at a former employer years and years ago.

Confidential - Pursuant to Protective Order

```
 1   He's a part-time resource for SPSI.
 2        Q.     Okay.  So to the extent that
 3   Greg Palmer had any involvement in the
 4   derailment response in East Palestine, was
 5   that under the umbrella of SPSI?
 6        A.     Yes.  He was my night shift
 7   safety officer.
 8        Q.     Understood.
 9               Looking at the dates and the
10   times here, I just want to direct your
11   attention to the very top of the second page.
12   It says, "Messages in chronological order.
13   Times are shown in GMT plus 00:00.
14               Do you know what that means?
15        A.     We reviewed this yesterday.
16   Greenwich Mean, I think.
17        Q.     And can we agree that it's
18   reflecting the time in a time -- in a time
19   zone other than east -- the time zone
20   applicable to East Palestine, Ohio?
21        A.     Okay.  Yes.
22        Q.     Right?
23               And I'll represent to you that
24   GMT is five hours ahead of the time in East
25   Palestine, at least at the time these texts
```

Confidential - Pursuant to Protective Order

```
 1    would have been sent.

 2              Okay?

 3         A.    Okay.

 4         Q.    So where we're referring to the

 5    dates and the times, we actually have to

 6    adjust them backwards five hours.

 7              So if I'm going to make those

 8    kind of comments, I just want to orient you

 9    to where -- where I'm coming from.

10              Okay?

11         A.    Uh-huh.

12         Q.    Direct your attention to

13    Mr. Palmer's text from 2/6/2023 at what it

14    says is 4:13 a.m.

15              Do you see that?

16         A.    Yes.

17         Q.    If we adjust it for time, that

18    would have actually been five hours earlier,

19    February 5, 2023, at 11:13 p.m.

20              Make sense?

21         A.    Okay.  Yes.

22         Q.    Mr. Palmer says, "All four cars

23    are at 65 degrees F.  He was able to find

24    jacket tears."

25              Do you see that?
```

Confidential - Pursuant to Protective Order

1       A.      I do.

2       Q.      65 degrees F, the F is a

3  reference to Farenheit.

4               Right?

5       A.      Yes.

6       Q.      And Mr. Palmer's reference to

7  jacket tears is a reference to the ability to

8  use those point-and-shoot thermometers or

9  those thermal imagers to get through the

10 insulated jacket onto the shell of the car

11 itself.

12              Right?

13      A.      This is what Greg believed from

14 the report from the guys.

15      Q.      And at least according to this

16 text message, Mr. Palmer does not express any

17 concerns about the reliability of that

18 65-degree Fahrenheit measurement in the four

19 cars he's referencing.

20              Right?

21      A.      He did not communicate anything

22 more than that.

23              (McCarty Exhibit 11 marked for

24      identification.)

25

Confidential - Pursuant to Protective Order

1    QUESTIONS BY MR. GOMEZ:

2         Q.     Okay.  We can put that one

3    aside, sir.

4              Let's pull up Document

5    Number 170, which we'll mark as Exhibit 11.

6              Mr. McCarty, this document,

7    Exhibit 11, it appears to be a February 5,

8    2023, afternoon entry findings document that

9    was produced at Bates number SPSI 001747 to

10   001748.

11             Do you see that?

12        A.     Yes.

13        Q.     This document, an entry

14   findings document, is that something that is

15   typically created by SPSI in the course of

16   responding to a derailment?

17        A.     These were notes that I guess

18   one of our employees jotted down from his

19   entry operations.

20        Q.     One of your employees who was

21   on the site as an employee -- well, as part

22   of SPSI's efforts to respond to the

23   derailment.

24             Right?

25        A.     Yes.

Confidential - Pursuant to Protective Order

1    Q.    Do you know which employee?

2    A.    I'd have to go back and ask --

3    I'm not sure on this memory.  I don't

4    remember who put this together.  I don't.

5    Q.    And would this doc -- do you

6    know whether this document would have been

7    created contemporaneously with the entry

8    that's being documented?

9    A.    I'm sorry, what's the word

10    "contemporaneously"?

11    Q.    Fair enough.

12          At or around the same time as

13    the entry that's being documented.

14    A.    It was probably typed up

15    afterwards.

16    Q.    So whoever this employee is for

17    SPSI goes into the site, they do their work,

18    they come out of the site, and then they type

19    up their notes in a document like the one

20    that we see here as Exhibit 11.

21          Fair?

22    A.    Not necessarily.  Not

23    immediately.  I mean, this was probably on

24    scratch paper or something and then prettied

25    up later.

Confidential - Pursuant to Protective Order

1     Q.     So taken from like handwritten

2   notes and then made -- and then typed up into

3   one of these types of documents.

4            Fair?

5     A.     Yeah.

6     Q.     Yeah.

7            Okay.  And that would have been

8   done as part of SPSI personnel's employment

9   with SPSI.

10           Right?  It's not done for

11  personal purposes?

12    A.     Correct.  This would be an SPSI

13  question.

14    Q.     And this is the type of record

15  that SPSI would then maintain to document

16  what was found at different entries on the

17  site.

18           Fair?

19    A.     Fair.

20    Q.     Let's move through some of

21  the -- some of the notes that are referenced

22  here.

23           You see where it says, "vinyl

24  chloride cars listed from east to west?"  Top

25  of the page?

```
 1          A.     Yes.

 2          Q.     Okay.  It then lays out the

 3   different cars that we've discussed in the

 4   same order that we discussed them.

 5                 Fair?

 6          A.     Yes.

 7          Q.     The first car is TILX402025,

 8   "eastern-most VC car."

 9                 Right?

10          A.     Eastern-most -- yeah,

11   eastern-most.  Yes, I'm with you.

12          Q.     And it notes that there was a

13   60 PSI pressure gauge reading at 12:30?

14          A.     Yes.

15          Q.     60 PSIG is a normal pressure

16   reading for a VCM car.

17                 Right?

18          A.     Yes.

19          Q.     And using the pressure curves

20   that we discussed before, that would also

21   correspond to a normal temperature from the

22   VCM cars.

23                 Right?

24          A.     Yes.

25          Q.     With respect to this section,
```

Confidential - Pursuant to Protective Order

1    for TILX402025, there is nothing to indicate

2    that the pressure reading was unreliable.

3              Right?

4         A.    On the TILX car, that's

5    correct.

6         Q.    And there -- again, just

7    referencing this section of the document that

8    we're discussing, there's nothing in this

9    section to suggest that the pressure reading

10   for this particular car was inaccurate.

11             Correct?

12        A.    That is correct.

13        Q.    Let's move on to the next car.

14   OCPX080235, heat-impacted car that has not

15   burned/relieved.

16             Do you see that?

17        A.    Yes.

18        Q.    This section goes on to note

19   that there's a temperature reading of

20   67 degrees on the pressure plate.

21             Correct?

22        A.    Well, that's what it says here,

23   but I'm wondering how our people did that

24   when they were -- this is the first I've seen

25   this data, to be honest with you.  I don't --

1    they shouldn't have been anywhere near that

2    pressure plate, but I'm following the

3    information here.

4         Q.    Okay.  Putting aside the safety

5    concerns and whether they should or should

6    not have been there, you don't have any

7    reason to disagree with this being an

8    accurate representation of what they did.

9              Right?

10        A.    Again, I'd have to investigate

11   and verify who collected this data, you know,

12   did they confuse scratch papers when they

13   were asked to put this together for whoever

14   subpoenaed this information.

15             That's why I got to be careful

16   in how I answer this, because I'm just now

17   seeing this here, and I don't -- I don't

18   necessarily -- I can't confirm this.  I

19   can't.

20        Q.    Okay.  You're testifying as the

21   corporate designee for SPSI.

22             Right?

23        A.    I am.

24        Q.    This was a document produced by

25   SPSI.

Confidential - Pursuant to Protective Order

```
 1              Right?
 2     A.       Apparently so, yes.
 3     Q.       Are you not prepared to testify
 4   to the accuracy of the information in this
 5   document as SPSI's corporate representative?
 6     A.       I'm a little surprised by -- I
 7   don't know who prepared this.  So at this
 8   moment -- is that a follow-up thing, or how
 9   does this work?  I don't know what I don't
10   know in the process here, but...
11              MR. HANSON:  This was produced
12         by SPSI, and in -- it was responsive
13         to the subpoena, to the 30(b)(6)
14         subpoena.
15              I don't believe as SPSI he has
16         to have complete and total recall of
17         every piece of paper that has been
18         produced.
19              We'll certainly, if you'd like,
20         follow up this evening and try to
21         figure out what we can find out about
22         this, since there's a second day, and
23         try to do -- and try to give better
24         answers, if you would like.
25              MR. GOMEZ:  I just want to know
```

Confidential - Pursuant to Protective Order

1        if this is a document that he can or

2        can't testify to at this point as a

3        corporate representative.

4               MR. HANSON:  Well, I think

5        he --

6               MR. GOMEZ:  I believe the

7        answer is -- I believe the answer is

8        on the record.

9               MR. HANSON:  Yeah.

10              MR. GOMEZ:  And I'm fine to

11      move on.

12              MR. HANSON:  Okay.

13  QUESTIONS BY MR. GOMEZ:

14      Q.    You can't today, right?

15      A.    Yeah, I mean --

16      Q.    All right.

17      A.    -- I think, yeah, that'd be --

18  let's move on.

19      Q.    All right.  Putting that --

20  putting that aside, you can -- you can

21  confirm that at least it says on this -- on

22  this piece of paper, the document we've

23  marked as Exhibit 11, that the temperature

24  reading was 67 degrees Fahrenheit on the

25  pressure plate.

Confidential - Pursuant to Protective Order

```
1                    Right?
2         A.    That's what someone's reported.
3         Q.    A temperature reading on a
4    pressure plate, that's a good reading.
5                    Right?
6         A.    It's not representative of the
7    temperature in the product, but it is one
8    thing in reference documents that can be an
9    indicator of increased temperature in the
10   car.
11        Q.    Okay.  So I want to make sure I
12   understand correctly.
13                   It's not a -- it's not a --
14   it's not representative of the product
15   temperature, but it could be an indicator of
16   what the product temperature is.
17                   Is that what you're saying?
18        A.    So the pressure plate itself is
19   over an inch thick of metal.
20        Q.    Uh-huh.
21        A.    So your external ambient --
22   whatever reading you're getting outside in
23   ambient air is not going to be representative
24   of the liquid in the car.
25                   But we have, in our emergency
```

Confidential - Pursuant to Protective Order

1    response, been able to use point-and-shoot

2    thermometers on pressure -- because heat

3    rises.  So if the pressure plate gets warm,

4    it can be an indicator.

5        Q.    And again, focusing just on

6    this section, the section for OCPX080235,

7    there's nothing written in this section that

8    you see in the document calling into question

9    the accuracy or the reliability of that

10   67-degree Fahrenheit reading.

11            Correct?

12       A.    What was your -- I'm sorry,

13   your question?  I was still thinking about --

14   what was the question?

15       Q.    Referencing just this section

16   that we've been talking about for OCPX080235,

17   there's nothing written in this document, in

18   that section, that calls into question the

19   reliability or the accuracy of that

20   temperature reading.

21            Correct?

22       A.    Not written here, no.

23       Q.    Let's move on to the next one.

24            OCPX080179, car that had

25   aggressively relieved.

1                    Do you see that?

2          A.       Yes.

3          Q.       That's the car that vented for

4    70 minutes February -- afternoon of

5    February 4th.

6                    Right?

7          A.       Yes.

8          Q.       And that would have been the

9    car that escalated the concern about

10   polymerization actively happening within the

11   VCM cars.

12                   Correct?

13         A.       Yes.

14         Q.       The document states that for

15   that car, OCPX080179, the temp reading was

16   85 degrees Fahrenheit, taken approximately

17   knee-high from ballast level.

18                   Did I read that correctly?

19         A.       Yes.

20         Q.       Knee-high from ballast level

21   would approximately be 1 to 2 feet above the

22   surface level?

23                   Is that fair?

24         A.       Yes.

25         Q.       And that would be the liquid

1    phase for a car.

2                  Right?

3       A.      Well, that would be the outer

4    jacket material.

5       Q.      Well, there's nothing that says

6    that the reading was through the jacket or

7    through a hole in the jacket.

8                  Right?

9       A.      Well, again, the -- none of my

10   employees I interviewed, and I interviewed

11   them all who would have had a hand in thermal

12   monitoring, all of my employees -- and as --

13   again, the NTSB subpoena, I had to

14   investigate, okay, tell me about these

15   readings, and make sure I knew what I thought

16   all my guys reported to me.

17                  And they all confirmed.

18   Literally none of my employees felt that they

19   got good, accurate readings of the tank shell

20   in any of the efforts.

21      Q.      This document does not say

22   that, though, for this particular car.

23                  Correct?

24      A.      This -- any references -- I'm

25   just still hung up on somebody in my company

Confidential - Pursuant to Protective Order

1    climbed on that housing, and I don't know

2    why.

3              But the -- these things there

4    were from point-and-shoot thermometers on the

5    external of the jacket.

6        Q.    But again -- and I want to make

7    sure we're clear about this.

8              In this document that we're

9    looking at, Exhibit 11, the section for

10   OCPX080179, there is no reference to the

11   temperature readings that were taken being

12   unreliable or inaccurate.

13             Correct?

14       A.    No.  In all the recordings,

15   they were documented because we were asked to

16   document them.

17       Q.    85 degrees Fahrenheit, that

18   would correspond to roughly the normal

19   loading pressure for a VCM car at 60 to

20   70 PSI.

21             Isn't that right?

22       A.    Can I look back at the pressure

23   curve?

24       Q.    Sure.  It's page 49, I believe.

25       A.    And I'm sorry, what was exactly

Confidential - Pursuant to Protective Order

1   your question?

2        Q.    Sure.

3              At 85 degrees Fahrenheit, we're

4   looking at a corresponding pressure of

5   roughly 70 PSI.

6              Is that fair?

7        A.    Yes.

8        Q.    Okay.  And that is, in fact,

9   roughly the normal loading pressure for a

10  VCM-containing railcar.

11             Isn't that correct?  A tank

12  car?

13       A.    Yes.

14       Q.    85 degrees Fahrenheit is also

15  about 100 degrees less than the temperature

16  required to activate the PRD, according to

17  the pressure curve.

18             Right?

19       A.    100 -- what was your question?

20  100 what?

21       Q.    Sure.

22             85 degrees --

23       A.    Pressure or degrees?

24       Q.    The reading that we're looking

25  at here for this particular car, 85 degrees,

Confidential - Pursuant to Protective Order

1   according to the pressure curve, is roughly

2   100 degrees less than the temperature

3   required to activate the PRD?

4        A.     Yes, if the 85 degrees was

5   representative of the temperature in the car,

6   but it wasn't.

7        Q.     Well, the document doesn't say

8   that.

9               Right?

10       A.     It does not say that.

11       Q.     Let's move to the next car,

12   GATX095098.

13              Do you see that?

14       A.     095098.

15       Q.     The document for -- or in this

16   section, the document says, "Temp reading

17   60 degrees Fahrenheit taken via three

18   different tears in jacket."

19              Did I read that correctly?

20       A.     Yes.

21       Q.     Three different tears in the

22   jacket means that 60 degrees was the reading

23   at the shell for this particular tank car at

24   those three spots.

25              Correct?

Confidential - Pursuant to Protective Order

1      A.      No.

2              MR. HANSON:   Objection.

3   QUESTIONS BY MR. GOMEZ:

4      Q.      Why not?

5      A.      Because every one of my

6   employees doing these readings reported to me

7   that they never felt confident they ever

8   touched the jack -- the tank shell itself.

9      Q.      But the document doesn't say

10  that.

11              Right?

12     A.      The document does not say that.

13     Q.      Okay.  And you don't even know

14  who wrote this document?

15     A.      I need to verify who put this

16  together.  I don't know which one of my

17  employees put this together.

18     Q.      So as you sit here right now,

19  you can't compare what the employee who wrote

20  this document, whoever that is, put in this

21  document versus what they told you verbally.

22              Fair?

23     A.      Fair.

24     Q.      Let's move on to the next car.

25  OCPX80370.

Confidential - Pursuant to Protective Order

1             Do you see that?

2       A.      80370, yes.

3       Q.      And there's three bullet points

4  referencing temperature.  They are bullet

5  points 2 through -- 2 through 4.

6             The first says, "Temp reading

7  135 degrees Fahrenheit at 14:30 on 2/5/23."

8             Right?

9       A.      I think I lost you.  Where are

10  you at?

11       Q.      Second bullet point.

12       A.      Second bullet point.  Okay.

13       Q.      It says, "Temp reading

14  135 degrees Fahrenheit at 14:30 on 2/5/23."

15       A.      Yes.

16       Q.      Right?

17             Then the next reading recorded

18  for that car was 138 degrees at 15:30,

19  2/5/23.

20             Right?

21       A.      Yes.

22       Q.      That would have been about an

23  hour later?

24       A.      Appears to be, yes.

25       Q.      And then the final temperature

Confidential - Pursuant to Protective Order

1    noted in this section of the document is a

2    temp reading of 135 degrees Fahrenheit at

3    16:30 on 2/5/2023.

4              Is that right?

5         A.    Yes.

6         Q.    That same bullet point goes on

7    to note that there were two other holes in

8    the jacket where the temp measured

9    100 degrees Fahrenheit.

10              Do you see that?

11        A.    I see that.

12        Q.    There is nothing in this

13   document, specifically this section for

14   OCPX80370, calling into question the accuracy

15   or the reliability of these readings.

16              Right?

17        A.    No, there's not.

18        Q.    The reference to two other

19   holes in the jacket reading a temperature of

20   100 degrees Fahrenheit, was that information

21   that was shared with you in the field?

22        A.    No, it was not.

23        Q.    The reference to two other

24   readings through tears in the jacket at

25   100 degrees Fahrenheit, do you know whether

Confidential - Pursuant to Protective Order

1    that was ever communicated to Norfolk

2    Southern?

3          A.     No, I do not.

4          Q.     The reference to two holes in

5    the jacket with a corresponding temperature

6    of 100 degrees Fahrenheit, do you know

7    whether that was ever communicated to

8    incident command?

9          A.     No, I do not.

10               (McCarty Exhibit 12 marked for

11         identification.)

12   QUESTIONS BY MR. GOMEZ:

13         Q.     We can put that aside, sir.

14               Let's bring up Document

15   Number 172, which we will mark as Exhibit 12.

16               Mr. McCarty, Exhibit 12 is an

17   e-mail exchange between you and Michael

18   Kline.

19               Do you see that?

20         A.     Yes.

21         Q.     And it was produced as Bates

22   number SPSI 008099, bottom right-hand corner.

23               Right?

24         A.     Yes.

25         Q.     The subject of the e-mail is VC

1  car temp data information.

2          Correct?

3      A.      Yes.

4      Q.      And Mr. Kline is writing to

5  you -- well, let me take a step back.

6          Who is Michael Kline?

7      A.      He was a project manager then.

8  He's assistant general manager today.

9      Q.      So at the time of the

10  derailment, he was a project manager?

11     A.      Yes.

12     Q.      Okay.  And he writes to you in

13  this e-mail from March 30, 2023, in the

14  second paragraph, "All temperature data was

15  taken using a point-and-shoot-style

16  thermometer.  The readings were taken from

17  the tank shell through openings in the

18  jacket.  Due to ongoing safety concerns, SPSI

19  did not remove any sections of jacket, so the

20  readings were taken at the lowest available

21  points in the car where the jackets had been

22  damaged during the derailment."

23          Did I read that correctly?

24     A.      Yes.

25     Q.      So Mr. Kline is telling you

1    that in the course of taking these

2    temperatures, SPSI personnel didn't actively

3    remove any jackets.

4              Right?

5    A.      Correct.

6    Q.      But instead were taking

7    readings at the lowest available points where

8    the jackets had been compromised and they

9    could get through to the tank shells.

10             Right?

11             MR. HANSON:  Objection.

12             THE WITNESS:  That's the

13     context that's not talked about here.

14   QUESTIONS BY MR. GOMEZ:

15   Q.      Okay.  There's no context

16   provided in this document.

17             Right?

18   A.      There is not.

19   Q.      And there's also no commentary

20   about whether the temperatures were reliable.

21             Right?

22   A.      No, there's not.

23   Q.      There's nothing that Michael

24   Kline says in this e-mail about these

25   readings being inaccurate.

Confidential - Pursuant to Protective Order

```
 1                    Right?
 2        A.      No, there's not.
 3        Q.      There's nothing in this e-mail
 4   about reports from the personnel who took
 5   these temperature data reporting that they
 6   didn't get to the jacket -- or to the tank
 7   shell.
 8                    Right?
 9        A.      You're correct.
10        Q.      Okay.  He goes on to finish the
11   e-mail, "If you need anything else clarified,
12   let me know."
13                    Do you know if you responded to
14   this e-mail?
15        A.      I called him.
16        Q.      You called him?
17        A.      Yes.
18        Q.      And what did you talk about?
19        A.      Re-interviewed like -- just to
20   verify.  I mean, everything that our guys
21   were telling me, they didn't feel good that
22   anything with these data were accurate
23   because they could not guarantee that they
24   were getting to the jacket -- or to the tank.
25   They were only getting to little
```

Confidential - Pursuant to Protective Order

1  golf-ball-sized holes or very small crevices

2  of cracks in jackets.  That's the context

3  that's missing in all this.

4      Q.     And did Mr. Kline go back to

5  the employees who took these temperature

6  readings based off that phone call?

7      A.     Well, he was one of them.

8      Q.     He was one of them?

9      A.     Yeah.

10     Q.     So Mr. Kline, who is writing

11 this e-mail, actually physically took some of

12 the temperature readings.

13            Right?

14     A.     It's my understanding.

15     Q.     And if Mr. Kline wanted to put

16 in this e-mail that he felt these temperature

17 readings that he took were inaccurate or

18 unreliable, he could have done that, right?

19            MR. HANSON:  Objection.

20            MR. LEVINE:  Objection.

21            THE WITNESS:  Yeah, I can't

22       speak to whether he -- I can't speak

23       to that.

24 QUESTIONS BY MR. GOMEZ:

25     Q.     Okay.  That's important

Confidential - Pursuant to Protective Order

1   context.

2           Right?

3       A.      It was already communicated.

4       Q.      So you're saying Mr. Kline

5   didn't have to communicate that to you?

6       A.      It had already been

7   communicated in the -- in the first one and

8   the second entry teams.  The second entry

9   team also communicated the same thing

10  Mr. Tokarski communicated after the first

11  entry team.  That's why we communicated to

12  Norfolk Southern twice about it.

13      Q.      So communicated verbally, but

14  never communicated in writing?

15      A.      No.

16          (McCarty Exhibit 13 marked for

17          identification.)

18  QUESTIONS BY MR. GOMEZ:

19      Q.      Let's pull up Document

20  Number 138, which we'll mark as Exhibit 13.

21          Mr. McCarty, this Exhibit 13 is

22  the Group G, Exhibit 31 to the NTSB

23  investigative hearings.

24          Right?

25      A.      Yes.

Confidential - Pursuant to Protective Order

1    Q.    And it's the interview

2  transcript from the interview you gave on

3  February 23, 2023.

4            Right?

5    A.    Yes.

6    Q.    Have you reviewed this document

7  before today?

8    A.    Yes, I reviewed it in the --

9  before the NTSB hearings in June.

10   Q.    And February 23, 2023, that

11 would have been roughly 20 days after

12 derailment.

13           Right?

14   A.    Yes.

15   Q.    Fair to say that everything

16 that happened in the 20 days preceding this

17 interview was still pretty fresh in your

18 mind?

19   A.    Relatively speaking.

20   Q.    It's a significant derailment.

21           Right?

22   A.    Significant derailment.

23   Q.    Significant response.

24           Right?

25   A.    Significant response.

Confidential - Pursuant to Protective Order

1      Q.      Memorable.

2              Right?

3      A.      Memorable.

4      Q.      Okay.  And you knew that you

5   were giving this interview to the NTSB

6   because it's their job to determine how

7   derailments occur so that they can prevent

8   them from happening in the future.

9              Fair?

10     A.      Yes, that's their -- that's

11  their primary function.

12     Q.      So you knew that it was

13  important to be truthful when you gave this

14  statement to the NTSB.

15             Right?

16     A.      Yes.

17     Q.      You knew that it was important

18  for you to be accurate in the information you

19  were giving the NTSB.

20             Right?

21     A.      Yes.

22     Q.      And you knew that it was

23  important to be complete in the information

24  you were giving the NTSB.

25             Right?

Confidential - Pursuant to Protective Order

1    A.    I mean, when you say

2  "complete," we're all human beings.  If I

3  missed something, it wouldn't have been a

4  deliberate miss.  I mean, I -- you know,

5  so --

6    Q.    So you didn't deliberately

7  leave out any important information.

8          We can agree on that, right?

9    A.    Yes.  Correct.

10    Q.    And if additional information

11  came to mind after you gave this interview,

12  you had the opportunity to share that with

13  the NTSB as well.

14          Right?

15    A.    I would have done that in the

16  hearings, yes.

17    Q.    And you also had the ability to

18  actually review this transcript for any

19  errors or anything that you omitted.

20          Right?

21    A.    Yes, through that errata

22  program, yeah.

23    Q.    Having reviewed this document

24  before, can you point me to anywhere where

25  you indicate that there were concerns about

Confidential - Pursuant to Protective Order

1    the reliability or the accuracy of the

2    temperature readings that were being taken

3    between February 4th and February 6th?

4                    MR. HANSON:  Do you -- you

5           better read the whole thing.

6                    THE WITNESS:  Yeah, I was going

7           to say --

8                    MR. GOMEZ:  We can go off the

9           record, and you can read the whole

10          thing.

11                   MR. HANSON:  Okay.  Let's do

12          that.

13                   THE WITNESS:  I was going to

14          say, I don't know if they even asked

15          me about that.

16                   MR. HANSON:  No, read the whole

17          thing.  Read the whole thing.  That's

18          what he wants to know.

19                   THE WITNESS:  Can I take a

20          five-minute break real quick?

21                   MR. GOMEZ:  You can take all

22          the break you want.

23                   THE WITNESS:  Okay.

24                   VIDEOGRAPHER:  Off the record

25          at 1:53.

Confidential - Pursuant to Protective Order

1        (Off the record at 1:53 p.m.)

2        VIDEOGRAPHER:  We are now back

3    on the record at 2:12.

4    QUESTIONS BY MR. GOMEZ:

5        Q.    So, Mr. McCarty, we just took a

6    quick break.

7        Two housekeeping notes.  The

8    first is, we marked an annotated copy of

9    Exhibit 13 before we took the break.  We've

10   now swapped that out for a clean copy, which

11   is what you have in front of you and which

12   will be part of the record.  That's number 1.

13       A.    Okay.

14       Q.    Number 2, the question that I

15   had asked before the break, I'm going to

16   withdraw that question and instead ask you

17   some different questions about Exhibit 13.

18       Okay?

19       A.    Okay.

20       Q.    With respect to Exhibit 13, you

21   mentioned that you were familiar with and I

22   think went through the errata process.

23       Is that correct?

24       A.    Yes.

25       Q.    And in that process, you had an

Confidential - Pursuant to Protective Order

1   opportunity to review the transcript to make

2   sure that it was correct and accurate.

3                Right?

4        A.     Yes.

5        Q.     You had the opportunity to

6   provide clarifications if there was issues

7   that needed to be clarified.

8                Right?

9        A.     Yes.

10       Q.     You had an opportunity to

11  correct misstatements that were noted in the

12  transcript if there were misstatements.

13       A.     Yes.

14       Q.     Correct?

15               So can we agree that

16  Exhibit 13, with your changes in the errata

17  process, is a true and accurate reflection of

18  the statements you made to the NTSB in

19  connection with that February 23, 2023

20  interview?

21       A.     Yes.

22       Q.     So if it appears in that

23  transcript, again, Exhibit 13, it was

24  something you told the NTSB during that

25  statement.

1          Correct?

2     A.     Yes.

3     Q.     And if it doesn't appear in

4   that transcript from February 23, 2023, then

5   it's not a statement that you made to the

6   NTSB during that interview.

7          Correct?

8     A.     Yeah, if it's not in here, it

9   wasn't recorded, right.

10    Q.     It's not that it wasn't

11  recorded; it's that it wasn't said.

12         Right?

13    A.     Oh, yeah, correct.  Not part of

14  that process.

15         (McCarty Exhibit 14 marked for

16         identification.)

17  QUESTIONS BY MR. GOMEZ:

18    Q.     We can put that one aside.

19         Let's bring up Document

20  Number 175, which we'll mark as Exhibit 14.

21         Mr. McCarty, the document that

22  we're marking as Exhibit 14, I just want to

23  orient you on how the best way to transition

24  through the pages.

25         Unfortunately, the resolution

Confidential - Pursuant to Protective Order

1    is such that some of the page numbers are cut

2    off in the bottom right-hand corner.

3         A.    Okay.

4         Q.    But the screen has the full

5    numbers on the bottom right-hand corner.

6               So that's how we'll be

7    referencing the document and allow you to

8    orient yourself.

9               Okay?

10        A.    Oh, okay.  Got it.

11        Q.    Does that make sense?

12        A.    Yes.

13        Q.    Very good.

14              Mr. McCarty, Exhibit 14 is a

15   presentation that you made to the Senate

16   Commerce Committee on March 27, 2023.

17              Right?

18        A.    Yes.

19        Q.    And is this, in fact, the

20   presentation that we were discussing earlier

21   in connection with some text messages between

22   you and Chip Day?

23        A.    Yes.

24        Q.    And this was the presentation

25   to -- I think we called it the subcommittee.

Confidential - Pursuant to Protective Order

1    It wasn't the full Senate but a certain

2    number of senators and staffers and the like?

3         A.    Yes.

4         Q.    And the purpose of this

5    presentation was in part to provide

6    information about your response to the East

7    Palestine derailment.

8         A.    Yeah.

9               And I'm sorry.  Can I clarify

10   my previous answer?

11        Q.    Of course.

12        A.    The senators weren't there.

13   Just their staffers --

14        Q.    Okay.

15        A.    -- just for the record.  The

16   senators didn't show up for the meeting; just

17   their staffers.

18        Q.    Okay.

19        A.    I just wanted to get that

20   clear.

21              Okay.  What was your next

22   question?  I'm sorry.

23        Q.    Sure.

24              Part of the purpose of this

25   presentation, in part, was to provide

Confidential - Pursuant to Protective Order

1    information about your response to the East

2    Palestine derailment.

3              Right?

4        A.     Yes, that's what initiated

5    their inquiry.

6        Q.     If we look at the page that's

7    marked SPSI 114195 -- and that'll come up on

8    the screen as well to help orient you.

9        A.     Yes.

10       Q.     This is the start of the

11   presentation specific to East Palestine.

12             Fair?

13       A.     Yeah, this was probably

14   two-thirds of the way through the

15   presentation.

16       Q.     Okay.  And if we scroll down to

17   page 114202, there's a part of the

18   presentation that reflects observations of

19   conditions Saturday into Sunday.

20             Do you see that?

21       A.     202, yes.

22       Q.     And there's a bullet point

23   towards the middle of the page that reads,

24   "Close-up assessment of that car revealed,

25   colon," and then several observations below

Confidential - Pursuant to Protective Order

1    it.

2              Right?

3      A.     Yes.

4      Q.     That last observation, the last

5    bullet point, can you please read that into

6    the record?

7      A.     The very last bullet point on

8    that page?

9      Q.     Yes, please.

10     A.     The "west side of that car was

11   at 135 Fahrenheit, and it increased in

12   30 minutes to 138 Fahrenheit."

13     Q.     That statement that you made in

14   this presentation, Exhibit 14, about the

15   temperature of this western-most VCM car to

16   the United States Senate subcommittee

17   staffers was based off of temperature

18   readings that were taken by SPSI personnel on

19   the site.

20             Correct?

21     A.     That particular reference to

22   those particular readings?  You're looking at

23   the temperature reader.  That was me.

24     Q.     Oh, you took that particular

25   reading?

Confidential - Pursuant to Protective Order

```
1        A.     Yes.

2        Q.     Okay.

3        A.     Well, I took the 135.  I took

4    the 135.  Other employees took the 138

5    30 minutes later.

6        Q.     Okay.  So you have firsthand

7    knowledge of the 135 referenced here.

8               Right?

9        A.     Yes.

10       Q.     And then other employees took

11   the 138 that's referenced here.

12       A.     Yes.

13       Q.     Right?

14              The PowerPoint does not note

15   that these temperatures were unreliable.

16              Right?

17       A.     No.  These were the ones of all

18   five cars involved -- well, the four cars

19   that would have had heat impingement, this is

20   the one that there was enough jacket removed.

21   The jacket space was -- you know, I'm trying

22   to show here measurements, but probably a

23   couple of feet by a foot in width.

24              We had one snapshot of one

25   spacious area where we could truly -- I
```

Confidential - Pursuant to Protective Order

1  put -- I told -- I took my glove off my hand,

2  put the back of my hand on the car.  It was

3  too hot to touch.  I had to hold it three

4  seconds and couldn't hold it much longer than

5  a few seconds and I would burn my hand

6  otherwise.

7            So we went another entry, went

8  and got a thermal imaging camera, took the

9  temperature, got 135, and then started

10 checking it every few minutes.

11      Q.    So of all the temperature

12 measurements taken from different points

13 across all of these cars in a 48-hour period,

14 the only one that's reliable are the highest

15 ones that are indicated here as 135 and 138?

16      A.    The only car that we had one

17 spot, and only one spot, on that car that I

18 knew about, that I personally observed, was

19 that spot of torn jacket on the western-most

20 side of the car.

21      Q.    And again, as you sit here

22 today, is there any document that you're

23 aware of, e-mail, text message, other type of

24 document, created at or around the time of

25 the derailment, indicating that the other

1  temperatures taken of the VCM cars were

2  unreliable or inaccurate?

3       A.     Documentation seems to be no.

4  It was the verbal communications between my

5  personnel and me, and me to Norfolk Southern

6  HAZMAT staff.

7       Q.     This presentation that you gave

8  to the Senate subcommittee staffers, do you

9  independently recall whether this

10 presentation contained information about

11 Oxy's conclusion that polymerization was not

12 occurring in the cars?

13      A.     I can't recall.  I'd have to go

14 back and...

15      Q.     Without looking at the

16 document, you couldn't tell whether or not

17 you told the Senate subcommittee that Oxy

18 concluded polymerization was not occurring in

19 the cars?

20      A.     I don't recall.

21      Q.     We can put that one aside, sir,

22 and we'll bring up -- actually, bring out

23 Exhibit Number 1 again.  At the bottom of the

24 stack.

25      A.     Oh.

Confidential - Pursuant to Protective Order

1    Q.    And again, Exhibit Number 1 is

2    the HAZMAT materials group fact -- group

3    chair's factual report.

4         Right?

5    A.    Yes.

6    Q.    I'm going to orient you to

7    page 92 of 158, specifically Table 12 in the

8    center of the page.

9         And with full understanding

10   that that table is pretty small in printed

11   form, it also appears blown up on the screen

12   in front of you for ease of reference.

13        Okay?

14   A.    Yeah.  Okay.

15   Q.    Mr. McCarty, the information

16   that we see in Table 12 appears to be

17   temperature readings and then a graph of

18   temperature readings taken by SPSI on

19   February -- between February 5th and

20   February 6, 2023.

21        Is that correct?

22   A.    Yes.

23   Q.    And having reviewed this table,

24   can you confirm that these temperature

25   readings are in fact the temperature readings

Confidential - Pursuant to Protective Order

1    that were obtained by SPSI personnel for

2    these cars during that period?

3          A.     I'm going to concede that the

4    notes that our folks took and provided to

5    Norfolk Southern ended up in this report.

6    I'll concede that, yes.

7          Q.     Okay.  And made their way into

8    these kind of charts that we're looking at?

9          A.     Yes.

10         Q.     Okay.  Fair enough.

11                These temperature readings for

12   the first four vinyl chloride cars that we

13   see in the -- in the chart on the left-hand

14   side, you'd agree with me that they reflect

15   fairly stable temperatures.

16                Right?

17         A.     No, that's where we're

18   disagreeing.  I'm not saying that these

19   temperatures -- they're just not accurate of

20   the liquid in a car.  That's the message that

21   is driven home.  I'm on the record in the

22   NTSB hearings.  That's the -- these are not

23   representative of liquid in that car.

24         Q.     Got it.

25                So you're -- so you're not

Confidential - Pursuant to Protective Order

1    disputing that these are the numbers that

2    SPSI came up with and reported to the NTSB.

3    Instead, you're disputing that they're not

4    accurate measurements of the temperature of

5    the product in the car?

6         A.    That's correct.

7         Q.    You mentioned earlier in

8    connection with a statement that was

9    attributed to you to the incident commander

10   about the runaway polymerization temperature

11   of 153 to 158, that you took exception to

12   that and stated that to the NTSB.

13             Do you remember that?

14        A.    No.  In fact, going back to

15   your question this morning, and that was some

16   miscommunication, disconnect between the

17   incident commander's assumption that we were

18   referring to polymerization.

19             Any conversation about

20   increasing pressure in the cars and

21   increasing temperature in the cars had to do

22   with damage assessment that we never had a

23   good chance to do.  And it took one car with

24   one critical damage to detonate and land in

25   the town.

Confidential - Pursuant to Protective Order

1          So a little disconnect in

2   communication.

3      Q.      Just referencing what appears

4   in the document itself, in Exhibit 1, the

5   attribution by the NTSB to comments made

6   about the runaway polymerization temperature

7   to the incident command, you disagree with

8   that.

9          Right?

10     A.      As I stated this morning, that

11  was a -- wherever the NTSB got that

12  statement, it was not from me.

13     Q.      And you told them that it

14  wasn't from you.

15          Right?

16     A.      I'm not so sure that they ever

17  asked me.  This is in their June document.

18  That never came up, as I recall, in my

19  February interview.

20     Q.      So is it your testimony that

21  with respect to that conversation that's

22  attributed to you, you never told the NTSB

23  that that was inaccurate?

24     A.      If they asked me a question

25  during the hearings, I would have clarified

1    it.  I don't recall if they asked me that

2    question or not.

3         Q.     Outside of the hearings, you

4    haven't gone to the NTSB with respect to that

5    particular statement that we're referring to

6    and said, I didn't -- I didn't say this to

7    anybody; it's inaccurate?

8         A.     As I recall, they never offered

9    me an errata data sheet opportunity on their

10   draft report.  They didn't give me an

11   opportunity to clarify what they put in their

12   report.

13        Q.     With respect to what we're

14   looking at here, Table 12, the temperatures

15   that were reported and recorded, outside of

16   the investigative hearings in East Palestine,

17   have you communicated with the NTSB about

18   your belief that these are inaccurate or

19   unreliable as measures of the actual

20   temperature of the product in the VCM cars?

21        A.     I communicated with them very

22   clearly during the hearings at East

23   Palestine.

24        Q.     Okay.  My question was, outside

25   of those hearings, have you communicated with

Confidential - Pursuant to Protective Order

1    the NTSB that what appears in this Table 12

2    on page 92 of Exhibit 1 is an inaccurate,

3    unreliable measure of the actual temperature

4    of the product inside the VCM cars?

5        A.     Now you're grouping all the

6    cars into that statement with the way you're

7    phrasing the question.

8              The car on the west, the

9    western-most car, whatever car number that

10   was, by itself, on the west, that certainly

11   had us concerned on Sunday afternoon or

12   Sunday morning, whenever it was we found that

13   it had quit burning.  And I don't remember

14   the timeline.

15             But at sometime Sunday, people

16   said it quit burning, and we went to assess

17   it.  That's kind of when that elevated

18   concern happened.

19       Q.    So let me rephrase that.

20             Outside of the investigative

21   hearings in June of 2023 in East Palestine,

22   have you communicated that the temperatures

23   that appear in Table 12 of Exhibit 1 for the

24   four VCM cars to the east are not accurate or

25   reliable measures of the temperature of the

Confidential - Pursuant to Protective Order

1    VCM product in the tank cars?

2         A.    Any communications I had with

3    the NTSB were through the errata data sheet

4    process from the February -- whatever date it

5    was they interviewed me in the church in East

6    Palestine and the June hearings in East

7    Palestine.  Those are the only communications

8    I've had regarding this with the NTSB.

9              MR. GOMEZ:  Sir, I've only got

10        about an hour left across both

11        notices, so I'm going to reserve the

12        remainder of my time and invite the

13        other attorneys to ask you their

14        questions.

15             THE WITNESS:  Okay.

16             MR. GOMEZ:  Thank you.

17             THE WITNESS:  You're welcome.

18             VIDEOGRAPHER:  We are off the

19        record at 2:27.

20         (Off the record at 2:27 p.m.)

21             VIDEOGRAPHER:  We are now back

22        on the record at 2:31.

23             DIRECT EXAMINATION

24    QUESTIONS BY MR. SWANSON:

25         Q.    Mr. McCarty, good afternoon.

Confidential - Pursuant to Protective Order

```
1   My name is Brian Swanson, and I represent

2   Trinity.

3           Before we dive in here, I just

4   wanted to confirm.  On the record this

5   morning, my understanding, based on comments

6   from your attorney, is that the testimony

7   you're providing in response to my questions

8   is testimony on behalf of Drew McCarty and on

9   behalf of SPSI.

10          Is that your understanding as

11  well, sir?

12      A.    Yes, sir.

13      Q.    Thank you.

14          Okay.  So as I said, I

15  represent Trinity.  Trinity is a company you

16  are familiar with.

17          True?

18      A.    Yes, sir.

19      Q.    Can you tell me, what's your

20  understanding of what Trinity does?

21      A.    So they build, produce and

22  lease tank cars.

23      Q.    Okay.  And setting aside for

24  purposes of this question the East Palestine

25  derailment, have you worked with individuals
```

1    at Trinity in any of the prior derailments

2    that you've worked around the country?

3        A.    I can't recall my -- my

4    experience with Trinity at derailments, but

5    we are a Trinity vendor for C6r services.

6    We're certified in valves and fittings, and

7    Trinity is one of our customers.

8        Q.    Okay.  That was a lot of words

9    that I didn't understand.

10            Can you tell me or explain a

11   little bit in detail that I or a jury might

12   understand what your relationship -- SPSI's

13   relationship is with Trinity?

14       A.    So in your question, you asked

15   do we have derailment experience with

16   Trinity, and I honestly can't recall any

17   specific derailment-related work experience

18   with Trinity.

19            However, on a periodic basis,

20   your fleet management service, repair folks

21   at Trinity, call upon our special service

22   capabilities to go maybe change a valve on a

23   car that needs changed.  And perhaps it's an

24   empty residue car, not a clean and purged

25   car.

Confidential - Pursuant to Protective Order

1            So we can don PPE, we can go do

2    things in the field with flaring and

3    scrubbing and do things that most mobile

4    repair shops can't do because they're not

5    HAZMAT guys.

6        Q.    So that would be in the context

7    of a derailment, you may be called on by

8    Trinity to do some work on valves or other

9    things you have expertise in?

10       A.    Well, in derailments, in my

11   experience, Trinity wouldn't necessarily

12   contract us at a derailment.

13            Either the host railroad or if

14   the derailment happened in a chemical plant,

15   whoever's accident that it was, are generally

16   the customer that would contract us.  Not

17   necessarily Trinity, the car owner.

18       Q.    So what's the situation, I

19   guess I missed it, where Trinity would

20   contract with you to perform the services

21   that you described?

22       A.    So an example would be such

23   where Trinity leases a car to X, Y, Z

24   chemical company.  And depending on how that

25   lease is set up between Trinity and that

Confidential - Pursuant to Protective Order

1    company, either Trinity is 100 percent

2    responsible for the service equipment or

3    their customer, the person leasing the car,

4    may be responsible for maintaining service

5    equipment.

6              In either case, regardless of

7    who is commercially responsible for that

8    service equipment, because of our C6r

9    credentials and what the FRA enforcement

10   folks are expecting out of us as a mobile

11   repair unit, whether we're getting paid by

12   the car leasor -- I guess leasor or leasee --

13   I forget the legal terms there.  But the

14   person leasing the car, whether we're working

15   for your customer or whether we're working

16   directly for Trinity, either way, Trinity is

17   in the loop because we're working on a

18   Trinity car.

19             So it's a long way to answer

20   your question, but that is truly how it

21   works.

22        Q.    No, and I appreciate that,

23   because it's something I didn't understand

24   before.

25             Based on the work that you've

Confidential - Pursuant to Protective Order

1    done for Trinity in these circumstances, you

2    have familiarity with their cars.

3                    True?

4        A.      In a broad sense.  I mean, each

5    car, as you know, is inherently different,

6    set up for different customers.

7        Q.      Let me ask you specifically now

8    as to East Palestine.

9                    I understand that you were in

10   East Palestine beginning the evening of

11   February 3rd of 2023.

12                   Is that true?

13       A.      Yes.

14       Q.      And you were there at least

15   through the vent and burn operations on the

16   6th.

17                   Correct?

18       A.      Yes.

19       Q.      During that time, from the 3rd

20   to the 6th with the vent and burn, did you

21   interact with anyone from Trinity when you

22   were on the ground?

23       A.      No, not that I recall.

24       Q.      Okay.  And that's no calls, no

25   texts, no personal interactions.

Confidential - Pursuant to Protective Order

1          True?

2     A.     Not that I recall.

3     Q.     No one from Trinity, to your

4  knowledge, provided any input as to whether

5  the vent and burn was a good idea or a bad

6  idea.

7          True?

8     A.     Not to me directly.  I have no

9  knowledge if they communicated with Norfolk

10  Southern.  I don't know.

11     Q.     No one told you, hey, we spoke

12  to Trinity, and this is their view.

13          Correct?

14     A.     No.

15     Q.     I am correct?

16     A.     You're correct.

17     Q.     Yeah.  Thank you.

18          And no one from Trinity

19  provided any input to you or to anyone else

20  that you know regarding whether the VCM was

21  polymerizing.

22          True?

23     A.     To my understanding, that's

24  true.  Not to me.  I wasn't privy to any

25  conversations with Trinity in that.

Confidential - Pursuant to Protective Order

```
 1          Q.      Okay.  And I'm going to try to
 2   not retread a lot of ground here from what's
 3   covered this morning.  I might have to set
 4   some things up, so if you're -- if I sound a
 5   little repetitive, that's the only reason
 6   why.
 7                  You understand, sir, that
 8   Trinity owned a single car, VCM car, that was
 9   involved in the derailment.
10                  Correct?
11          A.      I understand that now, after
12   all this, yes.
13          Q.      Right.
14                  No dispute about that.
15                  Right?
16          A.      Correct.
17          Q.      That car, we've seen that
18   you've referred to it as the eastern-most VCM
19   car.
20                  Correct?
21          A.      Yes, sir.
22          Q.      It's also referred to as car
23   TILX402025.
24                  Right?
25          A.      Yes.
```

Confidential - Pursuant to Protective Order

1    Q.    And I've seen it sometimes

2  referred to as Car 26, sometimes referred to

3  as Car 28, depending on whether you count the

4  locomotives at the -- at the head of the

5  train.

6         Is that fair?

7    A.    I hadn't heard that before, but

8  I would -- if people were doing that,

9  counting locomotives makes sense.

10    Q.    Okay.  And it may not matter,

11  but sometimes documents refer to it

12  differently, so I want to make sure we're on

13  the same page.  I'll try be as clear as I can

14  if it matters.

15         Okay?

16    A.    Okay.

17         (McCarty Exhibit 15 marked for

18         identification.)

19  QUESTIONS BY MR. SWANSON:

20    Q.    And we're obviously going to

21  spend a lot of time talking about the Trinity

22  car today.  But because I'm more of a visual

23  person and most juries are more visual, I

24  just want to show you a picture just so we

25  can situate that car in the -- in the

Confidential - Pursuant to Protective Order

1    derailment.

2              So I'm going to mark -- and if

3    we could put up, please, D34, which we'll

4    mark as Exhibit 15.

5              How about this then?  I am such

6    a knucklehead.

7              Can we pull up -- we'll just do

8    it.  I'll put the video up later.

9              If you guys need one, it's just

10   a picture.

11             So you have, sir, in front of

12   you Exhibit 15.

13             Is that what you have?

14   A.     Yes, sir.

15   Q.     Okay.  And this is Exhibit D34

16   from the NTSB hearings.

17             Correct?

18   A.     Yes.

19   Q.     You can see it's titled

20   "Figure 1, Hazardous Materials Group Chair's

21   Factual Report," and then it's a labeling of

22   the various cars that were involved in the

23   derailment.

24             Is that what you have, sir?

25   A.     Yes.

1  Q.    If you look at the second page

2  of Exhibit 15, the bottom photograph, you can

3  see a picture of a car that's designated 28.

4        Do you see that?

5  A.    Yes.

6  Q.    If you then look at the chart

7  on the side of those photographs, you can see

8  the reference that the Car 28 is TILX402025.

9        Right?

10 A.    Yes, sir.

11 Q.    Okay.  And can I call that for

12 shorthand the Trinity VCM car?

13 A.    Absolutely, yes.

14 Q.    Okay.  And we'll understand

15 we're talking about the very same car.

16       Right?

17 A.    Yes, sir.

18 Q.    It was -- there was a question

19 this morning about whether that had ever been

20 referred to as the white car.

21       It sounded like that wasn't

22 something you were familiar with?

23 A.    I hadn't heard anybody refer to

24 it as the white car, but --

25 Q.    I hadn't either, but it makes

Confidential - Pursuant to Protective Order

1    sense looking at the picture.

2         A.    Yeah, it's painted white.

3    Yeah.

4         Q.    Okay.  And specifically now,

5    not just looking at the picture, but in

6    seeing the picture, you recall specifically

7    that car when you were on the ground in East

8    Palestine between the 3rd and the 6th.

9              Correct?

10        A.    Yes, sir.

11        Q.    Thank you.  Now you can set it

12   aside.

13        A.    I just thought I was

14   identifying the car.  I'm sorry.

15        Q.    Okay.  And obviously, unless I

16   tell you differently, my questions today are

17   going to focus on that Trinity car and not on

18   the -- on the other VCM cars, unless I tell

19   you.

20             Okay?

21        A.    Okay.  Thank you.

22        Q.    And I think agree with me that

23   the Trinity VCM car was differently situated

24   than the other VCM cars in the derailment.

25             Correct?

Confidential - Pursuant to Protective Order

1      A.      Yes, it was.

2      Q.      And we're going to talk about

3   the reasons for that as we go through the

4   testimony.

5              Did you know, sir, that Norfolk

6   Southern has filed a lawsuit against Trinity

7   relating to the derailment in East Palestine?

8      A.      I have become aware of that in

9   this process.

10     Q.      Okay.  And from your hand

11  gestures, it's something you learned from the

12  attorneys?

13     A.      Well, being subpoenaed to be

14  here was kind of when it came together for

15  me.

16     Q.      Let me ask a better question.

17             When did you first learn that

18  Norfolk Southern had filed a lawsuit against

19  Trinity relating to the East Palestine

20  derailment?

21     A.      I can't remember if it was

22  mentioned in news articles when the press

23  release went out, whether Trinity was named

24  or not or whether it was my subpoena for this

25  deposition.  I can't pinpoint of when I knew.

Confidential - Pursuant to Protective Order

1   Q.    And you also don't recall how

2   it was that you learned of the lawsuit

3   against Trinity?

4   A.    No.  And to this moment, I

5   really don't even know the nature of it.

6   Q.    You're anticipating my

7   questions --

8   A.    Okay.

9   Q.    -- so let me -- so you don't

10  know anything about the specific claims that

11  have been made against Trinity by Norfolk

12  Southern.

13        Correct?

14  A.    I do not.

15  Q.    I'm still going to ask you

16  about some of them, okay --

17  A.    Sure.

18  Q.    -- and see if you have any

19  comment on the allegations that have been

20  made.

21        In the complaint that Norfolk

22  Southern filed against Trinity, they allege

23  that Trinity's VCM car, Car 26, has

24  discrepancies between its AAR 4-2 Certificate

25  of Construction and the tank car's actual

Confidential - Pursuant to Protective Order

1    characteristics.  That's what they allege.

2              Okay?

3              MR. HANSON:  Can we just rely

4       that that's their representation of

5       what they say?  Because he said he's

6       never seen that.

7              MR. SWANSON:  Yeah, I know, and

8       I don't want to -- I'm not hiding

9       anything.  I'm just not going to mark

10      it as an exhibit.  But if you guys

11      want to look at it, I have no problem

12      with that.

13             MR. HANSON:  Thank you.

14             And what paragraph was that,

15      sir?

16             MR. SWANSON:  So this is

17      paragraph 120 --

18             MR. HANSON:  Okay.

19             MR. SWANSON:  -- of the

20      complaint that Trinity -- or excuse

21      me, Norfolk Southern filed against

22      Trinity.  So that's on page 24, if you

23      want to follow along.

24             Okay?

25             MR. HANSON:  Thank you.

1          THE WITNESS:  Yes, thank you.

2   QUESTIONS BY MR. SWANSON:

3          Q.     So do you see on paragraph 120

4   of the complaint that Norfolk Southern filed,

5   it says, "Here, there were multiple

6   discrepancies identified by the Federal

7   Railroad Administration between the approved

8   documents and the actual physical

9   characteristics of the vinyl chloride tank

10  cars on Train 32N."

11          Do you see that?

12          A.     Yes, sir.

13          Q.     32N is obviously the train that

14  derailed?

15          A.     Train --

16          Q.     Okay.  And then what I just

17  read to you is subparagraph A in 120, which

18  reads, "Trinity Industries Leasing Company's

19  Car 26 has discrepancies between its AAR 4-2

20  Certificate of Construction and the tank

21  car's actual characteristics."

22          Did I read that correctly, sir?

23          A.     Yes, I'm glad you did, because

24  when I glanced at it, I thought it was first

25  saying you had 26 discrepancies, and I was

Confidential - Pursuant to Protective Order

1    like, wow, that was a lot.

2              But I'm sorry -- yes, never

3    mind.  The 26th car, I'm following you so

4    far.

5         Q.    Okay.  And that's -- right?

6    That's why I had it make it clear.

7              You understand that's the

8    Trinity VCM car.

9              Correct?

10        A.    Yes, sir.

11        Q.    What's an AAR 4-2 Certificate

12   of Construction?

13        A.    In basic terms, it's the birth

14   certificate of the tank car.  Certificate of

15   Construction is the -- what they call a COC,

16   Certificate of Construction.

17        Q.    Have you ever seen the

18   Certificate of Construction for Trinity's VCM

19   car?

20        A.    I have not.

21        Q.    Sitting here today, can you

22   tell me what any of these so-called

23   discrepancies are between the Certificate of

24   Construction and the Trinity car that Norfolk

25   Southern detonated on February 6th of 2023?

Confidential - Pursuant to Protective Order

1    A.    And where are you guiding me to

2  look specifically?  I'm sorry, can -- your

3  question again?  Where do you want me to look

4  for --

5    Q.    Let me try it again.

6          Sitting here today, can you

7  tell me what any of these so-called

8  discrepancies are between the Certificate of

9  Construction for Trinity's VCM car and the

10  Trinity car that Norfolk Southern detonated

11  on February 6, 2023?

12    A.    In the first part of your

13  question -- I haven't read all of this, but

14  are they about to outline their claims of

15  discrepancies?  Because I've never seen the

16  Certificate of Construction.

17    Q.    Okay.  So has anybody ever told

18  you that alleged discrepancies existed

19  between the Certificate of Construction and

20  Trinity's VCM car that you detonated -- that

21  Norfolk Southern detonated in East Palestine?

22    A.    Other than listening to Randy

23  Keltz's testimony in panel 4 back in June, I

24  caught that he found some discrepancies where

25  car didn't match paper, paper matched car, in

Confidential - Pursuant to Protective Order

1    Randy Keltz's words.  But beyond that, I

2    don't know.

3        Q.    Okay.  So that -- you're

4    referring there to the NTSB hearings that

5    happened in June of 2023.

6              Right?

7        A.    Yes, sir.

8        Q.    Months after the vent and burn

9    operation on February 6th of 2023.

10             Correct?

11       A.    Yes.

12       Q.    To the extent there were

13   discrepancies between the Certificate of

14   Construction and the car that existed in East

15   Palestine, those alleged discrepancies had

16   nothing to do with the decision to include

17   Trinity's VCM car in the vent and burn

18   operation.

19             Correct, sir?

20             MR. LEVINE:  Objection.

21             THE WITNESS:  I was going to

22        say, I can't speak for Norfolk

23        Southern's HAZMAT staff.

24             In my observations of that car,

25        that -- the answer would be no to your

Confidential - Pursuant to Protective Order

 1              question, I believe.  It just -- your

 2              question is, any nonconformance that

 3              Randy Keltz identified weeks later,

 4              the answer is, it didn't play into our

 5              decision, if that's what you're -- if

 6              that's what your question was.

 7     QUESTIONS BY MR. SWANSON:

 8              Q.      That's what my question should

 9     have been, because you phrased it better than

10     I.

11              Whatever discrepancies

12     Mr. Keltz identified in his June testimony to

13     the NTSB, those discrepancies, whether they

14     existed or not, had nothing to do, in your

15     view, with the decision to vent and burn

16     Trinity's VCM car February 6, 2023, correct?

17              MR. LEVINE:  Objection.

18              THE WITNESS:  From my vantage

19          point at SPSI, I can only speak to

20          what I observed.  And I can't

21          speculate of what information Norfolk

22          Southern may or may not have had.

23              Their -- if they had access to

24          chain -- not chain of custody.  I'm

25          sorry, certificate -- COC.  We also

Confidential - Pursuant to Protective Order

```
 1          say chain of custody in our work.  The

 2          COC.

 3              I don't know if NS had access

 4          to the Certificate of Construction or

 5          not.  I just don't know.  So I can't

 6          speak for the whole, but I can speak

 7          for SPSI.

 8     QUESTIONS BY MR. SWANSON:

 9          Q.    Okay.  So, and I appreciate

10     that.  And I'm going to get this question

11     right here, and then we'll move on.

12              Whatever discrepancies

13     Mr. Keltz identified in his June testimony to

14     the NTSB, those discrepancies, whether they

15     existed or not, had nothing to do with your

16     view of whether Trinity's VCM car should be

17     detonated in the vent and burn, February 6,

18     2023.

19              Correct?

20          A.    I won't say correct in -- I

21     got -- I got to flag your word "detonation"

22     in that sentence because I don't want to

23     accidentally get saying yes to the word

24     "detonation."

25              I agree to the -- to the --
```

Confidential - Pursuant to Protective Order

1    these non-conformances, whatever Randy Keltz

2    flagged, would not have had any bearing on

3    the tactical assessments that we were making

4    in the field.

5              The emergency de-inventory

6    process known as vent and burn would be the

7    right way to say things like that, is why I

8    wanted to get that clarified.

9         Q.    Are you -- and that's fine.

10   I'll take that answer.

11             Are you aware of anyone on the

12   ground in East Palestine between February 3rd

13   and February 6th when the vent and burn

14   occurred who had any knowledge at all of

15   these so-called discrepancies that Mr. Keltz

16   claims to have identified in his testimony to

17   the NTSB in June?

18        A.    No, I was never made aware of

19   any.

20        Q.    Does the same go for the

21   Certificate of Construction for the Oxy

22   Vinyls cars?  Did you see any of those when

23   you were on the ground in East Palestine?

24        A.    No.  During that weekend, we --

25   and to this day, I haven't seen Certificates

Confidential - Pursuant to Protective Order

1    of Construction on any of them.  So, no,

2    that -- we didn't have access to that data.

3         Q.     So whatever was contained in

4    the Certificates of Construction for the

5    derailed VCM cars, it had nothing to do with

6    the decision to vent and burn any of those

7    VCM cars.

8              Fair?

9              MR. HANSON:  Objection.

10             MR. LEVINE:  Objection.

11             THE WITNESS:  Yeah, I guess I'm

12        going to flag the word "decision."  It

13        wasn't our decision to do that, but,

14        yeah, we had no access to that

15        information.

16   QUESTIONS BY MR. SWANSON:

17        Q.    Okay.  Let me -- let me -- I

18   want to get this right.

19             You, Drew McCarty, recommended

20   that the five -- ultimately recommended that

21   the five VCM cars all be included in the vent

22   and burn operation.

23             True?

24        A.    Norfolk Southern ultimately

25   recommended all five.

Confidential - Pursuant to Protective Order

1    Q.    I want to know if you

2    recommended.

3    A.    We, the contractor team and the

4    Norfolk Southern HAZMAT team, we knew we were

5    going to have to take four, and five was if,

6    and only if, mechanical couldn't do something

7    with that fifth car quickly, efficiently and

8    safely.

9         And someone from mechanical

10   assessed that and determined, no, it's not

11   safe to put people in there.  We're not going

12   to go through the effort to move it.  It's

13   just got to go with the other ones.

14        So that's my paraphrasing of

15   how that went down.

16   Q.    Okay.  And believe me, we're

17   going to talk about that.

18   A.    Okay.

19   Q.    My question is, you, Drew

20   McCarty, recommended to the folks at Norfolk

21   Southern and perhaps others at the end of the

22   day that all five vinyl chloride cars be

23   included in the vent and burn.

24        True?

25        MR. LEVINE:  Objection.

Confidential - Pursuant to Protective Order

```
1                THE WITNESS:  Yeah.  Started
2         off Saturday evening with -- after
3         that event with that activating PRD on
4         that third car that we talked about
5         this morning.
6                My presentation to Scott
7         Deutsch and Scott Gould after that
8         was, I think we just lost hot-tapping.
9         Need to be considering vent and
10        burning, was the exact words.
11               Beyond that, the NS staff, the
12        contractor staff, over the next, you
13        know, 24-hour period certainly
14        considered every tactical option
15        possible and kept getting back to vent
16        and burn as the safest approach.
17   QUESTIONS BY MR. SWANSON:
18        Q.    When the vent and burn was
19   executed on February 6th, was it your view,
20   Drew McCarty's view, that all five vinyl
21   chloride cars should be included in the vent
22   and burn?
23               Yes or no?
24        A.    Yes.  On the 6th, yes.
25        Q.    And the Certificates of
```

Confidential - Pursuant to Protective Order

1    Construction for any of those cars had

2    nothing to do with you arriving at that view.

3            True?

4        A.    Correct.

5        Q.    Thank you.

6            Let's look, if we can, at

7    page 167.  Excuse me, paragraph 167, which is

8    page, it looks like, 34.

9        A.    I'm sorry, what --

10       Q.    167.

11       A.    167.

12       Q.    That's okay.

13       A.    I had 157.  Sorry.

14       Q.    On page 34 of the complaint

15   that Norfolk Southern filed against Trinity,

16   paragraph 167 reads, "Oxy Vinyls shipped

17   vinyl chloride in tank cars with aluminum

18   components in the pressure release devices

19   and in other components on each of the vinyl

20   chloride tank cars.  For example, Cars 26,

21   27, 28 and 29 contained aluminum in the PRD

22   springs, PRD surface, or had aluminum used in

23   various valves on the tank car."

24            And I'll stop there.

25            Did I read that correctly, sir?

1    A.    Yes.

2    Q.    At the time that the vent and

3  burn of the five VCM cars occurred on

4  February 6th, were you aware of any aluminum

5  components that existed in any of the VCM

6  cars that were vented and burned?

7    A.    No, sir.

8    Q.    Sitting here today, do you know

9  whether that's true or not, that any of the

10  VCM cars contained aluminum in PRD springs,

11  surfaces or in other valves?

12    A.    It first came up to my

13  attention with Randy Keltz's questioning back

14  on the -- February whatever day it was in the

15  church, their first interview of me.

16    I didn't -- I was not aware.

17  So he brought it to my attention that that

18  seemed to be part of their observations.  So

19  that was the first I'd even had an inkling on

20  aluminum components.

21    Q.    Okay.  Thank you.

22    A.    Yes, sir.

23    Q.    Let me just ask you a broad

24  question.

25    As someone who was on the

Confidential - Pursuant to Protective Order

1  ground from February 3rd to February 6th when

2  the vent and burn occurred, can you tell me a

3  single thing you believe Trinity did wrong?

4       A.     No, sir.  To my knowledge,

5  didn't even know Trinity was engaged.

6       Q.     Can you identify anything that

7  Trinity did that you believe they shouldn't

8  have done?

9       A.     Once again, I wasn't even aware

10 of Trinity being involved.

11      Q.     Anything that you sought from

12 Trinity that they didn't provide for you?

13      A.     Didn't know they were involved.

14      Q.     Well, you knew they had a car

15 involved.

16             Right?

17      A.     Well, yeah.  But as far as

18 personnel, I wasn't sure if NS reached out to

19 Trinity or vice versa.  I don't know.

20      Q.     Okay.  Let's talk now a bit

21 more specifically about Trinity's VCM car in

22 the derailment.

23             You agree with me, I think,

24 that Trinity's VCM car didn't cause the

25 derailment.

1          Right?

2     A.     No, I think the NTSB's honed in

3   on a hot wheel bearing of a car.

4     Q.     Right.

5          Let me -- sometimes a double

6   negative.

7          You agree with me that

8   Trinity's VCM car did not cause the

9   derailment.

10          Correct?

11          MS. KARIS:  Objection to

12       foundation.

13          THE WITNESS:  As I say, I'm not

14       a root cause derailment finding kind

15       of guy.  I'm just going off the NTSB

16       report that says it was a covered

17       hopper car wheel bearing.

18   QUESTIONS BY MR. SWANSON:

19     Q.     The Trinity VCM car didn't

20   breach upon derailment.

21          Correct?

22     A.     That's correct.

23     Q.     You agree with me that the

24   derailment in East Palestine was a violent

25   derailment.

Confidential - Pursuant to Protective Order

1          Right?

2      A.     Yes.

3      Q.     How fast were those -- how fast

4   was 32N going through East Palestine when it

5   derailed.

6          Do you know?

7      A.     My understanding was between 45

8   and 50 mile an hour.

9      Q.     The Trinity VCM car stayed

10  intact despite derailing at that speed.

11         Right?

12     A.     Yes.

13     Q.     Did you at any point perform a

14  damage assessment on Trinity's VCM car?

15     A.     I personally did not.

16     Q.     Do you know if one was done?

17     A.     Yes.  My understanding was

18  mechanical and Chip Day did one sometime

19  between Sunday afternoon and Monday morning.

20     Q.     So before the vent and burn?

21     A.     Yes.

22     Q.     Were you made privy to their

23  findings?

24     A.     Yes.

25     Q.     Did anybody identify any dents

1  in Trinity's VCM car?

2       A.     I don't know the specifics.  I

3  was just told that mechanical didn't think

4  they could re-rail it due to whatever

5  reasons, and they didn't want to put people

6  in there for extended operations.

7       Q.     So am I correct that the damage

8  assessment of Trinity's VCM car was done in

9  the context of determining whether it could

10  be moved or re-railed?

11       A.     Again, I didn't do that, so I

12  don't want to speculate on mechanical's

13  approach to that.

14            Mechanical department handles

15  wreck clearing, so that's -- it's really a

16  question for NS mechanical.

17       Q.     Okay.  I'll return to that.

18            So you can't tell me, sitting

19  here today, whether the Trinity VCM car had

20  any scores, gouges or anything else?

21       A.     We were starting to do that

22  process on Saturday afternoon when the third

23  car in did what it did.  And the minute it

24  did what it did, the guys got out of there,

25  and we never got back to that.

Confidential - Pursuant to Protective Order

1      Q.      Now, what we do know is that

2   Trinity's VCM car was not subjected to the

3   pool fires that you've talked about today.

4              Correct?

5      A.      Not the sustained pool fires.

6   The charring you see, it appeared in our

7   first drone flyover with the local sheriff's,

8   drone.  You could see that there had been a

9   fire under it, charred paint and a little bit

10  of kind of smoky residual out on the ballast

11  in the first, but it didn't have a sustained

12  duration pool fire that caused us too much

13  concern with the thermal blanket that it has

14  on it.

15             (McCarty Exhibit 16 marked for

16         identification.)

17  QUESTIONS BY MR. SWANSON:

18     Q.      Can we pull up, which I think I

19  sent you, D 61?

20             Okay.  What I've handed you has

21  been marked as Exhibit 16.  This is

22  Exhibit D 61 from the NTSB hearing.

23             It's a one-page.  It's a

24  photograph entitled "UAS Aerial Photograph,

25  TILX402025 Proximity to Pool Fire,

Confidential - Pursuant to Protective Order

1   February 3rd to 4th, 2023, Time Unknown."

2              Is that the document you have

3   in front of you, sir?

4        A.    Yes.

5        Q.    And are you aware of aerial

6   photographs that were taken of the derailment

7   the evening of February 3rd and 4th?

8        A.    Yes.

9        Q.    If you look at the picture on

10   the second page of Exhibit 16, is this

11   something you've seen before?

12       A.    Yes.

13       Q.    You can see the red circle

14   around a white train car.  You understand

15   that to be Trinity's VCM car.

16              Correct?

17       A.    Yes, sir.

18       Q.    The pool fires that you've been

19   describing, correct me if I'm wrong, but

20   those are the bright fire that seems to be

21   lit sort of to the left -- left-hand upper

22   corner of the train?  Train car?  Excuse me.

23       A.    That's correct.  That's the

24   fire that involved the 29th, 30th and 31st

25   cars.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  So if we look at

2  Exhibit 16, the fire that we see at the top

3  of the -- of the photo there, that's engulfed

4  three of the other VCM tank cars?

5    A.    Yes, sir.

6    Q.    And that fire is not, at least

7  in this photograph, impinging in any way on

8  Trinity's VCM car.

9         Correct?

10   A.    There had been a little bit of

11 radiant heat, but not dramatic.

12   Q.    Okay.  So there was some

13 radiant heat that caused charring on the

14 outside of the tank car?

15   A.    Yes.

16   Q.    And then you can see another

17 fire in the lower right-hand corner.

18        Do you know what that is, sir?

19   A.    Yes.  That was a breached

20 plastic pellets car.  That was just, you

21 know, solid plastic pellets burning.

22   Q.    And was that fire in any way

23 impinging on the Trinity VCM car that we see

24 in this photo?

25   A.    Subtle, very subtle radiant

Confidential - Pursuant to Protective Order

1  heat, but, no.

2       Q.     And I just want to make sure

3  it's clear.  You've testified previously

4  Trinity's VCM tank car was not subjected to

5  pool fires.

6            Do you recall that in your

7  statement to the NTSB?

8       A.     I do.  And I guess I --

9       Q.     And that's accurate.

10           Correct?

11      A.     It is.  I should have had the

12 preface of sustained pool fires.  Because you

13 can see that -- and even in the same red

14 circle, if you see a little bit of smoky,

15 smoky there, it was early recognized that,

16 you know, whatever that original, you know,

17 burning was, it had subsided back into

18 that -- like whatever liquids were burning

19 underneath all the other ones, it may have

20 initially surged under pressure that way but

21 just burned back.  It's just one of those

22 things that whatever was burning, burned out

23 early.

24      Q.     Got it.

25           So when you said at the outset

1    of my questioning that the Trinity VCM car

2    was situated differently from the other VCM

3    cars, one reason is that it wasn't subjected

4    to sustained pool fires.

5              Correct?

6       A.    Correct.

7       Q.    Another way that it was

8    distinguished from the other VCM cars is

9    that -- is that Trinity's VCM car had

10   functioning valves on it even after the

11   derailment.

12             Right?

13      A.    We cycled one vapor valve with

14   a pressure gauge to get a gauge reading.  We

15   didn't cycle the other valves.

16      Q.    So it had at least a

17   functioning valve.

18             Right?

19      A.    Yes.

20      Q.    That was an angle valve on

21   the -- on the tank car.

22             Correct?

23      A.    Yes, sir.

24             Pardon my voice.  I'm sorry.

25      Q.    That's okay.  If you need to

1    break or water, you just let me know.  It's

2    not a -- it's not a marathon for you.

3              You were able to put a pressure

4    gauge on the Trinity VCM car after the pool

5    fires had subsided.

6              Right?

7    A.      That was our entry Saturday

8    afternoon when we felt -- you know, after the

9    pool fires had calmed down, the pressure

10   relief devices had calmed down on those other

11   cars, I guess the 30, 31 cars, that was the

12   era on Saturday afternoon where we had an

13   entry team, you know, going towards the

14   isobutylene car, an entry team going to the

15   Trinity car, to start getting pressure gauges

16   on them, start seeing what the internal

17   pressures were, get temperatures.  We were

18   starting to do those kinds of things, look at

19   the damage assessment, when that 30th car did

20   what it did and drove us all out of there.

21   Q.      Right.

22             So before the sustained venting

23   of 8179, you or your team were able to access

24   the Trinity VCM car and put a pressure gauge

25   on an angle valve and measure the pressure of

Confidential - Pursuant to Protective Order

1    that car.

2            Correct?

3        A.    Yes.  And that wasn't me.  That

4    was part of my team, yes.

5        Q.    But you knew it happened?

6        A.    Yes.

7        Q.    You were aware that the

8    pressure readings that they obtained from

9    Trinity's VCM car were not alarming.

10            Correct?

11       A.    That's correct.

12       Q.    And you now know that the

13   pressure readings that you obtained from

14   the -- you and your team obtained from the

15   Trinity VCM car never exceeded 60 PSI from

16   any reading you ever took from it.

17            Right?

18       A.    I'll take your -- if that's in

19   the data, yes, that's an accurate statement.

20       Q.    Or 60 to 65.  I'll give you a

21   range.

22            The pressure readings from

23   Trinity's VCM car were never alarming to you

24   during your time on the ground in East

25   Palestine.

Confidential Pursuant to Protective Order

1           Correct?

2      A.      That's true.  That's an

3  accurate statement.

4      Q.      And because you were able to

5  attach the gauge right to the angle valve,

6  you didn't question the accuracy of the

7  pressure readings that you obtained from that

8  car.

9           Right?

10     A.      No, we got a good vapor

11  pressure curve.

12     Q.      So whatever the pressure

13  readings that are reflected in the records

14  for the Trinity car, those are accurate in

15  your view.

16           Correct?

17     A.      For the Trinity car.

18     Q.      Yep.  That's what I'm asking

19  about --

20     A.      Yes.

21     Q.      -- the Trinity car.

22           Okay.  Now, in addition to

23  having accurate pressure readings from the

24  Trinity VCM car, you also had temperature

25  readings that you took from that car.

Confidential - Pursuant to Protective Order

```
 1              Correct?

 2       A.      I'm understanding that that was

 3   included in the efforts, yes.

 4       Q.      Okay.  And you talked a lot

 5   about the temperature readings in response to

 6   questions this morning.  I don't want to

 7   rehash all of that.

 8              But you did -- your testimony

 9   today, as I understand it, is that your view

10   is that the pressure reading -- or the

11   temperature readings for the VCM cars were

12   not reliable.

13              Is that -- is that your

14   testimony?

15       A.      It is.

16       Q.      Now, I want to ask you

17   specifically about the temperature readings

18   you got for the Trinity VCM car.

19              And if you could pull out

20   Exhibit 1, and turn it to page 92.  This is

21   the factual -- the Hazardous Materials Group

22   Chair's Factual Report you testified about

23   this morning.  So Exhibit 1, page 92.

24              MR. HANSON:  It's that one.

25              THE WITNESS:  No, this is
```

Confidential - Pursuant to Protective Order

```
 1          Exhibit 4.  I'm sorry.  I'm sorry.
 2          I'm reading it wrong.
 3                  MR. HANSON:  What page?
 4                  MR. SWANSON:  Yeah, sure.
 5          Page 92 of 158.  It's the one you were
 6          looking at earlier.
 7                  THE WITNESS:  I may need a
 8          voice break here soon.  I'm not sure
 9          what's going on with my throat, but...
10                  MR. SWANSON:  You want to take
11          one now?
12                  THE WITNESS:  We'll get through
13          this.  Go ahead.
14  QUESTIONS BY MR. SWANSON:
15          Q.    Okay.  All right.  You have
16  page 92 of Exhibit 1 open in front of you,
17  sir?
18          A.    Yes, sir.
19          Q.    And you recognize this.  You
20  testified about it this morning, the
21  temperature readings that were taken from the
22  VCM cars.
23                  Right?
24          A.    Yes.
25          Q.    On the -- there's a chart
```

Confidential - Pursuant to Protective Order

```
 1    there, Table 12.
 2            Do you see that?
 3        A.      Yes, sir.
 4        Q.      On the far left, that car --
 5    the left-hand column of that chart, you see
 6    TILX402025?
 7        A.      Yes.
 8        Q.      Trinity's VCM car?
 9        A.      Yes, sir.
10        Q.      There are temperature readings
11    that go from, looks like, 4 -- if my military
12    time is correct, 4 p.m. on February 5th
13    through 2:30 p.m. on February 6th.
14            Is that right?
15        A.      I think so.  I think that
16    sounds right.
17        Q.      Okay.  And 2:30 on
18    February 6th, that's just a couple hours
19    before the vent and burn was initiated.
20            Correct?
21        A.      Yes.
22        Q.      You can see, if -- you might
23    have to squint.  I'll try to represent to you
24    that the temperature readings that were
25    obtained from the Trinity VCM car never
```

Confidential - Pursuant to Protective Order

1    exceed 65 degrees.

2              Is that accurate?

3        A.    Yes.  From however they were

4    doing with a laser pointer, yeah.

5        Q.    Okay.  And they used the same

6    device --

7        A.    Yeah.

8        Q.    -- on the Trinity car that they

9    used on all the VCM cars.

10             Right?

11       A.    They did.

12       Q.    And what you know from looking

13   at some of the other documents that you saw

14   this morning is that the temperature relates

15   to the pressure in the tank car.

16             Right?

17       A.    An accurate temperature -- in

18   the case of the Trinity car, we had an

19   accurate pressure reading with our gauge.  So

20   the temperatures here, again, I'm going to

21   say, are meaningless because they were taken

22   from outside the jacket of the car without

23   contacting tank shell.

24       Q.    Well --

25       A.    This car, even though the data,

Confidential - Pursuant to Protective Order

1    you know, appears favorable, I'm going to

2    tell you I don't believe that the Trinity car

3    was polymerizing.  That was not a concern of

4    mine with that eastern-most car.

5        Q.    And I appreciate that, and

6    we're going to talk more about that.

7              But is it -- is it your

8    testimony that in your view, between

9    February 3rd and February 6th, the Trinity

10   VCM car was never polymerizing.

11             Correct?

12       A.    Correct.

13       Q.    And these -- the temperature

14   readings that were obtained for the Trinity

15   car are consistent with the pressure readings

16   that you had obtained for that car.

17             Correct?

18       A.    It -- coincidentally, yes.  But

19   this is outside jacket temperatures, is what

20   this was reading, not the liquid temperature

21   inside the car.

22       Q.    Well, it's not a jacket

23   temperature; it's through a hole in the

24   jacket.

25             Right?

Confidential – Pursuant to Protective Order

1    A.    Again, the holes that our guys

2  had put on notes, I -- they -- they've told

3  me repeatedly in my interviews with them,

4  getting all of that clarified, they didn't

5  have good access to the tank.  That's the

6  real information that somehow didn't get put

7  to paper.

8    Q.    Okay.  So the temperature

9  readings for Trinity's car are consistent

10  with the accurate pressure readings that you

11  obtained.  In your view, that's just a

12  coincidence.

13          Is that your testimony?

14    A.    These temperature readings here

15  are no less -- are no more representative of

16  liquid in the car than the ones that were

17  collected for the other three cars on that

18  east end.  That's the -- that's what I'm

19  trying to make sure is very clear.

20          This data happens to

21  coincidentally coincide with the vapor

22  pressure curve of VCM.

23    Q.    But for the Trinity car, you

24  weren't concerned about the temperature

25  readings because you had the pressure

Confidential - Pursuant to Protective Order

1    readings that you relied on.

2              Correct?

3        A.      That's correct.

4        Q.      From the -- from the time of

5    the derailment to the time that Norfolk

6    Southern executed the vent and burn on the

7    five VCM cars, you weren't really worried

8    about Trinity's car from a safety, blowing up

9    kind of thing.  Those are your words.

10             Correct?

11       A.      Correct.

12       Q.      You and your team determined

13   that the VCM in Trinity's VCM car remained

14   stable from the time of derailment to the

15   time of the vent and burn.

16             Correct?

17       A.      It did not show us any

18   indication that it was polymerizing.

19       Q.      So I'm correct; it was your

20   view that the VCM in Trinity's VCM car

21   remained stable from the time of derailment

22   to the time of the vent and burn.

23             Correct?

24       A.      Correct.

25       Q.      At least leading up to the

Confidential - Pursuant to Protective Order

1    decision to include Trinity's VCM car in the

2    vent and burn, you were hopeful that that car

3    could be re-railed and sent on its way.

4               Right?

5        A.    I was.

6        Q.    Okay.  And obviously that's

7    something that you would never recommend to

8    anybody if you believed there was a risk of

9    polymerization in that car.

10               Right?

11        A.    Right.

12        Q.    That's not something that you

13    would recommend to anybody if you believed

14    that there was a risk of a BLEVE occurring in

15    that car.

16               Correct?

17        A.    Correct.

18        Q.    And I'm not sure it's in the

19    record.  What's a BLEVE?

20        A.    Boiling Liquid Expanding Vapor

21    Explosion.

22        Q.    That's a bad thing.

23               Right?

24        A.    That's a bad thing.

25        Q.    Okay.  And you didn't have any

Confidential - Pursuant to Protective Order

1    concern about Trinity's VCM car as it related

2    to any potential BLEVE.

3              Right?

4         A.    No, we did not.

5         Q.    We're going to talk about this

6    later, but you ultimately -- or your crews

7    ultimately determined that they couldn't

8    re-rail the Trinity's VCM car.

9              Right?

10        A.    Well, for clarity, it would

11   have been the mechanical department that did

12   that walkthrough with Chip Day.

13        Q.    Are you aware of the reason, or

14   were you told the reason that the car could

15   not be re-railed?

16        A.    I don't recall specifics, but

17   it was a recipe of putting a lot of people in

18   there to move the car, and again, putting an

19   extended operation into a hazardous area.  If

20   they got it re-railed, it wouldn't stay on

21   the trucks.

22              I can't remember, you know, all

23   the details because I didn't do the damage

24   assessment, but they just said they couldn't

25   re-rail it.  If they tried, it was going to

1    be an extended operation with a lot of people

2    in there, and it was just not worth the risk.

3        Q.    Got it.

4              You testified this morning

5    you've been involved in a lot of train

6    derailments over the course of your career.

7              Right?

8        A.    Yes.

9        Q.    Do you agree with me that

10   Trinity's VCM car performed exactly as it was

11   designed to perform in the event of a

12   derailment like that in East Palestine?

13             MR. HANSON:  Objection.

14             THE WITNESS:  Yeah, the word

15        "exactly" is -- again, I'm not like

16        every micro detail.  It's kind of like

17        the chemistry question repeatedly this

18        morning.  I'm not a micro deal tank

19        car builder/engineer to know exactly

20        what all those exactlys mean.

21             You know, my 35 years'

22        experience and a lot of derailments, a

23        lot of tank car knowledge, what I

24        expect in a derailment is for a tank

25        car to hold together.  Okay?

Confidential - Pursuant to Protective Order

1            But I also expect that when

2      they're critically damaged or have

3      signs of damage, and especially hidden

4      damage that is the wildcard in a lot

5      of this, it's a dangerous thing.

6  QUESTIONS BY MR. SWANSON:

7      Q.    I understand.  And I'm not

8  looking for minutiae here.

9            You're somebody who goes on to

10  derailment sites and is worried about the

11  safety of the community around and making

12  sure that everyone is safe.

13           Right?

14     A.    Yes.

15     Q.    The Trinity car in this

16  derailment, for your purposes, performed

17  exactly as you would want it to perform in a

18  derailment like happened in East Palestine.

19           Right?

20           MR. LEVINE:  Objection.

21           THE WITNESS:  Well, there's

22      that word "exactly" again.  It

23      performed well.  It kept the product

24      in the car.

25

1    QUESTIONS BY MR. SWANSON:

2         Q.    The pressure release device on

3    Trinity's VCM car, I think I heard your

4    testimony this morning that that pressure

5    release device never actuated upon the

6    derailment?

7         A.    We never observed it going off.

8    I guess the caveat to that is, did it go off

9    in the first two hours and I'm not aware of

10   that I wasn't there?  But I -- we have no

11   observations of it ever going off.

12        Q.    If it did actuate, okay, if it

13   did actuate, but you didn't see it but it did

14   actuate, it performed as it was intended to

15   perform.

16             Right?

17             MR. LEVINE:  Objection.

18             THE WITNESS:  Yeah, that would

19        be speculative.

20             And I'll just go ahead and put

21        on the record because -- the reason

22        we're pretty confident it never

23        actuated is because of that pressure

24        reading that we got.

25             Had it activated, it would have

Confidential - Pursuant to Protective Order

1          activated it at, you know, over a

2          200-some PSI.  So the pressure gauge

3          would have picked up on that.

4    QUESTIONS BY MR. SWANSON:

5          Q.     Sorry, I didn't mean to

6    interrupt you.

7          A.     No, you're fine.

8          Q.     I'll put it differently.

9                 Can you identify any

10   performance issues with the VCM -- or with

11   Trinity's VCM car, either its structure or

12   its -- or its PRD following the derailment?

13         A.     No, I can't say that I can.

14                MR. SWANSON:  All right.  Do

15         you want to take your voice break?

16                THE WITNESS:  Can I, please?  I

17         don't know what's going on, but I --

18                MR. SWANSON:  Let's go off the

19         record.

20                VIDEOGRAPHER:  Off the record

21         at 3:14.

22          (Off the record at 3:14 p.m.)

23                VIDEOGRAPHER:  We are now back

24         on the record at 3:29.

25

1    QUESTIONS BY MR. SWANSON:

2         Q.     Mr. McCarty, I want to ask you

3    a few questions about your arrival in East

4    Palestine.

5              As I understand it, you arrived

6    in the town late February 3rd.

7              Is that right?

8         A.     Yes.

9         Q.     Shortly after the derailment

10   had occurred?

11        A.     Well, you know, define

12   "shortly," I guess.  It would have been the

13   evening.

14        Q.     You tell me what time it was.

15   That'll help.

16        A.     Yeah, well, I don't remember.

17   I didn't timestamp when I pulled on-site.

18   That's a popular question these last several

19   months.  So I don't recall what time I

20   actually got on-site.

21        Q.     Got it.  And that's fine.

22              It was sometime before midnight

23   on the 3rd?

24        A.     Yes.

25        Q.     You were contacted, as I

1  understand it, by Scott Deutsch?

2      A.      Yes.

3      Q.      Who is Scott Deutsch?

4      A.      Scott Deutsch is one of the

5  Norfolk Southern's HAZMAT managers.  He

6  happens to be the -- I guess the senior

7  manager.  He's in this region.  This is his

8  kind of home region.

9      Q.      And remind me where your home

10 base is?

11     A.      So our headquarters is

12 Washington, Pennsylvania.

13     Q.      Which is how far from East

14 Palestine?

15     A.      Roughly an hour, an hour and

16 15 minutes.

17     Q.      What specifically did

18 Mr. Deutsch tell you when he called?

19     A.      I didn't write it down word for

20 word, but the general is -- was to say, we

21 have a derailment involving fire, multiple

22 tank cars.  Start getting your guys together

23 and, you know, bring some firefighting

24 capabilities, HAZMAT response trailer.  And

25 that was kind of the initial information's

1    developing kind of dispatch.

2         Q.    So you hang up the phone with

3    Mr. Deutsch.

4              What do you do next?

5         A.    So I start dispatching our

6    personnel.  In this case, Ryan Tokarski was

7    one of my senior managers who lives between

8    my house and East Palestine, so I sent him

9    straight to the site.

10             I live approximately 11 miles

11   from my shop.  So I went to my shop, grabbed

12   a trailer, at least grabbed some -- to show

13   up with some resources for plugging,

14   patching, diking, damming, one of our general

15   response trailers.

16             And other people were

17   dispatched out from SPSI, and they were

18   following up with firefighting assets and

19   other stuff, so...

20        Q.    Ryan Tokarski was the first

21   SPSI employee to arrive in East Palestine?

22        A.    Yes.

23        Q.    Do you know how much -- how

24   soon before you got there he arrived?

25        A.    Best memory, 30 minutes to hour

Confidential - Pursuant to Protective Order

1    at the most.

2        Q.      When you arrived in East

3    Palestine, what's the first thing you did?

4        A.      Found Ryan and found Scott

5    Deutsch.

6        Q.      Did they -- did you have a

7    discussion with Mr. Tokarski and Mr. Deutsch

8    at that time?

9        A.      Yes.  We were trying to find

10   the commanders, whoever in charge at the fire

11   department.

12       Q.      Were you able to find them?

13       A.      After a lot of searching, yes.

14       Q.      And was it Chief Drabick or

15   someone else you were -- you were seeking

16   out?

17       A.      No, I guess that actually may

18   show up in my transcript in February.  I

19   thought at the time it would have been Chief

20   Dra -- I found out after, Chief Drabick

21   wasn't there for the first day and a half or

22   something.

23              But one of his staff or one of

24   his command staff was who we ultimately met

25   with, and I didn't get his name.  I just --

Confidential - Pursuant to Protective Order

1  you know.

2           NTSB inquired about that on --

3  on that February thing, and I hadn't realized

4  that the chief wasn't there for the first

5  day, day and a half or whatever, but...

6      Q.     So you show up in East

7  Palestine.  You have a meeting with

8  Mr. Tokarski and Mr. Deutsch.

9           You set out to find the fire

10  chief, and you have a discussion with one of

11  Chief Drabick's personnel.

12           Is that accurate?

13      A.     Yes.

14      Q.     What was that first discussion

15  you had with the fire department?

16      A.     Concerned that they had a lot

17  of people deployed in what was going to be a

18  futile effort and putting a lot of people at

19  risk.

20      Q.     All right.  And when you say "a

21  lot of people deployed," do you mean a lot of

22  firefighters who were involved in trying to

23  put out the pool fires?

24      A.     Yeah, they were -- they were

25  throwing water literally everywhere.  They

Confidential - Pursuant to Protective Order

1  were throwing water south, east, from the

2  north to -- from south to north, from north

3  to south.  They had several operations going

4  on.

5       Q.     All right.  You said it was

6  going to be futile.

7            What's your basis for that?

8       A.     So, massive amount of fire.  A

9  massive amount of unknowns in the derailment

10  at that time.  Couldn't really -- our

11  struggle that whole night was getting car

12  numbers compared to products to compare what

13  was actually -- you know, the status of

14  everything.

15            One of our early challenges was

16  get to status of every tank car, status of

17  repair.  And that was inherently difficult on

18  this particular derailment.

19       Q.     You say it was futile.

20            How did you know at the time

21  that the effort was, as you say, futile, if

22  you didn't know what the products were that

23  were burning or anything else?

24       A.     That's where the 35 years'

25  HAZMAT experience comes on, even more than

Confidential - Pursuant to Protective Order

1    that in the fire service.

2              We were told early on that --

3    we were asking why the tanker shuttles.  You

4    guys don't have hydrants.  They said, yeah,

5    we broke a city water line.  So they didn't

6    have a reliable water source.

7              The sheer gallons-per-minute

8    flow that they were attempting to sustain

9    wasn't going to be enough to put out the

10   fires that they had.  They had a ton of

11   three-dimensional fires at that time.

12             They didn't even understand

13   what they were trying to extinguish.  You

14   can't extinguish fires when you don't

15   understand what's burning.

16        Q.   Was it your recommendation that

17   all firefighting personnel evacuate the

18   scene?

19        A.   That -- yeah, that was -- Scott

20   Deutsch and Ryan Tokarski and I were on the

21   same page with that.  We suggested they back

22   up.

23        Q.   And one of the reasons for that

24   was your concern for their safety?

25        A.   Absolutely.

1    Q.    So you have a meeting with

2    the -- with somebody from the fire

3    department.  You can't recall a name right

4    now.

5          You advise that person that in

6    your view, the pool fire scene should be

7    cleared of personnel.

8          Is that right?

9    A.    Yes.

10   Q.    What happened next?

11   A.    They rewound their operations.

12   They got everybody cleared up.

13         And as they were doing that,

14   Ryan Tokarski and I did the best we could as

15   they were clearing up to get a look at

16   whatever we could get a look at.

17         And right about the time the

18   firemen were truly cleared up, the first PRD

19   was going off.

20   Q.    So the first -- remind me of

21   the timing of the first PRD going off, as

22   best you can recall.

23   A.    I think it was somewhere

24   between 11 p.m. and 1 a.m.

25   Q.    On the --

Confidential - Pursuant to Protective Order

```
1        A.      Of the Friday night.

2        Q.      11 p.m. on the 3rd or 1 a.m. on

3    the 4th?

4        A.      Yes.

5        Q.      All right.  And at that point,

6    your recollection is that the -- is that all

7    fire personnel were cleared from the pool

8    fire site?

9        A.      Yes.

10       Q.      Did you walk the derailment

11   line, observe any cars that evening sometime

12   between the 3rd and the morning of the 4th?

13       A.      It was limited.  Ryan and I

14   were obviously concerned for our own safety

15   as well.  We were limited to the walk on

16   the -- we were in the south side from the

17   west to east from the southwest corner of

18   CeramFab.

19       Q.      You mentioned Mr. Tokarski, and

20   then you said "other employees."

21               How many SPSI employees

22   ultimately deployed to East Palestine between

23   the 3rd and the 6th?

24       A.      I'd have to go back to notes.

25   I don't remember that number on my memory.
```

Confidential - Pursuant to Protective Order

```
 1        Q.     Can you give me even an
 2   estimate?  Was it a dozen?  Two dozen?  Half
 3   dozen?
 4        A.     It could have been a dozen.
 5   Maybe more.
 6        Q.     All right.  Who do you recall
 7   other than Mr. Tokarski?
 8        A.     Well, let's see here.  You
 9   mentioned Greg Palmer earlier, night shift
10   safety.
11               D'Shawn Herrera.  Excuse me, he
12   would have been night shift.
13               Again, I'm sorry, it's been a
14   year ago.  I'd have to go back to notes.  I'm
15   sorry.
16        Q.     No apologies.  Just looking for
17   your best recollection.
18        A.     Yeah.
19        Q.     That's all I can get.
20               Of the folks you can recall
21   from SPSI who were on the scene, did you
22   consider any to be -- have expertise in
23   stabilized VCM?
24        A.     None of them are chemists
25   either.  I'm going to go back to my -- none
```

1    of us are chemists, so I'm going to say no to

2    that.

3         Q.    So you've talked about your

4    experience with VCM.  Nobody on the SPSI team

5    had some other experience, greater

6    experience, chemistry experience, that you

7    didn't possess.

8              Fair?

9         A.    Fair.

10        Q.    Had any of the SPSI folks who

11   came to the site in East Palestine ever been

12   involved in a vent and burn operation of cars

13   that had derailed in a town?

14        A.    Greg Palmer, our night shift

15   safety guy, I had him take the lead in burn

16   pit prep because he had actively participated

17   in his career with some vent and burn

18   operations as well.

19        Q.    And we're going to return to

20   this.

21             Tell me what you mean by "burn

22   pit prep."

23        A.    So, containment.  Part of the

24   vent and burn process.  It's an emergency

25   de-inventorying tactic.  And you don't just

Confidential - Pursuant to Protective Order

1  open up the cars and let the stuff run where

2  it wants to run.  You know, we want to

3  contain it.  We want to trap it.

4            And, you know, we do that

5  through purposefully building and

6  manipulating burn pits that will hold that

7  capacity of that material.

8       Q.    So when you do a vent and burn,

9  you have some ability to control where the

10  fire occurs.

11            Is that fair?

12       A.    That's fair.

13       Q.    You said that Mr. Palmer had

14  been involved in vent and burns previously.

15  The question I asked was a little bit more

16  specific.

17            Did he have any experience

18  conducting a vent and burn of cars that had

19  derailed in a town?

20       A.    I don't know where his exact

21  experiences were.  I'm sorry, I can't refer

22  to that.

23       Q.    All right.  And you had never

24  been involved in a vent and burn that

25  occurred in a town.

Confidential - Pursuant to Protective Order

```
 1                Correct?
 2        A.      No, I was.  Downtown Flint,
 3  Michigan, back in January 2000.
 4        Q.      Tell me about that derailment.
 5        A.      So it actually wasn't a
 6  derailment.  That was actually considered a
 7  non-accident release situation in which a --
 8  I don't mean to chuckle at that, but as I
 9  think about it, it was a PRD failure in that
10  case, the pressure relief device on a propane
11  car.  And the ultimate root cause had a
12  broken spring.
13                It was release -- excuse me.
14  Losing my voice again.  Sorry.
15                The PRD was relieving at a much
16  lower set to discharge -- it was relieving
17  much too early.  It was relieving underneath
18  of the car's normal working pressure.  It was
19  just leaking propane, basically.  It had an
20  active propane leak because the PRD was
21  lifting in normal transportation.
22                And it found a propane switch
23  heater.  The vapors of propane are heavier
24  than air.  Found a switch heater on the
25  railroad, and this car of propane rolled into
```

Confidential – Pursuant to Protective Order

1   downtown Flint, Michigan, rail yard on fire

2   from the protective housing.

3        Q.     And on that car in Flint,

4   Michigan, in 2000, you conducted a vent and

5   burn?

6        A.     Yes, we did.

7        Q.     Exactly as what occurred in

8   East Palestine?

9        A.     Yes.

10       Q.     Two charges on the car, burn

11  pit was dug, et cetera?

12       A.     Yes.

13              Well, we didn't actually dig a

14  hole in that case because it was in the

15  middle of a rail yard.  We actually brought

16  in several truckloads of dirt and built an

17  aboveground moat, if you will, aboveground

18  dam and dike around the entire tank car and

19  made sure it had capacity and everything.

20       Q.     How close was that rail yard to

21  any residential areas?

22       A.     Pretty close.  It had a

23  propane -- one of those -- kind of like a

24  regional propane distribution place across

25  the street.  They had a tire recycling place

Confidential - Pursuant to Protective Order

1   across the fence line.  There was houses --

2   there was houses, recyclers, propane, rail

3   yard.  There was a lot of exposures.

4        Q.    Is that the only vent and burn

5   that you've participated in that took place

6   in a town?

7        A.    Myself, yes.

8        Q.    Before East Palestine?

9        A.    Yes.

10       Q.    And as best you know, anyone on

11  your team?

12       A.    Yeah, other than Greg Palmer,

13  I'm confident to say that none of our other

14  SPSI guys would have been privy to that.

15       Q.    When the -- you talked about

16  the firefighters being cleared from the pool

17  fires.

18            When they were cleared, were

19  other efforts made to try to put out,

20  extinguish, the pool fires?

21       A.    No, not until -- we didn't do

22  any real fire suppression until wreck

23  clearing operations following the vent and

24  burn.

25       Q.    I don't have experience in

Confidential - Pursuant to Protective Order

1    firefighting, but I understand from reading

2    other testimony that there were unmanned

3    monitors that were on the ground in East

4    Palestine on February 3rd or 4th.

5              Is that true?

6        A.    There might have been a couple

7    from the fire department.  I'm not sure how

8    many they had deployed.

9        Q.    Tell us what an unmanned

10   monitor is.

11       A.    So they're portable, and you

12   kind of -- one or two people wrestle them in

13   a position, stake them into the ground so

14   they don't kind of jump and rock and slide.

15   It takes people to deploy them, set them up,

16   establish flow, establish a direction of your

17   water that you want to flow it at, and then

18   you walk away from it.

19              As long as the water flow

20   sustains, it keeps flowing water.

21       Q.    At any time when you were in

22   East Palestine, did you or anyone else train

23   unmanned monitors on the pool fires to try to

24   extinguish them more quickly?

25       A.    No.

Confidential - Pursuant to Protective Order

1    Q.    All right.  Were unmanned

2  monitors -- you said they were used in East

3  Palestine?

4    A.    I don't know if the firemen had

5  them out or not.

6    Q.    You don't recall ever

7  witnessing unmanned monitors being used to

8  fight fires in any way in East Palestine?

9    A.    I just don't recall.  If they

10  had any, I don't remember tripping over them.

11  But they had a lot of operations going on.

12    Q.    The pool fires ultimately

13  extinguished on their own.

14          Correct?

15    A.    That's right.

16    Q.    Do you recall the time?

17  Generally the day and time?

18    A.    We observed -- they burned out,

19  for the most part.  But I'll say the majority

20  of pool fires seemed to die out, like, after

21  lunch-ish on Saturday.

22    Q.    How long after they died out

23  then was the extended release from

24  the Car 28?

25    A.    Somewhere in the vicinity of

Confidential - Pursuant to Protective Order

1    three to five hours.

2         Q.    Can you give me -- so there

3    were -- there were four VCM cars that were

4    subject to the pool fires continually.

5              Right?

6    A.    Correct.

7         Q.    How long --

8    A.    Wait.  You say three or four?

9         Q.    I said four.

10   A.    Yeah, that's correct.

11        Q.    All right.  How long were those

12   cars subjected to pool fires?

13   A.    From Friday night well into,

14   like I say, through midday Saturday.

15        Q.    More than 12 hours?

16   A.    Yes.

17        Q.    Continual fire?

18   A.    Yes.

19        Q.    Okay.  I want to ask you now,

20   return to the Trinity VCM car and what was

21   done with it, what was considered to be done

22   with it, et cetera.

23              And to guide me through that,

24   I'd like, if you can, please, to pull back

25   out Exhibit 14.

Confidential - Pursuant to Protective Order

```
 1              While you're doing that,
 2   Exhibit 14 is the PowerPoint presentation
 3   that was prepared for your appearance before
 4   the Senate Commerce Committee in March
 5   of 2023.
 6        A.    Okay.
 7        Q.    Just let me know when you have
 8   that in front of you.
 9        A.    Yes.  Got it.
10        Q.    And you've talked a bit about
11   this in response to some earlier questions.
12   I'm not going to go back through all of that.
13              I would, if you could, please,
14   like you to turn to the number on the lower
15   right-hand corner that ends in 193.
16        A.    Okay.
17        Q.    Okay.  You testified earlier
18   today about a call that you had with the Oxy
19   folks in Dallas.
20              Do you recall that?
21        A.    There was a couple calls.
22        Q.    Okay.  You had discussions with
23   the folks in Dallas where one or more of them
24   told you that based on the evidence that you
25   presented to them, polymerization was not
```

Confidential - Pursuant to Protective Order

1    occurring.

2                 Right?

3         A.     There was somebody in Dallas

4    that just didn't think it was happening.

5         Q.     And you said in response to a

6    question that when they said that, they

7    didn't give you any options.

8                 Remember saying that?

9         A.     Oh, yeah.

10        Q.     Okay.  What I'm looking at here

11   on -- the slide that ends in 193 is a slide

12   titled "Tactical Options for Tank Cars."

13                Do you see that?

14        A.     Yes.

15        Q.     And this is a slide that you

16   put together.

17                Correct?

18        A.     Yes.

19        Q.     These are listing options for

20   tank cars that have derailed, and you or

21   other HAZMAT folks need to make a decision

22   about what to do with them.

23                Right?

24        A.     Yes.

25        Q.     And so when you say, well, Oxy

Confidential - Pursuant to Protective Order

1    didn't give us options, you knew what our

2    options were, how to handle cars that might

3    or might not be polymerizing.

4              Right?

5         A.    We had talked through these

6    options and explained why we weren't

7    comfortable hot-tapping, so those options

8    were considered.

9         Q.    Okay.  So what I want to do is

10   I want to focus these options on the Trinity

11   VCM car, which as you've acknowledged was

12   differently situated than the others.

13             Okay?

14        A.    Okay.

15        Q.    So the first option that -- and

16   by the way, let me take a step back and ask

17   you about how this document came together.

18             Did you create the slide that

19   ends in 193 personally?

20        A.    Yes, I did.

21        Q.    This is based on your

22   experience in train derailments?

23        A.    Yes.

24        Q.    Based on any literature you

25   might have read?

Confidential - Pursuant to Protective Order

1    A.    Yes.

2    Q.    All right.  Based on

3 presentations you've previously given?

4    A.    Yes.

5    Q.    Based on other derailments that

6 you've worked at?

7    A.    Yes.

8    Q.    Okay.  And is this a slide, a

9 193 slide, that you present to The Chlorine

10 Institute, for instance?

11    A.    No, this was a very specific --

12 this was developed for that Senate

13 subcommittee.

14    Q.    Okay.  So when you look at the

15 tactical options for tank cars that are

16 listed, are these specific to the East

17 Palestine derailment or did they apply to

18 other derailments?

19    A.    Oh, no, this is -- I mean, this

20 could be presented in any given training

21 class, if that's --

22    Q.    Understood.

23    A.    So, no, it wasn't specific for

24 East Palestine.

25    Q.    Okay.  According to SPSI, this

1    is the book on the options that you have for

2    tank cars in a derailment.

3                Correct?

4        A.      Yes.

5        Q.      All right.  And it's important

6    that you treat every tank car in a derailment

7    individually and assess them individually.

8                Right?

9        A.      Yes.

10       Q.      Vent and burn being what you've

11   called the last option, you just don't go out

12   and willy-nilly vent and burn every tank car

13   that derails.

14               Right?

15       A.      Correct.

16       Q.      It's a serious thing to do?

17       A.      Correct.

18       Q.      All right.  So looking at the

19   initial tactical option for tank cars, it

20   says, "Do nothing."

21               Right?

22       A.      Uh-huh.

23       Q.      "Negligible damages, no leaks,

24   et cetera, move or re-rail the car."

25               That's option -- tactical

Confidential - Pursuant to Protective Order

```
1    option number 1 for tank cars.

2                Right?

3        A.     Yes.

4        Q.     All right.  And when it comes

5    to the -- let me ask you first.

6                It says, "Move or re-rail the

7    car."

8                Those are two separate things.

9                Right?

10       A.     Yes.

11       Q.     Re-railing the car is putting

12   it back on the tracks, sending it along its

13   way or moving it out of harm's way.

14                Right?

15       A.     Yes.

16       Q.     Moving the car is taking it and

17   moving it out of harm's way, be it out of

18   fire's way or something else.

19                Right?

20       A.     Yes.

21       Q.     And both of those options

22   require heavy equipment to do it?

23       A.     Yes.

24       Q.     All right.

25       A.     And people.
```

1      Q.     For at least a time, that

2  was -- that was how Norfolk Southern and its

3  contractors, including SPSI, elected to deal

4  with the Trinity VCM car.

5             Correct?

6      A.     What was the question?

7      Q.     That is -- so looking at

8  tactical option 1, do nothing, move or

9  re-rail car, that's an option that Norfolk

10 Southern and you were considering for the

11 Trinity VCM car.

12            Right?

13     A.     Yes.

14     Q.     All right.  You talked a bit

15 about the different wrecking crews that were

16 on-site in East Palestine.

17            Right?

18     A.     I think so, yes.

19     Q.     Yeah.

20            Do you -- do you -- and maybe

21 you didn't.  Maybe it's in my head, but let's

22 do it now.

23            All right.  How many wrecking

24 crews were called to the scene in East

25 Palestine to help with the derailment

Confidential - Pursuant to Protective Order

1    response?

2         A.    I recall at least two.  I know

3    Hulcher and Corman were there.  I can't

4    remember.  I think -- well, three.

5    Cranemasters was also there.

6         Q.    So Hulcher, Cranemasters and

7    who was the third?

8         A.    R.J. Corman.

9         Q.    R.J. Corman.

10             Okay.  All right.  And they're

11   called wrecking crews.  That was sort of a

12   new term to me.

13             One thing that they can do in a

14   derailment site is they can move cars from

15   one location to another if necessary.

16             True?

17        A.    True.

18        Q.    All right.  Was one of those

19   three specifically responsible for dealing

20   with the tank cars to the extent they could

21   be dealt with?

22        A.    That would have fallen under NS

23   mechanical department, not us.

24        Q.    So let me take a step back to

25   make sure I understand this.

1              Was it Norfolk Southern, you're

2    saying, who was responsible for calling the

3    professional wreckers in to help in East

4    Palestine?

5         A.    Yes.

6         Q.    All right.  Did you have any

7    communications with any of the professional

8    wreckers about coming to East Palestine to

9    help?

10        A.    No, I did not.

11        Q.    All right.  When, to the best

12   of your recollection, did any of the

13   professional wreckers arrive in East

14   Palestine?

15        A.    I don't know.

16        Q.    You've testified that you've

17   participated in a lot of derailments.

18              Is it normal to have three

19   separate wrecking crews on-site for a train

20   derailment?

21              MR. LEVINE:  Objection.

22              THE WITNESS:  No, it is typical

23        in a wreck of that size, yes.

24   QUESTIONS BY MR. SWANSON:

25        Q.    So you didn't think it unusual

Confidential - Pursuant to Protective Order

1     to have three separate wrecking crews

2     on-site?

3           A.    No.

4           Q.    And I'm sorry if you said this

5     a minute ago.

6                 You don't know if one of those

7     three was specifically responsible for the

8     VCM cars?

9           A.    No, I don't know.

10          Q.    Who was it who was in charge of

11    giving direction to the professional wreckers

12    once they were on-site in East Palestine?

13          A.    So that always falls under the

14    mechanical department.  As far as which

15    mechanical person was giving the guidance, I

16    don't know.

17          Q.    Can you tell me who from

18    Norfolk Southern was a member of the -- what

19    you call NS mechanical?

20          A.    The Pittsburgh area fellow is

21    Josiah Saxe, and I don't know how to spell

22    his name.  I'm sorry.  But...

23          Q.    Okay.  Okay.  So I'm going to

24    ask you about re-railing the car, but moving

25    a tank car involves different equipment than

Confidential - Pursuant to Protective Order

1    re-railing a tank car.

2                    Is that accurate?

3          A.      Not necessarily.

4          Q.      The same equipment can be used

5    to do either?

6          A.      Sometimes.

7          Q.      What equipment is that?

8          A.      Well, side booms are popular.

9    In the case of Cranemasters, they have what

10   they call Mantis cranes.  They're a walking

11   crane.  Different capacities, different

12   sizes.  I don't know what they had on-site,

13   but -- so there is a couple of different

14   tools that have been used for that.

15         Q.      But to move a loaded tank car,

16   you need equipment that's capable of moving

17   250,000 pounds or more.

18                    Is that accurate?

19         A.      In that case, my experience

20   would be four side booms and, again, not to

21   overlook the people.  It -- the people is

22   significant.

23         Q.      So just focusing on the

24   equipment that was on-site, that you saw

25   on-site in East Palestine, was there -- was

Confidential - Pursuant to Protective Order

1    there sufficient equipment, appropriate

2    equipment, to move the Trinity VCM car at any

3    point between February 3rd and February 6th?

4    Just was there sufficient equipment?

5         A.    Yes.

6         Q.    And what equipment could have

7    been used to move the Trinity car?

8         A.    I'm not a mechanical, but I'm

9    experienced enough to know it would have

10   taken four side booms, or a combination of

11   multiple side booms and a walking crane.  It

12   could have been anywhere from four to five

13   pieces of equipment.

14        Q.    And if you have the right

15   equipment, which you said right equipment

16   exists in East Palestine, to move a tank car,

17   that can be accomplished in one to two hours.

18              Is it fair to say?

19        A.    No.

20        Q.    How long does it take?

21        A.    The perspective I think when

22   wreck clearing gets started, once the

23   momentum is going and they're clearing a

24   wreck, that's a decent estimate.

25              But to get set up, get

Confidential - Pursuant to Protective Order

1    deployed, get in there, get access, rig it,

2    move it, that can go anywhere from one to

3    four hours.

4          Q.    So Trinity's VCM car, you

5    were -- you and your team were in, stuck the

6    pressure gauge on that car, on Saturday

7    afternoon.

8                Right?

9          A.    Yes.

10         Q.    And you saw that it was -- the

11   pressure was normal.  The VCM was stable.

12               Right?

13         A.    Yes.

14         Q.    Did you then tell any of the --

15   did anybody then tell any of the wrecking --

16   professional wreckers to get their equipment

17   over there and move this thing out of the

18   way?

19         A.    I don't believe so, no.

20         Q.    Why not?

21         A.    We were trying to keep

22   everybody out of that hot zone for their

23   safety.

24         Q.    Well, the fires had

25   extinguished.  The pool fires had

Confidential - Pursuant to Protective Order

```
 1    extinguished.

 2              Right?

 3       A.      They had burned down.  That's

 4    why we were in there.

 5       Q.      Right.

 6       A.      But the moment that we bugged

 7    out, after that third car in did what it did,

 8    we wanted no operations in that area.

 9       Q.      So you -- was anybody

10    physically present in that -- in the site of

11    the pool fires after the extended venting for

12    more than an hour?

13       A.      Inevitably --

14              MR. LEVINE:  Objection.

15              THE WITNESS:  Inevitably, SPSI

16         had to put personnel in there to build

17         berms, and the ESI fellows had to set

18         their charges.  So we had to do

19         certain tasks as a getting ready for

20         the vent and burn.

21              But we absolutely limited the

22         amount of people in there to the bare

23         minimum and minimized our exposure

24         risks of those activities.

25
```

Confidential - Pursuant to Protective Order

```
 1   QUESTIONS BY MR. SWANSON:

 2       Q.      How long -- when you talk about

 3   preparing for the vent and burn, how long,

 4   continuously, were the folks at ESI on the

 5   site, on the cars, in that area that you had

 6   evacuated?

 7       A.      I'm estimating maybe two to

 8   three hours.

 9       Q.      How about you and your team in

10   preparing for the vent and burn operations?

11   How long continually were you in that area

12   that you had evacuated?

13       A.      We had two people in there with

14   them doing the berms while they were doing

15   their charges.  I had one guy at night on a

16   track hoe.  He would have been a couple

17   hours.  So no more than a couple hours per

18   person.

19       Q.      Okay.  So you had folks who you

20   exposed to this area for two to three hours

21   in order to vent and burn.

22               Right?

23       A.      Yes.

24       Q.      All right.  You didn't ask any

25   of the professional wreckers to go in and try
```

Confidential - Pursuant to Protective Order

1    to move Trinity's VCM car, movement that

2    could have occurred, according to you, in one

3    to four hours?

4              MR. HANSON:  Objection.

5              THE WITNESS:  Yeah, that was

6         not my call.  And part of that was,

7         you know, this whole phenomenon

8         like -- just no unnecessary personnel

9         to be operating in there was a -- was

10        a -- kind of a -- again, I wasn't --

11        don't think I was -- you know.

12             Every time we walked into that

13        hot zone, I'll just say pretty much

14        most of my employees acknowledged they

15        were pucker-factored, and they wanted

16        to minimize their time in there and

17        get out.  So this is not a site where

18        everybody's comfortable getting in

19        there and working.

20             So I can't speak for Norfolk

21        Southern's mechanical.  I can't speak

22        for their contractors.  That's a

23        factor in this equation.

24    QUESTIONS BY MR. SWANSON:

25        Q.    And that's a factor in any

Confidential - Pursuant to Protective Order

1    derailment, I would imagine.

2                  Isn't it, sir?

3         A.      Yes.

4         Q.      All right.  And I think you

5    called them non -- no unnecessary personnel.

6                  You agree with me, I think,

7    that it would have been preferable to move

8    Trinity's VCM car rather than venting and

9    burning that car and sending all of its

10   contents into the environment.

11                 Right?

12                 MR. LEVINE:  Objection.

13                 THE WITNESS:  As I had

14         testified, I -- there was a time where

15         myself and even a couple of the

16         Norfolk Southern guys, we were

17         considering getting that car out of

18         there.

19                 And after mechanical had looked

20         at it and evaluated what it was going

21         to take to move it, mechanical made

22         the decision not to put people in

23         there.

24   QUESTIONS BY MR. SWANSON:

25         Q.      So when you say "mechanical,"

Confidential - Pursuant to Protective Order

1   then you're again referring to Norfolk

2   Southern?

3        A.    Norfolk Southern mechanical and

4   Chip Day, who did that assessment on that

5   particular car.  I don't know the details

6   because I didn't do it.

7        Q.    So that's a question for

8   Mr. Day, in your view?

9        A.    It's really a question for

10  Norfolk Southern mechanical, in my view.

11       Q.    Do you have -- as you sit here

12  today, do you know what reason was given for

13  the inability to move the Trinity VCM car?

14            MR. LEVINE:  Objection.

15            THE WITNESS:  I got rough

16       memory of they couldn't re-rail it,

17       and they didn't want to put people in

18       for extended period of time to move

19       it, drag it, set it far away.

20            I mean, just general

21       conversation, but I don't know

22       specifics.

23  QUESTIONS BY MR. SWANSON:

24       Q.    Do you know if Mr. Day or NS

25  mechanical ever told the professional

1    wreckers that the VCM in Trinity's VCM car

2    was stable and not polymerizing?

3        A.    I don't know.

4        Q.    And I think you said sitting

5    here today, you can't tell me what individual

6    was responsible for giving direction to the

7    wreckers?

8        A.    I don't know.

9        Q.    And do you know if the wreckers

10   were doing their own assessment of the cars

11   or whether they were relying on information

12   from NS and others?

13       A.    I don't know.

14       Q.    But what you do know is

15   ultimately there was a decision, whoever made

16   it, that the Trinity car could not be moved

17   or re-railed.

18            Is that right?

19       A.    That's correct.

20       Q.    I've seen some testimony or

21   documents that talk about a damaged bolster

22   on Trinity's VCM car.

23            Do you have any recollection of

24   hearing about a damaged bolster?

25       A.    Not specifically, but that

Confidential - Pursuant to Protective Order

1  would track with -- if they didn't think they

2  could re-rail it, that would make sense.

3       Q.    Did you ever lay eyes on the

4  bolster of that car?

5       A.    I did not.

6       Q.    So you don't know one way or

7  the other whether the bolster was damaged?

8       A.    I don't know.

9       Q.    Okay.  So going back to

10 Exhibit 14 and slide 193, the next option is,

11 "Do nothing.  Let fires burn out from safe

12 distance until car's status can be verified,"

13 et cetera.

14            Do you see that?

15      A.    Yes.

16      Q.    What's the difference there

17 between the first "do nothing" option?

18      A.    So this reflects let fires burn

19 out.  And in fact it's, what'd I say, let

20 Mother Nature take its course.  Let

21 thermodynamics of tank car packages and

22 fires -- if something's going to blow up, let

23 it blow up.  Don't put any person at risk

24 trying to be a hero.

25            The first operating period --

Confidential - Pursuant to Protective Order

1   the general approach to all HAZMAT

2   derailments is in the first operating period,

3   when you have a mixed freight train and such

4   dynamics, the safest course of action is to

5   keep people back, evaluate what you have.

6   That's this message here.  Keep people back.

7   Evaluate what you have until car statuses can

8   be verified.

9              Those are the kinds of things

10  we try to do with drones and with the state

11  police flyover.  Those were kinds of things

12  we were trying to do with that entry

13  operation on Saturday, trying to gather these

14  data.  That was all that work in progress

15  through the night Friday into Saturday.  That

16  kind of fits into that second bullet point.

17       Q.    And if the folks at Oxy were

18  right and polymerization was not occurring,

19  that would have been an option that you could

20  consider.

21              Right?

22       A.    Well, that was on your car.

23  That was pretty much what happened.  The pool

24  fire that had been under your car early, it

25  burned itself out before we got there.

Confidential - Pursuant to Protective Order

1    That's a good example of the Trinity car

2    fitting into that category.

3         Q.    Okay.  All right.  Bullet

4    number 3, "Transfer product from car.  Due to

5    leak or other critical damage, need to

6    lighten the package for wreck clearing or for

7    other environmental concern such as spill

8    prevention."

9              Did I read that correctly?

10    A.    Yes.

11         Q.    Describe for me how that works,

12    because -- and the reason I ask is because

13    there are some other product transfer methods

14    that are below it.

15              So what's meant by "transfer

16    product from car" in bullet 3?

17         A.    Sure.  So say a tank car is

18    damaged and can't continue on in

19    transportation.  The product in the car is

20    okay.  It needs to move on to destination.

21    You have to transfer it into a good package.

22              So that would be an example of

23    that.

24         Q.    Okay.  Is that something that

25    you have done in other derailments that you

Confidential - Pursuant to Protective Order

1    have been a part of?

2        A.      Yes.

3        Q.      Now, for the -- for the Trinity

4    VCM car, as you've testified about, you were

5    able to attach a pressure gauge to an angle

6    valve that was functioning.

7                Right?

8        A.      Yes.

9        Q.      And you know, I think, that an

10   angle valve is used to onload and offload

11   product from the tank car.

12               Correct?

13       A.      Yes.  And we put on a vapor

14   line.  That would be part of the unloading

15   system, yes.

16       Q.      Okay.  So one option that

17   exists in a train derailment is putting a

18   vapor line onto a valve, like an angle valve,

19   and unloading product.

20               Correct?

21       A.      Well, the vapor line wouldn't

22   remove the liquid product, but we would -- in

23   a transfer tactics of vinyl chloride, it

24   would receive the discharge pressure from a

25   cork and vapor compressor and essentially add

Confidential - Pursuant to Protective Order

```
1   pressure to that car to push liquid out of
2   it.  That would be the transfer technique
3   using that vapor line.
4        Q.     Okay.  So for Trinity's VCM
5   car, you have a stable product that's not
6   polymerizing.
7             Correct?
8        A.     We didn't have that suspicion,
9   no.  We thought it was okay.
10       Q.     And you had a functioning angle
11  valve that's used to onload and offload
12  product from the car.
13            Correct?
14       A.     Well, that particular valve, it
15  was a vapor valve, just for clarity.  We
16  don't move liquid out of that valve.  It
17  would be the vapor valve.
18       Q.     Is it impossible to move liquid
19  out of that valve?
20       A.     Actually, it would be, because
21  it -- but anyway, but it's -- go ahead, I'll
22  follow you.
23       Q.     What's that?
24       A.     You're next.  I'm just -- we
25  couldn't get liquid out of the valve.
```

Confidential - Pursuant to Protective Order

1    Q.    You couldn't get liquid out of

2   the angle valve?

3    A.    No.

4    Q.    Did you evaluate other valves

5   on Trinity's VCM car to see if they were

6   functioning?

7    A.    We did not.  We never cycled or

8   checked all those liquid line valves.  We

9   didn't want to touch them, we didn't want to

10  open them, because they had had a fire around

11  them at one point.

12   Q.    Well, they'd had a fire around

13  them that had extinguished by the time you

14  first saw the car on Saturday the 4th, right?

15   A.    Well, my guys were on -- on the

16  5th put a pressure gauge on it.

17   Q.    Okay.  So the 5th it was -- you

18  were able to access --

19   A.    I'm sorry, the 4th.

20   Q.    The 4th.  Excuse me.

21         On the 4th, you put a pressure

22  gauge on the angle valve of Trinity's VCM

23  car.

24         Correct?

25   A.    My guys did, yes.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  And your testimony is

2  that your guys didn't look at any of the

3  other valves on that Trinity car to see if

4  they were functioning and could be used to

5  offload product.

6             Is that your testimony?

7    A.    We didn't purposely open any

8  valves.

9    Q.    So you don't know whether there

10  were valves that could have been used to

11  offload product from Trinity's VCM car

12  because that's not something that you or your

13  team checked.

14             Correct?

15    A.    At that entry, putting the

16  pressure gauge on the car on Saturday

17  afternoon, that was not part of the crew's

18  assignments.

19             And the reason that it wasn't,

20  if we would have opened a valve, and if it

21  would have had a leak from heat damage, for

22  example, we may or may not have been able to

23  get the valve closed again had it been

24  heat-damaged from whatever pool fire had been

25  under it early.

Confidential - Pursuant to Protective Order

1    They were limited to a vapor

2    valve to put a gauge on it, and that's

3    something that's a relative risk.

4         If we have a small leak from

5    some packing stem packing, it's a manageable

6    leak and a small release.

7         If you have a leak from a

8    liquid valve, there's a 340-to-1 expansion

9    ratio from liquid to vapor, so it can be an

10   exponentially worse leak.

11        So we purposely avoided

12   tampering with those liquid line valves.

13   Q.   So then let me make sure I

14   understand.  In the slide 193, looking at the

15   options, it goes from most preferable to

16   least preferable.

17        Right?

18   A.   Generally, yes.

19   Q.   Okay.  So transfer product is

20   pretty high up.  If you can do it, let's do

21   it.

22        Right?

23   A.   In concept, yes, but I'm

24   following you.

25   Q.   Okay.  And that assessment was

Confidential - Pursuant to Protective Order

1  not made for Trinity's car because of what

2  you've just described as concerns you had for

3  the liquid valves?

4      A.    No, that's not true.  It was

5  considered.

6      Q.    Okay.  Tell me what discussions

7  were had and what I can learn about those.

8          MR. LEVINE:  Objection.

9          THE WITNESS:  Okay.  So --

10          MR. SWANSON:  What's the

11      objection?

12          MR. LEVINE:  So tell me what

13      conversations were had and what I can

14      learn about them?

15          MR. SWANSON:  Yeah.

16          MR. LEVINE:  You want him to

17      tell you what you can learn about

18      them?  Seriously?

19          All right.  It seems like a bit

20      of an ambiguous, broad question.

21          THE WITNESS:  Well, this is an

22      example of Scott Deutsch, Scott Gould

23      and Drew McCarty talking in our

24      trailer after that PRD excursion on

25      Saturday afternoon.

1  QUESTIONS BY MR. SWANSON:

2       Q.     Okay.

3       A.     So fundamentals of, you know,

4  this car is upright, generally.  It was

5  generally upright, you know.  There was known

6  pressure in the car that seemed tracking with

7  the favored pressure curve.  So we did talk

8  about this.

9              Access to or receiving tank

10  car, you can't get there from here.  You

11  can't get an empty vinyl chloride car here

12  anytime soon at risk of all the other cars.

13             The key factor in this, where

14  I'm going with the conversation, is, all

15  these other cars we were really afraid of.

16  We were very concerned of these other cars,

17  what their conditions really were.

18             This is a full-day operation of

19  people, deployment, leak testing, transfer

20  operations, and that's just tank car to tank

21  car.

22             In the likelihood of getting

23  tank car in the best good rail, non-broken

24  rail, was several feet down the track, you

25  know, just distance to get to transfer and

Confidential - Pursuant to Protective Order

1    such.  It would have been a major deployment.

2              We would have had to find a way

3    to add inhibitor to the load, because even

4    though it didn't show signs of

5    polymerization, conservative measures -- back

6    to the we don't want to accidentally put

7    something that could polymerize due to other

8    factors in the derailment from earlier heat.

9    A lot of factors there, X factors.

10             Had we found a tank car in the

11   region nearby, piped it several hundred feet

12   down the tracks to good rail, set it all up,

13   transferred it, added inhibitor to it, sent

14   that car on its way and de-inventoried that

15   car, it would have put a lot of people in the

16   den of rattlesnakes for way too long.

17             That's the main reason it

18   was -- and trucks were not an option.

19   Somebody said, well, can't you just get

20   trucks.  Trucks in vinyl chloride service are

21   not like a phone call away down the street in

22   Pittsburgh.  They're just -- any trucks for

23   vinyl chloride would have been from Texas at

24   probably the closest.

25        Q.    When you say "trucks," you

1    mean --

2        A.      Tank trucks.

3        Q.      -- to accept the product?

4        A.      Right.

5        Q.      Okay.

6        A.      So it boiled down to personnel

7    working in the area where we had this car at

8    5 p.m. Saturday just misbehave.  And I'm not

9    putting any personnel in that area for any

10   extended period of time.  That's the real

11   answer why transfer was taken off the table.

12       Q.      What about -- so there's

13   pressure reduction is the next option.

14   Venting, flaring, scrubbing.

15               What's that?

16       A.      So pressure reduction from a

17   tank car, some products you can vent to

18   atmosphere.  For example, carbon dioxide.  A

19   refrigerated car with an inert gas like

20   nitrogen, argon, carbon dioxide, you can just

21   vent those to the atmosphere.  They're part

22   of the atmosphere.

23               Flaring would be something like

24   an LPG.

25               Scrubbing would be something

1   like chlorine.

2           So things that can be

3   managed -- vapor-pressure managed is what

4   this is referring to.

5       Q.    Is liquid flaring an option for

6   VCM cars?

7       A.    It tactically was a tool in the

8   toolbox, yes.

9       Q.    And why was liquid flaring not

10  conducted on Trinity's VCM car?

11      A.    For a similar process of

12  thinking as the transfer from a number of

13  personnel having the time, making -- putting

14  people into what would have been a minimum of

15  four operations on four different cars.

16          It would have taken an extended

17  amount of time to deploy.  Welding involved,

18  called hot work, basically welding under the

19  cars, putting nipples on the cars.  And we

20  drill through the cars, is the process of

21  hot-tapping.

22          I feel like I lost my -- what

23  was your question?  I'm sorry.  I'm getting

24  tired at the end of the day.  I'm sorry.

25      Q.    That's okay.

Confidential - Pursuant to Protective Order

```
 1              Why was liquid flaring not
 2   conducted on Trinity's VCM car?
 3        A.    Okay.  So that -- okay.  So we
 4   were having momentum towards that from what
 5   we were observing all night Friday night.
 6              And it was that third car in
 7   from the east that kind of stopped all
 8   aggressive work in that hot zone, and it had
 9   to do with putting a lot of people in harm's
10   way.
11              And part of the factors -- a
12   lot of factors.  Inch-and-a-quarter hole.  If
13   you're going to hot-tap, the hole is an
14   inch-and-a-quarter diameter.  And it's
15   basically another de-inventorying tactic.
16              And liquid flaring is
17   essentially burning it off in a control burn
18   pit.
19        Q.    Why is liquid flaring
20   preferable to venting and burning?
21        A.    You can have valves.  There's
22   probably a few, you know -- there's -- you
23   can -- you can close and open valves.  You
24   know, you can stop a flare.  You can start a
25   flare.  So that's when you hot-tap and
```

Confidential - Pursuant to Protective Order

1    install your own valves, you have a little

2    more finesse controls.  You can throttle big

3    fire, little fire.  You know, you can give

4    fuel, strip back fuel.

5              That's probably the main

6    reason.

7         Q.    Would venting and burning

8    Trinity's -- would hot -- would liquid

9    flaring Trinity's VCM car have been

10   preferable to venting and burning the car

11   from an environmental perspective?

12        A.    From an environmental

13   perspective --

14        Q.    Yeah.

15        A.    -- no.  No.

16        Q.    Okay.  Because it's -- the

17   inventory is going to go into the

18   environment, regardless --

19        A.    Yeah.

20        Q.    -- on fire?

21        A.    The reality is, hot-tapping and

22   liquid flaring, the same pounds of vinyl

23   chloride would have been destroyed by fire.

24   It had been -- it's another de-inventorying

25   tactic.

1    Q.    Well, you know, hot-tapping,

2    explain that to me, because I understood that

3    as something different from just burning it

4    off.

5    A.    So hot-tapping is gaining

6    access to the product when things like the --

7    a lot of photos you've seen where the valves

8    and fittings are otherwise just trashed, and

9    we can't use them.

10          The process of hot-tapping is

11   welding a nipple onto the lowest point in the

12   car.  That requires digging a pit, in this

13   case a pit where hundreds of thousands of

14   gallons of flammable, combustible liquids

15   were still oozing and -- you know,

16   environmental pollution at the site.  We'd

17   have been digging in and working in pits full

18   of environmental issues.

19          We would have had to strike

20   arcs in still potentially flammable

21   atmospheres, which is inherently dangerous,

22   and you could light somebody up in a flash

23   fire.

24          There was someone on one of the

25   calls talking about burn rates on PRD

1    excursions and had a theory that, hey,

2    there's a chance some of these cars are

3    already burned out, quote/unquote, so that

4    was another X factor in the process.

5              And as soon as we kind of

6    realized, like, you know, if they think

7    they've been burning this long and we might

8    weld into a vapor space, that immediately

9    takes hot-tapping off the table.  You can

10   never burn into a vapor space of any tank.

11        Q.    You could have hot-tapped

12   Trinity's VCM car.

13              Right?

14        A.    Yes.  It was still loaded.

15        Q.    And why did you decide to --

16   why was it -- why was the decision made to

17   vent and burn that car rather than hot-tap

18   it?

19        A.    For the same reason as the

20   transfer.  Just putting people into that area

21   for work when all the other rattlesnakes were

22   still sitting there.

23        Q.    Vent and burn is the last

24   option on here.

25              Why is it the last option?

1    A.    Well, there is no valves to

2  open and close.  You know, once you punch the

3  holes, there's no turning back.  I mean,

4  there's -- it is a controlled process in

5  terms of, you know, step 1, relieve vapor

6  pressure in the car with explosive shape

7  charge on -- or an explosive charge on the

8  vapor space.  And then step 2, de-inventory

9  to the burn pits.

10          So it's just -- it's just not

11  something that the railroads or anybody else

12  wants to just automatically put on the table.

13  We're just -- that's -- we just want to

14  exhaust all other options.

15    Q.    So if you could have -- if --

16  in your view, if possible to vent and burn

17  four cars versus five cars at East Palestine,

18  that would have been preferable.

19          Right?

20    A.    I would have liked to see us

21  move that car, but once mechanical said they,

22  you know, couldn't move it, wouldn't move it,

23  whatever their decision was, I respected

24  their decision, and I supported it.

25    Q.    Well, let me ask you about

Confidential - Pursuant to Protective Order

1    that, because I think you said earlier that

2    in a vent and burn operation you can control

3    where the fire goes.  That's why you have

4    burn pits, et cetera.

5              Right?

6    A.      Yeah, we definitely

7    controlled -- I mean, we make sure that it

8    doesn't get away from us.

9    Q.      And what you knew from the

10   Trinity car is that it had been a distance

11   from the pool fires for a period of 12 to

12   14 hours.

13             Right?

14   A.      Different pool fires, but

15   I'm -- go ahead, I'm following you.

16   Q.      Yeah, so 12 to 14 hours.

17             Right?

18   A.      Not a very far distance, but,

19   yes.

20   Q.      Yeah, not a very far distance.

21             And despite being exposed at

22   not very far distance to those fires, it had

23   stable product in it, and its pressure gauge

24   was registering fine.

25             Right?

1    A.    Yes.

2    Q.    And the vent and burn fires

3  don't last for 14 hours.

4          Do they?

5    A.    No.

6    Q.    So it is at least possible that

7  rather than detonating Trinity's VCM car, you

8  could have left it where it was.  Preferable

9  to moving.  You could have left it where it

10 was and vent and burned the other cars.

11         Correct?

12   A.    No.

13   Q.    Why?

14   A.    Well, first I'll take the

15 exception to the word "detonate."  That was

16 not a -- it was a controlled de-inventory.

17         That car was in way too close a

18 proximity to what would have burned off

19 approximately -- one full car, two half cars,

20 probably the equivalent of two of the other

21 full cars.  No, it was much too close.

22   Q.    Was there an analysis that was

23 done?

24         I mean, as you've testified,

25 the Trinity VCM car was in close proximity to

Confidential - Pursuant to Protective Order

1  14 hours worth of -- 12, 14 hours worth of

2  fires.

3              Right?

4      A.     No.  We've testified that it

5  was far away from that.  It was not -- that

6  car -- the third -- 30th?  What's the

7  number -- 28th?

8      Q.     28th.

9      A.     Your car was 28th.

10             The 29th car, if you look at

11  your picture -- the burn pit that we were

12  talking about was immediately north of 28.

13  That's the best way to say this.

14             Where that -- where the burn

15  pits were --

16     Q.     You got to tell me what you're

17  looking at here.

18     A.     I'm sorry, Exhibit 6.

19     Q.     Okay.  Go ahead.

20     A.     So cars, what is it, 29, 30,

21  31, the burn pit was essentially the north

22  ditch.

23             The space, if you look at

24  the -- kind of a -- if 28 makes the right leg

25  of a V and 29 makes the left leg of the V,

Confidential - Pursuant to Protective Order

1    that was essentially the massive part of the

2    burn pit for Cars 30 -- 31, 30 and 29.

3              And we extended the burn pit

4    past Car 27 to the east in the ditch to the

5    railroad.  We utilized the railroad's natural

6    topography to manage that burn.

7         Q.    Okay.  So the inability -- the

8    inability to -- or the -- what you perceived

9    to be the necessity to vent and burn

10   Trinity's VCM car had to do with the location

11   of the burn pit that was going to be dug to

12   execute the vent and burn.

13             Correct?

14        A.    Yeah.  Topography and land gave

15   us very limited option where we could put the

16   burn pit.  We had to put it where we had to

17   put it.

18        Q.    Okay.  Thank you for that.

19             Tell you what.  I'm going to

20   bounce around a little bit now and just ask

21   you a few questions that are going to seem

22   unrelated, then I'm going to reserve the rest

23   of my time for tomorrow.

24             Okay?

25        A.    Sure.

Confidential - Pursuant to Protective Order

```
 1          Q.     When you were on-site in East
 2   Palestine, as I understand it, you maintained
 3   a field notebook of your activities.
 4                 Is that right?
 5          A.     I did for a little while.
 6          Q.     Well, let me ask you about
 7   that.
 8                 Is that -- is it your standard
 9   practice at train derailments to maintain a
10   field notebook?
11          A.     I try.
12          Q.     And what's the purpose for
13   maintaining a field notebook?
14          A.     Traditionally, and in my world,
15   it's to make sure I'm capturing notes that I
16   try to put on our daily drawn paperwork.
17          Q.     In your East Palestine field
18   notebook, what sorts of things did you
19   include?
20          A.     Anywhere from our people to a
21   narrative of what did we do today.  It's
22   pretty much trying to tell our customer,
23   here's what we did for you today.  That's
24   kind of my narrative at the end of the
25   paperwork.
```

Confidential - Pursuant to Protective Order

```
 1        Q.     Sir, you've talked a lot
 2  about -- today about discussions that you had
 3  with the folks at Oxy Vinyls in Dallas.
 4               Right?
 5        A.     It's come up a couple times,
 6  yes.
 7        Q.     Yeah.
 8               And I take it that that's the
 9  sort of thing you would have jotted down in
10  your field notebook, what those discussions
11  were?
12        A.     Not necessarily, no.
13        Q.     Are you saying you didn't,
14  or --
15        A.     I did not.
16        Q.     Oh.  So you -- so you -- in
17  your field notebook, you did not take any
18  notes of the discussions that you had with
19  the folks at Oxy Vinyls?
20        A.     If I did, it got washed -- I
21  don't know if you know this or not.
22        Q.     I know -- just let's --
23        A.     It got washed.
24        Q.     Let's stick to my questions.
25  I'll get you where you want to go.
```

Confidential - Pursuant to Protective Order

```
 1        A.      I don't remember taking many
 2   notes --
 3        Q.      Okay.
 4        A.      -- if any.
 5        Q.      Can you recall any notes that
 6   you would have put down into your field
 7   notebook?
 8        A.      I don't.
 9        Q.      Would you have recorded
10   temperatures in your field notebook?
11        A.      I don't think so.  If I did, it
12   would have been the one that I took that's --
13   maybe the one I took.  Maybe.
14        Q.      Would you have put in notes
15   about what to do about the Trinity VCM car?
16        A.      No.
17        Q.      Would you have put in notes
18   about what -- so now I'm a little bit
19   confused.  I mean, these are pretty important
20   issues that I'm asking about, and you're
21   saying, no, that wouldn't go in the field
22   notebook, that wouldn't go in the field
23   notebook.
24                Tell me what would go in the
25   field notebook.
```

Confidential - Pursuant to Protective Order

```
 1        A.      My field notes have to do more
 2   with broad statements of what service did we
 3   provide today for Norfolk Southern.
 4               When they have consultants like
 5   CTH {sic} and Arcadis on the scene, all the
 6   kind of chronological notes of capturing the
 7   event is in their consultant world.  So I
 8   traditionally don't take a lot of detailed
 9   notes.
10        Q.      So ultimately you -- as I
11   understand it, that -- your field notebook
12   ended up in the wash?
13        A.      Unfortunately, yes.
14        Q.      And tell me when that was
15   relative to the vent and burn.
16        A.      It would have been afterwards.
17        Q.      How long afterwards?
18        A.      Within a week or two
19   afterwards.
20        Q.      So the vent and burn -- or
21   excuse me.  The field notebook was, what,
22   contained in a jacket?  A pair of jeans?
23   Where was it?
24        A.      We have what we call Tecasafe
25   fabric, Tecasafe coveralls, flame-resistant
```

Confidential - Pursuant to Protective Order

1    coveralls.  It was in a bellows pouch pocket,

2    and I didn't remember that it was there when

3    I washed it.

4         Q.    I saw a text you've probably

5    seen where somebody said, sorry about your

6    field notebook.

7              Have you seen that?

8         A.    I haven't, but --

9         Q.    Okay.  What was your reaction

10   to learning that your -- you put your field

11   notebook through the wash?

12        A.    I was pretty embarrassed at

13   myself, pretty mad at myself.

14        Q.    Why is that if it just doesn't

15   contain any information that's relevant?

16        A.    It contains information

17   relevant to me and Norfolk Southern for my

18   invoicing.

19        Q.    Got it.

20        A.    It's my notes of trying to show

21   them in our narrative, you know...

22        Q.    When you took the field

23   notebook out of the wash, did you review it

24   to see if anything was legible anymore?

25        A.    It was smeared.  It was -- I

1    threw it away.

2        Q.    All right.  You obviously

3    billed Norfolk Southern for the work that

4    SPSI conducted --

5        A.    Yes, sir.

6        Q.    -- as part of the derailment

7    management.

8              How much has SPSI invoiced

9    Norfolk Southern for all the work involved

10   in -- that you've done at East Palestine?

11       A.    I honestly don't know.  I'd

12   have to ask our CFO on that one.

13       Q.    All right.  Give me a ballpark.

14       A.    I truly don't know right now.

15   It was pretty chaotic last year for that --

16   that -- we -- the biggest variable in that is

17   transportation disposal of RCRA wastewater.

18       Q.    Has SPSI invoiced more than a

19   million dollars?

20       A.    Yes.

21       Q.    More than $5 million?

22       A.    Yes.

23       Q.    More than $10 million?

24       A.    Yes.

25       Q.    More than $15 million?

Confidential - Pursuant to Protective Order

```
1     A.     Yes.
2     Q.     More than $20 million?
3     A.     Yes.
4     Q.     More than $50 million?
5     A.     Yes.
6     Q.     More than $100 million?
7     A.     Yes.
8     Q.     More than $200 million?
9     A.     I don't think so.
10    Q.     So between 100 million and
11  $200 million, what's your best estimate for
12  how much SPSI has invoiced Norfolk Southern
13  for work its work in East Palestine?
14    A.     I know as the president I
15  should know that answer, and I'm just a
16  little embarrassed that I don't.  I'd have to
17  ask my CFO that question.
18    Q.     Well, that's something, if I
19  asked you tomorrow, you could find out and
20  tell me?
21    A.     Yes, I can find out tonight.
22  Yes.
23    Q.     Okay.  Thanks.
24           Have you received any -- so
25  when you -- when you bill Norfolk Southern
```

Confidential - Pursuant to Protective Order

1    for SPSI's work, do you bill your employees

2    by the hour?  How does the billing work?

3    What do you get paid for?

4         A.     Time and materials.

5         Q.     Okay.

6         A.     Personnel and our equipment.

7         Q.     Okay.  Did SPSI receive any

8    bonus payments or any independent payments

9    from Norfolk Southern for the work that you

10   did in East Palestine?

11        A.     No.

12        Q.     I take it you've done prior

13   work for Norfolk Southern.

14               Is that right?

15        A.     Yes.

16        Q.     Can you tell me, just focusing

17   on derailments, how many -- how many

18   derailments you've worked for Norfolk

19   Southern?

20        A.     It would be too many to count.

21   It's been a long time.

22        Q.     All right.  Since the East --

23   your work in East Palestine, has SPSI been

24   retained by Norfolk Southern to do other

25   work?

Confidential - Pursuant to Protective Order

1      A.     Yes.

2      Q.     What sorts of work?

3      A.     Oh, some nonemergency

4 separators, some derailments, some transfers

5 in the -- in the -- one of the examples I

6 gave you of some maybe in-yard sideswipe

7 needs transferred, repackaged, stuff like

8 that.

9      Q.     Has SPSI ever been sued for its

10 role in a train derailment or derailment

11 cleanup?

12     A.     No, sir.

13     Q.     Have you ever provided a

14 deposition or other testimony in any

15 litigation involving a train derailment?

16     A.     Not until this experience, no.

17     Q.     Okay.  I think -- well, let

18 me -- I thought I was going to, and now I'm

19 gonna not be quite done.

20           You witnessed the vent and burn

21 operation.

22           Correct?

23     A.     Yes.

24     Q.     Where were you standing?  How

25 close were you?

Confidential - Pursuant to Protective Order

1      A.      I was behind Brave Industries

2   on the north.

3      Q.      The complaint that Norfolk

4   Southern filed against Trinity references a

5   video that they claim showed polymerized

6   material escaping from one of the VCM cars.

7              Are you familiar with that

8   video?

9      A.      I saw it long after the fact.

10  I hadn't seen it until Chip mentioned it at

11  the NTSB hearing.  And I said, who has this

12  video?  I'd like to see it.

13             So I did see it.  And I don't

14  remember who has it, but I did see it.

15     Q.      And can you describe for me

16  what it showed that indicated to you that

17  polymerized material was escaping from that

18  car?

19     A.      So it was the western-most car,

20  and in Chip's testimony, he described like

21  sparklers.  I had not seen that because I was

22  kind of behind the building when it ignited.

23             But there does show like what

24  appears to be chunks of things burning away

25  from the vertical -- the vertical pressure

Confidential - Pursuant to Protective Order

1    vapor and liquid throwing vertically.  There

2    does appear to be chunks of stuff kind of

3    kicking out from that column.

4         Q.    And do you have any independent

5    knowledge or view as to what those, what you

6    called chunks, are?

7         A.    We believe from all the

8    chemistry that we learned about vinyl

9    chloride, we believe that it was polymerizing

10   from all indications we had from that

11   particular car.

12        Q.    I understand that.

13              But I'm asking you, when you

14   saw these what you called chunks, other than

15   your view that you thought polymerization was

16   happening, what would a polymerized chunk

17   look like?

18        A.    Flying, burning plastic in a

19   generic sense.

20        Q.    What color?

21        A.    Orange-white fire.

22        Q.    So you thought you saw

23   orange-white chunks that were coming out of

24   this car that you thought were polymerized

25   material?

Confidential - Pursuant to Protective Order

1        A.      I saw the video that someone

2    brought to my attention, and it kind of

3    backed up what Chip said he observed.

4        Q.      Right.

5                But I'm asking now what you saw

6    with your own eyes.  All right?

7                Your --

8        A.      I saw a video months after the

9    fact.

10       Q.      I understand that.

11       A.      You're asking me to go off

12   somebody's smartphone video.

13       Q.      Let me get my question out.

14       A.      Okay.

15       Q.      You saw a video, right?

16               Somebody tells you the video

17   shows polymerized material coming out.

18               Right?  Yes?

19       A.      Yes.

20       Q.      You then view that video.

21               Correct?

22       A.      Yes.

23       Q.      You see what you've just

24   testified to me were white-orange chunks

25   coming out.

Confidential - Pursuant to Protective Order

```
 1              Correct?

 2      A.      Yes.

 3      Q.      And how big were these

 4   white-orange chunks?

 5      A.      I can't guess.  I don't know

 6   how far.  But there were so many

 7   measurements, I couldn't guess.

 8      Q.      And do you have an independent

 9   view, based on your knowledge of

10   polymerization, that those white-orange

11   chunks were in fact polymerized material

12   versus something else?

13      A.      Is it possible it was something

14   else?  I concede it's possible it was

15   something else.

16      Q.      You just -- you don't know one

17   way or the other.

18              Right?

19      A.      You can't be 100 percent sure.

20      Q.      Well, you can't be 50 percent

21   sure.

22              Right?

23              You don't know what was in

24   that -- what was coming out in those

25   orange-white chunks?
```

1    A.    Solidified material from that

2    tank car were leaving the column as it was

3    burning.

4

5    Q.    Again, I'm on the last exhibit

6    or two here.

7          Okay.  What number are we up to

8    here?

9          By the way, before we come to

10   Exhibit 17, you said that the video that you

11   just testified about that you saw, where did

12   you see that?

13   A.    I was trying to remember who

14   showed it to me.  I think it might have been

15   Scott Gould.  I don't recall whether it was

16   him or Jon Simpson or another contractor.  I

17   just don't remember who showed it to me.

18   Q.    And when did you see it?

19   A.    It was after the NTSB hearings.

20         (McCarty Exhibit 17 marked for

21         identification.)

22   QUESTIONS BY MR. SWANSON:

23   Q.    Okay.  So Exhibit 17 is a text

24   chain between you and Chip Day dated

25   February 9, 2023.

Confidential - Pursuant to Protective Order

1        Correct?

2        A.      2/9/2023, yes.

3        Q.      And as you just peruse this,

4   you recall this text chain, I take it?

5        A.      Yes.

6        Q.      So February 9 is three days

7   after the vent and burn?

8        A.      The 9th, yeah -- yes.

9        Q.      And Mr. Day is sending you

10  pictures that I will concede in the -- in the

11  exhibit that was -- that was produced to us

12  that the pictures are sort of hard to see or

13  make out.

14          But you recall getting pictures

15  from Mr. Day on this date.

16          Correct?

17       A.      Yes.

18       Q.      Who took the pictures?

19       A.      I'm -- that would have to be

20  Chip on his smartphone to send them to me.

21       Q.      Do you know what the pictures

22  are?

23       A.      He described it -- I kind of

24  asked him that in one of the texts.  I said,

25  are these inside the cars?

Confidential - Pursuant to Protective Order

1          He said, yes.  Or he said,

2     inside.

3          And I asked him, hard to tell

4     from photos.  Polymers, question mark?

5          He said, yes, sir.

6          And I just acknowledged.

7     Q.     So if you look at the first two

8     texts he sends you, there are two pictures.

9          Right?

10    A.     Yes.

11    Q.     And then he texts you the word

12    "justice," all caps with three exclamation

13    points.

14         Right?

15    A.     Yes.

16    Q.     What did you understand that to

17    mean?

18    A.     Chip was -- I mean, we were

19    obviously -- I -- I'd say -- I shouldn't

20    speculate what Chip meant, is what I should

21    say right now.

22         I know what Chip was thinking.

23    He felt that -- you know, the same way that

24    we all felt when Oxy folks said that they

25    just didn't think it was polymerizing.  But

1   yet we know nitrogen left the car Friday

2   night, and we just had our doubts, right?  We

3   just -- we just couldn't go on them thinking

4   that it wasn't polymerizing.

5          And in his mind -- this is just

6   Chip.  I just -- I've known Chip for a long

7   time and, you know, he's basically just

8   saying, like, hey, there was polymers here.

9   That's what he's trying to say.  You know,

10  that's the perspective.

11     Q.     Yeah.  I mean, from the time

12  the vent and burn was executed, you and

13  Mr. Day were both looking for evidence of

14  polymerization.

15          Correct?

16     A.     I wasn't.

17     Q.     Well, can you -- do you know

18  when -- can you look at these pictures?  And

19  if you can't from the -- from the quality we

20  have here, I understand.

21          But can you tell me in looking

22  at those what the evidence of polymers is?

23     A.     Well, I wasn't there looking at

24  whatever Chip looked at, whatever he took

25  pictures of, and that's why I asked him what

Confidential - Pursuant to Protective Order

1    these were.  So that's a question for Chip.

2         Q.    Okay.  So you can't look at

3    these pictures and point to something and say

4    that's a polymer or not a polymer?

5         A.    I can't off a photograph.

6         Q.    Do you think that -- is Mr. Day

7    qualified, do you think, to look at a picture

8    and identify polymers from a burned-out tank

9    car?

10             MR. LEVINE:  Objection.

11             THE WITNESS:  He's worked for

12        Oxy a lot longer than I have, and I

13        would think he knows what polymers

14        are.

15   QUESTIONS BY MR. SWANSON:

16        Q.    You wouldn't be the one to look

17   at a picture and say, that's a polymer,

18   that's not a polymer, even if the quality was

19   better than this.

20             Is that fair?

21        A.    Well, that's why I asked him.

22        Q.    Yep.  No, I understand.

23             But is that a fair assessment

24   that I just made?

25        A.    Yes.

1      MR. SWANSON:  Okay.  So with

2         that, sir, I appreciate you answering

3         my questions.  I'm going to reserve

4         whatever time I have for tomorrow.

5            We can go off the record and

6         decide if we want to continue on or

7         call it.

8            MR. HANSON:  Sure.

9            MR. SWANSON:  So, thank you.

10           VIDEOGRAPHER:  Off the record

11        at 4:38.

12       (Off the record at 4:38 p.m.)

13           VIDEOGRAPHER:  We are now back

14        on the record at 4:56.

15           DIRECT EXAMINATION

16    QUESTIONS BY MS. HERLIHY:

17       Q.    Good afternoon, Mr. McCarty.

18       A.    Good afternoon.

19       Q.    We met earlier.  My name is Kim

20    Herlihy.  I represent Oxy Vinyls.

21           Thanks for your time today.  I

22    know you've had many opportunities to talk

23    about the train derailment at this point, so

24    we appreciate you doing it once more.

25           Prior to the train derailment,

Confidential - Pursuant to Protective Order

1    did you have a business relationship with Oxy

2    Vinyls?

3         A.     Yes.

4         Q.     And how would you describe that

5    relationship?

6         A.     We are one of Oxy's emergency

7    response contractors for both emergencies,

8    and occasionally that, similar I mentioned to

9    the Trinity fellow, was those C6r valve and

10   fitting services on the nonemergency service

11   events.

12        Q.     Okay.  How long has SPSI been a

13   contractor of Oxy Vinyls?

14        A.     I don't remember when we first

15   started working for Oxy, but it's been a long

16   time.  Maybe for the whole time we've been in

17   business.  Could be 20 years.  Could be at

18   least 15.  Somewhere in that area.

19        Q.     Okay.  Is your relationship

20   limited to Oxy Vinyls or is it a broader

21   relationship with the entire chemical

22   corporation?

23        A.     I'd have to go back to our

24   contract and see if it's Occidental Chemical

25   Corporation or just Oxy Vinyls.  I'd have to

Confidential - Pursuant to Protective Order

1  go back and refresh my memory on that.

2      Q.    Okay.  You mentioned -- I think

3  I understood you to say that Chip Day has

4  been working with Oxy Vinyls longer than you

5  have?

6      A.    Yes.

7      Q.    And how long has he been

8  working with Oxy Vinyls?

9      A.    My understanding, he's been a

10  vendor dating back to the '90s, working for

11  Oxy through his career experiences.

12      Q.    Okay.  And have you and SRS

13  competed from time to time for Oxy business?

14      A.    Yeah, indirectly or directly.

15  I won't say we really competed, as -- we're

16  certainly competitors.  We're business

17  competitors.  But we also -- frankly, due to

18  The Chlorine Institute programming, we do

19  occasionally subcontract each other because

20  of the services we provide in geographic

21  areas.

22      Q.    Does one or the other of you

23  have a closer relationship with Oxy Vinyls,

24  to your knowledge?

25      A.    I don't consider my personal

Confidential - Pursuant to Protective Order

1   relationship very close with Oxy.  I have a

2   good relationship with the folks from Oxy

3   that I deal with, but I -- we don't do what

4   I'll call regular business with Oxy.  I

5   wouldn't think that we're a big vendor for

6   Oxy.

7          Q.     Okay.  In that, I think you

8   said, 15- to 20-year period that you've had a

9   business relationship with Oxy Vinyls, how

10  many engagements have you been subcontracted

11  on or contracted on?

12         A.     Probably a round number of a

13  half a dozen.

14         Q.     Were any of those train

15  derailments?

16         A.     Not contracted by Oxy, but

17  worked with Oxy at Paulsboro comes to mind.

18         Q.     Okay.  We'll set that aside for

19  a moment.

20                But in this half dozen or so

21  engagements by Oxy, none of those were train

22  derailment cases.

23                Is that correct?

24         A.     Let me think clearly before I

25  answer it.

1    Q.    Okay.  Sure.  It's late in the

2  day.  Take your time.

3    A.    Yeah, I don't think Oxy had any

4  of its own derailments in the plants that we

5  responded to, so I'll say -- yeah, it

6  wouldn't have been -- Oxy wouldn't have

7  contracted us for a derailment.

8    Q.    Okay.  Did any of them involve

9  vinyl chloride monomer?

10    A.    Yes.

11    Q.    Okay.  Which one or ones?

12    A.    Whoo.  I can vividly recall

13  working with the Oxy Vinyls strike team in

14  Illinois, Urbana, Illinois, area on, I think

15  it was, the Canadian National Railway.  I

16  can't remember if the car was banged up or it

17  had some reason why we were hired to transfer

18  it.

19            Oxy sent their strike team to

20  the site and worked with Oxy's strike team on

21  that transfer.

22            They provided the safety

23  oversight, kind of just, you know, Oxy's ears

24  and eyes on the site kind of thing.  That

25  would have been one example.

Confidential - Pursuant to Protective Order

1                 Paulsboro, New Jersey, 2012,

2    was another example.  Again, it wasn't Oxy's

3    derailment, but Oxy's products were involved.

4                 There was a loaded vinyl

5    chloride car a couple years ago.  I remember

6    Tim Kelly calling on a Friday afternoon, and

7    I can't remember exactly where.  I want to

8    say somewhere in Iowa.  The pressure plate

9    was leaking.  The loaded car had arrived at a

10   consignee, one of the Oxy customer sites,

11   leaking from the pressure plate.

12                The customer called Oxy.  Oxy

13   called us.  We sent a couple guys out with

14   PPE and tools to take care of that leak.

15                Those are three that come to

16   mind.

17        Q.    Okay.  Just to back up a little

18   bit.

19                I understand the Paulsboro

20   incident, you were not engaged by Oxy.

21                Correct?

22        A.    That's correct.

23        Q.    Okay.  In the Illinois Canadian

24   Railway matter, were you engaged by Oxy in

25   that matter?

1    A.    No.  We would have worked for

2    the railroad.

3    Q.    Okay.  And then in the -- you

4    think it was Iowa incident where Tim Kelly

5    called you, were you engaged by Oxy in that

6    event?

7    A.    Yes.

8    Q.    Okay.  So as far as engagements

9    by Oxy of SPSI, is that the only one that

10    involved vinyl chloride, the one in Iowa that

11    Tim Kelly called you about?

12    A.    Possibly.  I'm trying to think.

13    We've also done some C6r work

14    for Oxy.  I just -- I'm just not intimately

15    in tune with each repair we do because I have

16    people that manage that service for us.  And

17    I know that we've done some things for Oxy's

18    tank car fleet people.  I don't recall any

19    specific vinyl chloride cars that might have

20    been in that.

21    I know, you know, from caustic

22    to vinyl to other things Oxy Vinyls has that

23    we may have had some tank car repair

24    activity.  I don't know with memory.

25    Q.    Okay.  The only one that you

Confidential - Pursuant to Protective Order

1    specifically remember is the one that you

2    think was in Iowa that Tim Kelly called you

3    about?

4         A.    Yeah, that was fairly -- I'm

5    going to say within the last couple of years.

6         Q.    Okay.  And was that -- that was

7    a -- involved a railcar, a tank car?

8         A.    Yes, ma'am.

9         Q.    And what was the status of that

10   tank car?  Was it --

11        A.    It was loaded.

12        Q.    -- still -- okay.

13        A.    It was loaded.  It had just

14   arrived at the Oxy customer's site.

15        Q.    And you said there was

16   something leaking from the pressure plate?

17        A.    Yes.  The -- your customer's

18   site personnel found the pressure plate, the

19   circumferential flange bolting down into the

20   car, was leaking.

21        Q.    Okay.  And what did SPSI do to

22   resolve that issue?

23        A.    We were able to, one, verify

24   that and snug it down.  We were able to get

25   some momentum and torque on the pressure

Confidential - Pursuant to Protective Order

1    plate nuts to tighten that up and stop the

2    leak.

3         Q.    Okay.  So you didn't have to

4    take any of the offloading or transloading

5    measures or re-railing measures that you

6    talked about at length with Trinity's

7    counsel.

8              Right?

9         A.    No, it was at their rack, and

10   they just wanted their product.  So once we

11   stopped the leak, they went back to business

12   as usual and unloaded the product to your

13   customer.

14        Q.    Was there any concern or

15   discussion about polymerization at that time?

16        A.    Not in that scenario.

17        Q.    Okay.  Who would you consider

18   your chief contact at Oxy Vinyls?  Is it Tim

19   Kelly?

20        A.    Yes.

21        Q.    How long has that been the

22   case?

23        A.    I don't -- I don't recall, but

24   it's been a while.  I mean, it's -- he's been

25   in the emergency response role for a while

Confidential - Pursuant to Protective Order

1    for Oxy.

2         Q.    Okay.  Who else has been a

3    contact for you at Oxy over the years?

4         A.    A couple fellows in the strike

5    team, that Justin Cox and Kevin Machemehl.

6    David Gray at one point.  I know he's no

7    longer with Oxy.  Years ago it was John

8    Makazlit {phonetic}.  I know he's no longer

9    with Oxy.

10         Some of -- the Diane Larsons,

11    Butch Polasek, those folks, before they

12    retired.

13         Q.    And how long have you worked

14    with Justin Cox?

15         A.    It's been predominantly with

16    the CHLOREP programming in Mississippi, so

17    it's been several years.

18         Q.    How many Oxy engagements have

19    you had in which you were working with Justin

20    Cox?

21         A.    With Justin on a response, that

22    was the first time.

23         Q.    In East Palestine?

24         A.    Yes.

25         Q.    Okay.  How many times previous

Confidential - Pursuant to Protective Order

1    to East Palestine had you worked with SRS?

2        A.    Can I back up to the Justin Cox

3    one?

4        Q.    Sure.

5        A.    I can't remember if Justin Cox

6    was in Paulsboro or not.  I remember Kevin

7    Machemehl being kind of like the Vinyl lead

8    at Paulsboro, but I'm now having foggy

9    memory.

10            Maybe Justin would have been

11   there, too, and I just don't remember, but I

12   don't want to miss that in the record.

13       Q.    Okay.

14       A.    And I'm sorry, what was your

15   next question?

16       Q.    I'll go back to that in a

17   minute --

18       A.    I'm sorry.

19       Q.    -- but let me, since you raised

20   that question about Paulsboro.

21            Do you recall Kevin Machemehl

22   being on the scene in Paulsboro?

23       A.    I do.

24       Q.    Okay.  And who else from Oxy do

25   you recall being on the scene in Paulsboro,

1    if anyone?

2        A.    The plant manager from the

3    Paulsboro's plant at the time, and I don't

4    recall his name.  I'm sorry.

5        Q.    And they were there to provide

6    technical advice about vinyl chloride?

7        A.    Yes, and logistical support.

8              The local plant was pulling

9    cars in to vacuum in support of tactics.

10       Q.    Okay.  When you say "in support

11   of tactics," what do you mean?

12       A.    So at Paulsboro, there was a

13   breached car vinyl -- it was impaled by

14   another tank car, shelf coupler and sill.

15             There was auto-refrigerated

16   vinyl chloride in that -- in the low end of a

17   breached car, and we were trying to get it

18   extracted through vane pumping and other

19   methods, and pulling cars in the vacuum on

20   the -- we had a good rail that pulled right

21   up to man to a bridge, man to a creek bridge.

22   It's a turntable bridge.

23             So we had receiving cars and

24   daigy -- excuse me, daisy chaining cars as we

25   were rotary vane pumping and vacuuming at the

1    same time, which helped extract that

2    auto-refrigerated vinyl.

3         Q.    And Oxy was helping with

4    logistic support for that operation?

5         A.    Yes.  Oxy was at the Paulsboro

6    plant, pulling those cars down in the vacuum

7    so that they could enhance that performance

8    of that vane pump operation.

9         Q.    Okay.  In the Paulsboro

10   incident, there was in fact a breach of the

11   railcar.

12             Correct?

13        A.    Yes.

14        Q.    In East Palestine, the vinyl

15   chloride cars did not breach.

16             Correct?

17        A.    That's correct.

18        Q.    In the Paulsboro incident, was

19   the vinyl chloride exposed to the air upon

20   breach?

21        A.    Yes.

22        Q.    Was it opposed -- exposed to

23   sunlight upon breach?

24        A.    Yes.  Potentially, yes.

25        Q.    Was it exposed to heat upon

1    breach?

2         A.    Well, cold work.  When a shelf

3    coupler would have punched through it, yeah,

4    there would have been some heat of cold work

5    when that happened.

6         Q.    Did the vinyl chloride in that

7    instance polymerize in any way?

8         A.    No.

9         Q.    And eventually the vinyl

10   chloride was loaded to another railcar or to

11   another vessel and removed?

12        A.    In what happened there, we

13   maximized recovery, whatever -- we removed it

14   from whatever.  Starting thousand-plus was

15   down to like less than 500 into those

16   receiving Oxy tank cars.  And what was left,

17   we ended up putting a carrier solvent acetone

18   down into the railcar.

19             As the chemists describe it to

20   me, it would be like putting marbles in this

21   bottle.  The VCM behaves like marbles in the

22   solution.  Then you take the marbles and

23   everything out of the pumping solution, and

24   it worked like a champ.

25             So there was a couple different

Confidential - Pursuant to Protective Order

1    tactics at Paulsboro.

2         Q.     Okay.  When you say the

3    chemists described it to you, do you mean the

4    chemists at Oxy?

5         A.     No, that was actually -- at the

6    time, that would have been Barry Lindley.  At

7    the time, he would have worked for DuPont.

8    Or Chemours.  I can't remember when DuPont

9    and Chemours -- but he was a DuPont guy for

10   years.

11        Q.     And how did Barry Lindley

12   happen to be consulted with respect to that

13   incident?

14        A.     Barry has been -- on my

15   personal career, Barry is one of two DuPont

16   chemists that were on their DuPont global

17   team that were always kind of very

18   responsible care, offering to help others,

19   you know, regardless of who the responsible

20   party was.

21             So very solid, street smart

22   chemists that have gotten me through a lot of

23   jobs over the years.

24        Q.     So you reached out to Barry

25   Lindley?

Confidential - Pursuant to Protective Order

1    A.    Yes.

2    Q.    And did you employ Barry

3   Lindley?  Or was he contracted to help with

4   that derailment in any way?

5    A.    No, huh-uh.  It was just

6   offering his knowledge.

7    Q.    Did you reach out to Barry

8   Lindley with respect to East Palestine at

9   all?

10    A.    No, not during East Palestine.

11  But I had had his teachings -- like I say,

12  he's one of the many that have taught me over

13  the years.

14    Q.    Okay.  Was there reason not to

15  reach out to him?

16    A.    Like I say, we felt all the --

17  all the things we were experiencing -- no,

18  no, I didn't feel moved to call him during

19  the weekend, no.

20    Q.    Okay.  Did you ever talk to Bob

21  Gold from -- formerly of Westlake, with

22  respect to the East Palestine train

23  derailment?

24    A.    Only before the NTSB -- I'm

25  sorry, not NTSB, but this Senate Commerce

Confidential - Pursuant to Protective Order

1    Committee.  I did give Bob a call, because

2    he's one that I'd learned from through The

3    Chlorine Institute over the years.

4              And he did confirm.  I mean, he

5    didn't tell me anything we weren't already

6    feeling.

7         Q.    And what kind of questions did

8    you ask of Bob Gold?

9         A.    I just asked him to confirm,

10   you know, how do people -- how does the

11   polymerization -- you know, how do they --

12   how do they initiate polymerization in the

13   plants.

14             And he said, it's real simple.

15   They put it in a resector, put steam to the

16   internal reactor and kick off polymerization.

17        Q.    Did he tell you that they don't

18   use any kind of initiator?

19        A.    He never mentioned initiators.

20        Q.    Okay.  Because earlier I think

21   there was some testimony that at least you

22   had -- you had reason to believe that

23   Westlake polymerizes VCM into PVC without an

24   initiator.

25             Do you know whether that's true

Confidential - Pursuant to Protective Order

1   or not?

2       A.      I believe that may have been

3   something that was read from a Mr. Day

4   testimony, perhaps.  But I can tell you

5   since -- you asked me a question; I'll give

6   you an honest answer.

7       Q.      Sure.

8       A.      I called Bob Gold before the

9   Senate Commerce Committee just to -- just to

10  make sure that I'm not missing something.

11  And I felt good after that phone call that I

12  really didn't.

13      Q.      But you didn't ask him, it

14  sounds like, can VCM polymerize without an

15  initiator.

16              You just didn't talk about

17  initiators in that call?

18      A.      No, I didn't ask him that

19  specific question.

20      Q.      Did you ask him whether VCM can

21  polymerize purely by the application of heat?

22      A.      That's pretty much what he told

23  me.  I can't say I asked him that question.

24              I think I asked him a question

25  of how do you guys polymer -- how do you do

Confidential - Pursuant to Protective Order

1    your plant?  How do you make your stuff?

2            And that's what he told me.

3        Q.    He told you, we apply heat, and

4    that's it?

5        A.    Yes.

6        Q.    Okay.  He didn't mention

7    anything about an initiator?

8        A.    No.

9        Q.    Okay.  What does Bob Gold do

10   today; do you know?

11       A.    I don't know.  I know he's

12   retired from Westlake, but I don't know.

13       Q.    Okay.  But you didn't talk to

14   him before the vent and burn operation.

15           Correct?

16       A.    No.

17       Q.    And you've just had that one

18   conversation with him?

19       A.    Yes.

20       Q.    Okay.  Okay.  I want to take

21   you back to a couple of the times that you've

22   been lucky enough to sit in this chair and be

23   asked questions by lawyers or NTSB members.

24           So following the derailment --

25   and we already looked at this -- you were

1    interviewed by the NTSB.

2            Correct?

3        A.      Yes, ma'am.

4        Q.      And that was within a few weeks

5    of the derailment.

6            Right?

7        A.      Yeah.  I was reminded today, it

8    was the 23rd of February.

9        Q.      Good.  Thanks for reminding me.

10       A.      Yeah, this was on the document.

11       Q.      At the time, what did you do to

12   prepare for that hearing -- or I'm sorry, for

13   that interview?

14       A.      Absolutely nothing.

15       Q.      Okay.

16       A.      I was pretty much in the

17   trenches 16 hours a day and left the trenches

18   to go meet those folks at the church.

19       Q.      Okay.  That was kind of what I

20   was going to ask you.

21           I assume you spent a lot of

22   time in East Palestine between February 3rd

23   and February 23rd.

24           Right?

25       A.      Yes, ma'am.

Confidential - Pursuant to Protective Order

1    Q.    Do you think you were there

2    most of the time between the 3rd and the

3    23rd?

4    A.    I was there literally every day

5    from the 3rd of February, night, the night

6    of.  Other than commuting to my house for

7    naps and showers, I worked at East

8    Palestine -- I didn't get myself on any other

9    jobs until after, like, sometime at the end

10   of March.  I mean, it was --

11   Q.    Okay.

12   A.    Once it became where -- it was

13   kind of like we could see the scope of work

14   was going to be the scope of work for a while

15   and I knew things were under control, I kind

16   of went back to helping other customers.

17   Q.    Okay.  You were lucky enough to

18   be within commuting distance and to sleep in

19   your own bed during that time.

20        Right?

21   A.    That was a blessing, yes,

22   ma'am.

23   Q.    So back to that interview.

24        Did you speak with counsel in

25   advance of that interview?

1    A.    No.

2    Q.    You didn't meet with lawyers to

3    prepare you for that interview?

4    A.    No.

5    Q.    Did you review any documents in

6    advance of that interview?

7    A.    No.

8    Q.    And that was, like we said,

9    maybe about 20 days after the derailment.  So

10   within a few weeks of the derailment.

11         Right?

12   A.    It was, yeah, within a few

13   weeks of the derailment, yes.

14   Q.    Okay.  We don't need to go

15   through that interview.  I think you've

16   already kind of recognized it on the record.

17   I may have a couple of follow-ups on it, but

18   I don't want to spend a lot of time on it.

19         Now I'm going advance you to

20   the hearing in East Palestine.

21         So that's in June?

22   A.    Yes.

23   Q.    I think almost four months

24   after your interview.

25         Right?

1       A.      Uh-huh.

2       Q.      Yes?

3               MR. HANSON:  You got to say yes

4       out loud.

5               THE WITNESS:  I'm sorry.  Yes.

6               MR. HANSON:  No, no, it's not

7       the mic's fault.

8               THE WITNESS:  Yes.

9    QUESTIONS BY MS. HERLIHY:

10      Q.      It's hard.

11              Between the time of that

12   interview and the time of your hearing

13   testimony in June, did you have any other

14   discussions with the NTSB about the train

15   derailment?

16      A.      I don't think so.  I mean, they

17   called me to let me know I was going to be

18   getting this notice to show up, you know.

19              Other than that notice,

20   offering to make travel plans for me, things

21   like that, not that I can recall, no.

22      Q.      Okay.  Yeah, maybe I should

23   have been a little more clear.

24              You didn't have any other

25   substantive discussions with anyone at the

Confidential - Pursuant to Protective Order

1    NTSB between February 23rd and then when you

2    testified at the hearing in June.

3            Right?

4        A.    No.

5        Q.    Okay.  What did you do to

6    prepare for the hearing in June?

7        A.    What I learned in this process,

8    as you-all as attorneys would call attorney

9    prep days, to kind of educate me about the

10   process.  Certainly not tell me what to say,

11   but maybe kind of coach me on, like, listen

12   carefully to the questions, the things that

13   all you good attorneys would do with your

14   clients, that kind of stuff.

15       Q.    So you engaged counsel?

16       A.    Yes.

17       Q.    And met with counsel to prepare

18   for the hearing?

19       A.    Yes.

20       Q.    How many days did you spend

21   preparing with counsel?

22       A.    I don't recall.

23       Q.    Multiple?

24       A.    In-person days, maybe one and a

25   half.  There were some kind of cyber, what do

1  you call WebEx-type calls.  Maybe less than

2  five, maybe.

3       Q.     Okay.

4       A.     It's a little foggy.  I'm

5  sorry, I don't remember that number.

6       Q.     Quite all right.

7              So I call them remote meetings,

8  I guess.

9       A.     There you go, yeah.

10      Q.     Five or less remote meetings

11  with counsel, and one and a half days of

12  in-person prep?

13      A.     Yeah, that sounds right.

14      Q.     Okay.  And from what firm --

15  well, let's say it this way.

16             There are two law firms here

17  with you today.

18             Correct?

19      A.     Yes, ma'am.

20      Q.     Were you meeting with

21  representatives from each of those firms in

22  advance of the hearing?

23      A.     Yes.

24      Q.     Okay.  And do both firms

25  represent you?

Confidential - Pursuant to Protective Order

1     A.     No.  Dentons represents me and

2  SPSI.

3     Q.     Okay.  And WilmerHale

4  represents Norfolk Southern?

5     A.     Yes.

6     Q.     Okay.  Were the lawyers from

7  WilmerHale part of all of those prep sessions

8  that you had before the hearing in June?

9     A.     I believe so.  I can't recall

10  any that were just us.  I believe so.

11     Q.     Okay.  And was it the same

12  people that are here today from WilmerHale

13  and from Dentons?

14     A.     No.  No.  Actually, no.

15     Q.     Who do you recall from

16  WilmerHale being part of your prep sessions

17  for the June hearing?

18     A.     A lady named Katie from

19  California, but I'm sorry, I'm not good

20  with -- again, I didn't take a lot of notes.

21     Q.     That's quite all right.

22            Anyone else?

23     A.     Honestly, it's -- I don't take

24  good notes --

25     Q.     Okay.

Confidential - Pursuant to Protective Order

```
 1          A.      -- with this stuff.

 2          Q.      So you don't know the names,

 3   but you understand there was -- there were

 4   lawyers from WilmerHale participating in

 5   those prep sessions?

 6          A.      Yes, ma'am.

 7          Q.      And your counsel that's here

 8   with you today was part of those --

 9          A.      Yes.  Yes, Morgan and Lexie

10   were -- were my -- I guess the continuity.

11          Q.      Okay.  And you testified just

12   on the one panel at the NTSB hearing.

13                  Correct?

14          A.      Yes, ma'am.

15          Q.      Okay.  Was the first day,

16   second panel?

17          A.      Yes, I believe that's accurate.

18          Q.      And there were representatives

19   from Oxy on that panel as well.

20                  Right?

21          A.      Yes, I think so.

22          Q.      Mr. Thomas and Mr. Smith?

23          A.      Yes.

24          Q.      And you had met Mr. Smith in

25   East Palestine, so you knew him.
```

Confidential – Pursuant to Protective Order

```
 1                   Right?
 2        A.       Yes.
 3        Q.       Had you met Paul Thomas before
 4   that?
 5        A.       I don't think so.
 6        Q.       But you had been on calls with
 7   him.
 8                   Correct?
 9        A.       There were a lot of people from
10   Oxy on calls that I -- again, I didn't take
11   notes of who.  There was a lot of
12   introductions on the calls of who's who, and
13   I didn't -- I didn't take any notes.
14        Q.       Sure.  Just kind of like this
15   room.  There's a lot of people in here.
16        A.       I shook hands this morning, but
17   I didn't write any of your names down.
18        Q.       I get it.  Okay.
19                   So you weren't sure whether you
20   had met him before or spoken to him before?
21        A.       Correct.
22        Q.       Okay.  And there was another
23   Oxy witness at the NTSB hearing, Karenanne
24   Stegmann.
25                   Do you remember ever speaking
```

Confidential - Pursuant to Protective Order

1   with Ms. Stegmann?

2           A.      No.  I mean, she might have

3   been a person on one of the calls, but,

4   again, I don't know with certainty.

5           Q.      Do you recall the names of any

6   Oxy personnel that you spoke with from Dallas

7   that weekend of the derailment?

8           A.      Well, Tim, the response guy,

9   kind of facilitated getting the calls going.

10  And again, no, I didn't write down people's

11  names and their roles, so, no, I was not

12  taking those detailed notes.

13          Q.      Was anyone else who was

14  listening in on those calls with you taking

15  notes of the calls?

16          A.      Not -- the first call for us,

17  we were literally in a mop closet, in a broom

18  closet, in a garage, so I don't think so.

19          Q.      Okay.  Were you on one of those

20  calls with Jon Simpson?  Do you recall that?

21          A.      Norfolk Southern's Jon Simpson

22  may have been on a call.

23          Q.      And another call with Scott

24  Gould?

25          A.      Scott Gould was definitely on

1    the one in the mop closet.  I can remember

2    him being there.

3         Q.    Okay.  Did you have any

4    substantive discussions with anyone from Oxy

5    that Norfolk Southern wasn't present for?

6         A.    There was a call -- I'm -- I

7    want to say it was Sunday morning, at some

8    point Sunday morning.  We were in SRS's

9    rental car.  And it was just myself, Terry

10   Rockwell, Chip Day, and Kent Farquhar from

11   SRS.

12        Q.    And was Scott Gould on that

13   call but from another location?

14        A.    You know, I don't remember.  I

15   don't know.

16        Q.    Okay.  Would you have passed on

17   to Scott Gould anything that happened on that

18   call with Oxy?

19        A.    Either him or Scott Deutsch,

20   yes.

21        Q.    Okay.  You mentioned --

22        A.    Or Robert Wood.  One of the

23   managers definitely knew.

24        Q.    Okay.  I noticed you mentioned

25   those three quite a bit in talking earlier,

Confidential - Pursuant to Protective Order

1    but not Jon Simpson too often.

2              Is that because you were

3    working different shifts than Jon Simpson?

4        A.    Yeah, he was night shift, and

5    we had some time -- I overlapped a little bit

6    each shift to make sure that handoff and that

7    operation.  You know, there was a little bit

8    of overlap.  I made sure we're okay before I

9    went to my house and took a nap and such,

10   but...

11       Q.    Okay.  You had mentioned

12   earlier that there was kind of a chain of

13   command or a chain of information where SPSI

14   and SRS would pass information on to NS, and

15   NS would pass information on to the incident

16   command.

17             Do you remember talking about

18   that?

19       A.    Yes, ma'am.

20       Q.    And then on the way back,

21   incident command may share something with NS.

22   NS may decide whether or not they need to

23   share that with SPSI and SRS.

24             Does that sound about right?

25       A.    Yes.

Confidential - Pursuant to Protective Order

```
 1        Q.      Were there times where there
 2   was information that SPSI and SRS gathered
 3   but didn't pass on to Norfolk Southern?
 4        A.      Not that I'm aware of.
 5        Q.      So any information that you
 6   learned, for instance, from discussions with
 7   Oxy you would have passed on to Norfolk
 8   Southern?
 9        A.      Yes.
10        Q.      And any information you learned
11   from your guys in the field, you would have
12   passed on to Norfolk Southern?
13        A.      Yes.
14        Q.      And that would include
15   temperature readings or pressure gauge
16   readings.
17               Correct?
18        A.      Yes.
19        Q.      Okay.  And you personally would
20   have passed it on to one of the gentlemen
21   we've just discussed - Mr. Gould,
22   Mr. Deutsch, Mr. Wood or possibly
23   Mr. Simpson.
24               Correct?
25        A.      Yes.
```

Confidential - Pursuant to Protective Order

1    Q.    Okay.  Great.

2          Was there anybody else from

3    SPSI who was taking that communication role

4    from time to time and passing information on

5    to NS besides you?

6    A.    Oh, for sure.  And it was

7    specifically with these temperatures, is

8    where I'm going to hone in on the specifics.

9          That night shift is where that

10   really started happening.  And all that, you

11   know -- even that timeline on Sunday, Sunday

12   night into Monday, is when all of that

13   temperature trending was requested.

14         And, you know, I was present

15   for the first two entry teams that both

16   reported the same things, like this is

17   stupid, why are we doing this, this is bogus

18   data.  And I'll get that same message from

19   100 percent of my people that were trying to

20   do it.

21         And I passed that along, not

22   once, but twice, to Norfolk Southern HAZMAT

23   staff, and it was Robert Wood and Jon

24   Simpson.  I just don't remember which I told

25   first, but --

Confidential - Pursuant to Protective Order

1    Q.    Okay.

2    A.    So that's, you know, fact-based

3  sharing that --

4    Q.    Okay.

5    A.    But my -- I'm sorry, to your

6  question.

7          They were texting stuff.  They

8  were -- they were basically -- you know, my

9  guys were trying to do good for our customer.

10  Our customer was pushing us to do it, so they

11  were doing what our customer was asking and

12  pushing data.  So that's the perspective.

13    Q.    Right.

14          But, for instance, I think we

15  saw a text where Greg Palmer was passing

16  information on to Jon Simpson.

17          Right?

18    A.    Yes.  It looked like it.

19    Q.    As far as your guys in the

20  field who could have been taking

21  temperatures, I just want to make sure I know

22  all the names.

23          We talked about D'Shawn.

24    A.    Uh-huh.

25    Q.    What's D'Shawn's last name?

Confidential - Pursuant to Protective Order

1          A.      Herrera.

2          Q.      Herrera.  Okay.  Thank you.

3                  And I'm sorry if I got this

4    wrong.  Was Greg Palmer also taking

5    temperatures personally?

6          A.      No, he was our safety guy for

7    night shift.

8          Q.      Okay.

9          A.      He would have been relaying

10   information.

11         Q.      Okay.  Who else by name would

12   have been taking temperatures for SPSI?

13         A.      Well, Ryan Tokarski that you

14   know about.  D'Shawn Herrera.  And I have

15   to again go back to notes to remind myself of

16   that.  But I can check that tonight.

17         Q.      What notes would you go back to

18   look at?

19         A.      Well, my dailies, you know,

20   my -- when I say those notes that my notebook

21   did have early on, it was for my seven --

22   what we call the seven-day daily.  That last

23   paragraph at the end of every page supporting

24   our invoice, you know, I did have that early

25   on, so I had those kind of notes.

1          Now -- so that's going to tell

2    me who was on night shift.  It's going to

3    remind my -- who was there at night shift.

4          And then I can go back to,

5    like, D'Shawn, and say, okay, D'Shawn, you

6    and who.  You know, I got to remember, you

7    know, who it was that we confirmed this with,

8    but...

9       Q.    Okay.  Now I'm really confused,

10   I'm sorry.

11         You said you would -- you could

12   go back and look at your notes.

13         If you went back to your house

14   or your office, what notes, like physically

15   what would you look at to answer who was

16   taking the temperature readings?

17      A.    Okay.  Good question.

18         So the notes don't exist

19   anymore.  I accidentally washed them, and

20   they got ruined.

21      Q.    Okay.

22      A.    But before they got ruined, I

23   had -- the dailies were done for that first

24   week or so of operating.  Until my notes got

25   ruined, they supported our seventh-page

Confidential Pursuant to Protective Order

1   narrative.

2          And the NTSB has it.  They're

3   in the NTSB stuff somewhere, so I'm sure

4   you-all have that.

5          What I'm referring to is, I

6   have to go back to notes.  I'm referring back

7   to the dailies to remind myself which SPSI

8   worked night shift.  Talk to D'Shawn --

9      Q.    I see.

10     A.    -- you know, remind myself --

11  because it was D'Shawn and somebody.  You

12  know, somebody went with him to get the

13  readings.

14         And I know prior to the

15  hearings I reverified all this.  I knew those

16  names back in June, but I don't remember now.

17     Q.    Okay.  You mentioned something

18  called a seven-page narrative or a

19  seventh-page narrative.

20         What does that mean?

21     A.    So we call it our dailies.

22  It's a slang term at SPSI.  We call it the

23  daily.  So it's -- page 1 is our personnel.

24         Page 2 is our equipment that we

25  own, our rolling stock.

Confidential - Pursuant to Protective Order

1          Page 3 is like meters and

2     communications.

3          Page 4 is our PPE and other

4     expendable materials.

5          Page 5 is subcontractors and

6     rental equipment.

7          Page 6 is any kind of

8     purchases, like a hotel bill, rental cars,

9     stuff like that.

10          And the seventh, the seventh

11     page is pretty much, what did we do today.

12     Q.     Okay.

13     A.     It's just a narrative for our

14     customers to help support what it is we did.

15     Q.     Okay.  So we -- let's just go

16     back to the names.

17          You talked about D'Shawn

18     Herrera.  Ryan Tokarski.

19          Earlier there was a name

20     mentioned.  Mike Kline?

21     A.     Mike Kline.  He -- I believe he

22     took some of the readings.

23     Q.     Okay.  And what about Mike

24     Burket?

25     A.     Mike Burket was my day shift

Confidential - Pursuant to Protective Order

1   safety supervisor.

2        Q.      Okay.

3        A.      And that's where I see, you

4   know, after I got -- I won't say blindsided.

5   I just didn't remember ever seeing that

6   document, and I come to find out in the, you

7   know, submittals here that he actually

8   e-mailed it to me back in February.

9                And I don't know that I ever

10  looked at it because it was long after the

11  incident.

12       Q.      You're talking about a document

13  that we saw earlier today?

14       A.      It was today, yes.

15       Q.      And then you've looked at the

16  e-mail communication of that document on a

17  break?

18       A.      Yes.

19       Q.      Okay.  And that reminded you

20  that he did send you that information back

21  in, I believe, March?

22       A.      I don't remember when the date

23  was, but it was weeks after the derailment.

24       Q.      Okay.  Were you surprised to

25  see that when you got it?

Confidential - Pursuant to Protective Order

1      A.     I'm not sure if I ever opened

2  it because we were -- like I say, I was in

3  the trenches 16 hours a day.  And at that

4  era, you know, it didn't seem too pressing,

5  so...

6      Q.     Okay.  I'm old school, so I

7  just have these -- despite looking so young,

8  I'm old school, so I have hard copies that

9  we'll mark as the next exhibit.

10      A.     I'm sorry, she processes --

11           MR. HANSON:  She has to mark

12      it.

13           MS. HERLIHY:  What number is

14      that, Carrie?

15           (McCarty Exhibit 18 marked for

16      identification.)

17  QUESTIONS BY MS. HERLIHY:

18      Q.     So I will provide to you

19  guys -- you can pass out -- pass out as you'd

20  like a document that we will mark as

21  Exhibit 18.

22      A.     Thank you.

23      Q.     So, Mr. McCarty, this is an

24  e-mail from Michael Burket to you on

25  Thursday, February 23, 2023, at 1:57 p.m.

Confidential - Pursuant to Protective Order

```
 1                    Correct?

 2           A.      Yes.

 3           Q.      Do you know whether that's

 4   actually 1:57 p.m. that it was sent, or is

 5   that an indication of some funky, different

 6   time zone?

 7           A.      I honestly don't know from -- I

 8   just was introduced to this Greenwich thing

 9   yesterday for -- so I don't know.

10           Q.      Okay.  So you don't know

11   whether it was two o'clock or whether it

12   could have been perhaps five hours earlier at

13   nine o'clock a.m.

14                    Right?

15           A.      Well, the fact that this isn't

16   marked at Greenwich Time, I have to take it

17   at face value that it's Eastern Standard

18   Time.

19           Q.      Okay.  So we'll assume this was

20   sent at 1:57 p.m. on Thursday, February 23rd.

21                    Correct?

22           A.      Yes.

23           Q.      That's the same day that you

24   were testifying -- or, I'm sorry.  That's the

25   same day that you were interviewed by the
```

Confidential - Pursuant to Protective Order

1    NTSB.

2              Correct?

3        A.    Yes.

4        Q.    Where were you when you were

5    interviewed by the NTSB?

6        A.    In East Palestine at the

7    church.

8        Q.    You said that many times.

9    Sorry.  I missed that.

10       A.    That's all right.

11       Q.    Were you being interviewed

12   remotely by the NTSB?

13       A.    No.  It was in person.

14       Q.    Everyone was there in the room?

15       A.    Somebody dialed in.  Someone

16   from NTSB was remote, but I don't know who.

17       Q.    Okay.  Did you have access to

18   your e-mail that day?

19       A.    I mean, I -- maybe.

20       Q.    So this appears to have come at

21   2 in the afternoon, and your interview ended

22   early afternoon.

23             Do you generally remember that?

24       A.    It actually was in the morning.

25   It was a morning interview.

Confidential - Pursuant to Protective Order

1     Q.     But it ended in early

2   afternoon.

3               Is that right?

4     A.     No.  It was over by --

5   something from like 9 to 11, something like

6   that.

7     Q.     Okay.

8     A.     It was definitely over before

9   lunch.

10    Q.     Okay.  What exhibit number was

11  this?  13.

12              Okay.  I'm going to ask you to

13  give me one minute.

14              Okay.  So you were interviewed

15  at 9 a.m., and you say that ended around

16  11 a.m.

17              Is that your memory?

18    A.     Give or take, yes.

19    Q.     And then what did you do after

20  that?  Did you return to the job site?

21    A.     Stopped in at the Norfolk

22  Southern, what's called the Norfolk Southern

23  room at the church just to -- as a courtesy

24  stop-in with my customer to see if they

25  needed anything from me before I went back

Confidential - Pursuant to Protective Order

1    out in the field, and then I went back out in

2    the field.

3         Q.    Okay.  All right.  I was going

4    down my list of people who might have taken

5    temperatures.  I just wanted to find out.

6              We had mentioned D'Shawn, Ryan,

7    Mike Kline.  And then when I mentioned Mike

8    Burket, you didn't think he was somebody who

9    actually took temperatures.  It was like --

10         A.    I don't think so, because he

11   was day shift safety.

12              MR. HANSON:  Why don't you let

13       her finish.

14              THE WITNESS:  I'm sorry.

15   QUESTIONS BY MS. HERLIHY:

16         Q.    It's a long question.  I know

17   it's hard to wait.

18              He was a day shift supervisor,

19   you said, or day --

20         A.    Safety.

21         Q.    Day shift safety officer?

22         A.    Yes.  Yeah.

23         Q.    Okay.  And what's the job of a

24   day shift safety officer?

25         A.    Keep the safety plan updated,

Confidential - Pursuant to Protective Order

1    making sure the shift change job briefings

2    are documented, and kind of buzz around and

3    check different operations, just keep an eye

4    on operations for a safety perspective.

5         Q.    Does he take daily or regular

6    notes of what's going on on job sites?

7         A.    I asked him to on this one just

8    because I was a little tied up otherwise.

9         Q.    Okay.  The notes that you

10   mentioned unfortunately went through the

11   wash, were those notes just for this job in

12   East Palestine?

13        A.    Yeah.

14        Q.    Okay.  So you had just started

15   a new notebook for that?

16        A.    Yeah.

17        Q.    And how -- what's the notebook

18   look like?  How large is this notebook?

19        A.    Smaller than a pocket, but -- I

20   mean, smaller than this, but bigger than a

21   shirt pocket.  It wasn't a shirt pocket

22   notebook.  It was probably a -- I don't know,

23   a 5 by 7, maybe, something like that.

24        Q.    And it's like a flip notebook

25   with binding on the edge?

Confidential - Pursuant to Protective Order

```
 1         A.      It had a spiral binder.

 2    Spiral-bound notebook.

 3         Q.      Okay.  And once it went through

 4    the wash, did you throw it away, or do you

 5    still have it?

 6         A.      No, I threw it away.  It was

 7    smeared.  It was unfortunately a felt-tip pen

 8    that I had been carrying, and it just

 9    smeared.

10         Q.      Okay.  How many pages of the

11    notebook had you filled up?

12         A.      I don't -- I don't recall.

13         Q.      Had you been using that

14    notebook until the day it went into the wash?

15         A.      Yes.

16         Q.      Did you do the wash at home, at

17    your house?

18         A.      Yes.

19         Q.      Did you do that wash or did

20    your wife do that wash, is the real question?

21         A.      If you know my wife, it was me.

22    Sorry, but --

23         Q.      That's what would happen in my

24    house as well.

25                 Okay.  Can we pull out -- could
```

Confidential - Pursuant to Protective Order

1    we get Exhibit 2?  Or Tab 2.  Sorry.  Tab 2.

2              (McCarty Exhibit 19 marked for

3         identification.)

4    QUESTIONS BY MS. HERLIHY:

5         Q.    All right.  I guess we'll mark

6    this as 19, Carrie.

7              All right.  So, Mr. Day, {sic}

8    what I've handed you is a document that on

9    the first page says "Norfolk Southern Railway

10   and Specialized Professional investment --

11   Specialized Professional Services, Inc.,

12   Environmental Response Emergency Agreement,

13   8/15/2016."

14             Do you have that in front of

15   you?

16        A.    Yes.

17        Q.    And do you recognize this as

18   your agreement with Norfolk Southern --

19        A.    This is --

20        Q.    -- related to emergency

21   response?

22        A.    Yes.

23        Q.    Okay.  Has this agreement been

24   modified since August 2016?

25        A.    If it has, it's only been as

Confidential - Pursuant to Protective Order

1    like subtle rates, maybe just adding some

2    stuff that maybe wasn't previously in there.

3    But that would have been the extent of any

4    modifications that I'm aware of.

5         Q.    Okay.  So if I understand what

6    you're saying, it may have been modified with

7    respect to particular rates for particular

8    equipment or services, but the master

9    agreement has not changed?

10        A.    Not to my knowledge.

11        Q.    Okay.  If you look at the page

12   that's 7000 on the bottom.

13        A.    Yes.

14        Q.    In the section titled

15   "Emergency Work," it says, "The tasks to be

16   performed by contractor on an emergency basis

17   for a period not to exceed 72 hours from

18   initial mobilization by railway, unless

19   otherwise specified in the applicable service

20   order, to mitigate a hazardous condition

21   caused by the release of hazardous or

22   nonhazardous substances into the environment,

23   on or off railway's property, as requested

24   and authorized by the engineer or other

25   responsible official of railway."

Confidential - Pursuant to Protective Order

1                Sorry, I read a long definition

2     there, but it's defining what emergency work

3     means.

4                Right?

5          A.    Uh-huh.

6          Q.    Yes?

7          A.    Yes.

8          Q.    And that's the work that's done

9     in the first 72 hours from initial

10    mobilization?

11         A.    As defined here, yes.

12         Q.    Okay.  Was that -- has that

13    been modified in any way that you're aware

14    of?

15         A.    No.

16         Q.    Was there any special service

17    order related to East Palestine that changed

18    that definition of emergency work?

19         A.    No.

20         Q.    Okay.  You arrived on-scene on

21    Friday evening around 10 or 11.

22                Does that sound right?

23         A.    Yes.

24         Q.    So the 72-hour period would

25    have expired on Monday evening around 10 or

1    11?

2         A.    Sounds right.

3         Q.    Okay.  If you flip to Exhibit A

4    of this document, which is on page 16,

5    there's a schedule of prices and conditions.

6         A.    Yes.

7         Q.    Do you see that?

8         A.    Yes.

9         Q.    And the actual SPSI rates have

10   been redacted.

11               Correct?

12        A.    Yes.

13        Q.    But it's true that those

14   emergency response rates listed at the

15   beginning of this exhibit are higher per hour

16   than the nonemergency hourly rates.

17               Right?

18        A.    Yes.

19        Q.    How much higher?

20        A.    Not dramatic.  I don't -- you

21   know, I'd have to go back to the specific

22   agreement to refresh myself.

23        Q.    Okay.

24        A.    They're not dramatically

25   different.

Confidential - Pursuant to Protective Order

1      Q.     Okay.  Can you give me a

2  general, like a percentage?  Is it time and a

3  half kind of thing or two times?

4      A.     No, probably more like 10,

5  20 percent.

6      Q.     Okay.  That's something you

7  could check?

8      A.     I can check that, yes.

9      Q.     And you are the one who signed

10  this agreement.

11         Correct?

12      A.     Yes.

13      Q.     Now, if you turn to page 8 of

14  this document, there's a section called

15  Indemnification.

16      A.     Yes.

17      Q.     Have you read that section

18  recently?

19      A.     No.

20      Q.     Did you read it -- have you

21  read it since the beginning of this year?

22      A.     No.

23      Q.     Okay.  Did you confer with a

24  lawyer before signing this document?

25      A.     No.

Confidential - Pursuant to Protective Order

1    Q.    If you look at page 8,

2  Section 8.1(a) says, "Contractor shall

3  indemnify and hold harmless the indemnified

4  parties," and then there's lots of legal

5  language there.

6          Do you see that?

7    A.    Yes.

8    Q.    And in this case, the

9  "contractor" is you.

10         Right?

11   A.    Yes.

12   Q.    And the "indemnified parties"

13 are Norfolk Southern and its related

14 entities.

15         Right?

16   A.    Yes.

17   Q.    So this agreement, you are

18 indemnifying and holding harmless Norfolk

19 Southern.

20         Correct?

21   A.    I'd have to reread this.  I

22 only -- can I read this for a minute?

23   Q.    You're welcome to.

24         I'll also say that the -- just

25 to be clear, Section D of that identifies the

Confidential - Pursuant to Protective Order

1    terms "indemnified parties" and "indemnified

2    party" to include Norfolk Southern and its

3    affiliates.

4              Do you see that?

5    A.      Okay.

6              Okay.  I've caught -- I've read

7    it.

8    Q.      Okay.  My question was, in this

9    agreement, SPSI is indemnifying and holding

10   harmless Norfolk Southern.

11             Correct?

12   A.      In this agreement.  And it

13   hadn't been read since 2016, yes.

14             (McCarty Exhibit 20 marked for

15        identification.)

16   QUESTIONS BY MS. HERLIHY:

17   Q.      Okay.  Let's move on to Tab 3,

18   which will be Exhibit 20.

19             All right.  Mr. McCarty, what

20   you should have in front of you is what the

21   court reporter has marked as Exhibit 20.  It

22   is an e-mail from David Schoendorfer to you

23   and Chip Day.

24             Correct?

25   A.      Yes.

Confidential - Pursuant to Protective Order

```
 1        Q.      And it's dated February 6th,
 2   2:20 p.m.
 3                Right?
 4        A.      Yes.
 5        Q.      2:21 p.m., I guess.
 6        A.      Yeah.
 7        Q.      That's a couple hours before
 8   the vent and burn was initiated.
 9                Correct?
10        A.      Yes.
11        Q.      And it attaches a hold harmless
12   agreement.
13                Do you see that?
14        A.      Yes.
15        Q.      This one is not signed, but
16   eventually you did sign this agreement.
17                Correct?
18        A.      Yes.
19        Q.      How did this agreement come
20   about, and who requested that this agreement
21   be entered into?
22        A.      I did.
23        Q.      Okay.  And why did you request
24   that?
25        A.      Quite frankly, Jason Poe.
```

1    He -- his -- his prerequisite for providing

2    his service was that Norfolk Southern would

3    need to indemnify him.  And that kind of

4    grabbed my attention, like, you know, I

5    probably signed something years ago, in

6    whatever day, whatever year this would have

7    been.  And I said, Jason, that's a really

8    good idea.

9                 And I called David

10   Schoendorfer.  I said, Dave, Jason Poe is not

11   going to do his service without something

12   like that being signed.  And, Dave, I mean,

13   I -- I'm going to ask you to have Norfolk

14   Southern do the same consideration for me and

15   SRS.

16               So that's how it originated.

17        Q.    When did you call David

18   Schoendorfer and say that?

19        A.    I'd have to look at my phone

20   records.  I don't recall.

21        Q.    But it was after Jason Poe had

22   been engaged and mobilized to do the vent and

23   burn.

24               Right?

25        A.    Yes.

Confidential - Pursuant to Protective Order

1    Q.    Okay.  Because he wouldn't do

2    the vent and burn without this kind of

3    indemnification and hold harmless agreement?

4    A.    Correct.

5    Q.    Now, Mr. Poe sent you a

6    proposed indemnification and hold harmless

7    agreement.

8          Right?

9    A.    I think he did.

10   Q.    That's not the one that you

11   ended up signing, though, with Norfolk

12   Southern, is it?

13   A.    No, Norfolk Southern generated

14   this document.

15   Q.    Okay.  And did you have a

16   lawyer review this document before you signed

17   it?

18   A.    I did not.

19   Q.    Did you read and review the

20   hold harmless agreement that Jason Poe shared

21   with you and compare it to the one that you

22   signed with Norfolk Southern?

23   A.    I did not, because it ended up

24   where Jason -- the original dispatch, the

25   understanding was, I'm subcontracting SRS.

Confidential - Pursuant to Protective Order

```
1    SRS is subcontracting ESI.  And I'm still not
2    100 percent sure, but I think ESI ended up
3    direct contracting with Norfolk Southern.  I
4    think, but I don't know that with certainty.
5         Q.    Okay.  So my question was, did
6    you read and review the hold harmless
7    agreement that Jason Poe sent you and compare
8    it to this agreement?  That's Exhibit 20.
9         A.    No, I didn't.  I didn't really
10   study his again.  It was -- I didn't do a lot
11   of e-mailing from the field.
12        Q.    Okay.  And did you have any
13   conversations with Chip Day about a hold
14   harmless agreement?
15        A.    I had informed him that I had
16   asked Norfolk Southern for this.
17        Q.    Okay.  So you had the
18   discussion with Jason about a hold harmless
19   agreement, and then you passed that on to
20   Chip as well?
21        A.    No.  I let Dave Schoendorfer at
22   Norfolk Southern know that Jason and ESI was
23   going to need this.
24              And the next sentence to Dave
25   was, Dave, I'm going to ask Norfolk Southern
```

1   for the same thing.

2           I didn't have a document to

3   give to Norfolk Southern.  I didn't have that

4   kind of thing prepared, so Norfolk Southern's

5   legal person prepared it.

6      Q.    Why did you feel like in this

7   case you needed this kind of agreement?

8      A.    Well, as I suspected, and I

9   just reread it since 2016 about five minutes

10  ago, you know, there's language in here that

11  says I could be on the hook for environmental

12  pollution.

13          Well, we're getting ready to

14  kind of -- we -- in our -- 99.99 percent of

15  our jobs, we have no drips, no spills, no

16  errors, and we purposely don't put things in

17  the environment.

18          In this case, part of the

19  tactics that was going to get authorized by

20  our client in command was going to be to

21  emergency de-inventory tank cars.  And I just

22  wanted to make sure that my employees and my

23  company were protected from that, you know.

24     Q.    Protected in case there was a

25  claim or a lawsuit for --

```
1      A.     Yes.

2      Q.     Okay.

3             MR. HANSON:  Again, let her --

4             THE WITNESS:  I'm sorry.

5             MR. HANSON:  -- finish her

6      question.

7  QUESTIONS BY MS. HERLIHY:

8      Q.     I can say it again.

9             You wanted your employees and

10 yourself and your company to be protected in

11 case there was a lawsuit?

12     A.     Yes, ma'am.

13     Q.     Had you had any discussions

14 with anybody about a potential lawsuit at

15 this point?

16     A.     No.

17     Q.     If you turn to the second page

18 of that hold harmless agreement, I just want

19 to ask you a couple things.

20            Realizing this is a, you know,

21 a legal document, and if you don't know the

22 answer, that's fine.

23            But in that first clause it

24 says, "Whereas."  It says, "Client has asked

25 contractors to perform certain work for
```

1    client with regard to the requested tank car

2    vent and burn project" --

3         A.     Excuse me.

4         Q.     -- "located at East Palestine,

5    Ohio derailment site."

6               And when it says "certain

7    work," was that something less than all of

8    the work that you were doing there for

9    Norfolk Southern, or was the idea to cover

10   all of the work you were doing?

11        A.     I don't know that that was ever

12   defined.

13        Q.     Okay.  Did you feel, and do you

14   feel today, that you're covered 100 percent

15   by this agreement for all of the work that

16   you did with respect to East Palestine for

17   Norfolk Southern?

18        A.     Yes, ma'am.

19        Q.     Okay.  And then if you go down

20   to the section that's numbered 1, it says,

21   "Indemnity and hold harmless."

22               About the middle of that

23   paragraph, there's the words "willful

24   misconduct of contractors."

25               Do you see that?

Confidential - Pursuant to Protective Order

```
1        A.      I'm sorry, which paragraph are
2   you on?
3        Q.      It's paragraph number 1.
4        A.      Oh.  Okay.  Yeah.
5        Q.      And about in the middle of that
6   paragraph, it has the words "willful
7   misconduct of contractors."
8        A.      Okay.  I see that.
9        Q.      And does that indicate to you
10  that even if you and your company, who are
11  the contractors under this agreement, commit
12  some willful misconduct, you are still
13  indemnified and held harmless by Norfolk
14  Southern for that?
15       A.      The way I would read this is
16  if -- if for some -- you know, if there's
17  anything that we would have done as a willful
18  misconduct, then I'm reading this as -- that
19  that's where maybe it wouldn't apply, right?
20  Is that -- kind of how I understand how this
21  was written.
22       Q.      Okay.  What part of this
23  language makes you think that's what that
24  means?
25       A.      Let me reread the whole
```

Confidential - Pursuant to Protective Order

1    paragraph.

2         Q.    Sure.

3         A.    Let me just look at the whole

4    paragraph, top to bottom.

5              Huh.  Well, I got to tell you,

6    in all the contracts I've written in 35 years

7    doing business, I must say I'm surprised at

8    how that's worded.

9              But it appears that Norfolk

10   Southern in this paragraph is, in fact,

11   indemnifying us even if we would have done

12   something willfully, misconduct.  And, you

13   know, that did not happen.

14             But the way this reads just

15   surprised me, because that's pretty

16   surprising.

17        Q.    Same for me, which is why I

18   asked you.

19             But having read that --

20        A.    -- I read it, because I can

21   tell you, I got this and kept moving.  I kept

22   working.

23        Q.    Okay.

24        A.    I have that faith in my client.

25        Q.    Okay.  But we -- again, we can

Confidential - Pursuant to Protective Order

1　agree that that language does appear to cover

2　you for willful misconduct?

3　　　　A.　　　It appears that way.

4　　　　Q.　　　Okay.  And it goes on in the

5　final sentence to talk about attorneys' fees,

6　that this indemnification applies to and

7　includes, without limitation, to the payment

8　of all penalties, fines, judgments, awards,

9　decrees, attorneys' fees and related costs or

10　expenses, and any reimbursements to

11　contractors for all legal expenses and costs

12　incurred by them.

13　　　　　　　　Right?

14　　　　A.　　　That is how it reads, yes.

15　　　　Q.　　　Okay.  And Norfolk Southern is,

16　in fact, paying your attorneys' fees.

17　　　　　　　　Correct?

18　　　　A.　　　Yes, ma'am.

19　　　　Q.　　　And any related costs that you

20　have with respect to this litigation?

21　　　　A.　　　Yes, ma'am.

22　　　　Q.　　　And they paid your attorneys'

23　fees with respect to the investigative

24　hearing by the NTSB as well.

25　　　　　　　　Correct?

Confidential - Pursuant to Protective Order

```
 1          A.      Yes, ma'am.

 2          Q.      So you're not out of pocket any

 3   money as a result of this litigation.

 4                  Is that correct?

 5          A.      No, ma'am.

 6          Q.      Okay.  They've covered it all?

 7          A.      Yes.

 8          Q.      Okay.  Was SPSI a member of

 9   unified command?

10          A.      No.

11          Q.      And Oxy was not a member of

12   unified command.

13                  Correct?

14          A.      I don't believe so.

15          Q.      Do you have any reason to

16   believe that they were?

17          A.      I just know that Oxy had three

18   folks in town.  I was not privy to a lot of

19   conversations at the command operation.

20          Q.      Did you ever see -- did you

21   ever go to a meeting of the unified command?

22          A.      I went to what we called shift

23   change briefings --

24          Q.      Okay.

25          A.      -- which was pretty much all
```

Confidential - Pursuant to Protective Order

```
 1    parties in the room.  So there was a lot of
 2    folks there.
 3         Q.    Okay.  And were folks from Oxy
 4    in that room?
 5         A.    I think they would have been,
 6    at least one or two briefings, I think, but I
 7    didn't exactly keep track of them.
 8         Q.    Okay.  So you just don't know?
 9         A.    I'm not certain.
10         Q.    Crossing off things because
11    you've had a lot of questions asked of you.
12              Mr. Swanson, Trinity's counsel,
13    showed you, I believe, the complaint against
14    Trinity.  And it's also against Oxy Vinyls.
15              Were you aware that Oxy Vinyls
16    was sued by Norfolk Southern?
17         A.    I think that had just been in a
18    press release, yes.
19         Q.    Okay.  Do you understand the
20    basis of Norfolk Southern's claims against
21    Oxy?
22         A.    I don't, until this was shared
23    today.  And honestly, I didn't read beyond
24    the few lines that he asked me to read.  So
25    at this moment, no, I don't know.
```

Confidential - Pursuant to Protective Order

1      Q.     Okay.  Do you take issue with
2   anything that Oxy did with respect to the
3   East Palestine train derailment?
4              MR. LEVINE:  Objection.
5              THE WITNESS:  Wow, that's a
6      broad-brush statement, question.
7              Can you repeat?  Just make sure
8      I understand the question.
9   QUESTIONS BY MS. HERLIHY:
10     Q.     Yeah.  I'm wondering if you
11  place blame or take issue with anything that
12  Oxy did with respect to the train derailment.
13     A.     Oh, I certainly --
14             MR. LEVINE:  Same objection.
15             THE WITNESS:  -- don't place
16     blame.
17  QUESTIONS BY MS. HERLIHY:
18     Q.     Okay.
19     A.     I certainly don't place blame.
20     Q.     Okay.  Do you feel like Oxy did
21  anything wrong?
22     A.     Well, you've asked the
23  question.  I'm going to go on my 35 years of
24  experience to share with you what I think Oxy
25  could have done better.

Confidential - Pursuant to Protective Order

1       Q.      Please.

2       A.      Empower the people that it

3    sends to the sites.

4       Q.      Okay.  And what do you mean by

5    that?

6       A.      My experience with Oxy from

7    scheduled transfer in Illinois years ago to

8    Paulsboro, New Jersey, to East Palestine is

9    such where when they send dignitaries out to

10   the site for help and support, the common

11   thread that I've personally observed is

12   nobody's allowed to make a decision till

13   talking to Dallas.

14               That's just -- that's a candid,

15   honest answer to your question.

16      Q.      Okay.  And do you think that --

17   well, let's talk about this derailment,

18   because I'm really specific to this

19   situation.

20               Do you think that changed the

21   way you went about making decisions on the

22   scene in East Palestine?

23      A.      Well, to clarify, decisions

24   really weren't ours to make, the word

25   "decision."

1          But, no, I think this -- just a

2    disconnect of people here that included the

3    strike team response guy that knows the

4    tactics, knows the options, knows the risk.

5    You've got a chemist here that may or may not

6    have shared that he's not the actual chemist

7    that makes vinyl, but certainly was sent

8    there because he's a chemist that understands

9    Oxy Vinyls is a VCM producer, yada yada.

10          So again, we -- and again, take

11   Oxy off the table.  Chemical company X sends

12   experts to the site to help.

13          You know, that's just to share.

14   You asked the question.  That's one thing I

15   think Oxy could do better at.

16      Q.    Okay.  That's what I want to

17   know.

18          Are there other things you

19   think Oxy could have or should have done

20   differently with respect to East Palestine

21   other than perhaps, I think you said,

22   empowering the people it sends to the site?

23      A.    I think when we ask the

24   question, if they're going to make a pretty

25   strong assumption from Texas that says, we

Confidential - Pursuant to Protective Order

1    just don't think it's polymerizing, but don't

2    have any solutions to offer, it puts us in a

3    box.  It puts our back against the wall that

4    we're back to our tactics and toolboxes.

5    Okay.  So they're believing this.

6                  But we have eons of data from

7    decades of training and decades and all these

8    different chemical resources and their own

9    employees that they sent here to help

10   questioning the person on the end of the

11   phone.

12                 The person on the other end --

13   if they feel so strongly in their minds it's

14   not polymerizing, yet they don't have any

15   answers to help us, our backs are still

16   against the wall.

17                 We have to do something to

18   improve safety of this community.

19                 So that's -- it's -- we respect

20   all input from all of our customers.  That's

21   a sincere statement.

22                 What could Oxy do better?

23   Offer ideas.  Offer tactical options.  And

24   that's another -- I mean, that's my answer.

25        Q.    So you -- let's talk about a

Confidential - Pursuant to Protective Order

1    couple of those things.

2              You heard clearly from Oxy that

3    this wasn't polymerizing.  Their perspective

4    was, don't vent and burn this because it's

5    not polymer -- don't do it because of

6    polymerization.

7              That's what they said, right?

8              MR. LEVINE:  Objection.

9              THE WITNESS:  Well, whoever it

10        was on the phone Sunday morning, their

11        words were, we just don't think it's

12        polymerizing.

13   QUESTIONS BY MS. HERLIHY:

14        Q.    Okay.  And didn't they also

15   say, you guys are on the ground, if you're

16   going to do a vent and burn, that's your

17   decision, but don't do it because it's

18   polymerizing?

19              Do you remember hearing that?

20        A.    Maybe.

21        Q.    Okay.

22        A.    And I don't remember the exact

23   conversation.

24        Q.    Okay.  Do you remember anything

25   else from that conversation?

Confidential - Pursuant to Protective Order

```
1         A.    A little bit of back-and-forth
2    of, you know, how do you -- how -- we asked
3    them, how do you stabilize with nitrogen, and
4    they basically said, load the cars, put
5    nitrogen on top.
6              And again, that just --
7    nitrogen is the first thing to leave the car
8    on Friday night when the PRD started venting.
9              So those kind of things were
10   talked about, but -- it wasn't a very long
11   call, as I recall.  It wasn't that long of a
12   phone call.
13        Q.    Okay.  Do you -- have you, at
14   any other time when you have been engaged by
15   Oxy, looked to them for advice about how to
16   actually respond to an emergency site?
17        A.    Yes.
18        Q.    In what situation?
19        A.    Well, Paulsboro, for example.
20   We bounced that idea off of them about the
21   acetone carrier solvent.  And they did run it
22   by their chemists, and they agreed that that
23   did sound like a bona fide idea.
24              So that was a Barry Lindley
25   idea to the contractor, contractor to CSX,
```

1    CSX to Oxy, group think, buy in with Oxy

2    chemists and execute.

3         Q.    Okay.  And maybe I'm asking my

4    question badly.

5              But what I'm -- what I'm trying

6    to get at is, are there situations where you,

7    as the emergency response contractor, look to

8    the chemical manufacturer to make an

9    emergency response decision or

10   recommendation?

11        A.    Sometimes, and especially in a

12   situation like this.  If they're not agreeing

13   with our next course of action that seemed

14   logical to us as our last tool in the

15   toolbox, they just didn't seem to have any

16   other options.

17        Q.    What it sounds like they said

18   was it's not polymerizing, right?

19              That was their belief, right?

20        A.    Yes.

21        Q.    Okay.  Do you think they should

22   not have told you that without another

23   solution?

24        A.    Oh, no, no, no.  I respected

25   their input.  And I appreciated their input.

Confidential - Pursuant to Protective Order

```
 1              But then minutes later, Oxy

 2   employees that were sent there to help are

 3   questioning that message.

 4        Q.    And I wanted to ask you about

 5   that, too, "minutes later."

 6              Because the three Oxy people

 7   didn't arrive on the scene until at least

 8   noontime on Sunday.

 9        A.    Okay.

10        Q.    And this call was at 7 or

11   8 a.m.

12        A.    Okay.

13        Q.    Okay.  You seemed very clear

14   about the "minutes later."

15        A.    Yeah, that's my -- what they

16   call a brain fog on timeline.

17        Q.    Okay.

18        A.    But it was that morning.

19        Q.    Okay.  But it wasn't like you

20   got off the call and then immediately talked

21   to the people who were in East Palestine.

22              Right?  Correct?

23        A.    In my memory I thought it was,

24   but apparently not if there's a timeline that

25   says it was a few-hour gap.
```

Confidential - Pursuant to Protective Order

1      Q.     I mean, if the strike team

2  leader and Steve Smith and Alex Torres were

3  on the ground in East Palestine, why would

4  you have been on the phone with the people in

5  Dallas without them involved?

6           MR. LEVINE:  Objection.

7           THE WITNESS:  Well, that was a

8      question we had, too.  Why were they

9      not invited on the call.

10  QUESTIONS BY MS. HERLIHY:

11      Q.     Okay.  You thought they were on

12  the ground there in East Palestine already?

13      A.     I just wondered why they

14  weren't on the call.

15      Q.     Okay.  You wondered why who

16  wasn't on the call?

17      A.     The guys that asked us how the

18  call went.  What did they say on the call.

19  It just surprised us.  You guys weren't on

20  the call?

21      Q.     Okay.  So the three guys who

22  were there at East Palestine asked you, how

23  did that call go with Oxy?

24      A.     Yes.

25      Q.     And you thought they had been

Confidential - Pursuant to Protective Order

1    on the call?

2         A.    I assumed if they were part of

3    the Oxy team that they would have been on the

4    call.

5         Q.    Okay.  Later that day, you --

6    maybe you don't know this.  But are you aware

7    that later that day there was an internal

8    team call among the Oxy folks which was

9    then -- afterwards, the results were reported

10   back to you?

11        A.    I'm not -- I'm not sure I am

12   familiar with that.

13               What was that day?

14        Q.    Okay.  That's on Sunday, Sunday

15   evening.

16        A.    Okay.

17        Q.    Do you remember speaking with

18   Steve Smith following a call he had with the

19   Oxy team on Sunday evening?

20        A.    I don't know that I do.

21        Q.    Okay.  His testimony is he,

22   after some discussions with you on the scene,

23   he went back to talk to the Dallas team

24   further, and came back and reiterated that

25   this is not polymerization.

Confidential - Pursuant to Protective Order

```
 1        A.      -- yeah.

 2        Q.      I'm sorry?

 3        A.      I'm sorry.  I'm just getting

 4   tired.  I'm sorry.

 5        Q.      And he came back and reiterated

 6   that this is not polymerization.

 7                Do you remember that?

 8        A.      I don't.

 9        Q.      Okay.  Do you have any reason

10   to believe it didn't happen?

11                MR. LEVINE:  Objection.

12                THE WITNESS:  No, I -- Steve

13        was -- I like -- I have no reason to

14        believe Steve would lie.

15   QUESTIONS BY MS. HERLIHY:

16        Q.      Okay.  Okay.

17                I have ten minutes remaining.

18   I'm happy to stop now.  I don't think I'm

19   going to need all my time tomorrow.

20        A.      Like I say, this is your time.

21   I'm -- I mean, I'm --

22        Q.      I know you're getting tired.

23   We're all getting tired.  It's -- whatever.

24        A.      I just don't -- I don't mean to

25   cut your questions off.  I apologize.
```

```
 1          Q.     I understand.  It's hard.
 2                 We can keep going for the ten
 3    minutes.  I'm probably going to have more
 4    tomorrow.  So we can either break now or --
 5    it's up to you guys.
 6          A.     That's your decision.  I mean,
 7    I --
 8                 MR. HANSON:  Why don't we wrap
 9          it up for tonight.
10                 MS. HERLIHY:  That's fine.
11                 VIDEOGRAPHER:  Then we are off
12          the record at 6:03.
13           (Off the record at 6:03 p.m.)
14                     - - - - - - -
15
16
17
18
19
20
21
22
23
24
25
```

1                    CERTIFICATE

2          I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
3  Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
4  of the examination, John Andrew McCarty, was
duly sworn by me to testify to the truth, the
5  whole truth and nothing but the truth.

6          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
7  testimony as taken stenographically by and
before me at the time, place and on the date
8  hereinbefore set forth, to the best of my
ability.

9
          I DO FURTHER CERTIFY that I am
10 neither a relative nor employee nor attorney
nor counsel of any of the parties to this
11 action, and that I am neither a relative nor
employee of such attorney or counsel, and
12 that I am not financially interested in the
action.

13

14

15
   _____
16 CARRIE A. CAMPBELL,
   NCRA Registered Diplomate Reporter
17 Certified Realtime Reporter
   California Certified Shorthand
18 Reporter #13921
   Missouri Certified Court Reporter #859
19 Illinois Certified Shorthand Reporter
   #084-004229
20 Texas Certified Shorthand Reporter #9328
   Kansas Certified Court Reporter #1715
21 New Jersey Certified Court Reporter
   #30XI00242600
22 Louisiana Certified Court Reporter
   #2021012
23 Notary Public
   Dated:  January 25, 2024
24

25

Confidential - Pursuant to Protective Order

```
 1              INSTRUCTIONS TO WITNESS

 2   DATE: January 25, 2024

 3              Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13              It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

ACKNOWLEDGMENT OF DEPONENT

I,_____, do
hereby certify that I have read the foregoing
pages and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
John Andrew McCarty                DATE

Subscribed and sworn to before me this

_____ day of _____, 20 _____.

My commission expires: _____

Notary Public

Confidential - Pursuant to Protective Order

```
1                - - - - - - -
                     ERRATA
2                - - - - - - -

3    PAGE    LINE   CHANGE

4    _____   _____  _____

5    _____   _____  _____

6    _____   _____  _____

7    _____   _____  _____

8    _____   _____  _____

9    _____   _____  _____

10   _____   _____  _____

11   _____   _____  _____

12   _____   _____  _____

13   _____   _____  _____

14   _____   _____  _____

15   _____   _____  _____

16   _____   _____  _____

17   _____   _____  _____

18   _____   _____  _____

19   _____   _____  _____

20   _____   _____  _____

21   _____   _____  _____

22   Subscribed and sworn to before me this

23   _____ day of _____, 20 _____.

24   My commission expires: _____

25   Notary Public
```

Confidential - Pursuant to Protective Order

```
 1                      - - - - - - -
                        LAWYER'S NOTES
 2                      - - - - - - -

 3      PAGE     LINE

 4      _____    _____    _____

 5      _____    _____    _____

 6      _____    _____    _____

 7      _____    _____    _____

 8      _____    _____    _____

 9      _____    _____    _____

10      _____    _____    _____

11      _____    _____    _____

12      _____    _____    _____

13      _____    _____    _____

14      _____    _____    _____

15      _____    _____    _____

16      _____    _____    _____

17      _____    _____    _____

18      _____    _____    _____

19      _____    _____    _____

20      _____    _____    _____

21      _____    _____    _____

22      _____    _____    _____

23      _____    _____    _____

24      _____    _____    _____

25
```

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3

    IN RE: EAST PALESTINE    ) CASE NO.
4   TRAIN DERAILMENT          ) 4:23-CV-00242-BYP
                              ) JUDGE BENITA Y. PEARSON
5

6            THURSDAY, JANUARY 25, 2024
7     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
8                      - - -
9              Videotaped deposition of John
10   Andrew McCarty, Volume II, in his personal
11   capacity and as 30(b)(6) designee for
12   Specialized Professional Services, Inc., held
13   at the offices of Dentons Cohen and Grigsby,
14   625 Liberty Avenue, Fifth Floor, Pittsburgh,
15   Pennsylvania, commencing at 9:03 a.m.
16   Eastern, on the above date, before Carrie A.
17   Campbell, Registered Diplomate Reporter,
18   Certified Realtime Reporter, Illinois,
19   California & Texas Certified Shorthand
20   Reporter, Missouri, Kansas, Louisiana & New
21   Jersey Certified Court Reporter.
22                      - - -
23

             GOLKOW LITIGATION SERVICES
24                 877.370.DEPS
                  deps@golkow.com
25

```
 1              A P P E A R A N C E S :
 2
 3      GRANT & EISENHOFER P.A.
        BY:  ADAM J. GOMEZ
 4           agomez@gelaw.com
             ADAM STOLTZ
 5           astoltz@gelaw.com
        123 South Justison Street, 7th Floor
 6      Wilmington, Delaware  19801
        (303) 622-7000
 7      Counsel for Plaintiffs
 8
 9      WILMER CUTLER PICKERING HALE AND DORR LLP
        BY:  NOAH A. LEVINE
10           noah.levine@wilmerhale.com
        7 World Trade Center
11      250 Greenwich Street
        New York, New York  10007
12      (212) 230-8800
13
        and
14
15      WILMER CUTLER PICKERING HALE AND DORR LLP
        BY:  BENJAMIN T. MORRIS
16           benjamin.morris@wilmerhale.com
        60 State Street
17      Boston, Massachusetts  02109
        (617) 526-6000
18      Counsel for Norfolk Southern
        Corporation and Norfolk Southern
19      Railway Company
20
21      BARTLIT BECK HERMAN PALENCHAR &
        SCOTT LLP
22      BY:  BRIAN SWANSON
             brian.swanson@bartlitbeck.com
23      54 West Hubbard, Suite 300
        Chicago, Illinois 60654
24      (312) 494-4400
        Counsel for Trinity Industries
25      Leasing Company
```

John Andrew McCarty

```
 1        VORYS, SATER, SEYMOUR AND PEASE LLP
          BY:  KIMBERLY WEBER HERLIHY
 2             kwherlihy@vorys.com
               SARA INGRAM
 3             saingram@vorys.com
          52 East Gay Street
 4        Columbus, Ohio  43215
          (614) 464-6400
 5        Counsel for Oxy Vinyls
 6
 7        KIRKLAND & ELLIS LLP
          BY:  HARIKLIA KARIS
 8             hariklia.karis@kirkland.com
               SYDNE K. COLLIER
 9             sydne.collier@kirkland.com
          300 North LaSalle
10        Chicago, Illinois  60654
          (312) 862-2000
11        Counsel for GATX and General
          American Marks Company
12
13
          DENTONS
14        BY:  MORGAN J. HANSON
               morgan.hanson@dentons.com
15             ALEXIS B. THURSTON
               lexie.thurston@dentons.com
16        625 Liberty Avenue, Fifth Floor
          Pittsburgh, Pennsylvania  15222
17        (412) 297-4900
          Counsel for Specialized Professional
18        Services, Inc., and Drew McCarty
19
20     ALSO PRESENT:
          MICHAEL FRONZAGLIA, trial
21        technician, Precision Trial Solutions
22
23     V I D E O G R A P H E R :
          CHARLES STOCKHAUSEN,
24        Golkow Litigation Services
25                     - - -
```

1                          INDEX

2                                              PAGE

   APPEARANCES.................................. 487

4  EXAMINATIONS

5    BY MS. HERLIHY............................ 491

6    BY MS. KARIS.............................. 536

7    BY MR. GOMEZ.............................. 656

8    BY MS. HERLIHY............................ 708

9

10                        EXHIBITS

11   No.   Description                       Page

12   21    Text messages between Drew         518
           McCarty and Paul Williams,
13         NS-CA-003481989 - NS-CA-003481990

14   22    Group D, Exhibit 66, Incident      521
           Status Report, February 5, 2023,
15         NS-CA-001621932 - NS-CA-001621939

16   23    Amended Notice of Rule 30(b)(6)    557
           Videotaped Deposition of
17         Specialized Professional
           Services, Inc.

18

     24    Metadata for Exhibit 18            678

19

20    (Exhibits attached to the deposition.)

   CERTIFICATE.................................712

   ACKNOWLEDGMENT OF DEPONENT..................714

   ERRATA......................................715

   LAWYER'S NOTES..............................716

25

John Andrew McCarty

```
 1              VIDEOGRAPHER:  We are now on
 2         the record.  My name is Charles
 3         Stockhausen.  I am the videographer
 4         for Golkow Litigation Services.
 5              Today's date is Thursday,
 6         January 25, 2024, and the time is
 7         9:03 a.m.
 8              This video deposition is being
 9         held at 625 Liberty Avenue, Fifth
10         Floor, Pittsburgh, Pennsylvania 15222,
11         In Re of East Palestine Train
12         Derailment, for the United States
13         District Court, Northern District of
14         Ohio, Eastern Division.
15              The deponent is Drew McCarty.
16              Counsel will be noted on the
17         stenographic record.
18              And the court reporter is
19         Carrie Campbell.  She will now swear
20         in the witness.
21              JOHN ANDREW MCCARTY,
22    of lawful age, having been first duly sworn
23    to tell the truth, the whole truth and
24    nothing but the truth, deposes and says on
25    behalf of the Plaintiffs, as follows:
```

John Andrew McCarty

1           MR. HANSON:  Before we get

2      started with the questioning, I just

3      wanted to put on the record that this

4      is the second day of Mr. McCarty's

5      sort of combined individual and

6      30(b)(6) deposition.  We're not --

7      since we are not making any

8      distinction between him in his

9      individual capacity or his corporate

10     capacity, I think we can just roll

11     along as we were before unless there's

12     an objection from anyone.

13          MR. GOMEZ:  No objection.

14          MS. HERLIHY:  No objection.

15     And with the understanding that the

16     stipulations and discussions we put on

17     the record at the beginning of

18     yesterday apply into today.

19          MR. HANSON:  Absolutely.

20          MS. HERLIHY:  Great.

21       DIRECT EXAMINATION (continued)

22   QUESTIONS BY MS. HERLIHY:

23     Q.    Good morning, Mr. McCarty.

24     A.    Good morning.

25     Q.    Welcome to day 2.

John Andrew McCarty

```
 1                    I have tried to narrow down
 2     what I want to ask you, and so I'll be
 3     jumping around a little bit.  I apologize.
 4                    I neglected to ask you
 5     yesterday when we were talking about
 6     preparations that you did for the NTSB
 7     interview and then the hearing what you did
 8     to prepare for your deposition today.
 9                    So could you describe to me
10     what you did to prepare for -- I should say,
11     for your deposition yesterday and today?
12         A.     Just pretty much met here in
13     this room with Morgan and Lexie and Noah and
14     Ben and a couple of the other folks from
15     WilmerHale on cyber connections.
16                    Pretty much it.
17         Q.     Okay.  Was there anyone other
18     than lawyers from WilmerHale and/or Dentons
19     involved in that meeting?
20         A.     No.
21         Q.     Was it a single meeting or more
22     than one?
23         A.     Just a single-day meeting.  It
24     was five or six hours, I guess.
25         Q.     Okay.  And when was that?
```

John Andrew McCarty

1    A.    This week, Tuesday.

2    Q.    Okay.  Outside of meeting with

3    counsel for Norfolk Southern and your own

4    counsel, did you speak with anyone in

5    preparation for your deposition?

6    A.    No.

7    Q.    Did you review any documents in

8    preparation for your deposition?

9    A.    Yes.  Lexie had sent me

10   something.  I forget what she sent me, but it

11   was an e-mail from Lexie sent to me last week

12   or so, and I looked at it Tuesday evening.

13   Q.    Okay.  And was that something

14   you used to refresh your memory for the

15   deposition?

16   A.    I guess -- not so -- well, I

17   guess yes, indirectly.  I don't remember what

18   it was, to be honest with you.  I don't

19   remember what it was.

20   Q.    Okay.  You have no recollection

21   of the topic?

22   A.    At this moment, no, I don't.

23   Q.    Okay.  Between yesterday and

24   today, did you do anything to prepare for

25   your deposition?

John Andrew McCarty

```
1          A.      Today?

2          Q.      Yes.

3          A.      Yes, ma'am.  Last night I kind

4   of did some homework on what I promised

5   you-all I would.

6          Q.      Okay.  I appreciate that.

7                  Did you do that on your own --

8          A.      Yes.

9          Q.      -- or with -- okay.

10                 And did you meet with anybody

11  between yesterday and today --

12         A.      No.

13         Q.      -- to prepare for your

14  deposition?

15         A.      No.

16         Q.      Well, let's talk about the

17  homework you did.

18                 What topics did you do homework

19  on last night?

20         A.      Someone had asked me yesterday

21  about gross sales.  That number was 157

22  million in 2023.

23         Q.      So that's from February 3rd

24  through the end of 2023?

25         A.      Yeah, that was our -- what we
```

John Andrew McCarty

1   could call final billing for 2023 for that

2   project for Norfolk Southern.

3          Q.      Okay.  And are you continuing

4   to work on that project in 2024?

5          A.      Yes, we're still there.

6          Q.      Okay.  Have you sent any bills

7   for 2024 yet?

8          A.      Most likely, but I didn't

9   explore that last night.

10          Q.      Okay.  Has that 157 million

11   that you billed to Norfolk Southern been

12   paid?

13          A.      I didn't think to ask the CFO

14   that.  Predominantly, yes, Norfolk Southern

15   has been good about helping us keep up with

16   cash flow.  Yes, they've been very good about

17   that.

18          Q.      Okay.  Does that 157 million

19   include time that you or your employees spent

20   in hearings or in interviews with the NTSB?

21          A.      Yes.  Some of that would

22   include that.

23          Q.      Okay.  So you would be paid on

24   an hourly basis for that time spent with the

25   NTSB?

1      A.      Yes, ma'am.

2      Q.      What's your hourly rate, you

3  personally, your hourly rate for NTSB-related

4  activities?

5      A.      I honestly don't remember.  The

6  2016 rates, I think, have gone up some since

7  2016, but it's in the vicinity of 100 and

8  something an hour.

9      Q.      Okay.  And is there a different

10  rate for other people at SPSI, like Ryan

11  Tokarski, for instance?

12      A.      Yes, ma'am.

13      Q.      And what would his rate be

14  compared to yours?

15      A.      Probably in the vicinity of 80

16  to a hundred dollars an hour, something like

17  that.

18      Q.      Okay.  And then are you also

19  paid for your time in deposition today?

20      A.      Yes.

21      Q.      And is that at the 100 -- I

22  can't remember what you said.  100 and --

23      A.      Yeah, whatever the

24  nonemergency -- that would be that

25  nonemergency application.

John Andrew McCarty

```
 1          Q.      Nonemergency hourly rate?
 2          A.      Yes.
 3          Q.      Okay.  And so you would be paid
 4     for prep time and deposition time by Norfolk
 5     Southern?
 6          A.      Yes.
 7          Q.      What other homework did you do
 8     last night?
 9          A.      There was three assignments.
10     What were they?
11              The gross sales.  Oh, the delta
12     from -- on the rate schedule, talking about
13     rates.  Someone had asked, what is the --
14     kind of the percentage delta from
15     nonemergency to emergency or vice versa.
16              The lady that helps me do --
17     does our billing, we just took ten minutes
18     together on the phone and took a snapshot of
19     a few rates.  And I chuckle because it's --
20     it was surprising to me.  So one of them was
21     actually just one dollar difference.  Other
22     ones were like a 12 percent.
23              So a safe, broad -- we didn't
24     go through every single rate, but generally
25     speaking, our emergency to nonemergency
```

John Andrew McCarty

1    predominantly looks at labor.

2              The large -- the majority of

3    equipment remains unchanged for the most

4    part.  But it was probably a range from 5

5    percent to 15 percent, is a safe range to

6    share.

7         Q.    Okay.  When we looked at that

8    document yesterday, those rates were

9    redacted, as you recall.

10             Correct?

11        A.    Yes.

12        Q.    Were the rates that were in

13   that 2016 document still current?

14        A.    No, they would probably --

15   there would have been increases between then

16   and now.

17        Q.    Okay.  And do you have

18   documentation that would show what the

19   increases are between then and now on your

20   rates with Norfolk Southern?

21        A.    I think so.  I think -- my --

22   the lady that helps me with our billing,

23   Penny is her name, she would probably have

24   that, yes.

25             MR. HANSON:  Counsel, if

John Andrew McCarty

```
 1              there's no objection, can we designate
 2              the discussion of the particularized
 3              rates that we charge as confidential?
 4                   This is a competitive industry,
 5              and the rates that our company
 6              charges, we prefer not to be a public
 7              record.
 8                   MS. HERLIHY:  I mean, I don't
 9              think we've talked about any
10              particular rates other than, I
11              suppose, for the NTSB hearing.
12                   MR. HANSON:  Well, that's his
13              non --
14                   MS. HERLIHY:  Okay.
15                   MR. HANSON:  He's described
16              that as his nonemergency rates.  So
17              that's his -- would be his standard
18              rate.  And we would just prefer that
19              those particular parts be
20              confidential.
21                   MS. HERLIHY:  I don't have any
22              problem with that.
23                   Do others?
24                   MR. GOMEZ:  No.
25                   MS. HERLIHY:  I mean, I'd like
```

John Andrew McCarty

```
1            to --
2                 MR. SWANSON:  Not for now.  I
3            mean, down the road we might have to
4            revisit it, but if you want to mark it
5            as confidential in the transcript,
6            that's fine with Trinity.
7                 MR. HANSON:  Thank you.  We
8            appreciate it.
9       QUESTIONS BY MS. HERLIHY:
10           Q.    Okay.  And just to go back so I
11      understand, what did you say your
12      nonemergency hourly rate is?
13           A.    Again, ma'am, for the record, I
14      don't exactly remember.
15           Q.    Okay.
16           A.    And not all of our clients get
17      the same rates.  These would be kind of lower
18      rates for Norfolk Southern and other folks
19      because, you know, we have a -- kind of a --
20      kind of an every year local, backyard
21      presence with Norfolk Southern.  So we have a
22      lot of activity with Norfolk Southern by our
23      regional presence to their railroads.
24                So I don't remember exactly the
25      rates.
```

John Andrew McCarty

```
1           Q.     Okay.  And would you say the
2     same of your emergency hourly rate?
3           A.     Yes.
4           Q.     Do you not remember that?
5           A.     No, I don't remember all our
6     rates.
7           Q.     Okay.  After discussing last
8     night with Penny, do you remember what your
9     personal, either nonemergency or emergency,
10    hourly rate is?
11          A.     Honestly, ma'am, I don't.
12          Q.     Okay.  So --
13          A.     We snapshotted three or four
14    rates, and we did the quick percentages, and
15    that's all we did.
16          Q.     Okay.  So the best you can tell
17    me right now is that the difference between
18    emergency rates and nonemergency rates is
19    between 5 and 15 percent?
20          A.     We feel it's a safe, accurate
21    report today, yes.
22          Q.     Uh-huh.
23          A.     On the Norfolk Southern rate
24    schedule.
25          Q.     Understood.
```

1          What was the third homework

2    assignment you followed up on last night?

3          A.     I -- the one document somebody

4    prepared that I had e-mailed to me from Mike

5    Kline.  And it obviously took me by surprise

6    that one of our guys may have climbed on that

7    one car to get a point and shoot.

8               So I took it upon myself to

9    call every single one of our field

10   supervisors and interviewed everybody, from

11   day shift to night shift, and asked them very

12   specifically, did anybody ever climb on that

13   car and do this?

14              And the answer was a resounding

15   no from all of them.  So I'm not sure how

16   that got misconstrued and put on paper.

17         Q.    Okay.  So, first of all, you

18   mentioned the e-mail from Mike Kline.

19              Did you mean an e-mail from

20   Mike Burket?

21         A.    I'm sorry, Mike Burket.  Thank

22   you.  Mike Burket.

23         Q.    And tell me each of the field

24   supervisors that you called last night.

25         A.    Okay.  Yeah, that's right, that

John Andrew McCarty

```
 1    was another -- you were looking for the name.

 2              So D'Shawn Herrera, we

 3    mentioned him yesterday.

 4              Blaise MacDonald.  Connor

 5    Fritz.

 6              Night shift safety guy, Greg

 7    Palmer.

 8              Alex Klepsic?  Did I mention

 9    Alex Klepsic?

10        Q.    Not yet.

11        A.    Okay.  Alex Klepsic.

12              And a couple other technicians,

13    Charles Filby and Max Kalchthaler.  And I

14    don't know -- I can't spell Max's last name

15    very well, Kalchthaler.

16        Q.    Anyone else?

17        A.    No, those were our employees

18    that would have been involved in the

19    collection of those thermometer readings.

20        Q.    Okay.  And you didn't mention

21    Mike Burket, but did you talk with him last

22    night as well?

23        A.    I did.  I also talked to Mike

24    Burket and asked him to remind me, like, hey,

25    you sent this me e-mail on the 23rd.  Did
```

John Andrew McCarty

1    Norfolk Southern ask for that?  Did I ask for
2    that?
3                    And he reminded me, I did ask
4    for it.  And I had asked for him to please --
5    he said, Drew, you asked me to kind of put
6    together notes because you had this NTSB
7    thing, like the thing I was trying to get
8    ready for.
9                    As I admitted yesterday, I
10   never saw it.  He didn't get it done in time
11   for that hearing and, quite frankly, after
12   the fact, I kept moving.  I went right back
13   in the field.
14                   So that's why I was a little
15   surprised when I saw it yesterday.
16        Q.    So just to make sure I
17   understand.
18                   Before you were having the
19   interview with the NTSB, you asked Mike
20   Burket to gather some information for you?
21        A.    Yes.
22        Q.    And he didn't get it to you in
23   time?
24        A.    Correct.
25        Q.    What information did you ask

1    him to gather for you?

2         A.    It was a broad-brush question.

3    I just -- again, I had never been interviewed

4    by the NTSB ever in my career.  That was a

5    first for me, so I had no idea how that

6    process even worked.

7              I was simply trying to ask

8    Mike, because he was helping me with notes

9    among his safety duties, hey, can you put it

10   together for me, because I don't know what

11   they're going to ask me.

12             It ended up I didn't have it

13   for that interview anyway.

14        Q.    But what specifically did you

15   ask him to gather for you, I guess is my

16   question?

17        A.    Just whatever general notes --

18   he summarized the general notes in that Word

19   document.

20        Q.    What general notes did he tell

21   you he used to summarize in that document?

22        A.    Would have been -- the document

23   pretty much summarized the culmination of

24   relayed information from the field to that

25   document.

John Andrew McCarty

```
 1          Q.     I'm actually trying to get at,
 2   like, what notes did Mike Burket go back to
 3   look at to create that.
 4               Do you know?
 5          A.     I believe whatever was scanned
 6   and submitted.  Y'all have whatever notes
 7   were available, and it wasn't very much.  I
 8   mean, it was -- a lot of this was verbal
 9   relay, and that's where I -- you know, I
10   can't -- I believe that's probably what
11   happened here on that particular line.  It
12   was probably a verbal miscommunication
13   relayed by people.
14               But I can tell you that every
15   one of those guys, none of them crawled on
16   that car.
17          Q.     Okay.  And so the issue that
18   you were specifically following up with those
19   guys about last night was the reading that
20   was on the pressure plate on OCPX80235.
21               Is that correct?
22          A.     The -- that was one.  I had
23   three issues.  I asked him three questions.
24   That was certainly a big one.
25               Secondly, I had them put it in
```

John Andrew McCarty

1    their words.  I didn't bait them.  I said,

2    was there any point at any of the cars that

3    you found tears in jackets, holes in the

4    cars, where you felt comfortable that you

5    ever got a laser thermometer to the tank

6    shell.  And they were all an absolute no.

7                  That was the other question.

8                  The other -- I think down the

9    page there, there was something in the

10   western-most car where somebody'd reported

11   finding two more spots.  That was the third

12   thing I asked them.

13                  And I did, in fact, find that

14   one person found, like, as they described,

15   golf-ball-sized holes.  But again, the same

16   report.

17                  What's not in there that they

18   had -- again, the same -- the reason they

19   never got to me, because there was no change

20   in what had been reported to me in that they

21   didn't feel that they got contact with the

22   tank.

23        Q.    Okay.  So you're talking about

24   three things you raised with them.  The

25   pressure plate issue, excuse me, that they

1    never thought they got good readings, you're

2    saying?

3         A.     Correct.

4         Q.     And that they only went through

5    golf-ball-sized holes in the OCPX80370 car?

6         A.     That's the one on the west.

7         Q.     Correct.

8         A.     And, again, I can't remember

9    what was written there, but it was in the

10   vicinity of the body bolsters they described.

11   One guy described a golf-ball-sized hole.

12   Another guy might have grabbed a little crack

13   in the jacket.

14          So there was -- excuse me.  The

15   consistent story out of all the guys is they

16   never had any good gaps to get to the tank

17   shell, other than on that car where I took my

18   gloved hand off -- I took my glove off my

19   hand, put the back of my hand on the car on

20   the bare spot that I found, and it was too

21   hot to keep my hand on the car.

22        Q.     Okay.  Did Mike Burket give you

23   any explanation as to why he didn't note

24   anywhere on this document, which was

25   previously marked as Exhibit 18, that there

John Andrew McCarty

1    was any concern about the reliability of the

2    temperatures?

3         A.    I'm sorry, I was looking for

4    this document.

5               What was your --

6         Q.    Okay.  You're welcome to look

7    at it.

8         A.    What was your question?  I'm

9    sorry.

10        Q.    It's number 18, if you want to

11   take a look at it.

12        A.    Yeah, what was your question --

13   I'm sorry, what was your --

14        Q.    My question was, did Mike

15   Burket give you any explanation as to why he

16   didn't note anywhere on this Exhibit 18

17   document that there was any concern by SPSI

18   about the reliability of the temperatures?

19        A.    No.  I had simply asked him to

20   summarize the notes that were already out

21   there with Norfolk Southern since the evening

22   of the 5th.

23        Q.    Okay.  So based on what you

24   talked with Mike Burket about, you believe

25   there is a written note somewhere in SPSI's

1    files that reflects all of the statements in

2    Exhibit 18?

3              MR. LEVINE:  Objection.

4              THE WITNESS:  Either a written

5         note or his perception of a relayed

6         verbal communication --

7    QUESTIONS BY MS. HERLIHY:

8         Q.    Okay.

9         A.    -- would be my honest answer to

10   that.

11        Q.    Okay.  And when did Mike Burket

12   indicate to you that he prepared this

13   document that's dated 2/5/23?

14        A.    He didn't specifically indicate

15   that, and I didn't think to ask him.

16        Q.    Okay.  All right.  In the

17   interest of time, I'm going to move on from

18   that.  But others may have some questions, so

19   you might want to keep Exhibit 18 nearby.

20        A.    Okay.

21        Q.    We may have covered this

22   yesterday, but I'm not 100 percent sure, so I

23   want to confirm.

24              I know you didn't take any

25   notes memorializing your discussions with the

John Andrew McCarty

```
 1    incident command or with Norfolk Southern.

 2              Correct?

 3       A.    Correct.

 4       Q.    Are you aware of anyone at SPSI

 5    doing that?

 6       A.    I don't know.

 7       Q.    Okay.  You haven't seen any

 8    notes by anyone on your team that reflect

 9    conversations with incident command or

10    Norfolk Southern?

11       A.    Not that I can recall.

12       Q.    Okay.  You were at the hearing

13    in June.  We already talked about the NTSB

14    hearing at which you testified.

15              Correct?

16       A.    Yes.

17       Q.    And you heard Chief Drabick say

18    that Norfolk Southern never informed him at

19    any point that they had spoken to Oxy Vinyls

20    and that Oxy Vinyls did not believe

21    polymerization was occurring.

22              Right?

23       A.    I heard Mr. Drabick's

24    testimony.

25       Q.    Okay.  Do you have any reason
```

John Andrew McCarty

1    to disagree with what he said?

2         A.    No.  I mean, I witnessed his

3    testimony, and I was not aware of that until

4    that testimony, so I have no reason to doubt

5    Chief --

6         Q.    Did you believe, before you

7    heard that testimony, that Norfolk Southern

8    had passed on to Oxy Vinyls -- I'm sorry, let

9    me start over again.

10             Did you believe, before you

11   heard Chief Drabick say that at the hearing,

12   that Norfolk Southern had, in fact, passed on

13   to Chief Drabick that Oxy Vinyls didn't

14   believe polymerization was occurring?

15        A.    I never had a belief one way or

16   the other.  I wasn't involved in those

17   communications.

18        Q.    Okay.  Did you make sure that

19   Norfolk Southern knew that Oxy Vinyls didn't

20   believe polymerization was occurring?

21        A.    Yes, I shared that phone call

22   from the -- from the whole rental car phone

23   call.  Norfolk Southern's HAZMAT staff knew

24   that phone call and what the folks in Dallas

25   had said.

John Andrew McCarty

```
 1          Q.     You just don't know what they
 2    did with that information afterwards?
 3          A.     That's correct.
 4          Q.     Okay.  And you didn't share it
 5    with Chief Drabick.
 6                 Correct?
 7          A.     No.  I -- I was -- my role
 8    was -- I'm --
 9          Q.     Right.
10          A.     -- for Norfolk Southern.
11    Norfolk Southern is dealing with command.
12          Q.     Got it.
13                 Which means you also didn't
14    share it with Governor DeWine.
15                 Right?
16          A.     No.
17          Q.     Or with Governor Shapiro?
18          A.     No.
19          Q.     Or with anyone at the
20    Pennsylvania Department of Environmental
21    Protection?
22          A.     No.
23          Q.     Or with the Ohio EPA?
24          A.     No.
25          Q.     Or with the US EPA?
```

John Andrew McCarty

```
1       A.      No.

2       Q.      Or with the National Guard?

3       A.      No.

4       Q.      Or with anyone at NS, other

5  than the people we talked about yesterday?

6       A.      No.

7       Q.      Like, for instance, Alan Shaw?

8       A.      No.

9       Q.      Okay.  Did you share that

10  information from Oxy with anyone other than

11  with Norfolk Southern's HAZMAT people?

12       A.      Well, Chip Day, who was in the

13  car.  The rental car people, me, Chip --

14       Q.      Sure.

15       A.      No.

16       Q.      I mean, Chip heard it himself.

17               Correct?

18       A.      Yes.

19       Q.      Okay.  We looked yesterday at

20  an exhibit that Chip Day sent you following

21  the vent and burn, and it had some real

22  grainy photographs that he indicated he

23  thought were polymer.

24               Do you remember that exhibit?

25       A.      Yes, ma'am.
```

John Andrew McCarty

1      Q.     Are you aware of any testing

2   that was done related to any of the

3   substances in the pictures that Chip Day sent

4   you?

5      A.     I am -- I'm aware of the NTSB

6   lab testing that was done as part of their

7   investigation, yes.

8      Q.     Okay.  And what do you know

9   about the results of that lab testing?

10     A.     I just saw the results, but

11  I have -- frankly, I haven't studied them.

12  I -- and just to clarify your question --

13     Q.     Sure.

14     A.     -- and to clarify what I can

15  say I'm not certain of is what exactly was

16  sampled.  I can't say that anybody crawled in

17  the tank and grabbed stuff from inside the

18  tank.

19            So I think what was sampled,

20  I -- you know, I can't speak to what was

21  sampled.

22     Q.     Okay.  But you indicated that

23  you were aware that the NTSB did lab testing

24  of some materials that, I believe, you

25  believe they were tested for PVC -- let me

John Andrew McCarty

1    say this differently.

2              Are you aware of any findings

3    that there was actually PVC in or around the

4    tank cars following the vent and burn?

5         A.    So my understanding is, as part

6    of the investigation, that NTSB asked Oxy to

7    grab samples.  We -- actually, Mike Kline

8    assisted that process, I think, from a safety

9    assistant.

10             But again, exactly what was

11   sampled, I wasn't there to witness it.  The

12   results that I read indicated that there was

13   no evidence of polymerization.

14        Q.    You recall reading a report

15   that said that?

16        A.    That was in the NTSB draft data

17   in early June, prior to the hearings.  I was

18   surprised by that, but that's all I can state

19   at this point.  I was surprised by that.

20        Q.    Was there any other testing

21   done that you're aware of?

22        A.    Not that I'm aware of.

23        Q.    Okay.  At some point the VCM

24   cars undergo a purging.

25             Is that correct?

John Andrew McCarty

```
1          A.      In this case, they were
2    assessed after the vent and burn, and the air
3    monitoring data had already been -- the
4    inside of the cars had been burned out and
5    naturally ventilated, so there was no need to
6    do any technical follow-up with them.
7          Q.      Okay.  So they weren't -- they
8    were not purged by SPSI after the vent and
9    burn?
10         A.      That is correct.
11         Q.      Was there the opportunity to
12   take samples from the interior of those cars
13   at that time following the vent and burn?
14         A.      Well, the NTSB immediately put
15   them on hold, so nobody was allowed to touch
16   the cars.
17         Q.      Okay.  So SPSI was not
18   permitted to do that?
19         A.      We were not permitted to do
20   anything without NTSB directing us to do it.
21         Q.      So at least as far as SPI --
22   SPSI goes, you did not do any testing or
23   analysis of any residue of the VCM cars
24   following the vent and burn to determine if
25   there was PVC?
```

John Andrew McCarty

```
1           A.      No, we were never asked or

2    directed to do that.  And again, because of

3    the NTSB/FRA hold -- it was both agencies or

4    one.  Whichever agency said, these cars are

5    not to be touched, we didn't touch the cars.

6                (McCarty Exhibit 21 marked for

7           identification.)

8    QUESTIONS BY MS. HERLIHY:

9           Q.      Okay.  Mr. McCarty, the court

10   reporter has handed you a document that we

11   will mark as Exhibit 21.

12               And I'll represent for the

13   record this is NS-CA-003481989, and it is a

14   text message between you and Paul Williams.

15               Right?

16          A.      Yes.

17          Q.      And who is Paul Williams?

18          A.      Paul Williams is one of the

19   Norfolk Southern what I'll call senior HAZMAT

20   manager.  He's one of the folks on their

21   staff.

22          Q.      And if you look on the second

23   page of this document, it says from Paul

24   Williams, "Oxy will be getting back to you

25   tonight after they meet with corporate.
```

John Andrew McCarty

1    Please give me a quick call after."

2               Do you see that?

3    A.      Yes.

4    Q.      And you said okay?

5    A.      I see it.

6    Q.      Yesterday we talked about

7    whether you remembered there being a

8    conversation with the Oxy team on-site about

9    having to go and speak with Dallas and then

10   come back and talk to you more about

11   polymerization.

12              Does this refresh your memory

13   about that at all?

14   A.      Well, in the phrasing of your

15   question, it doesn't surprise me.  You know,

16   after the -- we had that conference -- the

17   call in the car, the rental car, and then the

18   discussion in our ops trailer with the three

19   fellows from Oxy, that didn't surprise me one

20   bit if they were going to call Dallas and

21   have a chat with Dallas.  That kind of tracks

22   with expectation and memory, I guess, rough

23   memory.

24              I don't remember specifically

25   this text trail until, you know, this process

John Andrew McCarty

1    here, this here.  So I guess I'm --

2         Q.    Well, my question -- yesterday

3    I was trying to see if you remembered having

4    a conversation with the three gentlemen from

5    Oxy on Sunday evening after they had talked

6    with Dallas, particular to the issue of

7    polymerization.

8         A.    I don't remember meeting with

9    them, no.

10        Q.    Okay.

11        A.    I mean, if something was said,

12   it would have been said in passing.  And

13   if -- and if they just confirmed what they

14   said in the rental car hours later, it

15   didn't -- I mean, it just is them being a

16   mouthpiece for Dallas, is how I might have

17   interpreted any such short conversation in

18   passing.

19        Q.    Okay.  But you just don't --

20        A.    I don't remember a meeting.  I

21   don't even remember -- I don't even remember

22   the conversation.  It just -- if it was a

23   conversation, it would have been a very quick

24   conversation.

25        Q.    Okay.  So fair to say you just

John Andrew McCarty

1   don't recall whether there was that

2   conversation on Sunday evening?

3       A.     I honestly don't remember a

4   conversation.

5       Q.     You had a lot going on.  I get

6   it.

7       A.     Amen.

8       Q.     I get it.

9              (McCarty Exhibit 22 marked for

10      identification.)

11  QUESTIONS BY MS. HERLIHY:

12      Q.     Okay.  Mr. McCarty, I'm giving

13  you a document that's marked Exhibit 22.

14  It's titled "Incident Status Report,

15  February 5, 2023."

16      A.     Okay.

17      Q.     This is an incident status

18  report, I believe, prepared by Norfolk

19  Southern.  And my question is whether you

20  have any involvement in preparing the

21  incident status report.

22      A.     No, ma'am.

23      Q.     Okay.  If you could turn to

24  page 4 of 7 on this document, there's a

25  section that says, "Site Activities Planned

John Andrew McCarty

1    for the Next Operating Period" at the bottom.

2         A.    Okay.

3         Q.    Are you with me?

4         A.    Yes.

5         Q.    And that first bullet point

6    says -- so this is -- again, it's site

7    activities that are being planned for the

8    next operating period.

9              It says, "Meeting with local

10   officials to explain potentials with VCM cars

11   and changing conditions warranting vent and

12   burn operational tactic."

13             Do you see that?

14        A.    Yes.

15        Q.    What changing conditions were

16   occurring on the site with respect to the VCM

17   cars on Sunday, the 5th?

18        A.    I don't know the time in which

19   this was prepared or who prepared it, but

20   that would have been the western-most car

21   burning itself out from the protective

22   housing, pressure relief device, two liquid

23   lines, vapor line.  The service equipment had

24   been burning, leaking and burning, since

25   Friday night and had burned itself out.

John Andrew McCarty

```
 1                  Upon the assessment with myself
 2       and Charles Filby, found it to be not
 3       burning, no audible hiss, leaking, with any
 4       pressure behind any -- in other words -- in
 5       other words, why would the -- our assessment
 6       was, fire's out.
 7                  It had been a nice
 8       three-dimensional fire doing its thing for
 9       days.  And there was no tornado winds.  There
10       was no rainstorm.  There was no other
11       explanation for why the fire suddenly went
12       out, other than fuel source removed.  In
13       other words, it wasn't enough leak to sustain
14       fire anymore.  So you remove fuel from the
15       fire triangle, fire goes out.
16                  So in the assessment, there was
17       no audible pressure leak being detected from,
18       you know -- Charles was on the car, right up
19       with his -- you know, reasonably within a
20       foot or so of the housing.  Held his breath,
21       so his air pack wasn't making an audible
22       sound to -- he listened carefully.  There was
23       no -- there was no audible hiss.  So that
24       is -- they're plugged up.  Something plugged
25       up those orifices.  No longer feeding the
```

John Andrew McCarty

```
 1    fire, so that's a change in condition.
 2              Then with our own observation
 3    of an outer jacket, a big enough gap that I
 4    could get my hand on it, took off my glove,
 5    put the back of my hand on it.  It was too
 6    hot that I couldn't hold my hand more than
 7    three seconds.
 8              So that's the honed-in -- what
 9    I distinctly remember on that day, it would
10    fit that answer to your question.
11       Q.    Okay.  So we got two things,
12    the fire going out and the heat increasing?
13       A.    Yes.
14       Q.    Those were the -- kind of the
15    changing conditions on Sunday that were
16    warranting a vent and burn operational
17    tactic?
18       A.    Well, it was adding to --
19       Q.    Or discussion?
20       A.    It was adding to the recipe of
21    entire -- of all -- I mean, it's one factor
22    in a lot of factors, but, yes.
23       Q.    Okay.  And the heat at that car
24    actually ended up decreasing by about
25    10 degrees by the time of the vent and burn.
```

John Andrew McCarty

```
1                    Right?  Maybe more?

2          A.    I don't recall what the charts

3    say.

4          Q.    Okay.  Do you have any reason

5    not to believe what's on the charts?

6          A.    Well, the --

7                MR. LEVINE:  Objection.

8                THE WITNESS:  I mean, the data

9          collected was the data collected.

10               As a possibility, in all my

11         years of experience and all the

12         chemists and all the producers that

13         have taught me in monomers and

14         polymerization -- polymerizable

15         materials, in my own personal

16         experience jackhammering tanks and

17         doing anything from gooey, partially

18         reacted gum in the middle, to

19         jackhammering and physically removing

20         solidified crud from around the outer

21         perimeters of tanks, a possibility

22         that would potentially explain that

23         temperature decrease would be polymer

24         formation inside the car further

25         insulating things like point-and-shoot
```

John Andrew McCarty

```
1              thermometers.

2              So --

3    QUESTIONS BY MS. HERLIHY:

4         Q.    Did you --

5         A.    -- it's a long way to answer

6    your question.

7         Q.    It is.  And I won't try to

8    break it down too much, but just ask whether

9    you expressed that to anyone at the time.

10        A.    Not specifically, no.

11        Q.    Okay.  Did anyone ask you for

12   an explanation of why the temperatures might

13   be going down in a polymerization situation?

14        A.    No, not that I recall.

15        Q.    Okay.  Have you been in a

16   polymerization situation where something's

17   actively polymerizing yet the temperature is

18   going down?

19        A.    No.  This is a rare event.

20        Q.    Okay.

21        A.    This -- I've not -- no.

22        Q.    Typically, polymerization is an

23   exothermic reaction.

24              Correct?  It gives off heat?

25        A.    From my understanding in the
```

John Andrew McCarty

```
1    heat of chem -- yeah, chemical reactions like
2    this, my understanding, they would generate
3    some heat.
4           Q.     And they happen quickly.
5                  Correct?
6                  MR. LEVINE:  Objection.
7                  THE WITNESS:  Well, some --
8           they're all different.  I think that's
9           one thing that I've been taught is,
10          the chemistry is different from a
11          styrene to a methyl methacrylate to a
12          VCM.  I acknowledge that products are
13          different, so they're going to react
14          differently.
15   QUESTIONS BY MS. HERLIHY:
16          Q.     What have you been taught about
17   the speed at which VCM polymerizes?
18          A.     Nothing specifically.
19          Q.     Okay.  So you don't know how
20   quickly VCM polymerizes?
21          A.     I do not.
22          Q.     Okay.  And you talked about
23   Charles Filby climbing up on top of the car
24   and getting his face right next to the
25   pressure relief device?
```

John Andrew McCarty

1          A.     Well, I told him to keep his

2    head and upper torso clear of the protective

3    housing, but get close where you can listen

4    and get your meter into it.  So --

5          Q.     So -- sorry.

6          A.     No, no, no.  I respect the

7    question.

8                 Obviously his safety is number

9    one.  So we specifically briefed, don't put

10   your head over the -- we keep the upper body,

11   torso, clear of those kinds of things.

12                And I was on the ladder.  I

13   mean, we were both on the car.  I just had

14   him do the walking.  Okay?  I kind of

15   started, got him up there, because I said,

16   you know what, I've done these for years, you

17   get up here.

18                So I coached him from on the

19   ladder and on the ground.  I got two vantage

20   points of him.  And anyway, I was up and down

21   off the ladder of the car, too.

22                So -- I'm sorry, I got winded

23   there.

24          Q.     That's okay.  I forgot what my

25   question was, too.

John Andrew McCarty

```
 1                    Yeah, I just want talk about
 2    Charles Filby and how close he got to the
 3    pressure plate.
 4                    Was he close enough to have
 5    taken a temperature?
 6         A.    We did not have a thermometer
 7    with us on that entry.  We had a
 8    photoionization detector with him, and that
 9    was -- because that was the other thing.
10    If it was -- why did the fire burn out.
11                    The purpose at entry was, we
12    were assessing why did the fire burn out.
13    And my concern was, if it's actively leaking
14    and unignited, it's going to find some
15    residual fire on the ground, because the
16    vapor density is heavier than air, and it
17    could flash back and have a sudden and
18    violent whoosh to the -- kind of a problem,
19    and have another problem, right?
20                    So --
21         Q.    My question was, though, was he
22    close enough to have taken a temperature?
23                    If he had the right equipment
24    with him, could he have taken a temperature
25    at the pressure plate?
```

John Andrew McCarty

```
 1          A.     Yes.  Hindsight 20/20, he could
 2    have had a -- if we'd have thought about
 3    taking an infrared thermometer there, we
 4    could have, yeah.
 5          Q.     Did you get close enough for
 6    you to actually hear whether there was a hiss
 7    sound --
 8          A.     No.
 9          Q.     -- or was it just Charles?
10          A.     Like I say, he's 30 years
11    younger than me.  I let him do the climbing.
12                 And like I say, I'm trying to
13    teach the next generation, so these are
14    little opportunities that I'm trying to
15    capture in my career.
16          Q.     Okay.  So you didn't actually
17    hear whether there was a hiss coming out or
18    not?
19          A.     No, I relied on Charles' report
20    for that.
21          Q.     Okay.
22          A.     And on my own observation from
23    the ladder and on the ground, no.
24          Q.     How far away were you from the
25    pressure plate?
```

John Andrew McCarty

```
 1          A.      So the ladder of a hopper car,
 2   I'd have to go back to the length of the
 3   cars, but basically half the length of the
 4   vinyl car.  They were pretty much parallel
 5   with each other, so...
 6          Q.      Close -- do you think you were
 7   close enough to hear as well as Charles did?
 8   Excuse me.
 9          A.      Not as well as him.
10                  I just wanted to caveat that,
11   you know, I also used my own senses to listen
12   for myself, even from the ground.  It's
13   just -- I want to just make sure I get clear
14   on the record.
15          Q.      Okay.
16          A.      And the ladder.
17          Q.      Okay.  I think this is my last
18   question or maybe series of questions,
19   Mr. McCarty.
20                  Is it true that hot-tapping can
21   be done to a critically damaged car even if
22   all the valves and fittings are not usable or
23   accessible?
24          A.      Well, that's actually the
25   fundamental purpose of the tactic.
```

John Andrew McCarty

1        Q.      Okay.

2        A.      When you don't have usable

3    valves and fittings, that's when we consider

4    hot-tapping, yes.

5        Q.      Okay.  You didn't do it here

6    because you suspected polymerization.

7                Correct?

8        A.      There were a few factors.

9    Certainly all the data suggests a likelihood

10   of probability of polymerization.

11               The environmental spillage that

12   had been spilled on the ground, we'd have had

13   to dig through it, dig pits and put people in

14   the ground, in potential LEL conditions with

15   welders from those residual, flammable,

16   combustible liquids that could still be

17   oozing and seeping around those soils at that

18   moment in time.

19               The third factor -- and again,

20   all these calls with all these folks that

21   don't even get their names.  But I guess

22   someone had brought up somebody did

23   calculations of PRDs going off and burn

24   rates.  And then you add liquid line gaskets

25   failing and some liquid adding to that with

John Andrew McCarty

```
 1    liquid line gasket failures.

 2                Somebody speculated that

 3    there's a possibility that some of these cars

 4    could have been empty from the time they

 5    burned.  So that is a big X factor in all of

 6    this.

 7                You just -- once somebody --

 8    somebody with -- somebody that says they did

 9    calculations and suspect that they could be

10    empty, that is a serious X factor in the

11    thought process.

12        Q.    Okay.  Let's talk about that

13    last piece first.

14                When you say "somebody," who

15    are you talking about?

16        A.    Again, I didn't get people's

17    names.  There was a lot of people on those

18    calls.

19        Q.    Are you talking about someone

20    at Oxy?

21        A.    Yes, ma'am, I believe so.

22        Q.    You're saying someone at Oxy

23    did calculations that indicated that some of

24    these cars could have been empty?

25        A.    Someone on one of those calls
```

John Andrew McCarty

```
 1    talked about PRD burn rates and speculating

 2    that they -- at least one or more of these

 3    cars could be empty.

 4         Q.    Okay.  There's a difference in

 5    my mind between speculating they could have

 6    been empty and doing calculations.

 7               Did somebody tell you they --

 8         A.    No, no, someone said --

 9         Q.    Let me finish my question.

10         A.    I'm sorry.

11         Q.    Did somebody actually tell you

12    they did calculations of that?

13         A.    Someone said they did

14    calculations.

15         Q.    Okay.  You don't know who it

16    was?

17         A.    I'm sorry, I don't.

18         Q.    Okay.  And when was that?

19         A.    I don't -- I don't remember

20    which call it would have been.  I don't.

21         Q.    Did you share that information

22    with Norfolk Southern?

23         A.    Yes.

24         Q.    Do you know whether that

25    information was shared with incident command?
```

John Andrew McCarty

```
1        A.      I don't know.

2        Q.      And who did you share it with

3   at Norfolk Southern?

4        A.      I believe it was either

5   probably Scott Deutsch or Jon Simpson that

6   would have actually been on the call.

7        Q.      Did you ask for copies of those

8   calculations?

9        A.      No.

10       Q.      Do you know how those

11  calculations were done?

12       A.      No.

13       Q.      Have you ever seen those

14  calculations?

15       A.      No.

16       Q.      Has anyone today ever said they

17  did those calculations?

18              MR. LEVINE:  Objection.

19              THE WITNESS:  Other than those

20       calls, I mean, after the fact, no.

21  QUESTIONS BY MS. HERLIHY:

22       Q.      Okay.  And since that time, you

23  still haven't seen those calculations?

24       A.      No.

25              MS. HERLIHY:  Okay.  All right.
```

John Andrew McCarty

1           I don't know whether I have any time

2           left, but if I do, I'll reserve it.  I

3           might have a few minutes, but I will

4           let our next participant step up.

5                   Thank you, Mr. McCarty.  I

6           appreciate it.

7                   THE WITNESS:  You're welcome.

8                   VIDEOGRAPHER:  Off the record

9           at 9:44.

10           (Off the record at 9:44 a.m.)

11                   VIDEOGRAPHER:  We are now back

12           on the record at 9:54.

13                   DIRECT EXAMINATION

14    QUESTIONS BY MS. KARIS:

15           Q.     Mr. McCarty, good morning, I

16    guess.  It's still morning.

17           A.     Good morning.

18           Q.     My name is Carrie Karis.  I'm

19    an attorney with Kirkland & Ellis that

20    represents GATX and General American Marks

21    Company.

22           A.     Okay.

23           Q.     As I understand it, both

24    yesterday and today, the testimony you've

25    been giving has been on behalf of yourself,

John Andrew McCarty

```
1    but also on behalf of SPSI.

2              Is that correct?

3         A.    Yes, ma'am.

4         Q.    Okay.  And that's because you

5    are the principal owner of SPSI.

6              Correct?

7         A.    Yes.  Yes, ma'am.

8         Q.    How many employees does SPSI

9    have?

10        A.    Today, over a hundred.

11        Q.    And at the time of the incident

12   on February 3rd of 2023, how many employees

13   did SPSI have, roughly?

14        A.     In the 90s.  I think 2022 would

15   have been, into 2023, roughly 90-some.

16        Q.     And of the 90 or hundred

17   employees, how many are technical folks as

18   opposed to other functions like CFOs or

19   administrators or anything like that?

20        A.     Can you kind of narrow down

21   your word "technical folks"?

22        Q.     Sure.

23        A.     Like would you define a

24   technical --

25        Q.     I want to exclude -- apologies.
```

```
 1                   I want you to exclude anybody
 2      that serves in an administrative function.
 3           A.     Okay.
 4           Q.     Or anybody that serves human
 5      resources.
 6           A.     Okay.
 7           Q.     Or anybody that serves in a
 8      financial, invoicing, AR, even your CFO.
 9                   Take those folks out.
10           A.     Okay.
11           Q.     Folks that provide technical
12      services of any sort to your customers.
13           A.     Okay.  Well, it's still, I
14      think -- in our positions, we have mechanics,
15      truck drivers, field technicians that I
16      wouldn't necessarily consider technical
17      people.  That's why I kind of asked you to --
18      can you help me hone in on what your --
19           Q.     Fair point.
20                   Let's include all those folks -
21      technicians, truck drivers, field folks.
22           A.     Of the 90-some in that era --
23      can I have a minute to think through?
24           Q.     Sure.
25           A.     Because I'm trying to process
```

John Andrew McCarty

1    those.

2         Q.    Sure.

3         A.    70-ish, 75-ish.

4         Q.    Of those 70-ish or so SPSI

5    employees from 2023, how many have worked on

6    the East Palestine derailment?

7              And again, ballpark.

8         A.    Yeah.  And the reason I'm

9    taking the time, we've tried to keep a core

10   continuity there for consistency, so -- but,

11   you know, certainly as people take vacations

12   and come and go, that's a variable.

13        Q.    Are we talking about half, or

14   are we talking about more than half?

15        A.    No, maybe a third.  If that's

16   where --

17        Q.    A third?

18        A.    Maybe a third is -- you know.

19   But I guess I'm trying to clarify, if I sent,

20   like, a person to relieve somebody for a week

21   or two for a vacation, do you want that

22   person also included, or are you --

23        Q.    I understand --

24        A.    -- looking for raw numbers?

25        Q.    Roughly a third.

John Andrew McCarty

1          Is that fair?

2     A.     Yes.

3     Q.     Okay.  Now, you testified

4  earlier that SPSI has billed $157 million to

5  date to the East -- or I'm sorry, let me

6  correct that.

7          You testified that SPSI has

8  billed $157 million for the calendar year

9  2023 for the East Palestine derailment to

10 Norfolk Southern.

11          Correct?

12     A.     Yes.

13     Q.     Does that 157 million include

14 work done by subcontractors, or was that just

15 SPSI employees?

16     A.     No, ma'am.  That includes all

17 subcontractors.  Things like subcontractors,

18 rental equipment and, like, waste

19 transportation and disposal.

20     Q.     Okay.  Are you the sole

21 principal owner of SPSI?

22     A.     Yes.

23     Q.     Was Norfolk Southern by far

24 your largest customer in 2023?

25     A.     Yes.

John Andrew McCarty

```
 1          Q.      Did you do other work for

 2   Norfolk Southern beyond the East Palestine

 3   derailment in 2023?

 4          A.      Yes.

 5          Q.      How much other work did you --

 6   would you say you did in 2023 for Norfolk

 7   Southern?

 8          A.      I don't have a guess.

 9   That's -- maybe at a break I can call my CFO

10   and run that report.  I --

11          Q.      No need.

12                  Would it be in the millions of

13   dollars?

14          A.      Potentially over a million.

15   Potentially.

16          Q.      Okay.  Now, you understand just

17   from the work you've done alone that the East

18   Palestine derailment is a significant issue

19   for Norfolk Southern.

20                  Correct?

21          A.      Oh, absolutely.

22          Q.      And you understand that there

23   have been a number of lawsuits that have been

24   filed arising from that action against

25   Norfolk Southern -- or from that incident, I
```

John Andrew McCarty

1    should say, against Norfolk Southern.

2              Correct?

3        A.    Yes.

4        Q.    And Norfolk Southern has agreed

5    to pay for your lawyers in connection with

6    services -- for legal services that you're

7    required to participate in.

8              Correct?

9        A.    Yes, ma'am.

10       Q.    And Norfolk Southern has, in

11   fact, sent their lawyers along to join in any

12   meetings that you've had where you discuss

13   various testimony you're going to give.

14             Correct?

15       A.    Yes, ma'am.

16       Q.    Norfolk Southern's lawyers have

17   been present to help prepare you to testify

18   to Congress.

19             Correct?

20       A.    Never had any meetings, but I

21   am thinking there might have been a Zoom call

22   or something.  This is a rough memory, but

23   there might have been a Zoom call of some

24   sort.  But I honestly don't remember

25   specific -- what I recall is making sure I

John Andrew McCarty

```
1    had Norfolk Southern's blessing to do this,

2    because I was put in an awkward situation

3    when I got the request.

4         Q.    Sir, respectfully, I'm going to

5    go back to my question.

6         A.    I'm sorry.

7         Q.    I'm going to move to strike the

8    answer.

9         A.    I'm sorry.

10        Q.    If you can just listen to my

11   question.

12        A.    Okay.

13        Q.    And when I say "meetings," that

14   includes in-person, Zoom or on the phone.

15              Okay?  Is that fair?

16        A.    Okay.

17        Q.    Norfolk Southern's lawyers have

18   been present or participated in any meetings

19   that you had to go prepare to testify to

20   Congress.

21              Correct?

22        A.    I have a really rough memory

23   that "maybe" is my answer.

24        Q.    Okay.  Before you went to talk

25   to the NTSB, when you were interviewed by the
```

John Andrew McCarty

1  NTSB, did you meet with any Norfolk Southern

2  lawyers?

3      A.      No.

4      Q.      Before you went to testify,

5  though, at the hearings in East Palestine in

6  June of 2023, you did meet with Norfolk

7  Southern's lawyers.

8              Correct?

9      A.      Yes, ma'am.

10     Q.      And you met with Norfolk

11 Southern's lawyers on multiple occasions, you

12 told us, before you went to the June 2023

13 hearings.

14             Correct?

15     A.      Yes.

16     Q.      And I think you said three,

17 four, five meetings.

18             Is that accurate?

19     A.      In my rough memory, there was

20 some -- that would be the -- what I'll call

21 the cyber-type meetings, the online stuff,

22 and what I'll call a day and a half of

23 in-person.

24     Q.      And how many cyber-type

25 meetings?

John Andrew McCarty

```
 1          A.     That's that three to five
 2   memory.
 3          Q.     Okay.  So somewhere between
 4   five and seven occasions, either by phone or
 5   in person before you went to testify to the
 6   NTSB in June of 2023, you met with Norfolk
 7   Southern's lawyers.
 8                 Correct?
 9          A.     Yes, ma'am.
10          Q.     And similarly, we asked you to
11   come and testify here today, correct?
12                 Or yesterday and today,
13   correct?
14          A.     Yes.
15          Q.     And again, Norfolk Southern's
16   lawyers were present for the meetings that
17   you had.
18                 Correct?
19          A.     Yes.
20          Q.     The only meetings that Norfolk
21   Southern's lawyers didn't meet with you for
22   was when you met with the NTSB to talk to
23   them shortly after the incident and give your
24   interview February 23rd of 2023.
25                 Correct?
```

John Andrew McCarty

1        A.      That's correct.

2        Q.      Okay.  Now, you also met with

3    the NTSB while the incident was unfolding

4    before the vent and burn operations.

5                Correct?

6        A.      I don't recall that.  If there

7    was any introduction, it would have been a

8    handshake, and here's so-and-so from NTSB,

9    but no meeting.

10       Q.      Okay.  Now, is it correct,

11   Mr. McCarty, excuse me, that at least up

12   until you went to testify to the NTSB in June

13   of 2023, you had never told the NTSB that you

14   had any concerns about the reliability of the

15   temperature measurements that were taken

16   on-site on February 5th and February 6th?

17       A.      I'm sorry, can you repeat that?

18       Q.      Sure.

19               At the June 2023 hearings --

20       A.      Okay.

21       Q.      -- you raised with the NTSB in

22   a public setting that you had concern about

23   the temperature readings that had been taken

24   on February 5th and February 6th.

25               Correct?

John Andrew McCarty

```
1          A.     Yes, ma'am.

2          Q.     Before June of 2023, did you

3    ever tell the NTSB that you had concerns

4    about the temperature readings and the

5    accuracy of those readings that had been

6    taken on February 5th and February 6th?

7          A.     During my interview with them

8    at the church in East Palestine back in

9    February, none of that came up, although my

10   recollection of my -- we certainly -- I

11   mentioned the -- I remember talking to them

12   about when we found those changed conditions

13   on Sunday with that western-most car.  I'm

14   sure I told them that.

15              But other than that, I can't

16   remember if they ever asked me anything about

17   those temperature readings, and I'm sure of

18   that.

19         Q.     So let me go back to my

20   question.

21              Did you ever tell the NTSB that

22   you had concerns about the accuracy of

23   temperature readings taken on February 5th

24   and February 6th?  Did you ever tell them

25   that anytime before the June 2023 hearings?
```

John Andrew McCarty

```
 1          A.     No, that was just -- I think
 2    when they had that draft report in early June
 3    was the first time that was kind of thrown in
 4    my face, like, holy crap, there's all these
 5    readings out here on the record.
 6                So no is the answer.  It would
 7    have been just at those hearings.
 8          Q.     Okay.  So it's okay to just
 9    give a simple answer, yes or no.
10          A.     Yeah, I'm just trying to make
11    sure what the question was.  I'm just making
12    sure.
13          Q.     I heard you say that was the
14    first time it was kind of thrown in your
15    face, holy crap, there's these readings out
16    there in the record.
17                Is that right?
18          A.     Yeah.
19          Q.     You realized that in June
20    of 2023?
21                MR. HANSON:  Let's let her
22          finish her question and then answer.
23                THE WITNESS:  I'm sorry.  I'm
24          sorry.
25
```

John Andrew McCarty

```
 1    QUESTIONS BY MS. KARIS:

 2         Q.    Is that correct?

 3         A.    That's correct.

 4         Q.    And you didn't know before June

 5    of 2023 that there were temperature readings

 6    that had been conveyed to the NTSB?

 7         A.    I knew they were doing an

 8    investigation.  I guess in their collection

 9    of data in that -- you know, we weren't

10    hiding anything.  It was just like -- I

11    was -- I was -- my reaction was, I had told

12    people these data weren't right, and here it

13    is -- you know, here it is for all the world

14    to see.  And that's why I testified the way I

15    did, because I need to clear the record.

16    These data are bogus.

17         Q.    Yeah.  So we're going to talk

18    about whether the data is bogus.

19              But I'm just trying to get to,

20    before June of 2023, for whatever the reason,

21    you never told anybody at the NTSB that you

22    had concerns about those temperature

23    readings.

24              Is that correct?

25         A.    That's correct.
```

John Andrew McCarty

1      Q.     Okay.  You did know, from

2  February 5th until June of 2023, that the

3  NTSB had undertaken an investigation of the

4  incident.

5             Correct?

6      A.     Yes.

7      Q.     And you knew that they were

8  interviewing folks to learn what work they

9  had done in connection with the incident.

10            Correct?

11     A.     Yes.

12     Q.     And in fact, you yourself were

13  interviewed.

14            Correct?

15     A.     Yes, ma'am.

16     Q.     And you were interviewed about

17  what role and involvement you had in

18  connection with the incident.

19            Correct?

20     A.     Yes.

21     Q.     And you were asked specifically

22  about the vent and burn operations.

23            Correct?

24     A.     I believe, yes, that was --

25  that was -- they asked me about that.  They

John Andrew McCarty

1  basically asked me to start the interview

2  with recalling my story, right?  Like just

3  recalling my experiences from the period.

4           So at some point they had

5  questions afterwards, and I believe that was

6  one of them.

7       Q.    Right.

8           And in fact, one of the things

9  you talked to them about in your interview

10  was the fact that you were attempting to

11  gauge pressure from the vessels.

12           Correct?

13       A.    We considered and had tried to

14  get pressures, and we realized we couldn't

15  get good pressures, so that conversation

16  would have come up.  I don't remember word

17  for word what's in there --

18       Q.    Right.

19       A.    -- but I'm listening.

20       Q.    Right.

21           The conversation with the NTSB

22  included why was the decision made to vent

23  and burn.

24           Correct?

25       A.    I don't recall the specifics of

John Andrew McCarty

1    that meeting --

2              Q.    Okay.

3              A.    -- at this point in time.

4              Q.    You do recall there being some

5    discussion about trying to get pressures from

6    the tank cars and being unable to do so.

7                    Correct?

8              A.    It would have been part of

9    that, yes.

10             Q.    And you understood that the

11   NTSB was trying to understand what's the

12   basis for why this vent and burn operation

13   took place.

14                   Correct?

15                   MR. LEVINE:  Objection.

16                   THE WITNESS:  I'd say I don't

17         know that they were making that clear

18         to me.  I can't say that I understood

19         their -- I mean, again, this was my

20         first experience in 35 years with such

21         an interview, so I didn't assume

22         anything with their process or what

23         their goals were.

24   QUESTIONS BY MS. KARIS:

25             Q.    You spoke to the NTSB about how

1    you thought there was a high probability that

2    the fires had triggered polymerization.

3              Correct?

4         A.    Yes, ma'am.

5         Q.    And you talked to the NTSB,

6    regardless of what you understood why they

7    were doing it, that you were part of the

8    group that recommended vent and burn.

9              Correct?

10        A.    We were certainly part of the

11   group that looked at all options.

12        Q.    Okay.  And you understood at

13   least for whatever the NTSB was doing, part

14   of their discussion was -- with you was about

15   the vent and burn operations.

16             Correct?

17        A.    Yes, ma'am.

18        Q.    But despite the fact that you

19   talked to them about trying to take

20   temperatures and the vent and burn operations

21   and the reason for the vent and burn

22   operations, you never mentioned concern over

23   the accuracy of the thermal image -- I'm

24   sorry, of the thermal readings taken that

25   day.

John Andrew McCarty

```
1              Correct?  Or those days, to be
2      accurate.
3              MR. HANSON:  Objection.
4              THE WITNESS:  Yeah, I'd say
5         part of your question, I'd like you
6         to -- there was part of your question
7         that says about I discussed
8         temperature stuff with them, and I
9         guess I want to make sure I heard your
10        question clearly.
11             If I could ask you to repeat
12        your question.
13     QUESTIONS BY MS. KARIS:
14        Q.    Sure.
15             Well, you agree with me that
16     you talked to the NTSB about the fact that
17     you went in with a thermal imaging camera and
18     you documented a reading?
19        A.    On the western-most car.
20             MR. LEVINE:  Objection.
21     QUESTIONS BY MS. KARIS:
22        Q.    Right.
23             And you talked about the fact
24     that in that vicinity you got 135 Fahrenheit
25     in ambient conditions at the time were much
```

John Andrew McCarty

```
1    lower.
2              You talked to them about that,
3    right?
4         A.    In addition, my own bare hand
5    couldn't be held on it for more than three
6    seconds, yes, ma'am.
7         Q.    Okay.  I didn't ask what else.
8         A.    I understand.  I'm just
9    clarifying for the record.
10        Q.    So just answer the question, if
11   you wouldn't mind.
12        A.    Okay.
13        Q.    My question was, you talked to
14   the NTSB about the fact that you got
15   135-degree Fahrenheit temperature reading
16   using a thermal imaging camera.
17             Correct?
18        A.    Yes, ma'am.
19        Q.    You talked to them about the
20   fact that you were monitoring to look at
21   whether there was any trending.
22             Correct?
23        A.    I think so, yes, ma'am.  I
24   think I remember that from the meeting.
25        Q.    And you also told the NTSB how
```

John Andrew McCarty

1     it never got worse, thankfully, than that

2     135-degree temperature reading that you got.

3                    Correct?

4         A.     I did.

5                    MR. LEVINE:  Objection.  Sorry,

6         objection.

7     QUESTIONS BY MS. KARIS:

8         Q.     So you were talking about

9     temperatures with the NTSB in your interview

10    on February 28th {sic} of 2023.

11                   Correct?

12        A.     On that particular car.

13        Q.     Right.

14        A.     I want to make sure that's

15    clear, on that western-most car.

16        Q.     I understand that.  On that

17    particular car.

18                   But on that particular car, or

19    in the context of your whole interview, you

20    certainly never mentioned one word about

21    concern over the accuracy of any of the

22    temperature readings.

23                   Is that correct?

24                   MR. HANSON:  Objection.

25                   THE WITNESS:  I don't -- I'd

John Andrew McCarty

```
 1            have to go back and look through that
 2            whole document, but I don't remember
 3            doing that, no.
 4     QUESTIONS BY MS. KARIS:
 5            Q.     I will represent to you that I
 6     have gone through it page and line --
 7            A.     Okay.
 8            Q.     -- and there's no mention
 9     anywhere --
10            A.     Okay.
11            Q.     -- of the accuracy.
12                   And I just want to make sure
13     you don't recall talking to them about it and
14     somehow it didn't end up in the transcript.
15            A.     No, that's -- that would jive
16     with my recollection.  I don't think that
17     ever came up.
18            Q.     Okay.  So the first time it
19     came up with the NTSB, as we established, was
20     in June of 2023, and that would be after you
21     had multiple meetings with lawyers.
22                   Correct.
23            A.     It was after I saw their draft
24     report.
25                   (McCarty Exhibit 23 marked for
```

John Andrew McCarty

```
 1          identification.)

 2     QUESTIONS BY MS. KARIS:

 3          Q.     Okay.  Now, I've handed you

 4     what I think we've marked as Exhibit 25.

 5          A.     23?

 6          Q.     23, excuse me.

 7               Mr. McCarty, do you recognize

 8     Exhibit 23?

 9          A.     Yes.

10          Q.     All right.  And that is, for

11     the record, a notice of your deposition --

12          A.     For today.

13          Q.     -- for today, including the

14     corporate rep topics.

15               Correct?

16          A.     Yes, ma'am.

17          Q.     All right.  And you -- before

18     yesterday, you came prepared to testify about

19     the topics that were in that notice of

20     deposition.

21               Correct?

22          A.     Yes, I certainly hope so.  It's

23     why I'm here.

24          Q.     Now, did you -- you told us

25     that last night you went and did some
```

John Andrew McCarty

1  homework.

2          Is that correct?

3     A.    Yes, ma'am.

4     Q.    And that would be while you

5  were in the middle of your testimony, because

6  you knew you were coming back today to answer

7  my questions.

8          Correct?

9     A.    Well, to clarify, it was

10 questions that you-all or whoever interviewed

11 me yesterday wanted me to follow up on, so...

12    Q.    Did anybody ask you to go call

13 all the folks that had worked on the incident

14 and taken temperature readings?

15    A.    Well, I thought I promised

16 somebody a follow-up on that --

17    Q.    Okay.

18    A.    -- so my understanding was,

19 yeah, that was part of my homework.

20    Q.    Okay.

21    A.    So if I misunderstood, I

22 apologize.

23    Q.    Fair enough.

24          You understood that was part of

25 the homework that you were to do.

John Andrew McCarty

```
 1              Correct?
 2       A.     Yes.
 3       Q.     All right.  And you ended up
 4  speaking, if I heard you correctly, with four
 5  different people last night?
 6       A.     I think it was more than that.
 7  I think I gave you the list of folks.
 8       Q.     I may have not gotten them all,
 9  but at least four folks.
10              Fair?
11       A.     Yeah.  Yes.
12       Q.     Had you talked to them about
13  the work that they had done before we started
14  the deposition yesterday in order to prepare
15  to testify?
16       A.     No.  Not for this deposition,
17  no.
18       Q.     Okay.  But you understood that
19  one of the topics for the dep notice was the
20  temperature readings taken on February 4th --
21  I'm sorry, 5th and 6th.
22              Correct?
23       A.     Yes.
24       Q.     All right.  I want to follow up
25  and ask you a few questions.
```

John Andrew McCarty

```
 1              First of all, did you discuss
 2    with them what led you to call them last
 3    night?
 4         A.    Just clarifying that the
 5    questions that y'all asked me yesterday on
 6    clarifying, you know, did they get to the
 7    metal, which I already knew from June.  The
 8    same questions that we already asked and
 9    answered, just went back around and verified,
10    and it's verified.
11         Q.    Okay.  So you told them, I'm in
12    the middle of a deposition, or I'm having my
13    testimony taken, and I have some follow-up
14    questions for you.
15              Is that fair?
16         A.    I did tell them that, you know,
17    the attorneys had some questions, and it was
18    the same things we were fact-finding, you
19    know, in preparation for the East Palestine
20    hearings.
21              And I already knew the answers.
22    That's why I testified to the answers in East
23    Palestine.  And they just reconfirmed it last
24    night.
25         Q.    All right.  So I want to talk a
```

John Andrew McCarty

1  little bit about either last night if they

2  told you this or the work that you had done

3  to come in prepared to testify here before.

4          With respect to the temperature

5  readings that Mr. Klepsic took, do you know

6  on how many occasions he took readings?

7      A.    Him specifically, no, ma'am.

8      Q.    Do you know approximately how

9  many readings he took?

10      A.    Again, for any one of those

11  guys, I couldn't tell you who did more than

12  ours.  I just -- I don't know who took more

13  than others.

14      Q.    Okay.  Do you know which of the

15  tank cars any one of them took a reading on?

16      A.    No, I didn't interview them to

17  that detail.  They were all entry teams,

18  checking the cars for Jon Simpson.

19      Q.    Okay.  But do you know whether

20  they would go back to -- each of them would

21  go back to the same car, since there were

22  readings taken every hour, or whether they

23  were alternating what cars they were going

24  to?

25          MR. LEVINE:  Objection.

John Andrew McCarty

```
 1                THE WITNESS:  I'm not certain,
 2      ma'am.
 3  QUESTIONS BY MS. KARIS:
 4      Q.    Do you know for any car that
 5  they took a reading, where they were standing
 6  when they took the readings?
 7      A.    Yes.  There was consistency in
 8  that because the options just weren't there.
 9  They were very limited.
10      Q.    Okay.
11      A.    So they were going to the same
12  limited, bad options.
13      Q.    All right.  We're going to talk
14  about those limited, bad options.
15             But you know where they were
16  standing, is what I'm hearing.
17             Correct?
18      A.    Well, I don't, but they do.
19      Q.    Well, maybe I misspoke.  I
20  asked whether you know for any of those cars
21  where they were standing when they took those
22  readings.
23             Do you know, is the question?
24      A.    Okay.  I missed that.  Somehow
25  I missed that question.
```

John Andrew McCarty

```
1                So, no.  Specifically where
2      they found those golf ball holes, each of
3      them in their own words had led me -- these
4      golf ball holes, low, high, a couple of them
5      were in the vapor space, a couple of them
6      were low.  And I don't remember which cars
7      were which or who did what, when, so I don't
8      have those details.
9           Q.    So let's just break that up a
10     little bit.
11          A.    Okay.
12          Q.    For any one of the cars, do you
13     know at which location the temperature
14     readings were taken from?
15          A.    Well, one of the documents
16     yesterday, one of the notes, had talked
17     something about a knee-high reading.  That
18     would have been one of several of different
19     locations.  So I do know of that one.
20          Q.    Other than -- okay.
21                And even the knee-high reading,
22     do you know on which side of the tank car it
23     was?
24          A.    If it's not in that note from
25     yesterday, no, ma'am, I don't.
```

1    Q.    Okay.  Do you know whether the

2  readings were taken closer to the front or

3  closer to the back of the tank cars?

4    A.    I don't know, ma'am.

5    Q.    The holes, the golf-sized

6  hole -- the golf-ball-sized holes, did you

7  yourself observe them?

8    A.    No, I did not.

9    Q.    So when you tell us that these

10 were golf-ball-sized holes, you haven't seen

11 them.

12         Correct?

13   A.    Correct.

14   Q.    You don't know where on the car

15 those readings were taken.

16         Correct?

17   A.    Correct.

18   Q.    You yourself didn't take any

19 readings.

20         Correct?

21   A.    Correct.

22   Q.    You never attempted to take any

23 readings.

24         Correct?

25   A.    The reading on the far west

John Andrew McCarty

1    car, the 135 --

2         Q.    Fair point.

3               With the exception of the one

4    reading of 135 that you told us about, take

5    my client's car, GATX95098, which was not

6    that car, you never attempted to take a

7    reading of that car.

8               Correct?

9         A.    Not personally, no, ma'am.

10        Q.    Okay.  And so what you've been

11   telling us about here in terms of the

12   readings, that's not what you yourself had

13   observed?

14        A.    I myself, that's correct.

15        Q.    Okay.  Now, your team was, at

16   the time, communicating with you about the

17   readings they were taking.

18               Correct?

19        A.    In the first two entries, yes,

20   ma'am.

21        Q.    Okay.  And in fact, your team

22   continued communicating with you about the

23   readings they had taken, as we saw in

24   Exhibit 18, on February 23rd in order to help

25   prepare you testify.

1            And I'll hand this back to you.

2       A.    Thank you.

3       Q.    I think you told Ms. Herlihy

4  that's why that document was prepared.  Or

5  sent to you, at least.

6            Correct?

7       A.    Well, it was sent to me on the

8  23rd of February.

9       Q.    Yeah.  That's what I heard you

10  say.

11       A.    Yeah.

12       Q.    And I apologize if I misspoke.

13            But to be clear, information

14  was communicated to you in February, at least

15  at the time of the incident or subsequently,

16  concerning the temperature readings that had

17  been taken.

18            Correct?

19       A.    The first two entry teams, I

20  was actively in tune, wanting to know if

21  anybody had any good chance to get to the

22  tank shell.

23            And when two entry teams with

24  two of my most senior, skilled, experienced

25  folks absolutely said, no, these are not

John Andrew McCarty

```
1   reliable, when I communicated that to Norfolk
2   Southern, at that moment I did not pay a lot
3   of attention to the subsequent readings.  And
4   they were to alert me if anything radically
5   changed.  Nothing ever radically changed.
6            So that's the honest answer to
7   those data that were -- again, I was
8   confident from my people that they were bogus
9   data, so I didn't actively engage in the
10  future hours.  Unless something was --
11  strange that occurred, they were to alert me.
12  But other than that, I did not track every
13  single text.
14       Q.    I'm going to come back to the
15  bogus data.  But you would agree with me that
16  that data continued to be collected on an
17  hourly basis on February 5th and
18  February 6th.
19            Correct?
20       A.    I believe so, yes.
21       Q.    And data was being collected at
22  a time when you believed that polymerization
23  was occurring.
24            Correct?
25       A.    I believe it was a potential of
```

1    occurring, yes, ma'am.

2        Q.    And data was being collected by

3    members of your team and staff going up close

4    to those cars that you thought were

5    polymerizing.

6            Correct?

7        A.    Yes, ma'am.

8        Q.    And they were collecting data

9    that you thought was unreliable.

10           Correct?

11       A.    Yes, ma'am.

12       Q.    And you knew that the risk that

13   they were facing was, if polymerization was

14   occurring, at any point in time those cars

15   could have exploded.

16           Correct?

17       A.    Yes, ma'am.

18       Q.    But you continued to send your

19   team out to collect bogus data that you

20   thought was not accurate or useful for any

21   purpose.

22           Is that correct?

23       A.    That's correct.

24       Q.    Okay.  And that bogus data,

25   what you're calling bogus data now, or at

1    least at the hearing starting in June --

2         A.    And the night of February 5th

3    to Norfolk Southern --

4         Q.    We're going to get to that in a

5    second, I promise you.

6              MR. HANSON:  Just let her ask

7         her question.

8              THE WITNESS:  I'm sorry.

9    QUESTIONS BY MS. KARIS:

10        Q.    That bogus data, you never once

11   put in any written document that you did not

12   believe that data was accurate.

13             Correct?

14        A.    No, I did not.

15        Q.    You never once mentioned to the

16   NTSB in February -- 20 days post-incident

17   that that data was bogus.

18             Correct?

19             MR. HANSON:  Objection.

20             THE WITNESS:  They never asked

21        me for that, and I didn't think to

22        talk about it.

23   QUESTIONS BY MS. KARIS:

24        Q.    Okay.  Now, you said you told

25   two folks at Norfolk Southern, at least two

John Andrew McCarty

1    folks at Norfolk Southern, that the data was

2    bogus.

3              Correct?

4         A.    Yes, ma'am.

5         Q.    And I believe you told

6    Ms. Herlihy today, you told those two folks

7    at Norfolk Southern that the data was bogus.

8              Correct?

9         A.    Yes, ma'am.

10        Q.    But you don't recall telling

11   anybody else at incident command that the

12   data was bogus.

13             Correct?

14        A.    That's correct.

15        Q.    You don't recall telling folks

16   from the Ohio EPA or any other government

17   agency.

18             Correct?

19        A.    It was not our role to

20   communicate with the command staff.  That

21   was -- we communicated with Norfolk Southern

22   HAZMAT.  It's not the line of communication.

23        Q.    I'm not asking whether it was

24   your role to communicate with them or not.

25             If you were putting your

John Andrew McCarty

1    employees at risk of being present when an

2    explosion took place from polymerization, and

3    you've got fire department, you've got the

4    EPA, you've got different local emergency

5    officials, you never once went up to them and

6    said, you guys are putting my crew at risk

7    with these temperature readings that we're

8    taking that I, in my 35 years of experience,

9    think is bogus.

10              Correct?

11              MR. LEVINE:  Objection.

12   QUESTIONS BY MS. KARIS:

13       Q.    Is that correct?

14              MR. LEVINE:  Objection.

15              THE WITNESS:  I never spoke

16       with the fire chief about it.

17   QUESTIONS BY MS. KARIS:

18       Q.    All right.  You continued to

19   put your folks at risk, believing that the

20   data was bogus.  That's what you're telling

21   us.

22              Correct?

23       A.    That was our assignment at the

24   time.

25       Q.    Right.

John Andrew McCarty

```
 1                    And you were getting paid by

 2       the hour for the work that you were doing at

 3       the time.

 4                    Correct?

 5            A.      Sure.

 6            Q.      Okay.  Now, let's talk about

 7       the work that you were doing and the

 8       communications you had.

 9                    You did talk to Oxy's folks

10       back in Dallas.

11                    Correct?

12            A.      Yes, ma'am.

13            Q.      And you understood, I think you

14       told me -- you told Ms. Herlihy, excuse me --

15       that one of the criticisms or things for

16       improvement that you would suggest to Oxy is

17       they need to better empower their folks on

18       the ground because too much power resides

19       with the folks in Dallas.

20                    Correct?

21                    MR. LEVINE:  Objection.

22       QUESTIONS BY MS. KARIS:

23            Q.      In a nutshell.

24            A.      I did say that yesterday, yes.

25            Q.      Yeah.  And you said you knew
```

John Andrew McCarty

1   that going into the incident from your prior

2   experiences with Oxy.

3          Right?

4     A.      There was a consistent pattern

5   that I observed during the East Palestine

6   incident with the Paulsboro incident, yes.

7     Q.      Yeah.

8          So when you arrived at East

9   Palestine, you had prior experience with Oxy.

10         Correct?

11    A.      Yes, ma'am.

12    Q.      And your prior experience told

13  you the folks in Dallas are the ones with the

14  power and authority, not the boots on the

15  ground here in East Palestine.

16         Right?

17    A.      Not prior to, no.  I'd say no

18  to that question the way it's phrased.  If

19  you want to rephrase it, I'll -- if you want

20  to restate it or --

21    Q.      Sure.

22    A.      I can't say I had any

23  preconceived notion of that, no.

24    Q.      What you had is prior

25  experience with Oxy in which you had formed

John Andrew McCarty

1    the view that they don't empower the folks --

2    that all decisions basically go back to the

3    folks in Dallas.  I think that's what you

4    told us yesterday.

5              Correct?

6              MR. LEVINE:  Objection.

7              THE WITNESS:  That was a --

8         that was an observation that she asked

9         an open question, and I thought about

10        it, and that's an honest reply.

11   QUESTIONS BY MS. KARIS:

12        Q.    Okay.

13        A.    The scheduled job that I recall

14   in Illinois, nonemergency job --

15        Q.    I don't need to know which

16   cases.

17        A.    Well, I'm just saying it was

18   built up over --

19        Q.    I'm going to move to strike the

20   rest.

21        A.    Okay.

22        Q.    We're limited on time, so if we

23   could just focus on my question.

24        A.    I'd like to get on the record

25   that I did not have a preconceived notion

John Andrew McCarty

1   going into East Palestine with that ideology.
2   I did not.
3          Q.    Okay.  Fair enough.
4                Now, but you did know that at
5   least the reason you were getting on the
6   phone with the folks in Dallas from Oxy is
7   because Oxy thought those folks had something
8   to contribute to the decision-making.
9                Is that fair?
10               MR. LEVINE:  Objection.
11               THE WITNESS:  Sure.
12  QUESTIONS BY MS. KARIS:
13         Q.    Okay.  And when you talked
14  to -- do you know the gentleman's name who
15  you spoke to in Dallas, or was it more -- I
16  think there were several people on the phone,
17  but you said you remember at least one.
18               Correct?
19         A.    My lead contact with Oxy
20  emergency response is Tim.
21         Q.    Was that who you were speaking
22  to in Dallas?
23         A.    He was one, I think,
24  orchestrated the phone call.
25         Q.    Right.

John Andrew McCarty

```
 1           A.     He was one of the many people
 2    on the call.
 3           Q.     Do you remember Mr. Brennan
 4    being on the phone?
 5           A.     Again --
 6           Q.     You don't?
 7           A.     -- I don't remember names.
 8           Q.     Okay.  Whoever it was that was
 9    on the phone at Oxy, did you tell those folks
10    that, hey, we're getting these temperature
11    readings, and I think they're bogus?
12                  MR. LEVINE:  Objection.
13                  THE WITNESS:  I don't remember
14        the calls in sentence-by-sentence
15        detail.  I don't recall.
16    QUESTIONS BY MS. KARIS:
17           Q.     Okay.  Now, I think you
18    testified yesterday that you -- that this was
19    a team effort.
20                  Is that right?
21           A.     Yes, ma'am.
22           Q.     Loss of people to offer
23    insight, is what you testified to.
24                  Correct?
25           A.     Yes.
```

John Andrew McCarty

```
 1          Q.      Okay.  And did you include the
 2    Oxy team in that "lots of people to offer
 3    insight"?
 4          A.      Yes, ma'am.  There was a lot of
 5    people on those phone calls.
 6          Q.      All right.  But all those
 7    people on those phone calls, did you tell any
 8    of them that you were not trusting the
 9    temperature readings that you guys were
10    getting at the scene, on the ground, by the
11    hour?
12                  MR. LEVINE:  Objection.
13                  THE WITNESS:  Yeah, the time of
14        the calls with Oxy, those temperature
15        readings hadn't been collected.
16    QUESTIONS BY MS. KARIS:
17          Q.      Okay.  There were temperature
18    readings collected on February 5th and
19    February 6th.
20                  Is that fair?
21          A.      Yes, ma'am.  Afternoon, evening
22    of the 5th, into the morning of the 6th.
23          Q.      You had a conversation with
24    somebody at 8 a.m., or 8 or 9 a.m., on
25    February 5th at Oxy.
```

John Andrew McCarty

1              Correct?

2        A.      That sounds about right.

3        Q.      Was that the only conversation

4    you ever had with anybody over in Dallas?

5        A.      That's my memory.  It was in a

6    rental car.  It was the SRS rental car.

7    That's my memory, yes.

8        Q.      So after that one conversation,

9    again, you never communicated with anybody at

10   Oxy, is that correct, that was in Dallas?

11       A.      That's my memory, yes, ma'am.

12       Q.      Okay.  And so after the

13   temperature readings started, you did not at

14   any point ask to speak to anybody in Dallas

15   about what, if anything, is occurring in the

16   field that we're going out there and getting

17   these hourly readings?

18       A.      I'm sorry.

19       Q.      That was a bad question.

20       A.      Yeah, let me -- I didn't follow

21   the question.

22       Q.      The temperature readings, you

23   started collecting them February 5th.

24              Correct?

25       A.      Yeah, sometime that afternoon,

John Andrew McCarty

1    evening-ish.  I don't remember exactly what

2    time.

3          Q.     And we already established, I

4    believe, they were taken on the hour.

5                Correct?

6          A.     Something like that.

7          Q.     Do you know how many readings

8    were taken each time, on the hour, one of

9    your employees was taking a reading?

10         A.     I don't remember, no.

11         Q.     You know and you don't

12   remember, or you just never knew how many

13   readings they were taking?

14         A.     They were trying to --

15   everywhere they had those little bit of gaps,

16   they were trying to get temperature readings

17   from.  That's what they did every entry.

18   Every entry, they went to every gap they had

19   to offer.

20         Q.     Did they take only one reading,

21   though, is the question?

22         A.     At each entry?

23         Q.     Yes.

24         A.     It would have been a reading

25   from whatever, you know, small gap they

1    thought they had to try.  So I'm not -- I

2    guess I'm not really clear on the question,

3    but that's my best answer.

4         Q.    Okay.  I'll move on.

5               I think you have Exhibit 1

6    there.  I think it was Exhibit 1.

7               MR. HANSON:  It's in the stack.

8    QUESTIONS BY MS. KARIS:

9         Q.    The Chair's factual report,

10   hazardous materials factual report.

11              If I could direct your

12   attention to page 93.

13              And I believe you testified

14   earlier that you read this report before you

15   went to the NTSB hearing.

16              Correct?

17        A.    Yeah, I think this was that --

18   this was their draft in early June, yes,

19   ma'am.

20        Q.    And I think you started by

21   telling Mr. Gomez that with respect to the

22   last paragraph on page 94, that as soon as

23   you saw what's referenced there, that the

24   SPSI president and SRS project manager told

25   IC that if at any point the tank car rose to

```
1    150 degrees, for safety reasons they would
2    withdraw personnel from the area and stop any
3    attempt to mitigate, and that they also went
4    on to tell the incident command that should
5    the temperature in the tank car reach 153 to
6    158, the result would be rapidly increasing
7    temperature and uncontrolled polymer
8    reaction.
9              Correct?
10        A.    That's what's written in the
11   report.
12        Q.    And you said, I read it, it was
13   wrong, I never said that, and I wanted to
14   correct that.
15        A.    Exactly.
16        Q.    Okay.  But you didn't only read
17   that paragraph; you read the whole report.
18              Is that fair?
19        A.    I can't say I read the entire
20   report bumper to bumper, but the sections
21   that, you know --
22        Q.    The sections that applied to
23   you, at least?
24        A.    Yes, ma'am.
25        Q.    Okay.  And that paragraph is in
```

John Andrew McCarty

```
 1      Section 8.5.
 2                  Right?
 3                  If we can go to the prior page,
 4      Mike.  Or the top -- there you go.
 5                  And it's under a section titled
 6      "Decision to Conduct the Vent and Burn of
 7      Vinyl Chloride Tank Cars."
 8                  Right?
 9          A.      Yes.
10          Q.      And the very first sentence of
11      that says, "The East Palestine, Ohio, chief
12      incident commander, IC, told NTSB
13      investigators that on February 5th of 2023 at
14      4:47" -- I'm sorry, "17:47," which is 5:47 in
15      the evening, "the SPSI president and the SRS
16      project manager notified the IC about
17      temperature data concerns regarding the vinyl
18      chloride tank cars."
19                  Right?
20          A.      Well, that's what's written in
21      this.  That is what's written here.
22          Q.      Okay.  And it says that the
23      SPSI president, you, and the SRS project
24      manager notified incident command about the
25      temperatures.
```

```
 1                    Is that -- should that be
 2   Norfolk Southern only?
 3        A.       Norfolk Southern initiated that
 4   meeting with the commander that afternoon.
 5   Both SRS and SPSI, myself and Chip, were
 6   there supporting Norfolk Southern's
 7   conversations with the chief.
 8                    And, you know, again, I'm going
 9   to say the same thing.  I never told the
10   chief anything about the 60 to 80 degrees
11   Fahrenheit thing, again, because I believe
12   they were bogus data.
13                    I can't speak to what Norfolk
14   Southern may have told the chief and the
15   chief believed that we said that, but it was
16   not us that said that.
17        Q.    Okay.  Now, if you go down
18   further in the paragraph, it says, "The IC
19   told NTSB investigators" -- I'm sorry, last
20   paragraph, first sentence -- "that on
21   February 6, 2023, at about 10 a.m., Ohio
22   Governor DeWine arrived at the East Palestine
23   incident command post."
24                    Did you ever have any
25   conversations with Governor DeWine?
```

John Andrew McCarty

```
 1        A.     Yes, ma'am.

 2        Q.     And I mean in connection with

 3   the incident at the time, just to be clear.

 4        A.     That's the only time I ever met

 5   the gentleman.

 6        Q.     Okay.  Fair enough.

 7               Shortly after lunch, or

 8   mid-afternoon, a meeting occurred in the ICP

 9   between all stakeholders, estimated 60 to a

10   hundred individuals, including with Ohio

11   Governor DeWine and his staff, Pennsylvania

12   Governor Shapiro, several other politicians,

13   Norfolk Southern, federal and Ohio EPA,

14   Pennsylvania Department of Environmental

15   Protection, the Ohio Department of Health,

16   the National Guard, CTEH, and Beaver County

17   and Columbiana County Ohio emergency

18   services.

19               Right?

20        A.     The timeline on that is not

21   correct when it says lunch or after lunch.

22   That would have been before lunch, like late

23   morning.

24        Q.     But the rest of it in terms of

25   the participants of the meeting that you were
```

```
 1    in is accurate.

 2                Is that fair?

 3         A.    Again, the NTSB prepared this.

 4    I have no knowledge of who all was in that

 5    room.  So I don't know what agencies were

 6    there, other than the governor and some folks

 7    I recognized from a couple of those agencies.

 8         Q.    Did you know that the EPA was

 9    there and some emergency responders were

10    there?

11         A.    I wasn't sure who all exactly

12    was in this room.  There was a lot of people

13    in the room.

14         Q.    Okay.

15         A.    And my limited -- time in that

16    room was limited.

17         Q.    All right.  Fair enough.

18                It goes on to say that

19    "Governor DeWine led the meeting, which began

20    with an explanation of the vent and burn

21    process."

22                Correct?

23         A.    I don't remember it beginning

24    that way, ma'am.  I don't.

25         Q.    Okay.  It then goes on to say
```

1    that "The SPSI president and SRS project

2    manager provided a detailed explanation of

3    why vent and burn was needed and how it could

4    be accomplished" -- "how it would be

5    accomplished."

6              Do you see that?

7        A.    I see it written there, yes,

8    ma'am.

9        Q.    Is that accurate?

10       A.    Partially.

11       Q.    Okay.  Did you, along with

12   Mr. Day, provide a detailed explanation for

13   why vent and burn action was needed?

14       A.    That was our understanding for

15   why we were called to go visit with the

16   governor.  He had some questions for us on

17   these questions.

18              And as we started to go down

19   this path, he kind of abruptly interrupted

20   and didn't let us finish.

21       Q.    Okay.  Did you provide any

22   explanation for why vent and burn was needed?

23       A.    Yes, ma'am.

24       Q.    Okay.  Now, if you go to the

25   next page, middle of the paragraph, it says,

John Andrew McCarty

```
 1      "According" -- I'm sorry, third paragraph,
 2   middle of the paragraph.
 3            "According to the incident
 4   command, the SPSI president and SRS project
 5   manager insisted that he had only 13 minutes
 6   to decide whether to allow the vent and burn
 7   to proceed because they wanted to begin at
 8   5 p.m." --
 9        A.    3 p.m.
10        Q.    I'm sorry, "15:00," 3 p.m.
11        A.    Yes, ma'am.
12        Q.    -- "and before sunset to avoid
13   the effects of atmospheric temperature
14   inversion and allow the vapor cloud to
15   disperse."
16            Is that an accurate statement?
17        A.    Again, partially.
18        Q.    Okay.  Let's break it down
19   then.
20            Did you inform anybody,
21   including Governor Devine -- DeWine, excuse
22   me, that the operations had to begin -- or
23   you wanted them to begin by 3 p.m.?
24        A.    That was our goal, yes, ma'am.
25        Q.    And was there a discussion that
```

1    there were only 13 minutes left to allow the

2    vent and burn to proceed because of what time

3    it was?

4         A.    I remember that conversation

5    vividly.

6         Q.    Okay.  Did you express that

7    view of there being only 13 minutes left?

8         A.    That was me, ma'am.

9         Q.    Okay.  And tell us what you

10   said about there being 13 minutes left.

11        A.    The context and the timing in

12   which that statement was made by me was after

13   a -- what I felt was a significant time and

14   momentum delay that had been caused by

15   leaving the job site when we were ready to

16   get Jason Poe's guys going to come to the

17   command post, have this meeting with the

18   governor.

19             And what's not presented here

20   is the time it took to get some air modeling

21   that had been given to him, that was

22   inaccurate, kind of redone and reconsidered

23   by the command staff.

24             So when he came back into the

25   room, it was a different room at that point.

John Andrew McCarty

1    And I don't remember the timeline.  Whether

2    it was 30 minutes or an hour and a half, I

3    don't recall.

4                    What I do recall, that was

5    after lunch.  That was kind of like between

6    12 and 12:30, and he was laser-focused on a

7    12:30 press release.

8                    I interrupted.  I said,

9    Governor, all due respect, I said, we need to

10   do this before dark.  We need at least three

11   hours to set up.

12                   That was the context in which I

13   said this.  So that's the -- that is me.  It

14   was me that said it.

15                   But quite frankly, we had

16   already lost time that day.  He was going to

17   go on a press -- I just didn't feel like, are

18   we going to really wait for a press

19   conference before command makes a decision.

20                   At that point, he and the fire

21   chief collectively had a conversation, and we

22   were authorized to go.

23        Q.    Okay.  So the reference to the

24   13 minutes to decide, do you know where that

25   comes from?

John Andrew McCarty

```
 1        A.      You'd have to ask the NTSB.
 2        Q.      I will tell you that if you
 3  look further up, it notes there that they had
 4  to wait for corrected data in connection with
 5  the plume model.  So it is referenced there.
 6                But what I'm curious about is,
 7  it was your view that a decision needed to be
 8  made very quickly on February 6th with
 9  respect to vent and burn taking place that
10  day.
11                Correct?
12        A.      Can you reask -- I'm sorry, I
13  just --
14        Q.      Sure.
15        A.      Can you reask your question?
16  Just rephrase -- don't rephrase.  Just ask it
17  again, I'm sorry.
18        Q.      It was your view on
19  February 6th that a decision needed to be
20  made very quickly as to whether there was
21  going to be a vent and burn operation.
22                Correct?
23        A.      I'm going to just preface my
24  answer with my understanding that that
25  decision had already been made, Sunday, after
```

1    the command staff meeting with the incident

2    commander.

3              My understanding was, we were

4    marching orders, get it going, get it done.

5    And my push for the 13 minutes was only -- I

6    was concerned if this would have waited till

7    dark, that environmental conditions could

8    have and probably would have had a potential

9    to be worse if we didn't have daylight and

10   atmospheric conditions in the favor of the

11   burn.  So --

12        Q.    So --

13        A.    -- that's my honest and correct

14   answer.

15        Q.    Okay.  So the decision had been

16   made already from the prior day, is your

17   testimony.

18              Correct?

19        A.    That was my understanding.

20        Q.    Okay.  And after the decision

21   was made, your team continued to go out and

22   collect temperature data.

23              Correct?

24        A.    At the request of our customer,

25   yes, ma'am.

John Andrew McCarty

```
1        Q.      And so even though there's
2   already been a decision that we're going to
3   vent and burn.
4              Correct?
5        A.      (Gestures.)
6        Q.      You're continuing to collect
7   temperature data that you think is
8   unreliable?
9        A.      That's correct.
10       Q.      And the reason you decided to
11  recommend vent and burn on February 5th was
12  because you believed there was polymerization
13  taking place.
14             Correct?
15       A.      I believe there was every
16  potential for polymerization taking place.
17       Q.      I want to explore that a little
18  bit.
19             Did you believe that
20  polymerization was actually taking place or
21  that the potential existed for there to be
22  polymerization?
23       A.      Both.
24       Q.      Okay.  So you believed on
25  February 5th that the tank -- the VCM in the
```

John Andrew McCarty

1  tank cars were actually polymerizing.

2            Correct?

3       A.       Specifically, the four other

4  than the TILX car.  Not the TILX car.  I felt

5  that was behaving itself.

6       Q.       Fair enough.

7            You believed the TILX402025

8  car, the white car, as has been called, that

9  one was not actually polymerizing on

10 February 5th.

11           Correct?

12      A.       We don't believe so, no.

13      Q.       Okay.  But you believed that

14 the other four tank cars were already

15 polymerizing on February 5th.

16           Correct?

17      A.       For clarity, I believe that at

18 least two of them were --

19      Q.       Which two?

20      A.       -- and that the other two, by

21 process of same conditions, same environment,

22 a probability of.  That's why I said both.

23           The car on the west that I

24 personally --

25      Q.       Let me give you Exhibit 6 here,

John Andrew McCarty

1    and if you could give me the car numbers.

2         A.     Okay.  The 55th car, referenced

3    as OCPX80370, is what I call the west car.

4         Q.     Okay.

5         A.     Excuse me.

6         Q.     And that's the one that was the

7    temperature reading of 135 that you told us

8    about.

9                Correct?

10        A.     The one that I couldn't hold my

11   hand on.  It was too hot to hold, yes, ma'am.

12        Q.     Okay.  Which other one?

13        A.     I'm just looking at the car

14   number here.

15               The 30th car, identified as

16   OCPX80179.  That's the one that behaved the

17   way it did on Saturday afternoon.  Suddenly

18   and violently, with exponential more

19   pressure, force, sustaining relief at the end

20   of the day Saturday.

21        Q.     That's the one that had the

22   70 minutes of --

23        A.     Yes, ma'am.

24        Q.     -- the PRD going off that you

25   described.

John Andrew McCarty

1          Correct?

2          A.    Yes, ma'am.

3          Q.    Okay.  Other than those two,

4    had you formed a view as to whether GAT --

5    strike that.

6                Had you formed a view on

7    February 5th as to whether GATX95098, my

8    client's car, was actually polymerizing on

9    February 5th?

10         A.    It was sustained even more.  If

11   you look at the source of the pool fires just

12   west of that car with all the -- the 111 cars

13   piled up against it that were fuel-feeding

14   those pool fires under those three cars,

15   yeah, it -- those two cars, the GATX car and

16   the other OCPX car, it was that -- in the --

17   in the same pool fire conditions.  This is

18   behaving this way.  There's a probability and

19   a possibility that the other two could be as

20   well.

21         Q.    So I'm not sure which of those

22   it is, because I asked you at the beginning,

23   which cars did you think were polymerizing on

24   February 5th.

25               And you told me at least two.

1    You believed two cars were polymerizing on

2    the 5th.

3              Correct?

4         A.    Yes, ma'am.

5         Q.    Now I'm asking you the third

6    car, GATX95098.  On February 5th,

7    Mr. McCarty, did you believe that that tank

8    car was already polymerizing?

9         A.    I believe when its PRD quit

10   going off, that it could be.

11        Q.    Okay.  Could be is different

12   than is.

13             Correct?

14        A.    There's no absolutes in

15   emergency response.

16        Q.    Okay.

17        A.    You know, we've already

18   identified, couldn't get samples, couldn't

19   get good temperature readings.  There was a

20   lot we could not assess.

21        Q.    Okay.  So you believed that

22   that car could have been polymerizing,

23   GATX95098.

24             Correct?

25        A.    Yes.

John Andrew McCarty

```
 1          Q.      Now, with respect to that car,
 2   do you know whether that car had remained
 3   intact post-derailment?
 4          A.      Yes.  It never showed any signs
 5   of leaking, other than the fires from the
 6   protective housing.
 7          Q.      And we're going to talk a
 8   little bit more about that car, but just to
 9   be clear, did you form an opinion as to
10   whether GATX95098 performed as it was
11   designed, which you told us yesterday meant
12   that you'd expect it to hold together?
13          A.      Your question is performed as
14   designed.  There's a lot of performance
15   factors, and that was with regard to
16   specifically the TILX car that didn't leak.
17          Q.      Did the GATX95098 car leak?
18          A.      Well, when the pressure relief
19   device activated and it was relieving
20   flammable vapor and caught fire with all the
21   pool fires igniting it, and then it melted
22   out all the other elastomers and added more
23   three-dimensional, fuel-fed fire, essentially
24   the service equipment did fail and have leaks
25   that fueled the fires.
```

John Andrew McCarty

1     Q.     Okay.  Let's break that down.

2            After sustaining hours of fire,

3     at that point some of the service equipment

4     stopped functioning, is what you're saying.

5            Correct?

6     A.     Yes.

7     Q.     Other than any release from the

8     service equipment that melted, the elastomers

9     that may have melted after being in fire for

10    hours, did the tank car itself remain intact?

11    A.     The tank car itself, the

12    package of the shell of the tank car, did not

13    leak.

14    Q.     Okay.  Did you form an opinion

15    as to whether GATX95098 performed as it was

16    designed, even if that meant that some of the

17    elastomers melted after being in a fire for

18    hours?

19            MR. HANSON:  Objection.

20            THE WITNESS:  I did not form an

21        opinion about any of those cars

22        afterwards.

23    QUESTIONS BY MS. KARIS:

24    Q.     And you don't have an opinion

25    sitting here today.

John Andrew McCarty

```
 1                    Is that correct?
 2                    MR. LEVINE:  Same objection.
 3                    THE WITNESS:  No, ma'am.
 4       QUESTIONS BY MS. KARIS:
 5            Q.    Okay.  So now I want to go back
 6       to the discussion of whether there was actual
 7       polymerization at the time that you were
 8       expressing your view that there was a very
 9       short window to vent and burn on
10       February 6th.
11                    I believe you testified --
12       strike that.
13                    So is it accurate, Mr. McCarty,
14       to say that on February 6th, before the vent
15       and burn took place, you were present for
16       discussions with at least Governor Divine and
17       other -- DeWine, excuse me, and other members
18       of the incident command?
19            A.    Again, I don't remember who all
20       was in that room, ma'am.  There was a lot of
21       people in that room.  I don't remember who
22       all was in there, and I certainly didn't know
23       them all.
24            Q.    Okay.  Do you know whether you
25       were the first one to recommend vent and
```

1    burn --

2         A.    The word "recommend" --

3         Q.    -- for the East Palestine

4    incident?

5         A.    -- is not my first -- I'm

6    sorry, let you finish your question.

7         Q.    Go ahead.

8              It's not your first choice of

9    words?

10        A.    Well, I mean, the honest answer

11   is, when we came out of that -- when that one

12   car, this 30th car, behaved the way it did

13   late in the day, the first conversation --

14   when you asked was the first

15   recommendation -- is -- if I can repeat

16   your -- I guess was the first, I think is

17   what I picked up --

18        Q.    Were you the first one to

19   recommend vent and burn?

20        A.    Okay.  The first.  When you

21   said "first" is what grabbed me, not

22   "recommend."

23              So when we got everybody in the

24   clear, rallied up back at our ops trailer,

25   Scott Deutsch, Scott Gould and myself, I just

John Andrew McCarty

1    presented that as, gentlemen, I think we've

2    just lost hot-tapping.  I said, we got to

3    think through this.  That was the first

4    conversation.

5            Q.    Okay.  And after the "thinking

6    through this" that you just identified, who

7    first came to the conclusion, to your

8    knowledge, that vent and burn is the way to

9    go here?

10           Because you told me that

11   decision was made on February 5th.

12           MR. LEVINE:  Objection.

13           THE WITNESS:  Can you say your

14       question again?

15   QUESTIONS BY MS. KARIS:

16           Q.    Sure.  It was a terrible

17   question.

18           Who first came to the

19   conclusion, to your knowledge, that vent and

20   burn was the way to go on February 5th?

21           MR. LEVINE:  Objection.

22           THE WITNESS:  I don't know.

23       There was, I mean, a lot of Norfolk

24       Southern staff, myself, Chip Day,

25       Terry Rockwell.  I don't know who

```
 1          ultimately concluded -- I don't know.
 2    QUESTIONS BY MS. KARIS:
 3          Q.     Do you know approximately what
 4    time you finished that discussion about,
 5    gentlemen, hot-tap, not really an option
 6    anymore?
 7          A.     It would have been within an
 8    hour after we got everybody -- from whatever
 9    time that PRD activated, it was not long
10    after that.  Within the next hour or so.
11          Q.     Okay.  And how long was that
12    after you had had the conversation with Oxy
13    in which their folks were saying from Dallas
14    that there is no polymerization taking place?
15              MR. LEVINE:  Objection.
16              THE WITNESS:  Yeah, that
17          conversation from Oxy never occurred
18          yet at that point.
19    QUESTIONS BY MS. KARIS:
20          Q.     Okay.  Let's switch gears a
21    little bit.
22          A.     Can we take five?
23              MS. KARIS:  Sure.
24              THE WITNESS:  Can we take a
25          five-minute break?
```

John Andrew McCarty

1          MS. KARIS:  Absolutely.

2          VIDEOGRAPHER:  We are off the

3     record at 10:54.

4      (Off the record at 10:54 a.m.)

5          VIDEOGRAPHER:  We are back on

6     the record at 11:07.

7  QUESTIONS BY MS. KARIS:

8     Q.    Mr. McCarty, I believe you just

9  testified that you believed no later than

10 February 5th that there was polymerization

11 occurring.

12          Correct?

13    A.    I believe there was a high

14 chance of that, yes, ma'am.

15    Q.    Okay.  Now, you testified

16 earlier that you have seen results of some

17 samples that were taken in March of 2023 that

18 looked for the issue of polymerization.

19          Correct?

20    A.    I have seen those tables of

21 data that the NTSB produced, yes.

22    Q.    Okay.  And what those tables of

23 data indicate is based on the testing that

24 was performed, there was no polymerization.

25          Correct?

John Andrew McCarty

```
 1          A.      That's what they --
 2                  MR. LEVINE:  Objection.
 3                  THE WITNESS:  That's what they
 4          seem to indicate.
 5     QUESTIONS BY MS. KARIS:
 6          Q.      Okay.  You have not studied
 7     that data or those results, other than
 8     reading them.
 9                  Correct?
10          A.      That's correct.
11          Q.      You haven't done any
12     independent testing of those results.
13                  Correct?
14                  I mean of -- strike that.
15                  You haven't done any
16     independent analysis of those results.
17                  Correct?
18          A.      No, ma'am.
19          Q.      Okay.  And you haven't taken
20     any samples yourself.
21                  Correct?
22          A.      Correct.
23          Q.      You haven't undertaken any
24     study to see whether the decision that you --
25     strike that.
```

John Andrew McCarty

```
 1                  You haven't undertaken any

 2     study to determine whether your belief that

 3     polymerization was or could have been

 4     occurring on February 5th was accurate.

 5                  Correct?

 6        A.     No, I've never done any

 7     follow-up.  No, I -- no is the answer.  No.

 8        Q.     The only data that exists with

 9     respect to whether, in fact, polymerization

10     was taking place that you're aware of is

11     Oxy's testing.

12                  Correct?

13        A.     That's my understanding.

14        Q.     And that data reaches the

15     opposite conclusion of what your belief was.

16                  Correct?

17                  MR. LEVINE:  Objection.

18                  THE WITNESS:  It seems to

19            indicate that no polymerization had

20            occurred.

21     QUESTIONS BY MS. KARIS:

22        Q.     Now, we talked a lot about the

23     temperature readings and your belief that

24     they were bogus.

25                  Correct?
```

John Andrew McCarty

1      A.      Yes.

2      Q.      Okay.  Would you agree with me

3   that if those temperature readings were

4   accurate, those temperature readings were

5   supportive of a conclusion that there was no

6   polymerization taking place?

7               MR. LEVINE:  Objection.

8               THE WITNESS:  If those readings

9          would have been indicative of the tank

10         and internal temperatures, with a big

11         if, they would have trended similar to

12         the TILX car to the east.

13  QUESTIONS BY MS. KARIS:

14     Q.      Let me go back to my question.

15  I didn't ask you about the TILX car.

16              Do you agree that if those

17  temperature readings taken on February 5th

18  and February 6th, almost on an hourly basis,

19  if those were accurate, those support a

20  conclusion that there was no polymerization

21  taking place post-derailment in East

22  Palestine?

23              MR. LEVINE:  Objection.

24              THE WITNESS:  Yeah, it's a

25         broad-brush not defining tank cars.

John Andrew McCarty

```
 1                    The one on the west, because I
 2            personally couldn't hold my hand on
 3            the metal of that car and know how hot
 4            it was, I mean, I'm going to certainly
 5            keep that separate from my response to
 6            this.
 7                    It was the three cars in the --
 8            behind Leake Oil, referred to as the
 9            29th, 30th and 31st car, in which the
10            reported temperature readings that I
11            absolutely believe were not accurate
12            of the tank car temperatures.
13                    With the hypothetical that you
14            asked -- you asked the hypothetical.
15            If we could have gotten internal
16            readings of the product in the cars,
17            then I concur with the science that
18            those temperatures would have
19            corresponded to normal handling
20            pressure curves of vinyl chloride.
21    QUESTIONS BY MS. KARIS:
22            Q.     You called it the hypothetical.
23            A.     Well, it is hypothetical,
24    ma'am.
25            Q.     Okay.  To be clear, there are
```

John Andrew McCarty

1    temperature readings taken on February 5th

2    and 6th.

3              Correct?

4       A.     Temperature readings were

5    taken, yes, ma'am.

6       Q.     You disagree with the

7    reliability of those temperature readings.

8              Correct?

9       A.     I disagree that they were not

10   representative of the temperatures in those

11   tank cars.

12       Q.     And if those temperature

13   readings --

14       A.     I think I might have misspoke

15   there.  I got to be careful of how I just

16   spoke that.

17             The temperature readings that

18   were collected on those three tank cars,

19   29th, 30th and 31st tank cars, never had any

20   contact with the tank shell itself and

21   certainly not the product inside.

22             So I have to keep staying

23   grounded in the facts, despite how you ask a

24   question.  So I know that's a long way to

25   answer, and I didn't mean -- if I interrupted

John Andrew McCarty

1    you, I apologize.

2         Q.    Grounded in facts or otherwise,

3    if those readings taken on February 5th and

4    6th of the tank cars that were reading

5    65 degrees or 62 degrees, of those tank cars,

6    if those were accurate, that would be

7    supportive of no polymerization.

8              Correct?

9              MR. LEVINE:  Objection.

10             THE WITNESS:  You're asking me

11        a hypothetical "if."

12   QUESTIONS BY MS. KARIS:

13        Q.    Yes.

14        A.    And I'm stating a fact that the

15   data for those cars was not accurate.  So

16   you're asking me a hypothetical.

17        Q.    I'll accept that it's a

18   hypothetical in your eyes.

19             Would you agree, though, that

20   that would be supportive of no

21   polymerization?

22             Yes or no, if you can say.

23             MR. LEVINE:  Objection.

24             THE WITNESS:  I believe I

25        already answered that a few minutes

```
 1          ago, ma'am.
 2     QUESTIONS BY MS. KARIS:
 3          Q.      Okay.  Let's go now to what you
 4     have done to verify whether in fact there was
 5     polymerization taking place on February 5th
 6     and 6th.
 7                  What have you done since then,
 8     if you will?  Have you done anything?
 9                  MR. LEVINE:  Objection.
10                  THE WITNESS:  No.  No.
11     QUESTIONS BY MS. KARIS:
12          Q.      Okay.  You are not an engineer.
13                  Correct?
14          A.      No.
15          Q.      Is that correct?
16          A.      That's correct.
17          Q.      And you have no formal
18     engineering education.
19                  Correct?
20          A.      That's correct.
21          Q.      You are not a polymer chemist.
22                  Correct?
23          A.      That's correct.
24          Q.      In fact, you're not a chemist
25     at all.
```

John Andrew McCarty

```
 1                  Correct?
 2        A.      That's correct.
 3        Q.      You don't hold yourself out to
 4   be an expert in chemistry.
 5        A.      That's correct.
 6        Q.      You don't hold yourself out to
 7   be an expert in polymerization.
 8                  Correct?
 9        A.      That's correct.
10        Q.      You don't hold yourself out to
11   be a subject matter expert in vinyl chloride.
12                  Correct?
13        A.      Correct.
14        Q.      And you don't hold yourself out
15   to be an expert in polymerization of vinyl
16   chloride.
17                  Correct?
18        A.      Correct.
19        Q.      Of the folks from Norfolk
20   Southern that you identified who were
21   involved in the discussion as to whether
22   polymerization was taking place, do you know
23   any of them to be an expert in vinyl
24   chloride?
25        A.      No, I'm not aware of that.
```

1    Q.    The folks that you were

2    speaking to that were involved in the

3    discussion on whether to vent and burn, do

4    you know any of them to be subject matter

5    experts on polymerization of vinyl chloride?

6    A.    Can you rephrase the -- you're

7    asking about the Norfolk Southern staff?  I

8    guess I got it -- can you rephrase the

9    question?

10    Q.    Sorry, let me reask.  Terrible

11    question.

12    The folks that you spoke to at

13    Norfolk Southern regarding whether or not you

14    should vent and burn and whether or not

15    polymerization was taking place, do you

16    consider any of them to be experts in

17    polymerization of vinyl chloride monomer?

18    A.    No.

19    Q.    Do you consider any of them to

20    be an expert in vinyl chloride monomer,

21    period, regardless of polymerization?

22    A.    No.

23    Q.    You testified early yesterday

24    that you attend meetings at The Chlorine

25    Institute where VCMs are discussed.

John Andrew McCarty

```
 1              Correct?

 2       A.     Yes.

 3       Q.     And I think you said you've

 4  attended roughly 25 to 30 such sessions?

 5       A.     Over the years, that's probably

 6  a good estimate.

 7       Q.     And just ballpark, how long is

 8  each session?

 9       A.     The programs are generally a

10  week-long training session.

11       Q.     Okay.  And of that week-long

12  training session, how much of it is dedicated

13  to talking about VCMs and polymerization?

14       A.     Usually just a segment.  In

15  certain years it would just be like a --

16  probably less than an hour presentation, and

17  other years it's that plus case-study

18  sharing, stuff like that.

19       Q.     Okay.  So is it fair to say

20  that in those 25 to 30 sessions that you've

21  attended, each session spends between one to

22  two hours speaking of the subject of VCM and

23  polymerization?

24       A.     I think that would be a fair

25  estimate.
```

John Andrew McCarty

1    Q.    Okay.  And you testified

2    yesterday that there was a difference between

3    stabilized VCM versus VCM involved in a

4    derailment.

5              Did I hear that correctly?

6              MR. LEVINE:  Objection.

7              THE WITNESS:  Yeah.  I can't

8        remember the exact discussion

9        yesterday, ma'am.  I'm sorry, I don't

10       remember the exact discussion

11       yesterday.

12   QUESTIONS BY MS. KARIS:

13   Q.    Fair enough.

14            In the one- to two-hour

15   presentations that you participate in at The

16   Chlorine Institute, how much of that time is

17   spent on discussing whether VCM involved in a

18   derailment can or would polymerize?

19   A.    It's certainly part of those

20   presentations, yes.

21   Q.    How much of that time, is the

22   question?  Ballpark.

23   A.    I honestly -- it's probably its

24   own slide or within a slide of chemical

25   characteristics.  So somewhere between 5 and

1    15 minutes, depending on the presenter.

2         Q.    Mr. McCarty, have you ever

3    published in a peer-reviewed journal?

4         A.    A peer-reviewed journal?  No,

5    ma'am.

6         Q.    Have you ever published

7    anything in any context that you shared with

8    the public on VCM and polymerization?

9         A.    I'm sorry, your question again?

10             When you say "the public," I

11   don't know if that Senate Commerce Committee

12   characterizes that.  I'm not sure what

13   you're -- can you --

14        Q.    Any published -- sure.

15             Something that the general

16   public -- because you said you give these

17   presentations at The Chlorine Institute.

18             Correct?

19        A.    Okay.

20        Q.    But they provide you the

21   content, is what I heard you say yesterday.

22             Correct?

23        A.    Yes, ma'am.  Yes, ma'am.

24        Q.    Have you ever drafted content

25   about VCM and polymerization?

John Andrew McCarty

```
 1        A.    I don't think -- no, I don't
 2   remember doing any of that.  Anything -- that
 3   would have been a Chlorine Institute
 4   document.
 5        Q.    And that, you told us, they
 6   gave you the content, and you present it.
 7              Correct?
 8        A.    Yes, ma'am.
 9        Q.    And I'm asking whether you've
10   ever authored anything that you've presented
11   either to a trade group, industry
12   organization or any other context that speaks
13   to the subject of polymerization of VCM.
14        A.    I can't recall anything, no.
15        Q.    Okay.  Let's talk about vent
16   and burn.
17              Have you ever published
18   anything regarding vent and burn?
19        A.    No.
20        Q.    By the way, are you aware of
21   anyone that was in East Palestine from
22   February 3rd to February 6th that had had
23   prior experience with vent and burn
24   operations in a populated area involving
25   vinyl chloride monomer?
```

John Andrew McCarty

```
 1            A.      Not in vinyl chloride, no,
 2      ma'am.
 3                    Well, populate -- Chip -- let
 4      me clarify that.  Chip, as a young
 5      technician, participated in Livingston,
 6      Louisiana, that I was aware of, but I
 7      can't -- I don't think Livingston was
 8      necessarily a heavily populated area.  So
 9      that's the qualifier to your question in my
10      answer.
11          Q.      The vent and burn operations in
12      East Palestine were in a populated area.
13                    Correct?
14          A.      Yes, ma'am.
15          Q.      Okay.  Yesterday you mentioned
16      Mr. Polymer -- Mr. Palmer, excuse me, in
17      response to a question you were asked about
18      who had prior experience of vent and burn of
19      VCM in a community.
20                    But when I went back and looked
21      at the transcript, I wasn't sure if you were
22      answering the question asked.
23                    So anybody from your team, from
24      those 35, 45 employees who have worked on
25      this incident, that had any prior experience
```

John Andrew McCarty

1    in vent and burn of vinyl chloride monomer in

2    a community?

3                    MR. LEVINE:  Objection.

4                    THE WITNESS:  No, ma'am.

5    QUESTIONS BY MS. KARIS:

6         Q.    I want to ask you about

7    polymerization and your understanding and

8    familiarity with it, recognizing you're not a

9    subject matter expert.

10                   You testified yesterday that

11   you understood that nitrogen had been

12   introduced by Oxy to purge oxygen from the

13   tank cars before they were loaded for

14   transport.

15                   Correct?

16        A.    My understanding from Oxy is

17   they pad it with nitrogen after loading.

18        Q.    After loading.

19                   So they load, and then they pad

20   with nitrogen.

21                   Correct?

22        A.    That was my understanding.

23        Q.    Okay.  And what that does is it

24   purges the oxygen.

25                   Correct?

John Andrew McCarty

```
1          A.      Yes.
2          Q.      Do you know, with that oxygen
3    in the vessel, whether an inhibitor would
4    cause -- what inhibitor would cause
5    polymerization and whether it -- let me start
6    one at a time.  Bad question.
7                  Without oxygen in the vessel,
8    or purged -- strike that.
9                  You had agreed, I believe,
10   yesterday with Mr. Gomez that the
11   introduction of nitrogen results in expelling
12   oxygen to a degree of less than 200 parts per
13   billion.
14                 Correct?
15                 MR. LEVINE:  Objection.
16                 THE WITNESS:  Yeah, that's a
17       specific that I believe that someone
18       stated.  And I -- you know, I guess I
19       say nitrogen purging displaces oxygen,
20       but the rest of that is absolutes that
21       I'm -- I guess I'm -- what was your
22       question?  I guess that whole --
23   QUESTIONS BY MS. KARIS:
24         Q.      Do you know to what extent or
25   degree it displaces oxygen?
```

1        A.      Well, part of that is on any

2    given project, on any given job, on any given

3    tank car or tank truck or drum loaded, how

4    much nitrogen, for how long, always drives

5    those concentrations down.  So the longer

6    they purge, the more they drive the

7    concentration of oxygen down.

8        Q.      Do you know what the condition

9    or circumstances were of the vinyl chloride

10   monomers that were on the five tank cars that

11   derailed?

12       A.      So I do remember Oxy shared

13   some of those details in that call with the

14   rental car -- in the cab of the rental car

15   conversation.

16              And either Terry Rockwell or I

17   or Chip brought up, like, well, what are your

18   thoughts when they've been venting since

19   Friday night?  And that's when things got

20   kind of quiet.

21       Q.      Did anybody mention to you that

22   Oxy did not believe that heat, or the

23   introduction of the heat to those tank cars,

24   was sufficient to polymerize that chemical?

25              MR. HANSON:  Objection.

John Andrew McCarty

```
 1              THE WITNESS:  There was
 2        somebody on the phone that tried to
 3        tell us things like that that led them
 4        to their belief.
 5              And again, we get back to
 6        there's a tremendous amount of heat
 7        here.  You're telling us you're only
 8        stabilizing with nitrogen.  Nitrogen
 9        left the car on Friday night with the
10        activation of the pressure relief
11        devices.
12              So we respect the input.  We
13        understand that's how they stabilize
14        them at the time of shipment.
15              But what -- we believe that,
16        you know, there might have been a
17        disconnect in engineering thoughts
18        from, you know, someone sitting, you
19        know, 2,000 miles away.  We believe
20        that they just weren't grasping that
21        we didn't believe nitrogen was in the
22        car anymore because of the conditions
23        in the field.
24   QUESTIONS BY MS. KARIS:
25        Q.    I want to talk a little bit
```

John Andrew McCarty

1    about that then.

2              You reached the conclusion,

3    even before you spoke to Oxy, that nitrogen

4    had left the cars Friday night with the

5    activation of the PRVs.

6              Correct?

7              MR. LEVINE:  Objection.

8              THE WITNESS:  That is a factual

9         behavior in any purged tank car in any

10        condition like that.  Anything in the

11        vapor space is a purged gas.  It's the

12        first thing to leave the car when a

13        PRD activates.

14   QUESTIONS BY MS. KARIS:

15        Q.    Mr. McCarty, respectfully,

16   rather than you speaking for the world, I

17   would like you to tell me what your belief

18   was.

19              So it was your view on Friday

20   night, that would be February 3rd, that

21   nitrogen had left the cars with the

22   activation of the PRV.

23              Is that correct?

24        A.    Any purged gas would have left

25   the car in those behaviors, yes, ma'am.

John Andrew McCarty

```
 1          Q.     All right.  Now, and you
 2   believe that the pressure relief valve
 3   devices activating is what caused the
 4   nitrogen to go right out of the car into the
 5   atmosphere.
 6               Correct?
 7          A.     That would have been the --
 8   what we call the top phase gas.  The
 9   specific -- or the vapor density of vinyl
10   chloride is heavier than nitrogen.  Nitrogen
11   would have been a purged gas on top of the
12   vinyl chloride.
13          Q.     Okay.
14          A.     It would have been the first to
15   leave the car.
16          Q.     Okay.  So now I want to explore
17   the concept of the PRD driving nitrogen right
18   out of the car to the atmosphere.
19               You agree that these tank cars
20   were under pressure post-derailment.
21               Correct?
22          A.     Yes.
23          Q.     There was no breach of the tank
24   cars post -- immediately post-derailment
25   until the vent and burn operations.
```

John Andrew McCarty

```
 1                Correct?
 2                MR. LEVINE:  Objection.
 3                THE WITNESS:  Correct.
 4     QUESTIONS BY MS. KARIS:
 5          Q.    You agree that post-derailment,
 6     when the PRDs were activating, it was the
 7     introduction of heat, or the fire, that was
 8     generating pressure inside the cars.
 9                Correct?
10          A.    No, ma'am.  Vinyl chloride has
11     its own vapor pressure.  Its chemistry has
12     its own vapor pressure in the cars.
13          Q.    What do you think was causing
14     the PRDs to activate?
15          A.    Early on, the pool fires under
16     the cars.
17          Q.    Okay.  And the pool fires under
18     the cars were generating heat.
19                Correct?
20          A.    Yes, ma'am.
21          Q.    Okay.  And so that heat that
22     was being introduced through those pool fires
23     under the cars was increasing the pressure in
24     the tank cars that were intact.
25                Correct?
```

John Andrew McCarty

```
1              A.      Yes, ma'am.

2              Q.      Okay.  And so what you have is

3      the pressure relief valve activating, so

4      you've got pressure from inside the tank

5      going out with the release of the PRV.

6                      Correct?

7              A.      Yes, ma'am.

8              Q.      And that's because the pressure

9      inside is higher than the pressure outside of

10     that tank car.

11                     Correct?

12             A.      Because -- I'm sorry, maybe

13     that's a twofold question.

14             Q.      Would you agree with me that

15     the pressure inside the tank cars was greater

16     than the atmospheric pressure?

17             A.      Oh, yes.  Yes.  Yes.  Yes.

18     Yes.

19             Q.      And when pressure drops to a

20     certain level, then the valve closes.

21                     Correct?

22             A.      That's what we observed, yes,

23     ma'am.

24             Q.      Okay.  Was there any point, in

25     your opinion, when you felt that the pressure
```

John Andrew McCarty

```
 1    inside the vessel wasn't greater than the

 2    pressure outside of the vessel?

 3         A.     No.  The chemistry of vinyl

 4    chloride, that would be like that every day

 5    of the week.

 6         Q.     Okay.  So pressure inside

 7    greater than pressure outside.

 8              Correct?

 9    A.     Yes.

10    Q.     Intact tank car.

11              Correct?

12    A.     Yes.

13         Q.     Okay.  You agree with me that

14    you can't have pressure flowing from a higher

15    pressure area to a lower pressure area.

16              Is that correct?

17    A.     In concept, yes, ma'am.

18         Q.     Okay.  Not only in concept; in

19    science and physics.

20              Correct?

21              MR. LEVINE:  Objection.

22              THE WITNESS:  Again, there's --

23         there's -- I -- there have been

24         documented case studies where in

25         things like PRD activations, things
```

John Andrew McCarty

1          have been formed in the interface of

2          oxygen, moisture, at the interfaces of

3          where chemical vapors release and

4          things reclose, and in the process of

5          reclosing, that momentary collection

6          of moisture or oxygen around that.

7     QUESTIONS BY MS. KARIS:

8          Q.     Tell me where those -- name any

9     of those case studies for me.

10         A.     I realize it's a broad-brush

11    statement.  That's a combination of a variety

12    of instructors and customers that have shared

13    with me over the years.

14              You know, you see things formed

15    around a sample jar with crystalline

16    formation.  The jar is closed, but yet that

17    vapor interface -- the interface of vapor in

18    the chemistry to the outside atmosphere does

19    some sort of chemical reaction there.

20              So it is a --

21         Q.     That jar is not pressurized the

22    way a tank car is, is it?

23         A.     No, ma'am.

24         Q.     Okay.  So tell me a situation

25    where a tank car that is pressurized has an

John Andrew McCarty

1    incident that you're aware of where higher

2    pressure flows to lower pressure area.

3            A.      Ma'am, I'm going on a variety

4    of customer travels.

5                    In my travels, they share case

6    studies of things getting gummed up, plugged

7    up, and they've explained it to me that at

8    the interface of a release, conditions can

9    change at that interface, is what I've been

10   taught in my travels.  And I'm sorry, I don't

11   have a specific reference for you.

12           Q.      Have you ever received any

13   training, formal training -- not what

14   customers tell you they think happened; any

15   formal training -- that supports the

16   proposition that in a pressurized vessel you

17   can have pressure flowing from a higher

18   pressure area to a lower pressure area?

19           A.      No formal training as such, no,

20   ma'am.

21           Q.      Have you read any peer-reviewed

22   studies that support the proposition that you

23   can have pressure flowing from a higher

24   pressure area to a lower pressure area in a

25   pressurized vessel such as a tank car?

John Andrew McCarty

```
1          A.      No, ma'am.
2          Q.      Okay.  Leaving aside then what
3   your customers may have anecdotally told you,
4   are you aware of any scientifically accepted
5   principle or study that supports that you
6   could have pressure flowing from a higher
7   pressure area to a lower pressure area?
8          A.      No, ma'am.
9          Q.      Okay.  You would agree that
10  fluids flow from a higher pressure to a lower
11  pressure in a system, correct?
12                 In a pressurized system,
13  correct?
14         A.      Yes, ma'am.
15         Q.      Okay.  When the PRDs were
16  activated, to your knowledge, at any point
17  did the pressure outside exceed the pressure
18  inside to allow for flow into the pressurized
19  tank cars?
20         A.      No, ma'am.
21         Q.      You agree as a general
22  proposition that you would need higher
23  pressure outside to allow for the flow into
24  the tank cars.
25                 Correct?
```

John Andrew McCarty

```
 1                 MR. LEVINE:  Objection.

 2                 THE WITNESS:  I'm sorry, can

 3       you please repeat that question?  It

 4       was kind of a unique question.

 5   QUESTIONS BY MS. KARIS:

 6       Q.    Sure.

 7                 You need higher pressure

 8   outside the tank cars than inside the tank

 9   cars to allow for flow into the tank cars.

10                 Correct?

11       A.    Yes, ma'am.

12                 MR. LEVINE:  Objection.

13   QUESTIONS BY MS. KARIS:

14       Q.    Okay.  Mr. McCarty, you

15   mentioned nitrogen a couple of times.

16                 Would you agree nitrogen isn't

17   being used to stabilize VCM?

18       A.    Please repeat your question?

19       Q.    Sure.

20                 Is it the purging of the oxygen

21   that causes the stabilization, or is it the

22   introduction of the nitrogen?

23       A.    From what --

24                 MR. LEVINE:  Objection.

25                 THE WITNESS:  From what we were
```

John Andrew McCarty

```
 1          told, Oxy was using nitrogen to purge
 2          the oxygen.  Nitrogen inert gas.
 3     QUESTIONS BY MS. KARIS:
 4          Q.     Okay.
 5          A.     So they're one -- it's a means
 6     to an end.  They use nitrogen to deplete
 7     oxygen.
 8          Q.     Right.  They use nitrogen to
 9     deplete the oxygen.
10               Correct?
11          A.     That's my understanding.
12          Q.     But it's the depletion of the
13     oxygen that causes the stabilization.
14               Correct?
15          A.     So we've been told by Oxy, yes,
16     ma'am.
17          Q.     And so when the PRVs are
18     released and the nitrogen is purged, as you
19     have told us --
20               Are you with me?
21          A.     So far.
22          Q.     -- how is nitrogen getting
23     introduced into the tank car?
24               MR. HANSON:  Objection.
25               THE WITNESS:  Oxy -- well, I
```

John Andrew McCarty

```
 1          can -- Oxy put it there at the time of

 2          shipping.  It was already in the car.

 3   QUESTIONS BY MS. KARIS:

 4          Q.    But it's in a pressurized

 5   vessel.

 6                Correct?

 7          A.    Yes, ma'am.

 8          Q.    Oxygen has to flow back into

 9   that pressurized vessel.

10                Correct?

11                MR. LEVINE:  Objection.

12                THE WITNESS:  No.

13   QUESTIONS BY MS. KARIS:

14          Q.    So it's your view that when the

15   nitrogen gets purged, the end result is that

16   the oxygen actually increases in the vessel.

17                Is that correct?

18                MR. HANSON:  Objection.

19                THE WITNESS:  As I say, every

20          time that PRD cycles, at the interface

21          there's absolutely a chance that as

22          that PRD recloses, atmospheric oxygen

23          and air influence that sealing

24          surface.  And that active gap opening

25          with every bad elastomer, everything
```

John Andrew McCarty

```
1              in the free radicals of fire burning,

2              that's the fundamental place where it

3              can occur.  And I've been told that by

4              a number of customers over my years.

5       QUESTIONS BY MS. KARIS:

6         Q.     Okay.  So you say there's

7       absolutely a chance that the PRD, when it

8       recloses, that introduce -- that that

9       introduces atmospheric oxygen.

10              Is that right?

11        A.     We're starting to split hairs

12      here.

13        Q.     I thought I read back your

14      answer straight from the transcript.

15        A.     It doesn't have to necessarily

16      go down into the car, and I never said that

17      it did.  It's the interface where the melted

18      gaskets, elastomers, in this case, PRD

19      O-rings, it's at that interface of leak,

20      super-seated gases, fire and reclosing,

21      there's a lot of dynamics going on there.

22              And I've had clients for all my

23      career in periodic cases of in-the-plant

24      accidents and -- where they found evidence in

25      these interface areas, is my combined
```

John Andrew McCarty

```
1    experience over 30-some years.
2         Q.     Leaving aside what your
3    customers tell you, have you ever done any
4    studies to determine whether that is
5    possible?
6         A.     No.
7         Q.     Have you ever collected any
8    data or undertaken any scientific analysis to
9    determine whether that is possible?
10        A.     I have not personally, no.
11        Q.     You're relying on what your
12   customers have told you.
13               Is that correct?
14        A.     (Witness nods head.)
15               MR. HANSON:  You have to say
16        your answer.
17               THE WITNESS:  I'm sorry, yes,
18        ma'am.
19   QUESTIONS BY MS. KARIS:
20        Q.     And do you know what, if any,
21   studies your customers have undertaken for
22   this proposition that you introduced about
23   oxygen being introduced at the interface when
24   a PRV valve opens and then recloses?
25               MR. LEVINE:  Objection.
```

John Andrew McCarty

```
 1                    THE WITNESS:  I'm sorry,
 2          restate your question.
 3     QUESTIONS BY MS. KARIS:
 4          Q.      Do you know what, if any,
 5     studies your customers have undertaken for
 6     this proposition that they told you about?
 7          A.      I may not specifically.  Just
 8     case studies after the fact and sharing for
 9     safety.
10          Q.      Okay.  Case studies that they
11     themselves have performed?
12          A.      Yes, ma'am.
13          Q.      And have you looked at the
14     analysis of those case studies?
15          A.      Not in detail.  Just attended
16     their training sessions.
17          Q.      Right.
18                  Have you -- have they published
19     those case studies in any literature that one
20     could go see to see if they're reliable?
21          A.      I don't know.
22          Q.      Have you yourself ever
23     published or undertaken any study to
24     determine how polymerization takes place?
25          A.      No, ma'am.
```

John Andrew McCarty

1      Q.      I told you at the beginning
2  that I represent GATX.
3              Did you know that one of the
4  vinyl chloride monomer cars that was involved
5  in the derailment, GATX95098, was owned by
6  GATX?
7      A.      In my experience, the first
8  reporting marks generally indicate ownership
9  of cars, but I guess I know cars can be
10  bought and sold.
11             So that would be a presumption
12  on my part, that General American would own
13  that car.
14     Q.      Did you ever reach out to
15  anybody at GATX at any time from February 3rd
16  of 2023, until today in connection with this
17  event?
18     A.      No, ma'am.
19     Q.      Have you undertaken any
20  analysis to determine what, if anything, GATX
21  did wrong in connection with this incident?
22     A.      No, ma'am.
23     Q.      Sitting here today, you have no
24  opinion as to whether my client did anything
25  wrong.

John Andrew McCarty

```
 1              Correct?

 2      A.      I have no opinion on that,

 3   ma'am, no.

 4      Q.      Okay.  Were you aware that

 5   Norfolk Southern sued GATX?

 6      A.      Only by media announcement

 7   and this subpoena to be here with you today

 8   and yesterday.

 9      Q.      Okay.  Now, did anybody discuss

10   with you any of Norfolk Southern's -- leaving

11   aside conversations with lawyers.  But did

12   anybody ever discuss with you any issues with

13   respect to any paper discrepancies of

14   GATX95098?

15      A.      The only knowledge I had prior

16   to yesterday and today was Randy Keltz's

17   testimony in panel 4 in June where I heard

18   him kind of use the phase, paper didn't match

19   car, car didn't match paper.

20              And even to qualify my answer

21   today, I am not clear on which cars he was

22   talking about, whether it was a GA and

23   Occidental or a TILX.  I just -- I know that

24   was out there at the hearings.

25      Q.      Fair enough.
```

John Andrew McCarty

1          So you would agree that

2     whatever discrepancies Mr. Keltz identified,

3     whether they exist or not, they had nothing

4     to do with any of the decisions or

5     recommendations you made in connection with

6     the vent and burn operations.

7          Correct?

8     A.     As we analyzed our tactical

9     options and discussed those options with the

10    Norfolk Southern HAZMAT staff, the nuances

11    of, you know, what was found out after the

12    fact in terms of car matched paper, paper

13    matched car, had no bearing on the

14    discussions with the Norfolk Southern

15    hazardous materials team during that weekend.

16    Q.     Okay.  So just to be crystal

17    clear, any issues with respect to the

18    paperwork of GATX95098 had no bearing

19    whatsoever on any of the discussions that you

20    had from February 3rd through the time of the

21    vent and burn operations.

22         Correct?

23    A.     Speaking for myself personally

24    and SPSI as a whole, we weren't privy to any

25    discussions about any of that kind of

1    paperwork.

2        Q.    And for all of those thousands

3    of hours that you have spent on this

4    project --

5        A.    Bless you.

6        Q.    -- have you heard anybody say

7    that they made any decision on February 3rd

8    through February 6th based on the paperwork

9    of GATX95098?

10       A.    No, ma'am, I never heard those

11   words.

12       Q.    So not only did you not make

13   any decisions, you haven't even heard anybody

14   say that any decision was made based on that

15   paperwork.

16           Correct?

17       A.    That's -- correct.

18       Q.    You testified yesterday in

19   response to one question that you had heard

20   something about the wheel bearing of one of

21   the cars causing the derailment.

22           Correct?

23       A.    Yes, ma'am.

24       Q.    You have reached no opinions or

25   conclusions as to what caused that wheel

John Andrew McCarty

```
1    bearing to fail.

2                 Correct?

3         A.     No, ma'am.

4         Q.     You don't know whether Norfolk

5    Southern failed to perform a required

6    inspection that led to that wheel bearing

7    failure.

8                 Correct?

9         A.     No, ma'am.

10        Q.     And you don't know whether

11   Norfolk Southern failed to perform a

12   mechanical inspection on any of those cars

13   that were in the derailment.

14                Correct?

15        A.     No, ma'am.

16        Q.     Are you familiar with something

17   called a wayside detector?

18        A.     I learned about them through

19   East Palestine hearings, that panel that

20   talked about all that.  I learned a lot about

21   that, just in general.

22        Q.     You didn't know anything about

23   them before then?

24        A.     I knew they existed, but in my

25   role as a hazardous materials emergency
```

1    responder, environmental contractor, that's

2    not like the -- you know, I'm not a

3    railroader that moves freight.

4        Q.    All right.  A couple more

5    questions, and I think I'll be out of time

6    any minute here.

7              You testified yesterday that

8    you concluded that the valve of a car or

9    multiple cars had not activated for some time

10   and that that could have been because the PRD

11   was gummed up.

12             Do you recall that testimony?

13       A.    I can't remember which part of

14   yesterday's testimony, but if you're -- I

15   guess can you rephrase your question?

16       Q.    Sure.

17       A.    I just to make sure I get your

18   question.

19       Q.    I believe you said, at least

20   with respect to the car that made the hissing

21   sound that you described that then had the

22   70-minute consecutive release, you concluded

23   that that car had a PRV that had been gummed

24   up.

25             Is that correct?

John Andrew McCarty

1          MR. LEVINE:  Objection.

2          THE WITNESS:  It was one

3     possibility.

4          And for the clarity of sequence

5     to your question, the audible hiss

6     coincided with during that 70 minutes,

7     not one before the other, just for

8     clarity.

9          And, yes, that pressure relief

10    device had been functioning at a much

11    lower pressure, functioning, cycling,

12    functioning, cycling, functioning,

13    cycling, and then didn't.  And all the

14    sudden -- essentially got stuck.

15 QUESTIONS BY MS. KARIS:

16    Q.     Okay.

17    A.     It was stuck until it was

18 unstuck.

19          And during a relatively narrow

20 time window, it had accumulated a whole lot

21 of pressure in that car when there wasn't an

22 aggressive pool fire under the car anymore.

23    Q.     Okay.  Did you reach any

24 conclusions as to whether the pressure relief

25 valve for my client's car, 95098, whether

1    that valve had been stuck at any point?

2         A.      "Conclusions" is a strong word.

3    But deductive reasoning and risk management

4    consideration, the consideration was if the

5    car right next to it just behaved this way

6    and had been paralleling behavior for hours

7    prior, we had to believe for everybody's

8    safety that the GA car could have done the

9    same thing at any moment.

10        Q.      Okay.

11        A.      That was our line of thinking.

12        Q.      So what you believed is, it may

13   have done the same thing at any moment.

14              Correct?

15        A.      Yes, ma'am.

16        Q.      But you would agree with me,

17   from February 5th through the time of the

18   vent and burn on February 6th, you were not

19   aware of anybody saying that the GATX car

20   pressure relief valve performed in that same

21   way.

22              Correct?

23              MR. LEVINE:  Objection.

24              THE WITNESS:  In the same way

25        as...

John Andrew McCarty

```
1    QUESTIONS BY MS. KARIS:
2         Q.    A sudden release, as you
3    described yesterday, from increased pressure
4    for an extended period of time.
5         A.    I guess I'm going to share
6    fact-based.  It never activated again.
7         Q.    Okay.
8         A.    But it could have been stuck.
9         Q.    Right.
10              So it could have been stuck.
11              Correct?
12        A.    Yes.
13        Q.    But what you do know fact-based
14   is it never activated again.
15              Correct?
16        A.    That's correct.
17        Q.    And could have been stuck is
18   one possibility.
19              Correct?
20        A.    That's right.
21        Q.    Another possibility is that the
22   pressure never got high enough again to
23   activate the pressure relief valve.
24              Correct?
25        A.    It is a possibility.
```

1      Q.     Okay.  And you didn't undertake

2   any study to determine which of those

3   scenarios was the actual case.

4           Correct?

5           MR. LEVINE:  Objection.

6           THE WITNESS:  We considered

7        tactics to get in there and gathering

8        data, which we were starting to try to

9        do in those Saturday afternoon hours

10       when the 30th car behaved the way it

11       did and drove us out of the hot zone.

12   QUESTIONS BY MS. KARIS:

13      Q.     Mr. McCarty, respectfully, is

14   it correct that you did not undertake any

15   study to determine which of the scenarios we

16   talked about was what caused the PRV valve on

17   GATX95098 to not activate again?

18           MR. LEVINE:  Objection.

19           MR. HANSON:  Objection.

20           THE WITNESS:  I think I just

21       answered that.

22   QUESTIONS BY MS. KARIS:

23      Q.     Is that a yes or no?

24           You told me you went back into

25   the other car.  You saw how it behaved.

John Andrew McCarty

```
 1    That's what caused you to move back.

 2            But my question is, does that

 3    mean, therefore, you never did a study of

 4    GATX95098?

 5            MR. HANSON:  I apologize.

 6        Objection.

 7            THE WITNESS:  Yeah, that's not

 8        how I responded.

 9            So for clarity, when the PRDs

10        had calmed down, and so did the fires,

11        we initiated efforts on exactly what

12        you're asking me.  And before the

13        entry team could get to the GATX car,

14        the event that took place on the

15        afternoon of Saturday with the 30th

16        car occurred.  And the moment that

17        occurred, the efforts were suspended

18        and never resumed.

19    QUESTIONS BY MS. KARIS:

20        Q.    Okay.  So from February 5th,

21    when the event on the car that you were

22    describing took place, through the time of

23    the vent and burn, those efforts were never

24    resumed to determine what was causing the PRV

25    valve on GATX95098 to not activate.
```

```
 1              Correct?

 2              MS. HERLIHY:  Objection.  Form.

 3              MR. HANSON:  Objection.

 4              THE WITNESS:  Say, hearing you

 5         read that back to me, and I realize

 6         that's what I said, I want to qualify.

 7              Norfolk Southern's request of

 8         us with the temperature reading

 9         attempts would have been a way to try

10         to get that assessment.  So I can't

11         say that we didn't try.

12              You're asking me if we tried to

13         do that.  I can't say we didn't try.

14    QUESTIONS BY MS. KARIS:

15         Q.    I don't know that I said "try,"

16    and if I did --

17         A.    If I misunderstood the

18    question --

19         Q.    Let me repeat the question.

20              You never did a study to

21    determine what caused GATX95098 to not -- the

22    pressure relief valve to not activate again

23    on February 5th or February 6th before the

24    vent and burn?

25              MR. HANSON:  Objection.
```

John Andrew McCarty

```
 1                    THE WITNESS:  Yeah, so you say
 2         study.  I think assessment is -- can
 3         you help me understand if -- can you
 4         define the word "study" in your mind,
 5         what you --
 6    QUESTIONS BY MS. KARIS:
 7         Q.    I'm going to move on in the
 8    interest of time.
 9         A.    Okay.
10         Q.    Is it fair to say any work that
11    you did, you would have reported that to
12    incident command or somebody at Norfolk
13    Southern?
14         A.    Not incident command.  Norfolk
15    Southern.
16         Q.    Okay.  Would you agree with me
17    that a decision to vent and burn a railcar is
18    a significant decision that has serious
19    consequences?
20         A.    Serious decision, yes.
21               I can absolutely debate the
22    comment you make on serious consequences.  I
23    think that's subjective.
24         Q.    Okay.  You knew when you were
25    supporting the recommendation, if that's how
```

John Andrew McCarty

```
1    you want to call it, that you would be
2    releasing hazardous substances into the
3    environment as a result of the vent and burn.
4              Correct?
5    A.      Yes, ma'am.
6    Q.      And you knew, therefore, it was
7    important to get it right in terms of whether
8    a vent and burn was necessary.
9              Correct?
10             MR. LEVINE:  Objection.
11             THE WITNESS:  I think it was
12        important to execute the vent and burn
13        correctly.
14   QUESTIONS BY MS. KARIS:
15   Q.      It was equally important to
16   make the right decision on whether to vent
17   and burn.
18             Correct?
19             MR. LEVINE:  Objection.
20             THE WITNESS:  That was the
21        correct decision.
22   QUESTIONS BY MS. KARIS:
23   Q.      Mr. McCarty, respectfully,
24   that's not my question.
25             You knew that it was important
```

John Andrew McCarty

1    to make the right decision on whether to vent

2    and burn.

3            A.      Well, to clarify --

4                    MR. LEVINE:  Objection.

5                    THE WITNESS:  -- ma'am, with

6            all due respect, that wasn't my

7            decision.

8    QUESTIONS BY MS. KARIS:

9            Q.      When you supported the

10   decision -- is that an accurate way of

11   putting it, first of all?

12           A.      Yes.

13           Q.      Okay.  When you supported the

14   decision to go forward with the vent and burn

15   in a populated area, would you agree with me

16   that it was important for that decision to be

17   the correct decision?

18                   MR. HANSON:  Objection.

19                   THE WITNESS:  Yes.

20   QUESTIONS BY MS. KARIS:

21           Q.      And if you did not think that

22   polymerization was occurring, you would not

23   have supported vent and burn.

24           Correct?

25                   MR. LEVINE:  Objection.

John Andrew McCarty

```
1              THE WITNESS:  It's not

2         necessarily the case.  As I testified

3         in June, that was just simply one

4         variable in a complex recipe of risk

5         assessment.

6    QUESTIONS BY MS. KARIS:

7         Q.     Okay.  And would you say that

8    the risk of polymerization -- strike that.

9              The view that polymerization

10   was occurring was a significant variable in

11   what you described a complex recipe of risk

12   assessment?

13             MR. HANSON:  Objection.

14             THE WITNESS:  And please

15        forgive me for asking you to repeat

16        this again, but it's an important

17        question.  I want to make sure I heard

18        it good.

19             Can you -- do you mind

20        repeating the question?

21   QUESTIONS BY MS. KARIS:

22        Q.     Your belief that polymerization

23   was occurring, was that a significant

24   variable in what you described to be a

25   complex recipe of risk assessment?
```

John Andrew McCarty

```
 1              MR. LEVINE:  Objection.
 2              THE WITNESS:  It was a
 3        variable.
 4    QUESTIONS BY MS. KARIS:
 5        Q.    Okay.  I didn't ask whether it
 6    was a variable.  I asked if it was a
 7    significant variable.
 8              Can you say one way or the
 9    other?
10              MR. LEVINE:  Objection.
11              THE WITNESS:  It was a
12        significant variable.
13    QUESTIONS BY MS. KARIS:
14        Q.    Would you agree that the
15    decision to vent and burn is a choice of last
16    resort?
17        A.    Yes, ma'am.
18        Q.    Do you know William Carol, a
19    professor at Indiana, a former employee of
20    Oxy Vinyls?
21        A.    I do not know him personally.
22    If it's who I think it is, I believe he was a
23    gentleman they had testifying in East
24    Palestine in June, I believe.
25        Q.    Okay.  Did you speak to him at
```

John Andrew McCarty

1    all at those hearings?

2         A.    I don't think I did.  If at

3    all, it might have been a handshake in the

4    parking lot with a cup of coffee on the way

5    into the building, but I don't recall meeting

6    him, no.

7         Q.    Okay.  Fair to say you don't

8    know anything about his credentials or

9    qualifications?

10        A.    Only what was introduced at the

11   hearings.

12        Q.    Okay.  Different subject.  Last

13   topic.

14              You told us earlier this

15   morning, in fact I think you started there,

16   saying that you've made 100 and -- your

17   company has made 157 million from --

18        A.    Not made, no, ma'am.  That was

19   gross sales.

20        Q.    Billed.  Gross sales.

21        A.    Yes, ma'am.

22        Q.    Okay.  And I think you said

23   earlier you're not sure quite what your

24   billing rate is.

25              Correct?

John Andrew McCarty

```
 1          A.      I don't remember.  No.

 2          Q.      But you are billing at your

 3     hourly rate to sit and testify these past two

 4     days.

 5                  Correct?

 6          A.      Yes, ma'am.

 7          Q.      And every time that you've

 8     testified regarding this incident, you are

 9     being paid for it.

10                  Correct?

11          A.      Yes, ma'am.

12          Q.      And every hour that you've

13     spent getting ready to testify, you've billed

14     for that, too.

15                  Correct?

16          A.      Yes, ma'am.

17                  MS. KARIS:  I have no further

18          questions at this time.  Thank you.

19                  And I'm going to pass.

20                  VIDEOGRAPHER:  We are off the

21          record at 11:53.

22           (Off the record at 11:53 a.m.)

23                  VIDEOGRAPHER:  We are now back

24          on the record at 12:07.

25                  REDIRECT EXAMINATION
```

1    QUESTIONS BY MR. GOMEZ:

2         Q.    Mr. McCarty, thanks for

3    speaking with me again.  I have a few

4    follow-up questions based off of some of the

5    questions that were asked by the other

6    attorneys.

7              You just had a fairly detailed

8    discussion with Ms. Karis about pressure

9    relief devices and nitrogen be expelled.

10             Fair to say you remember that,

11   right?

12        A.    Yes.

13        Q.    And if I heard you correctly,

14   one of the concerns with nitrogen being

15   expelled in that process is that as the

16   pressure relief devices close, there can be

17   some oxygen infiltration in that interface

18   area.

19             Is that correct?

20        A.    Yes.

21        Q.    Do you have any training,

22   knowledge or experience indicating how much

23   oxygen infiltrates when the pressure relief

24   device closes?

25        A.    No.

John Andrew McCarty

```
 1          Q.      Did you receive any information
 2    to that effect between February 3rd and
 3    February 6th in connection with the VCM PRDs
 4    activating in East Palestine?
 5          A.      No.
 6          Q.      Do you have any training,
 7    knowledge or experience regarding the amount
 8    of oxygen that would have to be introduced to
 9    a VCM railcar in order to effect
10    polymerization of that chemical?
11          A.      Not specifically, no.
12          Q.      And fair to say that you also
13    did not receive any information to that
14    effect between February 3rd and February 6th
15    in connection with the PRDs activating in
16    East Palestine?
17          A.      I'm sorry.  Repeat the
18    question.  I don't mean to ask you to repeat,
19    but --
20          Q.      No problem.
21          A.      I want to keep up.  I just want
22    to make sure I'm catching it.
23          Q.      Yeah.  So I'll just rephrase it
24    to make sure we're on the same page.
25                  Did you receive any information
```

John Andrew McCarty

1    indicating how much oxygen infiltrates that

2    interface of the PRD between February 3rd and

3    February 6th while responding to the East

4    Palestine derailment?

5         A.     No.

6         Q.     Do you have any knowledge,

7    training or experience regarding the rate at

8    which oxygen has to be introduced to VCM in

9    order to effect a polymerization reaction?

10              MS. HERLIHY:  Object to the

11         form.

12              THE WITNESS:  Not in specific

13         concentrations, no.

14   QUESTIONS BY MR. GOMEZ:

15        Q.     Fair to say you did not receive

16   any information between February 3rd and

17   February 6th regarding the rate at which

18   oxygen would need to be introduced to VCM to

19   effect polymerization, if at all?

20        A.     That's a correct statement.

21        Q.     If you felt that you needed

22   information along the lines of oxygen

23   infiltration rates, the amount of oxygen

24   that's needed to impact the polymerization of

25   VCM, if at all, while in the field for any

1    given HAZMAT incident, how would you go about

2    getting that information?

3                    MR. LEVINE:  Objection.

4                    THE WITNESS:  That's the kind

5         of stuff that the producers can offer.

6    QUESTIONS BY MR. GOMEZ:

7         Q.    "The producers" meaning the

8    product manufacturer?

9         A.    Yes.

10        Q.    Is that fair?

11               So if we take that and apply it

12   to East Palestine, it would have been Oxy

13   that would have been able to provide that

14   information.

15               Right?

16                    MR. LEVINE:  Objection.

17                    THE WITNESS:  I would hope so,

18        yes.

19   QUESTIONS BY MR. GOMEZ:

20        Q.    At any point in time, did you

21   request that type of information from Oxy in

22   connection with the East Palestine

23   derailment?

24        A.    No.

25        Q.    Did you believe information

John Andrew McCarty

1    regarding the oxygen infiltration rate and

2    the amount of oxygen that might infiltrate

3    via a PRD closing was relevant to the

4    question of whether polymerization was

5    occurring in the VCM railcars between

6    February 3rd and February 6th?

7         A.    I'm going to apologize again.

8    That was a long question.  And I'm sorry.

9    Just kind of segment that out for me, again,

10   please.

11        Q.    Sure.  I'm going to read it

12   back and then break it up if we need to.

13            Okay?

14        A.    Okay.

15        Q.    Did you believe that -- did you

16   believe that information regarding oxygen

17   infiltration rate via a PRD was relevant to

18   the question of whether polymerization was

19   occurring in the VCM railcars between

20   February 3rd and February 6th?

21        A.    I'm going to be very careful

22   how I answer.

23            I didn't think that the -- the

24   explicit details of those scientific

25   calculations would have been necessary given

1    the environmental conditions that we were all

2    faced with in East Palestine.

3         Q.    And what specific environmental

4    conditions are you referring to in that

5    response?

6         A.    The tremendous pool fires,

7    sustained pool fires.  And I guess to take

8    the answer to -- the conclusion of the answer

9    is, in a hypothetical, even if I would have

10   asked for that data, we had no way to measure

11   it.  So it was -- there would have been no

12   way to measure that.

13        Q.    So because ultimately there

14   wouldn't have been a way to quantity that in

15   the field, the relevance of that information

16   wasn't as strong.

17             Is that a fair

18   characterization?

19             MR. LEVINE:  Objection.

20             THE WITNESS:  Right.  Whether

21        someone said it on the phone or we

22        found it in a stack of data, there

23        would have been no way to quantify it.

24   QUESTIONS BY MR. GOMEZ:

25        Q.    But the concept that oxygen

John Andrew McCarty

1     could be infiltrating the VCM cars as the

2     PRDs were activating was something you were

3     mindful of when considering whether the cars

4     were actually undergoing polymerization.

5                    Is that fair?

6          A.     That was another long question.

7                    If you're asking me about that

8     interface that I described in the last lady

9     that was inquiring --

10         Q.     Ms. Karis?

11         A.     Is that what you're asking?

12         Q.     Let me read it back, and if we

13    have to break it up, we'll break it up.

14                    But is it fair that the concept

15    that oxygen could be infiltrating the VCM

16    cars as the PRDs were activating was

17    something you were mindful of when

18    considering whether the cars were actually

19    undergoing polymerization?

20                    MR. LEVINE:  Objection.

21                    THE WITNESS:  It's the latter

22             part of, I guess, the concept at the

23             front of your question, and you're

24             saying the act of polymerization at

25             the end of your question that's

1          confusing my mind right now and how

2          the question is being -- I guess I'm

3          not sure -- I hate to ask you to do it

4          one more time.  Yeah, I'm sorry.  It

5          just seems to be -- not finding --

6          following the question.

7     QUESTIONS BY MR. GOMEZ:

8          Q.    Let me try and break it up and

9     see if we can get on the same page.

10              Fair to say that one of the

11    challenges of the East Palestine derailment

12    was determining whether there was a

13    possibility of polymerization in the VCM

14    cars.

15              Right?

16         A.    Yes, that was certainly a risk.

17         Q.    And there were several factors

18    or conditions that you were considering when

19    trying to assess the risk for polymerization

20    in the VCM cars.

21              Right?

22         A.    Yes.

23         Q.    Was the concept that oxygen can

24    infiltrate the VCM cars via the PRD, as

25    you've described, one of those variables or

John Andrew McCarty

1    conditions you were mindful of when assessing

2    the risk for polymerization?

3         A.      To clarify, at the interface,

4    that's where I think the previous questioning

5    and testimony was -- I appreciated it to

6    clarify the phenomenon.  It was really at the

7    interface during those cyclings and in the

8    process of the actual burning at those

9    interfaces.

10              The process of fire is a

11   process of free radical behavior that all --

12   you need oxygen for fire.  So it was

13   inherently present all around those

14   interfaces.

15              So I know it's a long way to

16   answer your question, but that's what I'm on

17   the record.

18        Q.      Okay.  So the presence or

19   existence of oxygen at that interface, as

20   you've called it, was a factor that you were

21   mindful of in assessing the condition of the

22   railcars.

23              Right?

24        A.      Yes.

25        Q.      And the condition of the

John Andrew McCarty

1    railcars, including the possibility for

2    polymerization.

3             Right?

4    A.      Yes.

5    Q.      I want to bring back up Exhibit

6    Number 11, which should be in your stack,

7    hopefully.

8             MR. HANSON:  Mr. Gomez, can you

9        just tell him which one it is?  Like

10       what the content is?

11            MR. GOMEZ:  Sure.  It's the

12       February 5, 2023 afternoon entry

13       findings that were discussed a little

14       bit earlier with Ms. Herlihy.

15            THE WITNESS:  I'm looking.  I

16       know it's in here somewhere.  Sorry.

17            It's got to be here, right?

18       I'd say it's 11.  This is 18.

19            MR. LEVINE:  It --

20            MR. GOMEZ:  It may have been

21       marked -- yeah.  We can refer to 18,

22       Mr. McCarty.

23            THE WITNESS:  I have it.

24            MR. GOMEZ:  It's not a problem.

25

1    QUESTIONS BY MR. GOMEZ:

2         Q.    At least if we're referring to

3    it as 18, it's my understanding that the

4    2/5/23 afternoon entry findings is the latter

5    part of that document.

6              Is that correct?

7         A.    When you say the latter part of

8    the afternoon, I'm looking towards the bottom

9    where it says OCPX080370 at like 16:30 hours.

10        Q.    Sorry, I may have misspoken.  I

11   just want to orient you in terms of the

12   exhibit.

13             The afternoon entry findings

14   are the latter pages of the exhibit, not

15   latter afternoon.

16        A.    I'm sorry.

17        Q.    That's fine.  It's been a long

18   couple of days.  I want to make sure we're

19   talking about the same document.

20        A.    Okay.

21             MR. LEVINE:  Adam, can I ask

22        for clarity?  Which exhibit are you

23        looking at now?  What is the sticker?

24             MR. GOMEZ:  It's 18.

25             MR. LEVINE:  Got it.  Okay.

```
 1              MR. GOMEZ:  And I'm referring
 2         to the portion of 18 that was also
 3         marked as 11.
 4              And just for everyone's
 5         edification, the Bates numbers are
 6         SPSI 001747 to 1748.
 7              MR. LEVINE:  Just trying to
 8         keep it clear.
 9              MR. GOMEZ:  No, I get it.
10    QUESTIONS BY MR. GOMEZ:
11         Q.    Now, you, if I recall correctly
12    from Ms. Herlihy's questions, one of your
13    undertakings last night was to speak with
14    several supervisors regarding the contents of
15    this document.
16              Is that fair?
17         A.    A couple key points that were
18    surprising to me yesterday, yes.
19         Q.    Okay.  And you spoke to
20    supervisors regarding those key points that
21    stood out to you yesterday when you and I
22    were discussing the document.
23              Fair?
24         A.    Fair.
25         Q.    I want to make sure I have the
```

1    folks that you spoke with correctly, and if I

2    mispronounce anyone's names, my apologies.

3              The first person you noted was

4    D'Shawn Herrera?

5         A.    Yes.

6         Q.    You also noted Blaise

7    MacDonald?

8         A.    Yes.

9         Q.    You noted Connor Fritz?

10        A.    Yes.

11        Q.    Greg Palmer as well?

12        A.    Greg Palmer.

13              But to clarify, he never took

14   any readings.  He was relaying information

15   from the guys in the field to Jon Simpson.

16   So he wouldn't have been the one with the

17   thermometer, but he was the night shift

18   safety guy.

19        Q.    Understood.

20              And just for purposes of my

21   questioning, he's someone you spoke to last

22   night regarding the document we have in front

23   of you?

24        A.    Yes, sir.

25        Q.    Alex Klepsic?

John Andrew McCarty

```
 1          A.      Yes.

 2          Q.      That's another one.

 3                  Right?

 4          A.      Yes.

 5          Q.      You also spoke with Charles

 6     Filby?

 7          A.      Yes.  Actually just this

 8     morning.  Charles was already sleeping when I

 9     tried him last night.

10          Q.      Okay.  You also spoke with

11     Max -- and I don't want to pronounce his last

12     name.

13          A.      I'm with you there.

14                  Kalchthaler is the best I got.

15          Q.      Okay.  And the last person that

16     I noted was Mike Burket.

17                  Is that correct?

18          A.      Yes.

19                  And Mike Burket, for the record

20     never did any readings himself.  He authored

21     this summary on my request.  And that's how

22     Michael Burket -- and that's why I called

23     him.

24                  And I called Mike Kline last

25     night, too, because Mike was kind of my lead
```

1    guy, has been my lead guy, there since I

2    transitioned off the site.

3              So -- and Mike was, you know,

4    part of this relay of information as well,

5    but never did any of the readings himself.

6         Q.    Other than the list that we

7    just went through and the addition of Mike

8    Kline, was there anyone else that you spoke

9    to last night or this morning regarding the

10   portion of Exhibit 18 that we're discussing

11   now?

12        A.    No.

13        Q.    Okay.  If that's the case, you

14   did not speak to Ryan Tokarski regarding

15   this --

16        A.    Oh, I'm sorry.  I'm sorry.

17   Ryan and Cody Tokarski should be names on

18   this list.  Thank you.  Thank you for that

19   question.  I don't mean to omit them.

20             So the earlier -- please

21   reflect the earlier -- I accidentally

22   omitted, yes, Ryan Tokarski and his brother

23   Cody were also both guys -- Ryan was the

24   first one to take the readings.  D'Shawn was

25   the second crew.

1                Thank you for the question.

2        Q.    Okay.  So Ryan Tokarski is an

3    additional person, and then his brother is --

4        A.    His brother Cody.

5        Q.    Cody?

6        A.    Yes.

7        Q.    Also last name Tokarski?

8        A.    Yes.

9        Q.    We discussed briefly, if you

10   recall, Ryan Tokarski yesterday.

11                Right?

12       A.    Yes.

13       Q.    Ryan Tokarski is one of your

14   senior operations managers.

15                Is that right?

16       A.    Senior field guy.  He's --

17   we've -- he's actually now my number one

18   program service manager since then.  But he's

19   one of my most senior guys that's been with

20   me a long time.

21       Q.    At the time of the derailment,

22   February 3, 2023, was Mr. Ryan Tokarski still

23   one of your senior guys?

24       A.    Yes.

25       Q.    And Mr. Tokarski -- when I

John Andrew McCarty

1    refer to Mr. Tokarski, it's going to be Ryan,

2    not Cody.

3        A.    Yes.

4        Q.    Mr. Tokarski was one of the

5    SPSI personnel who first responded to the

6    derailment alongside you.

7              Right?

8        A.    Yes.

9        Q.    I think he may have actually

10   beat you there.

11             Is that correct?

12       A.    He was there slightly before

13   me, yes.

14       Q.    And yesterday we discussed a

15   statement that Mr. Tokarski made in an

16   interview to the NTSB.

17             Do you recall that

18   conversation?

19       A.    I do.

20       Q.    And correct me if I'm wrong, it

21   was actually your suggestion that the NTSB

22   speak to Mr. Tokarski.

23             Right?

24       A.    Yes.

25       Q.    And we discussed Mr. Tokarski's

John Andrew McCarty

1    statements regarding the accuracy or the

2    reliability of the tank measurements.

3              Do you remember that?

4         A.    I remember that.

5         Q.    Did you ask Mr. Tokarski

6    specifically about anything he recalled in

7    connection with those statements when you

8    spoke with him last night?

9         A.    No, I just kind of narrowed my

10   questions to this document.

11        Q.    This document deals with

12   temperatures of the various VCM cars, amongst

13   other things.

14             Right?

15        A.    Yes.

16        Q.    And the reason you reached out

17   to folks last night and this morning was to,

18   in part, refresh your recollection as to

19   whether these were, in fact, accurate or

20   reliable temperature measurements.

21             Right?

22        A.    Yes.

23        Q.    If we spoke yesterday about

24   statements Mr. Tokarski made regarding the

25   reliability and the accuracy of the

1   temperature measurements to the NTSB, and you

2   had the opportunity to speak with him about

3   that subject in connection with this

4   document, is there any reason why you didn't

5   bring up his interview with the NTSB as part

6   of that conversation?

7        A.      No.

8        Q.      So as you sit here today, you

9   don't have any more or less understanding of

10  what exactly he did say to the NTSB.

11           Right?

12       A.      No, I've never read his

13  testimony.

14       Q.      And you've never asked him

15  whether, in fact, he said the measurements

16  that were taken of the VCM cars, temperature

17  measurements, were reliable and accurate.

18           Right?

19       A.      No, he and I have not talked

20  about that.

21           I'm sorry.  Your question.  Are

22  you asking me about his testimony, or are you

23  asking me if he and I ever talked about his

24  accuracy of temperatures?  Because, yes, we

25  did in the field.

John Andrew McCarty

1    Q.    In connection --

2    A.    So I want to make sure --

3    Q.    Sure.

4    A.    -- I just didn't accidentally

5    speak.

6    Q.    Nope.  And I want to make sure

7    we have a clear record.

8          So my question is limited to

9    whether you've discussed with him any

10   statements he may have made to the NTSB in

11   his interview regarding the accuracy and

12   reliability of the temperature readings.

13   A.    No, I've not talked to him

14   about his testimony.

15   Q.    I think you mentioned -- or you

16   added Mike Kline as an individual --

17   A.    Yes.

18   Q.    -- on the list of folks that

19   you spoke to.

20         And Mike Kline wasn't taking

21   temperature measurements himself, but he was,

22   correct me if I'm wrong, involved in the

23   process of relaying them?

24   A.    Yes.  And that's kind of what I

25   got out of him last night is, hey, did you

John Andrew McCarty

1    ever have a thermometer, and were you ever

2    one of the ones crawling around the cars

3    looking for temperatures.  And he said no.

4              But I was kind of relaying some

5    of the data to Jon Simpson and such for

6    Norfolk Southern.

7         Q.    And it's your understanding

8    that the portion of Exhibit 18 that we're

9    looking at now, Bates numbers 1747 and 1748,

10   that was prepared by not Mike Kline but Mike

11   Burket.

12        A.    Yes.

13        Q.    Right?

14              And that it was prepared by

15   Mike Burket at your request?

16        A.    That's what Mike reminded me of

17   last night, because yesterday I didn't recall

18   it.  I didn't remember asking him for it.  I

19   didn't remember the context of why it was

20   sent the day of my NTSB interview.

21              And I just put it out there

22   to -- I had Mike Kline and Mike Burket on the

23   speakerphone because they were both kind of

24   helpers for me at the site.  I said, can you

25   guys remember, like, did Norfolk Southern ask

1    us for this?  Did I ask you to prepare it

2    or --

3                    And he said, well, Drew, you

4    did.  He said, you -- you know.

5                    And I said, do you remember why

6    I asked you?

7                    And he basically said, yeah,

8    you were hoping that I could give you a

9    summary of stuff you had asked me to just --

10   whatever notes, can you put them together for

11   me as a -- he tried to do this to help me, as

12   a cheat sheet for me before my NTSB

13   interview.  I had never been to an NTSB

14   interview before.  I didn't really know what

15   to expect.

16                   And in the final analysis, I

17   really didn't have this data prior to that

18   interview anyway.

19        Q.    You mentioned a side-by-side

20   discussion, I think that's what you said,

21   between Mike -- with yourself, Mike Burket

22   and Mike Kline.

23                   Is that a discussion that took

24   place within the last 24 hours?

25        A.    Just last evening, yes.

John Andrew McCarty

1      Q.     Okay.  And that's where you

2  asked for them to help you remember how this

3  document came about.

4      A.     Yes.

5      Q.     Fair?

6      A.     Correct.

7      Q.     And I want to make sure again

8  that I understand it correctly.

9             It was in the course of that

10 conversation last night that you were

11 reminded you had made the request for this

12 document to be prepared in anticipation of

13 giving a statement to the NTSB.

14             Right?

15     A.     Correct.  That's what Mike

16 Burket shared with me.  I take his word for

17 it.  I believe him.

18             (McCarty Exhibit 24 marked for

19        identification.)

20 QUESTIONS BY MR. GOMEZ:

21     Q.     Let's pull up Document 177,

22 which we will mark as Exhibit 24.

23             Mr. McCarty, Exhibit 24, I will

24 represent to you, is a printout of the

25 metadata associated with the portion of

1   Exhibit 18 that we've been discussing,

2   specifically Bates numbers SPSI 001747 to

3   SPSI 001748.

4             My question to you is, are you

5   familiar with the concept of metadata?

6        A.    Not really.

7        Q.    Okay.  I'm not terribly

8   familiar with it either, except to say that

9   I'll represent to you that it's data about a

10  file.  It provides core data about the nature

11  of a file.

12       A.    Okay.

13       Q.    Okay?

14             And I will also represent to

15  you that this is the core data about the

16  nature of the file we've been discussing that

17  was produced by SPSI.

18       A.    Okay.

19       Q.    You with me?

20       A.    Okay.

21       Q.    Okay.  And you can see that at

22  the top of Exhibit 24, there's a reference to

23  the document begin number and end numbers.

24             Do you see that?

25       A.    Okay, yes.

John Andrew McCarty

1    Q.    And it's 1747 to 1748.

2          Right?

3    A.    Okay.

4    Q.    And that corresponds with the

5    numbers that are in the portion of Exhibit 18

6    that we've been discussing, also 1747 and

7    1748.

8          Right?

9    A.    Okay.  I think I'm following.

10   Q.    If we look at the information

11   provided with the document that we've just

12   been discussing, the metadata that was

13   provided with the document we've just been

14   discussing, you'll see that there's a number

15   of fields, a lot of which are blank.  But I

16   want to direct your attention to -- towards

17   the middle of the page, there's a -- there's

18   a field for author.

19         Do you see that?

20   A.    Yes.

21   Q.    And it notes that Michael Kline

22   is the author of the document we've been

23   discussing.

24         Do you see that?

25   A.    Okay.  Yeah.

1      Q.    Fair to say Michael Kline
2  didn't recall in the conversation you had
3  last night being the author of the document
4  we've been discussing?
5      A.    That's a fair assessment, yeah.
6  I didn't get that from the conversation last
7  night.
8      Q.    And if we look up a few lines,
9  there's another field that says "OS creation
10 date/time."
11            Do you see that?
12     A.    I do.
13     Q.    And it notes that the
14 document's creation date and time was
15 actually February 9, 2023, at 14:35.
16            Do you see that?
17     A.    I do.
18     Q.    Based off of the data that has
19 been provided with the document we've been
20 discussing, again, those two Bates numbers
21 from Exhibit 18, do you think it's possible
22 that that document was created well in
23 advance of your NTSB hearing on February 9,
24 2023?  Or NTSB interview, I'm sorry.
25            MR. LEVINE:  Objection.

John Andrew McCarty

```
 1                    THE WITNESS:  I'll say, can you
 2          repeat the exact wording of your
 3          question?
 4     QUESTIONS BY MR. GOMEZ:
 5          Q.     Sure.
 6                 Based off of the data provided
 7     along with the document that was produced as
 8     part of Exhibit 18 that we've been
 9     discussing --
10          A.     Uh-huh.
11          Q.     -- do you believe it is
12     possible that instead of being prepared for
13     purposes of your NTSB interview, this
14     document was actually created on February 9,
15     2023?
16                    MR. HANSON:  Objection.
17                    THE WITNESS:  Based on this
18          data, I have to acknowledge it looks
19          like it is possible.
20     QUESTIONS BY MR. GOMEZ:
21          Q.     And if it had been created on
22     February 9, 2023, that would have been three
23     to four days after the vent and burn.
24                 Right?
25          A.     Yes, three days or so, it looks
```

John Andrew McCarty

```
 1    like.  Yes.
 2         Q.     It would have been roughly four
 3    days after the temperature readings we were
 4    discussing in the document were taken.
 5                Correct?
 6         A.     Correct.
 7         Q.     And based off of your
 8    understanding from the discussion last night
 9    with both Michael Kline and Michael Burket,
10    it would have been based on notes and other
11    observations taken during the period of
12    February 5th into February 6th.
13                Right?
14         A.     I believe that to be accurate,
15    yes.
16         Q.     Okay.  We can put that aside,
17    sir.  Thank you.
18                We don't need to refer to the
19    document, per se, but I think I know the
20    answer.
21                If Mike -- Michael Kline didn't
22    mention being the author potentially of the
23    document that we have been discussing, fair
24    to say he didn't give any insights last night
25    about how it was created?
```

John Andrew McCarty

```
 1          A.      That's a fair assessment.
 2          Q.      But if Michael Burket
 3    remembered receiving a request from you in
 4    advance of your NTSB interview to prepare --
 5    I think you called it maybe a cheat sheet at
 6    one point for the interview?
 7          A.      Yeah, just all the notes that
 8    they had been assembling.  And I mean "they"
 9    meaning my crews.  And those two guys were my
10    kind of lead guys for administrative support,
11    and that's why I called them both last night.
12          Q.      Uh-huh.
13          A.      You know, I can kind of --
14    based on this metadata, whatever you call --
15    metadata?  Is that the word?
16          Q.      That's what it's called.
17          A.      It's -- I can acknowledge
18    metadata suggests that a Mike Kline initiated
19    a Word document on the 9th at 14:35 hours.
20    And possibly some of that information had
21    already been initiated, perhaps at Norfolk
22    Southern's request, when I made the request
23    to Mike Burket.  They work together.  Hey,
24    I've already got this started.
25                  I can kind of see how that
```

John Andrew McCarty

```
 1    could have happened.
 2         Q.    Okay.  So if we go one step
 3    further from your answer, it's possible some
 4    of the information, at least in the document
 5    we've been discussing, was available to you
 6    before the NTSB interview.
 7               Right?
 8               MR. LEVINE:  Objection.
 9               THE WITNESS:  It's possible,
10    yes.
11    QUESTIONS BY MR. GOMEZ:
12         Q.    I'm going to switch gears now.
13               You discussed with other
14    counsel a meeting at one of the schools which
15    included, among other folks, Governor DeWine.
16               Do you remember that
17    discussion?
18         A.    Quite well.
19         Q.    I think you've called it a --
20    in the past, a political -- a political
21    hornet's nest.
22               You remember that?
23         A.    That's how I'll probably --
24    I'll never forgot that moment in my entire
25    life.  Yes, sir, it's a good description.
```

John Andrew McCarty

```
1              Q.      And I know that there was a lot
2       of people there, and it's hard to recall
3       exactly who was there from what agency.
4                      But can we agree that Governor
5       DeWine was there?
6                      Right?
7              A.      Governor DeWine was there.
8              Q.      Chief Drabick was there?
9              A.      I think so, but to be honest
10      with you, when we walked in the room, the
11      governor jumped us pretty quick.  My eyes
12      never really panned the room, to be honest
13      with you.
14             Q.      Fair enough.
15                     I think you said earlier that
16      at one point you saw the governor have a
17      conversation with Chief Drabick, and then you
18      got the authority to go ahead with the vent
19      and burn.
20                     Do you recall that?
21             A.      That was after that
22      intervention meeting.  That was an
23      encounter -- I should say not an
24      intervention -- encounter that was -- the
25      initial encounter with the governor was in a
```

John Andrew McCarty

1  room with a whole lot of people.  It was

2  after air modeling considerations had been

3  reevaluated.

4              And when the governor walked

5  into another room that I just happened to be

6  in and -- his comment to that room was, well,

7  I guess we got all this fancy stuff that

8  nobody knows how to operate, so I guess I've

9  got a press conference in eight minutes, or

10  whatever it was, is kind of how his -- and

11  that's when I interjected.  I said, Governor,

12  all due respect, I said, if we need -- we

13  need to do this in the daylight.  If you've

14  got to go to a press conference, we need at

15  least three hours.  We need to, you know, get

16  somebody to green light this for sure,

17  because I thought it was -- again, in my

18  mind, it had been green lighted the day

19  before.

20              So that's -- I know it's a long

21  question -- it's a long answer, but that's

22  the truth.

23       Q.    No, I appreciate the

24  clarification.  And I want to focus on what I

25  would call the second interaction there --

1       A.      Okay.

2       Q.      -- where you raise your hand to

3   say something to the governor.

4               At that point in time he was

5   with Chief Drabick.

6               Correct?

7       A.      I actually remember him having

8   to find Chief Drabick.  I believe he exited

9   the room, found Chief Drabick, and then came

10  back with the, this is authorized.  Go.  Why

11  aren't you done yet kind of tone.

12      Q.      Okay.  So you saw them at some

13  point both together when they authorized the

14  vent and burn?

15      A.      I remember the governor leave

16  the room to go find the chief, and I'm pretty

17  cloudy right now as to if the chief walked

18  back into the same room I was in or not.  But

19  the governor did.

20              So I -- that's -- I can't

21  remember if the chief and the governor were

22  standing side-by-side or not.  Perhaps

23  someone else might, but I can't remember.

24      Q.      Focusing on that second

25  interaction again, do you recall specifically

John Andrew McCarty

1  anyone else who was in the room from any

2  particular agency, organization, anything of

3  the like?

4       A.    I'm sorry, I can't even

5  remember what room I was in.  I apologize.  I

6  don't remember what room I was in.

7       Q.    But at a minimum, we have at

8  one -- at one point in time, Governor DeWine

9  and Chief Drabick.

10           Right?

11      A.    Again, I can't -- I can't

12 verify that Chief Drabick was in the first

13 room.  And I also cannot vividly remember

14 when the governor turned around to go find

15 Chief Drabick, if Chief Drabick followed his

16 shirttails in.  I just don't remember.

17      Q.    Let's start with Chief Drabick.

18           At any point between

19 February 3rd and February 6th -- actually,

20 let me withdraw that and confirm something.

21           Yesterday when you and I spoke,

22 I think we generally discussed the flow of

23 information as being SPSI and SRS to Norfolk

24 Southern, Norfolk Southern then to unified or

25 incident command.

John Andrew McCarty

```
1              Right?
2       A.     Yes.
3       Q.     It's the general flow of
4  information.
5              Correct?
6       A.     Yes.
7       Q.     And then to the extent
8  information needed to go from incident or
9  unified command back to SPSI or SRS, that
10 would likewise flow through Norfolk Southern.
11             Right?
12      A.     It would have flowed through
13 Norfolk Southern, yes.
14      Q.     Again, that's a general
15 description of the way the communications
16 worked.
17             Fair?
18      A.     Fair.
19      Q.     At any point in time between
20 February 3rd and February 6th, specifically
21 the vent and burn on February 6th, did you
22 have direct communication with Chief Drabick?
23      A.     Not that I can recall without
24 the presence of Norfolk Southern.
25      Q.     At any point in time between
```

John Andrew McCarty

1    February 3rd and February 6th, other than the

2    interaction that you just described, did you

3    have any direct contact with Governor DeWine?

4         A.    No.

5         Q.    I don't want to make you rehash

6    the -- whether Chief Drabick was in another

7    room or came back with the governor, but do

8    you recall during that general interaction

9    having any conversation with Chief Drabick?

10        A.    Not directly, no.

11        Q.    When you spoke with Governor

12   DeWine after lunch on February 6th, that

13   second interaction, I believe?  I don't want

14   to get it wrong.

15        A.    No, I think that's the right

16   date, yeah.

17        Q.    Okay.  Did you discuss with him

18   specifically your opinions about whether

19   polymerization was occurring in the VCM cars?

20        A.    No.

21        Q.    During that same interaction

22   with Governor DeWine, did you identify for

23   him or tell him that Occidental Chemical, Oxy

24   Vinyls, had concluded polymerization was not

25   occurring in the VCM cars?

```
 1            A.      No.
 2            Q.      In that same interaction with
 3     Governor DeWine, did you have a discussion
 4     about the inherent risks of a vent and burn
 5     operation?
 6                    MR. LEVINE:  Objection.
 7                    THE WITNESS:  I'm trying to
 8            recall.
 9                    The first encounter with the
10            governor, the spirit of that and the
11            reason they invited us in was to
12            answer governor's questions.  And he
13            had -- and he interrupted us.  He
14            pretty much didn't let us get through
15            our presentation.  He pretty much
16            jumped our ass.
17     QUESTIONS BY MR. GOMEZ:
18            Q.      And that was specific to an air
19     modeling plume.
20                    Right?
21            A.      Yes.
22            Q.      So I want to take the plume
23     aside.  I know you discussed the plume with
24     Governor DeWine.  And I want to focus on
25     other specific discussions that may or may
```

John Andrew McCarty

1    not have occurred.

2         A.     Yeah.

3         Q.     At any point on February 6th in

4    your interactions with Governor DeWine, did

5    you discuss other inherent risks in a vent

6    and burn operation?

7         A.     Someone -- and I don't remember

8    if the governor asked or if someone else in

9    the room asked about how ignition could be

10   guaranteed.  Like how can there be an

11   assurance that once ESI, you know, does their

12   shape charges or does their blast charges,

13   excuse me, they're hole-cutting charges --

14   I'm using that as a generic.  I'm not an

15   explosives expert.  That's ESI -- how did the

16   planning process assure ignition.

17              And we deferred to Jason Poe on

18   that answer.

19              And I can tell you in my own

20   35-year career, I felt very assured that

21   those redundancies were in place for

22   everyone's collective safety.

23              Now, that was a momentary

24   discussion by someone asking that question.

25   I don't remember who asked it.

John Andrew McCarty

```
 1                    I do remember the governor
 2     looking right at me in that second
 3     encounter -- and I appreciate this got my
 4     memory going -- he asked me to -- and he --
 5     something like, can you give me -- can you
 6     give me in 60 seconds or less how this works,
 7     you know, kind of that kind of presentation
 8     question from the governor.
 9                    And I can vividly remember my
10     response to him, and it went like this.
11                    I said, well, Governor, the
12     first shape charge lets the vapor pressure
13     out of the car.  There's a -- there's an
14     explosive charge that releases vapor pressure
15     from in the car.  It's a vertical charge.
16                    And I actually went {witness
17     makes audible sound}, and then, boom, hit the
18     second charge, which is the liquid release
19     into the control burn pit.
20                    And he genuinely appreciated
21     that.  I could see his light bulb come on of,
22     now I understand.  And that was -- I remember
23     that vivid interaction with the governor.
24          Q.    And in the course of giving
25     that 60-second explanation or at any time --
```

John Andrew McCarty

```
 1    any other time, for that matter, did you
 2    discuss with Governor DeWine the potential
 3    that in the course of doing the vent and burn
 4    operation there could be a catastrophic tank
 5    failure?
 6         A.    I don't remember if that
 7    question ever came up or if I ever thought to
 8    talk about it.  So I'm going to say I don't
 9    have any memory of that conversation.
10         Q.    Do you recall discussing with
11    anyone at Norfolk Southern the risk for a
12    catastrophic tank failure in the course of
13    conducting a vent and burn operation?
14         A.    The Norfolk Southern HAZMAT
15    staff all received the same training I did.
16         Q.    So you assumed --
17         A.    There was no discussion of that
18    particular topic.
19         Q.    Okay.  So if your reference
20    to -- I want to make sure I understand your
21    reference to receiving the same training that
22    you did.
23               Is it your understanding that
24    while you may not have had a specific
25    discussion with the Norfolk Southern HAZMAT
```

John Andrew McCarty

```
1    folks regarding the potential for a

2    catastrophic tank failure in the vent and

3    burn operation, because they received the

4    same training, you assumed they were aware of

5    that potential?

6         A.    It's a very remote potential.

7         Q.    Remote or not, it is a

8    possibility.

9               Correct?

10        A.    Anything in mechanical stuff is

11   possible.

12        Q.    It's, in fact -- it's a

13   possibility that's specifically discussed by

14   the FRA in its vent and burn manual.

15              Right?

16        A.    Probably, yes.

17        Q.    It's a possibility that is

18   specifically discussed in training put on by

19   SERTC.

20              Right?

21        A.    Yes.

22        Q.    Do you know, as you sit here

23   today, whether at any point in time personnel

24   from Norfolk Southern communicated to

25   incident or unified command the potential for
```

1    a catastrophic tank failure in the course of

2    conducting a vent and burn operation?

3         A.     I am not aware of any

4    communications of that -- of that topic.  I'm

5    not aware of any.

6         Q.     And is it fair to say no one

7    from SPSI directly communicated to anyone on

8    incident or unified command the potential for

9    a catastrophic tank failure in the course of

10   conducting a vent and burn operation?

11        A.     That's accurate.

12        Q.     Same line of questions, but a

13   different concept.

14              In the interaction that you

15   had -- interactions that you had with

16   Governor DeWine on February 6th, did you

17   discuss with him the potential for a vapor

18   cloud explosion in the course of conducting a

19   vent and burn operation or project?

20        A.     When you describe a vapor cloud

21   explosion, there was no such conversation.

22        Q.     There was no such conversation

23   with Governor DeWine or at all?

24        A.     I'd never heard that term until

25   you just said it.  So when you say "vapor

John Andrew McCarty

```
 1    cloud explosion," that would imply unignited
 2    vapors -- okay.  Hold on.  Not
 3    ignited vapors.
 4              Someone asked the -- that was
 5    back -- that was the same question that I
 6    already responded to but in a different way.
 7              Someone had asked, how can you
 8    guarantee ignition.  Once these holes get
 9    punched in the cars, how can we all guarantee
10    ignition.  And that's where the redundancies
11    were engineered into it.
12              So that's where that dialogue
13    would have come from in the possibility of,
14    what if you purposely release VCM and it
15    doesn't ignite.  Then there'd be that
16    possibility of an uncontrolled vapor cloud
17    finding an ignition source.
18              So that would have been the
19    context of any such question by somebody.
20         Q.   So I want to make sure I
21    understand that.
22              In the course of that
23    discussion, it was brought to you as a
24    question, how can we ensure ignition of the
25    VCM once it's released from the tank car.
```

1          Correct?

2     A.     Yes.

3            MR. LEVINE:  Objection.

4  QUESTIONS BY MR. GOMEZ:

5     Q.     And in the course of that

6  discussion, did anyone raise the concern that

7  if -- specifically raise the concern that if

8  the VCM failed to ignite, there could be the

9  formation of a vapor cloud that would find an

10  ignition source and then explode?

11     A.     I don't remember their exact

12  wording of their exact question, but you

13  have, in fact, captured the essence of the

14  question of -- of the question that we're

15  asking about how can it be assured for

16  ignition.  That was certainly a possibility

17  if it wouldn't have ignited.

18            So that was the spirit of the

19  question, just maybe not --

20     Q.     No, I appreciate that.

21            And I guess the follow-up then

22  is, if it wasn't specifically discussed, "it"

23  being the potential for unignited VCM to lead

24  to a vapor cloud explosion, do you know if

25  Governor DeWine appreciated the spirit of

John Andrew McCarty

1    that question, as you -- as you described it?

2              MR. HANSON:  Objection.

3              MR. LEVINE:  Objection.

4              THE WITNESS:  I can't -- yeah,

5         I don't know what he's thinking.  I

6         can't testify to what he may or may

7         not have been thinking.

8    QUESTIONS BY MR. GOMEZ:

9         Q.    So as you sit here today, you

10   don't know if at any point in time Governor

11   DeWine was made aware of the potential for a

12   vapor cloud explosion in the course of the

13   vent and burn operation?

14             MR. HANSON:  Objection.

15             MR. LEVINE:  Objection.

16             THE WITNESS:  No, he -- he was

17        in that room when that question was

18        asked, and he was part of that

19        conversation.  I just don't remember

20        if he was the one that asked the

21        question.

22   QUESTIONS BY MR. GOMEZ:

23        Q.    Okay.  So you're assuming that

24   he heard that conversation and understood

25   that the risk that the question was trying to

1    address was the concept of a vapor cloud

2    explosion?

3              MR. HANSON:  Objection.

4              MR. LEVINE:  Objection.

5              THE WITNESS:  Whoever in the

6         room asked the question about the

7         redundancy of ignition and

8         guaranteeing ignition, their

9         question -- and when you -- when you

10        use those words "vapor cloud

11        explosion," that's where I'm getting

12        my recall.

13             Whoever asked that question

14        with the how can we guarantee

15        ignition, their question included that

16        dialogue.  So the governor would have

17        heard that dialogue in the framework

18        of a question of the person that asked

19        the question, tied to the ignition.

20   QUESTIONS BY MR. GOMEZ:

21        Q.    Okay.  And in the course of

22   that same conversation that we're referring

23   to, did you -- did you share with that group

24   that Oxy had concerns that a vent and burn

25   could cause an unintended vapor cloud

John Andrew McCarty

1    explosion?

2              MR. HANSON:  Objection.

3              THE WITNESS:  Again, we

4         communicated with Norfolk Southern.

5         If Oxy had communicated that on one of

6         the calls, we would have given them

7         the same assurances for ignition that

8         we gave to the person in that room

9         that asked the same question.

10   QUESTIONS BY MR. GOMEZ:

11        Q.    So you don't recall having,

12   yourself, conversations with anyone from Oxy,

13   whether in the field in East Palestine or

14   Dallas, about the concern that if a vent and

15   burn was to be authorized, a potential risk

16   was a vapor cloud explosion?

17        A.    That is a -- that's a -- it's

18   one of the planning elements, as we plan to

19   do things like this, that we assure adequate

20   redundancies for ignition, to guarantee

21   ignition to eliminate that risk.

22        Q.    And in the course of planning

23   to mitigate against that risk, did you also

24   plan for or model the potential damage that

25   would occur if a vapor cloud explosion took

John Andrew McCarty

1    place?

2         A.    I'm not aware of that

3    specific -- that would be a question for

4    Norfolk Southern and CTH {sic}.  I'm not

5    aware of what all modeling was done by whom.

6         Q.    In terms of your interactions,

7    if any, with Chief Drabick directly, right,

8    did any of those interactions include a

9    discussion about the potential for a vapor

10   cloud explosion in the course of conducting a

11   vent and burn?

12        A.    If -- if Chief Drabick was in

13   the room at the first governor intervention

14   in which that person asked that question, he

15   certainly would have been part of that

16   discussion and listening to that

17   conversation.

18             Beyond that, as I testified

19   earlier, I -- I didn't exactly pan the room

20   to know who all was there.  I just -- like I

21   say, the governor was eye to eye with us the

22   minute we walked through the door.

23             Beyond that, I can say there

24   was no vivid conversation with the chief

25   about that topic.

John Andrew McCarty

```
1        Q.      Beyond potentially what you
2    just described, do you have any knowledge of
3    whether Norfolk Southern discussed with Chief
4    Drabick the potential for a vapor cloud
5    explosion in the course of conducting a vent
6    and burn operation?
7        A.      Yeah.  Once again, I don't know
8    what Norfolk Southern would have -- may or
9    may not have communicated to him that I
10   wasn't present for.
11       Q.      I don't think that this has
12   been --
13           MR. HANSON:  Your co-counsel
14       would like to shut down for the
15       hearing.
16           MS. KARIS:  Keep going.
17           MR. GOMEZ:  I got two more
18       questions.  I promise.  Hopefully.
19   QUESTIONS BY MR. GOMEZ:
20       Q.      I don't think it's been asked
21   in the course of your two days now, but if
22   you could, can you tell me who you
23   understood -- individual people, who you
24   understood to be part of unified or incident
25   command in East Palestine?
```

1    A.    Well, from Friday night when I

2    got there, certainly the fire department had

3    their senior official.  There was Ohio EPA,

4    Pennsylvania DEP.  I can't remember when I

5    first saw someone from US EPA.  I don't

6    remember a timeline.  I remember somebody

7    from a county EMA.

8              And again, everybody was

9    crammed into a -- what I thought was a former

10   firehouse.  Come to find out later was a

11   police station garage before it evolved into

12   the church or school or school or church.

13   And again, I can't remember the sequencing of

14   when things moved.

15             But -- I know it's a long way

16   to answer your question, but...

17        Q.    You mentioned a couple of

18   different entities.  I want to make sure

19   we're on the same page.

20             Fire department was one, right?

21        A.    Excuse me.

22        Q.    Is that yes or no?  I'm sorry.

23        A.    Oh, I'm sorry.

24        Q.    Let me ask it again.

25        A.    Yes, fire department.

John Andrew McCarty

```
 1          Q.      Okay.  Fire department was one.

 2                  Ohio EPA.

 3                  Yes?

 4          A.      Yes.

 5          Q.      Pennsylvania DEP.

 6                  Correct?

 7          A.      Yes.

 8          Q.      US EPA.

 9                  Right?

10          A.      Yes.

11          Q.      County EMA.

12                  Right?

13          A.      Yes.

14          Q.      That would have been Columbiana

15   County EMA?

16          A.      I believe so.

17          Q.      Was Norfolk Southern also part

18   of incident command?

19          A.      Yes.  Sorry, I missed -- and

20   the police department.  The police chief was

21   also there.  Whatever -- it was -- I don't

22   know if he's city or county, but the police

23   for local East Palestine, police were

24   represented as well.

25          Q.      Okay.  So that was the corpus
```

John Andrew McCarty

1    or the body of incident or unified command as

2    you understood it.

3                    Right?

4         A.    To my best memory, yes, sir.

5         Q.    And was it your understanding

6    that as information flowed from SRS and SPSI

7    to NS and then incident or unified command,

8    that that information was reaching all of

9    those organizations that made up unified or

10   incident command?

11                   MR. LEVINE:  Objection.

12                   THE WITNESS:  Yeah.  I mean, I

13        communicate with my customer, and then

14        the customer handles those kind of

15        communications.  Beyond that, I can't

16        speculate.

17                   MR. GOMEZ:  Okay.  Sir, thank

18        you for your time across the last two

19        days.

20                   THE WITNESS:  You're welcome.

21                   MR. GOMEZ:  Those are the

22        questions I have.

23                   THE WITNESS:  You're welcome.

24                   MR. HANSON:  All right.  Until

25        1:30?

```
 1                    MR. GOMEZ:  Yeah, we'll go off
 2         the record.
 3                    MR. HANSON:  Yeah.
 4                    VIDEOGRAPHER:  Off the record
 5         at 12:54.
 6          (Off the record at 12:54 p.m.)
 7                    VIDEOGRAPHER:  We are back on
 8         the record at 12:58.
 9                    REDIRECT EXAMINATION
10    QUESTIONS BY MS. HERLIHY:
11         Q.     Thanks.
12                    Mr. McCarty, we've talked a lot
13    about pool fires, and they seemed to have
14    been one of the major contributing factors to
15    the derailment and to ultimately the
16    decisions that were made.
17                    Just want to make clear.  The
18    pool fires were not caused by any material
19    that leaked from the VCM cars.
20                    Correct?
21         A.     That's correct.
22         Q.     Okay.  Those were not -- those
23    were somebody else's fault; that had nothing
24    to do with VCM?
25         A.     Other products, not VCM.
```

John Andrew McCarty

```
 1            Q.     Okay.  From breached railcars?
 2            A.     Yes.
 3            Q.     Okay.  I'm going to go back
 4      quickly to this paperwork issue.  I know
 5      you've heard it a number of times.  And I
 6      already asked you a couple of questions about
 7      it, but I had one more.
 8                   I know you mentioned the first
 9      time you heard anybody raise any paperwork
10      discrepancies was when Randy Keltz testified
11      about that at the NTSB hearing.
12            A.     Uh-huh.
13            Q.     Have you ever heard anybody say
14      that they made any decision or recommendation
15      with respect to the vent and burn operation
16      as a result of paperwork discrepancies with
17      any of the VCM cars?
18            A.     I never heard anyone say
19      anything like that, no.
20            Q.     Okay.  But earlier we talked
21      about a couple different cars, so I just
22      wanted to make sure that that applies to all
23      of the VCM cars.
24                   Right?
25            A.     That's a true statement.
```

```
 1          Q.      Okay.  Great.

 2                  And then when you were

 3    mentioning the group of your guys that you

 4    talked with last night, you had a -- one

 5    conversation that both of the Mikes, Mike

 6    Kline and Mike Burket, were on that call with

 7    you.

 8                  Right?

 9          A.      Yes.

10          Q.      So it was the three of you

11    together?

12          A.      Yes.

13          Q.      With the other individuals that

14    you talked with, did you talk with them

15    individually or as a group call?

16          A.      Individually.

17          Q.      So each one of those people you

18    had a phone call with individually?

19          A.      Yes.

20                  MS. HERLIHY:  Okay.  Those are

21          all my questions.  So, thank you.

22          Appreciate it.

23                  THE WITNESS:  You're welcome.

24                  MS. HERLIHY:  Brian?

25                  MR. SWANSON:  Nothing more for
```

John Andrew McCarty

```
 1          Trinity.
 2               MS. HERLIHY:  Okay.  Thank you.
 3               MR. HANSON:  And we'll just on
 4      the record ask that it be designated
 5      confidential under the protective
 6      order.
 7               MS. HERLIHY:  Okay.  All right.
 8               VIDEOGRAPHER:  Off the record
 9      at 1 p.m.
10      (Deposition concluded at 1:00 p.m.)
11                    - - - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE
 2             I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 4    of the examination, John Andrew McCarty, was
      duly sworn by me to testify to the truth, the
 5    whole truth and nothing but the truth.
 6             I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 7    testimony as taken stenographically by and
      before me at the time, place and on the date
 8    hereinbefore set forth, to the best of my
      ability.
 9
              I DO FURTHER CERTIFY that I am
10    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
11    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
12    that I am not financially interested in the
      action.
13
14
16         CARRIE A. CAMPBELL,
           NCRA Registered Diplomate Reporter
17         Certified Realtime Reporter
           California Certified Shorthand
18         Reporter #13921
           Missouri Certified Court Reporter #859
19         Illinois Certified Shorthand Reporter
           #084-004229
20         Texas Certified Shorthand Reporter #9328
           Kansas Certified Court Reporter #1715
21         New Jersey Certified Court Reporter
           #30XI00242600
22         Louisiana Certified Court Reporter
           #2021012
23         Notary Public
           Dated:  January 26, 2024
24
25
```

John Andrew McCarty

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13              It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

John Andrew McCarty

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2

 3

 4         I,_____, do
      hereby certify that I have read the foregoing
 5    pages and that the same is a correct
      transcription of the answers given by me to
 6    the questions therein propounded, except for
      the corrections or changes in form or
 7    substance, if any, noted in the attached
      Errata Sheet.
 8

 9

10

11

12    _____
      John Andrew McCarty           DATE
13

14

15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18

19    Notary Public
20

21

22

23

24

25
```

```
 1                       - - - - - - -

                           ERRATA

 2                       - - - - - - -

 3      PAGE    LINE    CHANGE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

John Andrew McCarty

1                    - - - - - - -

                    LAWYER'S NOTES

2                    - - - - - - -

3      PAGE    LINE

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | **CASE NO. 4:23-CV-00242-BYP** **JUDGE BENITA Y. PEARSON** |

**ERRATA TO THE DEPOSITION TRANSCRIPT OF JOHN ANDREW MCCARTY**
**TAKEN ON JANUARY 24 AND JANUARY 25, 2024**

I have reviewed the transcript of my testimony of January 24 and January 25, 2024, and hereby make the following changes in form and/or substance:

| PAGE | LINE(S) | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 13 | 20 | "Street Smart Chemistry" to "street smart chemistry" | Clarification |
| 17 | 3 | "It's" to "Its" | Transcription error |
| 24 | 23 | "that's very a" to "that's a very" | Transcription error |
| 28 | 12 | "a broad, not" to "a broad -- not" | Clarification |
| 33 | 7 | Delete comma after "dry" | Clarification |
| 33 | 15 | Delete comma after "people" | Clarification |
| 45 | 15 | "started" to "start it" | Transcription error |
| 93 | 1 | "me, that" to "me was that" | Clarification |
| 146 | 3 | Delete "in" after "not" | Clarification |
| 187 | 20 | "where of" to "to be aware of" | Clarification |
| 197 | 5 | "we like" to "we were like" | Clarification |
| 214 | 3 | "PRD off {sic}" to "PRD went off" | Clarification |
| 319 | 2 | "on" to "in" | Clarification |
| 323 | 18 | "deal" to "detail" | Transcription error |

| PAGE | LINE(S) | CHANGE | REASON FOR CHANGE |
|------|---------|--------|-------------------|
| 325 | 10 | "that I" to "that because I" | Clarification |
| 332 | 16 | "get to" to "get the" | Clarification |
| 386 | 16 | "drawn" to "job" | Transcription error |
| 389 | 5 | "CTH {sic}" to "CTEH" | Clarification |
| 413 | 8 | "Makazlit {phonetic}" to McHazlett | Clarification |
| 421 | 25 | "polymer" to "polymerize" | Clarification |
| 523 | 2 | "Filby, found" to "Filby, we found" | Clarification |
| 532 | 10 | "of probability" to "or probability" | Clarification |
| 562 | 12 | "ours" to "others" | Transcription error |
| 577 | 3 | "Brennan" to "Brenon" | Transcription error |
| 643 | 13 | "the" to "of a" | Clarification |
| 653 | 18 | "Carol" to "Carroll" | Transcription error |
| 703 | 4 | "CTH {sic}" to "CTEH" | Clarification |

I, John Andrew McCarty, read the foregoing deposition and hereby state that the foregoing is true and correct, except as noted herein.

_John Andrew McCarty_
John Andrew McCarty

_Feb. 23, 2024_
Date