**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | Case No. 4:23-CV-00242-BYP<br><br>JUDGE BENITA Y. PEARSON |

**MEMORANDUM IN SUPPORT OF THIRD-PARTY PLAINTIFFS NORFOLK
SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
GATX CORPORATION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 1

    I.      Roller Bearing Operation And Maintenance ........................................................ 2

    II.     February 3, 2023 Derailment And The Failure Of GATX's Railcar 23 ................. 7

STANDARD OF REVIEW .................................................................................................. 9

ARGUMENT ...................................................................................................................... 10

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blume v. Potter*,
    289 F. App'x 99 (6th Cir. 2008) ...................................................................................10

*Bonasera v. New River Electrical Corp.*,
    518 F. Supp. 3d 1136 (S.D. Ohio 2021) .........................................................................9

*Bowling v. CSX Transportation, Inc.*,
    2013 WL 866459 (S.D. Ohio Mar. 7, 2013) ..................................................................9

*Comer v. Shrum*,
    2021 WL 2210592 (E.D. Tenn. June 1, 2021) ...............................................................9

*Czarney v. Porter*,
    853 N.E.2d 692 (Ohio App. 2006) ...............................................................................11

*Fox v. Kia America, Inc.*,
    2024 WL 1328730 (N.D. Ohio Mar. 28, 2024) ...........................................................10

*Hardwick v. 3M Co.*,
    2019 WL 4757134 (S.D. Ohio Sept. 30, 2019) ...........................................................10

*Hartsel v. Keys*,
    87 F.3d 795 (6th Cir. 1996) .........................................................................................10

*In re National Prescription Opiate Litigation*,
    440 F. Supp. 3d 773 (N.D. Ohio 2020)........................................................................11

*Lewis v. Norfolk Southern Railway Co.*,
    2012 WL 3758838 (N.D. Ohio July 31, 2012) ............................................................10

*Moore v. Philip Morris Cos.*,
    8 F.3d 335 (6th Cir. 1993) ...........................................................................................10

*Rayco Manufacturing, Inc. v. Deutz Corp.*,
    771 F. Supp. 2d 819 (N.D. Ohio 2010).......................................................................10

*Ross v. Nutt*,
    203 N.E.2d 118 (Ohio 1964)........................................................................................10

*Taylor v. Webster*,
    231 N.E.2d 870 (Ohio 1967)........................................................................................11

**Statutes, Rules, and Regulations**

49 C.F.R. §§ 180 *et seq.*.................................................................................................6

Fed. R. Civ. P. 56(a) ...............................................................................................................9, 10

**Other Authorities**

11 James Wm. Moore, *Moore's Federal Practice* § 56.122[2] (3d ed. 2024) .............................10

## INTRODUCTION

The failure of a roller bearing on Railcar 23, a car owned by third-party defendant GATX, caused that car and 37 others to derail in East Palestine, Ohio, on February 3, 2023.  The undisputed evidence confirms that failure—of the roller bearing on GATX's railcar—was a but-for and proximate cause of the derailment.  Summary judgment is appropriate on that part of Norfolk Southern's third-party claims against GATX.

At trial, the finder of fact will hear much more about GATX—how that company, one that has contributed nothing to East Palestine's recovery, failed to exercise ordinary care in maintaining and inspecting the roller bearings on Railcar 23.  Among other failures, GATX failed to properly inspect the roller bearings after they sat outside—idle and unprotected from extreme wind and rain—during Hurricane Harvey, a devastating Category 4 hurricane.  To put settled industry knowledge simply, roller bearings do not like water.  Water intrusion can degrade the lubricating grease that prevents friction and overheating, which can cause a roller bearing to fail.  That is what happened here—and GATX could have, and should have, prevented it.  But Norfolk Southern acknowledges that the full extent of GATX's negligent treatment of Railcar 23, and allocation of liability among the defendants, will require a trial.  Trial is not necessary, however, to establish the undisputed—and indisputable—point that the failure of the roller bearing on GATX's railcar caused Train 32N to derail.

## STATEMENT OF FACTS

GATX owned Railcar GPLX75465.  SUF ¶ 4; Ex. 1 (Car # GPLX075465) at -183 (noting "Car Owner: GATC" for GPLX75465); Ex. 2 (Sbragia 30(b)(6) Dep.) at 11:18-21; Dkt.

1

194 at 3 ("GATX owned two of the derailed railcars—Railcars 23 and 29 ….").[1]  On the day of the derailment, February 3, 2023, Railcar GPLX75465 was traveling east along Norfolk Southern's Fort Wayne Line on Norfolk Southern Train 32N in the twenty-third car position— hence the name "Railcar 23."  SUF ¶¶ 1-2; Ex. 3 (Email from Scott Deutsch to Peggy Clark, dated February 3, 2023) at -583 (including Train 32N consist listing Railcar GPLX75465 as railcar 23); Ex. 2 (Sbragia 30(b)(6) Dep.) at 11:22-24; Ex. 4 (Wolf Opening Rep.) ¶ 15.

