PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  EAST PALESTINE TRAIN DERAILMENT | ) ) ) ) ) ) ) ) | CASE NO.  4:23CV0242 |
| | | JUDGE BENITA Y. PEARSON |
| | | **MEMORANDUM OF OPINION AND ORDER** [Resolving ECF No. 629] |

Pending is Third-Party Plaintiffs Norfolk Southern Corporation and Norfolk Southern

Railway Company's (collectively "Norfolk Southern") Motion to Exclude the Expert Report and

Testimony of James H. Rader (ECF No. 629) proffered by Third-Party Defendants GATX

Corporation and General American Marks Company ("GATX").  The Court has been advised,

having reviewed the record, the parties' briefs, and the applicable law.  For the reasons that

follow, the motion is denied.

**I.**

GPLX 75465 (Car 23) – the railcar owned by GATX[1] – was added to Train 32N at the

Terminal Railroad Association of St. Louis's ("TRRA") terminal in Madison, Illinois.  TRRA,

not Norfolk Southern, was obligated to inspect Train 32N before it departed Madison.  *See*

Deposition of James H. Rader (ECF No. 629-4) at PageID #: 37936:20 - PageID #: 37937:3.

Before it derailed in East Palestine, Train 32N passed over a series of hot bearing detectors

("HBDs") that monitor the radiant temperatures of a train's roller bearings to prevent

---

[1] *See* Stipulation Regarding Uncontested Facts (ECF No. 586) at PageID #: 17627, ¶¶ 3-4; *see also* Stipulation (ECF No. 740).

(4:23CV0242)

derailments.  A Norfolk Southern HBD in Salem, Ohio recorded a bearing temperature spike on

the L1 wheel of GPLX 75465 − whose failed roller bearing caused the derailment on February 3,

2023.  GATX argues that Train 32N derailed in East Palestine because Norfolk Southern's HBD

system failed to inform the crew of a bearing temperature spike, which would have caused the

crew to stop the train.  Gary Rambo − the wayside analyst on duty when Train 32N derailed −

missed the 953 alert[2] at the Salem detector because he was preoccupied with alerts from five

other trains.  *See* Deposition of Gary Rambo (ECF No. 622-6) at PageID #: 33458; 33463.  The

crew of Train 32N testified that had they been informed of the 953 alert at the Salem detector,

they would have stopped the train before it derailed in East Palestine.  *See* Deposition of Kevin

Stauffer (ECF No. 622-7) at PageID #: 33626; Deposition of Michael Anthony Faison (ECF No.

622-5) at PageID #: 33401; Deposition of Javon Jordan Dep. Tr. (ECF No. 622-8) at PageID #:

33712.

## II.

The Federal Rules of Evidence, and specifically Rule 702, "assign to the trial judge the

task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand."  *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  Rule 702

governs the admissibility of expert testimony and codifies the Supreme Court's holdings in

*Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  Expert testimony is

admissible only if (1) the testimony is based on sufficient facts or data, (2) the testimony is the

---

[2]  "A 953 Alert indicates a bearing temperature spike."  Opposing Expert Report
of James H. Rader (ECF No. 629-3) at PageID #: 37743 (citing Deposition of Thomas
Fox (ECF No. 622-4) at PageID #: 33286; NS-CA-000692637, p. 1 ("953 Alert (Bearing
Temperature Spike)").

(4:23CV0242)

product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony satisfies those standards.  *See* Fed. R. Evid. 702 advisory committee's note (2000); *Daubert*, 509 U.S. at 592 n.10.  Expert testimony is not admissible "is the exception rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

Furthermore, a *Daubert* analysis includes consideration of Fed. R. Evid. 403. *Daubert*, 509 U.S. at 595.  Therefore, courts in the Sixth Circuit employ a four prong test to determine the admissibility of expert opinions:  "(1) that the witness, a qualified expert, (2) was testifying to a proper subject, (3) which conformed to a generally accepted explanatory theory, and (4) the probative value of the testimony outweighed its prejudicial effect." *United States v. Smithers*, 212 F.3d 306, 312 (6th Cir. 2000) (citing *United States v. Green*, 548 F.2d 1261 (6th Cir.1977)).

