PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:  EAST PALESTINE TRAIN          )
DERAILMENT                            )        CASE NO.  4:23CV0242
                                      )
                                      )        JUDGE BENITA Y. PEARSON
                                      )
                                      )        **MEMORANDUM OF OPINION**
                                      )        **AND ORDER**
                                      )        [Resolving ECF No. 630]


Pending is Third-Party Plaintiffs Norfolk Southern Corporation and Norfolk Southern

Railway Company's ("Norfolk Southern") Motion to Exclude the Expert Report and Testimony

of Drs. Lee Swanger and Sarah Parker (ECF No. 630) proffered by Third-Party Defendants

GATX Corporation and General American Marks Company ("GATX").  The Court has been

advised, having reviewed the record, the parties' briefs, and the applicable law.  For the reasons

that follow, the motion is denied.

**I.**

GPLX 75465 (Car 23) – the railcar owned by GATX[1] – was added to Train 32N at the

Terminal Railroad Association of St. Louis's ("TRRA") terminal in Madison, Illinois.  TRRA,

not Norfolk Southern, was obligated to inspect Train 32N before it departed Madison.  *See*

Deposition of James H. Rader (ECF No. 629-4) at PageID #: 37936:20 - PageID #: 37937:3.

Before it derailed in East Palestine, Train 32N passed over a series of hot bearing detectors

---

[1]  *See* Stipulation Regarding Uncontested Facts (ECF No. 586) at PageID #: 17627, ¶¶ 3-4; *see also* Stipulation (ECF No. 740).  "At the time of the derailment, GPLX 75465 was leased to Braskem America, Inc. ("Braskem")."  ECF No. 586 at PageID #: 17628, ¶ 12.

(4:23CV0242)

("HBDs") that monitor the radiant temperatures of a train's roller bearings to prevent

derailments.  A Norfolk Southern HBD in Salem, Ohio recorded a bearing temperature spike on

the L1 wheel of GPLX 75465 – whose failed roller bearing caused the derailment on February 3,

2023.  GATX argues that Train 32N derailed in East Palestine because Norfolk Southern's HBD

system failed to inform the crew of a bearing temperature spike, which would have caused the

crew to stop the train.  Gary Rambo – the wayside analyst on duty when Train 32N derailed –

missed the 953 alert[2] at the Salem detector because he was preoccupied with alerts from five

other trains.  *See* Deposition of Gary Rambo (ECF No. 622-6) at PageID #: 33458; 33463.  The

crew of Train 32N testified that had they been informed of the 953 alert at the Salem detector,

they would have stopped the train before it derailed in East Palestine.  *See* Deposition of Kevin

Stauffer (ECF No. 622-7) at PageID #: 33626; Deposition of Michael Anthony Faison (ECF No.

622-5) at PageID #: 33401; Deposition of Javon Jordan Dep. Tr. (ECF No. 622-8) at PageID #:

33712.

## II.

The Federal Rules of Evidence, specifically Rule 702, "assign to the trial judge the

task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand."  *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  Rule 702

governs the admissibility of expert testimony and codifies the Supreme Court's holdings in

*Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  Expert testimony is

---

[2]  "A 953 Alert indicates a bearing temperature spike."  Opposing Expert Report
of James H. Rader (ECF No. 629-3) at PageID #: 37743 (citing Deposition of Thomas
Fox (ECF No. 622-4) at PageID #: 33286; NS-CA-000692637, p. 1 ("953 Alert (Bearing
Temperature Spike)").

(4:23CV0242)

admissible only if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony satisfies those standards.  *See* Fed. R. Evid. 702 advisory committee's note (2000); *Daubert*, 509 U.S. at 592 n.10.  Expert testimony is not admissible "is the exception rather than the rule."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

Furthermore, a *Daubert* analysis includes consideration of Fed. R. Evid. 403.  *Daubert*, 509 U.S. at 595.  Therefore, courts in the Sixth Circuit employ a four prong test to determine the admissibility of expert opinions:  "(1) that the witness, a qualified expert, (2) was testifying to a proper subject, (3) which conformed to a generally accepted explanatory theory, and (4) the probative value of the testimony outweighed its prejudicial effect."  *United States v. Smithers*, 212 F.3d 306, 312 (6th Cir. 2000) (citing *United States v. Green*, 548 F.2d 1261 (6th Cir.1977)).

