IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| IN RE: EAST PALESTINE TRAIN DERAILMENT | ) Case No. 4:23-CV-00242-BYP<br>) JUDGE BENITA Y. PEARSON<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 60(b)(3), 60(b)(6) AND 60(d)(3)**

## I. INTRODUCTION

Movant class members[1] respectfully move for relief from the Final Approval Order entered on September 27, 2024 approving the class action settlement. This motion is based on substantial evidence of fraud and misrepresentation by class counsel, who concealed critical expert findings about health risks to the Court and to the class claimants. Class counsel did so while filing extraordinary claims on behalf of some claimants that had documented permanent injuries diagnosed from their treating physicians. Despite this, Class Counsel induced class members to sign personal injury releases in exchange for inadequate personal injury payments. The documented misconduct fundamentally undermines the integrity of the settlement process and warrants relief under Federal Rules 60(b)(3), 60(b)(6) and 60(d)(3).

## II. FACTUAL BACKGROUND

This Court, on September 27, 2024, approved a class action settlement in the amount of six-hundred-million dollars ($600,000,000.00) to be paid by Norfolk Southern arising out of the February 3, 2023, train derailment in East Palestine, Ohio and the February 6, 2023, burn of vinyl chloride. (ECF 452-2.) Norfolk Southern and class counsel concealed critical soil and water testing

---

[1] *See* Ex. 1

results, made false representations to class members about health risks, and misled this Court during the fairness hearing about the basis for their expert reports and about the representations made to class members.

### A. DERAILMENT AND VENT AND BURN:

On February 1, 2023, Norfolk Southern sent a train containing 38 rail cars, including 11 rail cars containing hazardous chemicals, from Madison, Illinois to Conway, Pennsylvania.[2]  Norfolk knew its train carrying 11 cars of hazardous chemicals was at risk of derailing.[3] Overheated bearings are the most common mechanical or electrical cause of rail incidents.[4] Because overheated bearings are so dangerous, railroad tracks have Hot Bearing Detectors ("HBDs") along the track that measure the bearing's temperature.[5] A wheel bearing on one of the train cars overheated at 103 degrees and was actually on fire as the train drove over the HBD in Salem, Ohio.[6] Norfolk Southern choose not to notify the train crew that the wheel bearing was overheated and on fire and instead choose to wait to notify the train crew until the train went over the HBD in East Palestine 40 minutes later, at which time the wheel bearing was up to 253 degrees.[7] The train crew was notified of the excessive temperature, but it was too late, and the train derailed 2 minutes after the crew was notified.[8]

---

[2] National Transportation Safety Board, Norfolk Southern Railway Derailment and Hazardous Materials Release, East Palestine, Ohio, February 2, 2023, NTSB SPC-24-06 Illustrated Digest, p. 2 ( June 25, 2024).
[3] Between 2013 and 2022, Norfolk Southern's crash rate increased by almost 81% nationwide. In 2021, Norfolk had 38 incidents in the State of Ohio, alone. As Norfolk's incident rate has nearly doubled in the past 10 years, at least 20 of those derailments since 2015 have involved chemical releases.
[4] NTSB SPC-24-06, p. 4.
[5] *Id.*
[6] *Id.* at 5.
[7] *Id.*
[8] *Id.* at 5-6.

Norfolk Southern chose to transport some of the hazardous materials on their train in DOT-111 tank cars, which are known to fail and release hazardous materials in a derailment.[9] As expected, those three tank cars carrying flammable and combustible liquids were cracked or punctured during the derailment, releasing their contents.[10] A fire broke out during the derailment, fed by the spilled flammable and combustible liquids.[11] The fire spread to other tank cars and freight cars.[12] The fire burned and smoldered, continuing to release hazardous materials, for at least five days.



Photo courtesy of Eric's Train Yard

But that was not the only hazardous materials release. Five pressurized tank cars carrying the hazardous material vinyl chloride survived the initial derailment intact; however, four of the five cars were exposed to fire, causing the tank cars to heat up.[13] If tank cars carrying vinyl chloride get above 185 degrees, the heat can cause vinyl chloride to boil and expand, a process called

---

[9] *Id.* at 3.
[10] *Id.* at 2.
[11] *Id.*
[12] *Id.*
[13] *Id.*

polymerization, which can cause an explosion.[14] Even so, as long as the tank cars remain under 185 degrees, polymerization will likely not occur and the tank car will not explode.[15]

Railroad companies have several options for removing hazardous materials from derailed tank cars including simply transferring the product to another tank car.[16]  A "vent and burn" procedure, in which the vinyl chloride is drained from the tank cars and burned, is always a method of last resort because vinyl chloride is a known carcinogen that has been linked to liver, brain and lung cancer.[17] The products of vinyl chloride combustion, including hydrogen chloride, carbon monoxide, soot, and traces of phosgene, can be toxic to a community and the environment.[18]



**Figure 9.** Illustration of a vent and burn procedure.

On February 4, 2023, Norfolk determined it should conduct a "vent and burn."[19] On February 5, 2023, representatives of Oxy Vinyls, the owner of the vinyl chloride in the tank cars

---

[14] *Id.* at 8-9.
[15] *Id.* at 8.
[16] *Id.* at 12.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 10.

determined that polymerization was not occurring and a vent and burn of the vinyl chloride was not necessary.[20] OxyVinyls informed Norfolk that polymerization was not occurring and that monitoring showed decreasing temperatures well below 185 degrees in all five tank cars.[21] Later that evening, Norfolk told the Federal and State authorities that polymerization was occurring and Norfolk began preparations for a vent and burn.[22]

