# EXHIBIT 2

8303600000000

# INDIVIDUAL SETTLEMENT AND FINAL AGREEMENT TO RELEASE PERSONAL INJURY CLAIMS

THIS INDIVIDUAL SETTLEMENT AND FINAL AGREEMENT TO RELEASE PERSONAL INJURY CLAIMS ("Personal Injury Release") is made and entered into this 21 day of August 2024, by and between Austin Druckenbrod [Name] ("Releasor"), and Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Company," and together with Releasor, the "Parties").

Capitalized terms herein have the definition provided in the Class Action Settlement Agreement, dated April 26, 2024, except as otherwise defined in this Personal Injury Release.

## WITNESSETH THAT:

WHEREAS, Releasor is a Settlement Class Member in *In re: East Palestine Train Derailment*, No. 4:23-CV-00242, pending in the United States District Court for the Northern District of Ohio;

WHEREAS, the Company and the Class Representatives in that Action, individually and on behalf of the Settlement Class, have agreed to settle that Action by entering into a Settlement Agreement, dated April 26, 2024;

WHEREAS, in addition to any compensation awarded to Releasor through his/her/their membership in the Settlement Class by submission of a Claim, Releasor has chosen to enter into this Personal Injury Release in order to receive the benefit of this Personal Injury Release, namely a Personal Injury Payment;

WHEREAS, Releasor affirms that he/she/they was physically located within 10 miles of the Derailment Site at any time between the date of the Incident (defined below) and the Settlement Date; and

WHEREAS, the Parties hereto desire to enter into this Personal Injury Release relating to the release of Personal Injury Claims (as defined in Paragraph 5 below) that Releasor may have against the Released Parties (as defined in Paragraph 11 below) arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Incident, which is defined to mean the February 3, 2023 derailment of Norfolk Southern train 32N in East Palestine, Ohio, including without limitation the February 6, 2023 controlled release (also referred to as the vent and burn) of hazardous materials contained in certain derailed railcars and the chemical release, fire, emergency response, clean-up, remediation, shelter-in-place and evacuation in and around East Palestine, Ohio following the February 3, 2023 train derailment and February 6, 2023 controlled release.



83036000000000

NOW, THEREFORE, in consideration of the Personal Injury Payment to be provided to Releasor, the receipt and sufficiency of which is hereby mutually acknowledged by the Parties, the Parties agree as follows:

1. Releasor shall receive a Personal Injury Payment from the Personal Injury Settlement Fund, with the amount of the Personal Injury Payment to be determined by the Settlement Administrator and Class Counsel, and pursuant to the distribution plan described in Section XIII.C.3 of the Settlement Agreement.

2. In entering into this Release, Releasor understands that the following table represents the potential, average payment amounts based on proximity to the Derailment Site, for individuals seeking a Personal Injury Payment. Releasor understands that his/her/their payment could be more or less depending on the determination of the Settlement Administrator and Class Counsel.

**Potential, Average Personal Injury Payments**

| 0-2 Miles | Approximately $10,000 |
|---|---|
| 2-5 Miles | Approximately $5,000 |
| 5-10 Miles | Approximately $1,000 |

3. This Personal Injury Release shall become effective upon issuance of the Court's order finally approving the Settlement—or, if Releasor is a minor, upon the completion by Class Counsel of all necessary steps to secure valid and legally enforceable releases for minors.

4. This Personal Injury Release shall remain effective:

   A. regardless of whether the Settlement Agreement is ever modified or reversed on any appeal by any court; and

   B. regardless of any appeals or court decisions relating in any way to the liability of the Released Parties in any current or future litigation.

Capitalized terms in this Personal Injury Release defined by reference to the Settlement Agreement shall continue to have their defined meaning in all events, regardless of whether the foregoing circumstances described in Paragraph 4.A or 4.B occur.

