IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: EAST PALESTINE TRAIN DERAILMENT

_____

) Case No. 4:23-CV-00242-BYP
) JUDGE BENITA Y. PEARSON
)
)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 60(b)(3), 60(b)(6) and 60(d)(3)**

## I. INTRODUCTION

Movant class members[1] respectfully move for relief from the Final Approval Order entered on September 27, 2024, approving the class action settlement. This motion is based on substantial evidence of fraud and misrepresentation by class counsel, who concealed critical expert findings about health risks while inducing class members to sign personal injury releases in exchange for inadequate personal injury payments. The documented misconduct fundamentally undermines the integrity of the settlement process and warrants relief under Federal Rules 60(b)(3), 60(b)(6) and 60(d)(3).

## II. FACTUAL BACKGROUND

This Court, on September 27, 2024, approved a class action settlement in the amount of six-hundred-million dollars ($600,000,000.00) to be paid by Norfolk Southern arising out of the February 3, 2023, train derailment in East Palestine, Ohio and the February 6, 2023, burn of vinyl chloride. (ECF 452-2.) Norfolk Southern and class counsel concealed critical soil and water testing results, made false representations to class members about health risks, and misled this Court

_____

[1] *See* Ex. 1

during the fairness hearing about the basis for their expert reports and about the representations made to class members.

## A. DERAILMENT AND VENT AND BURN:

On February 1, 2023, a Norfolk train departed from Madison, Illinois bound for Conway, Pennsylvania. Two days later, on February 3, 2023, the train consisting of three locomotives and 149 train cars and measuring 9,309 feet long, left Toledo, Ohio headed east.[2] 11 of the 149 train cars were carrying hazardous chemicals.[3] Norfolk Southern chose to transport 5 of the 11 train cars full of hazardous materials in DOT-111 tank cars, which are known to fail and release hazardous materials in a derailment.[4]

Overheated wheel bearings are the most common mechanical or electrical cause of rail incidents.[5] Because overheated bearings are so dangerous, railroad tracks have Hot Bearing Detectors ("HBDs") along the tracks that detect when wheel bearings are overheating and at risk of failing and causing a derailment.[6]

As Norfolk's train traveled through Salem, Ohio, the HBD detected an overheating wheel bearing at 103 degrees and video footage shows the wheel bearing was actually on fire as it traveled through Salem.[7] The HBD sent an alarm but Norfolk Southern choose not to notify the train crew that the wheel bearing was overheating and on fire and instead choose to wait to take any action until the train went over the HBD in East Palestine 40 minutes later, at which time the wheel

---

[2] *Id.*
[3] *Id.*
[4] *Id.* at p. 3.
[5] NTSB SPC-24-06, p. 4.
[6] *Id.*
[7] *Id.*

bearing was up to 253 degrees.[8] The train crew was notified of the excessive temperature, but it was too late, and 38 cars derailed, just 560 yards past the many homes along the train tracks.[9]

Of the 11 derailed hazardous materials cars, three carrying flammable and combustible liquids were cracked or punctured during the derailment and released some contents.[10] The tank cars that were breached as they derailed were the DOT-111 tank cars.[11]

A fire broke out during the derailment, fed by the spilled flammable and combustible liquids. The fire spread to other tank cars and freight cars. The fire burned and smoldered, continuing to release hazardous materials, for several days.



Photo courtesy of Eric's Train Yard

But that was not the only hazardous materials release.  Five pressurized tank cars carrying the hazardous material vinyl chloride survived the initial derailment intact; however, four of the

---

[8] *Id.* at p. 5.
[9] *Id.* at 5-6.
[10] Id. at p. 2.
[11] Id.

five cars were exposed to fire, causing the tank cars to heat up.[12] If tank cars carrying vinyl chloride get above 185 degrees, the heat can cause vinyl chloride to boil and expand, a process called polymerization, which can cause an explosion.[13] In any event, as long as the tank cars remain under 185 degrees, polymerization will likely not occur and the tank car will not explode.[14]

Railroad companies have several options for removing hazardous materials from derailed tank cars including simply transferring the product to another tank car.[15]  A "vent and burn" procedure, in which the vinyl chloride is drained from the tank cars and burned, is always a method of last resort because vinyl chloride is a known carcinogen that has been linked to liver, brain and lung cancer.[16] The products of vinyl chloride combustion, including hydrogen chloride, carbon monoxide, soot, and traces of phosgene, can be toxic to a community and the environment.[17]



**Figure 9.** Illustration of a vent and burn procedure.

---

[12] *Id.*
[13] *Id.* at 8-9.
[14] *Id.* at 8.
[15] *Id.* at 12.
[16] *Id.*
[17] *Id.*

On February 4, 2023, Norfolk determined it should conduct a "vent and burn."[18] On February 5, 2023, representatives of OxyVinyls, the owner of the vinyl chloride in the tank cars determined that polymerization was not occurring and a vent and burn of the vinyl chloride was not necessary.[19] OxyVinyls informed Norfolk that polymerization was not occurring and that monitoring showed decreasing temperatures well below 185 degrees in all five tank cars.[20] Later that evening, Norfolk told the Federal and State authorities that polymerization was occurring and Norfolk began preparations for a vent and burn.[21]

On February 6, despite Oxy Vinyls conclusions and no evidence of polymerization leading to an explosion, Norfolk met with incident command and advocated for approval of a vent and burn of the vinyl chloride.[22] Norfolk did not invite Oxy Vinyls to the meeting and did not tell incident command that Oxy Vinyls concluded polymerization was not occurring and recommended against a vent and burn.[23] Instead, Norfolk told the incident commander that they wanted to begin the vent and burn before 3:00 p.m. that afternoon due to an impending atmospheric event, giving the incident commander only 13 minutes to decide whether to allow Norfolk to proceed with the vent and burn.[24] Incident command, on the recommendation and urging of Norfolk, approved the vent and burn.[25]

---

[18] *Id.* at 10.
[19] *Id.* at 8.
[20] *Id.*
[21] *Id.* at 10.
[22] *Id.* at 10-11.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 12.

