**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | **CASE NO. 4:23-CV-00242-BYP** |
| | **JUDGE BENITA Y. PEARSON** |

**CLASS COUNSEL'S MEMORANDUM IN SUPPORT OF THEIR**
**STEP ONE MOTION FOR AN ORDER TO SHOW CAUSE AGAINST**
<u>**KROLL SETTLEMENT ADMINISTRATION LLC**</u>

## <u>TABLE OF CONTENTS</u>

**Page**

I.     **INTRODUCTION** ................................................................................................... 1

II.    **BACKGROUND** ...................................................................................................... 3

    A.   Kroll's Claimed Skill, Experience and Expertise in Administering Settlements that are Premised on Point-Based Allocation Systems .................................................... 3

    B.   Kroll's Contributions to the Development of the Point-Based Allocation System in this Settlement .................................................................................................................... 4

    C.   Kroll's Faulty Claim Processing and Incorrect Award Determinations ............................. 7

    D.   Kroll's Lack of Diligent and Catastrophic Mistakes Resulted in this Court Removing Kroll as Settlement Administrator ...................................................................................... 12

    E.   Epiq's Review and Discovery of Additional Significant and Pervasive Errors Made by Kroll ........................................................................................................................... 15

    F.   Kroll's Delay and Gross Negligence Have Caused Significant Harm to the Class .......... 18

III.    **ARGUMENT** ........................................................................................................... 19

    A.   The Court Has Jurisdiction Over the Settlement Until the Fund Is Fully Distributed ...... 19

    B.   The Court Should Exercise Its Inherent and Equitable Authority to Sanction Kroll and Order Related Relief for Kroll's Failure to Administer the Settlement Diligently, in Good Faith and in Accordance with the Court's Orders .............................................................. 20

       1.   This Court Has the Power to Sanction Kroll ............................................................. 21

       2.   The Court Has the Inherent and Equitable Power to Order Restitution or Disgorgement of Settlement Funds as a Contempt Sanction ........................................................... 23

       3.   The Court Should Use Its Inherent and Equitable Power to Order the Restitution and Disgorgement of Funds Kroll Collected in Fees from the Settlement Fund ................ 24

IV. **CONCLUSION** ........................................................................................................ 26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Backo v. Loc. 281, United Bhd. of Carpenters & Joiners of Am.*,
    308 F. Supp. 172 (N.D.N.Y. 1969), *aff'd*,438 F.2d 176 (2d Cir. 1970) ................................21

*Chambers v. NASCO*,
    501 U.S 32 (1991)..........................................................................................................22

*Cirino v. Bureau of Workers' Comp.*,
    171 N.E.3d 840 (Ohio Ct. App. 2021)...........................................................................24

*Clapper v. Clark Dev., Inc.*,
    No. 5:09 CV 00569, 2014 WL 1493150 (N.D. Ohio Apr. 15, 2014), *aff'd,* No.
    14-3500, 2015 WL 13688415 (6th Cir. Apr. 29, 2015)...................................................22

*Collins v. Barry*,
    841 F.2d 1297 (6th Cir. 1988) .......................................................................................21

*Cordoza v. Pac. States Steel Corp.*,
    320 F.3d 989 (9th Cir. 2003) .........................................................................................23

*In re Corrugated Container Antitrust Litig.*,
    752 F.2d 137 (5th Cir. 1985) .........................................................................................20

*Dahingo v. Royal Caribbean Cruises, Ltd.*,
    312 F.Supp.2d 440 (S.D.N.Y. 2004) .............................................................................23

*DiPonio Const. Co., Inc. v. Int'l Union of Bricklayers & Allied Craftworkers,
Local 9*,
    687 F.3d 744 (6th Cir. 2012) .........................................................................................23

*Elec. Workers Pension Tr. Fund of Loc. Union |58, IBEW v. Gary's Elec. Serv.
Co.*,
    340 F.3d 373 (6th Cir. 2003) .....................................................................................21, 22

*Jaynes v. Austin*,
    20 F. App'x 421 (6th Cir. 2001) ....................................................................................19

*In re Lightning Techs., Inc.*,
    641 B.R. 872 (Bankr. E.D. Mich. 2022)........................................................................22

*McComb v. Jacksonville Paper Co.*,
    336 U.S. 187 (1949)...................................................................................................21, 22

*In re Orthopedic Bone Screw Products Liability Litigation*,
    246 F.3d 315 (3d Cir. 2001).........................................................................23

*In re PHC, Inc. S'holder Litig.*,
    894 F.3d 419 (1st Cir. 2018)......................................................................23

*RE/MAX Int'l, Inc. v. Realty One, Inc.*,
    271 F.3d 633 (6th Cir. 2001) .....................................................................20

*TWM Mfg. Co. v. Dura Corp.*,
    722 F.2d 1261 (6th Cir. 1983) ...................................................................21

*U.S. v. Universal Management Services, Inc., Corp.*,
    191 F.3d 750 (6th Cir. 1999) .....................................................................24

*Williamson v. Recovery Limited Partnership*,
    826 F.3d 297 (6th Cir. 2016) .....................................................................24

**Other Authorities**

Fed. R. Civ. Pro. 71 ...........................................................................................22

Fed. R. Civ. Pro. 65(d)(2) ..................................................................................22

Fed. R. Civ. Pro. 23 ...........................................................................................23

## I.    INTRODUCTION

On behalf of the Settlement Class[1], Class Counsel respectfully moves the Court for an Order directing Kroll Settlement Administration LLC ("Kroll") to show cause why the Court should not enter an Order: (1) sanctioning and holding Kroll in contempt; and (2) disgorging Kroll of funds it received as payment from the Settlement Fund.[2]

This Court appointed Kroll as Settlement Administrator on May 21, 2024. Kroll submitted sworn testimony of its capabilities in support of its appointment, and willingly undertook the obligation to diligently administer the Settlement on behalf of the Settlement Class. On June 11, 2025, this Court entered an Order suspending and terminating Kroll's appointment as Settlement Administrator, and substituting Epiq Class Action & Claims Solutions, Inc. ("Epiq"). This substitution came as a result of the discovery that Kroll had not followed the Court's adopted Plan of Distribution. ECF No. 979. Pursuant to their replacement appointment, Epiq immediately began the process of collecting and analyzing the data that Kroll had amassed.

Epiq has now had the opportunity to complete a significant portion of its review of the Voluntary Exposure (also known as Voluntary Personal Injury) claims processed by Kroll. This review, unfortunately, has revealed alarming, large-scale errors—errors in addition to the issuance of payments prior to computing the value of a single point. These errors include that of the 10,533 denied Voluntary Exposure claims Epiq has reviewed so far, Kroll incorrectly rejected almost

---

[1] Capitalized terms used herein shall have the meaning set forth in the Settlement Agreement filed of record on April 26, 2024, at ECF No. 452-2, and finally approved by the Court on September 27, 2024, at ECF No. 557.

