IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: EAST PALESTINE TRAIN DERAILMENT | ) Case No. 4:23-CV-00242-BYP<br>) JUDGE BENITA Y. PEARSON<br>)<br>) |

## MOVANT'S REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(3), 60(b)(6) and 60(d)(3)

### I.    INTRODUCTION

Movants respectfully submit this Reply not as an attempt to relitigate prior objections or criticize the Court's diligent oversight at the fairness hearing, but to present significant new evidence—including material misrepresentations by Class Counsel during the fairness hearing and coordinated concealment of adverse expert findings—that fundamentally undermines the fairness and integrity of the settlement process.

### II.    ARGUMENT

#### A. CLASS COUNSEL MADE AFFIRMATIVE MISPRESENTATIONS TO THE COURT ON TWO CRITICAL ISSUES

##### 1.  Misstatement Regarding EPA Data Reliance

At the fairness hearing, in response to objections from experts Stephen Petty and Scott Smith establishing that the EPA's data on dioxin and other contaminants was unreliable, Class Counsel assured the Court that Petty's and Smith's objections were irrelevant and could be disregarded, because Class Counsel did not rely on EPA data. Class Counsel told the Court:

> We didn't rely on EPA data. We went out and did our own testing. We did split samples. We eliminated background levels. We did everything that we were supposed to do.

(ECF 553, p 65:4-7)

Contrary to direct statement to the Court, Class Counsel submitted the declaration of Dr. Richard J. Schuhmann in support of their motion for final approval of the settlement and Schuhmann relies exclusively on EPA-generated data for background levels and risk thresholds. (ECF 518-10.) Schuhmann's declaration cites only to EPA sampling and background data; they do not incorporate any of their own sampling results (ECF 518-10 ¶¶16–18). Thus, Class Counsel misrepresented the factual basis of their risk analysis and denied reliance on the very data they used to support the settlement. As shown below, this is not just a trivial misrepresentation with no consequences. Class Counsel's total reliance on EPA sampling and background data, and their misrepresentation regarding this fact to this Court, has transformed the lives of Movants.

### 2.  Misrepresentation Regarding "Zero Risk"

During the fairness hearing, the Court asked whether Dr. Arch "Carson's video "suggests no worries, no illness will befall any of you?" (ECF 553, p 55:13-14.) On this topic, Class Counsel told this Court: "We have never proffered any information to suggest that there is zero risk in this community. … He didn't say there was zero risk; rather, he said the risk was unknown, but very low." (ECF 553, p 55:8-9, 56:21-25.)

The video itself, however, contains categorical assurances:

**Based on my best judgment, there will not be any long-term health impact of chemical exposure from the derailment to community members of East Palestine.**

**As far as people just living in East Palestine or working there or in nearby neighboring communities, we don't expect there to be any long-term health effects associated with chemical exposure resulting from the derailment.**

> **The levels [of carcinogens] that people were exposed to in the community were so small that we don't expect any kinds of cancers or other health effects to have results from those.**
>
> **I would personally not expect one person to develop a cancer as a result of this exposure that is due to those chemical exposures.**
>
> I think the answer to that is yes, it's too early for some things, but it's not too early to predict the overall health effects will occur from this. Certainly, if we're thinking of one potential cancer that occurs 20 years from now, it's too soon to count that, **but we pretty well know what exposures resulted from this train derailment and we can pretty well predict that people are going to be safe in the long term.**[1]

Additionally, Class Counsel told the Court Dr. Carson was "a friend, a colleague of one of the members of the PEC" and that "Dr. Carson's video was meant as nothing more than an attempt to quell some of the fearmongering."  (ECF 553, p 55:18-19, 56:20-21.) What Class Counsel failed to tell the Court, however, is that Class Counsel hired a public relations firm ("Rebuttal PR") to record, edit, and produce Dr. Carson's statements for the August 1, 2024 town hall *and approved the video*. The July 26, 2024 email from Stephanie Wolf of Rebuttal PR to Elizabeth Graham, CC'ing Class Counsel and Dr. Carson, states:

> Linked below is the edited version of the video we recorded last week. With your approval, we'll share this at the virtual town hall meeting on Thursday, August 1. (Russ Abney forwarding instruction: "don't distribute before the town hall please").

(Exhibit 3, Email from Stephanie Wolf, Rebuttal PR, to Elizabeth Graham, Class Counsel, July 26, 2024 (first received by counsel for Movants in June 2025)).

By disavowing "zero risk" while presenting professionally produced, categorical assurances of safety, Class Counsel deliberately misled both the Court and the settlement class. Movants do not question the Court's thorough review. This motion arises solely from these newly documented

---

[1] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM

misstatements by Class Counsel—misstatements that prevented an accurate assessment of the settlement's fairness and the inducement of personal injury releases.[2]

## B. CLASS COUNSEL CONCEALED THEIR OWN EXPERT'S ADVERSE TESTING RESULTS BY ADVANCING INACCURATE EPA DATA

Class Counsel's own expert Stephen Petty conducted testing and as such, has independent information regarding contamination in East Palestine and the surrounding area. Yet Class Counsel did not present Petty's testing results and information regarding contamination to the Court or the public in support their motion to approve the settlement. Instead, Class Counsel presented a declaration stating in essence that the derailment and vent and burn caused no additional contamination beyond that already present in the area due to backyard trash burning.   The declaration relied entirely on inaccurate EPA data and contradicted the findings of Class Counsel's own expert Stephen Petty. Class Counsels' concealment of their own expert's adverse testing results and their advancement of inaccurate EPA data in support of their motion to approve the settlement was done to induce another to act to his her or detriment and opt into the personal injury portion of the settlement.

