# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | Case No. 4:23-CV-00242 |
| | JUDGE BENITA Y. PEARSON |

**KROLL SETTLEMENT ADMINISTRATION LLC'S
OPPOSITION TO CLASS COUNSEL'S
STEP ONE MOTION FOR ORDER TO SHOW CAUSE**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

    A.    The Court's orders required KSA to distribute settlement funds using class counsel's formulas. ..................................................................................3

    B.    The Court's orders required KSA to calculate a fixed amount for each personal injury payment, unlike the pro rata amounts for relative shares of direct payments. .....................................................................................4

        1.    Direct payments .........................................................................4

        2.    Personal injury payments ............................................................5

    C.    Class counsel developed the allocation plan and, to encourage more claims, promised class members even higher personal injury payments. ...........................6

    D.    Class counsel set a "preliminary" allocation for all personal injury payments. ......9

    E.    Class counsel's allocation plan required KSA to calculate fixed personal injury payments—not a pro rata division of relative shares. ...................................9

    F.    When class counsel directed KSA to begin making personal injury payments, they knew that KSA was still evaluating claims on a rolling basis. .....................12

    G.    Class counsel approved of KSA calculating personal injury payments using the $25,000 base payment formula from the plan of distribution. .........................14

    H.    KSA discovered and told class counsel that personal injury payments might exceed their "preliminary" allocation for those payments....................................15

    I.    KSA learned that it was terminated, with contempt proceedings to begin. ...........15

ARGUMENT ........................................................................................................17

    I.    Class counsel must prove with clear and convincing evidence that KSA fully understood the meaning of a definite and specific court order but ignored it. ......17

    II.    KSA followed the Court's orders. ........................................................18

        A.    The orders required KSA to calculate each payment by starting with $25,000 and adjusting it based only on factors specific to each claim. ......18

        B.    A pro rata or proportional approach would have violated the Court's orders............................................................................................20

        C.    Class counsel cite no cases supporting contempt here..............................23

    III.    Inadvertent calculation errors—which KSA discovered, disclosed, and offered to repay—do not show that KSA chose to ignore a court order. .........................24

    IV.    Class counsel cannot prove contempt for any other issues...................................27

        A.    KSA's experience was neither the subject of an order nor misrepresented. .........................................................................27

        B.    KSA fully cooperated when transferring records to Epiq, without violating any unequivocal command from the Court. ..............................27

i

V.     The motion's requests for relief are improper. ..........................................28

     A.     Class counsel cannot obtain disgorgement of all amounts KSA received. ................................................................................28

     B.     Class counsel cannot force KSA to discuss this case or others every time a litigant considers hiring KSA for class administration work.........30

CONCLUSION..................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cal. Artificial Stone Paving v. Molitor,*
   113 U.S. 609 (1885)..................................................................................18

*In re Columbia Gas Cases,*
   No. 1877CV01343G (Mass. Super. Ct.).....................................................23

*Cordoza v. Pac. States Steel Corp.,*
   320 F.3d 989 (9th Cir. 2003)....................................................................29

*Davis v. Detroit Downtown Dev. Auth.,*
   2020 WL 3097262 (E.D. Mich.)................................................................22

*De Simone v. VSL Pharms.,*
   36 F.4th 518 (4th Cir. 2022).....................................................................26

*Elec. Workers Pension Tr. Fund v. Gary's Elec. Serv. Co.,*
   340 F.3d 373 (6th Cir. 2003) ........................................................18, 23, 30

*Gascho v. Glob. Fitness Holdings,*
   875 F.3d 795 (6th Cir. 2017) ...........................................................17, 18, 25, 27

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
   512 U.S. 821 (1994)..................................................................................30

*Liu v. SEC,*
   591 U.S. 71 (2020)....................................................................................28

*McCormick v. Adtalem Glob. Educ.,*
   2018-CH-04872 (Ill. Cir. Ct.)...................................................................23

*Osborn v. Griffin,*
   865 F.3d 417 (6th Cir. 2017).....................................................................28

*PlayNation Play Sys. v. Velex,*
   939 F.3d 1205 (11th Cir. 2019)..................................................................26

*Taggart v. Lorenzen,*
   587 U.S. 554 (2019)..................................................................................18

## INTRODUCTION

Class counsel accuses Kroll Settlement Administration (KSA) of failing to use a pro rata proportional system to split up personal injury payments among class members. They contend that their Court-approved settlement agreement and plan to distribute the settlement funds required KSA to use that system to divide the amount they set aside for personal injury claims.

So far, the Court has heard only class counsel's side of the story. But their contention contradicts the actual requirements of the agreement and plan as well as what they told this Court to win approval of both. Most importantly, their contention contradicts what they told class members to persuade them to opt in and release their personal injury claims.

At every turn—in the agreement and the plan's plain language, in written and verbal statements to this Court, and at a videotaped meeting with class members—class counsel promised that a formula starting with a $25,000 base case would determine personal injury payments. They never hinted that any sort of proportional or pro rata comparison of class members would play any role in reducing that base amount. They might wish now that they had put that system into place, but they did not, and they cannot blame KSA.

On that record, class counsel asks this Court to hold KSA in contempt. Their motion gets just one thing right: "To justify holding a litigant in civil contempt, the moving party must demonstrate by clear and convincing evidence that the non-moving party violated a definite and specific order of the court." (Mot., Dkt. 1005-1, at 21-22.) But their motion will disappoint any reader who expected it to begin by quoting the agreement and plan provisions that KSA supposedly violated. Incredibly, the motion never quotes *any* provision. That is because the agreement and plan *require* an independent calculation for each class member's separate personal injury payment; they *forbid* the use of a pro rata proportional allocation system.

After the Court preliminarily approved the settlement and the claims period opened, so few class members made personal injury claims that class counsel worried the defendant would

withdraw from the settlement, nullifying class counsel's $162 million fee. To encourage more claims, and for the benefit of class members, class counsel boosted each payment from a base of $10,000 to a new base of $25,000. Then they held a videotaped town hall at which they told class members "those payments are now … going to be $25,000 per person." There was no mention of a pro rata or proportional adjustment.

The plan's text confirms this. It states that personal injury claimants have a "base" of 100 points and are "entitled to $25,000 per person," with "payments increasing or decreasing from the 'base case' depending on the factors presented in *their* claim forms," such as distance from the derailment, which increase or decrease the number of points. *Every* personal injury illustration in the plan showed an independent calculation for each person's payment. No illustration mentioned any other class member's claim, as a pro rata adjustment would require. Nor did any illustration refer to any kind of pro rata, proportional, or relative share of a fund.

The plan set a "preliminary" allotment for personal injury payments of $120 million. In case that amount might not cover all claims, the plan also included "two additional safeguards for just compensation." The plan allowed undistributed funds from one type of claim to be poured over for other types of claims, and it held back $10 million "to reinforce any program that may need to be recapitalized for any reason." It added that the "final" total allotment for personal injury claims would depend on the number and specifics of the claims received.

Class counsel now complain there are too many personal injury claims, but their motion does not mention the safeguards that address this situation. Nor does their motion explain how, if personal injury payments were supposed to divide proportionally the entire amount allocated for them, there could ever be undistributed funds to pour over for other types of claims.

Given the clarity of their agreement, plan, and statements to this Court and class members, class counsel's claim to have been "shocked" and "stunned" upon learning that KSA

2

started each calculation at $25,000 and adjusted it with points using the plan's factors (Mot. at 11-12) is the real shock and stunner. Class counsel *directed* KSA to calculate payments that way and *directed* KSA to evaluate and pay claims on a rolling basis to start the payments as quickly as possible—without first evaluating all claims together to divide a total allocation into proportional shares. KSA had to process tens of thousands of claims, assist class members in remedying claim deficiencies, and allow time for challenges to payments. Doing all those things simultaneously at the start would have been impossible.

