# Exhibit 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: EAST PALESTINE TRAIN DERAILMENT** | Case No.: 4:23-cv-00242-BYP <br><br> <u>CLASS ACTION</u> <br><br> **DECLARATION OF ANGELA FERRANTE IN SUPPORT OF KROLL SETTLEMENT ADMINISTRATION LLC'S RESPONSE TO CLASS COUNSEL'S STEP ONE MOTION** <br><br> The Hon. Benita Y. Pearson |

I, Angela Ferrante, declare under penalty of perjury as follows:

## I.      **INTRODUCTION**

1.      I am a Managing Director and the Chief Operating Officer of Kroll Settlement Administration LLC ("KSA"). I am over 21 years of age. The following statements contained in this declaration are based on my personal knowledge.

2.      I was an integral member of the day-to-day KSA administration team for the East Palestine settlement.

3.      The East Palestine train derailment was an unspeakable tragedy.

4.      This engagement was one of KSA's largest engagements ever. I personally spent substantial hours working in East Palestine at our settlement center, often spending entire weeks there. It was a privilege to be appointed by the Court, and we took our role as settlement administrator very seriously.

## II.  <u>TOPICS COVERED IN THIS DECLARATION</u>

5.     This Declaration is being submitted along with the Declaration of Scott Fenwick ("Fenwick Declaration"). I tried to avoid any unnecessary duplication. This Declaration covers the following topics:

- KSA's notice and claims gathering program (Section III);

- KSA's settlement centers (Section IV);

- The importance of class members opting into the settlement and executing personal injury releases (Section V);

- The $25,000 base payment value established by class counsel that drove the claims rate to skyrocket (Section VI);

- Class counsel's knowledge that KSA had not evaluated the claims before the claims report or the final approval hearing (Section VII);

- The parties' understanding that KSA would not calculate all payments before starting to send out payments on a rolling basis (Section VIII);

- The appeal (Section IX);

- The parties' knowledge post-distribution that KSA was processing and evaluating claims on a rolling basis (Section X);

- The dispute about the preliminary allocation for personal injury payments (Section XI); and

- The events preceding KSA's termination (Section XII).

### III.   KSA'S NOTICE AND CLAIMS GATHERING PROGRAM

6.     The Step One Motion appears to portray KSA as class counsel's damages or allocation plan expert. But as the Court's orders and the contemporaneous emails reflect, as the claims "administrator," KSA performed important administrative tasks relating to the settlement.

7.     While class counsel and their experts (not KSA) worked on the plan of distribution and the settlement formulas, KSA's first order of business was to engage in extensive efforts to provide class members with notice of the settlement and the claims process so that they could opt in to the settlement.

8.     Once KSA obtained the class list, we mailed notices and claim forms to 13,739 businesses and 371,778 residents via first-class mail on May 30, 2024. *See* Dkt. 518-7, at ¶ 5 (9/5/24 Decl. of Scott M. Fenwick of KSA in Connection with Final Approval of Settlement).

9.     We published a summary notice twice in eight local newspapers, Dkt. 518-6 at ¶ 7 (9/5/24 Decl. of Jeanne C. Finegan, APR of KSA Regarding Publication and Media Notice Implementation), and created a dedicated settlement website (www.EastPalestineTrainSettlement.com), which went live on May 31, 2024. Dkt. 518-7 at ¶ 6 (9/5/24 Fenwick Decl.).

10.    As of June 11, 2025, the settlement website had received 164,292 unique visitors.

11.    To help promote claim filing, KSA also established a toll-free telephone number (operated 24 hours a day) for settlement class members to call and obtain additional information regarding the settlement through an Interactive Voice Response system. *Id*. at ¶ 7.

12.    As of June 11, 2025, the IVR system had received 70,799 calls, and 53,332 callers had been connected to live operators.

13.　　We also maintained a post office box with the mailing address *In re: East Palestine Train Derailment Settlement*, c/o KSA, P.O. Box 5324, New York, NY 10150-5324 to receive exclusion requests, claim forms, objections, and correspondence from class members. *Id.* ¶ 8.

14.　　We engaged in an extensive media and community outreach campaign to ensure that class members received proper notice. We served more than 650,000 online display banner ads directing class members to the settlement website, along with more than 2.8 million social media impressions on Facebook, Instagram, and YouTube. Dkt. 518-6 ¶¶ 9, 11 (Finegan Decl.).

15.　　We ran over 2,200 commercials on local networks and cable television. *Id.* ¶ 15. We issued two press releases, on June 3 and August 9, 2024, reminding class members of the claim filing deadline. *Id.* ¶ 18.

16.　　Further, as directed by class counsel and defense counsel, KSA sent multiple notices to class members reminding them of the claim filing deadline and their potential claims. KSA sent a first reminder notice to class members on July 9, 2024. The first set of reminder notices consisted of postcard mailings to 187,697 class members and email reminders to 197,763 class members. KSA then sent a second reminder notice by email on July 31, 2024, and by postcard mailing on August 2, 2024. The second set of reminder notices consisted of a postcard mailing to 279,190 class members and email reminders to 105,968 class members.[1]

17.　　As stated in connection with the Court's final approval hearing, KSA's notice program was both comprehensive and highly effective. Our robust direct mail and media campaign reached approximately 99% of all class members, with an average frequency of nearly 3 times.

---

[1] The second reminder notice was mailed physically via postcard to any settlement class member for whom we did not have an email address or whose email bounced during the delivery of the first reminder notice.

*Id.* ¶ 4. And it complied fully with the timeline ordered by the Court when it appointed KSA. *See* Preliminary Approval Order, Dkt. 458 ¶ 10.

18.    To my knowledge, Epiq will not be conducting its own replacement claims gathering or notice program. *See* Class Counsel's Step One Motion ("Mot."), Ex. N, Dkt. 1012-14, ¶ 6 (Decl. of Michael R. O'Connor Regarding Administration Transfer and Status Update).

