**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: EAST PALESTINE TRAIN DERAILMENT | : <br> : <br> : <br> : | Case No. 4:23-cv-0242 <br><br> Judge Benita Y. Pearson |

**CLASS COUNSEL'S REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR STEP ONE MOTION FOR AN ORDER TO SHOW CAUSE AGAINST <u>KROLL SETTLEMENT ADMINISTRATION LLC</u>**

I.  **INTRODUCTION**

For all its efforts to reframe the undisputed record of its many deviations from the Court's orders in administering this Settlement, Kroll Settlement Administration LLC's ("Kroll") Opposition to Class Counsel's Step One Motion for Order to Show Cause ("Response") cannot overcome three dispositive truths that compel a finding of contempt: (1) points-based systems for determining class member awards in a class action "enable[] each claim to be valued equitably along the specific dimensions for which points are awarded, **with determination of the precise dollar amount of each point reserved until the various uncertainties in the size of the fund and the values of the valid claims against the fund are *finally resolved*"**[1]; (2) the Court's orders approving the Settlement and adopting the Plan of Distribution (the "Plan") required such a points-based system for calculating Class Members' Voluntary Exposure Payments[2]; and (3) although Class Counsel never directed, instructed or otherwise told Kroll to deviate from the points-based system set forth in the Plan,[3] Kroll violated this Court's orders by failing to properly implement the Plan. Despite terming them mere "calculation errors," Kroll cannot deny its distribution of the Voluntary Exposure Payments deviated from the Court's orders, including, *inter alia*, that Kroll failed to accurately determine the correct address for claims, entirely failed to record whether Class Members were physically present in the Class area, failed to accurately apply direction and location points, and in two categories, Kroll invented and applied multipliers that did not exist in the Plan.[4] Kroll's entire explanation is premised on "calculation errors" and the untenable position

---

[1] Declaration of Professor Lynn A. Baker, ECF No. 519-3, attached as Exhibit A, at ¶22.
[2] ECF Nos. 555, 557.
[3] Nov. 13, 2025, Deposition Transcript of Scott Fenwick ("Fenwick Tr."), attached as Exhibit B, 32:1-5.
[4] *See* Class Counsel's Memorandum in Support of Their Step One Motion for an Order to Show Cause Against Kroll Settlement Administration LLC ("Opening Memorandum") at 15-18; Opening Memorandum Exhibit N, Declaration of Michael O'Connor, at ¶¶ 43-44 (explaining Kroll

1

that this Court's orders required it to assign all Class Members a starting point of $25,000 (based the value of a point being $250) for Voluntary Exposure Payment *before* Kroll had any idea what the value of all claims would be, or whether all Voluntary Exposure claims would exceed the approximately $120 million allocated specifically to Voluntary Exposure Payments.[5]

To justify its repeated deviations from the Plan, Kroll relies on a selection of misleading or incomplete quotes and misstatements from its own representatives, many of which are set forth for the first time in declarations attached to its Response, all to blame Class Counsel for Kroll's own errors. Simply put, these statements lack any credibility. In this respect, the Court need look only to Scott Fenwick, a senior director at Kroll, who testified at his November 13, 2025 deposition that he supposedly told Class Counsel the Voluntary Exposure Payments might exceed $120 million "in the *beginning* of March," only to later clarify it was actually "*May 6th of 2025*," when Class Counsel questioned newly provided data.[6] Despite his sworn testimony, only 11 days later Mr. Fenwick signed a declaration in support of the Response wherein his recollection was suddenly materially different, swearing "I recall that, in *late* March 2025, after the March 25th report discussed in [his colleague's declaration] I noted to class counsel in telephone communications that [Kroll] was concerned that there may not be enough funds in the personal injury 'pot' of the funds allocated under the plan of distribution."[7] Mr. Fenwick's timeline grows even more confusing (and unbelievable) in subsequent paragraphs of his declaration that explain he noted errors in initial calculations "around mid-April 2025," evidently the first time Mr. Fenwick had

---

made up a 0.75 multiplier that "is not part of the Plan of Distribution" for Category 6) and ¶ 50 (explaining that Kroll applied a 0.25 multiplier and that this "is not a value contained in the Distribution Plan" for Category 2).

