# EXHIBIT B



Scott Fenwick

11/13/2025

In Re: East Palestine Train Derailment

**Hartford Reporting & Technology**

**7733 Forsyth Boulevard, Suite 1100**

**St. Louis, Missouri  63105**

**(855) 443-3767**

**www.hartfordreporting.com**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: EAST PALESTINE      ) CASE NO.
TRAIN DERAILMENT           ) 4:23-CV-00242-BYP
                           ) JUDGE BENITA Y. PEARSON

THURSDAY, NOVEMBER 13, 2025

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of Scott
Fenwick, held at the offices of Saltz
Mongeluzzi Bendesky P.C., 1650 Market Street,
52nd Floor, Philadelphia, Pennsylvania,
commencing at 10:01 a.m. Eastern Time, on the
above date, before Carrie A. Campbell,
Registered Diplomate Reporter, Certified
Realtime Reporter, Illinois, California &
Texas Certified Shorthand Reporter, Missouri,
Kansas, Louisiana & New Jersey Certified
Court Reporter.

- - -

HARTFORD REPORTING & TECHNOLOGY
855.443.3767
www.hartfordreporting.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1              A P P E A R A N C E S :

 2

 3       BURG SIMPSON ELDREDGE HERSH &
         JARDINE, P.C.
 4       BY:  SETH A. KATZ
              skatz@burgsimpson.com
 5       40 Inverness Drive East
         Englewood, Colorado  80112
 6       (303) 792-5595

 7

 8       and

 9       GRANT & EISENHOFER P.A.
         BY:  ADAM J. GOMEZ
10            agomez@gelaw.com
              M. ELIZABETH GRAHAM
11            egraham@gelaw.com
         123 South Justison Street, 6th Floor
12       Wilmington, Delaware  19801
         (303) 622-7000
13

14       and

15

16       SIMMONS HANLY CONROY
         BY:  JAYNE CONROY         (VIA ZOOM)
17            jconroy@simmonsfirm.com
         112 Madison Avenue, 7th Floor
18       New York, New York  10016
         (212) 784-6400
19       Counsel for Plaintiffs

20

21       WINSTON & STRAWN LLP
         BY:  SCOTT AHMAD
22            sahmad@winston.com
              MATTHEW W. WOODRUFF   (VIA ZOOM)
23            mwoodruff@winston.com
         300 North La Salle Drive, Suite 4400
24       Chicago, Illinois  60654
         (312) 558-3197
25       and
```

```
1          FLANNERY | GEORGALIS, LLC
           BY:  CHRISTOPHER JOYCE     (VIA ZOOM)
2               cjoyce@flannerygeorgalis.com
           1621 Euclid Avenue Keith Building
3          Floor 20
           Cleveland, Ohio  44115
4          (216) 367-2120
           Counsel for Kroll Settlement
5          Administration and Scott Fenwick

6


7          WILMER CUTLER PICKERING HALE AND DORR LLP
           BY:  ALBINAS PRIZGINTAS    (VIA ZOOM)
8               albinas.prizgintas@wilmerhale.com
           2100 Pennsylvania Avenue NW
9          Washington, DC  20037
           (202) 663-6000
10

11         and

12

           WILMER CUTLER PICKERING HALE AND DORR LLP
13         BY:  KATHERINE V. MACKEY    (VIA ZOOM)
                katherine.mackey@wilmerhale.com
14         60 State Street
           Boston, Massachusetts  02109
15         (617) 526-6000
           Counsel for Norfolk Southern
16         Corporation and Norfolk Southern
           Railway Company
17

18

      ALSO PRESENT:
19         VINCE ROSICA, trial technician,
           Nexus Trial Solutions, affiliate of
20         Hartford Reporting

21

22    V I D E O G R A P H E R :
           DAVID LANE,
23         Golkow Litigation Services

24                   - - -

25
```

```
 1                      INDEX

 2                                          PAGE

    APPEARANCES...............................   2

 4  EXAMINATIONS

 5     BY MR. KATZ............................   7

 6     BY MR. AHMAD.......................... 108

 7     BY MR. KATZ.......................... 112

 8

 9                    EXHIBITS

10   No.    Description                      Page

11  1      Order approving the plan of         24
           distribution entered by Judge
12         Pearson on September 27, 2024

13  2      East Palestine Train Derailment,    35
           Plan of Distribution
14

15  3      In re East Palestine Train          48
           Derailment, No. 23-cv-00242 (N.D.
           Ohio), Proposed Settlement
16         Administration Timeline

17  4      E-mail from Scott Fenwick           51

18  5      Letter to Ms. Wallace and Members   51
           of the Unity Council for the East
19         Palestine Train Derailment

20  6      Declaration of Michael R. O'Connor  72
           regarding Administration Transfer
21         and Status Update

22  7      Printout of Kroll website, printed  99
           on November 12, 2025, at 8:13 p.m.
23         Eastern Time

24      (Exhibits attached to the deposition.)

25
```

CERTIFICATE................................114

ACKNOWLEDGMENT OF DEPONENT.....................116

ERRATA....................................117

LAWYER'S NOTES................................118

1    VIDEOGRAPHER:  We're now on the
2    record.  Today's date is November 13,
3    2025.  Our time on the record is
4    10:01 a.m.
5         My name is David Lane, legal
6    videographer for Hartford Reporting &
7    Technology.
8         This deposition is being held
9    in the matter of East Palestine Train
10   Derailment.
11        Our deponent today is Scott
12   Fenwick.
13        Counsel will be noted on the
14   stenographic record.
15        The court reporter today is
16   Carrie Campbell, who will now swear in
17   our witness.
18
19        SCOTT FENWICK,
20   of lawful age, having been first duly sworn
21   to tell the truth, the whole truth and
22   nothing but the truth, deposes and says on
23   behalf of Plaintiffs, as follows:
24
25        VIDEOGRAPHER:  Please begin.

Scott Fenwick                          CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1                    DIRECT EXAMINATION
 2    QUESTIONS BY MR. KATZ:
 3         Q.     Can you please state your name?
 4         A.     Scott Fenwick.
 5         Q.     Okay.  And you just took an
 6    oath to tell the truth.
 7                 Correct?
 8         A.     Yes.
 9         Q.     The whole truth.
10                 Right?
11         A.     Yes.
12         Q.     That would include not telling
13    half-truths.
14                 Right?
15         A.     Yes.
16         Q.     And you understand what a
17    half-truth is?
18         A.     Yeah.
19         Q.     Okay.  Mr. Fenwick, by whom are
20    you employed?
21         A.     Kroll Settlement
22    Administration.
23         Q.     And prior to Kroll, it was
24    called Heffler.
25                 Correct?
```

```
 1           A.      That is correct.

 2           Q.      And you were employed there

 3    when it was called Heffler?

 4           A.      Heffler Claims Group, correct.

 5           Q.      Okay.  And why was the name

 6    transition made, if you know?

 7           A.      We went through an acquisition

 8    2019 by -- purchased by Duff & Phelps, Prime

 9    Clerk, and then we went through a rebranding

10    and became Kroll Settlement Administration.

11           Q.      Purchased by who?

12           A.      Duff & Phelps, Prime Clerk.

13           Q.      And what are they?

14           A.      Pardon me?

15           Q.      What are they?

16           A.      Prime Clerk was a

17    restructuring -- a restructuring firm.

18           Q.      Okay.  Mr. Fenwick, you and I

19    have known each other for several years.

20                   Correct?

21           A.      Yes.  We were first introduced

22    during the Columbia Gas matter in 2000 -- end

23    of 2019.

24           Q.      Right.

25                   And that's -- we met when
```

```
 1    Kroll, or at that time Heffler, was appointed

 2    as the settlement administrator for the

 3    Columbia Gas settlement.

 4                  Right?

 5         A.      Yes.

 6         Q.      And is it fair to say that you

 7    served in the same role for Kroll in both the

 8    East Palestine and Columbia Gas settlement

 9    administrations?

10                  MR. AHMAD:  Object to form.

11    QUESTIONS BY MR. KATZ:

12         Q.      You can answer.

13         A.      There were similarities, yes.

14         Q.      You conducted similar duties in

15    both settlements.

16                  Right?

17         A.      Yes.

18         Q.      Okay.  Is it fair to say that

19    the plan of distribution in Columbia Gas was

20    similar to the plan of distribution in East

21    Palestine?

22         A.      No.

23         Q.      Okay.  Why not?

24         A.      Can you elaborate on that?

25         Q.      Yeah.  Why is it not fair to
```

say that the two plans were similar?

     A.     Columbia Gas, the lump-sum
payment on the Columbia Gas side was geared
towards a pro rata allocation whereby there
was -- specifically for the lump sum, there
was $80 million that was set aside.  And in
order to get a piece of that, obviously you
had to file a valid claim.  And then for that
piece, all of the claims were evaluated prior
to any money going out the door pursuant to
the court order that said all claims need to
be reviewed, validated, points allocated.
And then based on that, you get a piece of
that $80 million.

     Q.     Okay.  Fair to say that both
plans of distribution, Columbia Gas and East
Palestine, dealt with fixed sums of money?

     A.     Can you elaborate on that one
more, too?

     Q.     Sure.

            What part don't you understand?

     A.     They both had settlement
amounts, gross segment amounts, yes.

     Q.     Right.  They both had fixed
pots of money for the settlement amount.

```
 1                    Right?
 2                    MR. AHMAD:  Object to form.
 3                    THE WITNESS:  There was
 4           $80 million that was available
 5           specifically for the lump sum on
 6           Columbia Gas.
 7                    There was a preliminary
 8           allocation of $130 million allocated
 9           for residential payments under the
10           East Palestine matter.
11      QUESTIONS BY MR. KATZ:
12           Q.    Okay.  You understand that the
13      East Palestine settlement was $600 million.
14                    Right?
15           A.    Correct.
16           Q.    Wasn't going to go above that.
17                    Right?
18                    MR. AHMAD:  Object to form.
19                    THE WITNESS:  Yes.
20      QUESTIONS BY MR. KATZ:
21           Q.    Kroll certainly could not spend
22      or distribute more than $600 million in
23      total.
24                    Correct?
25                    MR. AHMAD:  Object to form.
```

```
 1    QUESTIONS BY MR. KATZ:
 2          Q.      In East Palestine.
 3          A.      Yes.
 4          Q.      Okay.  Is it fair to say that
 5    both the East Palestine settlement plan of
 6    distribution and the Columbia Gas plan of
 7    distribution both utilized a point system?
 8          A.      They were different point
 9    system structures.
10          Q.      But both used point systems?
11          A.      They were different point
12    system structures.
13          Q.      Okay.  Did the East Palestine
14    plan of distribution use a point system?
15          A.      Yes, where a point was -- or
16    excuse me, 100 points was equal to $25,000
17    with respect to the residential payments.
18          Q.      And that's a fixed amount --
19                  MR. AHMAD:  Hold on.  We have
20          to let him finish his answer.
21    QUESTIONS BY MR. KATZ:
22          Q.      Were you finished?
23          A.      Yeah.  Each point, it was --
24    everybody started with 100 points.  The
25    100 points equates to $25,000.  And from
```

```
 1    there, people went up or down as far as their
 2    allocation calculation, dependent upon the
 3    eight different categories under the personal
 4    injury section of the plan of distribution.
 5           Q.    Okay.  And so there was a point
 6    system, yes.
 7                  Correct?
 8                  MR. AHMAD:  Object to form.
 9                  THE WITNESS:  There was a point
10           system in the East Palestine matter
11           that started with a hundred points per
12           person that equates to $25,000.
13    QUESTIONS BY MR. KATZ:
14           Q.    Okay.  And if in total, for the
15    personal injury part of the settlement, there
16    had been 10 million points across all valid
17    claims, what would the amount have been under
18    your -- under your understanding of the
19    settlement plan?
20                  MR. AHMAD:  Object to form.
21                  THE WITNESS:  I -- it's 10
22           million times the 250, which is
23           100 points at $25,000.  About 250.  So
24           it would be 10 million times $250.
25
```

```
 1   QUESTIONS BY MR. KATZ:

 2          Q.      Which is $2.5 billion.

 3                  Right?

 4          A.      Sure.

 5          Q.      Okay.  And that's more than

 6   600 million.

 7                  Right?

 8          A.      Yes.

 9          Q.      Certainly more than

10   120 million.

11                  Right?

12          A.      Yes.

13          Q.      Okay.  And in Columbia Gas, you

14   also used a point system.

15                  Right?

16          A.      A different type of point

17   system in Columbia Gas.

18          Q.      But a point system nonetheless.

19                  Correct?

20          A.      There was a different point

21   system under Columbia Gas, correct.

22          Q.      Okay.  And how was it

23   different?

24          A.      As I explained earlier,

25   Columbia Gas had 80 million, and everybody
```

```
 1    got a piece of that pie based on how many

 2    points.  And under Columbia Gas, in essence,

 3    you really started at zero.

 4                And then from there, dependent

 5    upon the various categories under this one --

 6    I don't remember them all off the top of my

 7    head -- so, for example, where you lived,

 8    your proximity to the epicenter of the

 9    accident, you got points.  And then you also

10    had multipliers on how many people may have

11    resided, did you have elderly individuals.

12                So in essence you started at

13    zero, and you then were allocated points

14    based on the formula within that particular

15    settlement.

16        Q.    Is it fair to me to

17    characterize your role in the East Palestine

18    settlement administrator as -- administration

19    as a project manager?

20        A.    Sure.  Yeah.

21        Q.    Okay.  You oversaw the

22    administration process.

23                Right?

24        A.    Certain aspects of it, yes.

25        Q.    All right.  Was one of those
```

```
 1    aspects that you oversaw with regard to the

 2    East Palestine settlement administration the

 3    review and scoring of claims by Kroll's

 4    people?

 5         A.    Not entirely, no.

 6         Q.    Okay.  Did you have any role in

 7    that?

 8         A.    There were times where I

 9    reviewed some claims and complex ones that

10    people may have brought to my attention, but

11    we had groups that were responsible for doing

12    that.

13         Q.    But you oversaw the groups that

14    were doing the actual front-line review.

15               Correct?

16         A.    No, I did not.

17         Q.    You didn't overview them at

18    all?

19         A.    No, I did not supervise or

20    anything to the -- to the people that were

21    reviewing the claims, no.

22         Q.    Who did?

23         A.    I guess I don't know off the

24    top of my head.

25         Q.    Okay.  Do you know where the
```

```
1    claims review was done physically?

2         A.    We had some people that were

3    reviewing in our -- in various offices.  I --

4    some were in Philadelphia.  Some, I think,

5    were in New York and other places, yeah.

6         Q.    Any review being done outside

7    the US?

8         A.    I believe so, yes.

9         Q.    Can you tell me where?

10        A.    India.

11        Q.    Okay.  Anyplace else?  Outside

12   the US?

13        A.    Not that I recall.

14        Q.    Okay.  And what percentage, if

15   you know, of the claims that were reviewed

16   were reviewed by the staff in India?

17        A.    I have no idea.

18        Q.    How many reviewers were hired

19   in India?

20        A.    I have no idea.

21        Q.    Can you describe for me your

22   role in connection with the claims review for

23   East Palestine?

24        A.    We had a client service team

25   would draft some of those -- the review
```

```
 1    guidelines and things along those lines, and
 2    I at times would review part of those drafts
 3    and what those guidelines were beyond that,
 4    and then they would turn that over to the
 5    review team where they reviewed the claims.
 6          Q.     Were you responsible at all for
 7    ensuring compliance with the plan of
 8    distribution?
 9          A.     We all are.
10          Q.     Okay.  So that's a yes?
11          A.     Yes.
12          Q.     And when you say "we all," who
13    is we all?
14          A.     Oh, those of us at Kroll
15    Settlement Administration.
16          Q.     Who specifically?
17          A.     Those that worked on this
18    settlement.
19          Q.     Every single person?
20          A.     Those on the client service
21    team, yes.
22          Q.     Can you tell me the names of
23    those people on the client service team?
24          A.     There's quite a few.  You had
25    Paul Ferruzzi and Derek Cataldi.  There was a
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1    Michelle.  There was Bryana.  There were

 2    others that were involved and maybe moved to

 3    other teams as well.

 4                 So will I be able to name them

 5    all off the top of my head?  Probably not.

 6         Q.     Okay.  Mr. Fenwick, in order to

 7    get ready to testify today, did you review

 8    any documents?

 9         A.     Yes.

10         Q.     What did you review?

11         A.     The plan of distribution as

12    well as Michael O'Connor's declaration.

13         Q.     Anything else?

14         A.     No.

15         Q.     Okay.  And you're here today

16    because the Court ordered you to appear

17    today.

18                 Right?

19                 MR. AHMAD:  Object to form.

20                 THE WITNESS:  Yes.

21    QUESTIONS BY MR. KATZ:

22         Q.     And you're aware that Kroll's

23    attorneys asked the Court to prevent class

24    counsel from deposing you.

25                 Correct?
```

```
 1                   MR. AHMAD:  Object to form.
 2                   And also, I'm going to instruct
 3             you not to answer on the basis of
 4             attorney-client privilege.  Anything
 5             we discussed about the circumstances
 6             of that is privileged.
 7    QUESTIONS BY MR. KATZ:
 8             Q.      Can you answer that question
 9    without divulging the conversation between
10    you and your lawyer?
11             A.      Answer which question?
12             Q.      Whether you're aware that
13    Kroll's counsel asked the Court to prevent us
14    from taking your deposition today.
15                   MR. AHMAD:  Yeah, and again,
16             I'm going to instruct you not to
17             answer that question.
18    QUESTIONS BY MR. KATZ:
19             Q.      Again, can you answer the
20    question without telling us something you
21    were told by a lawyer?
22             A.      Yes.
23             Q.      Okay.  Based on information
24    that you obtained not from talking to
25    Mr. Ahmad or any other lawyer, are you aware
```

1    that Kroll's counsel, Kroll's lawyers, asked

2    the Court to prevent your deposition from

3    going forward?

4           A.     Can you repeat that?

5                  MR. KATZ:  Can you please just

6           read it back?

7                  (Court Reporter read back

8           question.)

9                  THE WITNESS:  Yes.

10                 MR. AHMAD:  And I'm going to

11          inject -- object again.  This is based

12          on conversations that he and I had,

13          which are attorney-client privilege.

14          It also mischaracterizes what the

15          request to the Court was.

16                 But -- so I'm going to instruct

17          you not to answer.

18                 THE WITNESS:  Okay.

19   QUESTIONS BY MR. KATZ:

20          Q.     Mr. Fenwick, in the Columbia

21   Gas settlement, isn't it true that Kroll, at

22   the time Heffler, scored all claims to get a

23   total points value before issuing a single

24   payment?

25          A.     That is correct.

```
1         Q.      And in that process for
2    Columbia Gas, Kroll also, after computing the
3    total number of points, applied that against
4    the total pot of money to come up with the
5    value of a single point.
6                  Correct?
7                  MR. AHMAD:  And I'm just going
8         to warn you for the first time that
9         the Court's order relating to
10        Mr. Fenwick's deposition cautioned
11        class counsel to narrowly tailor,
12        quote/unquote, the questions to be
13        based on his personal knowledge of the
14        findings and Mr. O'Connor's
15        declaration.  So that will be warning
16        one.
17                  MR. KATZ:  Okay.
18                  MR. AHMAD:  Okay.
19                  MR. KATZ:  I appreciate the
20        warning, but this is related to the
21        findings in Mr. O'Connor's
22        declaration.
23                  And as you know, Mr. O'Connor,
24        in his declaration, had a finding that
25        it was improper -- or at least that
```

1       money was sent out the door -- he

2       didn't characterize it as

3       proper/improper -- before all the

4       points were computed.

5              MR. AHMAD:  Sure.  The one that

6       Ms. Graham told him to add that day.

7       Understood.

8              Go ahead.  But, yeah, Matt, you

9       can answer.

10             MR. KATZ:  I don't think

11      there's a question, a full question,

12      out there.

13             So can you read back how far I

14      got in the question?

15             (Court Reporter read back

16      question.)

17             MR. KATZ:  That is the

18      question.

19             THE WITNESS:  Yes.

20  QUESTIONS BY MR. KATZ:

21      Q.     Okay.  And then as part of that

22  administration, Kroll took the value of a

23  single point, multiplied it by any class

24  member's number of points to come up with an

25  award.

1           Correct?

2       A.      That is correct.

3       Q.      Did Kroll follow that same

4   process in East Palestine; yes or no?

5       A.      The process in East Palestine

6   was different, so, no.

7               (Fenwick Exhibit 1 marked for

8       identification.)

9   QUESTIONS BY MR. KATZ:

10      Q.      Okay.  Hey, Vince, this is

11  going to be my Document 2.

12              Mr. Fenwick, we're going to

13  mark as Exhibit Number 1 the order in this

14  case approving the plan of distribution

15  entered by Judge Pearson on September 27,

16  2024.

17              You've seen this order before.

18              Right?

19      A.      Yes.

20      Q.      Okay.  And if you turn to

21  paragraph 9 on page 3, the order states, "The

22  plan covers a dozen different categories of

23  information and data, and allocates points to

24  each claim based on that data, or, in the

25  case of businesses, based on actual net

```
 1    losses.  The categories of data, as well as
 2    the point allocation system and actual loss
 3    business payments, are fair, reasonable and
 4    adequate."
 5              Did I read that correctly?
 6        A.    Yes.
 7        Q.    And then in the last sentence,
 8    the Court found, "The method of distribution
 9    for the voluntary exposure supplement is also
10    fair, reasonable and adequate."
11              Right?
12        A.    Yes, that's how it reads.
13        Q.    Okay.  And then if you look at
14    paragraph 13 on the next page, that is where
15    the Court appoints Kroll.
16              Correct?
17              MR. AHMAD:  Object to form.
18    QUESTIONS BY MR. KATZ:
19        Q.    Withdraw.
20              That paragraph -- you see
21    paragraph 13 says -- it starts with, "The
22    Court hereby approves and adopts the plan of
23    distribution."
24              Right?
25        A.    Yes.
```

1  Q.    And then it concludes with "The
2  Court further directs settlement
3  administrator, Kroll Settlement
4  Administration, LLC, Kroll, to implement the
5  plan according to its terms and conditions."
6           Correct?
7  A.    Yes.
8  Q.    And the plan is a point-based
9  system.
10           Right?
11           MR. AHMAD:  Object to form.
12           THE WITNESS:  The plan is set
13      up whereby that an individual is
14      allocated --
15  QUESTIONS BY MR. KATZ:
16  Q.    Points.
17  A.    -- 100 points to start at
18  $25,000, and then from there they go up and
19  down based on the categories in the plan of
20  distribution.
21  Q.    Yeah.
22           With no deviation at all from
23  $25,000 for a hundred points?
24  A.    Based on the plan of
25  distribution, no.