## I.  ROLLER BEARING OPERATION AND MAINTENANCE

Railcar 23 was equipped with roller bearings.  SUF ¶ 8; Ex. 5 (Poplawski Opening Rep.) ¶ 66; *see* Ex. 6 (Mechanical Group Factual Report) at -276.  A railcar consists of a car body, which carries the freight; two trucks, which distribute the load of the car to the wheelsets; and the wheelsets.  SUF ¶ 8; Ex. 7 (Norfolk Southern's Online Glossary of Railroad Terminology, hereafter "Glossary of Railroad Terminology") at -6593-6594, -6598, -6600; Ex. 8 (Rambo Dep.) at 54:17-57:5; Ex. 5 (Poplawski Opening Rep.) ¶¶ 18-19.  A wheelset, in turn, consists of two wheels connected by an axle, and two roller bearings.  SUF ¶ 8; Ex. 8 (Rambo Dep.) at 56:11-24; Ex. 7 (Glossary of Railroad Terminology) at -6407, -6598, -6600; Ex. 5 (Poplawski Opening Rep.) ¶ 20.  Each roller bearing is assigned a position descriptor, consisting of an L or R designating whether it is on the left or right side of the car, and the axle number starting from the front of the car.  Ex. 9 (2023 Field Manual of AAR Interchange Rules) at -775-776; Ex. 5 (Poplawski Opening Rep.) ¶ 32.  Thus the "L1" bearing is the first bearing on the left side of the car.  Ex. 9 (2023 Field Manual of AAR Interchange Rules) at -775-776; Ex. 5 (Poplawski Opening Rep.) ¶ 32.

---

[1] Unless otherwise noted, "Ex. ___" citations reference exhibits to the Declaration of Alan Schoenfeld filed herewith, "SUF ___" citations reference the parties' Stipulation Regarding Uncontested Facts, Dkt. 586, emphasis is added, and objections are omitted for deposition citations.

Roller bearings connect the rotating parts of the railcar (the wheels and axle) to the non-rotating components (the trucks and car body). SUF ¶¶ 8-9; Ex. 7 (Glossary of Railroad Terminology) at -6208, -6407, -6593-6594; Ex. 5 (Poplawski Opening Rep.) ¶ 21; Ex. 10 (Fox Dep.) at 27:5-9. They are attached to the "axle journal," meaning the part of the axle that extends outside the wheel. SUF ¶ 10; Ex. 7 (Glossary of Railroad Terminology) at -5871, -6203-6204, -6208; Ex. 5 (Poplawski Opening Rep.) ¶ 29. A cylindrical cup is the point of attachment to the trucks, and the cup contains two cone assemblies. SUF ¶ 9; Ex. 5 (Poplawski Opening Rep.) ¶¶ 22-23. The cone assembly, in turn, consists of the cone itself, which is attached to and rotates with the axle journal, and "rollers," which are on the exterior of the cone and roll along both the outer surface of the cone and the inner surface of the cup. SUF ¶ 10; Ex. 11 (Rail 202 Literature & Publications) at -596, -600; Ex. 7 (Glossary of Railroad Terminology) at -6203-6204; Ex. 5 (Poplawski Opening Rep.) ¶ 24; *see also* Ex. 8 (Rambo Dep.) at 55:13-56:1.

Roller bearings are packed with grease to prevent friction between the rotating and stable components. Ex. 7 (Glossary of Railroad Terminology) at -6203-6204, -6594; Ex. 5 (Poplawski Opening Rep.) ¶ 26. When there is "excessive friction between bearing and journal," which can be due to "lack of lubricant or foreign matter," a roller bearing may overheat—colloquially known as a "hot box." Ex. 7 (Glossary of Railroad Terminology) at -6168-6169; *see also* Ex. 2 (Sbragia 30(b)(6) Dep.) at 91:11-23 ("a bearing requires lubrication to properly function"); Ex. 12 (Saxe Dep.) at 103:6-14 (a bearing can fail to due factors including "damage, improper lubrication, being submerged in water"); Ex. 5 (Poplawski Opening Rep.) ¶¶ 26, 35, 42, 51-52; Ex. 13 (Poplawski Dep.) at 78:14-79:18 (agreeing that "inadequate lubrication" within roller bearings can "cause them to overheat and burn off"). At the time of the derailment, Norfolk Southern had in place a comprehensive wayside detection system across its network to detect