## III.

Rader has "more than 45 years of railroad related experience." ECF 629-3 at PageID #: 37736, § 1, ¶ 1.2.  He began his career as a railcar inspector over 40 years ago and has "been inspecting cars ever since." ECF 629-4 at PageID #: 37794:20-22; PageID #: 37795:16-20.  That experience spans railroad safety, regulation, and operations, including, among other areas, railcar inspection and maintenance, auditing of inspection and maintenance practices, assistance with accident investigations, and developing and ensuring regulatory compliance. *See* ECF 629-3 at PageID #: 37736, § 1, ¶ 1.2.  Rader has decades of experience inspecting railcars, including as both a carman in the field and, more recently, a consultant. *See* ECF 629-4 at PageID #:

(4:23CV0242)

37794:20-22; PageID #: 37795:16-20.  Over the years, he has also gained "practical industry experience" with HBDs in working on behalf of railcar owners who rely on the accuracy of the data generated by HBDs and who rely on railroads to respond appropriately to that data in real time.  ECF No. 629-4 at PageID #: 38002:5-21; PageID #: 37879:5-14.

He opines on how Norfolk Southern's policies and practices – specifically as they relate to pre-departure inspections and HBDs – contributed to Train 32N's derailment.  Specifically, Rader opines that "Norfolk Southern failed to validate that TRRA performed a required inspection of Train 32N," deviating from industry standards, and thus "created gaps in the inspection and recordkeeping process that may have prevented the derailment."  ECF 629-3 at PageID #: 37737, § 2, ¶ 2; PageID #: 37751, § 5.  Rader also opines that "Norfolk Southern failed to properly setup its Wayside Detector System and improperly staffed its Wayside Desk," which "prevent[ed] the crew from learning that the L1 bearing was overheated, with what appeared on contemporaneous video to be molten metal and fire emanating from the L1 bearing, when it passed the Salem detector and stopping the train."  ECF No. 629-3 at PageID #: 37737, § 2, ¶ 1.  Applying his experience in railcar inspection and documentation practices, Rader concludes that Norfolk Southern failed to act consistent with what its own corporate representative called a "good practice" in maintaining records of pre-departure inspections.[3]  ECF 629-3 at PageID #: 37752, 37754-55.  That, in turn, prevented Norfolk Southern from verifying that a proper pre-departure mechanical inspection of GPLX 75465 had even been conducted.  According to Rader, each of these policies and practices contributed to Train 32N's derailment.

---

[3]  Deposition of David Dixon (ECF No. 591) at PageID #: 18751:24-18752:8 ("Norfolk Southern feels it is a good practice" to have a written record showing that a qualified mechanical inspection was performed.).

4

(4:23CV0242)

Next, applying his practical industry experience, Rader concludes that Norfolk Southern's HBD policies – which Norfolk Southern states do not require a wayside analyst to take action after a 953 alert but, instead, allow automatic transmittal of a "no defects" announcement to the train crew – prevented the crew from learning of the alert and stopping Train 32N before it derailed. *See* ECF No. 629-3 at PageID #: 37743-44; 37750. In addition, Rader concludes that Norfolk Southern's policy of staffing just one analyst at a time at its Wayside Desk caused the analyst on duty on the night of the derailment to miss the 953 alert at Salem and, as a result, fail to notify the crew of the alert, which would have resulted in the crew stopping the train before it derailed. *See* ECF No. 629-3 at PageID #: 37745-46, 37748.

**IV.**

Norfolk Southern moves the Court to exclude Rader's report and testimony concerning its use of HBDs and wayside detection monitoring. Norfolk Southern challenges both Rader's qualifications as an expert and his ability to testify under the relevance and reliability standards set forth in *Daubert* and its progeny.

**A.**

Norfolk Southern argues that Rader is not qualified to opine on issues related to HBDs or wayside detection monitoring systems.

Under Fed. R. Evid. 702, "expert witnesses must be qualified to testify to a matter relevant to the case, and a proffering party can qualify their expert with reference to his 'knowledge, skill, experience, training or education.' " *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir.2007) (quoting Rule 702). "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact."