**III.**

The testimony of Drs. Swanger and Parker is will be import to the jury's determination of the cause of the failed L1 roller bearing on GPLX 75465, which Norfolk Southern acknowledges is a "remaining question" in the case at bar and "highly disputed, and for the jury to decide."  Memorandum in Support (ECF No. 630-1) at PageID #: 38133.  Drs. Swanger and Parker's report delineates the scope of each expert's opinions:

> . . . Specifically, Dr. Swanger was asked to provide responsive expert opinions *regarding the journal burn-off of GPLX 75465*. . . .  Additionally, Dr. Swanger was asked to review and evaluate *the expert report of Joseph Poplawski*, proffered by Norfolk Southern.  Dr. Parker was asked to provide responsive

3

(4:23CV0242)

> expert opinions regarding *issues related to the bearing grease that are pertinent to the journal burn-off and to the expert report of Joseph Poplawski*.

Opposition Expert Report of Lee Swanger, Ph.D., P.E. and Sarah Parker, Ph.D. (ECF No. 630-3) at PageID #: 38160, § 1.2 (emphasis added).  Drs. Swanger and Parker opine in the Joint Report that none of the following conditions caused the alleged failure of the L1 bearing on GPLX 75465:  (1) excessive fatigue spalling; (2) water intrusion resulting in water etch and corrosion or grease emulsion; (3) false brinneling *i.e.*, vibrations; (4) overloading; or (5) static internal grease separation.  *See* ECF No. 630-3 at PageID #: 38162, § 2, ¶ 1.  They also respond to the Opening Expert Report of Joseph Poplawski, Norfolk Southern's proffered expert (ECF No. 618-7), specifically rebutting his opinions that "attribut[e] the L1 bearing failure to Hurricane Harvey" – a Category 4 hurricane in which a year's worth of rain fell during just four days.  ECF No. 630-3 at PageID #: 38162, § 2, ¶ 3.

    Drs. Swanger and Parker rely on a variety of record evidence to support their causal analysis.  They cite scientific articles supporting that the "[t]eardown of the mate bearing [here, the R1 bearing on GPLX 75465] is often performed in the case of journal burn-off to help infer the cause of failure, since the evidence on a burned-off journal is destroyed as a consequence of the burn-off."  ECF No. 630-3 at PageID #: 38166, § 5.  Drs. Swanger and Parker state that both the R1 and L1 bearings "experienced virtually identical environmental exposures, loading scenarios and the like throughout their lifetimes after reconditioning and installation on GPLX 75465."  ECF No. 630-3 at PageID #: 38167, § 5.  In the present case, Dr. Swanger physically inspected the R1 bearing in person, which "was reconditioned and placed on GPLX 75465 at the same time and by the same bearing and wheel shop as the L1 bearing."  ECF No. 630-3 at PageID #: 38166-67, § 5.  According to Dr. Swanger, that inspection confirmed the absence of

(4:23CV0242)

various conditions that could have caused a bearing failure, including excessive fatigue spalling, water etching, indentations matching the roller element spacing, fracturing of roller elements, and other damage.  *See* ECF No. 630-3 at PageID #: 38168-73.

Dr. Swanger explained in the Joint Report how he considered the physical properties of the R1 bearing, including the bearing cup, and why – based on scientific methodology – he concluded that the bearing had not suffered water damage from Hurricane Harvey.  *See* ECF No. 630-3 at PageID #: 38170-71, § 5.1.3; PageID #: 38215-31.  Drs. Swanger and Parker also note several potential causes of the alleged bearing failure that they did not rule out through their analysis.  *See* ECF No. 630-3 at PageID #: 38173-75, § 5.2.

GPLX 75465 was present at Braskem's railyard in La Porte, Texas during Hurricane Harvey in 2017.  Appendix F of the Joint Report, entitled "Flooding and Wind Analysis," details additional evidence supporting the opinions of Drs. Swanger and Parker, including (1) testimony from Braskem employees that, between 2017 and 2023, GPLX 75465 did not flood during any weather events, including Hurricane Harvey; (2) academic studies analyzing satellite data that showed no flooding occurred at Braskem's railyard during Hurricane Harvey; and (3) data measured at the Houston Hobby Airport confirming that wind in the vicinity of the Braskem railyard during Hurricane Harvey did not reach a velocity so as to cause rain to enter the L1 bearing of GPLX 75465.  *See* ECF No. 630-3 at PageID #: 38220-31.

## IV.

Norfolk Southern moves the Court to exclude as unreliable the testimony of Drs. Swanger and Parker regarding causes of the L1 bearing failure on GPLX 75465 (Car 23).  But Norfolk Southern's argument "fundamentally confuses the *credibility and accuracy* of [Drs.