On February 6, despite OxyVinyls conclusions and no evidence of polymerization leading to an explosion, Norfolk met with incident command and advocated for approval of a vent and burn of the vinyl chloride.[23] Norfolk did not invite OxyVinyls to the meeting and did not tell incident command that OxyVinyls concluded polymerization was not occurring and recommended against a vent and burn.[24] Instead, Norfolk told the incident commander that they wanted to begin the vent and burn before 3:00 p.m. that afternoon due to an impending atmospheric event, giving the incident commander only 13 minutes to decide whether to allow Norfolk to proceed with the vent and burn.[25] Incident command, on the recommendation and urging of Norfolk, approved the vent and burn.[26]

On February 6, 2023 at 4:47 p.m., one hour and 47 minutes later than planned, Norfolk opened the five tank cars, drained the vinyl chloride and lit it on fire.[27] The burning vinyl chloride resulted in a column of black smoke that grew into a persistent toxic cloud.[28]

---

[20] *Id.* at 8.
[21] *Id.*
[22] *Id.* at 10.
[23] *Id.* at 10-11.
[24] *Id.*
[25] *Id.*
[26] *Id.* at 12.
[27] *Id.*
[28] *Id.*



**Figure 10.** The vent and burn 3 minutes after detonation. (Courtesy of NS.)

## B.  CLASS ACTION LAWSUIT AND SETTLEMENT AGREEMENT

The first Complaint was filed on February 7,2023. (ECF 1.)

According to class counsel, counsel "retained numerous experts for liability and damages" and were "on-site with experts within weeks of the derailment." (ECF 518-2, ¶ 45.) Class counsel coordinated an "extensive environmental sampling and testing program to determine the impact of the derailment and subsequent vent and burn." (ECF 518-2, ¶ 32.)  Class counsel's "environmental testing included approximately 160 sampling sites in and around East Palestine, covering sites at a 30-mile radius from the derailment site and sites as far as 45 miles from the derailment site . . . in area over 2,800 square miles."  (ECF 518-2, ¶ 33.) Class counsel ensured the attorneys from their law firms were present at every site for the environmental testing done by Plaintiffs' experts. *Id.* The environmental testing program also required that class counsel investigate the background levels of relevant contaminants in the areas where sampling was conducted. *Id.*

Class counsel also retained or consulted several experts in order to establish damages, a non-exhaustive list of which includes experts in air modeling, source term calculating, chemistry, chemical properties, meteorology, toxicology, epidemiology, environmental remediation, geology, hydrology, medical monitoring, industrial hygiene, pulmonology, oncology, real property diminution in value, forensic accounting for commercial loss modeling, and population modeling and research. (ECF 518-2, ¶ 47.)

Based on Class counsel's discussions with its experts, Class counsel had the information needed to determine 1) the strength of Plaintiffs' case against Norfolk Southern on liability and 2) what geographic areas were most impacted by the events of and following the derailment, and how they were impacted, including the type and amount of toxic chemicals that had been created, where they had traveled, where they were most concentrated geographically, the number of people in those geographic areas, **the likelihood of disease or injury from both acute and chronic exposure to those toxic chemicals,** . . . . (ECF 518-2, ¶ 49, emphasis added.)

Class counsel "worked intently with Plaintiffs' experts, knew the substance of their expected expert opinions, and were well prepared to present their testimony." (ECF 518-2, ¶ 49.)

On February 19, 2024, class counsel and Norfolk participated in mediation. A settlement agreement was not reached but settlement discussions continued. (ECF 518-2, ¶ 56.) "Given the state of settlement negotiations," on March 18, 2024, class counsel and the defendants jointly moved to extend the April 1, 2024, deadline for Plaintiff's Expert designation deadline. (ECF 518-2, ¶ 56; ECF 431.)

Plaintiff's expert designation deadline is extended to April 15, 2024. (ECF 432.)  On April 9, 2024, a settlement agreement is reached. (ECF 518-2, ¶ 51.) Plaintiffs' expert witnesses were

never designated and class member residents were never informed of the results of the extensive testing done by the plaintiffs' experts. On April 26, 2024, class counsel filed their motion for preliminary approval of the settlement. (ECF 452.)

The Class Action Settlement Agreement included a confidential Supplemental Termination Agreement, which purports to grant Norfolk Southern the "unilateral right to terminate the Settlement" if there "Settlement Class Members' participation rates trigger numerical thresholds." (ECF 452-2, ¶ XI(C).)

### C. CLASS COUNSEL'S REPRESENTATIONS TO THE PROPOSED CLASS REGARDING THE LEVEL OF CONTAMINATION AND THE LONG-TERM HEALTH CONSEQUENCES:

Class counsel held several town hall meetings regarding the class action settlement including on June 11, 2024, June 20, 2024, July 19, 2024, August 1, 2024, and August 15, 2024. (ECF 518-8, ¶ 43.) Rather than provide information from one of the Plaintiffs' numerous expert witnesses, Class counsel hired Rebuttal PR, a public relations company, to prepare information to address proposed class members' concerns about the level of contamination and the long-term health consequences.

On July 26, 2024, class counsel's public relations company provided counsel with a video by Dr. Arch Carson. Dr. Carson was not retained by Plaintiffs. Rather, he is a friend of one of the attorneys on the class action Plaintiffs Executive Committee (PEC). (ECF 553, 55:18-20.)