5. Releasor, for himself/herself and his/her heirs, parents, beneficiaries, administrators, executors, successors, assigns, agents, principals, representatives, subrogees, and subrogors, hereby unconditionally, absolutely, and irrevocably fully and forever releases, acquits, covenants not to sue, and discharges the Released Parties from any and all past, present, or future Personal Injury Claims, defined to mean claims, rights, legal or administrative complaints, demands, suits, liability (including all direct and/or indirect

  

liability), damages, losses, costs, debts, actions, and causes of action (in law or equity), or expenses of any kind whatsoever, known or unknown, that have been or could have been brought in connection with:

(a) Past, present, or future personal injury or bodily injury, and any progression and/or exacerbation of personal injury or bodily injury, of whatsoever kind or nature, where such injury, progression, and/or exacerbation in whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the Incident, or wrongful death and/or survival actions as a result of such injury, progression, and/or exacerbation; and/or

(b) Loss of past, present, or future salary, wages, or other earnings, impairment of earning capacity, loss of service, ability or capacity, emotional or psychological distress, disease, illness, mental or physical pain or suffering, emotional or mental harm, anguish or loss of enjoyment of life, funeral, burial and estate administration expense, and any and all other injury, loss, damage, harm of whatsoever kind or nature growing out of, arising out of, or arising as a consequence of, whether in whole or in part, directly or indirectly, any personal injury or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life, to another person, and any progression and/or exacerbation of personal injury or bodily injury to another person, of whatsoever kind or nature, where such injury, progression, and/or exacerbation in whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the Incident, or wrongful death and/or survival actions as a result of such injury, progression, and/or exacerbation; and/or

(c) Loss of support, services, consortium, companionship, society, or affection, or damage to familial relations arising out of any personal injury or bodily injury, including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life, to another person, and any progression and/or exacerbation of personal injury or bodily injury to another person, of whatsoever kind or nature, where such injury, progression, and/or exacerbation in whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the Incident, or wrongful death and/or survival actions as a result of such injury, progression, and/or exacerbation; and/or

(d) Increased risk, possibility, or fear of suffering in the future from any disease, injury, illness, emotional or mental harm, condition, or death, in whole or in part arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Incident.

6. Releasor acknowledges and agrees that unknown consequences or progression of presently known injuries, diseases or illnesses may arise, develop, or be discovered in the future, including disabling conditions not now known to Releasor, and that future medical treatment, including surgery, may be necessary. Releasor understands that he/she/they may have suffered, or may in the future develop, injuries, diseases, illnesses, damages, and/or other harms that are presently unknown to Releasor as a result or consequence of the Incident as set forth above.



8303600000000

7.   Releasor acknowledges and agrees that the consideration received under this Personal Injury Release constitutes full and complete consideration for the release and discharge of Personal Injury Claims as defined in Paragraph 5, including any and all past, present, or future claims, rights, legal or administrative complaints, demands, suits, liability (including all direct and/or indirect liability), damages, losses, costs, debts, actions, and causes of action (in law or equity), or expenses of any kind whatsoever, known or unknown, arising from or otherwise concerning such unknown or future complications or progression, including the effects and consequences thereof and regardless of whether Releasor enters into this Personal Injury Release based upon a misunderstanding of any fact or a misunderstanding of any applicable law.

8.   Releasor understands and agrees that the signing of this Personal Injury Release prevents Releasor or any person or entity acting by or through Releasor from making and/or asserting any further claim, right, demand, suit, cost, debt, action and/or cause of action of any nature whatsoever against Released Parties, or any of them, concerning the Incident as set forth above. Releasor further understands and agrees that making and/or asserting any further claim, right, demand, suit, cost, debt, action and/or cause of action of any nature whatsoever against Released Parties, or any of them, concerning the Incident as set forth above shall constitute a material breach of the Release and shall entitle the Company to recover the amount of the Personal Injury Payment as well as any attorneys' fees and expenses resulting therefrom.

9.   Releasor understands and agrees that the signing of this Personal Injury Release shall be deemed an express waiver and relinquishment to the fullest extent permitted by law, of the provisions, rights, and benefits of Section 1542 of the California Civil Code (or any other analogous state or federal law), which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Releasor further understands and agrees that the signing of this Personal Injury Release shall be deemed an express waiver and relinquishment to the fullest extent permitted by law, of any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable, or equivalent to § 1542 of the California Civil Code. Releasor acknowledges that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention to finally and forever settle and release the Personal Injury Claims (as defined in Paragraph 5 above), notwithstanding any unknown claims they may have.