On February 6, 2023 at 4:47 p.m., one hour and 47 minutes later than planned, Norfolk opened the five tank cars, drained the vinyl chloride and lit it on fire.[26] The burning vinyl chloride resulted in a column of black smoke that grew into a persistent toxic cloud.[27]



**Figure 10.** The vent and burn 3 minutes after detonation. (Courtesy of NS.)

On February 8, 2023, local authorities tell residents they can safely go back to their home. That same day, Norfolk's trains are back up and running on the tracks through East Palestine.

---

[26] *Id.*
[27] *Id.*



Between February 8 and February 15, 2023, low levels of the chemical known as butyl acrylate are being detected at multiple sampling sites along the Ohio River downstream of the derailment site.



On February 10, 2023, the EPA sent a letter to Norfolk stating "vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether are known to have been and continue to be released to the air, surface soils, and surface waters."

## B.  CLASS ACTION LAWSUIT AND SETTLEMENT AGREEMENT

The first Complaint was filed on February 7,2023. (ECF 1.)

According to class counsel, counsel "retained numerous experts for liability and damages" and were "on-site with experts within weeks of the derailment." (ECF 518-2, ¶ 45.) Class counsel coordinated an "extensive environmental sampling and testing program to determine the impact of the derailment and subsequent vent and burn." (ECF 518-2, ¶ 32.)  Class counsel's "environmental testing included approximately 160 sampling sites in and around East Palestine, covering sites at a 30-mile radius from the derailment site and sites as far as 45 miles from the derailment site . . . in area over 2,800 square miles."  (ECF 518-2, ¶ 33.) Class counsel ensured the attorneys from their law firms were present at every site for the environmental testing done by Plaintiffs' experts. *Id.* The environmental testing program also required that class counsel investigate the background levels of relevant contaminants in the areas where sampling was conducted. *Id.*

Class counsel also retained or consulted several experts in order to establish damages, a non-exhaustive list of which includes experts in air modeling, source term calculating, chemistry, chemical properties, meteorology, toxicology, epidemiology, environmental remediation, geology, hydrology, medical monitoring, industrial hygiene, pulmonology, oncology, real property diminution in value, forensic accounting for commercial loss modeling, and population modeling and research. (ECF 518-2, ¶ 47.)

Based on Class counsel's discussions with its experts, Class counsel had the

information needed to determine 1) the strength of Plaintiffs' case against Norfolk Southern on liability and 2) what geographic areas were most impacted by the events of and following the derailment, and how they were impacted, including the type and amount of toxic chemicals that had been created, where they had traveled, where they were most concentrated geographically, the number of people in those geographic areas, **the likelihood of disease or injury from both acute and chronic exposure to those toxic chemicals,** . . . . (ECF 518-2, ¶ 49, emphasis added.)

Class counsel "worked intently with Plaintiffs' experts, knew the substance of their expected expert opinions, and were well prepared to present their testimony." (ECF 518-2, ¶ 49.)

On February 19, 2024, class counsel and Norfolk participated in mediation. A settlement agreement was not reached but settlement discussions continued. (ECF 518-2, ¶ 56.) "Given the state of settlement negotiations," on March 18, 2024, class counsel and the defendants jointly moved to extend the April 1, 2024, deadline for Plaintiff's Expert designation deadline. (ECF 518-2, ¶ 56; ECF 431.)

Plaintiff's expert designation deadline is extended to April 15, 2024. (ECF 432.) On April 9, 2024, a settlement agreement is reached. (ECF 518-2, ¶ 51.) Plaintiffs' expert witnesses were never designated and class member residents were never informed of the results of the extensive testing done by the plaintiffs' experts. On April 26, 2024, class counsel filed their motion for preliminary approval of the settlement. (ECF 452.)

The Class Action Settlement Agreement included a confidential Supplemental Termination Agreement, which purports to grant Norfolk Southern the "unilateral right to terminate the Settlement" if there "Settlement Class Members' participation rates trigger numerical thresholds." (ECF 452-2, ¶ XI(C).)

### C. CLASS COUNSEL'S REPRESENTATIONS TO THE PROPOSED CLASS REGARDING THE LEVEL OF CONTAMINATION AND THE LONG-TERM HEALTH CONSEQUENCES:

Class counsel held several town hall meetings regarding the class action settlement including on June 11, 2024, June 20, 2024, July 19, 2024, August 1, 2024 and August 15, 2024. (ECF 518-8, ¶ 43.) Rather than provide information from one of the Plaintiffs' numerous expert witnesses, Class counsel hired Rebuttal PR, a public relations company, to prepare information to address proposed class members' concerns about the level of contamination and the long-term health consequences.