[2] Class Counsel expressly reserve, and indeed contemplate, on behalf of the Class, all rights to request such other, further and different relief than set forth in this Motion as may be warranted by their ongoing review and evaluation of Kroll's administration of the Settlement including, without limitation, further monetary sanctions, including for overpayments made from the Fund, and an award of attorneys' fees.  Specifically, Class Counsel intends to file its "Step Two" Motion after an audit of the financial ramifications of the mishandling of the Class funds, as discussed herein.

1,000 claims as outside eligible boundaries, and incorrectly denied hundreds of other claims for failure to cure deficiencies. Prompted by these discoveries, Epiq also undertook a preliminary review of "approved" Voluntary Exposure payments that, to-date, has revealed almost 1,000 claims approved with invalid dates, 12,180 claims missing formal points assignments, and, in the cases that did receive formal points assignments, almost 2,500 claims with scores that cannot exist under the Plan of Distribution — because Kroll applied multipliers *that do not appear anywhere* in the Plan of Distribution—or are likely otherwise incorrect.

     As a result of these many errors, Epiq is conducting a thorough audit of all submitted claims. This will require review of *every* claim for correct data input, new adjudication of previously approved claims, providing Class Members another opportunity to cure deficient claims, and entirely re-calculating points based on Epiq's own evaluation. There is no other choice to ensure that the calculations are done correctly. This complete redo of the work that Kroll was appointed to complete is the sole result of Kroll's gross negligence and will significantly increase the costs taxed to the Class above those Class Counsel anticipated when entering into the Settlement Agreement and moving this Court for final approval of the Settlement and Plan of Distribution.[3]

     Given the incredible number of mistakes found to date, it is evident that when Kroll accepted payment of $9,542,182.60—funds that were taken out of the Settlement Fund and away from Class Members—it had completely failed to properly perform administration of the finite Settlement Fund. Kroll's lack of diligence and inexplicable actions not only have significantly

---

[3] S*ee* 9/06/24 Decl. of Scott Fenwick, ECF No. 518-7 ("As of September 3, 2024, Kroll has billed $2,361,940.74 for Administrative Expenses incurred in the administration of this matter…[and] estimates that it will bill an additional $14.6 million to complete the administration of this Settlement.").

delayed administration of the Settlement, but will result in significantly increased costs in Settlement Administration. Kroll has violated this Court's Orders, including deviating from the Plan of Distribution to the financial detriment of the Class. Thus, as a form of interim relief pending the completion of Epiq's review and a full, separate audit of the financial costs, Class Counsel asks this Court to disgorge Kroll of its fees collected to date for the administration of this Settlement.

## II.     BACKGROUND

### A.     Kroll's Claimed Skill, Experience and Expertise in Administering Settlements that are Premised on Point-Based Allocation Systems

Kroll advertises itself as ". . . raising the bar in class action, mass tort, regulatory and government claims administration" by ". . . ensur[ing] more accurate claims handling, speed and responsiveness." To this end, Kroll represents that its ". . . class action settlement administration team is comprised of subject matter experts with decades of experience managing some of the largest and most complex settlements in U.S. history" and ". . . work[s] closely with all parties, often assisting clients before settlement agreements are finalized, to ensure valuable, reliable and effective administration."  Kroll also boasts its ability to ". . . flag anything that stands out as something that should get some attention to look at to make sure [a settlement] is moving the way that it should." Included in Kroll's stated capabilities are Kroll's "pre-settlement consultation services," which prominently features "creating a plan of allocation."[4]

---

[4]     These statements can be found on Kroll's website (https://www.kroll.com/en/services/settlement-administration; https://www.kroll.com/en/services/settlement-administration/class-action;     and https://www.kroll.com/en/insights/publications/settlement-administration/natural-gas-explosion-settlement-massachusetts), as well as published interviews with President Randy Burkholder (https://www.youtube.com/watch?v=atLh_tKC-Ag&t=60s).

In the area of environmental class actions, Kroll specifically touts its experience and success, administering the $143 million settlement in the *In Re: Columbia Gas Cases*.[5]  In those cases, Kroll notes that it distributed over $91 million to more than 10,000 residential claimants by "develop[ing] a point-based allocation system for residential claims."[6]  According to Kroll Senior Director of Settlement Administration Scott Fenwick—the Kroll project lead in *East Palestine*—the point-based allocation system in *Columbia Gas* utilized six essential categories of information to assign points depending on degree of harm. *See* Fenwick Decl. in *Columbia Gas*, ¶¶27-32, attached as **Exhibit A**. Some of Class Counsel worked with and alongside Kroll in *Columbia Gas* to develop the point-based allocation system that was successfully implemented in those cases. By calculating the total number of points presented across all claims and then dividing the portion of the $143 million settlement allocated to residential claims by that total number of points, Kroll was able to translate each claim into a proportional monetary award that could then be distributed to the *Columbia Gas* claimants within the limits of the larger residential fund. *Id*. The use of this type of allocation approach is common and well-accepted in cases with limited funds and an unknown number of claims. *See* Declaration of Professor Lynn Baker in Support of Plaintiffs' Motion for Final Approval of Settlement ("Baker Decl."), ECF No. 519-3, ¶22.

**B.    Kroll's Contributions to the Development of the Point-Based Allocation System in this Settlement**

In the context of this similar prior experience with Kroll, Class Counsel engaged Kroll as the to-be-proposed Settlement Administrator for *East Palestine* on March 7, 2024, believing at

---

[5] https://www.kroll.com/en/publications/settlement-administration/natural-gas-explosion-settlement-massachusetts

[6] https://www.kroll.com/en/publications/settlement-administration/natural-gas-explosion-settlement-massachusetts

that time a settlement could be possible in the near future and Kroll would bring skill and experience developing and applying a point-based allocation system to bear for the benefit of the Class. *See* March 7-12, 2024 E-mail Discussion, attached as **Exhibit B**. Indeed, in the very same e-mail retaining Kroll, Class Counsel raised as "the first order of business" a discussion with Kroll regarding "the allocation point system" that would eventually be implemented in *East Palestine*. *See id*. In response, Kroll provided Class Counsel with, among other things, the "payment table" that was used in *Columbia Gas*, which would serve as a starting point for the *East Palestine* point-based allocation system. Notably, this "payment table" contained the categories and values assigned to the different factors used in *Columbia Gas*, as well as a demonstration of how points would be used to determine proportional shares of the Settlement Fund by dividing the finite pool of money assigned to each component of the Settlement by the total number of points presented across the complete universe of valid claims to reach a "value per point."  *See id*; Baker Decl., ¶22.