### 1.  Stephen Petty Was Retained and Paid by Class Counsel as Plaintiffs' Expert

---

[2] Emails exchanged among Class Counsel and Kroll in the weeks leading up to the September 2024 settlement hearing—now included in the exhibits filed by class counsel the day in their "step one"—show that Class Counsel recognized the agreed-upon $600 million fund (approximately $421.7 million net after fees and expenses) would not provide anywhere close to the advertised maximum awards of up to $70,000 for property damage and up to $25,000 for personal injury. As reflected in these communications, counsel discussed modeling participation assumptions of 25–50 percent and projected average payments of only a few thousand dollars per claimant, while conceding internally that only a limited number of residents located within one to two miles of the derailment could ever receive close to the top potential amounts. These contemporaneous emails therefore demonstrate that, even before seeking final approval, Class Counsel knew that the net settlement could not adequately compensate the full Class of affected victims.

Respondents attempt to lump together Stephen Petty, Scott Smith and George Thompson as "purported experts" and objectors to the settlement. (ECF 553 p 64; ECF 1002 5.) Even so, these three objecting experts cannot be conflated as one and the same. Scott Smith is an independent testing expert and George Thompson was an objector's expert. Stephen Petty, however, was retained by Class Counsel as an expert for the plaintiffs.

Petty's affidavit makes clear he was retained and paid by Class Counsel as their expert for this case:

> After a Norfolk Southern train derailed in East Palestine, Ohio, on February 3, 2023, **I was hired by plaintiffs' attorneys** Simmons Hanly Conroy; and later the other class law firms. Thus, I have independent information regarding contamination and other information regarding the incident. **I'm precluded from providing this information under confidentiality and intend to honor that confidentiality unless otherwise ordered by the court.**

(ECF 0551-1 ¶ 6 (emphasis added).) This language unambiguously identifies Petty as the plaintiffs' experts, not as an independent or objector's expert.

Norfolk Southern groups Petty with 'purported experts' that 'objectors relied heavily on,' implying Petty was working for or supporting objectors. Most remarkably, Class Counsel told the Court that Mr. Petty's position was not new to class counsel, stating:

> **We are well aware of what Mr. Petty says. He is one voice. . . . We have scores of other experts.**

(ECF 553, p 64:15-17.) This characterizes Petty as an external critic whose views Class Counsel had considered and rejected—not as Class Counsel's own retained expert whose findings they concealed.

Respondents' conflation of Petty as just another objector is misleading. When an objector's expert criticizes a settlement, the Court evaluates it as partisan advocacy. But an objection by Class

Counsel's own expert carries significant weight, especially since experts retained by counsel do not typically file affidavits supporting objections to settlements negotiated by their own retaining counsel. Respondent's inaccurate characterization of Petty is also not inadvertent. By treating him as merely another objector supporter, Respondents attempt to minimize the gravity of their concealment of his conclusions.

### 2. Petty's Testing Results and Conclusions Are Not Publicly Available

Petty's affidavit reveals he was bound by confidentiality obligations that prevented full disclosure of his findings and conclusions. While Respondents argue that the Court determined Petty "was not handcuffed," Class Counsel, seemingly speaking out of both sides of their mouths, states Petty was indeed bound by confidentiality, claiming: "Class counsel did not act fraudulently, nor did they commit any form of misconduct, by . . . **requiring Stephen Petty to abide by the terms of the settlement agreement.**" (ECF 1003 p 27 (emphasis added).)

Class Counsel specifically chose to rely on EPA data in support of the settlement, not on Petty's conclusions. As such, Petty's testing and conclusions are not and have never been publicly available.

### 3. Class Counsel Withheld Their Own Expert's Findings and Relied on Misleading EPA Data to Support the Settlement

#### a. Richard Schuhmann

While Class Counsel "did [their] own testing," "did split samples," "eliminated background levels," and "did everything that [they] were supposed to do," Class Counsel did not support their motion to approve the settlement with any of this evidence. Instead, Class Counsel filed with the Court the declaration of Richard Schuhmann, which relies entirely on the very EPA data their own expert states is invalid.

Class Counsel states through Schuhmann two things. First, Schuhmann states the soil in East Palestine and the surrounding area was already contaminated by PAH and dioxins/furans as a result of municipal and residential trash burning, "including barrel burning of household waste." (ECF 518-10, ¶ 15.) The only sources Schuhmann cites in support of these conclusions are two publications by the EPA.

Second, Schuhmann states soil samples collected following the derailment show dioxins/furans below the levels already present in the area from all the trash burning. (ECF 518-10, ¶ 17.)  To the contrary, Class Counsel's own expert Petty states testing has shown "there is significant environmental contamination." (ECF 555-1 ¶ 11.)

While Class Counsel admits they "did their own testing" and "eliminated backgrounds levels," they did not rely on their own testing to support their motion to approve the settlement and instead relied exclusively on the EPA's conclusions that PAH and dioxins/furans were present in East Palestine and the surrounding area before the derailment. Their own expert Stephen Petty contradicts the EPA's conclusions upon which Schuhmann relies.

### b.  Dr. Arch Carson

Consistent with the statements by Schuhmann, Class Counsel also presented video statements by Dr. Arch Carson stating testing shows no contamination beyond that already present in the environment before the derailment and vent and burn. Dr. Carson stated in the video shown at the August 1, 2024 town hall:

> . . . the industrial activity that has occurred in Northeast Ohio over many decades has spread a number of chemicals around the environment, so they're present there all the time. **But the derailment itself has not contributed to a significant increase of those chemicals in East Palestine**.