Neither class counsel nor KSA's replacement, Epiq, provides any reason for a contempt finding here. Neither identifies any problem with KSA's work other than some inadvertent calculation errors (unrelated to pro rata proportional payments) that KSA flagged for class counsel back in May and has offered to reimburse in full.

Both sides initially worked toward resolving the issues, but then class counsel abruptly decided to delay payments to class members by firing and litigating against KSA. Their litigation position has no support in the Court's orders or in contemporaneous evidence. In fact, discovery has now shown that class counsel strong-armed Epiq into parroting their position about a pro rata proportional allocation system in affidavits submitted to the Court.

With a full record, which the Court did not have previously in what class counsel presented, KSA now respectfully asks this Court to deny class counsel's motion, deny any finding of contempt, and order an end to this contempt proceeding.

## BACKGROUND

A.   **The Court's orders required KSA to distribute settlement funds using class counsel's formulas.**

In April 2024, class counsel announced a $600 million settlement. They sent KSA near-final drafts of the settlement agreement, but KSA did not participate in negotiating the settlement or the agreement.

The May 21, 2024, order that preliminarily approved the settlement also "preliminarily approves the Settlement Agreement and the terms embodied therein." (Preliminary Approval Order, Dkt. 458, § 2.) The agreement states that the $600 million settlement "shall be allocated pursuant to the terms in Section XIII." (Settlement Agreement, Dkt. 452-2, § II(SS).) Section XIII, in turn, states that after deducting items such as class counsel's fee—which totaled $162 million—the funds for class members "***shall be distributed … pursuant to allocation formulas and amounts to be determined by Class Counsel***." (*Id*. § XIII(C) (emphasis added).)

The agreement gave Norfolk Southern the right to "review and consent" to class counsel's formulas and amounts. (*Id*.) But it gave KSA, as administrator, no such right. Instead, it required KSA to apply class counsel's formulas. Under the agreement, KSA's duties were purely administrative. They included disseminating class notice, maintaining the settlement website, processing claim forms, and distributing awards. (*Id*. §§ II(D), V(A); *see also* Preliminary Approval Order §§ 8, 10.)

**B.    The Court's orders required KSA to calculate a fixed amount for each personal injury payment, unlike the pro rata amounts for relative shares of direct payments.**

The agreement authorized three types of payments: "direct" payments to households, payments for business losses, and payments for personal injury claims. (Settlement Agreement § XIII(C).) The agreement included different allocation terms for each type of payment.

### 1.    Direct payments

For direct payments, the agreement stated that each household with an approved claim would receive "a *portion* of the remaining Settlement Fund *after* payment of all approved Business Loss Payments, Personal Injury Payments, the Fee Award," and so on. (*Id*. § XIII(C)(1)(a) (emphases added).) Higher payments in other categories, such as personal injury, would reduce the amount available for direct payments. Thus, the amount available for direct

payments could be known only after the amounts of all other payments were known. There would be no direct payments until after all appeals of the settlement. (*Id*. § III(A).)

To divide the residual allocated for direct payments, a "point grading system" would use factors, such as length of displacement, to compare households and find each household's "***pro rata amount***." (*Id*. § XIII(C)(1)(b) (emphasis added).) The long-form notice to class members (an exhibit to the agreement) accordingly explained that "[i]f, after everyone sends in Claim Forms, the compensation claims [and expenses] total more than $600 million, … the [direct] payments will be reduced … on a ***pro rata basis***." (*Id*. Ex. D at 3 (emphasis added).) And class counsel's motion for preliminary approval explained that each direct payment would be in a "***pro rata amount***." (Mot. for Preliminary Approval, Dkt. 452-1, at 21 (emphasis added).) "After the claims deadline, the Settlement Administrator will calculate the ***relative shares*** of damages for these Class Members and distribute awards ***pro rata***." (*Id*. at 22 (emphases added).)

### 2.  Personal injury payments

The agreement did *not* apply those terms to personal injury claims. First, it required KSA to calculate and make personal injury payments *before* all other payments—even before appeals of the settlement. (Settlement Agreement § III(B).) Norfolk Southern funded the personal injury payments within 14 days of this Court finally approving the settlement. (*Id*. § XII(F).)

Second, the agreement required KSA to calculate personal injury payments without regard to the amount of other types of payments. Personal injury payments came first. Then any "unallocated monies for Personal Injury Payments w[ould] be reallocated to the Direct Payment distribution." (*Id*. § XIII(C)(3)(i).)

Third, the agreement *did not authorize* KSA to change any personal injury payment based on any other class member's payment or situation, or based on the total personal injury claims. The amount of each personal injury payment would be "determined pursuant to an allocation

5

formula," and KSA was required to follow it. (*Id.* §§ XIII(C)(3)(g), (D)(1)(a).) Unlike the terms governing direct payments, the agreement and the order preliminarily approving it *did not allow* KSA to compare claimants to divide a fixed amount of settlement money pro rata or proportionally to determine each claimant's share.

Accordingly, neither class counsel's motion for preliminary approval nor the long-form notice to class members ever said that personal injury payments would be based on a pro rata division, a proportional division, or relative shares of some fixed amount. (*Id.* Ex. D at 4.[1]) Instead, the notice explained that "the Settlement Administrator w[ould] use objective, Court-approved criteria like the nature of any physical injury and resulting medical treatment, if any, to allocate funds to each Eligible Personal Injury Settlement Class Member." (*Id.*)

## C.    Class counsel developed the allocation plan and, to encourage more claims, promised class members even higher personal injury payments.

After this Court preliminarily approved the settlement and agreement, class counsel began developing their plan to allocate the settlement funds. A key consideration was the parties' desire to boost the number of claims—especially personal injury claims. Norfolk Southern wanted more releases of personal injury claims to insulate itself from more lawsuits, with the agreement providing that only class members who made personal injury claims would release those claims. (*Id.* § II(MM)(2); *id.* Ex. E at 1.) Norfolk Southern was so concerned about a low claims rate that the parties agreed it had the "unilateral right" to terminate the settlement if the claims rate was too low, as specified in a side agreement with class counsel. (*Id.* § XI(C).) That side agreement is nonpublic. (*Id.*)

---

[1] The agreement mentioned pro rata payments just once in connection with personal injury claims. It stated that if any class members failed to redeem their personal injury checks, the unredeemed amount "shall be paid to Settlement Class Members who cashed their checks in a pro-rata distribution if economically feasible." (Settlement Agreement § XIII(D)(6).) That provision has nothing to do with the dispute here.

Terminating the settlement would deprive class counsel of $162 million, so they too were highly motivated to boost the claims rate. They even agreed to "encourage" eligible class members "to seek and obtain Personal Injury Payments by submitting Claim Forms for Personal Injury Payments and [by submitting] Personal Injury Releases." (*Id*. § XIII(C)(3)(e).)

In the long-form notice approved by this Court, class counsel stated that the potential personal injury payment for claimants who lived 0–2 miles from the derailment was approximately $10,000; for those 2–5 miles away, approximately $5,000; and for those 5–10 miles away, approximately $1,000. (*Id*. Ex. D at 4; Preliminary Approval Order § 10.) But those base payments did not produce enough claims.