19.    In other words, all of the aforementioned work benefited the settlement fund and class members.

## IV.    KSA'S SETTLEMENT CENTERS

20.    Beyond providing notice to class members, KSA established a claims settlement center to provide direct assistance to class members seeking to file claims. The first settlement center opened on June 3, 2024, and was located at 191 East Rebecca Street, East Palestine, Ohio 44413. Class members were able to visit the settlement center and meet with a KSA team member (or one of the class counsel attorneys) to obtain settlement information and receive assistance with completing their claim forms.

21.    Through August 22, 2024 (the claim filing deadline), over 11,000 class members visited the settlement center, and over 7,600 claim forms were submitted at the facility. But even after the claim deadline, class members continued to visit the facility to obtain further information about the status of the settlement and to attempt to cure deficiencies in submitted claims. The settlement center remained open through June 2025.

22.    While in operation, the settlement center was staffed by numerous members of the KSA team, as well as by locally hired staff. The settlement center had no fewer than four employees at any given time and, at its busiest, was staffed by twelve employees on average. Given the project's significance, the settlement center was often staffed with some of KSA's most senior

leadership staff, including myself and Randall Burkholder (KSA's President and Managing Director).

23.     We were present at the settlement center on a rolling basis throughout the claim filing period and until June 11, 2025. During that time, we frequently worked between 12 and 14 hours per day. For over a year, KSA team members lived and worked in or near East Palestine, just down the road from the derailment site that is the epicenter of the ongoing medical harms suffered by the class.

24.     The settlement center continued to be used after the claim filing deadline and was an invaluable resource for class members to get questions answered and work with KSA to cure deficiencies and other issues.

25.     The settlement center costs and work all benefited the settlement fund and the class. Without the settlement center, thousands of class members would not have been able to submit claims.

## V.     THE IMPORTANCE OF CLASS MEMBERS OPTING IN TO THE SETTLEMENT AND EXECUTING PERSONAL INJURY RELEASES

26.     Along with receiving claims, another of KSA's key responsibilities was ensuring that class members received and completed individual personal injury release forms (sample attached as **Ex. 2-A**). A completed form released that class member's claims against Norfolk Southern and other parties-in-interest in exchange for a payment out of the settlement fund.

27.     Accordingly, securing legally enforceable releases was key for the parties. KSA received those forms online, by mail, and in person at the settlement center.

28.     As KSA understands, if the claims rates dropped below numerical thresholds set forth in a nonpublic agreement signed by the parties, Norfolk Southern would have gained the unilateral right to terminate the settlement wholesale—class counsel's fees included.

## VI.   THE $25,000 BASE PAYMENT VALUE ESTABLISHED BY CLASS COUNSEL DROVE THE CLAIMS RATE TO SKYROCKET

29.     Class counsel's Step One Motion claims that the plan of distribution does not start with a fixed sum of 100 points valued at $25,000 ($250 per point) that is then adjusted upward or downward based on various factors. Rather, class counsel claims that each class member had no fixed starting point sum and had to opt in without knowing what their starting point value would be. Class counsel is incorrect.

30.     Class counsel and Norfolk Southern initially agreed that the starting point value for a class member would be $10,000.

31.     Indeed, in exchange for releasing their personal injury claims, the personal injury release forms originally stated the following average payments for potential class members based on their distance from the derailment site:

- $10,000 for those within 0-2 miles of the derailment site;

- $5,000 for those within 2-5 miles of the derailment site; and

- $1,000 for those within 5-10 miles of the derailment site.

32.     However, that base payment amount was not incentivizing class members to sign up for the settlement. Indeed, on July 22, 2024, class counsel's Beth Graham emailed KSA and said:

> The low take rate on PI is putting the settlement in jeopardy. We agree weekend hours will help.
>
> M. Elizabeth ("Beth") Graham
> Partner

**Ex. 2-B** at 1 (7/22/24 email from B. Graham) (emphasis added).

33.     In response to class counsel's concern that the "low take rate on PI" was "putting the settlement in jeopardy," class counsel directed us to open the settlement center an extra day every week (now up to 6) starting that weekend. *Id.*

34.     Thereafter, class counsel and Norfolk Southern decided (without the knowledge or input of KSA) to increase the base case settlement payment by 150% from $10,000 to $25,000 (or $250 per point).

35.     KSA was not consulted or otherwise involved in class counsel's decision to increase the proposed average personal injury payment.

36.     On or about July 24, 2024, I distinctly recall that class counsel visited the settlement center and communicated to KSA that the personal injury claims received through that date (2,546) were too low—much lower than what the parties wanted.[2] From prior conversations with class counsel, we understood that, in fact, the parties believed the settlement was in danger. *See id.* (7/22/24 email from B. Graham saying the settlement was "in jeopardy").

37.     Accordingly, class counsel notified KSA that the parties had met and conferred and, in an effort to boost personal injury claims rates, had agreed to increase the personal injury point value by a substantial margin:

- $25,000 for East Palestine and 0-2 miles from the derailment site;

- $15,000 for those 2-5 miles from the derailment site;

- $5,000 for those 5-7 miles from the derailment site; and

- $2,000 for those 7-10 miles from the derailment site.

---

[2] The parties regularly received detailed information about the number and type of claims we received. During the active claim filing period, KSA provided daily claims reports and remained in constant communication with the parties. The July 24, 2024 report is attached as **Ex. 2-D**.

38.     I was at the settlement center that day. Considering the sheer size of the increased payment amount, I recall telling class counsel (Adam Gomez) that the sudden change might not be the best approach.

39.     At that point in time, neither the parties nor KSA had a full understanding of the number or types of claims yet to be filed, including claims by first responders, minors, class members that lived outside the 10-mile exposure zone but worked within it, or class members that had suffered Extraordinary Injuries. All of those would require special treatment under the settlement agreement.

40.     But class counsel assured me that the parties had thoroughly evaluated the revised point value. Class counsel told me that the underlying calculations supporting their decision had been "checked backwards and forwards."