[5] Notably, Direct Payments, not Voluntary Exposure Payments, were anticipated to be the largest allotment of the Settlement Fund at an estimated $265,000. ECF No. 519-1 at 7.
[6] Fenwick Tr. at 45:08-47:04.
[7] Response, Exhibit 1 at ¶45.

2

reviewed the payment calculation model in *months*. *Id*. at ¶45. Tellingly, despite attaching 250 pages of communications documenting virtually every exchange between Kroll and Class Counsel over the course of the Settlement's administration, neither Kroll nor Mr. Fenwick proffer a single writing demonstrating that these "early-March", "late-March" or "mid-April" alleged conversations concerning such a critical issue ever took place.[8]

In fact, and as required by the Plan of Distribution, Class Counsel consistently communicated to Kroll that a points-based system needed to be used to calculate two different categories of payments—Direct and Voluntary Exposure[9]—before they were distributed. Although Class Counsel's discussions with the Court and the community consistently used *estimated, potential* values to illustrate what the final Voluntary Exposure Payments might ultimately be based on participation and claims rates *at the time*, Class Counsel could not have foreseen Kroll would misapply those *estimated, potential* figures as the base amount for each Class Member as to Voluntary Exposure Payments without first scoring all claims and determining the actual value of a single point. Such an approach defies common sense, especially for Kroll, which boasted "many years" of "extensive" experience administering thousands of class actions to the Court,[10] including a previous class action with some Class Counsel in which an analogous points-based system was used correctly to distribute a finite settlement fund.

All told, it is beyond dispute that Kroll knew how points-based allocation systems function, that it was to use a points-based system for awarding Voluntary Exposure Payments, and that its failure to follow this Court-ordered requirement is chief among the myriad of deviations from the

---

[8] Fenwick Tr. 45:08-24.
[9] The Voluntary Exposure Supplements, or Payments, are also referred to as Personal Injury Payments.
[10] September 5, 2024, Declaration of Scott Fenwick, ECF No. 518-7 at ¶¶ 2, 24.

3

Plan resulting in its mismanagement of the Settlement Fund and unfair distributions to the Class. These multiple deviations from the Plan support finding Kroll in contempt and, pursuant to the equitable powers of the Court, ordering it to: (a) disgorge the funds it has collected from the Class; and (b) to disclose all instances where Kroll has been terminated, suspended, or replaced as administrator in any current or future class actions where it serves or seeks to serve as claims administrator.

I. BACKGROUND

a. The Fundamentals of a Points-Based Allocation System.

As described to the Court at final approval, in large class action settlements, funds should not be divided and distributed equally among all class members because such a *pro rata* division does not consider the equitable differences among class members' claims. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855, 119 S. Ct. 2295, 144 L.Ed.2d 715 (1999). An equitable solution is to value each claim differently based on relevant factors. Baker Decl.at ¶19. In large class actions with finite settlement funds, this raises a logistical challenge, namely how each claim can be assigned a dollar figure before the value of all claims are known. The solution is the use of well-accepted points-based allocation systems, where each claim is assigned a number of points rather than a dollar figure, and, after all claims have been assigned points, the total available fund is divided by the sum of all points, to reach an actual dollar figure that can then be awarded to all claims. Baker Decl. at ¶22.

Rather than follow this approach in administering the Settlement, Kroll undisputedly assigned each participating Class Member a fixed point value of $250 per point before ever reviewing, scoring, or tabulating all valid claims for Voluntary Exposure. Not only is this contrary to the Court's orders, it is simply not how a points-based system works—no fixed dollar figure can

4

be applied to a point before all points are first assigned, totaled, and applied to the fixed sum of money to be distributed. To do otherwise would render the act of assigning points a meaningless step in the process because awards could be calculated by directly applying enhancements or detractions to an absolute monetary award.

      **b. Class Counsel Consistently Told Kroll the Settlement Used a Points-Based Allocation System, And Kroll Never Indicated It Deviated from that System.**

Class counsel formally engaged Kroll here to assist with developing the "allocation point system [as] the first order of business." *See* Opening Memorandum, Exhibit B. Between March 2024 and August 2024, Kroll discussed the developing the Plan, which, as Class Counsel consistently explained, always relied on a point-based allocation system. *See* Opening Memorandum at 5-7. During this period, Kroll never took the position that each Class Member's Voluntary Exposure Payment would be determined based on a fixed $25,000 rate. *Id.* Yet Kroll now claims it was told to use a fixed rate of $25,000 for all Class Members, while overlooking all the evidence it knew it was supposed to value all total claims by points to determine the actual value of a point before distributing Voluntary Exposure Payments.