1          Q.     Okay.  There's nothing in this
2     order that says a point is $250.
3                 Right?
4          A.     I have not read it all --
5          Q.     Take your time and look at it.
6          A.     -- so...
7                 No, I see nothing in what you
8     provided me that lists $250.
9          Q.     As a value of a point.
10                Right?
11         A.     Correct.
12         Q.     Okay.  Mr. Fenwick, you
13    attended the final fairness hearing.
14                Right?
15         A.     Yes.
16         Q.     You paid attention when the
17    arguments were being made.
18                Correct?
19         A.     Yes.
20         Q.     And you sat in the courtroom
21    for the entire time.
22                Correct?
23         A.     Yes.
24         Q.     In fact, you sat what we call
25    in the well.

```
1                    Right?

2         A.      Yes.

3         Q.      Mr. Fenwick, let me know if you

4    agree with this statement:  The use of a

5    point system is a well-accepted practice in

6    contexts such as the settlement in East

7    Palestine in which two key conditions exist:

8    the funds to be allocated are limited, and

9    the precise number and value of claims to be

10   made against the fund cannot be known in

11   advance.

12                 MR. AHMAD:  Object to form.

13         And the counsel appears to be reading

14         from a document that the witness --

15                 MR. KATZ:  You know, we've got

16         objection to form.  There's no

17         coaching.  And if we need to get Judge

18         Pearson on -- you know we're talking

19         to her at noon -- we can address

20         coaching.

21                 MR. AHMAD:  I'm just -- okay.

22         Okay.

23                 MR. KATZ:  Just objection to

24         form.

25                 MR. AHMAD:  Okay.
```

```
 1                    MR. KATZ:  We had it yesterday
 2          where my objections were objection to
 3          form.
 4                    MR. AHMAD:  Okay.  Object to
 5          form.
 6                    MR. KATZ:  If you're trying to
 7          coach your witness --
 8                    MR. AHMAD:  I'm not --
 9                    MR. KATZ:  -- we can talk to
10          Judge Pearson at noon and have a
11          second hearing on your conduct at the
12          deposition.
13                    MR. AHMAD:  Okay.  I'm not
14          coaching and --
15                    MR. KATZ:  Okay.  So if --
16                    MR. AHMAD:  -- I'm simply
17          asking --
18                    MR. KATZ:  If it happens again,
19          we're talking to the judge at noon.
20          Trust me, we will raise it.
21                    MR. AHMAD:  Okay.  Objection to
22          form.
23     QUESTIONS BY MR. KATZ:
24          Q.     Mr. Fenwick, do you agree with
25     this statement:  The use of a point system is
```

```
 1    a well-accepted practice in contexts such as
 2    a settlement like the one here in which two
 3    key conditions exist:  the funds to be
 4    allocated are limited, and the precise number
 5    and value of the claims to be made against
 6    the fund cannot be known in advance?
 7              MR. AHMAD:  Object to form.
 8              THE WITNESS:  There's -- in the
 9         settlement administration world, there
10         are several settlements that have
11         varying point systems.  Some of them
12         have limited funds.  Some of them
13         don't specify limited funds or
14         anything along those lines.
15              So it's -- can you generally
16         say that that's how they all -- no,
17         they're all -- they're all different.
18    QUESTIONS BY MR. KATZ:
19         Q.    Okay.  So you disagree with
20    that statement?
21              My question is, do you disagree
22    with the statement that I just made; yes or
23    no?
24              Do you agree or disagree with
25    that statement?
```

Case: 4:23-cv-00242-BYP  Doc #: 1099-2  Filed: 12/01/25  33 of 149.  PageID #: 72506

1          A.      Can I hear it again?

2          Q.      Sure.  I'll read it.

3          A.      Yeah.

4          Q.      Do you agree or disagree with

5    this statement:  The use of a point system is

6    a well-established -- a well-accepted

7    practice in contexts such as the settlement

8    in this case in which two key conditions

9    exist:  the funds to be allocated are

10   limited, and the precise number and value of

11   the claims to be made against the fund cannot

12   be known in advance?

13         A.      No, I disagree.

14         Q.      Okay.  Do you disagree or agree

15   with this statement:  Class actions commonly

16   use a point system which, as demonstrated in

17   this case, enables each claim to be valued

18   equitably along the specified dimensions for

19   which points are awarded, with the

20   determination of a precise dollar amount of

21   each point preserved until the various

22   uncertainties in the size of the fund and the

23   values of the valid claims against the fund

24   are finally resolved?

25         A.      No, I disagree.

       Q.      Mr. Fenwick, in carrying out

the settlement administration in this

litigation, did class counsel ever tell you

to deviate from the plan of distribution?

       A.      No.

       Q.      As part of the settlement

administration in this case, did class

counsel ever do the original review of any

claims?

       A.      The original review?  No.

       Q.      Class counsel never went to

Kroll's facilities and sat down and scored

claims that were submitted by class members.

       Right?

       A.      No.

       Q.      Okay.  Isn't it true, sir, that

you were involved in developing, with class

counsel, the plan of distribution for the

East Palestine litigation in the spring

of 2024?

       A.      No.

       Q.      Isn't it true you sent class

counsel what was used in Columbia Gas as a

starting point for the plan of distribution

in this litigation?

1      A.     Following a request from class

2  counsel.  They asked us to provide them the

3  notice and claim forms from Columbia Gas,

4  along with the payment structure that was

5  used, and we provided that per their request.

6      Q.     You also sent class counsel an

7  allocation point system document along with

8  Kroll's version of how the three types of

9  awards could be calculated in this

10  litigation.

11          Right?

12          MR. AHMAD:  Object to form.

13          THE WITNESS:  What was provided

14      was a document that I prepared, a

15      spreadsheet, that did a -- an example

16      of how the $600 million could be split

17      across the various sources of money --

18      being what I mean by sources of

19      money -- for the residential payments

20      versus the business payments versus

21      the voluntary exposure payments, which

22      was based on, at that point in time,

23      information provided -- census data

24      provided from Adam Gomez and other

25      class counsel that broke out how many

```
 1              potential class members there are

 2              under distances and things along those

 3              lines, and from there just did run

 4              some numbers to see how much could be

 5              available in each pot, which was also

 6              based on the fact that voluntary

 7              exposure payments would have a base

 8              payment of $10,000.

 9      QUESTIONS BY MR. KATZ:

10              Q.      And that was done by you.

11              Correct?

12              A.      That is correct.

13              Q.      And that was done by you prior

14      to the settlement agreement being signed.

15              Right?

16              A.      That, I don't know.

17              Q.      Okay.  Mr. Fenwick, isn't it

18      true that in connection with the voluntary

19      exposure payments, Kroll began sending out

20      payments to class members prior to scoring

21      all of the voluntary exposure claims that

22      were submitted?

23              A.      Yes.

24              Q.      Okay.  And it's your testimony

25      that that's consistent with the plan of
```

```
 1    allocation?

 2          A.      The plan of distribution, yes.

 3                  (Fenwick Exhibit 2 marked for

 4          identification.)

 5    QUESTIONS BY MR. KATZ:

 6          Q.      Okay.  Well, let's take a look

 7    at the plan of distribution.  I'll mark it as

 8    number 2.

 9                  And, Vince, for you, that would

10    be my number 3.

11                  And, Mr. Fenwick, you have

12    Exhibit 2 in front of you?

13          A.      Yes, I do.

14          Q.      Okay.  And if you look at the

15    top, there's seven boxes.

16                  Correct?

17          A.      Yes.

18          Q.      All right.  And the first box

19    has a direct payment in the allocation of the

20    $600 million as $265 million.

21                  Right?

22          A.      Yes.

23          Q.      And when you looked at the plan

24    of distribution, did you understand that to

25    mean that was the fixed pot of money for the
```

```
 1   direct payment of claims?
 2                MR. AHMAD:  Object to form.
 3                THE WITNESS:  No.
 4   QUESTIONS BY MR. KATZ:
 5        Q.    Okay.  And there's a box next
 6   to it that says "Business losses."
 7                Did you understand that to mean
 8   that $25 million was the amount allocated for
 9   the business losses?
10        A.    Preliminary allocated for
11   business losses, yes.
12        Q.    A fixed pot of money.
13                Correct?
14                MR. AHMAD:  Object to form.
15                THE WITNESS:  No.
16   QUESTIONS BY MR. KATZ:
17        Q.    Okay.  And then for the
18   personal injury exposure supplement, it's
19   $120 million.
20                Correct?
21        A.    Correct.
22        Q.    And did you understand that to
23   be a fixed pot of money?
24        A.    No.
25        Q.    Okay.  What is the basis for
```

 1   your understanding that these amounts are not

 2   a fixed pot of money?

 3        A.    From what counsel told us and

 4   what's here, that these were preliminary

 5   assignments in that there could be -- the

 6   money could be moved over from bucket to

 7   bucket versus the pour-over provision which

 8   you instructed us on.

 9        Q.    Okay.  So it's your testimony

10   that Kroll could have spent all $600 million

11   in the personal injury exposure payment due

12   to the pour-over provisions?

13        A.    No.

14        Q.    Okay.  Why not?

15        A.    Because some of that was paid

16   out to class counsel.

17        Q.    Okay.

18        A.    Some of that was paid out to

19   us.

20        Q.    Okay.

21        A.    And others.

22        Q.    Okay.  So other than the fees

23   and expenses, is it your testimony that Kroll

24   could have spent the remainder of the

25   $600 million on the personal injury exposure

```
 1   supplement as a result of the pour-over
 2   provisions?
 3        A.     We calculated the voluntary
 4   exposure payments based on the plan of
 5   allocation, which was a 25,000 base starting
 6   point.  And again, people, went up and down
 7   based on that.
 8        Q.     That's not my ques --
 9        A.     Yeah.
10        Q.     That's not my question.
11        A.     So what that could have led to,
12   I don't know.
13        Q.     Could Kroll have allocated all
14   of the money net of fees and costs to one
15   bucket, leaving zero in the direct payment
16   and zero in the business loss?
17             MR. AHMAD:  Object to form.
18             THE WITNESS:  I think that
19        we're all involved and knew what was
20        being paid out, and then from there, I
21        think that we would have discussions
22        to see, okay, what's going on, and
23        what do we need to do to discuss,
24        which was taking place.
25
```

```
1    QUESTIONS BY MR. KATZ:

2         Q.     Okay.  When you say "we're all

3    involved and knew what was being paid out,"

4    what do you mean?

5         A.     Well, class counsel was aware

6    of the distributions we were making and how

7    much was being paid.

8         Q.     Okay.  And how was that being

9    communicated to class counsel?

10        A.     Through the statistics that we

11   were sending out.

12        Q.     Okay.  And is it your testimony

13   that -- how often were those statistics being

14   sent to class counsel?

15        A.     I think weekly.

16        Q.     Okay.  And is it your testimony

17   that every week, starting from the day of

18   approval until Kroll was terminated and

19   replaced as settlement administrator, that

20   the exact amount of money that Kroll paid out

21   was disclosed to class counsel in your

22   statistics?

23             MR. AHMAD:  Object to form.

24             THE WITNESS:  I don't know if

25        it was every week.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
Scott Renwick

```
 1    QUESTIONS BY MR. KATZ:

 2         Q.      Okay.  When did it start?

 3         A.      I don't recall.

 4         Q.      Okay.  When was the first time

 5    you told class counsel, either in writing or

 6    verbally, that money had begun but we haven't

 7    scored all the claims yet?

 8         A.      Well, payments began at the end

 9    of November.

10         Q.      Okay.  And at that point in

11    time had you told class counsel we didn't

12    score all the claims?

13         A.      I think they were well aware,

14    yes.

15         Q.      Okay.  Did you tell them.

16                 My question is not, do you

17    think.

18         A.      Yes.

19         Q.      They were well aware.

20         A.      Yes.

21         Q.      Did you tell them?

22         A.      Yes.

23         Q.      And how did you tell them?

24         A.      Well, through various e-mails

25    when we're seeing we're going through a
```

 1   deficiency process, so one should infer that

 2   that claim has not been scored.

 3                And counsel, class counsel, was

 4   well aware we were continuing with that

 5   deficiency process well into 2025.  So...

 6        Q.    All right.  So --

 7        A.    And there were -- yeah, go

 8   ahead.

 9        Q.    No, if you weren't finished,

10   finish your answer.

11        A.    No, I'm good.

12        Q.    Okay.  Let's turn to the plan

13   of distribution.

14                Can you read on page 6

15   footnote 4 for me?

16        A.    "Point value to be determined

17   for illustrative purposes only."

18        Q.    Okay.  Can you read footnote 5

19   for me?

20        A.    "Point value to be determined

21   for illustrative purposes only."

22        Q.    Okay.  And can you turn to

23   page 10 for me and read footnote 9?

24        A.    "Point value to be determined

25   for illustrative purposes only."

```
 1          Q.      Okay.  And what does footnote 9
 2    relate to?
 3          A.      An example, looks like, of --
 4    pertaining to medical treatment, points
 5    associated with medical treatment and --
 6          Q.      Right.
 7          A.      -- then an offset based on
 8    reimbursements that individuals may have
 9    received.
10          Q.      Okay.  In that example, it's
11    5 points for medical treatment totaling
12    $3,000.
13              Right?
14          A.      Yes.
15          Q.      So a point would have been
16    $600.
17              Right?
18          A.      In this hypothetical example,
19    yes.
20          Q.      That's not $250.
21              Is it?
22          A.      No.
23          Q.      Okay.  And the same if you look
24    at footnote 10.
25              Can you read footnote 10 for
```

 1    me?

 2         A.      "Point value to be determined

 3    for illustrative purposes only."

 4         Q.      And it also relates to 5 points

 5    equaling $3,000.

 6                 Right?

 7                 MR. AHMAD:  Object to form.

 8                 THE WITNESS:  Based on that

 9         example, the hypothetical example,

10         yes.

11    QUESTIONS BY MR. KATZ:

12         Q.      Okay.  And again, 5 points

13    equaling $3,000 is not $250 a point.

14                 Right?

15         A.      No.

16         Q.      All right.  We talked about

17    what if the total number of points in the

18    personal injury bucket would have been

19    10 million points.  It would be $2.5 billion

20    paid out.

21                 Right?

22                 MR. AHMAD:  Object to form.

23                 THE WITNESS:  Yes.

24    QUESTIONS BY MR. KATZ:

25         Q.      So if it was a million points,

```
1    it would have been $250 million paid out.

2                    Right?

3         A.      Yes.

4         Q.      Okay.  Let's go back to the

5    10 million points.

6                    If that had been the case,

7    where was Kroll going to get the extra money?

8                    MR. AHMAD:  Object to form.

9                    THE WITNESS:  Again, we were --

10        I think we would have conversations,

11        class counsel, Kroll and defense

12        counsel, on that prior to getting to

13        that point.

14   QUESTIONS BY MR. KATZ:

15        Q.      Okay.  At what point -- I mean,

16   at $250 a point flat, without knowing the

17   total number of points, good chance money

18   would have run out.

19                    Right?

20        A.      I don't know that.

21        Q.      Okay.  Well, what was the plan

22   when money ran out?

23                    MR. AHMAD:  Object to form.

24                    THE WITNESS:  I can't speak to

25        that.
```

```
1    QUESTIONS BY MR. KATZ:

2         Q.     What was Kroll going to do when

3    money ran out?

4              MR. AHMAD:  Object to form.

5              THE WITNESS:  I can't speak to

6         that.

7    QUESTIONS BY MR. KATZ:

8         Q.     Okay.  What was Kroll going to

9    do if the money in the voluntary exposure

10   personal injury bucket got over 120 million?

11        A.     We were addressing that with

12   class counsel.

13        Q.     Okay.  And how did you -- how

14   did you address that?

15             Well, let me start over.

16             When did you begin to address

17   that with class counsel?

18        A.     I believe in the beginning of

19   March some conversations.

20        Q.     Conversations with who?

21        A.     I believe Adam Gomez.

22        Q.     Okay.  And were those in

23   e-mails?

24        A.     No.  Phone calls.

25        Q.     Okay.  Fair to say that almost
```

```
 1    invariably phone calls were followed up with

 2    a confirming e-mail of how class counsel

 3    instructed Kroll to handle something when a

 4    question was raised?

 5              MR. AHMAD:  Object to form.

 6              THE WITNESS:  Not in all

 7         instances.

 8    QUESTIONS BY MR. KATZ:

 9         Q.    Okay.  So what was the plan if

10    the $120 million ran out, from Kroll's

11    perspective?

12              MR. AHMAD:  Object to form.

13              THE WITNESS:  Again, we were --

14         had -- were addressing that with class

15         counsel --

16    QUESTIONS BY MR. KATZ:

17         Q.    Okay.

18         A.    -- to see what to do.

19              And then based on the -- a

20    specific conversation I had with Adam Gomez

21    on May 6th, we had instructed, well, provide

22    more information, if you can, on the claims

23    that had not been scored, as -- as well as

24    then he mentioned again during that call that

25    we have the money set aside as well as the
```

```
1    pour-over provision that can be used.

2         Q.      May 6th of 2025.

3                 Right?

4         A.      2025.

5         Q.      Okay.  And that's just weeks

6    before Kroll was replaced as claims

7    administrator.

8                 Right?

9                 MR. AHMAD:  Object to form.

10                THE WITNESS:  Yes.

11   QUESTIONS BY MR. KATZ:

12        Q.      Okay.  How much money did Kroll

13   actually pay out as part of the voluntary

14   exposure personal injury component of the

15   settlement before being terminated?

16        A.      Right off the top of my head,

17   I don't recall, really, right off the top of

18   my head.

19        Q.      Best estimate?

20        A.      I -- it was just over

21   10,000-some claims.  What -- again, what that

22   actual dollar amount, I really don't recall.

23   I don't recall.

24        Q.      How many total points had Kroll

25   allocated to the claims that it paid out
```

1    prior to it being terminated?

2           A.    I don't know that, again,

3    because the points would have been directly

4    correlated to the amount of money that we

5    paid out, and I don't know exactly what that

6    was off the top of my head.

7                 (Fenwick Exhibit 3 marked for

8           identification.)

9    QUESTIONS BY MR. KATZ:

10          Q.    I'm going to mark -- Vince,

11    this is my number 6, just so you have it.

12    It's a one-page document.  I'm going to mark

13    it as Exhibit 3.

14                And at the top you'll see it's

15    on Kroll Settlement Administrator --

16    Administration-branded paper.

17                Correct?

18          A.    Yes, it appears to be.

19          Q.    This is something Kroll created

20    and provided to class counsel.

21                Right?

22                MR. AHMAD:  Object to form.

23                THE WITNESS:  I believe this

24          was provided very early on in the

25          settlement proceedings, yes.

Scott Fenwick                    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    QUESTIONS BY MR. KATZ:

 2          Q.      But it was provided by Kroll to

 3    class counsel.

 4                  Right?

 5          A.      Very early on, yes.  At the

 6    beginning of the settlement.

 7          Q.      Okay.  And it was sent to class

 8    counsel by you.

 9                  Right?

10          A.      I don't recall if I sent it or

11    if somebody else sent it.

12          Q.      All right.  You had a role in

13    creating this.

14                  Right?

15          A.      I don't know.

16          Q.      Okay.

17          A.      I don't know if I did or not.

18          Q.      The title is the "Proposed

19    Settlement Administration Timeline."

20                  Is that right?

21          A.      That is correct.

22          Q.      And you see the last date is

23    December 16th.

24                  Right?

25          A.      Yes.
```

```
1        Q.      And the event is initial
2   partial payments to East Palestine residents
3   only.
4                Right?
5        A.      Yes.
6        Q.      Okay.  And then the comment in
7   the column to the right is, "All other
8   payments to be made once all claims are
9   finalized, first quarter 2025."
10               Right?
11       A.      That is correct.
12       Q.      Okay.  The payments that Kroll
13  made, the 10,000 or so claims that were paid
14  out, they weren't initial partial payments to
15  East Palestine residents only.
16               Correct?
17       A.      No.
18       Q.      Okay.  You can put that aside,
19  Mr. Fenwick.
20               Do you remember something
21  called the Unity Council?
22       A.      Yes.
23       Q.      We got a request from them
24  about information regarding the settlement.
25               Right?
```

1          A.      Yes.

2          Q.      And do you remember helping

3    class counsel respond to that e-mail -- or

4    that e-mail, which we sent a letter?

5          A.      I read the response that class

6    counsel prepared, yes.

7          Q.      And did you have any role in

8    reviewing drafts for class counsel?

9                  MR. AHMAD:  Object to form.

10                 THE WITNESS:  Not that I

11        recall, apologies, off the top of my

12        head.  I remember reviewing it.

13   QUESTIONS BY MR. KATZ:

14         Q.      You remember reviewing the

15   final or drafts?

16         A.      I -- honestly, I don't recall.

17                 (Fenwick Exhibits 4 and 5

18        marked for identification.)

19   QUESTIONS BY MR. KATZ:

20         Q.      Mr. Fenwick, I'm going to show

21   you two separate exhibits.

22         A.      Uh-huh.

23         Q.      Exhibit 4, Vince, is my

24   number 5, and this is a draft response to the

25   Unity Council.

```
 1                    And Exhibit 5 -- Vince, you

 2     don't have this -- is an e-mail that you

 3     wrote.

 4                    Correct?

 5          A.     That is correct.

 6          Q.     And the drafts --

 7                    MR. AHMAD:   This is 4 and this

 8          is 5?

 9                    MR. KATZ:  Correct.

10     QUESTIONS BY MR. KATZ:

11          Q.     And the -- Exhibit 4 is the

12     attachment to Exhibit 5.

13                    Okay?

14          A.     Okay.

15          Q.     You wrote Exhibit 5.

16                    Right?

17                    MR. AHMAD:  Object to form.

18     QUESTIONS BY MR. KATZ:

19          Q.     The top e-mail in Exhibit 5.

20                    Right?

21          A.     Yes, I replied to an e-mail

22     from Adam Gomez --

23          Q.     Right.

24          A.     -- that he sent, correct.

25          Q.     And Adam Gomez sent you, "Here
```

1    is the rough draft of the response for

2    review."

3              And the response relates to the

4    Unity Council's request.

5              Right?

6              MR. AHMAD:  Object to form.

7              THE WITNESS:  Yes.

8    QUESTIONS BY MR. KATZ:

9         Q.    And ultimately, the final draft

10   of the response to the Unity Council was

11   posted on the website.