overheated bearings, including an extensive network of "hot box detectors" or "HBDs," which use infrared thermal scanning to measure the above-ambient temperature of a railcar's roller bearings as the train passes.  SUF ¶ 20; Ex. 14 (Zarembski Rebuttal Rep.) ¶¶ 14, 18, 29-30, 37.  When certain temperature-related conditions are met, HBDs are programmed to generate an alert to Norfolk Southern's Wayside Help Desk for evaluation, signaling a potential issue with a bearing that may require further monitoring.  SUF ¶¶ 23, 25-27; Ex. 14 (Zarembski Rebuttal Rep.) ¶¶ 19, 30, 44.  Sufficiently elevated above-ambient temperature readings will trigger an audible, real-time warning (i.e., an alarm) to the train crew, signaling they should stop the train.  SUF ¶¶ 26, 54; Ex. 14 (Zarembski Rebuttal Rep.) ¶¶ 30, 41-42.

Bearing temperatures are expected to fluctuate during normal train operation. Ex. 15 (An Implementation Guide for Wayside Detector Systems) at -601 (noting that an overheated bearing "may cool off at reduced speed or stop point before it can be confirmed by a detector system"); *see also* Ex. 5 (Poplawski Opening Rep.) ¶ 96.  But significant overheating can indicate that something is wrong with the bearing.  Ex. 15 (An Implementation Guide for Wayside Detector Systems) at -601; *see also* Ex. 13 (Poplawski Dep.) at 291:12-16.  Heat can cause the cone to expand while the cup stays the same size.  Ex. 5 (Poplawski Opening Rep.) ¶¶ 24, 51.  As the room inside the cup decreases, the rollers on the outside of the cone become pinched and friction increases, increasing heat even further.  Ex. 5 (Poplawski Opening Rep.) ¶ 51; *see also* Ex. 7 (Glossary of Railroad Terminology) at -6168-6169.  That increase in friction causes the cone to continue expanding, and the cycle continues until eventually the roller attached to the cone can no longer rotate, the roller twists, and the bearing fails.  Ex. 16 (Kennedy Dep.) at 56:8-15; Ex. 5 (Poplawski Opening Rep.) ¶ 52.  This is called a "thermal preload lockup."  Ex. 5 (Poplawski Opening Rep.) ¶ 51.

Thermal preload lockup can cause a "burn off" failure, otherwise known as a "wrung journal."  SUF ¶ 29; *See* Ex. 12 (Saxe Dep.) at 94:23-95:4; Ex. 17 (Schnautz Dep.) at 65:12-19; Ex. 16 (Kennedy Dep.) at 56:8-15; Ex. 18 (Gold Dep.) at 110:12-15.  "Burn off" is when the failed bearing "seizes onto the axle," further accelerating a temperature rise that causes the journal (the part of the axle outside the wheel) to soften and stretch, until the narrowest part of the journal snaps off from the axle and causes "the side frame [of the car body] to drop down."  SUF ¶ 29; Ex. 12 (Saxe Dep.) at 94:23-95:4; *see also* Ex. 4 (Wolf Opening Rep.) ¶¶ 15, 17; Ex. 5 (Poplawski Opening Rep.) ¶ 101; Ex. 12 (Saxe Dep.) at 103:2-5.  Such a bearing failure can be "catastrophic," Ex. 12 (Saxe Dep.) at 102:24-25, and can cause a derailment in "a matter of minutes," Ex. 19 (Fabery Dep.) at 84:12-17.  *See also* Ex. 15 (An Implementation Guide for Wayside Detector Systems) at -601 (noting that "[a] bearing can become overheated very quickly and may even burn off in just 1 to 3 minutes").

GATX's Railcar 23 was equipped with Timken All-Purpose bearings.  Ex. 20 (Microsoft Excel Spreadsheet containing GPLX75465 wheel bearing information); Ex. 5 (Poplawski Opening Rep.) ¶ 67; Ex. 2 (Sbragia 30(b)(6) Dep.) at 31:7-15.  This is a "self-contained apparatus that comes preassembled and prelubricated."  Ex. 5 (Poplawski Opening Rep.) ¶ 68; *see also* Ex. 8 (Rambo Dep.) at 55:13-56:1 (bearing is "self-contained"); Ex. 21 (Parada Dep.) at 38:6-24 (bearing is "sealed"); Ex. 7 (Glossary of Railroad Terminology) at -6204 (noting that "roller bearings are sealed assemblies of rollers, races, cups and cones pressed onto axle journals and generally lubricated with grease").  Visual inspections carried out as part of the pre-departure inspection of a train, as required by federal safety regulations, can identify certain *external* signs of damage—including discoloration, leaking grease, loose or missing cap screws, and loose or damaged seals.  *See* Ex. 22 (Williams 30(b)(6) Dep.) at 73:17-74:11, 115:18-