5

(4:23CV0242)

*Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir.1998) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir.1984)).  To determine whether a witness is so qualified to opine on issues in the case, a court "must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony."  *Berry v. Crown Equip. Corp.*, 108 F. Supp.2d 743, 749 (E.D. Mich. 2000); *see also Kumho Tire*, 526 U.S. at 156 ("The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case.") (internal quotation marks and cite omitted).

Norfolk Southern argues that Rader is not qualified to offer his opinions regarding HBDs because he does not have specific experience "with the functioning, installation, or placement of HBDs" or the operation of a "wayside desk."  ECF No. 629-1 at PageID #: 37715.  Norfolk Southern does not, however, dispute that Rader has more than 45 years of experience in the railroad industry, including "experience in Congressional legislation, federal transportation policy, rulemaking, enforcement, [and] accident and incident investigations."  *See* Rader's Curriculum Vitae (ECF No. 629-3 at PageID #: 37773-74) at PageID #: 37773.  Throughout his career, Rader has overseen the inspection of railcars, auditing of railcar construction, repairs, and pre-transportation practices, developing railroad safety regulations, providing regulatory counsel, ensuring compliance with federal regulations and Association of American Railroads ("AAR") standards, and assisting with rail-related accident investigations.  *See* ECF No. 629-3 at PageID #: 37773-74.

Norfolk Southern, nevertheless, contends that Rader's extensive railroad experience does not matter because he lacks "specific" experience in HBD and wayside desk operations.  The

(4:23CV0242)

Court disagrees for two reasons.  First, Norfolk Southern misrepresents Rader's experience.

Rader declared in his deposition that although his more than 45 years of experience in the

railroad industry did not involve "designing, installing, maintaining, [or] calibrating wayside

detectors," he does have "practical industry experience" with HBDs in working on behalf of

railcar owners who rely on the accuracy of the data generated by HBDs that is communicated to

them by railroads, and also rely on railroads to respond appropriately to that data in real time.

Rader testified during cross-examination as follows:

> Q  Do you have any work that you've done that would establish that that
> conclusion is incorrect?
> A  No.  I was not asked to look at that, and I wouldn't be the expert to look
> at the design, installation, calibration of a wayside detector.
> Q  That's outside of your area of expertise?
> A  Yes, it is.  I come to the point as a user of the equipment no different
> than the train crew or the wayside desk analyst or a car owner being informed
> about hot bearings on wheels.

ECF No. 629-4 at PageID #: 37879:5-14.

> Q  Are your opinions as to those topics based on your experience in the
> industry and the materials that you reviewed?
>                                    *   *   *
> A  Yes.  I mean, my -- I have almost 50 years in the industry working in
> the railroad industry.  My experience, again, is not designing, installing,
> maintaining, calibrating wayside detectors.  It's not has to do with the wayside
> desk, it's rather my practical industry experience and as a user of the wayside
> detectors.
> So as a car owner and when I worked for Greenbrier or any other company
> as car owners, we relied on those detectors to be accurate no different than the
> train crew or the wayside desk analysts.  They're users, not design engineers.

ECF No. 629-4 at PageID #: 38002:5-21.  Contrary to Norfolk Southern's contention, Rader does

have practical experience interpreting wayside detector data, and he is therefore qualified to

opine on how the railroad (like train crews and wayside desk analysts) would likely act in

response to HBD data.

7

(4:23CV0242)