(4:23CV0242)

Swanger and Parker's testimony] with its *reliability*."  *In re Scrap Metal*, 527 F.3d at 529

(emphasis in original).  Norfolk Southern does not dispute that the opinions of Drs. Swanger and

Parker are based on evidence in the record.  Regardless of how they weigh that evidence, their

opinions are thus "the product of reliable principles and methods . . . [that] have been reliably

applied in the case."  *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021) (internal

quotation marks omitted).  Norfolk Southern's criticisms are for the jury to consider in the

present case.  Because their expert testimony is "grounded in facts based on the physical

evidence," and because that "evidence could be accepted by the jury as credible," exclusion is

inappropriate.  *Greenwell v. Boatwright*, 184 F.3d 492, 499 (6th Cir. 1999).

## A.

Norfolk Southern argues that Drs. Swanger and Parker ignore damage to the R1 bearing

consistent with damage from Hurricane Harvey.  GATX responds that Dr. Swanger's opinion

that the R1 bearing did not undergo water damage during Hurricane Harvey has a sufficient

factual basis.  Norfolk Southern specifically suggests that Dr. Swanger ignored the appearance of

a "striped pattern along the outboard raceway" of the cup of the R1 bearing, which it claims is

"consistent with damage from Hurricane Harvey."  ECF No. 630-1 at PageID #: 38137-38.  Dr.

Swanger conducted a complete in person visual inspection of the R1 bearing.  *See* ECF No. 630-

3 at PageID #: 38212-19.  That inspection included "the cup of the R1 bearing," where the

striping noted by Norfolk Southern appeared.  Dr. Swanger testified during cross-examination at

his deposition:

> Q  We've handed you what's been marked Exhibit 11.
> Do you recognize this photograph?
> A  I recognize the cone of the R1 bearing.  I don't know if -- whether or
> not I've seen this exact photograph.

(4:23CV0242)

>        Q  Okay.  Then it's fair to say you don't recall if you took this photograph
> during the inspection of the R1 bearing?
>        A  It's possible, but I don't -- don't know whether or not I did.
>        Q  And you said it's the cone of the R1 bearing.
>        All of its internal components have been removed so we can see the
> raceways on the inner surface of that cup, correct?
>        A  I believe I said it's the cup of the R1 bearing.

Deposition of Lee Swanger, Ph.D., P.E. (ECF No. 630-4) at PageID #: 38379:10 - PageID #:

38380:2.

>        Q  So the only thing you were allowed to do was observe and photograph this
>        component shown in the photograph; is that right?
>        A  Yes.

ECF No. 630-4 at PageID #: 38382:7-10.  Dr. Swanger confirmed the absence of numerous

physical defects in the R1 bearing through that physical inspection.  *See, e.g.*, ECF No. 630-3 at

PageID #: 38169 ("[n]o water etching or excessive fatigue spalling"); ECF No. 630-3 at PageID

#: 38170 (no "[i]ndentations that match the roller element spacing"); ECF No. 630-3 at PageID

#: 38171 (no "spalling, cracking or fracture of roller elements").  Norfolk Southern does not

challenge these findings.  Instead, it contends the whole of Drs. Swanger and Parker's testimony

should be excluded because, in light of the striping in the cup of the R1 bearing, Dr. Swanger

should have concluded that the R1 bearing experienced water damage during Hurricane Harvey.

The Court does not agree.  Norfolk Southern's contention is merely a criticism that Dr.

Swanger did not reach the same conclusion as Poplawski regarding the existence of water

damage to the R1 bearing due to Hurricane Harvey.  That Dr. Swanger disagrees with Poplawski

says nothing about the reliability of his methodology of physically inspecting the R1 bearing.

(4:23CV0242)

The Court notes it was Poplawski who admittedly never inspected the R1 bearing in person,[3] but only viewed photos of it – and only after issuing his Opening Expert Report (ECF No. 618-7). *See* Poplawski Rebuttal Expert Report (ECF No. 630-5) at PageID #: 38451-53.  In addition, the disagreement between these experts does not show that Dr. Swanger's application of an in person inspection-based methodology is unreliable.  Because the opinions of Dr. Swanger are based upon facts in the record, Norfolk Southern's challenges merely go to "the accuracy of [Dr. Swanger's] conclusions," not to "the reliability of [his] testimony." *In re Scrap Metal*, 527 F.3d at 530.  Nevertheless, "[a]dmissibility under Rule 702 does not require perfect methodology." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009).  In *Best*, the Sixth Circuit reversed the district court's exclusion of expert testimony because the defendant's "attacks on [his opinion] amount[ed] to factual disputes suitable for cross-examination." *Id.* at 180 (citing *Daubert*, 509 U.S. at 596).