On August 1, 2024, class counsel held a town hall meeting by Zoom.[29]

---

[29] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM



Dr. Carson was introduced as a "completely independent third party:"

> "We'd like to share a quick video from an experienced doctor who has followed the derailment and generously offered his expertise. He is not involved in the litigation, and this is a completely independent third party."





Dr. Chip Carson, M.D., Ph.D., Principal of Environmental Medicine Consultants

The video of Dr. Carson was played, during which Dr. Carson was asked the following questions,

to which he made the following statements:

Q: What are the health impacts associated with the chemicals released by the derailment?

**Based on my best judgment, there will not be any long-term health impact of chemical exposure from the derailment to community members of East Palestine.**

**As far as people just living in East Palestine or working there or in nearby neighboring communities, we don't expect there to be any long-term health effects associated with chemical exposure resulting from the derailment.**

Q: "How much higher would the contamination levels have to be in order to be at a dangerous level?"

**The number of chemicals that have been produced and that may remain in very low levels in the East Palestine area are dwarfed by the amount of other substances that are there that have been put there over years of just normal human activity.**

Q: Is there any cause for concern over carcinogens that were released?"

**The levels [of carcinogens] that people were exposed to in the community were so small that we don't expect any kinds of cancers or other health effects to have results from those.**

Q: What are the chances of someone developing an illness like cancer in the future because of this chemical exposure?

**I would personally not expect one person to develop a cancer as a result of this exposure that is due to those chemical exposures.**

**But we do know that there are lots of things people are exposed to all the time that are more likely to cause cancers, and so the result of the exposure from the train derailment is much less of a risk than those other exposures.**

Q: How would you respond to claims that its too early to know the long-term health effects of the derailment?"

I think the answer to that is yes, it's too early for some things, but it's not too early to predict the overall health effects will occur from this. Certainly, if we're thinking of one potential cancer that occurs 20 years from now, it's too soon to count that, **but we pretty well know what exposures resulted from this train derailment and we can pretty well predict that people are going to be safe in the long term.**

### D. CLASS COUNSEL KNEW PROPOSED CLASS MEMBERS WERE PERMANENTLY INJURED AND DIAGNOSED WITH ILLNESS CAUSED BY TOXIC EXPOSURE FOLLOWING THE DERAILMENT.

While class counsel told class members that there was no contamination and there would be no long-term health effects because of the derailment, class counsel knew some class members were very sick and that their doctors were prepared to testify that their illnesses were caused by exposure to contaminants released by the train derailment. These class member claims are not just conjecture, their treating physicians verified in their medical records the permanency of the injury directly related to the exposure.

On August 21, 2024, class counsel signed and submitted an Extraordinary Injury Claim Statement for Austin Druckenbrod. (Ex. 2, Extraordinary Injury Claim Statement.) Therein, class counsel details Mr. Druckenbrod's exposure to contamination when he reported to work at 6:00 a.m. on February 8, 2023 and the medical treatment received in the following days, weeks and months. Counsel states:

He was next seen at Cleveland Clinic on July 24, 2023 and underwent repeat pulmonary function testing with methacholine challenge. The results of this subsequent study which confirmed his previously suspected diagnosis of RADS. Dr. MacMurdo, the director of the Occupational Lung Disease Program at Cleveland Clinic, diagnosed Mr. Druckenbrod with moderate persistent RADS. Significantly, Dr. MacMurdo opined that his RADS was caused by his exposure to the contaminants released by the Norfolk Southern train derailment. . . . [Dr. MacMurdo] is prepared to testify that Mr. [Druckenbrod's] RADS was caused by his exposure to the chemicals released by the train derailment.

(Ex. 2., p. 2-3.)

### E.  CLASS COUNSEL'S EXPERT RELYS ON EPA DATA

On September 6, 2024, after the requisite numbers of proposed class members opted in to the personal injury payment, class counsel filed their Motion for Final Approval of Settlement. (ECF 518.) In support of their motion, class counsel attached the affidavit of one expert, Richard Schuhmann, Ph.D., regarding the proposed class's exposure to toxic chemicals. (ECF 518-10.)

In his affidavit, Schuhmann states that environmental samples were only collected between February 21, 2023 and March 4, 2023 and April 20, 2023 and April 25, 2023. (*Id.* ¶ 6.) Schuhmann states that the soil sample results were compared to pre-existing contaminants or "background" samples. (*Id.* at ¶ 15.) In other words, soil samples were taken from areas the EPA determined to not to have been contaminated at the time of the derailment and vent and burn and those samples were used as the control samples or "background" samples showing what was already in the environment before the derailment. Based on that comparison, Schuhmann states that based on that comparison, the chemicals found in East Palestine and the surrounding vicinity were already there before the derailment "as a result of impact from regional and local combustion processes over time." *Id.* Schuhmann states: "Regional historic combustion byproducts likely arose from municipal waste incineration." *Id.* In support of this conclusion, Schuhmann cites to EPA

publication *Locating and Estimating Air Emissions From Sources of Dioxins and Furnas*, EPA-454/R-97-003 (1997). *Id.* Schuhmann further states: "Local combustion byproducts likely originate from residential burning including barrel burning of household waste." *Id.*  In support of this conclusion, Schuhmann cites EPA statements regarding dioxins produced by backyard burning. *Id.*

Finally, in reliance on the EPA control or "background" samples, as well as the cited EPA sources, Schuhmann concludes that East Palestine was already contaminated by dioxins from backyard burning, stating: "The majority of residential soil samples collected and analyzed for dioxins/furans were below **the US EPA East Palestine background**." (*Id.* at ¶17.)