10. Releasor agrees to indemnify and hold harmless Released Parties, or any of them, for any and all losses, claims, causes of action, actions, liabilities, judgments, verdicts, awards or demands of any kind or nature, by any tortfeasor or alleged tortfeasor, or any other person or entity asserting any independent or derivative claim or right, whether by law, contract or otherwise, including, but not limited to, actions for contribution and/or indemnification, arising out of any of the matters released herein.

11. Released Parties means:

    A. Norfolk Southern and any of its past or present parents, subsidiaries, affiliated companies, and corporations, and any of their past or present officers, directors, managers, employees, general partners, limited partners, principals, insurers, reinsurers, shareholders, attorneys, advisors, representatives, agents, consultants, contractors, service providers, successors, or assigns;

    B. OxyVinyls LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company (collectively defined as the "Non-Settling Railcar Defendants");

    C. any other manufacturers, owners, lessors, lessees, shippers, and consignees of the rail cars and products involved in the Incident;

    D. the manufacturers, installers, and designers of the rail track or other railroad equipment associated with the Incident, including without limitation Progress Rail;

    E. the Association of American Railroads;

    F. Terminal Railroad Association of St. Louis;

    G. any persons, business entities, and agencies that assisted in or supported the emergency response, remediation, air monitoring, soil monitoring, water monitoring, and clean-up activities associated with the Incident—including for avoidance of doubt and without limitation, Arcadis U.S., Inc.; Braskem America Inc.; Center for Toxicology and Environmental Health (CTEH); EnviroScience, Inc.; Explosive Service International; Specialized Professional Services Inc. (SPSI); Midland Manufacturing; Specialized Response Solutions (SRS); Hazardous Products Abatement Company (HEPACO); EnviroServe; Engineering Systems Inc. (Esi); Cranemasters; Hulcher Services, Inc.; R.J. Corman Railroad Group; and Timken Company—including the activities of private, public, and governmental agencies, entities, and authorities, whether federal, state, county, or local, their employees, officers, agents, members, and volunteers; and

    H. any owners, lessors, and lessees of any other real property located at the site of the Incident.

For the avoidance of doubt, any of the "Released Parties" includes, for any of the foregoing entities, any past or present parents, subsidiaries, affiliated companies, and corporations, and any past or present officers, directors, managers, employees, general partners, limited partners, principals, insurers, reinsurers, shareholders, attorneys, advisors, representatives, agents, consultants, contractors, service providers, successors, or assigns.

12. Releasor retains Personal Injury Claims, if any, against persons or entities who are not Released Parties; but such reservation creates no basis for a claim of contribution, subrogation, or indemnification (collectively, an "Insurer Claim"), however denominated, by any non-Released Party against any Released Party. For avoidance of doubt, this Release shall apply to all related Insurer Claims of the Releasor's subrogees or insurance carriers, and Releasor expressly waives any contractual or other right or claim of contribution, subrogation, or indemnification by any insurer or other party for an Insurer Claim against any Released Parties. If Releasor has made an insurance claim or has received insurance proceeds for any itemized loss or damage relating to Personal Injury Claims caused by the Incident, and Releasor submits an itemized claim for the same loss or damage as part of the Personal Injury Payment, then Releasor will indemnify Released Parties for any liability that Released Parties, or any of them, incur for an Insurer Claim, provided that (a) the Insurer Claim is brought by an entity seeking to recover payment of insurance proceeds to Releasor for the same itemized loss or damage; and (b) the amount for which Releasor indemnifies Released Parties shall be limited to only that amount of the Personal Injury Payment to Releasor made directly for said itemized loss or damage, if any.

13. Releasor agrees to satisfy any and all valid liens that have been asserted and/or which could be or may be asserted for reimbursement of any medical benefits provided to the Releasor by a third party, including without limitation Medicare or Medicaid, as a result of any injuries allegedly caused by the Incident.

14. Releasor is ____ is not __X__ [Check One] entitled to Medicare Parts A through D.

15. This Release is not intended to affect—and instead expressly preserves—any and all of Norfolk Southern's rights of contribution, subrogation, or indemnity under any law, including for avoidance or doubt and without limitation Norfolk Southern's claims against the Non-Settling Railcar Defendants under Ohio law, including Ohio R.C. § 2307.25, titled "Right of contribution; settlements; subrogation; indemnity," Ohio R.C. § 2307.26, titled "Contribution," Ohio R.C. § 2307.28, titled "Release or covenant not to sue or not to enforce judgment," or any other applicable law.