On July 26, 2024, class counsel's public relations company provided counsel with a video by Dr. Arch Carson. Dr. Carson was not retained by Plaintiffs. Rather, he is a friend of one of the attorneys on the class action Plaintiffs Executive Committee (PEC). (ECF 553, 55:18-20.)

On August 1, 2024, class counsel held a town hall meeting by Zoom.[28]



Dr. Carson was introduced as a "completely independent third party:"

---

[28] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM

"We'd like to share a quick video from an experienced doctor who has followed the derailment and generously offered his expertise. He is not involved in the litigation, and this is a completely independent third party."





The video of Dr. Carson was played, during which Dr. Carson was asked the following questions, to which he made the following statements:

Q: What are the health impacts associated with the chemicals released by the derailment?

**Based on my best judgment, there will not be any long-term health impact of chemical exposure from the derailment to community members of East Palestine.**

**As far as people just living in East Palestine or working there or in nearby neighboring communities, we don't expect there to be any long-term health effects associated with chemical exposure resulting from the derailment.**

Q: "How much higher would the contamination levels have to be in order to be at a dangerous level?"

**The number of chemicals that have been produced and that may remain in very low levels in the East Palestine area are dwarfed by the amount of other substances that are there that have been put there over years of just normal human activity.**

Q: Is there any cause for concern over carcinogens that were released?"

**The levels [of carcinogens] that people were exposed to in the community were so small that we don't expect any kinds of cancers or other health effects to have results from those.**
Q: What are the chances of someone developing an illness like cancer in the future because of this chemical exposure?

**I would personally not expect one person to develop a cancer as a result of this exposure that is due to those chemical exposures.**

**But we do know that there are lots of things people are exposed to all the time that are more likely to cause cancers, and so the result of the exposure from the train derailment is much less of a risk than those other exposures.**

Q: How would you respond to claims that its too early to know the long-term health effects of the derailment?"

I think the answer to that is yes, it's too early for some things, but it's not too early to predict the overall health effects will occur from this. Certainly, if we're thinking of one potential cancer that occurs 20 years from now, it's too soon to count that, **but we pretty well know what exposures resulted from this train derailment and we can pretty well predict that people are going to be safe in the long term.**

**D.  CLASS COUNSEL KNEW PROPOSED CLASS MEMBERS WERE SICK AND DIAGNOSED WITH ILLNESS CAUSED BY TOXIC EXPOSURE FOLLOWING THE DERAILMENT.**

While class counsel told class members that there was no contamination and there would

be no long-term health effects as a result of the derailment, class counsel knew some class members

were very sick and that their doctors were prepared to testify that their illnesses were caused by exposure to contaminants released by the train derailment.

On August 21, 2024, class counsel signed and submitted an Extraordinary Injury Claim Statement for Austin Druckenbrod. (Ex. 2, Extraordinary Injury Claim Statement.) Therein, class counsel details Mr. Druckenbrod's exposure to contamination when he reported to work at 6:00 a.m. on February 8, 2023 and the medical treatment received in the following days, weeks and months. Counsel states:

> He was next seen at Cleveland Clinic on July 24, 2023 and underwent repeate pulmonary function testing with methacholine challenge. The results of this subsequent study which confirmed his previously suspected diagnosis of RADS. Dr. MacMurdo, the director of the Occupational Lung Disease Program at Cleveland Clinic, diagnosed Mr. Druckenbrod with moderate persistent RADS. Significantly, Dr. MacMurdo opined that his RADS was caused by his exposure to the contaminants released by the Norfolk Southern train derailment. . . . [Dr. MacMurdo] is prepared to testify that Mr. [Druckenbrod's] RADS was caused by his exposure to the chemicals released by the train derailment.

(Ex. 2., p. 2-3.)

The fact that class counsel knew this information was first discovered by the movants undersigned counsel in July 2025.

### E.  CLASS COUNSEL'S EXPERT RELYS ON EPA DATA

On September 6, 2024, after the requisite numbers of proposed class members opted in to the personal injury payment, class counsel filed their Motion for Final Approval of Settlement. (ECF 518.) In support of their motion, class counsel attached the affidavit of one expert, Richard Schuhmann, Ph.D., regarding the proposed class's exposure to toxic chemicals. (ECF 518-10.)

In his affidavit, Schuhmann states that environmental samples were only collected between February 21, 2023 and March 4, 2023 and April 20, 2023 and April 25, 2023. (*Id.* ¶ 6.) Schuhmann

states that the soil sample results were compared to pre-existing contaminants or "background" samples. (*Id.* at ¶15.) In other words, soil samples were taken from areas the EPA determined to not to have been contaminated at the time of the derailment and vent and burn and those samples were used as the control samples or "background" samples showing what was already in the environment before the derailment. Based on that comparison, Schuhmann states that based on that comparison, the chemicals found in East Palestine and the surrounding vicinity were already there before the derailment "as a result of impact from regional and local combustion processes over time." *Id.* Schumann states: "Regional historic combustion byproducts likely arose from municipal waste incineration." *Id.* In support of this conclusion, Schuhmann cites to EPA publication *Locating and Estimating Air Emissions From Sources of Dioxins and Furnas*, EPA-454/R-97-003 (1997). *Id.* Schuhmann further states: "Local combustion byproducts likely originate from residential burning including barrel burning of household waste." *Id.*  In support of this conclusion, Schuhmann cites EPA statements regarding dioxins produced by backyard burning. *Id.*

Finally, in reliance on the EPA control or "background" samples, as well as the cited EPA sources, Schuhmann concludes that East Palestine was already contaminated by dioxins from backyard burning, stating: "The majority of residential soil samples collected and analyzed for dioxins/furans were below **the US EPA East Palestine background**." (*Id.* at ¶17.)