Based on Kroll's representations and stated familiarity with the point-based allocation system, Kroll proposed an approach similar to that used in *Columbia Gas* as the cornerstone of the point-based allocation system in *East Palestine* for Direct and Voluntary Exposure (also known as Personal Injury) payments. Kroll shared the point-based allocation system that would soon become the Plan of Distribution with Class Counsel and counsel for Norfolk Southern by early April 2024, when an agreement in principle appeared imminent. To be sure, the exact point-based allocation system in *East Palestine* was the product of an iterative process completed only after many months of consultation among Kroll, Class Counsel, and counsel for Norfolk Southern. For example, in mid-April 2024, Class Counsel provided Kroll with a draft of the Allocation Plan and Point System outlining the factors that would likely be used to calculate awards in the Direct and Voluntary Exposure payment claims. *See* April 16-18, 2024 E-mail Discussion, attached as **Exhibit C**. On

April 18, 2024, Kroll responded to Class Counsel by providing its thoughts on the categories and factors, as well as a sample of calculated awards, which set forth certain estimates regarding the different types of payments households and individuals could receive under the point system depending on different claims rates. *See id*. ("East Palestine Kroll Sample Calculated Awards 04172024"). This core concept was repeatedly shared with the Settlement Class itself, owing to Kroll's input, including when Class Counsel penned a letter response to the Unity Council for the East Palestine Train Derailment stating that "[I]ndividual award amounts under the Settlement are based on the information received during the claims process, as well as the total number of Class Members who submit claims" and "[m]ore precise estimates of Class Member awards can only be determined once the claims process has been completed, all claims have been reviewed and points have been allocated to all submissions."[7] *See* June 12-14, 2024 E-mail Discussion, attached as **Exhibit D,** and "EP – Response Letter to Unity Council (Draft) 6.12.24, § 13," attached as **Exhibit E**.

By the end of August 2024, following the close of the claims period, Class Counsel, with Kroll's assistance and analysis, completed developing the point-based allocation system and provided the final version to Kroll for its comments and approval. *See* August 28, 2024, E-mail Discussion and Meeting ("Allocation and Point System (Draft 3.0) 8.28.24"), attached as **Exhibit F**. Following review and discussion of the Plan of Distribution, Kroll did not have any questions, concerns or modifications, nor did it express any confusion regarding the Plan of Distribution's terms or application. Indeed, at no point between August 28, 2024, and the filing of the Plan of

---

[7] This axiom was also reflected in the Court-approved Long Form Notice, reviewed and approved by Kroll, which states "[i]f, after everyone sends in Claims Forms, the compensation claims total more than $600 million, net of all other expenses under the Settlement, the payments will be reduced. If the compensation claims are less than $600 million net of costs, the payments will be increased and/or additional payments will be made." ECF No. 452-2, pp. 57-62.

Distribution with the Court on September 6, 2024, or the final approval hearing on September 25, 2024, did Kroll express anything other than full understanding and agreement with the point system as submitted to the Court.

What is more, as required by Section V(D) of the Settlement Agreement, Kroll provided a draft Final Claims Report to the parties on August 28, 2024, which stated that "[t]he final value assigned to all Claims for Personal Injury Payments for all Eligible Personal Injury Settlement Class Members who have submitted a Claim Form and executed a Personal Injury Release is currently estimated not to exceed $125 million." *See* August 28-29 E-mail Discussion ("EastPalestine_Claim Report for Counsel"), attached as **Exhibit G**. The following day, in recognition that claims continued to be received, and after Class Counsel conferred with counsel for Norfolk Southern, Kroll revised the total estimated value upwards ". . . not to exceed $130 million." *See id*. ("EastPalestine_Claim Report for Final.pdf" attachment). At no point after August 29, 2024 (until Class Counsel raised the issue with Kroll on May 7, 2025), did Kroll indicate the estimated $130 million for Voluntary Exposure claims was insufficient or needed to be increased based on new claims statistics. In fact, on September 26, 2024—one day after the Court's final approval hearing and nearly thirty days after Kroll's final Claims Report—Kroll confirmed the $130 million valuation for Voluntary Exposure claims was correct. In reliance thereon, that sum was wired into the QSF on October 11, 2024.

## C.    Kroll's Faulty Claim Processing and Incorrect Award Determinations

Following final approval of the Settlement on September 27, 2024, Kroll worked with Class Counsel to refine its implementation of the point-based allocation system for Voluntary Exposure claims through further discussion of how the Plan of Distribution applied to certain scenarios (e.g., an individual living directly between two distance categories or how the

"trackside" factor should be delineated). Included in these discussions was explicit consideration of the distinction between the larger East Palestine area and the Village of East Palestine in the Plan of Distribution. In response to Kroll's request for clarification on the "Village of East Palestine" issue, in October 2024, Class Counsel explicitly advised Kroll:

> **As to the Village of EP issue, the Village is different from the East Palestine zip code (anything with a 44413 zip code). Anyone who lives within the geographic boundaries of the Village of EP or out to 2 miles should be treated differently from those outside of the 2 miles who still have an East Palestine (44413) zip code . . .**

*See* October 8-15, 2024 E-mail Discussion, attached as **Exhibit H**. Following receipt of this information and review of a boundary map of the Village of East Palestine, Kroll confirmed that it understood the distinction for purposes of implementing the point-based allocation system for Voluntary Exposure payments, which was its sole focus at the time given the filing of an appeal staying distribution of the Direct Payment program. Once again, at no point during these discussions or throughout the fall and winter of 2024-2025 did Kroll express a lack of understanding that the Plan of Distribution required calculations from a fixed award amount or that the number of claims for Voluntary Exposure payments were expected to exceed the valuations Kroll confirmed at the end of September 2024.

As the claims process continued, in mid-November 2024, Kroll advised the parties that almost ninety (90) days after the end of the claims period, Kroll had received an additional 1,315 claims—"as a result of a post office error"—that needed to be entered, reviewed, and would "obviously increase the overall claims count."[8]  *See* November 18, 2024 E-mail Discussion, attached as **Exhibit I**. This news immediately alarmed Class Counsel because such an increase in

---

[8] This number of claims represents roughly five percent (5%) of all valid claims, which in turn could potentially represent roughly $6.5 million of the allocated Voluntary Exposure fund. Kroll claimed that this error was not its fault but rather that of the USPS.

claims so long after the claims deadline had the potential to upend Kroll's calculation of awards and delay payments. When pointedly asked to "discuss exactly what this means for calculations," Kroll responded that it would not know the effects until the claims had been reviewed for any Voluntary Exposure claims, all deficiencies cured, and the information in the claims scored. *See id*. Class Counsel reiterated that this analysis is the first step under the point-based allocation system, and that Kroll needed to conduct that review as soon as possible in order to continue with the process. *See id*. Kroll acknowledged the need to follow this process and committed to perform that type of review on a priority basis. *See id*. At no time did Kroll even hint that the newly discovered claims would pose a problem to the allocation process or the timing of distributions for Voluntary Exposure payments. This makes sense, as again, the process contemplates a fixed settlement amount of $130 million being divided by the total number of scored points for all claims to achieve a dollar value per point.