The amount of contamination that would be associated with measurable health effects would depend on the individual chemicals and to some extent on the characteristics of the exposure. But I can tell you that the chemical contaminations that have been clearly associated with health effects in communities have been hundreds of times greater than the measured levels that we are now finding in East Palestine from the derailment. **The number of chemicals that have been produced and that may remain in very low levels in the East Palestine area are dwarfed by the amount of other substances that are there that have been put there over years of just normal human activity**.[3]

While Class Counsel claims they hired and worked with experts to determine "the likelihood of disease or injury from both acute and chronic exposure," to the toxic chemicals released during the derailment and vent and burn, they did not rely on their toxicologist's opinions to support the settlement and instead presented the video of Dr. Carson who, like Schuhmann, said toxins were already present in East Palestine and the surrounding area before the derailment. (ECF 518-2, ¶ 49.)

Class Counsel concealed their own expert's conclusions through the advancement of the story line that the derailment and vent and burn did not contribute to the presence of toxins in the environment, despite their own expert Stephen Petty's contrary conclusions.

### 4. Petty's Unprecedented Step of Filing an Objection Affidavit Reveals the Severity of Concealment

Experts retained by counsel do not typically file affidavits supporting objections to settlements negotiated by their own retaining counsel. This extraordinary step underscores that Petty recognized class members were being misled, but his confidentiality obligations prevented him from fully disclosing his findings through normal channels. He felt ethically compelled to speak out the only way he could while staying within the confines of the contractual obligations. When Class Counsel's own expert states that health assurances being provided to class members by Class

---

[3] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM

Counsel are "at best speculation, and at worst simply incorrect," that is evidence of concealment and fraud by Class Counsel.

### C. RECENTLY RELEASED DOCUMENTS VALIDATE CONCERNS OVER CLASS COUNSEL'S RELIANCE ON EPA DATA TO SUPPORT CLAIMS OF "ZERO RISK."

Class Counsel's misrepresentation to the Court that they "did not rely on EPA data," and the concealment of their own expert Petty's testing results matters, particularly in light of recently released documents confirming background (control) samples were taken from contaminated areas.

Norfolk Southern, its contractors and the EPA took background (control) soil samples from areas that were contaminated and took contamination test samples from areas that were not contaminated – the exact opposite of what should have been done. This is because the sampling plan created by Norfolk and its contractors, and approved by the EPA, used an erroneous vent and burn evacuation area to determine the locations for both background (control) samples and contamination test samples.

Wind rose data on the morning of February 6, 2023, the day of the vent and burn, showed winds coming from the northwest to the southeast. (ECF 551-1, ¶ 28-29.) Based on this wind rose data, the decision was made to evacuate to the southeast two miles deep and one mile wide. The area of evacuation identified by Ohio Governor Mike DeWine and released to the public shows an area to the south and east of East Palestine, consistent with winds traveling out of the northwest.[4]

That said, between noon and 1:00 p.m., the winds changed, becoming calm and coming from the west/southwest or southeast/south. (ECF 551-1, ¶ 28-29.) At no time during the vent and burn did the winds blow from the northwest to the southeast as anticipated. To this day,

---

[4] https://governor.ohio.gov/media/news-and-media/east-palestine-update-evacuation-area-extended-controlled-release-of-rail-car-contents-planned-for-3-30-pm-02062023

Norfolk Southern, its contractors and the EPA, have not acknowledged these significant changes to wind speeds and directions during the vent and burn.  (ECF 551-1, ¶ 33.)

Despite the wind change, Norfolk's and its contractor's dioxin soil sampling plan, which was approved by the EPA, was based on the assumption that the dioxins and furnans and other toxic pollutants from the vent and burn went and were deposited in the one-mile by two-mile evacuation zone to the southeast of the burn. Based on this faulty assumption, Norfolk's contractors took background (control) samples from areas outside the evacuation zone and said the levels of toxic contaminants in those areas were evidence of the level of contaminants already in the soil before the derailment and vent and burn. Norfolk's contractors took test samples from the areas inside the evacuation zone and determined those samples represented the level of contaminants resulting from the derailment and vent and burn. (ECF 551-1, ¶ 33-34.)

Documents released in July 2025 through Freedom of Information Act (FOIA) raise additional concerns about the integrity of Norfolk's and the EPA's soil sampling plan. (Exhibit 4, EPA letter (publicly released in June 2025)).

In a March 6, 2023 letter, the EPA approved two material changes to the soil sampling plan. First, it approved the removal of five chemical compounds from the testing list:

1. 2,3,4,6-Tetrachlorophenol
2. 1,2,4,5-tetrachlorobenzene
3. Pentachlorobenzene
4. 1,2,3-trichlorobenzene
5. 1,2,4-trichlorobenzene

*Id.* This means, soil samples would not even be tested for these particular chemical compounds, including the benzene compounds listed. Second, the EPA changed the baseline sample

locations directing that baseline samples be taken farther west and in areas potentially impacted by the toxic plumes, which compromised the entire sampling plan. *Id*.

This is further validated by Scott Smith's testing results showing significant contamination in East Palestine and surrounding areas as recently as August 2025 as explored below.

### D. THE PERSONAL INJURY RELEASES WERE PROCURED THROUGH FRAUDULENT MISREPRESENTATIONS THAT ARE NOW PROVEN FALSE

#### 1. Dr. Carson's Presentation Was a Professionally Produced PR Campaign, Not An Independent Expert Opinion

Class Counsel argues that Dr. Carson was "a completely independent third party," who was "not paid by Class Counsel." (ECF 1003, p 21.) The email dated July 26, 2024—six days before the August 1 town hall—proves otherwise.