Class members began making claims at the end of May 2024. On July 22, with one month left in the claims period, class counsel wrote, "The low take rate on PI [personal injury] is putting the settlement in jeopardy." (Ex. 2, Angela Ferrante Decl., ¶ 36, Ex. 2-B, B. Graham email, at 1.) Within days, class counsel dramatically increased the base amount of personal injury payments, to $25,000. (Ferrante Decl. ¶ 37.)

KSA Chief Operating Officer Angela Ferrante was at the in-person settlement intake center at that time. (*Id*. ¶¶ 36-38.) Around July 24, she told class counsel that the increase could be a bad idea, given that no one knew how many claims would be filed. (*Id*. ¶¶ 38-39.) But class counsel told her that the parties had thoroughly evaluated this revised approach and "checked [it] backwards and forwards," so KSA should plan on base payments of $25,000. (*Id*. ¶ 40.)

Next, class counsel made sure class members knew about the increase. They circulated flyers titled "Message from Court-Appointed Counsel." (*Id.*, Ex. 2-C, Flyer.) The flyers said that "a greater per person Personal Injury Payment will be available." (*Id*.)

Then, on August 1, with three weeks left in the claims period, class counsel held a town hall to encourage class members to make claims. A partner from a class counsel firm explained

that $10,000 had been "intentionally conservative," and class counsel was "able to revisit those payments" and "announce that ***those payments are now ... going to be $25,000 per person***." (*Entire Class Action Attorney Town Hall 8-1-24*, at 41:20-42:03, YOUTUBE (Aug. 1, 2024), youtube.com/watch?v=OoiAgylTLpM (emphasis added).) "We're now at the point where, again, ***we're able to revise those personal injury payments up to the tune of $25,000 per person*** in East Palestine." (*Id.* at 44:37-45:51 (emphasis added).)

No one at the town hall told class members that rather than receive a base of $25,000 per person, claimants would receive only a pro rata or relative share of some limited fund that class counsel set aside. In fact, the partner continued, "***As more people participate*** and we get firmer data about those numbers, ***these payment values could potentially rise as well***." (*Id.* at 42:11-42:19 (emphases added).) If claimants were indeed going to receive a pro rata or proportional share of a limited fund, *more* claimants could never *raise* the payments.

All this had the desired effect: The claims rate suddenly spiked higher. Up to July 24 (one week before the town hall), class members made around ***2,500*** personal injury claims. (Ferrante Decl. ¶ 36.) Then, during the two and a half weeks from August 5 (a few days after the town hall) to the end of the claims period on August 22, the number of known personal injury claims spiked well over 300 percent. (*Id.* ¶ 47.) Timely claims continued to be processed after August 22 and ultimately reached over 30,000. Class members filed claims because class counsel promised $25,000 base payments.

The overall rate for all claims was roughly three times higher than in a typical class action case. (S. Fenwick Final Approval Decl., Dkt. 518-7, ¶ 17.) At the fairness hearing, this Court stated that it was "pleased that the class members' reception of the agreement has been overwhelming." (Fairness Hr'g Tr., Dkt. 553, at 115:8-9.)

**D.    Class counsel set a "preliminary" allocation for all personal injury payments.**

After the claims period ended, class counsel finished their allocation plan. They sent it to KSA on August 28. (Ex. 1, Scott Fenwick Decl., ¶ 19; *see also id.* Ex. 1-F.) On August 29, one week after the claims period ended, KSA submitted to class counsel and Norfolk Southern the claims report that the settlement agreement required. (Mot. Ex. G, Dkt. 1012-7.) The report explains the number of claims that KSA received and states that "the final value assigned" to all personal injury claims "is currently estimated not to exceed $130 million." (*Id*. ¶ 2 (20 of 25).)

Class counsel's contempt motion uses that report to falsely accuse ***KSA*** of valuing the personal injury claims at $130 million. (Mot. at 7.) But that figure came from class counsel and Norfolk Southern—not KSA. Fenwick Decl. ¶ 28; Ex. 1-H.

KSA told class counsel that the report would include "only … the count of direct claims and PI [personal injury] claims in our possession." (Ferrante Decl. ¶ 51; Fenwick Decl. Ex. 1-I at 2.) It would *not* include claims that arrived later, and "[w]e hope it is evident that we cannot have every claim reviewed and deficiencies identified and cured by this date." (*Id*.) Thus, class counsel knew that KSA's report could not provide the total number of personal injury claims or the size of all personal injury claims combined.

The same day the report was due, class counsel told KSA that "***the PI*** [***personal injury***] ***allocation should be $130mm*** following discussion with NS [Norfolk Southern] this morning." (Fenwick Decl. ¶ 28; *see also id.* Ex. 1-H at 1 (emphasis added).) The parties decided on $130 million. KSA had nothing to do with it.

**E.    Class counsel's allocation plan required KSA to calculate fixed personal injury payments—not a pro rata division of relative shares.**

Another week later, class counsel moved this Court to approve their "Plan of Distribution." (Mot. for Final Approval, Dkt. 519-1.) Their motion states that KSA will "verify

the Class Member's eligibility for the [personal injury payment] and calculate their award using the formula established by the Plan of Distribution." (*Id*. at 5.)

The motion explains that the plan "sets a preliminary allotment of the net Settlement fund to each of the three programs contemplated under the Settlement." (*Id*. at 7.) The plan states that the "preliminary" allocation for all personal injury payments was $120 million (not $130 million). (Ex. 1-Z, Plan of Distribution (corrected version), at 1.) But the "final" allocation for all personal injury payments would be determined by "[t]he number of points calculated" for all those payments combined. (*Id*. at 7.) The total points in all claims, at $250 per point (the $25,000 base payment divided by the base of 100 points), would determine the final amount. The final amount was *not* a predetermined amount to be split pro rata.

The plan explained that "preliminary allotments are expected to pay all submitted claims fairly," but there were "two additional safeguards for just compensation" in case there were too many claims. (Mot. for Approval at 7, Dkt. 519-1.) First, there were "various 'pour over' or 'waterfall' provisions, which allow undistributed funds from one program to be moved into another as the need arises until all funds are disbursed." (*Id*. at 7-8.) "Second, the Plan of Distribution establishes a Class-wide holdback of $10,000,000, designed to reinforce any program that may need to be re-capitalized for any reason." (*Id*. at 8.) These safeguards "retain[ed] the flexibility to ensure the entire Settlement Fund is disbursed in accordance with any *changes that might occur as claims are continuously processed and evaluated*." (*Id*. (emphasis added).)

In a critical provision, the plan directs KSA—which played no role in developing this approach—to calculate each personal injury payment:

> All eligible class members start with a "base" of 100 points, which is intended to reflect the "average" individual living in the Village of East Palestine at the time of the Derailment. The "base" of 100 points is equivalent to one $25,000 share of the [personal injury] program. ***The "base case" is therefore entitled to $25,000 per***

10

> *person, with* [*qualified claimants'*] *payments increasing or decreasing from the "base case" depending on the factors presented in their claim forms.*

(Plan of Distribution at 7 (emphasis added).) The factors "are converted to multipliers that reflect enhancements or detractions based on severity or degree of impact." (*Id.*)

Thus, the plan states that each qualifying claimant is "entitled" to $25,000, adjusted only by the factors presented in his or her own claim form. The plan *does not allow* any class member's personal injury payment to be affected in any way by the number of claimants, the size of their claims, the total number of points, or a pro rata or proportional distribution.