41.     To further drive up new claims, class counsel also told KSA that the parties would be distributing pamphlets (example attached as **Ex. 2-C**) reflecting these revised amounts throughout East Palestine and encouraged KSA staff at the Settlement Center to stress these revised amounts to class members.[3]

42.     In those pamphlets, class counsel told their clients that "[b]ased upon claim filings as of right now, it appears early preliminary estimates have proven to be conservative, and a greater per person Personal Injury Payment will be available." *Id.* The key portion of the pamphlet is below:

---

[3] As **Ex. 2-A** shows, the personal injury release forms were never updated to reflect the parties' decision to increase their proposed average payments. KSA requested the parties' permission to print and distribute revised, correct personal injury release forms, but the parties directed KSA not to do so.



43.     We had no information about class counsel's "preliminary estimates," or how they had "proven to be conservative." Class counsel never shared how they came up with their new $25,000 "base payment," which, as discussed in the Fenwick Declaration, ultimately locked in the value of each point under the plan of distribution.

44.     I also understand that a video recording of an August 1, 2024 town hall by class counsel was recently posted to YouTube. As shown in the video recording, class counsel communicated to their clients that they had vetted their preliminary base payments of $25,000 and that class members should expect to receive—at a minimum—$25,000. *Entire Class Action Attorney Town Hall 8-1-24*, YOUTUBE (Aug. 1, 2024), https://www.youtube.com/watch?v=OoiAgy1TLpM. KSA was not part of that presentation by class counsel to their clients.

45.     But, as you can see, Adam Gomez of class counsel explains during the video:

I touched upon this before, but as I mentioned, our claims estimates and the value of the claims that were originally provided in the notice [$10,000] were based on intentionally conservative estimates. What we do not want to do is overpromise and underdeliver in any respect. So we used historical data and other resources to gauge

what those payments could be like always explaining that they could change upwards as we receive more claims information.

We are now at the point where, again, we're able to revise those personal injury payments up to the tune of $25,000 per person in East Palestine ….

*Id.* at 44:37–45:23.

46.     Class counsel's plan to increase personal injury claim rates worked.

47.     On July 24, 2024 (roughly six weeks after the settlement center opened), KSA had received approximately 2,500 personal injury claims, as noted above. But after that date, the personal injury claims increased over 300% through the end of the claim filing period:

| Week of | Number of PI Claims Filed |
|---|---|
| 29-Jul-24 | 3,943 |
| 5-Aug-24 | 6,323 |
| 12-Aug-24 | 9,390 |
| 19-Aug-24 | 15,963 |

**VII.     CLASS COUNSEL KNEW THAT KSA HAD NOT EVALUATED THE CLAIMS BEFORE THE CLAIMS REPORT OR THE FINAL APPROVAL HEARING**

48.     Class counsel's Step One Motion appears to suggest that KSA could have immediately processed and validated all of the claims received, before either the claims deadline or the final approval hearing. This is inaccurate, as the Fenwick Declaration further demonstrates.

49.     At the end of August 2024, as class counsel understood, the claims process remained ongoing. As we made sure to note in the claims report, we "continue[d] to receive timely Claim Forms and Personal Injury Release forms submitted by Settlement Class Members through the mail." Mot., Ex. G, Dkt. 1012-7, at 19. KSA could not have processed all claims, as class counsel contends, because KSA had not even *received* all of the claims. We continued to receive and process new claims for months afterward. *See id.*, Ex. I, Dkt. 1012-9, at 4-49.

50.    Before KSA could start evaluating and calculating those claims, each one had to "be scanned, then data entered, then processed for various conditions, then processed for various deficiencies, then QA'd." **Ex. 1-I** at 2 (8/8/24 email from A. Ferrante).

51.    It was a huge undertaking. I explained this to class counsel weeks earlier, when I clearly communicated that KSA had not (and would not) be evaluating and calculating all claims before preparing the claims report:

> I also want to note for the benefit of the group that pursuant to the terms of the settlement agreement we must have our claim report to all counsel within 7 days of the claim filing deadline (8/29). This will only be the count of direct claims and PI claims in our possession. We hope it is evident that we cannot have every claim reviewed and deficiencies identified and cured by this date. Notably, we will likely still be receiving timely claims postmarked prior to the filing deadline as we are preparing the 8/29 claim report.

*Id.*

52.    That continued to be the case, as class counsel knew fully. Indeed, documents submitted to the Court by class counsel in connection with the final approval hearing stated that KSA was still "in the process of reviewing Claims to identify those that are deficient in any manner," and how that would be the case for "several months." *E.g.*, Dkt. 518-7, ¶ 20 (9/5/24 Fenwick Decl.).

## VIII.  THE PARTIES UNDERSTOOD THAT KSA WOULD NOT CALCULATE ALL PAYMENTS BEFORE STARTING TO SEND OUT PAYMENTS ON A ROLLING BASIS

53.    Class counsel's Step One Motion states that KSA should have refused to pay out claims to class members until it had processed and evaluated all claims, determined the total number of points, and apportioned class counsel's preliminary personal injury fund allocation

accordingly. This ignores the Court-ordered settlement documents, as the Fenwick Declaration explains.

54.     This also ignores the immense timing and other pressures on KSA (and the parties, for that matter) to begin rolling out settlement payments.

55.     On September 27, 2024, the Court entered an order finally approving the settlement (the "Final Order"), which provided as follows:

- "The Parties and their counsel are *hereby directed to implement and consummate the Settlement Agreement and the Plan of Distribution, according to their terms and conditions*." Final Order, Dkt. 557, ¶ 18 (emphasis added).

- "*The Parties are hereby authorized to agree to adopt such amendments, modifications, and expansions of the Settlement and Plan of Distribution* and their implementing documents, including the Settlement Agreement and all Exhibits to the Settlement Agreement, *without further approval from the Court*, if those amendments, modifications, or expansions (a) are consistent in all material respects with this Order and (b) do not limit the rights of Settlement Class Members." *Id.* ¶ 24 (emphases added).

56.     The Court's Final Order started the clock. Under the settlement agreement, KSA and the parties were required to "begin" distributing payments within 30 days of final approval. Settlement Agreement, Dkt. 452-2, § XIII(D). So, KSA immediately began working with the parties to implement the distribution process and begin getting checks out.