      **i. Kroll's Proposed Timeline for Voluntary Exposure Payments Confirm Its Understanding of How the Points-Based Allocation System Should Operate.**

On April 1, 2024, Mr. Fenwick provided a proposed timeline to Class Counsel for discussions with the Court. *See* Opening Memorandum, Exhibit Q at April 1, 2024 E-mail from Scott Fenwick. The timeline proposed by Fenwick included "**partial payments** to East Palestine residents only" by December 16, 2024, with "[a]ll other payments to be made **once all claims are finalized**, first quarter 2025." *See* Timeline from Kroll, attached as Exhibit C. Thus, Kroll *knew* it needed to review, score, and "finalize" all claims before it could determine the final value of a point and issue full Voluntary Exposure awards to Class Members.

5

ii. **Kroll's Input to the Settlement Agreement and Notice Program Establishes Its Understanding of How Points-Based Allocation System Are Implemented.**

Class Counsel provided Kroll drafts of the Settlement Agreement, as they knew it was important to make sure that Kroll had input, understood the terms, and could meet the Settlement's various deadlines. When Class Counsel provided Mr. Fenwick a draft of the Settlement Agreement on April 3, 2024, Mr. Fenwick provided comments to the provisions addressing when payments would begin, including:

> Not sure how all the timing will eventually work, and it [sic] **all claims will be finalized within the timeline to meet this 30-day window**.  We had discussed at least issuing partial payments to East Palestine residents by Christmas.

Again, Kroll clearly knew final payments could not be determined until *all claims were finalized*. In comments to a subsequent draft, Mr. Fenwick revisited this point and asked to require payments begin "within 30 days of the effective date *or after claim validation is complete*" to allow for a situation wherein Kroll could not determine the final value of a point within the initial 30-day window because claims still needed to be verified. Pursuant to this request, the final Settlement Agreement, and Court order adopting the agreement, permitted Kroll to delay distribution beyond 30 days, until after claim verification (which, inexplicably, Kroll did not). *See* ECF 452-2 PageID# 6026, ¶XIII(D)(1); ECF No. 557. The Settlement Agreement also recognized the importance of Kroll's input, explaining "the amount of each Personal Injury Payment shall be determined pursuant to an allocation formula by Class Counsel and the Administrator." ECF 452-2 PageID# 6025, ¶XIII(C)(3)(g).

6

Kroll, the architect of the notice program,[11] knew that the allocation here required all payments to be reduced or increased based on claims rates.[12] The Long Form Notice indicated Voluntary Exposure Payments would be "approximately $1,000" to "approximately $10,000." Long Form Notice, (ECF No. 452-5 at Page ID#: 6133), attached as Exhibit D. Kroll does not offer any explanation as to how all Class members were entitled to identical base payments based on this Notice. Instead, it disingenuously argues that this "base payment" was later "increased to $25,000," and it was not told to issue payments "pro rata." But, Kroll well knew the point allocation system here was drafted in the same manner as *Columbia Gas*, a prior explosion case wherein the Settlement Agreement, Notice and Plan of Distribution never stated that payments were "pro rata," yet awards from the fixed fund were based, in part, on the total number of claims made against that settlement. *See* Opening Memorandum at 13 n.11.

Kroll's position that Class Counsel "dramatically increased the base amount of personal injury payments, to $25,000" is likewise a disingenuous deflection from Kroll's own errors. As Kroll well knows, individual awards decrease or increase with higher or lower participation rates, respectively. Based on lower-than-expected participation rates in July 2024, Class Counsel adjusted its estimates for final Voluntary Exposure Payments to $25,000. Kroll knew this was an estimate; indeed, pamphlets Class Counsel distributed to the community, which were kept and

---

[11] Kroll's expert, Director and Head of Kroll Notice Media, Jeanne Finegan, heavily assisted in drafting the long and short form notices. ECF No. at 452-4 at ¶¶ 3, 5, just as she did in *Columbia Gas*.