12             Right?

13        A.    I don't recall.

14        Q.    Okay.

15        A.    I think it was.

16        Q.    Let's look at Exhibit 4.  And

17   if you could, look at paragraph 13.

18             And the question being asked

19   and responded to is, "Will residents have a

20   calculation of their final payment before

21   they agree to opt in or out?"

22             Right?

23        A.    Yes.

24        Q.    Can you read aloud the last

25   sentence of that paragraph?

1     A.     "More precise estimates of

2 class member awards can only be determined

3 once the claims process has been completed,

4 all claims have been reviewed and points have

5 been allocated to all submissions."

6     Q.     And the first part of this

7 paragraph talks about the direct payment

8 claims.

9          Right?

10          Well, here, let's break it

11 down.

12          The paragraph starts,

13 "Individual award amounts under the

14 settlement are based on information received

15 during the claims process, as well as the

16 total number of class members who submit

17 claims."

18          Did I read that correctly?

19     A.     Yes.

20     Q.     All right.  And then the next

21 sentence relates to the direct payment, and

22 it says, "Information obtained during the

23 claims process is then translated into

24 objective points across more than a dozen

25 factors," and it includes seven factors.

1                   Correct?

2          A.      Yes.

3          Q.      Then the next sentence says,

4    "The same process is used for calculating

5    payments under the personal injury program

6    and includes," four factors.

7                   Correct?

8          A.      Yes, that's what it says.

9          Q.      And then it talks about the

10   long form notice, and it's based on the

11   available data and represents best estimates.

12                  Right?

13         A.      Yes.

14         Q.      Okay.  And in the long form

15   notice, you'll recall that class members were

16   told that it's a $600 million settlement.

17   Awards will vary.  If there's more than

18   600 -- or if there's more claims than would

19   consume $600 million, net fees and costs, the

20   amounts will go down.  And if the claims

21   submitted are under that amount, you might

22   get more than the projected estimates.

23                  Right?

24                  MR. AHMAD:  Object to form.

25                  THE WITNESS:  I believe it said

```
 1            that with respect to the direct

 2            payments, yes.

 3     QUESTIONS BY MR. KATZ:

 4            Q.     Okay.  But it said it with

 5     regard to $600 million.

 6                   Right?

 7                   MR. AHMAD:  Object to form.

 8                   THE WITNESS:  I'd have to look

 9            at the notice.

10     QUESTIONS BY MR. KATZ:

11            Q.     Okay.  Do you know what the

12     term "IVR script" means, Mr. Fenwick?

13            A.     Interactive voice response.

14            Q.     And what is that?

15            A.     That is our voice response

16     related to the toll-free telephone number.

17            Q.     So if someone calls with a

18     question, then the voice response gives an

19     answer.

20                   Right?

21            A.     Yes.

22            Q.     And the IVR script also talked

23     about if compensated claims are less than

24     $600 million, amounts might go up.  If it's

25     more than $600 million, amounts might go
```

1    down.

2                    Right?

3                    MR. AHMAD:  Object to form.

4                    THE WITNESS:  I don't know off

5          the top of my head.  I'd have to

6          listen to it.

7    QUESTIONS BY MR. KATZ:

8          Q.    Okay.  You helped create those

9    scripts, though.

10                   Right?

11                   MR. AHMAD:  Object to form.

12                   THE WITNESS:  No.

13   QUESTIONS BY MR. KATZ:

14         Q.    Okay.  You shared those draft

15   scripts with class counsel and defense

16   counsel.

17                   Right?

18         A.    I'm sure someone in our office

19   did, yes, to get approval of those, yes.

20         Q.    All right.  And do you think

21   that someone was you?

22         A.    I don't recall off the top of

23   my head.

24         Q.    Okay.  Mr. Fenwick, do you

25   remember being involved or seeing drafts of

```
1   the settlement agreement before it was

2   executed?

3           A.      I think so.

4           Q.      And the particular paragraph

5   that gave you some pause was the provision

6   about when payments would start.

7                   Right?

8                   MR. AHMAD:  Object to form.

9                   THE WITNESS:  I don't recall.

10  QUESTIONS BY MR. KATZ:

11          Q.      All right.  Do you recall being

12  concerned that payments beginning within

13  30 days of approval of the settlement gave

14  you some concern?

15          A.      Yes.

16          Q.      And you were concerned that not

17  all claims would be reviewed and validated

18  and scored by then.

19                  Right?

20          A.      Yes.

21          Q.      Okay.  Mr. Fenwick, can you

22  pull up the plan of distribution again for

23  me, which we marked as Exhibit Number 2?

24                  And go back to footnote 9 for

25  me.
```

1      A.      Uh-huh.

2      Q.      "Point value to be determined

3  for illustrative purposes only."

4              What does that mean to you?

5      A.      That this is just a

6  hypothetical example.

7      Q.      Okay.  You can put that aside

8  for now.

9              Mr. Fenwick, do you agree with

10  me that Kroll, in administering the

11  settlement in the East Palestine Train

12  Derailment case, did not follow or comply

13  with the plan of distribution with regard to

14  100 percent of the claims that it evaluated?

15      A.      Can you elaborate?

16      Q.      What part don't you understand?

17      A.      We applied the plan of

18  distribution first for the voluntary exposure

19  payments starting at $25,000 base, correct.

20              And I think we followed that

21  plan of distribution by adjusting people up

22  or down based on that point system and their

23  relative, you know, situations in each one of

24  the eight categories.

25      Q.      For the claims that were scored

```
1    by Kroll, 100 percent were done following the
2    plan of distribution to the letter, is your
3    testimony?
4         A.    We calculated claims using the
5    plan of distribution, correct.
6         Q.    Okay.  My question is, did you
7    follow the plan --
8         A.    Yes.
9         Q.    Let me finish the question.
10             For every single claim that
11   Kroll scored for the personal injury
12   voluntary exposure payment, was the plan of
13   distribution followed to the letter across
14   every single one of those?
15             MR. AHMAD:  Object to form.
16             You can answer.
17             THE WITNESS:  We followed the
18        structure of the plan of distribution,
19        correct.
20   QUESTIONS BY MR. KATZ:
21        Q.    Can you answer the question yes
22   or no, that you did it with regard to every
23   single claim --
24        A.    All claims that we would have
25   scored, we would have done the same process
```

1  where we would look at the claim, start at
2  the $25,000 base, and people would go up and
3  down from there.  Correct.
4       Q.    But the plan is a point base,
5  not a dollar base.
6             Right?
7             MR. AHMAD:  Object to form.
8             THE WITNESS:  The plan starts
9        at -- everybody has a base of
10       100 points, and that hundred points is
11       equal to $25,000.
12             And then, again, depending upon
13       where you sit within each of the
14       respective eight categories, I think
15       it is, you would go up or down
16       depending upon your individual
17       circumstances.
18  QUESTIONS BY MR. KATZ:
19       Q.    Your points would go up or
20  down.
21             Right?
22       A.    That is correct.
23       Q.    Were there any claims that were
24  scored where -- where Kroll simply started
25  with $25,000 and used the dollar amount to go

1    up and down instead of points going up and

2    down?

3              MR. AHMAD:  Object to form.

4              THE WITNESS:  We, again,

5         followed that plan of distribution and

6         set up where you start at $25,000, and

7         depending upon where you lived, how --

8         when were you present, all those, your

9         points were adjusted up or down based

10        on those factors.

11   QUESTIONS BY MR. KATZ:

12        Q.    Right.  My question is a little

13   different.

14              My question is, were there any

15   claims that were scored where, instead of

16   saying your hundred points was adjusted,

17   you -- Kroll evaluated the claim that your

18   $25,000 was adjusted?

19        A.    We did our calculations based

20   on points.

21        Q.    Always?

22        A.    Starting with the $25,000 base,

23   yes.

24        Q.    Okay.  So every single claim

25   was based on points going up or down, not

Scott Cerwick    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1   dollar amount going up and down?

2             MR. AHMAD:  Object to form.

3             THE WITNESS:  Yes.  Again, it

4        would start with the hundred points.

5        And from there, points went up or down

6        based upon then the factors in each of

7        the categories.

8   QUESTIONS BY MR. KATZ:

9        Q.    And every single claim was

10  scored following the plan of distribution to

11  the letter?

12       A.    Handled in that same fashion,

13  yes.

14       Q.    Okay.  Were some scored

15  claims -- excuse me.  Withdraw.

16       A.    Uh-huh.

17       Q.    Were some claims scored and

18  paid by Kroll without following the plan of

19  distribution, say, for example, failing to

20  distinguish between the Village of East

21  Palestine and the ZIP code for East

22  Palestine?

23             MR. AHMAD:  Object to form.

24             THE WITNESS:  Yes.  We

25        identified that there were unfortunate

```
 1              mistakes in some calculations, yes.

 2     QUESTIONS BY MR. KATZ:

 3         Q.      So my -- go back to my question

 4     a few moments ago.

 5         A.      Uh-huh.

 6         Q.      Isn't it true that not every

 7     single claim evaluated and scored by Kroll

 8     was done following the plan of distribution?

 9              MR. AHMAD:  Object to form.

10              THE WITNESS:  We followed the

11         plan of distribution.  Unfortunately,

12         some of those points were allocated

13         incorrectly.

14     QUESTIONS BY MR. KATZ:

15         Q.      Okay.  So if you allocated

16     points incorrectly, you applied a multiplier

17     from the plan that was applied incorrectly.

18              Right?

19         A.      Yes.

20         Q.      Which would be deviation from

21     the plan.

22              Right?

23              MR. AHMAD:  Object to form.

24              THE WITNESS:  It was --

25              MR. AHMAD:  Let him finish.
```

```
 1                    THE WITNESS:  It was an error
 2        made, yes.
 3   QUESTIONS BY MR. KATZ:
 4        Q.     And there were several errors
 5   made.
 6                    Right?
 7        A.     I guess definition of
 8   "several."
 9        Q.     Okay.  Fair enough.
10                    If the plan called for a
11   multiplier of 1.0 and Kroll applied 0.5 as a
12   multiplier, that wouldn't be following the
13   plan.
14                    Right?
15                    MR. AHMAD:  Object to form.
16                    THE WITNESS:  That would have
17        been an error, unfortunately, as part
18        of going through the process of
19        allocating the points.
20   QUESTIONS BY MR. KATZ:
21        Q.     But it would not have been part
22   of the plan.
23                    Right?
24        A.     It would have been an error
25   when we were following the plan of
```

```
 1   distribution.
 2        Q.      Okay.  So for some reason you
 3   can't say that that claim wasn't reviewed --
 4   wasn't scored following the plan.
 5             Right?
 6        A.      There was an error as they were
 7   doing when trying to follow the plan of
 8   distribution, correct.
 9        Q.      Isn't it true, sir, that there
10   were multipliers applied by Kroll that didn't
11   exist anywhere in the plan for that
12   particular category?
13        A.      Yes.
14        Q.      So claims scored in that regard
15   would have been a deviation of the plan.
16             Right?
17             MR. AHMAD:  Object to form.
18             THE WITNESS:  Similarly, it was
19        just errors in the calculations that
20        were being done as we followed what
21        the plan of distribution laid out.
22   QUESTIONS BY MR. KATZ:
23        Q.      Well, I thought when you first
24   said an error, if you got a -- the plan says
25   if you're in this group you get a 1, in this
```

1    group a .5, that's an error, right?

2              You applied the wrong

3    multiplier that's in the plan, right?

4              MR. AHMAD:  Object to form.

5              THE WITNESS:  It's an error,

6        yes.

7    QUESTIONS BY MR. KATZ:

8        Q.    Okay.  So it's a deviation from

9    the plan because you applied the wrong

10   multiplier.

11             Right?

12             MR. AHMAD:  Object to form.

13             THE WITNESS:  It's an error in

14       the calculation, yes.

15   QUESTIONS BY MR. KATZ:

16       Q.    Okay.  And what about when you

17   make up a multiplier that doesn't exist in

18   that plan.  That's not a math error.

19             Right?

20             MR. AHMAD:  Object to form.

21             THE WITNESS:  No, it's not a

22       math error.

23   QUESTIONS BY MR. KATZ:

24       Q.    It's also not a misapplication

25   putting someone in the wrong column.

```
 1                    Right?

 2                    MR. AHMAD:  Object to form.

 3                    THE WITNESS:  It's an error in

 4        the calculations.

 5   QUESTIONS BY MR. KATZ:

 6        Q.     It's not a deviation from the

 7   plan, in your view?

 8        A.     We followed the plan of

 9   distribution when we were doing the

10   calculations, and there were errors that took

11   place.

12        Q.     Okay.  So you have the plan in

13   front of you.

14                    Right?

15        A.     Yes, I do.

16        Q.     It is Exhibit 2.

17                    Can you look at page 8 for me?

18        A.     Sure.

19        Q.     And you'll see category 2,

20   direction points.

21        A.     Yes.

22        Q.     And there are two options.

23                    Right?

24        A.     Yes.

25        Q.     The first option for
```

1   200 degrees to 317 degrees is a .5

2   multiplier, right, or a 50 percent reduction?

3          A.     Yes.

4          Q.     And all other directions it's a

5   1 multiplier, or no deviation.

6                 Right?

7          A.     No deduction.

8          Q.     Would you agree with me that

9   .25 of the multiplier does not appear

10  anywhere in the plan for category 2 direction

11  points?

12         A.     Yes.

13         Q.     Okay.  If there were claims

14  scored by Kroll that had a .25 for category 2

15  direction points, that would be a deviation

16  from the plan.

17                Correct?

18                MR. AHMAD:  Object to form.

19                THE WITNESS:  If there were

20        points like that, it would have been

21        an error in the calculations.

22  QUESTIONS BY MR. KATZ:

23         Q.     Okay.  But not a deviation from

24  the plan?

25                MR. AHMAD:  Object to form.

Scott Fenwick                    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                    THE WITNESS:  An error in the

2          calculations.

3     QUESTIONS BY MR. KATZ:

4          Q.      Would it have been a deviation

5     from the plan; yes or no, sir?

6          A.      It would have been an error in

7     the calculations as we were following the

8     plan distribution.

9          Q.      If you're following the plan,

10    where does .25 appear in this category?

11         A.      It doesn't.

12         Q.      Okay.  So how can you be

13    applying a multiplier that doesn't appear in

14    the plan --

15                   MR. AHMAD:  Object to form.

16    QUESTIONS BY MR. KATZ:

17         Q.      -- and still not be deviating

18    from the plan?

19                   MR. AHMAD:  Object to form.

20                   THE WITNESS:  Again, it was --

21          if that happened, it would have been

22          an error that took place.

23    QUESTIONS BY MR. KATZ:

24         Q.      So you disagree that applying a

25    .25 multiplier in category 2 is a deviation

Scott Senwick CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    from the plan?

 2         A.      Correct.

 3         Q.      Okay.  Go to category 6 below

 4    that, please.

 5              Do you see an option for 0.75

 6    multiplier as an option for category 6,

 7    exposure and/or symptom points nature?

 8         A.      No.

 9         Q.      Do you agree or disagree that

10    if claims were scored by Kroll with a .75

11    multiplier for this category, that would be a

12    deviation from the plan?

13              MR. AHMAD:  Object to form.

14              THE WITNESS:  Similarly, it

15         would have been an error in our

16         calculations.

17    QUESTIONS BY MR. KATZ:

18         Q.      Would it have been a deviation

19    from the plan?

20         A.      Well, it would be an error in

21    the calculations.

22         Q.      Yes or no:  Would it have been

23    a deviation from the plan?

24         A.      No.

25         Q.      Okay.  Were there claims that
```

```
 1   were scored by Kroll with a .75 multiplier
 2   for category 6?
 3          A.      I believe there were.
 4                  (Fenwick Exhibit 6 marked for
 5          identification.)
 6   QUESTIONS BY MR. KATZ:
 7          Q.      Okay.  Let's mark the next --
 8   that's going to be the declaration.
 9   Exhibit 6.
10                  MR. AHMAD:  We've been going
11          about an hour.
12                  MR. KATZ:  Okay.
13                  MR. AHMAD:  I don't know if it
14          makes sense to take our first break --
15                  MR. KATZ:  Probably not.
16                  Do you need a break,
17          Mr. Fenwick?
18                  THE WITNESS:  I'm okay right
19          now.
20                  MR. AHMAD:  Okay.
21                  THE WITNESS:  Yeah, I'm fine.
22   QUESTIONS BY MR. KATZ:
23          Q.      So we're going to mark as
24   Exhibit 6 -- it is exhibit -- and to the
25   motion for the order to show cause, it's my
```

```
1    1, Vince, which is the declaration of Michael
2    O'Connor.
3                    And we've given you the full --
4    all the exhibits.  I don't intend to go to
5    the exhibits, but I wanted to give you a
6    complete document.
7                    MR. AHMAD:  Okay.
8                    MR. KATZ:  I do plan to only
9            cover the declaration part, at least
10           for now.
11                   MR. AHMAD:  And since it is the
12           full document, and I assume we're
13           treating this deposition transcript
14           the same as the one yesterday, and
15           we're just going to have to figure out
16           what the -- what the process is for
17           the transcript.
18                   MR. KATZ:  Yeah.  The
19           protective order in the case has all
20           transcripts are deemed confidential
21           until there's a period for review.
22                   But obviously with regard to
23           this exhibit, it will be deemed
24           confidential even beyond that
25           expiration.  I mean, we've all agreed
```

```
 1            that because this is the unredacted
 2       version --
 3                 MR. AHMAD:  Right.
 4                 MR. KATZ:  -- it's going to be
 5       treated differently.
 6                 But the transcript has -- it
 7       will be covered by the protective
 8       order.
 9                 MR. AHMAD:  The transcript,
10       yeah.  Yeah.
11                 MR. KATZ:  There's a process
12       for the transcript.
13                 MR. AHMAD:  Yeah.
14                 MR. KATZ:  It's in the
15       protective order.
16                 MR. AHMAD:  Yeah, got it.
17                 MR. KATZ:  That you should
18       familiarize yourself with it.
19                 MR. AHMAD:  No.  No.  I mean,
20       I've -- I've seen it.  It's just,
21       again, it's a -- there's a little bit
22       of a question as to what phase of this
23       proceeding we're at.
24                 But, yeah, we'll talk off the
25       record.
```

```
 1    QUESTIONS BY MR. KATZ:

 2         Q.     Okay.  You have the exhibit in

 3    front of you, Mr. Fenwick?

 4         A.     Yes.

 5         Q.     All right.  So let's take a

 6    look the three topics we kind of just talked

 7    about.

 8                And you're familiar with the

 9    area of East Palestine from your work in this

10    case a little bit.

11                Right?

12         A.     Yes.

13         Q.     You understand that the ZIP

14    code for East Palestine of 44413 goes beyond

15    the village as it's been defined in the plan,

16    in the case.

17                Right?

18         A.     Yes.

19         Q.     And the village goes out to two

20    miles, but people outside of that distance

21    still have the same ZIP code as East

22    Palestine.

23                Right?

24         A.     Yes.

25         Q.     Okay.  And in scoring the
```

1   claims, including the claims that Kroll paid

2   out, isn't it true that Kroll treated

3   everybody with the 44413 ZIP code as being in

4   the village for purposes of the plan of

5   distribution and location points?

6           A.      Everybody?  No.

7           Q.      Some small group got through?

8   Treated differently?

9           A.      I think there was an error in

10  the calculation with some of the batches of

11  claims that went out, yes.

12          Q.      Okay.  So some of the batches

13  where the people were beyond two miles, in

14  that two to three-mile area, didn't get the

15  .6 multiplier.

16                  Right?

17                  And if you look at the plan of

18  distribution, it's category 1.

19                  Right?

20          A.      Yes, some -- there were

21  individuals that did not receive the correct

22  multiplier in that category, correct.

23          Q.      And the error resulted in those

24  people not getting a reduction, right, not

25  getting a .6 reduc -- multiplier instead of a

```
 1    .1.

 2                   Right?

 3         A.       Correct.

 4         Q.       So Kroll overallocated the

 5    number of points by not applying a deduction.

 6                   Right?

 7                   MR. AHMAD:  Object to form.

 8                   THE WITNESS:  Yes.

 9    QUESTIONS BY MR. KATZ:

10         Q.       Even though the plan called for

11    a reduction if someone with the 44413 ZIP

12    code was between two and three miles?

13         A.       Correct.

14         Q.       Okay.  And that holds true for

15    some of the claims that Kroll actually

16    already paid.

17                   Right?

18         A.       Yes.  We had identified that,

19    yes.

20         Q.       And if you look at Michael

21    O'Connor's declaration, which is Exhibit 6,

22    it talks about paragraphs -- this in

23    paragraphs 51 and 52.

24                   Correct?

25         A.       Yes.
```

```
 1          Q.     And you see in paragraph 52 it
 2    says, "Epiq identified 250 paid claims that
 3    had this problem."
 4                  Right?
 5          A.     That's what it says.
 6          Q.     Okay.  And do you have any
 7    reason to dispute the number of claims
 8    identified by Epiq?
 9          A.     I'd have to look at the data to
10    confirm that.
11          Q.     Do you have any reason to
12    dispute it sitting here today?
13                  MR. AHMAD:  Object to form.
14                  THE WITNESS:  I wouldn't be
15          able to unless I was looking at the
16          data.
17    QUESTIONS BY MR. KATZ:
18          Q.     Okay.  And how about the 120
19    valid claims?
20          A.     We did not score any of those
21    that are listed as valid.  We did not
22    officially allocate points to those claims.
23          Q.     Okay.  So what does it mean
24    they were valid?
25          A.     It just means that upon review
```

1    of the claim form, we determined that all the

2    information was there to be able to go

3    through the process of eventually calculating

4    those claims.

5          Q.     Was there a draft of those

6    points for those valid claims?  For any of

7    the valid claims?

8          A.     No, we did not have a draft of

9    those points.  We only calculated points when

10   we extracted the batches to do the

11   calculations.

12         Q.     So you disagree that there were

13   any valid claims that Kroll even began to

14   score incorrectly on the distance category

15   for location points?

16         A.     We calculated claims when we

17   pulled them out to -- for the batches.

18   That's when we would calculate the claims.

19         Q.     What do you mean by that?

20         A.     As class counsel is aware,

21   there was a process that we went through

22   whereby we did a batch processing where we

23   had a certain number of claims, and as we

24   were reviewing those claims, we would do the

25   calculation of those particular claims.