116:17; Ex. 2 (Sbragia 30(b)(6) Dep.) at 58:2-18; Ex. 23 (Wilcox Dep.) at 27:17-28:4; Ex. 24 (Barner Dep.) at 31:21-32:19; Ex. 8 (Rambo Dep.) at 192:17-194:7; Ex. 12 (Saxe Dep.) at 115:21-116:12; Ex. 5 (Poplawski Opening Rep.) ¶¶ 50, 54.  But because the bearing is a closed system, *internal* defects are not observable in a visual inspection; disassembly is required to detect an internal defect.  Ex. 25 (Wolf Dep.) at 89:18-22 ("There's a high probability that there were internal defects that would not have been visible externally[.]"); Ex. 26 (Sbragia Dep.) at 98:16-99:2 (agreeing that a visual inspection cannot not necessarily detect "if there's a problem with the bearing itself" because a bearing is an "enclosed system"); Ex. 2 (Sbragia 30(b)(6) Dep.) at 58:14-18 (stating that "[w]e never take apart wheel bearings" as part of an inspection); Ex. 23 (Wilcox Dep.) at 135:4-18 (agreeing that a bearing could have wear and tear that would not be visible from a visual inspection); Ex. 12 (Saxe Dep.) at 103:22-104:3 ("Q. And these are the types of things that you would expect car inspectors to look for and identify before it becomes a problem; correct?  THE WITNESS: Visible items, yes.  Internal, we cannot -- physically no way to do that."); Ex. 27 (Wolf Rebuttal Rep.) ¶ 21 (internal defects "cannot be equated with observable bearing defects, such as leaking grease or discoloration"); *see also* Ex. 5 (Poplawski Opening Rep.) ¶¶ 50, 124-126, 138.

As in the case of Railcar 23, many of the railcars on any given train are typically owned by railcar companies, here GATX—rather than the railroads themselves.  Railroads must therefore rely on railcar owners and manufacturers to ensure that their cars are compliant with federal laws and regulations.  *See generally* 49 C.F.R. §§ 180 *et seq*.  Indeed, railroads often do not have insight into the history of railcars that they do not own, such as whether the car has been exposed to extreme weather events.  The railcar owner is responsible for the inspection, maintenance, and repair of such railcars.  *See* Ex. 2 (Sbragia 30(b)(6) Dep.) at 36:13-22, 38:20-

39:13, 54:3-9, 62:1-25, 97:16-98:8, 115:11-116:20; Ex. 26 (Sbragia Dep.) at 58:18-59:3, 234:11-235:2; Ex. 21 (Parada Dep.) at 88:16-89:12, 91:5-20, 92:8-23, 134:16-19.  Accordingly, the proper maintenance of railcars by their owners is a critical component of train safety, including in particular, roller bearing safety.

## II.     FEBRUARY 3, 2023 DERAILMENT AND THE FAILURE OF GATX'S RAILCAR 23

GATX's Railcar 23 was transferred to Norfolk Southern and placed onto Train 32N on February 1, 2023.  *See* SUF ¶ 35; Ex. 25 (Wolf Dep.) at 259:20-25; Ex. 28 (Williams Dep.) at 46:10-14.  From February 1 to early evening on February 3, Train 32N's journey in Illinois and through part of Ohio was uneventful.  *See* SUF ¶¶ 35-39.  On the night of February 3, before its derailment, Train 32N passed three HBDs in northeast Ohio, the first of which was about 30 miles west of East Palestine.  SUF ¶ 40; Ex. 14 (Zarembski Rebuttal Rep.) ¶ 61.  As the undisputed evidence confirms, those three detectors, each of which was calibrated properly and in good working order, issued the appropriate alerts and alarms as intended.  Ex. 14 (Zarembski Rebuttal Rep.) ¶¶ 58, 84.

On February 3, between 7:47 pm and 7:51 pm, an HBD in Sebring, Ohio, reported the L1 bearing on Railcar 23 as being 38°F above ambient temperature.  SUF ¶¶ 41-42; Ex. 14 (Zarembski Rebuttal Rep.) ¶ 62; *see also* Ex. 5 (Poplawski Opening Rep.) ¶ 79.  These readings were within the normal range.  Ex. 14 (Zarembski Rebuttal Rep.) ¶ 62; *see also* Ex. 29 (System Safety and Human Performance Group Chair's Factual Report) at -437.  The train then passed another HBD between 8:13 pm and 8:17 pm in Salem, Ohio, which reported the L1 bearing as being 103°F above ambient temperature—just high enough, relative to other bearings on the same side of the train, to trigger an alert for Norfolk Southern's Wayside Help Desk to monitor the bearing over the following detectors, but not high enough to require immediate action or to trigger an alarm to the train crew.  SUF ¶¶ 46, 49; Ex. 14 (Zarembski Rebuttal Rep.) ¶¶ 41-42,