Second, Norfolk Southern's focus on HBDs or wayside detection monitoring is too narrow for determining Rader's expert qualification in the present case.  An expert's "lack of experience in a more specialized area within the field goes to the weight and not admissibility of [his] testimony." *Ross v. Am. Red Cross*, No. 2:09-cv-905, 2012 WL 1656995, at *4 (S.D. Ohio May 10, 2012), *aff'd*, 567 Fed.Appx. 296 (6th Cir. 2014) (citing *Surles*, 474 F.3d at 294).  "[A]n argument opposing admissibility of the testimony [of Rader] on the grounds that it is outside [his] area of expertise must fail." *Benton v. Ford Motor Co.*, 492 F. Supp.2d 874, 877 (S.D. Ohio 2007) (citing *Morales*, 151 F.3d at 515).  Rader will testify to the practical implications of Norfolk Southern's HBD system in the case at bar, *i.e.*, Norfolk Southern's failure to alert the crew of Train 32N of the overheated bearing and prompt the crew to stop the train.  "As a threshold matter, expert witnesses must be qualified to testify to a matter relevant to the case, and a proffering party can qualify their expert with reference to his 'knowledge, skill, experience, training or education.' " *Surles*, 474 F.3d at 293 (quoting Rule 702).  As long as the background and general experience of the expert leaves him "well-positioned" to assist the jury, "[i]t is of little consequence to questions of admissibility that [the expert] lack[s] expertise in the very specialized area." *Id.* at 294.  It is ultimately up to the jury to determine for itself the credibility and weight to be given to Rader's opinions and testimony.

**B.**

Next, Norfolk Southern contends that Rader's opinions concerning HBDs and wayside detection monitoring are unreliable.

8

(4:23CV0242)

## 1.

According to Norfolk Southern, Rader's opinions on HBD alert criteria and functionality are unreliable.  Norfolk Southern claims that Rader's opinion that "[h]ad Norfolk Southern lowered the K value threshold or required action after the first [953] alert, the derailment could have been prevented[,]" ECF No. 629-3 at PageID #: 37750,[4] is "unreliable" because it lacks any "methodology" or "explanation."  ECF 629-1 at PageID #: 37718-19.  GATX argues to the contrary that Rader's opinions and testimony are reliable because he "conducted a thorough evidentiary analysis centered on the facts developed in the record and drew from his knowledge and experience in the railroad industry to derive his opinions concerning Norfolk Southern's alert criteria."  ECF No. 670 at PageID #: 46543-44.  Rader does not profess to base his opinions concerning HBDs on any industry standards or regulations.  *See* ECF No. 629-3 at PageID #: 37749, § 4.5 (basing opinions "on the material I have reviewed[ ] and . . . on my experience in the industry").

When assessing the effect of Norfolk Southern's stated policy for 953 alerts, Rader concludes that policy impeded Norfolk Southern employees from stopping Train 32N before it derailed.  *See* ECF No. 629-3 at PageID #: 37750, § 4.2.1.1.  He relied on Norfolk Southern's own documents and the testimony of its Wayside Desk operators and train crew to conclude that: (1) a 953 alert "is triggered when a wayside detector measures a bearing temperature with a Kt value greater than 4"; (2) "Norfolk Southern's wayside detector system does not automatically transmit an audible announcement to the train crew" after a single 953 alert, but, instead, the

---

[4] K value thresholds are measurements used to detect anomalies in bearing temperature.

(4:23CV0242)

crew receives a "no defects" announcement; and, (3) the wayside analyst is (according to Norfolk Southern) "not *require*[d]" to take any action after a single 953 alert, including informing the train crew of the alert.  ECF No. 629-3 at PageID #: 37743-44, § 4.2.1.1 (emphasis in original). He also verified that the HBD reading of GPLX 75465's L1 bearing at the Salem detector satisfied the criteria for a 953 alert.  *See* ECF No. 629-3 at PageID #: 37747, § 4.4.  Finally, Rader reviewed the testimony of the crew of Train 32N, which confirmed that, had they been informed of the 953 alert at the Salem detector, they would have stopped Train 32N before it derailed in East Palestine.  *See* ECF No. 629-3 at PageID #: 37747-48, § 4.4.  Rader's opinions on HBD alert criteria and functionality "rests upon a reliable foundation" and are nothing like the kind of "unsupported speculation" that *Daubert* excludes.  *In re Scrap Metal*, 527 F.3d at 529-30. His conclusions "have a basis in established fact."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000).