In *United States v. Lang*, 717 Fed.Appx. 523 (6th Cir. 2017), the Court of Appeals held that an expert opinion is reliable when it rests on a "*sufficient*" factual basis and is not "plainly contradict[ed]" by the record. *Id.* at 536 (emphasis in original).  Because Dr. Swanger's opinions are based on "established fact[s]" in the record, *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) they satisfy *Daubert*'s reliability standard.

An expert applies a methodology in an unreliabe fashion when, for example, he "cherry-pick[s] data to bolster his case." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 347 (6th Cir. 2024).  According to GATX, Dr.

---

[3]  Poplawski attended the inspection virtually for health reasons, rather than in person.  *See* Reply Memorandum (ECF No. 706) at PageID #: 51405 n. 1.

(4:23CV0242)

Swanger's decision not to discuss in the Joint Report (ECF No. 630-3) the R1 bearing's purported "striping" as evidence of weather damage is not unreliable "cherry-picking" – it was a good-faith, scientifically grounded (and accurate) expert opinion.  *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp.3d 724, 736 (N.D. Ohio 2014) ("fail[ure] to consider" evidence "go[es] to the weight, not the admissibility, of [the expert's] testimony" when he "provides reasonable explanations" for doing so).  Dr. Swanger provided a reasonable explanation for his decision not to discuss the R1 bearing's averred "striping" as evidence of weather damage.  Given the "yellow color of the iron hydroxide" and "unequal prominence of the stripes" in certain areas, Dr. Swanger concluded that it was the result of "aqueous corrosion" that "formed after the derailment and after the fire was out" – not six (6) years prior during Hurricane Harvey.  Dr. Swanger testified during cross-examination as follows:

> Q  Does this photo alone tell you anything about when those stripes were formed in this component?
>
>         *  *  *
>
> A  Yes.
> BY MR. HOBGOOD:
> Q  What does it tell you?
> A  I believe that the yellow coloration that we see associated with a couple of the stripes and that we see in the area between the raceways are what is, in this position, the bottom of the cup, I believe that yellow color is from the formation of iron hydroxide.
> Q  And do you have an opinion as to when that formed?
> A  Yes.
> Q  When did it form, in your opinion?
> A  After the derailment and after the fires were out.
> Q  As to the stripes that are on the right-hand side, do you have an opinion as to when those formed?
>
>         *  *  *
>
> A  I believe those also formed after the derailment and after the fire was out.
> BY MR. HOBGOOD:
> Q  And what would the mechanism have been to cause those stripes to form after the derailment and after the fire was out?

(4:23CV0242)

> A  Aqueous corrosion.
> Q  Do you have any evidence to support the timing of that corrosion?
> A  Yes.
> Q  What is that evidence?
> A  The yellow color of the iron hydroxide.
> Q  Is there any other evidence that you have?
> A  Yes.
> Q  What is that evidence?
> A  It is that the -- as you've called them, the stripes are more prominent on the right side of the cone in this photograph with this orientation, and less prominent at the bottom of the outboard raceway in this photograph in this orientation.
>
> Q  So you think that unequal prominence of the stripes supports your opinion that this is aqueous corrosion that occurred after the derailment?
> Do I understand that correctly?
> A  Yes.

ECF 630-4 at PageID #: 38382:11 - PageID #: 38384:14.  Norfolk Southern disputes whether Dr. Swanger is correct that the purported "striping" formed after the derailment, but that goes to the accuracy of his testimony, not the reliability of it, which is for the jury to resolve.

*See, e.g.*, *United States v. Stafford*, 721 F.3d 380, 395 (6th Cir. 2013) (district court did not abuse its discretion in admitting evidence of gunshot-residue test and conclusions to be drawn from it despite failure to collect other evidence from defendant during arrest); *Stephenson v. Fam. Sols. of Ohio, Inc.*, 645 F. Supp.3d 755, 771-72 (N.D. Ohio 2022) (finding that expert damage calculations, which failed "to consider certain factual information" were reliable and that the factual deficiencies went to the "weight of the evidence rather than . . . its admissibility").

Norfolk Southern urges the Court to exclude Dr. Swanger's deposition testimony and "new" opinion (quoted above) that aqueous corrosion to the R1 bearing occurred after the derailment under Fed. R. Civ. P. 26(a)(2).  *See* ECF No. 630-1 at PageID #: 38138.  Because Dr. Swanger's deposition testimony and opinion that the striping in the cup of the R1 bearing was the result of "aqueous corrosion" that "formed after the derailment and after the fire was out"

(4:23CV0242)

comport with "the general scheme" of Drs. Swanger and Parker's Joint Report (ECF No. 630-3) – namely, its ruling out of potential causes of the failed L1 bearing, including through analysis of the physical condition of its companion R1 bearing – it "[does] not constitute an unfair surprise" as to the nature of Dr. Swanger's testimony and is not a "new expert opinion under Rule 26." *EEOC v. R&L Carriers, Inc.*, 664 F. Supp.3d 784, 793 (S.D. Ohio 2023) (quoting *McHugh v. Olympia Ent., Inc.*, 37 Fed.Appx. 730, 736 (6th Cir. 2002)).  Moreover, Rule 26(a)(2) "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("[Rule] 26(a)(2)(B) does not limit an expert's testimony simply to reading his report.  No language in the rule would suggest such a limitation.").