## F. OBJECTIONS TO CONCLUSIONS DRAWN FROM EPA TESTING AND CARSON STATEMENTS

After the video of Dr. Carson was played to the proposed class members, two testing experts filed Affidavits objecting to the class actions settlement. (ECF 534; ECF 536.)

Scott Smith is an independent testing expert that began conducting soil and water samples in East Palestine in February 2023 at the request of residents. (ECF 536, ¶20.) Smith stated he had made 27 trips to East Palestine and completed 31 rounds of testing. (*Id.* at ¶23.) Smith's testing results showed extremely elevated levels of toxic chemicals in East Palestine and the surrounding communities. (*Id.* at ¶54.) Smith's results contradicted the testing results released by the EPA. In his affidavit, Smith explained that the EPA testing results were invalid and did not accurately reflect the true extent of contamination in East Palestine. (*Id.* at ¶54.)

Stephen Petty is also an independent testing expert. Petty, however, was hired by class counsel to conduct the extensive testing plan developed by class counsel. (ECF 534, ¶6.) In his affidavit, Petty also advised that the EPA testing data was flawed, in part because the area tested by the EPA focused on the area that was evacuated for the vent and burn. (*Id.* at ¶32.) Petty explained

that the evacuation zone was based on wind directions on the morning of February 6, 2023, however, the winds changed before the vent and burn was conducted, which caused the toxic plume to affect different areas than those expected and evacuated. (*Id.* at ¶32, 34.) Despite the change in the migration of the toxic plume, the EPA was inaccurately focusing their testing on the evacuation zone. *Id.* Most importantly, Petty explained that the EPA was obtaining their control or "background" samples from areas that were directly impacted by the toxic plume from the vent and burn and therefore, did not accurately reflect the "background," i.e. the contaminates in the area before the derailment:

> The dioxin soil sampling plan is based on assuming the one-mile by two-mile evacuation zone to the southeast of the "controlled burn" was where the dioxins and furans and other pollutants deposited, and the other areas outside the evacuation area were treated as background for the Arcadis dioxin soil sampling plan. At least during the time of the controlled burn, this plan is backwards. The background areas, where the plume actually went, would likely have higher dioxin readings than the evacuation zone, where the plume did not go. . . . To my knowledge, to this day the EPA has not either recognized or acknowledged, these significant changes to wind speeds and directions during the times of the "controlled burn."

(*Id.* at ¶32.)

In additional, Petty stated that independent testing expert Scott Smith's testing was valid and therefore reliable. (*Id.* at ¶7.) Finally, Petty advised that the statements made by Dr. Carson, opinions were "at best speculation, and at worst simply incorrect." (*Id.* at ¶9.)

### G.  CLASS ACTION SETTLEMENT FAIRNESS HEARING AND MISLEADING STATEMENTS BY CLASS COUNSEL

The Court conducted the fairness hearing on September 25, 2023. (ECF 553.) The Court addressed class counsel and inquired about the lodged objections. In response, class counsel Elizabeth Graham told the Court that 1) objections regarding the validity of EPA data did not

matter because Plaintiffs did not rely on EPA data, and 2) Dr. Carson never told class members they would not get sick. These statements to the Court were misleading.

### 1. EPA Data

In response to the objections to the class action settlement due to flawed EPA testing, Attorney Graham told the Court that such objections did not matter because class counsel and their experts did not rely on EPA data even though the one expert affidavit submitted to the Court in support of the settlement did just that, relying entirely on flawed EPA data. Graham told the Court as follows:

> I'd also like to talk just briefly about the barrage of paper that was filed last night, including the declarations of **Mr. Smith**, **Mr. Petty** and Mr. Thompson.
> These are not -- what is contained in those declarations, and we've read them all, is not new to class counsel. And indeed, it is not new to this Court. They were submitted -- with the exclusion of Mr. Petty's declaration, they were submitted to Your Honor in support of a motion to enlarge time, which this Court denied.
>
> **We are well aware of what Mr. Petty says. He is one voice.** And we understand his methodology and his testing that was done. We have scores of other experts. And, again, detailed in the **declaration of Richard Schuhmann**. We have done our homework.
>
> So this is not some smoking gun that we didn't uncover. This is not something that wasn't out in the public domain. This isn't something that we're trying to hide. It's simply additional testing.
>
> And largely what the declarations and the attorney who supports them seems to suggest is that the EPA data in some way was unreliable.
>
> So I can tell the Court, as you may recall, we had a sampling protocol that Mr. Katz and I negotiated early on with the Defendants, and we adhered to it. **We didn't rely on EPA data.** We went out and we did our own testing. We did split samples. We eliminated background levels. We did everything that we were supposed to do.
>
> So we feel like we did our homework, and these declarations bear no relevance on anything that is before your court -- before the Court in support of this settlement.

(ECF 553, 64:6-65:11.)

Contrary to Graham's statements to the Court, Schuhmann's affidavit relies on EPA data in concluding that dioxins and other chemicals were already present in the environment before the derailment due to burning:  "The majority of residential soil samples collected and analyzed for dioxins/furans were below **the US EPA East Palestine background**." (ECF 518-10, ¶17.) If, in fact, class counsel did not rely on EPA data, they have yet to release that information to their clients or the Court. Instead, class counsel only relies on the affidavit of Schuhmann who did rely only on EPA data.