16. Releasor agrees that the provisions of this Personal Injury Release are severable. In the event that any provision is found to be unlawful or unenforceable, Releasor further agrees that the remaining provisions hereof shall remain in full force and effect.

17. Releasor agrees this Personal Injury Release constitutes the final, complete, and exclusive agreement and understanding between the Company and Releasor and supersedes any and all other agreements, written or oral, between Company and Releasor with respect to the subject matter of this Personal Injury Release in settlement of Personal Injury Claims arising out of or related to the Incident.





## East Palestine Train Derailment

### Important Information About the Attached
### Individual Settlement and Final Agreement to Release Personal Injury Claims

*You have the right to consult with Class Counsel,*
*or an attorney of your own choosing, before signing a release of legal rights.*

The attached Individual Settlement and Final Agreement to Release Personal Injury Claims ("Personal Injury Release") is a binding legal document. By signing this document, in exchange for a Personal Injury Payment, you are forever waiving and releasing all Personal Injury Claims that you may have against Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively "the Company") or any other Released Party in connection with the February 3, 2023 derailment of Norfolk Southern train 32N in East Palestine, Ohio, including without limitation the February 6, 2023 controlled release (also referred to as the vent and burn) of hazardous materials contained in certain derailed railcars and the chemical release, fire, emergency response, clean-up, remediation, shelter-in-place and evacuation in and around East Palestine, Ohio following the February 3, 2023 train derailment and February 6, 2023 controlled release (all collectively, "the Incident").

By signing the attached Personal Injury Release, you are forever giving up and discharging any rights that you may have for any Personal Injury Claims arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Incident even if you are not currently aware of any such Personal Injury Claims and even if any such Personal Injury Claims arise in the future or do not manifest themselves until the future.

By signing the attached Personal Injury Release, you acknowledge that you have read and understand the terms of the Personal Injury Release, including the capitalized defined terms referenced therein, and that you execute the Personal Injury Release voluntarily and without being pressured or influenced by, and without relying upon, any statement or representation made by any person acting on behalf of the Company.

The Personal Injury Payment that you are eligible for arises under the putative class action *In re: East Palestine Train Derailment*, No. 4:23-CV-00242, pending in the United States District Court for the Northern District of Ohio. A class action settlement has been proposed in that case, but the Court has not yet given final approval to that proposed class action settlement.

- **No Payment Until Final Approval.** If you decide to sign the attached Personal Injury Release, you will not receive any Personal Injury Payment unless and until the Court issues its final order approving the proposed class action settlement.
- **Payment And Personal Injury Release Effective Regardless Of Any Appeals.** But if the Court does grant final approval, this Personal Injury Release will become immediately effective (or, if you are a minor, upon completion of any necessary minor approval process), and your determined Personal Injury Payment will be distributed, regardless of any appeals of the proposed class action settlement.


83036


CF


Page 1 of 10



8303600000000

It is possible that an appellate court could modify or reverse any final approval of the proposed class action settlement. Moreover, it is possible that the terms of the proposed class action settlement may change in the future as a result of further legal proceedings. **By signing this Personal Injury Release, however, you are forever waiving and releasing all past, present, or future Personal Injury Claims, known and unknown, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Incident regardless of the outcome or resolution of the proposed class action settlement in *In re: East Palestine Train Derailment*, No. 4:23-CV-00242 (N.D. Ohio).**

## ACKNOWLEDGMENT

I acknowledge that I have read and understand the information above. I agree to accept the payment as a final settlement of all past, present, or future Personal Injury Claims, known and unknown, related to or arising from the Incident.

Austin Druckenbrod
Printed Name

*Austin Druckenbrod*  08/21/2024
Signature                                                Date

18. The Personal Injury Release constitutes no admission of liability or wrongdoing by the Company, and the Personal Injury Payment is made purely by way of compromise and settlement.