## F.  OBJECTIONS TO CONCLUSIONS DRAWN FROM EPA TESTING AND CARSON STATEMENTS

After the video of Dr. Carson was played to the proposed class members, two testing experts filed Affidavits objecting to the class actions settlement. (ECF 534; ECF 536.)

Scott Smith is an independent testing expert that began conducting soil and water samples in East Palestine in February 2023 at the request of residents. (ECF 536, ¶20.) Smith stated he had

made 27 trips to East Palestine and completed 31 rounds of testing. (*Id.* at ¶23.) Smith's testing results showed extremely elevated levels of toxic chemicals in East Palestine and the surrounding communities. (*Id.* at ¶54.) Smith's results contradicted the testing results released by the EPA. In his affidavit, Smith explained that the EPA testing results were invalid and did not accurately reflect the true extent of contamination in East Palestine. (*Id.* at ¶54.)

Stephen Petty is also an independent testing expert. Petty, however, was hired by class counsel to conduct the extensive testing plan developed by class counsel. (ECF 534, ¶6.) In his affidavit, Petty also advised that the EPA testing data was flawed, in part because the area tested by the EPA focused on the area that was evacuated for the vent and burn. (*Id.* at ¶32.) Petty explained that the evacuation zone was based on wind directions on the morning of February 6, 2023, however, the winds changed before the vent and burn was conducted, which caused the toxic plume to affect different areas than those expected and evacuated. (*Id.* at ¶32, 34.) Despite the change in the migration of the toxic plume, the EPA was inaccurately focusing their testing on the evacuation zone. *Id.* Most importantly, Petty explained that the EPA was obtaining their control or "background" samples from areas that were directly impacted by the toxic plume from the vent and burn and therefore, did not accurately reflect the "background," i.e. the contaminates in the area before the derailment:

> The dioxin soil sampling plan is based on assuming the one-mile by two-mile evacuation zone to the southeast of the "controlled burn" was where the dioxins and furans and other pollutants deposited, and the other areas outside the evacuation area were treated as background for the Arcadis dioxin soil sampling plan. At least during the time of the controlled burn, this plan is backwards. The background areas, where the plume actually went, would likely have higher dioxin readings than the evacuation zone, where the plume did not go. . . . To my knowledge, to this day the EPA has not either recognized or acknowledged, these significant changes to wind speeds and directions during the times of the "controlled burn."

(*Id.* at ¶32.)

And Petty stated that independent testing expert Scott Smith's testing was valid and therefore reliable. (*Id.* at ¶7.) Finally, Petty advised that the statements made by Dr. Carson, were "at best speculation, and at worst simply incorrect." (*Id.* at ¶9.)

## G. CLASS ACTION SETTLEMENT FAIRNESS HEARING AND MISLEADING STATEMENTS BY CLASS COUNSEL

The Court conducted the fairness hearing on September 25, 2023. (ECF 553.) The Court addressed class counsel and inquired about the lodged objections. In response, class counsel Elizabeth Graham told the Court that 1) objections regarding the validity of EPA data did not matter because Plaintiffs did not rely on EPA data, and 2) Dr. Carson never told class members they would not get sick. These statements to the Court were misleading.

### 1. EPA Data

In response to the objections to the class action settlement due to flawed EPA testing, Attorney Graham told the Court that such objections did not matter because class counsel and their experts did not rely on EPA data even though the one expert affidavit submitted to the Court in support of the settlement did just that, relying entirely on flawed EPA data. Graham told the Court as follows:

> I'd also like to talk just briefly about the barrage of paper that was filed last night, including the declarations of **Mr. Smith**, **Mr. Petty** and Mr. Thompson.
> These are not -- what is contained in those declarations, and we've read them all, is not new to class counsel. And indeed, it is not new to this Court. They were submitted -- with the exclusion of Mr. Petty's declaration, they were submitted to Your Honor in support of a motion to enlarge time, which this Court denied.
>
> **We are well aware of what Mr. Petty says. He is one voice.** And we understand his methodology and his testing that was done. We have scores of other experts.

And, again, detailed in the **declaration of Richard Schuhmann**. We have done our homework.

So this is not some smoking gun that we didn't uncover. This is not something that wasn't out in the public domain. This isn't something that we're trying to hide. It's simply additional testing.

And largely what the declarations and the attorney who supports them seems to suggest is that the EPA data in some way was unreliable.

So I can tell the Court, as you may recall, we had a sampling protocol that Mr. Katz and I negotiated early on with the Defendants, and we adhered to it. **We didn't rely on EPA data.** We went out and we did our own testing. We did split samples. We eliminated background levels. We did everything that we were supposed to do.

So we feel like we did our homework, and these declarations bear no relevance on anything that is before your court -- before the Court in support of this settlement.

(ECF 553, 64:6-65:11.)

Contrary to Graham's statements to the Court, Schuhmann's affidavit relies on EPA data in concluding that dioxins and other chemicals were already present in the environment before the derailment due to burning:  "The majority of residential soil samples collected and analyzed for dioxins/furans were below **the US EPA East Palestine background**." (ECF 518-10, ¶17.) If, in fact, class counsel didn't rely on EPA data, they have yet to release that information to their clients or the Court. Instead, class counsel only rely on the affidavit of Schuhmann who did relied only on EPA data.