Following these developments, Kroll began issuing Voluntary Exposure award payments to eligible Class Members later in November 2024, increasing the volume of claim award determinations steadily through March 2025. On March 25, 2025, Kroll provided the parties with its first ". . . reporting of the payment and determination letter status . . ." rather than its normal weekly claims statistics reports. *See* March 25, 2025, E-mail Discussion, attached as **Exhibit J**. Although the weekly claims statistics reports before March 25, 2025, included information regarding the total number of claims received, they did not include information regarding the number of claims reviewed and scored, the total number of points awarded across all scored claims, the dollar amount of award determinations or payments, or the projected total monetary value of all claims. *See* Exhibit J ("[i]n lieu of the normal weekly statistics reporting, we will be providing the attached reporting of the payment and determination letter status instead."). The March 25,

2025 report was the **first time** Kroll reported to the parties: (a) the total amount awarded for Voluntary Exposure claims, but not yet paid; and (b) the total amount awarded for Voluntary Exposure claims and disbursed for payment. *See id.* According to the March 25, 2025 report, Kroll had processed 12,446 claims for payment, representing roughly 47% of all Voluntary Exposure claims, for a projected total spend of approximately $138 million when accounting for pending rejections.[9] At no point did Kroll indicate that with approximately 53% of claims remaining to be processed for payment, it expected to exceed the valuation of Voluntary Exposure payments in the Plan of Distribution.

Kroll next provided a payment report to the parties on April 1, 2025, which contained statistics virtually identical to those in the March 25, 2025 report, sent only six days earlier. *See* April 1, 2025 E-mail Discussion, attached as **Exhibit K**. Kroll sent another report to the parties on May 1, 2025, followed by an e-mail to Class Counsel only—removing Norfolk Southern's counsel who had received all the prior statistic reports—on May 6, 2025, wherein it asked for approval to reject 4,646 claims for failure to cure deficiencies and another 4,819 claims for being outside the 10-mile area of eligibility, for a total of 9,465 claims. *See* May 6, 2025, E-mail Discussion, attached as **Exhibit L**. Recognizing that a significant portion of these claims were not expressly represented in the May 1, 2025 report, Class Counsel immediately questioned Kroll whether the payment statistics factored in all rejected claims. When Kroll responded that these rejected claims had already been built into the payment reports, it became clear that "Count of Personal Injury Claims

---

[9] Although not reflected in the March 25, 2025 report, Kroll had previously indicated that roughly 4,400 Voluntary Exposure claims were subject to rejection for failure to cure deficiencies. *See* March 18, 2025 E-mail Discussion, attached as **Exhibit M**. Considering additional information provided after this date, it appears the total number of potential rejections for failure to cure deficiencies was actually closer to 5,400, indicating a total projected spend of approximately $134 million—well in line with projections when accounting for the vast differences across the range of payments amounts over the Class area, duplicates, and otherwise invalid claims.

Filed" in the May 1, 2025 report was actually the "Count of [**Valid**] Personal Injury Claims" accounting for issues like uncured deficiencies, ineligibility and duplicates. Under those circumstances, the projected spend rate from March 25, 2025, and April 1, 2025, had grown exponentially to exceed $170 million—more than $40 million over the Voluntary Exposure program valuation that Kroll had apparently never reviewed, reevaluated, or reassessed in light of ongoing claims data, despite knowing that Kroll's assignment was to distribute a fixed sum of money across all Voluntary Exposure claims.

Upon receipt of this information, Class Counsel immediately convened a Zoom meeting with Kroll on May 7, 2025, to discuss how the rate of spend for Voluntary Exposure claims had increased so significantly over a such a short period of time, whether Kroll projected the total value of claims to exceed the Voluntary Exposure fund and, if so, by how much. During that meeting, Kroll stated that: (1) the total number of claims requiring a payment of $25,000 or more was far greater than originally expected; (2) Kroll had yet to score all claims—almost nine months after the claim submission deadline—such that it could project what the total spend of the Voluntary Exposure program would be; and (3) based on the average value of payments per claim, the anticipated shortage for the Voluntary Exposure fund could exceed $25 million. When asked how under the point-based allocation system payments could be issued in amounts that would exceed the finite Voluntary Exposure fund, Kroll disclosed, for the first time, that instead of using points to calculate proportional shares, it interpreted the Plan of Distribution as requiring all Class Members to start with a fixed sum of $25,000 that would then be adjusted up or down based on various factors without regard for any effect on other claims or the limits of the fund. This methodology—that Kroll stated it was using—is in direct violation of the Court's Order and the Plan of Distribution, as well as common sense. Needless to say, Class Counsel was shocked by

11

this statement, and stunned that after close to eight months, and after having billed the Class more than $9.5 million in administration fees, Kroll had not reviewed and preliminarily scored all relevant claims before issuing checks. Kroll concluded the May 7, 2025 meeting by indicating that it would attempt to provide preliminary, rough scores for the remaining Voluntary Exposure claims in order to determine by exactly how much its total spend had exceed projections and the amounts allocated to the predetermined Voluntary Exposure fund.

### D.  Kroll's Lack of Diligent and Catastrophic Mistakes Resulted in this Court Removing Kroll as Settlement Administrator

Following the May 7, 2025 letter, Kroll and Class Counsel engaged in numerous discussions and meetings aimed at understanding how the Voluntary Exposure fund came to be mismanaged, the potential long-term implications to remaining claims, and possible solutions to preserve the rights of all Class Members, including those who did not choose to file claims for a Voluntary Exposure payment.[10]

To that end—and after repeated requests—the rough calculations were eventually provided to Class Counsel on May 20, 2025, less than two weeks after the first meeting on these issues. It is unclear why, if it took only 10 business days to perform these rough calculations in 2025, the same could not have been done before Kroll began to issue payments in late November 2024, and certainly in the nearly eight months between the final approval hearing and Kroll's removal. Evidently, the formal calculations, which would need to go through the official claims process, were never performed for 12,180 of these rough calculations. *See* Declaration of Michael R.

---

[10] So as to avoid worsening the effects of Kroll's mismanagement, Class Counsel instructed Kroll to suspend issuing all Voluntary Exposure awards and payments during this period. As a result, no new Voluntary Exposure awards or payments have been issued since May 7, 2025.

O'Connor Regarding Administration Transfer and Status Update ("O'Connor Decl."), attached as **Exhibit N,** at ¶53.