Class Counsel hired a public relations firm, "Rebuttal PR," to record, edit, and produce Dr. Carson's video. (Exhibit 3, Email from Stephanie Wolf, Rebuttal PR, to Elizabeth Graham, Class Counsel, July 26, 2024 (first received by counsel for Movants in June 2025)). The PR firm's email to Class Counsel states: "Hi Dr. Carson, Linked below is the edited version of the video we recorded last week. With your approval, we'll share this at the virtual town hall meeting we're holding on Thursday, August 1."

The email was sent to Elizabeth Graham (Gelman Law, Class Counsel) and copied to Seth Katz, Adam Gomez, and Russ Abney (all Class Counsel), as well as Dr. Carson himself. When forwarding the email, Class Counsel Russ Abney instructed: "don't distribute before the town hall please"—demonstrating strategic control over the video's release.

Contrary to Class Counsel's representations to this Court, this was not an independent expert providing candid medical opinions. This was a coordinated public relations campaign,

11

professionally produced and strategically timed, designed to induce class members to opt into personal injury releases.

### 2. Class Counsel Represented Dr. Carson as a "Completely Independent Third Party."

Not only did Class Counsel misrepresent Dr. Carson's involvement in this case to this Court, they also misrepresented Dr. Carson's involvement to Class Members.

On August 1, 2024, the video of Dr. Carson was shown to Class Members at a town hall meeting. Before the video was presented, Dr. Carson was introduced as a completely independent third party:

> We'd like to share a quick video from an experienced doctor who has followed the derailment and generously offered his expertise. He is not involved in the litigation, and this is a completely independent third party.[5]

Just as Class Counsel failed to inform this Court, Class Counsel failed to inform Class Members that, Class Counsel hired a public relations firm, "Rebuttal PR," to record, edit, and produce Dr. Carson's video. And "Rebuttal PR" requested the approval of the Class Counsel of their edits to the video in preparation for the townhall. Again, this was not an independent expert providing candid medical opinions. This was a coordinated public relations campaign, professionally produced and strategically timed, designed to induce class members to opt into personal injury releases.

### 3. Movants Relied Directly on Dr. Carson's Statements in Deciding to Opt In to Personal Injury Releases

At least one Movant will testify that she opted into the personal injury portion of the settlement specifically based on Dr. Carson's statements at the August 1, 2024 town hall that there

---

[5] See video of town hall meeting: https://www.youtube.com/watch?v=OoiAgy1TLpM

would be no long-term health effects. This establishes direct, reasonable reliance on the misrepresentations.

Dr. Carson made assurances of no long-term health effects. Movants reasonably relied on these categorical assurances from a toxicologist presented to them by their own fiduciary counsel. They accepted the promise of personal injury payments and signed releases of their personal injury claims based on these representations that there would be no long-term health effects.

### 4. Dr. Carson's Health Assurances Have Been Proven Categorically False

Dr. Carson's statements were not merely "speculative" as Class Counsel's own expert Petty warned—they have been proven false by subsequent events and scientific evidence.

### a. Kent State University, et al. Study (Published February 2025)

A comprehensive study published in February 2025 by researchers from Kent State University, Louisiana State University, University of Pittsburgh, and North Carolina State University provides definitive scientific evidence that Dr. Carson's health assurances were false. The peer-reviewed study, published in "Environmental Science: Processes & Impacts," found that 48% of soil samples exceeded EPA cancer risk screening levels for dioxin contamination, and elevated levels of environmentally persistent free radicals (EPFRs) extended throughout the community at concentrations up to five times higher than background levels. (Exhibit 5, Environmental Science: Processes & Impacts.)

The study explicitly found that "EPFRs have been shown to produce cardiovascular and respiratory effects" and that "dioxins are known to be carcinogenic, while furans are classified as likely carcinogens"—contradicting Dr. Carson's assurance that there would be "no long-term health impact." Most significantly, the study concluded that "these results highlight the

environmental health impact of the derailment and associated combustion," requiring "comprehensive longitudinal monitoring and remediation efforts."

This represents the first peer-reviewed scientific study to demonstrate direct correlations between EPFRs and dioxin contamination in field-collected soil samples, with contamination levels comparable to known Superfund sites. Even remediated areas showed elevated contamination compared to background levels, indicating the inadequacy of cleanup efforts completed before the settlement.

### b. Dr. Beatrice Golumb, University of California San Diego Study (Published December 2024).

Additionally, Dr. Beatrice Golomb of UC San Diego School of Medicine, a leading researcher on Gulf War Illness and toxic exposures, published a peer-reviewed case study in December 2024 titled "Echoes of Gulf War Illness: A Case Study of Chronic Symptoms from Toxic Exposure in East Palestine, Ohio."[6] The study evaluated whether health problems following the East Palestine derailment matched the diagnostic criteria for Gulf War Illness (GWI)—a chronic multisymptom illness resulting from mixed toxic chemical exposure.

Dr. Golomb's broader research on East Palestine residents, presented on the second anniversary of the derailment (February 3, 2025), revealed that 77% of East Palestine study participants meet the diagnostic criteria for Gulf War Illness. Gulf War Illness is a recognized medical condition affecting approximately 250,000 veterans (about one-third of those deployed to the 1990-91 Gulf War). It is characterized by chronic, debilitating symptoms including fatigue, muscle pain, cognitive problems, respiratory issues, gastrointestinal distress, and skin problems.

---

[6] https://www.gavinpublishers.com/article/view/echoes-of-gulf-war-illness-a-case-study-of-chronic-symptoms-from-toxic-exposure-in-east-palestine-ohio-

As of October 2025, Gulf War Illness has received an official ICD-10 diagnostic code, formally recognizing it as a legitimate medical disorder.

Dr. Golomb's research demonstrates that the East Palestine toxic exposure has produced the same chronic multisymptom illness profile seen in Gulf War veterans—a population whose illness is well-documented, medically recognized, and officially acknowledged as resulting from toxic chemical exposures.