There is more. The plan gave five illustrations of how to calculate personal injury payments. *None* mentions other claimants, the size of their claims, the total number of points, or a pro rata or proportional distribution. (*Id.* at 9-10.[2]) Each calculates a fixed amount starting with $25,000 and adjusting it up or down based on factors such as distance from the derailment. (*Id.*)

At the fairness hearing, class counsel confirmed that is how the plan works: "Again, all claimants start with a 100 base of points. That's on an individual basis, and it represents an individual $25,000 share of what's been allotted to that supplemental program." (Fairness Hr'g Tr. at 77:3-6.) A "$25,000 share" is *not* an as-yet-unknown pro rata or proportional share.

This Court "approve[d] and adopt[ed] the Plan." (Order Approving Plan, Dkt. 555, § 13.) The order "direct[ed] the settlement administrator, [KSA], to **implement the Plan according to**

---

[2] After the illustrations, the plan gave two examples of reductions to awards based on amounts that Norfolk Southern previously paid to class members. Those examples hypothesized a class member whose medical treatment was valued at five points. (Plan of Distribution at 10-11.) Footnotes cautioned that the examples were "illustrative" because the actual "[p]oint value" for any *real* class member's medical treatment would have "to be determined" based on the treatment(s) the class member received. (*Id.* at 10, 11 nn. 9, 10.) The examples had nothing to do with the $250 per point value that the plan required KSA to use when calculating personal injury payments, which is why class counsel's contempt motion did not mention those footnotes.

11

*its terms and conditions*." (*Id*. (emphasis added).) The order also authorized the parties—but *not* KSA—to amend or modify the plan without additional Court approval. (*Id*. § 15.)

On the same day this Court approved and adopted the plan, this Court also gave final approval to the settlement. (Final Approval Order, Dkt. 557, § 7.) Under that order, the settlement agreement has "the full force of an order of the Court." (*Id*. § 17.)

This Court also approved expenses and attorneys' fees. (Fee & Expense Order, Dkt. 556.) In that order, the Court explained that the parties worked with KSA, "a respected notice provider and settlement administrator." (*Id*. at 7.) The order explained that KSA (a) sent "thousands of individual notices by mail and thousands more by email"; (b) augmented "this direct effort with supplemental forms of notice, including a substantial digital notice effort, which included a targeted state-of-the-art social media outreach campaign"; (c) opened "a brick-and-mortar claims center" the week of June 3, 2024, that was "originally open five days a week—and then extended to six days a week with expanded hours in light of the extraordinary interest and participation in the settlement"; (d) staffed the claims center with KSA employees, who answered questions and assisted class members; (e) opened a second claims center on July 31, 2024; and (f) provided a call center that "took at least 48,031 calls." (*Id*. at 8-9.)

## F. When class counsel directed KSA to begin making personal injury payments, they knew that KSA was still evaluating claims on a rolling basis.

Soon after this Court approved the settlement, several objectors appealed. (Notice of Appeal, Dkt. 558.) With appeals pending, the settlement agreement forbade any direct payments or payments for business losses, but it *required* personal injury payments to begin within 30 days of final approval—without ever requiring KSA to first calculate the total number of points. (Settlement Agreement § XIII(D).) On October 2, KSA responded to class counsel:

> Our focus is on PI [personal injury] Payments. Here is what will transpire this month and into November …:
> - We will begin sending out PI payment amount letters this month.

12

- PI Claimants will have 10 days … to challenge their calculated payment amount.
- If no challenge, we can proceed with the payment. Based on this process, I would anticipate PI payments will begin to go out in mid to late November. As we discussed, this satisfies the requirements under the Settlement, as PI payments will begin by year end (as subject to claim validation).
- If a Claimant challenges their payment, the steps in the attached will be followed.

(Ex. 2-F, Oct. 2, 2024, email, at 1.)

A Court-approved supplement to the plan explained the process for a class member to challenge an award. (Dkt. 525.) A single challenge could involve reconsideration by KSA, an appeal to the special master, and an appeal to the Court. (*Id.* at 1-3.) KSA could not finish calculating a particular claimant's points and final award until that process concluded. (*Id.* at 1.) Under the supplement's time frames, it could easily take months.

With the need for KSA to process each of the tens of thousands of claims, announce each award to its recipient, and wait for all challenges to be resolved, it was *impossible* to know the total number of points at the outset. (Ferrante Decl. ¶¶ 48-52.) Class counsel *never* directed KSA to first calculate the total number of points, yet the payments had to begin. (*Id.* ¶ 59.) Class counsel repeatedly emphasized to KSA that personal injury payments had to go out as soon as possible because the derailment occurred more than a year earlier. (*Id.*)

Class counsel knew that KSA was processing personal injury claims in batches over time, not all at once before payments began. A KSA declaration, which class counsel filed in support of final approval, stated that KSA "continues to process claims received." (S. Fenwick Final Approval Decl. ¶ 17.) The settlement's "claims rate [was] almost three times what is typical in class action administrations" (*id.*), so this could not help but take a long time. (It would also take a lot of extra time because here, unlike in most cases, most claim forms were filed on paper instead of electronically, so their data had to be entered manually into a computer. (Ferrante Decl. ¶ 66; Fenwick Decl. ¶ 51.)) To help class members cure defects in their forms, KSA

13

planned to email and mail deficiency letters, call class members, and reopen the settlement center on September 17—for "*several months.*" (S. Fenwick Final Approval Decl. ¶ 20 (emphasis added).) Class counsel made the same point in their motion for approval: "Importantly, the claims process contemplates outreach … to ensure that deficient or incomplete claims are cured and receive appropriate consideration. That outreach has been actively ongoing and is expected to continue *well after Final Approval*." (Mot. for Approval at 4 n.2 (emphasis added).)

No one could know the number of valid claims or points until all those efforts—and class member challenges to awards—were finished. Yet class counsel *insisted* that payments begin in early December 2024, when they *knew* that information was unknown. (Ferrante Decl. ¶¶ 73-75, 89, 95; *id.* Ex. 2-L at 1-2.) They knew KSA was processing claims on a rolling basis, not all at once at the beginning. (Ferrante Decl. ¶¶ 64-103; Fenwick Decl. ¶¶ 40-41.) As just one of many examples proving this, on December 21, 2024—*after* the first round of payments—KSA sent class counsel a draft press release to update the community. (Ex. 2-M, draft press release.) It explained that "[t]he [KSA] team is working as fast as possible to process Personal Injury Claims." (*Id.* at 3.) Class counsel knew that work was not finished.

KSA's March 2025 report stated that KSA had, at that point, processed just 12,000 of the 31,125 personal injury claims. (Mot. Exs. J, K; Ex. 1-R at 3.) A later email shows that class counsel knew KSA was continuing to process personal injury claims in April and May 2025. (Ex. 2-P, KSA emails, at 1, 3; Ex. 1-S at 1.) Of course, they knew payments began in December.

**G.    Class counsel approved of KSA calculating personal injury payments using the $25,000 base payment formula from the plan of distribution.**

Contrary to their made-up litigation position, class counsel was also aware that KSA's payment calculations were *not* based on a pro rata or proportional division. For example, on October 1, 2024, class counsel and KSA reviewed "sample calcs" so that KSA could "confirm we come to an agreement on the correct numbers." (Fenwick Decl. ¶ 41; Ex 1-K at 1.) The "sample

calcs" *all* started with base payments of 100 points valued at $25,000. (*Id.*) Class counsel

confirmed these calculations *in writing* to KSA. (*Id.* ("Yes … If you apply the correct multipliers

(which [the Judge] has approved) then you get the numbers you noted.").) That is only one of

many examples. (Fenwick Decl. ¶¶ 41, 43; *see also, e.g.*, *id*. Ex. 1-L, 1-N, 1-P; Ferrante Decl.