57.     There was immense, mounting community pressure on the parties and KSA to start paying claims.

58.     At times, I and other KSA employees on the ground in East Palestine even feared for our safety. KSA spent hundreds of thousands of dollars hiring security to protect us and class counsel as we worked at the settlement centers. *See* **Ex. 1-V** (East Palestine engagement billing analysis). KSA's CEO was the target of threats and online harassment at one point. For example, around December 2024, I saw a comment on Facebook reacting to posts about the settlement that said, "I wouldn't put it past Americans to remind [KSA] how CEOs are handled."

59.     Both class counsel and defense counsel repeatedly stressed that it was crucial that payments went out as soon as possible, recognizing that the community had been waiting for payments since the derailment occurred, almost two years earlier. Class counsel never asked about point values (which class counsel had already preset in the plan of distribution) or told KSA to calculate all payments before distributing checks. And again, the plan of distribution sets the point value at a fixed amount, with "pour over" and holdback provisions if the "preliminary allotment" to a particular fund is exceeded. *See* Fenwick Decl. ¶¶ 21-22, 31-39.

## IX.     THE APPEAL

60.     On October 8, 2024, notices of appeal were filed challenging the direct payments and business loss payments—around half of the total settlement.

61.     Distributions related to those portions of the settlement fund were stayed pending appeal.

62.     At no time after the appeal was filed did class counsel ask KSA to double-check class counsel's allocation estimate.

63.     I understand that that the appeal was recently resolved.

## X.     THE PARTIES KNEW POST-DISTRIBUTION THAT KSA WAS EVALUATING CLAIMS ON A ROLLING BASIS

64.     Class counsel's Step One Motion appears to suggest that class counsel was in the dark about KSA's calculations, payments, and other administration activities until early May 2025. But countless emails show that class counsel was well aware that "[KSA] had not reviewed and preliminarily scored all relevant claims before issuing checks." Mot., Dkt. 1005-1, at 12.

65.     After the notice of appeal, the parties directed KSA to begin processing and calculating the submitted personal injury claims for imminent distribution under the settlement agreement. KSA and the parties agreed that KSA would attempt to start sending out personal injury

determination letters by mid- to late-November, so around a month later. **Ex. 2-F** at 1 (10/2/24 email from S. Fenwick).[4] A screenshot of the email is below:

> Thanks for this Adam, and thanks for your time earlier.
> Just to confirm a few items from our call:
> • Even though appeal(s) may be forthcoming, we are to continue pressing forward with all work at this time, unless you (Counsel) direct us to put pencils down.
> • We will get you some estimates on added administration costs if the settlement is on appeal for upwards of a year.
> • Our focus is on PI Payments. Here is what will transpire this month and into November, in light of the payment appeals process in the attached:
>   ○ We will begin sending out PI payment amount letters this month.
>   ○ PI Claimants will have 10 days per the attached to challenge their calculated payment amount.
>   ○ If no challenge, we can proceed with the payment. Based on this process, I would anticipate PI payments will begin to go out in mid to late November. As we discussed, this satisfies the requirements under the Settlement, as PI payments will begin by year end (as subject to claim validation).
>   ○ If a Claimant challenges their payment, the steps in the attached will be followed.
> • Regarding the Plan of Distribution; under the Household Composition (Children) category, the .90x multiplier applies to households with 2 or fewer children (this incorporates households with no children).

*Id.*

66.    At this time in October, most of the claims still required extensive processing and analysis. In part, this was due to the complexity of the claim forms and required documentation. And unlike many other settlements, most of the claims in this administration were filed physically on paper, rather than electronically. Processing each claim required a KSA staff member to manually enter and cross-check all associated data for accuracy.[5] *See also* **Ex. 1-I** at 2 (8/8/24

---

[4] As noted above, KSA took instruction from the parties on the interpretation and application of the plan of distribution. The parties (not KSA) were authorized to agree to adopt such amendments, modifications, and expansions of the settlement and plan of distribution and their implementing documents without Court approval, including the settlement agreement and all exhibits to it.

[5] Unfortunately, because data relating to different factors and categories could be (and was) placed in multiple locations on the claim forms, including the margins, it was impossible to use OCR technology or a similar tool to process the claims more expeditiously.

email from A. Ferrante emphasizing that the claims intake procedures required "a tremendous amount of resources to process").

67.     For scale, we received over 50,000 claims, which continued to roll in for weeks and months after the final approval hearing.[6] Not surprisingly, the claim intake process (which was mainly conducted by the employees at the two settlement centers), associated data processing, and subsequent quality control was very time- and labor-intensive. And because class counsel had not shared the draft plan of distribution until late August 2024 (or the final plan of distribution until late September), we had been unable to get a jump on the calculations.

### The Parties Knew KSA Was Performing Calculations and Payments in Batches

68.     KSA and the parties agreed that we would calculate and distribute personal injury payments on a rolling basis, starting with payments to class members whose claims had been fully processed and contained no anomalies or deficiencies. That was the first batch of several that were processed in that manner, subject to the review and approval of the parties. Beginning with that batch, we began sending determination letters to each personal injury claimant, which would note their calculated payment amount under the plan of distribution.

69.     Each determination letter notified the class member that they had 10 days to accept (by check or ACH), challenge, or appeal their calculated payment amount. If no challenge was

---

[6] For instance, on November 18, KSA received a number of timely claims lost due to a post office error. Mot., Ex. I, Dkt. 1012-9 at 3. That was a problem, but not because it would somehow upend the allocation totals or change the value of a point. As the same email chain shows, we had been receiving and processing hundreds of new claims for months. *See id.* at 4-49. Indeed, class counsel did not direct KSA to stop payment and calculation efforts to process the newly discovered claims (*see id.* at 1-2), as they now contend. Mot. at 9 (claiming that KSA "needed to conduct that review as soon as possible in order to continue with the process").

received within 13 days (the 10-day notice period plus a 3-day buffer) KSA would proceed with the payment process.[7]

70.     But if a class member challenged their payment within the 13-day period, we followed the process outlined in the Appeals of Claim Determinations document that class counsel filed with the Court as a supplement to the plan of distribution. *See* Dkt. 525. KSA would consider the supporting documentation or other evidence provided in their appeal and within 30 days would issue a revised claim determination letter or a notice affirming the original claim determination, or would request additional information.