[12] *See* Opening Brief, Exhibit O, May 22-23 2024 E-mails. The Court may recall there were news reports erroneously explaining that the $600 million would simply be divided by the number of impacted people and that is what everyone would receive. The "pro rata" language was ultimately removed from the Notice to avoid confusion to Class members, as discussed in the e-mail chain with Kroll, and that discussion alone should have alerted Kroll that Voluntary Exposure Payments were to be made on a pro rata basis. *Id.* Kroll's Response fails to address, let alone explain, how it misinterpreted this e-mail discussion.

7

handed out in the claims center where numerous Kroll executives—including Mr. Fenwick and Angela Ferrante—worked, along with advertisements and mailed postcards, explained this concept clearly, stating the "**average, potential payments for East Palestine Residents**" for East Palestine residents and noting Class Members "**could receive** a $25,000 Personal Injury Payment." Kroll's Response quoted from such a pamphlet but conspicuously left out a critical portion that contradicts its narrative; the pamphlet explained "**[b]ased upon claim filings as of right now, it appears early preliminary estimates have proven to be conservative**, and a greater per person Personal Injury Payment will be available." *See* Messages from Court-Appointed Counsel, attached as Exhibit E (omitted portion in bold). Class Counsel clearly communicated payments varied based on total claims.[13]

      **c. The Motion to Approve and Implement the Plan of Distribution and September 25, 2024 Hearing Confirm a Points-Based Allocation System Was to Be Used.**

Class Counsel's Motion to Approve and Implement the Plan of Distribution (ECF No. 519) and Memorandum in Support (ECF No. 519-1) (collectively "Distribution Motion") and attached exhibits, filed on September 6, 2024, clearly required a points-based allocation system for Voluntary Exposure Payments. The Distribution Motion explained "[w]ith respect to Voluntary Exposure Supplement payments, the Plan of Distribution operates in *precisely the same manner*

---

[13] Kroll again cherry-picks quotes from a virtual Town Hall held by Class Counsel to further its argument that Class Counsel "never hinted" payments were proportional or pro rata, but in doing so, omits from its quotes the statements that make clear payments were subject to the total number of participants. Further, the presentation guiding the Town Hall discussion mirrored the pamphlets, noting the "[e]stimated amount individuals will receive has doubled, based on the most recent claims data, to $25,000 per person," and "[b]ased upon claim filings as of right now, it appears early preliminary estimates have proven to be conservative, and a greater per person Personal Injury Payment will be available." *See* Town Hall PowerPoint, attached as Exhibit F, at slides 11 and 12. Even the portion of the video Kroll cites explained payments would be "*up to*" $25,000, not that they would start at $25,000.

*as the Direct Payment program*[14] to provide fair, reasonable and adequate compensation, albeit with different categories of factors . . . [o]nce again, using the information from each claim form, these factors are then individually applied to every eligible Class Member participating in the Voluntary Exposure Supplement program to produce a total number of points, which in turn translates into a monetary distribution." ECF No. 519-1 at 9-11. The plan of distribution explained "[a]ll multipliers . . . are applied consistently and objectively to the eligible class member's 'base' award of 100 points." Corrected Plan of Distribution, attached as Exhibit G, at 7. Kroll ultimately rests on only a single sentence in the Plan of Distribution to explain its massive error:

> All eligible class members start with a "base" of 100 points, which is intended to reflect the "average" individual living in the Village of East Palestine at the time of the Derailment [with exposure to chemicals and symptoms including respiratory distress, without medical care or formal diagnoses]. *The "base" of 100 points is equivalent to one $25,000 share of the Voluntary Exposure Supplement program.* The "base case" is therefore entitled to $25,000 per person, with other individuals' payments increasing or decreasing from the "base case" depending on the factors presented in their claim forms.