```
1    That's when we did that.
2               And at that same time then, we
3    would share the information with defense
4    counsel to review the personal injury
5    documentation as well so that they could make
6    sure that that information was valid as well.
7         Q.    And --
8         A.    That was when we calculated the
9    points for those claims.
10        Q.    And there were claims that were
11   calculated in that manner where the payment
12   wasn't sent out.
13              Correct?
14        A.    We were calculating some claims
15   in April, and those claims had not gone
16   through the entire process and had not gone
17   out, correct.
18        Q.    So they had been scored but not
19   sent out yet.
20              Right?
21        A.    Because we had been reviewing
22   those and identi -- and identified that "no."
23   And those claims did not eventually get
24   through the entire process, correct.  That
25   was a small batch of claims.
```

1      Q.     Okay.  All right.  If you could

2  turn to page 20 of Mr. O'Connor's

3  declaration, which is at the bottom, you'll

4  see just above paragraph 45, category 2,

5  direction points.

6            Do you see that?

7      A.     Yes.

8      Q.     Okay.  And that's the category

9  2 we were just talking about a few moments

10  ago where there is no .25 multiplier.

11            Correct?

12      A.     Correct.

13      Q.     And if you look at paragraph 50

14  of Mr. O'Connor's declaration, he says he

15  identified 32 claims with a valid status

16  where the direction points were .25, and it's

17  a value not contained in the distribution

18  plan.

19            Right?

20      A.     Again, we did not calculate the

21  claims in a valid status.  We did that when

22  we would pull the information for that batch,

23  and that's when we would do that calculation.

24      Q.     And some of those claims were

25  computed but not sent out.

Scott Fenwick   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1                     Right?
 2          A.      That -- that, I don't know if
 3   this -- any of this 32 were in that --
 4          Q.      Okay.
 5          A.      -- situation.  That, I don't
 6   know.
 7          Q.      But claims were computed and
 8   then not sent out just before Kroll was
 9   terminated as the claims administrator.
10                     Right?
11          A.      We were going through a
12   calculation of some claims, yes.
13          Q.      So some claims were computed
14   and not sent out.
15                     Correct?
16          A.      Yes.  We were in the process of
17   calculating another batch of claims to issue
18   distribution checks.  And they were going
19   through the calculations, and the process had
20   not been completed for those claims to get
21   out the door.
22          Q.      And if Kroll applied a .25
23   multiplier for category 2, that would be
24   something that doesn't appear in the plan.
25                     Right?
```

```
 1                    MR. AHMAD:  Object to form.
 2                    THE WITNESS:  If we had done
 3          that for those batch of claims, yes.
 4          That .25 is not part of the
 5          distribution plan.
 6   QUESTIONS BY MR. KATZ:
 7          Q.     If you had done that for any
 8   claim, it wouldn't have been something that
 9   was contained in the plan.
10                    Right?
11          A.     Yes, we covered that.
12          Q.     Okay.  Let's go back up to
13   paragraph 47 of Mr. O'Connor's declaration,
14   which is Exhibit 6.
15                    Again, this is still talking
16   about category 2.
17                    Correct?
18          A.     It appears to, yes.
19          Q.     Okay.  And if you go back to
20   the plan and you look at category 2, there's
21   a note under the box of multipliers.
22                    Right?
23          A.     Yes.
24          Q.     And the note says, "Direction
25   points are only applicable to claims made
```

1    outside the Village of East Palestine or two

2    miles from the derailment site."

3              Correct?

4         A.    That's what it says.

5         Q.    So the plan is that if the

6    claimant is within the two miles, the

7    direction points don't get applied.

8              Right?

9         A.    That is correct.

10        Q.    Okay.  And if a claimant is

11   from 200 degrees to 317 degrees, there's a .5

12   multiplier.

13             Right?

14        A.    If they're outside of the two

15   miles or the Village of East Palestine,

16   correct.

17        Q.    And -- but if they're outside

18   of those two miles and in that direction of

19   200 to 317 --

20        A.    Yes.

21        Q.    -- they would get a 50 percent

22   reduction.

23             Right?

24        A.    That would be correct.

25        Q.    Everybody else would get no

```
 1    deduction.

 2              Right?

 3        A.    Correct.

 4        Q.    No add -- it's a 1 multiplier,

 5    so it's a neutral.

 6              Right?

 7        A.    Yes.

 8        Q.    So if Kroll scored claims and

 9    paid claims for people outside of the two

10    miles but in the 200 to 317 direction but

11    gave them a 1, that would be a misapplication

12    of the plan.

13              Right?

14        A.    That would be an error in the

15    calculations, correct.

16        Q.    Which would be a misapplication

17    of the plan.

18              Right?

19              MR. AHMAD:  Object to form.

20              THE WITNESS:  Yes, that would

21        have been -- that would have been an

22        error in the calculations that we

23        would have done.

24    QUESTIONS BY MR. KATZ:

25        Q.    Right.
```

```
 1              Because under the terms of the
 2   plan, if it was being followed, they would
 3   have gotten a 50 percent reduction.
 4              Right?
 5              MR. AHMAD:  Object to form.
 6              THE WITNESS:  Yes.  Anyone that
 7        was outside of two miles and in that
 8        200 degree to 317 degrees should be
 9        receiving a 50 percent reduction.
10   QUESTIONS BY MR. KATZ:
11        Q.    Going back to paragraph 50 of
12   Mr. O'Connor's declaration, which reads, "In
13   addition, Epiq identified 32 claims with a
14   valid status where the direction points were
15   .25.  This is not a value contained in the
16   distribution plan."
17              Did I read that correctly?
18        A.    That's what it says.
19        Q.    Do you dispute that conclusion?
20              MR. AHMAD:  Object to form.
21              THE WITNESS:  I can't speak to
22        what Epiq followed.
23   QUESTIONS BY MR. KATZ:
24        Q.    Okay.  So you don't dispute it;
25   you just don't know.
```

```
1              Right?
2              MR. AHMAD:  Object to form.
3              THE WITNESS:  Again, we didn't
4         value -- we didn't calculate claims in
5         the valid status in our database.  We
6         did that when we pulled them to do
7         their distribution.
8    QUESTIONS BY MR. KATZ:
9         Q.    Right.
10             But there are claims that were
11   scored that -- after validation, but they
12   weren't paid out because payments stopped.
13             Right?
14        A.    That is correct.  We were in
15   the process of doing another round of
16   distributions, and those never went through
17   the entire cycle in order to get issued
18   checks.
19        Q.    When would a claim be changed
20   in status from valid to paid in Kroll's
21   operation?
22        A.    After we issued the payment.
23        Q.    Okay.  So you could have a
24   valid claim that was scored, but because the
25   payment didn't go out, it wouldn't -- it
```

1    would still be valid, not paid.

2              Right?

3              MR. AHMAD:  Object to form.

4              THE WITNESS:  We could have

5       pulled the claim up to start the

6       process of doing the calculations, but

7       that information, again, would not

8       have been finalized, any of the

9       points, until we finished the

10      calculations.

11   QUESTIONS BY MR. KATZ:

12      Q.    So would that claim still be

13   filed under the valid status or would it be

14   paid?

15      A.    Valid.

16      Q.    Okay.  So there is a universe,

17   or there was a universe, of claims that fall

18   into that category.  They're valid.  Scores

19   were done.  However, payment wasn't made, but

20   they're still considered valid.

21              Right?

22      A.    We were in the processing of

23   scoring, calculating a batch of claims.

24   Which claims they were and how many, I don't

25   recall, but we were in the process of doing

```
 1    some calculations.

 2           Q.      So, yes, there are claims, or

 3    there were claims, in the valid status that

 4    were scored, but payment wasn't sent out yet.

 5               Correct?  Yes or no.

 6               MR. AHMAD:  Object to form.

 7               THE WITNESS:  They were not

 8        fully scored.  We were going through

 9        that process of doing the

10        calculations.

11    QUESTIONS BY MR. KATZ:

12           Q.      Okay.  So computations were

13    assigned.

14               Right?

15               MR. AHMAD:  Objection.

16               THE WITNESS:  We were in the

17        process of going through the

18        calculations.

19    QUESTIONS BY MR. KATZ:

20           Q.      Isn't there a group -- or

21    wasn't there a group of claims that Kroll had

22    completed scoring, and class counsel said

23    don't send them out because we didn't want to

24    exacerbate the problem just prior to Kroll's

25    being terminated?
```

```
 1              MR. AHMAD:  Objection.
 2              THE WITNESS:  Not that I
 3        recall.
 4   QUESTIONS BY MR. KATZ:
 5        Q.    Okay.  So is it your testimony,
 6   yes or no, that any claim that was in the
 7   valid status did not have a score?
 8              MR. AHMAD:  Object to form.
 9   QUESTIONS BY MR. KATZ:
10        Q.    It's a yes or no.  Just want to
11   make sure I understand your testimony.
12        A.    We had not calculated those
13   claims.
14        Q.    So is that a yes, there was not
15   a single claim under the valid status that
16   had a score --
17              MR. AHMAD:  Objection.
18   QUESTIONS BY MR. KATZ:
19        Q.    -- when Kroll was terminated?
20              MR. AHMAD:  Object to form.
21              THE WITNESS:  We were going
22        through the process of a batch of
23        valid claims.  Where that was in the
24        process, I don't know.
25
```

Scott Fenwick                    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1    QUESTIONS BY MR. KATZ:

 2         Q.     Okay.  Why can't you say yes

 3    or -- answer that question yes or no?  I'm

 4    just trying to follow along.

 5         A.     Uh-huh.

 6         Q.     Is there a reason you can't say

 7    yes or no?  Can't answer yes or no?

 8         A.     I'm stating the facts of

 9    where -- what was going on with --

10         Q.     But your job here today is to

11    answer my question.

12              My question is, yes or no, is

13    there a single claim in the valid status that

14    Kroll had scored prior to Kroll being

15    terminated?

16              MR. AHMAD:  Object to form.

17              THE WITNESS:  I don't recall

18         because we were going through the

19         process of calculating a batch of

20         claims at that time.

21    QUESTIONS BY MR. KATZ:

22         Q.     Okay.  You were going through

23    the process.

24              Had any claims in that batch

25    been scored?
```

```
 1          A.     I don't know.  I don't recall
 2    where in that process that we had ceased or
 3    how far we got.
 4          Q.     Before you were terminated.
 5          Right?
 6                 MR. AHMAD:  Object to form.
 7                 THE WITNESS:  Before we ceased
 8      that process.
 9    QUESTIONS BY MR. KATZ:
10          Q.     Well, the Court terminated
11    Kroll as the settlement administrator.
12          Right?
13          A.     Yes.
14          Q.     And that process was going on,
15    and then Kroll was terminated by the Court as
16    settlement administrator.
17          Right?
18                 MR. AHMAD:  Object to form.
19                 THE WITNESS:  Yes.
20    QUESTIONS BY MR. KATZ:
21          Q.     All right.  Let's go to
22    paragraph 42, 3 and 4 in Mr. O'Connor's
23    declaration, which relates to category 6,
24    exposure and/or symptom points nature.
25                 Looking at the plan --
```

```
 1                    MR. AHMAD:  I'm sorry, what
 2          page are you on?  Sorry.
 3                    MR. KATZ:  Of which?
 4                    MR. AHMAD:  Are you in the
 5          declaration?
 6                    MR. KATZ:  I'm in the
 7          declaration at paragraphs 42 to 44.
 8                    MR. AHMAD:  Oh, great.  Sorry.
 9          That answered my question.
10                    MR. KATZ:  And in the plan it's
11          paragraph 8.
12                    MR. AHMAD:  Oh, okay.
13                    MR. KATZ:  So there's both.
14                    MR. AHMAD:  Thank you.  Sorry.
15     QUESTIONS BY MR. KATZ:
16          Q.    Mr. Fenwick, are you there?
17          A.    Yes.
18          Q.    Okay.  If you look at
19     category 6, do you see .75 as an option for a
20     multiplier in the plan?
21          A.    No.
22          Q.    And if you look at paragraph 43
23     of Mr. O'Connor's declaration, he references
24     Epiq identified .75 assigned as a multiplier
25     for 685 claims with a status of paid.
```

1          Did I read that correctly?

2     A.     Yes.

3     Q.     If Kroll paid claims using a

4   .75 multiplier, was this part, category 6 of

5   the plan, properly applied; yes or no?

6     A.     There was -- there was an error

7   in that calculation with respect to that.

8     Q.     So fair to say the plan wasn't

9   properly applied?

10     A.     There was an error that took

11   place with respect to those calculations.

12     Q.     Would you agree that that's a

13   deviation from the plan, to apply a .75

14   multiplier to category 6?

15          It's a yes or no:  Would you

16   agree to that?

17     A.     We followed the plan of

18   distribution --

19     Q.     Okay.

20     A.     -- and there was an error that

21   took place.

22     Q.     That's not my question.

23          My question is, do you agree

24   with the statement:  Applying a .75

25   multiplier to category 6, exposure and/or

```
 1   symptom points, is a deviation from the plan
 2   of distribution?
 3        A.     No, it was an error that took
 4   place.
 5        Q.     So you disagree with that
 6   statement?
 7        A.     Yes.
 8        Q.     All right.  And then in --
 9   later in paragraph 43 of Mr. O'Connor's
10   declaration, he takes a screenshot of an
11   e-mail exchange between you and Epiq.
12               Correct?
13        A.     Yes, looks to be.
14        Q.     And in that e-mail, Epiq was
15   identifying to you the application of this
16   .75 multiplier.
17               Correct?
18               MR. AHMAD:  Object to form.
19               THE WITNESS:  Yes.
20   QUESTIONS BY MR. KATZ:
21        Q.     And your response is, Kroll,
22   indicating it's from you, "We identified this
23   as well, and it's an error that occurred on a
24   few records.  Counsel did not direct us to
25   deviate from the plan of distribution."
```

```
 1                   Correct?

 2         A.      That's what it says, correct.

 3         Q.      And when you wrote it, you were

 4   being truthful.

 5                   Right?

 6         A.      Yes.

 7         Q.      When you wrote that response,

 8   you were being honest.

 9                   Right?

10         A.      Yes.

11         Q.      And when you wrote that

12   response, you were trying to accurately

13   convey your thoughts.

14                   Correct?

15         A.      Yes.

16         Q.      Okay.  In your parlance, is 685

17   claims a few claims with regard to this

18   settlement?

19         A.      I don't know if that's a few

20   claims or a lot of claims or some.  It's --

21   it's 685.

22         Q.      Okay.  So am I to understand

23   your testimony correctly, you do not dispute

24   that Kroll, in a universe of paid claims,

25   applied a .75 multiplier for category 6?
```

```
1           A.      Correct.  We identified that

2     error as well, yes.

3                   MR. KATZ:  Why don't we take a

4           short break so that -- let's go off

5           the record.

6                   VIDEOGRAPHER:  We're going to

7           go off the record at 11:25 a.m.

8            (Off the record at 11:25 a.m.)

9                   VIDEOGRAPHER:  Back on the

10          record at 12:52 p.m.

11    QUESTIONS BY MR. KATZ:

12          Q.      Mr. Fenwick, earlier in your

13    testimony before the break, you told us that

14    Kroll utilized claim reviewers in India.

15                  Is that correct?

16          A.      Yes.

17          Q.      Did Kroll ever disclose to

18    class counsel and defense counsel that claims

19    would be reviewed in India?

20                  MR. AHMAD:  Object to form.

21                  THE WITNESS:  I don't know.

22    QUESTIONS BY MR. KATZ:

23          Q.      Okay.  Did Kroll, or Heffler at

24    the time, utilize claims reviewers in India

25    for the Columbia Gas settlement
```

```
 1   administration?

 2         A.      No, I do not believe so.

 3         Q.      Okay.  What steps, if any, in

 4   this litigation did Kroll employ to assure

 5   the security and confidentiality of class

 6   member data for claims that were reviewed in

 7   India?

 8         A.      I'm not an expert --

 9               MR. AHMAD:  Objection to form.

10               THE WITNESS:  -- in our

11         technology.

12   QUESTIONS BY MR. KATZ:

13         Q.      So you don't know?

14         A.      I'm not an expert in our

15   systems and technology.

16         Q.      Yes or no:  Do you know what

17   steps, if any, Kroll employed to ensure the

18   security and confidentiality of class member

19   data for claims that were reviewed in India?

20               MR. AHMAD:  Object to form.

21               THE WITNESS:  We have security

22         systems and measures.  Do I know

23         specifically what those all are?  No,

24         I do not know.

25
```

```
 1    QUESTIONS BY MR. KATZ:

 2         Q.     Okay.  Was there a Kroll member

 3    of the executive team in India overseeing

 4    that portion of the claims review?

 5         A.     Not to my knowledge.

 6         Q.     Okay.  And am I correct in my

 7    understanding that you testified earlier that

 8    Kroll did not develop the plan of

 9    distribution in the East Palestine matter?

10         A.     Correct.

11         Q.     Does Kroll ever develop a plan

12    of distribution for a class action settlement

13    when it's going to be the administrator?

14         A.     Off the top of my head, I don't

15    recall situations where the administrator,

16    us, developed a plan of distribution.

17         Q.     Okay.  Well, did Kroll develop

18    the plan of distribution for Columbia Gas?

19         A.     No.

20              (Fenwick Exhibit 7 marked for

21         identification.)

22    QUESTIONS BY MR. KATZ:

23         Q.     Vince, I'm going to use my

24    number 7, which we are actually going to mark

25    as Exhibit 7.
```

```
 1                    And for the record, this is a
 2      printout of Kroll's website.  And you can see
 3      the time it was printed was November 12,
 4      2025, at 8:13 p.m., and that was Eastern Time
 5      when I printed this.
 6           A.      Uh-huh.
 7                   MR. AHMAD:  This is 7?  Sorry.
 8                   MR. KATZ:  This is 7.
 9                   MR. AHMAD:  Okay.
10      QUESTIONS BY MR. KATZ:
11           Q.      And this is from the Kroll
12      website.
13                   Do you recognize the page,
14      Mr. Fenwick?
15           A.      Not entirely.  I don't --
16           Q.      Okay.
17           A.      -- frequent our website, no.
18           Q.      Okay.  And, well, if you look
19      at the first substantive page, which is on
20      page 2 because of the printing, it says,
21      "Columbia Gas settlement, a complex
22      multi-community administration."
23                   Correct?
24           A.      Where are you looking?  Sorry.
25           Q.      Page 2, the big black box.
```

Scott Ferencz                    #ONIH030-A2 PURSUANT TO PROTECTIVE ORDER

1          So maybe it's page 1 on the way
2     it printed.
3          A.     Okay.  Yes, it says that.
4          Q.     "Columbia Gas settlement, a
5     complex multi-community administration."
6               Right?
7          A.     Yes.
8          Q.     And if you scroll further down,
9     there's a heading for Kroll's solutions.
10         A.     Okay.
11         Q.     Do you see that?
12         A.     Yes.
13         Q.     And that's at the very bottom
14    of the page.
15               Correct?
16         A.     Yes.
17         Q.     And then at the top of the very
18    next page, in the left-hand column -- Vince,
19    keep going down.  Next page, top left box.
20               Can you read that?  Starts
21    "Kroll."
22         A.     "Kroll developed a
23    comprehensive, multi-faceted settlement
24    administration program that addressed the
25    unique needs of each community."

1        Q.     All right.  And then on the

2   next page, you see there's a header for

3   customized claims processing?

4        A.     Yes.

5        Q.     Can you read the first bullet

6   point, please?

7        A.     "Developed a point-based

8   allocation system for residential claims."

9        Q.     And then if you can go to one

10  more page, please.

11             And you see after the five

12  bullet points there is a paragraph of text.

13             Right?

14        A.     Yes.

15        Q.     And can you please read just

16  the first sentence?

17        A.     "The program demonstrated

18  Kroll's ability to design and execute a

19  highly customized settlement administration

20  solution that effectively served a diverse

21  community while maintaining the integrity of

22  the claims process."

23        Q.     Okay.  You can put aside

24  Exhibit 7.

25             I just want to make sure I

```
1    understand your explanation of some of the

2    differences between Columbia Gas, the

3    settlement there, and the settlement

4    administration in East Palestine for a few

5    minutes.

6                My recollection, and is this

7    accurate, that one of the differences is in

8    Columbia Gas, the claimants started with zero

9    points.

10               Correct?

11        A.    Yes.

12        Q.    And in East Palestine for the

13   personal injury voluntary exposure fund, the

14   claimants started at 100 points.

15               Correct?

16        A.    100 points worth $25,000,

17   correct.

18        Q.    They started at a hundred

19   points?

20        A.    Started at a hundred points

21   worth $25,000, yes.

22        Q.    Okay.  And is there a reason

23   you can't just answer my question, which is,

24   they started at a hundred points.