46-47, 63; Ex. 29 (System Safety and Human Performance Group Chair's Factual Report) at -437 (noting that "[a]t Salem, the alert (code 953 – Bearing temperature spike) did not reach the threshold of an on-train alarm"); *see also* Ex. 5 (Poplawski Opening Rep.) ¶¶ 80, 94, 96; Ex. 13 (Poplawski Dep.) at 286:24-287:13, 292:23-293:6.

Half an hour later, shortly before the derailment, third-party video footage shows sparks coming from the Railcar 23 wheelset.  Ex. 5 (Poplawski Opening Rep.) ¶¶ 83, 85, 97.  At 8:52 pm, an HBD in East Palestine measured the L1 bearing at 253°F above ambient temperature, triggering an audible alarm alerting the crew to immediately stop the train.  SUF ¶¶ 52, 54; Ex. 14 (Zarembski Rebuttal Rep.) ¶ 64; *see also* Ex. 5 (Poplawski Opening Rep.) ¶ 84; Ex. 19 (Fabery Dep.) at 100:15-18; Ex. 29 (System Safety and Human Performance Group Chair's Factual Report) at -437.  Before the crew could bring the train to a controlled stop, Train 32N derailed.  SUF ¶ 55; Ex. 14 (Zarembski Rebuttal Rep.) ¶ 64; *see also* Ex. 29 (System Safety and Human Performance Group Chair's Factual Report) at -424.

As indicated by impact markings on the rail track and ties at mile post 49.5, Railcar 23 was the first car—both in time and in order of railcars—to derail.  Ex. 4 (Wolf Opening Rep.) ¶¶ 15, 17; Ex. 22 (Williams 30(b)(6) Dep.) at 161:4-10; Ex. 30 (Bilthuis Dep.) at 73:20-25; Ex. 25 (Wolf Dep.) at 72:19-73:1.  Railcar 23's derailment immediately preceded the derailment of 37 other cars from the mainline track, including 11 cars carrying hazardous materials.  SUF ¶ 56; Ex. 4 (Wolf Opening Rep.) ¶¶ 15, 17; Ex. 25 (Wolf Dep.) at 72:19-73:1; Ex. 30 (Bilthuis Dep.) at 73:20-25.

Following the derailment, on-site personnel found a damaged leading axle from GATX's Railcar 23 adjacent to a pileup containing Railcar 23.  *See* Ex. 12 (Saxe Dep.) at 95:21-96:1 ("I saw the wrung journal laying on the ground and I saw the wheelset, yes."); *id*. at 97:1-13, 213:2-

8

10; Ex. 30 (Bilthuis Dep.) at 73:12-14; Ex. 4 (Wolf Opening Rep.) ¶ 18; *see also* Ex. 6 (Mechanical Group Factual Report) at -265, -276.  That axle was missing its L1 journal, which, along with the roller bearing, was discovered mangled and on the other side of the pileup of derailed cars.  Ex. 4 (Wolf Opening Rep.) ¶ 18; Ex. 16 (Kennedy Dep.) at 141:1-7 (agreeing that the journal was "deformed and even melted or burned down at the bottom"); *see also* Ex. 6 (Mechanical Group Factual Report) at -277 (noting that the bearing "was found separated from the axle" and that "steel components within the reconditioned bearing had evidence of melting, portions of components galled and melted together, and extensive rub damage and plastic deformation").  The recovered L1 journal was deformed into a conical shape, measuring approximately two inches in diameter at its tip where it broke from the axle, while a normal journal would be 6.8 inches in diameter.  Ex. 5 (Poplawski Opening Rep.) ¶¶ 101-102.

## STANDARD OF REVIEW

A party may move for partial summary judgment by "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Partial summary judgment is an established means of resolving core, undisputed issues to bring about more efficient and focused trials.  *See, e.g.*, *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1152-1157 (S.D. Ohio 2021) (granting motion for partial summary judgment on the issue of whether a party was occupying a vehicle at the time of an accident); *Comer v. Shrum*, 2021 WL 2210592, at *2, *4 (E.D. Tenn. June 1, 2021) (same on the issue of whether "a bullet fired from [defendant's gun]" was "the cause of death"); *Bowling v. CSX Transp., Inc.*, 2013 WL 866459, at *6 (S.D. Ohio Mar. 7, 2013) (same "on the element of negligence per se"). "The freedom to use summary judgment procedure to address particular issues or elements of a

9

claim is an important feature of Rule 56, making it a much more useful case management device."  11 James Wm. Moore, *Moore's Federal Practice* § 56.122[2] (3d ed. 2024).