Rader also pointed out the inconsistency in Norfolk Southern's wayside operations guidance.  He testified during cross-examination at his deposition that Norfolk Southern's "Wayside Help Desk Standard Operating Procedure" (ECF No. 670-3), which was provided to the National Transportation Safety Board ("NTSB"), requires the wayside analyst to "talk to the crew" upon transmittal of a 953 alert.  ECF 629-4 at PageID #: 37962:25 - PageID #: 37963:3; PageID #: 37965:25 - PageID #: 37966:2.[5]

---

[5]  Rader also opines on an 853 alert in his expert report.  *See* ECF No. 629-3 at PageID #: 3744, § 4.2.1.2; PageID #: 37750, §4.5.  In his deposition, however, Rader testified that he had "come to understand" since authoring his report that "there was additional criteria on an 853 alert" that the L1 bearing on GPLX 75465 did not satisfy on the night of the derailment.  ECF No. 629- 4 at PageID #: 37908:20 - PageID: 37909:12. Those criteria were not, however, reflected in the "documents that Norfolk Southern

(continued...)

10

(4:23CV0242)

Norfolk Southern suggests that Rader's decision not to answer certain hypotheticals during his deposition – such as questions about how Norfolk Southern should adjust its HBD alert criteria, or whether the crew of Train 32N would have stopped the train had they been told that Norfolk Southern policy did not require them to (which is a disputed fact) – indicates a lack of reliability. *See* ECF No. 629-1 at PageID #: 37716-17. But "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand" – as Rader's testimony is here – not that he "*know* answers to all the questions a case presents—even to the most fundamental questions." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (emphasis in original).

The Court finds that Rader's opinions on Norfolk Southern's HBD alert criteria and functionality are reliable. *see First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (holding that "testimony derived largely from [the expert's] own practical experiences throughout forty years in the [relevant] industry" was reliable).

**2.**

Norfolk Southern maintains that Rader's opinions concerning its wayside detection monitoring are unreliable. But again, these opinions are not mere "unsupported speculation," but instead rest on a detailed analysis of the record evidence informed by Rader's lengthy experience in the railroad industry. *See In re Scrap Metal*, 527 F.3d at 529-30.

---

[5](...continued)
submitted to the National Transportation Safety Board," on which Rader relied in reaching his opinions regarding 853 alerts. ECF No. 629- 4 at PageID #: 37909:5-6. This is a subject for exploration during direct and cross-examination of Rader at trial.

(4:23CV0242)

Rader reviewed documents produced by Norfolk Southern and the testimony of its Wayside Desk staff.  His review revealed that, following Norfolk Southern's implementation of Precision Scheduled Railroading ("PSR"),[6] two Research positions were eliminated at the Wayside Desk by 2020.  *See* ECF 629-3 at PageID #: 37745, § 4.3.  His review also revealed that, at the time of the derailment, (1) Norfolk Southern's practice was to have a single wayside analyst working a 12-hour shift and monitoring its entire wayside detection system, *see* ECF No. 629-3 at PageID #: 37746, § 4.3; (2) Norfolk Southern had no backup system to ensure responses to alerts, ECF No. 622-4 at PageID #: 33267 ("Q  . . . When you are on your 12-hour shift, acting solo, as the . . . Wayside Analyst, if you get multiple alerts coming in at around the same time, do you have a backup system?  Somebody that's going to respond to those alerts, because you are handling others?  A.  No.  Q.  So if too many alerts come in, they basically have to wait until you get to them.  Correct?  A.  That's right."); and, (3) as stated above, the wayside analyst on duty when Train 32N derailed missed the 953 alert at the Salem detector because he was preoccupied with alerts from five other trains.  *See* ECF No. 622-6 at PageID #: 33458; 33463.  The evidence reviewed by Rader also shows occasions in March 2023, *i.e.*, after the derailment in the case at bar, when Rambo, upon receiving similar alerts that he did notice, instructed train crews to stop after one HBD reading.  *See* ECF No. 629-3 at PageID #: 37749, § 4.4.

---

[6]  Norfolk Southern's former CEO, Alan Shaw, testified during cross-examination at his deposition that Norfolk Southern implemented PSR in late 2018 to increase the flow of railcars from yards to customers.  Deposition of Alan Shaw (ECF No. 579) at PageID #: 16213:9 - PageID #: 16214:22.  As part of PSR, Norfolk Southern's trains became longer and heavier, ECF No. 579 at PageID #: 16102:6-17, meanwhile its inspection times became shorter.  Certain inspection times were reduced by almost 40%.  *See* Deposition of Jamie Williams (ECF No. 709-1) at PageID #: 51537 (admitting that from February 2018 to February 2023, Norfolk Southern's man minutes per car went from over 150 seconds per car to under 90 seconds per car).