The Court notes that Dr. Swanger's statements during his deposition that aqueous corrosion to the R1 bearing occurred after the derailment were made in response to Norfolk Southern's own questioning.  A party can hardly complain to have to been "unfairly surprised" from testimony that its own counsel solicited.  *See, e.g.*, *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-md-2846, 2:18-cv-01509, 2020 WL 8707603, at *6 (S.D. Ohio April 16, 2020) (refusing to strike deposition testimony as a "new opinion" when the plaintiffs "claim[ed] to be surprised by [an] opinion" that they themselves "elicit[ed] . . . from [the expert] through their questioning").  The Court finds Dr. Swanger's challenged deposition testimony appropriately supplements, elaborates upon, and explains his opinions as disclosed in the Joint Report (ECF No. 630-3).

Finally, Norfolk Southern claims that because Dr. Swanger does not reach the same conclusions from an inspection of the condition of the R1 bearing, his testimony is not "based on

(4:23CV0242)

sufficient facts or data" under Rule 702.  *See* ECF No. 630-1 at PageID #: 38136.  But Rule 702

allows experts to "reach different conclusions based on competing versions of the facts." *Boaz*

*v. Vitatoe Aviation, LLC*, Nos. 21-11386, 21-11602, 21-11682, 2023 WL 4477127, at *9 (E.D.

Mich. July 11, 2023) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).  Its

requirement that an expert base his opinions on "sufficient facts or data" does not "authorize a

trial court to exclude an expert's testimony on the ground that the court believes one version of

the facts and not the other."  Fed. R. Evid. 702 advisory committee's note (2000); *Micro Chem.,*

*Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed.Cir. 2003) ("When, as here, the parties' experts

rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of

facts underlying one expert's testimony.").  Therefore, the Court does not credit one

interpretation of the condition of the R1 bearing over the other.

### B.

Next, Norfolk Southern contends that Drs. Swanger and Parker's "opinion ruling out

Hurricane Harvey-related causes for the L1 bearing failure is unreliable" because "it depends on

a false equivalence between the R1 and L1 bearings."  ECF No. 630-1 at PageID #: 38140.

GATX responds that Drs. Swanger and Parker's consideration of the R1 bearing to make

inferences about the L1 bearing is supported by evidence in the record.  The R1 and L1 bearings

are the same type of bearing and were installed on the same axle, at the same time, by the same

shop.

As stated above, Drs. Swanger and Parker assert that both the R1 and L1 bearings

"experienced virtually identical environmental exposures, loading scenarios and the like

throughout their lifetimes after reconditioning and installation on GPLX 75465."  ECF No. 630-

(4:23CV0242)

3 at PageID #: 38167, § 5.  Norfolk Southern deems that assertion "false," but again, a motion to

exclude an expert's testimony is not the proper mode to challenge the accuracy of the expert's

conclusions.  *See In re Scrap Metal*, 527 F.3d at 530.  So long as the expert's opinion "ha[s] a

basis in established fact," it is admissible, and any challenges to its factual basis "bear on the

weight" of the opinion – as decided by the jury – "rather than on its admissibility."  *McLean v.*

*988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000).

> Dr. Swanger testified during cross-examination at his deposition:
>
> > Q  And despite the fact that the L1 bearing and the R1 bearing are on
> > different sides of the railcar, you still feel that the R1 bearing is an appropriate
> > proxy for the L1 bearing, correct?
> > *   *   *
> > A For the reasons I've given today, yes.

ECF No. 630-4 at PageID #: 38399:24 - PageID #: 38400:6.  Drs. Swanger and Parker's use of

the R1 bearing as a "proxy" for the L1 bearing has a basis in established fact.  As stated above,

they opine that the "[t]eardown of the mate bearing [here, the R1 bearing on GPLX 75465] is

often performed in the case of journal burn-off to help infer the cause of failure, since the

evidence on a burned-off journal is destroyed as a consequence of the burn-off."  ECF No. 630-3

at PageID #: 38166, § 5.  Drs. Swanger and Parker cite statements from the Roller Bearing

Manufacturers Engineering Committee and a 2022 academic article published in the

peer-reviewed journal, Engineering Failure Analysis.  *See* ECF No. 630-3 at PageID #: 38166

nn. 15, 26.  The Joint Report also provides:

> Specifically, the R1 bearing was attached to the same axle as the L1 bearing.
> Therefore, if the L1 bearing was submerged, for example as a result of flooding
> from a hurricane, then the R1 bearing would also have necessarily been
> submerged during the flooding.  Similarly, if the L1 bearing was exposed to
> excessive vibrations, the R1 bearing would have also been exposed to excessive

(4:23CV0242)

> vibrations.  Accordingly, the R1 mate bearing is the closest surrogate available for
> the destroyed L1 bearing.