### 2.  Dr. Carson

In response to the objections to the class action settlement due to Dr. Carson's statements to proposed class members, Attorney Graham told the Court that they have never told class members there was zero risk because they know there is a real risk, but that they are only offering the personal injury payment based on the time it will take for people to know whether they will get sick. Graham told the Court as follows:

> MS. GRAHAM: . . . if a class member is concerned about future health risks, and they are within a 10-mile radius, **we are presuming that there is an exposure.**
>
> **We are presuming that the concern is real** and they may avail themselves of monetary compensation, significant sums of monetary compensation, in addition to what they're receiving from the direct payment or the business loss component.
>
> So I agree that **there is no possible way that any expert can, with certainty, say two people, five people, zero people are going to get sick.** But what we all agree is it's going to be decades from now before these symptoms manifest.
>
> **We have never proffered any information to suggest that there is zero risk to this community.**
>
> THE COURT: So the video you heard Mr. Abraham speak to the Court about, played by Plaintiffs' counsel –
>
> MS. GRAHAM: Yes.

16

THE COURT: -- that suggests no worries, no illness will befall any of you, did that happen?

MS. GRAHAM: So the video that he refers to is Dr. Arch Carson, and Dr. Carson is an occupational and industrial medicine expert. He has not been retained by Plaintiffs' counsel. **He is a friend, a colleague of one of the members of the PEC** (Plaintiffs' Executive Committee).
. . .

And what was happening, Your Honor, . . . What was happening at the time that that video was posted was there was quite a bit of fearmongering in the press. There were a lot of allegations about everybody is going to get sick, this is the next Chernobyl, and the like.

What our experts did was qualified testing. We identified the threshold levels of the contaminants. We identified the likely dispersion patterns. And, yes, we evaluated the risk. **And we know that there's a risk with exposure to some of these chemicals.**
. . .
So Dr. Carson's video was meant as nothing more than an attempt to quell some of the fearmongering. **He didn't say there was zero risk.** What he said is the likely risk. And again, he is an occupational and industry medicine doctor. **What he said was that the likely risk is unknown and that it is likely very low, in his opinion.**

We didn't offer that as evidence. We knew this. We've spoken to other doctors as well. **What we did know is that the risk is uncertain, and that the types of diseases that are connected to the types of toxins that were on the railcars result, if ever, in symptoms decades down the road, because the latency period is such that you have to wait to see what's going to happen.**

So, again, the settlement was designed to give people the option to take some money, and perhaps quell some of their fears that they wouldn't be able to get testing or relief or medical treatment, or not. They would still get their direct payment, a substantial sum, even if they didn't want the personal injury component.

(ECF 553, 4:13-57:18.)

Contrary to Graham's statements to this Court, class counsel through Dr. Carson told the proposed class the following:

Based on my best judgment, **<u>there will not be any long-term health impact</u>** of chemical exposure from the derailment to community members of East Palestine.

17

As far as people just living in East Palestine or working there or in nearby neighboring communities, **we don't expect there to be any long-term health effects** associated with chemical exposure resulting from the derailment.

The number of chemicals that have been produced and that may remain in very low levels in the East Palestine area are dwarfed by the amount of other substances that are there that have been put there over years of just normal human activity.

The levels [of carcinogens] that people were exposed to in the community were so small that **we don't expect any kinds of cancers or other health effects to have results from those**.

I would personally **not expect one person to develop a cancer** as a result of this exposure that is due to those chemical exposures.

But we do know that there are lots of things people are exposed to all the time that are more likely to cause cancers, and so the result of the exposure from the train derailment is much less of a risk than those other exposures.

I think the answer to that is yes, it's too early for some things, but it's not too early to predict the overall health effects will occur from this. Certainly, if we're thinking of one potential cancer that occurs 20 years from now, it's too soon to count that, but we pretty well know what exposures resulted from this train derailment and **we can pretty well predict that people are going to be safe in the long term**.[30]

Graham misled this Court when she said they never told people there was zero risk.

Class counsel also misled class members when they said Dr. Carson was an "independent 3rd party" and when they presented Carson's statements that there will be no long term health impact, don't expect any long-term health effects, don't expect any kinds of cancers or other health effect, don't expect one person to develop a cancer, and can predict people will be safe in the long run.

### III. LEGAL STANDARD

### A. Rule 60(b) Relief from Judgment or Order

---

[30] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM

Federal Rule of Civil Procedure 60(b) permits relief from a final judgment for specific reasons, including:

> (b)(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; and

> (b)(6) any other reason that justifies relief.

A Rule 60(b) motion can be made even though an appeal has been taken and is pending. *King v. First Am. Investigations, Inc*., 287 F.3d 91, 94 (2d Cir.2002). A Rule 60(b) motion is addressed to the sound discretion of the Court. *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co*., 536 F.2d 1115 (1976).

### 1. Rule 60(b)(3) Fraud, Misrepresentation or Misconduct by an Opposing Party

Rule 60(b)(3) allows relief from a judgment due to fraud, misrepresentations, or misconduct by an opposing party. The misconduct must substantially interfere with the moving party's ability to fully and fairly present their case. *Info-Hold, Inc. v. Sound Merch., Inc*., C.A.6 (Ohio) 2008, 538 F.3d 448, 455, 87 U.S.P.Q.2d 1923.