19. In entering into this Release, Releasor represents that he/she/they has completely read all terms and that such terms are fully understood and voluntarily accepted by him/her/them. Releasor hereby confirms that Releasor was afforded the opportunity to and if Releasor so decided did confer with Class Counsel, or an attorney of his/her/their choice, concerning the terms and conditions of this Release.

THUS, RELEASOR HEREBY ACKNOWLEDGES THAT RELEASOR HAS READ THE ENTIRETY OF THIS RELEASE, UNDERSTANDS ITS TERMS AND ITS MEANING AND EFFECT, AND THAT, BY SIGNING THIS RELEASE, UNDERSTANDS AND AGREES THAT RELEASOR IS RELEASING HIS/HER/THEIR RIGHTS REFERENCED HEREIN AGAINST RELEASED PARTIES, AND EACH OF THEM.

_Austin Druckenbrod_
Releasor Name

_[signature]_
Releasor Signature

08/21/2024

8303600000000

—If Releasor Is A Minor—

Releasor's Years of Age At The Time of Signature: _____

_____
Parent's Name

_____        ____/____/_____
Parent's Signature                                    Date

(____)_____
Phone number

_____@_____
Email address

_____
Address

_____
Address 2

_____  _____  _____
City                                                        State          Zip

83036      CF      Page 10 of 10

8 3 0 3 6 0 0 0 0 0 0 0

diagnosed by a medical professional (attach additional pages as necessary). If you leave this question blank, the Settlement Administrator will construe your answer as "no.":

| Description of Symptoms or Injuries | Medical Treatment by Medical Professional (Y/N) | Formal Diagnosis by Medical Professional (Y/N) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

➢ **If this Household member is over the age of 16, attach a copy of a valid, government issued identification.**

## III. Affirmation and Certification
*All claimants must complete Section III.*

**By signing below and submitting this Claim, I, on behalf of myself and the members of my Household identified above, swear or affirm under penalty of perjury that neither myself nor any member of my Household has been fully compensated for loss, damages, or injury incurred as a result of the February 3, 2023 derailment of Norfolk Southern Train 32N, including the February 6, 2023 "vent and burn" (the "Incident") by any prior insurance payments, and that all information contained herein and all information submitted to the Settlement Administrator is truthful and accurate.**

_____  08/21/2024
Signature of Claimant            Date

## Extraordinary Injury Claim Statement

**CLAIMANT: Austin Druckenbrod**

On February 3, 2023 Mr. Druckenbrod was a happy fit 24-year-old working a production job at NVR Building Products which is located at ▮▮▮▮▮ (a copy of his pay stub from this time period accompanies his claim form). NVR is adjacent to the train tracks and approximately 1 mile east of the derailment site.

**Summary of Events:**

The records[1] substantiating the following summary are attached as indicated. Additionally, Mr. Druckenbrod, through his claim form, has verified each fact contained herein. Counsel for Mr. Druckenbrod is happy to answer any questions related to either the facts of this claim or the damages suffered by Mr. Druckenbrod.

On the night of February 3, 2023, a Norfolk Southern freight train carrying an assortment of hazardous chemicals derailed near East Palestine, a town bordering Ohio and Pennsylvania. The derailment involved 38 train cars, with 11 containing hazardous materials, including vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, and benzene. The incident resulted in a fiery wreck, releasing toxic chemicals into the air and water. On February 6th, Norfolk Southern instituted an unnecessary and reckless "controlled" burn of the remaining hazardous chemicals at the site.

Mr. Druckenbrod lives 8 miles Northeast of the derailment site but smelling the chemicals in the air he evacuated his residence at 1:00 am on February 5th and traveled to his parents' house in Canton - 43 miles away – in an effort to avoid exposure to the anticipated explosion/burn. He stayed there until the day before he was ordered to return to work - February 8, 2023. Because his shift began at 6:00 am on the 8th, and because his employer had warned him that he should not be late just because there were road closures in the area[2], Mr. Druckenbrod drove to NVR on the night of February 7th as a dry run to ensure that he would not be late for work. What he found when arrived at NVR was disconcerting – the strong smell of chemicals and smoke/fog rising off/from the ground. His eyes and nose immediately became irritated, and he left the area. Receiving no notice that his company was ceasing operations Mr. Druckenbrod navigated around numerous road closures to reported for work at 6:00 am on February 8 as he was instructed to do.