### 2. Dr. Carson

In response to the objections to the class action settlement due to Dr. Carson's statements to proposed class members, Attorney Graham told the Court that they have never told class members there was zero risk because they know there is a real risk, but that they are only offering

the personal injury payment based on the time it will take for people to know whether they will get

sick. Graham told the Court as follows:

> MS. GRAHAM: . . . if a class member is concerned about future health risks, and they are within a 10-mile radius, **we are presuming that there is an exposure.**
>
> **We are presuming that the concern is real** and they may avail themselves of monetary compensation, significant sums of monetary compensation, in addition to what they're receiving from the direct payment or the business loss component.
>
> So I agree that **there is no possible way that any expert can, with certainty, say two people, five people, zero people are going to get sick.** But what we all agree is it's going to be decades from now before these symptoms manifest.
>
> **We have never proffered any information to suggest that there is zero risk to this community.**
>
> THE COURT: So the video you heard Mr. Abraham speak to the Court about, played by Plaintiffs' counsel –
>
> MS. GRAHAM: Yes.
>
> THE COURT: -- that suggests no worries, no illness will befall any of you, did that happen?
>
> MS. GRAHAM: So the video that he refers to is Dr. Arch Carson, and Dr. Carson is an occupational and industrial medicine expert. He has not been retained by Plaintiffs' counsel. **He is a friend, a colleague of one of the members of the PEC** (Plaintiffs' Executive Committee).
> . . .
>
> And what was happening, Your Honor, . . . What was happening at the time that that video was posted was there was quite a bit of fearmongering in the press. There were a lot of allegations about everybody is going to get sick, this is the next Chernobyl, and the like.
>
> What our experts did was qualified testing. We identified the threshold levels of the contaminants. We identified the likely dispersion patterns. And, yes, we evaluated the risk. **And we know that there's a risk with exposure to some of these chemicals.**
> . . .
> So Dr. Carson's video was meant as nothing more than an attempt to quell some of the fearmongering. **He didn't say there was zero risk.** What he said is the likely

risk. And again, he is an occupational and industry medicine doctor. **What he said was that the likely risk is unknown and that it is likely very low, in his opinion.**

We didn't offer that as evidence. We knew this. We've spoken to other doctors as well. **What we did know is that the risk is uncertain, and that the types of diseases that are connected to the types of toxins that were on the railcars result, if ever, in symptoms decades down the road, because the latency period is such that you have to wait to see what's going to happen.**

So, again, the settlement was designed to give people the option to take some money, and perhaps quell some of their fears that they wouldn't be able to get testing or relief or medical treatment, or not. They would still get their direct payment, a substantial sum, even if they didn't want the personal injury component.

(ECF 553, 4:13-57:18.)

Contrary to Graham's statements to this Court, class counsel through Dr. Carson told the

proposed class the following:

Based on my best judgment, **there will not be any long-term health impact** of chemical exposure from the derailment to community members of East Palestine.

As far as people just living in East Palestine or working there or in nearby neighboring communities, **we don't expect there to be any long-term health effects** associated with chemical exposure resulting from the derailment.

The number of chemicals that have been produced and that may remain in very low levels in the East Palestine area are dwarfed by the amount of other substances that are there that have been put there over years of just normal human activity.

The levels [of carcinogens] that people were exposed to in the community were so small that **we don't expect any kinds of cancers or other health effects to have results from those**.

I would personally **not expect one person to develop a cancer** as a result of this exposure that is due to those chemical exposures.

But we do know that there are lots of things people are exposed to all the time that are more likely to cause cancers, and so the result of the exposure from the train derailment is much less of a risk than those other exposures.

I think the answer to that is yes, it's too early for some things, but it's not too early to predict the overall health effects will occur from this. Certainly, if we're thinking

of one potential cancer that occurs 20 years from now, it's too soon to count that, but we pretty well know what exposures resulted from this train derailment and **we can pretty well predict that people are going to be safe in the long term**.[29]

Graham misled this Court when she said they never told people there was zero risk. Class counsel also misled class members when they said Dr. Carson was an "independent 3rd party" and when they presented Carson's statements that there will be no long term health impact.

### III. LEGAL STANDARD

#### A.  Rule 60(b) Relief from Judgment or Order

Federal Rule of Civil Procedure 60(b) permits relief from a final judgment for specific reasons, including:

> (b)(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; and

> (b)(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

A Rule 60(b) motion can be made even though an appeal has been taken and is pending. *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir.2002). A Rule 60(b) motion is addressed to the sound discretion of the Court. *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115 (1976).

#### 1.  Rule 60(b)(3) Fraud, Misrepresentation or Misconduct by an Opposing Party

Rule 60(b)(3) allows relief from a judgment due to fraud, misrepresentations, or misconduct by an opposing party. To obtain relief under rule 60(b)(3), the movant must prove the adverse party

---

[29] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM

engaged in fraud, misrepresentation, or misconduct by clear and convincing evidence. *See Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978). "Misconduct," as used in Rule 60(b)(3), does not require a showing of "nefarious intent or purpose as a prerequisite to redress." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988). The misconduct must substantially interfere with the moving party's ability to fully and fairly present their case. *Info-Hold, Inc. v. Sound Merch., Inc.*, C.A.6 (Ohio) 2008, 538 F.3d 448, 455, 87 U.S.P.Q.2d 1923.