These discussions and the underlying data brought two overarching errors into stark focus—both of which were clearly hidden from the parties until Class Counsel uncovered them.

First, it is evident that Kroll completely failed to follow the Court's September 25, 2025 Order adopting the Plan of Distribution and implement the point-based allocation system correctly, despite the fact that it was repeatedly discussed throughout the development of the Plan of Distribution and claims process. Rather than follow the fundamental claims administration process of reviewing all claims, tabulating all points across the claims, and dividing the finite Voluntary Exposure fund by those points to determine the actual dollar value of each point, Kroll inexplicably ignored the concept of points entirely, choosing instead to apply the enhancements and detractions in the point system to the "estimated, potential average payment" of $25,000.[11] This approach

---

[11] Kroll has taken the position that because neither the Settlement Agreement nor the Plan of Distribution uses the phrase "*pro rata*" with respect to Voluntary Exposure payments, it was constrained to ignore the concept of points and instead calculate payments from the fixed $25,000 sum. This pretext is wholly meritless and flatly inconsistent with the concept of a point-based allocation system. *First*, with respect to class action allocations, straightforward "*pro rata*" distribution is disfavored ". . . in complex cases [because it] is often unattainable and rarely, if ever, treats class members fairly relative to one another." *See* Plaintiffs' Memorandum in Support of Approval and Implementation of the Plan of Distribution, ECF No. 519-1, p. 3 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855, 119 S. Ct. 2295, 144 L.Ed.2 715 (1999)). Instead, point systems achieve fairness by dividing a finite settlement fund proportionally amongst Class Members in accordance with the information provided throughout the entirety of the claims process to achieve a precise dollar value per point. *See* Baker Decl., ¶22. *Second*, Kroll was intimately involved in discussions with Class Counsel and counsel for Norfolk Southern regarding possible confusion over the use of the phrase "*pro rata*" in Settlement documents and communications with the Class that could be interpreted as promising equal payments to all Class Members regardless of the severity of impact. *See* May 22-23, 2024 E-mail Discussion, attached as **Exhibit O**; *see also* "East Palestine Residents Unhappy with Norfolk After Settlement", *NewsNation* (April 10, 2024) ("About 100,000 residents and businesses are eligible to get money from the settlement. They have to be within a 20-mile radius of the derailment. Split per person, that means these residents can expect to get about $6,000 each before attorney's fees are added in . . ."), attached as **Exhibit P**. As a result, the parties decided, and Kroll agreed, that it was best to

resulted in awarding Voluntary Exposure payments without any regard for the total value of all claims relative to the fixed fund such that thousands of participating Class Members are likely to go completely unpaid through no fault of their own if not corrected.[12]  Based on data provided by Kroll through May 20, 2025, it appears the total value of the overpayments issued to Class Members as a result of Kroll's foundational error is at least $17,249,717.45.[13]

Second—and possibly even more disturbingly—throughout the course of discussions in May 2025, Class Counsel discovered that Kroll had also overcalculated the awards to thousands of Class Members who had already received their Voluntary Exposure payments. *See* May 13-15, 2025 E-mail Discussion, attached as **Exhibit Q**. More specifically, despite explicitly discussing the point system's distinction between the Village of East Palestine and larger East Palestine area in October 2024, Class Counsel uncovered that Kroll had failed to adhere to that difference in the Plan of Distribution, leading to at least $2.1 million in overpayments. *See id*. When Class Counsel first raised this error to Kroll in a telephone call on May 14, 2025, Kroll indicated that it knew it had made the error and was in the process of reviewing claims to determine the full implications.

---

remove any references to "*pro rata*" from all Settlement documents going forward in an abundance of caution and only as a means of avoiding any confusion among members of the Class, the Community at large and the media – not to eliminate the concept of proportionality entirely from the Settlement or point-based allocation system. *Third*, Kroll does not (and cannot) dispute that this Settlement and allocation system were modeled off *Columbia Gas* where the point-based system was correctly implemented yet neither the settlement agreement nor the allocation plan in that case made any mention of "*pro rata*" distributions. *See Columbia Gas* Settlement Agreement, attached as **Exhibit R**.

[12] Kroll was never able to provide Class Counsel with any explanation of how it planned to address unpaid claims once the finite Voluntary Exposure fund had been exhausted had it continued to pay claims at that rate.

[13] As discussed below, the accuracy of Kroll's underlying data and calculations has been called into question by Epiq's review to date. Consequently, the true cost of Kroll's mistakes is likely higher than this figure and can only be calculated once Epiq completes its full review and a financial audit is conducted.

To this day, it remains unclear when Kroll first learned of this overpayment error, why the error was not immediately reported to the parties, and whether the parties would have been told of the error at all had Class Counsel not manually reviewed claims calculations to confirm fidelity to the Plan of Distribution.[14]

In light of the foregoing, the Court agreed that there was sufficient evidence to believe Kroll likely failed to use a point system, or implement the Plan of Distribution, before disbursing payments, and that Kroll likely miscalculated Voluntary Exposure payments. ECF No. 979 at ¶¶7-8. The Court also found that Kroll likely "overpaid certain Class Members' Voluntary Exposure claims to the detriment of other participating Class Members and the Qualified Settlement Fund ("QSF"), and that Kroll's appointment as Settlement Administrator should be immediately suspended and terminated, so as to protect the Class from further potential harm." ECF No. 979 at ¶9.

### E. Epiq's Review and Discovery of Additional Significant and Pervasive Errors Made by Kroll

After the Court's appointment of Epiq as Substitute Settlement Administrator on June 11, 2025, Epiq began its review of Kroll's Voluntary Exposure claims data. As a preliminary matter, when Kroll sent Epiq its data, Epiq discovered several threshold issues in the Settlement's

---

[14] Kroll's explanation that the error resulted from a "misunderstanding" of the Plan of Distribution is appallingly disingenuous. Not only was this concept specifically discussed and clarified in October 2024 (*see* **Exhibit H**), but Class Counsel's review of the data indicates this element of the point system was applied correctly to some Class Members and incorrectly to others. The error instead appears to be the result of some fault in Kroll's processing and quality control review similar to the miscalculation errors Kroll committed in the *Devry University Settlement,* where Kroll had to be replaced as settlement administrator when it mis-scored some 50,000 claims to the tune of roughly $16.5 million in incorrect payments. *See* Declaration of Randall P. Burkholder, attached as **Exhibit S**. Regardless of the reasons, suffice it to say that had Kroll disclosed the *Devry* errors to Class Counsel, it would not have been selected as Settlement Administrator or offered to the Court for appointment in *East Palestine*.

administration, including, *inter alia*, that there were multiple sets of data and record duplication; there was no data on mailings or communications with Class Members; and the data files did not include process details relating to any person that would have reviewed the Claim Form information, including date, time, or employee reviewing the claim, all of which undermine the accuracy of the entire administration. O'Connor Decl. at ¶83. Nevertheless, based on the data Kroll provided to Epiq, it appears Kroll processed a total of 38,721 Voluntary Exposure claims, which were ultimately categorized by Kroll as follows:

| | |
|---|---|
| Paid | 10,075 |
| Valid | 16,600 |
| Entirely Deficient | 904 |
| Entirely Rejected | 11,142 |
| **TOTAL** | 38,721 |

O'Connor Decl. at ¶13.