### c.   Dr. Erin Haynes, University of Kentucky Study Published February 2024

Dr. Erin Haynes of the University of Kentucky, in collaboration with the National Institutes of Health, conducted a pilot biomonitoring study in July 2023—five months following the February 3, 2023, train derailment in East Palestine, Ohio. The study enrolled 19 non-smoking participants living within approximately one mile of the derailment site to minimize confounding variables from tobacco exposure and maximize the likelihood of detecting derailment-related chemical exposure. The research team measured immune markers at the University of Kentucky laboratory and analyzed urine metabolites at Wayne State University, comparing results against a national CDC population sample of 1,000 individuals and a control group from Marietta, Ohio.[7]

The study revealed significant immune system abnormalities among East Palestine residents compared to a California comparison group. Participants demonstrated elevated levels of inflammatory cytokines, growth factors, and markers indicating chronic low-grade inflammation coupled with ongoing tissue repair. Dr. Haynes emphasized that such chronic inflammation can affect every organ and every body system and increases the risk for major diseases including heart disease, stroke, cancer, and autoimmune disorders. The presence of these markers five months

---

[7] https://www.youtube.com/watch?v=xkRtNMAoqKs

post-derailment suggests sustained physiological stress and potential long-term health implications. *Id.*

The study also revealed significant urine metabolite findings among East Palestine residents. The metabolite HEMA (2-hydroxyethyl mercapturic acid, also known as N-acetyl-S-(2-hydroxyethyl)-cysteine) can originate from exposure to vinyl chloride, ethylene oxide, or acrylonitrile. Detection rates showed a dramatic disparity: 74% of East Palestine residents (14 out of 19) tested positive for the metabolite HEMA, compared to only 5% of the national CDC population and 0% of Marietta residents. *Id.*

In an unplanned but revealing component of the research, four members of the research staff—including Dr. Haynes herself—underwent biomonitoring during their two-day visit to East Palestine. Two staff members resided locally (one in Rogers, Ohio, and one in Marietta), while two traveled from the Cincinnati/Kentucky area. On the first day of arrival, 50% of staff tested positive for HEMA; by the second day, 100% showed detectable levels. This finding strongly suggests ongoing environmental contamination in the East Palestine area as of July 2023, as individuals with no prior exposure developed detectable metabolite levels within 48 hours of arrival. *Id.*

The study documents objective biomarkers of exposure and effect that persisted five months after the derailment. The immune marker findings demonstrate measurable physiological changes associated with increased disease risk. The 74% detection rate of vinyl chloride-related metabolites in a small, highly exposed population—compared to 5% nationally and 0% in the nearby control community—establishes a clear exposure gradient linked to proximity to the derailment site.

Dr. Haynes findings demonstrate: (1) objective, peer-reviewed scientific evidence of persistent biological effects; (2) exposure biomarkers substantially elevated above national and regional baselines; (3) physiological changes associated with recognized disease pathways; and (4) temporal persistence of both exposure and biological effects extending months beyond the acute incident.

Dr. Carson assured class members there would be "no long-term health impacts." The actual scientific evidence shows Carson's statements were not true.

### 5. Scott Smith's Ongoing Testing Shows Continued Contamination Above Safety Levels

Scott Smith, an independent environmental testing expert, has conducted serial testing in East Palestine from February 2023 through August 2025, more than two and a half years after the derailment. His affidavit, executed under penalty of perjury, documents that contamination not only persists but, in many locations, has worsened over time. (Exhibit 6, Scott Smith Aff. Oct. 12, 2025.)

Smith has independently collected and reviewed testing samples from over 80 distinct sites in and around East Palestine, focusing on dioxins, furans, and semi-volatile organic compounds including polycyclic aromatic hydrocarbons (PAHs). Smith's most recent testing in August 2025, conducted after final settlement approval, reveals contamination at levels that can only be described as catastrophic. Smith states:

> 5. Recent soil samples collected in August 2025 continue to show dioxins, furans and PAHs that far exceed background (control) samples. For example, one sample in the impact zone resulted in **3,973** total semi-volatile organic compounds as compared to the control sample with 136 total semi-volatile organic compounds. The sample from the impact zone is 29.21 times (2,821%) higher than the control sample. Another sample in the impact zone resulted in **6,698** total semi-volatile organic compounds, which is 49.25 times (4,825%) higher than the control sample.

17

6. Recent sediment and creek bank testing in Sulphur Run at Taggart Street in August 2025 resulted in 294 ppt (parts per trillion), **4,895 ppt** total semi-volatile organic compounds on the right creek bank and **6,444 ppt** total semi-volatile organic compounds on the left bank. This clearly illustrates how the creek banks remain significantly more contaminated than the sediment by a factor of at least 15X.

7. In numerous instances, tested soils and creek bank samples show persistent or increased contamination over time, particularly in locations subject to visible remediation and/or heavy rainfall/flooding. For example, I have tested the same locations over time that appear to show increasing contamination from what I refer to as the third event, the remediation of the most contaminated soil and other impacted areas after April 18, 2023 – when to the best of my knowledge the EPA and/or other Norfolk Southern dioxin testing ended.

8. Multiple samples over time show TEQs (toxic equivalency – the number used to express the combined toxicity of multiple related chemicals as a single number) far in excess of standardized thresholds.