¶¶ 64-103.) In addition, before each payment went out, class counsel and Norfolk Southern

reviewed it, and they could see it used $25,000 base payments (and had nothing to do with a

total number of points for all personal injury claims). (Ex. 2-H; *see also* Ferrante Decl.

¶¶ 82-98.) That practice continued until mid-January 2025, when they abandoned their reviews

to speed up the delivery of payments. (Ferrante Decl. ¶¶ 95-96.)

**H.      KSA discovered and told class counsel that personal injury payments might exceed their "preliminary" allocation for those payments.**

As KSA continued to process personal injury claims, it appeared that total payments

could eventually exceed class counsel's "preliminary" allotment for them. Class counsel's

contempt motion (at 10-12) tries to take credit for discovering this issue in early May 2025, but

KSA told class counsel about it *repeatedly* starting in late March, soon after KSA's March 25

report. (Fenwick Decl. ¶¶ 44-48.) Each time, class counsel directed KSA to the plan's

"safeguards," including the pour-over provisions. (*Id.* ¶ 46.)

But then, on May 12, class counsel asked KSA to join a call to discuss "overpayment

errors" and requested a report of all payments made. (Ferrante Decl. ¶ 105.) On the call, class

counsel accused KSA of disobeying the plan by not making pro rata payments or by otherwise

underpaying class members. (*Id.*) Class counsel asserted that this resulted in the personal injury

fund allotment being exceeded by $17 million, which KSA itself needed to pay. (*Id.*)

**I.       KSA learned that it was terminated, with contempt proceedings to begin.**

On June 11, KSA received the Court's order terminating its appointment as administrator.

(Dkt. 979.) The order states that class counsel requested it. (*Id.* at 1.) KSA had not been aware of,

or given the opportunity to respond to, that request. The request does not appear on the Court's docket. The evidentiary support for the request was a declaration from class counsel Seth Katz, which does not bear a docket number (and was not given to KSA until October 22, 2025).

After learning about the order, KSA filed a motion asking for leave to be heard on it, with KSA's response to the order attached as an exhibit. (Dkt. 983.) The Court denied the motion and struck the response from the docket. (Dkt. 984.) The Court stated that KSA would be allowed to explain its position when responding to an anticipated motion for contempt. (*Id*. at 1.)

The order terminating KSA directed class counsel to retain an auditor and to submit to the Court the auditor's report about "the nature, scope, and financial ramifications of any miscalculation errors that may have been made" by KSA. (Order, Dkt. 979, § 12.) After the report was done, class counsel would be allowed to file a motion to show cause. (Order, Dkt. 984, at 2.) The Court later granted class counsel permission to move for contempt before the auditor completed its report but required the motion to be supported by a declaration from Epiq "detailing its findings of the various ways that Kroll violated the Court's prior Order (ECF No. 555 [the order approving the plan]) in administering the settlement." (Order, Dkt. 1004, at 4.)

Epiq's declaration asserts that personal injury "[p]ayments to Class Members here require the administrator to determine the accurate number of points available to all eligible class members, from which we can determine the value of a single point. … [W]e would not begin distributing full payments" until all payments (or their maximum total) are known. (Mot. Ex. N ¶ 5.) The declaration never identifies any provision in any order requiring pro rata proportional payments. The declaration ignores the unanimous contrary statements and illustrations in the settlement agreement and plan.

During discovery, KSA discovered that those statements appear in Epiq's declaration only because class counsel put them there. Epiq's first draft included examples of alleged

overpayments. The calculations naturally included what the declarant, Michael O'Connor, asserted were the proper payment amounts—*starting with base payments of $25,000*. (Ex. 3, EPIQ000440 O'Connor Decl. draft, ¶¶ 50, 52-53, 56.) Upon seeing this, class counsel told him that he "[s]hould NOT put a value in for Epiq … b/c Epiq hasn't computed value of a point." (Ex. 4, EPIQ000717 O'Connor Decl. draft, cmt. SK7.) Every time that O'Connor stated the proper amount of a payment, Katz reiterated, "Epiq should NOT be assigning a value or differential." (*Id.* cmts. SK8, SK9, SK10.) In the next drafts, O'Connor followed Katz's instructions. (Ex. 5, EPIQ000068 O'Connor Decl. draft, cmt. MO13; Ex. 5A, at 1 (noting addition of footnote), EPIQ0001356 O'Connor Decl. draft).

Then, on the *very same day* the declaration was signed and filed, class counsel Beth Graham texted O'Connor: "Hey Michael. Do you have a minute for me? We want you to add a single line to your declaration re: Kroll's failure to calculate the value of a point before sending checks out being a fundamental misstep[.] Claims admin 101[.]" (Ex. 6, EPIQ001642.) O'Connor responded: "Sure thing[.] Call me when ready!" (*Id.*) O'Connor then emailed, "Beth just called me with a material addition to make." (Ex. 7, EPIQ000544.)

Later that day, O'Connor emailed the signed declaration to class counsel, explaining that he added the statements "[a]t Beth's request." (Ex. 8, EPIQ000326.) O'Connor testified that was what happened. (Ex. 9, O'Connor Tr., at 39:20-41:18, 102:2-106:7.) He admitted that when adding those statements, he did not consider the language of the plan, the motion for final approval, or what class counsel told class members at the town hall. (*Id.* at 106:19-107:10.)

**ARGUMENT**

**I.** **Class counsel must prove with clear and convincing evidence that KSA fully understood the meaning of a definite and specific court order but ignored it.**

"Contempt is a measure of last resort, not first resort." *Gascho v. Glob. Fitness Holdings*, 875 F.3d 795, 799 (6th Cir. 2017). To "guard against arbitrary exercises of the

contempt power," the "party that seeks civil contempt sanctions must demonstrate by clear and convincing evidence that the opposing party knowingly violated a definite and specific order of the court." *Id*. at 800 (cleaned up). Contempt is "reserved for those who fully understand the meaning of a court order and yet choose to ignore its mandate." *Id*. (cleaned up). Thus, "civil contempt 'should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (quoting *Cal. Artificial Stone Paving v. Molitor*, 113 U.S. 609, 618 (1885)).

The Sixth Circuit emphasizes that "the burden of showing that an order is definite and specific is heavy" and "demanding." *Gascho*, 875 F.3d at 800 (cleaned up). It "should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers Pension Tr. Fund v. Gary's Elec. Serv.*, 340 F.3d 373, 379 (6th Cir. 2003). Courts must read any ambiguity "in favor of the party charged with contempt" and may not "hold a party in contempt unless that party was disobeying a clear and unequivocal court command." *Gascho*, 875 F.3d at 800; *see also id*. at 801 (a contempt "judgment must set forth in specific detail an *unequivocal* command" (cleaned up)).

## II. KSA followed the Court's orders.

### A. The orders required KSA to calculate each payment by starting with $25,000 and adjusting it based only on factors specific to each claim.

Three orders address KSA's responsibility to make personal injury payments. All required KSA to use class counsel's formula, which required KSA to calculate each payment by starting with $25,000 and adjusting it based solely on factors specific to each claim. No order allowed KSA to give claimants a pro rata or proportional share of some set fund.

The first and second orders approved and adopted the settlement agreement (Dkts. 458, 557), which required KSA to follow class counsel's formulas for payments to class members. When explaining the distinct types of payments, the agreement stated that each direct payment

would be a "pro rata amount" that resulted from dividing the total available amount. (Settlement Agreement § XIII(C)(1).) To determine each pro rata share, KSA would have to compare the severity of each claim in the context of all other claims. As class counsel's motion for preliminary approval stated, "the Settlement Administrator will calculate the ***relative shares*** of damages for these [direct payment] Class Members and distribute awards ***pro rata***" (Mot. for Preliminary Approval at 22 (emphases added).)