71.     Any class member who still disagreed with the dollar amounts calculated could appeal to a Special Master within seven days of the date of KSA's revised determination and, seven days after that, could appeal to the Court.[8] There were many layers of review built into the system, which operated to catch as many errors as possible before any given calculation was deemed final.

72.     The first batch of award determination letters were sent out on October 31, 2024, and those claimants had until November 13th to accept or challenge the amount calculated under the plan of distribution. For class members who accepted payment by ACH, we processed their payments promptly after the response deadline. For class members who opted to receive a check

---

[7] Given the potential for fraudulent claims in a settlement administration of this size, KSA and the parties determined that a second phase made sense for claimants who opted not to receive their payment by ACH. We also hoped to avoid a local mail carrier carrying thousands—and potentially millions—of dollars on any given day. If no objection was received, we agreed that class members set to receive more than $2,000 of personal injury payments by check would receive a second letter, which asked them to make an appointment to pick up their checks at the settlement center.

[8] As of the transition date to Epiq we understand there to be five claims that required further review by the Special Master. KSA is unaware of any claim determination appeals that required the Court's guidance to resolve.

for an amount greater than $2,000, on November 26, 2024, we sent letters to each claimant instructing them to make an appointment to pick up their checks at the settlement center. Those payments were made available for pick-up at the settlement center the first week of December 2024. And for class members who did not respond to their determination letters, and whose payment amounts were less than $2,000, we distributed their payments by USPS Priority mail on December 2, 2024.

73.    As these payments were made, we were still processing and calculating claims in upcoming batches, and the parties knew that. *See* Mot., Ex. I, Dkt. 1012-9, at 4-49; **Ex. 1-Q** at 1 (11/25/2024 email from D. Cataldi telling class counsel that "[t]he next round of payment calculations are still in review at the moment").

## Ongoing Deficiency Review Process

74.    Class counsel's Step One Motion also glosses over how, the whole time, KSA was still validating claims based on the parties' agreed deficiency review process, which aimed to ensure that deficient or incomplete claims were cured and could receive appropriate consideration for payment. *See* **Ex. 1-O** at 1 (11/12/24 email from M. Strachan providing class counsel with a chart showing that thousands of deficiency letters were pending or had been sent out).

75.    The parties were fully aware of this. This ongoing process is also inconsistent with class counsel's new position that the expectation was that all claims would be fully evaluated before the point value was determined.

76.    If a personal injury claim was determined to be deficient in any manner, we would send a deficiency letter identifying the information required to complete or correct the claim and providing instructions on how to cure the deficiency. We would send a deficiency letter when, for instance, a direct payment claim was filed but not all members of the household filed personal

injury claims, or when the personal injury claim had an anomaly or was missing key calculation information (for example, proof of residence in East Palestine).

77.   Claimants were then provided with 45 days to respond with revised or supplementary documentation. But if the claimant failed to reply to the deficiency letter or cure the deficiencies within that time, the claim would be rejected. (And even then, many rejections could be appealed.)

78.   To help the community understand and cure these deficiencies, we re-opened the settlement center in mid-September 2024. From the beginning, we understood from class counsel that the deficiency review process would "continue well after Final Approval." Dkt. 519-1 at 4 n.2 (Pl.'s Memo. in Support of Approval and Implementation of the Plan of Distribution).

79.   As that process continued, the total number of validated (not deficient) claims continued to grow, which affected the number of payable claims. Until all of a claim's deficiencies were cured and the claim was determined to be accurate, it could not be evaluated, calculated, and paid under the plan of distribution.

80.   We continued reviewing deficiencies and sending out deficiency notices (subject to party approval) through May of 2025, as class counsel were aware. *See* **Ex. 2-G** at 2 (3/18/25 email from M. Strachan reminding class counsel that "there are still a few deficiency letters that will need to be sent" as KSA's review continues); **Ex. 1-T** at 1-4 (5/28/25 emails confirming that class counsel directed KSA to proceed with processing deficiencies "in the ordinary course" through May 2025).

**Class Counsel Worked with KSA on a Daily Basis**

81.     Despite what class counsel now claim, the parties were kept closely apprised of the distribution process and the amounts being paid out.

82.     After KSA calculated payments according to the plan of distribution, we would send all calculations, deficiency determinations, and relevant documentation to Class Counsel and Norfolk Southern for their review, including a full claim file and images of each personal injury release. *See* **Ex. 2-H** at 1-2 (10/23/24 email from P. Ferruzzi providing defense counsel and class counsel with that information); **Ex. 2-H-1** (selected columns from spreadsheet referenced in email showing breakdown of personal injury payments).

83.     No payment went out until Norfolk Southern signed off on KSA's calculations and determined that KSA had correctly applied the plan of distribution to the materials submitted by the class member. *See* **Ex. 2-H** at 1 (10/24/24 email from A. Prizgintas approving payments as outlined in the attached spreadsheet).   In **Ex. 2-H**, for example, Norfolk Southern, with Class Counsel copied, approved payments in amounts that use the $25,000 base payment formula from the plan of distribution. *See id.*; *see also* **Ex. 2-H-1** (spreadsheet of payment amounts and point totals). If any issues were discovered, Norfolk Southern would flag the issue for KSA, which would make any corrections needed before paying the claim. *See* **Ex. 2-I** at 7 (12/20/24 email from K. Mackey approving round of calculations and flagging questions from counsel). KSA sent Norfolk Southern approximately 5,055 class members' full payment calculations and personal injury releases for review and approval, which ensured that those claims were correctly processed according to the parties' eligibility standards and allocation plan.