*Id.*[15] This statement applied an estimated dollar figure of $25,000 to a hypothetical average resident in the Village of East Palestine in order to subsequently perform example calculations, but Kroll knew that the example $25,000 was never meant to apply as a fixed, base sum for each Class Member. Kroll's position that this one sentence meant all claims should have an initial fixed rate of $25,000 does not make sense in full context, as Kroll did not receive this statement in a vacuum. Later in that same section, calculations for offsets to personal injury payments valued 5 points as

---

[14] Despite these statements and identical language in the Plan of Distribution for both Direct Payment and Voluntary Exposure Payment programs, Mr. Fenwick testified that only the Direct Payment program required Kroll to determine a precise dollar figure per point based on a review of all valid claims submitted under the Settlement, with no reasonable explanation as to why the two programs would differ. (Fenwick Tr. 106:8-106:13).

[15] Identical language—save for a different dollar amount and adjusting individual for household concepts—appears in the Plan as it relates to the Direct Payment portion of the Settlement. *Id.* at 1.

$3,000 (or $600 per point) and explained "*[p]oint value to be determined; for illustrative purposes only.*" *Id.* at n.9 and n.10. Contrary to Kroll's assertion, this is direct confirmation that the value of a point was not fixed at $250. As an experienced settlement administrator, a distribution assigning a fixed base rate across all un-scored claims on a finite settlement fund should have immediately set of its alarms.[16] Further, Kroll had the benefit of its own experience, months of discussions with Class Counsel regarding the points-based system, communications from Class Counsel to the Class explaining the points-based allocation system, the clear language of the Distribution Motion, and the Declaration of Lynn Baker, attached to the Distribution Motion, explaining how a points system is used and that it applied to Voluntary Exposure Payments. Baker Decl., ECF No. 519-3.

During the Final Approval hearing, which Mr. Fenwick attended, Class Counsel again explained that, like the Direct Payment program, the Voluntary Exposure Supplement would be distributed pursuant to a point system, estimating a $70,0000 payment for the Direct Payment allotment for a typical claim and $25,000 payment for the average Voluntary Exposure Supplement claim. ECF No. 553, Hearing Transcript, attached as Exhibit H, at 70:13-21; 71:4-7: 77:3-8. The Court approved and adopted the Plan of Distribution, thus giving it the force of a Court order. ECF No. 555. The Court's order specifically noted the Plan treated Class Members equitably relative to each other, distributions varied in accordance with degree of impact, and took appropriate account of differences among claims and "whether the scope of the release affects Class Members in

---

[16] Kroll argues that the existence of pour-over provisions proves Class Counsel anticipated claims would be continuously processed and evaluated and accounted for the possibility claims exceeded the Voluntary Exposure allotment; this is a mischaracterization. This safeguard was not meant to remedy the Settlement Administrator's failures to follow the Plan. Rather, it was meant to ensure that all monies would be paid for the benefit of the Class, rather than revert to Norfolk Southern.

10

different ways." ECF No. 555 at ¶¶ 6-9. The Court explicitly directed Kroll "to implement the Plan according to its terms and conditions." ECF No. 555 at ¶13.

### d. Distribution Following Final Approval of the Settlement and Plan of Distribution.

Contrary to its assertion now, Kroll never communicated to Class Counsel that it began distributing Voluntary Exposure Payments before it calculated, even on a rough basis, the true value of each point—none of the emails or documents it cites contradict that fact. Class Counsel never imagined Kroll would deviate from the points-based allocation system and fail to conduct even a preliminary analysis of all points claimed against the Voluntary Exposure fund before beginning payments. Nor did Class Counsel have any reason to duplicate Kroll's work by performing its own total valuation of all points. Kroll argues that Class Counsel affirmed that one point had a fixed value $250, but the e-mails Kroll attaches in support demonstrate only that Class Counsel confirmed *the multipliers* Kroll used were applied correctly in sample, hypothetical calculations, or explained how the multipliers should be used; none of the e-mails demonstrate that Class Counsel knew of or approved a fixed assignment of $250 per point. *See* Kroll's Response at Exhibits 1-K, 1-L, 1-N, 1-P. Until filing its Response, Kroll also never communicated that it was "impossible" to calculate "the total number of points at the outset." Indeed, as noted in the Opening Memorandum, though it took Kroll nearly eight months to calculate approximately 2/3 of the point assignments for one of three categories of payments (albeit, as noted by Epiq,[17] with an