25               Right?
```

```
 1                    MR. AHMAD:  Object to form.
 2     QUESTIONS BY MR. KATZ:
 3          Q.     They started at a hundred
 4     points in East Palestine.
 5                    Right?
 6                    MR. AHMAD:  Object to form.
 7                    THE WITNESS:  They started at a
 8          hundred points worth the $25,000 per
 9          the plan of distribution, yes.
10     QUESTIONS BY MR. KATZ:
11          Q.     Okay.  Is there a reason that
12     you can't just answer that yes or no, you
13     have to add more to it?
14                    Do you have a script you're
15     supposed to be following?
16                    MR. AHMAD:  Object to form.
17          Now you're arguing with the witness.
18                    MR. KATZ:  No, it's a question.
19                    MR. AHMAD:  No, it's not.
20          You're arguing with the witness, sir.
21     QUESTIONS BY MR. KATZ:
22          Q.     You can answer.
23          A.     I have no script.
24          Q.     Okay.  You agree that in
25     Columbia Gas it was a pro rata distribution.
```

1              Right?

2        A.     For the lump-sum payments, it

3  was pro rata distribution for the

4  $80 million, yes, correct.

5        Q.     And that was part of -- that

6  word "pro rata," or that phrase "pro rata,"

7  was in the plan of distribution in Columbia

8  Gas.

9              Is that your testimony?

10       A.     I don't know if that phrase is

11  in there.

12       Q.     Okay.  Was it in the settlement

13  agreement in Columbia Gas?

14       A.     I don't recall off the top of

15  my head.

16       Q.     Okay.  But Columbia Gas was a

17  pro rata distribution of the net proceeds.

18             Right?

19       A.     Yes, because you added up all

20  the points for all of the claimants, and then

21  you divided -- each person got their share of

22  all those points multiplied by the

23  $80 million, correct.

24       Q.     Okay.  And the differences for

25  East Palestine in the voluntary exposure

```
 1    personal injury, it's your testimony that
 2    it's not a pro rata settlement.
 3              Correct?  Yes or no.
 4              MR. AHMAD:  Object to form.
 5              THE WITNESS:  It's not pro
 6         rata.
 7    QUESTIONS BY MR. KATZ:
 8         Q.    Okay.  Under your understanding
 9    of the plan of distribution in East
10    Palestine, is the East Palestine direct
11    payment portion of the settlement a pro rata
12    distribution?
13         A.    Yes.
14         Q.    Mr. Fenwick, we are in the
15    homestretch for my first round with you.  We
16    may come back, depending on what happens
17    next.  So here we go.
18              You ready for the last couple
19    of questions?
20         A.    Yeah.
21         Q.    When class counsel uncovered
22    that Kroll was set to outspend the
23    $120 million voluntary exposure claim fund,
24    class counsel and Kroll had some telephone
25    calls or Zoom meetings.
```

```
 1                     Right?
 2                     MR. AHMAD:  Object to form.
 3                     THE WITNESS:  Yes.
 4     QUESTIONS BY MR. KATZ:
 5          Q.     In May of 2025.
 6                     Right?
 7          A.     Yes.
 8          Q.     And isn't it true that during
 9     one of those calls, you said to class counsel
10     you would take the heat for this, or
11     something to that effect?
12                     MR. AHMAD:  Object to form.
13                     THE WITNESS:  Not that I
14          recall.
15     QUESTIONS BY MR. KATZ:
16          Q.     Okay.  And isn't it true that
17     during one of those calls, you said to class
18     counsel, this is on me?
19                     MR. AHMAD:  Object to form.
20                     THE WITNESS:  Not that I
21          recall.
22                     MR. KATZ:  Okay.  That's all I
23          have for now.  I'll pass the witness,
24          reserving the balance of my four hours
25          for recross.
```

```
 1                    MR. AHMAD:  Sounds good.  Thank
 2         you.
 3                    And just to confirm, Norfolk
 4         Southern doesn't have any questions?
 5                    MR. FARCAS:  Right.  No
 6         questions subject to any further
 7         questions from you.
 8                    CROSS-EXAMINATION
 9    QUESTIONS BY MR. AHMAD:
10         Q.    And, Mr. Fenwick, just --
11    actually, just a handful of questions.
12                    Exhibit 7 was a printout of the
13    website.
14                    Do you see that?
15         A.    Yes, I do.
16         Q.    Okay.  Were you involved in any
17    way preparing the statements that are on this
18    Kroll website?
19         A.    No.
20         Q.    Okay.
21         A.    No.
22         Q.    To your knowledge, sir, did
23    class counsel visit this website before
24    deciding to hire Kroll?
25         A.    I do not know.
```

```
 1          Q.      Okay.  And can you talk about
 2    your previous relationship with class counsel
 3    prior to getting hired for this litigation?
 4          A.      Particulars?
 5          Q.      Yeah, I'll break it down.
 6          A.      Okay.
 7          Q.      Did you work with Mr. Katz on
 8    the Columbia Gas settlement?
 9          A.      Yes.
10          Q.      Okay.  Did you work with
11    Mr. Gomez?
12          A.      Yes.
13          Q.      Okay.  Did you work with
14    Ms. Graham?
15          A.      Yes, I did.
16          Q.      Okay.  On the Columbia Gas
17    settlement?
18          A.      All on the Columbia Gas
19    settlement.
20          Q.      Okay.  And the Columbia Gas
21    settlement predated the East Palestine
22    settlement.
23                  Correct?
24          A.      That is correct.
25          Q.      Okay.  And are you familiar
```

```
1    with somebody at Kroll named Mark Rapazzini?

2         A.    Yes.

3         Q.    Mr. Rapazzini was involved in

4    bringing this East Palestine engagement into

5    Kroll?

6         A.    That is correct.

7         Q.    As well as you.

8               Right?

9         A.    That is correct.

10        Q.    Okay.  And before Kroll, you

11   worked at Heffler Claims Group.

12              Right?

13        A.    No.  Heffler Claims Group

14   became part of Kroll.

15        Q.    Correct.

16        A.    Before Heffler or Kroll claims

17   group, I worked at Rust Consulting, which is

18   another class action submit -- administrator.

19        Q.    Okay.  And -- and how did you

20   get that job at Heffler Claims Group?

21        A.    I had met at Rust Consulting

22   when I was there both Mark Rapazzini and

23   Ms. Graham.  She was also employed at Rust

24   Consulting.

25              I believe it was in 2012 that
```

```
 1    they had left Heffler -- or excuse me, they
 2    left Rust Consulting, and they both went over
 3    to Heffler Claims Group in 2012.
 4              And then a year later after
 5    they had left, they had both called me,
 6    reached out to me, to, shall I say, recruit
 7    me or asked if I would come on over to
 8    Heffler Claims Group.
 9         Q.    And Mr. Rapazzini previously
10    had a law firm with Ms. Graham also?
11         A.    Yes.
12         Q.    And so fair to say at the time
13    Kroll was retained in connection with the
14    East Palestine litigation, that class counsel
15    sitting here at this very table had had a lot
16    of experience with Kroll?
17         A.    Yes.
18              MR. AHMAD:  Those are all the
19         questions I have, subject to any
20         follow-up questions you have.
21              MR. KATZ:  Give me one second.
22              VIDEOGRAPHER:  We're going to
23         go off the record.  1:04 p.m.
24          (Off the record at 1:04 p.m.)
25              VIDEOGRAPHER:  Back on the
```

```
 1              record, the time is 1:04 p.m.
 2                   REDIRECT EXAMINATION
 3    QUESTIONS BY MR. KATZ:
 4         Q.      Mr. Fenwick, just very few
 5    questions.  Perhaps only one.
 6                   A few moments ago you told me
 7    that for the direct payment part of East
 8    Palestine, it's a pro rata.
 9                   What do you base that on?
10         A.      I believe that settlement
11    agreement states that.
12         Q.      Okay.  So your understanding,
13    it's the settlement agreement?
14         A.      Yeah, or -- I believe it --
15    yes.
16                   MR. KATZ:  Okay.  That's all I
17         have.
18                   THE WITNESS:  Uh-huh.
19                   MR. KATZ:  Nothing further.
20                   MR. AHMAD:  Nothing further for
21         me.
22                   And obviously we -- just
23         staying on the record, you know, we're
24         going to meet and confer on
25         confidentiality and designate a
```

1        confidential for now pursuant to the

2        Court's orders that we've been

3        discussing.

4             And then we'll -- I always get

5        it wrong -- you know, request

6        signature or whatever that is.

7             And then if we need to put our

8        order on the record, I think we

9        ordered like a mega expedited or

10       whatever that option is.

11           MR. KATZ:  We can go off the

12       record.

13           MR. AHMAD:  Yeah, we can go off

14       the record now.

15           VIDEOGRAPHER:  Okay.  This ends

16       today's deposition.  We're going to go

17       off the record at 1:05 p.m.

18    (Deposition concluded at 1:05 p.m.)

19             - - - - - - -

20

21

22

23

24

25

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Scott Fenwick, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.


_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  November 13, 2025

INSTRUCTIONS TO WITNESS


Please read your deposition over
carefully and make any necessary corrections.
You should state the reason in the
appropriate space on the errata sheet for any
corrections that are made.

After doing so, please sign the
errata sheet and date it.  You are signing
same subject to the changes you have noted on
the errata sheet, which will be attached to
your deposition.

It is imperative that you return
the original errata sheet to the deposing
attorney within thirty (30) days of receipt
of the deposition transcript by you.  If you
fail to do so, the deposition transcript may
be deemed to be accurate and may be used in
court.

ACKNOWLEDGMENT OF DEPONENT


              I,_____, do
hereby certify that I have read the foregoing
pages and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.




_____
Scott Fenwick                    DATE



Subscribed and sworn to before me this

_____ day of _____, 20 _____.

My commission expires: _____



Notary Public

_ _ _ _ _ _ _

ERRATA

_ _ _ _ _ _ _

PAGE        LINE        CHANGE

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

ScottStenwick                    #ONIIIDRAL PERSONT TOPPNITO RRRDR                    Page 118