A motion for partial summary judgment should be granted where there is no genuine dispute as to any material fact with respect to the part of the claim at issue.  Fed. R. Civ. P. 56(a). There is no genuine factual dispute if the opposing party is unable to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts" at issue.  *Blume v. Potter*, 289 F. App'x 99, 102 (6th Cir. 2008) (quoting *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-340 (6th Cir. 1993)).

<u>**ARGUMENT**</u>

This Court should grant partial summary judgment on the issue whether the failed roller bearing on GATX's Railcar 23 was a but-for and proximate cause of the derailment of Train 32N.  There is no genuine dispute, and the evidence overwhelmingly proves, that GATX owned Railcar 23, Railcar 23's roller bearing overheated and failed, that failure caused Railcar 23 to derail, and the derailment of Railcar 23 caused Train 32N at large to derail.  The Court should therefore resolve this causation element now.  *See Hartsel v. Keys*, 87 F.3d 795, 803-804 (6th Cir. 1996) (affirming summary judgment on element of causation); *Lewis v. Norfolk S. Ry. Co.*, 2012 WL 3758838, at *4 (N.D. Ohio July 31, 2012) (resolving causation at summary judgment stage); *Rayco Mfg., Inc. v. Deutz Corp.*, 771 F. Supp. 2d 819, 823 n.8 (N.D. Ohio 2010) (same).

Because Ohio's law of negligence involves a "proximate causation" standard, *Fox v. Kia America, Inc.*, 2024 WL 1328730, at *9 (N.D. Ohio Mar. 28, 2024) (citing *Ross v. Nutt*, 203 N.E.2d 118, 120 (Ohio 1964)), Norfolk Southern must prove that the failed roller bearing "was a substantial factor in bringing about an injury and without which the injury would not have occurred," *Hardwick v. 3M Co.*, 2019 WL 4757134, at *16 (S.D. Ohio Sept. 30, 2019).  Norfolk

Southern need not demonstrate that the failed roller bearing was the only proximate cause of the derailment.  "Like federal courts, Ohio courts recognize 'there can be more than one proximate cause of a particular injury.'"  *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 795 (N.D. Ohio 2020) (quoting *Taylor v. Webster*, 231 N.E.2d 870, 873 (Ohio 1967)); *see also Czarney v. Porter*, 853 N.E.2d 692, 694 (Ohio App. 2006) ("It is well accepted that two factors can … each be[] considered a proximate cause of the injury.").  This causation standard is easily satisfied here.  There is no doubt that the derailment would not have occurred had the roller bearing on GATX's railcar not failed (but-for causation), nor that this failure was a substantial factor in bringing about the derailment (proximate causation).

*First*, there is no disputing that GATX owned Railcar 23.  SUF ¶ 4; Ex. 1 (Car # GPLX075465) at -183 (noting "Car Owner: GATC" for GPLX75465); Ex. 2 (Sbragia 30(b)(6) Dep.) at 11:18-21; Dkt. 194 at 3.

*Second*, there is no disputing that the L1 roller bearing on GATX's Railcar 23 overheated and failed.  Among the many fact and expert witnesses deposed in this case, no knowledgeable witness has disputed the point.  *See, e.g.*, Ex 22 (Williams 30(b)(6) Dep.) at 153:21-154:1 ("Q. The bottom line is, it's an overheated wheel bearing that caused the journal to burn off; true?  … THE WITNESS: True."); Ex. 17 (Schnautz Dep.) at 67:5-9 ("[T]he facts that have been gathered in my area, that I'm aware of, would indicate that this bearing was overheated ... and failed."); Ex. 19 (Fabery Dep.) at 99:14-100:1 (agreeing that the "wheel bearing burned off"); Ex. 12 (Saxe Dep.) at 94:14-19, 95:5-9, 215:4-9 (bearing failure was the only identified mechanical cause of derailment); Ex. 4 (Wolf Opening Rep.) ¶ 15 ("From all the available evidence and data, it is my opinion that Train 32N derailed because the L1 bearing ... suffered a fatal failure and burnt off[.]"); Ex. 25 (Wolf Dep.) at 39:7-8 (stating that cause of the derailment was "a burned-

11

off journal bearing"); Ex. 24 (Barner Dep.) at 90:3-5 ("Q. What is your understanding based on of what caused the derailment?  A. Burnt off journal bearing."); Ex. 31 (Hopewell Dep.) at 194:3-7 (agreeing that the bearing at issue was the L1 bearing on railcar GPLX 75465); Ex. 2 (Sbragia 30(b)(6) Dep.) at 30:4-11 ("Q. Moments before the derailment, surveillance video showed a wheel bearing on GPLX75465 in the final stage of overheat failure; is that correct?  A. I'm aware of that.").