(4:23CV0242)

Norfolk Southern suggests that evidence reviewed by Rader should have led him to conclude that the wayside analyst on duty when Train 32N derailed would not have alerted the train crew even had he seen the 953 alert at Salem.  *See* ECF No. 629-1 at PageID #: 37722.  But that kind of challenge to the factual basis of Rader's opinions has nothing to do with the reliability or admissibility of the testimony.  Rather, it is the kind of argument that Norfolk Southern may make to the jury if it truly thinks that Rader's opinions deserve little weight.  *See In re Scrap Metal*, 527 F.3d at 530-31; *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 180 (6th Cir. 2009) (reversing exclusion of expert testimony when defendant's "attacks on [his opinion] amount[ed] to factual disputes suitable for cross-examination").

Rader's conclusions concerning Norfolk Southern's wayside detection monitoring "have a basis in established fact."  *McLean*, 224 F.3d at 801.  Therefore, the Court finds that Rader's opinions are reliable.  *See First Tenn. Bank*, 268 F.3d at 335.

### V.

Finally, Norfolk Southern moves the Court to exclude  Rader's opinions regarding pre-departure inspections.

### A.

Norfolk Southern argues that Rader's opinions on its pre-departure inspection practices are "irrelevant to the factual disputes in this case and should be excluded on that basis alone." Memorandum in Support (ECF 629-1) at PageID #: 37723.  Norfolk Southern states that because GPLX 75465 was added to Train 32N at TRRA's yard in Madison, Illinois, it was TRRA's – not Norfolk Southern's – responsibility to inspect GPLX 75465 before departure.  Rader's opinion is that, upon receiving Train 32N, "Norfolk Southern failed to document and confirm that TRRA

13

(4:23CV0242)

performed the federally required freight car inspections under 49 CFR 215 prior to moving the

train. . . .”  ECF 629-3 at PageID #: 37755, § 5.3.  According to Rader, potential issues with the

L1 bearing “that w[ere] observable through visual inspection . . . could have been missed” due to

Norfolk Southern’s “substandard inspection and documentation practices” and, as a result,

causally contributed to the derailment of Train 32N.  ECF 629-3 at PageID #: 37756, § 5.3.

      Rule 702’s relevancy – or “helpfulness” – provision requires that the expert’s testimony

assist the trier of fact.  “This requirement has been interpreted to mean that scientific testimony

must ‘fit’ the facts of the case, that is, there must be a connection between the scientific research

or test result being offered and the disputed factual issues in the case in which the expert will

testify.”  *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at

592).  The issue that Rader addresses in his report is not who was responsible for the inspection,

but instead how Norfolk Southern’s pre-departure inspection practices – and, specifically, its

failure to verify or document a pre-departure inspection of GPLX 75465 – may have causally

contributed to the derailment.  That question implicates a fundamental issue in this case.

**B.**

      Next, Norfolk Southern contends that Rader’s opinions regarding pre-departure

inspections are unreliable.  Specifically, Norfolk Southern takes issue with Rader’s opinions that

those practices “did not meet industry inspection standards,” including those “regarding

inspection documentation,” ECF 629-3 at PageID #: 37751, § 5.1; PageID #: 37752, § 5.2,

because Rader supposedly does not identify any industry standards.  Rather, they are his “own

personal preferences and subjective expectations, unmoored from any knowledge of any

‘industry standard’ whatsoever.”  ECF No. 629-1 at PageID #: 37725.