ECF No. 630-3 at PageID #: 38167, § 5.  In addition, "records and markings on the bearings

indicate that the R1 bearing was reconditioned and placed on GPLX 75465 at the same time and

by the same bearing and wheel shop as the L1 bearing."  ECF No. 630-3 at PageID #: 38166-67,

§ 5.  According to GATX, these stated facts provide a reliable foundation for Drs. Swanger and

Parker to treat the R1 bearing as "the closest surrogate available for the destroyed L1 bearing."

Norfolk Southern disagrees.  It contends the R1 and L1 bearings experienced "different

exposures to weather events (such as the angle of rainfall and sunlight) and variation in the

loading (such as when tracks curve)" because they were "installed on opposite sides of [the]

railcar."  ECF No. 630-1 at PageID #: 38141.  But that disagreement with Drs. Swanger and

Parker's evidence-based assumption about the appropriateness of using the R1 bearing as a

proxy for the destroyed L1 bearing goes only to the accuracy of the testimony, not its reliability.

According to Norfolk Southern, "Drs. Parker and Swanger's methodology places undue *weight*

on the condition of the R1 bearing as representative of the condition of the L1 bearing."  ECF

No. 630-1 at PageID #: 38141 (emphasis added).  Because Norfolk Southern challenges the

"weight" of the evidence relied on by Drs. Swanger and Parker, not the reliability of their

opinions, exclusion is unjustified.  *See Lang*, 717 Fed.Appx. at 536 (holding the district court did

not abuse its discretion in denying motion to strike expert testimony when movant made

arguments about the weight of the evidence, rather than its admissibility); *Thomas v. Lambert*,

606 F. Supp.3d 592, 603 (E.D. Mich. 2022) ("[A]rguments related to 'contrary evidence' or

'incompleteness' go to the weight of [an expert opinion] rather than its admissibility. . . .")

(quoting *Lang*, 717 Fed.Appx. at 536).  To the extent that Norfolk Southern asserts that the

14

(4:23CV0242)

possibility of variation between the R1 and L1 bearings undermines Dr. Swanger's conclusion, that too is a subject for exploration during direct and cross-examination, as well as a factual dispute for the jury to resolve.

The Court will allow Drs. Swanger and Parker to use the R1 bearing as one item of evidence in a broader opinion about the potential causes of the L1 bearing's failure.  Dr. Swanger's physical inspection of the R1 bearing and use of that bearing as a proxy for the L1 bearing is only one piece of evidence supporting the disputed conclusion that the L1 bearing did not experience Hurricane Harvey-related damage.  "As a general evidentiary matter, 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it,' and 'a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence.' ")  *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 23 n.16 (1st Cir. 2011) (quoting *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987)).

Finally, the R1 bearing evidence is only one part of Drs. Swanger and Parker's analysis.  In addition to Dr. Swanger's inspection of the R1 bearing, which was installed on the opposite side of the same axle as the L1 bearing, their opinions are based on, among other evidence:  (1) testimony from Braskem employees that, between 2017 and 2023, GPLX 75465 did not flood during any weather events, including Hurricane Harvey; (2) academic studies analyzing satellite data that showed no flooding occurred at Braskem's railyard during Hurricane Harvey; and (3) data measured at the Houston Hobby Airport confirming that wind in the vicinity of the Braskem railyard during Hurricane Harvey did not reach a velocity so as to cause rain to enter the L1 bearing of GPLX 75465.  *See* ECF No. 630-3 at PageID #: 38220-31; ECF No. 630-4 at PageID #: 38290:16-25.  Drs. Swanger and Parker's testimony will not be excluded because Norfolk

15

(4:23CV0242)

Southern does not credibly argue that it lacks "a reasonable factual basis." *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018).