To establish grounds for relief under Rule 60(b)(3), courts employ the following general definition of fraud: "the knowing misrepresentation of a material fact, or concealment of the same when there is a duty to disclose, done to induce another to act to his or her detriment." *Id.*, citing BLACKS LAW DICTIONARY 685 (8th Ed.2004); 37 AMJUR.2D Fraud and Deceit § 23 (2001). The moving party need not demonstrate that the adverse party has committed all the elements of fraud specified in the law of the state where the federal court is sitting, but must simply show that the conduct was fraudulent under a general common-law understanding of fraud. *Id.*

Under Rule 60(b)(3), a judgment may be set aside for fraud discovered after the entry of judgment. *Brady v. Beams*, 10 Cir., 132 F.2d 985, 987, cert. denied 319 U.S. 747, 63 S.Ct. 1032, 87 L.Ed. 1702.

Relief under Rule 60(b)(3) must be sought within one year of the judgment.

### 2. Rule 60(b)(6) Any Other Reason the Justifies Relief

Rule 60(b)(6) provides relief for "any other reason that justifies relief" and is reserved for extraordinary circumstances not covered by the other subsections. Courts have consistently held that relief under Rule 60(b)(6) requires clear and convincing evidence of exceptional or extraordinary circumstances. *Info-Hold, Inc. v. Sound Merch., Inc.*, C.A.6 (Ohio) 2008, 538 F.3d 448, 455, 87 U.S.P.Q.2d 1923. The movant must also demonstrate that principles of equity mandate relief, balancing the finality of judgments against the need for justice. *In re Mercury Data Systems, Inc.,* 586 B.R. 260 (2018).

Rule 60(b)(6) serves as a "safety valve" for addressing situations where class members are disadvantaged by misconduct or procedure irregularities in the settlement process. *Pearson v. Target Corp.*, 893 F.3d 980 (2018). Rule 60(b)(6) is fundamentally equitable in nature and can be involved to protect the interest of the class when the settlement process has been compromised. *Id.*

Rule 60(b)(3) and 60(b)(6) are mutually exclusive – Rule 60(b)(6), as a residual catchall, applies only if the other specifically enumerated rules do not. *Pearson v. Target Corp.*, 893 F.3d 980 (2018).

Rule 60(b)(6) is open-ended; it is flexible and gives courts "wide discretion." *Id.* It is available only in extraordinary circumstances, but courts may consider a wide range of factors to determine whether extraordinary circumstances are present. *Id.*

Motions under Rule 60(b)(6) must be filed within a reasonable time.

**B.  Rule 60(d)(3) Fraud on the Court**

Federal Rule of Civil Procedure 60(d) grants the Court power to set aside a judgment for "fraud on the court."

The term "fraud on the court" is a nebulous concept. Fraud on the court is fraudulent or dishonest conduct by an officer of the court. *Kupferman v. Consolidated Rsch. & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir. 1972). A clear example of fraud on the court is the corruption of judicial officers. *Root Refin. Co. v. Universal Oil Products Co.*, 3 Cir., 169 F.2d 514, 534, cert. denied sub nom. *Universal Oil Products v. William Whitman Co.*, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444.

Fraud on the court requires a showing, through clear and convincing evidence, of the following elements:

1) [conduct] on the part of an officer of the court; that
2) is directed to the judicial machinery itself;
3) is intentionally false, willfully blind to the truth, or is in reckless disregard of the truth;
4) is a positive averment or a concealment when one is under a duty to disclose; and
5) deceives the court.

*Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010), quoting *Carter v. Anderson*, 585 F.3d 1007, 1011-12 (6th Cir.2009).

The Sixth Circuit treats motions for relief under Rule 60(d)(3), procedurally, as either an independent action or a post-judgment motion, so long as the classification does not prejudice the adverse party. *General Medicine, P.C. v. Horizon/CMS Health Care Corp.*, 475 Fed.Appx. 65 (2012), citing *Mitchell v. Rees*, 651 F.3d 593, 595 (6th Cir.2011), citing *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 81 n. 7 (5th Cir. 1970); 11 Wright, Miller & Kane, Federal Practice & Procedure §

2868 n. 30, at 405 (1995). *See also*, *Maloof v. Level Propane, Inc.*, 429 Fed.Appx, 462, 467 (6th Cir. 2011) (fraud-on-the-court finding under Rule 60(d)(3)); Mitchell, 651 F.3d at 595 (6th Cir.2011) (independent action under Rule 60(d)(1)).

### IV. ARGUMENT

#### A. Defendants and Class Counsel's Conduct Constitutes Fraud and Misrepresentation Under Rule 60(b)(3)

Defendants and class counsel concealed and misrepresented material facts that substantially interfered with the class members' ability to fully and fairly determine whether to opt into the personal injury payment, which justifies relief under Rule 60(b)(3).

#### 1) Fraud and Material Misrepresentations to Class Members

##### a. Concealment of Plaintiffs' Experts' Conclusions.

Defendants and class counsel negotiated a settlement agreement that effectively concealed from class members the conclusions of the plaintiffs' experts, which to this day have never been disclosed to the class members.