Mr. Druckenbrod worked in an openair warehouse directly down the trainline from the derailment site. He and his co-workers could smell the chemicals in the air, but even in the

---

[1] Medical records referenced in this claim were obtained by Mr. Druckenbrod through his medical healthcare portals. Records obtained by counsel are attached collectively as Exhibit 24. Should the Administrator desire to obtain any of these records from Mr. Druckenbrod's healthcare providers he will provide a current HIPPA release upon request.

[2] Exhibit 1

Austin Druckenbrod

Page 2 of 5

presence of burning eyes, and nasal and lung irritation, they assumed they were not in any significant danger as the area was covered in first responders and no one suggested that NVR cease operations. Mr. Druckenbrod's symptoms continued to increase and by midway through his shift on February 9th, Mr. Druckenbrod's headache, burning eyes, nasal and lung irritations significantly worsened and now included nose bleeds and coughing up blood. He was seen in the emergency department at 5:10 pm on February 9th[3] at which time he was told not to return to work until February 15th.[4] A pulmonary embolism was ruled out breathing treatments were administered, prescription medications provided, and further workup suggested.

Mr. Druckenbrod followed up with local physicians at Mercy Health Physicians' Internal Medicine practice for continued care. He was seen there on February 20th [5] and 22nd[6] and March 22rd[7] and continued to receive treatment for symptoms (throwing up blood, wheezing, coughing up blood, burning throat) caused by his exposure to the toxic elements from the Norfolk Southern train derailment. His local physicians referred him to Cleveland Clinic Pulmonary Medicine for more a more thorough workup and evaluation (Ex. 6, p1).

Mr. Druckenbrod's symptoms persisted, and finally he was able to be seen at Cleveland Clinic's Pulmonary Medicine Department on April 7, 2023. After pulmonary function testing and a thorough examination, Mr. Druckenbrod's symptoms were determined to be most consistent with Reactive Airways Dysfunction Syndrome (RADS) due to chemical exposure from the Norfolk Southern train derailment in East Palestine, Oh. He was prescribed high-dose Symbicort and Albuterol and instructed not to return to work for at least a month until is symptoms resided.[8]

On April 28, 2023 Mr. Druckenbrod returned to Cleveland Clinic as instructed for a follow-up visit. Because his symptoms were not resolving, Mr. Druckenbrod was instructed to not return to work for three months as his symptoms (coughing up blood and shortness of breath) have not resolved. His chart also notes that in addition to the concerns for his health that he has the added stress of not being able to afford his medications and not being paid while out of work.[9]

He was next seen at Cleveland Clinic on July 24, 2023 and underwent repeat pulmonary function testing with methacholine challenge. The results of this subsequent study which confirmed his previous suspected diagnosis of RADS. Dr. MacMurdo, the Director of the Occupational Lung Disease Program at Cleveland Clinic, diagnosed Mr. Druckenbrod with moderate

---

[3] Exhibit 2
[4] Exhibit 3
[5] Exhibit 4
[6] Exhibit 5
[7] Exhibit 6
[8] Exhibit 7; As noted supra, his instruction to say off work was subsequently extended until July 28, 2023.
[9] Exhibits 8 and 9.

persistent RADS. Significantly, Dr. MacMurdo opined that his RADS was caused by his exposure to the contaminants released by the Norfolk Southern train derailment.[10]

Mr. Druckenbrod's symptoms remained bothersome ("like he can't get the air out" of his lungs and productive bloody coughs) and he had "not had significant improvement" at his October 18th follow-up with Dr. MacMurdo.[11] And in his most recent appointment with her on March 19, 2024 it was noted that Mr. Druckenbrod had developed a "significant breathing pattern dysfunction which has developed following his RADS symptoms – actively working with Dr. Milstein on this with some improvement."[12]

Mr. Druckenbrod has incurred the additional expense and inconvenience of the following additional studies/therapies, all ordered by Dr. MacMurdo and performed at Cleveland Clinic:

- Nitric Oxide Studies on 12/7/23 and 3/18/24[13]
- Laryngoscope Study on 1/12/24[14] - "I recommend to undergo an individual course of respiratory retraining therapy"
- Respiratory Training on 12/7/23[15]
- Spirometry on 4/7/23[16] - "Spirometry shows a *reduced FEV1/FVC ratio*; but individually normal FVC and FEV1predicted values. This pattern indicates *mild obstruction* or a normal variant. There is a *significant bronchodilator response*"
- CT Scan of the chest – "diffuse bronchial wall thickening, which can be seen in the setting of reactive airways disease"[17]

As indicated by his Cleveland Clinic physicians' notes, Mr. Druckenbrod suffered from significant anxiety following his toxic exposure and resulting pulmonary incapacity as well as his loss of income and inability to afford the medications needed to treat his RADS[18]. This anxiety mandated Mr. Druckenbrod seek the services of a mental health professional.  On June 26, 2023, and again on October 11, 2023 Mr. Druckenbrod was evaluated and diagnosed as suffering from PTSD as a result of the events related to the train derailment and prescribed antidepressants to help him deal with this serous mental injury.[19]

---

[10] Exhibits 10 and 9; Claimant's counsel personally consulted with his pulmonologist, Dr. MacMurdo, who is the Director of the Occupational Lung Disease Program at Cleveland Clinic.  She is prepared to testify the Mr. DD's RADS was caused by his exposure to the chemicals released by the train derailment.
[11] Exhibit 11.
[12] Exhibit 16, p. 2.
[13] Exhibits 12 and 15.
[14] Exhibit 13.
[15] Exhibit 14.
[16] Exhibit 17.
[17] Exhibit 20.
[18] See Exhibit 10, p.1.
[19] Exhibits 18 and 19.

Austin Druckenbrod

Page 4 of 5

Realizing that he may never be able to return to his physically demanding production job[20], Mr. Druckenbrod resigned effective July 21, 2023, and accepted a lower paying job; one away from East Palestine and one that did not require physical labor.

**Physical, Financial and Mental Impacts:**

Mr. Druckenbrod's young happy life has been upended. He was forced to give up the job he loved, suffers from PTSD and traumatizing and potentially lifelong injury to his lungs which have significantly impaired his ability to enjoy the activities average 24-year-old men enjoy.

As a result of his injuries, Mr. Druckenbrod has incurred significant medical expenses for treatment at Cleveland Clinic and at St. Elizabeth's Hospital. As indicated repeatedly in his medical and billing records, Mr. Druckenbrod has not been able to afford the most effective medications to treat his injury, nor has he been able to fully pay for all the medical care that has been required. Invoices from Cleveland Clinic and from St. Elizabeth's Hospital for Mr. Druckenbrod's are collectively attached as Exhibit 22 and 23 respectively.[21] His Cleveland Clinic billing records indicate the charges that are past due and have been turned over to bill collectors. Not only has this created a tremendous amount of stress and anxiety in Mr. Durckenbrod's life; it has also negatively impacted his credit reputation.

Recent jury awards for similar injuries to men under 40 years of age have ranged from $3 to $6.8 million. Given the grossly negligent conduct that was adduced during depositions in this case, it is almost certain that a jury would award Mr. Druckenbrod significantly more.

**Conclusion:**

Mr. Druckenbrod has entered into this settlement program voluntarily based on the representation that each claim would be individually and fairly assessed. He understands that by entering into this program that he will avoid the expense and delay in receiving compensation that a jury trial would entail. That, however, should not result in him being undercompensated solely to benefit those individuals that have no physical or medically diagnosed mental injuries.

**Representation:**

All questions and requests regarding this claim should be directed to Mr. Druckenbrod's counsel:

Mikal Watts (mikal@wattsllp.com)
Russell T. Abney (russ@wattsllp.com)
**WATTS LAW FIRM LLP**

---

[20] Despite being a physical job, as indicated in his medical records, it was a job Mr. Druckenbrod enjoyed and excelled at.
[21] While the billing records are somewhat confusing, but counsel's calculations the bills from Cleveland Clinic were over $21,375 and over $5,500 from St. Elizabeth's Hospital.

Austin Druckenbrod

███████████████████████

Page 5 of 5

811 Barton Springs Rd., Ste. 725
Austin, TX 78704
Office: 512.479.0500