To establish grounds for relief under Rule 60(b)(3), courts employ the following general definition of fraud: "the knowing misrepresentation of a material fact, or concealment of the same when there is a duty to disclose, done to induce another to act to his or her detriment." *Id.*, citing BLACKS LAW DICTIONARY 685 (8th Ed.2004); 37 AMJUR.2D Fraud and Deceit § 23 (2001). The moving party need not demonstrate that the adverse party has committed all the elements of fraud specified in the law of the state where the federal court is sitting, but must simply show that the conduct was fraudulent under a general common-law understanding of fraud. *Id.*

Under Rule 60(b)(3), a judgment may be set aside for fraud discovered after the entry of judgment. *Brady v. Beams*, 10 Cir., 132 F.2d 985, 987, cert. denied 319 U.S. 747, 63 S.Ct. 1032, 87 L.Ed. 1702.

Relief under Rule 60(b)(3) must be sought within one year of the judgment. Fed. R. Civ. P. 24(c)(1).

## 2. Rule 60(b)(6) Any Other Reason the Justifies Relief

Rule 60(b)(6) provides relief for "any other reason that justifies relief" and is reserved for extraordinary circumstances not covered by the other subsections. Courts have consistently held that relief under Rule 60(b)(6) requires clear and convincing evidence of exceptional or

extraordinary circumstances. *Info-Hold, Inc. v. Sound Merch., Inc.*, C.A.6 (Ohio) 2008, 538 F.3d 448, 455, 87 U.S.P.Q.2d 1923. The movant must also demonstrate that principles of equity mandate relief, balancing the finality of judgments against the need for justice. *In re Mercury Data Systems, Inc.,* 586 B.R. 260 (2018).

Rule 60(b)(6) serves as a "safety valve" for addressing situations where class members are disadvantaged by misconduct or procedure irregularities in the settlement process. *Pearson v. Target Corp.*, 893 F.3d 980 (2018). Rule 60(b)(6) is fundamentally equitable in nature and can be involved to protect the interest of the class when the settlement process has been compromised. *Id.*

Rule 60(b)(3) and 60(b)(6) are mutually exclusive – Rule 60(b)(6), as a residual catchall, applies only if the other specifically enumerated rules do not. *Pearson v. Target Corp.*, 893 F.3d 980, 984 (2018).

Rule 60(b)(6) is open-ended; it is flexible and gives courts "wide discretion." *Id.* It is available only in extraordinary circumstances, but courts may consider a wide range of factors to determine whether extraordinary circumstances are present. *Id.*

Motions under Rule 60(b)(6) must be filed within a reasonable time. Fed. R. Civ. P. 24(c)(1).

## B.  Rule 60(d)(3) Fraud on the Court

Federal Rule of Civil Procedure 60(d) grants the Court power to set aside a judgment for "fraud on the court."

The term "fraud on the court" is a nebulous concept. Fraud on the court is fraudulent or dishonest conduct by an officer of the court. *Kupferman v. Consolidated Rsch. & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir. 1972). A clear example of fraud on the court is the corruption of judicial

officers. *Root Refin. Co. v. Universal Oil Products Co.*, 3 Cir., 169 F.2d 514, 534, cert. denied sub

nom. *Universal Oil Products v. William Whitman Co.*, 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444.

Fraud on the court requires a showing, through clear and convincing evidence, of the

following elements:

1) [conduct] on the part of an officer of the court; that
2) is directed to the judicial machinery itself;
3) is intentionally false, willfully blind to the truth, or is in reckless disregard of the truth;
4) is a positive averment or a concealment when one is under a duty to disclose; and
5) deceives the court.

*Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010), quoting *Carter v. Anderson*, 585 F.3d 1007, 1011-

12 (6th Cir.2009).

The Sixth Circuit treats motions for relief under Rule 60(d)(3), procedurally, as either an

independent action or a post-judgment motion, so long as the classification does not prejudice the

adverse party. *General Medicine, P.C. v. Horizon/CMS Health Care Corp.*, 475 Fed.Appx. 65 (2012),

citing *Mitchell v. Rees*, 651 F.3d 593, 595 (6th Cir.2011), citing *Bankers Mortg. Co. v. United States*,

423 F.2d 73, 81 n. 7 (5th Cir. 1970); 11 Wright, Miller & Kane, Federal Practice & Procedure §

2868 n. 30, at 405 (1995). *See also*, *Maloof v. Level Propane, Inc.*, 429 Fed.Appx, 462, 467 (6th Cir.

2011) (fraud-on-the-court finding under Rule 60(d)(3)); Mitchell, 651 F.3d at 595 (6th Cir.2011)

(independent action under Rule 60(d)(1)).

### IV. ARGUMENT

#### A. Defendants and Class Counsel's Conduct Constitutes Fraud, Misrepresentation or Misconduct Under Rule 60(b)(3)

Defendants and class counsel concealed and misrepresented material facts that substantially

interfered with the class members' ability to fully and fairly determine whether to opt into the

personal injury payment, and then mispresented their actions to this Court, which justifies relief under Rule 60(b)(3).