Of the "Entirely Rejected" claims, 5,882 were rejected for being geographic outside the class boundaries. O'Connor Decl. at ¶2. Epiq reviewed these claims and found that, generally, Kroll was inconsistent or incorrect in what address it used from the claim form to determine location for Voluntary Exposure payment purposes (including residence, physical location, and/or property owned), that the Kroll data on these denials was sometimes completely blank, and the address information was overall unreliable. O'Connor Decl. at ¶¶17-18. This is particularly problematic as the Class Member's distance from the derailment changes their assigned points, which is calculated based on address. O'Connor Decl. at ¶16. All told, Epiq found that there was an error rate of 15.6% in this category, which is an unacceptably high error rate. O'Connor Decl. at ¶15.

After discovering the staggeringly high error rate in the class boundary denials, Epiq next reviewed all personal injury claims rejected for failure to cure deficiencies. O'Connor Decl. at ¶24.

16

Epiq has reviewed 4,671 of these claims, finding that 7.8% were incorrect. O'Connor Decl. at ¶24.

This is, again, an unacceptably high error rate, and includes problems such as:

> (i) Epiq cannot always confirm that Class Members were properly advised
> regarding the defects they needed to cure; (ii) some claimants appear to have
> cured the defects in their claims, but were still rejected; and (iii) some of the claims do
> not appear to have been deficient at all, yet were still sent a defect notice and
> ultimately rejected.

O'Connor Decl. at ¶24.

Considering the scale of errors in the denied claims, Epiq determined it would also be necessary to review all approved claims to ensure fairness to the Class. O'Connor Decl. at ¶3. Like the review of denied claims, this analysis demonstrated that Kroll's errors persisted across all categories of claims. Specifically, Epiq's initial review of approved claims has already found that, based on Kroll's own data input, at least 919 approved claims had proof of residence dates outside the acceptable date range contained in the Plan of Distribution, and there was never any communication with the Class Members to validate their Settlement eligibility. O'Connor Decl. at ¶¶3, 35-36. Further, many of these approvals also had address inconsistencies in Kroll's database that resulted in mis-scoring of claims, sometimes awarding too few points. O'Connor Decl. at ¶¶37-38. As Class Counsel found out on May 7, 2025, in Epiq's review of 16,600 "Valid" claims, only 4,420 had been formally reviewed and allocated any sort of points. O'Connor Decl. at ¶53.

Even more disturbingly, Epiq's review determined that for those claims that were assigned points, Kroll's data input and points allocation were deeply flawed. For example, Kroll does not appear to have captured data at all for an entire category in the Plan of Distribution—physical presence in the class area. O'Connor Decl. at ¶39. Another category, exposure and symptoms points, should have used multipliers of ".9", "1", or "1.25" according to the Plan of Distribution; however, Epiq found several instances of an unauthorized ".75" multiplier being used, which Kroll

17

admitted was an error and could not explain. O'Connor Decl. at ¶¶43-44. Kroll similarly misapplied direction points and location points with no perceived pattern, or explanation from Kroll, resulting in certain Class Members being inconsistently and improperly awarded points under the Plan of Distribution. O'Connor Decl. at ¶¶45-52.

In certain cases, Kroll's errors even extended to completely missing Class Members' Voluntary Exposure claims. O'Connor Decl. at ¶¶54-56. Specifically, based on Epiq's preliminary review, there are at least a half dozen claims where a claimant is listed on the claim form as making a Voluntary Exposure claim but does not have a corresponding individual claim file that can be reviewed, approved, scored and paid. O'Connor Decl. at ¶54. For all intents and purposes, it is as if these Class Members never submitted a Voluntary Exposure claim because Kroll did not correctly review and record the claim forms. *Id*. It is currently unknown exactly how many Class Members may have been entirely cut out of the Settlement by this error until Epiq can complete a full review of all claim forms and Voluntary Exposure claims.

Based on the unacceptably high error rate and unreliable data from Kroll, Epiq has determined that, in order to fulfil its obligation as Settlement Administrator, it must review all claim forms and supporting documentation to ensure accurate data collection, review all previously approved claims, provide Class Members an opportunity to cure deficiencies; assign points without regard to Kroll's allocations, and re-adjudicate each claim itself. O'Connor Decl. at ¶6.

**F.    Kroll's Delay and Gross Negligence Have Caused Significant Harm to the Class**

Kroll's errors and mismanagement of the Settlement Fund are intensified by its delays and mistreatment of the Community. Although Kroll had eight months between final approval of the Settlement and its removal as Settlement Administrator, less than half of all Voluntary Exposure participants received their award determinations or payments, virtually all of which have now been

confirmed as incorrect to one degree or another.[15] Whether owing to general neglect or, worse, intentional delay to conceal the results of the pervasive errors described above, Class Members were entitled to a Settlement Administrator who resolved their claims accurately and expeditiously. Yet, the parties have collectively received hundreds of complaints from Class Members that their clearly valid claims were not timely processed, Kroll lacked transparency as to the status of the claims process, and Kroll failed to provide adequate answers to questions about Class Member claims.

While Class Members have grown increasingly frustrated, Kroll has pocketed over $9.5 million from the Settlement Fund for its own fees. Now, Epiq will have to redo much of what Kroll received payment for, and the payment to Epiq for this duplicative work will dip even further into the Settlement Fund, stretched thin by Kroll. These issues would be unacceptable under normal circumstances, but when viewed in light of Kroll's gross negligence and disregard, they paint an even more troubling picture that must be rectified. Kroll simply should not be permitted to keep the fees it collected for work it failed to correctly perform for the Class, and Class Counsel thus requests the Court Order disgorgement of the fees and costs that Kroll collected in this matter.