9. For example, samples taken in June 2024 resulted in the following Dioxin TEQs, all of which are well over the background (control) sample of 1.7 parts per trillion (ppt) and the Norfolk Southern contractor, Arcadis Characterization Work Plan for Derailment-Area Soil which set forth a dioxin RSL (regional screening level) of 4.8 ppt:

| | |
|---|---|
| ZG Soil: | 23 ppt |
| TF Soil: | 26 ppt |
| SW Soil: | 27 ppt |
| BD Soil: | 27.6 ppt |
| RTO Soil: | 30 ppt |
| KH Soil: | 34 ppt |
| SG Soil: | 49 ppt |
| Enchanted Salon Soil: | 59 ppt |
| Brushville Supply Soil (1): | 460 ppt |
| Brushville Supply Soil (2): | 1,900 ppt |

10. Similarly, samples taken in June 2024 resulted in the following PAH and Dioxin TEQs, all of which are also well over the background (control) sample of 30.6 ppt and 1.7 ppt:

| Soil Testing | PAH TEQ (ppb) | Dioxin TEQ (ppt) |
|---|---|---|
| EM Control | 30.8 | 1.7 |
| JS | 119.7 | 5.3 |
| RT | 129.7 | 30 |
| VL | 143.6 | 5.6 |
| BD | 155.7 | 27.6 |
| RK | 291.5 | 9.1 |
| SW | 346.4 | 27.0 |
| LM | 348.6 | 10.0 |
| ZG | 398.7 | 23.0 |
| SG | 420.5 | 8.8 |
| NV | 428.6 | 7.1 |
| AG | 493.1 | 6.8 |
| SMc | 496.3 | 9.4 |
| KF | 506.5 | 10.0 |

(Id., ¶¶5-10.)

Dr. Carson assured class members: "we pretty well know what exposures resulted from this train derailment and we can pretty well predict that people will be safe in the long term." Smith's findings prove this statement was false.

The significance of Smith's August 2025 findings cannot be overstated. This is not historical contamination that has dissipated. This is active, ongoing exposure to cancer-causing dioxins and toxic organic compounds at levels up to 400 times safety standards, occurring right now, in locations where Movants and their families live.

When Movants signed personal injury releases in August 2024 based on Carson's assurances of safety, contamination levels in their community were 29-49 times higher than background for organic compounds, up to 400 times higher than safety levels for dioxins, were increasing rather than decreasing at many locations, and were persisting in creek banks where children play.

Movants released personal injury claims for future cancers, chronic illnesses, and other health conditions for very little money and they did so based on Carson's assurance that they would be

"safe in the long term." Personal injury releases procured under these circumstances where Class Counsel assured safety while their own expert Stephen Petty warned of dangers, and where ongoing testing shows contamination at catastrophic levels, must be voided for Movants.

### 6.  Movants Are Now Developing Serious Illnesses Including Cancer

The most devastating proof that Dr. Carson's assurances were false is that Movants are now sick. Several Movants have developed serious illnesses since signing the personal injury releases, including chronic, long-term health impacts, including cancer. Dr. Carson's representation that "we can pretty well predict that people will be safe in the long term" has been proven false. People are not safe. They are sick. Some have cancer and some have died.

Movants released personal injury claims worth potentially millions of dollars (cancer treatment costs, lost wages, pain and suffering, etc.) for payments of $25,000 or less based on assurances that they would not suffer long-term health effects. Those assurances were false, and the resulting harm is catastrophic.

### 7.  Class Counsel's Own Expert Stephen Petty Warned That Dr. Carson's Assurances Were Wrong

Class Counsel cannot claim they were unaware of the risks. Their own retained environmental and exposure expert, Stephen Petty, explicitly warned that Dr. Carson's health assurances were problematic.

Petty stated in his affidavit: "I also was motivated to speak out at this time because toxicologist Dr. Arch Chip Carson, who was hired by plaintiffs' attorneys, told class members in a video shown at a town hall on August 1, 2024 that they can expect no long term health impacts due to the derailment, subsequent fires, and release of multiple chemicals in East Palestine. . . My opinion, based on my long-time knowledge as an exposure expert on hundreds of cases, and a

review of publicly available data and the lack of supporting analyses he provided, is that his opinions were in general, at best speculation, and at worst simply incorrect." (ECF 0551-1 ¶ 9.)

Petty elaborated: "As far as the comments on personal injury by Dr. Carson are concerned, his assurances are, in my opinion, premature and unsupported by any cited cumulative exposure analyses. Dr. Carson also made the statement that 'we pretty well know what exposures resulted from this train derailment'... to my knowledge, nobody has completed a cumulative exposure assessment for individuals to the cocktail mix of chemicals to which they were potentially exposed." (ECF 0551-1 ¶ 12.)

Class Counsel hired a PR firm to create, edit, and distribute Carson's reassuring video. Class Counsel silenced their own expert Petty through confidentiality restrictions. This demonstrates their deliberate choice to amplify false assurances and suppress contrary expert opinions.

### E. PAYMENT ACCEPTANCE DOES NOT VALIDATE FRAUDULENTLY INDUCED RELEASES

Class Counsel emphasizes that 13 Movants have received payment and even attaches images of the checks to ensure the public knows the amount each person received. (ECF 1003, p 2, Ex. B.) This is irrelevant, harassment, and done for the sole purpose of embarrassing class members.

A release obtained by fraud in factum is void ab initio. *Pierre Invs., Inc. v. Anspach Meeks Ellenberger, LLP*, 2024 U.S. App. LEXIS 10561 (6th Cir.), citing *Picklesimer v. Baltimore & Ohio R.R. Co.* (1949), 151 Ohio St. 1, 5, 84 N.E.2d 214 ("When the fraud alleged would render the release void, the releasor is not required to give back the consideration that he received for the release in order to avoid the bar and pursue a cause of action purportedly encompassed by the release."). A

release procured through fraud remains voidable even after consideration is paid.  *Id.*, citing *Lewis v. Mathes*, 2005-Ohio-1975, ¶15-16 (5th Dist. ("Where a release is obtained through fraud in the inducement, it is merely voidable.").