For personal injury payments, however, the agreement said nothing of the sort. It *never* authorized pro rata, proportional, or relative share awards. As the long-form notice stated, KSA "will use objective, Court-approved criteria like the nature of any physical injury and resulting medical treatment, if any, to allocate funds to each Eligible Personal Injury Settlement Class Member." (Settlement Agreement Ex. D at 4.) Neither the orders nor the agreement allowed KSA to compare claimants and divide a fund into shares.

The third order approved class counsel's plan and required KSA to "implement the Plan according to its terms and conditions." (Order Approving Plan § 13). For personal injury payments, the plan explained that the calculation would start with an "average" claimant, deemed to have a "base" of 100 points worth $25,000, which would be adjusted based *solely* on factors specific to each claim, such as distance from the derailment. (Plan of Distribution at 7.) The plan states that "100 points is equivalent to a $25,000 share." (*Id*.) Thus, each point was worth $250. Claimants with 100 points are "therefore ***entitled*** to $25,000 per person, with … payments increasing or decreasing from the 'base case' depending on the factors presented in their claim forms." (*Id*. (emphasis added).)

The plan ***did not allow*** KSA to assign pro rata, proportional, or relative shares in which, for example, a class member with 100 points received anything other than $25,000. Nor did the plan allow KSA to compare claims when calculating payments. It only allowed KSA to evaluate

each claimant's individual factors, from his or her claim form, and adjust the payment upward or downward from $25,000 based on the number of points. That is what KSA did.

**B.     A pro rata or proportional approach would have violated the Court's orders.**

Class counsel contends that KSA violated the plan by starting each claimant "with a fixed sum of $25,000 that would then be adjusted up or down based on various factors without regard for any effect on other claims or the limits of the fund." (Mot. at 11.) They argue that KSA should have "us[ed] points to calculate proportional shares" and used those shares to divide whatever total for personal injury claims that they selected. (*Id.*)

That approach would violate the Court's orders adopting and requiring KSA to follow the settlement agreement and the plan. The orders *did not allow* pro rata, proportional, or relative shares. The orders made each personal injury claimant "entitled" to the fixed amount of $25,000, as adjusted *only* by factors specific to that person's own claim. (Order Approving Plan § 13; Plan of Distribution at 7.) If KSA had followed the approach that class counsel now advocates, which would have required KSA to reduce each personal injury payment, claimants would have accused KSA of violating the Court's orders.

Class counsel's new approach would also have made nonsense of other provisions of the agreement and plan. Under that new approach, they would have set aside a fixed amount as a fund for all personal injury payments, and KSA would have assigned each claimant a proportional share. (Mot. at 11.) If KSA had followed that approach, it would have been *impossible* for any money to remain in the personal injury fund after all personal injury payments were made. The proportional shares would have, by definition, totaled 100 percent. Yet the settlement agreement and plan both state that funds left over from personal injury claims will pour over into the amount for direct payments. (Settlement Agreement

§ XIII(C)(3)(i); Plan of Distribution at 1.) That could happen only if claimants received fixed payments that did *not* total 100 percent of the money that class counsel preliminarily allocated.

Class counsel also knew that KSA was basing personal injury payments on the $25,000 figure, not on proportional or relative shares. They even told class members, at the town hall, that "***those payments are now*** … ***going to be $25,000 per person***." (*Town Hall 8-1-24*, at 41:45-42:03, YOUTUBE (Aug. 1, 2024), youtube.com/watch?v=OoiAgyITLpM (emphasis added).)

As Epiq's declaration explains, a proportional or relative share approach would have required KSA to determine the total number of points *before* making any payments. (Epiq Decl. ¶ 5.) Yet class counsel *insisted* that KSA begin making payments before processing and validating all claims—and before all challenges to payment determinations were finished. (Ferrante Decl. ¶¶ 73-75, 92-93.) Payments began in November 2024, and class counsel frequently reviewed sample calculations and batches of the actual payments and saw that they had nothing to do with proportional shares or the total number of points. (*Id*. ¶¶ 82-86.) A few weeks *after* the first round of payments, KSA told class counsel that it was still "working as fast as possible to process Personal Injury claims." (Ex. 2-M at 3.) In March 2025, KSA told class counsel that it had processed 12,000 of the 31,125 personal injury claims. (Ex. 1-R at 3.) KSA provided similar updates in April. (*E.g.*, Ex. 1-S at 1 ("[W]e are working on calculations for approximately 13,000 valid class members …."); *see also* Ex. 2-O; Ex. 2-P.) It is reprehensible for class counsel to move for *contempt* against KSA on the ground that court orders required KSA to use a proportional approach from the start that class counsel always knew KSA was not using.

Epiq's declaration also provides illustrations of personal injury payments that contradict the plan. For example, Epiq gives this example:

| | Location Points | Direction Points | Physical Presence Points | Age Points | Symptoms Points (Existence) | Symptoms Points (Nature) | Medical Treatment Points | Formal Diagnosis Points | Total Points | Award Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Kroll | 1.1 | 1 | .5 | 1 | .75 | 1 | 1 | 1 | 41.25 | $10,312.50 |
| Epiq | 1.1 | 1 | 1 | 1 | .75 | 1 | 1 | 1 | 82.5 | TBD[5] |

(Epiq Decl. ¶ 38.) The footnote after "To Be Determined" ("TBD") says that "Epiq cannot yet determine what this claimant's correct payment should have been because we do not know the value of a point," because Epiq has not yet processed and verified all personal injury claims to find the total number of points. (*Id*. ¶ 38 n.5.)

The plan's illustrations, however, calculate each payment *without* any reference to other claims or the total number of points. For example:

| Base Points | Location | Direction | Physical Presence (Time) | Child | Elderly | Exposure/Symptoms | Nature of Symptoms | Treatment | Diagnosis | Total Points | Total Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | 1x | 1x | 1x | Null | Null | 1x | .90x | 1x | 1x | 90 | $22,500 |

(Plan of Distribution at 9.) This hypothetical claimant had 90 points, so with the fixed value of $250 per point, the payment is $22,500. This illustration—like *every* personal injury illustration in the plan—shows that the required calculation was an adjustment from $25,000. (*Id.* at 9-10.) It was *not* a calculation of a proportional or relative share using the total number of points.

Discovery revealed that Epiq's original draft calculated and showed examples of actual payments. (Ex. 3, EPIQ000440.) But, at class counsel's insistence, Epiq removed those examples and added language to the declaration about the need to first calculate the total number of points. (Ex. 4, Draft Decl., ¶ 35 and Katz Comment, Ex. 5, EPIQ000068; Ex. 5A at EPIQ0001356, Draft Declaration at n.5.)

The only fair reading of the Court's orders, settlement agreement, and plan shows that KSA followed them. But, as another court explained, even if there were grounds for a disagreement about the meaning of an order, it "could have easily been addressed by asking the court itself to clarify the issue. Escalating the disagreement into a contempt proceeding only

22

draws into question [the movant's] own good faith and judgment." *Davis v. Detroit Downtown Dev. Auth.*, 2020 WL 3097262, at *3 (E.D. Mich.). So too here.

**C.     Class counsel cite no cases supporting contempt here.**

None of the cases that class counsel cite will support a finding that KSA fully understood and chose to ignore a court order. Many do not even involve civil contempt proceedings. None involves a class action administrator, much less an administrator that followed the court's orders and class counsel's directions.