84. To my knowledge, class counsel was copied on virtually every email between KSA and Norfolk Southern that discussed the claims to be reviewed and the timeline to review them in. *E.g.*, *id.*

85. Class counsel were always aware that KSA had not processed and calculated all personal injury claims—we were doing so in batches, on a rolling basis, according to the distribution procedure they directed us to follow. *See* **Ex. 2-J** at 1-2 (2/5/25 email from M. Strachan providing counsel with a chart showing KSA's progress on the first five batches of calculations and determination letters).[9]

86. Never once did the parties, notably extremely sophisticated parties, instruct KSA to pause payments, go back, and "review[] and preliminarily score[] all relevant claims before issuing checks." Mot. at 12. They never once asked about the point value because the point value was fixed per the Court-ordered settlement documents.

87. Further, during this process, we frequently provided class counsel with detailed payment reporting statistics for the claims that Norfolk Southern had approved and we had paid. For example, class counsel was briefed on the number of claims in each batch calculated, the average payment amounts to class members, and the total distribution amounts for each batch. *See, e.g.*, **Ex. 1-X** at 1 (11/27/24 email from D. Cataldi providing all relevant information for the first batch of payments).

---

[9] There were many additional factors, conversations, and considerations. As we continued to calculate claims, we were constantly receiving guidance from class counsel on how to deal with certain borderline or otherwise tricky claim situations. *See, e.g.* **Ex. 2-K** (1/8/25 email from P. Ferruzzi memorializing class counsel's calculation instructions for first responders, local workers, and others). But in all those conversations, class counsel never said a word about pausing payments until all calculations were done. They directed us to send them out faster.

### To Speed Up Rolling Calculations/Payments, Class Counsel Suspended Some Review Procedures

88.     Due to the number and complexity of the claims in each batch, defense counsel's close review typically took between two to five weeks. *See* **Ex. 2-J** (2/5/25 email from M. Strachan).

89.     However, class counsel appeared to be getting increasingly frustrated that the rigorous claim review process was taking so long. **Ex. 2-L** at 1-2 (12/19/24 email from B. Graham pressing for payments to continue getting out sooner).

90.     On December 21, 2024, because of ongoing community pressure and class counsel's insistence that claims had to be processed faster, KSA drafted a press release to update the community on the timing of calculations and payments, attached as **Ex. 2-M**. The press release, which was sent to class counsel, noted:

- "The [KSA] team is working as fast as possible to process Personal Injury claims." *Id.* at 3.

- "Any Personal Injury claim that is deficient in any manner are sent a letter with instructions on how to cure (correct) the deficiency." *Id.* at 4.

- "[KSA] had no role in determining the terms of the Settlement and Plan of Distribution. [KSA] is responsible for administering the Settlement per the terms of the Settlement Agreement, the Plan of Distribution and other Court orders." *Id.*

91.     Class counsel never disagreed with the substance of KSA's press release. But they vetoed sending it out—despite the fact that it would have provided much-needed visibility to class members. *See* **Ex. 2-N** at 1 (12/23/24 email from class counsel to KSA). Class counsel reemphasized that they just wanted KSA to move faster on processing and calculating claims, getting checks out, and completing the deficiency and appeal processes.

92.     Despite KSA "pushing as hard as we [could to] get more personal injury payments issued," thousands were still under review by Norfolk Southern, with thousands more that we were waiting for them to begin looking at. **Ex. 2-L** at 1 (12/19/24 email from M. Rapazzini explaining the ongoing review process to class counsel).

93.     Given that, the parties began discussing the personal injury payment process and how Norfolk Southern's review could be streamlined "so that th[e] PI payments can go out as quickly as possible." **Ex. 2-I** at 9 (12/11/24 email from A. Prizgintas).

94.     The parties thus began to revise the process.

95.     On December 19, 2024, the parties conferred and directed KSA to expedite the calculation process. In other words, spend less time reviewing and validating outgoing calculations before sending them to Norfolk Southern for counsel's approval. The parties discussed limiting the scope of Norfolk Southern's review to further ensure that payments could go out as quickly as possible.

96.     On or about January 16, 2025, the parties directed KSA to stop sending Norfolk Southern the full payment calculations and to, going forward, calculate and pay personal injury claims without their continued review of the calculations.

97.     A few weeks later, on or about February 8, 2025, KSA team members reminded the parties that, on top of everything else, KSA and the parties had not begun reviewing claims asserted by class members alleging extraordinary injuries, which could have a material impact on personal injury payments. Class counsel acknowledged the potential impact of outstanding extraordinary injury claims and determined that they would review the extraordinary personal injury and business loss claims themselves, rather than pay KSA to do so.

98.     Then, in the months that followed, KSA continued processing and calculating claims on a rolling basis. We continued to do so according to the methodology approved by the parties and as required by the plan of distribution. Because KSA had processed and paid a substantial number of the total claims submitted, we began providing the parties with reports noting the payments made and the percentage of total claims paid. The parties had not requested that reporting, but we thought it could provide helpful context as the administration progressed into its later stages.

99.     The first report with this level of detail was sent on March 25th. **Ex. 1-R** (3/25/25 email providing data regarding claims filed, the percentage processed for payment, and the total amounts paid, as well as reminding class counsel to notify KSA "if you would like to see anything in addition or different"). We sent another one six days later, attached as **Ex. 2-O** (4/1/25 email providing the same information, along with estimated payment totals for pending determination letters), and another three weeks after that responding to several follow-up questions from class counsel. **Ex. 1-S** (4/24/25 email from P. Ferruzzi providing A. Gomez with total and projected determination letters sent).

100.    Notably, the latter email from Mr. Ferruzzi shows that class counsel was aware well into April 2025 that calculations were still being performed. *See id.* at 1 ("In addition, we are working on calculations for approximately 13,000 valid class members and we anticipate having their determination letters sent out around the week of May 21, 2025, after the QA is completed.").

101.    We then sent one last report on May 1, attached as **Ex. 2-P** (5/1/25 email from M. Strachan updating the previously provided payment statistics).

102.    Even with the first report, it became clear that continuing to pay claims at the current rate (that is, continuing to properly apply the parties' plan of distribution) would create a

risk of exceeding the "preliminary" allotment. Claim deficiencies were being cured on an ongoing basis, resulting in numerous and often high-value claims.