---

[17] Kroll's Response keeps its criticism of Epiq brief, focusing its argument on the fact Class Counsel suggested edits to Michael O'Connor's declaration. Kroll's Response at 16-17, 22. However, there is nothing untoward about Class Counsel's suggested edits; Mr. O'Connor reviewed and agreed with the suggested changes before signing his declaration. Response, Exhibit 9, O'Connor Tr. at 41:4-11, 45:11-23, 75:4-21; *see U.S. v. Kalymon*, 541 F.3d 624, 637-38 (6th Cir. 2008) (finding it is not nefarious for attorneys "to reduce an expert's oral opinion to writing as long as it reflects the actual views" of the expert); *Al Qari v. Am. Steamship Co.*, No. 21-CV-10650, 2023 WL 5202311, at *6 (E.D. Mich. Aug. 14, 2023) (noting "it is not uncommon for counsel to

exceptionally high error rate[18]), after Class Counsel's discovery of Kroll's failure to follow the Plan and insistence on finalized point totals, it took Kroll only ten business days to roughly score the remaining 1/3. Opening Memorandum at 12.

There appears to be at least one factor that contributed to Kroll's failure to follow the Plan, including its application of a $250 point value and numerous other catastrophic errors it made in collecting and interpreting claims. *See* Opening Memorandum at 7-18. As Class Counsel first learned during Mr. Fenwick's deposition, Kroll outsourced administration of the Settlement to India,[19] allowing multiple large-scale deviations to persist for nearly eight months, apparently without any significant oversight or quality control processes. *See* Response, Exhibit 1, at ¶¶53-64. (Mr. Fenwick acknowledging that he did not begin to "fully investigate" the potential scale of processing and calculation errors until mid-April 2025, later realizing the errors were in every payment beyond the first batch); Fenwick Tr. at 97:13-99:05 (acknowledging that Kroll used reviewers in India, but he was not aware whether anyone from Kroll's executive teams oversaw the India portion of the claims review).

---

prepare affidavits or declarations for a witness and then to have the witness review and sign the statement," and declining to exclude a declaration on that basis).

[18] While Epiq estimates its own error rate at around 1%, Kroll's errors in certain categories ranged from 7.8 to 15.6%. Opening Memorandum at 16-17.

[19] Mr. Fenwick did not know the specifics of the reviewers who were located in India, including what data privacy measures were in place for safeguarding Class Member personal identifying information ("PII"), which can include social security numbers, bank account numbers, medical records, etc. Fenwick Tr. 98:3-24. This raises significant questions about whether and to what extent Class Member PII is at risk due to inadequate safeguards.

II. **ARGUMENT**

    a. **Class Counsel Proved by Clear and Convincing Evidence Kroll Violated a Court Order, Kroll Admits Some of Those Violations, and the Court's Equitable Powers Include Granting the Requested Remedy.**

Class Counsel has provided clear and convincing evidence that Kroll deviated from the definite and specific Court-ordered Plan of Distribution. Kroll specifically deviated from the Court's September 27, 2024 Order (ECF No. 555), when it applied a $25,000 fixed payment that did not treat Class Members equitably relative to each other, did not adequately vary distributions in accordance with degree of impact, and did not take appropriate account of differences among claims or whether the scope of the release affected Class members in different ways. *See* ECF No. 555 at ¶¶ 6-9. Class Counsel's evidence establishes that Kroll likely overlooked this massive error as it occurred, along with other errors that were missed for months. Kroll cannot credibly dispute that it deviated from Court-ordered Plan of Distribution. *See* ECF No. 555 at ¶13; Fenwick Tr. at 64:15-65:02. Though Class Counsel has demonstrated even more ways in which Kroll erred, Kroll admits it miscalculated claimants' distance from the derailment and used incorrect multipliers that deviated from the Plan of Distribution. Response at 24-25. Kroll also admits that the errors it does acknowledge resulted in nearly $4.8 million in overpayments, and Kroll charged at least $3.25 million[20] for its efforts in calculating claims.