```
 1                    _ _ _ _ _ _ _
                      LAWYER'S NOTES
 2                    _ _ _ _ _ _ _

 3         PAGE      LINE
           ____      ____      _____
 4
           ____      ____      _____
 5
           ____      ____      _____
 6
           ____      ____      _____
 7
           ____      ____      _____
 8
           ____      ____      _____
 9
           ____      ____      _____
10
           ____      ____      _____
11
           ____      ____      _____
12
           ____      ____      _____
13
           ____      ____      _____
14
           ____      ____      _____
15
           ____      ____      _____
16
           ____      ____      _____
17
           ____      ____      _____
18
           ____      ____      _____
19
           ____      ____      _____
20
           ____      ____      _____
21
           ____      ____      _____
22
           ____      ____      _____
23
           ____      ____      _____
24
           ____      ____      _____
25
```

## WORD INDEX

**< $ >**
**$10,000**    34:8
**$120**    36:19
  46:10
  106:23
**$130**    11:8
**$2.5**    14:2
  43:19
**$25**    36:8
**$25,000**
  12:16, 25
  13:12, 23
  26:18, 23
  59:19    61:2,
  11, 25    62:6,
  18, 22
  103:16, 21
  104:8
**$250**    13:24
  27:2, 8
  42:20
  43:13    44:1,
  16
**$265**    35:20
**$3,000**
  42:12    43:5,
  13
**$600**    11:13,
  22    33:16
  35:20
  37:10, 25
  42:16
  55:16, 19
  56:5, 24, 25
**$80**    10:6,
  14    11:4
  105:4, 23

**< 0 >**
**0.5**    65:11
**0.75**    71:5
**02109**    3:14
**084-004229**
  114:19

**< 1 >**
**1**    4:11
  24:7, 13
  66:25    69:5
  73:1    76:18
  77:1    85:4,
  11    101:1
**1.0**    65:11
**1:04**    111:23,
  24    112:1
**1:05**    113:17,
  18
**10**    13:16,
  21, 24
  41:23
  42:24, 25
  43:19    44:5
**10,000**    50:13
**10,000-some**
  47:21
**10:01**    1:13
  6:4
**100**    12:16,
  24, 25
  13:23
  26:17
  59:14    60:1
  61:10
  103:14, 16
**10016**    2:17
**108**    4:6

**11:25**    97:7,
8
**112**    2:17
  4:7
**12**    4:22
  100:3
**12:52**    97:10
**120**    14:10
  45:10    78:18
**123**    2:11
**13**    1:6
  6:2    25:14,
21    53:17
  114:23
**13921**    114:18
**1621**    3:2
**1650**    1:11
**16th**    49:23
**1715**    114:20
**19801**    2:12

**< 2 >**
**2**    4:2, 13
  24:11    35:3,
8, 12    58:23
  68:16, 19
  69:10, 14
  70:25    81:4,
9    82:23
  83:16, 20
  100:20, 25
**20**    3:3
  81:2    116:16
**200**    69:1
  84:11, 19
  85:10    86:8
**2000**    8:22
**20037**    3:9
**2012**    110:25

**111:3**
**2019**    8:8, 23
**202**    3:9
**2021012**
  114:22
**2024**    4:12
  24:16    32:20
**2025**    1:6
  4:22    6:3
  41:5    47:2,
4    50:9
  100:4
  107:5
  114:23
**2100**    3:8
**212**    2:18
**216**    3:4
**23-cv-00242**
  4:15
**24**    4:11
**25**    69:9, 14
  70:10, 25
  81:10, 16
  82:22    83:4
  86:15
**25,000**    38:5
**250**    13:22,
  23    78:2
**27**    4:12
  24:15

**< 3 >**
**3**    4:13
  24:21
  35:10    48:7,
13    92:22
**30**    58:13
  115:15
**300**    2:23
**303**    2:6, 12

**30XI00242600**
114:*21*
**312**   2:*24*
**317**   69:*1*
84:*11, 19*
85:*10*   86:*8*
**32**   81:*15*
82:*3*   86:*13*
**35**   4:*13*
**367-2120**   3:*4*

**< 4 >**
**4**   4:*17*
41:*15*
51:*17, 23*
52:*7, 11*
53:*16*   92:*22*
**4:23-CV-00242-**
**BYP**   1:*4*
**40**   2:*5*
**42**   92:*22*
93:*7*
**43**   93:*22*
95:*9*
**44**   93:*7*
**4400**   2:*23*
**44115**   3:*3*
**44413**   75:*14*
76:*3*   77:*11*
**45**   81:*4*
**47**   83:*13*
**48**   4:*13*

**< 5 >**
**5**   4:*18*
41:*18*
42:*11*   43:*4,*
*12*   51:*17,*
*24*   52:*1, 8,*
*12, 15, 19*

67:*1*   69:*1*
84:*11*
**50**   69:*2*
81:*13*
84:*21*   86:*3,*
*9, 11*
**51**   4:*17, 18*
77:*23*
**52**   77:*23*
78:*1*
**526-6000**
3:*15*
**52nd**   1:*12*
**558-3197**
2:*24*

**< 6 >**
**6**   4:*20*
41:*14*
48:*11*   71:*3,*
*6*   72:*2, 4,*
*9, 24*   76:*15,*
*25*   77:*21*
83:*14*
92:*23*
93:*19*   94:*4,*
*14, 25*   96:*25*
**60**   3:*14*
**600**   14:*6*
55:*18*
**60654**   2:*23*
**617**   3:*15*
**622-7000**
2:*12*
**663-6000**   3:*9*
**685**   93:*25*
96:*16, 21*
**6th**   2:*11*
46:*21*   47:*2*

**< 7 >**
**7**   4:*5, 22*
99:*20, 24,*
*25*   100:*7, 8*
102:*24*
108:*12*
**72**   4:*20*
**75**   71:*10*
72:*1*   93:*19,*
*24*   94:*4, 13,*
*24*   95:*16*
96:*25*
**784-6400**
2:*18*
**792-5595**   2:*6*
**7th**   2:*17*

**< 8 >**
**8**   68:*17*
93:*11*
**8:13**   4:*22*
100:*4*
**80**   14:*25*
**80112**   2:*5*
**855.443.3767**
1:*22*
**859**   114:*18*

**< 9 >**
**9**   24:*21*
41:*23*   42:*1*
58:*24*
**9328**   114:*20*
**99**   4:*22*

**< A >**
**a.m**   1:*13*
6:*4*   97:*7, 8*

**ability**
102:*18*
114:*8*
**able**   19:*4*
78:*15*   79:*2*
**accident**
15:*9*
**accurate**
103:*7*
115:*18*
**accurately**
96:*12*

**ACKNOWLEDGMENT**
5:*2*   116:*1*
**acquisition**
8:*7*
**action**
99:*12*
110:*18*
114:*11, 12*
**actions**
31:*15*
**actual**
16:*14*
24:*25*   25:*2*
47:*22*
**ADAM**   2:*9*
33:*24*
45:*21*
46:*20*
52:*22, 25*
**add**   23:*6*
85:*4*   104:*13*
**added**   105:*19*
**addition**
86:*13*
**address**
28:*19*
45:*14, 16*

addressed
  101:24
addressing
  45:11    46:14
adequate
  25:4, 10
adjusted
  62:9, 16, 18
adjusting
  59:21
administering
  59:10

Administration
  3:5    4:16,
  20    7:22
  8:10    15:18,
  22    16:2
  18:15
  23:22    26:4
  30:9    32:2,
  7    49:19
  98:1
  100:22
  101:5, 24
  102:19
  103:4
Administration
-branded
  48:16
administration
s    9:9
administrator
  9:2    15:18
  26:3    39:19
  47:7    48:15
  82:9    92:11,
  16    99:13,
  15    110:18
adopts    25:22

advance
  28:11    30:6
  31:12
affiliate
  3:19
age    6:20
ago    64:4
  81:10    112:6
agomez@gelaw.c
om    2:10
agree    28:4
  29:24
  30:24    31:4,
  14    53:21
  59:9    69:8
  71:9    94:12,
  16, 23
  104:24
agreed    73:25
agreement
  34:14    58:1
  105:13
  112:11, 13
ahead    23:8
  41:8
AHMAD    2:21
  4:6    9:10
  11:2, 18, 25
  12:19    13:8,
  20    19:19
  20:1, 15, 25
  21:10    22:7,
  18    23:5
  25:17
  26:11
  28:12, 21,
  25    29:4, 8,
  13, 16, 21
  30:7    33:12
  36:2, 14

38:17
  39:23    43:7,
  22    44:8, 23
  45:4    46:5,
  12    47:9
  48:22    51:9
  52:7, 17
  53:6    55:24
  56:7    57:3,
  11    58:8
  60:15    61:7
  62:3    63:2,
  23    64:9, 23,
  25    65:15
  66:17    67:4,
  12, 20    68:2
  69:18, 25
  70:15, 19
  71:13
  72:10, 13,
  20    73:7, 11
  74:3, 9, 13,
  16, 19    77:7
  78:13    83:1
  85:19    86:5,
  20    87:2
  88:3    89:6,
  15    90:1, 8,
  17, 20
  91:16    92:6,
  18    93:1, 4,
  8, 12, 14
  95:18
  97:20    98:9,
  20    100:7, 9
  104:1, 6, 16,
  19    106:4
  107:2, 12,
  19    108:1, 9
  111:18

112:20
  113:13
ALBINAS    3:7
albinas.prizgi
ntas@wilmerhal
e.com    3:8
allocate
  78:22
allocated
  10:12    11:8
  15:13
  26:14    28:8
  30:4    31:9
  36:8, 10
  38:13
  47:25    54:5
  64:12, 15
allocates
  24:23
allocating
  65:19
allocation
  10:4    11:8
  13:2    25:2
  33:7    35:1,
  19    38:5
  102:8
aloud    53:24
amount
  10:25
  12:18
  13:17
  31:20    36:8
  39:20
  47:22    48:4
  55:21
  61:25    63:1
amounts
  10:23    37:1
  54:13

55:20
56:24, 25
and/or    71:7
92:24    94:25
answer    9:12
12:20    20:3,
8, 11, 17, 19
21:17    23:9
41:10
56:19
60:16, 21
91:3, 7, 11
103:23
104:12, 22
answered
93:9
answers
116:5
Anyplace
17:11
apologies
51:11
appear
19:16    69:9
70:10, 13
82:24
APPEARANCES
4:2
appears
28:13
48:18    83:18
applicable
83:25
application
95:15
applied
22:3    59:17
64:16, 17
65:11
66:10    67:2,

9    82:22
84:7    94:5,
9    96:25
apply    94:13
applying
70:13, 24
77:5    94:24
appointed
9:1
appoints
25:15
appreciate
22:19
appropriate
115:6
approval
39:18
57:19    58:13
approves
25:22
approving
4:11    24:14
April    80:15
area    75:9
76:14
arguing
104:17, 20
arguments
27:17
aside    10:6
46:25
50:18    59:7
102:23
asked    19:23
20:13    21:1
33:2    53:18
111:7
asking    29:17
aspects
15:24    16:1

assigned
89:13    93:24
assignments
37:5
associated
42:5
assume    73:12
assure    98:4
attached
4:24
115:11
116:7
attachment
52:12
attended
27:13
attention
16:10    27:16
attorney
114:10, 11
115:15
attorney-
client    20:4
21:13
attorneys
19:23
available
11:4    34:5
55:11
Avenue    2:17
3:2, 8
award    23:25
54:13
awarded
31:19
awards    33:9
54:2    55:17
aware    19:22
20:12, 25
39:5    40:13,

19    41:4
79:20

< B >
back    21:6,
7    23:13, 15
44:4    58:24
64:3    83:12,
19    86:11
97:9
106:16
111:25
balance
107:24
base    34:7
38:5    59:19
61:2, 4, 5,
9    62:22
112:9
based    10:13
15:1, 14
20:23
21:11
22:13
24:24, 25
26:19, 24
33:22    34:6
38:4, 7
42:7    43:8
46:19
54:14
55:10
59:22    62:9,
19, 25    63:6
basis    20:3
36:25
batch    79:22
80:25
81:22
82:17    83:3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88:23
90:22
91:19, 24
**batches**
76:10, 12
79:10, 17
**began** 34:19
40:8 79:13
**beginning**
45:18 49:6
58:12
**begun** 40:6
**behalf** 6:23
**believe**
17:8 45:18,
21 48:23
55:25 72:3
98:2
110:25
112:10, 14
**Bendesky**
1:11
**BENITA** 1:4
**Best** 47:19
55:11 114:8
**beyond** 18:3
73:24
75:14 76:13
**big** 100:25
**billion**
14:2 43:19
**bit** 74:21
75:10
**black** 100:25
**Boston** 3:14
**bottom** 81:3
101:13
**box** 35:18
36:5 83:21

100:25
101:19
**boxes** 35:15
**break** 54:10
72:14, 16
97:4, 13
109:5
**bringing**
110:4
**broke** 33:25
**brought**
16:10
**Bryana** 19:1
**bucket** 37:6,
7 38:15
43:18 45:10
**Building** 3:2
**bullet**
102:5, 12
**BURG** 2:3
**business**
25:3 33:20
36:6, 9, 11
38:16
**businesses**
24:25

< C >
**calculate**
79:18
81:20 87:4
**calculated**
33:9 38:3
60:4 79:9,
16 80:8, 11
90:12
**calculating**
55:4 79:3
80:14

82:17
88:23 91:19
**calculation**
13:2 53:20
67:14
76:10
79:25
81:23
82:12 94:7
**calculations**
62:19 64:1
66:19 68:4,
10 69:21
70:2, 7
71:16, 21
79:11
82:19
85:15, 22
88:6, 10
89:1, 10, 18
94:11
**California**
1:16 114:17
**call** 27:24
46:24
**called** 7:24
8:3 50:21
65:10
77:10 111:5
**calls** 45:24
46:1 56:17
106:25
107:9, 17
**Campbell**
1:14 6:16
114:2, 16
**carefully**
115:4

**Carrie** 1:14
6:16 114:2,
16
**carrying**
32:1
**CASE** 1:2
24:14, 25
31:8, 17
32:7 44:6
59:12
73:19
75:10, 16
**Cataldi**
18:25
**categories**
13:3 15:5
24:22 25:1
26:19
59:24
61:14 63:7
**category**
66:12
68:19
69:10, 14
70:10, 25
71:3, 6, 11
72:2 76:18,
22 79:14
81:4, 8
82:23
83:16, 20
88:18
92:23
93:19 94:4,
14, 25 96:25
**cause** 72:25
**cautioned**
22:10
**ceased** 92:2,

7
census      33:23
Certain
 15:24      79:23
certainly
 11:21      14:9
CERTIFICATE
 114:1
CERTIFICATE...
..............
..............
....114    5:1
Certified
 1:15, 17, 18
 114:2, 3, 17,
 18, 19, 20,
 21, 22
certify
 114:3, 6, 8
 116:4
chance      44:17
CHANGE      117:3
changed
 87:19
changes
 115:10
 116:6
characterize
 15:17      23:2
checks
 82:18      87:18
Chicago      2:23
CHRISTOPHER
 3:1
circumstances
 20:5      61:17
cjoyce@flanner

ygeorgalis.com
 3:2

claim      10:8
 24:24
 31:17      33:3
 41:2      60:10,
 23      61:1
 62:17, 24
 63:9      64:7
 66:3      79:1
 83:8      87:19,
 24      88:5, 12
 90:6, 15
 91:13
 97:14
 106:23
claimant
 84:6, 10
claimants
 103:8, 14
 105:20
Claims      8:4
 10:9, 11
 13:17      16:3,
 9, 21      17:1,
 15, 22      18:5
 21:22      28:9
 30:5      31:11,
 23      32:9, 13
 34:21      36:1
 40:7, 12
 46:22      47:6,
 21, 25      50:8,
 13      54:3, 4,
 8, 15, 17, 23
 55:18, 20
 56:23
 58:17
 59:14, 25
 60:4, 24
 61:23
 62:15

 63:15, 17
 66:14
 69:13
 71:10, 25
 76:1, 11
 77:15      78:2,
 7, 19, 22
 79:4, 6, 7,
 13, 16, 18,
 23, 24, 25
 80:9, 10, 14,
 15, 23, 25
 81:15, 21,
 24      82:7, 9,
 12, 13, 17,
 20      83:3, 25
 85:8, 9
 86:13      87:4,
 10      88:17,
 23, 24      89:2,
 3, 21      90:13,
 23      91:20,
 24      93:25
 94:3      96:17,
 20, 24
 97:18, 24
 98:6, 19
 99:4      102:3,
 8, 22
 110:11, 13,
 16, 20
 111:3, 8
class      19:23
 22:11
 23:23
 31:15      32:3,
 7, 11, 13, 17,
 22      33:1, 6,
 25      34:1, 20
 37:16      39:5,

 9, 14, 21
 40:5, 11
 41:3      44:11
 45:12, 17
 46:2, 14
 48:20      49:3,
 7      51:3, 5,
 8      54:2, 16
 55:15
 57:15
 79:20
 89:22
 97:18      98:5,
 18      99:12
 106:21, 24
 107:9, 17
 108:23
 109:2
 110:18
 111:14
Clerk      8:9,
 12, 16
Cleveland
 3:3
client
 17:24
 18:20, 23
coach      29:7
coaching
 28:17, 20
 29:14
code      63:21
 75:14, 21
 76:3      77:12
Colorado      2:5
Columbia
 8:22      9:3,
 8, 19      10:2,
 3, 16      11:6
 12:6      14:13,

17, 21, 25
15:2    21:20
22:2    32:23
33:3    97:25
99:18
100:21
101:4
103:2, 8
104:25
105:7, 13,
16    109:8,
16, 18, 20
column    50:7
67:25
101:18
come    22:4
23:24
106:16
111:7
commencement
114:3
commencing
1:13
comment    50:6
commission
116:17
commonly
31:15
communicated
39:9
community
101:25
102:21
Company    3:16
compensated
56:23
complete
73:6

completed
54:3    82:20
89:22
complex
16:9
100:21
101:5
compliance
18:7
comply    59:12
component
47:14
comprehensive
101:23
computations
89:12
computed
23:4    81:25
82:7, 13
computing
22:2
concern
58:14
concerned
58:12, 16
concluded
113:18
concludes
26:1
conclusion
86:19
conditions
26:5    28:7
30:3    31:8
conduct
29:11
conducted
9:14
confer
112:24

CONFIDENTIAL
1:7    73:20,
24    113:1
confidentialit
y    98:5, 18
112:25
confirm
78:10    108:3
confirming
46:2
connection
17:22
34:18
111:13
CONROY    2:14,
16
considered
88:20
consistent
34:25
Consulting
110:17, 21,
24    111:2
consume
55:19
contained
81:17    83:9
86:15
contexts
28:6    30:1
31:7
continuing
41:4
conversation
20:9    46:20
conversations
21:12
44:10
45:19, 20
convey    96:13

Corporation
3:16
Correct    7:7,
25    8:1, 4,
20    11:15,
24    13:7
14:19, 21
16:15
19:25
21:25    22:6
24:1, 2
25:16    26:6
27:11, 18,
22    34:11,
12    35:16
36:13, 20,
21    48:17
49:21
50:11, 16
52:4, 5, 9,
24    55:1, 7
59:19    60:5,
19    61:3, 22
66:8    69:17
71:2    76:21,
22    77:3, 13,
24    80:13,
17, 24
81:11, 12
82:15
83:17    84:3,
9, 16, 24
85:3, 15
87:14    89:5
95:12, 17
96:1, 2, 14
97:1, 15
99:6, 10
100:23
101:15

103:*10, 15,*
*17* 105:*4,*
*23* 106:*3*
109:*23, 24*
110:*6, 9, 15*
116:*5*
**corrections**
115:*4, 7*
116:*6*
**correctly**
25:*5* 54:*18*
86:*17* 94:*1*
96:*23*
**correlated**
48:*4*
**costs** 38:*14*
55:*19*
**Council**
4:*18* 50:*21*
51:*25* 53:*10*
**Council's**
53:*4*
**Counsel**
2:*18* 3:*4,*
*15* 6:*13*
19:*24*
20:*13* 21:*1*
22:*11*
28:*13* 32:*3,*
*8, 11, 18, 23*
33:*2, 6, 25*
37:*3, 16*
39:*5, 9, 14,*
*21* 40:*5, 11*
41:*3* 44:*11,*
*12* 45:*12,*
*17* 46:*2, 15*
48:*20* 49:*3,*
*8* 51:*3, 6,*
*8* 57:*15, 16*

79:*20* 80:*4*
89:*22*
95:*24*
97:*18*
106:*21, 24*
107:*9, 18*
108:*23*
109:*2*
111:*14*
114:*10, 11*
**couple**
106:*18*
**COURT** 1:*1,*
*19* 6:*15*
10:*11*
19:*16, 23*
20:*13* 21:*2,*
*7, 15* 23:*15*
25:*8, 15, 22*
26:*2* 92:*10,*
*15* 114:*18,*
*20, 21, 22*
115:*19*
**courtroom**
27:*20*
**Court's**
22:*9* 113:*2*
**cover** 73:*9*
**covered**
74:*7* 83:*11*
**covers** 24:*22*
**create** 57:*8*
**created**
48:*19*
**creating**
49:*13*
**CROSS-**
**EXAMINATION**
108:*8*

**customized**
102:*3, 19*
**CUTLER** 3:*7,*
*11*
**cycle** 87:*17*

< D >
**data** 24:*23,*
*24* 25:*1*
33:*23*
55:*11* 78:*9,*
*16* 98:*6, 19*
**database**
87:*5*
**date** 1:*14*
6:*2* 49:*22*
114:*7*
115:*9*
116:*12*
**Dated** 114:*23*
**DAVID** 3:*22*
6:*5*
**day** 23:*6*
39:*17*
116:*16*
**days** 58:*13*
115:*15*
**DC** 3:*9*
**dealt** 10:*17*
**December**
49:*23*
**deciding**
108:*24*
**Declaration**
4:*20* 19:*12*
22:*15, 22,*
*24* 72:*8*
73:*1, 9*
77:*21* 81:*3,*
*14* 83:*13*

86:*12*
92:*23* 93:*5,*
*7, 23* 95:*10*
**deduction**
69:*7* 77:*5*
85:*1*
**deemed**
73:*20, 23*
115:*18*
**defense**
44:*11*
57:*15* 80:*3*
97:*18*
**deficiency**
41:*1, 5*
**defined**
75:*15*
**definition**
65:*7*
**degree** 86:*8*
**degrees**
69:*1* 84:*11*
86:*8*
**Delaware**
2:*12*
**demonstrated**
31:*16*
102:*17*
**dependent**
13:*2* 15:*4*
**depending**
61:*12, 16*
62:*7* 106:*16*
**deponent**
6:*11* 116:*1*
**DEPONENT......**
**..............**
**116** 5:*2*
**deposes** 6:*22*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

deposing
  19:24
  115:14
deposition
  1:9    4:24
  6:8    20:14
  21:2    22:10
  29:12
  73:13
  113:16, 18
  115:3, 12,
  16, 17
DERAILMENT
  1:4    4:13,
  15, 19    6:10
  59:12    84:2
Derek    18:25
describe
  17:21
Description
  4:10
design
  102:18
designate
  112:25
determination
  31:20
determined
  41:16, 20,
  24    43:2
  54:2    59:2
  79:1
develop
  99:8, 11, 17
developed
  99:16
  101:22
  102:7
developing
  32:17

deviate
  32:4    95:25
deviating
  70:17
deviation
  26:22
  64:20
  66:15    67:8
  68:6    69:5,
  15, 23    70:4,
  25    71:12,
  18, 23
  94:13    95:1
differences
  103:2, 7
  105:24
different
  12:8, 11
  13:3    14:16,
  20, 23    24:6,
  22    30:17
  62:13
differently
  74:5    76:8
dimensions
  31:18
Diplomate
  1:15    114:2,
  16
DIRECT    7:1
  35:19    36:1
  38:15    54:7,
  21    56:1
  95:24
  106:10
  112:7
direction
  68:20
  69:10, 15
  81:5, 16

83:24    84:7,
  18    85:10
  86:14
directions
  69:4
directly
  48:3
directs    26:2
disagree
  30:19, 21,
  24    31:4, 13,
  14, 25
  70:24    71:9
  79:12    95:5
disclose
  97:17
disclosed
  39:21
discuss
  38:23
discussed
  20:5
discussing
  113:3
discussions
  38:21
dispute
  78:7, 12
  86:19, 24
  96:23
distance
  75:20    79:14
distances
  34:2
distinguish
  63:20
distribute
  11:22
distribution
  4:11, 13

9:19, 20
  10:16    12:6,
  7, 14    13:4
  18:8    19:11
  24:14    25:8,
  23    26:20,
  25    32:4, 18,
  24    35:2, 7,
  24    41:13
  58:22
  59:13, 18,
  21    60:2, 5,
  13, 18    62:5
  63:10, 19
  64:8, 11
  66:1, 8, 21
  68:9    70:8
  76:5, 18
  81:17
  82:18    83:5
  86:16    87:7
  94:18    95:2,
  25    99:9, 12,
  16, 18
  104:9, 25
  105:3, 7, 17
  106:9, 12
distributions
  39:6    87:16
DISTRICT    1:1
diverse
  102:20
divided
  105:21
DIVISION    1:2
divulging
  20:9
Document
  24:11
  28:14    33:7,

*14* 48:*12*
73:*6*, *12*
**documentation**
80:*5*
**documents**
19:*8*
**doing** 16:*11*,
*14* 66:7
68:*9* 87:*15*
88:*6*, *25*
89:*9* 115:*8*
**dollar**
31:*20*
47:*22* 61:*5*,
*25* 63:*1*
**door** 10:*10*
23:*1* 82:*21*
**DORR** 3:*7*, *11*
**dozen** 24:*22*
54:*24*
**draft** 17:*25*
51:*24* 53:*1*,
*9* 57:*14*
79:*5*, *8*
**drafts** 18:*2*
51:*8*, *15*
52:*6* 57:*25*
**Drive** 2:*5*,
*23*
**due** 37:*11*
**Duff** 8:*8*, *12*
**duly** 6:*20*
114:*4*
**duties** 9:*14*

< E >
**earlier**
14:*24*
97:*12* 99:7

**early** 48:*24*
49:*5*
**EAST** 1:*2*
2:*5* 4:*13*,
*18* 6:*9*
9:*8*, *20*
10:*16*
11:*10*, *13*
12:*2*, *5*, *13*
13:*10*
15:*17* 16:*2*
17:*23* 24:*4*,