Nor could they because the evidence fully supports that conclusion.  In the immediate leadup to the derailment, the HBDs measured a rapid rise of temperatures from the L1 bearing—from a normal 38°F above ambient temperature between 7:47 pm and 7:51 pm to 253°F above ambient temperature at 8:52 pm.  SUF ¶¶ 40-42, 46, 52, 54; Ex. 14 (Zarembski Rebuttal Rep.) ¶¶ 61-64; *see also* Ex. 5 (Poplawski Opening Rep.) ¶¶ 79, 84; Ex. 19 (Fabery Dep.) at 100:15-18; *see also* Ex. 29 (System Safety and Human Performance Group Chair's Factual Report) at -437. The reading from the HBD at 8:52 pm triggered an alarm alerting the crew of the impending emergency.  SUF ¶ 54; Ex. 14 (Zarembski Rebuttal Rep.) ¶ 64; *see also* Ex. 5 (Poplawski Opening Rep.) ¶ 84.  Third-party video footage further confirms that the bearing on Railcar 23 had started to undergo "burn off" at this time: what first appeared as orange glow became an intense show of sparks in the moments before the derailment.  SUF ¶ 51; Ex. 5 (Poplawski Opening Rep.) ¶¶ 83, 85, 97; Ex. 14 (Zarembski Rebuttal Rep.) ¶ 63; Ex. 4 (Wolf Opening Rep.) ¶ 15.

After the derailment, the L1 journal from Railcar 23 was discovered separated from the rest of the axle.  *See* Ex. 12 (Saxe Dep.) at 95:21-96:1 ("I saw the wrung journal laying on the ground and I saw the wheelset, yes."); *id*. at 97:1-13, 213:2-10; Ex. 30 (Bilthuis Dep.) at 73:12-14; Ex. 4 (Wolf Opening Rep.) ¶ 18; *see also* Ex. 6 (Mechanical Group Factual Report) at -265.

12

The L1 journal was deformed into a conical shape, measuring approximately two inches in diameter at its tip where it broke from the axle even though a normal journal would be 6.8 inches in diameter at that point.  Ex. 5 (Poplawski Opening Rep.) ¶¶ 101-102.  The L1 roller bearing itself was discovered broken and mangled on the other side of the pileup of derailed cars.  Ex. 4 (Wolf Opening Rep.) ¶ 18; Ex. 16 (Kennedy Dep.) at 141:1-7 (agreeing that the journal was "deformed and even melted or burned down at the bottom"); *see also* Ex. 6 (Mechanical Group Factual Report) at -277 (noting that the bearing "was found separated from the axle" and that "steel components within the reconditioned bearing had evidence of melting, portions of components galled and melted together, and extensive rub damage and plastic deformation").  This is all consistent with a "burn off" roller bearing failure.  Ex. 4 (Wolf Opening Rep.) ¶¶ 2, 15, 17-19; *see also* Ex. 5 (Poplawski Opening Rep.) ¶¶ 101-102.

*Third*, there is no disputing that the failure of the roller bearing caused Railcar 23 to derail.  It is well known to the industry that "burn off" from an overheated roller bearing can "cause a derailment in a matter of minutes."  Ex. 19 (Fabery Dep.) at 84:12-17; *see also* Ex. 15 (An Implementation Guide for Wayside Detector Systems) at -601 (noting that "[a] bearing can become overheated very quickly and may even burn off in just 1 to 3 minutes").  That is what occurred here.  Gary Wolf is an expert with over "53 years of experience in the rail industry, including over 49 years of experience specializing in the investigation of train derailments and accidents"; he has been qualified as an expert in railway and train operations and "derailment causation in approximately 300 cases" throughout the United States.  Ex. 4 (Wolf Opening Rep.) ¶ 3.  Wolf opined that "the L1 bearing on GPLX 75465 suffered a fatal failure and burnt off, allowing the side frame of GPLX 75465 to drop onto the track and begin the derailing process." Ex. 4 (Wolf Opening Rep.) ¶ 15; *see also id*. ¶¶ 2, 17, 19.  Again, among the many witnesses

deposed in this case, no knowledgeable witness has disputed the point that Railcar 23's derailment resulted from the L1 roller bearing's failure.  *See* Ex. 24 (Barner Dep.) at 90:3-14 (stating that the "[b]urnt off journal bearing" is what caused the derailment); Ex. 32 (Bedell Dep.) at 77:5-10 (agreeing that "the derailment was caused by an overheated wheel bearing"); Ex. 30 (Bilthuis Dep.) at 72:19-73:25 (stating that "a wrung journal" caused the derailment); Ex. 19 (Fabery Dep.) at 99:14-100:1 (agreeing that the train derailed because "that wheel bearing burned off and caused the derailment"); Ex. 12 (Saxe Dep.) at 94:14-19, 95:5-9, 214:25-215:9 (stating that wrung journal was the only identified mechanical cause of the derailment).