14

(4:23CV0242)

Rader does, however, provide evidence that is probative of best practices in the railroad industry as it relates to maintaining pre-departure inspection documentation. He cites the testimony of Norfolk's Southern own corporate representative, whom testified that Norfolk Southern itself "feels it is a good practice" to maintain written documentation of pre-departure mechanical inspections. ECF 629-3 at PageID #: 37752 (quoting Dixon Deposition (ECF No. 591) at PageID #: 18751:24-18752:8). Rader also mentions a citation received by Norfolk Southern from the Federal Railroad Administration ("FRA") "for failing to perform pre-departure inspections pursuant to 49 CFR §215" for a number of outbound railcars just months before the derailment in the case at bar. See ECF 629-3 at PageID #: 37752 (citing FRA Inspection Report dated 9/22/2022 (ECF No. 670-2)). Finally, he cites (1) testimony from one of Norfolk Southern's general managers of the Northern Region confirming the absence of records of any pre-departure mechanical inspection of GPLX 75465; and (2) evidence suggesting that no pre-departure inspection of GPLX 75465 occurred,[7] including post-derailment FRA inspection reports of the cars on Train 32N and testimony from the TRRA carmen who were on duty when GPLX 75465 was added to Train 32N. See ECF 629-3 at PageID #: 37754-55.

In *United States v. Lang*, 717 Fed.Appx. 523 (6th Cir. 2017), the Sixth Circuit held that an expert opinion is reliable when it rests on a "*sufficient*" factual basis and is not "plainly contradict[ed]" by the record. *Id.* at 536 (emphasis in original). Because Rader's opinions are based on "established fact[s]" in the record, *McLean*, 224 F.3d at 801, they satisfy *Daubert's* reliability standard.

---

[7] Norfolk Southern notes that a Class I air brake slip was provided in this case. *See* ECF No. 629-1 at PageID #: 37727; Reply Memorandum (ECF No. 705) at PageID #: 51396.

(4:23CV0242)

Based on his more than 45 years of railroad related experience, Rader explained during cross-examination at his deposition that had a pre-departure inspection been performed on GPLX 75465, he would have expected to see "a document that shows that . . . car men were actually on the track doing a mechanical inspection." ECF No. 629-4 at PageID #: 37835:20 - PageID #: 37836:7; *see Surles*, 474 F.3d at 296 (affirming admission of expert testimony when the expert "state[d] that his opinions were based on his extensive experience and review of the relevant materials"). Such documentation would typically take the form of "a blue flag record" showing when "the yardmaster . . . inform[ed] the car department that tracks . . . are available for mechanical inspection." ECF No. 629-4 at PageID #: 37836:9 - 37837:6; PageID #: 37839:5-18. Given these typical documentation practices, Rader testified that "before . . . assum[ing] the responsibility" for a train on its line, it is best practice for a railroad to confirm "th[e] train [was] inspected," whether through an audit or receipt of inspection documentation. ECF No. 629-4 at PageID #: 37937:4 - PageID #: 37938:14; *see also* ECF No. 629-4 at PageID #: 37939:20 - PageID #: 37940:14. These detailed descriptions of railroad industry documentation practices show that Rader's opinions regarding pre-departure inspections are nothing like the kind of "unsupported speculation" that *Daubert* excludes. *In re Scrap Metal*, 527 F.3d at 530. Moreover, "[when] the reliability of the evidence is in dispute, it is more appropriate for a judge to admit the evidence than to keep it from the fact-finder because '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, 90 F. Supp.3d 746, 752 (S.D. Ohio 2015) (quoting *Daubert*, 509 U.S. at 596).

16

(4:23CV0242)

Norfolk Southern nonetheless claims that Rader "ignores" evidence "that is contrary to his opinions" and "improperly offer[s] his own credibility determinations" when it comes to the testimony of the TRRA inspectors.  ECF No. 629-1 at PageID #: 37727.  The argument that an expert "ignore[s] evidence that contradict[s] his conclusions" goes "to the weight, not the admissibility, of [his] testimony."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp.3d 724, 736 (N.D. Ohio 2014).

Therefore, the Court finds that Rader's opinions regarding Norfolk Southern's pre-departure inspection of Train 32N are reliable.

**VI.**

For the foregoing reasons and those that have been articulated in the memorandum of the points and authorities on which GATX relies, Norfolk Southern's Motion to Exclude the Expert Report and Testimony of James H. Rader (ECF No. 629) is denied.


        IT IS SO ORDERED.


    January 24, 2025              /s/ Benita Y. Pearson
Date                         Benita Y. Pearson
                             United States District Judge

17