## V.

Norfolk Southern maintains that Drs. Swanger and Parker's assertions of "potential causes not ruled out," which they provide solely for the purpose of "just offering alternatives," should be excluded as "unsupported speculation" because they do not confirm that those potential causes "were in fact likely causes of the L1 bearing failure." ECF No. 630-1 at PageID #: 38142-43 (citing *Daubert*, 509 U.S. at 590).  GATX responds it is not their burden to establish the likely causes of the L1 bearing failure on GPLX 75465; rather, that burden rests on Norfolk Southern – the party with the burden of proving causation at trial.  *See Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-24277-CIV-MARTINEZ/GOODMAN, 2017 WL 10775768, at *23 (S.D. Fla. June 12, 2017) ("The Court disagrees with [the plaintiff]'s claim that a defendant's expert has an obligation to specifically opine on root cause.  [The defendant] is under no affirmative obligation to prove the root cause . . . -- it is [the plaintiff] who must carry the burden."), *report and recommendation adopted*, No. 14-24277-CIV-MARTINEZ-GOODMAN, 2017 WL 10775767 (S.D. Fla. Dec. 14, 2017) .  GATX has no burden to establish causation in the case at bar, and Drs. Swanger and Parker properly seek to rebut Poplawski's opinions that "attribut[e] the L1 bearing failure to [water damage due to] Hurricane Harvey," not offer their own root-cause assessment.  ECF No. 630-3 at PageID #: 38162, § 2, ¶ 3.

An expert may rebut the causal opinion of another expert by showing that he failed to consider plausible "alternative causes" or "offer an explanation for why the proffered alternative

16

(4:23CV0242)

cause was not the sole cause." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp.2d 1142, 1162 (E.D. Wash. 2009) (when "a defendant points to . . . plausible alternative cause[s]," an expert must offer an "explanation for why he or she has concluded that it was not the sole cause" for her methodology to be reliable) (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999)). Drs. Swanger and Parker have properly responded to Poplawski's opinions by noting plausible alternative causes that affect the weight that the jury should give the latter's testimony.

**VI.**

Finally, Norfolk Southern argues that Drs. Swanger and Parker's Joint Report (ECF No. 630-3) should be excluded because it violates Fed. R. Civ. P. 26.

Rule 26(a)(2)(B) does not preclude a joint expert report and there is "no reason to think the practice [is] always and inherently impermissible" under Rule 26. *See, e.g.*, *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 Fed.Appx. 810, 815-16 (10th Cir. 2013) (explaining that "[c]o-authored expert reports aren't exactly uncommon"). In *Barker*, the Tenth Circuit allowed a joint report when both experts "reviewed the same materials and, working together, came to the same opinions." *Id.* at 816. Multiple federal courts have allowed joint expert reports. *See, e.g.*, *Montgomery v. Wal-Mart Stores, Inc.*, No. 12cv3057-AJB (DHB), 2015 WL 11233382, at *5 (S.D. Cal. Sept. 24, 2015) (finding that "joint expert reports are not per se improper"); *see also Univ. of Fla. Research Found., Inc. v. Motorola Mobility LLC*, No. 13-61120-CIV-MOORE/TORRES, 2013 WL 12043502, at *8 (S.D. Fla. Dec. 23, 2013) (same).

If all of the statements and opinions in a joint report are the opinions of each of the experts individually as well as their mutual and collective opinions, a joint report does not have

17

(4:23CV0242)

to "delineate which opinions belong to which expert." *Valley Pizza* at 816.  When a joint report properly delineates the opinions, however, each expert may testify regarding "the respective portions of [the] report that are attributable to [each]."  *See In re Com. Money Ctr., Inc.*, 737 F. Supp.2d 815, 823 n.5 (N.D. Ohio 2010); *see also Soo Line R. Co. v. Werner Enters.*, 8 F. Supp.3d 1130, 1139 (D. Minn. 2014) (declining to grant the "harsh penalty of excluding [a joint expert] report and testimony" when a party "argue[d] that the expert report d[id] not . . . articulate the division of labor between [the experts]"); *Rivers v. B Braun Interventional Sys. Inc.*, No. 19-CV-988, 2023 WL 7166520, at *16 (E.D. Wis. Oct. 31, 2023) ("Provided it is clear which expert is responsible for which opinions, Rule 26(a)(2)(B) does not prohibit joint expert reports."). *Precision Trenchless, LLC v. Saertex multiCom LP*, No. 3:19-CV-0054 (JCH), 2022 WL 594096, at *22 n.27 (D. Conn. Feb. 28, 2022) ("This court agrees that a joint-authored Report might not violate Rule 26(a)(2) if, for example, it disclosed which opinions were attributable to each expert, giving the opposing party notice and permitting them to direct questioning to the appropriate expert.").