On June 28, 2023, this Court entered a Case Management Conference Order and Plan setting a deadline for Plaintiffs' to identify their retained experts and provide written expert reports of April 1, 2024. (ECF No. 98.) On February 19, 2024, the parties mediated the case. While a settlement was not reached, settlement discussions continued. On March 18, 2024, Defendants and class counsel jointly moved to extend expert witness designation deadlines to allow the parties to negotiate a settlement agreement before Plaintiffs' deadline to designate expert witness and before Plaintiffs' experts' conclusions were disclosed. (See ECF 518-2, ¶ 48.) The joint motion was granted and the deadline for Plaintiffs' expert disclosures was extended to April 15, 2024. (ECF 432.) On April 9, 2024, Defendant and class counsel reached a settlement agreement before the

extended expert deadline, thereby keeping the conclusions of Plaintiffs' experts from ever seeing the light of day.  To this day, the class members have never learned the results of the testing performed by Plaintiffs' testing expert Stephen Petty. Likewise, class members have never learned the conclusions of the other expert witnesses hired by class counsel, including those experts who determined "what geographic areas were most impacted by the events of and following the derailment, and how they were impacted, including the type and amount of toxic chemicals that had been created, where they had traveled, where they were most concentrated geographically, the amount of people in those geographic areas, the likelihood of disease or injury from both acute and chronic exposure to those toxic chemicals, the diminution in value of real property within those geographic areas, and commercial losses within those areas." (ECF 518-2, ¶ 49.)  And while class members have never learned the conclusions reached by Plaintiffs' experts on these issues vital to their decision whether to opt in to the personal injury payment, class members were required to pay for the costs incurred for those expert conclusions. Class counsel told the Court they had incurred costs of $5,302,128.18 prosecuting the case on behalf of the class members and the greatest costs incurred were payments to expert witnesses. (ECF 520-1, p 33.)

Defendants and class counsels' concealment of material facts is fraud justifying relief under Rule 60(b)(3). *Info-Hold, Inc. v. Sound Merch., Inc.*, C.A.6 (Ohio) 2008, 538 F.3d 448, 87 U.S.P.Q.2d 1923, *citing* BLACKS LAW DICTIONARY 685 (8th Ed.2004); 37 AMJUR.2D Fraud and Deceit § 23 (2001).

### b. Misrepresenting the Testing Results of Plaintiffs' Testing Expert – Affidavit of Schuhmann.

While the testing results and conclusions of Plaintiffs' experts were never actually released, class counsel provided the Affidavit of Schuhmann in support of their motion to approve the

settlement, which suggested that Plaintiffs' experts' testing found that the derailment and vent and burn resulted in no increased contamination, which is not the case.

Schuhmann's affidavit states that environmental samples were collected and compared to control or "background" samples, which showed that the chemicals found in East Palestine and the surrounding vicinity were already there before the derailment and that the derailment did not result in any increased contamination. (ECF 518-10 at ¶ 6, 15, 17.) Even so, the conclusions included in Schuhmann's affidavit are entirely based on flawed EPA data, not the testing of Plaintiffs' own experts.  There is no evidence in the record, in the affidavit of Dr. Schuhmann the class's hired testing expert's results were reviewed.

### c. Mispresenting the Health Impacts of the Derailment and Vent and Burn – Video of Dr. Carson

Before the deadline for class members to opt in to the personal injury payment, class counsel presented class members with the completely baseless and incorrect statements of Dr. Arch Carson. Class counsel told the class members that Dr. Carson was an "experienced doctor who has followed the derailment and generously offered his expertise" and was "a completely independent third party," suggesting Dr. Carson had no untoward reason for offering his conclusions.  Class counsel did not disclose that Dr. Carson had in fact been hired and presumably paid by class counsel's public relations firm to convince class members to opt into the personal injury payment.

Class counsel grossly misrepresented the health impact of the chemical exposure from the derailment and vent and burn but hiring Dr. Carson to tell them there will be no long-term health effects, no cancers of any kind, and that people will be safe in the long run.

### d. Concealment of Class Members with Documented Illness Caused by Contaminants from the Derailment

Class counsel concealed from class members that, contrary to Dr. Carson's statements, some class members were already *permanently injured* and had been diagnosed with illnesses caused by the derailment. Class counsel further concealed that the *permanently injured* class members' doctors were prepared to testify that the illness was caused by the derailment.

Knowing this information would have affected class members decision whether to opt into the personal injury payment.

### e.  Concealment of Adverse Expert Findings – Stephen Petty and Scott Smith

Finally, class counsel failed to inform the class members that Plaintiffs' own testing expert Stephen Petty and an actual independent third-party testing expert Scott Smith, both contested any conclusion based on the EPA's testing results and the statements presented by Dr. Carson.

Both Petty and Smith filed affidavits, objecting to the class action settlement. Smith stated that his own independent testing showed extremely elevated levels of toxic chemicals in East Palestine and the surrounding communities, which contradicted the testing results released by the EPA.

Stephen Petty stated that he was "hired by plaintiffs' attorneys Simmons Hanley Conroy; . . . . Thus, I have independent information regarding contamination and other information regarding the incident. I'm precluded from providing this information under confidentiality and intend to honor that confidentiality unless otherwise ordered by the court." (ECF 534, ¶ 6.)

In his affidavit, Petty advised that the EPA testing data was flawed based on use of control or "background" samples taken by the EPA from contaminated areas. (*Id.* ¶ 6.) Petty stated since he could not release his own testing data, the purpose of his affidavit was to at least state on the record that 1) independent testing expert Scott Smith's testing was valid and therefore reliable, 2)

25

EPA testing data was flawed and not reliable as a basis for the settlement, and 3) the statements made by Dr. Carson were "at best speculation, and at worst simply incorrect." Petty stated:

> I also was motivated to speak out at this time because toxicologist Dr. Arch Chip Carson, who was hired by plaintiffs' attorneys, told class members in a video shown at a town hall on August 1, 2024 that they can expect no long term health impacts due to the derailment, subsequent fires, and release of multiple chemicals in East Palestine. He was basically saying there was really nothing to see there. My opinion, based on my long-time knowledge as an exposure expert on hundreds of cases, and a review of publicly available data and the lack of supporting analyses he provided, is that his opinions were in general, at best speculation, and at worst simply incorrect.