Several cases establish relieve under Rule 60(b)(3) is warranted here. In *Rozier v. Ford Motor Co.*, the Fifth Circuit established the foundational standards for Rule 60(b)(3) relief. *See Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978). The court held that misconduct in withholding discovery information that prevents a party from fully and fairly presenting their case justifies relief from judgment. Importantly, the court emphasized that "the policy of deterring discovery abuses which assault the fairness and integrity of litigation must be accorded precedence over the policy of putting an end to litigation." *Id.* Likewise in *MMAR Group v. Dow Jones*, the court granted Rule 60(b)(3) relief where the plaintiff failed to produce tape recordings that would have severely undercut their libel claims. *See MMAR Group v. Dow Jones,* 187 F.R.D. 282 (S.D. Tex. 1999). The court found this misconduct prevented defendants from fully and fairly presenting their defense, emphasizing that Rule 60(b)(3) "furnishes an escape valve to protect fairness and integrity of litigation in federal courts." *Id.  See also Hernandez v. Results Staffing*, 907 F.3d 354 (5th Cir. 2018) (affirming rule 60(b)(3) relief where the plaintiff made misrepresentations about medical records and failed to supplement incomplete discovery responses, holding misconduct prevented the defendant from effectively arguing their defense.)

In this case, Defendants' and class counsels' deliberate act to settle the class action before expert reports were disclosed represents a calculated strategy to prevent class members from learning the truth about contamination and health effects. The timing was not coincidental but designed to avoid disclosure of damaging expert opinions, prevent development of scientific evidence supporting class claims, and shield Defendants from liability based on full factual

development. Moreover, by settling before expert disclosures, Defendants and class counsel circumvented their obligation to engage in meaningful discovery that would inform the class about the true extent of contamination and health impacts.

Defendants' and class counsels' misconduct resulted in class members being deprived of material information. Following *Rozier*, the concealed expert reports would have been "the catalyst for an entirely different approach to the case" as the Plaintiffs' expert opinions likely contained scientific evidence of contamination extent and health effects, causation analysis linking derailment to specific injuries, and contradictory evidence to Defendants' current position that the there really was no contamination and even if there were, it's all been cleaned up now.[30] Additionally, the class members could not adequately evaluate their options, particularly whether to opt in to the personal injury payment without knowing the scope of potential liability based on expert analysis, the strength of causation arguments, and long-term health implications for class members.

As established in *Rozier*, "the policy of deterring discovery abuses which assault the fairness and integrity of litigation must be accorded precedence over the policy of putting an end to litigation." This principle applies with even greater force in class actions where class members rely on class counsel to represent their interests. Here, not only did Defendants and class counsel negotiate a settlement deliberately designed to prevent disclosure of material expert evidence, they presented the Affidavit of Schumann as expert evidence of the fairness of the settlement. Yet the Affidavit of Schumann simply regurgitated the flawed EPA data. When the flawed EPA data was raised by Plaintiffs' own expert tester Stephen Petty and independent expert tester Scott Smith,

---

[30] https://nsmakingitright.com/site-progress/#:~:text=%E2%80%94%20Site%20restoration%20activities%20are%20complete%2C%20and,made%20to%20not%20interfere%20with%20Village%20traffic.

class counsel told this Court that they were wrong and that class counsel "we didn't reply on EPA data."   Even more egregious, class counsel also told class members that an "independent" medical doctor concluded there would be no health concerns. When the inaccuracy of those statements were also raised by Petty and Smith, class counsel misrepresented the facts when they told this Court "we have never proffered any information to suggest that there is zero risk to this community."   Courts must approve class settlements as "fair, reasonable, and adequate" under Rule 23(e). The conduct of Defendants and class counsel undermined this Court's ability to meet this standard since the Court, through no fault of her own, lacked the essential and accurate information to evaluate fairness.

The Defendants' and class counsels' strategic settlement before expert disclosures and gross misrepresentations to class members and this Court constitutes fraud, misrepresentation, and misconduct and justifies relief under Rule 60(b)(3). The cited case law strongly supports relieve where parties deliberately withhold information through misconduct. The timing and circumstances of this settlement demonstrate a calculated effort to avoid disclosure of expert evidence that would have fundamentally altered the litigation dynamic and settlement negotiations.

Movant's motion should be granted to vindicate the integrity of the class action mechanism and ensure that class members receive the benefit of complete factual development before agreeing to settle their claims.

## B. Extraordinary Circumstances Justify Relief Under Rule 60(b)(6) and/or Rule 60(d)(3).

The combination of concealed expert conclusions, false health assurances to vulnerable class members, and material misrepresentations to this Court during the fairness hearing constitute extraordinary circumstances warranting relief under Rule 60(b)(6) and/or rule 60(d)(3).

The leading case addressing relief from judgment or order in the presence of fraud is *Hazel-Atlas Glass Co., v. Hartford-Empire Co.*, 322 U.S. 238 (1944). In *Hazel-Atlas*, Hartford-Empire orchestrated a sophisticated fraud to obtain a patent and subsequent court judgment. *Hazel-Atlas, 322 U.S. at 240-41*. The company's officials and attorneys secretly authored an article praising their "gob feeding" glass-making device, then arranged for William P. Clarke, president of the Flint Glass Workers' Union, to sign it as the ostensible author. *Id*. This fabricated article was presented as the independent opinion of a disinterested expert when it was actually corporate propaganda designed to deceive both the Patent Office and the courts. *Id*.

The fraud succeeded initially. The Patent Office granted the patent in 1928. *Id*. The fraud remained hidden for nine years until exposed during a 1941 antitrust prosecution. Evidence revealed that Hartford had secretly paid Clarke for his cooperation and induced Hazel-Atlas to settle for $1,000,000 based on the fraudulently obtained judgment. *Id*. at 248.