## III.    ARGUMENT

### A.    The Court Has Jurisdiction Over the Settlement Until the Fund Is Fully Distributed

As a threshold issue, the Court has jurisdiction to enforce its Final Approval Order. *See Jaynes v. Austin*, 20 F. App'x 421, 425 (6th Cir. 2001) (finding a district court retains the power to enforce but not expand on its orders, even with an appeal pending, so long as the judgment has not been stayed or superseded). In addition to the Court's inherent power to enforce

---

[15] On June 11, 2025, the same day as its removal as Settlement Administrator, Kroll sent rejection notices to 11,142 participants. O'Connor Decl. at ¶14.

its orders, in class actions, the Court also retains jurisdiction as the "ultimate guardian of the interests of the class members" with a duty to see that any settlement it approves on behalf of the class is completed. *In re Corrugated Container Antitrust Litig.*, 752 F.2d 137, 141 (5th Cir. 1985) (finding the court retained jurisdiction over settlement fund distribution, even after the case had been dismissed with prejudice, because of its duty to the class members, and noting that the court's judgment approving settlement retained judgment over the settlement funds); *see also RE/MAX Int'l, Inc. v. Realty One, Inc.,* 271 F.3d 633, 645 (6th Cir. 2001) (holding that the district court retained subject matter jurisdiction after entry of dismissal where the order contemplated the court's continued role after dismissal).

Indeed, in its Final Approval Order in this matter, the Court expressly:

> retain[ed] continuing and exclusive jurisdiction over this action for purposes of resolving issues relating to or ancillary to administration, consummation, interpretation and enforcement of the Settlement Agreement; and, retain[ed] jurisdiction for purposes of ensuring compliance with the terms of the Settlement Agreement and any Order of the Court issued in connection therewith.

*See* Final Approval Order, ECF No. 557, ¶25. Similarly, in the Settlement Agreement, the Parties agreed, "[t]he Court shall retain jurisdiction with respect to the interpretations, implementation, and enforcement of the terms of this Agreement and all orders and judgments entered in connection therewith . . ." Settlement Agreement, ECF No. 452-2, § XVIII(L).

**B. The Court Should Exercise Its Inherent and Equitable Authority to Sanction Kroll and Order Related Relief for Kroll's Failure to Administer the Settlement Diligently, in Good Faith and in Accordance with the Court's Orders**

This Court can, and should, order Kroll to return the approximately $9.5 million in clearly unearned fees it took from the Settlement Fund and Class Members under its inherent and explicit power to enforce its own orders and impose sanctions in this class action.

### 1.    This Court Has the Power to Sanction Kroll

When a court seeks to enforce its orders or supervise its judgments, "one weapon in its arsenal is contempt of court." *Elec. Workers Pension Tr. Fund of Loc. Union |58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378–79 (6th Cir. 2003) (citing *NLRB v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 588 (6th Cir . 1987)). This power "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory." *Id.* (citing *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 550). "Contempt proceedings enforce the message that court orders and judgments are to be complied with in a prompt manner." *Id.* (citing *Cincinnati Bronze,* 829 F.2d at 590).

"Civil . . . contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); s*ee also Collins v. Barry*, 841 F.2d 1297, 1300 (6th Cir. 1988) ("[C]ivil contempt seeks to remedy a deprivation or a loss."). "Although civil contempt may serve incidentally to vindicate the court's authority, its primary purposes compel obedience to a court order and compensate for injuries caused by noncompliance." *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983); *see Backo v. Loc. 281, United Bhd. of Carpenters & Joiners of Am.*, 308 F. Supp. 172, 179 (N.D.N.Y. 1969), *aff'd,* 438 F.2d 176 (2d Cir. 1970) ("[c]ivil contempt is remedial, and a court has power to award damages and attorney's fees to a party aggrieved by the contempt, limited to the actual loss caused by the contempt plus the costs and expenses, including counsel fees, incurred in investigating and prosecuting the contempt"). To justify holding a litigant in civil contempt, the moving party must demonstrate by clear and convincing evidence that the non-

21

moving party "violated a definite and specific order of the court." *Elec. Workers Pension Trust Fund of Local Union # 58*, 340 F.3d at 378. Importantly, the absence of willfulness does not relieve one from civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S. Ct. 497, 499, 93 L. Ed. 599 (1949).

Federal courts also have the inherent power to impose sanctions against a non-party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Clapper v. Clark Dev., Inc.*, No. 5:09 CV 00569, 2014 WL 1493150, at *1 (N.D. Ohio Apr. 15, 2014), *aff'd,* No. 14-3500, 2015 WL 13688415 (6th Cir. Apr. 29, 2015). "It is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it." *Id.* In fact, "Fed. R. Civ. Pro. 71 grants district courts the power to enforce orders against 'a person who is not a party . . . as if a party.'" *Id.* Rule 71 states, "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." *Id.*; *see In re Lightning Techs., Inc.*, 641 B.R. 872, 874 (Bankr. E.D. Mich. 2022) (granting the plaintiff's motion for civil contempt against third-party for falsely holding itself out as a debtor or buyer). To succeed in holding a non-party in contempt, the movant must too satisfy Federal Rule of Civil Procedure 65(d)(2), which requires that the non-party is either (1) a party, (2) an officer, agent, servant, employee, or attorney of the party, or (3) "persons who are in active concert or participation" with a party or its officers, agents, servants, employees, or attorneys. Fed. R. Civ. P. 65(d)(2). The movant must also show that the non-party was "aware of the injunction and [knew] that their acts violate[d] the injunction." *Clapper*, 2014 WL 1493150, at *1 (citing *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 508 Fed.App'x. 498, 502 (6th Cir. 2012)).[16]

---

[16] While the Court "must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process," "[i]n the Sixth Circuit, there is no requirement that a full evidentiary hearing be held before imposing sanctions." *Chambers v. NASCO*, 501 U.S 32,

2.      **The Court Has the Inherent and Equitable Power to Order Restitution or Disgorgement of Settlement Funds as a Contempt Sanction**

In complex class actions, "[s]ettlement administration . . . often requires courts to use their equitable powers under Rule 23 to manage disparate interests competing over a finite pool of assets with which to satisfy the class." *In re Orthopedic Bone Screw Products Liability Litigation*, 246 F.3d 315, 321 (3d Cir. 2001). "The equitable powers of the court may also be invoked to deal with other problems that commonly arise during administration of the settlement . . . and are retained by the court until the settlement fund is actually distributed." *Id.* (cleaned up) (citing *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir.1972)); *see id.* (noting the court has fiduciary duties to the whole class, and individual class members, during settlement administration).

Part of the Court's inherent and equitable authority is the ability to oversee and supervise a class action settlement administrator in the performance of its duties, which includes acting in good faith and without violating or evading contractual responsibilities, inaction or lack of diligence. *See Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F.Supp.2d 440, 448 (S.D.N.Y. 2004); *see also Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 1001 (9th Cir. 2003) (finding no error where the district court disgorged a special master of certain funds because he breached fiduciary duties, behaved unethically, failed to keep records, generally failed to accomplish the task for which he was appointed, lied to and was disloyal to the court); *In re PHC, Inc. S'holder Litig.*, 894 F.3d 419, 435 (1st Cir. 2018) (ordering disgorgement of fees by a fiduciary because ". . . it is standard fare for a court to fashion remedies that deny a breaching fiduciary undue gain or advantage received by virtue of his position . . .").