Moreover, the payments Movants received, between $1,800 and $25,000, are grossly inadequate for the serious health conditions they are now experiencing. Cancer treatment alone can cost hundreds of thousands of dollars. Chronic illnesses are permanently disabling. Movants accepted nominal payments based on assurances they would not get sick. They are now sick. The releases must be voided.

F. **THE FRAUD IS COMPLETE: FALSE STATEMENTS, RELIANCE, AND RESULTING HARM**

The elements of fraud are satisfied. Class Counsel, through Dr. Carson, made false representations. Dr. Carson assured Class Members that there would be "no long-term health impact" and people would be "safe in the long term." Class Counsel knew of the falsity. Class Counsel's own expert Petty warned that the EPA data was invalid and that Dr. Carson's statements were speculative and incorrect. Class Counsel knew no cumulative exposure assessment had been completed, yet Class Counsel presented the assuring statements from Dr. Carson with reckless disregard for their truth.

Additionally, Class Counsel intended to induce reliance by hiring a PR firm to professionally produce and strategically release Dr. Carson's video at the August 1 town hall. This was not inadvertent or negligent—it was a coordinated campaign to induce personal injury releases. Class Members opted in specifically based on Dr. Carson's statements. Reliance on fiduciary class counsel's health expert was reasonable.

22

Moreover, Movants signed releases for inadequate consideration and are now suffering serious illnesses including cancer and other chronic illnesses linked to exposure to the chemicals released in the derailment and vent and burn. They released claims worth potentially millions for payments under $25,000.

The fraud is not speculative or theoretical. It is complete, proven, and causing ongoing harm.

### G. CLASS COUNSEL'S FIDUCIARY BREACH COMBINED WITH ACTUAL RESULTING HARM ESTABLISHES EXTRAORDINARY CIRCUMSTANCES

Respondents argue that Rule 60(b)(6) requires "extraordinary circumstances" and cite *BLOM Bank SAL v. Honickman, 605 U.S. 204 (2025)*, for the proposition that this standard is strict. The circumstances here easily qualify.

First, Class Counsel owed fiduciary duties to Movants and systematically breached those duties by concealing their own expert's warnings while presenting false health assurances. Second, Class Counsel used contractual confidentiality provisions to prevent their own expert from warning class members of the falsity. Third, Movants were vulnerable individuals affected by a catastrophic environmental disaster, relying on their fiduciary counsel for guidance. Fourth, the personal injury payments of $25,000 or less were grossly inadequate for the releases of claims now including cancer and chronic debilitating illness. Fifth, there is actual resulting harm. This is not a case where harm is speculative. Movants are sick, some with chronic illnesses and some with cancer. The harm is real, ongoing, and severe. Sixth, this was not isolated misconduct but a systematic pattern involving expert retention, concealment, presentation of false assurances, and inducement of thousands of releases.

23

The combination of fiduciary fraud and catastrophic resulting harm represents precisely the type of "extraordinary circumstances" warranting relief under Rule 60(b)(6). If class counsel can fraudulently induce releases from sick and dying class members with impunity, the class action mechanism is fundamentally broken.

## H.  FRAUD ON THE COURT UNDER RULE 60(d)(3) IS ESTABLISHED

As explained in section A above, Class Counsel made material misrepresentations to this Court that undermined its ability to fairly evaluate the settlement. Class Counsel represented to the Court that the settlement was fair, class members were adequately informed, and expert consultation supported the settlement structure including the personal injury payment option. Class Counsel failed to disclose to the Court that, Class Counsel's own expert believed that the information being presented to the Court and Class Members was flawed.

Class Counsel never disclosed to this Court that Dr. Carson's presentation was a professionally produced PR video, created by a firm Class Counsel hired, edited to Class Counsel's specifications, and released with Class Counsel's approval. The Court may have understood Carson to be an independent expert providing candid medical opinions. He was not—he was part of a coordinated PR campaign.

The Court's evaluation of settlement fairness was compromised by Class Counsel's failure to disclose that their own expert contradicted the health assurances being provided to class members. This constitutes fraud on the court.

## I.  THIS COURT RETAINS JURISDICTION TO ADDRESS MOVANTS' MOTION

Both Norfolk Southern and Class Counsel assert the Court lacks jurisdiction because an appeal is pending. While a district court generally cannot grant relief from a judgment during a pending appeal without appellate authorization, the court retains jurisdiction to consider a Rule 60(b) motion on the merits or to indicate whether it would grant relief if jurisdiction were obtained. A district court may examine the merits of a Rule 60(b) motion and if the court intends to grant the motion, it must enter an order so indicating; the party seeking relief can then move the court of appeals to remand the action. *See First Nat'l Bank v. Hirsch*, 535 F.2d 343, 346 (6th Cir. 1976) (per curiam).

If the Court finds merit in Movants' claims—particularly given the new evidence of actual resulting harm—the proper procedure is to explain that the motion would be granted subject to obtaining authorization from the Sixth Circuit. This would allow Movants to seek remand or address the jurisdictional issue with the appellate court.

### J.   THE MOTION IS TIMELY

Movants' motions are timely. The motions were filed within the one-year period prescribed by Rule 60(c)(1) for Rule 60(b)(3) motions. Moreover, additional information has arisen since the fairness hearing and approval of the settlement that makes Movants' motions timely as established by the following timeline:

**DECEMBER 2024 DR. GOLUMB'S STUDY RESULTS RELEASED,** showing 77% of participants met Gulf War Illness Criteria.

**FEBRUARY 2025 KENT STATE STUDY RESULT RELEASED**, finding that 48% of soil samples exceeded EPA cancer risk screening levels for dioxin contamination, and elevated

levels of environmentally persistent free radicals (EPFRs) extended throughout the community at concentrations up to five times higher than background levels.