For example, class counsel's motion relies heavily on *Electrical Workers*, 340 F.3d 373. There, an order required the defendant to pay the plaintiffs, and the defendant's officer admitted "that he knew of the court's order yet failed to observe it." *Id*. at 382. Rather than pay the money, he tripled his own salary, used company money to pay for personal luxury items, directed the company to pay all creditors other than the plaintiffs, and so on. *Id*. at 377-78. That case says nothing about KSA or its conduct here.

Class counsel's motion also relies heavily on *In re Columbia Gas Cases*, No. 1877CV01343G (Mass. Super. Ct.), a case in which KSA was the administrator. Some class counsel here were also class counsel there—so they know better. The order in *Columbia Gas* stated that "after all lump sum claims have been submitted and points allotted, the $80 million fund will be divided by the total points for all lump sum claimants and a dollar value per point will be established." (Ex. 1-J at 10.) That was, indeed, a provision requiring a proportional or relative share calculation. But the orders here say nothing of the sort.

Finally, class counsel rely on *McCormick v. Adtalem Glob. Education*, 2018-CH-04872 (Ill. Cir. Ct.), which they call the *Devry University Settlement*. That is one of the 3,000 or so class actions that KSA has administered. There, KSA was in the process of mailing checks when it discovered some errors. (Ex. 10, KSA Emergency Mot. for Status Conference, at 1.)

23

Class counsel there told KSA to let the class members cash the erroneous checks, so KSA asked the court for guidance. (*Id.* at 2-3.) Class counsel retaliated by filing a motion to suspend KSA. After a status conference, the court directed class counsel and KSA to work out the issues, which led to the withdrawal of both motions, KSA paying limited costs and fees associated with the errors, and another administrator handling the rest of the case. (Ex. 11, Stipulation & Order Resolving Issues; Ex. 12, Agreed Order Withdrawing Mots.) The court did not hold KSA in contempt, sanction KSA, find that KSA did anything wrong, or make any other finding of conceivable relevance here. (Ex. 13, Stipulated Order Dismissing KSA.)

## III.   Inadvertent calculation errors—which KSA discovered, disclosed, and offered to repay—do not show that KSA chose to ignore a court order.

Apart from the issue of proportional personal injury payments, KSA discovered that it had miscalculated the distances associated with the zip codes of some class members, resulting in errors when calculating their personal injury payments. Almost all these errors resulted in overpayments to class members, and KSA offered to repay the overpayments to preserve the settlement fund. Thus, those errors benefited some class members and could not hurt any others.

In mid-April, when reviewing initial calculations for a batch of claims, KSA found that the calculations misapplied certain multipliers. (Fenwick Decl. ¶ 53.) KSA held the payment letters for this batch and fixed the calculations. (*Id.* ¶ 54.) At the time, KSA did not know to what extent (if at all) the calculations in prior batches were incorrect, so it needed to investigate. (*Id.* ¶ 55.) Throughout May, class counsel and KSA discussed an incorrect multiplier being used for claimants whose addresses were in East Palestine but who neither resided in the Village of East Palestine nor within two miles of the derailment. (*Id.* ¶¶ 56-58; Ferrante Decl. ¶ 110.)

KSA determined that *correct* multipliers were used for the first batch of claims but some incorrect multipliers were used for later batches of claims. (Fenwick Decl. ¶ 58.) The change resulted from a KSA employee misunderstanding a December 2024 conversation between the

24

parties, during which counsel for Norfolk Southern asked why payments to claimants with East Palestine addresses were "so low." (*Id*. ¶ 59.) The employee mistakenly—but in good faith—understood the parties to be exempting East Palestine addresses from distance and direction multipliers. (*Id*. ¶ 60.) The employee changed the multipliers without following KSA's review and quality-assurance protocols. (*Id*. ¶ 61.)

As a result of the employee's errors and failure to follow the protocols, KSA terminated his employment. KSA regrets the employee's actions, takes responsibility for them, again apologizes, and again offers to pay for them—an offer that, for reasons known only to them, class counsel consistently *rejected* and fails to acknowledge.

KSA's full review of past payments estimates that the incorrect multipliers related to East Palestine led to some claimants being overpaid a total of roughly $4.5 million. (*Id*. ¶ 62.) During its review, KSA also discovered multiplier errors related to whether a claimant was exposed to chemicals and had symptoms. (*Id*. ¶ 63.) This resulted in overpayments of $292,400. (*Id*. ¶ 64.) KSA offers to compensate the settlement fund for those overpayments[3] to make the fund whole, without clawing back overpayments from class members who received them.

It appears that KSA and class counsel recognized the multiplier errors at roughly the same time. They discussed those errors in early May, and KSA informed class counsel that it was reviewing past payments. (*Id*. ¶ 65; Ferrante Decl. ¶ 110; Mot. Ex. Q, Dkt. 1012-17, at 1.) KSA never hid problems with the multipliers.

KSA respectfully submits that inadvertent multiplier errors do not justify a finding of contempt. There is no evidence at all—much less, clear and convincing evidence—that KSA

---

[3] KSA also estimates there were *underpayments* of $11,125 because of the incorrect East Palestine multipliers and $955,600 because of the incorrect chemical/symptom multipliers. Any *underpaid* class members should of course receive full payments. But those payments were never made from the settlement fund, so there is nothing for KSA to compensate.

knowingly chose to ignore a court order. *Gascho*, 875 F.3d at 800. KSA intended to follow the Court's orders and believed in good faith it was following those orders. KSA itself did not benefit from any error; in fact, KSA has offered to pay for the errors. And by catching the errors and offering to reimburse all overpayments, KSA has ensured that they hurt no class member (while providing some class members with a windfall). Even though some class members were overpaid, the reimbursement will prevent any overpayment from depleting the settlement fund.

To err is human, so no administration is perfect even though perfection is always the goal. Epiq estimates its own substantive and nonsubstantive error rate when adjudicating claims at around 1 percent. (Epiq Decl. ¶ 9.[4]) Epiq admitted that "in any given year, Epiq is making hundreds if not thousands of manual adjudication errors." (Ex. 9, O'Connor Tr. at 39:9-12.) Epiq also admitted that it has never "seen a manual adjudication settlement where there were zero errors." (*Id*. at 37:8-11.) Epiq's review of the claim forms here even has its own errors (Fenwick Decl. ¶ 88), so one can only wonder whether Epiq will be class counsel's next contempt target.

The multiplier errors here cost the settlement fund roughly $4.8 million in overpayments, which is 0.8 percent of the $600 million total. KSA thus substantially complied with the plan, despite those inadvertent mistakes, which should also prevent any finding of contempt. *De Simone v. VSL Pharms.*, 36 F.4th 518, 530 (4th Cir. 2022); *PlayNation Play Sys. v. Velex*, 939 F.3d 1205, 1212-13 (11th Cir. 2019).

---

[4] Epiq, rather than quantifying any errors by KSA or reaching any conclusions about them, simply provided 12 examples of alleged errors. Most of those relate to KSA's claim denials or KSA's early drafts of calculations, which had not yet gone through KSA's final review. (Fenwick Decl. ¶¶ 82-86.) *None* resulted in *any* payments at all, let alone overpayments, so they did not deplete the settlement fund. If any denials were erroneous, the challenge process will correct them, with no harm to class members. (Ex. 9, O'Connor Tr., at 129:8-21, 130:5-15.)