103.    We told the parties this, but each time we were directed to the "pour over" and holdback provisions in the settlement agreement.[10] Despite multiple detailed reports over a three-month period, class counsel still never expressed concern or directed KSA to stop processing and paying claims.

## XI.    DISPUTE ABOUT THE PRELIMINARY ALLOCATION FOR PERSONAL INJURY PAYMENTS

104.    During a May 6, 2025 phone call, I understand that Mr. Fenwick again advised class counsel that continuing to apply the terms of the plan of distribution could result in the potential oversubscription of the preliminary amount allocated to the personal injury settlement fund. Class counsel's Adam Gomez again directed KSA to the provision in the plan of distribution that provides: "Preliminary assignments to each program are subject to 'pour over' provisions and can be re-allocated as necessary to achieve fair, reasonable and adequate compensation of all claims within a given program." *See* Mot., Ex. L, Dkt. 1012-12 at 2 (5/6/25 email from A. Gomez: "Just caught up with Scott.").

105.    About a week later, on May 12, 2025, class counsel asked KSA to join a call to discuss alleged "overpayment errors" and requested a report of all payments made. On May 13, 2025, KSA, including its President and Managing Director, Randall Burkholder, joined a call with class counsel where KSA was accused of not following the plan of distribution. Class counsel claimed that KSA should have calculated the personal injury payments pro rata instead, or

---

[10] As set forth in the Fenwick declaration, conversations about potential for overpayments began sometime in late March after we provided class counsel our report with additional claims data on March 25th. Fenwick Decl. ¶¶ 45-46; *see* **Ex. 1-R**.

otherwise underpaid Class Members. Class counsel asserted KSA was responsible for the fact the "preliminary allocation" for personal injury payments was ahead of pace by $17 million. Class counsel demanded that KSA fund this "shortfall."

106.    At no point was KSA directed to distribute the personal injury funds pro rata. KSA was always directed by the parties to proceed with payments in accordance with the plan of distribution, and they were kept apprised of the same along the way, as noted above. Indeed, there is no mention of pro rata calculations in the plan of distribution or the settlement agreement with respect to personal injury payments. The only reference to pro rata calculations in either the plan of distribution or the settlement agreement is with respect to direct payments and business loss payments.

107.    The parties signed off on both the payments to be made and the methodology KSA used to calculate them. Counsel for Norfolk Southern reviewed and approved those payments and the amounts thereof on October 24, 2024; December 20, 2024; and January 2, 2025 (3,377 payments totaling $22,565,118.61). **Ex. 2-H** at 1 (10/24/24 email from A. Prizgintas approving payments); **Ex. 2-I** at 6-7 (12/20/24 and 1/2/25 emails from K. Mackey approving payments), **Ex. 2-J** at 1-2 (2/5/25 email from M. Strachan showing approval timeline). Of the 10,075 personal injury payments paid by KSA to date (totaling $59,955,550), 33.5% of the total paid population and 37.6% of the total dollars paid were approved by the Parties—using the base of 100 points valued at $25,000 set forth in the plan of distribution.

108.    Further, and perhaps most notably, to perform a pro rata calculation, all claims would have needed to be fully reviewed and assigned claim values before the total personal injury allocation could even be estimated. But class counsel never asked for or mentioned a point value, because class counsel had already given it to KSA. Indeed, the Parties were well aware that KSA

continued to undertake the review process and stressed the importance of paying claims on a rolling basis, as described above.

109. Notwithstanding these baseless allegations, KSA continued to work and confer with the Parties. KSA provided a full accounting of all personal injury claims the same evening of the call on May 13, 2025.

110. As KSA continued to review what had been done to ensure nothing had been missed, a calculation error issue was discovered. *See* Fenwick Decl. ¶¶ 53-61. On May 15, 2025, Mr. Burkholder received an email from class counsel also identifying the issue, which related to the application of the point system with respect to claimants with East Palestine addresses but who were not in the Village of East Palestine. In essence, claimants who live in East Palestine but have addresses greater than 2 miles from the derailment site were subject to reductions based on location and distance from the derailment site that had not been applied. Mr. Burkholder promptly replied that KSA had identified the same issue. Mot., Ex. Q, Dkt. 1012-17 at 1 (5/15/25 email from R. Burkholder).

111. In connection with that email, class counsel requested an additional report with all 10,075 paid claims as well as all images of the actual claim forms. That report and the claim forms requested were posted on a secure file folder on May 20, 2025.

112. On May 21, 2025, in good faith and despite it being outside the scope of our retention, Mr. Burkholder circulated a report of the paid claims with six proposed scenarios to try to assist the parties with the "overpayments," which were discussed with the parties on a call held that same evening. During that call KSA made clear that it would pay for any actual errors made, including the East Palestine versus Village of East Palestine distance calculation issue that had been identified.

113.    During that call, KSA suggested six options for the parties' consideration of how the shortfall could be addressed: (1) a calculation of what all claims would receive if they were all paid pro rata using $130,000,000 in the personal injury payment "bucket"; (2) a calculation where the claims already paid would remain as paid (~$60,000,000 and no claw back of the funds)[11] and paying all remaining claims a pro rata share of the remaining $70,000,000 funds; (3) a calculation where the claims already paid would remain as paid (~$60,000,000 and no claw back of the funds) and paying all remaining claims using a tiered base payment amount based on distances from the derailment site ($17,000 base for those 2 miles or less from the derailment site, $10,000 base for those 2-3 miles out, $9,000 base for those 3-4 miles out and $7,500 base for those 4-10 miles out); (4) a calculation where the claims already paid would remain as paid (~$60,000,000 and no claw back of the funds) and paying all remaining claims using a tiered base payment based on distances from the derailment site and then adjusting those payments pro rata based on the $70,000,000 remaining; (5) a calculation where the claims already paid would remain as paid (~$60,000,000 and no claw back of the funds) and paying all remaining claims using a tiered base payment amount applied to all claims based on distances from the derailment site; and (6) a calculation where the claims already paid would remain as paid (~$60,000,000 and no claw back of the funds) and paying all remaining claims the original payment amounts noted in the personal injury release forms (*e.g.*, **Ex. 2-A**) and applying a pro rata increase for those less than 2 miles from the remainder of the $70,000,000.