---

[20] Kroll argues that its fees for all non-calculation work, including the cost of sending notices, gathering claim forms, operating the settlement center, and operating telephones and website totaled "roughly $5.7 million," but this is a curious figure given that, as of September 6, 2024, after the claims period had closed, Kroll billed only $2,361,940.74 for "administrative expenses . . . which include[d] Notice and media costs." (ECF No. 518-7 at ¶24), and the total cost of operating the settlement centers was "over 409,000." Response at Exhibit 1 ¶73; *see* Opening Memorandum at 2, n.3. Kroll's own invoice analysis is questionable; for example, it claims $5,700,000 of the charges are unrelated to calculating claims, but includes charges for "claim form receipt and processing" in that figure. Response, Exhibit 23 at 2; *see* Opening Memorandum, Exhibit N, at ¶¶ 3,4,6 (noting Epiq had to verify information from claims forms were accurately

13

Kroll posits that these "inadvertent multiplier errors do not justify a finding of contempt," and that "to err is human." This is an insult to the Class and this Court—to err is human, but for Kroll to pay so little mind to their Court-ordered role as settlement administrator that its mistakes marred distributions for months on end, while Kroll charged the Class *at least* $3.2 million for its calculation-related work and misspent *at least* $4.5 million, and likely upwards of $17 million, is contemptuous.[21] *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991) (finding partial compliance, or even a good faith effort at compliance, is insufficient to overcome a finding of contempt; the test is whether "defendants took *all reasonable steps within their power* to comply with the court's order," which, included asking for clarification of purportedly ambiguous language in the order.) (emphasis added). Contrary to Kroll's suggestion, the absence of willfulness, or even an attempt to remedy the deviation, does not relieve it from civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S. Ct. 497, 499, 93 L. Ed. 599 (1949) (finding the absence of willfulness does not provide relief for civil contempt); *see Concerned Pastors for Soc. Action v. Khouri*, 720 F. Supp. 3d 522, 536-38 (E.D. Mich. 2024) ("Good faith is not a defense to civil contempt," nor is late compliance or "an attempt to remedy the deviation.").

The Court has the broad power to grant Class Counsel's requested relief under Rule 23, and it can fashion any remedy that prevents undue gain or advantage gained by virtue of one's position, including disgorgement and disclosure. *See* Opening Memorandum at 23-25. Courts have

---

captured to perform calculations). Kroll's calculations may, once more, be mistaken. Kroll's invoices to Class Counsel are attached as Exhibit J.

[21] Class Counsel calculated the cost of these deviations at about $17,249,717.45. *See* Opening Memorandum at 25. However, this is Class Counsel's estimate of the harm to the Settlement Fund. A precise amount, which will be the subject of the second step of the Order to Show Cause, will be available after: (a) Epiq completes their analysis of the claims review, corrects for all of the deviations from the Plan and the errors made by Kroll, and determines the value of a single point; and (b) the forensic accountant performs their analysis of the economic harm to the Settlement Fund based, in part, on the information provided to it as a result of Epiq's work.

14

"wide discretion" in selecting any "contempt sanctions intended to coerce future compliance." *G.&C. Merriam Co. v. Webster Dictionary, Inc.*, 639 F.2d 29, 41 (1st Cir. 1980); *see Boston v. Williams*, Case No. 1:23-cv-00752 (October 28, 2025, N.D. Ga.), attached as Exhibit I (ordering attorney in violation of Rule 11, but not yet in contempt, to file a notice to the court, and copy of the sanctioning order, in all pending and future cases in the Northern District of Georgia in which she appeared for five years).

### III.   CONCLUSION

Class Counsel respectfully requests the Court grant Class Counsel's Step One Motion for an Order to Show Cause Against Kroll Settlement Administration LLC, for the reasons set forth in its Memorandum in Support and herein.

Dated: December 1, 2025    Respectfully submitted,

*/s/ M. Elizabeth Graham*
M. Elizabeth Graham (pro hac vice)
**GRANT & EISENHOFER P.A.**
123 S. Justison Street, 6th Floor
Wilmington, DE 19801
303-622-7000
303-622-7100 (fax)
egraham@gelaw.com

Seth A. Katz (pro hac vice)
**BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO 80112
303-792-5595
303-708-0527 (fax)
skatz@burgsimpson.com

Jayne Conroy (pro hac vice)
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor New York, NY 10016
212-784-6400
212-213-5949 (fax)
jconroy@simmonsfirm.com

15

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2025 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ M. Elizabeth Graham*
M. Elizabeth Graham
Grant & Eisenhofer P.A.