*5* 28:*6*
32:*19* 50:*2*,
*15* 59:*11*
63:*20*, *21*
75:*9*, *14*, *21*
84:*1*, *15*
99:*9* 103:*4*,
*12* 104:*4*
105:*25*
106:*9*, *10*
109:*21*
110:*4*
111:*14*
112:7
**EASTERN** 1:*2*,
*13* 4:*23*
100:*4*
**effect**
107:*11*
**effectively**
102:*20*
**egraham@gelaw.**
**com** 2:*11*
**eight** 13:*3*
59:*24* 61:*14*
**EISENHOFER**
2:*9*
**either** 40:*5*

**elaborate**
9:*24* 10:*18*
59:*15*
**elderly**
15:*11*
**ELDREDGE** 2:*3*
**ELIZABETH**
2:*10*
**E-mail** 4:*17*
46:*2* 51:*3*,
*4* 52:*2*, *19*,
*21* 95:*11*, *14*
**e-mails**
40:*24* 45:*23*
**employ** 98:*4*
**employed**
7:*20* 8:*2*
98:*17*
110:*23*
**employee**
114:*10*, *11*
**enables**
31:*17*
**ends** 113:*15*
**engagement**
110:*4*
**Englewood**
2:*5*
**ensure** 98:*17*
**ensuring**
18:7
**entered**
4:*11* 24:*15*
**entire**
27:*21*
80:*16*, *24*
87:*17*
**entirely**
16:*5* 100:*15*

**epicenter**
15:*8*
**Epiq** 78:*2*,
*8* 86:*13*, *22*
93:*24*
95:*11*, *14*
**equal** 12:*16*
61:*11*
**equaling**
43:*5*, *13*
**equates**
12:*25* 13:*12*
**equitably**
31:*18*
**errata**
115:*6*, *9*, *11*,
*14* 116:7
117:*1*
**ERRATA........**
**..............**
**..............**
**....117** 5:*3*
**error** 65:*1*,
*17*, *24* 66:*6*,
*24* 67:*1*, *5*,
*13*, *18*, *22*
68:*3* 69:*21*
70:*1*, *6*, *22*
71:*15*, *20*
76:*9*, *23*
85:*14*, *22*
94:*6*, *10*, *20*
95:*3*, *23*
97:*2*
**errors** 65:*4*
66:*19* 68:*10*
**essence**
15:*2*, *12*
**estimate**
47:*19*

estimates
54:*1*  55:*11*, *22*
Euclid  3:*2*
evaluated
10:*9*  59:*14*
62:*17*  64:*7*
event  50:*1*
eventually
79:*3*  80:*23*
everybody
12:*24*
14:*25*  61:*9*
76:*3*, *6*
84:*25*
exacerbate
89:*24*
exact  39:*20*
exactly  48:*5*
EXAMINATION
7:*1*  112:*2*
114:*4*
EXAMINATIONS
4:*4*
example
15:*7*  33:*15*
42:*3*, *10*, *18*
43:*9*  59:*6*
63:*19*
exchange
95:*11*
excuse
12:*16*
63:*15*  111:*1*
execute
102:*18*
executed
58:*2*
executive
99:*3*

Exhibit
24:*7*, *13*
35:*3*, *12*
48:*7*, *13*
51:*23*  52:*1*, *11*, *12*, *15*, *19*  53:*16*
58:*23*
68:*16*  72:*4*, *9*, *24*  73:*23*
75:*2*  77:*21*
83:*14*
99:*20*, *25*
102:*24*
108:*12*
EXHIBITS
4:*9*, *24*
51:*17*, *21*
73:*4*, *5*
exist  28:*7*
30:*3*  31:*9*
66:*11*  67:*17*
expedited
113:*9*
expenses
37:*23*
experience
111:*16*
expert  98:*8*, *14*
expiration
73:*25*
expires
116:*17*
explained
14:*24*
explanation
103:*1*
exposure
25:*9*  33:*21*

34:*7*, *19*, *21*
36:*18*
37:*11*, *25*
38:*4*  45:*9*
47:*14*
59:*18*
60:*12*  71:*7*
92:*24*
94:*25*
103:*13*
105:*25*
106:*23*
extra  44:*7*
extracted
79:*10*

< F >
facilities
32:*12*
fact  27:*24*
34:*6*
factors
54:*25*  55:*6*
62:*10*  63:*6*
facts  91:*8*
fail  115:*17*
failing
63:*19*
fair  9:*6*, *18*, *25*
10:*15*  12:*4*
15:*16*  25:*3*, *10*  45:*25*
65:*9*  94:*8*
111:*12*
fairness
27:*13*
fall  88:*17*
familiar
75:*8*  109:*25*

familiarize
74:*18*
far  13:*1*
23:*13*  92:*3*
FARCAS  108:*5*
fashion
63:*12*
fees  37:*22*
38:*14*  55:*19*
Fenwick
1:*10*  3:*5*
4:*17*  6:*12*, *19*  7:*4*, *19*
8:*18*  19:*6*
21:*20*  24:*7*, *12*  27:*12*
28:*3*  29:*24*
32:*1*  34:*17*
35:*3*, *11*
48:*7*  50:*19*
51:*17*, *20*
56:*12*
57:*24*
58:*21*  59:*9*
72:*4*, *17*
75:*3*  93:*16*
97:*12*
99:*20*
100:*14*
106:*14*
108:*10*
112:*4*
114:*4*
116:*12*
Fenwick's
22:*10*
Ferruzzi
18:*25*
figure  73:*15*

file    10:8
filed    88:13
final    27:13
 51:15    53:9,
20
finalized
50:9    88:8
finally
31:24
financially
114:12
finding
22:24
findings
 22:14, 21
fine    72:21
finish
 12:20
 41:10    60:9
64:25
finished
 12:22    41:9
88:9
firm    8:17
111:10
first    6:20
 8:21    22:8
 35:18    40:4
 50:9    54:6
59:18
66:23
68:25
72:14
100:19
 102:5, 16
106:15
five    102:11
fixed    10:17,
24    12:18
 35:25

36:12, 23
37:2
FLANNERY    3:1
flat    44:16
Floor    1:12
 2:11, 17
3:3
follow    24:3
 59:12    60:7
66:7    91:4
followed
46:1    59:20
60:13, 17
62:5    64:10
66:20    68:8
86:2, 22
94:17
Following
33:1    60:1
63:10, 18
64:8    65:12,
25    66:4
70:7, 9
104:15
follows    6:23
follow-up
111:20
footnote
41:15, 18,
23    42:1, 24,
25    58:24
foregoing
114:6    116:4
form    9:10
11:2, 18, 25
13:8, 20
19:19    20:1
25:17
26:11
28:12, 16,

24    29:3, 5,
22    30:7
33:12    36:2,
14    38:17
39:23    43:7,
22    44:8, 23
45:4    46:5,
12    47:9
48:22    51:9
52:17    53:6
55:10, 14,
24    56:7
57:3, 11
58:8    60:15
61:7    62:3
63:2, 23
64:9, 23
65:15
66:17    67:4,
12, 20    68:2
69:18, 25
70:15, 19
71:13    77:7
78:13    79:1
83:1    85:19
86:5, 20
87:2    88:3
89:6    90:8,
20    91:16
92:6, 18
95:18
97:20    98:9,
20    104:1, 6,
16    106:4
107:2, 12,
19    116:6
forms    33:3
formula
 15:14

forth    114:8
forward    21:3
found    25:8
four    55:6
107:24
frequent
100:17
front    35:12
68:13    75:3
front-line
16:14
full    23:11
73:3, 12
fully    89:8
fund    28:10
30:6    31:11,
22, 23
103:13
106:23
funds    28:8
30:3, 12, 13
31:9
further
26:2    101:8
108:6
112:19, 20
114:6, 8

< G >
Gas    8:22
9:3, 8, 19
10:2, 3, 16
11:6    12:6
14:13, 17,
21, 25    15:2
21:21    22:2
32:23    33:3
97:25
99:18
100:21

101:*4*
103:*2, 8*
104:*25*
105:*8, 13,*
*16* 109:*8,*
*16, 18, 20*
**geared** 10:*3*
**generally**
30:*15*
**GEORGALIS**
3:*1*
**getting**
44:*12*
76:*24, 25*
109:*3*
**give** 73:*5*
111:*21*
**given** 73:*3*
116:*5*
**gives** 56:*18*
**go** 11:*16*
23:*8* 26:*18*
41:*7* 44:*4*
55:*20*
56:*24, 25*
58:*24* 61:*2,*
*15, 19, 25*
64:*3* 71:*3*
73:*4* 79:*2*
83:*12, 19*
87:*25*
92:*21* 97:*4,*
*7* 102:*9*
106:*17*
111:*23*
113:*11, 13,*
*16*
**goes** 75:*14,*
*19*

**going** 10:*10*
11:*16* 20:*2,*
*16* 21:*3, 10,*
*16* 22:*7*
24:*11, 12*
38:*22*
40:*25* 44:*7*
45:*2, 8*
48:*10, 12*
51:*20* 62:*1,*
*25* 63:*1*
65:*18* 72:*8,*
*10, 23*
73:*15* 74:*4*
82:*11, 18*
86:*11* 89:*8,*
*17* 90:*21*
91:*9, 18, 22*
92:*14* 97:*6*
99:*13, 23,*
*24* 101:*19*
111:*22*
112:*24*
113:*16*
**Golkow** 3:*23*
**GOMEZ** 2:*9*
33:*24*
45:*21*
46:*20*
52:*22, 25*
109:*11*
**good** 41:*11*
44:*17* 108:*1*
**gotten** 86:*3*
**GRAHAM** 2:*10*
23:*6*
109:*14*
110:*23*
111:*10*

**GRANT** 2:*9*
**great** 93:*8*
**gross** 10:*23*
**Group** 8:*4*
66:*25* 67:*1*
76:*7* 89:*20,*
*21* 110:*11,*
*13, 17, 20*
111:*3, 8*
**groups**
16:*11, 13*
**guess** 16:*23*
65:*7*
**guidelines**
18:*1, 3*

**< H >**
**HALE** 3:*7, 11*
**half-truth**
7:*17*
**half-truths**
7:*13*
**handful**
108:*11*
**handle** 46:*3*
**Handled**
63:*12*
**HANLY** 2:*14*
**happened**
70:*21*
**happens**
29:*18*
106:*16*
**HARTFORD**
1:*20* 3:*20*
6:*6*
**head** 15:*7*
16:*24* 19:*5*
47:*16, 18*
48:*6* 51:*12*

57:*5, 23*
99:*14*
105:*15*
**header** 102:*2*
**heading**
101:*9*
**hear** 31:*1*
**hearing**
27:*13* 29:*11*
**heat** 107:*10*
**Heffler**
7:*24* 8:*3,*
*4* 9:*1*
21:*22*
97:*23*
110:*11, 13,*
*16, 20*
111:*1, 3, 8*
**held** 1:*10*
6:*8*
**helped** 57:*8*
**helping** 51:*2*
**hereinbefore**
114:*8*
**HERSH** 2:*3*
**Hey** 24:*10*
**highly**
102:*19*
**hire** 108:*24*
**hired** 17:*18*
109:*3*
**Hold** 12:*19*
**holds** 77:*14*
**homestretch**
106:*15*
**honest** 96:*8*
**honestly**
51:*16*
**hour** 72:*11*
**hours** 107:*24*

hundred
  13:11
  26:23
  61:10
  62:16    63:4
  103:18, 20,
  24    104:3, 8
hypothetical
  42:18    43:9
  59:6

< I >
idea    17:17,
20
identi    80:22

identification
  24:8    35:4
  48:8    51:18
  72:5    99:21
identified
  63:25
  77:18    78:2,
8    80:22
  81:15
  86:13
  93:24
  95:22    97:1
identifying
  95:15
Illinois
  1:16    2:23
  114:19
illustrative
  41:17, 21,
25    43:3
  59:3
imperative
  115:13

implement
  26:4
improper
  22:25
include    7:12
includes
  54:25    55:6
including
  76:1
incorrectly
  64:13, 16,
17    79:14
INDEX    4:1
India    17:10,
16, 19
  97:14, 19,
24    98:7, 19
  99:3
indicating
  95:22
individual
  26:13
  54:13    61:16
individuals
  15:11    42:8
  76:21
infer    41:1
information
  20:23
  24:23
  33:23
  46:22
  50:24
  54:14, 22
  79:2    80:3,
6    81:22
  88:7
initial
  50:1, 14
inject    21:11

injury    13:4,
15    36:18
  37:11, 25
  43:18
  45:10
  47:14    55:5
  60:11    80:4
  103:13
  106:1
instances
  46:7
instruct
  20:2, 16
  21:16
instructed
  37:8    46:3,
21
INSTRUCTIONS
  115:1
integrity
  102:21
intend    73:4
Interactive
  56:13
interested
  114:12
introduced
  8:21
invariably
  46:1
Inverness
  2:5
involved
  19:2    32:17
  38:19    39:3
  57:25
  108:16
  110:3
issue    82:17

issued
  87:17, 22
issuing
  21:23
its    26:5
IVR    56:12,
22

< J >
JARDINE    2:3
JAYNE    2:16
jconroy@simmon
sfirm.com
  2:16
Jersey    1:18
  114:21
job    91:10
  110:20
JOYCE    3:1
JUDGE    1:4
  4:11    24:15
  28:17
  29:10, 19
Justison
  2:11

< K >
Kansas    1:18
  114:20
KATHERINE
  3:13
katherine.mack
ey@wilmerhale.
com    3:13
KATZ    2:4
  4:5, 7    7:2
  9:11    11:11,
20    12:1, 21
  13:13    14:1
  19:21    20:7,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*18    21:5, 19*
*22:17, 19*
*23:10, 17,*
*20    24:9*
*25:18*
*26:15*
*28:15, 23*
*29:1, 6, 9,*
*15, 18, 23*
*30:18    34:9*
*35:5    36:4,*
*16    39:1*
*40:1    43:11,*
*24    44:14*
*45:1, 7*
*46:8, 16*
*47:11    48:9*
*49:1    51:13,*
*19    52:9, 10,*
*18    53:8*
*56:3, 10*
*57:7, 13*
*58:10*
*60:20*
*61:18*
*62:11    63:8*
*64:2, 14*
*65:3, 20*
*66:22    67:7,*
*15, 23    68:5*
*69:22    70:3,*
*16, 23*
*71:17    72:6,*
*12, 15, 22*
*73:8, 18*
*74:4, 11, 14,*
*17    75:1*
*77:9    78:17*
*83:6    85:24*
*86:10, 23*

*87:8    88:11*
*89:11, 19*
*90:4, 9, 18*
*91:1, 21*
*92:9, 20*
*93:3, 6, 10,*
*13, 15*
*95:20    97:3,*
*11, 22*
*98:12    99:1,*
*22    100:8,*
*10    104:2,*
*10, 18, 21*
*106:7*
*107:4, 15,*
*22    109:7*
*111:21*
*112:3, 16,*
*19    113:11*
**keep**    *101:19*
**Keith**    *3:2*
**key**    *28:7*
*30:3    31:8*
**kind**    *75:6*
**knew**    *38:19*
*39:3*
**know**    *8:6*
*16:23, 25*
*17:15*
*22:23    28:3,*
*15, 18*
*34:16*
*38:12*
*39:24*
*44:20    48:2,*
*5    49:15, 17*
*56:11    57:4*
*59:23*
*72:13    82:2,*
*6    86:25*

*90:24    92:1*
*96:19*
*97:21*
*98:13, 16,*
*22, 24*
*105:10*
*108:25*
*112:23*
*113:5*
**knowing**
*44:16*
**knowledge**
*22:13    99:5*
*108:22*
**known**    *8:19*
*28:10    30:6*
*31:12*
**Kroll**    *3:4*
*4:22    7:21,*
*23    8:10*
*9:1, 7*
*11:21*
*18:14*
*21:21    22:2*
*23:22    24:3*
*25:15    26:3,*
*4    34:19*
*37:10, 23*
*38:13*
*39:18, 20*
*44:7, 11*
*45:2, 8*
*46:3    47:6,*
*12, 24*
*48:15, 19*
*49:2    50:12*
*59:10    60:1,*
*11    61:24*
*62:17*
*63:18    64:7*

*65:11*
*66:10*
*69:14*
*71:10    72:1*
*76:1, 2*
*77:4, 15*
*79:13    82:8,*
*22    85:8*
*89:21*
*90:19*
*91:14*
*92:11, 15*
*94:3    95:21*
*96:24*
*97:14, 17,*
*23    98:4, 17*
*99:2, 8, 11,*
*17    100:11*
*101:21, 22*
*106:22, 24*
*108:18, 24*
*110:1, 5, 10,*
*14, 16*
*111:13, 16*
**Kroll's**
*16:3    19:22*
*20:13    21:1*
*32:12    33:8*
*46:10*
*87:20*
*89:24*
*100:2*
*101:9*
*102:18*

**< L >**
**La**    *2:23*
**laid**    *66:21*
**LANE**    *3:22*

6:5
law    111:10
lawful    6:20
lawyer
  20:10, 21, 25
lawyers    21:1
LAWYER'S
  5:4    118:1
leaving
  38:15
led    38:11
left    101:19
  111:1, 2, 5
left-hand
  101:18
legal    6:5
Letter    4:18
  51:4    60:2,
  13    63:11
limited
  28:8    30:4,
  12, 13    31:10
LINE    117:3
  118:3
lines    18:1
  30:14    34:3
listed    78:21
listen    57:6
lists    27:8
Litigation
  3:23    32:3,
  19, 25
  33:10    98:4
  109:3
  111:14
little
  62:12
  74:21    75:10
lived    15:7
  62:7

LLC    3:1
  26:4
LLP    2:18
  3:7, 11
location
  76:5    79:15
long    55:10,
  14
look    25:13
  27:5    35:6,
  14    42:23
  53:16, 17
  56:8    61:1
  68:17    75:6
  76:17
  77:20    78:9
  81:13
  83:20
  93:18, 22
  100:18
looked    35:23
looking
  78:15
  92:25
  100:24
looks    42:3
  95:13
loss    25:2
  38:16
losses    25:1
  36:6, 9, 11
lot    96:20
  111:15
Louisiana
  1:18    114:22
lump    10:5
  11:5
lump-sum
  10:2    105:2

< M >
MACKEY    3:13
Madison    2:17
maintaining
  102:21
making    39:6
manager
  15:19
manner    80:11
March    45:19
mark    24:13
  35:7    48:10,
  12    72:7, 23
  99:24
  110:1, 22
marked    24:7
  35:3    48:7
  51:18
  58:23    72:4
  99:20
Market    1:11
Massachusetts
  3:14
math    67:18,
  22
Matt    23:8
matter    6:9
  8:22    11:10
  13:10    99:9
MATTHEW    2:22
mean    33:18
  35:25    36:7
  39:4    44:15
  59:4    73:25
  74:19
  78:23    79:19
means    56:12
  78:25

measures
  98:22
medical
  42:4, 5, 11
meet    112:24
meetings
  106:25
mega    113:9
member    54:2
  98:6, 18
  99:2
Members
  4:18    32:13
  34:1, 20
  54:16    55:15
member's
  23:24
mentioned
  46:24
met    8:25
  110:21
method    25:8
Michael
  4:20    19:12
  73:1    77:20
Michelle
  19:1
miles    75:20
  76:13
  77:12    84:2,
  6, 15, 18
  85:10    86:7
million
  10:6, 14
  11:4, 8, 13,
  22    13:16,
  22, 24    14:6,
  10, 25
  33:16
  35:20    36:8,

| | | | |
|---|---|---|---|
| *19* · · 37:*10*, | **moved** · · 19:*2* | **narrowly** | 116:*7* |
| *25* · · 43:*19*, | · 37:*6* | · 22:*11* | **NOTES** · · 118:*1* |
| *25* · · 44:*1, 5* | **multi-** | **nature** · · 71:*7* | **NOTES.........** |
| · 45:*10* | **community** | · 92:*24* | **.............** |
| · 46:*10* | · 100:*22* | **NCRA** · · 114:*16* | **.........118** |
| · 55:*16, 19* | · 101:*5* | **necessary** | · 5:*4* |
| · 56:*5, 24, 25* | **multi-faceted** | · 115:*4* | **notice** · · 33:*3* |
| · 105:*4, 23* | · 101:*23* | **need** · · 10:*11* | · 55:*10, 15* |
| · 106:*23* | **multiplied** | · 28:*17* | · 56:*9* |
| **minutes** | · 23:*23* | · 38:*23* | **NOVEMBER** |
| · 103:*5* | · 105:*22* | · 72:*16* · · 113:*7* | · 1:*6* · · 4:*22* |
| | **multiplier** | **needs** · · 101:*25* | · 6:*2* · · 40:*9* |
| **misapplication** | · 64:*16* | **neither** | · 100:*3* |
| · 67:*24* | · 65:*11, 12* | · 114:*10, 11* | · 114:*23* |
| · 85:*11, 16* | · 67:*3, 10, 17* | **net** · · 24:*25* | **number** · · 22:*3* |
| **mischaracteriz** | · 69:*2, 5, 9* | · 38:*14* | · 23:*24* |
| **es** · · 21:*14* | · 70:*13, 25* | · 55:*19* | · 24:*13* · · 28:*9* |
| **Missouri** | · 71:*6, 11* | · 105:*17* | · 30:*4* · · 31:*10* |
| · 1:*17* · · 114:*18* | · 72:*1* · · 76:*15,* | **neutral** · · 85:*5* | · 35:*8, 10* |
| **mistakes** | *22, 25* | **never** · · 32:*11* | · 43:*17* |
| · 64:*1* | · 81:*10* | · 87:*16* | · 44:*17* |
| **moments** | · 82:*23* | **New** · · 1:*18* | · 48:*11* |
| · 64:*4* · · 81:*9* | · 84:*12* · · 85:*4* | · 2:*17* · · 17:*5* | · 51:*24* |
| · 112:*6* | · 93:*20, 24* | · 114:*21* | · 54:*16* |
| **money** · · 10:*10,* | · 94:*4, 14, 25* | **Nexus** · · 3:*19* | · 56:*16* |
| *17, 25* · · 22:*4* | · 95:*16* · · 96:*25* | **noon** · · 28:*19* | · 58:*23* · · 77:*5* |
| · 23:*1* · · 33:*17,* | **multipliers** | · 29:*10, 19* | · 78:*7* · · 79:*23* |
| *19* · · 35:*25* | · 15:*10* | **Norfolk** | · 99:*24* |
| · 36:*12, 23* | · 66:*10* · · 83:*21* | · 3:*15, 16* | **numbers** · · 34:*4* |
| · 37:*2, 6* | **mwoodruff@wins** | · 108:*3* | **NW** · · 3:*8* |
| · 38:*14* | **ton.com** · · 2:*22* | **North** · · 2:*23* | |
| · 39:*20* · · 40:*6* | | **NORTHERN** · · 1:*1* | **< O >** |
| · 44:*7, 17, 22* | **< N >** | **Notary** | **oath** · · 7:*6* |
| · 45:*3, 9* | **N.D** · · 4:*15* | · 114:*23* | **Object** · · 9:*10* |
| · 46:*25* | **name** · · 6:*5* | · 116:*19* | · 11:*2, 18, 25* |
| · 47:*12* · · 48:*4* | · 7:*3* · · 8:*5* | **note** · · 83:*21,* | · 13:*8, 20* |
| **Mongeluzzi** | · 19:*4* | *24* | · 19:*19* · · 20:*1* |
| · 1:*11* | **named** · · 110:*1* | **noted** · · 6:*13* | · 21:*11* |
| **motion** · · 72:*25* | **names** · · 18:*22* | · 115:*10* | · 25:*17* |
| | | | · 26:*11* |

objections
29:2
objective
54:24
obtained
20:24    54:22
obviously
10:7    73:22
112:22
occurred
95:23
O'Connor
4:20    22:23
73:2
O'Connor's
19:12
22:14, 21
77:21    81:2,
14    83:13
86:12
92:22
93:23    95:9
office    57:18
offices
1:10    17:3
officially
78:22
offset    42:7
Oh    18:14
93:8, 12
OHIO    1:1
3:3    4:15
Okay    7:5,
19    8:5, 18
9:18, 23
10:15
11:12    12:4,
13    13:5, 14
14:5, 13, 22
15:21    16:6,

28:12    29:4
30:7    33:12
36:2, 14
38:17
39:23    43:7,
22    44:8, 23
45:4    46:5,
12    47:9
48:22    51:9
52:17    53:6
55:24    56:7
57:3, 11
58:8    60:15
61:7    62:3
63:2, 23
64:9, 23
65:15
66:17    67:4,
12, 20    68:2
69:18, 25
70:15, 19
71:13    77:7
78:13    83:1
85:19    86:5,
20    87:2
88:3    89:6
90:8, 20
91:16    92:6,
18    95:18
97:20
98:20
104:1, 6, 16
106:4
107:2, 12, 19
objection
28:16, 23
29:2, 21
89:15    90:1,
17    98:9

25    17:11,
14    18:10
19:6, 15
20:23
21:18
22:17, 18
23:21
24:10, 20
25:13    27:1,
12    28:21,
22, 25    29:4,
13, 15, 21
30:19
31:14
32:16
34:17, 24
35:6, 14
36:5, 17, 25
37:9, 14, 17,
20, 22
38:22    39:2,
8, 12, 16
40:2, 4, 10,
15    41:12,
18, 22    42:1,
10, 23
43:12    44:4,
15, 21    45:8,
13, 22, 25
46:9, 17
47:5, 12
49:7, 16
50:6, 12, 18
52:13, 14
53:14
55:14    56:4,
11    57:8, 14,
24    58:21
59:7    60:6
62:24

63:14
64:15    65:9
66:2    67:8,
16    68:12
69:13, 23
70:12    71:3,
25    72:7, 12,
18, 20    73:7
75:2, 25
76:12
77:14    78:6,
18, 23    81:1,
8    82:4
83:12, 19
84:10
86:24
87:23
88:16
89:12    90:5
91:2, 22
93:12, 18
94:19
96:16, 22
97:23    98:3
99:2, 6, 17
100:9, 16,
18    101:3,
10    102:23
103:22
104:11, 24
105:12, 16,
24    106:8
107:16, 22
108:16, 20
109:1, 6, 10,
13, 16, 20,
25    110:10,
19    112:12,
16    113:15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

once   50:8
54:3
one-page
48:12
ones   16:9
operation
87:21
opt   53:21
option
68:25   71:5,
6   93:19
113:10
options
68:22
ORDER   1:7
4:11   10:7,
11   19:6
22:9   24:13,
17, 21   27:2
72:25
73:19   74:8,
15   87:17
113:8
ordered
19:16   113:9
orders   113:2
original
32:8, 10
115:14
outside
17:6, 11
75:20   84:1,
14, 17   85:9
86:7
outspend
106:22
overallocated
77:4

oversaw
15:21   16:1,
13
overseeing
99:3
overview
16:17

< P >
P.A   2:9
P.C   1:11
2:3
p.m   4:22
97:10
100:4
111:23, 24
112:1
113:17, 18
PAGE   4:2,
10   24:21
25:14
41:14, 23
68:17   81:2
93:2
100:13, 19,
20, 25
101:1, 14,
18, 19
102:2, 10
117:3   118:3
pages   116:5
paid   27:16
37:15, 18
38:20   39:3,
7, 20   43:20
44:1   47:25
48:5   50:13
63:18   76:1
77:16   78:2
85:9   87:12,

20   88:1, 14
93:25   94:3
96:24
PALESTINE
1:2   4:13,
19   6:9
9:8, 21
10:17
11:10, 13
12:2, 5, 13
13:10
15:17   16:2
17:23   24:4,
5   28:7
32:19   50:2,
15   59:11
63:21, 22
75:9, 14, 22
84:1, 15
99:9   103:4,
12   104:4
105:25
106:10
109:21
110:4
111:14
112:8
paper   48:16
paragraph
24:21
25:14, 20,
21   53:17,
25   54:7, 12
58:4   78:1
81:4, 13
83:13
86:11
92:22
93:11, 22
95:9   102:12

paragraphs
77:22, 23
93:7
Pardon   8:14
parlance
96:16
part   10:21
13:15   18:2
23:21   32:6
47:13   54:6
59:16
65:17, 21
73:9   83:4
94:4   105:5
110:14
112:7
partial
50:2, 14
particular