*Fourth* and finally, there is no disputing that Railcar 23's derailment caused the derailment of the successive 37 cars from the mainline track, including 11 cars carrying hazardous materials.  Railcar 23 was the first car—both in time and in placement on the train—to derail, as indicated by impact markings on the rail and ties at mile post 49.5.  Expert Gary Wolf opined that, after the L1 bearing on Railcar 23 failed, the side frame of that car dropped onto the track and "beg[a]n the derailing process."  Ex. 4 (Wolf Opening Rep.) ¶ 15; *see also id.* ¶ 17.  He explained further that this failure is what "precipitated the [] eventual derailment of the train and the [] pile-up of the train."  Ex. 25 (Wolf Dep.) at 72:23-73:1.  Once again, no knowledgeable witness has disputed the point.  *See, e.g.*, Ex. 30 (Bilthuis Dep.) at 73:20-25 (agreeing that Railcar 23 "was the first car to derail" and "triggered the derailment of all the other cars"); Ex. 22 (Williams 30(b)(6) Dep.) at 161:4-10 (explaining that Railcar 23 was the first to derail).

There are factual disagreements bearing on Norfolk Southern's case against GATX— separate from the clear, undisputed connection between GATX's failed roller bearing and the derailment—that will need to be resolved at trial to determine the full extent of GATX's liability. GATX, a company that has contributed nothing to East Palestine since the derailment, will likely

continue attempting to shift responsibility for its negligence to Norfolk Southern or others.  But it will have that chance at trial.  As relevant here, there is no genuine dispute that the failure of GATX's roller bearing was both a but-for and proximate cause of the derailment.

## **CONCLUSION**

Norfolk Southern respectfully requests that the Court grant partial summary judgment in its favor against GATX.

Dated: October 9, 2024

Respectfully submitted.

WILMER CUTLER PICKERING
   HALE AND DORR LLP

DICKIE, MCCAMEY &
   CHILCOTE, P.C.

*/s/ Alan Schoenfeld*
_____

ALAN SCHOENFELD*
ANDREW RHYS DAVIES*
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
andrew.davies@wilmerhale.com

DAVINA PUJARI*
CHRIS RHEINHEIMER*
One Front Street, Suite 3500
San Francisco, CA 94111
Tel.: (628) 235-1000
Fax: (628) 235-1011
davina.pujari@wilmerhale.com
chris.rheinheimer@wilmerhale.com

ALBINAS PRIZGINTAS*
2100 Pennsylvania Avenue NW
Washington, DC 20036
Tel.: (202) 663-6000
Fax: (202) 663-6363
albinas.prizgintas@wilmerhale.com

*Pro hac vice*

J. LAWSON JOHNSTON
SCOTT D. CLEMENTS, Ohio Bar No. 0096529
AARON PONZO*
PAUL ROMAN*
Two PPG Place, Suite 400
Pittsburgh, PA 15222
Tel.: (412) 281-7272
Fax: (412) 888-811-7144
ljohnston@dmclaw.com
sclemenets@dmclaw.com
aponzo@dmclaw.com
proman@dmclaw.com

*Pro hac vice*

*Counsel for Defendants / Third-Party Plaintiffs*
*Norfolk Southern Corporation and Norfolk Southern Railway Company*

## CERTIFICATION OF WRITTEN REQUEST FOR JUDGMENT OR DISMISSAL

I certify that on September 24, 2024, pursuant to requirements set out in ECF 98 ¶ 18, Norfolk Southern submitted a written request for judgment to GATX.  GATX replied on September 27, 2024, and refused to agree to judgment.  Norfolk Southern maintains it is entitled to partial summary judgment.

*/s/ Alan Schoenfeld*
ALAN SCHOENFELD

## CERTIFICATE OF LOCAL RULE 7.1 COMPLIANCE

I certify that this Memorandum adheres to the page limitations set forth in the Local Rule 7.1(f) for mass-tort cases because it does not exceed 40 pages in length.

*/s/ Alan Schoenfeld*
ALAN SCHOENFELD

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2024, I caused a copy of the foregoing to be filed with the Clerk of the Court using the Court's CM/ECF electronic filing system, which will provide electronic notice to all counsel of record.

*/s/ Alan Schoenfeld*
ALAN SCHOENFELD