As stated above, the Joint Report provides, in relevant part, that any opinions regarding the journal burn-off or the report of Poplawski – except any opinions specific to "the bearing grease"– are attributable to Dr. Swanger, while any opinions related to "the bearing grease that are pertinent to the journal burn-off and to the expert report of Joseph Poplawski" are attributable to Dr. Parker.  ECF No. 630-3 at at PageID #: 38160, § 1.2.  Dr. Swanger testified during cross-examination at his deposition:

> A  I don't know who asked Dr. Parker to join, and so I don't know why that person or entity asked Dr. Parker to join this effort.  But I was glad to have Dr. Parker with her specific detailed expertise in grease, based on both her academic

18

(4:23CV0242)

> and her vocational background, assist in the analysis and explanation and
> response to Mr. Poplawski's opinions relative to grease.

ECF No. 630-4 at PageID #: 38251:16-23.  And even though Dr. Swanger stated there is no

opinion in the Joint Report (ECF No. 630-3) that he does not feel "qualified" to address, he

nonetheless recognizes that "Dr. Parker is in a much better position to testify" regarding her

opinions, including ¶ 6 of § 6.2.4 in the Joint Report.  *See* ECF No. 630-4 at PageID #: 38251:25

- PageID #: 38253:2.

> Dr. Parker similarly testified during cross-examination at her deposition:
>
> > Q.  So if there is a topic outside of issues related to bearing grease, do I
> > understand that you don't plan to offer an opinion on that topic?
> > A.  I think as this states, I plan to offer opinions related to the bearing
> > grease that are pertinent to the journal burn-off.  So to the extent that a topic does
> > not address those topics, I don't plan to offer opinions.  However, as I mentioned
> > before, my scope is to be responsive to statements of Mr. Poplawski in these
> > areas, and so I can't specifically exclude something in response to Mr. Poplawski
> > that would be also related to another topic.

Deposition of Sarah Parker, Ph.D. (ECF No. 630-9) at PageID #: 38712:7-19.

> > Q.  So if that statement made by Mr. Poplawski is not relevant to bearing
> > grease and not relevant to the grease's relationship to journal burn-off, do you
> > intend to offer an opinion?
> > A.  To the extent it's not relevant to the grease and its relationship to the
> > journal burn-off, I do not plan to offer opinions in that area.

ECF No. 630-9 at PageID #: 38713:4-10.

> Dr. Parker repeatedly stated throughout her deposition that she would not opine on

subjects that do not relate to the bearing grease:

> A.  I don't intend to specifically offer opinions about specific parties and their
> responsibilities related to railcar maintenance.  However, to the extent that that
> topic were to become relevant to a conversation about grease and its potential
> contribution to the journal burn-off, that would be my technical area.

ECF No. 630-9 at PageID #: 38701:12-18.

19

(4:23CV0242)

     A.  There are portions of the joint report that incorporate the concepts of bearing failures that the Weibull distribution informs.  Those portions of the report I expect Dr. Swanger to testify to.  However, to the extent it's relevant to the grease and its relationship to the journal burn-off, it's possible that I would also discuss those.

ECF No. 630-9 at PageID #: 38721:12-18.

     A.  To the extent that it is related to the grease and the grease's relationship to the journal burn-off, it's possible that I would address that topic, but I expect that primarily to be addressed by Dr. Swanger.

ECF No. 630-9 at PageID #: 38752:14-18.  Given that Drs. Swanger and Parker have designated the portions of their report that are attributed to each of them, the Court will not exclude their Joint Report (ECF No. 630-3) and testimony.

The court will allow Drs. Swanger and Parker to testify, but only after they designate[ ] the portions of the expert report[ ] attributable to [each expert] by color-coding," so it can be determined what opinions belonged to each expert.  *In re Com. Money Ctr., Inc.*, 737 F. Supp.2d at 823 n.5; *Dan v. United States*, No. CIV 01-25 MCA/LFG-ACE, 2002 WL 34371519, at *3 (D.N.M. Feb. 6, 2002) (Without such delineation of which opinion belongs to which expert, admitting the testimony of Drs. Swanger and Parker could result in the type of "trial by ambush" Fed. R. Civ. P. 26 is designed to avoid.).

## VII.

For the foregoing reasons and those that have been articulated in the memorandum of the points and authorities on which GATX relies, Norfolk Southern's Motion to Exclude the Expert Report and Testimony of Drs. Lee Swanger and Sarah Parker (ECF No. 630) is denied.

(4:23CV0242)

Drs. Swanger and Parker shall designate the portions of the Joint Report (ECF No. 630-3) attributable to each expert by color-coding by a date agreed to by lead counsel of record.

        IT IS SO ORDERED.

    January 31, 2025                             /s/ Benita Y. Pearson
Date                                         Benita Y. Pearson
                                             United States District Judge