*(Id.* at ¶ 9.)

These misrepresentations are particularly egregious because they directly related to the core issue class members needed to evaluate – future health risks – when deciding whether to accept personal injury releases for minimal compensation.

2) **Material Misrepresentations to the Court**

Defendants and class counsel made false statements and misrepresented material facts to the Court during the critical fairness hearing, which justifies relief under Rule 60(b)(3).

a. **Misrepresented Testing Independence.**

During the fairness hearing, class counsel claimed independence from EPA data while relying on it. Graham told the Court that the objections of their own testing excerpt Petty and independent testing expert Smith were irrelevant because class counsel did not reply on EPA data. Graham told the Court:

> And largely what the declarations and the attorney who supports them seems to suggest is that the EPA data in some way was unreliable.
>
> So I can tell the Court, as you may recall, we had a sampling protocol that Mr. Katz and I negotiated early on with the Defendants, and we adhered to it. **We didn't rely**

**on EPA data.** We went out and we did our own testing. We did split samples. We eliminated background levels. We did everything that we were supposed to do.

While telling the Court they did their own sampling and did not rely on EPA data, the expert affidavit they rely on by Schuhmann cites only to EPA data. Graham fails to tell the Court that class counsel had never released any of the testing they had done and all of the data they were now relying on to support the settlement was based exclusively on EPA data. Counsel's material misrepresentations prevented the Court from conducting the rigorous fairness analysis required under Rule 23(e).

### b. Mispresented the Statements of Dr. Carson Presented to Class Members.

Also during the fairness hearing, class counsel told the Court that they have never told people there was zero risk. In fact, that is exactly what they told class members when they played the video of Dr. Carson, in which he said there will be no long term health effects, the number of chemicals released are "dwarfed" by the amount of chemicals already in the environment, no cancers of any kinds are expected and he doesn't expect one person to develop a cancer, the risk of cancer from the derailment is much less than the risk of cancer from other things, and that he can predict that people will be safe in the long run.

### 3) Effect of the Fraud and Misrepresentations

Defendants and class counsel's fraud and misrepresentations prevented class members from making informed decisions about accepting personal injury payments and releasing Defendants from further liability. Defendants and class counsel's misrepresentations prevented the Court from making an informed fairness determination based on complete information. As established in the authority, Rule 60(b)(3) provides a mechanism for seeking relief from a judgment or order obtained through fraud, misrepresentation, or other misconduct.

B. **Extraordinary Circumstances Justify Relief Under Rule 60(b)(6) and/or Rule 60(d)(3).**

The documented pattern of fraud and misrepresentations on the Court and the fraud and misrepresentations by class counsel to its own clients constitutes extraordinary circumstances warranting relief under Rule 60(b)(3).

The combination of concealed expert conclusions, false health assurances to vulnerable class members, and material misrepresentations to this Court during the fairness hearing constitute extraordinary circumstances.  "Inequitable settlements are an unfortunate recurring bug in our system of class litigation. . . . All too often, class counsel negotiate a settlement with substantial attorneys' fees but meager benefits for the class." *Pearson v. Target Corporation*, 893 F.3d 980 (2018), citing *e.g., Redman v. RadioShack Corp.*, 768 F.3d 622, 638-39 (7the Cir. 2014).

Here, class counsel appears to have used the threat of releasing Plaintiffs' experts' reports as leverage for obtaining a settlement agreement from Norfolk Southern. While that leverage appears to have benefited Defendants' and class counsel, class members are left in the dark as to the testing results and the true consequences to their health. These same class members could receive up to $25,000 for their personal injury claims that may include permanent injuries. Class counsel prioritized settlement completion over their duty to provide accurate information to class members or this Court.

Affirmative misrepresentations or omissions by counsel in obtaining settlement approval may constitute fraud on the court, warranting relief. *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626 (1978).  As recognized in *Pearson v. Target*, Rule 60(b)(6) serves as a "safety valve" for situations where the settlement process has been compromised. The Seventh Circuit noted that Rule 60(b)(6)

can be invoked "to protect the interests of the class when the settlement process has been compromised."

The misconduct here is particularly egregious because it involves environmental contamination and health risks, where class members rely heavily on expert scientific evidence they cannot independently evaluate. Class counsel's concealment of expert findings and substitution of false assurances undermines the fundamental fairness required in class action settlements.

### V. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Grant this Motion for Relief from Order under Rule 60(b)(3), 60(b)(6) and/or 60(d)(3);

B.  Prohibit enforcement of Personal Injury opt-ins and releases signed by movants;

C.  Order disclosure of all expert reports, testing data, and communications commissioned by class counsel;

D.  Grant such other relief as justice requires.

Respectfully submitted,

*/s/ Jedidiah I. Bressman*
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)
**Law Office of David A. Bressman**
2727 Tuller Parkway, Suite 100
Dublin, OH 43017
(614)538-1116
Fax: (614)761-8399
Jedidiah@Bressmanlaw.com
David@Bressmanlaw.com
Attorneys for Plaintiffs

**Certificate of Service**

I hereby certify that, on September 25, 2025, a copy of the foregoing was served on all parties of record via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

/s/ Jedidiah I. Bressman
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)