The Supreme Court reversed the Circuit Court of Appeals' denial of relief, holding that equitable relief against fraudulent judgments alleviates hardships arising from the general court-made rule that judgments should not be disturbed. *Id*. The Court emphasized that "tampering with the administration of justice" involves "far more than an injury to a single litigant" and constitutes "a wrong against the institutions set up to protect and safeguard the public". *Id*. at 246.

The comparisons between *Hazel-Atlas* this case are striking. Just as Harford fabricated an article and falsely attributed it to an independent expert, the class action attorneys in this case presented class members with an "independent" medical opinion that no one would get sick as a result of the derailment. Just as in *Hazel-Atlas*, in which Harford's fraud targeted both the Patent Office and the appellate court, the class action attorneys misrepresented to the class members the

health risks from contamination and to this Court in the settlement proceedings. Additionally, Hartford's fraud directly influenced the Patent Office to grant a patent and induced a $1,000,000 settlement from *Hazel-Atlas*, and likewise, the class action attorneys procured from their fraud opt-ins to the personal injury payment portion of the class action settlement and this Court's approval of the class action settlement. Moreover, while the patent litigation in *Hazel-Atlas* affected broad public interest beyond the immediate parties, this class action settlement involving contamination and public health carries even greater public interest implications, as they affect numerous victims and the integrity of the class action itself.

Relief under Rule 60(b)(6) and/or Rule 60(d)(3) is also available in the class action context. The *Pearson v. Target Corporation* case involved a consumer class action against dietary supplement sellers for false efficacy claims in which various procedural manipulations harmed the class interests. *See Pearson v. Target Corporation*, 893 F.3d 980 (2018). The court recognized the potential negatives arising from a class action, stating: "Inequitable settlements are an unfortunate recurring bug in our system of class litigation. . . . All too often, class counsel negotiate a settlement with substantial attorneys' fees but meager benefits for the class." *Pearson*, 893 F.3d at 982, citing *e.g., Redman v. RadioShack Corp.*, 768 F.3d 622, 638-39 (7th Cir. 2014). "[C]lass action cases – with all their inherent agency problems – require an extra analytical step to ensure that the interests of the class are protected." *Id.* If a class action settlement disappoints expectations, "a class member could file a motion in the district court under Fed. R. Civ. P. 60(b)(3)(misconduct by an opposing party) or 60(b)(6) (any other reason that justifies relief)." *Id.,* quoting *Safeco Insurance Company of America v. American Int'l Group*, 710 F.3d 754, 758 (7th Cir. 2013). The Seventh Circuit held that Rule 60(b)(6) serves as an equitable safety valve against schemes that compromise class interests.

Unfortunately, this "unfortunate recurring bug" cited by *Pearson* appears to have occurred here in this class action. Class counsel used the threat of releasing Plaintiffs' experts' reports as leverage for obtaining a settlement agreement from Norfolk Southern. While that leverage benefited Defendants' and class counsel, class members are left in the dark as to the testing results and the true consequences to their health. Class counsel prioritized settlement completion over their duty to provide accurate information to class members. As determined in *Pearson*, extraordinary circumstances exist whenever misconduct schemes threaten class welfare, and courts retain broad equitable discretion to fashion appropriate relief under Rule 60(b)(6).

Federal courts, long ago established the general rule that they would not alter or set aside their judgments, which springs from the belief that in most instances society is best served by stopping litigation after judgment has been entered. *Hazel-Atlas*, 322 U.S. at 244.  Yet there has existed alongside the rule a rule of equity that under certain circumstances, "one of which is after-discovered fraud," relief will be granted against judgments. *Id.*  As in *Pearson,* movants here do not seek to unwind the class settlement or relitigate the case. Movants ask only to be permitted the opportunity to opt out of the personal injury portion of the class action settlement agreement. "This makes countervailing interest in finality under Rule 60(b) somewhat less compelling." *Pearson*, 893 F.3d at 986-87.

The combination of concealed expert conclusions, false health assurances to vulnerable class members, and material misrepresentations to this Court during the fairness hearing constitute extraordinary circumstances warranting relief under Rule 60(b)(6) and/or rule 60(d)(3). Moreover, the misconduct here is particularly egregious because it involves environmental contamination and health risks, where class members rely heavily on expert scientific evidence they cannot

independently evaluate. Class counsel's concealment of expert findings and substitution of false assurances undermines the fundamental fairness required in class action settlements.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Grant this Motion for Relief from Order under Rule 60(b)(3), 60(b)(6) and/or 60(d)(3);

B. Prohibit enforcement of Personal Injury opt-ins and releases signed by movants;

C. Order disclosure of all expert reports, testing data, and communications commissioned by class counsel;

D. Grant such other relief as justice requires.

Respectfully submitted,

*/s/ Jedidiah I. Bressman*
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)
**Law Office of David A. Bressman**
2727 Tuller Parkway, Suite 100
Dublin, OH 43017
(614)538-1116
Fax: (614)761-8399
Jedidiah@Bressmanlaw.com
David@Bressmanlaw.com
Attorneys for Plaintiffs

**Certificate of Service**

I hereby certify that, on September 29, 2025, a copy of the foregoing was served on all parties of record via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

/s/ Jedidiah I. Bressman
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)