---

45 (1991); *DiPonio Const. Co., Inc. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 687 F.3d 744, 752 (6th Cir. 2012). Rather, the district court has the discretion "to determine whether an evidentiary hearing would assist the court in its decision." *DiPonio Const. Co., Inc.*, 687 F.3d at 752.

Importantly, the Sixth Circuit "presumes the full scope of equitable powers may be exercised by the courts," with "[r]estitution and disgorgement [being] part of the courts' traditional equitable authority."[17] *U.S. v. Universal Management Services, Inc., Corp.*, 191 F.3d 750, 760-61 (6th Cir. 1999) (collecting cases) (cleaned up); *see also Williamson v. Recovery Limited Partnership*, 826 F.3d 297, 299-301 (6th Cir. 2016) (explaining that the court may police itself using its inherent power to assess attorney's fees against those who hamper the enforcement of a court order). "Absent a clear command by Congress that a statute providing for equitable relief excludes certain forms of such relief, this court will presume the full scope of equitable powers may be exercised by the courts." *Universal Mgmt. Servs., Corp.*, 191 F.3d at 761 (rejecting argument that the applicable statute needed to explicitly authorize restitution); *see id.* ("a district court's equitable powers are even broader and more flexible when the public interest is involved").

### 3. The Court Should Use Its Inherent and Equitable Power to Order the Restitution and Disgorgement of Funds Kroll Collected in Fees from the Settlement Fund

The Court has already used its inherent and equitable powers to order the suspension and termination of the appointment of Kroll as settlement administrator. ECF No. 979. Given the magnitude of the additional failures uncovered by Epiq's audit, and the undisputed financial ramifications, Class Counsel now seek additional equitable relief to ensure the Settlement Funds Kroll took are returned to the Class. Class Counsel ask for this relief promptly, and urgently, given the ongoing need to fund settlement administration and payments to Class Members. *See Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d at 32 (noting that one goal in balancing the

---

[17] Under Ohio law, restitution and disgorgement of fees are equitable remedies. *Cirino v. Bureau of Workers' Comp.*, 171 N.E.3d 840, 846 (Ohio Ct. App. 2021).

court's equitable powers is "expedient settlement resolution."); *Elec. Workers Pension Trust Fund of Local Union*, 340 F.3d 378 (recognizing contempt proceedings enforce prompt compliance).

Here, as Settlement Administrator appointed by the Court, Kroll had a duty to complete its task with diligence and in good faith. It did not, and the Court thus terminated Kroll from this position. ECF No. 979. It is evident from Kroll's repeated acknowledgement of the Plan of Distribution and associated point-based allocation system, and its inexplicable departure from it, that Kroll knew it was in violation of the Court's Orders while processing and paying Voluntary Exposure claims. Additional information from Epiq has since made it alarmingly clear that Kroll wantonly disregarded its obligations as Settlement Administrator, knowingly disregarded the Court's orders, and violated its fiduciary obligations to the Class by utterly failing to manage administration of this Settlement. The errors reach all aspects of the administration, from data collection, data input, record keeping, adjudication of claims, and communications with the Class and Class Counsel.

As a result of Kroll's failure, the Class has suffered significant losses and damages, including over $9.5 million in fees[18] that Class Counsel seeks to disgorge, along with at least $17,249,717.45 in damages as a result of Kroll's dereliction of its administrative duties. Further, Epiq must now repeat or correct much of Kroll's work, which will cost millions of dollars in additional administrative work. In addition to these costs, Kroll's negligence has frustrated the expedient resolution of the Settlement and added significant delay to the process of distributing Voluntary Exposure payments.

---

[18] Hindsight also raises concern over Kroll's invoices for more than $9.5 million in fees when it evidently did not perform even the basic data collection and input necessary for settlement administration and, prior to its removal, had not notified even half of the Class Members participating in Voluntary Exposure payments of their determination.

In short, Kroll's gross negligence and wanton carelessness lead to one inescapable conclusion—Kroll must be held to account for its mismanagement of the Settlement through appropriate repayment that makes the Class financially whole. Every day that Kroll keeps the Settlement Funds it received, those Settlement Funds are unavailable for the benefit of the Class—these funds should be promptly returned to the Settlement Fund to be used on behalf of the Class. Class Counsel therefore request the Court again use its equitable power, and ensure an expedient settlement resolution, by ordering Kroll to immediately return the $9,542,182.60 it took from the Class Members' Settlement Fund.

## IV. CONCLUSION

For the foregoing reasons, Class Counsel respectfully request the Court exercise its broad inherent and equitable powers to issue an Order to Show Cause to Kroll asking why it should not:

1.      Find Kroll in contempt for: (a) materially misrepresenting to the parties and the Court its experience, skill and expertise in administering class action settlements involving the use of a point-based allocation system; (b) failing to adhere to Court orders including, but not limited to, the Plan of Distribution; (c) concealing material errors in the implementation of the Plan of Distribution affecting the Settlement and Settlement Class; and (d) failing to diligently or adequately collect and record data from the Settlement Class;

2.      Order disgorgement of all sums paid to Kroll and Order Kroll to return to the Settlement Class the $9,542,182.60 in payments received for work it improperly performed as Settlement Administrator by depositing the sum of those payments in

the new Qualified Settlement Fund established by Epiq within 5 business days of the Court's order[19]; and

3.    Order Kroll in any current or future class action, mass tort, regulatory or government claims administration where it serves, or is proposed to serve, as administrator to affirmatively disclose to the parties and presiding court all prior instances where Kroll has been terminated, suspended or replaced as administrator including, but not limited to, the *Devry University Settlement* and *East Palestine*.

Dated: October 23, 2025                Respectfully submitted,

*/s/ M. Elizabeth Graham*
M. Elizabeth Graham (pro hac vice)
**GRANT & EISENHOFER P.A.**
123 S. Justison Street, 6th Floor
Wilmington, DE 19801
303-622-7000
303-622-7100 (fax)
egraham@gelaw.com

Seth A. Katz (pro hac vice)
**BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO 80112
303-792-5595
303-708-0527 (fax)
skatz@burgsimpson.com

Jayne Conroy (pro hac vice)
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor New York, NY 10016
212-784-6400
212-213-5949 (fax)
jconroy@simmonsfirm.com

---

[19] As set forth above, Class Counsel intend to move this Court for further contempt sanction against Kroll in Step Two once a final review and audit of the claims process is completed such that the total value of all overpayments from the Settlement Fund can be precisely calculated.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2025 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

<u>*/s/ M. Elizabeth Graham*</u>
M. Elizabeth Graham
Grant & Eisenhofer P.A.