**MAY 2025 FEMA AND EPA EMAILS RELEASED:** In May 2025, Movants learned for the first time that FEMA and EPA emails obtained through a Freedom of Information Act (FOIA) request showed that government officials knew about potential cancer-clusters and other serious health issues that would result from the vent and burn as early as March 2024, a direct contradiction to Dr. Carson's health assurances. (Exhibit 7, FEMA email.) In the obtained internal FEMA communications, James McPherson, appointed by President Biden to assess unmet needs in East Palestine, explicitly refers to a "really toxic plume." McPherson's emails also reference the potential occurrence of a "cancer cluster" in East Palestine. Clearly high-level government officials were fully aware of the toxic nature of the chemical release and as well as both the immediate health risks and long long-term carcinogenic effects on the community. *Id.*

**JUNE 2025 AUSTIN DRUCKENBROD DISCOVERED:** Counsel for Movants learned for the first time that while Class Counsel told Class Members through Schuhmann and Dr. Carson that there was no contamination and there would be no long-term health effects as a result of the derailment, class counsel knew some class members were very sick and that their doctors had determined that their illnesses were caused by exposure to contaminants released by the train derailment. (See Exhibit 2, Extraordinary Injury Claim Statement for Austin Druckenbrod.)

**JUNE 2025 EMAIL FROM REBUTTAL OBTAINED:** Counsel for Movants learned for the first time that Dr. Carson was not an "independent third party," he was hired by a PR firm hired by Class Counsel to produce the video of Carson to show at the August 1, 2024 town hall.

(Exhibit 3, Email from Stephanie Wolf, Rebuttal PR, to Elizabeth Graham, Class Counsel, July 26, 2024.)

**JULY 2025 EPA LETTER CHANGING SAMPLING PLAN RELEASED:** The March 6, 2023 letter from the EPA approving two material changes to the soil sampling plan – removing five chemical compounds from the testing list and changing the baseline sample locations and directing baseline samples be taken farther west in areas potentially impacted by the toxic plume, which compromised the entire sampling plan- was first released to the public and Movants in July 2025. (Exhibit 4, EPA letter.)

**AUGUST 2025 TESTING RESULTS RECEIVED:** Scott Smith's additional testing showed ongoing and increasing exposure to cancer-causing dioxins and toxic organic compounds at levels up to 400 times safety standards. (Exhibit 6, Scott Smith Aff. Oct. 12, 2025.)

**ONGOING:** Residents from East Palestine and the surrounding area are being diagnosed with chronic illnesses, including cancer, and some have already died.

## III.    CONCLUSION

For the reasons set forth, Movants respectfully request that this Court grant relief from the final settlement approval under Rule 60(b)(3), based on Class Counsel's material misrepresentations and concealment of critical facts, including their own retained expert's contrary opinions, the professional production and strategic dissemination of Carson's false assurances, and their reliance on EPA data to validate their risk assessments. The evidence that Class Counsel intentionally silenced their own expert, Stephen Petty, who revealed catastrophic contamination levels and health risks, confirms a pattern of deliberate concealment designed to induce class members into accepting grossly inadequate compensation. Moreover, new scientific,

27

environmental, and medical evidence——the peer-reviewed Kent State study confirming elevated cancer risks, the ongoing and increasing contamination documented by Scott Smith's recent August 2025 testing, and the peer-reviewed Golomb study establishing 77% of East Palestine residents meet criteria for Gulf War Illness—proves that the health impacts are real, severe, and ongoing. These facts negate any claim of no risk and show that the settlement and releases were obtained through fraud, misrepresentation, and concealment of material facts. Finally, the record demonstrates that Class Counsel's actions were not inadvertent mistakes but coordinated efforts to mislead both this Court and the class, including misstatements during the fairness hearing. This Court's integrity and the fairness of the settlement demand that relief be granted, allowing for a full and honest consideration of the true risks, harms, and legal consequences.

## IV. RELIEF REQUESTED

WHEREFORE, Movants respectfully requests that this Court:

A. Indicate that it would grant relief if the jurisdictional issue is resolved, allowing Movants to seek appropriate relief from the Sixth Circuit;

B. Issue an immediate order prohibiting enforcement of Personal Injury releases signed by Movants pending resolution of these allegations, given the ongoing harm to Movants' health;

C. Order disclosure of all materials related to the fraud including:

1. All communications between Class Counsel and Stephen Petty

2. All testing data and reports generated by Petty

3. All expert reports and opinions from experts retained by Class Counsel

4. All documents relating to confidentiality restrictions imposed on experts

5.  All communications regarding Dr. Carson's presentation and statements

6.  All documents relating to cumulative exposure assessments (or lack thereof)

D.  Order depositions of all witnesses related to the fraud including, but not limited to, Dr. Arch Carson

E.  Set an evidentiary hearing on the fraud allegations

F.  Grant any other relief that the Court deems just and proper, including potential sanctions against Class Counsel for misrepresentations to the Court.

Respectfully submitted,

*/s/ Jedidiah I. Bressman*
Jedidiah I. Bressman (0096637)
**Law Office of David A. Bressman**
2727 Tuller Parkway, Suite 100
Dublin, OH 43017
(614)538-1116
Fax: (614)761-8399
Jedidiah@Bressmanlaw.com
David@Bressmanlaw.com
Tre@Bressmanlaw.com
Attorneys for Plaintiffs

**Certificate of Service**

This is to certify that the foregoing was served upon all counsels by through the efiling system on October 24, 2025.

/s/ Jedidiah I. Bressman
Jedidiah I. Bressman (0096637)
David A. Bressman (0047128)