**IV.    Class counsel cannot prove contempt for any other issues.**

**A.    KSA's experience was neither the subject of an order nor misrepresented.**

KSA cannot be in contempt for anything it said about its experience in class action administration or its experience administering proportional settlement systems. Contempt requires a knowing violation of an unequivocal court order. That is impossible here because no court order required KSA to disclose its experience. KSA's statements about its experience all *predate* the Court's orders, so they *cannot* be contemptuous. "[A] court cannot hold a party in contempt retroactively." *Gascho*, 875 F.3d at 802. Class counsel is urging this Court to abuse its discretion by "relying on pre-order conduct to hold [KSA] in contempt." *Id.*

In any event, class counsel identify no misrepresentation. Their motion simply argues that KSA did not correctly perform its duties. It is undisputed that KSA does have ample experience with all types of class action settlements—and knows the difference between orders that require proportional payments and orders that do not. The orders here do not.

**B.    KSA fully cooperated when transferring records to Epiq, without violating any unequivocal command from the Court.**

The order directed KSA to do six things to facilitate the transfer of the administration to Epiq. They are (1) confer with Epiq; (2) put Epiq's contact information on the settlement website and redirect class member inquiries to Epiq; (3) give Epic control over the settlement website, email, and phone number; (4) give Epiq and class counsel an inventory of all available data and administration-related materials and case reports; (5) transfer those items to Epiq; and (6) transfer control over the settlement fund to Epiq. (Order, Dkt. 979, § 1l.)

Class counsel's motion does not identify a knowing violation of any of those requirements. Instead, the motion points to differences in how KSA and Epiq kept records, as well as the steps KSA took to address data problems that Epiq reported. That shows KSA's

27

diligence, not that KSA chose to ignore a court order. There are no pending requests from Epiq to KSA. (Ex. 9, O'Connor Tr., at 170:20-22.) Working together, KSA and Epiq resolved every issue. (Ex. 1-G.) At his deposition, Epiq's O'Connor confirmed that KSA was cooperative and responsive in addressing Epiq's requests for information, and Epiq received all the information it needed. (Ex. 9, O'Connor Tr. at 171:17-24.)

## V.     The motion's requests for relief are improper.

As explained above, KSA should not be held in contempt. For that reason, this Court should not award any remedy. In any event, the remedies that the motion requests are improper.

### A.     Class counsel cannot obtain disgorgement of all amounts KSA received.

The motion asks this Court to order KSA to disgorge $9.5 million it received from the settlement fund. To start, KSA did not receive $9.5 million. The payments to KSA totaled around $8.95 million (and around $750,000 was invoiced but not paid). (Fenwick Decl. ¶ 70; *see also id*. Ex. 1-V (billing and cost analysis).) Even with the correct figure in mind, there are three reasons the Court should deny the motion's request.

First, it is undisputed that KSA did not intend to violate a court order, misappropriate settlement funds, or receive any benefit from its inadvertent multiplier errors. (Ex. 9, O'Connor Tr. at 43:12-16, 169:13-20.) KSA offered to compensate the settlement fund for the overpayments that it made in good faith. (Fenwick Decl. ¶¶ 61, 64, 66-67.) If there are additional costs from Epiq getting up to speed and performing recalculations, class counsel should ask KSA for compensation for the fund for those amounts, not disgorgement of every dollar KSA received.

Second, "courts must deduct legitimate expenses before ordering disgorgement" to avoid imposing a punishment for civil contempt. *Liu v. SEC*, 591 U.S. 71, 91-92 (2020). "An equitable disgorgement award seeks to deprive the wrongdoer of his *ill-gotten profits*," not legitimate expenses. *Osborn v. Griffin*, 865 F.3d 417, 452 (6th Cir. 2017) (emphasis added). Here, around

28

$1.9 million of the $8.95 million are legitimate out-of-pocket expenses (not even including KSA's full-time-employee costs) that KSA paid for the benefit of the class. (Fenwick Decl. ¶ 77.) These expenses, which the class had to incur without regard to any issues identified in the motion, included items such as paying for class notice, mailings, the settlement centers (and security at them), and operating telephone hotlines and websites. (*Id*. ¶¶ 72-73; *see also id*. Ex. 1-V.) Class counsel cannot win disgorgement of those unquestioned expenses.

Third, class counsel cannot win disgorgement because Epiq must "completely redo" KSA's work. The motion does not question a great deal of KSA's work, such as work on class notice, media outreach, correspondence with class members, gathering claim forms, staffing in-person settlement centers, and assisting class members with filling out forms and correcting deficiencies. (*Id*. ¶¶ 71-76; Ex. 1-V.) KSA's fees for that work totaled roughly $5.7 million. (*Id*. ¶ 74; Ex. 1-V.) The only work that Epiq claims to be redoing is recalculating claims. KSA's fees for that work totaled roughly $3.25 million (*id*. ¶ 76), which is the absolute maximum that a payment to compensate the fund could cover.

One of the cases that class counsel cite makes clear that KSA should not disgorge fees for valuable, unquestioned work. In *Cordoza v. Pacific States Steel*, 320 F.3d 989, 993 (9th Cir. 2003), the district court assigned a special master to oversee the cleanup and development of contaminated land to obtain funds to pay class members. But the court determined that the special master also billed for legal services for himself and overcharged for his assistant's services. *Id*. at 994. The Ninth Circuit upheld the district court's order requiring disgorgement of those amounts alone. The district court concluded that, aside from the improper amounts, the special master's "early efforts … warranted his keeping much of the money he already received." *Id*. at 1001. Disgorgement applies only to ill-gotten profits, so KSA should not be required to disgorge fees and expenses for unchallenged work that benefited the class.

29

**B.     Class counsel cannot force KSA to discuss this case or others every time a litigant considers hiring KSA for class administration work.**

Class counsel cite no case or other authority to support punishing KSA by having this Court order it to discuss "all prior instances where [KSA] has been terminated, suspended or replaced as administrator" whenever KSA serves or is considered to serve as an administrator. (Mot. at 27.). That is because such an order would be unlawful.

As the motion (at 21) admits, there are only two legitimate purposes for civil contempt: (1) coercing compliance with an order or (2) compensating for a violation of an order. *E.g.*, *Elec. Workers*, 340 F.3d at 385. What class counsel proposes is neither. Their proposal is not remedial but punitive, so it "may not be imposed on someone who has not been afforded the protections that the Constitution requires of criminal proceedings." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994) (cleaned up).

If litigants want to learn more about KSA's experience here or in other cases, they can ask KSA or do their own research (with news articles about the administrations in this case and *Devry* readily available). But no civil contempt order may force its subject to take actions other than complying with a court order or compensating the complaining party for violating one. Thus, no matter how this Court rules on this motion, it should deny this request for relief.

## CONCLUSION

KSA respectfully asks this Court to deny class counsel's motion, deny any finding of contempt, and order an end to this proceeding against KSA.

Dated: November 24, 2025

WINSTON & STRAWN LLP

/s/ Scott M. Ahmad
STEPHEN V. D'AMORE*
SCOTT M. AHMAD*
SCOTT P. GLAUBERMAN*
35 W. Wacker Dr.
Chicago, IL 60601-9703
Tel: (312) 558-5600
Fax: (312) 558-5700
SDamore@winston.com
SAhmad@winston.com
SGlauberman@winston.com

RACHAEL E. THOMPSON*
800 Capital St., Suite 2400
Houston, TX 77002-2925
Tel: (713) 651-2600
Fax: (713) 651-2700
RThompson@winston.com

* Pro hac vice

Respectfully submitted,

FLANNERY GEORGALIS, LLC

CHRISTOPHER J. JOYCE
Ohio Bar No. 0086576
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Tel: (216) 466-0416
CJoyce@flannergeorgalis.com

*Counsel for Kroll Settlement Administration LLC*

31

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 24, 2025, a copy of the foregoing was served on all parties of record via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

/s/ *Scott M. Ahmad*
Scott M. Ahmad