---

[11] Importantly, KSA did note as part of these discussions that approximately $5 million in payments had not yet been cashed and those payments could be canceled and recalculated based on the future handling that the parties would agree on. But KSA was instructed not to cancel those payments.

114.    These calculations, of course, raise the question of where the money to cover the shortfall would come from if the parties chose option one, which they indicated they were most in favor of.[12]

115.    Accordingly, class counsel asked KSA to undertake an analysis where we would debit overpayments from future payments to be made as direct payments, knowing, of course, that not all class members would be entitled to direct payments (first responders, for example).

116.    In order to do this analysis, all direct payment claims would have needed to have been calculated, which had not yet been done as of that date. KSA was asked how quickly we could put that together, and we noted that we would work expeditiously to calculate those claims based on the information we had at that time. We reiterated that, although all claims had been processed by that time, as the parties were aware, the claims had not yet been fully reviewed for accuracy, because the parties had agreed that KSA should focus on the personal injury claims and the processes relating to payment of those claims, as well as identifying and curing deficiencies. Notwithstanding, KSA committed to providing that report by June 13, 2025.

## XII.    EVENTS PRECEDING KSA'S TERMINATION

117.    As KSA was working on the report, KSA also began processing an additional batch of deficiencies.

118.    On May 27, 2025, KSA uploaded data relating to 1,160 claims marked either deficient or rejected, seeking guidance on what class counsel would like us to do with respect to

---

[12] As noted above, the parties have wide discretion on how to handle payment allocations pursuant to the final order and could have selected one of the options provided without needing to address curing the "shortfall," especially since they have indicated since these conversations began that they believe the payments should have been made pro rata from the inception.

those claims because payments were on hold until further notice. **Ex. 1-T** at 6-8 (5/27/25 email from P. Ferruzzi).

119.    On May 28, 2025, KSA continued to follow up asking class counsel for guidance on how they would like to handle those and the 10,600 claims that had been previously tagged as needing to be rejected. *Id.* at 4-5 (5/28/25 email from P. Ferruzzi). Also on May 28, 2025, class counsel looped in defense counsel (to our knowledge this was the first time defense counsel had been made aware of the issues that had been discussed since May 6th), noting that "[*KSA*] *should process these claims in the ordinary course as it would with any other deficiencies or rejections.*" *Id.* at 2-4 (5/28/25 email from A. Gomez) (emphasis added).

120.    Given all of the discussions that had been occurring since May 6th, I personally followed up later that day seeking express confirmation from the parties on how to proceed with the rejection letters. Counsel continued to wash their hands of handling and next steps, replying: "*If the claims are deficient, they should follow the deficiency process that* [*KSA*] *has implemented for all other claims. If the claims are invalid based on* [*KSA*]*'s review, a determination should be issued to that effect.*" *Id.* at 3 (5/28/25 email from A. Gomez) (emphasis added).

121.    I attempted to seek direction or clarification by sending two additional requests. *Id.* at 1-3 (5/28/25 emails from A. Ferrante). Receiving no direct answers or instructions, and seeking to limit further conflict, KSA ultimately proceeded with sending the rejection and deficiency letters. We believed that the parties were proceeding in good faith, never once guessing that the parties would seemingly purposefully place us in a position where the letters would go out and the parties would move to have us replaced.

122.    Before sending them, I sent the following email to Adam Gomez, which he never responded or objected to:

Thanks Adam. On the 924 deficient claims, we had categorized them in various categories, and we wanted the parties to confirm that they would not prefer us handle a subset of them differently based on the specific categories assigned. We understand your email to be instructing us to proceed with sending deficiency notices to all of them, irrespective of category, which we will do.

On the 190 invalid claims, we also understand that you wish us to proceed with sending them rejection letters, which we will also do.

*Id.* at 1 (5/28/25 email from A. Ferrante).

123.    Also starting on May 28, 2025, class counsel began pressing for a compressed timeframe on the delivery of the direct claims report we noted would be provided on June 13, 2025. **Ex. 2-E** at 8-9 (5/28/25 email from B. Graham requesting calculations "before 6/13").

124.    Class counsel followed up again on May 30 and June 4. *Id.* at 3-5 (5/30/25 and 6/4/25 emails from B. Graham). We responded that we were doing our best to expedite our review, but that the very earliest we could deliver the report would be June 11th and that we could not be certain it would be ready so quickly. *Id.* at 3-4 (5/30/25 and 6/4/25 emails from A. Ferrante).

125.    To keep the parties apprised of our progress, I proactively emailed class counsel on June 9th to inform class counsel that we were still diligently working on the report and were doing our best to deliver earlier than June 13th. *Id.* at 1-2 (6/9/25 email from A. Ferrante). I did so again on June 11th, when it became clear it would not be possible to deliver the report sooner than June 13th. *Id.* at 1 (6/11/25 email from A. Ferrante).

126.    On June 11, 2025, KSA was notified that the Court had entered an order terminating its retention as settlement administrator. Notwithstanding all of the work being done and what we believed to be collaboration with the parties, KSA was not told that class counsel was going to seek KSA's termination. Indeed, the June 11th Court order was the first time KSA had any notice of that fact.

127.    KSA still provided the report on June 13, 2025, as promised, and cooperated fully in the transition to the new administrator, Epiq. **Ex. 1-U** (6/13/25 email from S. Fenwick providing report).

128.    Also, class counsel's Step One Motion appears to imply that KSA only sent out deficiency letters to class members on June 11th, the same day it was terminated. Those letters were sent out after advising class counsel they were being sent out, and before KSA received the termination order.

## CERTIFICATION

I declare under penalty of perjury under the laws of the United States that the above is true and correct to the best of my knowledge and that this declaration was executed on November 24, 2025, in Port Washington, New York.

_____
ANGELA FERRANTE