15:14   58:4
66:12   79:25
Particulars
109:4
parties
114:10
pass   107:23
Paul   18:25
pause   58:5
pay   47:13
payment
10:3   21:24
33:4   34:8
35:19   36:1
37:11
38:15
53:20   54:7,
21   60:12
80:11
87:22, 25
88:19   89:4

106:11
112:7
**payments**
11:9    12:17
25:3    33:19,
20, 21    34:7,
19, 20    38:4
40:8    50:2,
8, 12, 14
55:5    56:2
58:6, 12
59:19
87:12    105:2
**PEARSON**    1:4
4:12    24:15
28:18    29:10
**Pennsylvania**
1:12    3:8
**people**    13:1
15:10    16:4,
10, 20    17:2
18:23    38:6
59:21    61:2
75:20
76:13, 24
85:9
**percent**
59:14    60:1
69:2    84:21
86:3, 9
**percentage**
17:14
**period**    73:21
**person**
13:12
18:19
105:21
**personal**
13:3, 15
22:13

36:18
37:11, 25
43:18
45:10
47:14    55:5
60:11    80:4
103:13
106:1
**perspective**
46:11
**pertaining**
42:4
**phase**    74:22
**Phelps**    8:8,
12
**Philadelphia**
1:12    17:4
**Phone**    45:24
46:1
**phrase**
105:6, 10
**physically**
17:1
**PICKERING**
3:7, 11
**pie**    15:1
**piece**    10:7,
9, 13    15:1
**place**    38:24
68:11
70:22
94:11, 21
95:4    114:7
**places**    17:5
**Plaintiffs**
2:18    6:23
**plan**    4:11,
13    9:19, 20
12:5, 6, 14
13:4, 19

18:7    19:11
24:14, 22
25:22    26:5,
8, 12, 19, 24
32:4, 18, 24
34:25    35:2,
7, 23    38:4
41:12
44:21    46:9
58:22
59:13, 17,
21    60:2, 5,
7, 12, 18
61:4, 8
62:5    63:10,
18    64:8, 11,
17, 21
65:10, 13,
22, 25    66:4,
7, 11, 15, 21,
24    67:3, 9,
18    68:7, 8,
12    69:10,
16, 24    70:5,
8, 9, 14, 18
71:1, 12, 19,
23    73:8
75:15    76:4,
17    77:10
81:18
82:24    83:5,
9, 20    84:5
85:12, 17
86:2, 16
92:25
93:10, 20
94:5, 8, 13,
17    95:1, 25
99:8, 11, 16,

18    104:9
105:7    106:9
**plans**    10:1,
16
**Please**    6:25
7:3    21:5
71:4    102:6,
10, 15
115:3, 8
**point**    12:7,
8, 10, 11, 14,
15, 23    13:5,
9    14:14, 16,
18, 20    22:5
23:23    25:2
27:2, 9
28:5    29:25
30:11    31:5,
16, 21
32:24    33:7,
22    38:6
40:10
41:16, 20,
24    42:15
43:2, 13
44:13, 15,
16    59:2, 22
61:4    102:6
**point-based**
26:8    102:7
**points**
10:12
12:16, 24,
25    13:11,
16, 23    15:2,
9, 13    21:23
22:3    23:4,
24    24:23
26:16, 17,
23    31:19

42:4, *11*
43:4, *12, 17, 19, 25*   44:5, *17*   47:*24*
48:3   54:4, *24*   61:*10, 19*   62:*1, 9, 16, 20, 25*
63:4, *5*
64:12, *16*
65:*19*
68:*20*
69:*11, 15, 20*   71:*7*
76:5   77:5
78:22   79:*6, 9, 15*   80:*9*
81:5, *16*
83:25   84:*7*
86:14   88:*9*
92:24   95:*1*
102:*12*
103:9, *14, 16, 19, 20, 24*   104:*4, 8*
105:*20, 22*
**portion**
99:4   106:*11*
**posted**   53:*11*
**pot**   22:*4*
34:5   35:*25*
36:*12, 23*
37:*2*
**potential**
34:*1*
**pots**   10:*25*
**pour-over**
37:*7, 12*
38:*1*   47:*1*

**practice**
28:5   30:*1*
31:*7*
**precise**
28:9   30:*4*
31:*10, 20*
54:*1*
**predated**
109:*21*
**preliminary**
11:7   36:*10*
37:*4*
**prepared**
33:14   51:*6*
**preparing**
108:*17*
**PRESENT**
3:16   62:*8*
**preserved**
31:*21*
**prevent**
19:*23*
20:13   21:*2*
**previous**
109:*2*
**previously**
111:*9*
**Prime**   8:*8, 12, 16*
**printed**
4:22   100:*3, 5*   101:*2*
**printing**
100:*20*
**Printout**
4:22   100:*2*
108:*12*
**prior**   7:*23*
10:9   34:*13, 20*   44:*12*

48:1   89:*24*
91:*14*
109:3   114:*3*
**privilege**
20:4   21:*13*
**privileged**
20:*6*
**PRIZGINTAS**
3:*7*
**pro**   10:*4*
104:*25*
105:*3, 6, 17*
106:*2, 5, 11*
112:*8*
**Probably**
19:5   72:*15*
**problem**
78:3   89:*24*
**proceeding**
74:*23*
**proceedings**
48:*25*
**proceeds**
105:*17*
**process**
15:22   22:*1*
24:*4, 5*
41:*1, 5*
54:*3, 15, 23*
55:4   60:*25*
65:*18*
73:*16*
74:11   79:*3, 21*   80:*16, 24*   82:*16, 19*   87:*15*
88:*6, 25*
89:*9, 17*
90:*22, 24*
91:*19, 23*

92:2, *8, 14*
102:*22*
**processing**
79:*22*
88:22   102:*3*
**program**
55:*5*
101:*24*
102:*17*
**project**
15:*19*
**projected**
55:*22*
**proper/imprope r**   23:*3*
**properly**
94:5, *9*
**Proposed**
4:15   49:*18*
**propounded**
116:*6*
**PROTECTIVE**
1:7   73:*19*
74:*7, 15*
**provide**
33:2   46:*21*
**provided**
27:8   33:*5, 13, 23, 24*
48:*20, 24*
49:*2*
**provision**
37:7   47:*1*
58:*5*
**provisions**
37:12   38:*2*
**proximity**
15:*8*

**Public**
114:23
116:19
**pull**   58:22
81:22
**pulled**
79:17    87:6
88:5
**purchased**
8:8, 11
**purposes**
41:17, 21,
25    43:3
59:3    76:4
**PURSUANT**
1:7    10:10
113:1
**put**   50:18
59:7
102:23
113:7
**putting**
67:25

**< Q >**
**quarter**   50:9
**ques**   38:8
**question**
20:8, 11, 17,
20    21:8
23:11, 14,
16, 18
30:21
38:10
40:16    46:4
53:18
56:18    60:6,
9, 21   62:12,
14    64:3
74:22    91:3,

11, 12    93:9
94:22, 23
103:23
104:18
**QUESTIONS**
7:2    9:11
11:11, 20
12:1, 21
13:13    14:1
19:21    20:7,
18    21:19
22:12
23:20    24:9
25:18
26:15
29:23
30:18    34:9
35:5    36:4,
16    39:1
40:1    43:11,
24    44:14
45:1, 7
46:8, 16
47:11    48:9
49:1    51:13,
19    52:10,
18    53:8
56:3, 10
57:7, 13
58:10
60:20
61:18
62:11    63:8
64:2, 14
65:3, 20
66:22    67:7,
15, 23    68:5
69:22    70:3,
16, 23
71:17    72:6,

22    75:1
77:9    78:17
83:6    85:24
86:10, 23
87:8    88:11
89:11, 19
90:4, 9, 18
91:1, 21
92:9, 20
93:15
95:20
97:11, 22
98:12    99:1,
22    100:10
104:2, 10,
21    106:7,
19    107:4,
15    108:4, 6,
7, 9, 11
111:19, 20
112:3, 5
116:6
**quite**   18:24
**quote/unquote**
22:12

**< R >**
**Railway**   3:16
**raise**   29:20
**raised**   46:4
**ran**   44:22
45:3    46:10
**Rapazzini**
110:1, 3, 22
111:9
**rata**   10:4
104:25
105:3, 6, 17
106:2, 6, 11
112:8

**reached**
111:6
**read**   21:6,
7    23:13, 15
25:5    27:4
31:2    41:14,
18, 23
42:25    51:5
53:24
54:18
86:17    94:1
101:20
102:5, 15
115:3    116:4
**reading**
28:13
**reads**   25:12
86:12
**ready**   19:7
106:18
**really**   15:3
47:17, 22
**Realtime**
1:16    114:2,
17
**reason**   66:2
78:7, 11
91:6
103:22
104:11
115:5
**reasonable**
25:3, 10
**rebranding**
8:9
**recall**
17:13    40:3
47:17, 22,
23    49:10
51:11, 16

53:13
55:15
57:22    58:9,
11    88:25
90:3    91:17
92:1    99:15
105:14
107:14, 21
**receipt**
115:15
**receive**
76:21
**received**
42:9    54:14
**receiving**
86:9
**recognize**
100:13
**recollection**
103:6
**record**   6:2,
3, 14   74:25
97:5, 7, 8,
10   100:1
111:23, 24
112:1, 23
113:8, 12,
14, 17
**records**
95:24
**recross**
107:25
**recruit**
111:6
**REDIRECT**
112:2
**reduc**   76:25
**reduction**
69:2    76:24
77:11

84:22    86:3,
9
**references**
93:23
**regard**   16:1
56:5    59:13
60:22
66:14
73:22    96:17
**regarding**
4:20    50:24
**Registered**
1:15    114:2,
16

**reimbursements**
42:8
**relate**   42:2
**related**
22:20    56:16
**relates**
43:4    53:3
54:21    92:23
**relating**
22:9
**relationship**
109:2
**relative**
59:23
114:10, 11
**remainder**
37:24
**remember**
15:6    50:20
51:2, 12, 14
57:25
**repeat**   21:4
**replaced**
39:19    47:6

**replied**
52:21
**Reporter**
1:15, 16, 17,
19   6:15
21:7    23:15
114:2, 3, 16,
17, 18, 19,
20, 21, 22
**REPORTING**
1:20    3:20
6:6
**represents**
55:11
**request**
21:15    33:1,
5    50:23
53:4    113:5
**reserving**
107:24
**resided**
15:11
**residential**
11:9    12:17
33:19    102:8
**residents**
50:2, 15
53:19
**resolved**
31:24
**respect**
12:17    56:1
94:7, 11
**respective**
61:14
**respond**   51:3
**responded**
53:19
**response**
51:5, 24

53:1, 3, 10
56:13, 15,
18    95:21
96:7, 12
**responsible**
16:11    18:6
**restructuring**
8:17
**result**   38:1
**resulted**
76:23
**retained**
111:13
**return**
115:13
**review**   16:3,
14    17:1, 6,
22, 25    18:2,
5    19:7, 10
32:8, 10
53:2    73:21
78:25    80:4
99:4
**reviewed**
10:12    16:9
17:15, 16
18:5    54:4
58:17    66:3
97:19    98:6,
19
**reviewers**
17:18
97:14, 24
**reviewing**
16:21    17:3
51:8, 12, 14
79:24    80:21
**Right**   7:10,
14    8:24
9:4, 16

10:24    11:1,
14, 17    14:3,
7, 11, 15
15:23, 25
19:18
24:18
25:11, 24
26:10    27:3,
10, 14    28:1
32:14
33:11
34:15
35:18, 21
41:6    42:6,
13, 17    43:6,
14, 16, 21
44:2, 19
47:3, 8, 16,
17    48:21
49:4, 9, 12,
14, 20, 24
50:4, 7, 10,
25    52:16,
20, 23    53:5,
12, 22    54:9,
20    55:12,
23    56:6, 20
57:2, 10, 17,
20    58:7, 11,
19    61:6, 21
62:12
64:18, 22
65:6, 14, 23
66:5, 16
67:1, 3, 11,
19    68:1, 14,
23    69:2, 6
72:18    74:3
75:5, 11, 17,
23    76:16,

19, 24    77:2,
6, 17    78:4
80:20    81:1,
19    82:1, 10,
25    83:10,
22    84:8, 13,
23    85:2, 6,
13, 18, 25
86:4    87:1,
9, 13    88:2,
21    89:14
92:5, 12, 17,
21    95:8
96:5, 9
101:6
102:1, 13
103:25
104:5
105:1, 18
107:1, 6
108:5
110:8, 12
**role**    9:7
15:17    16:6
17:22
49:12    51:7
**ROSICA**    3:19
**rough**    53:1
**round**    87:15
106:15
**run**    34:3
44:18
**Rust**    110:17,
21, 23    111:2

< S >
sahmad@winston
.com    2:21
**Salle**    2:23
**Saltz**    1:10

**sat**    27:20,
24    32:12
**saying**    62:16
**says**    6:22
25:21    27:2
36:6    54:22
55:3, 8
66:24    78:2,
5    81:14
83:24    84:4
86:18    96:2
100:20
101:3
**score**    40:12
78:20
79:14    90:7,
16
**scored**
21:22
32:12    40:7
41:2    46:23
58:18
59:25
60:11, 25
61:24
62:15
63:10, 14,
17    64:7
66:4, 14
69:14
71:10    72:1
80:18    85:8
87:11, 24
89:4, 8
91:14, 25
**Scores**    88:18
**scoring**
16:3    34:20
75:25
88:23    89:22

**Scott**    1:9
2:21    3:5
4:17    6:11,
19    7:4
114:4
116:12
**screenshot**
95:10
**script**
56:12, 22
104:14, 23
**scripts**
57:9, 15
**scroll**    101:8
**second**
29:11
111:21
**section**    13:4
**security**
98:5, 18, 21
**see**    25:20
27:7    34:4
38:22
46:18
48:14
49:22
68:19    71:5
78:1    81:4,
6    93:19
100:2
101:11
102:2, 11
108:14
**seeing**
40:25    57:25
**seen**    24:17
74:20
**segment**
10:23
**send**    89:23

sending
34:19    39:11
sense    72:14
sent    23:1
32:22    33:6
39:14    49:7,
10, 11    51:4
52:24, 25
80:12, 19
81:25    82:8,
14    89:4
sentence
25:7    53:25
54:21    55:3
102:16
separate
51:21
September
4:12    24:15
served    9:7
102:20
service
17:24
18:20, 23
Services
3:23
set    10:6
26:12
46:25    62:6
106:22
114:8
SETH    2:4
Settlement
3:4    4:15
7:21    8:10
9:2, 3, 8
10:22, 25
11:13    12:5
13:15, 19
15:15, 18

16:2    18:15,
18    21:21
26:2, 3
28:6    30:2,
9    31:7
32:2, 6
34:14
39:19
47:15
48:15, 25
49:6, 19
50:24
54:14
55:16    58:1,
13    59:11
92:11, 16
96:18
97:25
99:12
100:21
101:4, 23
102:19
103:3
105:12
106:2, 11
109:8, 17,
19, 21, 22
112:10, 13
settlements
9:15    30:10
seven    35:15
54:25
share    80:3
105:21
shared    57:14
sheet    115:6,
9, 11, 14
116:7
short    97:4

Shorthand
1:17    114:3,
17, 19, 20
show    51:20
72:25
side    10:3
sign    115:8
signature
113:6
signed    34:14
signing
115:9
similar
9:14, 20
10:1
similarities
9:13
Similarly
66:18    71:14
SIMMONS    2:14
simply
29:16    61:24
SIMPSON    2:3
single
18:19
21:23    22:5
23:23
60:10, 14,
23    62:24
63:9    64:7
90:15    91:13
sir    32:16
66:9    70:5
104:20
108:22
sit    61:13
site    84:2
sitting
78:12
111:15

situation
82:5
situations
59:23    99:15
size    31:22
skatz@burgsimp
son.com    2:4
small    76:7
80:25
solution
102:20
Solutions
3:19    101:9
somebody
49:11    110:1
sorry    93:1,
2, 8, 14
100:7, 24
Sounds    108:1
sources
33:17, 18
South    2:11
Southern
3:15, 16
108:4
space    115:6
speak    44:24
45:5    86:21
specific
46:20
specifically
10:5    11:5
18:16    98:23
specified
31:18
specify
30:13
spend    11:21
spent    37:10,

*24*

split  33:*16*

spreadsheet
33:*15*

spring  32:*19*

staff  17:*16*

start  26:*17*
40:*2*  45:*15*
58:*6*  61:*1*
62:*6*  63:*4*
88:*5*

started
12:*24*
13:*11*  15:*3*,
*12*  61:*24*
103:*8, 14,*
*18, 20, 24*
104:*3, 7*

starting
32:*24*  38:*5*
39:*17*
59:*19*  62:*22*

starts
25:*21*
54:*12*  61:*8*
101:*20*

State  3:*14*
7:*3*  115:*5*

statement
28:*4*  29:*25*
30:*20, 22,*
*25*  31:*5, 15*
94:*24*  95:*6*

statements
108:*17*

STATES  1:*1*
24:*21*
112:*11*

stating  91:*8*

statistics
39:*10, 13, 22*

Status  4:*21*
81:*15, 21*
86:*14*  87:*5,*
*20*  88:*13*
89:*3*  90:*7,*
*15*  91:*13*
93:*25*

staying
112:*23*

stenographic
6:*14*

stenographical
ly  114:*7*

steps  98:*3,*
*17*

stopped
87:*12*

STRAWN  2:*18*

Street  1:*11*
2:*11*  3:*14*

structure
33:*4*  60:*18*

structures
12:*9, 12*

subject
108:*6*
111:*19*
115:*10*

submissions
54:*5*

submit
54:*16*
110:*18*

submitted
32:*13*
34:*22*  55:*21*

Subscribed
116:*15*

substance
116:*7*

substantive
100:*19*

Suite  2:*23*

sum  10:*5*
11:*5*

sums  10:*17*

supervise
16:*19*

supplement
25:*9*  36:*18*
38:*1*

supposed
104:*15*

Sure  10:*20*
14:*4*  15:*20*
23:*5*  31:*2*
57:*18*
68:*18*  80:*6*
90:*11*
102:*25*

swear  6:*16*

sworn  6:*20*
114:*4*
116:*15*

symptom
71:*7*  92:*24*
95:*1*

system  12:*7,*
*9, 12, 14*
13:*6, 10*
14:*14, 17,*
*18, 21*  25:*2*
26:*9*  28:*5*
29:*25*  31:*5,*
*16*  33:*7*
59:*22*  102:*8*

systems
12:*10*

30:*11*
98:*15, 22*

< T >

table  111:*15*

tailor  22:*11*

Take  27:*5*
35:*6*  72:*14*
75:*5*  97:*3*
107:*10*

taken  114:*7*

takes  95:*10*

talk  29:*9*
74:*24*  109:*1*

talked
43:*16*
56:*22*  75:*6*

talking
20:*24*
28:*18*
29:*19*  81:*9*
83:*15*

talks  54:*7*
55:*9*  77:*22*

team  17:*24*
18:*5, 21, 23*
99:*3*

teams  19:*3*

technician
3:*19*

TECHNOLOGY
1:*20*  6:*7*
98:*11, 15*

telephone
56:*16*
106:*24*

tell  6:*21*
7:*6*  17:*9*
18:*22*  32:*3*
40:*15, 21, 23*

Scott Fennell · · · · · · · Case: 4:23-cv-00242-BYP · · Doc #: 1059-2 · Filed: 12/01/25 · 147 of 149. · PageID #: 72620 · · · · · · Page 27

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

telling
7:12    20:20
term    56:12
terminated
39:18
47:15    48:1
82:9    89:25
90:19
91:15    92:4,
10, 15
terms    26:5
86:1
testified
99:7
testify
19:7    114:4
testimony
34:24    37:9,
23    39:12,
16    60:3
90:5, 11
96:23
97:13
105:9
106:1    114:7
Texas    1:17
114:20
text    102:12
Thank    93:14
108:1
things    18:1
34:2
think    17:4
23:10
38:18, 21
39:15
40:13, 17
44:10
53:15
57:20    58:3

59:20
61:14    76:9
113:8
thirty
115:15
thought
66:23
thoughts
96:13
three    33:8
75:6    77:12
three-mile
76:14
THURSDAY    1:6
Time    1:13
4:23    6:3
9:1    21:22
22:8    27:5,
21    33:22
40:4, 11
80:2    91:20
97:24
100:3, 4
111:12
112:1    114:7
Timeline
4:16    49:19
times    13:22,
24    16:8
18:2
title    49:18
today    6:11,
15    19:7, 15,
17    20:14
78:12    91:10
Today's    6:2
113:16
told    20:21
23:6    37:3
40:5, 11

55:16
97:13    112:6
toll-free
56:16
top    15:6
16:24    19:5
35:15
47:16, 17
48:6, 14
51:11
52:19    57:5,
22    99:14
101:17, 19
105:14
topics    75:6
total    11:23
13:14
21:23    22:3,
4    43:17
44:17
47:24    54:16
totaling
42:11
TRAIN    1:4
4:13, 19
6:9    59:11
transcript
73:13, 17
74:6, 9, 12
114:6
115:16, 17
transcription
116:5
transcripts
73:20
Transfer
4:20
transition
8:6

translated
54:23
treated
74:5    76:2,
8
treating
73:13
treatment
42:4, 5, 11
trial    3:19
true    21:21
32:16, 22
34:18    64:6
66:9    76:2
77:14
107:8, 16
Trust    29:20
truth    6:21,
22    7:6, 9
114:4, 5
truthful
96:4
trying    29:6
66:7    91:4
96:12
turn    18:4
24:20
41:12, 22
81:2
two    10:1
28:7    30:2
31:8    51:21
68:22
75:19
76:13, 14
77:12    84:1,
6, 14, 18
85:9    86:7
type    14:16

**types** 33:8

**< U >**
**Uh-huh**
51:22 59:1
63:16 64:5
91:5 100:6
112:18
**ultimately**
53:9
**uncertainties**
31:22
**uncovered**
106:21
**understand**
7:16 10:21
11:12
35:24 36:7,
22 59:16
75:13
90:11
96:22 103:1
**understanding**
13:18 37:1
99:7 106:8
112:12
**Understood**
23:7
**unfortunate**
63:25
**Unfortunately**
64:11 65:17
**unique**
101:25
**UNITED** 1:1
**Unity** 4:18
50:21
51:25 53:4,
10

**universe**
88:16, 17
96:24
**unredacted**
74:1
**Update** 4:21
**use** 12:14
28:4 29:25
31:5, 16
99:23
**utilize**
97:24
**utilized**
12:7 97:14

**< V >**
**valid** 10:8
13:16
31:23
78:19, 21,
24 79:6, 7,
13 80:6
81:15, 21
86:14 87:5,
20, 24 88:1,
13, 15, 18,
20 89:3
90:7, 15, 23
91:13
**validated**
10:12 58:17
**validation**
87:11
**value** 21:23
22:5 23:22
27:9 28:9
30:5 31:10
41:16, 20,
24 43:2

59:2 81:17
86:15 87:4
**valued** 31:17
**values** 31:23
**various**
15:5 17:3
31:21
33:17 40:24
**vary** 55:17
**varying**
30:11
**verbally**
40:6
**verbatim**
114:6
**version**
33:8 74:2
**versus**
33:20 37:7
**VIDEOGRAPHER**
6:1, 6, 25
97:6, 9
111:22, 25
113:15
**Videotaped**
1:9
**view** 68:7
**Village**
63:20
75:15, 19
76:4 84:1,
15
**VINCE** 3:19
24:10 35:9
48:10
51:23 52:1
73:1 99:23
101:18
**visit** 108:23

**voice** 56:13,
15, 18
**voluntary**
25:9 33:21
34:6, 18, 21
38:3 45:9
47:13
59:18
60:12
103:13
105:25
106:23

**< W >**
**Wallace** 4:18
**want** 89:23
90:10
102:25
**wanted** 73:5
**warn** 22:8
**warning**
22:15, 20
**Washington**
3:9
**way** 101:1
108:17
**website**
4:22 53:11
100:2, 12,
17 108:13,
18, 23
**week** 39:17,
25
**weekly** 39:15
**weeks** 47:5
**well** 19:3,
12 25:1
27:25 35:6
39:5 40:8,
13, 19, 24

41:*4, 5*
44:*21*
45:*15*
46:*21, 23,*
*25*   54:*10,*
*15*   66:*23*
71:*20*   80:*5,*
*6*   92:*10*
95:*23*   97:*2*
99:*17*
100:*18*
110:*7*
**well-accepted**
28:*5*   30:*1*
31:*6*
**well-established**
31:*6*
**went**   8:*7, 9*
13:*1*   32:*11*
38:*6*   63:*5*
76:*11*
79:*21*
87:*16*   111:*2*
**We're**   6:*1*
24:*12*
28:*18*
29:*19*
38:*19*   39:*2*
40:*25*
72:*23*
73:*12, 15*
74:*23*   97:*6*
111:*22*
112:*23*
113:*16*
**we've**   28:*15*
72:*10*   73:*3,*
*25*   113:*2*

**WILMER**   3:*7,*
*11*
**Wilmington**
2:*12*
**WINSTON**   2:*18*
**Withdraw**
25:*19*   63:*15*
**witness**
6:*17*   11:*3,*
*19*   13:*9, 21*
19:*20*   21:*9,*
*18*   23:*19*
26:*12*
28:*14*   29:*7*
30:*8*   33:*13*
36:*3, 15*
38:*18*
39:*24*   43:*8,*
*23*   44:*9, 24*
45:*5*   46:*6,*
*13*   47:*10*
48:*23*
51:*10*   53:*7*
55:*25*   56:*8*
57:*4, 12*
58:*9*   60:*17*
61:*8*   62:*4*
63:*3, 24*
64:*10, 24*
65:*1, 16*
66:*18*   67:*5,*
*13, 21*   68:*3*
69:*19*   70:*1,*
*20*   71:*14*
72:*18, 21*
77:*8*   78:*14*
83:*2*   85:*20*
86:*6, 21*
87:*3*   88:*4*
89:*7, 16*

90:*2, 21*
91:*17*   92:*7,*
*19*   95:*19*
97:*21*
98:*10, 21*
104:*7, 17,*
*20*   106:*5*
107:*3, 13,*
*20, 23*
112:*18*
115:*1*
**WOODRUFF**
2:*22*
**word**   105:*6*
**work**   75:*9*
109:*7, 10, 13*
**worked**
18:*17*
110:*11, 17*
**world**   30:*9*
**worth**
103:*16, 21*
104:*8*
**writing**   40:*5*
**wrong**   67:*2,*
*9, 25*   113:*5*
**wrote**   52:*3,*
*15*   96:*3, 7,*
*11*
**www.hartfordreporting.com**
1:*22*

**< Y >**
**Yeah**   7:*18*
9:*25*   12:*23*
15:*20*   17:*5*
20:*15*   23:*8*
26:*21*   31:*3*
38:*9*   41:*7*

72:*21*
73:*18*
74:*10, 13,*
*16, 24*
106:*20*
109:*5*
112:*14*
113:*13*
**year**   111:*4*
**years**   8:*19*
**yesterday**
29:*1*   73:*14*
**York**   2:*17*
17:*5*

**< Z >**
**zero**   15:*3,*
*13*   38:*15,*
*16*   103:*8*
**ZIP**   63:*21*
75:*13, 21*
76:*3*   77:*11*
**ZOOM**   2:*16,*
*22*   3:*1, 7,*
*13*   106:*25*